UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

-----------------------------------------------------

BRUCE CARNEIL WEBSTER,

            Petitioner,

    vs.

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,
TERRE HAUTE (USP),

           Respondent.

-----------------------------------------------------

CAUSE NO:

**2:12-cv-0086 WTL-WGH**

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2012 MAR -6 PM 1:46

SOUTHERN DISTRICT
LAURA A. BRIGGS
CLERK

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2241

### THIS IS A DEATH PENALTY CASE

Eric K. Koselke, # 5593-54
6202 N. College Avenue
Indianapolis, IN 46220
Telephone: (317) 722-2591
Facsimile: (317) 257-5300

*Attorneys for Petitioner Bruce Webster*

DORSEY & WHITNEY LLP
Steven J. Wells
Kirsten E. Schubert
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

*Attorneys for Petitioner Bruce Webster*

<u>**PETITION FOR WRIT OF HABEAS CORPUS**</u>
<u>**PURSUANT TO 28 U.S.C. § 2241**</u>

## I.  INTRODUCTION

Petitioner Bruce Carneil Webster, a prisoner at the Federal Bureau of Prisons

facility in Terre Haute, Indiana, moves this Court to vacate his death sentence under 28

U.S.C. § 2241.[1]  Although Mr. Webster does not challenge his conviction, he does seek

to challenge his sentence of death based on previously unavailable evidence that

establishes he is mentally retarded and therefore ineligible for the death penalty.  *See*

*Atkins v. Virginia*, 536 U.S. 304 (2002).  This new evidence, which consists of

government records previously unavailable to the Petitioner and recently obtained

testimonial evidence, is so significant that, although the Court of Appeals for the Fifth

Circuit held that 28 U.S.C. § 2255(h) barred it from exercising jurisdiction, the

concurrence concluded that: "If the evidence Webster attempts to introduce here were

ever presented to a judge or jury for consideration, it is virtually guaranteed that he would

be found to be mentally retarded." *In re Webster*, 605 F.3d 256, 259 (5th Cir. 2010)

(Wiener, J., concurring).  As set forth in detail below, this habeas petition satisfies the

requirements of a petition under 28 U.S.C. § 2241 and under the law of this Circuit

because, among other reasons, there is no mechanism under § 2255 to consider the

overwhelming but previously unavailable evidence that establishes Mr. Webster's mental

retardation and renders him categorically ineligible for the death penalty.

---

[1]     Mr. Webster's execution has been temporarily stayed in collateral litigation challenging the constitutionality of the lethal injection procedure in federal prison. See *Roane v. Holder*, No. 05-2337 (D.D.C. Feb. 21, 2007) (order granting preliminary injunction barring execution) (Declaration of Steven J. Wells ("Wells Decl.") Ex. A).

## II.    STATEMENT OF THE CASE

At a federal capital trial more than six years before *Atkins* was decided, Mr. Webster presented evidence that he is mentally retarded. That evidence included five scores from individually-administered IQ examinations all within the range associated with mental retardation; the testimony of Mr. Webster's childhood friends and acquaintances; and the testimony of four expert witnesses diagnosing Mr. Webster with mental retardation. In response, two government expert witnesses testified, after administering a partial IQ test that resulted in a sixth score within the range of mental retardation, that Mr. Webster was nevertheless faking low IQ scores to avoid a death sentence, and that his adaptive skills, as reflected primarily by his ability to keep an orderly prison cell, were evidence of normal functioning. The government also presented the testimony of two witnesses who claimed that Petitioner had never been placed in special education classes in school. In its closing argument, the government repeatedly argued that Mr. Webster was faking his IQ tests and had never been in special education classes. Although four of the twelve jurors found that Mr. Webster "is or may be mentally retarded," he was sentenced to death.

Now, Petitioner has obtained access to evidence – most of it from government files – that firmly establishes his mental retardation and directly refutes the evidence the government presented at trial to contest mental retardation. Previously undisclosed Social Security and school records demonstrate that three government physicians and psychologists tasked with weeding out fake disability claims examined Mr. Webster *prior to the commission of the crime*, when he was 20 years old. The government records

3

indicate that Mr. Webster tested at IQ scores (59 and 69) and exhibited deficits in adaptive functioning well within the range of mental retardation, and include explicit diagnoses of "mental retardation." One of these physicians noted expressly that there was no evidence that Petitioner was faking his condition. In addition, previously undisclosed records in the possession of the Social Security Administration demonstrate that Petitioner had, in fact, been placed in special education classes, contrary to the testimony of government witnesses at trial. The newly available evidence directly contradicts the government's arguments and evidence – central to its case at the punishment phase of the trial – that Mr. Webster was not mentally retarded, that he was faking his IQ tests, that he was not in special education classes in school, and that his adaptive functioning was normal.

Petitioner is mentally retarded. His lowest IQ score, 48, puts him at least three and one-third standard deviations below the mean, with an IQ higher than less than 0.1 percent of the population. *See* David Wechsler, *WAIS-III Administration and Scoring Manual* 24 (3d ed. 2003); Declaration of Dr. Marc J. Tassé, PhD ("Tassé Decl.") ¶ 15.[2] Furthermore, Petitioner's IQ scores are significantly lower than the scores of prisoners recently found to be mentally retarded by the federal courts. *See, e.g., United States v. Hardy*, 762 F. Supp. 2d 849, 857 (E.D. La. 2010) (IQ scores up to 76); *United States v. Lewis*, 2010 WL 5418901, *8-9 (N.D. Ohio Dec. 23, 2010) (IQ scores up to 76); *Rivera v. Quarterman*, 505 F.3d 349, 362 (5th Cir. 2007) (IQ scores up to 92), *cert. denied*, 555

---

[2]    The Declaration of Dr. Marc J. Tassé, PhD referenced herein is attached as Exhibit U to the Declaration of Steven J. Wells.

U.S. 827 (2008); *Holladay v. Allen*, 555 F.3d 1346, 1357 (11th Cir. 2009) (IQ scores up to 73); *United States v. Davis*, 611 F. Supp. 2d 472, 478 (D. Md. 2009) (IQ scores up to 76). The government has not identified, and counsel has not been able to find, any case decided since *Atkins* holding that a person with such consistently low IQ scores is *not* mentally retarded.

On October 21, 2009, Petitioner moved the Fifth Circuit, based on the same new evidence that is the basis for this Petition, for authorization to file a successive motion to vacate his death sentence under 28 U.S.C. § 2255(h)(1). The Fifth Circuit denied Petitioner's motion for authorization, holding that it lacked jurisdiction to entertain the application under 28 U.S.C. § 2255(h). *In re Webster*, 605 F.3d at 259 n. 8. Reading the language of § 2255(h)(1) narrowly, the court concluded that "a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital murder." *Id.* at 257. The Fifth Circuit held in essence that no matter how conclusive Mr. Webster's proof that he is in fact retarded, § 2255(h)(1) precluded the court from considering it because he is not also innocent of the crime. Mr. Webster filed a petition for writ of certiorari on the § 2255 question, which was denied. *Webster v. United States*, 131 S.Ct. 794 (2010).

As the Fifth Circuit's concurrence found, however, the limitations expressed in 28 U.S.C. § 2255(h)(1) can lead, and here have led, to an unconstitutional result. Judge Weiner concluded that the new evidence "virtually guaranteed that [Mr. Webster] would be found to be mentally retarded." *In re Webster*, 605 F.3d at 259. Yet, because of the

5

express limitations in that statute, 28 U.S.C. § 2255(h) produces an "absurdity" and a "Kafkaesque result," and would require the courts to "condone . . . an unconstitutional punishment." *Id.* at 259-60.

