**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

_____

| | |
|---|---|
| **BRUCE CARNEIL WEBSTER**, | § |
| Petitioner, | § |
| | § |
| v. | § CAUSE NO. 2:12-CV-0086-WTL-WGH |
| | § |
| **CHARLES L. LOCKETT, WARDEN**, | § |
| **UNITED STATES PENITENTIARY,** | § |
| **TERRE HAUTE (USP)** | § |
| | § |
| Respondent. | § |

_____

**RETURN TO ORDER TO SHOW CAUSE**

For his return to the order to show cause and in response to the petitioner Bruce Carneil

Webster's ("Webster") petition for a writ of habeas corpus, the respondent advises the Court as

follows:

**Background**

The petitioner Webster is a federal prisoner currently incarcerated at the United States

Penitentiary at Terre Haute, Indiana. He was convicted of kidnaping resulting in the death of

Lisa Rene (count one); conspiring to kidnap (count two); and using and carrying a firearm during

a crime of violence (count six). *United States v. Webster*, 162 F.3d 308, 317 (5th Cir. 1998).

On September 24, 1994, Webster and his co-defendants kidnaped Ms. Rene, a 16-year-old school

girl, from her Arlington, Texas, home in retaliation for her brothers' failure to supply marijuana

for which they had been paid.[1] Ms. Rene, who was sexually assaulted repeatedly by Webster and

---

[1]  The gruesome details surrounding the kidnapping and murder of Lisa Rene are set out in the Fifth
Circuit's opinion on direct appeal. *See Webster*, 162 F.3d at 318-19. The government has also attached the

his co-defendants, was taken to Pine Bluff, Arkansas, and held for several days before she was ultimately struck several times with a shovel by Webster and two co-defendants and buried – probably while still alive – in a local park.[2]  The jury recommended a sentence of death for Webster's extensive role in her kidnaping and brutal murder.  On September 30, 1996, Webster was sentenced to death on count one; life imprisonment on count two; and 60 months imprisonment on count six, with the latter two terms ordered to run consecutively.[3]  *See Webster*, 162 F.3d at 319.  Through 28 U.S.C. § 2241, Webster seeks to challenge his sentence of death by claiming that previously unavailable evidence substantiates his much-litigated claim that he is mentally retarded and therefore ineligible for the death penalty.[4]

Defense counsel determined early on that, given 18 U.S.C. § 3596(c)'s flat prohibition against the execution of the mentally retarded,[5] whether Webster is mentally retarded would be a critical issue in his defense, and acted accordingly.  Wells Dec. Ex. W (Declaration of Larry M. Moore, Trial Defense Counsel, ¶ 4.) (hereinafter Moore Declaration).  As will be subsequently

---

Statement of Facts from its brief which further details the facts underlying the offenses of conviction.

[2]  *See Webster*, 162 F.3d at 318-19.

[3]  Orlando Hall, a co-defendant, was also sentenced to death.  *See United States v. Hall*, 152 F.3d 381, 390 (5th Cir. 1998).  Steven Beckley, Demetrius Hall, and Marvin Holloway were not charged with offenses for which death was a possible penalty.  Each pled guilty and received a substantial sentence.

[4]  In late 2006/early 2007, Webster applied for commutation of his death sentence.  His request is being held in abeyance, where his sentence has been stayed in collateral litigation in a constitutional challenge in the District of Columbia to the federal method for execution.  *See* Wells Decl. Ex. A (Order); *Roane v. Gonzales*, 1:05-CV-2337 (D.C. District Court).  Despite repeated requests by the government, the stay has not been lifted, even though the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), held that the three-drug protocol used by the federal government for execution does not violate the Constitution's ban against cruel and unusual punishment.

[5]  At the time of Webster's conviction and the imposition of the death penalty, 18 U.S.C. § 3596 provided, in part, that "[a] sentence of death shall not be carried out upon a person who is mentally retarded."  18 U.S.C. § 3596(c).  Subsequent to Webster's conviction, the Supreme Court in *Atkins v. Virginia*, 536 U.S. 304 (2002), held that the execution of a mentally retarded criminal is "cruel and unusual punishment," prohibited by the Eighth Amendment.

discussed herein more specifically, defense counsel mounted a sustained, but unsuccessful, effort to establish that Webster is mentally retarded, including personally paying for expert assistance. Moore Declaration, ¶¶ 3-4. The district court, in response to filings by defense counsel and in recognition of section 3596(c), filed a "Factual Finding Regarding Mental Retardation," on June 21, 1996, in which the court stated, "Webster is not mentally retarded and ... he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty." (R12:1536.)

Webster's convictions and sentence were affirmed by United States Court of Appeals for the Fifth Circuit on December 3, 1998. *Webster*, 162 F.3d at 317. In addition to other issues, Webster challenged the district court's mental retardation finding on several grounds: the finding (1) contravened the Federal Death Penalty Act; (2) derogated Webster's rights to due process and effective assistance of counsel; (3) was contrary to the greater weight of the credible evidence; and (4) was inconsistent with the verdict. *See Webster*, 162 F.3d at 351. The Fifth Circuit concluded that the district court's actions were proper, and that the finding was supported by the evidence. Webster's petition for writ of certiorari was denied. *Webster v. United States*, 528 U.S. 829 (1999).

Webster filed a timely initial motion for relief pursuant to 28 U.S.C. § 2255 on September 29, 2000, and an amended motion on August 16, 2002. He raised multiple issues involving the determination of whether he is mentally retarded: (1) his due process rights were violated by the district court's alleged usurpation of the jury's right to determine whether he is mentally retarded; (2) he is ineligible for execution because he is mentally retarded; (3) the

evidence presented at trial was insufficient to support the district court's determination that he is not mentally retarded; (4) 18 U.S.C. § 3596 is unconstitutionally vague; and (5) binding international law forbids his execution because he is mentally retarded. The district court denied the motion, authoring a substantial order explaining why the evidence supported a finding that Webster, who admittedly has a low IQ, is not mentally retarded where he does not have sufficient deficiencies in adaptive skills.[6] *See Webster v. United States*, No. 4:00-CV-1646-Y, 2003 WL 23109787 (N.D. Tex. 2003) (attached) (herein after District Court Memorandum Order).

