## **Summary of Evidence in Support of Conviction and Sentence of Death**

**a. Guilt/Innocence Phase**

On September 24, 1994, Lisa Rene was a 16-year-old student at Lamar High School in Arlington, Texas. Lisa Rene was originally from the U.S. Virgin Islands and had come to the United States during the summer of 1994 to live with her sister, Pearl Rene, at 1526 Chukka Drive, Aapartment Number 507, in the Polo Run Apartments in Arlington, Texas. (R. 40: 86-87). A few minutes after 8:00 p.m. on September 24, 1994, Pearl Rene received a telephone call at work from her sister Lisa. Lisa was frantic and said, "Pearl, Pearl, come home, come home, someone's breaking into the door." (R. 40: 89-91). Pearl told Lisa to hang up and call 911, and left immediately for home. (R.40: 92). When Pearl arrived at her apartment approximately five minutes later, Arlington police were already at the scene. (R. 40: 92).

A cassette tape recording of Lisa Rene's 911 telephone call was admitted into evidence, and a transcript of the recording was admitted to aid the jury. The recording of the 911 telephone call is that of Lisa reporting that someone was trying to break into the apartment. In the background can be heard more than one man's voice asking for different people, telling Lisa to open the door, and identifying themselves as the FBI. During the telephone call, Lisa screamed as a man's voice asks her who was on the telephone. As she was screaming, the receiver was placed back on the telephone and the call was terminated. The 911 operator tried to call back but only got an answering machine recording. (R. 37: 3-8; GE 1-A, 1-B).

Thomas Hayden, a Arlington Police Department police officer, testified that at approximately 8:13 p.m. on September 24, 1994, he responded to a dispatch to 1526 Chukka Drive, Apartment 507. When Hayden and another officer arrived at the apartment, the glass to

the sliding glass door had been partially broken out and the apartment was empty.  (R. 37: 9-16).

On September 29, 1994, Steven Beckley gave a confession to an Arlington Police Detective and an FBI Agent in which he admitted that Lisa Rene had been kidnapped as the result of a drug deal gone  bad and in which he implicated himself, Orlando Hall and an individual known as "B-Love."  In this statement, Beckley stated that he had last seen Lisa Rene at the Pine Bluff Motel with B-Love.  (R. 17: 4-5; GE S-36).  On September 29, 1994, an arrest warrant was issued out of the City of Arlington for Orlando Hall, Steven Beckley, and Demetrius Hall for the kidnapping of Lisa Rene.  (GE S-10; R. 17: 12-14).  Webster, who was spotted by FBI agents on September 30, 1994 at the Pine Bluff Motel, was detained and arrested for the state offense of possession of marijuana and possession of a firearm by a felon.  (R. 17: 71-78; GE S-11, S-12, S-13).  At 10:45 p.m. on September 30, 1994, an arrest warrant was issued out of the City of Arlington, Texas for Webster for the offense of Aggravated Kidnapping of Lisa Rene. (R. 17: 12-13; GE S-10).

On September 30, 1994, Beckley gave a second statement admitting that Lisa Rene had been killed.  (R. 17: 12; R. 38: 111).  Beckley then assisted officers and agents by leading them to Byrd Lake Park in Pine Bluff, Arkansas, as the general location where Lisa Rene had been murdered and buried.  (R. 17: 14; R. 38: 112-113).  On October 1, 1994, Webster gave a statement to Arlington Detective Jim Ford and FBI Agent Garrett Floyd.  (R. 17: 15-17; R. 39: 20-24).  Webster then led the officers and agents directly to the grave site.  Beckley confirmed the location of the grave site before excavation began.  (R. 17:17-22; R. 38: 113; R. 39: 30-33). On October 2, 1994, Lisa Rene's body was found in Byrd Lake Park.  Lisa Rene had been stripped of her clothing, gagged, and buried in a four-foot deep grave.  (R. 40: 25-32).  Also on

2

October 2, 1994, after leading the officers to the grave, Webster gave a written statement to Arlington Detectives Jim Ford and Mike Stanton and FBI Agent Floyd.  (R. 39: 35-54;  R: 17: 22-24; GE 88, S-27).

The medical examiner testified that Lisa Rene died from multiple blunt force injuries combined with asphyxia.  She suffered from as many as 14 blunt force contusions.  (R. 40: 41-62).  She also suffered from hemorrhaging in the vaginal orifice.  (R. 40: 48-49).   The medical examiner testified that, in his opinion, Lisa Rene was unconscious, but still breathing when she was buried.  He also testified that she could have regained consciousness after she was buried.  (R. 40: 64-67).

At the trial, the government presented the testimony of codefendants Demetrius Hall (D. Hall), Beckley and Holloway, and the testimony of Lisa Rene's brother, Stanfield Vitalis, to prove the facts and circumstances surrounding the kidnapping, sexual assault, and murder of Lisa Rene.

In the spring of 1994, Orlando Hall (O. Hall), a drug dealer from El Dorado, Arkansas, had asked Beckley, a resident of Irving, Texas, to find O. Hall a marijuana connection in the Dallas area.  In the summer of 1994, O. Hall also recruited Holloway to start selling marijuana for Hall in Pine Bluff.  (R. 38: 12-13; R. 29: 101-104).  Beckley was able to put Hall in contact with two individuals they knew as Stan and Ebay as a source for marijuana.  Beckley and the Halls also referred to these two individuals as the Jamaicans because of their Caribbean accents.  (R. 38: 13-14).

In September 1994, while Beckley and D. Hall were visiting Hall's sister Cassandra Ross in Irving, O. Hall called Beckley and asked him to set up a marijuana transaction with the

3

Jamaicans, Stan and Ebay.  (R. 38: 20-21).  On September 20, 1994, Beckley met with Ebay and set up a meeting.  (R. 38: 23).  On the next day, Holloway drove O. Hall to the airport in Little Rock, Arkansas.  (R. 39: 105-106).  Beckley and D. Hall picked up O. Hall at the Dallas/Fort Worth Airport.  (R. 38: 23).  Later, O. Hall, Beckley and Latonya Anders met with Ebay at a car wash.  Still later, O. Hall and Beckley met with Stan and Ebay at the car wash and paid them $4700.  When Beckley and D. Hall went back to the car wash to pick up the marijuana, Stan and Ebay never showed.  (R. 38: 23-29; R. 37: 72-78).

