UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
-------------------------------------------------------

BRUCE CARNEIL WEBSTER,

                        :

          Petitioner,

                        :       CAUSE NO: 2:12-CV-0086-WTL-WGH

       vs.

                        :

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,    :
TERRE HAUTE (USP),

                        :

          Respondent.
-------------------------------------------------------

## PETITIONER'S REPLY TO
## RESPONDENT'S RETURN TO ORDER TO SHOW CAUSE


## <u>THIS IS A DEATH PENALTY CASE</u>


Eric K. Koselke, # 5593-54
6202 N. College Avenue
Indianapolis, IN 46220
Telephone:  (317) 722-2591
Facsimile:  (317) 257-5300

Steven J. Wells
Kirsten E. Schubert
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402
(612) 340-2600


*Attorneys for Petitioner Bruce Webster*

Mr. Webster seeks to present for the first time significant new evidence that he is mentally retarded and therefore categorically ineligible for execution under the Eighth Amendment. If considered, this evidence – primarily the results of examinations by government doctors and psychologists from before the time of his arrest – proves that executing Mr. Webster would be in direct violation of the Constitution. This evidence remained buried in government files for sixteen years, and, despite a request by Mr. Webster's trial counsel and a motion for discovery by his 2255 counsel, was only recently released by the Social Security Administration ("SSA"). The remedies provided in 28 U.S.C. § 2255 are plainly "ineffective" within the meaning of 28 U.S.C. § 2255(e) with respect to the circumstances presented here. As the Fifth Circuit has held, there is no mechanism under § 2255 to right the Constitutional wrong – the execution of a mentally retarded person – that Mr. Webster faces in this case. The writ of habeas corpus guaranteed in 28 U.S.C. § 2241 has been reserved for the rare circumstance where a fundamental injustice will result absent judicial intervention. This is that rare case.

The Government's response to Mr. Webster's Petition for Writ of Habeas Corpus ("Petition") is meritless. First, it argues that § 2241 does not provide a mechanism to address *any* evidence of a categorical exclusion – here, mental retardation – discovered after an initial § 2255 proceeding, no matter how conclusive the evidence. In essence, the Government argues that it doesn't matter if the new evidence proves beyond any doubt that Mr. Webster is mentally retarded. That argument misconstrues and misstates Seventh Circuit precedent and would eliminate the very purpose of § 2241 – to provide a means to redress a fundamental deprivation of constitutional rights where § 2255 proves ineffective. Further, the Government's argument would result in a suspension of the writ. It is not the law of this land, as the Government argues, that the courts must countenance an unconstitutional execution because their hands have been

tied by the Antiterrorism and Effective Death Penalty Act ("AEDPA"); that is why § 2241 remains in force *despite* AEDPA.

The Government further contends that the newly discovered evidence is neither "newly discovered" nor particularly significant. These arguments have no basis in fact and represent a complete about-face from the Government's case at trial, where it hotly contested the credibility of post-crime evaluations of mental retardation.

The Government would like to portray Mr. Webster's motion as a "simple" attempt to "add" new facts to a "prior claim," (Resp.'s Return to Order to Show Cause ("Gov't Mem.") 11), in the hope of denying him a judicial forum. But that is not this case. Mr. Webster is mentally retarded. He has now obtained powerful, pre-crime, government-generated evidence that not only establishes this intellectual disability but also refutes every argument the prosecution relied on to convince the jury and the courts otherwise. This is a unique and troubling case. Section 2241 is the only mechanism available to prevent the "Kafka-esque" imposition of the death penalty in this case. Mr. Webster respectfully requests that his Petition be granted. [1]

## I. THE PREVIOUSLY UNRELEASED EVIDENCE PROVES THAT BRUCE WEBSTER IS MENTALLY RETARDED

One in three jurors at Bruce Webster's trial were persuaded that Mr. Webster is or may be mentally retarded, despite the prosecution's allegations that Mr. Webster "manipulated" his IQ scores, lied about being in special education classes, and lived a fully functional life writing letters and making his bed behind prison walls. The new evidence presented here coupled with the strong evidence presented at trial proves that Mr. Webster is, in fact, mentally retarded. Not only is this evidence unquestionably "probative" and "significant" to the question of whether Mr.

---

[1] The Government is wrong in asserting that Mr. Webster has a petition for commutation held "in abeyance." (Gov't Mem. 2, n. 4.) Mr. Webster's prior commutation petition was withdrawn five years ago. (*See* Affidavit of Kirsten E. Schubert Ex. A.)