There is, then, a "glitch," *Unthank v. Jett*, 549 F.3d 534, 536 (7th Cir. 2008), in § 2255: the Fifth Circuit has ruled there is no mechanism for the federal courts to consider newly discovered evidence that proves a defendant is categorically ineligible for a death sentence under § 2255. Accordingly, Petitioner's claim falls squarely within § 2255's savings clause and meets the requirements of the plain language of 28 U.S.C. § 2241. Bruce Webster is categorically ineligible for the death penalty and is in custody in violation of the Constitution of the United States. Like prior cases where the Seventh Circuit has granted relief under § 2241, Petitioner's situation is extraordinary: absent action by this Court, Bruce Webster will be executed in violation of the Constitution, resulting in an unconstitutional suspension of the writ of habeas corpus.

Accordingly, Petitioner asks this Court to find that, under the facts and circumstances set out below, § 2241 provides him with a statutory basis by which to establish that he is mentally retarded and therefore categorically ineligible for a sentence of death. Specifically, Petitioner requests that this Court find that newly available contemporaneous Social Security records, along with newly obtained declarations of childhood friends, relatives, and acquaintances of Mr. Webster, viewed in light of the evidence as a whole, establish that Mr. Webster is mentally retarded and thus not eligible for the death penalty.

After setting forth the procedural history, Mr. Webster first addresses the evidence proving his retardation and then explains how this Court has jurisdiction to consider it pursuant to 28 U.S.C. § 2241.

## III. PROCEDURAL HISTORY

### A. MR. WEBSTER WAS TRIED, CONVICTED, AND SENTENCED TO DEATH IN 1996

On November 4, 1994, Mr. Webster was indicted on six counts in the Northern District of Texas, including kidnapping in which a death occurred in violation of 18 U.S.C. §§ 1201(a)(1) and (2), along with various noncapital offenses. Mr. Webster was tried and convicted; he was sentenced to death on the capital charge on June 20, 1996.

### B. EVIDENCE OF MENTAL RETARDATION

The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) defines mental retardation as (a) significantly subaverage intellectual functioning demonstrated by a full-scale IQ score of between 70-75 or lower; (b) concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety; and (c) onset before age 18 years. *See* DSM-IV-TR (American Psychiatric Association, 2000) at 41-42, 49; Tassé Decl. ¶ 12. This standard is routinely applied by courts in determining whether an individual suffers from mental retardation. *See e.g.*, *Hardy*, 762 F. Supp. 2d at 852-55; *Davis*, 611 F. Supp. 2d at 474-77; *Lewis*, 2010 WL 5418901, at *4-7.

### 1. EVIDENCE OF MENTAL RETARDATION PRESENTED AT TRIAL BY MR. WEBSTER

Mr. Webster submitted evidence of his mental retardation during the sentencing phase of his trial, including evidence of five IQ scores (48, 51, 55, 59, 65) and testimony from four psychologists and psychiatrists who had examined him and determined that his IQ fell within the range of the mentally retarded. Dr. Raymond Finn, a clinical psychologist certified and trained in diagnosing mental retardation, administered a full-scale intelligence test, the Wechsler Adult Intelligence Scale – Revised ("WAIS-R"), to Mr. Webster near the time of his arrest, and determined Mr. Webster has an IQ of 59. (Trial Tr. Vol. 23, 176:11-20, 186:20-187:9)[3] Dr. Finn stated that Mr. Webster's intelligence is in the lowest .3 percentile—"below the first percentile in terms of intelligence compared to the rest of the population,"—and that Mr. Webster is "clearly mentally retarded" under the accepted definitions.[4] (*Id.* 187:10-24.) Dr. Denis Keyes, a psychologist specializing in mental retardation, testified that he administered two intelligence tests, the Stanford-Binet Fourth Edition and the Kaufman Adolescent and Adult Intelligence Test, and found that Mr. Webster's composite IQ scores were 51 and 55, respectively, putting him in the lowest .2-.3 percent of the population. (Trial Tr. Vol. 24, 19:24-20:25, 26:11-28:1, 29:14-31:24, 34:1-35:23.) Dr. Keyes also tested Mr. Webster's adaptive deficits and found that Mr. Webster functioned at the level of a seven-year old. (*Id.* 37:10-44:12.) Dr. Keyes concluded that Mr. Webster is in fact

---

[3]     All excerpts of Trial Transcripts referenced herein are attached as Exs. B-F to the Declaration of Steven J. Wells.

[4]     Dr. Finn administered a second WAIS-R test to Mr. Webster during the trial and the results were again consistent with mental retardation. (Trial Tr. Vol. 23, 192:17-193:2.)

mentally retarded. (*Id.* 47:7-49:4.) Dr. Robert Fulbright, a neuro-psychologist, performed a battery of neuro-psychological tests on Mr. Webster and concluded that Mr. Webster has significant impairment in his intellectual capacity, attention capacity, reasoning abilities, and suffered from limited language and memory capabilities. (*Id.* 128:10-148:24.) Finally, Dr. Mark Cunningham, who had examined Mr. Webster and interviewed Mr. Webster's family, concluded that Mr. Webster suffers from mild mental retardation[5]. (*Id.* 185:17-189:8.) Additional evidence that Mr. Webster received a score of 48 on an IQ test administered by an Arkansas state mental health center in 1992 was also presented during the trial. (Trial Tr. Vol. 23, 177:11-178:6.) Notably, of the four complete, individually administered IQ tests admitted into evidence at trial, only one was administered before commission of the crime, when Mr. Webster was 19 years old. (*Id.*)

Mr. Webster also presented evidence of his adaptive deficits in three of the categories designated by the DSM-IV-TR—functional academics, home living, and communication and conceptual skills.[6] Dr. Denis Keyes administered a Vineland adaptive skills test to Mr. Webster. That test showed that Mr. Webster is not able to live on his own and function in the real world, (Trial Tr. Vol. 24, 44:4-12) (home living), and that Mr. Webster is not able to communicate regarding abstract thoughts, (*id.* 107:2-14)

---

[5]     "Mild" mental retardation is the term traditionally used to describe individuals within the IQ range of 50-55 to 70-75. *Mental Retardation: Definition, Classification, and Systems of Support* 27 (10th ed. 2002). Most individuals found to meet the *Atkins* criteria suffer from mild mental retardation. *See, e.g., Wiley v. Epps*, 625 F.3d 199, 214, 222 (5th Cir. 2010); *Thomas v. Allen*, 607 F.3d 749, 754, 760 (11th Cir. 2010).

[6]     *See* DSM-IV-TR at 42 ("*Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting").

(communication and conceptual skills). Dr. Raymond Finn testified that Mr. Webster is better at speaking than understanding, and that concepts have to be simplified in order for Mr. Webster to understand them, (Trial Tr. Vol. 23, 193:22-194:13) (communication and conceptual skills). Dr. Finn also noted that Mr. Webster's speech patterns, "marginal" school achievement, "marginal" employment history, and his inability to live on his own, supported his diagnosis of mental retardation. (*Id.* 193:7-21, 196:9-17.)

Mr. Webster's friends and family testified that classmates helped Mr. Webster with his homework and on exams, and that Mr. Webster repeated grades twice—in second grade and again in junior high, (*id.* 75:18 – 76:4, 138:2-5) (functional academics); that Mr. Webster was never able to live away from his mother's home, and that he only received income from welfare, food stamps, family members and girlfriends (*id.* 33:5-14, 67:4-17, 145:13-24) (home living); and that Mr. Webster may have been able to write letters, but that his handwriting was illegible (*id.* 102:22 – 103:3) (communication and conceptual skills).