The district court subsequently denied a certificate of appealability (COA) on most of the claims raised by Webster in his amended section 2255 motion, but granted a certificate to the Fifth Circuit on two: (1) the evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded; and (2) his alleged retardation renders him ineligible for a death sentence. *United States v. Webster*, 421 F.3d 308, 310 (5th Cir. 2005). The Fifth Court rejected Webster's contentions, explaining that

> Webster claims he is mentally retarded and thus ineligible for his death sentence, but given our rejection of his claim regarding the standard of proof and sufficiency of the evidence supporting the contrary finding at trial, this claim is reduced, in essence, to nothing more than an attempt to re-litigate the question. Indeed, Webster's brief does not point to any new evidence bearing directly on his mental capacity; instead, it summarizes the evidence presented at trial concerning his cognitive abilities and childhood experiences.

---

[6]  Mental retardation, which refers to substantial limitations in functioning manifesting before the age of 18, is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000); *Atkins*, 536 U.S. at 308 n.3; *see also Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (for purposes of Social Security, 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22").

*Webster*, 421 F.3d at 313-14. Webster's petition for writ of certiorari was denied. *Webster v. United States*, 549 U.S. 828 (2006).

Webster also challenged on appeal the district court's denial of COA on his remaining issues – several of which revolved around his mental retardation claim. *United States v. Webster*, 392 F.3d 787 (5th Cir. 2002). The Fifth Circuit held, *inter alia*, that the absence of mental retardation is not an element of the sentence that is constitutionally required to be determined by a jury. *Webster*, 392 F.3d at 792. The Fifth Circuit also found that the district court had not erred with respect to Webster's claim that his trial counsel were ineffective in failing to investigate and present additional mitigating evidence demonstrating mental retardation and the extreme abuse he suffered as a child. *Webster*, 392 F.3d at 793. The Court noted that the district court had "denied habeas relief, characterizing this ineffective assistance claim as one of degree – *i.e.*, Webster does not allege that counsel utterly failed to present evidence of mental retardation and child abuse but, instead, that counsel were ineffective for failing to investigate and present enough of such evidence. After engaging in an exhaustive review of the trial record, the district court determined that defense counsel presented a significant amount of such evidence; and, although more of the same or similar evidence could have been furnished, counsel were not constitutionally ineffective for failing to present more of the same." *Id*. The Fifth Circuit went on to explain that its

> review of the trial record confirms that Webster's counsel were far from constitutionally ineffective in investigating and presenting evidence of his mental condition and the abuse he suffered as a child. During the punishment phase, counsel presented lengthy and detailed testimony from four medical experts regarding Webster's mental capacity and the testimony of a fifth medical expert on surrebuttal to critique the methodology used by one of the government's experts in testing Webster's cognitive abilities. Moreover, counsel presented substantial evidence of

the abuse Webster suffered as a child, including testimony from his mother, two of his brothers, two of his sisters, an aunt, a niece, and an ex-girlfriend. All of these witnesses testified about the severe physical and sexual abuse that Webster's father inflicted on his children and his wife (Webster's mother). These witnesses recounted graphic and violent stories of sexual abuse; weekly beatings with hoses, fan belts, and extension cords; and various other forms of torture, including electric shock and burning. Even further, counsel presented testimony from an officer of the juvenile court in Arkansas that removed one of Webster's siblings from the home because of abuse. In light of this substantial body of evidence and the pre-trial investigation its presentation required, Webster's generalized allegation that more evidence of mental retardation and child abuse should have been presented is arguably frivolous.

*Webster*, 392 F.3d at 793-94.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "gives a convicted defendant only one further bite at the apple after his direct appeal unless he can demonstrate a compelling reason, as defined in [28 U.S.C. § 2255(h)] (newly discovered evidence of innocence or a new and retroactive rule of constitutional law), for being allowed a third bite (the first being the direct appeal, the second the first postconviction proceeding)." *In re Davenport*, 147 F.3d 605, 610 (7th Cir. 1998). Consequently, Webster, on October 22, 2009, requested that the Fifth Court certify a successive motion for post-conviction relief, as provided for in 28 U.S.C. § 2255(h), so that he could pursue a claim that newly discovered contemporaneous Social Security records, along with declarations from childhood friends, relative, and acquaintances, established by clear and convincing evidence that he is not eligible for the death penalty because he is mentally retarded. *See* 28 U.S.C. § 2255(h)(1) ("A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have

found the movant guilty of the offense").  Relying on the plain language of section 2255(h)(1), the Fifth Circuit denied his request, concluding that Webster could not bring a successive claim under section 2255(h)(1) where he could not show that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital murder.[4]  *In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010), *cert. denied*, *Webster v. United States*, ___ U.S. ___, 131 S. Ct. 794 (2010).[5]

Webster cannot meet the requirements of the savings clause

Having exercised his permissive statutory right to collaterally attack his sentence per section 2255(a), and after being denied a successive collateral attack on his sentence per section 2255(h), Webster seeks to bring his mental retardation claim under 28 U.S.C. § 2255(e), also known as the "savings clause."  *See United States v. Prevatte*, 300 F.3d 792, 798 (7th Cir. 2002) ("Section 2255 contains a 'savings clause' for petitioners who may be barred by the successive petition requirements contained in the statute.").  Under the "savings clause," a federal prisoner may file a habeas petition under 28 U.S.C. § 2241 if an otherwise available remedy under section 2255 is "inadequate or ineffective to test the legality of [a defendant's] detention."  28 U.S.C. § 2255(e); *see Unthank v. Jett*, 549 F.3d 534, 535-536 (7th Cir. 2008) ("According to § 2255(e), a federal prisoner may use § 2241 to contest his conviction or sentence only when 'the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention.'").