When O. Hall, Beckley and D. Hall were finally able to get in touch with Stan and Ebay by telephone, Stan and Ebay told them they had been robbed or "jacked" of the money and their automobile, and that they planned to get the guys who robbed them.  (R. 38: 29-31; R. 37: 79-80).  After several phone conversations, Stan and Ebay agreed to meet with O. Hall, Beckley and D. Hall the next day.  (R. 38: 31; R: 37: 81).

On Thursday, September 22, 1994, Stan and Ebay failed to meet O. Hall, Beckley and D. Hall at the agreed time.  (R. 38: 34; 37: 82).  O. Hall called a woman he knew who worked at Southwestern Bell and got the address at 1526 Chukka at the Polo Run Apartments, using a telephone number Beckley had found for Stan and Ebay.  (R. 38: 32-34; R. 37: 82).  O. Hall, D. Hall and Beckley went to the address at the Polo Run Apartments and sat in the parking lot and watched for Stan and Ebay.  They saw the same car that the Jamaicans had told O. Hall had been taken from them in the robbery.  O. Hall then knew that Stan and Ebay were not telling him the truth about being robbed of the money.  (R. 38: 34-35; R. 37: 84).

On Friday, September 23, 1994, Beckley and D. Hall obtained two handguns and purchased bullets from an Oshmans store.  (R. 38: 35-37; 37: 89-91).  Later that evening, Hall,

Beckley and D. Hall dressed in camouflaged clothing and drove Cassandra Ross's tan Cadillac Eldorado to the Polo Run Apartments.  They saw Stan, Ebay and another man leaving the apartments.  D. Hall went to the apartment he thought the men had left and knocked on the door.  When Lisa Rene answered the door,  D. Hall asked for a made-up person and then left when Lisa told him that no such person lived there.  (R. 38: 37-41; R. 37: 92-96).  Hall, Beckley and D. Hall then went back to Cassandra Ross's apartment in Irving.

O. Hall decided to contact Holloway and have him get Bruce Webster, also known as B-Love, to come down to Texas.  (R. 38: 41-42; R. 37: 97).  After several unsuccessful attempts, Holloway was finally able to locate Webster and bring him to his house where Webster talked with Orlando Hall by telephone.  Holloway took Webster to the home of Webster's girlfriend, Sylvia Henry, and told him that he would pick him up the following morning and take him to the airport. (R. 39: 107-114).

On Saturday, September 24, 1994, Holloway drove Webster to the airport in Little Rock, Arkansas.  (R. 39: 114-115).  Webster took a flight from Little Rock to Love Field Airport in Dallas on a flight arranged by O. Hall.  (R. 39: 113-114).  That same morning, Beckley picked Webster up at Love Field.  (R. 38: 42).  O. Hall, Beckley, Webster and D. Hall then met at the Wilson World Hotel.  (R. 38: 44; 37: 98).  The four of them dressed in camouflage clothing and went back to the Polo Run Apartments in Arlington, stopping to purchase beer on the way.  They waited in the parking lot watching for Stan and Ebay, leaving once to get more beer and to get some gas in a anti-freeze jug.  At one point, the Eldorado Cadillac stopped running. By the time they were able to get the car restarted, it was dark, and the four codefendants left the car running while they went to the apartment that had been identified by D. Hall the previous evening.  O.

Hall and Webster each had a handgun.  D. Hall had a small souvenir baseball bat, and Beckley had duct tape and the jug of gasoline.  (R. 38: 45-57; R. 37: 99-107).

Once at the apartment, Webster and D. Hall went to the front door and knocked while O. Hall and Beckley stayed back.  Webster tried to kick the front door in, and when he was unsuccessful, he and D. Hall went around to the sliding glass door on the patio.  D. Hall saw Lisa Rene on the telephone, and Webster shouted to her that they were the FBI.  Webster pointed his gun at the window, and D. Hall then smashed the sliding glass door with the bat he was carrying. Webster went into the apartment, tackled Lisa Rene and drug her out of the apartment and into the running car.  (R. 38: 57-60; R. 37: 107-113).

As they left the apartment complex, Hall was driving, Beckley was in the passenger side, D. Hall was in one back seat and Webster was in the other back seat, holding Lisa Rene on the floor between his legs.  (R. 37: 113).  They drove the Cadillac back to Cassandra Ross's apartment in Irving where they changed clothes and transferred Lisa Rene to Beckley's car.  O. Hall, Webster and Beckley took Lisa Rene out in Beckley's car to try to find a secluded place. During this drive, Hall raped Lisa Rene and made her preform oral sex on him.  After they were unable to find a secluded place, they drove back to the Wilson World Hotel.  Beckley and Webster cleaned their room while O. Hall kept Lisa Rene in the car.  They then drove back to the Ross apartment in Irving. (R. 38: 65-70).

Once back at the Ross apartment, O. Hall told Beckley to drive Lisa Rene to Pine Bluff and told D. Hall and Webster to go with them.  (R. 38: 69-72; R. 37: 119-120).  Near downtown Dallas, Webster raped Lisa Rene in the back seat of the car.  (R. 38: 73; R. 37: 121).  On the way to Pine Bluff, Webster and D. Hall switched places in the car, and D. Hall raped Lisa Rene.  (R.

38: 74-75; R. 37: 123-126).

When Beckley, Webster and D. Hall arrived at Pine Bluff at approximately 4:00 a.m or 5:00 a.m. on Sunday, September 25, 1994, they went to Holloway's house.  Webster told Holloway that O. Hall would tell him all about what had happened.  Holloway gave Webster some money for a motel room, and Beckley, Webster and D. Hall checked into the Pine Bluff Motel.  (R. 39: 115-117; R. 37: 127-128).  In the motel, Beckley raped Lisa Rene.  (R. 38: 77).