Webster is constitutionally ineligible for the death penalty, it has never been considered in any court.

## A. THE NEW EVIDENCE IS PIVOTAL

Mr. Webster seeks to present here powerful new evidence of his mental retardation, including the results of two IQ assessments that were administered before the commission of the crime, both of which place him squarely within the range of mental retardation (with scores of 59 and 69); two independent diagnoses of mental retardation, which necessarily took into account Mr. Webster's adaptive deficits,[2] made by unbiased government doctors before the commission of the crime; evidence that Mr. Webster was in special education classes during school, a fact highly probative of the adaptive deficits prong; and numerous declarations from individuals who knew Mr. Webster before age 18 and who can attest to a variety of his adaptive deficits, including his inability to tie his shoes and dress himself. It is clear that this new evidence, when viewed alongside the six IQ scores of 48, 51, 55, 59, 65, and 72 presented at trial, the trial testimony of Mr. Webster's childhood friends and acquaintances, and the four expert witnesses who diagnosed Mr. Webster with mental retardation at trial, constitutes undeniable proof that Mr. Webster is mentally retarded and therefore ineligible for the death penalty.

### 1. Mr. Webster's IQ was a Disputed Issue at Trial

The Government's suggestion that it "has never argued that Webster's IQ would not meet the definition for mental retardation" is simply untrue. (*See* Gov't Mem. 22.) The credibility

---

[2] *See Mental Retardation: Determining Eligibility for Social Security Benefits* 189 (Daniel J. Reschly et al. eds., 2002) (noting that "adaptive behavior is an essential component of the mental retardation diagnostic construct, and all agencies contemplating mental retardation diagnoses should give consideration to adaptive behavior" because "[a]daptive behavior has been fundamental to conceptions of mental retardation at least since the early 19th century") (citing E.A. Doll, *Historical Review of Mental Retardation 1800-1965: A Symposium*, 72 Am. J. Mental Deficiency 165 (1967), and E.A. Doll, *Current Thoughts on Mental Deficiency*, 41 Proc. Am. Ass'n on Mental Deficiency 33 (1936)).

and significance of Mr. Webster's low IQ scores were hotly contested at trial. Mr. Webster presented evidence of five IQ scores all falling well within the range of mental retardation. Mr. Webster also presented testimony from four psychologists and psychiatrists who had examined him and determined that his IQ fell within the range of the mentally retarded and that he was, in fact, mentally retarded. (*See* Petition 8-10.) The prosecution argued, on the other hand, not that low IQ scores are irrelevant to a diagnosis of mental retardation, but that *Mr. Webster's* IQ scores were irrelevant because he had *faked* them (or in the Government's words, that Mr. Webster was "motivated" to fake low scores on the IQ and behavioral skills tests in order to avoid a death sentence). (Trial Tr. Vol. 27, 63:16-65:11.) Dr. George Parker, the Government's expert, testified repeatedly that Mr. Webster's scores were artificially deflated because he was "motivated" to do poorly on the tests administered after his arrest. (Trial Tr. Vol. 26, 46:24-48:9, 49:3-50:23, 52:23-53:23, 67:1-12, 88:10-17.) The Government's other expert, Dr. Richard Coons, testified that he believed Mr. Webster was manipulating his performance on the IQ exams. (*Id.* 131:11-134:21, 142:1-147:10.)

Indeed, the district court relied on this testimony in its order denying § 2255 relief, stating "Both Parker and Coons believed that Webster was not motivated to do well on I.Q. tests administered after he was charged in this case, and pointed as evidence of this to prior tests where he scored higher . . . ." (Mem. Op. and Order Den. Am. Mot. to Vacate Conviction and Sentence, Sept. 30, 2003, 29) (internal citations omitted).)

Thus, evidence that Mr. Webster had tested with a very low IQ before the commission of the crime without motivation to "fake" the test scores powerfully undercuts the prosecution's argument at trial that Mr. Webster's scores could and should be disregarded as meaningless. The new diagnoses contained within the social security records provide an invaluable record of the

medical opinions of three different doctors who evaluated Mr. Webster outside the forensic setting in a real-world context before the crime had even occurred, at a time when Mr. Webster had applied for social security benefits for sinus problems. As even the Government's expert noted, a patient who seeks professional services in the non-forensic or "real world" setting does not have any "motivation to mislead or deceive;" in fact, as Dr. Parker stated, it would be "pretty silly" for a person seeking professional services "on their own hook, their own motivation," to "go to a doctor and then sit there and tell the doctor a bunch of lies about why he [] is there." (Trial Tr. Vol. 26, 53:1-23.)