## 2. THE GOVERNMENT'S EVIDENCE AND ARGUMENTS AT TRIAL

In the face of the overwhelming evidence of Mr. Webster's consistently low IQ scores and his adaptive deficits, the government argued that Mr. Webster was not mentally retarded because he was faking. The government presented testimony from Dr. George Parker, who administered a partial WAIS-R test and estimated that Mr. Webster's composite IQ score was 72. (Trial Tr. Vol. 26, 48:5 – 49:15, 75:6 – 77:23, 86:8-13.) Dr. Parker suggested repeatedly that Mr. Webster's scores were artificially deflated because

he was "motivated" to do poorly on the tests administered after his arrest, and concluded that Mr. Webster is not mentally retarded. (*Id.* 46:24 – 48:9, 49:3 – 50:23, 52:23 – 53:23, 67:1-12, 88:10-17.) Dr. Richard Coons, a psychiatrist who did not conduct an IQ test or a Vineland adaptive skills test, likewise testified that he did not believe Mr. Webster was mentally retarded and that Mr. Webster was manipulating his performance on the IQ exams. (*Id.* 131:11 – 134:21, 142:1 – 147:10.) Specifically, Dr. Coons stated that Mr. Webster lied when he told Dr. Finn that he was in special education classes, and that this lie was consistent with "an attempt to persuade that person that you had mental deficiencies that you didn't actually have." (*Id.* 132:11 – 133:7.)

The government rebutted Mr. Webster's evidence of adaptive deficits by focusing on Mr. Webster's abilities to adapt to life in prison. Dr. Parker and Dr. Coons, who visited Mr. Webster in prison together, testified that they had observed Mr. Webster put away his clothes, make his bed in his jail cell, and keep an organized cell (Trial Tr. Vol. 26, 59:20-25, 135:22 – 139:2); and that Mr. Webster was able to communicate effectively and speak in full sentences, read simple stories, and address an envelope (*id.* 58:10 – 59:6). The government also presented testimony from fellow inmates and prison guards who had contact with Mr. Webster while he was incarcerated or working in the prison system, and who believed Mr. Webster had adapted to life within that system. (*See* Trial Tr. Vol. 25, 86:6 – 103:12, 111:13 – 118:11, 123:2 – 130:09, 138:2-22; Trial Tr. Vol. 26, 21:22 – 29:13). Dr. Coons testified that Mr. Webster would score deceptively low on the adaptive skills test because he has "not chosen to adapt to an ordinary lifestyle" but to the "prison life he has chosen to live." (*Id.* 143:1 – 144:14.) The government presented

additional evidence of Mr. Webster's adaptive functioning outside of prison, including

testimony from two Watson Chapel Schools representatives who indicated that Mr.

Webster was not placed in special education classes and therefore was not retarded. (*See*

Trial Tr. Vol. 24, 226:8 – 232:15; Trial Tr. Vol. 25, 22:16 – 28:6, 35:18 – 89:10.)

At the close of the punishment phase of trial, the government argued that the jury

should discount the evidence of mental retardation, claiming that the evidence showed

Mr. Webster was an average student (because he had not been in special education

classes) who could function normally in prison, and that his low IQ scores were irrelevant

because Mr. Webster was "motivated" to fake low scores on the IQ and behavioral skills

tests in order to avoid a death sentence. (Trial Tr. Vol. 27, 63:16 – 65:11.)

## C. THE SENTENCING DECISION

On June 20, 1996, the jury found the government had proven beyond a reasonable

doubt certain aggravating factors that support a sentence of death, that the aggravating

factors sufficiently outweighed any mitigating factors, and that Mr. Webster should

receive the penalty of death.[7] (Trial Tr. Vol. 27, 101:10 – 103:8.) When determining

mitigating factors, four jurors found that the defense had proven by a preponderance of

the evidence that Mr. Webster "is or may be mentally retarded," (*id.* 20:23 – 21:2,

102:16-17 (Nonstatutory Mitigating Factor No. 1)), but the jury was given no instructions

as to the legal standard to be used in determining mental retardation (*id.* 20:23 – 21:1).

---

[7]    Mr. Webster was tried six years before the U.S. Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002). Mr. Webster's mental retardation claim was therefore evaluated under the statutory bar against the execution of mentally retarded individuals under 28 U.S.C. § 3596 at trial and on direct appeal.

On September 30, 1996, the Court issued its judgment, sentencing Mr. Webster to death. (Judgment in a Criminal Case, Docket No. 824[8].) The Fifth Circuit affirmed Mr. Webster's sentence and conviction on direct appeal. *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998).

### D. MR. WEBSTER CHALLENGED HIS SENTENCE UNDER 28 U.S.C. § 2255 BUT WAS DENIED ADDITIONAL DISCOVERY ON ISSUES OF MENTAL RETARDATION

Mr. Webster filed his initial Motion to Vacate Conviction and Sentence under 28 U.S.C. § 2255 ("2255 Motion") on September 29, 2000. (*See* 2255 Motion, Docket No. 998). While his 2255 Motion was pending, Mr. Webster filed a Motion for Leave to Conduct Discovery requesting discovery on several issues related to his mental retardation claim. (*See* Motion for Leave to Conduct Discovery (April 30, 2001) (Wells Decl. Ex. X).) One of Mr. Webster's discovery requests, Request for Discovery No. 8, specifically requested that the government be compelled to produce "any reports prepared by a mental health professional in the government's possession which, in any manner, questions or rebuts the testimony by the government's witnesses at trial (*i.e.*, Dr. Coons and Dr. Parker) on the issue of petitioner's mental retardation." (*Id.* at 10.) The Northern District of Texas denied the request. (*See* Memorandum Opinion and Order Denying Petitioner's Motion for Discovery (Wells Decl. Ex. Y).) Had the court granted it, the government would have been required to turn over the Social Security records that are the basis for the instant motion.

---

[8]     "Docket No." refers to the criminal docket entry in U.S. v. Webster, Case No. 4:94-cr-00121-Y (N.D. Tex.).

The district court denied Mr. Webster's Amended 2255 Motion in full on September 20, 2003. (*See* Memorandum Opinion and Order, Docket No. 1110.) The Fifth Circuit ultimately denied Mr. Webster's application for certificates of appealability. *United States v. Webster*, 421 F.3d 308 (5th Cir. 2005).

## IV. MR. WEBSTER HAS OBTAINED PREVIOUSLY UNDISCLOSED GOVERNMENT RECORDS THAT ESTABLISH HE IS CATEGORICALLY INELIGIBLE FOR THE DEATH PENALTY AND ENTITLED TO HABEAS RELIEF

Previously unavailable evidence going directly to the issue of Mr. Webster's mental retardation was recently uncovered by Mr. Webster's defense team. Although Mr. Webster's trial counsel requested these records before trial, they were not released by the Social Security Administration until recently. (*See* Declaration of Kristen K. LeRoux ("LeRoux Decl.") ¶ 12.[9]) Moreover, as discussed above, *supra* Part III.D, these records were specifically requested in Mr. Webster's Requests for Discovery, which were denied by the trial court. The records show that *government* physicians and psychologists examined Mr. Webster when he was 20, a year *before* the commission of the crime; that each doctor found that he had an extremely low IQ; and that two of them concluded he had mental retardation. The new tests directly undercut the government's central position at trial that Mr. Webster was faking low IQ scores in order to secure a mental retardation defense. The newly released Social Security records also contain previously unavailable evidence that Mr. Webster was, in fact, enrolled in special education classes—again, directly refuting the government's evidence and argument at trial.

---

[9] The Declaration of Kristen L. LeRoux referenced herein is attached as Exhibit V to the Declaration of Steven J. Wells.