---

[4]  The government had argued that Webster's "newly discovered evidence" was wholly insufficient to satisfy his burden under section 2255(h).

[5]  The Seventh Circuit's decision in *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997), suggests that, if reviewing a similar issue, it would likewise hold that a successive motion under section 2255 may not be filed on the basis of newly discovered evidence unless the motion challenges the conviction and not merely the sentence.

As the Seventh Circuit has explained in discussing the relationship between the savings clause of section 2255 and the federal habeas statute section 2241:

> In general, federal prisoners who wish to attack the validity of their convictions or sentences are required to proceed under § 2255. Furthermore, in the overwhelming majority of cases § 2255 specifically prohibits prisoners from circumventing § 2255 and challenging their convictions or sentences through a habeas petition under § 2241. There is, however, a recognition in the statute that it will not apply in a narrow class of cases. This is the so-called "savings clause" of § 2255, which allows prisoners to bring § 2241 petitions if they can show that the § 2255 remedy "is inadequate or ineffective to test the legality of [the prisoner's] detention."

*Prevatte*, 300 F.3d at 799 (quoting *Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001)).

Because "[t]he essential function [of habeas corpus] is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence," "a procedure for postconviction relief can fairly be termed inadequate when it is so configured as to deny a convicted defendant any opportunity for judicial rectification of so fundamental a defect in his conviction as having been imprisoned for a nonexistent offense." *In re Davenport*, 147 F.3d 605, 609, 611 (7th Cir. 1998). Thus, "[a] federal prisoner should be permitted to seek habeas corpus only if he had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence because the law changed after his first 2255 motion."[6] *Davenport*, 147 F.3d at 611.

Although, subsequent to the imposition of the death penalty here, the Supreme Court has held that the execution of a mentally retarded criminal is "cruel and unusual punishment,"

---

[6] There are three additional qualifications: (1) the change of law has to have been made retroactive by the Supreme Court; (2) the change must elude the permission in section 2255 for successive motions; if it does not, if therefore the prisoner is not barred from filing a successive such motion, then his 2255 remedy is not inadequate and he cannot apply for habeas corpus; and (3) the "change in law" is not to be equated to a difference between the law in the circuit in which the prisoner was sentenced and the law in the circuit in which he is incarcerated. *Davenport*, 147 F.3d at 611-612. Webster can meet none of them because, as will be discussed, he cannot show a change in law.

prohibited by the Eighth Amendment, there was "no change to the law" subsequent to Webster's conviction or sentence creating a fundamental defect that opens the door to a section 2241 proceeding. *See Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that execution of the mentally retarded is prohibited). The execution of the mentally retarded by the federal government was prohibited at the time of Webster's conviction and the imposition of his death penalty. *See* 18 U.S.C. § 3596(c) ("[a] sentence of death shall not be carried out upon a person who is mentally retarded").

Because of the statutory bar, the issue of his alleged mental retardation was front and center, with both the defense and the government marshaling considerable efforts toward it. Unlike many cases, where the issue is joined late in the process, whether Webster is mentally retarded has been thoroughly litigated with substantial fact finding from the very beginning, under the standard that even Webster acknowledges is the proper one. Moreover, the district court, although agreeing with the government in the section 2255 proceedings that several of Webster's mental retardation claims had been raised and rejected on direct appeal, considered those claims anew – although still rejecting them – because of the Supreme Court's intervening decision in *Atkins*. *See* District Court Memorandum Order at *5.

Like the petitioner in *Davenport* whose petition was denied, Webster has had the opportunity to raise the question of his alleged mental retardation – in Webster's case, twice in the district court (at trial and in a section 2255 proceeding) and thrice in the Fifth Circuit (on direct appeal, in an appeal from the denial of the section 2255 motion, and in an appeal from the denial of COA). "Nothing in section 2255, including limitations on successive motions," prevented Webster from obtaining relief on his claim that his alleged mental retardation barred

his execution. *Davenport*, 147 F.3d at 609. He simply failed to convince the trial court or the appellate court. He should not be permitted to attempt to prove that he is mentally retarded yet again, especially in light of "newly discovered evidence" that is neither newly discovered nor probative. As the Seventh Circuit noted in *Taylor*, "[e]very court that has addressed the matter has held that § 2255 is 'inadequate or ineffective' only when a structural problem in § 2255 forecloses even one round of effective collateral review – and then only when as in *Davenport* the claim being foreclosed is one of actual innocence." *Taylor v. Gilkey*, 314 F.3d 835 (7th Cir. 2002) (citing *Cradle v. United States ex rel. Miner*, 290 F.3d 536, 538-39 (3d Cir. 2002); *In re Jones*, 226 F.3d 328, 333-34 (4th Cir. 2000); *Reyes-Requena v. United States*, 243 F.3d 893, 902-03 (5th Cir. 2001); *United States v. Peterman*, 249 F.3d 458, 462 (6th Cir. 2001); *Wofford v. Scott*, 177 F.3d 1236, 1244 (11th Cir. 1999)).

Webster has had the opportunity for one round of effective collateral review. If he is correct that he must be permitted a second chance to prove his mental retardation because of "new evidence," then will he be permitted a third or fourth chance if he produces still more evidence. For example, if Webster takes another IQ test or has another expert evaluate his adaptive skills, what prevents him from claiming that he must be allowed to proceed under section 2241 once again because he has "new evidence"?