That same morning, Holloway and his wife picked up O. Hall at the Little Rock airport at 8:00 or 9:00 a.m.  On the way back from the airport, O. Hall explained to Holloway what had happened.  When Holloway asked O. Hall why he had let Webster take the girl, O. Hall said that he did not give a "fuck" about that girl.  When O. Hall and Holloway went to the Hotel room, they went back into the bathroom with Lisa Rene for 15 - 20 minutes.  When they came out, O. Hall said, "She know too much."  O. Hall interrogated her for awhile, and then she was tied to a chair and placed in a closet.  (R. 39: 118-124; R. 38: 79-80).

O. Hall and Holloway then left the motel and took Webster with them to give him a ride to his car.  During the ride, O. Hall told Webster that they needed to kill Lisa and find a place to get rid of her.  (R. 39: 125).  Webster responded that he knew plenty of places where they could kill her.  (R. 39: 124-126).  Hall and Webster also discussed methods of killing Lisa, including beating her to death, choking her, or shooting her.  (R. 39: 125-126).  That same afternoon, approximately 4:00 or 5:00 p.m., Webster picked up O. Hall at Holloway's house.   While he was waiting for Hall, Webster asked Holloway whether Hall was getting "shady," which means was he getting nervous.  (R. 39: 127-128).  Webster told Holloway that they had gotten him into all of this stuff and that "we're going to go on and do this, and it don't matter if it's kids or anybody,

you know, it don't matter." (R. 39: 128). Approximately an hour to an hour and a half later, O. Hall and Webster returned to Holloway's house, and O. Hall told Holloway that they had dug a grave. (R. 39: 127-128, 156). Later that same evening, O. Hall, Webster and Beckley took Lisa Rene to the grave they had dug earlier at Byrd Lake Park, but were unable to find the grave in the dark. (R. 38: 82-93; R. 39: 129-130).

That evening D. Hall and Beckley had to move Lisa Rene to another motel because they were afraid that the security guard at the Pine Bluff Motel was suspicious. (R. 38: ; R. 26: 204-206). At approximately 1:00 a.m. on Monday, September 26th, Beckley rented a room at the Townhouse Motel. Lisa Rene was tied to a chair and placed in the bathroom at this hotel. O. Hall and Webster both came to the room after Beckley checked in and made arrangements for O. Hall to page Webster a few hours later. (R. 38: 96-99; R. 37: 147-148).

Early that same morning, Webster came back to the motel room at Townhouse Motel and picked up O. Hall, Beckley and Lisa Rene. O. Hall left instructions for D. Hall to clean the motel room. Hall, Webster, and Beckley took Lisa Rene back to Byrd Lake Park. (R. 38: 99-100; R. 37: 150-157). At the park, O. Hall and Webster led the way toward the grave site. Beckley followed, guiding Lisa Rene by her shoulders. Lisa Rene's eyes were covered by a mask. Webster and Hall walked in front of Beckley and carried shovels and the yellow anti-freeze jug. (R. 38: 100-103).

Once at the grave site, Hall turned Lisa Rene's back toward the grave and put a sheet over her head. Hall then grabbed a shovel and hit Lisa Rene in the head one time. Lisa screamed and started running. O. Hall and Webster yelled for Beckley to grab her. Beckley grabbed Lisa and fell down. Because Lisa was screaming, Hall and Webster both shouted for Beckley to shut Lisa

8

up.  Beckley put his hand over her mouth and told her not to fight.  Beckley then hit her twice in the head and handed the shovel to Hall who then handed the shovel to Webster.  Webster hit her, and then Webster and Hall started taking turns hitting her.  Beckley saw Webster bending over at her head like he was tying something around her head.  Webster tried to get Beckley to drag Lisa into the grave, but Beckley could not.  Webster pulled Lisa into the grave and stripped her of her clothing.  Beckley started shoveling, but Webster did not think Beckley was shoveling fast enough, so he started shoveling.  Hall told Beckley to go back to the car and keep watch.  Beckley waited near the car for 10 to 15 minutes and then heard sirens.  When Beckley went back to the grave, Hall and Webster were finished shoveling.  (R. 38: 104-108)

O. Hall, Webster and Beckley then went back to the motel and picked up D. Hall.  Later that week, O. Hall told Beckley and D. Hall what to say if they got arrested.  At O. Hall's instruction, D. Hall and Beckley went to El Dorado, Arkansas where D. Hall and Beckley were arrested later that week.  (R. 38: 108-111; R. 37: 152-154).

The government also presented the testimony of Lisa Rene's brother, Stanfield Vitalis, to show that Vitalis and his brother Neil Rene had, in fact, stolen $4700 from O. Hall in a marijuana deal on September 23, 1994.  (R. 38: 201-219).  The government presented numerous physical exhibits to corroborate the testimony of Beckley and D. Hall, including receipts from the Wilson World Hotel (GE 20); airline tickets reflecting the flights taken by O. Hall and Webster (GE 40, 41-A, 41-B); and receipts reflecting cash receipts for the ammo, masks, gloves, tape and rope purchased by Beckley and D. Hall the two days before the kidnapping of Lisa Rene (GE 43, 44, 45, 46).  The government presented the security videotape and still photograph of the Texaco station next to the Polo Run Apartments where Webster and O. Hall can be seen dressed in

9

camouflage and buying beer the day that Lisa Rene was kidnaped.  (GE 23-A, 23-B).

The government also presented testimony from various FBI lab technicians corroborating the testimony of Beckley and D. Hall.  Specifically, the government showed that glass embedded in a small souvenir baseball bat found at the Ross residence in Irving was from the same glass as samples taken from the patio where Lisa Rene was abducted.   (R. 39: 210-214).  The government presented testimony proving that synthetic fibers found in Beckley's car and at the Townhouse Motel matched the synthetic hair extensions Lisa Rene was wearing.  (R. 39: 201-209).