That is exactly the evidence Mr. Webster seeks to present: the unrebutted opinions of three government-employed medical professionals that an individual who sought, in a real-world setting, their professional services to address an unrelated medical issue, is mentally retarded. (*See* Declaration of Marc Tassé ("Tassé Decl.") (Exhibit U to the Affidavit of Steven J. Wells ("Wells Aff.") ¶ 59 (the timing of Dr. Hackett's evaluation was significant because "Mr. Webster was not accused of murder or trying to escape the death penalty—a claim often raised as a possible motivation for malingering on a test of intelligence.")) The new evidence is directly relevant to the highly litigated issue of whether Mr. Webster's IQ scores were credible and whether he does in fact have an IQ that falls within the range of mentally retarded. (Trial Tr. Vol. 27, 63:16-65:11.) For the Government to suggest now that IQ scores were never really at issue is false; the prosecution consistently attacked their credibility. The new evidence directly undercuts, indeed, entirely eliminates, the government's primary argument to the jury and court as to why they should not seriously consider Mr. Webster's low IQ scores.

The Government's Attempt to Minimize the Importance of the SSA Examination Records Has No Basis in Any Evidence

Faced with unambiguous diagnoses and other findings that contradict its trial evidence, the Government attacks the "methodology and expertise" of the doctors who conducted these tests on behalf of and in the employ of a federal agency (*see* Gov't Mem. 21-22.), but that attack has no foundation.  The Government offers no evidence that any of the medical professionals in the employ of the federal government were unqualified or that their testing methodology was somehow flawed.  Nor does the Government offer any expert opinion in rebuttal to Dr. Marc Tassé's opinion (that the Social Security records "indicate that Mr. Webster had significant subaverage intellectual functioning . . . consistent with a diagnosis of mental retardation," (Tassé Decl. ¶ 61)).  Finally, there is again no basis for the Government's claim that the SSA doctors made their diagnoses because Mr. Webster "self-reported."  (*See* Gov't Mem. 21-22.)  It is clear from the face of these documents that Mr. Webster applied for benefits for sinuses and headaches (Wells Aff. Ex. G.18 (*Alleged Impairments*), G.26 (*Reasons for Visit*).)  He was referred to Dr. Spellman on December 22, 1993 "for a psychological evaluation in order to better ascertain eligibility for Social Security benefits." (*Id.* Ex. G.11.)  The contents of the records themselves indicate that Mr. Webster sought benefits for chronic sinus issues – not mental retardation – and that each of the government doctors recognized that Mr. Webster suffered from mental retardation.

3.     The New Evidence Shows Mr. Webster's Adaptive Deficits

The unrebutted new evidence of low IQ scores and the explicit diagnoses of mental retardation alone should be sufficient to earn Mr. Webster review by this Court.  Nevertheless, the social security records contain ample evidence of Mr. Webster's adaptive deficits, much of which was provided by the doctors themselves.  Contrary to the Government's assertions, two of

the doctors who diagnosed Mr. Webster as mentally retarded explicitly noted some of his deficits in adaptive functioning. In the "Current Level of Functioning" section of his report, Dr. Spellman noted, "He lives with his mother. He watches television, listens to the radio and goes walking. . . . He goes shopping sometimes. He accompanies his mother to church. He does no chores around the house. Mostly he seems to be idle around the house and on the streets." (Wells Aff. Ex. G.13.) Dr. Spellman then diagnosed Mr. Webster with mental retardation and stated, "Client will not get any better. He is not competent to manage funds, if awarded. There was no evidence of exaggeration or malingering." (*Id.*) Dr. Hackett, who performed a WAIS-R IQ test and diagnosed Mr. Webster as mentally retarded, evaluated Mr. Webster's functioning similarly, stating that Mr. Webster could not be functional in a community setting, would not function well in the work place, and could not manage his own benefits. (*Id.* Ex. G.14, 15-16.) These are all hallmark examples of adaptive deficits. *See Heller v. Doe*, 509 U.S. 312, 329 (1993) ("Mental retardation . . . results in 'deficits or impairments in adaptive functioning,' that is to say . . . how well the person meet the standards of personal independence and social responsibility expected of his or her age by his or her cultural group'").