Finally, Mr. Webster seeks to present newly obtained testimony demonstrating the manifestation of his mental retardation prior to age 18.[10] This testimony reflects Mr. Webster's inability to care for himself, including his inability to tie his shoes and dress himself as a teenager. Additional evidence demonstrates Mr. Webster's inability to understand simple language concepts and basic tasks. There is also newly obtained evidence regarding Mr. Webster's poor performance in school, which supports the finding that he has adaptive deficits in functional academics. *See* DSM-IV-TR at 49. Importantly, the newly obtained evidence illustrates that Mr. Webster displayed adaptive deficits before incarceration and in the non-prison environment. In contrast, much of the adaptive deficit evidence presented by the government at trial related to Mr. Webster's ability to function in the structured prison environment—an environment that experts in mental retardation deem inappropriate for measuring adaptive ability.[11]

---

[10] Mr. Webster's legal team also uncovered government records showing a pattern of abuse and violence in Mr. Webster's family. Child abuse and domestic violence are risk factors for mental retardation. *See The American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition Classification, and Systems of Supports* 60 tbl. 6.1 (11th ed. 2010); Tassé Decl. ¶ 26. Records obtained from the Arkansas Department of Human Services Child Maltreatment Central Registry on October 31, 2008 indicate that Mr. Webster was a victim of severe abuse at the age of 10. *See* Maltreatment Summary Report (Wells Decl. Ex. I at I.2-4); LeRoux Decl. ¶ 5. In addition, Social Security records for Mr. Webster's father, Willie Webster, obtained on February 9, 2009, indicate that Willie Webster was "functioning on a psychotic level" and that he "tends to lose his temper easily and is rough on both [his wife] and their children." *See* Report of Richard E. Walters, M.D. (Wells Decl. Ex. H at H.6 ); Report of Dr. Jim J. Moore (*id.* at H.11); LeRoux Decl. ¶ 12.

[11] Experts in the field discredit statements about an individual's ability to function in prison because the structured nature of the environment does not provide a true test of an individual's abilities. *See, e.g.*, J. Gregory Olley and Ann W. Cox, *Assessment of Adaptive Behavior in Adult Forensic Cases: The Use of the Adaptive Behavior Assessment System-II, in ABAS-II Clinical Use and Interpretation* 381, 386 (Thomas Oakland & Patti L. Harrison eds., 2008); *see also Wiley*, 625 F.3d at 218; *Adanandus v. Johnson*, 947 F. Supp. 1021, 1044 (W.D. Tex. 1996)

This newly available evidence directly contradicts and undercuts the government's case at trial that Mr. Webster was faking his IQ tests and that his adaptive functioning was normal. Together with the evidence presented at trial, no reasonable factfinder could find that Mr. Webster is not mentally retarded.

A.   **NEWLY AVAILABLE MEDICAL DIAGNOSES OF MENTAL RETARDATION IN SOCIAL SECURITY RECORDS REVEAL EVIDENCE OF PETITIONER'S SIGNIFICANT SUBAVERAGE INTELLECTUAL FUNCTIONING**

On September 9, 1993, Mr. Webster applied for Social Security benefits, claiming a disabling condition of sinus problems and headaches. In order to determine whether Mr. Webster was eligible for Social Security benefits based on this claim, the Social Security Administration had him evaluated by three separate medical professionals. It is clear from the records that two of these doctors performed psychological evaluations concluding that Mr. Webster has an IQ that falls well within the range of mental retardation, and each of these three doctors independently diagnosed Mr. Webster with extremely low IQ and/or mental retardation. Although Mr. Webster requested these records from the Social Security Administration prior to trial, and then again sought in post-conviction all relevant records from the government, they were withheld from Mr. Webster until February 9, 2009. (*See* Declaration of Larry M. Moore ("Moore Decl.") ¶ 4[12]; LeRoux Decl. ¶ 12.) This evidence directly refutes the government's evidence and

---

("petitioner's improved performance on some tests may be due to his living in a structured environment").

[12]     The Declaration of Larry M. Moore referenced herein is attached as Exhibit W to the Declaration of Steven J. Wells.

arguments presented at trial, and establishes that Mr. Webster suffers from mental retardation.

### 1. DR. EDWARD HACKETT'S DIAGNOSIS OF MILD MENTAL RETARDATION AND IQ SCORING OF 59

Dr. Edward Hackett conducted a Full Scale WAIS-R IQ test on Mr. Webster in October of 1993, in connection with his application for social security benefits. In Dr. Hackett's Psychometric Evaluation report, dated October 22, 1993, Mr. Webster's Full Scale WAIS-R IQ score is 59, with a Performance IQ of 49 and a Verbal IQ of 71. (*See* Psychometric Evaluation (Wells Decl. Ex. G at G.15).) Dr. Hackett's evaluation states "[Mr. Webster] is mildly retarded, but is also antisocial." (*Id.* at G.16.) His diagnoses were as follows: "Mild Mental Retardation. . . . Mr. Webster manifests no signs of wanting to improve or to seek employment. He appears to be a user of others." (*Id.*) In Dr. Hackett's Medical Report containing additional information, dated November 10, 1993, he stated that "[Mr. Webster] was viewed as a somewhat mild[ly] retarded con man, but very street wise. . . . [H]e could not be functional in a community setting. . . . He would also not function well in the work place." ( Medical Report (Wells Decl. Ex. G at G.14).) Dr. Hackett "did not feel that [Mr. Webster] could manage his own benefits. His behavior was somewhat bazaar [sic]. On the IQ scores performance was estimated lower than verbal. Dr. Hackett felt some organic function may be involved." (*Id.*)

Dr. Hackett's report reflects one of the earliest IQ tests administered to Mr. Webster. This report confirms the evidence in the trial record that Mr. Webster's IQ is below 70 and he accordingly has significant limitations in intellectual functioning. (*See*

Tassé Decl. ¶¶ 48-51, 58-61.) Dr. Hackett's report directly contradicts the opinions presented at trial by Dr. Coons and Dr. Parker that Mr. Webster was purposely malingering on the IQ tests administered after his arrest in order to avoid the death penalty, and that Mr. Webster is not mentally retarded. The Full Scale WAIS-R IQ test and report were completed when Mr. Webster was 20 years old and approximately eleven months before the date of the crime for which he faces execution. (*See* Tassé Decl. ¶ 59 ("Importantly, Dr. Hackett's evaluation of Mr. Webster's intellectual functioning was done almost 1 year before the date of the murder for which Mr. Webster was convicted and sentenced to death. This is significant because at the time of his performance on Dr. Hackett's WAIS-R, Mr. Webster was not accused of murder nor trying to escape the death penalty—a claim often raised as a possible motivation for malingering on a test of intelligence.").)

Moreover, Dr. Hackett's evaluation of Mr. Webster, one of the first known professional diagnoses of Mr. Webster's adaptive deficits, demonstrates that Mr. Webster has significant limitations in conceptual skills (such as managing daily life) and practical skills (such as seeking or keeping a job). Dr. Hackett's report is strong evidence of mental retardation that directly rebuts the evidence submitted by the government in its attempt to refute Mr. Webster's mental retardation claim.

### 2. DR. C.M. RITTELMEYER'S DIAGNOSIS OF MENTAL RETARDATION

In a report dated October 25, 1993 and entitled "General Physical Examination," Dr. C.M. Rittelmeyer also evaluated Mr. Webster's mental and physical condition. (*See*

General Physical Examination (Wells Decl. Ex. G at G.18).) Although Dr. Rittelmeyer's descriptions of Mr. Webster's physical health are unremarkable, his diagnosis of Mr. Webster is significant: "Mental retardation. Flat Feet. Chronic sinus problems and Allergies by history." (*Id.* at G.21.) Importantly, this report, too, was written well before the crime at issue in this case and, again, contradicts the central testimony of the government's trial witnesses that (1) Mr. Webster was malingering on the other IQ tests and (2) he is not retarded.