There was no structural problem with section 2255 that prevented Webster from an effective collateral review of his claim. There is no reason that Webster could not have obtained the declarations from his family, friends, and acquaintances to present contemporaneously with

his motion for relief under section 2255. In fact, much of what he produces is cumulative to evidence produced at trial – much of which was rebutted at trial.[7]

As for the Social Security records, Webster was aware of their existence – having himself made application for Social Security benefits. According to defense counsel, they were made aware of the records by Webster's family, and requested them from the Social Security Administration during their trial representation. Moore Declaration at ¶ 4. Defense counsel avers that he could not recall having seen the Social Security records that are the subject of this petition, and that to the best of his recollection, the documents were not provided to the defense team by the Social Security Administration for use at trial. *Id*. There is no record of the documents being requested again until late October of 2008 – years after Webster filed his initial and amended motions for relief under section 2255. Wells Dec. Ex. V (Declaration of Kristen K. Leroux, ¶¶ 3, 9.) According to Webster's exhibits, his Social Security records were received a little more than three months later, on February 9, 2009. *Id*., at ¶ 12. There is no assertion that he attempted to locate those records to support his section 2255 motion.[8] Webster raised the issue of his alleged mental retardation in both his initial and amended section 2255 motion – with almost two years between the two filings. Thus, he had ample time to request the records again. He should not be permitted to seek relief under section 2241 by simply "adding" on "new" evidence to support claims that have already been decided adversely to him in his section 2255

---

[7] Webster's experts based their conclusions, in part, on family members' statements that he lacked certain skills; the government experts "effectively [rebutted] some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family stated that he did not." *See* District Court Memorandum Order at *14.

[8] That the records were not received sooner by Webster was not a deliberate or malicious action by the government. Contrary to Webster's veiled comment, the records were not "withheld" from him by the prosecution, which was unaware of their existence.

motion, when that evidence could have been part of the first motion if he had acted with more diligence.

The remedy provided in section 2241 does not become available to Webster simply because he cannot meet the requirements for filing a successive section 2255 motion. Restrictions on filing successive section 2255 motions, standing alone, do not render that section "inadequate or ineffective" within the meaning of the savings clause. *Unthank v. Jett*, 549 F.3d at 535; *see also Wofford*, 177 F.3d at 1245 (agreeing with the Seventh Circuit's conclusion in *Davenport* that the restrictions on second section 2255 motions do not render section 2255 "inadequate or ineffective" to test the legality of a prisoner's detention within the meaning of the savings clause, such that he may resort to the section 2241 remedy). As the Seventh Circuit explained in *Unthank*, it considered and rejected this line of argument in *Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002). *Unthank*, 549 F.3d at 535.

The petitioner in *Taylor* wanted to argue, based on a new decision of the Supreme Court, that the disposition of his first section 2255 proceeding had been mistaken. *Id*. The intervening decision did not create a new and retroactive rule of constitutional law, however. *Id*. At most it just showed that an error had been made in applying an old rule to his situation, for which section 2255(h) would not allow a second collateral attack. *Id*. The petitioner argued that whenever section 2255(h) closes the door to a renewed challenge under section 2255, then section 2255(e) must open the door to a challenge under section 2241. *Id*. The Seventh Circuit rejected the petitioner's reasoning, concluding that this would make section 2255(h) self-defeating:

> To say that [the] limitations [adopted in 1996] authorize further collateral proceedings would be to use [§ 2255(e) ] to return the courts to the world of *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), in which

prisoners may file as many collateral attacks as they please, provided that they don't abuse the writ. One goal of the Antiterrorism and Effective Death Penalty Act of 1996, which added § 2244(b) and [§ 2255(h) ] to the Judicial Code, was to replace *Sanders* with an approach under which only defined circumstances permit successive collateral attacks. *See Burris v. Parke*, 95 F.3d 465 (7th Cir. 1996) (*en banc*). The escape hatch in [§ 2255(e) ] must be applied in light of that history.

*Id*. (quoting *Taylor*, 314 F.3d at 836); *see also Cooper v. United States*, 199 F.3d 898, 901 (7th Cir. 1999) ("that one has lost the right to relief under § 2255 does not automatically mean that one gets to seek relief under § 2241. It is only when a fundamental defect exists in the criminal conviction – a defect which cannot be corrected under § 2255 – that we turn to § 2241").

Finally, section 2255 is inadequate or ineffective only when a prisoner is unable to present a claim of actual innocence. *Unthank*, 549 F.3d at 535. A challenge to a sentence does not amount to a claim that a prisoner is innocent of the offense. *Id*. (citing *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997) (holding that a successive motion under section 2255 may not be filed on the basis of newly discovered evidence unless the motion challenges the conviction and not merely the sentence.)). Contrary to Webster's assertion, the Seventh Circuit in *Hope* also called into question *Sawyer v. Whitley*, 505 U.S. 333, 340-41 (1992), explaining that the exception for sentencing issues did not survive the amendment:

> Courts that before the amendment had to decide whether an application for postconviction relief came within the "actual innocence" exception to the requirement of proving cause and prejudice in order to be permitted to revive a waived ground for relief extended the exception to sentencing issues .... But we do not think the exception survives the amendment. The "actual innocence" exception of the prior law was judge-made, and so its contours were appropriately judge-fashioned and permissibly judge-expanded. The exception in the new law is graven in statutory language that could not be any clearer. When we consider ... the absence of any indication in the legislative history that "offense" was being used in some special sense different from its ordinary meaning, we think it highly unlikely that Congress intended the word to bear a special meaning.

*Hope*, 108 F.3d at 120.  Thus, a defendant must show "actual innocence" of the offense and not of the sentence. Webster should not be permitted to proceed under section 2241 where he cannot show that relief under section 2255 is inadequate or ineffective to test the legality of his detention, or that he is actually innocent of the offense of conviction.[9]

**Webster's newly available evidence has insufficient gravitas to raise doubt about earlier fact-finding**

Pretermitting the issue of whether this Court has jurisdiction under section 2241 to consider Webster's claim, he cannot show that he is categorically ineligible for the death penalty by virtue of being mentally retarded.  Even assuming that a showing of mental retardation would establish "actual innocence" of the "death penalty" such that he would be entitled to relief, Webster cannot show that both the District Court for the Northern District of Texas and the Fifth Circuit were wrong in holding that he had failed to do so.  *Taylor*, 314 F.3d at 835 (holding that section 2241 is available only when there is both a valid claim of actual innocence and the petitioner has not had an unobstructed, prior opportunity to present the claim); *Collins v. Holinka*, 510 F.3d 666, 667 (7th Cir. 2007) (review under section 2241 requires both lack of opportunity under section 2255 to test the validity of conviction and a claim of actual innocence); *see also Wofford*, 177 F.3d at 1244 n.4  ("Once the savings clause of § 2255 applies to open the