The government also presented the statement of Webster taken by Arlington Detective John Stanton and FBI Agent Garrett Floyd.  (R. 39: 40-56; GE 88).

**b. Punishment Phase**

Government's Case-in-Chief

After the jury returned a guilty verdict on counts one, two, three and six of the superseding indictment, a separate punishment hearing was held before the jury.  At the punishment hearing, the government presented the penitentiary records (pen packet) of Webster to show that on March 7, 1989, Webster was placed on probation for burglary in cause number CR-88-695-1, in Jefferson County, Arkansas.  The pen packet showed that Webster's probation for that offense was revoked on July 21, 1989, and Webster was sentenced to six years imprisonment.  Also, on July 21, 1989, Webster was sentenced to two concurrent six year sentences for a conviction for felon in possession of a firearm that occurred on May 23, 1989, cause number CR-89-329-1, Jefferson County, Arkansas, and for a conviction for interference with a law enforcement officer that occurred May 5, 1989, cause number CR-89-297, Jefferson

County, Arkansas.  (GE 100; R. 42:2-14).

Webster's Pen Packet also showed that he was released on parole from his three sentences on February 21, 1992.  Webster was convicted on October 28, 1992, for another offense of felon in possession of a firearm, cause number CR-92-623.  Webster's parole was revoked and he was returned to prison as a result of this conviction.  Webster was discharged from prison on August 5, 1993.  (GE 100; R. 42: 13-14).

The government presented evidence of Webster's disciplinary records from when he was incarcerated in the Arkansas Department of Corrections.  (GE 101-A, 101-B, 101-C, 101-D).  These records indicate that Webster had numerous incidents of failing to obey orders; battery or provoking a fight; assault; being out of his place of assignment; and taking property.  (GE 101-A; R. 42: 95-96).  These records also show that Webster's father, Willie Webster, was one of Webster's visitors.  (GE 101-D; R. 42: 99).  Webster worked on the hoe crew, had kitchen assignment, went to school in the afternoons, completed substance abuse treatment programs and made written requests for services in his own handwriting.  (R. 42: 97-99; GE 101-D, 101-C).

The government presented Webster's probation records.  These records showed that Webster was placed on probation for burglary on March 6, 1989.  Webster reported to his probation officer in April, May and June, 1989.  On May 12, 1989, a violation report was filed based upon the new offense of interference with a law enforcement officer and felony assault of a police officer.  A second violation report was filed on May 24, 1989, based upon an aggravated armed robbery offense.  Webster failed to appear at his revocation hearing.  On July 21, 1989, Webster's probation was revoked and he was sentenced to eight years imprisonment.  (R. 42: 103-112; GE 104).

11

During the punishment phase hearing, the government presented testimony concerning Webster's history for abusing women.  Sylvia Henry testified that she was Bruce Webster's girlfriend beginning in the spring of 1994, and that she had a child by Webster as a result of that relationship. Henry was two months pregnant with Webster's child during September 1994. While she dated Webster, he did not have a regular job but was making money from selling cocaine and marijuana supplied by O. Hall.  (R. 42: 35-38; 48-49).  Henry testified that Webster was violent to her on several occasions.  The first time was when Webster slapped her across the face when another man gave Henry a ride home.  Another incident was when Webster pushed Henry in the Duck Inn Club in Pine Bluff.  Henry testified that after she and Webster left the club, Webster pushed her down and kicked her in the back.  As Henry was trying to drive away in her car, Webster followed her in his car to a traffic light.  When Henry stopped her car, Webster kicked her window in.  Henry tried to drive off, but Webster followed her in his car and ran her into a ditch.  Webster then put Henry in his car, drove her to her home and tied Henry to the bed.  (R. 42: 49-54).

Henry also corroborated Marvin Holloway's testimony that Webster had gone to Kansas City when O. Hall had called and asked Marvin to send Webster to Texas.  Henry testified that the day after Webster had gone to Texas in September 1994, Webster and Holloway returned to Henry's Apartment.  Webster was proud and bragging about how they had "taken care of business."  Webster told Henry that the gold Gucci chain and necklace were his reward from O. Hall for taking care of business.  (R. 42: 38-43).  Webster left in the middle of the night, and the next day, Henry saw Webster with mud on his boots and pants.  (R. 42: 44-46).

During their relationship, Webster had told Henry that he was a member of the Folks

Gang.  Henry testified that she never heard Webster talk poorly about his parents and that his parents seemed to treat Webster the way normal parents treat a child..  (R. 42: 47, 57, 61).

Tlisa Booth testified that, in the summer of 1994, she was a student at the University of Arkansas, Pine Bluff, and was living with O. Hall's girlfriend, Lashonte Dones.  One evening during that summer, Webster was at Booth and Dones' apartment and helped himself to a peppermint stick without asking.  When Booth asked Webster why he was messing with something that was not his, Webster pushed Booth.  Booth and Webster then got into a shoving match, and Webster had to be forcibly removed from the apartment by his friends.  Webster cursed and screamed at Booth and told her if he ever saw her again he would kill her.  (R. 42: 19-24).  Booth also testified that a few weeks after that incident, she saw Webster slapping a women around in the Duck Inn Club in Pine Bluff.  (R. 42: 25-28).

Ray Smith, a disciplinary officer with the Arkansas Department of Corrections who also worked as a security guard at the Duck Inn Club, corroborated the testimony of both Sylvia Henry and Tlisa Booth.  Smith saw Webster knock Henry to the floor in the club, and he escorted Webster out of the club.  Later, when Sylvia Henry left, Smith followed her out to the parking lot.  By the time Smith got out to the parking lot, Webster was kicking Henry.  (R. 42: 78-81).