Moreover, Mr. Webster's deficient reading, writing, and language skills are apparent from simply looking at his SSA application, which is riddled with errors in spelling, grammar, syntax, and comprehension. (*See* Wells Aff. Ex. G.26, 28-35, 24, 50-57, 65-68.) The letter from the Watson Chapel School District indicates that Mr. Webster was in special education classes as a child (*id.* Ex. G.17), and the new declarations of Mr. Webster's relatives and acquaintances provide evidence of Mr. Webster's failure to adapt to life in an unstructured environment before the age of 18 (*id.* Ex. J-T).

These records directly contradict the prosecution's contentions at trial about Mr. Webster's functioning, which focused heavily on Mr. Webster's behavior in prison and performance in school. Even if an individual's ability to function in the highly regimented and rigidly controlled environment of prison were not (as they are) widely discredited as evidence of adaptive functioning,[3] this new evidence cuts to the heart of the government's "adaptive functioning" arguments at trial. Again, the Government provides no evidence to contradict the adaptive functioning findings by SSA medical professionals prior to the commission of the crime.

Furthermore, the Watson Chapel School District letter acknowledging that Mr. Webster's special education records were destroyed in the 1980s renders the prosecution's trial evidence on this issue at best unreliable. At trial, the prosecution presented evidence that Mr. Webster was never in, did not qualify for, and lied about being placed in special education classes, which, the prosecution argued, suggested Mr. Webster was not mentally retarded. (*See* Trial Tr. vol. 27, 66:16-24.) For example, one junior high counselor testified that while Mr. Webster's scores were low, he would not have been a candidate for special education. (Trial Tr. vol. 25, 57:1-59:7.) Another said she and did not believe that he needed to be referred for inclusion in special education classes. (*Id.* at 35:18-37:22.) Dr. Coons went so far as to tell the jury that Mr. Webster lied about being in special education classes in an attempt to manipulate a diagnosis of mental retardation. (Trial Tr. vol. 26, 132:11-133:7.) In resisting Mr. Webster's request for

---

[3]     *See Thomas v. Allen*, 614 F. Supp. 2d 1257, 1282 (N.D. Ala. 2009) (recognizing that "adaptive behavior is performance in one's community, not in restricted settings, such as prison"); *Wiley v. Epps*, 668 F. Supp. 2d 848, 900 (N.D. Miss. 2009) ("The Court notes that standardized [adaptive] measures are not normed for a prison population, and what a person can do in a structured environment is not indicative of how the individual will perform in the open community."); *see also* Tassé Decl. ¶ 28 (noting prison life and prison expectations for adaptive functioning cannot be substituted for society's expectations in determining the individual's functioning in the general community).

review, the Government relies on this trial evidence that is called into direct question by the new social security records. (Gov't Mem. 23-24.) The fact that Mr. Webster now has possession of a letter from his school stating that his special education records were destroyed is highly probative of whether Mr. Webster was qualified for special ed, whether he was placed in special ed, and, importantly, whether he lied about being in special ed.

The new evidence obtained from the SSA is, without a doubt, important. It is important because it directly undercuts the Government's central arguments at trial as to why Mr. Webster was not mentally retarded. And it is important because the jury was, despite the government's arguments at trial, already closely divided on the issue of Mr. Webster's mental retardation. Four members of Mr. Webster's jury were already persuaded by the evidence that Mr. Webster "is or may be mentally retarded." The new evidence squarely contradicts the evidence relied upon by the Government in arguing against a finding of mental retardation and provides significant corroboration for the evidence of mental retardation presented by Mr. Webster's attorneys during his trial. Had this evidence been made available during Mr. Webster's trial, there is a substantial likelihood that Mr. Webster would have been deemed mentally retarded and categorically ineligible for the death penalty.

## II. SECTION 2241 IS THE APPROPRIATE MECHANISM TO CHALLENGE MR. WEBSTER'S DETENTION

The writ of habeas corpus guaranteed by 28 U.S.C. § 2241 exists to untie judicial hands, and allow courts to correct fundamental injustices when they arise and cannot be otherwise remedied. As the new evidence described above shows, Mr. Webster is mentally retarded. And absent relief under § 2241, he will be executed in contravention of the Eighth Amendment. As such, § 2241 is the appropriate mechanism—and the *only* mechanism— by which Mr. Webster may challenge his detention.