### 3. DR. CHARLES SPELLMAN'S DIAGNOSIS OF MENTAL RETARDATION AND SCORING OF 69 OR LOWER

A psychological evaluation dated December 22, 1993, completed by Dr. Charles Spellman for the diagnosis of mental disorders to "better ascertain eligibility for Social Security benefits," further supports a contemporaneous diagnosis of mental retardation. (*See* Palaver, Inc. Evaluation for Mental Disorders (Wells Decl. Ex. G at G.11).) Dr. Spellman notes that "[i]deation was sparse and this appeared to be more of a function of his lower cognitive ability than of any mental illness. He came across as a slow fellow who did not know much and did not know how to communicate well." (*Id.* at G.12.) Regarding intellectual function, Dr. Spellman stated that "[Mr. Webster] was not able to register three objects. . . . He was not able to do simple calculations. He did not know what the sayings meant." (*Id.*) Dr. Spellman estimated Mr. Webster's IQ to be 69 or lower. (*Id.* at G.13.) In regard to Mr. Webster's level of adaptive functioning, Dr. Spellman stated: "[Mr. Webster] lives with his mother. He watches television, listens to the radio and goes walking. . . . He does no chores around the house. Mostly he seems to

19

be idle around the house and on the streets." (*Id.*) Dr. Spellman's only diagnoses of Mr. Webster were "1. Mental Retardation" and "2. Antisocial Personality by History." (*Id.*) Importantly, Dr. Spellman also noted that "[t]here was no evidence of exaggeration or malingering" and that "[Mr. Webster] will not get any better." (*Id.*)

Dr. Spellman's report further confirms the evidence in the trial record that Mr. Webster's IQ is below 70 and that he has significant limitations in intellectual functioning. (*See* Tassé Decl. ¶¶ 53-54, 58.) Along with Dr. Hackett's evaluation, Dr. Spellman's report is among one of the first known professional diagnoses of Mr. Webster's adaptive deficits. Dr. Spellman's evaluation of Mr. Webster demonstrates that Mr. Webster has significant limitations in conceptual skills (such as self direction, communication, and functional academics), social skills (such as taking responsibility), and practical skills (such as personal activities of daily life). Most importantly, Dr. Spellman evaluated Mr. Webster at age 20 and concluded that there was no evidence that Mr. Webster was faking his limitations—again, directly contradicting the testimony of the government's witnesses at trial.

### B. THE DIAGNOSES CONTAINED IN THE SOCIAL SECURITY RECORDS DIRECTLY REFUTE THE GOVERNMENT'S CASE AT TRIAL

These newly disclosed government records show complete and unbiased findings of mental retardation by government doctors; they aid substantially in buttressing the evidence of Mr. Webster's mental retardation; and, most importantly, they directly refute the government's arguments at trial that Mr. Webster was faking his IQ tests to avoid the death penalty. Dr. Hackett's diagnosis was based on *complete* administration of the

WAIS-R exam, Dr. Spellman's diagnosis was based on the administration of a

psychological examination, and all three diagnoses of mental retardation were made by

government-employed doctors when Mr. Webster was 20 years old, well before he

committed the crime at issue in this case. By contrast, the government's two trial

witnesses offered diagnoses made while Mr. Webster was incarcerated, years after the

newly available evaluations were completed. (*See* Trial Tr. Vol. 26, 59:12-19, 120:17 –

121:6.) The testing performed by the prosecution's witnesses was inherently flawed: Dr.

Parker's partial IQ test resulted in an estimated score based on incomplete administration

of the applicable examination, (*id.* 86:8-13; *see also* Tassé Decl. ¶ 16), while Dr. Coons

admitted that he was not certified or practiced in conducting evaluations for the purpose

of determining mental retardation: "As I told you, I don't do the psychological testing."

(*Id.* at 177:9-14.)[13]

The government attacked Mr. Webster's strong evidence of mental retardation at

trial by questioning Mr. Webster's "motivations" and accusing him of faking. As Dr.

Parker testified, in describing the difference in the way he determines mental retardation

in criminal subjects versus "real world" patients:

> [I]f you're sitting in your office and the patient comes in because he
> or she is having problems and they want help with it, and they are
> soliciting your professional services on their own hook, their own
> motivation, then the likelihood of trying to manipulate you or lie to
> you or deceive you or not do very well, it would be a pretty silly
> person to go to a doctor and then sit there and tell the doctor a bunch
> of lies about why he or she is there. But in forensic settings, of

---

[13]     The Texas Court of Criminal Appeals recently deemed Dr. Coons's methodology
inadmissible as "not scientifically reliable" under *Daubert*. *Coble v. Texas*, 330 S.W. 3d 253,
277-280 (Tex. Crim. App. 2010).

course, there is often serious motivation to mislead or deceive or get over on you or whatever, because the nature of the contract is different.

(Trial Tr. Vol. 26, 53:1-23.) Because these newly available diagnoses were made before Mr. Webster was incarcerated for this crime, when he was a "real world" patient, and expressly conclude that there is no evidence of malingering, they directly undermine the government's evidence and arguments that Mr. Webster was consistently faking later IQ tests in order to secure a mental retardation defense. (*See id.* at 224:18–225:4; Trial Tr. Vol. 27, 63:16 – 65:11; Tassé Decl. ¶¶ 51, 54, 59.)

C. **PREVIOUSLY UNDISCLOSED GOVERNMENT RECORDS SHOW THAT MR. WEBSTER HAS SIGNIFICANT FUNCTIONAL LIMITATIONS AND DIRECTLY CONTRADICT EVIDENCE PRESENTED BY THE GOVERNMENT AT TRIAL**

1. **EVIDENCE THAT MR. WEBSTER WAS ENROLLED IN SPECIAL EDUCATION CLASSES**

Additionally, the Social Security records contain previously undisclosed evidence that Mr. Webster was, contrary to government assertions at trial, placed in special education classes as a child. (*See* Letter from Lou Jackson, Watson Chapel Schools, to Social Security Administration (Nov. 8, 1993) (Wells Decl. Ex. G at G.17).) In this letter, Watson Chapel Schools Special Education Supervisor Lou Jackson explains that Mr. Webster's Special Education records had been destroyed in 1988. *Id.* This letter directly contradicts the evidence presented by two Watson Chapel Schools representatives who testified, as witnesses for the government, that Mr. Webster was not placed in special education classes and therefore did not meet the definition of mentally retarded. (Trial Tr. Vol. 24, 238:16 – 239:8, 247:21 – 248:8; Tassé Decl. ¶ 49 ("The one

salient element of this school district letter is an acknowledgement that Mr. Webster did receive special education services.").) It also directly contradicts Dr. Coons's testimony that Mr. Webster lied about being in special education classes in an attempt to manipulate a diagnosis of mental retardation. (Trial Tr. Vol. 26, 132:11 – 133:7.) This letter establishes that Mr. Webster was in fact enrolled in special education classes in the Watson Chapel Schools as a youngster and demonstrates that Mr. Webster has significant limitations in intellectual functioning and adaptive behavior, including impairments in functional academic skills.

## 2. THE APPLICATION COMPLETED BY MR. WEBSTER DEMONSTRATES MR. WEBSTER'S LIMITATIONS

Finally, the form completed by Mr. Webster to apply for Social Security disability benefits provides a clear example of Mr. Webster's deficits in syntax, spelling, punctuation, grammar, ability to answer a question, ability to write a complete sentence, and penmanship. (*See* Statement of Claimant or Other Person (Wells Decl. Ex. G at G.28-29); Disability Supplemental Interview Outline (Wells Decl. Ex. G at G.30-35).) In response to the application's prompt to describe the pain or other symptoms, Mr. Webster wrote: "it causes me to bet up set Easily headhurtsdiffiernt of bredth." (Statement of Claimant or Other Person (Wells Decl. Ex. G at G.28).) When asked what side effects his medication caused, Mr. Webster responded "Is leep bettEr." (*Id.*) When asked what he does on a normal day, Mr. Webster answered "I sleeps look at. cartoon." (Disability Supplemental Interview Outline (Wells Decl. Ex. G at G.30).) When asked to describe changes in his condition since onset, Mr. Webster replied "ain't got no chang." (*Id.*)