---

[9]  There is no merit to Webster's contention that cutting off opportunities for continuing review suspends the writ of habeas corpus in violation of the constitutional ban.  *See* U.S. Const. art. I, § 9, cl. 2.  "What is protected from suspension is the writ that limits a person's detention by the executive branch without trial.  There is no constitutional entitlement to post-judgment collateral review by the inferior federal courts, let alone to unending rounds of such review."  *Benefiel v. Davis*, 403 F.3d 825, 827 (7th Cir. 2005) (citing *Lindh v. Murphy*, 96 F.3d 856, 867-68 (7th Cir. 1996) (*en banc*), reversed on other grounds, 521 U.S. 320 (1997)); *see also Taylor*, 314 F.3d at 835 ("the writ protected by the Constitution is the writ known in 1789 – the pretrial writ used to thwart unjustified detention by the executive branch – and not the statutory extensions of collateral review later enacted by Congress. What the legislature gave, it may withdraw.").

portal to a § 2241 proceeding, the proper inquiry in that § 2241 proceeding will be whether the petitioner can establish actual innocence of the crime for which he has been convicted, as "actual innocence" is defined in *Bousley v. United States*, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).")

In line with the Fifth Circuit's admonition that he was simply rehashing trial evidence and had failed to point to any new evidence in his section 2255 motion, *Webster*, 421 F.3d at 313-14, Webster gathered "newly available" evidence in the form of the Social Security documents, a letter from his school district, and affidavits from family and friends to present in support of his successive section 2255 motion and which he now presents to this Court – all of which he contends further substantiates his claim. He is wrong. Despite Judge Weiner's comments in his concurrence in *In re Webster*, 605 F.3d at 259-60, what Webster presents to this Court is wholly insufficient to show that both the district court and the Fifth Circuit were wrong in concluding repeatedly that he has failed to show that he is mentally retarded.

Webster's evidence of Social Security records and declarations from his childhood friends, relatives, and acquaintances are neither newly discovered nor substantive. Such evidence was known or available to Webster at the time of trial and when he filed his initial section 2255 motion. The Social Security records add little in the way of probative value, given questions of methodology and expertise. Webster was seen by the doctors reflected in the reports in an effort to secure Social Security benefits; consequently, he had motive to present himself as mentally deficit therein as well. Moreover, the records do not reflect that the doctors actually made diagnoses of mental retardation based on the relevant mental retardation criteria. The declarations from his family, friends, and acquaintances likewise lack probative value, given

15

their reason for providing the declarations, and are cumulative of other evidence offered at trial. The letter from the school district lacks probative value, given the evidence at trial, and the limited relevance of Webster's placement or non-placement in special education classes.

*Evidence regarding mental retardation presented at trial*

The question of whether Webster is mentally retarded "was a highly contested one at trial." District Court Memorandum Order at *12. Given that a finding of mental retardation requires the manifestation of significantly subaverage intellectual functioning and related limitations in two or more of adaptive skill areas before the age of 18, both the government and the defense offered expert testimony as to Webster's IQ and his adaptive skills (communication, self-care, home living, social skills, community use, leisure, work, self-direction, health and safety, and functional academics). *See* Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000); *Atkins*, 536 U.S. at 308 n.3.[10]

The government presented testimony from two experts. Defense counsel presented testimony from four medical experts regarding Webster's mental capacity and a fifth medical expert on surrebuttal to critique the methodology used by one of the government experts to score Webster's IQ test. Both sides also introduced lay testimony regarding Webster's intellectual functioning and his adaptive skills.[11] All of the experts who testified at Webster's trial, including

---

[10] "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." Diagnostic and Statistical Manual of Mental Disorders 42 (4th ed.2000).

[11] For example, E.C. Turner, Linda Monk, and Pat Drewett, a counselor and two teachers, respectively, from the junior high school Webster attended, testified that he was not in special education classes and that, in their opinion, he was not mentally retarded. (R25:34-70.) Several correctional officers and fellow inmates testified that, while incarcerated, Webster engaged in various activities potentially inconsistent with a finding of mental retardation. For example, he wrote letters to fellow inmates; received letters and newspapers; read aloud from

those who testified for the government, agree that Webster's IQ test scores are low.  The

government experts concluded, however, that Webster's IQ was higher than his experts had

suggested and, more importantly, that Webster had sufficient adaptive skills to preclude

classifying him as mentally retarded.  *Webster*, 421 F.3d at 312-313.  The district court ultimately

found that the evidence at trial supported a finding that Webster is not mentally retarded.  District

Court Memorandum Order at 12.

As the district court explained in its order denying section 2255 relief:

> Webster called four expert witnesses who testified about his mental
> capacity, including Dr. Raymond Finn, Dr. Denis Keyes, Dr. Robert Fulbright,
> and Dr. Mark Cunningham.  Webster was given different I.Q. tests by some of
> these experts, and he scored between a composite score of between a 51 and a 65.
> (R. 23:184-94; R. 24:20).  Webster's experts agreed that an I.Q. score of around
> 70 or lower, along with a lack of adaptive skills and the onset of these deficits
> before the age of 18, are the criteria for a diagnosis of mental retardation.  (R.
> 23:183, 229-30).  In order to assess Webster's adaptive skills, Dr. Keyes used the
> Vineland test, which involved asking numerous questions of people who knew
> Webster before he was eighteen, including family members, teachers, and friends,
> but dropping those answers that are inconsistent with the answers of most of the
> interviewees.  (R. 24:36-42).  From this, Keyes determined that Webster lived at
> home, did not have a bank account or a charge card, and was never observed
> setting the dinner table, assisting in the preparation of meals, or making his bed.
> He also determined that no one had known Webster to keep secrets or confidences
> or address envelopes on his own.  (R. 24:44-5, 73-6).  Dr. Keyes testified that he
> did not speak to Webster's fellow gang members or police officers who had dealt
> with him before he was eighteen-years-old in reaching his results on the Vineland
> test.  (R. 24:82-4).  Based on this test, Dr. Keyes opined that Webster did have a
> lack of adaptive skills.  Based on the I.Q. scores, along with this adaptive skills
> test and evidence from family members that Webster had been "slow" as a child,
> all of Webster's experts diagnosed him as being mentally retarded.  (R. 24:43, 47,
> 144, 189).