The government presented the testimony of Lance Lawhon who transported Webster to the jail in Hot Springs Arkansas on September 30, 1994.  Lawhon testified that during the trip, Webster was complaining about being in pain from a venereal disease he had contracted.  Referring to the woman from whom he had contracted the disease, Webster stated, "If I was out now, I'd kill the bitch."  (R. 42: 84-86).

FBI Agent Garrett Floyd testified during the punishment phase hearing that while he was

13

transporting Webster back to Texas, Webster told Floyd that the killing of Lisa Rene was not personal, but was strictly business. During the different times that he was in Floyd's custody, Webster also told Floyd that he was a member of the Folk gang and that there could be three or four bodies buried in Byrd Lake Park. Webster told Floyd that they chose Byrd Lake Park because it was quiet, isolated and secluded. (R. 42: 119-125). During cross examination, Floyd testified that Webster had told him that he had brought the Folk gang from Chicago to Pine Bluff. Webster bragged to Floyd that he had had sex with more than 235 women. (R. 42: 132).

Arkansas State Trooper Maxie Thomas testified about an incident where Webster and several other individuals assaulted Thomas and his family in a park on May 5, 1989. Thomas testified that on that date, Webster and the other individuals had taken a baseball cap from Thomas's son. When Thomas approached the group and tried to get his son's cap back, Webster jumped Thomas and held him while another individual (Goldman) punched Thomas. (R. 42: 135-139). This fight continued until the Pine Bluff police arrived and Webster and Goldman were arrested. Thomas was hit several times by Goldman and Webster. At the police station, Webster told Thomas that he was a member of the Folk gang and that their symbol was a five-point star. Webster was wearing two necklaces, each with a five-point star. (R. 42: 139-147).

Mohamed Ghene testified that he was a Pakistani citizen who during the summer of 1989 lived in Pine Bluff and operated a clothing store. In July, 1989, two men came into Ghene's store and picked out approximately $150.00 worth of merchandise. They placed the merchandise on the counter and gave Ghene $50.00, saying that was all the money they had. One of the men leaned over the counter, looked, and told the other man to "do it." Ghene could see in a mirror behind the two men that the man leaning over the counter was reaching for what appeared to a

14

stainless steel pistol in the rear waist of his pants.  Ghene pulled out a BB pistol and told the two men to leave the store.  After they left, Ghene went outside and saw the two men standing across the road.  One of the men pulled out the pistol and fired a shot at Ghene.  (R. 42: 158-152).

Ghene reported this incident to the police.  The case was never prosecuted, because after reporting the incident, Ghene returned to Pakistan after he was repeatedly harassed.  (R. 42: 154, 160).  Although Ghene could not identify Webster at the time of the present trial, Pine Bluff Detective Rick Pritzen testified that Ghene identified Webster in a photo line-up the day after the incident.  (R. 42: 164).

During its case-in-chief during the punishment phase, the government proved up an incident where Webster, while he was incarcerated and awaiting trial on the present case, escaped from his area of the jail into the women's area of the jail.  The testimony showed that Webster had waited until all the cells in his area had been unlocked between 4:00 and 4:30 a.m. to allow another inmate to get ready to go to court.  Webster left his cell, then used a wire to unlatch a food chute.  Webster squeezed through the food chute and then made his way into the women's shower area where he was discovered.  (R. 42: 175-190, 200-207).

The government also presented the testimony of Agnes Rene, Lisa Rene's mother.  She testified that Lisa had come to live in Arlington with Lisa's sister Pearl Rene after hurricane Hugo closed all the schools.  Mrs. Rene testified that Lisa was an honor student and active in her church youth group.  Mrs. Rene described the loss she and her family's suffered as a result of the death of Lisa.  The victim impact statements of Mrs. and Mr. Rene and the Josephat family were introduced through Mrs. Rene.  (R. 42: 215-224; GE 106-A, 106-B, 106-C).

15

<u>Webster's Case-in-Chief</u>

Webster presented evidence to show that he had been severely abused as a child and that he suffered from mental retardation.  Webster presented testimony from his brothers, Mark and Tony Webster, and his sisters, Future Webster Rayford and Dorothy McKelvy, that all of the Webster children suffered severe physical and sexual abuse from their father, Willie Webster. (R. 43: 2-22;  34-43; 53-59).  These witnesses testified that the Webster children, including the defendant Webster, were beaten by Willie Webster with garden hoses, fan belts and other items. (R. 43: 8; 55; 109).  Willie Webster would make the siblings hold each other while he was beating them.  (R. 43: 10).  The Webster siblings also testified that Willie Webster made them perform degrading acts such as eating urine or pig slop, performing sexual acts on each other, and making prank sexual telephone calls to their aunt.  (R. 43: 12-13; 36-40; 55-59).  The witnesses also testified to several incidents where Willie Webster threatened family members with a firearm and actually fired shots to scare the family members.  (R. 43: 56, 110, 123). Webster's aunt and mother corroborated the testimony of Webster's brothers and sisters.  (R. 43: 120; 131).

Dr. Raymond Finn, a clinical psychologist, testified that he first examined Webster in January of 1995.  (R. 43: 177).  Finn testified that Webster scored a full scale IQ of 59 on the first test administered by Dr. Finn.  (R. 43: 187).  Webster was tested again by Dr. Finn the Sunday before trial, and Webster scored a full scale IQ of 65.  (R. 43: 192).  Dr. Finn testified that, in his opinion, Webster was mildly retarded or in what is called the educable range of mentally retarded.  (R. 43: 196).

Dr. Finn admitted on cross examination that he did not perform an adaptive skills

16

assessment of Webster.  (R. 43: 228-29).  Also during cross examination, Dr. Finn testified that he examined Webster for competency to stand trial and for mental illness.  (R. 43: 205-206).  Dr. Finn found that Webster was competent to stand trial, that is, Webster had some appreciation of having been charged with a crime, and he could assist his attorneys in his defense.  (R. 43: 206-207).  None of the doctors who examined Webster found that he was incompetent or that he suffered from a mental illness.  (R. 43: 209).  Dr. Finn testified that his examination of Webster also included whether there were, "any other kinds of emotional or psychological problems . . . that would have any kind of bearing on why they did what they did or how culpable they would be for their behavior."  (R. 43: 209).  Dr. Finn also admitted that Webster either had or probably had at least six of the seven criteria "A" for anti-social personality disorder specified in DSM IV.  (R. 43: 219-221).