**A.     THE SEVENTH CIRCUIT'S LIMITATIONS ON CERTAIN NON-CAPITAL § 2241 ACTIONS DO NOT APPLY HERE**

In certain rare cases where, because of the strict limitations of AEDPA, relief from an unconstitutional sentence is not available under 28 U.S.C. § 2255, a federal prisoner may bring a claim under 28 U.S.C. § 2241 if he can show that § 2255 is inadequate or ineffective to test the legality of his sentence.  Successive collateral attacks are permitted under AEDPA only when a prisoner has identified newly discovered evidence that establishes that no reasonable factfinder would have found him guilty of the offense, or where there is a new rule of constitutional law made retroactive by the Supreme Court to cases on collateral review.  *See* 28 U.S.C. § 2255(h).  Because the Fifth Circuit read the provision to exclude innocence of the death penalty, *see Sawyer v. Whitley*, 505 U.S. 333, 341-45 (1992), it refused to review the evidence which, in Judge Weiner's words, "virtually guarantees" that Mr. Webster would be found mentally retarded and thus ineligible for the death penalty.  *In re Webster*,  605 F.3d 256, 259 (5th Cir. 2010) (Wiener, J., concurring).  In this rare case of a federal capital prisoner who has obtained pre-crime evidence proving that he is categorically ineligible for the death penalty, review under § 2241 is the last resort.

The Government argues that the Seventh Circuit has limited § 2241 to situations in which a prisoner establishes that a change in statutory law has both negated his sentence and renders the prisoner innocent of the underlying offense. That is not accurate.

First, those limitations have never been imposed by the Seventh Circuit in a capital case.[4]

Second, and importantly, in the one *capital* case in which the Seventh Circuit addressed the availability of § 2241 review, it did not require either a subsequent change in law making defendant's conduct legal or proof that the prisoner was innocent of the underlying criminal offense to find that review was warranted. *See Garza v. Lappin*, 253 F.3d 918, 922-23 (7th Cir. 2001) (granting review under § 2241 when the basis petitioner's argument— a "cognizable treaty obligation not to execute [him]"—did not arise until after his direct appeal or his first § 2255 motion, and therefore it was "literally impossible for him to have raised" except under § 2241).

There is no indication that the Seventh Circuit would so dramatically limit § 2241 to make it inapplicable to the circumstances presented here. Indeed, taken to its logical extreme, the Government's argument, if adopted, would mean that Mr. Webster could present 50 separate, recently-discovered and previously-withheld IQ tests conducted prior to the crime, each accompanied by an evaluation of his various adaptive deficits and an unequivocal diagnosis of mental retardation, and he would still be unable to obtain judicial review of his categorical

_____

[4]    *See Unthank v. Jett*, 549 F.3d 534, 534-35 (7th Cir. 2008) (reviewing denial of prisoner's § 2241 petition, which raised the issue whether the sentencing court must recalculate his criminal history score after a prior conviction was vacated); *Taylor v. Gilkey*, 314 F.3d 832, 834 (7th Cir. 2002) (reviewing denial of prisoner's § 2241 petition, which raised the issue whether an error in interpreting the sentencing guidelines in a drug and firearms case deprived the court of jurisdiction); *United States v. Prevatte*, 300 F.3d 792, 794-96 (7th Cir. 2002) (reviewing dismissal of prisoner's § 2241 petition, which raised the issue whether the government had proven a nexus to interstate commerce at petitioner's malicious damage-to-property trial); *In re Davenport*, 147 F.3d 605, 607, 609 (7th Cir. 1998) (addressing jointly the § 2241 petitions of two prisoners convicted of federal firearm offenses, each of whom argued that they were convicted for a "status" not criminalized by statute); *Cooper v. United States*, 199 F.3d 898, 901 (7th Cir. 1999) (declining to address the merits of petitioner's § 2241 petition because his claims that DNA evidence would prove hair in a bag of cocaine was not his own did not change the fact that the hair was not newly discovered nor that he had been convicted despite its unknown origin); *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997) (holding that petitioner's successive § 2255 petition could not be filed based on newly discovered evidence when the evidence would only show petitioner was not an armed career criminal).

ineligibility for the death penalty. Similarly, an individual who was sentenced to death for a crime committed when he was ostensibly 18 years old could not obtain review of his sentence even after uncovering uncontroverted birth records showing that he was actually 17 when the crime was committed. The Fifth Circuit has held that § 2255 is completely unavailable to address any newly discovered evidence, no matter how conclusive, proving that an individual is categorically ineligible for the death penalty. The Government's position that § 2241 is similarly unavailable creates a constitutional black hole; there is no other mechanism to consider such evidence, yet it is unconstitutional to execute the mentally retarded or those who committed their crimes as minors. This is exactly the type of "glitch" that the § 2241 safety valve was designed to remedy.