When asked whether he was involved in any clubs or other groups, Mr. Webster

answered "Iwalk around in the club." (*Id.* at G.34.) These incomprehensible answers,

along with the nearly illegible penmanship, lack of syntax, capitalization, and

punctuation, demonstrate Mr. Webster's significant limitations in intellectual functioning

as well as his significant limitations in conceptual skills (such as language, writing, and

communication). These documents, created by and in the possession of a government

agency, bolster the mental retardation evaluations Mr. Webster offered at trial and

directly contradict the government's argument that although Mr. Webster's IQ scores

may be within the range of mental retardation, Mr. Webster does not have the required

adaptive deficits.[14]

\* \* \*

---

[14]      Mr. Webster also seeks to submit newly obtained evidence regarding Mr. Webster's adaptive deficits. (*See* Wells Decl. Exs. J - T.) In evaluating a defendant's adaptive deficits, courts have accorded great weight to testimony from family members and others who have had regular contact with the defendant (including parents, teachers, employers, and childhood friends). *See, e.g., Holladay v. Allen*, 555 F.3d 1346, 1349-50, 1364 (11th Cir. 2009) (affirming district court's finding that state prisoner was mentally retarded and therefore entitled to relief on a successive habeas corpus petition). Declarations recently obtained from childhood friends, relatives, and acquaintances of Mr. Webster over the course of multiple interviews with experts provide further evidence of Mr. Webster's mental retardation, and in particular, his limitations in adaptive behavior in functional academics, home living, communication, and social and interpersonal skills. While some of the information learned in the interviews supplements that previously presented at trial and on Mr. Webster's first § 2255 motion, much of the information constitutes new evidence which goes directly to the adaptive deficits prong of the currently accepted definition of mental retardation. Dr. Tassé states, "there is an abundance of examples of adaptive behavior deficits in the declarations as well as delayed milestones and childhood deficits. This information along with other previous psychological evaluations and these recently released SSA records are consistent with mental retardation…and has the added merit that it was not gathered in an institutional setting, such as a prison, which is unsuited for determining if an individual has mental retardation." (Tassé Decl. ¶ 60.) As a whole, the declarations demonstrate that Mr. Webster meets the accepted definition of being a person with mental retardation and is therefore ineligible for the death penalty.

This previously undisclosed evidence, viewed in light of the substantial evidence already presented at trial, demonstrates that Mr. Webster is mentally retarded and therefore ineligible for the death penalty. The numerous intelligence tests given to Mr. Webster over the past two decades provide uncontroverted evidence of his intellectual limitations. Mr. Webster has taken eight individually administered intelligence evaluations (including the newly disclosed tests administered by government psychologists from before the commission of the crime), and has scored in the mentally retarded range on all eight exams. Mr. Webster has shown that he has significant limitations in adaptive behavior, including an inability to care for himself, relate to others, and meet the demands of living in a community. While Mr. Webster presented testimony at trial from individuals who knew him before age 18, now for the first time, Mr. Webster has evidence of independent, professional diagnoses of his limitations in adaptive behavior from a time well before the commission of the crime at issue. This is compelling evidence that Mr. Webster has significant subaverage intellectual functioning, and is consistent with a diagnosis of mental retardation. (*See* Tassé Decl. ¶¶ 58, 60, 61.) Moreover, the previously unavailable and newly obtained evidence of adaptive deficits displayed at a young age and prior to incarceration in a non-prison environment provide the most pointed evidence of Mr. Webster's adaptive functioning capabilities available. Contrary to the government's trial testimony about Mr. Webster's ability to function in the prison environment, this strong evidence of deficits in living skills is of the kind on which experts routinely rely upon in assessing mental retardation.[15]

_____

[15]   As described in nt. 10, *supra*, statements about an individual's ability to function in

Four of the jurors at Mr. Webster's trial were persuaded by the evidence of mental retardation presented at trial. This was true despite the prosecution's damning claims of malingering, lack of special education placement, absence of proof of deficits prior to the crime – all of which have now been refuted by government doctors. Any reasonable factfinder considering the newly disclosed Social Security records and testimonial evidence, in addition to the substantial evidence already admitted at trial, would find Mr. Webster mentally retarded and therefore not eligible for the death penalty.

## V. BECAUSE SECTION 2255 IS INADEQUATE AND INEFFECTIVE, SECTION 2241 IS THE APPROPRIATE MECHANISM FOR PETITIONER TO CHALLENGE THE UNCONSTITUTIONALITY OF HIS DEATH SENTENCE BASED ON PREVIOUSLY UNAVAILABLE EVIDENCE

Pursuant to 28 U.S.C. § 2241, a writ of habeas corpus may be granted by the district courts when a federal prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(a), (c)(3). The Antiterrorism and Effective Death Penalty Act ("AEDPA"), *see* 28 U.S.C. § 2255 specifically provides that the district court in the jurisdiction in which a federal prisoner is held may entertain an application for a writ of habeas corpus where the remedy by motion under 28 U.S.C. § 2255(a) is "inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e); *see Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001); *Collins v. Holinka*, 510 F.3d 666, 667 (7th Cir. 2007). In these extraordinary circumstances, § 2255 has proved an ineffective remedy for Bruce Webster.

---

prison are no longer viewed as credible by experts or by courts when determining adaptive deficits.

**A.     MR. WEBSTER'S ATTEMPT TO PRESENT NEWLY
        DISCOVERED EVIDENCE TO THE FIFTH CIRCUIT UNDER
        SECTION 2255 WAS DENIED ON GROUNDS OF LACK OF
        JURISDICTION.**

On October 21, 2009, Mr. Webster moved the Fifth Circuit for authorization to

file a successive motion to vacate his death sentence under 28 U.S.C. § 2255(h)(1) on the

basis of the same newly discovered evidence that forms the basis for this Petition. The

motion was based on the fact that, although substantial evidence of Mr. Webster's mental

retardation had been presented at trial, the previously undisclosed evidence that forms the

basis for this Petition establishes that Mr. Webster is mentally retarded and categorically

ineligible for the death penalty.

The Fifth Circuit denied Mr. Webster's motion for authorization, holding that it

did not have jurisdiction to entertain the application under 28 U.S.C. § 2255(h). *In re

Webster*, 605 F.3d 256, 259 n. 8 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 794 (2010).

Reading the language of section 2255(h)(1) narrowly, the court concluded that "a

petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert

that the newly discovered evidence would negate his guilt of the offense of which he was

convicted, *i.e.*, capital murder." *Id.* at 257. The court concluded that such a result is

"compelled by the plain language of § 2255(h)(1), which does not encompass challenges

to a sentence." *Id.* While the court noted that reading "offense" to encompass "not only

a claim that a prisoner is not guilty of the offense of conviction but also a claim that he is

merely 'not guilty of the death penalty'" would accord with prior habeas corpus law

construing "actual innocence" to include "innocence of the death penalty," it nevertheless

found that "there is no reason to believe that Congress intended the language 'guilty of the offense' to mean 'eligible for a death sentence.'" *Id.* at 258.

Judge Wiener concurred in the opinion but wrote separately to emphasize the "absurdity of its Kafkaesque result: Because [Mr.] Webster seeks to demonstrate only that he is constitutionally ineligible for the death penalty – and not that he is factually innocent of the crime – we must sanction his execution." *Id.* at 259 (Wiener, J., concurring). Surveying the evidence presented in the motion, Judge Wiener concluded that "it is virtually guaranteed" that Mr. Webster would be found mentally retarded if the newly discovered evidence could be considered on the merits, but noted that "we must turn a blind eye to this evidence, as it speaks to [Mr.] Webster's constitutional eligibility for the death penalty and not his factual innocence of the crime." *Id.* at 259-60. Judge Wiener further stated that although he concurred in the majority's opinion "as a correct statement of the law, I continue to harbor a deep and unsettling conviction that, albeit under Congress's instruction which ties our judicial hands so illogically, we today have no choice but to condone just such an unconstitutional punishment." *Id.* at 260.