---

newspapers; wrote request slips for various services; wrote written grievances; submitted names and addresses of
people for his visitation list; and on one occasion complained because the change he received from the prison
commissary was incorrect.  (R25:86-103, 111-18, 122-25, 128-30, 136-38, 141-46; R26:24-35.)

Both Dr. Finn and Dr. Keyes acknowledged that cultural factors can have an effect on I.Q. scores (R 23:212; R. 24:59), and Dr. Keyes testified that the I.Q. tests required Webster to define words and recognize faces, and he did not know the definition of "inflation," nor did he recognize pictures of Shakespeare, Mark Twain, or Einstein, but he did recognize Elvis Presley and Stevie Wonder. (R. 24:60-2). Dr. Keyes also testified that Webster had reading and writing abilities that were unusual in a person with his alleged level of retardation and that Keyes attributes this to his belief that Webster probably suffers from "inorganic," as opposed to "organic" retardation. (R. 24:48, 111). Dr. Keyes also acknowledged, upon being questioned by this Court, that evidence that Webster was a leader in the kidnaping plot would be inconsistent with a diagnosis of mental retardation and that, in his opinion, it would have been "unlikely" that Webster was the one who physically took the victim. (R. 24:102).

The government, on the other hand, offered testimony from two experts, Dr. George Parker and Dr. Richard Coons. Dr. Parker testified that he administered an I.Q. test to Webster and his composite score was a 72. (R. 26:49). Dr. Parker and Dr. Coons testified that they did not believe that Webster is mentally retarded. (R. 26:143). Both Parker and Coons believed that Webster was not motivated to do well on I.Q. tests administered after he was charged in this case, and pointed as evidence of this to prior tests where he scored higher, such as tests given to him when he was in junior high, when he was in prison previously, and when he was in the Job Corps. (R. 26:51-3, 60-1, 63, 67, 126, 142). Parker also observed that the fact that someone like Webster lived in a sub-culture in which he was not exposed to a lot of vocabulary could cause his I.Q. scores to be lower. (R. 26:50-51).

Primarily, however, Parker and Coons questioned the results obtained by the defense when the test was administered to determine Webster's adaptive skills. Parker testified that he did not believe that the Vineland test was appropriate in Webster's case because of Webster's lifestyle, namely that of a drug dealer. Because of choices that Webster had made in his life, and because Webster had been in prison most of the time since he was fifteen years old, Parker and Coons believed that he would rate deceptively poor on the Vineland test. Dr. Parker and Dr. Coons also disputed some of the results Dr. Keyes did obtain with the Vineland test. Specifically, Dr. Keyes had indicated on the test that Webster's family members stated that Webster did not speak in complete sentences, did not read simple stories aloud, and did not read on his own initiative, when both the two experts and officers at the prison where he was housed after being charged in the instant case had observed that Webster did all of these things. Moreover, his

family had stated that they did not know whether Webster addressed envelopes, put his clothes away, or made his own bed, whereas Parker had in his possession an envelope Webster had addressed and had observed that Webster put his clothes away and made his bed in his jail cell. (R. 26: 58-9, 136-39). Parker and Coons also noted that Webster had shown cleverness when he sneaked into the women's part of the jail at one point, and he had shown the ability to adapt to the life he had chosen, as well as life in prison. (R. 26:143-44). Furthermore, Webster had shown adaptability by being deceitful to the police by way of cover stories and excuses when he was arrested with a motel key in his pocket, and had the adaptive ability to destroy evidence when he burned his clothes after Lisa Rene's murder. (R. 26:65-6).

Moreover, the government placed into evidence the testimony of Greg Barber, Webster's former parole officer, Gene Stewart, who was the principal at the junior high that Webster attended, and Rick McLaughlin, the vice-principal at that same school. They all testified that they did not believe that Webster was mentally retarded and that, when they were visited by Dr. Keyes earlier and told him their opinions, he told them that they could not help him because he was trying to keep Webster from being executed, a charge he disputed in his testimony. (R. 25:26-8, 238, 239-40, 247-48, 249). Moreover, E.C. Turner, Pat Drowett, and Linda Monk, a counselor and two teachers from the junior high Webster attended, testified that in their opinion, while Webster was in "basic" classes at school rather than advanced classes and dropped out in the ninth grade, he is not retarded. (R. 25:34-70). Finally, two fellow inmates and several officers from the federal prison where Webster had been housed for some time testified that Webster wrote letters to other inmates, albeit in almost indecipherable slang, received letters and newspapers, read aloud from the newspapers, wrote request slips for various services, wrote written grievances, submitted names and addresses of people for his visitation list, appeared to be reading from law books in the law library and taking notes, and on one occasion complained because the change he had received after purchasing materials from the commissary was incorrect. (R. 25:86-103, 111-18, 122-25, 128-30, 136-38, 141-46; R. 26:24-35).

In summary, all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that Webster has a low IQ. The experts disagreed about how low, but even a 72 I.Q. falls into the range where one can be diagnosed as mentally retarded, if one also has a deficit in adaptive skills. (R. 26:85-6). And the issue of adaptive skills or the lack thereof is where the parties converged at Webster's trial. While the defense did place into evidence the results of the Vineland test, government witnesses effectively

19

reputed some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family stated that he did not. Looking at all of the evidence presented by both sides at trial, while it is undisputed that Webster has had low scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "nonorganic" factors, which this Court understands to mean his lack of a quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math. This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills. *See Atkins*, 536 U.S. at 308, n. 3.