Webster presented the testimony of Dr. Denis Keyes, a certified school psychologist, a Ph.D. in special education, and a professor of special education at the College of Charleston.  (R. 44: 2-6).  Keyes testified that the definition of mental retardation is a significantly sub-average intellectual functioning and a deficit in adaptive functioning.  The difference between a mentally retarded person and a person with low intellectual functioning is the presence of deficits in adaptive skills in a mentally retarded person.  (R. 44: 9).  Without both a low IQ and a deficit in adaptive skills, a person is not mentally retarded.  Dr. Keyes testified that the definition for mental retardation has changed over the years.  According to the American Association on Mental Retardation, an IQ of between 75 and 50 would be considered mildly mentally retarded or what is now referred to as a person needing intermittent support levels.  (R. 44: 13).

Dr. Keyes administered a Stanford Binet IQ test to Webster, on which Webster made a

composite score of 51.  (R. 44: 20).  Dr. Keyes also administered a standard achievement test, on which Webster performed better than Dr. Keyes expected.  As a result, Dr. Keyes performed another IQ test, the Kaufman test, and Webster scored almost exactly the same as he did on the Stanford Binet.  Keyes testified that, based upon these results, "any question of malingering was thrown out the window."  (R. 44: 28-31).

Regarding adaptive skills, Dr. Keyes used what is called a "Vineland" adaptive skills scale that uses a scoring system for determining adaptive skills.  Dr. Keyes interviewed family members, family friends, school counselors, teachers and principals. Dr. Keyes came up with two "composite scores" on the Vineland scale using these interviews.  He admitted that he used a technique called "convergent validation," that is, when interviewing these various people, "You find the information that people give you that is most consistent.  If the information is inconsistent, you drop those people."  (R. 44:42).  Dr. Keyes also admitted that he did not interview the jailors in completing the Vineland based upon the reasoning that because the onset of mental retardation must occur before age 18, and Webster was older than 18 at the time he was incarcerated awaiting the trial of this case, Webster's conduct in jail would not have made any difference in Dr. Keye's adaptive skills analysis.  (R. 44: 39).

Based upon Webster's IQ scores and his adaptive skills scores, Dr. Keyes was of the opinion that Webster was mentally retarded.  (R. 44: 47).  On cross examination, Dr. Keyes admitted that he marked some questions "DK," standing for "don't know" for activities such as addressing envelopes.  He gave Webster scores of "0" for such activities as setting the table, preparing food and making his bed.  (R. 44: 73-75).  Dr. Keyes also gave Webster a score of "DK" for keeping secrets or confidences for more than one day despite knowing that Webster

had lied to the police about his involvement in the kidnapping and murder of Lisa Rene. (R. 44: 76).

On redirect examination, Dr. Keyes also testified that Webster would be able to function normally in an institutional setting like a prison or a mental institution. (R. 44: 85). During examination by the district court, Dr. Keyes testified that he did not think it was likely that Webster made the decision to grab Lisa Rene. He testified he did not think Webster could carry on a high level conversation or could read a text and understand everything he reads. Dr. Keyes testified that while he believes Webster has some organic retardation, he believes that Webster's formal diagnosis would be primary non-organic retardation. (R. 44: 111).

Dr. Robert Leroy Fulbright, a clinical neuropsychologist, testified that on March 19, 1996, he gave Webster a battery of tests. Based upon the results of these tests, Dr. Fulbright testified that Webster had significant impairment in his attention capacity. Webster's thinking was extremely concrete. The fact that Webster's left hand motor functioning was consistently lower than his right hand indicated some right hemisphere impairment. Dr. Fulbright testified that the results of the tests indicated Webster was either mentally retarded or severely brain damaged, and that Webster's entire presentation was consistent with mildly or moderately mentally retarded. Dr. Fulbright testified that Webster could not reason, think or plan; Webster is not able to monitor the output of what he says; and his ability to understand is quite limited. (R. 44: 120-150). Dr. Fulbright admitted on cross examination that he did not interview any jailors or family members before conducting his tests. (R. 44: 152). Dr. Fulbright admitted that his battery of tests would be easy to either fake or to do poorly by simply just not trying. (R. 44: 154-155). Also, the cross examination of Dr. Fulbright established that three of the four factors

19

for suspicions of malingering listed in the DSM IV were present in Webster's case.  (R. 44: 158-160).

Dr. Mark Cunningham, a clinical and forensic psychologist, testified that he examined Webster on May 7, 1996.  Dr. Cunningham diagnosed Webster with several psychological disorders, in particular; 1) mild variety mental retardation; 2) anti-social personality disorder; and 3) personality disorder not otherwise specified, involving both narcissistic and dependant features.  (R. 44: 188-89).  Dr. Cunningham testified that abused and neglected children are significantly more likely to display anti-social behavior and receive a diagnosis of anti-social personality disorder.  (R. 44: 189-190).

On cross examination, Dr. Cunningham testified that Webster told him during his interview that he remained at the car in Byrd Lake Park when Lisa was killed.  He thought that Webster showed a sense of regret but not a sense of remorse or acceptance of the wrongdoing.

Government's Rebuttal

In rebuttal, the government called Highway Patrolman Charles McLemore with the Arkansas State Police to prove that on June 15, 1992, Webster scored a 96 percent on the multiple choice portion of his driver's license examination and a 70 percent on the signs portion of the exam.  McLemore testified that there were three versions of the test and that the version that is actually given is selected at the time the person takes the test.  In order to cheat by receiving the answers to the test beforehand, a person would have to memorize 75 multiple choice questions and 30 road signs.  (R. 44: 225-232; GE 95).