**B.      SECTION 2255 IS INADEQUATE OR INEFFECTIVE TO RELIEVE MR. WEBSTER OF HIS UNCONSTITUTIONAL SENTENCE**

Mr. Webster has shown that § 2255 is inadequate and relief is therefore warranted under § 2241: Mr. Webster is a mentally retarded person in federal prison under a sentence of death, who has uncovered previously unavailable evidence that reveals a "fundamental defect" undermining the constitutionality of his sentence. Section 2255 is "inadequate" and "ineffective" to test the legality of Mr. Webster's detention. *See In re Webster*, 605 F.3d at 257-58. Because allowing his execution to proceed without a court having considered this argument—"the merits of which have never been considered by any judge or jury"—would be in contravention of the Eighth Amendment and the ultimate miscarriage of justice, *id*. at 259 (Wiener, J., concurring), relief is warranted under § 2241. While § 2241 does not require that Mr.

Webster prove that the evidence is newly discovered or that he is actually innocent,[5] he has established both.

### 1.   The Evidence Mr. Webster Seeks to Present Here is New

The Government accuses Mr. Webster of failing to be diligent in obtaining his Social Security records, which include the evidence of his adaptive deficits and low IQ, before trial and before filing his first habeas petition.  The Government provides no support whatever for its contention that lack of diligence is a basis for denying § 2241 review.  But even if a showing of reasonable diligence were required, that standard is clearly met here with unrebutted evidence. Like virtually all of the Government's contentions about the SSA records, its diligence argument lacks any basis.

First, it is undisputed that Mr. Webster's trial counsel requested any records in the possession of the SSA.  It is also undisputed that those records were never received, and that the SSA never gave any reason for failing to produce the records.  (*See* Gov't Mem. 11, 21-24.)  If Mr. Webster had received the Social Security records when they were first requested, the records would have been discovered earlier and would have been offered at trial.  Moreover, Mr. Webster requested, in connection with his § 2255 petition, that the court require the Government to produce "any reports prepared by a mental health professional in the Government's possession . . . on the issue of petitioner's mental retardation."  (*See* Motion for Leave to Conduct Discovery 10, ¶ 8 (April 30, 2001) (Wells Decl. Ex. X).)  The Government vigorously opposed that request and the Court refused to allow any discovery into issues of Mr. Webster's mental retardation.

---

[5]      Section 2241 does not impose the rigid requirements of § 2255.  Even if the evidence weren't "newly discovered" under the successive petition requirements of § 2255(h), it would still be appropriate for this court to evaluate it because it reveals a fundamental defect in Mr. Webster's capital sentence. *Compare* 28 U.S.C. § 2255(h)(1) (requiring "newly discovered evidence" before a petitioner may file a successive § 2255 petition) *with* 28 U.S.C. § 2241 (containing no similar requirement or language).

(*See* Gov't Resp. in Opp. to Pet'rs Mot. for Leave to Conduct Disc. and Brief In Supp. Thereof and Order Den. Pet'rs Mot. for Disc., *Webster v. United States*, Case No. 4:00-CV-1646-Y (June 18, 2002).)  Having successfully opposed Mr. Webster's request for discovery, the Government cannot now be heard to complain that Mr. Webster should have discovered more.

Mr. Webster does not know, of course, whether the prosecution's failure to locate and produce the records was a "deliberate or malicious action," (Gov't Mem. 11, n.8), and therefore makes no such allegation here; but the fact remains that, despite his prior requests, Mr. Webster has only now gained access to vital records that were in the control of a federal agency.

Further, there is considerable evidence that the SSA has not, in response to the requests of undersigned habeas counsel, been forthcoming in producing Mr. Webster's records – evidence which corroborates the fact that the SSA failed to produce the records earlier when requested by trial counsel.  The SSA required Mr. Webster to submit three separate consent forms over the course of nearly one year, and after transmitting what appears on its face to be only partially complete records, the SSA denied Mr. Webster's request for the apparently omitted records and stated that his folder had been "destroyed."  (*See* Supplemental Declaration of Kristen K. LeRoux ("LeRoux Supp. Dec.").)