Mr. Webster filed a petition for a writ of certiorari with the Supreme Court of the United States on July 27, 2010. In the petition, Mr. Webster argued among other issues [16]

---

[16]    Mr. Webster contended that as a threshold matter, the Court *could* consider the merits of the petition because the bar imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA") to the Court's review of denials of motions for authorization brought by *state* prisoners pursuant to 28 U.S.C. § 2254 does not apply to Mr. Webster, who is a *federal* prisoner challenging his sentence under section 2255. Mr. Webster also argued that in any event, he was seeking review not of a "denial of authorization" based on the merits of the *evidence* presented in the motion for authorization, but instead of the Fifth Circuit's holding that it lacked jurisdiction even to consider evidence of categorical ineligibility of the death penalty.

that the Fifth Circuit's holding rested on an interpretation of AEDPA that too narrowly construes the statutory text and would in Mr. Webster's case lead to the unconstitutional execution of a mentally retarded person.

In contending that the Supreme Court should not entertain Mr. Webster's petition at that time, the government argued that "Section 2244(b)(3)(E)'s bar against [the] Court's review of orders denying leave to file a second or successive Section 2255 motion does not mean that federal postconviction litigants are altogether without recourse to Court." (Resp't's Br. in Opp. 17, Oct. 29, 2010.) Indeed, the government expressly noted that "in cases where Section 2255 truly is an 'inadequate or ineffective' remedy, 28 U.S.C. 2255(e), federal defendants may seek habeas corpus relief under 28 U.S.C. 2241, with ultimate review in [the Supreme] Court." (*Id.*) The Court denied Mr. Webster's certiorari petition without opinion. *Webster v. United States*, 131 S.Ct. 794 (2010).

**B.** **PETITIONER SATISFIES THE SAVINGS CLAUSE OF SECTION 2255 AND THE REQUIREMENTS OF SECTION 2241.**

    **1.** **LIKE THE SUCCESSFUL PETITIONERS IN *GARZA* AND *DAVENPORT*, MR. WEBSTER FACES A PROCEDURAL "GLITCH" THAT PREVENTS HIM FROM CHALLENGING THE FUNDAMENTAL LEGALITY OF HIS DETENTION UNDER 2255.**

In order to invoke jurisdiction under 28 U.S.C.§ 2241, Mr. Webster must show that § 2255 is inadequate for providing redress. Adequacy is determined by considering whether, in the circumstances of the case, the "essential function" served by habeas corpus is impaired "by the limitations on the use of the remedy provided in Section 2255." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998) (the "essential function" of habeas corpus is to "give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence"); *see also Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002). "Inadequacy" is demonstrated when § 2255 is "so configured as to deny a convicted defendant any opportunity for judicial rectification" of a fundamental defect in his conviction or sentence. *In re Davenport*, 147 F.3d at 611 (emphasis in original omitted) (imprisonment for non-existent offense). Therefore, a petitioner with claims of the sort that "justif[y] collateral review, [but do not] justify sequential collateral attacks under [§ 2255(h)]" may be able to pursue those claims via § 2241. *Taylor*, 314 F.3d at 835 (internal citations omitted).

The facts and circumstances Mr. Webster presents here meet the requirements of the plain language and purpose of § 2241. As in *Garza*, 253 F.3d at 922, and *Davenport*, 147 F.3d at 611, here a "glitch" in § 2255 precludes Mr. Webster from challenging the

fundamental legality of the sentence of death imposed upon him. Mr. Webster is a mentally retarded person in federal prison under a sentence of death. A mentally retarded person is, of course, categorically ineligible for the death penalty; to execute a person with mental retardation is "excessive" and a violation of the Eighth Amendment. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). However, the Fifth Circuit has ruled that § 2255 does not allow a federal prisoner to bring a successive claim that he is categorically ineligible for the death penalty based on newly discovered evidence "where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital murder." *In re Webster*, 605 F.3d at 257. While the Fifth Circuit has found that Mr. Webster cannot meet the strict requirements of § 2255(h), the evidence he now seeks to present to this court implicates "a fundamental defect" that undermines the constitutionality of his sentence. *See In re Davenport,* 147 F.3d at 611.

It was simply not possible for Mr. Webster to bring his claim in connection with his original petition because most of the new evidence upon which this Petition is based was in government files that were neither produced to Petitioner nor made available to him, despite his request. (*See* LeRoux Decl. ¶ 12; Moore Decl. ¶ 4.) That evidence, as the Fifth Circuit concurrence made clear, was not merely cumulative, but instead is "virtually guaranteed" to result in a finding that Webster is mentally retarded – provided that it is ever allowed to be considered by a judge or jury. *In re Webster*, 605 F.3d at 259 (Wiener, J., concurring); *see supra* Part V. As in *Garza* and *Davenport*, it was "literally impossible" for Mr. Webster to present this evidence at an earlier time because the government had not revealed the existence of the evidence and the district court

31

foreclosed discovery in the first habeas proceeding. *Garza*, 253 F.3d at 923; *see also In re Davenport*, 147 F.3d at 610-11. Mr. Webster sought, but was denied access to, the Social Security records he now seeks to present to this court until they were provided to his current counsel. (LeRoux Decl. ¶ 12; *see also, supra* Part III.D.) The records directly contradict all that the government has relied on to argue that Mr. Webster does not have mental retardation. Although he could—and did—argue that he is mentally retarded within the meaning of *Atkins* before, this *new* evidence could not have been presented before, either on direct appeal or in Mr. Webster's initial § 2255 motion.

The newly available evidence presented here, taken together with the evidence presented at trial, proves that Mr. Webster is mentally retarded and, therefore, "actually innocent" of the death penalty and constitutionally ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). Because Petitioner's claims meet the plain language and purpose of both sections 2241 and 2255(e), this Court must find jurisdiction and allow him to proceed with his Petition; there is no other remedy for the fundamental and unconstitutional defect in Mr. Webster's detention.

### 2. MR. WEBSTER SATISFIES THE SEVENTH CIRCUIT'S REQUIREMENTS FOR THE EXERCISE OF JURISDICTION UNDER SECTION 2241.

In considering petitions brought pursuant to § 2241, the Seventh Circuit has, at times, imposed requirements above and beyond those found in the plain language of the statute. In non-capital cases, [17] the Seventh Circuit appears to require that, to establish

---

[17]     It is important to note that the cases in which these requirements have been imposed did *not* involve defendants under sentence of death. There is no indication that the Seventh Circuit

that 28 U.S.C. § 2255 is an "inadequate or ineffective" remedy, a petitioner must

demonstrate that he is "actual[ly] innocen[t]." *Taylor*, 314 F.3d at 835-36. Mr. Webster

satisfies the Seventh's Circuit's "actual innocence" requirement because, in the context of

a capital case, "innocence of the death penalty" *is* "actual innocence." *See Sawyer v.

Whitley*, 505 U.S. 333, 336 (1992) ("[T]o show 'actual innocence' one must show by

clear and convincing evidence that, but for a constitutional error, no reasonable juror

would have *found the petitioner eligible for the death penalty*....") (emphasis added).[18]

Congress did not alter or amend § 2241 as part of AEDPA and there is no indication that

Congress intended to overrule *Sawyer* in the § 2241 context. Indeed, the "gatekeeping"

requirements of § 2255 do not apply to § 2241 petitions. *See* Pub.L. No. 104-132, 110

Stat. 1214 (1996); *see also James v. Walsh*, 308 F.3d 162, 166 (2d Cir. 2002) (holding the

gatekeeping provisions of AEDPA do not apply to § 2241 petitions); *Chambers v. United*

---

intended to impose a requirement to show "actual innocence" on defendants challenging a
sentence of death under § 2241; in *Garza*, the Seventh Circuit *granted* review of a prisoner's
§ 2241 petition on the basis that the death sentence was imposed in error even in the absence of a
claim of "actual innocence." 253 F.3d at 923. Comparing *Garza* with (for example) *Taylor*, it is
clear that the heightened requirements established in *Taylor* apply only when a petitioner
challenges merely the length of his sentence, as opposed to the categorical exclusion from the
imposition of the death penalty. Although this judge-made rule effectively and improperly
amends § 2241 (which, unlike 28 U.S.C. § 2255(h)(1), was not amended by Congress to include
such a requirement), Petitioner, as set forth below, meets the additional requirements imposed by
the Seventh Circuit, regardless of their propriety.