District Court Memorandum Order at ** 12-14 (internal footnotes omitted).[12] [13] [14]

---

[12] The record reflects that Dr. Keyes did not take Webster's acts in the kidnaping and murder into account as part of his analysis of Webster's adaptive skills. For example, although Dr. Keyes testified that evidence Webster was a leader in the kidnaping plot would be inconsistent with a diagnosis of mental retardation and that, in his opinion, it would have been "unlikely" that Webster was the one who physically took the victim, the evidence showed that Webster did take Lisa Rene from her apartment. (R24:102; R38: 57-60; R37: 107-113). As an example of his leadership role, after he and Hall made the decision to kill Lisa Rene, Webster instructed one of his co-defendants to make her take a shower and told him that he was going to get a comb for Lisa to comb out her pubic hair. (R38: 78-81; 37: 134-39).

[13] Dr. Keyes's decision to use convergent validation meant that he included only information that would support a finding of mental retardation while omitting anything that would not. For example, this meant he totally discounted information from school personnel and Webster's parole officer that their experiences with Webster showed that he was not mentally retarded. Gene Stewart, who supervised Webster at Watson Chappel Junior High School in Pine Bluff as a school counselor, testified that Webster was not retarded, had not been assigned to special education classes, and that there was no reason to assign him to social education classes. He testified that Dr. Keyes had come to talk to him briefly in Pine Bluff. After they spoke for a few minutes, Dr. Keyes closed his book and said that Stewart had not given him any information that would be helpful. (R44:236-39.) Rick McLaughlin testified that he was the principal and former assistant principal at Watson Chappel Jr. High. He identified Webster as one of the students he formerly supervised. Mr. McLaughlin testified that he never noticed anything that would have indicated that Webster was mentally retarded. When Dr. Keyes visited with McLaughlin, Dr. Keyes told McLaughlin that he was trying to gather information to keep Webster from being put to death. (R44:243-250.) Greg Barber, a parole officer for the State of Arkansas who supervised Webster, testified that Webster appeared to understand the rules and conditions of his parole. When Barber was interviewed by Dr. Keyes in the spring of 1996, Dr. Keyes told Barber that Webster was mildly retarded and lectured Barber that Webster should not be executed. When Barber told Dr. Keyes that Webster never acted retarded, Dr. Keyes told Barber that he would not be able to help him and left. (R45:15-28; GE 102-A, 102-B, 102-C, 102-D).

[14] Dr. Keyes's reason for excluding interviews of the jailers demonstrates another reason why his analysis of Webster's adaptive skills was suspect. Although symptoms of mental retardation must manifest before a specified

To support his claim that he is mentally retarded, Webster offers Social Security records that he claims "show that government physicians and psychologists examined Mr. Webster when he was 20, a year before the commission of the crime; that each doctor found that he had an extremely low IQ, and that two of them concluded he had mental retardation." Petition at p. 14. His contention should fail because his evidence is not substantial.

Dr. C. M. Rittlemeyer, who conducted a general physical examination of Webster, included in his diagnosis: "Mental retardation. Flat feet. Chronic sinus problems and allergies." Wells Dec. Ex. G, pp. 18-25. There is no indication of how Dr. Rittlemeyer came about that "diagnosis." The records do not reflect any IQ or adaptive skills testing. In fact, the records do not demonstrate that Dr. Rittlemeyer even knew the critieria for a finding of mental retardation, or that he was qualified to make such an assessment. In fact, given that Dr. Rittlemeyer was conducting a physical examination, it appears that Webster may have self-reported mental retardation to Dr. Rittlemeyer, rather than the doctor making any independent assessment of Webster's mental acumen.

Dr. Charles Spellman, who conducted a psychological evaluation of Webster in order to better ascertain Webster's eligibility for Social Security benefits, "estimated" an IQ of 69, and listed a current level of functioning based on Webster's self-reporting. Wells Dec. Ex. G, pp. 11-14. There is no indication that he tested Webster to determine his IQ, or that he conducted any

---

age for the diagnosis to be mental retardation as opposed to some other condition, mental retardation refers to substantial limitations in present functioning. *See* Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000); *Atkins*, 536 U.S. at 308 n.3. Webster's abilities at the time of Dr. Keye's assessment – whether in jail or not – would therefore have been relevant.

analysis of Webster's adaptive skills. *Id.* In fact, there is no indication in these records that Dr. Spellman was even aware of the criteria for a mental retardation diagnosis. *Id.* He appears to have diagnosed Webster as mentally retarded solely on that IQ estimation, Webster's self-reporting, and his limited observations of Webster, who was motivated to exaggerate a mental deficiency because of his desire to gain Social Security benefits. *Id.*

From the records, it appears that Dr. Edward Hackett, a psychologist, administered a Wechsler Adult Intelligence Scale - Revised IQ test to Webster. Wells Dec. Ex. G, p. 15. He diagnosed Webster with mild mental retardation based on a Verbal IQ of 71, a Performance IQ of 49, and a Full Scale IQ of 59. *Id.* The record does not reflect that Dr. Hackett did any formal testing of Webster's adaptive skills. *Id.* The report does note, however, that "The claimant was quite verbal. There may have been some malingering, however, Dr. Hackett could not be sure. The IQ scores are not normal considering history. The claimant was viewed as a somewhat retarded con man, but very street wise." *Id.*

The government has never argued that Webster's IQ would not meet the definition for mental retardation. The government experts agreed that Webster has a low IQ, but concluded that his IQ was higher than his experts had suggested, noting that Webster had an incentive not to perform well on the cognitive tests administered after he was charged in this case, and pointing to prior cognitive tests taken by Webster where he had scored higher, such as tests given to him when he was in junior high, when he was in prison previously, and when he was in the Job Corps. (R:26:51-3, 60-1, 63, 67, 126, 142). Of the three doctors who examined Webster for Social Security purposes, the only doctor to actually give Webster an IQ test – Dr. Hackett – also questioned whether he was malingering. Wells Dec. Ex. G, p. 15.