Gene Stewart testified that he was the principal of Watson Chappel High School and previously the principal of Watson Chapel Junior High School.  Prior to that, Stewart was a

20

school counselor. Stewart had a bachelor's degree in school counseling and had contact on numerous occasions with retarded and mildly retarded students. Mr. Stewart identified Webster as a student he had supervised at Watson Chappel Junior High School. He testified that Webster was not retarded, had not been assigned to special education classes, and that there was no reason to assign him to social education classes. He testified that Dr. Keyes had come to talk to him briefly in Pine Bluff. After they spoke for a few minutes, Dr. Keyes closed his book and said that Stewart had not given him any information that would be helpful. (R. 44: 236-39).

Rick McLaughlin testified that he was the principal and former assistant principal at Watson Chappel Jr. High. He identified Webster as one of the students he formerly supervised and testified that Webster always came to school nicely dressed. Mr. McLaughlin testified that he never noticed anything that would have indicated that Webster was mentally retarded. When Dr. Keyes visited with McLaughlin, Dr. Keyes told McLaughlin that he was trying to gather information to keep Webster from being put to death. (R. 44: 243-250).

Greg Barber was a parole officer for the State of Arkansas who supervised Webster. Barber testified that Webster appeared to understand the rules and conditions of his parole. Webster filled out his monthly reports. Webster reported to Barber that he was going to Southeast Arkansas Mental Health Clinic, but there were no specific problems noted in Webster's file. Barber testified that in the spring of 1996, Dr. Keyes met with Barber in Barber's office. At that time Dr. Keyes told Barber that Webster was mildly retarded and lectured Barber that Webster should not be executed. When Barber told Dr. Keyes that Webster never acted retarded, Dr. Keyes told Barber that he would not be able to help him and left. (R. 45: 15-28; GE 102-A, 102-B, 102-C, 102-D).

21

Pat Drewett was Webster's ninth grade civics teacher at Watson Chapel Junior High School. Her class was not a special education class.  Webster slept a lot in her class.  He dressed nicely and wore lots of gold jewelry, bracelets and necklaces.  In her opinion, Webster was not mentally retarded.  Had she thought that he was, she would have recommended him for special education classes.  (R. 45: 34-38).

Linda Monk was Webster's ninth grade basic English teacher at Watson Chapel Jr. High School.  She testified that, "For a student in a basic class, he seemed like one of the brighter ones, although his grade did not reflect that." (R. 45: 43).  Webster slept a lot the first 9 weeks of class but seemed to pay more attention the second nine weeks.  Webster did not have any problems communicating and seemed mature for his age.  Ms. Monk testified that she has had contact with many mildly mentally retarded or borderline retarded students and that several of her students each year are classified as mildly or borderline retarded.  In her opinion, Webster was not borderline or mildly mentally retarded.  She felt like he did not excel because he just did not try.  The other students were afraid of him.  Webster wore a lot of jewelry.  Also, in her opinion, Webster was quite a bit brighter than his brother Tony, who she also taught. (R. 45: 42-47, 50).

E.C. Turner testified that he was a school counselor for 23 years, 13 at Watson Chapel Jr. High.  As a part of his duties, he administered achievement tests called M.A.T. 6 Surveys on a regular basis to seventh graders.  Based upon these test scores, a determination can be made whether a student should be enrolled in special education classes.  During his career, Turner diagnosed or came into contact on many occasions with mildly or moderately mentally retarded students.  He had no indication that Webster was suffering from mental retardation.  Webster's M.A.T. 6 Survey was in the 43rd percentile, placing Webster in the low average at Watson

Chapel.  Webster definitely would not have qualified for special education classes.  (R. 45: 52-59; GE 98-A).

Marcus Hollien testified that, in June 1992, he was a supervisor in a work program for teenagers known as the C.E.T.A. program in which Webster was working.  Hollien testified that he saw nothing that would indicate that Webster was retarded, and Webster was the individual that others followed.  Hollien's evaluation of Webster stated that, "Bruce is a very intelligent individual with good characteristics but needs to get self discipline."  (R. 45: 65-71; GE 99).

Tom McHan, a cabinet builder and a general contractor in Pine Bluff, testified that Webster worked clean up for him for a couple of days.  During that time, Webster would stay out late and would come in and sleep in one of McHan's buildings.  McHan fired Webster for sleeping on the job.  McHan was aware that Webster was a member of the Folks Gang.  (R. 45: 74-81).

The government introduced a letter written by Webster to fellow inmate John Clay on April 14, 1996, and a letter written by Webster to Marvin Holloway just a few weeks before Webster's trial.  (GE 121-A; 132-A).  In the letter written to John Clay, Webster asked for Clay's assistance in a plan to have sex with female jail inmates during visiting hours.  In the letter, Webster describes to Clay a plan whereby Clay will give Webster the names of some of the women Clay knew who were in custody and the names of some people not in custody that Webster could put on his visitation list.  The plan was for visitors to come into the jail and ask to visit Webster, Clay and some women inmates at the same time.  Webster told Clay in the letter that he could keep a watch for Clay, and then Clay could keep a watch for Webster.  (R. 45: 85-97; GE 121-A).  In the letter to Holloway, Webster talks in slang about how everyone knew that

23

he would "put in work" on someone, that is, that he was not afraid to shoot someone. (R. 45: 115; GE 132-A).

B.J. Valdez, the same jailer who had testified about Webster escaping into the women's area of the jail, testified that he had seen Webster reading newspapers and postcards and that on one occasion, Webster read a newspaper story out loud to Valdez over the intercom. Webster also managed his own commissary account and complained once when he had been short-changed. (R. 45: 122-125).

Luther Alexander, another detention officer, testified that he saw Webster in the law library of the jail almost everyday, and he saw Webster reading and taking notes from the law books. Once Webster when an oral complaint, Alexander told him to fill out a complaint slip. Webster responded that he could not because his attorney had told him not to fill out any more complaint slips. Before that time, Webster had been prolific in his written requests. (R. 45: 128-131).