Finally, the Government cannot have it both ways.  If, as the Government claims, Mr. Webster's 2255 counsel should have done something more (in the face of staunch opposition from the Government) to obtain the SSA records, Mr. Webster has a claim under *Martinez v. Ryan* for ineffective assistance from his 2255 counsel.  In *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the Supreme Court recently held that the right to effective counsel attaches at collateral review proceedings that "provide the first occasion to raise a claim." *Id.* at 1315, 1317.  The Court in *Martinez* sought to answer the question whether the petitioner was entitled to effective

assistance of counsel at his initial-review collateral review proceeding. The Court answered this question in the affirmative, relying in part on the principle that it was inequitable that "no court will review the petitioner's claims," to justify its departure from a previously announced rule. Thus, if this Court denies Mr. Webster the opportunity for review based on his counsel's failure to discover the records sooner, Mr. Webster's 2255 counsel's actions are actionable now as ineffective.

In sum, the Government does not assert or provide any evidence that the SSA records were available to Mr. Webster at trial. There is no dispute that trial counsel requested the records and there is no evidence that they were previously produced. Finally, the SSA's recent actions strongly suggest that it still has not been forthcoming with respect to Mr. Webster's records. No court has ever seen or evaluated this significant evidence that the SSA recently saw fit to produce.

2. <u>Mr. Webster is Categorically Ineligible for—and Thus Actually Innocent of—the Death Penalty</u>

Mr. Webster has shown that he is "actually innocent" of the capital offense for which he was convicted. As the Supreme Court recognized in *Sawyer v. Whitley*, 505 U.S. 333 (1992), the concept of "actual innocence" under the Constitution includes innocence of the death penalty; thus, a prisoner who is subject to a categorical exclusion such as mental retardation or juvenile status is "actually innocent" for purposes of 28 U.S.C. § 2241.

The Government argues that, under *Hope v. United States*, 108 F. 3d 119 (7th Cir. 1997), the pre-AEDPA concept of "actual innocence" did not survive the amendment of § 2255. But that non-capital case does not address the continuing applicability of *Sawyer* to categorical exclusions from the death penalty, and is not relevant here.

-16-

Rather, "[t]he normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986). Moreover, the Supreme Court has recognized that AEDPA does not "undermin[e] basic habeas principles" and seeks "to harmonize the new statute with prior law." *Holland v. Florida,* 130 S. Ct. 2546, 2562 (2010); *see also Slack v. McDaniel*, 529 U.S. 473, 483 (2000) ("AEDPA's present provisions . . . incorporate earlier habeas principles."). It is clear that, prior to AEDPA's enactment, "actual innocence" included "innocence of the death penalty." Because Congress, in enacting AEDPA, left § 2244 untouched, *Sawyer's* holding that "actual innocence" includes "innocence of the death penalty" remains in full force in an action brought under § 2241. Mr. Webster is "actually innocent" under *Sawyer*, and he is therefore "actually innocent" in this § 2244 action.

### C.  DENYING REVIEW UNDER SECTION 2255 WOULD RESULT IN THE UNCONSTITUTIONAL SUSPENSION OF THE WRIT

If relief under § 2241 is foreclosed, as the Government argues, a prisoner under sentence of death has no judicial means of challenging his death sentence where newly discovered evidence demonstrates that he is constitutionally ineligible for the death penalty. This result is, in the words of Judge Weiner, "Kafkaesque." It is also unconstitutional.

The "writ of habeas corpus plays a vital role in protecting constitutional rights." *Holland v. Florida*, 130 S. Ct. 2549, 2562 (2010) (quoting *Slack v. McDaniel*, 529 U.S. at 483). As discussed in the Petition, "[t]he essential function [of habeas corpus] is to give a prisoner a reasonable opportunity to obtain a *reliable* judicial determination of the fundamental legality of his conviction *and sentence*." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998) (emphasis added). The Savings Clause is, in short, a failsafe mechanism to prevent injustice. There can be