[18]    The Court in *Sawyer* tailored its definition of "actual innocence" to capital cases and
expressly included ineligibility for the death penalty because it acknowledged that the notion of
actual innocence "does not translate easily into the context of an alleged error at the sentencing
phase of a trial on a capital offense," 505 U.S. at 340, (quoting *Smith v. Murray*, 477 U.S. 527,
537 (1986)), whereas "[i]n the context of a noncapital case, the concept of 'actual innocence' is
easy to grasp." *Sawyer*, 505 U.S. at 341; *cf. Dretke v. Haley*, 541 U.S. 386, 396 (2004)
(observing that actual innocence claims "are likely to present equally difficult questions
regarding the scope of the actual innocence exception itself. Whether and to what extent the
exception extends to noncapital sentencing error is just one example.")

*States*, 106 F.3d 472, 475 (2d Cir. 1997) (holding the gatekeeping provisions of AEDPA applicable to §§ 2254 and 2255 were not triggered by a § 2241 petition even where it had been filed as a § 2255 petition).

Neither *Taylor* nor *Davenport* expressly equate the "actual innocence" requirement imposed upon § 2241 petitioners with a requirement that the petitioner be "not guilty of the underlying offense" as required for a motion for a successive petition under § 2255. *See Taylor*, 314 F.3d at 835-36; *In re Davenport*, 147 F.3d at 609-10. Instead, in both cases, the court's § 2241 analysis evinces the prudential concern for the preservation of judicial resources otherwise squandered by repeatedly testing the validity of convictions and for preventing petitioners from evading procedural requirements with comparatively minor technical failures. *Taylor*, 314 F.3d at 835-36; *In re Davenport*, 147 F.3d at 609-10. This Petition does not implicate these concerns. Mr. Webster does not seek to test the validity of his conviction or to raise minor technical pleading issues. Instead, he respectfully requests the Court allow him the opportunity to present – for the first time – newly discovered evidence of his mental retardation, rendering his execution unconstitutional. As Judge Wiener noted, the "innocence of the underlying offense" requirement in 28 U.S.C. § 2255(h) produces an "absurdity" and a "Kafkaesque result," and would require the courts to "condone . . . an unconstitutional punishment."

## VI.  FAILURE TO CONSIDER THE NEWLY AVAILABLE EVIDENCE UNDER § 2241 WILL RESULT IN A SUSPENSION OF THE WRIT OF HABEAS CORPUS.

The United States Constitution forbids Congress from suspending the writ of habeas corpus except during periods of invasion or rebellion. U.S. Const. art. I, § 9, cl. 2.

("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."). Where, as here, § 2255 is not available, failure to consider the newly available evidence of Mr. Webster's categorical ineligibility for the death penalty will result in an unconstitutional suspension of the writ of habeas corpus.

In *Holland v. Florida*, the Court held:

> When Congress codified new rules governing this previously judicially managed area of law, it did so without losing sight of the fact that the "writ of habeas corpus plays a vital role in protecting constitutional rights." . . . It did not seek to end every possible delay at all costs. . . . The importance of the Great Writ, the only writ explicitly protected by the Constitution . . . , along with congressional efforts to harmonize the new statute with prior law, counsels hesitancy before interpreting AEDPA's statutory silence as indicating a congressional intent to close courthouse doors that a strong equitable claim would ordinarily keep open.

130 S. Ct. 2549, 2562 (2010) (citations omitted). In *Triestman v. United States*, the Second Circuit noted that "serious Eighth Amendment and due process questions would arise with respect to AEDPA if we were to conclude that, by amending § 2255, Congress had denied [petitioner] the right to collateral review. . . ." 124 F.3d 361, 370, 378-79 (2d Cir.1997). The *Triestman* court found it was not required to decide the Suspension Clause issue, but noted the implications of the Suspension Clause had AEDPA been interpreted to preclude collateral review of petitions when "Congress has arguably cut off all post-conviction relief for a claim of actual innocence that was based on the existing record and that could not have been effectively brought previously." *Id.* at 378 n. 21. In *Martinez-Villareal v. Stewart*, Judge Nelson wrote that AEDPA "unconstitutionally suspends the

writ of habeas corpus . . . in an unambiguous fashion, by prohibiting the consideration of claims in second or successive petitions that do not fit the exceptions found in § 2244(b)(1) and (2)." 118 F. 3d 628, 653 (9th Cir. 1997) (Nelson, J., concurring), *aff'd* 523 U.S. 637 (1998); *see also United States v. Hayman*, 342 U.S. 205, 233 (1952) (noting that § 2255's "inadequate and ineffective" language preserves habeas for federal prisoners; *In re Dorsainvil*, 119 F.3d 245, 248 (3d Cir.1997) ("Were no other avenue of judicial review available for a party who claims that s/he is factually or legally innocent as a result of a previously unavailable statutory interpretation, we would be faced with a thorny constitutional issue."); *Holloway v. Jones*, 166 F. Supp. 2d 1185, 1190 (E.D. Mich. 2001) (finding that utilizing the one-year statute of limitations in AEDPA to preclude relief to a petitioner who can demonstrate factual innocence of the crime would constitute violation of the Suspension Clause).

Indeed, even the government, in its response to Petitioner's petition for certiorari, acknowledged the importance of the existence of a remedy under § 2241 when § 2255 is jurisdictionally unavailable. In attempting to dissuade the Court from granting certiorari, the government strongly suggested to the Court that absence of jurisdiction under § 2255 did not result in a suspension of the writ because Petitioner had another avenue of relief – § 2241. (Resp't's Br. in Opp. 17, Oct. 29, 2010).

Denying review under § 2241 would preclude all collateral review of previously unavailable evidence establishing the unconstitutionality of Mr. Webster's death sentence, and would therefore constitute an unconstitutional suspension of the writ.

## VII. CONCLUSION

Newly released evidence from an agency of the United States Government establishes that Bruce Webster is and always has been mentally retarded. The Fifth Circuit has held that 28 U.S.C. § 2255 precludes it from considering this evidence. Our laws cannot sanction the execution of one who is not eligible for execution. Section 2241 was enacted to ensure that travesties such as that which could occur in Mr. Webster's case do not occur. Petitioner respectfully urges this Court to exercise appropriate jurisdiction and prevent this "Kafka-esque" result from taking place.

### **REQUEST FOR RELIEF**

THEREFORE, for all the foregoing reasons, Mr. Webster asks this Court to:

1.    Hold that Bruce Webster has satisfied the jurisdictional requirements for proceeding under 28 U.S.C. § 2241; and

2.    Following any evidentiary hearing that this Court deems necessary, vacate his death sentence because he is mentally retarded and therefore ineligible for a sentence of death.

Dated: April 6, 2012                        DORSEY & WHITNEY LLP

                                            By _____
                                               Steven J. Wells
                                               Kirsten E. Schubert
                                            Suite 1500, 50 South Sixth Street
                                            Minneapolis, MN 55402-1498
                                            Telephone: (612) 340-2600
                                            Facsimile: (612) 340-2868


Dated: April ___, 2012                      By _____
                                               Eric K. Koselke, # 5593-54
                                            6202 N. College Avenue
                                            Indianapolis, IN 46220
                                            Telephone: (317) 722-2591
                                            Facsimile: (317) 257-5300

                                            *Attorneys for Petitioner Bruce Webster*