Moreover, trial evidence showing that Webster had a low score on an IQ test taken *before* the offense blunts his claim that the Social Security records would overwhelmingly refute the government's claim that he was malingering on tests *taken* after the offense. (R23:177-178.) Evidence that he scored low on the test given by Dr. Hackett was therefore cumulative of evidence already presented at trial, and would not have changed the district court's finding.

At best, Webster's records offer minimal support of his claim, given the questions about methodology and expertise. Most importantly, the basis for the district court's determination that Webster is not mentally retarded was not his IQ scores, but whether his adaptive skills were sufficiently deficient to deem him mentally retarded. Nothing in the Social Security records has any measurable impact on the court's determination as none of the doctors appeared to have conducted any analysis of Webster's adaptive skills.

As for the declarations from Webster's family, friends and acquaintances, they are cumulative of other such evidence offered at trial and in conjunction with his first section 2255 motion. Moreover, since each of them have incentive to exaggerate because of their desire to preclude Webster's execution, these declarations have little probative value. Because they are cumulative, could have been part of Webster's 2255 motion, and have little probative value, they likewise would not have impacted the district court's fact finding.

The fact that Webster has uncovered a letter from the Watson Chapel School District indicating that his special education records were destroyed in 1988 is likewise not probative of much. Wells Dec. Ex. G, p. 17. The letter is quite general and, although stating that his records were destroyed, does not offer much to support that he was actually enrolled in special education classes, especially in light of specific trial testimony from several witnesses that he was not.

(R44:236-39, 243-50; R45: 52-59; GE 98-A.)[15] Moreover, in his section 2255 motion, Webster

claimed that he was prevented from attending special education classes because of his race, not

because he did not qualify. District Court Memorandum Order, *8. In any event, whether or not

Webster attended any special education classes adds little to the relevant question – does he

suffer from sufficient deficits in his adaptive skills to render him mentally retarded? As both the

district court and the Fifth Circuit concluded, "[i]n the main, the prosecution presented

substantial evidence countering Webster's claim of mental retardation, and the government's

effort did not depend in any significant respect on Webster's non-enrollment in special education

courses." *Webster*, 392 F.3d at 798-799; District Court Memorandum Order, *8.

The evidence at trial showed that Webster demonstrated adaptability by working as a drug

dealer; by concocting cover stories after he was arrested; by making excuses to police when they

found on his person the key to the motel room in which Lisa Rene was held and raped; and by

burning his clothes after her murder. *Webster*, 421 F.3d at 313. The government also presented

evidence that, while incarcerated, he engaged in various activities inconsistent with mental

retardation, such as writing letters to fellow inmates; complaining when he received incorrect

change from the prison commissary; receiving letters and newspapers; reading aloud from

newspapers; writing request slips for various services; preparing written grievances; submitting

names and addresses of people for his visitation list; and sneaking into the women's section of

the jail.[16] *Id*. at 313-14 n.15. The district court, in rejecting Webster's mental retardation claim,

---

[15]   One of the school counselors testified that Webster scored in the 43rd percentile – low average – on an achievement test called the M.A.T. 6 Survey when he was in the seventh grade and definitely would not have qualified for special education classes. (R. 45: 52-59; GE 98-A).

[16]   The government introduced a letter written by Webster to fellow inmate John Clay on April 14, 1996. (GE 121-A; 132-A). In the letter written to John Clay, Webster asked for Clay's assistance in a plan to have sex with

found that this and other evidence reflected that Webster "has adapted to the criminal life that he chose," and that he has "the ability to communicate with others, [to] care for himself, [to] have social interaction with others, [to] live within the confines of the 'home' he has been in since he was sixteen, [to] use community resources within this home, [and to] read, write, and perform some rudimentary math." *Id*. at 313. And the Fifth Circuit found that the evidence supporting the district court's ruling was "substantial." *Webster*, 162 F.3d at 353.[17] Nothing presented by Webster justifies disturbing those findings.

## CONCLUSION

Webster's petition should be dismissed because he cannot meet the requirements of the savings clause. Section 2255 was neither inadequate or ineffective to test the legality of his detention. Webster raises no "legal" claim to this Court; instead, he asks the Court to reevaluate the factual underpinnings of his mental retardation claim by pointing to "new evidence" that is not sufficiently substantial to justify such an reevaluation.

Respectfully submitted,

JOSEPH H. HOGSETT
United States Attorney

By:  s/Gerald A. Coraz
      Gerald A. Coraz
      Assistant United States Attorney

---

female jail inmates during visiting hours. In the letter, Webster describes to Clay a plan whereby Clay will give Webster the names of some of the women Clay knew who were in custody and the names of some people not in custody that Webster could put on his visitation list. The plan was for visitors to come into the jail and ask to visit Webster, Clay and some women inmates at the same time. Webster told Clay in the letter that he could keep a watch for Clay, and then Clay could keep a watch for Webster. (R45: 85-97; GE 121-A).

[17]  In fact, Webster was able to convince only four of the 12 jurors, by a preponderance of the evidence, that he "is or may be," mentally retarded or that he suffers from low intellectual functioning. (R11:1500, 1521.)

Of Counsel:

SARAH R. SALDAÑA
United States Attorney
Northern District of Texas

/s/ Delonia A. Watson
DELONIA A. WATSON
Assistant United States Attorney
Texas State Bar Number 20937500
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, Texas 76102-6882
817.252.5200 OFFICE
817.252.5254 FAX

## CERTIFICATE OF SERVICE

I hereby certify that on August __7__, 2012, a copy of the foregoing was mailed, by first class U.S. Mail, postage prepaid and properly addressed to the following:

Eric K. Koselke, #5593-54
6202 N. College Avenue
Indianapolis, IN  46220

DORSEY & WHITNEY LLP
Steven J. Wells
Kirsten E. Schubert
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402

s/Gerald A. Coraz
Gerald A. Coraz
Assistant United States Attorney

Office of the United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048
(317) 226-6333