Mansfield Correction Officer Debra Harrison also testified that she had observed Webster reading, that Webster had given her a request form for a book, and that Webster talked to her about being short-changed in the commissary. Once when the government psychiatrist had come to visit Webster, Harrison came to call for someone to take Webster back to his cell. She observed Webster sitting in the middle of the floor, staring at the ceiling. When Webster saw her he smiled. (R. 45: 136-140).

Mansfield Correction Officer Richard Saenz testified that he observed Webster in the law library, reading, taking notes and helping other inmates. Saenz testified that on June 29, 1995, Webster faked a seizure because he wanted to talk to someone. Webster admitted to Saenz that

he had snuck into the women's area of the jail. Saenz testified that if Webster were denied television access, he would become very agitated, and on one occasion he threatened to kill Saenz if he could get a hold of him. (R. 45: 142-149).

The government introduced the numerous written request forms and complaint forms made by Webster while he was incarcerated in the Mansfield Law Enforcement Center awaiting trial. (R. 46: 23-33; GE 117-B, 117-C, 117-D, 117-E, 117-F, 117-H, 117-J). The defense stipulated that these requests and complaints (GE 117-B, 117-C, 117-D, 117-E, 117-F, 117-H, 117-J) and the letters to John Clay and Marvin Holloway (GE 121-A, 132-A) were in Webster's handwriting. (R. 46: 39-41).

In rebuttal, the government presented the testimony of Dr. George Parker, a psychologist, who testified that he was employed by the government to evaluate Webster. In Parker's opinion Webster was not mentally retarded. (R. 46: 43-48). Webster scored a 72 on the Wechsler adult IQ test. (R. 46: 49). However, consistent with the other experts' testimony, Parker testified that there were two main criteria to determining whether an individual is mentally retarded: first, a low IQ score, and second, a deficit in adoptive functioning. Dr. Parker testified that usually the adoptive skills evaluation is done with an instrument that involves behavior ratings, such as a Vineland adaptive skills scale. However, a Vineland scale in a situation such as Webster's is inappropriate and would lead to data that are possibly somewhere between misleading and false. (R. 46: 54-56).

Dr. Parker observed inconsistencies between Webster's behavior and what Dr. Keyes reported on his Vineland. Dr. Keyes marked the Vineland scale "don't know" for the category "speaks in complete sentences." Dr. Parker observed that Webster spoke in full sentences. Dr.

Keyes scored a "1" for the category "reads simple stories," and a "0" for the category "reads on own initiative." Dr. Parker observed that Webster could read simple stories and did, in fact, read on his own initiative. Dr. Keyes also marked "don't know" for the category "addresses envelope," whereas Dr. Parker observed envelopes that were addressed by Webster. Dr. Keyes scored "0s" for the categories, "puts clean clothes away," and, "makes own bed," whereas Dr. Parker observed that Webster kept his cell neat and his bed was neatly made. (R. 46: 57-59). Dr. Parker testified that teachers were probably in the best position to determine how a student is functioning and whether the student needs special education help. He testified that the letters written by Webster were certainly not indicative of someone who was mentally retarded. (R. 46: 63). Parker testified that what he observed of Webster was not consistent with Fulbright's results. Webster's statements to the law enforcement officers were not consistent with mental retardation. Parker administered Webster a test used to determine competency to stand trial and Webster got 100 percent of the questions correct. Webster was competent to stand trial and knew right from wrong. (R. 46: 62, 67-69).

On cross examination, Parker admitted he was not certified by MHMR for doing mental retardation assessments. He admitted he did not give all of the subtests of the Weschler IQ test and that he prorated the tests he had given to arrive at his estimated score of 72. (R. 46: 71-77). However, on redirect, Parker testified that it was common to prorate IQ test scores and regardless of Webster's score, he would not change his opinion that Webster was not mentally retarded. (R. 46: 101-104).

The government also presented the testimony of Dr. Richard Coons, a forensic psychiatrist of 22 years. He was familiar with the criteria set forth in the DSM IV for mental

retardation, and his assessment in criminal cases had from time to time included a determination of whether someone was retarded. (R. 46: 112-119). In March, 1996, Dr. Coons examined Webster along with Dr. Parker. Dr. Coons interviewed Webster at length. Webster was good at recalling sequential history. Webster lied about being in special education classes all through school. Webster's cell was neat and tidy and well organized. Dr. Coons saw books, mail and newspapers in the cell. Webster told Dr. Coons that he had escaped into the women's area four or five times before he was caught. Dr. Coons also interviewed Gary Cardinale, B.J. Valdez, and Debra Harrison. Dr. Coons testified that he saw no deficiencies in Webster's adaptive skills, and that adaptive skills is the more important of the two criteria for mental retardation. In Dr. Coons's opinion, Webster was not mentally retarded. (R. 46: 120-145).

Dr. Coons also reviewed statements made by Webster to the FBI agents such as "the killing of Lisa Rene was strictly business." Based upon those statements, a review of the documentation from the Southeast Arkansas Mental Health Clinic, the findings and evaluations of all the experts and the facts that had been related to the jury, Dr. Coons's opinion was that he would not disagree with the diagnosis that Webster was an antisocial personality disorder. Based upon these factors, the fact that Webster had a history of violence, and the fact that Webster had admitted to Dr. Coons that he was a gang member, Dr. Coons's opinion was that Webster would continue to be a danger in the penitentiary. (R. 46: 155-159).

Defendant's Surrebuttal

On surrebuttal, Webster presented the testimony of two investigators to show that E.C. Turner, Pat Drewett and Greg Barber had all stated in their interviews that they thought Webster was more of a follower than a leader and that he was easily influenced. (R. 46: 191-198).

Webster presented the testimony of Dr. George Denkowski, a psychologist certified by MHMR to do mental retardation testing, to testify that Dr. Parker improperly prorated his IQ test, and, therefore, Dr. Parker's tests were clinically invalid.  (R. 46: 201-206).