no question that to execute a prisoner who is *constitutionally ineligible* for the death penalty, and whose execution therefore violates the Eighth Amendment, would be a profound injustice and precisely the sort of fundamental defect the writ of habeas corpus is intended to remedy. Indeed, as the Supreme Court has recognized, a sentence of death is a punishment in a category of its own: "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Where, as here, § 2255 is not available, failure to consider the newly available evidence of Mr. Webster's categorical ineligibility for the death penalty would result in an unconstitutional suspension of the writ of habeas corpus. *See Holland*, 130 S. Ct. at 2562 (in deciding whether AEDPA's statutory limitations period could be equitably tolled, noting that the Great Writ is "the only writ explicitly protected by the Constitution [which] counsels hesitancy before interpreting AEDPA . . . as indicating a congressional intent to close courthouse doors"); *Triestman v. United States*, 124 F.3d 361, 371 (2d Cir. 1997) (noting the constitutional implications of cutting off all post-conviction relief for a claim of actual innocence that was based on the existing record and that could not have been brought previously). The Government itself recognized this when it suggested to the Supreme Court, in opposing Mr. Webster's request for a successive § 2255 petition, that § 2241 may be available as a further avenue of review to Mr. Webster. (*See* Gov't Brief in Opp'n to Pet. for Writ of Certiorari, 17, *Webster v. United States*, Case No. 10-150 (Oct. 2010).)

*     *     *

There is a very narrow category of individuals who are simply ineligible for a sentence of death,[6] and Mr. Webster is one of them. The purpose of habeas corpus is to ensure the fundamental legality of the convictions *and sentences* of prisoners; there is no more fundamental defect than executing a prisoner in contravention of the Constitution of the United States. Mr. Webster is not merely seeking a second "bite at the apple" nor is he arguing that he is entitled to the remedy provided by 28 U.S.C.§ 2241 "simply because he cannot meet the requirements for filing a successive section 2255 motion." (Gov't Mem. 6, 12). No fact finder has ever reviewed the newly discovered evidence that Mr. Webster seeks to present. Yet, as Judge Wiener noted, "[i]f the evidence that Webster attempts to introduce here were ever presented to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded." *In re Webster*, 605 F.3d at 259 (Wiener, J., concurring).

Instead, Mr. Webster falls into a discrete subset of petitioners who qualify for the remedy provided under § 2241 because a Circuit Court, in this case the Fifth Circuit, ruled that § 2255 does not allow a federal prisoner to bring a successive claim that he is categorically ineligible for the death penalty based on newly discovered evidence "where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, i.e., capital murder." *Id*. at 257. The Fifth Circuit held that Mr. Webster cannot meet the strict requirements of § 2255(h). However, the newly discovered evidence Mr. Webster seeks to present to this Court implicates "a fundamental defect" that undermines the constitutionality of his sentence. *See Davenport*, 147 F.3d at 611. As such, Mr. Webster's petition falls squarely into a class of cases that 28 U.S.C.§ 2241 seeks to protect. Although the Fifth Circuit determined that

---

[6]     The Supreme Court has held that there are two categories of individuals excluded eligibility for the death penalty—those who suffer from mental retardation, *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), and those who were under the age of eighteen when they allegedly committed a capital offense, *Roper v. Simmons*, 543 U.S. 551, 578 (2005).

§ 2255(h) "illogically" "tie[d]" its "judicial hands" forcing it to "condone . . . an unconstitutional punishment," *In re Webster*, 605 F.3d at 260 (Weiner, J., concurring), § 2255(e) and § 2241 empower this Court to consider the newly available evidence presented here, which taken together with the evidence presented at trial, proves that Mr. Webster is mentally retarded and, therefore, "actually innocent" of the death penalty and constitutionally ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). Indeed, as the Government has noted, "[t]he essential function [of habeas corpus] is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." (Gov't Mem. 8 (quoting *In re Davenport*, 147 F.3d at 609).)

## CONCLUSION

THEREFORE, for the reasons stated in the petition and in this reply, Mr. Webster respectfully requests that this Court: (1) grant Mr. Webster's request for an evidentiary hearing; and, (2) grant Mr. Webster's request for an order for leave to conduct additional discovery in support of his petition.

DORSEY & WHITNEY LLP

Dated: October 12, 2012

By  s/Kirsten E. Schubert
   Steven J. Wells
   Kirsten E. Schubert
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (952) 516-5526

Eric K. Koselke, # 5593-54
6202 N. College Avenue
Indianapolis, IN 46220
Telephone: (317) 722-2591
Facsimile: (317) 257-5300

**CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2012, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Date: October 12, 2012          s/Kirsten E. Schubert                    p
                                Kirsten E. Schubert
                                DORSEY & WHITNEY LLP
                                Suite 1500, 50 South Sixth Street
                                Minneapolis, MN 55402-1498
                                Telephone:  (612) 340-2600
                                Facsimile:  (612) 340-2868