APPEAL,HABEAS,PROSE,SA1,CLOSED

# U.S. District Court
# Southern District of Indiana (Terre Haute)
# CIVIL DOCKET FOR CASE #: 2:12−cv−00086−WTL−WGH

| | |
|---|---|
| WEBSTER v. LOCKETT | Date Filed: 04/06/2012 |
| Assigned to: Judge William T. Lawrence | Date Terminated: 11/13/2013 |
| Referred to: Magistrate Judge William G. Hussmann, Jr | Jury Demand: None |
| Case in other court:  7th Circuit, 14−01049 | Nature of Suit: 535 Death Penalty − Habeas Corpus |
| Cause: 28:2241 Petition for Writ of Habeas Corpus (federa | Jurisdiction: Federal Question |

Discovery Deadline:                        Settlement Conference:
Dispositive Motion Deadline:               Final Pretrial Conference:
                                           Trial Date:

**Petitioner**

**BRUCE CARNEIL WEBSTER**          represented by   **Eric K. Koselke**
                                                    141 East Washington Street
                                                    Suite 200
                                                    Indianapolis, IN 46204
                                                    (317)722−2591
                                                    Fax: (317)920−9726
                                                    Email: ekoselke@wkelaw.com
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Kirsten E. Schubert**
                                                    DORSEY &WHITNEY LLP
                                                    50 South Sixth Street
                                                    Suite 1500
                                                    Minneapolis, MN 55402−1498
                                                    612−492−6755
                                                    Fax: 612−340−8800
                                                    Email: schubert.kirsten@dorsey.com
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Steven J. Wells**
                                                    DORSEY &WHITNEY LLP
                                                    50 South Sixth Street
                                                    Suite 1500
                                                    Minneapolis, MN 55402−1498
                                                    612−340−7809
                                                    Fax: 952−516−5526
                                                    Email: wells.steve@dorsey.com
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

V.

1

**Respondent**

**CHARLES LOCKETT**
*Warden, United States Penitentiary,*
*Terre Haute (USP)*

represented by **Gerald A. Coraz**
UNITED STATES ATTORNEY'S
OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204−3048
(317)226−6333
Fax: (317)226−6125
Email: gerald.coraz@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 04/06/2012 | 1 | 8 | PETITION for Writ of Habeas Corpus, filed by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Receipt # IP029188)(MAC) (Entered: 04/06/2012) |
| 04/06/2012 | 2 | 47 | NOTICE of Appearance by Eric K. Koselke on behalf of Petitioner BRUCE CARNEIL WEBSTER. (MAC) (Entered: 04/06/2012) |
| 04/06/2012 | 3 | | DECLARATION of Steven J. Wells re 1 Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. Section 2241 by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y)(MAC) (Entered: 04/06/2012) |
| 04/06/2012 | 4 | 49 | CIVIL COVER SHEET, filed by Petitioner BRUCE CARNEIL WEBSTER. (MAC) (Entered: 04/06/2012) |
| 04/19/2012 | 5 | 50 | MOTION for Attorney Kirsten E. Schubert to Appear pro hac vice, filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Text of Proposed Order Granting Schurbert to appear Pro Hac Vice)(RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 6 | 55 | MOTION for Attorney Steven J. Wells to Appear pro hac vice, filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Text of Proposed Order Granting Wells to appear Pro Hac Vice)(RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 7 | 60 | RECEIPT #IP029385 in the amount of $ 30.00 regarding PHV appearance of Kirsten E. Schubert. (RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 8 | 61 | RECEIPT #IP029386 in the amount of $ 30.00 regarding PHV appearance of Steven J. Wells. (RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 9 | 62 | ENTRY and ORDER TO SHOW CAUSE – A copy of this Entry and Order to Show Cause shall be distributed to the United States Attorney. The respondent shall have through May 30, 2012, in which to answer the allegations of the habeas petition, and in doing so shall show cause why the relief sought by the petitioner should not be granted. The petitioner shall have thirty (30) days |

2

| | | | |
|---|---|---|---|
| | | | after service of the answer in which to reply. (See Entry.) Copies mailed pursuant to distribution list. Signed by Judge William T. Lawrence on 4/19/2012.(RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 10 | 64 | ***PLEASE NOTE MARGINAL ENTRY***ORDER granting 6 Motion to Appear pro hac vice. Attorney Steven J. Wells for BRUCE CARNEIL WEBSTER added. Signed by Magistrate Judge William G. Hussmann, Jr., on 4/19/2012. (NRN) (Entered: 04/19/2012) |
| 04/19/2012 | 11 | 66 | ***PLEASE NOTE MARGINAL ENTRY***ORDER granting 5 Motion to Appear pro hac vice. Attorney Kristen E. Schubert for BRUCE CARNEIL WEBSTER added. Signed by Magistrate Judge William G. Hussmann, Jr., on 4/19/2012. (NRN) (Entered: 04/19/2012) |
| 05/02/2012 | 12 | 68 | NOTICE of Appearance by Gerald A. Coraz on behalf of Respondent CHARLES LOCKETT. (Coraz, Gerald) (Entered: 05/02/2012) |
| 05/02/2012 | 13 | 70 | MOTION for Extension of Time to August 28, 2012 , filed by Respondent CHARLES LOCKETT. (Attachments: # 1 Text of Proposed Order)(Coraz, Gerald) (Entered: 05/02/2012) |
| 05/09/2012 | 14 | 75 | ENTRY – granting in part and denying in part 13 Motion for Extension of Time. The respondent shall have through July 10, 2012, in which to show cause why the relief sought by the petitioner shall not be granted. (See Entry.) Signed by Judge William T. Lawrence on 5/9/2012. (RSF) (Entered: 05/09/2012) |
| 07/03/2012 | 15 | 76 | Second MOTION for Extension of Time to August 9, 2012 , filed by Respondent CHARLES LOCKETT. (Attachments: # 1 Text of Proposed Order)(Coraz, Gerald) (Entered: 07/03/2012) |
| 07/08/2012 | 16 | 82 | ORDER – granting 15 Motion for Extension of Time, to 8/9/12, in which to respond to the petitioner's Writ of Habeas Corpus. Signed by Judge William T. Lawrence on 7/8/2012. (RSF) Modified on 7/9/2012 – removed language regarding mailing copy to petitioner (RSF). (Entered: 07/09/2012) |
| 08/07/2012 | 17 | 84 | RETURN TO ORDER TO SHOW CAUSE, re 9 Order to Show Cause, filed by CHARLES LOCKETT.. (Attachments: # 1 Attach 1–Summary Evidence, # 2 Attach 2–Westlaw Document)(Coraz, Gerald) (Entered: 08/07/2012) |
| 08/16/2012 | 18 | 152 | First MOTION for Extension of Time to September 29, 2012 , filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Text of Proposed Order)(Schubert, Kirsten) (Entered: 08/16/2012) |
| 08/16/2012 | 19 | 158 | Amended MOTION for Extension of Time to September 28, 2012 , filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Text of Proposed Order)(Schubert, Kirsten) (Entered: 08/16/2012) |
| 08/20/2012 | 20 | 164 | ENTRY – denying as moot 18 Motion for Extension of Time, and granting 19 Motion for Extension of Time, to 9/28/12, in which to file reply. Signed by Judge William T. Lawrence on 8/20/2012. (RSF) Modified on 8/20/2012 (RSF). (Entered: 08/20/2012) |
| 09/20/2012 | 21 | 165 | Second MOTION for Extension of Time to October 12, 2012 , filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Proposed Order)(Schubert, Kirsten) (Entered: 09/20/2012) |

| 09/24/2012 | 22 | 171 | ORDER – granting 21 Motion for Extension of Time, to 10/12/12, in which to Reply to Respondent's Return to Order to Show Cause. Signed by Judge William T. Lawrence on 9/24/2012. (RSF) (Entered: 09/24/2012) |
|---|---|---|---|
| 10/12/2012 | 23 | 172 | RESPONSE *Reply to Return to Order to Show Cause*, re 17 Return to Order to Show Cause, filed by Petitioner BRUCE CARNEIL WEBSTER. (Schubert, Kirsten) (Entered: 10/12/2012) |
| 10/12/2012 | 24 | 193 | AFFIDAVIT re 23 Response *of Kirsten E. Schubert* by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Exhibit Exhibit A – 6–24–08 Rodgers Letter)(Schubert, Kirsten) (Entered: 10/12/2012) |
| 10/12/2012 | 25 | 196 | DECLARATION of Kristen K. LeRoux re 23 Response by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Exhibit A – 1996 Fax to SSA, # 2 Exhibit B – 10–27–08 Letter to SSA, # 3 Exhibit C – 12–15–08 Letter to SSA, # 4 Exhibit D – 10–8–09 Letter to SSA, # 5 Exhibit E – 10–22–09 Letter from SSA, # 6 Exhibit F – 11–23–09 Letter to SSA, # 7 Exhibit G – 12–4–09 Letter from SSA)(Schubert, Kirsten) (Entered: 10/12/2012) |
| 09/03/2013 | 26 | 240 | NOTICE of Change of Attorney Information. Consistent with Local Rule 5–3, Eric K. Koselke hereby notifies the Clerk of the court of changed contact information. (Koselke, Eric) (Entered: 09/03/2013) |
| 10/07/2013 | 27 | 241 | ORDER Granting in Part and Denying in Part United States' Motion for a Stay of Civil Proceedings in which the United States, its Agencies, or Officers are a Party. All such Civil actions are STAYED and immediately suspended, postponed and held in abeyance, pending further Order of the Court, except habeas corpus proceedings and those which are specifically exempted form this Order in Exhibit A. A copy of the United States Motion is attached to this Docket Entry. This Order is docketed into the following cases: 1:13–cv–01092–TWP–MJD, 1:13–cv–01093–WTL–TAB, 1:13–cv–01101–SEB–DKL, 1:13–cv–01110–RLY–MJD, 1:13–cv–01118–SEB–DKL, 1:13–cv–01119–SEB–MJD, 1:13–cv–01128–WTL–MJD, 1:13–cv–01132–SEB–DKL, 1:13–cv–01137–RLY–MJD, 1:13–cv–01141–SEB–DKL, 1:13–cv–01170–JMS–TAB, 1:13–cv–01172–JMS–DKL, 1:13–cv–01182–SEB–TAB, 1:13–cv–01200–SEB–DML, 1:13–cv–01209–TWP–MJD, 1:13–cv–01212–WTL–DML, 1:13–cv–01257–JMS–MJD, 1:13–cv–01283–RLY–MJD, 1:13–cv–01361–SEB–MJD, 1:13–cv–01381–TWP–DML, 1:13–cv–01383–RLY–DML, 1:13–cv–01517–TWP–DKL, 2:10–cv–00042–LJM–MJD, 2:10–cv–00140–JMS–WGH, 2:10–cv–00149–WTL–WGH, 2:10–cv–00172–JMS–WGH, 2:10–cv–00180–WTL–TAB, 2:10–cv–00244–WTL–WGH, 2:10–cv–00314–WTL–WGH, 2:11–cv–00004–LJM–WGH, 2:11–cv–00015–WTL–DKL, 2:11–cv–00091–WTL–DKL, 2:11–cv–00142–JMS–DKL, 2:11–cv–00149–WTL–WGH, 2:11–cv–00187–JMS–WGH, 2:11–cv–00262–JMS–DKL, 2:11–cv–00263–WTL–WGH, 2:11–cv–00299–WTL–WGH, 2:11–cv–00300–JMS–WGH, 2:11–cv–00337–JMS–MJD, 2:12–cv–00061–WTL–WGH, 2:12–cv–00080–WTL–WGH, 2:12–cv–00086–WTL–WGH, 2:12–cv–00109–WTL–DKL, 2:12–cv–00176–JMS–MJD, 2:12–cv–00177–JMS–WGH, |

4

| | | | |
|---|---|---|---|
| | | | 2:12–cv–00206–WTL–DKL, 2:12–cv–00211–WTL–DKL, 2:12–cv–00224–JMS–MJD, 2:12–cv–00248–LJM–DKL. Signed by Judge Richard L. Young on 10/7/2013. (Attachments: # 1 Motion to Stay)(MAC) (Entered: 10/07/2013) |
| 10/18/2013 | 28 | 248 | ORDER granting United States Motion for Order Lifting Stay of Civil Litigation in which the United States is a Party. Unless otherwise ordered by a judge of this Court or a bankruptcy judge in a particular case, any deadlines in a case, including bankruptcy cases, impacted by this Court's Order of October 7, 2013, imposed by order of a judicial officer of this Court, by a bankruptcy judge, by the Federal Rules of Civil Procedure, or by the Federal Rules of Bankruptcy Procedure, and in effect as of October 1, 2013, are hereby extended by 16 calendar days from the deadline. Any party may seek relief from this general Order extending time by motion in a particular case. This Order is docketed into the following cases: 1:13–cv–01092–TWP–MJD, 1:13–cv–01093–WTL–TAB, 1:13–cv–01101–SEB–DKL, 1:13–cv–01110–RLY–MJD, 1:13–cv–01118–SEB–DKL, 1:13–cv–01119–SEB–MJD, 1:13–cv–01128–WTL–MJD, 1:13–cv–01132–SEB–DKL, 1:13–cv–01137–RLY–MJD, 1:13–cv–01141–SEB–DKL, 1:13–cv–01170–JMS–TAB, 1:13–cv–01172–JMS–DKL, 1:13–cv–01182–SEB–TAB, 1:13–cv–01200–SEB–DML, 1:13–cv–01209–TWP–MJD, 1:13–cv–01212–WTL–DML, 1:13–cv–01257–JMS–MJD, 1:13–cv–01283–RLY–MJD, 1:13–cv–01361–SEB–MJD, 1:13–cv–01381–TWP–DML, 1:13–cv–01383–RLY–DML, 1:13–cv–01517–TWP–DKL, 2:10–cv–00042–LJM–MJD, 2:10–cv–00140–JMS–WGH, 2:10–cv–00149–WTL–WGH, 2:10–cv–00172–JMS–WGH, 2:10–cv–00180–WTL–TAB, 2:10–cv–00244–WTL–WGH, 2:10–cv–00314–WTL–WGH, 2:11–cv–00004–LJM–WGH, 2:11–cv–00015–WTL–DKL, 2:11–cv–00091–WTL–DKL, 2:11–cv–00142–JMS–DKL, 2:11–cv–00149–WTL–WGH, 2:11–cv–00187–JMS–WGH, 2:11–cv–00262–JMS–DKL, 2:11–cv–00263–WTL–WGH, 2:11–cv–00299–WTL–WGH, 2:11–cv–00300–JMS–WGH, 2:11–cv–00337–JMS–MJD, 2:12–cv–00061–WTL–WGH, 2:12–cv–00080–WTL–WGH, 2:12–cv–00086–WTL–WGH, 2:12–cv–00109–WTL–DKL, 2:12–cv–00176–JMS–MJD, 2:12–cv–00177–JMS–WGH, 2:12–cv–00206–WTL–DKL, 2:12–cv–00211–WTL–DKL, 2:12–cv–00224–JMS–MJD, 2:12–cv–00248–LJM–DKL. Signed by Judge Richard L. Young on 10/18/2013.(MAC) (Entered: 10/18/2013) |
| 11/13/2013 | 29 | 250 | ENTRY ON PETITION FOR WRIT OF HABEAS CORPUS – This cause is before the Court on Petitioner Bruce Carneil Webster's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. 1 Webster's motion is fully briefed, and the Court, being duly advised, DENIES the motion for the reasons set forth below. (See Entry.) Signed by Judge William T. Lawrence on 11/13/2013.(RSF) Modified on 11/13/2013 (RSF). (Entered: 11/13/2013) |
| 11/13/2013 | 30 | 263 | CLOSED JUDGMENT – JUDGMENT – The Petitioner take nothing by his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, and the civil action docketed as Cause No. 2:12–cv–86–WTL–WGH is DISMISSED WITH PREJUDICE. Signed by Judge William T. Lawrence on |

| | | | |
|---|---|---|---|
| | | | 11/13/2013.(RSF) Modified on 11/13/2013 (RSF). (Entered: 11/13/2013) |
| 01/09/2014 | 31 | 264 | NOTICE OF APPEAL as to 29 Entry, filed by Petitioner BRUCE CARNEIL WEBSTER. (Filing fee $505, receipt number 0756–2920875) (Schubert, Kirsten) (Entered: 01/09/2014) |
| 01/09/2014 | 32 | 267 | DOCKETING STATEMENT by BRUCE CARNEIL WEBSTER re 31 Notice of Appeal (Schubert, Kirsten) (Entered: 01/09/2014) |
| 01/09/2014 | 33 | 272 | SEVENTH CIRCUIT TRANSCRIPT INFORMATION SHEET by BRUCE CARNEIL WEBSTER re 31 Notice of Appeal (Schubert, Kirsten) (Entered: 01/09/2014) |
| 01/09/2014 | 34 | 273 | CERTIFICATE OF SERVICE by BRUCE CARNEIL WEBSTER *Petitioner/Appellant's Proposed List of Additional Items to Designate for Record on Appeal* (Schubert, Kirsten) (Entered: 01/09/2014) |
| 01/09/2014 | 35 | 274 | SEVENTH CIRCUIT APPEAL INFORMATION SHEET re 31 Notice of Appeal – **Instructions for Attorneys – Parties' Short Record, Instructions, and Designation of Record information attached.** (JLM) (Entered: 01/09/2014) |
| 01/09/2014 | 36 | 307 | **DEATH PENALTY CASE** Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 31 Notice of Appeal. – **for Court of Appeals Use Only.** (JLM) (Entered: 01/09/2014) |
| 01/09/2014 | 37 | 336 | USCA Case Number 14–1049 for 31 Notice of Appeal filed by BRUCE CARNEIL WEBSTER. (JLM) (Entered: 01/10/2014) |
| 01/13/2014 | 38 | 337 | ENTRY and NOTICE – Final judgment was entered in this action for habeas corpus relief on November 13, 2013. The petitioner filed a notice of appeal, which has been processed. Shortly after the notice of appeal was filed the petitioner filed a document entitled Certificate of Service. The court understands this document 34 to indicate the petitioner's desire that the record on appeal include materials which were not part of this court's record at the conclusion of the case. The petitioner's filing described above is in the form of a notice, not a motion. Any request to supplement the record on appeal should be filed not more than 28 calendar days from the issuance of this Entry and Notice. (See Entry.) (USCA # 14–1049) Signed by Judge William T. Lawrence on 1/13/2014.(RSF) **Copy emailed to USCA.** Modified on 1/14/2014 (JLM). (Entered: 01/13/2014) |
| 01/23/2014 | 39 | 339 | DESIGNATION of Record on Appeal by BRUCE CARNEIL WEBSTER re 31 Notice of Appeal (Schubert, Kirsten) (Entered: 01/23/2014) |
| 01/30/2014 | 40 | 341 | Entry Directing Further Proceedings – The clerk shall prepare and make available to counsel for the parties the record on appeal. This shall be done in whatever number of electronic volumes which will eventually be used by the Court of Appeals. The record thus prepared will be available when requested by the Court of Appeals, together with any materials in a supplemental record which may hereafter be authorized. (USCA #14–1049) Signed by Judge William T. Lawrence on 1/30/2014.(RSF) (Entered: 01/30/2014) |
| 01/30/2014 | 41 | | ***DOCKETED PER DOC #40*** Transmitted Record on Appeal to counsel re 31 Notice of Appeal by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Pleadings, # 2 Oversized Doc 3 (Part 1 of 2), # 3 Oversized Doc 3 (Part 2 of |

| | | | 2))(JLM) (Entered: 01/30/2014) |

**Case #: 2:12–cv–00086–WTL–WGH**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
------------------------------------------------------

BRUCE CARNEIL WEBSTER,

          Petitioner,

    vs.

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,
TERRE HAUTE (USP),

        Respondent.

------------------------------------------------------

    CAUSE NO:

## **2:12-cv-0086 WTL-WGH**

## **PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**

## <u>**THIS IS A DEATH PENALTY CASE**</u>

Eric K. Koselke, # 5593-54
6202 N. College Avenue
Indianapolis, IN 46220
Telephone: (317) 722-2591
Facsimile: (317) 257-5300

*Attorneys for Petitioner Bruce Webster*

DORSEY & WHITNEY LLP
Steven J. Wells
Kirsten E. Schubert
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600

*Attorneys for Petitioner Bruce Webster*

<u>**PETITION FOR WRIT OF HABEAS CORPUS**</u>
<u>**PURSUANT TO 28 U.S.C. § 2241**</u>

## I.     INTRODUCTION

Petitioner Bruce Carneil Webster, a prisoner at the Federal Bureau of Prisons facility in Terre Haute, Indiana, moves this Court to vacate his death sentence under 28 U.S.C. § 2241.[1] Although Mr. Webster does not challenge his conviction, he does seek to challenge his sentence of death based on previously unavailable evidence that establishes he is mentally retarded and therefore ineligible for the death penalty. *See Atkins v. Virginia*, 536 U.S. 304 (2002). This new evidence, which consists of government records previously unavailable to the Petitioner and recently obtained testimonial evidence, is so significant that, although the Court of Appeals for the Fifth Circuit held that 28 U.S.C. § 2255(h) barred it from exercising jurisdiction, the concurrence concluded that: "If the evidence Webster attempts to introduce here were ever presented to a judge or jury for consideration, it is virtually guaranteed that he would be found to be mentally retarded." *In re Webster*, 605 F.3d 256, 259 (5th Cir. 2010) (Wiener, J., concurring). As set forth in detail below, this habeas petition satisfies the requirements of a petition under 28 U.S.C. § 2241 and under the law of this Circuit because, among other reasons, there is no mechanism under § 2255 to consider the overwhelming but previously unavailable evidence that establishes Mr. Webster's mental retardation and renders him categorically ineligible for the death penalty.

---

[1] Mr. Webster's execution has been temporarily stayed in collateral litigation challenging the constitutionality of the lethal injection procedure in federal prison. See *Roane v. Holder*, No. 05-2337 (D.D.C. Feb. 21, 2007) (order granting preliminary injunction barring execution) (Declaration of Steven J. Wells ("Wells Decl.") Ex. A).

2

## II.    STATEMENT OF THE CASE

At a federal capital trial more than six years before *Atkins* was decided, Mr. Webster presented evidence that he is mentally retarded.  That evidence included five scores from individually-administered IQ examinations all within the range associated with mental retardation; the testimony of Mr. Webster's childhood friends and acquaintances; and the testimony of four expert witnesses diagnosing Mr. Webster with mental retardation.  In response, two government expert witnesses testified, after administering a partial IQ test that resulted in a sixth score within the range of mental retardation, that Mr. Webster was nevertheless faking low IQ scores to avoid a death sentence, and that his adaptive skills, as reflected primarily by his ability to keep an orderly prison cell, were evidence of normal functioning. The government also presented the testimony of two witnesses who claimed that Petitioner had never been placed in special education classes in school. In its closing argument, the government repeatedly argued that Mr. Webster was faking his IQ tests and had never been in special education classes.  Although four of the twelve jurors found that Mr. Webster "is or may be mentally retarded," he was sentenced to death.

Now, Petitioner has obtained access to evidence – most of it from government files – that firmly establishes his mental retardation and directly refutes the evidence the government presented at trial to contest mental retardation.  Previously undisclosed Social Security and school records demonstrate that three government physicians and psychologists tasked with weeding out fake disability claims examined Mr. Webster *prior to the commission of the crime,* when he was 20 years old.  The government records

3

indicate that Mr. Webster tested at IQ scores (59 and 69) and exhibited deficits in adaptive functioning well within the range of mental retardation, and include explicit diagnoses of "mental retardation." One of these physicians noted expressly that there was no evidence that Petitioner was faking his condition. In addition, previously undisclosed records in the possession of the Social Security Administration demonstrate that Petitioner had, in fact, been placed in special education classes, contrary to the testimony of government witnesses at trial. The newly available evidence directly contradicts the government's arguments and evidence – central to its case at the punishment phase of the trial – that Mr. Webster was not mentally retarded, that he was faking his IQ tests, that he was not in special education classes in school, and that his adaptive functioning was normal.

Petitioner is mentally retarded. His lowest IQ score, 48, puts him at least three and one-third standard deviations below the mean, with an IQ higher than less than 0.1 percent of the population. *See* David Wechsler, *WAIS-III Administration and Scoring Manual* 24 (3d ed. 2003); Declaration of Dr. Marc J. Tassé, PhD ("Tassé Decl.") ¶ 15.[2] Furthermore, Petitioner's IQ scores are significantly lower than the scores of prisoners recently found to be mentally retarded by the federal courts. *See, e.g., United States v. Hardy*, 762 F. Supp. 2d 849, 857 (E.D. La. 2010) (IQ scores up to 76); *United States v. Lewis*, 2010 WL 5418901, *8-9 (N.D. Ohio Dec. 23, 2010) (IQ scores up to 76); *Rivera v. Quarterman*, 505 F.3d 349, 362 (5th Cir. 2007) (IQ scores up to 92), *cert. denied*, 555

---

[2] The Declaration of Dr. Marc J. Tassé, PhD referenced herein is attached as Exhibit U to the Declaration of Steven J. Wells.

U.S. 827 (2008); *Holladay v. Allen*, 555 F.3d 1346, 1357 (11th Cir. 2009) (IQ scores up to 73); *United States v. Davis*, 611 F. Supp. 2d 472, 478 (D. Md. 2009) (IQ scores up to 76). The government has not identified, and counsel has not been able to find, any case decided since *Atkins* holding that a person with such consistently low IQ scores is *not* mentally retarded.

On October 21, 2009, Petitioner moved the Fifth Circuit, based on the same new evidence that is the basis for this Petition, for authorization to file a successive motion to vacate his death sentence under 28 U.S.C. § 2255(h)(1). The Fifth Circuit denied Petitioner's motion for authorization, holding that it lacked jurisdiction to entertain the application under 28 U.S.C. § 2255(h). *In re Webster*, 605 F.3d at 259 n. 8. Reading the language of § 2255(h)(1) narrowly, the court concluded that "a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital murder." *Id.* at 257. The Fifth Circuit held in essence that no matter how conclusive Mr. Webster's proof that he is in fact retarded, § 2255(h)(1) precluded the court from considering it because he is not also innocent of the crime. Mr. Webster filed a petition for writ of certiorari on the § 2255 question, which was denied. *Webster v. United States*, 131 S.Ct. 794 (2010).

As the Fifth Circuit's concurrence found, however, the limitations expressed in 28 U.S.C. § 2255(h)(1) can lead, and here have led, to an unconstitutional result. Judge Weiner concluded that the new evidence "virtually guaranteed that [Mr. Webster] would be found to be mentally retarded." *In re Webster*, 605 F.3d at 259. Yet, because of the

5

express limitations in that statute, 28 U.S.C. § 2255(h) produces an "absurdity" and a "Kafkaesque result," and would require the courts to "condone . . . an unconstitutional punishment." *Id.* at 259-60.

There is, then, a "glitch," *Unthank v. Jett*, 549 F.3d 534, 536 (7th Cir. 2008), in § 2255: the Fifth Circuit has ruled there is no mechanism for the federal courts to consider newly discovered evidence that proves a defendant is categorically ineligible for a death sentence under § 2255. Accordingly, Petitioner's claim falls squarely within § 2255's savings clause and meets the requirements of the plain language of 28 U.S.C. § 2241. Bruce Webster is categorically ineligible for the death penalty and is in custody in violation of the Constitution of the United States. Like prior cases where the Seventh Circuit has granted relief under § 2241, Petitioner's situation is extraordinary: absent action by this Court, Bruce Webster will be executed in violation of the Constitution, resulting in an unconstitutional suspension of the writ of habeas corpus.

Accordingly, Petitioner asks this Court to find that, under the facts and circumstances set out below, § 2241 provides him with a statutory basis by which to establish that he is mentally retarded and therefore categorically ineligible for a sentence of death. Specifically, Petitioner requests that this Court find that newly available contemporaneous Social Security records, along with newly obtained declarations of childhood friends, relatives, and acquaintances of Mr. Webster, viewed in light of the evidence as a whole, establish that Mr. Webster is mentally retarded and thus not eligible for the death penalty.

After setting forth the procedural history, Mr. Webster first addresses the evidence proving his retardation and then explains how this Court has jurisdiction to consider it pursuant to 28 U.S.C. § 2241.

## III. PROCEDURAL HISTORY

### A. MR. WEBSTER WAS TRIED, CONVICTED, AND SENTENCED TO DEATH IN 1996

On November 4, 1994, Mr. Webster was indicted on six counts in the Northern District of Texas, including kidnapping in which a death occurred in violation of 18 U.S.C. §§ 1201(a)(1) and (2), along with various noncapital offenses. Mr. Webster was tried and convicted; he was sentenced to death on the capital charge on June 20, 1996.

### B. EVIDENCE OF MENTAL RETARDATION

The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) defines mental retardation as (a) significantly subaverage intellectual functioning demonstrated by a full-scale IQ score of between 70-75 or lower; (b) concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety; and (c) onset before age 18 years. *See* DSM-IV-TR (American Psychiatric Association, 2000) at 41-42, 49; Tassé Decl. ¶ 12. This standard is routinely applied by courts in determining whether an individual suffers from mental retardation. *See e.g.*, *Hardy*, 762 F. Supp. 2d at 852-55; *Davis*, 611 F. Supp. 2d at 474-77; *Lewis*, 2010 WL 5418901, at *4-7.

7

## 1.    EVIDENCE OF MENTAL RETARDATION PRESENTED AT TRIAL BY MR. WEBSTER

Mr. Webster submitted evidence of his mental retardation during the sentencing phase of his trial, including evidence of five IQ scores (48, 51, 55, 59, 65) and testimony from four psychologists and psychiatrists who had examined him and determined that his IQ fell within the range of the mentally retarded. Dr. Raymond Finn, a clinical psychologist certified and trained in diagnosing mental retardation, administered a full-scale intelligence test, the Wechsler Adult Intelligence Scale – Revised ("WAIS-R"), to Mr. Webster near the time of his arrest, and determined Mr. Webster has an IQ of 59. (Trial Tr. Vol. 23, 176:11-20, 186:20-187:9)[3] Dr. Finn stated that Mr. Webster's intelligence is in the lowest .3 percentile—"below the first percentile in terms of intelligence compared to the rest of the population,"—and that Mr. Webster is "clearly mentally retarded" under the accepted definitions.[4] (*Id.* 187:10-24.) Dr. Denis Keyes, a psychologist specializing in mental retardation, testified that he administered two intelligence tests, the Stanford-Binet Fourth Edition and the Kaufman Adolescent and Adult Intelligence Test, and found that Mr. Webster's composite IQ scores were 51 and 55, respectively, putting him in the lowest .2-.3 percent of the population. (Trial Tr. Vol. 24, 19:24-20:25, 26:11-28:1, 29:14-31:24, 34:1-35:23.) Dr. Keyes also tested Mr. Webster's adaptive deficits and found that Mr. Webster functioned at the level of a seven-year old. (*Id.* 37:10-44:12.) Dr. Keyes concluded that Mr. Webster is in fact

---

[3]    All excerpts of Trial Transcripts referenced herein are attached as Exs. B-F to the Declaration of Steven J. Wells.

[4]    Dr. Finn administered a second WAIS-R test to Mr. Webster during the trial and the results were again consistent with mental retardation. (Trial Tr. Vol. 23, 192:17-193:2.)

8

mentally retarded. (*Id.* 47:7-49:4.) Dr. Robert Fulbright, a neuro-psychologist, performed a battery of neuro-psychological tests on Mr. Webster and concluded that Mr. Webster has significant impairment in his intellectual capacity, attention capacity, reasoning abilities, and suffered from limited language and memory capabilities. (*Id.* 128:10-148:24.) Finally, Dr. Mark Cunningham, who had examined Mr. Webster and interviewed Mr. Webster's family, concluded that Mr. Webster suffers from mild mental retardation[5]. (*Id.* 185:17-189:8.) Additional evidence that Mr. Webster received a score of 48 on an IQ test administered by an Arkansas state mental health center in 1992 was also presented during the trial. (Trial Tr. Vol. 23, 177:11-178:6.) Notably, of the four complete, individually administered IQ tests admitted into evidence at trial, only one was administered before commission of the crime, when Mr. Webster was 19 years old. (*Id.*)

Mr. Webster also presented evidence of his adaptive deficits in three of the categories designated by the DSM-IV-TR—functional academics, home living, and communication and conceptual skills.[6] Dr. Denis Keyes administered a Vineland adaptive skills test to Mr. Webster. That test showed that Mr. Webster is not able to live on his own and function in the real world, (Trial Tr. Vol. 24, 44:4-12) (home living), and that Mr. Webster is not able to communicate regarding abstract thoughts, (*id.* 107:2-14)

---

[5] "Mild" mental retardation is the term traditionally used to describe individuals within the IQ range of 50-55 to 70-75. *Mental Retardation: Definition, Classification, and Systems of Support* 27 (10th ed. 2002). Most individuals found to meet the *Atkins* criteria suffer from mild mental retardation. *See, e.g., Wiley v. Epps*, 625 F.3d 199, 214, 222 (5th Cir. 2010); *Thomas v. Allen*, 607 F.3d 749, 754, 760 (11th Cir. 2010).

[6] *See* DSM-IV-TR at 42 ("*Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting").

(communication and conceptual skills). Dr. Raymond Finn testified that Mr. Webster is better at speaking than understanding, and that concepts have to be simplified in order for Mr. Webster to understand them, (Trial Tr. Vol. 23, 193:22-194:13) (communication and conceptual skills). Dr. Finn also noted that Mr. Webster's speech patterns, "marginal" school achievement, "marginal" employment history, and his inability to live on his own, supported his diagnosis of mental retardation. (*Id.* 193:7-21, 196:9-17.)

Mr. Webster's friends and family testified that classmates helped Mr. Webster with his homework and on exams, and that Mr. Webster repeated grades twice—in second grade and again in junior high, (*id.* 75:18 – 76:4, 138:2-5) (functional academics); that Mr. Webster was never able to live away from his mother's home, and that he only received income from welfare, food stamps, family members and girlfriends (*id.* 33:5-14, 67:4-17, 145:13-24) (home living); and that Mr. Webster may have been able to write letters, but that his handwriting was illegible (*id.* 102:22 – 103:3) (communication and conceptual skills).

### 2. THE GOVERNMENT'S EVIDENCE AND ARGUMENTS AT TRIAL

In the face of the overwhelming evidence of Mr. Webster's consistently low IQ scores and his adaptive deficits, the government argued that Mr. Webster was not mentally retarded because he was faking. The government presented testimony from Dr. George Parker, who administered a partial WAIS-R test and estimated that Mr. Webster's composite IQ score was 72. (Trial Tr. Vol. 26, 48:5 – 49:15, 75:6 – 77:23, 86:8-13.) Dr. Parker suggested repeatedly that Mr. Webster's scores were artificially deflated because

10

he was "motivated" to do poorly on the tests administered after his arrest, and concluded that Mr. Webster is not mentally retarded. (*Id.* 46:24 – 48:9, 49:3 – 50:23, 52:23 – 53:23, 67:1-12, 88:10-17.) Dr. Richard Coons, a psychiatrist who did not conduct an IQ test or a Vineland adaptive skills test, likewise testified that he did not believe Mr. Webster was mentally retarded and that Mr. Webster was manipulating his performance on the IQ exams. (*Id.* 131:11 – 134:21, 142:1 – 147:10.) Specifically, Dr. Coons stated that Mr. Webster lied when he told Dr. Finn that he was in special education classes, and that this lie was consistent with "an attempt to persuade that person that you had mental deficiencies that you didn't actually have." (*Id.* 132:11 – 133:7.)

The government rebutted Mr. Webster's evidence of adaptive deficits by focusing on Mr. Webster's abilities to adapt to life in prison. Dr. Parker and Dr. Coons, who visited Mr. Webster in prison together, testified that they had observed Mr. Webster put away his clothes, make his bed in his jail cell, and keep an organized cell (Trial Tr. Vol. 26, 59:20-25, 135:22 – 139:2); and that Mr. Webster was able to communicate effectively and speak in full sentences, read simple stories, and address an envelope (*id.* 58:10 – 59:6). The government also presented testimony from fellow inmates and prison guards who had contact with Mr. Webster while he was incarcerated or working in the prison system, and who believed Mr. Webster had adapted to life within that system. (*See* Trial Tr. Vol. 25, 86:6 – 103:12, 111:13 – 118:11, 123:2 – 130:09, 138:2-22; Trial Tr. Vol. 26, 21:22 – 29:13). Dr. Coons testified that Mr. Webster would score deceptively low on the adaptive skills test because he has "not chosen to adapt to an ordinary lifestyle" but to the "prison life he has chosen to live." (*Id.* 143:1 – 144:14.) The government presented

11

additional evidence of Mr. Webster's adaptive functioning outside of prison, including testimony from two Watson Chapel Schools representatives who indicated that Mr. Webster was not placed in special education classes and therefore was not retarded. (*See* Trial Tr. Vol. 24, 226:8 – 232:15; Trial Tr. Vol. 25, 22:16 – 28:6, 35:18 – 89:10.)

At the close of the punishment phase of trial, the government argued that the jury should discount the evidence of mental retardation, claiming that the evidence showed Mr. Webster was an average student (because he had not been in special education classes) who could function normally in prison, and that his low IQ scores were irrelevant because Mr. Webster was "motivated" to fake low scores on the IQ and behavioral skills tests in order to avoid a death sentence. (Trial Tr. Vol. 27, 63:16 – 65:11.)

## C.  THE SENTENCING DECISION

On June 20, 1996, the jury found the government had proven beyond a reasonable doubt certain aggravating factors that support a sentence of death, that the aggravating factors sufficiently outweighed any mitigating factors, and that Mr. Webster should receive the penalty of death.[7] (Trial Tr. Vol. 27, 101:10 – 103:8.) When determining mitigating factors, four jurors found that the defense had proven by a preponderance of the evidence that Mr. Webster "is or may be mentally retarded," (*id.* 20:23 – 21:2, 102:16-17 (Nonstatutory Mitigating Factor No. 1)), but the jury was given no instructions as to the legal standard to be used in determining mental retardation (*id.* 20:23 – 21:1).

_____

[7]     Mr. Webster was tried six years before the U.S. Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002). Mr. Webster's mental retardation claim was therefore evaluated under the statutory bar against the execution of mentally retarded individuals under 28 U.S.C. § 3596 at trial and on direct appeal.

12

On September 30, 1996, the Court issued its judgment, sentencing Mr. Webster to death. (Judgment in a Criminal Case, Docket No. 824[8].) The Fifth Circuit affirmed Mr. Webster's sentence and conviction on direct appeal. *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998).

### D. MR. WEBSTER CHALLENGED HIS SENTENCE UNDER 28 U.S.C. § 2255 BUT WAS DENIED ADDITIONAL DISCOVERY ON ISSUES OF MENTAL RETARDATION

Mr. Webster filed his initial Motion to Vacate Conviction and Sentence under 28 U.S.C. § 2255 ("2255 Motion") on September 29, 2000. (*See* 2255 Motion, Docket No. 998). While his 2255 Motion was pending, Mr. Webster filed a Motion for Leave to Conduct Discovery requesting discovery on several issues related to his mental retardation claim. (*See* Motion for Leave to Conduct Discovery (April 30, 2001) (Wells Decl. Ex. X).) One of Mr. Webster's discovery requests, Request for Discovery No. 8, specifically requested that the government be compelled to produce "any reports prepared by a mental health professional in the government's possession which, in any manner, questions or rebuts the testimony by the government's witnesses at trial (*i.e.*, Dr. Coons and Dr. Parker) on the issue of petitioner's mental retardation." (*Id.* at 10.) The Northern District of Texas denied the request. (*See* Memorandum Opinion and Order Denying Petitioner's Motion for Discovery (Wells Decl. Ex. Y).) Had the court granted it, the government would have been required to turn over the Social Security records that are the basis for the instant motion.

---

[8] "Docket No." refers to the criminal docket entry in U.S. v. Webster, Case No. 4:94-cr-00121-Y (N.D. Tex.).

13

The district court denied Mr. Webster's Amended 2255 Motion in full on September 20, 2003. (*See* Memorandum Opinion and Order, Docket No. 1110.) The Fifth Circuit ultimately denied Mr. Webster's application for certificates of appealability. *United States v. Webster*, 421 F.3d 308 (5th Cir. 2005).

## IV. MR. WEBSTER HAS OBTAINED PREVIOUSLY UNDISCLOSED GOVERNMENT RECORDS THAT ESTABLISH HE IS CATEGORICALLY INELIGIBLE FOR THE DEATH PENALTY AND ENTITLED TO HABEAS RELIEF

Previously unavailable evidence going directly to the issue of Mr. Webster's mental retardation was recently uncovered by Mr. Webster's defense team. Although Mr. Webster's trial counsel requested these records before trial, they were not released by the Social Security Administration until recently. (*See* Declaration of Kristen K. LeRoux ("LeRoux Decl.") ¶ 12.[9]) Moreover, as discussed above, *supra* Part III.D, these records were specifically requested in Mr. Webster's Requests for Discovery, which were denied by the trial court. The records show that *government* physicians and psychologists examined Mr. Webster when he was 20, a year *before* the commission of the crime; that each doctor found that he had an extremely low IQ; and that two of them concluded he had mental retardation. The new tests directly undercut the government's central position at trial that Mr. Webster was faking low IQ scores in order to secure a mental retardation defense. The newly released Social Security records also contain previously unavailable evidence that Mr. Webster was, in fact, enrolled in special education classes—again, directly refuting the government's evidence and argument at trial.

---

[9]     The Declaration of Kristen L. LeRoux referenced herein is attached as Exhibit V to the Declaration of Steven J. Wells.

Finally, Mr. Webster seeks to present newly obtained testimony demonstrating the manifestation of his mental retardation prior to age 18.[10] This testimony reflects Mr. Webster's inability to care for himself, including his inability to tie his shoes and dress himself as a teenager. Additional evidence demonstrates Mr. Webster's inability to understand simple language concepts and basic tasks. There is also newly obtained evidence regarding Mr. Webster's poor performance in school, which supports the finding that he has adaptive deficits in functional academics. *See* DSM-IV-TR at 49. Importantly, the newly obtained evidence illustrates that Mr. Webster displayed adaptive deficits before incarceration and in the non-prison environment. In contrast, much of the adaptive deficit evidence presented by the government at trial related to Mr. Webster's ability to function in the structured prison environment—an environment that experts in mental retardation deem inappropriate for measuring adaptive ability.[11]

---

[10] Mr. Webster's legal team also uncovered government records showing a pattern of abuse and violence in Mr. Webster's family. Child abuse and domestic violence are risk factors for mental retardation. *See The American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition Classification, and Systems of Supports* 60 tbl. 6.1 (11th ed. 2010); Tassé Decl. ¶ 26. Records obtained from the Arkansas Department of Human Services Child Maltreatment Central Registry on October 31, 2008 indicate that Mr. Webster was a victim of severe abuse at the age of 10. *See* Maltreatment Summary Report (Wells Decl. Ex. I at I.2-4); LeRoux Decl. ¶ 5. In addition, Social Security records for Mr. Webster's father, Willie Webster, obtained on February 9, 2009, indicate that Willie Webster was "functioning on a psychotic level" and that he "tends to lose his temper easily and is rough on both [his wife] and their children." *See* Report of Richard E. Walters, M.D. (Wells Decl. Ex. H at H.6 ); Report of Dr. Jim J. Moore (*id.* at H.11); LeRoux Decl. ¶ 12.

[11] Experts in the field discredit statements about an individual's ability to function in prison because the structured nature of the environment does not provide a true test of an individual's abilities. *See, e.g.,* J. Gregory Olley and Ann W. Cox, *Assessment of Adaptive Behavior in Adult Forensic Cases: The Use of the Adaptive Behavior Assessment System-II, in ABAS-II Clinical Use and Interpretation* 381, 386 (Thomas Oakland & Patti L. Harrison eds., 2008); *see also Wiley,* 625 F.3d at 218; *Adanandus v. Johnson,* 947 F. Supp. 1021, 1044 (W.D. Tex. 1996)

15

This newly available evidence directly contradicts and undercuts the government's case at trial that Mr. Webster was faking his IQ tests and that his adaptive functioning was normal. Together with the evidence presented at trial, no reasonable factfinder could find that Mr. Webster is not mentally retarded.

A. **NEWLY AVAILABLE MEDICAL DIAGNOSES OF MENTAL RETARDATION IN SOCIAL SECURITY RECORDS REVEAL EVIDENCE OF PETITIONER'S SIGNIFICANT SUBAVERAGE INTELLECTUAL FUNCTIONING**

On September 9, 1993, Mr. Webster applied for Social Security benefits, claiming a disabling condition of sinus problems and headaches. In order to determine whether Mr. Webster was eligible for Social Security benefits based on this claim, the Social Security Administration had him evaluated by three separate medical professionals. It is clear from the records that two of these doctors performed psychological evaluations concluding that Mr. Webster has an IQ that falls well within the range of mental retardation, and each of these three doctors independently diagnosed Mr. Webster with extremely low IQ and/or mental retardation. Although Mr. Webster requested these records from the Social Security Administration prior to trial, and then again sought in post-conviction all relevant records from the government, they were withheld from Mr. Webster until February 9, 2009. (*See* Declaration of Larry M. Moore ("Moore Decl.") ¶ 4[12]; LeRoux Decl. ¶ 12.) This evidence directly refutes the government's evidence and

---

("petitioner's improved performance on some tests may be due to his living in a structured environment").

[12] The Declaration of Larry M. Moore referenced herein is attached as Exhibit W to the Declaration of Steven J. Wells.

16

arguments presented at trial, and establishes that Mr. Webster suffers from mental retardation.

### 1.    DR. EDWARD HACKETT'S DIAGNOSIS OF MILD MENTAL RETARDATION AND IQ SCORING OF 59

Dr. Edward Hackett conducted a Full Scale WAIS-R IQ test on Mr. Webster in October of 1993, in connection with his application for social security benefits. In Dr. Hackett's Psychometric Evaluation report, dated October 22, 1993, Mr. Webster's Full Scale WAIS-R IQ score is 59, with a Performance IQ of 49 and a Verbal IQ of 71. (*See* Psychometric Evaluation (Wells Decl. Ex. G at G.15).) Dr. Hackett's evaluation states "[Mr. Webster] is mildly retarded, but is also antisocial." (*Id.* at G.16.) His diagnoses were as follows: "Mild Mental Retardation. . . . Mr. Webster manifests no signs of wanting to improve or to seek employment. He appears to be a user of others." (*Id.*) In Dr. Hackett's Medical Report containing additional information, dated November 10, 1993, he stated that "[Mr. Webster] was viewed as a somewhat mild[ly] retarded con man, but very street wise. . . . [H]e could not be functional in a community setting. . . . He would also not function well in the work place." ( Medical Report (Wells Decl. Ex. G at G.14).) Dr. Hackett "did not feel that [Mr. Webster] could manage his own benefits. His behavior was somewhat bazaar [sic]. On the IQ scores performance was estimated lower than verbal. Dr. Hackett felt some organic function may be involved." (*Id.*)

Dr. Hackett's report reflects one of the earliest IQ tests administered to Mr. Webster. This report confirms the evidence in the trial record that Mr. Webster's IQ is below 70 and he accordingly has significant limitations in intellectual functioning. (*See*

17

Tassé Decl. ¶¶ 48-51, 58-61.) Dr. Hackett's report directly contradicts the opinions presented at trial by Dr. Coons and Dr. Parker that Mr. Webster was purposely malingering on the IQ tests administered after his arrest in order to avoid the death penalty, and that Mr. Webster is not mentally retarded. The Full Scale WAIS-R IQ test and report were completed when Mr. Webster was 20 years old and approximately eleven months before the date of the crime for which he faces execution. (*See* Tassé Decl. ¶ 59 ("Importantly, Dr. Hackett's evaluation of Mr. Webster's intellectual functioning was done almost 1 year before the date of the murder for which Mr. Webster was convicted and sentenced to death. This is significant because at the time of his performance on Dr. Hackett's WAIS-R, Mr. Webster was not accused of murder nor trying to escape the death penalty—a claim often raised as a possible motivation for malingering on a test of intelligence.").)

Moreover, Dr. Hackett's evaluation of Mr. Webster, one of the first known professional diagnoses of Mr. Webster's adaptive deficits, demonstrates that Mr. Webster has significant limitations in conceptual skills (such as managing daily life) and practical skills (such as seeking or keeping a job). Dr. Hackett's report is strong evidence of mental retardation that directly rebuts the evidence submitted by the government in its attempt to refute Mr. Webster's mental retardation claim.

### 2. DR. C.M. RITTELMEYER'S DIAGNOSIS OF MENTAL RETARDATION

In a report dated October 25, 1993 and entitled "General Physical Examination," Dr. C.M. Rittelmeyer also evaluated Mr. Webster's mental and physical condition. (*See*

18

General Physical Examination (Wells Decl. Ex. G at G.18).) Although Dr. Rittelmeyer's descriptions of Mr. Webster's physical health are unremarkable, his diagnosis of Mr. Webster is significant: "Mental retardation. Flat Feet. Chronic sinus problems and Allergies by history." (*Id.* at G.21.) Importantly, this report, too, was written well before the crime at issue in this case and, again, contradicts the central testimony of the government's trial witnesses that (1) Mr. Webster was malingering on the other IQ tests and (2) he is not retarded.

### 3. DR. CHARLES SPELLMAN'S DIAGNOSIS OF MENTAL RETARDATION AND SCORING OF 69 OR LOWER

A psychological evaluation dated December 22, 1993, completed by Dr. Charles Spellman for the diagnosis of mental disorders to "better ascertain eligibility for Social Security benefits," further supports a contemporaneous diagnosis of mental retardation. (*See* Palaver, Inc. Evaluation for Mental Disorders (Wells Decl. Ex. G at G.11).) Dr. Spellman notes that "[i]deation was sparse and this appeared to be more of a function of his lower cognitive ability than of any mental illness. He came across as a slow fellow who did not know much and did not know how to communicate well." (*Id.* at G.12.) Regarding intellectual function, Dr. Spellman stated that "[Mr. Webster] was not able to register three objects. . . . He was not able to do simple calculations. He did not know what the sayings meant." (*Id.*) Dr. Spellman estimated Mr. Webster's IQ to be 69 or lower. (*Id.* at G.13.) In regard to Mr. Webster's level of adaptive functioning, Dr. Spellman stated: "[Mr. Webster] lives with his mother. He watches television, listens to the radio and goes walking. . . . He does no chores around the house. Mostly he seems to

be idle around the house and on the streets." (*Id.*) Dr. Spellman's only diagnoses of Mr. Webster were "1. Mental Retardation" and "2. Antisocial Personality by History." (*Id.*) Importantly, Dr. Spellman also noted that "[t]here was no evidence of exaggeration or malingering" and that "[Mr. Webster] will not get any better." (*Id.*)

Dr. Spellman's report further confirms the evidence in the trial record that Mr. Webster's IQ is below 70 and that he has significant limitations in intellectual functioning. (*See* Tassé Decl. ¶¶ 53-54, 58.) Along with Dr. Hackett's evaluation, Dr. Spellman's report is among one of the first known professional diagnoses of Mr. Webster's adaptive deficits. Dr. Spellman's evaluation of Mr. Webster demonstrates that Mr. Webster has significant limitations in conceptual skills (such as self direction, communication, and functional academics), social skills (such as taking responsibility), and practical skills (such as personal activities of daily life). Most importantly, Dr. Spellman evaluated Mr. Webster at age 20 and concluded that there was no evidence that Mr. Webster was faking his limitations—again, directly contradicting the testimony of the government's witnesses at trial.

### B. THE DIAGNOSES CONTAINED IN THE SOCIAL SECURITY RECORDS DIRECTLY REFUTE THE GOVERNMENT'S CASE AT TRIAL

These newly disclosed government records show complete and unbiased findings of mental retardation by government doctors; they aid substantially in buttressing the evidence of Mr. Webster's mental retardation; and, most importantly, they directly refute the government's arguments at trial that Mr. Webster was faking his IQ tests to avoid the death penalty. Dr. Hackett's diagnosis was based on *complete* administration of the

20

WAIS-R exam, Dr. Spellman's diagnosis was based on the administration of a psychological examination, and all three diagnoses of mental retardation were made by government-employed doctors when Mr. Webster was 20 years old, well before he committed the crime at issue in this case. By contrast, the government's two trial witnesses offered diagnoses made while Mr. Webster was incarcerated, years after the newly available evaluations were completed. (*See* Trial Tr. Vol. 26, 59:12-19, 120:17 – 121:6.) The testing performed by the prosecution's witnesses was inherently flawed: Dr. Parker's partial IQ test resulted in an estimated score based on incomplete administration of the applicable examination, (*id.* 86:8-13; *see also* Tassé Decl. ¶ 16), while Dr. Coons admitted that he was not certified or practiced in conducting evaluations for the purpose of determining mental retardation: "As I told you, I don't do the psychological testing." (*Id.* at 177:9-14.)[13]

The government attacked Mr. Webster's strong evidence of mental retardation at trial by questioning Mr. Webster's "motivations" and accusing him of faking. As Dr. Parker testified, in describing the difference in the way he determines mental retardation in criminal subjects versus "real world" patients:

> [I]f you're sitting in your office and the patient comes in because he or she is having problems and they want help with it, and they are soliciting your professional services on their own hook, their own motivation, then the likelihood of trying to manipulate you or lie to you or deceive you or not do very well, it would be a pretty silly person to go to a doctor and then sit there and tell the doctor a bunch of lies about why he or she is there. But in forensic settings, of

---

[13]     The Texas Court of Criminal Appeals recently deemed Dr. Coons's methodology inadmissible as "not scientifically reliable" under *Daubert. Coble v. Texas*, 330 S.W. 3d 253, 277-280 (Tex. Crim. App. 2010).

Case 2:12-cv-00086-WTL-WGH Document 1-1 Filed 04/06/12 Page 22 of 38 PageID #: 1673

course, there is often serious motivation to mislead or deceive or get over on you or whatever, because the nature of the contract is different.

(Trial Tr. Vol. 26, 53:1-23.) Because these newly available diagnoses were made before Mr. Webster was incarcerated for this crime, when he was a "real world" patient, and expressly conclude that there is no evidence of malingering, they directly undermine the government's evidence and arguments that Mr. Webster was consistently faking later IQ tests in order to secure a mental retardation defense. (*See id.* at 224:18–225:4; Trial Tr. Vol. 27, 63:16 – 65:11; Tassé Decl. ¶¶ 51, 54, 59.)

### C. PREVIOUSLY UNDISCLOSED GOVERNMENT RECORDS SHOW THAT MR. WEBSTER HAS SIGNIFICANT FUNCTIONAL LIMITATIONS AND DIRECTLY CONTRADICT EVIDENCE PRESENTED BY THE GOVERNMENT AT TRIAL

#### 1. EVIDENCE THAT MR. WEBSTER WAS ENROLLED IN SPECIAL EDUCATION CLASSES

Additionally, the Social Security records contain previously undisclosed evidence that Mr. Webster was, contrary to government assertions at trial, placed in special education classes as a child. (*See* Letter from Lou Jackson, Watson Chapel Schools, to Social Security Administration (Nov. 8, 1993) (Wells Decl. Ex. G at G.17).) In this letter, Watson Chapel Schools Special Education Supervisor Lou Jackson explains that Mr. Webster's Special Education records had been destroyed in 1988. *Id.* This letter directly contradicts the evidence presented by two Watson Chapel Schools representatives who testified, as witnesses for the government, that Mr. Webster was not placed in special education classes and therefore did not meet the definition of mentally retarded. (Trial Tr. Vol. 24, 238:16 – 239:8, 247:21 – 248:8; Tassé Decl. ¶ 49 ("The one

22

29

salient element of this school district letter is an acknowledgement that Mr. Webster did receive special education services.").) It also directly contradicts Dr. Coons's testimony that Mr. Webster lied about being in special education classes in an attempt to manipulate a diagnosis of mental retardation. (Trial Tr. Vol. 26, 132:11 – 133:7.) This letter establishes that Mr. Webster was in fact enrolled in special education classes in the Watson Chapel Schools as a youngster and demonstrates that Mr. Webster has significant limitations in intellectual functioning and adaptive behavior, including impairments in functional academic skills.

### 2. THE APPLICATION COMPLETED BY MR. WEBSTER DEMONSTRATES MR. WEBSTER'S LIMITATIONS

Finally, the form completed by Mr. Webster to apply for Social Security disability benefits provides a clear example of Mr. Webster's deficits in syntax, spelling, punctuation, grammar, ability to answer a question, ability to write a complete sentence, and penmanship. (*See* Statement of Claimant or Other Person (Wells Decl. Ex. G at G.28-29); Disability Supplemental Interview Outline (Wells Decl. Ex. G at G.30-35).) In response to the application's prompt to describe the pain or other symptoms, Mr. Webster wrote: "it causes me to bet up set Easily headhurtsdiffiernt of bredth." (Statement of Claimant or Other Person (Wells Decl. Ex. G at G.28).) When asked what side effects his medication caused, Mr. Webster responded "Is leep bettEr." (*Id.*) When asked what he does on a normal day, Mr. Webster answered "I sleeps look at. cartoon." (Disability Supplemental Interview Outline (Wells Decl. Ex. G at G.30).) When asked to describe changes in his condition since onset, Mr. Webster replied "ain't got no chang." (*Id.*)

When asked whether he was involved in any clubs or other groups, Mr. Webster answered "Iwalk around in the club." (*Id.* at G.34.) These incomprehensible answers, along with the nearly illegible penmanship, lack of syntax, capitalization, and punctuation, demonstrate Mr. Webster's significant limitations in intellectual functioning as well as his significant limitations in conceptual skills (such as language, writing, and communication). These documents, created by and in the possession of a government agency, bolster the mental retardation evaluations Mr. Webster offered at trial and directly contradict the government's argument that although Mr. Webster's IQ scores may be within the range of mental retardation, Mr. Webster does not have the required adaptive deficits.[14]

\* \* \*

---

[14] Mr. Webster also seeks to submit newly obtained evidence regarding Mr. Webster's adaptive deficits. (*See* Wells Decl. Exs. J - T.) In evaluating a defendant's adaptive deficits, courts have accorded great weight to testimony from family members and others who have had regular contact with the defendant (including parents, teachers, employers, and childhood friends). *See, e.g., Holladay v. Allen*, 555 F.3d 1346, 1349-50, 1364 (11th Cir. 2009) (affirming district court's finding that state prisoner was mentally retarded and therefore entitled to relief on a successive habeas corpus petition). Declarations recently obtained from childhood friends, relatives, and acquaintances of Mr. Webster over the course of multiple interviews with experts provide further evidence of Mr. Webster's mental retardation, and in particular, his limitations in adaptive behavior in functional academics, home living, communication, and social and interpersonal skills. While some of the information learned in the interviews supplements that previously presented at trial and on Mr. Webster's first § 2255 motion, much of the information constitutes new evidence which goes directly to the adaptive deficits prong of the currently accepted definition of mental retardation. Dr. Tassé states, "there is an abundance of examples of adaptive behavior deficits in the declarations as well as delayed milestones and childhood deficits. This information along with other previous psychological evaluations and these recently released SSA records are consistent with mental retardation…and has the added merit that it was not gathered in an institutional setting, such as a prison, which is unsuited for determining if an individual has mental retardation." (Tassé Decl. ¶ 60.) As a whole, the declarations demonstrate that Mr. Webster meets the accepted definition of being a person with mental retardation and is therefore ineligible for the death penalty.

24

This previously undisclosed evidence, viewed in light of the substantial evidence already presented at trial, demonstrates that Mr. Webster is mentally retarded and therefore ineligible for the death penalty. The numerous intelligence tests given to Mr. Webster over the past two decades provide uncontroverted evidence of his intellectual limitations. Mr. Webster has taken eight individually administered intelligence evaluations (including the newly disclosed tests administered by government psychologists from before the commission of the crime), and has scored in the mentally retarded range on all eight exams. Mr. Webster has shown that he has significant limitations in adaptive behavior, including an inability to care for himself, relate to others, and meet the demands of living in a community. While Mr. Webster presented testimony at trial from individuals who knew him before age 18, now for the first time, Mr. Webster has evidence of independent, professional diagnoses of his limitations in adaptive behavior from a time well before the commission of the crime at issue. This is compelling evidence that Mr. Webster has significant subaverage intellectual functioning, and is consistent with a diagnosis of mental retardation. (*See* Tassé Decl. ¶¶ 58, 60, 61.) Moreover, the previously unavailable and newly obtained evidence of adaptive deficits displayed at a young age and prior to incarceration in a non-prison environment provide the most pointed evidence of Mr. Webster's adaptive functioning capabilities available. Contrary to the government's trial testimony about Mr. Webster's ability to function in the prison environment, this strong evidence of deficits in living skills is of the kind on which experts routinely rely upon in assessing mental retardation.[15]

---

[15] As described in nt. 10, *supra*, statements about an individual's ability to function in

25

Four of the jurors at Mr. Webster's trial were persuaded by the evidence of mental retardation presented at trial. This was true despite the prosecution's damning claims of malingering, lack of special education placement, absence of proof of deficits prior to the crime – all of which have now been refuted by government doctors. Any reasonable factfinder considering the newly disclosed Social Security records and testimonial evidence, in addition to the substantial evidence already admitted at trial, would find Mr. Webster mentally retarded and therefore not eligible for the death penalty.

## V. BECAUSE SECTION 2255 IS INADEQUATE AND INEFFECTIVE, SECTION 2241 IS THE APPROPRIATE MECHANISM FOR PETITIONER TO CHALLENGE THE UNCONSTITUTIONALITY OF HIS DEATH SENTENCE BASED ON PREVIOUSLY UNAVAILABLE EVIDENCE

Pursuant to 28 U.S.C. § 2241, a writ of habeas corpus may be granted by the district courts when a federal prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(a), (c)(3). The Antiterrorism and Effective Death Penalty Act ("AEDPA"), *see* 28 U.S.C. § 2255 specifically provides that the district court in the jurisdiction in which a federal prisoner is held may entertain an application for a writ of habeas corpus where the remedy by motion under 28 U.S.C. § 2255(a) is "inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e); *see Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001); *Collins v. Holinka*, 510 F.3d 666, 667 (7th Cir. 2007). In these extraordinary circumstances, § 2255 has proved an ineffective remedy for Bruce Webster.

---

prison are no longer viewed as credible by experts or by courts when determining adaptive deficits.

26

**A. MR. WEBSTER'S ATTEMPT TO PRESENT NEWLY DISCOVERED EVIDENCE TO THE FIFTH CIRCUIT UNDER SECTION 2255 WAS DENIED ON GROUNDS OF LACK OF JURISDICTION.**

On October 21, 2009, Mr. Webster moved the Fifth Circuit for authorization to file a successive motion to vacate his death sentence under 28 U.S.C. § 2255(h)(1) on the basis of the same newly discovered evidence that forms the basis for this Petition. The motion was based on the fact that, although substantial evidence of Mr. Webster's mental retardation had been presented at trial, the previously undisclosed evidence that forms the basis for this Petition establishes that Mr. Webster is mentally retarded and categorically ineligible for the death penalty.

The Fifth Circuit denied Mr. Webster's motion for authorization, holding that it did not have jurisdiction to entertain the application under 28 U.S.C. § 2255(h). *In re Webster*, 605 F.3d 256, 259 n. 8 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 794 (2010). Reading the language of section 2255(h)(1) narrowly, the court concluded that "a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital murder." *Id.* at 257. The court concluded that such a result is "compelled by the plain language of § 2255(h)(1), which does not encompass challenges to a sentence." *Id.* While the court noted that reading "offense" to encompass "not only a claim that a prisoner is not guilty of the offense of conviction but also a claim that he is merely 'not guilty of the death penalty'" would accord with prior habeas corpus law construing "actual innocence" to include "innocence of the death penalty," it nevertheless

27

34

found that "there is no reason to believe that Congress intended the language 'guilty of the offense' to mean 'eligible for a death sentence.'" *Id.* at 258.

Judge Wiener concurred in the opinion but wrote separately to emphasize the "absurdity of its Kafkaesque result: Because [Mr.] Webster seeks to demonstrate only that he is constitutionally ineligible for the death penalty – and not that he is factually innocent of the crime – we must sanction his execution." *Id.* at 259 (Wiener, J., concurring). Surveying the evidence presented in the motion, Judge Wiener concluded that "it is virtually guaranteed" that Mr. Webster would be found mentally retarded if the newly discovered evidence could be considered on the merits, but noted that "we must turn a blind eye to this evidence, as it speaks to [Mr.] Webster's constitutional eligibility for the death penalty and not his factual innocence of the crime." *Id.* at 259-60. Judge Wiener further stated that although he concurred in the majority's opinion "as a correct statement of the law, I continue to harbor a deep and unsettling conviction that, albeit under Congress's instruction which ties our judicial hands so illogically, we today have no choice but to condone just such an unconstitutional punishment." *Id.* at 260.

Mr. Webster filed a petition for a writ of certiorari with the Supreme Court of the United States on July 27, 2010. In the petition, Mr. Webster argued among other issues [16]

---

[16] Mr. Webster contended that as a threshold matter, the Court *could* consider the merits of the petition because the bar imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA") to the Court's review of denials of motions for authorization brought by *state* prisoners pursuant to 28 U.S.C. § 2254 does not apply to Mr. Webster, who is a *federal* prisoner challenging his sentence under section 2255. Mr. Webster also argued that in any event, he was seeking review not of a "denial of authorization" based on the merits of the *evidence* presented in the motion for authorization, but instead of the Fifth Circuit's holding that it lacked jurisdiction even to consider evidence of categorical ineligibility of the death penalty.

28

that the Fifth Circuit's holding rested on an interpretation of AEDPA that too narrowly construes the statutory text and would in Mr. Webster's case lead to the unconstitutional execution of a mentally retarded person.

In contending that the Supreme Court should not entertain Mr. Webster's petition at that time, the government argued that "Section 2244(b)(3)(E)'s bar against [the] Court's review of orders denying leave to file a second or successive Section 2255 motion does not mean that federal postconviction litigants are altogether without recourse to Court." (Resp't's Br. in Opp. 17, Oct. 29, 2010.) Indeed, the government expressly noted that "in cases where Section 2255 truly is an 'inadequate or ineffective' remedy, 28 U.S.C. 2255(e), federal defendants may seek habeas corpus relief under 28 U.S.C. 2241, with ultimate review in [the Supreme] Court." (*Id.*) The Court denied Mr. Webster's certiorari petition without opinion. *Webster v. United States*, 131 S.Ct. 794 (2010).

29

**B.** **PETITIONER SATISFIES THE SAVINGS CLAUSE OF SECTION 2255 AND THE REQUIREMENTS OF SECTION 2241.**

    **1.** **LIKE THE SUCCESSFUL PETITIONERS IN *GARZA* AND *DAVENPORT*, MR. WEBSTER FACES A PROCEDURAL "GLITCH" THAT PREVENTS HIM FROM CHALLENGING THE FUNDAMENTAL LEGALITY OF HIS DETENTION UNDER 2255.**

In order to invoke jurisdiction under 28 U.S.C. § 2241, Mr. Webster must show that § 2255 is inadequate for providing redress. Adequacy is determined by considering whether, in the circumstances of the case, the "essential function" served by habeas corpus is impaired "by the limitations on the use of the remedy provided in Section 2255." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998) (the "essential function" of habeas corpus is to "give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence"); *see also Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002). "Inadequacy" is demonstrated when § 2255 is "so configured as to deny a convicted defendant any opportunity for judicial rectification" of a fundamental defect in his conviction or sentence. *In re Davenport*, 147 F.3d at 611 (emphasis in original omitted) (imprisonment for non-existent offense). Therefore, a petitioner with claims of the sort that "justif[y] collateral review, [but do not] justify sequential collateral attacks under [§ 2255(h)]" may be able to pursue those claims via § 2241. *Taylor*, 314 F.3d at 835 (internal citations omitted).

The facts and circumstances Mr. Webster presents here meet the requirements of the plain language and purpose of § 2241. As in *Garza*, 253 F.3d at 922, and *Davenport*, 147 F.3d at 611, here a "glitch" in § 2255 precludes Mr. Webster from challenging the

30

fundamental legality of the sentence of death imposed upon him. Mr. Webster is a mentally retarded person in federal prison under a sentence of death. A mentally retarded person is, of course, categorically ineligible for the death penalty; to execute a person with mental retardation is "excessive" and a violation of the Eighth Amendment. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). However, the Fifth Circuit has ruled that § 2255 does not allow a federal prisoner to bring a successive claim that he is categorically ineligible for the death penalty based on newly discovered evidence "where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital murder." *In re Webster*, 605 F.3d at 257. While the Fifth Circuit has found that Mr. Webster cannot meet the strict requirements of § 2255(h), the evidence he now seeks to present to this court implicates "a fundamental defect" that undermines the constitutionality of his sentence. *See In re Davenport*, 147 F.3d at 611.

It was simply not possible for Mr. Webster to bring his claim in connection with his original petition because most of the new evidence upon which this Petition is based was in government files that were neither produced to Petitioner nor made available to him, despite his request. (*See* LeRoux Decl. ¶ 12; Moore Decl. ¶ 4.) That evidence, as the Fifth Circuit concurrence made clear, was not merely cumulative, but instead is "virtually guaranteed" to result in a finding that Webster is mentally retarded – provided that it is ever allowed to be considered by a judge or jury. *In re Webster*, 605 F.3d at 259 (Wiener, J., concurring); *see supra* Part V. As in *Garza* and *Davenport*, it was "literally impossible" for Mr. Webster to present this evidence at an earlier time because the government had not revealed the existence of the evidence and the district court

31

foreclosed discovery in the first habeas proceeding. *Garza*, 253 F.3d at 923; *see also In re Davenport*, 147 F.3d at 610-11. Mr. Webster sought, but was denied access to, the Social Security records he now seeks to present to this court until they were provided to his current counsel. (LeRoux Decl. ¶ 12; *see also, supra* Part III.D.) The records directly contradict all that the government has relied on to argue that Mr. Webster does not have mental retardation. Although he could—and did—argue that he is mentally retarded within the meaning of *Atkins* before, this *new* evidence could not have been presented before, either on direct appeal or in Mr. Webster's initial § 2255 motion.

The newly available evidence presented here, taken together with the evidence presented at trial, proves that Mr. Webster is mentally retarded and, therefore, "actually innocent" of the death penalty and constitutionally ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). Because Petitioner's claims meet the plain language and purpose of both sections 2241 and 2255(e), this Court must find jurisdiction and allow him to proceed with his Petition; there is no other remedy for the fundamental and unconstitutional defect in Mr. Webster's detention.

### 2. MR. WEBSTER SATISFIES THE SEVENTH CIRCUIT'S REQUIREMENTS FOR THE EXERCISE OF JURISDICTION UNDER SECTION 2241.

In considering petitions brought pursuant to § 2241, the Seventh Circuit has, at times, imposed requirements above and beyond those found in the plain language of the statute. In non-capital cases, [17] the Seventh Circuit appears to require that, to establish

---

[17] It is important to note that the cases in which these requirements have been imposed did *not* involve defendants under sentence of death. There is no indication that the Seventh Circuit

that 28 U.S.C. § 2255 is an "inadequate or ineffective" remedy, a petitioner must demonstrate that he is "actual[ly] innocen[t]." *Taylor*, 314 F.3d at 835-36. Mr. Webster satisfies the Seventh's Circuit's "actual innocence" requirement because, in the context of a capital case, "innocence of the death penalty" *is* "actual innocence." *See Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) ("[T]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have *found the petitioner eligible for the death penalty....*") (emphasis added).[18]

Congress did not alter or amend § 2241 as part of AEDPA and there is no indication that Congress intended to overrule *Sawyer* in the § 2241 context. Indeed, the "gatekeeping" requirements of § 2255 do not apply to § 2241 petitions. *See* Pub.L. No. 104-132, 110 Stat. 1214 (1996); *see also James v. Walsh*, 308 F.3d 162, 166 (2d Cir. 2002) (holding the gatekeeping provisions of AEDPA do not apply to § 2241 petitions); *Chambers v. United*

---

intended to impose a requirement to show "actual innocence" on defendants challenging a sentence of death under § 2241; in *Garza*, the Seventh Circuit *granted* review of a prisoner's § 2241 petition on the basis that the death sentence was imposed in error even in the absence of a claim of "actual innocence." 253 F.3d at 923. Comparing *Garza* with (for example) *Taylor*, it is clear that the heightened requirements established in *Taylor* apply only when a petitioner challenges merely the length of his sentence, as opposed to the categorical exclusion from the imposition of the death penalty. Although this judge-made rule effectively and improperly amends § 2241 (which, unlike 28 U.S.C. § 2255(h)(1), was not amended by Congress to include such a requirement), Petitioner, as set forth below, meets the additional requirements imposed by the Seventh Circuit, regardless of their propriety.

[18] The Court in *Sawyer* tailored its definition of "actual innocence" to capital cases and expressly included ineligibility for the death penalty because it acknowledged that the notion of actual innocence "does not translate easily into the context of an alleged error at the sentencing phase of a trial on a capital offense," 505 U.S. at 340, (quoting *Smith v. Murray*, 477 U.S. 527, 537 (1986)), whereas "[i]n the context of a noncapital case, the concept of 'actual innocence' is easy to grasp." *Sawyer*, 505 U.S. at 341; *cf. Dretke v. Haley*, 541 U.S. 386, 396 (2004) (observing that actual innocence claims "are likely to present equally difficult questions regarding the scope of the actual innocence exception itself. Whether and to what extent the exception extends to noncapital sentencing error is just one example.")

33

*States*, 106 F.3d 472, 475 (2d Cir. 1997) (holding the gatekeeping provisions of AEDPA applicable to §§ 2254 and 2255 were not triggered by a § 2241 petition even where it had been filed as a § 2255 petition).

Neither *Taylor* nor *Davenport* expressly equate the "actual innocence" requirement imposed upon § 2241 petitioners with a requirement that the petitioner be "not guilty of the underlying offense" as required for a motion for a successive petition under § 2255. *See Taylor*, 314 F.3d at 835-36; *In re Davenport*, 147 F.3d at 609-10. Instead, in both cases, the court's § 2241 analysis evinces the prudential concern for the preservation of judicial resources otherwise squandered by repeatedly testing the validity of convictions and for preventing petitioners from evading procedural requirements with comparatively minor technical failures. *Taylor*, 314 F.3d at 835-36; *In re Davenport*, 147 F.3d at 609-10. This Petition does not implicate these concerns. Mr. Webster does not seek to test the validity of his conviction or to raise minor technical pleading issues. Instead, he respectfully requests the Court allow him the opportunity to present – for the first time – newly discovered evidence of his mental retardation, rendering his execution unconstitutional. As Judge Wiener noted, the "innocence of the underlying offense" requirement in 28 U.S.C. § 2255(h) produces an "absurdity" and a "Kafkaesque result," and would require the courts to "condone . . . an unconstitutional punishment."

## VI. FAILURE TO CONSIDER THE NEWLY AVAILABLE EVIDENCE UNDER § 2241 WILL RESULT IN A SUSPENSION OF THE WRIT OF HABEAS CORPUS.

The United States Constitution forbids Congress from suspending the writ of habeas corpus except during periods of invasion or rebellion. U.S. Const. art. I, § 9, cl. 2.

34

("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."). Where, as here, § 2255 is not available, failure to consider the newly available evidence of Mr. Webster's categorical ineligibility for the death penalty will result in an unconstitutional suspension of the writ of habeas corpus.

In *Holland v. Florida*, the Court held:

> When Congress codified new rules governing this previously judicially managed area of law, it did so without losing sight of the fact that the "writ of habeas corpus plays a vital role in protecting constitutional rights." . . . It did not seek to end every possible delay at all costs. . . . The importance of the Great Writ, the only writ explicitly protected by the Constitution . . . , along with congressional efforts to harmonize the new statute with prior law, counsels hesitancy before interpreting AEDPA's statutory silence as indicating a congressional intent to close courthouse doors that a strong equitable claim would ordinarily keep open.

130 S. Ct. 2549, 2562 (2010) (citations omitted). In *Triestman v. United States*, the Second Circuit noted that "serious Eighth Amendment and due process questions would arise with respect to AEDPA if we were to conclude that, by amending § 2255, Congress had denied [petitioner] the right to collateral review. . . ." 124 F.3d 361, 370, 378-79 (2d Cir.1997). The *Triestman* court found it was not required to decide the Suspension Clause issue, but noted the implications of the Suspension Clause had AEDPA been interpreted to preclude collateral review of petitions when "Congress has arguably cut off all post-conviction relief for a claim of actual innocence that was based on the existing record and that could not have been effectively brought previously." *Id.* at 378 n. 21. In *Martinez-Villareal v. Stewart*, Judge Nelson wrote that AEDPA "unconstitutionally suspends the

35

writ of habeas corpus . . . in an unambiguous fashion, by prohibiting the consideration of claims in second or successive petitions that do not fit the exceptions found in § 2244(b)(1) and (2)." 118 F. 3d 628, 653 (9th Cir. 1997) (Nelson, J., concurring), *aff'd* 523 U.S. 637 (1998); *see also United States v. Hayman*, 342 U.S. 205, 233 (1952) (noting that § 2255's "inadequate and ineffective" language preserves habeas for federal prisoners); *In re Dorsainvil*, 119 F.3d 245, 248 (3d Cir.1997) ("Were no other avenue of judicial review available for a party who claims that s/he is factually or legally innocent as a result of a previously unavailable statutory interpretation, we would be faced with a thorny constitutional issue."); *Holloway v. Jones*, 166 F. Supp. 2d 1185, 1190 (E.D. Mich. 2001) (finding that utilizing the one-year statute of limitations in AEDPA to preclude relief to a petitioner who can demonstrate factual innocence of the crime would constitute violation of the Suspension Clause).

Indeed, even the government, in its response to Petitioner's petition for certiorari, acknowledged the importance of the existence of a remedy under § 2241 when § 2255 is jurisdictionally unavailable. In attempting to dissuade the Court from granting certiorari, the government strongly suggested to the Court that absence of jurisdiction under § 2255 did not result in a suspension of the writ because Petitioner had another avenue of relief – § 2241. (Resp't's Br. in Opp. 17, Oct. 29, 2010).

Denying review under § 2241 would preclude all collateral review of previously unavailable evidence establishing the unconstitutionality of Mr. Webster's death sentence, and would therefore constitute an unconstitutional suspension of the writ.

36

## VII. CONCLUSION

Newly released evidence from an agency of the United States Government establishes that Bruce Webster is and always has been mentally retarded. The Fifth Circuit has held that 28 U.S.C. § 2255 precludes it from considering this evidence. Our laws cannot sanction the execution of one who is not eligible for execution. Section 2241 was enacted to ensure that travesties such as that which could occur in Mr. Webster's case do not occur. Petitioner respectfully urges this Court to exercise appropriate jurisdiction and prevent this "Kafka-esque" result from taking place.

<u>**REQUEST FOR RELIEF**</u>

THEREFORE, for all the foregoing reasons, Mr. Webster asks this Court to:

1.      Hold that Bruce Webster has satisfied the jurisdictional requirements for proceeding under 28 U.S.C. § 2241; and

2.      Following any evidentiary hearing that this Court deems necessary, vacate his death sentence because he is mentally retarded and therefore ineligible for a sentence of death.

Dated: April 6, 2012                      DORSEY & WHITNEY LLP

                                          By _____
                                              Steven J. Wells
                                              Kirsten E. Schubert
                                          Suite 1500, 50 South Sixth Street
                                          Minneapolis, MN 55402-1498
                                          Telephone:  (612) 340-2600
                                          Facsimile:  (612) 340-2868


Dated: April ___, 2012                    By _____
                                              Eric K. Koselke, # 5593-54
                                          6202 N. College Avenue
                                          Indianapolis, IN 46220
                                          Telephone:  (317) 722-2591
                                          Facsimile:  (317) 257-5300

                                          *Attorneys for Petitioner Bruce Webster*

Court Name: Southern District of Indiana
Division: 1
Receipt Number: IP029188
Cashier ID: mdagon
Transaction Date: 04/06/2012
Payer Name: KELLIE HILDENBRAND
----------------------------------------
WRIT OF HABEAS CORPUS
 For: ERIC K KOSELKE
 Case/Party: D-INS-2-12-CV-000086-001
 Amount:       $5.00
----------------------------------------
CREDIT CARD
 Amt Tendered: $5.00
----------------------------------------
Total Due:      $5.00
Total Tendered: $5.00
Change Amt:     $0.00

2:12-cv-00086-WTL-WGH


"Only when bank clears the check,
money order, or verifies credit of
funds is the fee or debt officially
paid or discharged.  A $53.00 fee
will be charged for a returned
check."


SCANNED
46

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

FILED
U.S. DISTRICT COURT
DIVISION

2012 APR -6 PM 1:46

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

BRUCE CARNEIL WEBSTER )
    Petitioner, )
)
vs. )     CAUSE NO:
)
CHARLES L. LOCKETT, WARDEN, )
UNITED STATES PENITENTIARY, )
Terre Haute (USP) )   **2 : 1 2 -cv- 0 0 8 6 WTL -WGH**
    Respondent, )
)

**APPEARANCE FORM**
Petitioner

*Re: Cause No.:*

1. Name of Defendant(s):     BRUCE CARNEIL WEBSTER

2. Defense Attorney=s Information:   Eric K. Koselke
    #5593-54
    6202 N. College
    Indianapolis, IN 46220
    Office: (317) 722-2591
    Fax: (317) 257-5300
    Email: ekoselke@wkelaw.com

1. Will Defendant accept service by FAX: Yes_____ No___X___

2. Additional information required by state of local rule: _____

_____

_____

*[signature]*
Eric K. Koselke, #5593-54
*Attorney at Law*

**SCANNED**
47

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing on Joseph Hogsett the United

States Attorney for the Southern District of Indiana at 10 W. Market St., Suite 2100,

Indianapolis, IN 46204 by hand delivery this 6th day of April, 2012.

Eric Koselke, #5593-54

Eric Kosleke
*Attorney ay Law*
6202 N. College Avenue
Indianapolis, IN 46220
(317) 722-2591 Telephone
Fascimile (317) 257-5300

*Attorneys for Petitioner Bruce Webster*

Enclosure
EKK/kd

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

**FILED**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

APR 06 2012

## I. (a) PLAINTIFFS
Bruce Carneil Webster

**(b)** County of Residence of First Listed Plaintiff _Vigo_
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Eric Koselke, 6201 N. College Ave. Indpls In 46220 (317) 722-2591 Dorsey + Whitney LLP, Steve J. Wells + Kirsten Schubert 50 South 6th St, Suite 1500. Minneapolis Minn. 55402 (612) 340-2600

## DEFENDANTS
Charles L. Lockett

U.S. CLERK'S OFFICE INDIANAPOLIS, INDIANA

County of Residence of First Listed Defendant _Vigo_
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Joseph Hogsett United States Attorney For Southern District of Indiana 10 W. Market St., Suite 2100 Indpls. In 46204 317-226-6333

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)* *(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Med. Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☒ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition)
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
22 U.S.C. §2241
Brief description of cause: Defendant ineligible for death penalty based on previously unavailable evidence

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE Richard W. Roberts
DOCKET NUMBER 1:05-CV-2337 (RWR)

DATE 4/6/12
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

Case 2:12-cv-00086-WTL-WGH Document 51 Filed 04/19/12 Page 1 of 5 PageID 927

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

FILED
U.S. DISTRICT COURT
DIVISION

2012 APR 18 PM 3: 38

DISTRICT
INDIANA
A. BRIGGS
CLERK

|                                    |   |                          |
|------------------------------------|---|--------------------------|
| BRUCE CARNEIL WEBSTER,             | ) |                          |
|                                    | ) |                          |
| Petitioner,                        | ) |                          |
|                                    | ) |                          |
| v.                                 | ) | Cause No. 2:12-CR-0086 WTL-WGH |
|                                    | ) | Judge William Lawrence   |
|                                    | ) |                          |
| CHARLES L. LOCKETT, WARDEN,        | ) |                          |
| UNITED STATES PENITENTIARY,        | ) |                          |
| TERRE HAUTE (USP),                 | ) |                          |
|                                    | ) |                          |
| Respondent.                        | ) |                          |

## MOTION OF KIRSTEN E. SCHUBERT TO APPEAR *PRO HAC VICE*

Pursuant to S. D. Ind. Local Rule 83-5(a)(2)(C), the undersigned counsel, Kirsten

E. Schubert of Dorsey & Whitney LLP, respectfully moves this Court for an order

granting admission *pro hac vice* for the purpose of appearing as counsel on behalf of

Bruce Carneil Webster in the above-styled cause only. In support of this motion, the

undersigned states:

1.     I have been admitted to practice in the following states and federal

jurisdictions: State Bar of Minnesota (2007); United States District Court for the District

of Minnesota (2007); United States District Court for the Southern District of New York

(2011) (admitted *pro hac vice* only).

2.     I am not currently the subject of any professional disciplinary sanction,

proceeding or investigation in any jurisdiction.

3. I certify that I will abide by the Seventh Circuit Standards of Professional Conduct.

4. I have presented a check in the amount of Thirty Dollars ($30.00) in payment of the administrative fees required to process this motion for admission *pro hac vice*.

WHEREFORE, the undersigned counsel respectfully requests this Court enter an order of admission *pro hac vice* for purposes of this cause only.

Respectfully submitted,

Dated: April 12, 2012

By _____
Kirsten E. Schubert

DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (952) 516-5698

Case 2:12-cv-00086-WTL-WGH Document 51 Filed 04/19/12 Page 3 of 3 PageID 529

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing on Joseph Hogsett the United States

Attorney for the Southern District of Indiana at 10 W. Market St., Suite 2100, Indianapolis, IN

46204 by hand delivery this 18th day of April, 2012.

Eric K. Koselke, #5593-54
*Attorney at Law*

Eric K. Koselke
*Attorney at Law*
6202 N. College Avenue
Indianapolis, IN 46220
Telephone (317) 722-2591
Facsimile (317) 257-5300
Email: ekoselke@wkelaw.com

Case 2:12-cv-00086-WTL-WGH Document 3-1 Filed 04/19/12 Page 1 of 2 PageID 990

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,                    )
                                          )
                 Petitioner,              )
                                          )
v.                                        )       Cause No. 2:12-CR-0086 WTL-WGH
                                          )       Judge William Lawrence
                                          )
CHARLES L. LOCKETT, WARDEN,               )
UNITED STATES PENITENTIARY,               )
TERRE HAUTE (USP),                        )
                                          )
                 Respondent .             )

## ORDER GRANTING MOTION TO APPEAR *PRO HAC VICE*

This cause has come before the Court upon the motion of Kirsten E. Schubert, counsel

for Bruce Carneil Webster, for leave to appear and participate *pro hac vice* in the above-

captioned cause only.  Being fully advised, it is now

ORDERED that the motion be, and hereby is GRANTED.


Dated: _____          _____
                                  Judge William Lawrence
                                  United States District Court
                                  Southern District of Indiana

= "LAST PAGE ONLY" = 1  " "4/11/2012 1:28 PM 4849-5291-7775\1  4/11/2012 1:28 PM

Copies to:

Eric K. Koselke
*Attorney at Law*
6202 N. College Avenue
Indianapolis, IN 46220
Telephone (317) 722-2591
Facsimile (317) 257-5300
Email: ekoselke@wkelaw.com

Kirsten E. Schubert
*Attorney at Law*
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone (612) 340-2600
Facsimile (952) 516-5698
Email: schubert.kirsten@dorsey.com

Steven J. Wells
*Attorney at Law*
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone (612) 340-2600
Facsimile (952) 516-5526
Email: wells.steve@dorsey.com

EKK/kmd
Enclosure

= "LAST PAGE ONLY" = 1 " "4/11/2012 1:28 PM 4849-5291-7775\1 4/11/2012 1:28 PM

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 55 of 341 PageID
Case 2:12-cv-00086-WTL-WGH Document 6 Filed 04/19/12 Page 1 of 5 PageID
#: 1699

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2012 APR 18 PM 3: 41

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

BRUCE CARNEIL WEBSTER, )
)
Petitioner, )
)
v. )     Cause No. 2:12-CR-0086 WTL-WGH
)     Judge William Lawrence
CHARLES L. LOCKETT, WARDEN, )
UNITED STATES PENITENTIARY, )
TERRE HAUTE (USP), )
)
Respondent . )

## MOTION OF STEVEN J. WELLS TO APPEAR *PRO HAC VICE*

Pursuant to S. D. Ind. Local Rule 83-5(a)(2)(C), the undersigned counsel, Steven

J. Wells of Dorsey & Whitney LLP, respectfully moves this Court for an order granting

admission *pro hac vice* for the purpose of appearing as counsel on behalf of Bruce

Carneil Webster in the above-styled cause only. In support of this motion, the

undersigned states:

1.     I have been admitted to practice in the following states and federal

jurisdictions: State Bar of Minnesota 1985; State Bar of Vermont 1984 (inactive) United

States District Court for the District of Minnesota 1985; United States District Court for

the Eastern District of Wisconsin 1996; United States District Court for the Western

District of Wisconsin 1993; United States Court of Appeals for the Third Circuit 2011;

United States Court of Appeals for the Fourth Circuit 1995; United States Court of

Appeals for the Fifth Circuit 2001; United States Court of Appeals for the Seventh Circuit 1993; United States Court of Appeals for the Eighth Circuit 1991; United States Court of Appeals for the Ninth Circuit 1994; United States Court of Appeals for the Federal Circuit 2002; and Supreme Court of the United States 2010.

2. I am not currently the subject of any professional disciplinary sanction, proceeding or investigation in any jurisdiction.

3. I certify that I will abide by the Seventh Circuit Standards of Professional Conduct.

4. I have presented a check in the amount of Thirty Dollars ($30.00) in payment of the administrative fees required to process this motion for admission *pro hac vice*.

WHEREFORE, the undersigned counsel respectfully requests this Court enter an order of admission *pro hac vice* for purposes of this cause only.

Respectfully submitted,

Dated: April 11, 2012

By _____
Steven J. Wells

DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (952) 516-5526

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 57 of 341 PageID
#: 1701
Case 2:12-cv-00086-WTL-WGH Document 61 Filed 04/19/12 Page 3 of 3 PageID 534

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing on Joseph Hogsett the United States

Attorney for the Southern District of Indiana at 10 W. Market St., Suite 2100, Indianapolis, IN

46204 by hand delivery this 18th day of April, 2012.

Eric K. Koselke, #5593-54
*Attorney at Law*

Eric K. Koselke
*Attorney at Law*
6202 N. College Avenue
Indianapolis, IN 46220
Telephone (317) 722-2591
Facsimile (317) 257-5300
Email: ekoselke@wkelaw.com

= "LAST PAGE ONLY" = 1 " "4/11/2012 1:28 PM 4849-5291-7775\1 4/11/2012 1:28 PM

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 58 of 341 PageID
Case 2:12-cv-00086-WTL-WGH Document 6-1 Filed 04/19/12 Page 1 of 2 PageID #: 995
#: 1702

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,      )
                           )
           Petitioner,        )
                           )
v.                         )     Cause No. 2:12-CR-0086 WTL-WGH
                           )     Judge William Lawrence
                           )
CHARLES L. LOCKETT, WARDEN,  )
UNITED STATES PENITENTIARY,   )
TERRE HAUTE (USP),          )
                           )
           Respondent .    )

## ORDER GRANTING MOTION TO APPEAR *PRO HAC VICE*

This cause has come before the Court upon the motion of Steven J. Wells, counsel for

Bruce Carneil Webster, for leave to appear and participate *pro hac vice* in the above-captioned

cause only.  Being fully advised, it is now

ORDERED that the motion be, and hereby is GRANTED.

Dated: _____      _____
                              Judge William Lawrence
                              United States District Court
                              Southern District of Indiana

Copies to:

Eric K. Koselke
*Attorney at Law*
6202 N. College Avenue
Indianapolis, IN 46220
Telephone (317) 722-2591
Facsimile (317) 257-5300
Email: ekoselke@wkelaw.com

Steven J. Wells
*Attorney at Law*
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone (612) 340-2600
Facsimile (952) 516-5526
Email: wells.steve@dorsey.com

Kirsten E. Schubert
*Attorney at Law*
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone (612) 340-2600
Facsimile (952) 516-5698
Email: schubert.kirsten@dorsey.com

EKK/kmd
Enclosure

Court Name: Southern District of Indiana
Division: 1
Receipt Number: IP029385
Cashier ID: mdagon
Transaction Date: 04/18/2012
Payer Name: DORSEY AND WHITNEY LLP

PRO HAC VICE
 For: KIRSTEN E SCHUBERT
 Case/Party: D-INS-1-12-LB-000001-001
 Amount:        $30.00

CHECK
 Check/Money Order Num: 1206271
 Amt Tendered:  $30.00

Total Due:       $30.00
Total Tendered:  $30.00
Change Amt:      $0.00

PHV FEE FOR KIRSTEN E SCHUBERT


2:12-CR-86-WTL-WGH

"Only when bank clears the check,
money order, or verifies credit of
funds is the fee or debt officially
paid or discharged.  A $53.00 fee
will be charged for a returned
check."

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 61 of 341 PageID
Case 2:12-cv-00086-WTL-WGH Document 81 Filed 04/19/12 Page 1 of 1 PageID
\#: 1705

Court Name: Southern District of Indiana
Division: 1
Receipt Number: IP029386
Cashier ID: mdagon
Transaction Date: 04/18/2012
Payer Name: DORSEY AND WHITNEY LLP

PRO HAC VICE
 For: STEVEN J WELLS
 Case/Party: D-INS-1-12-LB-000001-001
 Amount:       $30.00

CHECK
 Check/Money Order Num: 1206272
 Amt Tendered: $30.00

Total Due:       $30.00
Total Tendered: $30.00
Change Amt:      $0.00

PHV FEE FOR STEVEN J WELLS

2:12-CR-86-WTL-WGH

"Only when bank clears the check,
money order, or verifies credit of
funds is the fee or debt officially
paid or discharged.  A $53.00 fee
will be charged for a returned
check."

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 62 of 341 PageID
Case 2:12-cv-00086-WTL-WGH Document 9-1 Filed 04/19/12 Page 1 of 2 PageID 559
#: 1706

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA

BRUCE CARNEIL WEBSTER,               )
                                     )
                    Petitioner,      )
        vs.                          )        2:12-cv-86-WTL-WGH
                                     )
CHARLES LOCKETT,                     )
                                     )
                    Respondent.      )

### Entry and Order to Show Cause

The court, having considered the above action and the matters which are pending, makes the following rulings:

1.  The United States is **notified** of the filing of the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and of the supporting memorandum. This material has been scanned into the court's electronic docket. A copy of this Entry and Order to Show Cause shall be **distributed to** the United States Attorney.

2.  The respondent shall have **through May 30, 2012,** in which to answer the allegations of the habeas petition, and in doing so shall **show cause** why the relief sought by the petitioner should not be granted. The petitioner shall have **thirty (30) days after service of the answer** in which to reply.

    **IT IS SO ORDERED.**

Date: ___04/19/2012_____

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

**Distribution:**

**Eric K. Koselke**
**6202 N. College**
**Indianapolis, IN 46220**

**Office of the United States Attorney**
**10 West Market Street    Suite 2100**
**Indianapolis, IN   46204-3048**

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 64 of 341 PageID
#: 1708
Case 2:12-cv-00086-WTL-WGH   Document 40   Filed 04/19/12   Page 1 of 2   PageID 541

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

Counsel is instructed
to correct the cause
number on all future
filings to read
2:12-cv-86-WTL-WGH.

|  |  |  |
|---|---|---|
| BRUCE CARNEIL WEBSTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Cause No. 2:12-CR-0086 WTL-WGH |
| | ) | Judge William Lawrence |
| | ) | |
| CHARLES L. LOCKETT, WARDEN, | ) | |
| UNITED STATES PENITENTIARY, | ) | |
| TERRE HAUTE (USP), | ) | |
| | ) | |
| Respondent . | ) | |

## ORDER GRANTING MOTION TO APPEAR *PRO HAC VICE*

This cause has come before the Court upon the motion of Steven J. Wells, counsel for

Bruce Carneil Webster, for leave to appear and participate *pro hac vice* in the above-captioned

cause only.  Being fully advised, it is now

ORDERED that the motion be, and hereby is GRANTED.

Dated: ___04/19/2012___

_____
WILLIAM G. HUSSMANN, JR.
Magistrate Judge

64

Copies to:

Eric K. Koselke
*Attorney at Law*
6202 N. College Avenue
Indianapolis, IN 46220
Telephone (317) 722-2591
Facsimile (317) 257-5300
Email: ekoselke@wkelaw.com

Steven J. Wells
*Attorney at Law*
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone (612) 340-2600
Facsimile (952) 516-5526
Email: wells.steve@dorsey.com

Kirsten E. Schubert
*Attorney at Law*
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone (612) 340-2600
Facsimile (952) 516-5698
Email: schubert.kirsten@dorsey.com

EKK/kmd
Enclosure

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

Counsel is instructed to correct the cause number on all future filings to read 2:12-cv-86-WTL-WGH.

BRUCE CARNEIL WEBSTER,                          )
                                                )
             Petitioner,                        )
                                                )
v.                                              )       Cause No. 2:12-CR-0086 WTL-WGH
                                                )       Judge William Lawrence
                                                )
CHARLES L. LOCKETT, WARDEN,                     )
UNITED STATES PENITENTIARY,                     )
TERRE HAUTE (USP),                              )
                                                )
             Respondent .                       )

## ORDER GRANTING MOTION TO APPEAR *PRO HAC VICE*

This cause has come before the Court upon the motion of Kirsten E. Schubert, counsel

for Bruce Carneil Webster, for leave to appear and participate *pro hac vice* in the above-

captioned cause only. Being fully advised, it is now

ORDERED that the motion be, and hereby is GRANTED.

Dated: 04/19/2012

_____
WILLIAM G. HUSSMANN, JR.
Magistrate Judge

= "LAST PAGE ONLY" = 1 " "4/11/2012 1:28 PM 4849-5291-7775\1  4/11/2012 1:28 PM

Case 2:12-cv-00086-WTL-WGH Document 11 Filed 04/19/12 Page 2 of 2 PageID 344

Copies to:

Eric K. Koselke
*Attorney at Law*
6202 N. College Avenue
Indianapolis, IN 46220
Telephone (317) 722-2591
Facsimile (317) 257-5300
Email: ekoselke@wkelaw.com

Kirsten E. Schubert
*Attorney at Law*
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone (612) 340-2600
Facsimile (952) 516-5698
Email: schubert.kirsten@dorsey.com

Steven J. Wells
*Attorney at Law*
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone (612) 340-2600
Facsimile (952) 516-5526
Email: wells.steve@dorsey.com

EKK/kmd
Enclosure

= "LAST PAGE ONLY" = 1 " "4/11/2012 1:28 PM 4849-5291-7775\1 4/11/2012 1:28 PM

Case 2:12-cv-00086-JPH-MJD  Document 42-1  Filed 07/08/14  Page 68 of 341 PageID
Case 2:12-cv-00086-WTL-WGH  Document 12  Filed 05/02/12  Page 1 of 2 PageID #: 545
#: 1712

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER ,            )
                                   )
        Petitioner,                )
                                   )
    v.                             )          CAUSE NO. 2:12-cv-086-WTL-WGH
                                   )
CHARLES LOCKETT, WARDEN,           )
                                   )
        Respondent.                )


### APPEARANCE

Comes now Joseph H. Hogsett, United States Attorney for the Southern District of

Indiana, and enters his appearance as counsel for Charles Lockett, Warden, at Terre Haute,

Indiana.

                            Respectfully submitted,

                            JOSEPH H. HOGSETT
                            United States Attorney



                        By: s/Gerald A. Coraz
                            Gerald A. Coraz
                            Assistant United States Attorney

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 69 of 341 PageID
Case 2:12-cv-00086-WTL-WGH Document 42 Filed 05/02/12 Page 2 of 2 PageID 546
#: 1713

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2012, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to the following parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.

Eric K. Koselke
Attorney at Law
6202 N College
Indianapolis, IN 46220
ekoselke@wkelaw.com


I hereby certify that on May 2, 2012, a copy of the foregoing was mailed, by first class

U.S. Mail, postage prepaid and properly addressed to the following:

Kristen E. Schubert
Steven J. Wells
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498


                                        s/Gerald A. Coraz
                                        Gerald A. Coraz
                                        Assistant United States Attorney

Office of the United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048
(317) 226-6333

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER , | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:12-cv-086-WTL-WGH |
| | ) | |
| CHARLES LOCKETT, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |

## **MOTION FOR ENLARGEMENT OF TIME**

Comes now the respondent, by counsel, and moves for an enlargement of time of 90 days

to respond to the petitioner's Writ of Habeas Corpus.

In support of this motion, the respondent advises the Court as follows:

1.      The respondent's return (response) is currently due on or before May 30, 2012.

2.      This motion is not made for any purpose of delay but only to allow sufficient time

for the counsel for respondent to consult with the United States Attorney's Office from the

district in which the petitioner's conviction was obtained, ascertain the facts and to prepare and

submit, in coordination with the United States Attorney's Office from the district in which the

conviction and sentence was obtained and entered, a full, complete and appropriate response.

3.      The petitioner's counsel has been contacted and said counsel has advised the

undersigned that said counsel does not object to the enlargement of time sought by the

respondent.  Petitioner's counsel additionally advised that they will likely seek an enlargement

of time of ninety (90) days to reply to the respondent's return (response) and counsel for the

respondent advises the Court that the respondent has no objection to such an enlargement of time

(if requested).

70

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 71 of 341 PageID
Case 2:12-cv-00086-WTL-WGH Document 13 Filed 05/02/12 Page 2 of 3 PageID 548
#: 1715

WHEREFORE, the respondent respectfully prays that he be granted up to and including

August 28, 2012, to respond to the petitioner's Writ of Habeas Corpus.

Respectfully submitted,

JOSEPH H. HOGSETT
United States Attorney


By: s/Gerald A. Coraz
Gerald A. Coraz
Assistant United States Attorney

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 73 of 341 PageID
Case 2:12-cv-00086-WTL-WGH Document 13 Filed 05/02/12 Page 3 of 3 PageID 549
#: 1716

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2012, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to the following parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.

Eric K. Koselke
Attorney at Law
6202 N College
Indianapolis, IN 46220
ekoselke@wkelaw.com


I hereby certify that on May 2, 2012, a copy of the foregoing was mailed, by first class

U.S. Mail, postage prepaid and properly addressed to the following:

Kristen E. Schubert
Steven J. Wells
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498


                                    s/Gerald A. Coraz
                                    Gerald A. Coraz
                                    Assistant United States Attorney

Office of the United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048
(317) 226-6333

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER , | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:12-cv-086-WTL-WGH |
| | ) | |
| CHARLES LOCKETT, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |

## O R D E R

This matter having come before the Court on the respondent's motion for enlargement of

time, said motion being in the following words and figures, to-wit:

[H.I.]

And the Court, being duly advised in the premises, now GRANTS the motion for

enlargement of time.

The respondent shall have up to and including August 28, 2012, to respond to the

petitioner's Writ of Habeas Corpus.

So ORDERED.

DATED: _____

 

JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

Case 2:12-cv-00086-WTL-WGH   Document 13-1   Filed 05/02/12   Page 2 of 2   PageID 551

DISTRIBUTION:


Gerald A. Coraz, AUSA
United States Attorneys Office
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048


Eric K. Koselke
Attorney at Law
6202 N College
Indianapolis, IN 46220
ekoselke@wkelaw.com


Kristen E. Schubert
Steven J. Wells
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 75 of 341 PageID
Case 2:12-cv-00086-WTL-WGH Document 14 Filed 05/09/12 Page 1 of 1 PageID 552
#: 1719

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| vs. | ) | 2:12-cv-86-WTL-WGH |
| | ) | |
| CHARLES LOCKETT, | ) | |
| | ) | |
| Respondent. | ) | |

### E N T R Y

This is an action in which Bruce Webster, a federal inmate, seeks a writ of habeas corpus. The Supreme Court has emphasized that habeas corpus proceedings are intended to provide "swift, flexible, and summary determination[s]." *Browder v. Director, Dept. of Corrections,* **434 U.S. 257, 271 (1978)**; see also *Post v. Gilmore,* **111 F.3d 556, 557 (7th Cir. 1997)** ("Liberty's priority over compensation is why **28 U.S.C. § 1657** specifies that requests for collateral relief go to the head of the queue. . . .").

The court acknowledges that this action has just recently been filed and that it will take some time for the briefing to be completed. Nonetheless, a single extension of time in excess of 60 days for that purpose is not warranted. Accordingly, the respondent's motion for extension of time [13] is **granted in part and denied in part**, such that the respondent shall have **through July 10, 2012**, in which to show cause why the relief sought by the petitioner shall not be granted.

IT IS SO ORDERED.

Date: 05/09/2012 _____

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

**Distribution:**

**All electronically registered counsel**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER ,        )
                                        )

               Petitioner,     )
                                          )

        v.                    )         CAUSE NO. 2:12-cv-086-WTL-WGH
                                          )

CHARLES LOCKETT, WARDEN,    )
                                          )

            Respondent.    )

**MOTION FOR ENLARGEMENT OF TIME**

Comes now the respondent, by counsel, and moves for a second enlargement of time in which to respond to the petitioner Bruce Carneil Webster's ("Webster") petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2241.

In support of this motion, the respondent advises the Court as follows:

1. The petitioner Webster is a federal prisoner under a sentence of death imposed by the United States District Court for the Northern District of Texas. The petitioner's petition herein challenges the validity of that sentence.

2. A response (return to order to show cause) to the petitioner Webster's 28 U.S.C. § 2241 petition is currently due on or before July 10, 2012.

3. Because this case involves a penalty of death imposed by a sister judicial district, primary responsibility for preparing a response to Webster's petition has been allocated to an Assistant United States Attorney from the district that entered the conviction and where the sentence was imposed, with assistance being rendered by the undersigned Assistant United States Attorney. A number of factors make an enlargement of time to respond to Webster's petition necessary so that a complete, proper and appropriate response may be submitted.

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 77 of 341 PageID
Case 2:12-cv-00086-WTL-WGH Document 15 Filed 07/05/12 Page 2 of 4 PageID 554
#: 1721

4.  The Assistant United States Attorney from the Northern District of Texas assigned to this matter currently is working on (in addition to this case) two Fifth Circuit briefs and is preparing for an oral argument scheduled in the Fifth Circuit for July 9, 2012.

5.  In addition, the Northern District of Texas Assistant United States Attorney assigned to this matter has needed to interrupt her work schedule to attend to her seriously ill father in Maryland.  Further, said Assistant United States Attorney has encountered a vision problem that had to be medically addressed.

6.  An enlargement of time of thirty (30) days is required to allow for the preparation and submission of the respondent's response to Webster's petition due to the factors set forth above.

7.  This motion is not made for any purpose of delay, but only to allow sufficient time to prepare a complete and appropriate response in light of the most serious nature of the issue(s) before the Court.

8.  The undersigned counsel for the respondent has contacted counsel for Webster (Eric Koselke) and has been advised that said counsel has no objection to this enlargement request.

Wherefore, the respondent respectfully prays that he be granted up to and including August 9, 2012 to respond to the petitioner Webster's petition for a writ of habeas corpus.

Respectfully submitted,

JOSEPH H. HOGSETT
United States Attorney


By: s/Gerald A. Coraz
Gerald A. Coraz
Assistant United States Attorney

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 78 of 341 PageID
Case 2:12-cv-00086-WTL-WGH Document 15 Filed 07/05/12 Page 3 of 4 PageID 555
#: 1722

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2012, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to the following parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.

Eric K. Koselke
Attorney at Law
6202 N College
Indianapolis, IN 46220
ekoselke@wkelaw.com

I hereby certify that on July 3, 2012, a copy of the foregoing was mailed, by first class

U.S. Mail, postage prepaid and properly addressed to the following:

Kristen E. Schubert
Steven J. Wells
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498

s/Gerald A. Coraz
Gerald A. Coraz
Assistant United States Attorney

Office of the United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048
(317) 226-6333

CERTIFICATE OF SERVICE

Case 2:12-cv-00086-WTL-WGH Document 15 Filed 07/05/12 Page 4 of 4 PageID 556

Eric K. Koselke
Attorney at Law
6202 N. College
Indianapolis, IN 46220
ekoselke@wkelaw.com

Kristen E. Schubert
Steven J. Wells
DORSEY & WHITLEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER ,          )
                                 )
            Petitioner,          )
                                 )
      v.                         )          CAUSE NO. 2:12-cv-086-WTL-WGH
                                 )
CHARLES LOCKETT, WARDEN,         )
                                 )
            Respondent.          )

O R D E R

This matter having come before the Court on the respondent's motion for enlargement of time, said motion being in the following words and figures, to-wit:

[H.I.]

And the Court, being duly advised in the premises, now GRANTS the motion for enlargement of time.

The respondent shall have up to and including August 9, 2012, to respond to the petitioner's Writ of Habeas Corpus.

So ORDERED.

DATED: _____

                        _____
                        JUDGE, UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF INDIANA

DISTRIBUTION:


Gerald A. Coraz, AUSA
United States Attorneys Office
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048


Eric K. Koselke
Attorney at Law
6202 N College
Indianapolis, IN 46220
ekoselke@wkelaw.com


Kristen E. Schubert
Steven J. Wells
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498

Case 2:12-cv-00086-WTL-WGH Document 16 Filed 07/08/12 Page 1 of 2 PageID #: 1726

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER , | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:12-cv-086-WTL-WGH |
| | ) | |
| CHARLES LOCKETT, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |

O R D E R

This matter having come before the Court on the respondent's motion for enlargement of

time, said motion being in the following words and figures, to-wit:

[H.I.]

And the Court, being duly advised in the premises, now GRANTS the motion for

enlargement of time.

The respondent shall have up to and including August 9, 2012, to respond to the

petitioner's Writ of Habeas Corpus.

So ORDERED.

DATED: 07/08/2012

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 83 of 341 PageID
Case 2:12-cv-00086-WTL-WGH   Document 16   Filed 07/06/12   Page 2 of 2 PageID 560
#: 1727

DISTRIBUTION:


Gerald A. Coraz, AUSA
United States Attorneys Office
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048


Eric K. Koselke
Attorney at Law
6202 N College
Indianapolis, IN 46220
ekoselke@wkelaw.com


Kristen E. Schubert
Steven J. Wells
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 84 of 341 PageID
Case 2:12-cv-00086-WTL-WGH   Document 17-1   Filed 08/07/12   Page 1 of 26   PageID #: 961
#: 1728

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

---

| | |
|---|---|
| **BRUCE CARNEIL WEBSTER**, | § |
| Petitioner, | § |
| | § |
| v. | § CAUSE NO. 2:12-CV-0086-WTL-WGH |
| | § |
| **CHARLES L. LOCKETT, WARDEN**, | § |
| **UNITED STATES PENITENTIARY,** | § |
| **TERRE HAUTE (USP)** | § |
| | § |
| | § |
| Respondent. | § |

---

**RETURN TO ORDER TO SHOW CAUSE**

For his return to the order to show cause and in response to the petitioner Bruce Carneil

Webster's ("Webster") petition for a writ of habeas corpus, the respondent advises the Court as

follows:

**Background**

The petitioner Webster is a federal prisoner currently incarcerated at the United States

Penitentiary at Terre Haute, Indiana.  He was convicted of kidnaping resulting in the death of

Lisa Rene (count one); conspiring to kidnap (count two); and using and carrying a firearm during

a crime of violence (count six).  *United States v. Webster*, 162 F.3d 308, 317 (5th Cir. 1998).

On September 24, 1994, Webster and his co-defendants kidnaped Ms. Rene, a 16-year-old school

girl, from her Arlington, Texas, home in retaliation for her brothers' failure to supply marijuana

for which they had been paid.[1]  Ms. Rene, who was sexually assaulted repeatedly by Webster and

---

[1]  The gruesome details surrounding the kidnapping and murder of Lisa Rene are set out in the Fifth
Circuit's opinion on direct appeal.  *See Webster*, 162 F.3d at 318-19.  The government has also attached the

his co-defendants, was taken to Pine Bluff, Arkansas, and held for several days before she was ultimately struck several times with a shovel by Webster and two co-defendants and buried – probably while still alive – in a local park.[2]  The jury recommended a sentence of death for Webster's extensive role in her kidnaping and brutal murder.  On September 30, 1996, Webster was sentenced to death on count one; life imprisonment on count two; and 60 months imprisonment on count six, with the latter two terms ordered to run consecutively.[3]  *See Webster*, 162 F.3d at 319.  Through 28 U.S.C. § 2241, Webster seeks to challenge his sentence of death by claiming that previously unavailable evidence substantiates his much-litigated claim that he is mentally retarded and therefore ineligible for the death penalty.[4]

Defense counsel determined early on that, given 18 U.S.C. § 3596(c)'s flat prohibition against the execution of the mentally retarded,[5] whether Webster is mentally retarded would be a critical issue in his defense, and acted accordingly.  Wells Dec. Ex. W (Declaration of Larry M. Moore, Trial Defense Counsel, ¶ 4.) (hereinafter Moore Declaration).  As will be subsequently

---

Statement of Facts from its brief which further details the facts underlying the offenses of conviction.

[2]  *See Webster*, 162 F.3d at 318-19.

[3]  Orlando Hall, a co-defendant, was also sentenced to death.  *See United States v. Hall*, 152 F.3d 381, 390 (5th Cir. 1998).  Steven Beckley, Demetrius Hall, and Marvin Holloway were not charged with offenses for which death was a possible penalty.  Each pled guilty and received a substantial sentence.

[4]  In late 2006/early 2007, Webster applied for commutation of his death sentence.  His request is being held in abeyance, where his sentence has been stayed in collateral litigation in a constitutional challenge in the District of Columbia to the federal method for execution.  *See* Wells Decl. Ex. A (Order); *Roane v. Gonzales*, 1:05-CV-2337 (D.C. District Court).  Despite repeated requests by the government, the stay has not been lifted, even though the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), held that the three-drug protocol used by the federal government for execution does not violate the Constitution's ban against cruel and unusual punishment.

[5]  At the time of Webster's conviction and the imposition of the death penalty, 18 U.S.C. § 3596 provided, in part, that "[a] sentence of death shall not be carried out upon a person who is mentally retarded."  18 U.S.C. § 3596(c).  Subsequent to Webster's conviction, the Supreme Court in *Atkins v. Virginia*, 536 U.S. 304 (2002), held that the execution of a mentally retarded criminal is "cruel and unusual punishment," prohibited by the Eighth Amendment.

2

discussed herein more specifically, defense counsel mounted a sustained, but unsuccessful, effort to establish that Webster is mentally retarded, including personally paying for expert assistance. Moore Declaration, ¶¶ 3-4.  The district court, in response to filings by defense counsel and in recognition of section 3596(c), filed a "Factual Finding Regarding Mental Retardation," on June 21, 1996, in which the court stated, "Webster is not mentally retarded and ... he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him.  As a result, defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty."  (R12:1536.)

Webster's convictions and sentence were affirmed by United States Court of Appeals for the Fifth Circuit on December 3, 1998.  *Webster*, 162 F.3d at 317.  In addition to other issues, Webster challenged the district court's mental retardation finding on several grounds: the finding (1) contravened the Federal Death Penalty Act; (2) derogated Webster's rights to due process and effective assistance of counsel; (3) was contrary to the greater weight of the credible evidence; and (4) was inconsistent with the verdict.  *See Webster*, 162 F.3d at 351.  The Fifth Circuit concluded that the district court's actions were proper, and that the finding was supported by the evidence.  Webster's petition for writ of certiorari was denied.  *Webster v. United States*, 528 U.S. 829 (1999).

Webster filed a timely initial motion for relief pursuant to 28 U.S.C. § 2255 on September 29, 2000, and an amended motion on August 16, 2002.  He raised multiple issues involving the determination of whether he is mentally retarded: (1) his due process rights were violated by the district court's alleged usurpation of the jury's right to determine whether he is mentally retarded; (2) he is ineligible for execution because he is mentally retarded; (3) the

3

86

Case 2:12-cv-00086-WTL-WGH   Document 171   Filed 08/07/12   Page 4 of 26   PageID 964
#: 1731

evidence presented at trial was insufficient to support the district court's determination that he is not mentally retarded; (4) 18 U.S.C. § 3596 is unconstitutionally vague; and (5) binding international law forbids his execution because he is mentally retarded. The district court denied the motion, authoring a substantial order explaining why the evidence supported a finding that Webster, who admittedly has a low IQ, is not mentally retarded where he does not have sufficient deficiencies in adaptive skills.[6] *See Webster v. United States*, No. 4:00-CV-1646-Y, 2003 WL 23109787 (N.D. Tex. 2003) (attached) (herein after District Court Memorandum Order).

The district court subsequently denied a certificate of appealability (COA) on most of the claims raised by Webster in his amended section 2255 motion, but granted a certificate to the Fifth Circuit on two: (1) the evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded; and (2) his alleged retardation renders him ineligible for a death sentence. *United States v. Webster*, 421 F.3d 308, 310 (5th Cir. 2005). The Fifth Court rejected Webster's contentions, explaining that

> Webster claims he is mentally retarded and thus ineligible for his death sentence, but given our rejection of his claim regarding the standard of proof and sufficiency of the evidence supporting the contrary finding at trial, this claim is reduced, in essence, to nothing more than an attempt to re-litigate the question. Indeed, Webster's brief does not point to any new evidence bearing directly on his mental capacity; instead, it summarizes the evidence presented at trial concerning his cognitive abilities and childhood experiences.

---

[6] Mental retardation, which refers to substantial limitations in functioning manifesting before the age of 18, is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000); *Atkins*, 536 U.S. at 308 n.3; *see also Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (for purposes of Social Security, 20 C.F.R. Pt. 404, Subpt. P, App. I, § 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22").

Case 2:12-cv-00086-JPH-MJD   Document 421   Filed 07/08/14   Page 88 of 341 PageID
Case 2:12-cv-00086-WTL-WGH   Document 171   Filed 08/07/12   Page 9 of 26   PageID 905
#: 1732

*Webster*, 421 F.3d at 313-14.  Webster's petition for writ of certiorari was denied.  *Webster v.*
*United States*, 549 U.S. 828 (2006).

Webster also challenged on appeal the district court's denial of COA on his remaining
issues – several of which revolved around his mental retardation claim.  *United States v. Webster*,
392 F.3d 787 (5th Cir. 2002).  The Fifth Circuit held, *inter alia*, that the absence of mental
retardation is not an element of the sentence that is constitutionally required to be determined by
a jury.  *Webster*, 392 F.3d at 792.  The Fifth Circuit also found that the district court had not
erred with respect to Webster's claim that his trial counsel were ineffective in failing to
investigate and present additional mitigating evidence demonstrating mental retardation and the
extreme abuse he suffered as a child.  *Webster*, 392 F.3d at 793.  The Court noted that the district
court had "denied habeas relief, characterizing this ineffective assistance claim as one of degree –
*i.e.*, Webster does not allege that counsel utterly failed to present evidence of mental retardation
and child abuse but, instead, that counsel were ineffective for failing to investigate and present
enough of such evidence.  After engaging in an exhaustive review of the trial record, the district
court determined that defense counsel presented a significant amount of such evidence; and,
although more of the same or similar evidence could have been furnished, counsel were not
constitutionally ineffective for failing to present more of the same." *Id*.  The Fifth Circuit went
on to explain that its

> review of the trial record confirms that Webster's counsel were far from
> constitutionally ineffective in investigating and presenting evidence of his mental
> condition and the abuse he suffered as a child.  During the punishment phase, counsel
> presented lengthy and detailed testimony from four medical experts regarding
> Webster's mental capacity and the testimony of a fifth medical expert on surrebuttal
> to critique the methodology used by one of the government's experts in testing
> Webster's cognitive abilities.  Moreover, counsel presented substantial evidence of

<div align="center">5</div>

Case 2:12-cv-00086-WTL-WGH   Document 171   Filed 08/07/12   Page 6 of 26   PageID #: 906

the abuse Webster suffered as a child, including testimony from his mother, two of his brothers, two of his sisters, an aunt, a niece, and an ex-girlfriend. All of these witnesses testified about the severe physical and sexual abuse that Webster's father inflicted on his children and his wife (Webster's mother). These witnesses recounted graphic and violent stories of sexual abuse; weekly beatings with hoses, fan belts, and extension cords; and various other forms of torture, including electric shock and burning. Even further, counsel presented testimony from an officer of the juvenile court in Arkansas that removed one of Webster's siblings from the home because of abuse. In light of this substantial body of evidence and the pre-trial investigation its presentation required, Webster's generalized allegation that more evidence of mental retardation and child abuse should have been presented is arguably frivolous.

*Webster*, 392 F.3d at 793-94.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "gives a convicted defendant only one further bite at the apple after his direct appeal unless he can demonstrate a compelling reason, as defined in [28 U.S.C. § 2255(h)] (newly discovered evidence of innocence or a new and retroactive rule of constitutional law), for being allowed a third bite (the first being the direct appeal, the second the first postconviction proceeding)." *In re Davenport*, 147 F.3d 605, 610 (7th Cir. 1998). Consequently, Webster, on October 22, 2009, requested that the Fifth Court certify a successive motion for post-conviction relief, as provided for in 28 U.S.C. § 2255(h), so that he could pursue a claim that newly discovered contemporaneous Social Security records, along with declarations from childhood friends, relative, and acquaintances, established by clear and convincing evidence that he is not eligible for the death penalty because he is mentally retarded. *See* 28 U.S.C. § 2255(h)(1) ("A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have

6

found the movant guilty of the offense").  Relying on the plain language of section 2255(h)(1), the Fifth Circuit denied his request, concluding that Webster could not bring a successive claim under section 2255(h)(1) where he could not show that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital murder.[4]  *In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010), *cert. denied*, *Webster v. United States*, ___ U.S. ___, 131 S. Ct. 794 (2010).[5]

Webster cannot meet the requirements of the savings clause

Having exercised his permissive statutory right to collaterally attack his sentence per section 2255(a), and after being denied a successive collateral attack on his sentence per section 2255(h), Webster seeks to bring his mental retardation claim under 28 U.S.C. § 2255(e), also known as the "savings clause."  *See United States v. Prevatte*, 300 F.3d 792, 798 (7th Cir. 2002) ("Section 2255 contains a 'savings clause' for petitioners who may be barred by the successive petition requirements contained in the statute.").  Under the "savings clause," a federal prisoner may file a habeas petition under 28 U.S.C. § 2241 if an otherwise available remedy under section 2255 is "inadequate or ineffective to test the legality of [a defendant's] detention."  28 U.S.C. § 2255(e); *see Unthank v. Jett*, 549 F.3d 534, 535-536 (7th Cir. 2008) ("According to § 2255(e), a federal prisoner may use § 2241 to contest his conviction or sentence only when 'the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention.'").

---

[4]  The government had argued that Webster's "newly discovered evidence" was wholly insufficient to satisfy his burden under section 2255(h).

[5]  The Seventh Circuit's decision in *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997), suggests that, if reviewing a similar issue, it would likewise hold that a successive motion under section 2255 may not be filed on the basis of newly discovered evidence unless the motion challenges the conviction and not merely the sentence.

7

Case 2:12-cv-00086-WTL-WGH Document 171 Filed 08/07/12 Page 8 of 26 PageID 908

As the Seventh Circuit has explained in discussing the relationship between the savings clause of section 2255 and the federal habeas statute section 2241:

> In general, federal prisoners who wish to attack the validity of their convictions or sentences are required to proceed under § 2255. Furthermore, in the overwhelming majority of cases § 2255 specifically prohibits prisoners from circumventing § 2255 and challenging their convictions or sentences through a habeas petition under § 2241. There is, however, a recognition in the statute that it will not apply in a narrow class of cases. This is the so-called "savings clause" of § 2255, which allows prisoners to bring § 2241 petitions if they can show that the § 2255 remedy "is inadequate or ineffective to test the legality of [the prisoner's] detention."

*Prevatte*, 300 F.3d at 799 (quoting *Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001)).

Because "[t]he essential function [of habeas corpus] is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence," "a procedure for postconviction relief can fairly be termed inadequate when it is so configured as to deny a convicted defendant any opportunity for judicial rectification of so fundamental a defect in his conviction as having been imprisoned for a nonexistent offense." *In re Davenport*, 147 F.3d 605, 609, 611 (7th Cir. 1998). Thus, "[a] federal prisoner should be permitted to seek habeas corpus only if he had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence because the law changed after his first 2255 motion."[6] *Davenport*, 147 F.3d at 611.

Although, subsequent to the imposition of the death penalty here, the Supreme Court has held that the execution of a mentally retarded criminal is "cruel and unusual punishment,"

---

[6] There are three additional qualifications: (1) the change of law has to have been made retroactive by the Supreme Court; (2) the change must elude the permission in section 2255 for successive motions; if it does not, if therefore the prisoner is not barred from filing a successive such motion, then his 2255 remedy is not inadequate and he cannot apply for habeas corpus; and (3) the "change in law" is not to be equated to a difference between the law in the circuit in which the prisoner was sentenced and the law in the circuit in which he is incarcerated. *Davenport*, 147 F.3d at 611-612. Webster can meet none of them because, as will be discussed, he cannot show a change in law.

Case 2:12-cv-00086-WTL-WGH   Document 171   Filed 08/07/12   Page 9 of 26 PageID 969

prohibited by the Eighth Amendment, there was "no change to the law" subsequent to Webster's conviction or sentence creating a fundamental defect that opens the door to a section 2241 proceeding. *See Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that execution of the mentally retarded is prohibited). The execution of the mentally retarded by the federal government was prohibited at the time of Webster's conviction and the imposition of his death penalty. *See* 18 U.S.C. § 3596(c) ("[a] sentence of death shall not be carried out upon a person who is mentally retarded").

Because of the statutory bar, the issue of his alleged mental retardation was front and center, with both the defense and the government marshaling considerable efforts toward it. Unlike many cases, where the issue is joined late in the process, whether Webster is mentally retarded has been thoroughly litigated with substantial fact finding from the very beginning, under the standard that even Webster acknowledges is the proper one. Moreover, the district court, although agreeing with the government in the section 2255 proceedings that several of Webster's mental retardation claims had been raised and rejected on direct appeal, considered those claims anew – although still rejecting them – because of the Supreme Court's intervening decision in *Atkins*. *See* District Court Memorandum Order at *5.

Like the petitioner in *Davenport* whose petition was denied, Webster has had the opportunity to raise the question of his alleged mental retardation – in Webster's case, twice in the district court (at trial and in a section 2255 proceeding) and thrice in the Fifth Circuit (on direct appeal, in an appeal from the denial of the section 2255 motion, and in an appeal from the denial of COA). "Nothing in section 2255, including limitations on successive motions," prevented Webster from obtaining relief on his claim that his alleged mental retardation barred

his execution. *Davenport*, 147 F.3d at 609. He simply failed to convince the trial court or the appellate court. He should not be permitted to attempt to prove that he is mentally retarded yet again, especially in light of "newly discovered evidence" that is neither newly discovered nor probative. As the Seventh Circuit noted in *Taylor*, "[e]very court that has addressed the matter has held that § 2255 is 'inadequate or ineffective' only when a structural problem in § 2255 forecloses even one round of effective collateral review – and then only when as in *Davenport* the claim being foreclosed is one of actual innocence." *Taylor v. Gilkey*, 314 F.3d 835 (7th Cir. 2002) (citing *Cradle v. United States ex rel. Miner*, 290 F.3d 536, 538-39 (3d Cir. 2002); *In re Jones*, 226 F.3d 328, 333-34 (4th Cir. 2000); *Reyes-Requena v. United States*, 243 F.3d 893, 902-03 (5th Cir. 2001); *United States v. Peterman*, 249 F.3d 458, 462 (6th Cir. 2001); *Wofford v. Scott*, 177 F.3d 1236, 1244 (11th Cir. 1999)).

Webster has had the opportunity for one round of effective collateral review. If he is correct that he must be permitted a second chance to prove his mental retardation because of "new evidence," then will he be permitted a third or fourth chance if he produces still more evidence. For example, if Webster takes another IQ test or has another expert evaluate his adaptive skills, what prevents him from claiming that he must be allowed to proceed under section 2241 once again because he has "new evidence"?

There was no structural problem with section 2255 that prevented Webster from an effective collateral review of his claim. There is no reason that Webster could not have obtained the declarations from his family, friends, and acquaintances to present contemporaneously with

10

93

94

his motion for relief under section 2255.  In fact, much of what he produces is cumulative to evidence produced at trial – much of which was rebutted at trial.[7]

As for the Social Security records, Webster was aware of their existence – having himself made application for Social Security benefits.  According to defense counsel, they were made aware of the records by Webster's family, and requested them from the Social Security Administration during their trial representation.  Moore Declaration at ¶ 4.  Defense counsel avers that he could not recall having seen the Social Security records that are the subject of this petition, and that to the best of his recollection, the documents were not provided to the defense team by the Social Security Administration for use at trial.  *Id*.  There is no record of the documents being requested again until late October of 2008 – years after Webster filed his initial and amended motions for relief under section 2255.  Wells Dec. Ex. V (Declaration of Kristen K. Leroux, ¶¶ 3, 9.)  According to Webster's exhibits, his Social Security records were received a little more than three months later, on February 9, 2009.  *Id*., at ¶ 12.  There is no assertion that he attempted to locate those records to support his section 2255 motion.[8]  Webster raised the issue of his alleged mental retardation in both his initial and amended section 2255 motion – with almost two years between the two filings.  Thus, he had ample time to request the records again. He should not be permitted to seek relief under section 2241 by simply "adding" on "new" evidence to support claims that have already been decided adversely to him in his section 2255

---

[7]  Webster's experts based their conclusions, in part, on family members' statements that he lacked certain skills; the government experts "effectively [rebutted] some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family stated that he did not."  *See* District Court Memorandum Order at *14.

[8]  That the records were not received sooner by Webster was not a deliberate or malicious action by the government.  Contrary to Webster's veiled comment, the records were not "withheld" from him by the prosecution, which was unaware of their existence.

11

motion, when that evidence could have been part of the first motion if he had acted with more diligence.

The remedy provided in section 2241 does not become available to Webster simply because he cannot meet the requirements for filing a successive section 2255 motion. Restrictions on filing successive section 2255 motions, standing alone, do not render that section "inadequate or ineffective" within the meaning of the savings clause. *Unthank v. Jett*, 549 F.3d at 535; *see also Wofford*, 177 F.3d at 1245 (agreeing with the Seventh Circuit's conclusion in *Davenport* that the restrictions on second section 2255 motions do not render section 2255 "inadequate or ineffective" to test the legality of a prisoner's detention within the meaning of the savings clause, such that he may resort to the section 2241 remedy). As the Seventh Circuit explained in *Unthank*, it considered and rejected this line of argument in *Taylor v. Gilkey*, 314 F.3d 832 (7th Cir. 2002). *Unthank*, 549 F.3d at 535.

The petitioner in *Taylor* wanted to argue, based on a new decision of the Supreme Court, that the disposition of his first section 2255 proceeding had been mistaken. *Id*. The intervening decision did not create a new and retroactive rule of constitutional law, however. *Id*. At most it just showed that an error had been made in applying an old rule to his situation, for which section 2255(h) would not allow a second collateral attack. *Id*. The petitioner argued that whenever section 2255(h) closes the door to a renewed challenge under section 2255, then section 2255(e) must open the door to a challenge under section 2241. *Id*. The Seventh Circuit rejected the petitioner's reasoning, concluding that this would make section 2255(h) self-defeating:

> To say that [the] limitations [adopted in 1996] authorize further collateral proceedings would be to use [§ 2255(e) ] to return the courts to the world of *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), in which

prisoners may file as many collateral attacks as they please, provided that they don't abuse the writ. One goal of the Antiterrorism and Effective Death Penalty Act of 1996, which added § 2244(b) and [§ 2255(h) ] to the Judicial Code, was to replace *Sanders* with an approach under which only defined circumstances permit successive collateral attacks. *See Burris v. Parke*, 95 F.3d 465 (7th Cir. 1996) (*en banc*). The escape hatch in [§ 2255(e) ] must be applied in light of that history.

*Id*. (quoting *Taylor*, 314 F.3d at 836); *see also Cooper v. United States*, 199 F.3d 898, 901 (7th Cir. 1999) ("that one has lost the right to relief under § 2255 does not automatically mean that one gets to seek relief under § 2241. It is only when a fundamental defect exists in the criminal conviction – a defect which cannot be corrected under § 2255 – that we turn to § 2241").

Finally, section 2255 is inadequate or ineffective only when a prisoner is unable to present a claim of actual innocence. *Unthank*, 549 F.3d at 535. A challenge to a sentence does not amount to a claim that a prisoner is innocent of the offense. *Id*. (citing *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997) (holding that a successive motion under section 2255 may not be filed on the basis of newly discovered evidence unless the motion challenges the conviction and not merely the sentence.)). Contrary to Webster's assertion, the Seventh Circuit in *Hope* also called into question *Sawyer v. Whitley*, 505 U.S. 333, 340-41 (1992), explaining that the exception for sentencing issues did not survive the amendment:

> Courts that before the amendment had to decide whether an application for postconviction relief came within the "actual innocence" exception to the requirement of proving cause and prejudice in order to be permitted to revive a waived ground for relief extended the exception to sentencing issues .... But we do not think the exception survives the amendment. The "actual innocence" exception of the prior law was judge-made, and so its contours were appropriately judge-fashioned and permissibly judge-expanded. The exception in the new law is graven in statutory language that could not be any clearer. When we consider ... the absence of any indication in the legislative history that "offense" was being used in some special sense different from its ordinary meaning, we think it highly unlikely that Congress intended the word to bear a special meaning.

13

*Hope*, 108 F.3d at 120.  Thus, a defendant must show "actual innocence" of the offense and not of the sentence. Webster should not be permitted to proceed under section 2241 where he cannot show that relief under section 2255 is inadequate or ineffective to test the legality of his detention, or that he is actually innocent of the offense of conviction.[9]

**Webster's newly available evidence has insufficient gravitas to raise doubt about earlier fact-finding**

Pretermitting the issue of whether this Court has jurisdiction under section 2241 to consider Webster's claim, he cannot show that he is categorically ineligible for the death penalty by virtue of being mentally retarded.  Even assuming that a showing of mental retardation would establish "actual innocence" of the "death penalty" such that he would be entitled to relief, Webster cannot show that both the District Court for the Northern District of Texas and the Fifth Circuit were wrong in holding that he had failed to do so.  *Taylor*, 314 F.3d at 835 (holding that section 2241 is available only when there is both a valid claim of actual innocence and the petitioner has not had an unobstructed, prior opportunity to present the claim); *Collins v. Holinka*, 510 F.3d 666, 667 (7th Cir. 2007) (review under section 2241 requires both lack of opportunity under section 2255 to test the validity of conviction and a claim of actual innocence); *see also Wofford*, 177 F.3d at 1244 n.4  ("Once the savings clause of § 2255 applies to open the

---

[9] There is no merit to Webster's contention that cutting off opportunities for continuing review suspends the writ of habeas corpus in violation of the constitutional ban. *See* U.S. Const. art. I, § 9, cl. 2.  "What is protected from suspension is the writ that limits a person's detention by the executive branch without trial.  There is no constitutional entitlement to post-judgment collateral review by the inferior federal courts, let alone to unending rounds of such review." *Benefiel v. Davis*, 403 F.3d 825, 827 (7th Cir. 2005) (citing *Lindh v. Murphy*, 96 F.3d 856, 867-68 (7th Cir. 1996) (*en banc*), reversed on other grounds, 521 U.S. 320 (1997)); *see also Taylor*, 314 F.3d at 835 ("the writ protected by the Constitution is the writ known in 1789 – the pretrial writ used to thwart unjustified detention by the executive branch – and not the statutory extensions of collateral review later enacted by Congress. What the legislature gave, it may withdraw.").

14

portal to a § 2241 proceeding, the proper inquiry in that § 2241 proceeding will be whether the

petitioner can establish actual innocence of the crime for which he has been convicted, as "actual

innocence" is defined in *Bousley v. United States*, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d

828 (1998).")

In line with the Fifth Circuit's admonition that he was simply rehashing trial evidence and

had failed to point to any new evidence in his section 2255 motion, *Webster*, 421 F.3d at 313-14,

Webster gathered "newly available" evidence in the form of the Social Security documents, a

letter from his school district, and affidavits from family and friends to present in support of his

successive section 2255 motion and which he now presents to this Court – all of which he

contends further substantiates his claim.  He is wrong.  Despite Judge Weiner's comments in his

concurrence in *In re Webster*, 605 F.3d at 259-60, what Webster presents to this Court is wholly

insufficient to show that both the district court and the Fifth Circuit were wrong in concluding

repeatedly that he has failed to show that he is mentally retarded.

Webster's evidence of Social Security records and declarations from his childhood

friends, relatives, and acquaintances are neither newly discovered nor substantive.  Such

evidence was known or available to Webster at the time of trial and when he filed his initial

section 2255 motion.  The Social Security records add little in the way of probative value, given

questions of methodology and expertise.  Webster was seen by the doctors reflected in the reports

in an effort to secure Social Security benefits; consequently, he had motive to present himself as

mentally deficit therein as well.  Moreover, the records do not reflect that the doctors actually

made diagnoses of mental retardation based on the relevant mental retardation criteria.  The

declarations from his family, friends, and acquaintances likewise lack probative value, given

15

their reason for providing the declarations, and are cumulative of other evidence offered at trial. The letter from the school district lacks probative value, given the evidence at trial, and the limited relevance of Webster's placement or non-placement in special education classes.

*Evidence regarding mental retardation presented at trial*

The question of whether Webster is mentally retarded "was a highly contested one at trial." District Court Memorandum Order at *12. Given that a finding of mental retardation requires the manifestation of significantly subaverage intellectual functioning and related limitations in two or more of adaptive skill areas before the age of 18, both the government and the defense offered expert testimony as to Webster's IQ and his adaptive skills (communication, self-care, home living, social skills, community use, leisure, work, self-direction, health and safety, and functional academics). *See* Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000); *Atkins*, 536 U.S. at 308 n.3.[10]

The government presented testimony from two experts. Defense counsel presented testimony from four medical experts regarding Webster's mental capacity and a fifth medical expert on surrebuttal to critique the methodology used by one of the government experts to score Webster's IQ test. Both sides also introduced lay testimony regarding Webster's intellectual functioning and his adaptive skills.[11] All of the experts who testified at Webster's trial, including

---

[10] "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." Diagnostic and Statistical Manual of Mental Disorders 42 (4th ed.2000).

[11] For example, E.C. Turner, Linda Monk, and Pat Drewett, a counselor and two teachers, respectively, from the junior high school Webster attended, testified that he was not in special education classes and that, in their opinion, he was not mentally retarded. (R25:34-70.) Several correctional officers and fellow inmates testified that, while incarcerated, Webster engaged in various activities potentially inconsistent with a finding of mental retardation. For example, he wrote letters to fellow inmates; received letters and newspapers; read aloud from

16

those who testified for the government, agree that Webster's IQ test scores are low. The

government experts concluded, however, that Webster's IQ was higher than his experts had

suggested and, more importantly, that Webster had sufficient adaptive skills to preclude

classifying him as mentally retarded. *Webster*, 421 F.3d at 312-313. The district court ultimately

found that the evidence at trial supported a finding that Webster is not mentally retarded. District

Court Memorandum Order at 12.

      As the district court explained in its order denying section 2255 relief:

> Webster called four expert witnesses who testified about his mental
> capacity, including Dr. Raymond Finn, Dr. Denis Keyes, Dr. Robert Fulbright,
> and Dr. Mark Cunningham. Webster was given different I.Q. tests by some of
> these experts, and he scored between a composite score of between a 51 and a 65.
> (R. 23:184-94; R. 24:20). Webster's experts agreed that an I.Q. score of around
> 70 or lower, along with a lack of adaptive skills and the onset of these deficits
> before the age of 18, are the criteria for a diagnosis of mental retardation. (R.
> 23:183, 229-30). In order to assess Webster's adaptive skills, Dr. Keyes used the
> Vineland test, which involved asking numerous questions of people who knew
> Webster before he was eighteen, including family members, teachers, and friends,
> but dropping those answers that are inconsistent with the answers of most of the
> interviewees. (R. 24:36-42). From this, Keyes determined that Webster lived at
> home, did not have a bank account or a charge card, and was never observed
> setting the dinner table, assisting in the preparation of meals, or making his bed.
> He also determined that no one had known Webster to keep secrets or confidences
> or address envelopes on his own. (R. 24:44-5, 73-6). Dr. Keyes testified that he
> did not speak to Webster's fellow gang members or police officers who had dealt
> with him before he was eighteen-years-old in reaching his results on the Vineland
> test. (R. 24:82-4). Based on this test, Dr. Keyes opined that Webster did have a
> lack of adaptive skills. Based on the I.Q. scores, along with this adaptive skills
> test and evidence from family members that Webster had been "slow" as a child,
> all of Webster's experts diagnosed him as being mentally retarded. (R. 24:43, 47,
> 144, 189).

---

newspapers; wrote request slips for various services; wrote written grievances; submitted names and addresses of
people for his visitation list; and on one occasion complained because the change he received from the prison
commissary was incorrect. (R25:86-103, 111-18, 122-25, 128-30, 136-38, 141-46; R26:24-35.)

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 101 of 341
Case 2:12-cv-00086-WTL-WGH Document 17 Filed 06/07/12 Page 18 of 26 PageID 578
PageID #: 1745

Both Dr. Finn and Dr. Keyes acknowledged that cultural factors can have an effect on I.Q. scores (R 23:212; R. 24:59), and Dr. Keyes testified that the I.Q. tests required Webster to define words and recognize faces, and he did not know the definition of "inflation," nor did he recognize pictures of Shakespeare, Mark Twain, or Einstein, but he did recognize Elvis Presley and Stevie Wonder. (R. 24:60-2). Dr. Keyes also testified that Webster had reading and writing abilities that were unusual in a person with his alleged level of retardation and that Keyes attributes this to his belief that Webster probably suffers from "inorganic," as opposed to "organic" retardation. (R. 24:48, 111). Dr. Keyes also acknowledged, upon being questioned by this Court, that evidence that Webster was a leader in the kidnaping plot would be inconsistent with a diagnosis of mental retardation and that, in his opinion, it would have been "unlikely" that Webster was the one who physically took the victim. (R. 24:102).

The government, on the other hand, offered testimony from two experts, Dr. George Parker and Dr. Richard Coons. Dr. Parker testified that he administered an I.Q. test to Webster and his composite score was a 72. (R. 26:49). Dr. Parker and Dr. Coons testified that they did not believe that Webster is mentally retarded. (R. 26:143). Both Parker and Coons believed that Webster was not motivated to do well on I.Q. tests administered after he was charged in this case, and pointed as evidence of this to prior tests where he scored higher, such as tests given to him when he was in junior high, when he was in prison previously, and when he was in the Job Corps. (R. 26:51-3, 60-1, 63, 67, 126, 142). Parker also observed that the fact that someone like Webster lived in a sub-culture in which he was not exposed to a lot of vocabulary could cause his I.Q. scores to be lower. (R. 26:50-51).

Primarily, however, Parker and Coons questioned the results obtained by the defense when the test was administered to determine Webster's adaptive skills. Parker testified that he did not believe that the Vineland test was appropriate in Webster's case because of Webster's lifestyle, namely that of a drug dealer. Because of choices that Webster had made in his life, and because Webster had been in prison most of the time since he was fifteen years old, Parker and Coons believed that he would rate deceptively poor on the Vineland test. Dr. Parker and Dr. Coons also disputed some of the results Dr. Keyes did obtain with the Vineland test. Specifically, Dr. Keyes had indicated on the test that Webster's family members stated that Webster did not speak in complete sentences, did not read simple stories aloud, and did not read on his own initiative, when both the two experts and officers at the prison where he was housed after being charged in the instant case had observed that Webster did all of these things. Moreover, his

18

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 102 of 341
Case 2:12-cv-00086-WTL-WGH Document 17 Filed 06/07/12 Page 19 of 26 PageID #: 579
PageID #: 1746

family had stated that they did not know whether Webster addressed envelopes, put his clothes away, or made his own bed, whereas Parker had in his possession an envelope Webster had addressed and had observed that Webster put his clothes away and made his bed in his jail cell. (R. 26: 58-9, 136-39). Parker and Coons also noted that Webster had shown cleverness when he sneaked into the women's part of the jail at one point, and he had shown the ability to adapt to the life he had chosen, as well as life in prison. (R. 26:143-44). Furthermore, Webster had shown adaptability by being deceitful to the police by way of cover stories and excuses when he was arrested with a motel key in his pocket, and had the adaptive ability to destroy evidence when he burned his clothes after Lisa Rene's murder. (R. 26:65-6).

Moreover, the government placed into evidence the testimony of Greg Barber, Webster's former parole officer, Gene Stewart, who was the principal at the junior high that Webster attended, and Rick McLaughlin, the vice-principal at that same school. They all testified that they did not believe that Webster was mentally retarded and that, when they were visited by Dr. Keyes earlier and told him their opinions, he told them that they could not help him because he was trying to keep Webster from being executed, a charge he disputed in his testimony. (R. 25:26-8, 238, 239-40, 247-48, 249). Moreover, E.C. Turner, Pat Drowett, and Linda Monk, a counselor and two teachers from the junior high Webster attended, testified that in their opinion, while Webster was in "basic" classes at school rather than advanced classes and dropped out in the ninth grade, he is not retarded. (R. 25:34-70). Finally, two fellow inmates and several officers from the federal prison where Webster had been housed for some time testified that Webster wrote letters to other inmates, albeit in almost indecipherable slang, received letters and newspapers, read aloud from the newspapers, wrote request slips for various services, wrote written grievances, submitted names and addresses of people for his visitation list, appeared to be reading from law books in the law library and taking notes, and on one occasion complained because the change he had received after purchasing materials from the commissary was incorrect. (R. 25:86-103, 111-18, 122-25, 128-30, 136-38, 141-46; R. 26:24-35).

In summary, all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that Webster has a low IQ. The experts disagreed about how low, but even a 72 I.Q. falls into the range where one can be diagnosed as mentally retarded, if one also has a deficit in adaptive skills. (R. 26:85-6). And the issue of adaptive skills or the lack thereof is where the parties converged at Webster's trial. While the defense did place into evidence the results of the Vineland test, government witnesses effectively

19

reputed some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family stated that he did not. Looking at all of the evidence presented by both sides at trial, while it is undisputed that Webster has had low scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "nonorganic" factors, which this Court understands to mean his lack of a quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math. This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills. *See Atkins*, 536 U.S. at 308, n. 3.

District Court Memorandum Order at ** 12-14 (internal footnotes omitted).[12] [13] [14]

---

[12]   The record reflects that Dr. Keyes did not take Webster's acts in the kidnaping and murder into account as part of his analysis of Webster's adaptive skills. For example, although Dr. Keyes testified that evidence Webster was a leader in the kidnaping plot would be inconsistent with a diagnosis of mental retardation and that, in his opinion, it would have been "unlikely" that Webster was the one who physically took the victim, the evidence showed that Webster did take Lisa Rene from her apartment. (R24:102; R38: 57-60; R37: 107-113). As an example of his leadership role, after he and Hall made the decision to kill Lisa Rene, Webster instructed one of his co-defendants to make her take a shower and told him that he was going to get a comb for Lisa to comb out her pubic hair. (R38: 78-81; 37: 134-39).

[13]   Dr. Keyes's decision to use convergent validation meant that he included only information that would support a finding of mental retardation while omitting anything that would not. For example, this meant he totally discounted information from school personnel and Webster's parole officer that their experiences with Webster showed that he was not mentally retarded. Gene Stewart, who supervised Webster at Watson Chappel Junior High School in Pine Bluff as a school counselor, testified that Webster was not retarded, had not been assigned to special education classes, and that there was no reason to assign him to social education classes. He testified that Dr. Keyes had come to talk to him briefly in Pine Bluff. After they spoke for a few minutes, Dr. Keyes closed his book and said that Stewart had not given him any information that would be helpful. (R44:236-39.) Rick McLaughlin testified that he was the principal and former assistant principal at Watson Chappel Jr. High. He identified Webster as one of the students he formerly supervised. Mr. McLaughlin testified that he never noticed anything that would have indicated that Webster was mentally retarded. When Dr. Keyes visited with McLaughlin, Dr. Keyes told McLaughlin that he was trying to gather information to keep Webster from being put to death. (R44:243-250.) Greg Barber, a parole officer for the State of Arkansas who supervised Webster, testified that Webster appeared to understand the rules and conditions of his parole. When Barber was interviewed by Dr. Keyes in the spring of 1996, Dr. Keyes told Barber that Webster was mildly retarded and lectured Barber that Webster should not be executed. When Barber told Dr. Keyes that Webster never acted retarded, Dr. Keyes told Barber that he would not be able to help him and left. (R45:15-28; GE 102-A, 102-B, 102-C, 102-D).

[14]   Dr. Keyes's reason for excluding interviews of the jailers demonstrates another reason why his analysis of Webster's adaptive skills was suspect. Although symptoms of mental retardation must manifest before a specified

20

103

*Webster's "newly available evidence"*

To support his claim that he is mentally retarded, Webster offers Social Security records that he claims "show that government physicians and psychologists examined Mr. Webster when he was 20, a year before the commission of the crime; that each doctor found that he had an extremely low IQ, and that two of them concluded he had mental retardation." Petition at p. 14. His contention should fail because his evidence is not substantial.

Dr. C. M. Rittlemeyer, who conducted a general physical examination of Webster, included in his diagnosis: "Mental retardation. Flat feet. Chronic sinus problems and allergies." Wells Dec. Ex. G, pp. 18-25. There is no indication of how Dr. Rittlemeyer came about that "diagnosis." The records do not reflect any IQ or adaptive skills testing. In fact, the records do not demonstrate that Dr. Rittlemeyer even knew the critieria for a finding of mental retardation, or that he was qualified to make such an assessment. In fact, given that Dr. Rittlemeyer was conducting a physical examination, it appears that Webster may have self-reported mental retardation to Dr. Rittlemeyer, rather than the doctor making any independent assessment of Webster's mental acumen.

Dr. Charles Spellman, who conducted a psychological evaluation of Webster in order to better ascertain Webster's eligibility for Social Security benefits, "estimated" an IQ of 69, and listed a current level of functioning based on Webster's self-reporting. Wells Dec. Ex. G, pp. 11-14. There is no indication that he tested Webster to determine his IQ, or that he conducted any

---

age for the diagnosis to be mental retardation as opposed to some other condition, mental retardation refers to substantial limitations in present functioning. *See* Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000); *Atkins*, 536 U.S. at 308 n.3. Webster's abilities at the time of Dr. Keye's assessment – whether in jail or not – would therefore have been relevant.

Case 2:12-cv-00086-WTL-WGH Document 17 Filed 06/07/12 Page 22 of 26 PageID 582
PageID #: 1749

analysis of Webster's adaptive skills. *Id.* In fact, there is no indication in these records that Dr. Spellman was even aware of the criteria for a mental retardation diagnosis. *Id.* He appears to have diagnosed Webster as mentally retarded solely on that IQ estimation, Webster's self-reporting, and his limited observations of Webster, who was motivated to exaggerate a mental deficiency because of his desire to gain Social Security benefits. *Id.*

From the records, it appears that Dr. Edward Hackett, a psychologist, administered a Wechsler Adult Intelligence Scale - Revised IQ test to Webster. Wells Dec. Ex. G, p. 15. He diagnosed Webster with mild mental retardation based on a Verbal IQ of 71, a Performance IQ of 49, and a Full Scale IQ of 59. *Id.* The record does not reflect that Dr. Hackett did any formal testing of Webster's adaptive skills. *Id.* The report does note, however, that "The claimant was quite verbal. There may have been some malingering, however, Dr. Hackett could not be sure. The IQ scores are not normal considering history. The claimant was viewed as a somewhat retarded con man, but very street wise." *Id.*

The government has never argued that Webster's IQ would not meet the definition for mental retardation. The government experts agreed that Webster has a low IQ, but concluded that his IQ was higher than his experts had suggested, noting that Webster had an incentive not to perform well on the cognitive tests administered after he was charged in this case, and pointing to prior cognitive tests taken by Webster where he had scored higher, such as tests given to him when he was in junior high, when he was in prison previously, and when he was in the Job Corps. (R:26:51-3, 60-1, 63, 67, 126, 142). Of the three doctors who examined Webster for Social Security purposes, the only doctor to actually give Webster an IQ test – Dr. Hackett – also questioned whether he was malingering. Wells Dec. Ex. G, p. 15.

Case 2:12-cv-00086-WFL-WGH Document 17 Filed 06/07/12 Page 23 of 26 PageID 583
PageID #: 1750

Moreover, trial evidence showing that Webster had a low score on an IQ test taken *before* the offense blunts his claim that the Social Security records would overwhelmingly refute the government's claim that he was malingering on tests *taken* after the offense. (R23:177-178.) Evidence that he scored low on the test given by Dr. Hackett was therefore cumulative of evidence already presented at trial, and would not have changed the district court's finding.

At best, Webster's records offer minimal support of his claim, given the questions about methodology and expertise. Most importantly, the basis for the district court's determination that Webster is not mentally retarded was not his IQ scores, but whether his adaptive skills were sufficiently deficient to deem him mentally retarded. Nothing in the Social Security records has any measurable impact on the court's determination as none of the doctors appeared to have conducted any analysis of Webster's adaptive skills.

As for the declarations from Webster's family, friends and acquaintances, they are cumulative of other such evidence offered at trial and in conjunction with his first section 2255 motion. Moreover, since each of them have incentive to exaggerate because of their desire to preclude Webster's execution, these declarations have little probative value. Because they are cumulative, could have been part of Webster's 2255 motion, and have little probative value, they likewise would not have impacted the district court's fact finding.

The fact that Webster has uncovered a letter from the Watson Chapel School District indicating that his special education records were destroyed in 1988 is likewise not probative of much. Wells Dec. Ex. G, p. 17. The letter is quite general and, although stating that his records were destroyed, does not offer much to support that he was actually enrolled in special education classes, especially in light of specific trial testimony from several witnesses that he was not.

23

106

(R44:236-39, 243-50; R45: 52-59; GE 98-A.)[15]  Moreover, in his section 2255 motion, Webster

claimed that he was prevented from attending special education classes because of his race, not

because he did not qualify.  District Court Memorandum Order, *8.  In any event, whether or not

Webster attended any special education classes adds little to the relevant question – does he

suffer from sufficient deficits in his adaptive skills to render him mentally retarded?  As both the

district court and the Fifth Circuit concluded, "[i]n the main, the prosecution presented

substantial evidence countering Webster's claim of mental retardation, and the government's

effort did not depend in any significant respect on Webster's non-enrollment in special education

courses." *Webster*, 392 F.3d at 798-799; District Court Memorandum Order, *8.

The evidence at trial showed that Webster demonstrated adaptability by working as a drug

dealer; by concocting cover stories after he was arrested; by making excuses to police when they

found on his person the key to the motel room in which Lisa Rene was held and raped; and by

burning his clothes after her murder.  *Webster*, 421 F.3d at 313.  The government also presented

evidence that, while incarcerated, he engaged in various activities inconsistent with mental

retardation, such as writing letters to fellow inmates; complaining when he received incorrect

change from the prison commissary; receiving letters and newspapers; reading aloud from

newspapers; writing request slips for various services; preparing written grievances; submitting

names and addresses of people for his visitation list; and sneaking into the women's section of

the jail.[16]  *Id*. at 313-14 n.15.  The district court, in rejecting Webster's mental retardation claim,

---

[15]   One of the school counselors testified that Webster scored in the 43rd percentile – low average – on an achievement test called the M.A.T. 6 Survey when he was in the seventh grade and definitely would not have qualified for special education classes.  (R. 45: 52-59; GE 98-A).

[16]   The government introduced a letter written by Webster to fellow inmate John Clay on April 14, 1996. (GE 121-A; 132-A).  In the letter written to John Clay, Webster asked for Clay's assistance in a plan to have sex with

24

found that this and other evidence reflected that Webster "has adapted to the criminal life that he chose," and that he has "the ability to communicate with others, [to] care for himself, [to] have social interaction with others, [to] live within the confines of the 'home' he has been in since he was sixteen, [to] use community resources within this home, [and to] read, write, and perform some rudimentary math." *Id*. at 313. And the Fifth Circuit found that the evidence supporting the district court's ruling was "substantial." *Webster*, 162 F.3d at 353.[17] Nothing presented by Webster justifies disturbing those findings.

### CONCLUSION

Webster's petition should be dismissed because he cannot meet the requirements of the savings clause. Section 2255 was neither inadequate or ineffective to test the legality of his detention. Webster raises no "legal" claim to this Court; instead, he asks the Court to reevaluate the factual underpinnings of his mental retardation claim by pointing to "new evidence" that is not sufficiently substantial to justify such an reevaluation.

Respectfully submitted,

JOSEPH H. HOGSETT
United States Attorney

By:  s/Gerald A. Coraz
Gerald A. Coraz
Assistant United States Attorney

---

female jail inmates during visiting hours. In the letter, Webster describes to Clay a plan whereby Clay will give Webster the names of some of the women Clay knew who were in custody and the names of some people not in custody that Webster could put on his visitation list. The plan was for visitors to come into the jail and ask to visit Webster, Clay and some women inmates at the same time. Webster told Clay in the letter that he could keep a watch for Clay, and then Clay could keep a watch for Webster. (R45: 85-97; GE 121-A).

[17] In fact, Webster was able to convince only four of the 12 jurors, by a preponderance of the evidence, that he "is or may be," mentally retarded or that he suffers from low intellectual functioning. (R11:1500, 1521.)

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 109 of 341
Case 2:12-cv-00086-WTL-WGH Document 17 Filed 08/07/12 Page 26 of 26 PageID 586
PageID #: 1753

Of Counsel:

SARAH R. SALDAÑA
United States Attorney
Northern District of Texas

/s/ Delonia A. Watson
DELONIA A. WATSON
Assistant United States Attorney
Texas State Bar Number 20937500
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, Texas 76102-6882
817.252.5200 OFFICE
817.252.5254 FAX

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August  7 , 2012, a copy of the foregoing  was mailed, by first class U.S. Mail, postage prepaid and properly addressed to the following:

| | |
|---|---|
| Eric K. Koselke, #5593-54<br>6202 N. College Avenue<br>Indianapolis, IN  46220 | DORSEY & WHITNEY LLP<br>Steven J. Wells<br>Kirsten E. Schubert<br>50 South Sixth Street, Suite 1500<br>Minneapolis, MN  55402 |

s/Gerald A. Coraz
Gerald A. Coraz
Assistant United States Attorney

Office of the United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, IN 46204-3048
(317) 226-6333

26

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 110 of 341
Case 2:12-cv-00086-WTL-WGH   Document 17-1   Filed 08/07/12   Page 1 of 28   PageID-587
PageID #: 1754

## Summary of Evidence in Support of Conviction and Sentence of Death

**a. Guilt/Innocence Phase**

On September 24, 1994, Lisa Rene was a 16-year-old student at Lamar High School in Arlington, Texas. Lisa Rene was originally from the U.S. Virgin Islands and had come to the United States during the summer of 1994 to live with her sister, Pearl Rene, at 1526 Chukka Drive, Aapartment Number 507, in the Polo Run Apartments in Arlington, Texas. (R. 40: 86-87). A few minutes after 8:00 p.m. on September 24, 1994, Pearl Rene received a telephone call at work from her sister Lisa. Lisa was frantic and said, "Pearl, Pearl, come home, come home, someone's breaking into the door." (R. 40: 89-91). Pearl told Lisa to hang up and call 911, and left immediately for home. (R.40: 92). When Pearl arrived at her apartment approximately five minutes later, Arlington police were already at the scene. (R. 40: 92).

A cassette tape recording of Lisa Rene's 911 telephone call was admitted into evidence, and a transcript of the recording was admitted to aid the jury. The recording of the 911 telephone call is that of Lisa reporting that someone was trying to break into the apartment. In the background can be heard more than one man's voice asking for different people, telling Lisa to open the door, and identifying themselves as the FBI. During the telephone call, Lisa screamed as a man's voice asks her who was on the telephone. As she was screaming, the receiver was placed back on the telephone and the call was terminated. The 911 operator tried to call back but only got an answering machine recording. (R. 37: 3-8; GE 1-A, 1-B).

Thomas Hayden, a Arlington Police Department police officer, testified that at approximately 8:13 p.m. on September 24, 1994, he responded to a dispatch to 1526 Chukka Drive, Apartment 507. When Hayden and another officer arrived at the apartment, the glass to

1

Case 2:12-cv-00086-WTL-WGH Document 17-1 Filed 08/07/12 Page 2 of 28 PageID-588

the sliding glass door had been partially broken out and the apartment was empty. (R. 37: 9-16).

On September 29, 1994, Steven Beckley gave a confession to an Arlington Police Detective and an FBI Agent in which he admitted that Lisa Rene had been kidnapped as the result of a drug deal gone bad and in which he implicated himself, Orlando Hall and an individual known as "B-Love." In this statement, Beckley stated that he had last seen Lisa Rene at the Pine Bluff Motel with B-Love. (R. 17: 4-5; GE S-36). On September 29, 1994, an arrest warrant was issued out of the City of Arlington for Orlando Hall, Steven Beckley, and Demetrius Hall for the kidnapping of Lisa Rene. (GE S-10; R. 17: 12-14). Webster, who was spotted by FBI agents on September 30, 1994 at the Pine Bluff Motel, was detained and arrested for the state offense of possession of marijuana and possession of a firearm by a felon. (R. 17: 71-78; GE S-11, S-12, S-13). At 10:45 p.m. on September 30, 1994, an arrest warrant was issued out of the City of Arlington, Texas for Webster for the offense of Aggravated Kidnapping of Lisa Rene. (R. 17: 12-13; GE S-10).

On September 30, 1994, Beckley gave a second statement admitting that Lisa Rene had been killed. (R. 17: 12; R. 38: 111). Beckley then assisted officers and agents by leading them to Byrd Lake Park in Pine Bluff, Arkansas, as the general location where Lisa Rene had been murdered and buried. (R. 17: 14; R. 38: 112-113). On October 1, 1994, Webster gave a statement to Arlington Detective Jim Ford and FBI Agent Garrett Floyd. (R. 17: 15-17; R. 39: 20-24). Webster then led the officers and agents directly to the grave site. Beckley confirmed the location of the grave site before excavation began. (R. 17:17-22; R. 38: 113; R. 39: 30-33). On October 2, 1994, Lisa Rene's body was found in Byrd Lake Park. Lisa Rene had been stripped of her clothing, gagged, and buried in a four-foot deep grave. (R. 40: 25-32). Also on

2

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 112 of 341
Case 2:12-cv-00086-WTL-WGH   Document 17-1   Filed 08/07/12   Page 3 of 28   PageID 589
PageID #: 1756

October 2, 1994, after leading the officers to the grave, Webster gave a written statement to Arlington Detectives Jim Ford and Mike Stanton and FBI Agent Floyd.  (R. 39: 35-54;  R: 17: 22-24; GE 88, S-27).

The medical examiner testified that Lisa Rene died from multiple blunt force injuries combined with asphyxia.  She suffered from as many as 14 blunt force contusions.  (R. 40: 41-62).  She also suffered from hemorrhaging in the vaginal orifice.  (R. 40: 48-49).   The medical examiner testified that, in his opinion, Lisa Rene was unconscious, but still breathing when she was buried.  He also testified that she could have regained consciousness after she was buried.  (R. 40: 64-67).

At the trial, the government presented the testimony of codefendants Demetrius Hall (D. Hall), Beckley and Holloway, and the testimony of Lisa Rene's brother, Stanfield Vitalis, to prove the facts and circumstances surrounding the kidnapping, sexual assault, and murder of Lisa Rene.

In the spring of 1994, Orlando Hall (O. Hall), a drug dealer from El Dorado, Arkansas, had asked Beckley, a resident of Irving, Texas, to find O. Hall a marijuana connection in the Dallas area.  In the summer of 1994, O. Hall also recruited Holloway to start selling marijuana for Hall in Pine Bluff.  (R. 38: 12-13; R. 29: 101-104).  Beckley was able to put Hall in contact with two individuals they knew as Stan and Ebay as a source for marijuana.  Beckley and the Halls also referred to these two individuals as the Jamaicans because of their Caribbean accents.  (R. 38: 13-14).

In September 1994, while Beckley and D. Hall were visiting Hall's sister Cassandra Ross in Irving, O. Hall called Beckley and asked him to set up a marijuana transaction with the

3

112

Jamaicans, Stan and Ebay. (R. 38: 20-21). On September 20, 1994, Beckley met with Ebay and set up a meeting. (R. 38: 23). On the next day, Holloway drove O. Hall to the airport in Little Rock, Arkansas. (R. 39: 105-106). Beckley and D. Hall picked up O. Hall at the Dallas/Fort Worth Airport. (R. 38: 23). Later, O. Hall, Beckley and Latonya Anders met with Ebay at a car wash. Still later, O. Hall and Beckley met with Stan and Ebay at the car wash and paid them $4700. When Beckley and D. Hall went back to the car wash to pick up the marijuana, Stan and Ebay never showed. (R. 38: 23-29; R. 37: 72-78).

When O. Hall, Beckley and D. Hall were finally able to get in touch with Stan and Ebay by telephone, Stan and Ebay told them they had been robbed or "jacked" of the money and their automobile, and that they planned to get the guys who robbed them. (R. 38: 29-31; R. 37: 79-80). After several phone conversations, Stan and Ebay agreed to meet with O. Hall, Beckley and D. Hall the next day. (R. 38: 31; R: 37: 81).

On Thursday, September 22, 1994, Stan and Ebay failed to meet O. Hall, Beckley and D. Hall at the agreed time. (R. 38: 34; 37: 82). O. Hall called a woman he knew who worked at Southwestern Bell and got the address at 1526 Chukka at the Polo Run Apartments, using a telephone number Beckley had found for Stan and Ebay. (R. 38: 32-34; R. 37: 82). O. Hall, D. Hall and Beckley went to the address at the Polo Run Apartments and sat in the parking lot and watched for Stan and Ebay. They saw the same car that the Jamaicans had told O. Hall had been taken from them in the robbery. O. Hall then knew that Stan and Ebay were not telling him the truth about being robbed of the money. (R. 38: 34-35; R. 37: 84).

On Friday, September 23, 1994, Beckley and D. Hall obtained two handguns and purchased bullets from an Oshmans store. (R. 38: 35-37; 37: 89-91). Later that evening, Hall,

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 114 of 341
Case 2:12-cv-00086-WTL-WGH Document 17-1 Filed 08/07/12 Page 5 of 28 PageID 591
PageID #: 1758

Beckley and D. Hall dressed in camouflaged clothing and drove Cassandra Ross's tan Cadillac Eldorado to the Polo Run Apartments. They saw Stan, Ebay and another man leaving the apartments. D. Hall went to the apartment he thought the men had left and knocked on the door. When Lisa Rene answered the door, D. Hall asked for a made-up person and then left when Lisa told him that no such person lived there. (R. 38: 37-41; R. 37: 92-96). Hall, Beckley and D. Hall then went back to Cassandra Ross's apartment in Irving.

O. Hall decided to contact Holloway and have him get Bruce Webster, also known as B-Love, to come down to Texas. (R. 38: 41-42; R. 37: 97). After several unsuccessful attempts, Holloway was finally able to locate Webster and bring him to his house where Webster talked with Orlando Hall by telephone. Holloway took Webster to the home of Webster's girlfriend, Sylvia Henry, and told him that he would pick him up the following morning and take him to the airport. (R. 39: 107-114).

On Saturday, September 24, 1994, Holloway drove Webster to the airport in Little Rock, Arkansas. (R. 39: 114-115). Webster took a flight from Little Rock to Love Field Airport in Dallas on a flight arranged by O. Hall. (R. 39: 113-114). That same morning, Beckley picked Webster up at Love Field. (R. 38: 42). O. Hall, Beckley, Webster and D. Hall then met at the Wilson World Hotel. (R. 38: 44; 37: 98). The four of them dressed in camouflage clothing and went back to the Polo Run Apartments in Arlington, stopping to purchase beer on the way. They waited in the parking lot watching for Stan and Ebay, leaving once to get more beer and to get some gas in a anti-freeze jug. At one point, the Eldorado Cadillac stopped running. By the time they were able to get the car restarted, it was dark, and the four codefendants left the car running while they went to the apartment that had been identified by D. Hall the previous evening. O.

5

114

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 115 of 341
Case 2:12-cv-00086-WTL-WGH   Document 17-1   Filed 08/07/12   Page 6 of 28   PageID-592
PageID #: 1759

Hall and Webster each had a handgun.  D. Hall had a small souvenir baseball bat, and Beckley had duct tape and the jug of gasoline.  (R. 38: 45-57; R. 37: 99-107).

Once at the apartment, Webster and D. Hall went to the front door and knocked while O. Hall and Beckley stayed back.  Webster tried to kick the front door in, and when he was unsuccessful, he and D. Hall went around to the sliding glass door on the patio.  D. Hall saw Lisa Rene on the telephone, and Webster shouted to her that they were the FBI.  Webster pointed his gun at the window, and D. Hall then smashed the sliding glass door with the bat he was carrying. Webster went into the apartment, tackled Lisa Rene and drug her out of the apartment and into the running car.  (R. 38: 57-60; R. 37: 107-113).

As they left the apartment complex, Hall was driving, Beckley was in the passenger side, D. Hall was in one back seat and Webster was in the other back seat, holding Lisa Rene on the floor between his legs.  (R. 37: 113).  They drove the Cadillac back to Cassandra Ross's apartment in Irving where they changed clothes and transferred Lisa Rene to Beckley's car.  O. Hall, Webster and Beckley took Lisa Rene out in Beckley's car to try to find a secluded place. During this drive, Hall raped Lisa Rene and made her preform oral sex on him.  After they were unable to find a secluded place, they drove back to the Wilson World Hotel.  Beckley and Webster cleaned their room while O. Hall kept Lisa Rene in the car.  They then drove back to the Ross apartment in Irving. (R. 38: 65-70).

Once back at the Ross apartment, O. Hall told Beckley to drive Lisa Rene to Pine Bluff and told D. Hall and Webster to go with them.  (R. 38: 69-72; R. 37: 119-120).  Near downtown Dallas, Webster raped Lisa Rene in the back seat of the car.  (R. 38: 73; R. 37: 121).  On the way to Pine Bluff, Webster and D. Hall switched places in the car, and D. Hall raped Lisa Rene.  (R.

6

38: 74-75; R. 37: 123-126).

When Beckley, Webster and D. Hall arrived at Pine Bluff at approximately 4:00 a.m or 5:00 a.m. on Sunday, September 25, 1994, they went to Holloway's house. Webster told Holloway that O. Hall would tell him all about what had happened. Holloway gave Webster some money for a motel room, and Beckley, Webster and D. Hall checked into the Pine Bluff Motel. (R. 39: 115-117; R. 37: 127-128). In the motel, Beckley raped Lisa Rene. (R. 38: 77).

That same morning, Holloway and his wife picked up O. Hall at the Little Rock airport at 8:00 or 9:00 a.m. On the way back from the airport, O. Hall explained to Holloway what had happened. When Holloway asked O. Hall why he had let Webster take the girl, O. Hall said that he did not give a "fuck" about that girl. When O. Hall and Holloway went to the Hotel room, they went back into the bathroom with Lisa Rene for 15 - 20 minutes. When they came out, O. Hall said, "She know too much." O. Hall interrogated her for awhile, and then she was tied to a chair and placed in a closet. (R. 39: 118-124; R. 38: 79-80).

O. Hall and Holloway then left the motel and took Webster with them to give him a ride to his car. During the ride, O. Hall told Webster that they needed to kill Lisa and find a place to get rid of her. (R. 39: 125). Webster responded that he knew plenty of places where they could kill her. (R. 39: 124-126). Hall and Webster also discussed methods of killing Lisa, including beating her to death, choking her, or shooting her. (R. 39: 125-126). That same afternoon, approximately 4:00 or 5:00 p.m., Webster picked up O. Hall at Holloway's house. While he was waiting for Hall, Webster asked Holloway whether Hall was getting "shady," which means was he getting nervous. (R. 39: 127-128). Webster told Holloway that they had gotten him into all of this stuff and that "we're going to go on and do this, and it don't matter if it's kids or anybody,

7

116

you know, it don't matter." (R. 39: 128). Approximately an hour to an hour and a half later, O. Hall and Webster returned to Holloway's house, and O. Hall told Holloway that they had dug a grave. (R. 39: 127-128, 156). Later that same evening, O. Hall, Webster and Beckley took Lisa Rene to the grave they had dug earlier at Byrd Lake Park, but were unable to find the grave in the dark. (R. 38: 82-93; R. 39: 129-130).

That evening D. Hall and Beckley had to move Lisa Rene to another motel because they were afraid that the security guard at the Pine Bluff Motel was suspicious. (R. 38: ; R. 26: 204-206). At approximately 1:00 a.m. on Monday, September 26th, Beckley rented a room at the Townhouse Motel. Lisa Rene was tied to a chair and placed in the bathroom at this hotel. O. Hall and Webster both came to the room after Beckley checked in and made arrangements for O. Hall to page Webster a few hours later. (R. 38: 96-99; R. 37: 147-148).

Early that same morning, Webster came back to the motel room at Townhouse Motel and picked up O. Hall, Beckley and Lisa Rene. O. Hall left instructions for D. Hall to clean the motel room. Hall, Webster, and Beckley took Lisa Rene back to Byrd Lake Park. (R. 38: 99-100; R. 37: 150-157). At the park, O. Hall and Webster led the way toward the grave site. Beckley followed, guiding Lisa Rene by her shoulders. Lisa Rene's eyes were covered by a mask. Webster and Hall walked in front of Beckley and carried shovels and the yellow anti-freeze jug. (R. 38: 100-103).

Once at the grave site, Hall turned Lisa Rene's back toward the grave and put a sheet over her head. Hall then grabbed a shovel and hit Lisa Rene in the head one time. Lisa screamed and started running. O. Hall and Webster yelled for Beckley to grab her. Beckley grabbed Lisa and fell down. Because Lisa was screaming, Hall and Webster both shouted for Beckley to shut Lisa

8

117

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 118 of 341
Case 2:12-cv-00086-WTL-WGH   Document 17-1   Filed 08/07/12   Page 9 of 28   PageID 595
PageID #: 1762

up.  Beckley put his hand over her mouth and told her not to fight.  Beckley then hit her twice in the head and handed the shovel to Hall who then handed the shovel to Webster.  Webster hit her, and then Webster and Hall started taking turns hitting her.  Beckley saw Webster bending over at her head like he was tying something around her head.  Webster tried to get Beckley to drag Lisa into the grave, but Beckley could not.  Webster pulled Lisa into the grave and stripped her of her clothing.  Beckley started shoveling, but Webster did not think Beckley was shoveling fast enough, so he started shoveling.  Hall told Beckley to go back to the car and keep watch.  Beckley waited near the car for 10 to 15 minutes and then heard sirens.  When Beckley went back to the grave, Hall and Webster were finished shoveling.  (R. 38: 104-108)

O. Hall, Webster and Beckley then went back to the motel and picked up D. Hall.  Later that week, O. Hall told Beckley and D. Hall what to say if they got arrested.  At O. Hall's instruction, D. Hall and Beckley went to El Dorado, Arkansas where D. Hall and Beckley were arrested later that week.  (R. 38: 108-111; R. 37: 152-154).

The government also presented the testimony of Lisa Rene's brother, Stanfield Vitalis, to show that Vitalis and his brother Neil Rene had, in fact, stolen $4700 from O. Hall in a marijuana deal on September 23, 1994.  (R. 38: 201-219).  The government presented numerous physical exhibits to corroborate the testimony of Beckley and D. Hall, including receipts from the Wilson World Hotel (GE 20); airline tickets reflecting the flights taken by O. Hall and Webster (GE 40, 41-A, 41-B); and receipts reflecting cash receipts for the ammo, masks, gloves, tape and rope purchased by Beckley and D. Hall the two days before the kidnapping of Lisa Rene (GE 43, 44, 45, 46).  The government presented the security videotape and still photograph of the Texaco station next to the Polo Run Apartments where Webster and O. Hall can be seen dressed in

9

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 119 of 341
Case 2:12-cv-00086-WPL-WGH Document 17 14 Filed 08/07/12 Page 10 of 28 PageID 596
PageID #: 1763

camouflage and buying beer the day that Lisa Rene was kidnaped. (GE 23-A, 23-B).

The government also presented testimony from various FBI lab technicians corroborating the testimony of Beckley and D. Hall. Specifically, the government showed that glass embedded in a small souvenir baseball bat found at the Ross residence in Irving was from the same glass as samples taken from the patio where Lisa Rene was abducted. (R. 39: 210-214). The government presented testimony proving that synthetic fibers found in Beckley's car and at the Townhouse Motel matched the synthetic hair extensions Lisa Rene was wearing. (R. 39: 201-209).

The government also presented the statement of Webster taken by Arlington Detective John Stanton and FBI Agent Garrett Floyd. (R. 39: 40-56; GE 88).

**b. Punishment Phase**

Government's Case-in-Chief

After the jury returned a guilty verdict on counts one, two, three and six of the superseding indictment, a separate punishment hearing was held before the jury. At the punishment hearing, the government presented the penitentiary records (pen packet) of Webster to show that on March 7, 1989, Webster was placed on probation for burglary in cause number CR-88-695-1, in Jefferson County, Arkansas. The pen packet showed that Webster's probation for that offense was revoked on July 21, 1989, and Webster was sentenced to six years imprisonment. Also, on July 21, 1989, Webster was sentenced to two concurrent six year sentences for a conviction for felon in possession of a firearm that occurred on May 23, 1989, cause number CR-89-329-1, Jefferson County, Arkansas, and for a conviction for interference with a law enforcement officer that occurred May 5, 1989, cause number CR-89-297, Jefferson

10

County, Arkansas.  (GE 100; R. 42:2-14).

Webster's Pen Packet also showed that he was released on parole from his three sentences on February 21, 1992.  Webster was convicted on October 28, 1992, for another offense of felon in possession of a firearm, cause number CR-92-623.  Webster's parole was revoked and he was returned to prison as a result of this conviction.  Webster was discharged from prison on August 5, 1993.  (GE 100; R. 42: 13-14).

The government presented evidence of Webster's disciplinary records from when he was incarcerated in the Arkansas Department of Corrections.  (GE 101-A, 101-B, 101-C, 101-D).  These records indicate that Webster had numerous incidents of failing to obey orders; battery or provoking a fight; assault; being out of his place of assignment; and taking property.  (GE 101-A; R. 42: 95-96).  These records also show that Webster's father, Willie Webster, was one of Webster's visitors.  (GE 101-D; R. 42: 99).  Webster worked on the hoe crew, had kitchen assignment, went to school in the afternoons, completed substance abuse treatment programs and made written requests for services in his own handwriting.  (R. 42: 97-99; GE 101-D, 101-C).

The government presented Webster's probation records.  These records showed that Webster was placed on probation for burglary on March 6, 1989.  Webster reported to his probation officer in April, May and June, 1989.  On May 12, 1989, a violation report was filed based upon the new offense of interference with a law enforcement officer and felony assault of a police officer.  A second violation report was filed on May 24, 1989, based upon an aggravated armed robbery offense.  Webster failed to appear at his revocation hearing.  On July 21, 1989, Webster's probation was revoked and he was sentenced to eight years imprisonment.  (R. 42: 103-112; GE 104).

During the punishment phase hearing, the government presented testimony concerning Webster's history for abusing women. Sylvia Henry testified that she was Bruce Webster's girlfriend beginning in the spring of 1994, and that she had a child by Webster as a result of that relationship. Henry was two months pregnant with Webster's child during September 1994. While she dated Webster, he did not have a regular job but was making money from selling cocaine and marijuana supplied by O. Hall. (R. 42: 35-38; 48-49). Henry testified that Webster was violent to her on several occasions. The first time was when Webster slapped her across the face when another man gave Henry a ride home. Another incident was when Webster pushed Henry in the Duck Inn Club in Pine Bluff. Henry testified that after she and Webster left the club, Webster pushed her down and kicked her in the back. As Henry was trying to drive away in her car, Webster followed her in his car to a traffic light. When Henry stopped her car, Webster kicked her window in. Henry tried to drive off, but Webster followed her in his car and ran her into a ditch. Webster then put Henry in his car, drove her to her home and tied Henry to the bed. (R. 42: 49-54).

Henry also corroborated Marvin Holloway's testimony that Webster had gone to Kansas City when O. Hall had called and asked Marvin to send Webster to Texas. Henry testified that the day after Webster had gone to Texas in September 1994, Webster and Holloway returned to Henry's Apartment. Webster was proud and bragging about how they had "taken care of business." Webster told Henry that the gold Gucci chain and necklace were his reward from O. Hall for taking care of business. (R. 42: 38-43). Webster left in the middle of the night, and the next day, Henry saw Webster with mud on his boots and pants. (R. 42: 44-46).

During their relationship, Webster had told Henry that he was a member of the Folks

12

Case 2:12-cv-00086-JRH-MJD   Document 17-14   Filed 08/07/12   Page 13 of 28   PageID 599
Case 2:12-cv-00086-WPL-WGH   Document 42-1   Filed 07/08/14   Page 122 of 341
PageID #: 1766

Gang.  Henry testified that she never heard Webster talk poorly about his parents and that his parents seemed to treat Webster the way normal parents treat a child..  (R. 42: 47, 57, 61).

Tlisa Booth testified that, in the summer of 1994, she was a student at the University of Arkansas, Pine Bluff, and was living with O. Hall's girlfriend, Lashonte Dones.  One evening during that summer, Webster was at Booth and Dones' apartment and helped himself to a peppermint stick without asking.  When Booth asked Webster why he was messing with something that was not his, Webster pushed Booth.  Booth and Webster then got into a shoving match, and Webster had to be forcibly removed from the apartment by his friends.  Webster cursed and screamed at Booth and told her if he ever saw her again he would kill her.  (R. 42: 19-24).  Booth also testified that a few weeks after that incident, she saw Webster slapping a women around in the Duck Inn Club in Pine Bluff.  (R. 42: 25-28).

Ray Smith, a disciplinary officer with the Arkansas Department of Corrections who also worked as a security guard at the Duck Inn Club, corroborated the testimony of both Sylvia Henry and Tlisa Booth.  Smith saw Webster knock Henry to the floor in the club, and he escorted Webster out of the club.  Later, when Sylvia Henry left, Smith followed her out to the parking lot.  By the time Smith got out to the parking lot, Webster was kicking Henry.  (R. 42: 78-81).

The government presented the testimony of Lance Lawhon who transported Webster to the jail in Hot Springs Arkansas on September 30, 1994.  Lawhon testified that during the trip, Webster was complaining about being in pain from a venereal disease he had contracted.  Referring to the woman from whom he had contracted the disease, Webster stated, "If I was out now, I'd kill the bitch."  (R. 42: 84-86).

FBI Agent Garrett Floyd testified during the punishment phase hearing that while he was

13

transporting Webster back to Texas, Webster told Floyd that the killing of Lisa Rene was not personal, but was strictly business. During the different times that he was in Floyd's custody, Webster also told Floyd that he was a member of the Folk gang and that there could be three or four bodies buried in Byrd Lake Park. Webster told Floyd that they chose Byrd Lake Park because it was quiet, isolated and secluded. (R. 42: 119-125). During cross examination, Floyd testified that Webster had told him that he had brought the Folk gang from Chicago to Pine Bluff. Webster bragged to Floyd that he had had sex with more than 235 women. (R. 42: 132).

Arkansas State Trooper Maxie Thomas testified about an incident where Webster and several other individuals assaulted Thomas and his family in a park on May 5, 1989. Thomas testified that on that date, Webster and the other individuals had taken a baseball cap from Thomas's son. When Thomas approached the group and tried to get his son's cap back, Webster jumped Thomas and held him while another individual (Goldman) punched Thomas. (R. 42: 135-139). This fight continued until the Pine Bluff police arrived and Webster and Goldman were arrested. Thomas was hit several times by Goldman and Webster. At the police station, Webster told Thomas that he was a member of the Folk gang and that their symbol was a five-point star. Webster was wearing two necklaces, each with a five-point star. (R. 42: 139-147).

Mohamed Ghene testified that he was a Pakistani citizen who during the summer of 1989 lived in Pine Bluff and operated a clothing store. In July, 1989, two men came into Ghene's store and picked out approximately $150.00 worth of merchandise. They placed the merchandise on the counter and gave Ghene $50.00, saying that was all the money they had. One of the men leaned over the counter, looked, and told the other man to "do it." Ghene could see in a mirror behind the two men that the man leaning over the counter was reaching for what appeared to a

14

Case 2:12-cv-00086-WPL-WGH Document 17-14 Filed 08/07/12 Page 15 of 28 PageID 601

stainless steel pistol in the rear waist of his pants. Ghene pulled out a BB pistol and told the two

men to leave the store. After they left, Ghene went outside and saw the two men standing across

the road. One of the men pulled out the pistol and fired a shot at Ghene. (R. 42: 158-152).

Ghene reported this incident to the police. The case was never prosecuted, because after

reporting the incident, Ghene returned to Pakistan after he was repeatedly harassed. (R. 42: 154,

160). Although Ghene could not identify Webster at the time of the present trial, Pine Bluff

Detective Rick Pritzen testified that Ghene identified Webster in a photo line-up the day after the

incident. (R. 42: 164).

During its case-in-chief during the punishment phase, the government proved up an

incident where Webster, while he was incarcerated and awaiting trial on the present case, escaped

from his area of the jail into the women's area of the jail. The testimony showed that Webster

had waited until all the cells in his area had been unlocked between 4:00 and 4:30 a.m. to allow

another inmate to get ready to go to court. Webster left his cell, then used a wire to unlatch a

food chute. Webster squeezed through the food chute and then made his way into the women's

shower area where he was discovered. (R. 42: 175-190, 200-207).

The government also presented the testimony of Agnes Rene, Lisa Rene's mother. She

testified that Lisa had come to live in Arlington with Lisa's sister Pearl Rene after hurricane

Hugo closed all the schools. Mrs. Rene testified that Lisa was an honor student and active in her

church youth group. Mrs. Rene described the loss she and her family's suffered as a result of the

death of Lisa. The victim impact statements of Mrs. and Mr. Rene and the Josephat family were

introduced through Mrs. Rene. (R. 42: 215-224; GE 106-A, 106-B, 106-C).

15

Webster's Case-in-Chief

Webster presented evidence to show that he had been severely abused as a child and that he suffered from mental retardation. Webster presented testimony from his brothers, Mark and Tony Webster, and his sisters, Future Webster Rayford and Dorothy McKelvy, that all of the Webster children suffered severe physical and sexual abuse from their father, Willie Webster. (R. 43: 2-22; 34-43; 53-59). These witnesses testified that the Webster children, including the defendant Webster, were beaten by Willie Webster with garden hoses, fan belts and other items. (R. 43: 8; 55; 109). Willie Webster would make the siblings hold each other while he was beating them. (R. 43: 10). The Webster siblings also testified that Willie Webster made them perform degrading acts such as eating urine or pig slop, performing sexual acts on each other, and making prank sexual telephone calls to their aunt. (R. 43: 12-13; 36-40; 55-59). The witnesses also testified to several incidents where Willie Webster threatened family members with a firearm and actually fired shots to scare the family members. (R. 43: 56, 110, 123). Webster's aunt and mother corroborated the testimony of Webster's brothers and sisters. (R. 43: 120; 131).

Dr. Raymond Finn, a clinical psychologist, testified that he first examined Webster in January of 1995. (R. 43: 177). Finn testified that Webster scored a full scale IQ of 59 on the first test administered by Dr. Finn. (R. 43: 187). Webster was tested again by Dr. Finn the Sunday before trial, and Webster scored a full scale IQ of 65. (R. 43: 192). Dr. Finn testified that, in his opinion, Webster was mildly retarded or in what is called the educable range of mentally retarded. (R. 43: 196).

Dr. Finn admitted on cross examination that he did not perform an adaptive skills

16

assessment of Webster. (R. 43: 228-29). Also during cross examination, Dr. Finn testified that he examined Webster for competency to stand trial and for mental illness. (R. 43: 205-206). Dr. Finn found that Webster was competent to stand trial, that is, Webster had some appreciation of having been charged with a crime, and he could assist his attorneys in his defense. (R. 43: 206-207). None of the doctors who examined Webster found that he was incompetent or that he suffered from a mental illness. (R. 43: 209). Dr. Finn testified that his examination of Webster also included whether there were, "any other kinds of emotional or psychological problems . . . that would have any kind of bearing on why they did what they did or how culpable they would be for their behavior." (R. 43: 209). Dr. Finn also admitted that Webster either had or probably had at least six of the seven criteria "A" for anti-social personality disorder specified in DSM IV. (R. 43: 219-221).

Webster presented the testimony of Dr. Denis Keyes, a certified school psychologist, a Ph.D. in special education, and a professor of special education at the College of Charleston. (R. 44: 2-6). Keyes testified that the definition of mental retardation is a significantly sub-average intellectual functioning and a deficit in adaptive functioning. The difference between a mentally retarded person and a person with low intellectual functioning is the presence of deficits in adaptive skills in a mentally retarded person. (R. 44: 9). Without both a low IQ and a deficit in adaptive skills, a person is not mentally retarded. Dr. Keyes testified that the definition for mental retardation has changed over the years. According to the American Association on Mental Retardation, an IQ of between 75 and 50 would be considered mildly mentally retarded or what is now referred to as a person needing intermittent support levels. (R. 44: 13).

Dr. Keyes administered a Stanford Binet IQ test to Webster, on which Webster made a

17

composite score of 51.  (R. 44: 20).  Dr. Keyes also administered a standard achievement test, on which Webster performed better than Dr. Keyes expected.  As a result, Dr. Keyes performed another IQ test, the Kaufman test, and Webster scored almost exactly the same as he did on the Stanford Binet.  Keyes testified that, based upon these results, "any question of malingering was thrown out the window."  (R. 44: 28-31).

Regarding adaptive skills, Dr. Keyes used what is called a "Vineland" adaptive skills scale that uses a scoring system for determining adaptive skills.  Dr. Keyes interviewed family members, family friends, school counselors, teachers and principals. Dr. Keyes came up with two "composite scores" on the Vineland scale using these interviews.  He admitted that he used a technique called "convergent validation," that is, when interviewing these various people, "You find the information that people give you that is most consistent.  If the information is inconsistent, you drop those people."  (R. 44:42).  Dr. Keyes also admitted that he did not interview the jailors in completing the Vineland based upon the reasoning that because the onset of mental retardation must occur before age 18, and Webster was older than 18 at the time he was incarcerated awaiting the trial of this case, Webster's conduct in jail would not have made any difference in Dr. Keye's adaptive skills analysis.  (R. 44: 39).

Based upon Webster's IQ scores and his adaptive skills scores, Dr. Keyes was of the opinion that Webster was mentally retarded.  (R. 44: 47).  On cross examination, Dr. Keyes admitted that he marked some questions "DK," standing for "don't know" for activities such as addressing envelopes.  He gave Webster scores of "0" for such activities as setting the table, preparing food and making his bed.  (R. 44: 73-75).  Dr. Keyes also gave Webster a score of "DK" for keeping secrets or confidences for more than one day despite knowing that Webster

18

had lied to the police about his involvement in the kidnapping and murder of Lisa Rene. (R. 44: 76).

On redirect examination, Dr. Keyes also testified that Webster would be able to function normally in an institutional setting like a prison or a mental institution. (R. 44: 85). During examination by the district court, Dr. Keyes testified that he did not think it was likely that Webster made the decision to grab Lisa Rene. He testified he did not think Webster could carry on a high level conversation or could read a text and understand everything he reads. Dr. Keyes testified that while he believes Webster has some organic retardation, he believes that Webster's formal diagnosis would be primary non-organic retardation. (R. 44: 111).

Dr. Robert Leroy Fulbright, a clinical neuropsychologist, testified that on March 19, 1996, he gave Webster a battery of tests. Based upon the results of these tests, Dr. Fulbright testified that Webster had significant impairment in his attention capacity. Webster's thinking was extremely concrete. The fact that Webster's left hand motor functioning was consistently lower than his right hand indicated some right hemisphere impairment. Dr. Fulbright testified that the results of the tests indicated Webster was either mentally retarded or severely brain damaged, and that Webster's entire presentation was consistent with mildly or moderately mentally retarded. Dr. Fulbright testified that Webster could not reason, think or plan; Webster is not able to monitor the output of what he says; and his ability to understand is quite limited. (R. 44: 120-150). Dr. Fulbright admitted on cross examination that he did not interview any jailors or family members before conducting his tests. (R. 44: 152). Dr. Fulbright admitted that his battery of tests would be easy to either fake or to do poorly by simply just not trying. (R. 44: 154-155). Also, the cross examination of Dr. Fulbright established that three of the four factors

19

128

for suspicions of malingering listed in the DSM IV were present in Webster's case. (R. 44: 158-160).

Dr. Mark Cunningham, a clinical and forensic psychologist, testified that he examined Webster on May 7, 1996. Dr. Cunningham diagnosed Webster with several psychological disorders, in particular; 1) mild variety mental retardation; 2) anti-social personality disorder; and 3) personality disorder not otherwise specified, involving both narcissistic and dependant features. (R. 44: 188-89). Dr. Cunningham testified that abused and neglected children are significantly more likely to display anti-social behavior and receive a diagnosis of anti-social personality disorder. (R. 44: 189-190).

On cross examination, Dr. Cunningham testified that Webster told him during his interview that he remained at the car in Byrd Lake Park when Lisa was killed. He thought that Webster showed a sense of regret but not a sense of remorse or acceptance of the wrongdoing.

Government's Rebuttal

In rebuttal, the government called Highway Patrolman Charles McLemore with the Arkansas State Police to prove that on June 15, 1992, Webster scored a 96 percent on the multiple choice portion of his driver's license examination and a 70 percent on the signs portion of the exam. McLemore testified that there were three versions of the test and that the version that is actually given is selected at the time the person takes the test. In order to cheat by receiving the answers to the test beforehand, a person would have to memorize 75 multiple choice questions and 30 road signs. (R. 44: 225-232; GE 95).

Gene Stewart testified that he was the principal of Watson Chappel High School and previously the principal of Watson Chapel Junior High School. Prior to that, Stewart was a

20

school counselor.  Stewart had a bachelor's degree in school counseling and had contact on numerous occasions with retarded and mildly retarded students.  Mr. Stewart identified Webster as a student he had supervised at Watson Chappel Junior High School.  He testified that Webster was not retarded, had not been assigned to special education classes, and that there was no reason to assign him to social education classes.  He testified that Dr. Keyes had come to talk to him briefly in Pine Bluff.  After they spoke for a few minutes, Dr. Keyes closed his book and said that Stewart had not given him any information that would be helpful.  (R. 44: 236-39).

Rick McLaughlin testified that he was the principal and former assistant principal at Watson Chappel Jr. High.  He identified Webster as one of the students he formerly supervised and testified that Webster always came to school nicely dressed.  Mr. McLaughlin testified that he never noticed anything that would have indicated that Webster was mentally retarded.  When Dr. Keyes visited with McLaughlin, Dr. Keyes told McLaughlin that he was trying to gather information to keep Webster from being put to death.  (R. 44: 243-250).

Greg Barber was a parole officer for the State of Arkansas who supervised Webster.  Barber testified that Webster appeared to understand the rules and conditions of his parole.  Webster filled out his monthly reports.  Webster reported to Barber that he was going to Southeast Arkansas Mental Health Clinic, but there were no specific problems noted in Webster's file.   Barber testified that in the spring of 1996, Dr. Keyes met with Barber in Barber's office.  At that time Dr. Keyes told Barber that Webster was mildly retarded and lectured Barber that Webster should not be executed.  When Barber told Dr. Keyes that Webster never acted retarded, Dr. Keyes told Barber that he would not be able to help him and left.  (R. 45: 15-28; GE 102-A, 102-B, 102-C, 102-D).

Pat Drewett was Webster's ninth grade civics teacher at Watson Chapel Junior High School. Her class was not a special education class.  Webster slept a lot in her class.  He dressed nicely and wore lots of gold jewelry, bracelets and necklaces.  In her opinion, Webster was not mentally retarded.  Had she thought that he was, she would have recommended him for special education classes.  (R. 45: 34-38).

Linda Monk was Webster's ninth grade basic English teacher at Watson Chapel Jr. High School.  She testified that, "For a student in a basic class, he seemed like one of the brighter ones, although his grade did not reflect that."  (R. 45: 43).  Webster slept a lot the first 9 weeks of class but seemed to pay more attention the second nine weeks.  Webster did not have any problems communicating and seemed mature for his age.  Ms. Monk testified that she has had contact with many mildly mentally retarded or borderline retarded students and that several of her students each year are classified as mildly or borderline retarded.  In her opinion, Webster was not borderline or mildly mentally retarded.  She felt like he did not excel because he just did not try.  The other students were afraid of him.  Webster wore a lot of jewelry.  Also, in her opinion, Webster was quite a bit brighter than his brother Tony, who she also taught. (R. 45: 42-47, 50).

E.C. Turner testified that he was a school counselor for 23 years, 13 at Watson Chapel Jr. High.  As a part of his duties, he administered achievement tests called M.A.T. 6 Surveys on a regular basis to seventh graders.  Based upon these test scores, a determination can be made whether a student should be enrolled in special education classes.  During his career, Turner diagnosed or came into contact on many occasions with mildly or moderately mentally retarded students.  He had no indication that Webster was suffering from mental retardation.  Webster's M.A.T. 6 Survey was in the 43rd percentile, placing Webster in the low average at Watson

22

Chapel. Webster definitely would not have qualified for special education classes. (R. 45: 52-59; GE 98-A).

Marcus Hollien testified that, in June 1992, he was a supervisor in a work program for teenagers known as the C.E.T.A. program in which Webster was working. Hollien testified that he saw nothing that would indicate that Webster was retarded, and Webster was the individual that others followed. Hollien's evaluation of Webster stated that, "Bruce is a very intelligent individual with good characteristics but needs to get self discipline." (R. 45: 65-71; GE 99).

Tom McHan, a cabinet builder and a general contractor in Pine Bluff, testified that Webster worked clean up for him for a couple of days. During that time, Webster would stay out late and would come in and sleep in one of McHan's buildings. McHan fired Webster for sleeping on the job. McHan was aware that Webster was a member of the Folks Gang. (R. 45: 74-81).

The government introduced a letter written by Webster to fellow inmate John Clay on April 14, 1996, and a letter written by Webster to Marvin Holloway just a few weeks before Webster's trial. (GE 121-A; 132-A). In the letter written to John Clay, Webster asked for Clay's assistance in a plan to have sex with female jail inmates during visiting hours. In the letter, Webster describes to Clay a plan whereby Clay will give Webster the names of some of the women Clay knew who were in custody and the names of some people not in custody that Webster could put on his visitation list. The plan was for visitors to come into the jail and ask to visit Webster, Clay and some women inmates at the same time. Webster told Clay in the letter that he could keep a watch for Clay, and then Clay could keep a watch for Webster. (R. 45: 85-97; GE 121-A). In the letter to Holloway, Webster talks in slang about how everyone knew that

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 133 of 341
Case 2:12-cv-00086-WPL-WGH   Document 17-14   Filed 08/07/12   Page 24 of 28   PageID 610
PageID #: 1777

he would "put in work" on someone, that is, that he was not afraid to shoot someone. (R. 45: 115; GE 132-A).

B.J. Valdez, the same jailer who had testified about Webster escaping into the women's area of the jail, testified that he had seen Webster reading newspapers and postcards and that on one occasion, Webster read a newspaper story out loud to Valdez over the intercom. Webster also managed his own commissary account and complained once when he had been short-changed. (R. 45: 122-125).

Luther Alexander, another detention officer, testified that he saw Webster in the law library of the jail almost everyday, and he saw Webster reading and taking notes from the law books. Once Webster when an oral complaint, Alexander told him to fill out a complaint slip. Webster responded that he could not because his attorney had told him not to fill out any more complaint slips. Before that time, Webster had been prolific in his written requests. (R. 45: 128-131).

Mansfield Correction Officer Debra Harrison also testified that she had observed Webster reading, that Webster had given her a request form for a book, and that Webster talked to her about being short-changed in the commissary. Once when the government psychiatrist had come to visit Webster, Harrison came to call for someone to take Webster back to his cell. She observed Webster sitting in the middle of the floor, staring at the ceiling. When Webster saw her he smiled. (R. 45: 136-140).

Mansfield Correction Officer Richard Saenz testified that he observed Webster in the law library, reading, taking notes and helping other inmates. Saenz testified that on June 29, 1995, Webster faked a seizure because he wanted to talk to someone. Webster admitted to Saenz that

24

he had snuck into the women's area of the jail.  Saenz testified that if Webster were denied television access, he would become very agitated, and on one occasion he threatened to kill Saenz if he could get a hold of him.  (R. 45: 142-149).

The government introduced the numerous written request forms and complaint forms made by Webster while he was incarcerated in the Mansfield Law Enforcement Center awaiting trial.  (R. 46: 23-33; GE 117-B, 117-C, 117-D, 117-E, 117-F, 117-H, 117-J).  The defense stipulated that these requests and complaints (GE 117-B, 117-C, 117-D, 117-E, 117-F, 117-H, 117-J) and the letters to John Clay and Marvin Holloway (GE 121-A, 132-A) were in Webster's handwriting.  (R. 46: 39-41).

In rebuttal, the government presented the testimony of Dr. George Parker, a psychologist, who testified that he was employed by the government to evaluate Webster.  In Parker's opinion Webster was not mentally retarded.  (R. 46: 43-48).  Webster scored a 72 on the Wechsler adult IQ test.  (R. 46: 49).  However, consistent with the other experts' testimony, Parker testified that there were two main criteria to determining whether an individual is mentally retarded: first, a low IQ score, and second, a deficit in adoptive functioning.  Dr. Parker testified that usually the adoptive skills evaluation is done with an instrument that involves behavior ratings, such as a Vineland adaptive skills scale.  However, a Vineland scale in a situation such as Webster's is inappropriate and would lead to data that are possibly somewhere between misleading and false.  (R. 46: 54-56).

Dr. Parker observed inconsistencies between Webster's behavior and what Dr. Keyes reported on his Vineland.  Dr. Keyes marked the Vineland scale "don't know" for the category "speaks in complete sentences."   Dr. Parker observed that Webster spoke in full sentences.  Dr.

Keyes scored a "1" for the category "reads simple stories," and a "0" for the category "reads on own initiative."  Dr. Parker observed that Webster could read simple stories and did, in fact, read on his own initiative.  Dr. Keyes also marked "don't know" for the category "addresses envelope," whereas Dr. Parker observed envelopes that were addressed by Webster.  Dr. Keyes scored "0s" for the categories, "puts clean clothes away," and, "makes own bed," whereas Dr. Parker observed that Webster kept his cell neat and his bed was neatly made.  (R. 46: 57-59).  Dr. Parker testified that teachers were probably in the best position to determine how a student is functioning and whether the student needs special education help.  He testified that the letters written by Webster were certainly not indicative of someone who was mentally retarded. (R. 46: 63).  Parker testified that what he observed of Webster was not consistent with Fulbright's results.  Webster's statements to the law enforcement officers were not consistent with mental retardation.  Parker administered Webster a test used to determine competency to stand trial and Webster got 100 percent of the questions correct.  Webster was competent to stand trial and knew right from wrong.  (R. 46: 62, 67-69).

On cross examination, Parker admitted he was not certified by MHMR for doing mental retardation assessments.  He admitted he did not give all of the subtests of the Weschler IQ test and that he prorated the tests he had given to arrive at his estimated score of 72.  (R. 46: 71-77).  However, on redirect, Parker testified that it was common to prorate IQ test scores and regardless of Webster's score, he would not change his opinion that Webster was not mentally retarded.  (R. 46: 101-104).

The government also presented the testimony of Dr. Richard Coons, a forensic psychiatrist of 22 years.  He was familiar with the criteria set forth in the DSM IV for mental

26

135

retardation, and his assessment in criminal cases had from time to time included a determination of whether someone was retarded. (R. 46: 112-119). In March, 1996, Dr. Coons examined Webster along with Dr. Parker. Dr. Coons interviewed Webster at length. Webster was good at recalling sequential history. Webster lied about being in special education classes all through school. Webster's cell was neat and tidy and well organized. Dr. Coons saw books, mail and newspapers in the cell. Webster told Dr. Coons that he had escaped into the women's area four or five times before he was caught. Dr. Coons also interviewed Gary Cardinale, B.J. Valdez, and Debra Harrison. Dr. Coons testified that he saw no deficiencies in Webster's adaptive skills, and that adaptive skills is the more important of the two criteria for mental retardation. In Dr. Coons's opinion, Webster was not mentally retarded. (R. 46: 120-145).

Dr. Coons also reviewed statements made by Webster to the FBI agents such as "the killing of Lisa Rene was strictly business." Based upon those statements, a review of the documentation from the Southeast Arkansas Mental Health Clinic, the findings and evaluations of all the experts and the facts that had been related to the jury, Dr. Coons's opinion was that he would not disagree with the diagnosis that Webster was an antisocial personality disorder. Based upon these factors, the fact that Webster had a history of violence, and the fact that Webster had admitted to Dr. Coons that he was a gang member, Dr. Coons's opinion was that Webster would continue to be a danger in the penitentiary. (R. 46: 155-159).

Defendant's Surrebuttal

On surrebuttal, Webster presented the testimony of two investigators to show that E.C. Turner, Pat Drewett and Greg Barber had all stated in their interviews that they thought Webster was more of a follower than a leader and that he was easily influenced. (R. 46: 191-198).

27

Case 2:12-cv-00086-WPL-WGH Document 17-14 Filed 08/07/12 Page 28 of 28 PageID 614

Webster presented the testimony of Dr. George Denkowski, a psychologist certified by MHMR

to do mental retardation testing, to testify that Dr. Parker improperly prorated his IQ test, and,

therefore, Dr. Parker's tests were clinically invalid. (R. 46: 201-206).



Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. Texas, Fort Worth Division.
**Bruce Carneil WEBSTER**, Petitioner,
v.
UNITED STATES OF AMERICA, Respondent.
No. Civ.A. 4:00–CV–1646–.

Sept. 30, 2003.
MEMORANDUM OPINION AND ORDER
DENYING AMENDED MOTION TO VACATE
CONVICTION AND SENTENCE

MEANS, J.

**\*1** Petitioner Bruce Carneil Webster (Webster) is a federal prisoner under a death sentence who, having been being convicted of capital murder in this Court, has filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255. The government filed a brief opposing the motion and Webster replied. The Court denies Webster's motion.

I

*History of the Case*

On June 7, 1996, a jury convicted Webster of kidnaping in which a death occurred, conspiracy to commit kidnaping, and carrying a firearm during a crime of violence because of Webster's involvement in the kidnaping of Lisa Rene. After a subsequent punishment hearing the jury, after finding certain aggravating and mitigating factors to be present, recommended on June 20, 1996, that Webster receive the death penalty. This Court assessed the death penalty on September 30, 1996. The case was appealed to the Fifth Circuit Court of Appeals, which affirmed Webster's conviction and sentence. *United States v. Webster,* 162 F.3d 308 (5th Cir.1998).

Webster filed an initial motion to vacate on September 29, 2000. On April 4, 2001, this Court granted Webster's request to file a discovery motion, which he did on April 30, 2001. On June 18, 2002, this Court denied his

motion for discovery, and Webster filed an amended motion to vacate on August 16, 2002. The government filed its response on November 14, 2002, and Webster filed a reply on March 13, 2003.

The Fifth Circuit Court of Appeals recited the following factual background in its opinion on direct appeal:

Webster, [Orlando] Hall and Marvin Holloway ran a marijuana trafficking enterprise in Pine Bluff, Arkansas. They purchased marijuana in varying amounts in the Dallas/Fort Worth area with the assistance of Steven Beckley, who lived in Irving, Texas. The marijuana was transported, typically by Beckley, to Arkansas and stored in Holloway's house.

On September 21, 1994, Holloway drove Hall from Pine Bluff to the airport in Little Rock, and Hall took a flight to Dallas to engage in a drug transaction. Beckley and Hall's brother, Demetrius Hall (D.Hall), picked up Hall at the airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis and Neil Rene (N. Rene), at a car wash and gave them $4700 for the purchase of marijuana. Later that day, Beckley and D. Hall returned to the car wash to pick up the marijuana, but Vitalis and N. Rene never appeared.

When Hall got in touch with Vitalis and N. Rene by telephone, they claimed they had been robbed of the $4700. Using the telephone number that Beckley had dialed to contact Vitalis and N. Rene, Hall procured an address at the Polo Run Apartments in Arlington, Texas, from a friend who worked for the telephone company. Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car they had driven to the car wash, which they claimed was stolen from them along with the $4700. Hall therefore deduced that Vitalis and N. Rene had lied to him about having been robbed.

**\*2** On September 24, Hall contacted Holloway and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 139 of 341
PageID #: 1783
Case 2:12-cv-00086-WTL-WGH   Document 17-2   Filed 08/07/12   Page 2 of 4   PageID-616

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

had him drive Webster to the Little Rock airport. From there, Webster flew to Dallas. That evening, Hall, D. Hall, Beckley, and Webster returned to the Polo Run Apartments in a Cadillac owned by Cassandra Ross, Hall's sister. Hall and Webster were armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline. They approached the apartment from which they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door and knocked. The occupant, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and the police emergency phone number. After Webster unsuccessfully attempted to kick in the door, he and D. Hall looked through a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the door with the bat; Webster entered the apartment, tackled Lisa Rene, and dragged her to the car.

Hall and Beckley had returned to the car when they heard the sound of breaking glass. Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving. Once there, they exited the Cadillac and forced Lisa Rene into the back seat of Beckley's car; Hall climbed into the back seat as well. With Beckley at the wheel and Webster in the front passenger seat, they drove around looking for a secluded spot. During the drive, Hall raped Lisa Rene and forced her to perform fellatio on him.

Unable to find a spot to their liking, they eventually returned to Ross's apartment. From there, Beckley, D. Hall, and Webster drove Lisa Rene to Pine Bluff. Hall remained in Irving and flew back to Arkansas the next day. En route to Pine Bluff, Webster and D. Hall took turns raping Lisa Rene. Once Beckley, D. Hall and Webster reached Pine Bluff, they obtained money from Holloway to get a motel room. In the room, they tied Lisa Rene to a chair and raped her repeatedly.

Hall and Holloway arrived at the motel room on the morning of September 25. They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes. When Hall and Holloway came out of the

bathroom, Hall told Beckley, "She know too much." Hall, Holloway, and Webster then left the motel.

Later that afternoon, Webster and Hall went to Byrd Lake Park and dug a grave. That same evening, Webster, Hall, and Beckley took Lisa Rene to the park but could not find the grave site in the dark, so they returned to the motel room. In the early morning of September 26, Beckley and D. Hall moved Lisa Rene to another motel because they believed the security guard at the first motel was growing suspicious.

The same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park. They covered her eyes with a mask. Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders. At the grave site, Hall turned Lisa Rene's back toward the grave, placed a sheet over her head, and hit her in the head with a shovel. Lisa Rene screamed and started running. Beckley grabbed her, and they both fell down. Beckley hit her in the head twice with the shovel and handed it to Hall. Webster and Hall began taking turns hitting her with the shovel. Webster then gagged her and dragged her into the grave. He stripped her, covered her with the gasoline, and shoveled dirt back into the grave. When buried, Lisa Rene, although unconscious, likely was still breathing. Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

**\*3** Based on information from the victim's brothers, D. Hall was arrested; Hall and Beckley subsequently surrendered to the police. On September 29, just after turning himself in, Beckley gave a confession to a police detective and an FBI agent in which he admitted to the kidnaping of Lisa Rene and implicated himself, Hall, and an individual known as "B–Love." Beckley stated that he had last seen Lisa Rene at the Pine Bluff Motel with B–Love. A security guard at the motel informed the agents and officers that Webster went by the name B–Love, and provided a description of Webster and his vehicle. When Webster pulled into the motel parking lot during the early morning of September 30, he was detained and subsequently arrested.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

*Webster,* 162 F.3d at 318–20.

II.

*Standard of Review*

28 U.S.C. § 2255 provides that a federal prisoner may move the convicting court to vacate, set aside, or correct a conviction or sentence on the grounds that it was imposed in violation of the Constitution or the laws of the United States. *See* 28 U.S.C. § 2255. A petition under § 2255 "may not do service for an appeal," and it is presumed that a defendant stands fairly and finally convicted. *United States v. Shaid,* 937 F.2d 228, 231–32 (5th Cir.1991) (en banc), *citing United States v. Frady,* 456 U.S. 152, 164 (1982). Therefore a defendant may not raise even constitutional or jurisdictional issues for the first time on collateral appeal without establishing both cause for failing to raise the issue on direct appeal and actual prejudice resulting from the error. *Id.* A defendant must meet this cause-and-prejudice standard even where he alleges a fundamental constitutional error. *Id., citing Murray v. Carrier,* 477 U.S. 478, 493 (1986). Other types of error may not be raised for the first time under § 2255 unless the defendant establishes that the error could not have been raised on direct appeal *and,* if the error were condoned, it would result in a complete miscarriage of justice. *United States v.. Pierce,* 959 F.2d 1297, 1301 (5th Cir.1992).

Moreover, claims that were raised but rejected on direct appeal are also barred from federal habeas review. *United States v. Rocha,* 109 F.3d 225, 229 (5th Cir.1997). A federal habeas petitioner cannot, however, be expected to have raised a claim based on a Supreme Court case before that case was handed down. *Id.* Furthermore, ineffective assistance of counsel on appeal does satisfy the cause-and-prejudice standard. *Id.* And, finally, the Supreme Court has recently held that claims that counsel was ineffective at trial can be raised on habeas review under § 2255 regardless of whether the claims were previously raised on direct appeal. *United States v. Massaro,* 538 U.S. 500, 123 S.Ct. 1690, 1693–94, 155 L.Ed.2d 714 (2003).

III

*Issues Presented*

In his motion to vacate his conviction and sentence, Webster raises the following sixteen claims for relief:

**\*4** 1. Webster's rights to due process and equal protection and right to be free from cruel and unusual punishment were violated by the racially discriminatory effects of the federal capital sentencing scheme.

2. Webster's due-process rights were violated because the trial court made a factual finding on the issue of mental retardation that should have been made by the jury.

3. Trial counsel were ineffective in failing to investigate and present additional evidence regarding mental retardation.

4. Trial counsel were ineffective in failing to investigate and present evidence regarding racial bias in the school system in which Webster attended school as well as the potential biases of certain witnesses for the government.

5. Trial counsel were ineffective in failing to object to the trial court's decision to make the factual finding on the issue of mental retardation.

6. Trial counsel were ineffective in allowing a breakdown in communication with the mitigation specialist to affect the discovery, investigation, and presentation of evidence at trial.

7. Trial counsel were ineffective in failing to investigate and present to the jury an accurate portrait of the extreme abuse suffered by Webster as mitigating evidence.

8. Trial counsel were ineffective in failing to present evidence of Webster's special talents, musical abilities, and religious devotion as mitigating evidence.

9. Webster's due-process rights and right to be free from cruel and unusual punishment were violated because the government withheld information suggesting that Webster did not receive special education services in school because of racial discrimination.

10. Webster's due-process rights and right to be free

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-cv-00086-WTL-WGH   Document 17-2   Filed 08/07/12   Page 4 of 44   PageID-618

Page 4

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

from cruel and unusual punishment were violated by false testimony given by co-defendant Steven Beckley.

11. Webster's due-process rights and right to be free from cruel and unusual punishment were violated by false testimony given by co-defendant Marvin Holloway.

12. Webster is ineligible to be executed because he is mentally retarded.

13. The evidence presented at trial was insufficient to support the trial court's finding that Webster is not mentally retarded.

14. The trial court erred in dismissing a jury member and replacing him with an alternate juror after deliberations occurred at the guilt phase of the trial.

15. Webster's due-process rights have been violated because 18 U .S.C. § 3596 is unconstitutionally vague.

16. International law prohibits Webster's execution because he is mentally retarded.

Webster also requests an evidentiary hearing before this Court.

IV

*Procedural Bars*

In its response to Webster's petition, the government asserts several procedural bars to this Court's consideration of many of the claims that Webster raises in his petition. The government asserts that Webster is procedurally barred from raising his first, twelfth, thirteenth, and fourteenth claims because they were raised and rejected on direct appeal. The government also asserts that Webster is barred from raising his fifteenth claim for relief because it was not raised on direct appeal and he has failed to allege any cause and prejudice for the procedural default.

**\*5** In his reply, Webster asserts that he can overcome these procedural defaults, either because he raises claims based on new factual or legal bases or because his appellate counsel was ineffective on direct appeal. With

respect to Webster's first, twelfth, and thirteenth grounds, this Court agrees that these previously raised and rejected grounds are based on new facts or law. Specifically, Webster's selective-prosecution claim is based on statistics from the Department of Justice that were not available at the time of his trial or appeal. Likewise, his mental retardation claims, including claims twelve and thirteen, are based, in essence, upon cases handed down by the Supreme Court since his appeal became final. Accordingly, these claims are not procedurally barred from habeas review. And, in the interest of justice, this Court will address Webster's fifteenth ground although it was not raised on direct appeal, as Webster has alleged, albeit in a perfunctory manner, that his appellate counsel was ineffective.

Webster's fourteenth ground for relief, however, concerning this Court's decision to excuse one juror and replace him with an alternate juror, was raised and rejected on appeal. Webster does not allege any new factual or legal basis for this claim that would render it necessary for this Court to revisit this issue. Accordingly, the Court agrees that this claim is barred from review.

V

*Discussion of Claims*

A. *Selective–Prosecution claim*

In his first claim for relief, Webster, in essence, makes a selective-prosecution claim. Specifically, Webster contends that the government violated his constitutional rights because it has used ethnicity as a basis for seeking the death penalty against African–Americans like himself. Webster bases his claim on statistics that purport to show that the government has sought the death penalty against African–American defendants with disproportionate frequency as compared to defendants of other races.

*Applicable Law*

In *United States v. Armstrong,* 517 U.S. 456 (1996), the Supreme Court addressed the appropriate standard for establishing a selective-prosecution claim. In *Armstrong,* the Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their duties. The Court then went on to state that, in order to dispel this presumption and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 142 of 341
Case 2:12-cv-00086-WTL-WGH   Document 17-2   Filed 08/07/12   Page 5 of 14   PageID-619
PageID #: 1786

Page 5

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

establish that he has been selectively prosecuted on the basis of his race, a criminal defendant must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. And, in order to establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.* at 464–65.

### Analysis

At trial, Webster made a motion to dismiss the government's notice to seek the death penalty based on an affidavit presented to this Court indicating that 66% of federal death-penalty cases involved African–American defendants. This Court denied the motion and Webster's discovery request. Webster then appealed these decisions. On direct appeal, the Fifth Circuit denied this claim, holding that Webster had failed to make a sufficient showing that he was selectively prosecuted because he had not shown that the government had failed or refused to seek the death penalty against other similarly situated individuals, and he had failed to establish a discriminatory purpose on the part of the Department of Justice. The Fifth Circuit further held that Webster's statistical evidence did not rebut the presumption of good faith on the part of the prosecution. *Webster,* 162 F.3d at 334–35.

**\*6** On habeas review, Webster now points to statistics compiled by the Department of Justice as support for his claim. (Webster's Ex. A). But contrary to his assertion that this statistical evidence is sufficient to establish a *prima-facie* selective prosecution case, the Fifth Circuit in *United States v. Jones,* 287 F.3d 325, 333–35 (5th Cir.), *cert. denied,* 537 U.S. 1018 (2002), ruled that these statistics were not sufficient to establish a *prima-facie* case after being presented with the same Department of Justice Report, titled "Department of Justice, The Federal Death Penalty System: A Statistical Survey (1988–2000)." As Webster presents to this Court the same statistics that the Fifth Circuit has previously held to be insufficient to support a claim of selective prosecution, this Court is not at liberty to rule otherwise, and Webster's first claim for relief is denied.[FN1]

> **FN1.** Webster further asserts that the fact that this Court denied him the right to conduct discovery on this issue is the reason he cannot establish both prongs of the *Armstrong* standard.

But in both his motion for discovery and here, while Webster has arguably presented some statistical evidence to support his claim that there has been a disparate effect on African–Americans, Webster has presented no evidence that there were *similarly situated* white defendants against whom the death penalty was not sought. Furthermore, Webster has failed to present any evidence, inferred or otherwise, that there has been any discriminatory intent when prosecutors have decided to ask for permission to seek the death penalty against African–American individuals or when the Department of Justice has authorized the death penalty in cases against African–American defendants. Accordingly, following the reasoning in *Armstrong,* Webster's statistical evidence is not sufficient to establish either the elements of his claim of selective prosecution or the "some evidence" standard necessary to establish good cause for discovery.

### B. *Ineffective-assistance claims*

In grounds three through eighth, Webster asserts that his trial counsel were ineffective in several respects. Specifically, Webster contends that his trial counsel were ineffective for: failing to present additional evidence of his mental retardation, evidence of a racial bias in the school system for the area in Arkansas where Webster grew up as additional mitigating and impeachment evidence, accurate evidence regarding the abuse Webster suffered as a child, and evidence of Webster's musical abilities and religious devotion. Webster further asserts that his trial counsel were ineffective for allowing a breakdown in communication with their mitigation specialist to affect the investigation and presentation of evidence and for failing to object to this Court's decision to make the factual finding with regards to mental retardation.

### Standard of Review

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344–45 (1980). In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-cv-00086-WTL-WGH  Document 17-2  Filed 08/07/12  Page 6 of 14  PageID 620

Page 6

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

established in *Strickland v. Washington,* 466 U.S. 668 (1984). Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. 466 U.S. at 687. Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689. *See also Lockhart v. Fretwell,* 506 U.S. 364, 372 (1993) (holding habeas petitioner must show that trial result was unreliable or proceeding fundamentally unfair due to deficient performance of counsel).

*Applicable Facts*

At the punishment phase of the trial, defense counsel presented testimony from four experts regarding Webster's mental abilities, including Dr. Raymond Finn (R. 23:172–244), Dr. Denis Keyes (R. 24:2–119), Dr. Robert Fulbright (R. 24:120–172), and Dr. Mark Cunningham (R. 24:183–224). Furthermore, Dr. George Denkowski testified at surrebuttal in order to critique the methodology used by one of the government's experts in testing Webster's I.Q. (R. 26:200–219), and Dr. Cunningham also testified about abuse as a child and its effects on adults.

**\*7** Moreover, the defense put on testimony from Webster's mother, two of his brothers, two of his sisters, an aunt, a niece, and an ex-girlfriend. All of these witnesses testified, with varying degrees of knowledge, about the severe physical and sexual abuse that Webster's father inflicted on his wife and children, including weekly beatings with hoses and extension cords that left scars; the encouragement of sexual activity between the siblings and, on one instance, between one of Webster's brothers and his mother; and various forms of torture, including forcing the children to eat hog slop or to kiss the anus of a cat, burning one of his sons with an iron, placing hot sauce and pepper in the children's anuses, having the children beat each other, shooting guns at the children when they ran from the house, and killing Webster's dog. (R. 23:8–10, 13–14, 21, 37–40, 42, 55–7, 59, 105, 107–110, 112–13, 122–24, 126–27).

Webster's family members also testified that one of his brothers has been diagnosed as retarded and receives Social Security disability payments, one of his sisters receives disability payments due to a mental disorder, and another sister and his mother have received treatment for mental health problems. (R. 23:19,35–6, 71, 118–19, 136). The defense also presented testimony from an officer of the juvenile court in Arkansas that removed one of Webster's brothers from the home because of the abuse. (R. 24:171–182). Furthermore, Webster's mother testified about the murder of one of her sons and the serious effects that it had on Webster, such that she took him to a mental health clinic for evaluation. (R. 23:146–49). And, several of his family members testified that Webster went to church regularly and was active in church, knew the Bible well, and sang and played the drums in church. (R. 23:43, 48–9, 71–2, 78, 83, 140, 155).

Defense counsel also presented testimony from two defense investigators in an effort to impeach the testimony given by two government witnesses. Investigator Lawrence Connelley testified that he interviewed E.C. Turner, a school counselor who had earlier testified for the government, and Mr. Turner told him that Webster was more of a follower than a leader and was easily influenced. Connelley further testified that he interviewed Pat Drewett, who also told him that Webster was a follower who was easily influenced by others. (R. 26:192–94). Investigator John Strickland testified that he interviewed Greg Barber, Webster's parole officer who had earlier testified for the government. Strickland testified that Barber had told him that Webster was a follower who was easily influenced by other people. (R. 26:196–98).

As support for his ineffective-assistance claims, Webster has submitted written exhibits, including: court documents that indicate that the Watson Chapel School District, the district in which Webster attended school, was under federal-court supervision from 1971 until 1991 because it was deemed a racially segregated district (Webster's Ex. B–E); documents indicating that a school teacher in that district successfully sued the district in the 1980's for racial discrimination in its failure to promote her to a position of assistant principal (Exhibits F & G); and affidavits from defense counsel Larry Moore and mitigation specialist Annette Lamoreaux outlining differences between the two regarding fees claimed by Lamoreaux and their respective theories about the case.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-cv-00086-WTL-WGH   Document 17-2   Filed 08/07/12   Page 7 of 14   PageID 621

Page 7

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

(attachments H & I).

### Analysis

**\*8** Webster faults his trial counsel primarily for not presenting additional mitigating evidence at the punishment phase of the trial, including additional evidence of mental retardation, additional evidence of abuse from his childhood, and additional evidence of his musical abilities and his religious devotion. Specifically, Webster asserts that his trial counsel should have developed and presented evidence of the racially discriminatory history of the school district in which he attended school, as well as testimony from certain other witnesses located by habeas counsel, as evidence that Webster was not in special education classes in school because the district was racially biased against African–Americans, not because he was not eligible for these classes. Webster further asserts that his trial counsel should have elicited further testimony from government witness E.C. Turner about his belief that Webster was a "follower;" that counsel should have presented other unspecified evidence about Webster's musical abilities and religious devotion; and that counsel was ineffective for allowing a breakdown in communication with the mitigation specialist, which resulted in counsel using their investigators to investigate possible mitigating evidence rather than Ms. Lamoreaux. Finally, Webster contends that his counsel were ineffective for failing to object to this Court's findings regarding mental retardation, which resulted in the issue's being reviewed only for plain error on direct appeal.

With regard to Webster's assertion that his trial counsel was ineffective for failing to present *additional* evidence of his mental retardation, the abuse in his family, and his religious devotion and musical abilities, as outlined earlier, defense counsel put substantial amounts of this evidence into trial. Thus, Webster is contending that his counsel were ineffective for failing to put *enough* of this type of information into evidence. The Fifth Circuit, however, has cautioned that a reviewing court should be wary of claims that an attorney did not investigate enough or failed to present enough evidence. *Smith v. Cockrell,* 311 F.3d 661, 669 (5th Cir.2002), *citing Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir.2000). And although more of the same or similar evidence could

have possibly been presented by defense counsel, defense counsel did place a great deal of this type of evidence about Webster's past before the jury, and counsel were not ineffective for failing to present more of the same. *Prejean v. State,* 889 F.2d 1391, 1898–9 (5th Cir.), *cert. denied,* 494 U.S. 1090 (1990).

Likewise, counsel were not ineffective for failing to discover and present evidence about the racial discriminatory past of the school district. Webster contends that it was vitally important that his trial counsel establish that he was prevented from attending special education classes because of his race, not because he did not qualify. Webster contends that, had defense counsel placed this type of information into evidence, it would have effectively countered the government's contention that Webster is not mentally retarded. This Court, however, disagrees with Webster about the importance of this information. The government disputed Webster's allegations of mental retardation primarily through its own experts and the testimony of people other than his family who have known him both in and out of the prison system, not primarily by arguing that he is not mentally retarded because he was not in special education classes in school. Moreover, Webster's brother Mark testified that most of his brothers were in special education classes, and Tony Webster acknowledged that he was in "resource" classes in school. (R. 23:19, 31, 36). Therefore, any assertion that Webster was not placed in special education classes because the school district ignored the problems of its black students is countered by the fact that members of Webster's own family were in such classes. The Supreme Court noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 2065. Given the fact that evidence was presented at trial that other members of Webster's family were in special education classes at school, counsel cannot be faulted for not pursuing evidence of the school district's troubled past. Webster has failed to establish either prong of the *Strickland* standard with respect to this claim.

**\*9** With respect to Webster's claim that his attorneys were ineffective for failing to question E.C. Turner directly about his previous statements about Webster and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

his claim that they were ineffective in their relationship with the mitigation specialist, Webster has failed to prove any prejudice. Defense counsel put an investigator on the stand to impeach Turner's testimony at trial that Webster was not, in his opinion, retarded with other statements made by him. And, regardless of the type of relationship defense counsel had with the mitigation specialist, the defense called numerous witnesses to the stand to testify regarding several different mitigation issues. In fact, all twelve of the jurors found as a mitigating factor the fact that Webster suffered from abuse and neglect at home, four found as a mitigating factor that he either is or may be mentally retarded, six found it mitigating that he grew up in an atmosphere of violence and fear which misshaped his perception of violence, four found as a mitigating factor that his participation in the crime was, at least in part, attributable to the influence of another, and eleven jurors found as a mitigating factor the fact that he has the love and support of other members of his family. *Webster,* 162 F.3d at 319, n. 2. These findings indicate that defense counsel were successful in presenting convincing mitigating evidence. Webster has not shown that cross-examining Mr. Turner, rather than having an investigator testify, or that a better relationship between the attorneys and the mitigation specialist would have resulted in any substantially different information being placed before the jury or, more importantly, that the result of the trial would have been different.

Finally, with regards to Webster's claim that his attorneys were ineffective for failing to object to the factual finding on mental retardation by this Court, as the Fifth Circuit noted on direct appeal, the law on this issue is far from settled or clear. *Webster,* 162 F.3d at 351.[FN2] Counsel cannot be deemed ineffective for failing to object when the law is not clear that a potential error has occurred. *See Clark v. Collins,* 19 F.3d 959 (5th Cir.1994) (holding that counsel was not deficient in failing to object to racially-motivated peremptory strikes before *Batson* was handed down by the Supreme Court). Webster has not established either prong of the *Strickland* standard with respect to this claim. Webster's ineffective-assistance claims are without merit and are denied.

>    FN2. Indeed, as of the date of this opinion, a search on Westlaw reveals that only two

published federal cases even mention 18 U.S.C. § 3596(c), the statute concerning the federal statutory prohibition on executing the mentally retarded. One was the instant case on direct appeal before the Fifth Circuit and the other is *Atkins v. Virginia,* 536 U.S. 304 (2002), the recent Supreme Court case that held that executing the mentally retarded violates the Constitution. *Atkins* only mentions this statute in passing in a footnote. *Id* . At 314, n. 10.

C. *Mental–Retardation claims*

In his second, twelfth, thirteenth, fifteenth, and sixteenth grounds for relief, Webster asserts various claims that he is ineligible for the death penalty because he is mentally retarded. In his second claim, Webster asserts that this Court usurped the jury's role by making a factual finding that Webster is not mentally retarded. Instead, Webster asserts that he had a due process right to have the jury make that finding. In ground twelve, Webster asserts that he is ineligible for execution because he is mentally retarded. In ground thirteen, Webster contends that the evidence was insufficient to support this Court's finding that he was not mentally retarded. In ground fifteen, Webster argues that the federal statute that exempts mentally retarded defendants from execution is unconstitutionally vague, and in ground sixteen Webster argues that international law prohibits his execution because he is mentally retarded.

1. *Claims concerning 18 U.S.C. § 3596*

**\*10** In his second claim for relief, Webster asserts that he had a due-process right to have the jury make the factual determination under 18 U.S.C. § 3596(c) regarding whether he is ineligible for execution because is mentally retarded, and in his fifteenth ground, Webster contends that § 3596(c) is unconstitutionally vague.

18 U.S.C. § 3596 concerns the implementation of a sentence of death, and 18 U.S.C. § 3596 states, in relevant part, that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." *See* 18 U.S.C. § 3596(c). This subsection does not, however, give any guidance as to who is to make this determination. At trial, this Court chose to make the factual determination that, based upon the evidence presented at trial, Webster is not,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-cv-00086-WTL-WGH Document 17-2 Filed 08/07/12 Page 9 of 14 PageID-623

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

as a matter of law, mentally retarded. (R. 26:227–28).

On appeal, using the clear-error standard because Webster did not object at trial, the Fifth Circuit held that this Court had not erred in opting to make the factual finding itself. *Webster,* 162 F.3d at 351. In his habeas petition, however, Webster cites *Apprendi v. New Jersey,* 530 U.S. 466 (2000), and *Ring v. Arizona,* 536 U.S. 584 (2002), handed down after the opinion in this case on direct appeal, as support for his assertion that he had a due-process right to have the jury make this determination. In *Apprendi,* the Supreme Court held that a jury, rather than a judge, must find beyond a reasonable doubt any fact that exposes a criminal defendant to a penalty greater than the statutory maximum. *Id.* at 482–83. In *Ring,* the Supreme Court extended the rule announced in *Apprendi,* holding that capital-murder defendants are entitled to a jury determination on any fact that increases their maximum punishment, such as aggravating circumstances that make a capital defendant eligible for the death penalty. *Ring,* 536 U.S. at 588.

The Fifth Circuit, however, has specifically held that the rule announced in *Apprendi* is a new criminal procedural rule that is not retroactively applicable under the exceptions set forth in *Teague v. Lane,* 489 U.S. 288 (1989). *United States v. Brown,* 305 F.3d 304, 309–10 (2002). Accordingly, *Apprendi* is not applicable to initial petitions under § 2255. *Id.* While the Fifth Circuit has not ruled whether the rule in *Ring* should be applied retroactively, a case issued by the Fifth Circuit last year strongly suggests that it should not. *See In re Johnson,* 334 F.3d 403, 405 n. 1 (5th Cir.2003) (noting that, as *Ring* is essentially an application of *Apprendi,* logic would suggest that the rule announced in *Ring* is not retroactively available). Moreover, even if *Ring* is retroactively applicable, the Fifth Circuit has recently observed, albeit in the context of a state defendant seeking permission to file a second habeas petition, that neither *Ring* nor *Apprendi* renders the absence of mental retardation an element of capital murder which must be proven beyond a reasonable doubt. *Johnson,* 334 F.3d at 405. That is, the status of *not* being mentally retarded does not raise the sentence for the capital crime for which Webster was convicted to one where the death penalty is available. Rather, the status of being mentally retarded prevents the

death penalty from being carried out with regards to a federal defendant. Because neither *Ring* nor *Apprendi* is applicable to § 3596(c), Webster has not shown any reason for this Court to re-examine the Fifth Circuit's determination that it was not error for this Court to make the factual determination under § 3596(c).

**\*11** Webster further contends that § 3596(c) is unconstitutionally vague because it does not provide any guidance on who is to be the fact-finder, does not outline a burden of proof, and does not set forth any standards for defining mental retardation. He offers no case law as support for this claim. Moreover, as noted by the government in its response, even were this portion of the statute determined to be unconstitutionally vague, this would have no effect on Webster's conviction, as this statutory prohibition on execution has no bearing on his underlying conviction. Moreover, regardless of the failings of 18 U.S.C. § 3596(c), Webster's execution would be prohibited by Supreme Court case law were it determined that Webster is mentally retarded, *Atkins v. Virgina,* 536 U.S 304 (2002), and *Atkins* provides its own guidance for making this determination. Webster is therefore not entitled to relief on either of these claims.

*2. Sufficiency of evidence regarding mental retardation*

In his twelfth ground for relief, Webster asserts that he is ineligible for the death penalty because he is mentally retarded, and in his thirteenth ground he contends that the evidence is insufficient to support this Court's factual finding that Webster is not mentally retarded. As support for these grounds, Webster relies on *Atkins v. Virginia,* 536 U.S. 304 (2002), and *Jackson v. Virginia,* 443 U.S. 307 (1979). In *Atkins,* the Supreme Court held that the Eighth Amendment's ban on cruel and unusual punishment prohibits the execution of a mentally retarded person, while in *Jackson v. Virginia,* the Supreme Court held that a state inmate is entitled to federal habeas relief if a review of the record in the light most favorable to the prosecution established that no rational trier of fact could have found the proof of guilt beyond a reasonable doubt. *Id.* at 324, 326.

On direct appeal, the Fifth Circuit, using the "clearly erroneous" standard for review of a factual finding, held that the evidence presented at trial was sufficient to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 147 of 341
Case 2:12-cv-00086-WPL-WGH   Document 17-2   Filed 08/07/12   Page 10 of 14   PageID 624
PageID #: 1791

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

support this Court's finding that Webster is not mentally retarded. *Webster,* 162 F.3d at 352–53. Specifically, the Fifth Circuit noted that, not only had the government presented "substantial" evidence to support the finding, but only four of the twelve jurors found that Webster either is or may be retarded. Accordingly, the Fifth Circuit held that it could not be said that this Court clearly erred in making this finding. *Id.*

Webster, however, contends that the Fifth Circuit erred in this decision. While recognizing that neither § 3596(c) nor *Atkins* delineates a particular standard of review that should be used when assessing whether a finding regarding mental retardation is supported by the evidence, Webster argues that the *Jackson v. Virginia* standard should be utilized in determining on collateral review whether or not he is mentally retarded (Motion at 58).

It is highly unlikely that the "beyond a reasonable doubt" standard would be applicable to a factual finding on mental retardation, as this standard would imply that the government bore the burden of doubt of establishing "beyond a reasonable doubt" that a federal defendant is *not* retarded, which the opinion in *Atkins* does not even suggest. However, even were *Atkins* to require some greater standard of review than the "clear error" standard already used by the Fifth Circuit, such as the *Jackson* standard, viewed in the light most favorable to the prosecution, a rational fact-finder could have found that Webster is not mentally retarded based upon the evidence presented at trial.

**\*12** In that regard, this issue was a highly contested one at trial. Webster called four expert witnesses who testified about his mental capacity, including Dr. Raymond Finn, Dr. Denis Keyes, Dr. Robert Fulbright, and Dr. Mark Cunningham. Webster was given different I.Q. tests by some of these experts, and he scored between a composite score of between a 51 and a 65. (R. 23:184–94; R. 24:20). Webster's experts agreed that an I.Q. score of around 70 or lower, along with a lack of adaptive skills and the onset of these deficits before the age of 18, are the criteria for a diagnosis of mental retardation. (R. 23:183, 229–30).[FN3] In order to assess Webster's adaptive skills, Dr. Keyes used the Vineland test, which involved asking numerous questions of people who knew Webster before he was eighteen, including family members, teachers, and friends, but dropping those answers that are inconsistent with the answers of most of the interviewees. (R. 24:36–42). From this, Keyes determined that Webster lived at home, did not have a bank account or a charge card, and was never observed setting the dinner table, assisting in the preparation of meals, or making his bed. He also determined that no one had known Webster to keep secrets or confidences or address envelopes on his own. (R. 24:44–5, 73–6). Dr. Keyes testified that he did not speak to Webster's fellow gang members or police officers who had dealt with him before he was eighteen-years-old in reaching his results on the Vineland test. (R. 24:82–4). Based on this test, Dr. Keyes opined that Webster did have a lack of adaptive skills. Based on the I.Q. scores, along with this adaptive skills test and evidence from family members that Webster had been "slow" as a child, all of Webster's experts diagnosed him as being mentally retarded. (R. 24:43, 47, 144, 189).

> FN3. This definition is the same as that outlined by the Supreme Court in *Atkins,* 536 U.S. at 308, n. 3, 318.

Both Dr. Finn and Dr. Keyes acknowledged that cultural factors can have an effect on I.Q. scores (R 23:212; R. 24:59), and Dr. Keyes testified that the I.Q. tests required Webster to define words and recognize faces, and he did not know the definition of "inflation," nor did he recognize pictures of Shakespeare, Mark Twain, or Einstein, but he did recognize Elvis Presley and Stevie Wonder. (R. 24:60–2). Dr. Keyes also testified that Webster had reading and writing abilities that were unusual in a person with his alleged level of retardation and that Keyes attributes this to his belief that Webster probably suffers from "inorganic," as opposed to "organic" retardation. (R. 24:48, 111). Dr. Keyes also acknowledged, upon being questioned by this Court, that evidence that Webster was a leader in the kidnaping plot would be inconsistent with a diagnosis of mental retardation and that, in his opinion, it would have been "unlikely" that Webster was the one who physically took the victim. (R. 24:102).

The government, on the other hand, offered testimony

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 148 of 341
Case 2:12-cv-00086-WPL-WGH   Document 17-2   Filed 08/07/12   Page 11 of 14   PageID 625
PageID #: 1792

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

from two experts, Dr. George Parker and Dr. Richard Coons. Dr. Parker testified that he administered an I.Q. test to Webster and his composite score was a 72. (R. 26:49). Dr. Parker and Dr. Coons testified that they did not believe that Webster is mentally retarded. (R. 26:143). Both Parker and Coons believed that Webster was not motivated to do well on I.Q. tests administered after he was charged in this case, and pointed as evidence of this to prior tests where he scored higher, such as tests given to him when he was in junior high, when he was in prison previously, and when he was in the Job Corps. (R. 26:51–3, 60–1, 63, 67, 126, 142). Parker also observed that the fact that someone like Webster lived in a sub-culture in which he was not exposed to a lot of vocabulary could cause his I.Q. scores to be lower. (R. 26:50–51).

**\*13** Primarily, however, Parker and Coons questioned the results obtained by the defense when the test was administered to determine Webster's adaptive skills. Parker testified that he did not believe that the Vineland test was appropriate in Webster's case because of Webster's lifestyle, namely that of a drug dealer. Because of choices that Webster had made in his life, and because Webster had been in prison most of the time since he was fifteen years old, Parker and Coons believed that he would rate deceptively poor on the Vineland test. Dr. Parker and Dr. Coons also disputed some of the results Dr. Keyes did obtain with the Vineland test. Specifically, Dr. Keyes had indicated on the test that Webster's family members stated that Webster did not speak in complete sentences, did not read simple stories aloud, and did not read on his own initiative, when both the two experts and officers at the prison where he was housed after being charged in the instant case had observed that Webster did all of these things. Moreover, his family had stated that they did not know whether Webster addressed envelopes, put his clothes away, or made his own bed, whereas Parker had in his possession an envelope Webster had addressed and had observed that Webster put his clothes away and made his bed in his jail cell. (R. 26: 58–9, 136–39). Parker and Coons also noted that Webster had shown cleverness when he sneaked into the women's part of the jail at one point, and he had shown the ability to adapt to the life he had chosen, as well as life in prison. (R. 26:143–44). Furthermore, Webster had shown adaptability by being

deceitful to the police by way of cover stories and excuses when he was arrested with a motel key in his pocket, and had the adaptive ability to destroy evidence when he burned his clothes after Lisa Rene's murder. (R. 26:65–6).

Moreover, the government placed into evidence the testimony of Greg Barber, Webster's former parole officer, Gene Stewart, who was the principal at the junior high that Webster attended, and Rick McLaughlin, the vice-principal at that same school. They all testified that they did not believe that Webster was mentally retarded and that, when they were visited by Dr. Keyes earlier and told him their opinions, he told them that they could not help him because he was trying to keep Webster from being executed, a charge he disputed in his testimony. (R. 25:26–8, 238, 239–40, 247–48, 249). Moreover, E.C. Turner, Pat Drowett, and Linda Monk, a counselor and two teachers from the junior high Webster attended, testified that in their opinion, while Webster was in "basic" classes at school rather than advanced classes and dropped out in the ninth grade, he is not retarded. (R. 25:34–70). Finally, two fellow inmates and several officers from the federal prison where Webster had been housed for some time testified that Webster wrote letters to other inmates, albeit in almost indecipherable slang, received letters and newspapers, read aloud from the newspapers, wrote request slips for various services, wrote written grievances, submitted names and addresses of people for his visitation list, appeared to be reading from law books in the law library and taking notes, and on one occasion complained because the change he had received after purchasing materials from the commissary was incorrect. (R. 25:86–103, 111–18, 122–25, 128–30, 136–38, 141–46; R. 26:24–35).

**\*14** In summary, all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that Webster has a low IQ. The experts disagreed about how low, but even a 72 I.Q. falls into the range where one can be diagnosed as mentally retarded, if one also has a deficit in adaptive skills. (R. 26:85–6). And the issue of adaptive skills or the lack thereof is where the parties converged at Webster's trial. While the defense did place into evidence the results of the Vineland test, government witnesses effectively reputed some of those findings with direct evidence that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

Webster has adapted to his environment and does possess skills that his family stated that he did not. Looking at all of the evidence presented by both sides at trial, while it is undisputed that Webster has had low scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "nonorganic" factors, which this Court understands to mean his lack of a quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math. This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills. *See Atkins,* 536 U.S. at 308, n. 3. The evidence at trial therefore supports a finding that Webster is not mentally retarded and therefore is not rendered ineligible for the death penalty under either *Atkins* or 18 U.S.C. § 3596(c).

*3. International Law claim*

In his final claim on the issue of mental retardation, Webster asserts that binding international law prohibits his execution because he is mentally retarded. As support for this claim, Webster points to resolutions from the United Nations and the International Commission on Human Rights. (Motion at 65). Aside from whether these resolutions are, in fact, binding on the United States, as the government notes, because the Supreme Court has recently held that the United States Constitution prohibits the execution of the mentally retarded, international law provides no greater relief to him than domestic law. Webster's second, twelfth, thirteenth, fifteenth, and sixteenth grounds for relief are without merit and are denied.

D. *Brady claim*

In his ninth ground for relief, Webster contends that the government violated its duty under *Brady v. Maryland,* 373 U.S. 83 (1963), because the government was in possession of mitigating and impeachment evidence but did not provide it to Webster. Specifically, Webster

asserts that the government knew that the reason he was not placed in special education classes when he was in school was because of racial discrimination and knew that certain of the government's witnesses who testified at punishment about his educational background were biased against Webster.

**\*15** Under *Brady v. Maryland,* 373 U.S. 83, 87 (1963), the suppression of evidence favorable to the accused and material to either guilt or punishment by the State violates a defendant's due-process rights under the federal constitutional. And under *Brady,* the prosecution has the duty to turn over to the defense both exculpatory and impeachment evidence, whether or not it was requested by the defense. *United States v. Bagley,* 473 U.S. 667, 682, 685 (1985). Such evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A reasonable probability of a different result is shown when the suppression of evidence undermines confidence in the verdict. *Bagley,* 473 U.S. at 678.

Webster asserts that the government was aware that the Watson Chapel School District in Arkansas, where Webster attended school, had had a history of discriminating against African–Americans. Webster further asserts that part of this discrimination was the failure to place African–American students in special education classes when needed. Therefore, Webster asserts, had this information been provided to the defense, the defense could have impeached certain government witnesses, such as E.C. Turner, Linda Monk, and Pat Drewett, who testified that they did not believe that Webster was retarded and noted that he was not in special education classes in school. (R. 25:34–56).

Putting aside the issue of whether knowledge of the history of the Watson Chapel school district can be imputed to the prosecutors who prosecuted Webster's case, Webster has not established that, even if the evidence was withheld and could have been effectively used to impeach allegedly "biased" witnesses, it is material. In that regard, the Fifth Circuit has recognized that the materiality prong of the *Brady* standard is identical to the prejudice prong of the *Strickland* standard. *Martin v. Cain,* 246 F.3d 471 (5th Cir.), *cert. denied,* 534 U.S. 885 (2001); *Johnson v. Scott,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 150 of 341
Case 2:12-cv-00086-WPL-WGH Document 17-2 Filed 08/07/12 Page 13 of 14 PageID 627
PageID #: 1794

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

68 F.3d 106, 109–10 (5th Cir.1995). That is, in both instances, a habeas petitioner must establish a reasonable probability of a different verdict had the alleged error not occurred. In the instant case, this Court has already determined that Webster has failed to establish any prejudice because his trial counsel did not discover and present this purported evidence of the school system's history of racial discrimination. Accordingly, Webster has failed to establish that this evidence was material to the punishment he received as he has not shown a reasonable probability that he would not have received the death penalty had defense counsel known about this information. These claims are denied.

E. *False-testimony claims*

In his tenth and eleventh grounds for relief, Webster argues that his due-process rights were violated when the government presented the "untrue and damaging" testimony of two of his co-defendants, Steve Beckley and Marvin Holloway. Specifically, Webster contends that, after his trial, Beckley told a correctional officer and a fellow inmate that he had lied at Webster's trial in order to improve his own situation. Webster further contends that, after Webster's trial, his co-defendant Orlando Hall received a letter from Holloway indicating that Holloway owed Webster an apology, a statement that Webster alleges indicates that Holloway lied at trial. Webster further argues that his due-process rights were violated even if the government did not know about any untruthful testimony.

**\*16** Beckley and Holloway were co-defendants who testified at Webster's trial regarding both their own and Webster's involvement in the crime. Both testified about their motives for testifying against Webster, namely that both had pled guilty to various offenses and were hoping that the government would recommend to this Court that their sentences be lowered in recognition of their cooperation. (R. 19:4–7; R. 20:94–9). Nevertheless, Webster contends that he has evidence that both Beckley and Holloway lied when they testified about Webster's involvement in the crime.

It should be noted that Webster has not presented any actual evidence to this Court that either Beckley or Holloway have ever stated that they lied at Webster's trial.

In that regard, the statements allegedly made by Beckley and Holloway could very easily be read to mean that both men were apologetic for testifying at Webster's trial in order to improve their own situations. But even if Webster's allegations are taken as true, and all of Beckley's and Holloway's testimony about Webster's involvement in the crime is suspect, Webster has shown no due-process violation. In that regard, the Supreme Court has held that the presentation and admission of false evidence at trial violates a criminal defendant's due-process rights if the reliability of a given witness may be determinative of guilt or innocence. *Napue v. Illinois,* 360 U.S. 264, 269 (1959); *Mooney v. Holohan,* 294 U.S. 103 (1935). And this is true whether the presentation was intentional or through negligence. *Giglio v. United States,* 405 U.S. 150, 154 (1972). Predictably, then, none of the cases cited by Webster supports his contention that it is a due-process violation for false testimony to be presented at trial without the knowledge of the prosecution.<sup>FN4</sup> In fact, contrary to this assertion, in order to prevail on a claim that his constitutional rights were violated by the presentation of false testimony, Webster must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false. *Napue v. Illinois,* 360 U.S. at 271. Webster has failed even to allege that the government knew that any testimony given by Holloway or Beckley was false. Accordingly, this Court denies relief with respect to these claims.

> FN4. Webster does not contend that the evidence is insufficient to support his conviction or sentence without the alleged false testimony. Indeed, after he was arrested, Webster gave a written confession that was admitted into evidence at trial in which he acknowledged that he participated in the kidnaping of Lisa Rene, although, not surprisingly, by his accounting his participation in the crime was less than his co-defendants. (R. 20:40–55). Furthermore, Holloway's and Beckley's testimony was corroborated by the testimony of Demetrius Hall, another co-defendant (R. 18:98–152); the testimony of a woman who saw Webster at a 7–Eleven near the victim's apartment (R. 18:280); testimony from a security guard at the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-cv-00086-WPL-WGH   Document 17-2   Filed 08/07/12   Page 14 of 14   PageID 628

Page 14

Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)

(Cite as: 2003 WL 23109787 (N.D.Tex.))

motel where the victim was kept that the room was rented in Webster's name and he saw Webster on the premises (R. 19:176–92); testimony that Webster had the key to the motel room in his pocket when he was arrested (R. 19:247–54); testimony that Webster helped police officers locate the grave (R. 20:32–4); testimony that Webster had the victim's gold bracelet and necklace on him when he was arrested (R. 20:217, 219, 222); and testimony about Webster's own statements to the police that the killing was "strictly business." (R. 21A:72).

## VI

### Request for Evidentiary Hearing

Webster also requests that this Court conduct an evidentiary hearing on the claims he raised in his motion. Section 2255 does not require that a hearing be held to dispose of every motion made under its authority. *Coco v. United States,* 569 F.2d 367, 369 (5th Cir.1976). But § 2255 does require a hearing unless the motion, files, and record of the case conclusively show that no relief is appropriate. *United States v. Bartholomew,* 974 F.2d 39, 41 (5th Cir.1992). However, conclusive, rather than direct evidence, is required in order to deny relief without a hearing. *United States v. Drummond,* 910 F.2d 284, 285 (5th Cir.1990). Bona fide or contested fact issues must be resolved on the basis of an evidentiary hearing. *Booth v. United States,* 507 U.S. 243 (5th Cir.1975); *Reagor v. United States,* 488 F.2d 515 (5th Cir.1973).

**\*17** The record before this Court, including the exhibits submitted by Webster with his motion, do not create any contested fact issues that must be resolved in order to decide Webster's claims. To the contrary, most of Webster's claims are based on the record from the trial. And, with regard to the claims for which Webster has submitted additional evidence, the Court has decided these claims either by assuming that everything Webster alleges is true or based on legal, not factual, bases. Accordingly, because the record before this Court shows conclusively that Webster is not entitled to relief, his request for an evidentiary hearing is denied.

It is therefore ORDERED that Petitioner's motion to vacate his conviction and sentence under 28 U.S.C. § 2255

be, and is hereby, DENIED.

It is further ORDERED that the clerk of the Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested.

N.D.Tex.,2003.

Webster v. U.S.
Not Reported in F.Supp.2d, 2003 WL 23109787 (N.D.Tex.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:12-cv-00086-JPH-MJD  Document 42-1  Filed 07/08/14  Page 152 of 341
Case 2:12-cv-00086-WTL-WGH  Document 18  Filed 06/16/12  Page 1 of 4  PageID 629
PageID #: 1796

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,

Petitioner,

vs.                                    CAUSE NO. 2:12-cv-086-WTL-WGH

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,
TERRE HAUTE (USP),

Respondent.

## MOTION FOR ENLARGEMENT OF TIME

Petitioner, through its undersigned counsel, moves for an enlargement of time to reply to Respondent's Return to Order to Show Cause until September 29, 2012.

In support of this motion, the Petitioner states as follows:

1.      The Petitioner submitted his Petition to this Court on April 6, 2012;

2.      On April 19, 2012, this Court entered an Entry and Order to Show Cause requiring the Respondent to answer the allegations by May 30, 2012, and giving the Petitioner 30 days to reply to the Respondent's submission;

3.      On May 2, 2012, the Respondent submitted a Motion for Enlargement of Time to August 28, 2012 to respond to the Petition;

4.      The Court entered an Order granting in part and denying in part the Respondent's Motion, and requiring Respondent to respond to the Petition by July 10, 2012;

5.      On July 3, 2012, the Respondent submitted a second Motion for Extension of Time to August 9, 2012;

6.      On July 8, 2012, the Court granted the Respondent's Motion, requiring Respondent to answer by August 9, 2012;

7.      On August 7, 2012, the Respondent submitted its Return to Order to Show Cause;

8.      Under the Court's current scheduling order, Petitioner's Reply would be due September 7, 2012;

9.      In total, Respondent was given 110 days from the date the Show Cause Order was entered until the Return to Order to show Cause was filed and served;

10.     Petitioner now moves this Court for an order extending the time by which Petitioner is permitted to submit his Reply by 21 days, to September 28, 2012;

11.     This Motion is made not for the purpose of causing delay, but so that Petitioner can make a fulsome and reasoned Reply to the Respondent's Return to Order to Show Cause, which raises numerous legal and factual issues.

12.     An additional 21 days will allow counsel for Petitioner to prepare a Reply in this serious case that addresses the many issues raised by Respondent, without causing undue delay.

13.     Respondent has advised Petitioner that it would not object to Petitioner's request for an extension of time.

-2-

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 154 of 341
Case 2:12-cv-00086-WTL-WGH Document 18 Filed 08/16/12 Page 3 of 4 PageID 631
PageID #: 1798

-3-

154

Dated:  August 16, 2012     DORSEY & WHITNEY LLP


By /s/  Kirsten E. Schubert
  Steven J. Wells
  *Admitted pro hac vice*
  Kirsten E. Schubert
  *Admitted pro hac vice*
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

  Eric K. Koselke, # 5593-54
6202 N. College Avenue
Indianapolis, IN 46220
Telephone:  (317) 722-2591
Facsimile:  (317) 257-5300

*Attorneys for Petitioner Bruce Webster*

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 155 of 341
Case 2:12-cv-00086-WTL-WGH Document 18 Filed 08/16/12 Page 4 of 4 PageID 632
PageID #: 1799

# CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2012, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
Email:  ekoselke@wkelaw.com

Date:  August 16, 2012                     /s/  Kirsten E. Schubert
                                            Kirsten E. Schubert
                                            DORSEY & WHITNEY LLP
                                            Suite 1500, 50 South Sixth Street
                                            Minneapolis, MN 55402-1498
                                            Telephone:  (612) 340-2600
                                            Facsimile:  (612) 340-2868

-4-

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 156 of 341
Case 2:12-cv-00086-WTL-WGH   Document 18-1   Filed 06/10/12   Page 1 of 2   PageID 633
PageID #: 1800

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,

      Petitioner,

vs.                         CAUSE NO. 2:12-cv-086-WTL-WGH

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,
TERRE HAUTE (USP),

      Respondent.

## <u>ORDER</u>

This matter having come before the Court on the Petitioner's Motion for Enlargement of Time, this Court, having considered the above action and matters which are pending, makes the following rulings:

1.      The Petitioner's Motion for Enlargement of Time [DOCKET NO] is granted;

2.      Respondent shall have up to and through September 29, 2012 to Reply to Respondent's Return to Order to Show Cause.

IT IS SO ORDERED.

Date: _____     _____

                                       Hon. William T. Lawrence, Judge
                                       United States District Court
                                       Southern District of Indiana

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 157 of 341
Case 2:12-cv-00086-WTL-WGH Document 18-1 Filed 08/16/12 Page 2 of 2 PageID 634
PageID #: 1801

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2012, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following parties by operation of

the Court's electronic filing system.  Parties may access this filing through the Court's

system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Date: August 16, 2012                         /s/  Kirsten E. Schubert
                                              Kirsten E. Schubert
                                              DORSEY & WHITNEY LLP
                                              Suite 1500, 50 South Sixth Street
                                              Minneapolis, MN 55402-1498
                                              Telephone:  (612) 340-2600
                                              Facsimile:  (612) 340-2868

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 158 of 341
Case 2:12-cv-00086-WTL-WGH Document 19 Filed 06/16/12 Page 1 of 4 PageID #: 1635
PageID #: 1802

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,

        Petitioner,

        vs.                          CAUSE NO. 2:12-cv-086-WTL-WGH

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,
TERRE HAUTE (USP),

        Respondent.

## **AMENDED MOTION FOR ENLARGEMENT OF TIME**

Petitioner, through its undersigned counsel, moves for an enlargement of time to reply to Respondent's Return to Order to Show Cause until September 28, 2012.

In support of this motion, the Petitioner states as follows:

1. The Petitioner submitted his Petition to this Court on April 6, 2012;

2. On April 19, 2012, this Court entered an Entry and Order to Show Cause requiring the Respondent to answer the allegations by May 30, 2012, and giving the Petitioner 30 days to reply to the Respondent's submission;

3. On May 2, 2012, the Respondent submitted a Motion for Enlargement of Time to August 28, 2012 to respond to the Petition;

4. The Court entered an Order granting in part and denying in part the Respondent's Motion, and requiring Respondent to respond to the Petition by July 10, 2012;

5.      On July 3, 2012, the Respondent submitted a second Motion for Extension of Time to August 9, 2012;

6.      On July 8, 2012, the Court granted the Respondent's Motion, requiring Respondent to answer by August 9, 2012;

7.      On August 7, 2012, the Respondent submitted its Return to Order to Show Cause;

8.      Under the Court's current scheduling order, Petitioner's Reply would be due September 7, 2012;

9.      In total, Respondent was given 110 days from the date the Show Cause Order was entered until the Return to Order to show Cause was filed and served;

10.     Petitioner now moves this Court for an order extending the time by which Petitioner is permitted to submit his Reply by 21 days, to September 28, 2012;

11.     This Motion is made not for the purpose of causing delay, but so that Petitioner can make a fulsome and reasoned Reply to the Respondent's Return to Order to Show Cause, which raises numerous legal and factual issues.

12.     An additional 21 days will allow counsel for Petitioner to prepare a Reply in this serious case that addresses the many issues raised by Respondent, without causing undue delay.

13.     Respondent has advised Petitioner that it would not object to Petitioner's request for an extension of time.

-3-

Dated:  August 16, 2012                    DORSEY & WHITNEY LLP


                                           By  /s/  Kirsten E. Schubert
                                               Steven J. Wells
                                               *Admitted pro hac vice*
                                               Kirsten E. Schubert
                                               *Admitted pro hac vice*
                                           Suite 1500, 50 South Sixth Street
                                           Minneapolis, MN 55402-1498
                                           Telephone:  (612) 340-2600
                                           Facsimile:  (612) 340-2868

                                               Eric K. Koselke, # 5593-54
                                           6202 N. College Avenue
                                           Indianapolis, IN 46220
                                           Telephone:  (317) 722-2591
                                           Facsimile:  (317) 257-5300

                                           *Attorneys for Petitioner Bruce Webster*

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 161 of 341
Case 2:12-cv-00086-WTL-WGH   Document 19   Filed 08/16/12   Page 4 of 4   PageID #: 638
PageID #: 1805

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2012, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following parties by operation of

the Court's electronic filing system.  Parties may access this filing through the Court's

system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Date: August 16, 2012                          /s/  Kirsten E. Schubert
                                               Kirsten E. Schubert
                                               DORSEY & WHITNEY LLP
                                               Suite 1500, 50 South Sixth Street
                                               Minneapolis, MN 55402-1498
                                               Telephone:  (612) 340-2600
                                               Facsimile:  (612) 340-2868

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 162 of 341
Case 2:12-cv-00086-WTL-WGH Document 19-1 Filed 08/16/12 Page 1 of 2 PageID 639
PageID #: 1806

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,

          Petitioner,

        vs.                  CAUSE NO. 2:12-cv-086-WTL-WGH

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,
TERRE HAUTE (USP),

          Respondent.

## **ORDER**

     This matter having come before the Court on the Petitioner's Motion for

Enlargement of Time, this Court, having considered the above action and matters which

are pending, makes the following rulings:

     1.     The Petitioner's Motion for Enlargement of Time [DOCKET NO] is

granted;

     2.     Respondent shall have up to and through September 28, 2012 to Reply to

Respondent's Return to Order to Show Cause.

     IT IS SO ORDERED.

Date: August 16, 2012          _____

                              Hon. William T. Lawrence, Judge
                              United States District Court
                              Southern District of Indiana

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 163 of 341
Case 2:12-cv-00086-WTL-WGH   Document 19-1   Filed 08/16/12   Page 2 of 2   PageID 640
PageID #: 1807

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2012, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following parties by operation of

the Court's electronic filing system.  Parties may access this filing through the Court's

system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Date: August 16, 2012

/s/  Kirsten E. Schubert
Kirsten E. Schubert
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 164 of 341
Case 2:12-cv-00086-WTL-WGH   Document 20   Filed 08/20/12   Page 1 of 1   PageID #: 641
PageID #: 1808

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

BRUCE CARNEIL WEBSTER,           )
                                 )
                    Petitioner,  )
                                 )
vs.                              )          2:12-cv-086-WTL-WGH
                                 )
CHARLES LOCKETT, Warden,         )
                                 )
                    Respondent.  )


## E N T R Y

The petitioner's amended motion for extension of time [19] is **granted.** The petitioner shall have **through September 28, 2012,** in which to file his reply.

The petitioner's motion for extension of time [18] is **denied as moot.**

**IT IS SO ORDERED.**

Date: 08/20/2012

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana


**Distribution:**

**All electronically registered counsel**

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 165 of 341
Case 2:12-cv-00086-WTL-WGH Document 21 Filed 09/20/12 Page 1 of 4 PageID 642
PageID #: 1809

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,

Petitioner,

vs.                                           CAUSE NO. 2:12-cv-086-WTL-WGH

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,
TERRE HAUTE (USP),

Respondent.

## MOTION FOR ENLARGEMENT OF TIME

Petitioner, through its undersigned counsel, moves for a second extension of time

to reply to Respondent's Return to Order to Show Cause until October 12, 2012.

In support of this motion, the Petitioner states as follows:

1.     The Petitioner submitted his Petition to this Court on April 6, 2012.

2.     On April 19, 2012, this Court entered an Entry and Order to Show Cause

requiring the Respondent to answer the allegations by May 30, 2012, and giving the

Petitioner 30 days to reply to the Respondent's submission.

3.     On May 2, 2012, the Respondent submitted a Motion for Enlargement of

Time to August 28, 2012 to respond to the Petition.

4.     The Court entered an Order granting in part and denying in part the

Respondent's Motion, and requiring Respondent to respond to the Petition by July 10,

2012.

5.      On July 3, 2012, the Respondent submitted a second Motion for Extension of Time to August 9, 2012.

6.      On July 8, 2012, the Court granted the Respondent's Motion, requiring Respondent to answer by August 9, 2012.

7.      On August 7, 2012, the Respondent submitted its Return to Order to Show Cause.

8.      On August 16, 2012, Petitioner moved for an extension of time to file its Reply to Respondent's Return to Order to Show Cause to September 28, 2012.

9.      On August 20, 2012, the Court granted Petitioner's Motion, requiring Petitioner to submit its Reply by September 28, 2012.

10.     Petitioner now moves this Court for an order extending the time by which Petitioner is permitted to submit his Reply by an additional 14 days, to October 12, 2012.

11.     Respondent was granted two extensions in the time to respond to the Order to Show Cause, for a total extension of 71 days.

12.     In total, Petitioner has requested an additional 35 days to submit his Reply.

13.     This Motion is made not for the purpose of causing delay, but so that Petitioner can make a fulsome and reasoned Reply to the Respondent's Return to Order to Show Cause, which raises numerous legal and factual issues.  Counsel for Petitioner faces pressing deadlines in other cases, including the close of discovery on September 27 in a large commercial case, multiple briefing deadlines, and a busy trial schedule.

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 167 of 341
Case 2:12-cv-00086-WTL-WGH Document 21 Filed 09/20/12 Page 3 of 4 PageID #: 644
PageID #: 1811

14.     An additional 14 days will allow counsel for Petitioner to prepare a Reply in this serious case that addresses the many issues raised by Respondent, without causing undue delay.

15.     Respondent has advised Petitioner that it would not object to Petitioner's request for an extension of time.

Dated:  September 20, 2012            DORSEY & WHITNEY LLP


By  /s/  Kirsten E. Schubert
        Steven J. Wells
        *Admitted pro hac vice*
        Kirsten E. Schubert
        *Admitted pro hac vice*
    Suite 1500, 50 South Sixth Street
    Minneapolis, MN 55402-1498
    Telephone:  (612) 340-2600
    Facsimile:  (612) 340-2868

        Eric K. Koselke, # 5593-54
    6202 N. College Avenue
    Indianapolis, IN 46220
    Telephone:  (317) 722-2591
    Facsimile:  (317) 257-5300

    *Attorneys for Petitioner Bruce Webster*

-3-

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2012, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Date: September 20, 2012

/s/ Kirsten E. Schubert
Kirsten E. Schubert
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

-4-

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 169 of 341
Case 2:12-cv-00086-WTL-WGH   Document 21-1   Filed 09/20/12   Page 1 of 2   PageID 646
PageID #: 1813

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,

        Petitioner,

        vs.                      CAUSE NO. 2:12-cv-086-WTL-WGH

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,
TERRE HAUTE (USP),

        Respondent.

## **ORDER**

This matter having come before the Court on the Petitioner's Motion for Enlargement of Time, this Court, having considered the above action and matters which are pending, makes the following rulings:

1.      The Petitioner's Motion for Enlargement of Time [21] is granted;

2.      Respondent shall have up to and through October 12, 2012 to Reply to Respondent's Return to Order to Show Cause.

IT IS SO ORDERED.

Date: _____   _____
                                      Hon. William T. Lawrence, Judge
                                      United States District Court
                                      Southern District of Indiana

Case 2:12-cv-00086-JPH-MJD  Document 42-1  Filed 07/08/14  Page 170 of 341
Case 2:12-cv-00086-WTL-WGH  Document 21-12  Filed 09/20/12  Page 2 of 2  PageID 647
PageID #: 1814

170

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2012, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following parties by operation of

the Court's electronic filing system.  Parties may access this filing through the Court's

system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Date: September 20, 2012

/s/  Kirsten E. Schubert
Kirsten E. Schubert
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,

Petitioner,

vs.                                    CAUSE NO. 2:12-cv-086-WTL-WGH

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,
TERRE HAUTE (USP),

Respondent.

## **ORDER**

This matter having come before the Court on the Petitioner's Motion for

Enlargement of Time, this Court, having considered the above action and matters which

are pending, makes the following rulings:

1.      The Petitioner's Motion for Enlargement of Time [21] is granted;

2.      Respondent shall have up to and through October 12, 2012 to Reply to

Respondent's Return to Order to Show Cause.

IT IS SO ORDERED.

Date: ___09/24/2012_____

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution to all registered counsel via electronic notification

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
--------------------------------------------------------
BRUCE CARNEIL WEBSTER,

                          :

           Petitioner,

                          :        CAUSE NO: 2:12-CV-0086-WTL-WGH

         vs.

                          :

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,    :
TERRE HAUTE (USP),

                          :

          Respondent.
--------------------------------------------------------


### PETITIONER'S REPLY TO
### RESPONDENT'S RETURN TO ORDER TO SHOW CAUSE


## THIS IS A DEATH PENALTY CASE


Eric K. Koselke, # 5593-54
6202 N. College Avenue
Indianapolis, IN 46220
Telephone:  (317) 722-2591
Facsimile:  (317) 257-5300

Steven J. Wells
Kirsten E. Schubert
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN  55402
(612) 340-2600


*Attorneys for Petitioner Bruce Webster*

Mr. Webster seeks to present for the first time significant new evidence that he is

mentally retarded and therefore categorically ineligible for execution under the Eighth

Amendment.  If considered, this evidence – primarily the results of examinations by government

doctors and psychologists from before the time of his arrest – proves that executing Mr. Webster

would be in direct violation of the Constitution.  This evidence remained buried in government

files for sixteen years, and, despite a request by Mr. Webster's trial counsel and a motion for

discovery by his 2255 counsel, was only recently released by the Social Security Administration

("SSA").  The remedies provided in 28 U.S.C. § 2255 are plainly "ineffective" within the

meaning of 28 U.S.C. § 2255(e) with respect to the circumstances presented here.  As the Fifth

Circuit has held, there is no mechanism under § 2255 to right the Constitutional wrong – the

execution of a mentally retarded person – that Mr. Webster faces in this case.  The writ of habeas

corpus guaranteed in 28 U.S.C. § 2241 has been reserved for the rare circumstance where a

fundamental injustice will result absent judicial intervention.  This is that rare case.

The Government's response to Mr. Webster's Petition for Writ of Habeas Corpus

("Petition") is meritless.  First, it argues that § 2241 does not provide a mechanism to address

*any* evidence of a categorical exclusion – here, mental retardation – discovered after an initial

§ 2255 proceeding, no matter how conclusive the evidence.  In essence, the Government argues

that it doesn't matter if the new evidence proves beyond any doubt that Mr. Webster is mentally

retarded.  That argument misconstrues and misstates Seventh Circuit precedent and would

eliminate the very purpose of § 2241 – to provide a means to redress a fundamental deprivation

of constitutional rights where § 2255 proves ineffective.  Further, the Government's argument

would result in a suspension of the writ.  It is not the law of this land, as the Government argues,

that the courts must countenance an unconstitutional execution because their hands have been

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 174 of 341
Case 2:12-cv-00086-WTL-WGH Document 23-4 Filed 10/12/12 Page 3 of 21 PageID 651
PageID #: 1818

tied by the Antiterrorism and Effective Death Penalty Act ("AEDPA"); that is why § 2241

remains in force *despite* AEDPA.

The Government further contends that the newly discovered evidence is neither "newly

discovered" nor particularly significant. These arguments have no basis in fact and represent a

complete about-face from the Government's case at trial, where it hotly contested the credibility

of post-crime evaluations of mental retardation.

The Government would like to portray Mr. Webster's motion as a "simple" attempt to

"add" new facts to a "prior claim," (Resp.'s Return to Order to Show Cause ("Gov't Mem.") 11),

in the hope of denying him a judicial forum. But that is not this case. Mr. Webster is mentally

retarded. He has now obtained powerful, pre-crime, government-generated evidence that not

only establishes this intellectual disability but also refutes every argument the prosecution relied

on to convince the jury and the courts otherwise. This is a unique and troubling case. Section

2241 is the only mechanism available to prevent the "Kafka-esque" imposition of the death

penalty in this case. Mr. Webster respectfully requests that his Petition be granted. [1]

## I. THE PREVIOUSLY UNRELEASED EVIDENCE PROVES THAT BRUCE WEBSTER IS MENTALLY RETARDED

One in three jurors at Bruce Webster's trial were persuaded that Mr. Webster is or may

be mentally retarded, despite the prosecution's allegations that Mr. Webster "manipulated" his

IQ scores, lied about being in special education classes, and lived a fully functional life writing

letters and making his bed behind prison walls. The new evidence presented here coupled with

the strong evidence presented at trial proves that Mr. Webster is, in fact, mentally retarded. Not

only is this evidence unquestionably "probative" and "significant" to the question of whether Mr.

---

[1] The Government is wrong in asserting that Mr. Webster has a petition for commutation held "in abeyance." (Gov't Mem. 2, n. 4.) Mr. Webster's prior commutation petition was withdrawn five years ago. (*See* Affidavit of Kirsten E. Schubert Ex. A.)

-3-

Webster is constitutionally ineligible for the death penalty, it has never been considered in any court.

## A.    THE NEW EVIDENCE IS PIVOTAL

Mr. Webster seeks to present here powerful new evidence of his mental retardation, including the results of two IQ assessments that were administered before the commission of the crime, both of which place him squarely within the range of mental retardation (with scores of 59 and 69); two independent diagnoses of mental retardation, which necessarily took into account Mr. Webster's adaptive deficits,[2] made by unbiased government doctors before the commission of the crime; evidence that Mr. Webster was in special education classes during school, a fact highly probative of the adaptive deficits prong; and numerous declarations from individuals who knew Mr. Webster before age 18 and who can attest to a variety of his adaptive deficits, including his inability to tie his shoes and dress himself.  It is clear that this new evidence, when viewed alongside the six IQ scores of 48, 51, 55, 59, 65, and 72 presented at trial, the trial testimony of Mr. Webster's childhood friends and acquaintances, and the four expert witnesses who diagnosed Mr. Webster with mental retardation at trial, constitutes undeniable proof that Mr. Webster is mentally retarded and therefore ineligible for the death penalty.

### 1.    Mr. Webster's IQ was a Disputed Issue at Trial

The Government's suggestion that it "has never argued that Webster's IQ would not meet the definition for mental retardation" is simply untrue.  (*See* Gov't Mem. 22.)  The credibility

---

[2]    *See Mental Retardation: Determining Eligibility for Social Security Benefits* 189 (Daniel J. Reschly et al. eds., 2002) (noting that "adaptive behavior is an essential component of the mental retardation diagnostic construct, and all agencies contemplating mental retardation diagnoses should give consideration to adaptive behavior" because "[a]daptive behavior has been fundamental to conceptions of mental retardation at least since the early 19th century") (citing E.A. Doll, *Historical Review of Mental Retardation 1800-1965: A Symposium*, 72 Am. J. Mental Deficiency 165 (1967), and E.A. Doll, *Current Thoughts on Mental Deficiency*, 41 Proc. Am. Ass'n on Mental Deficiency 33 (1936)).

and significance of Mr. Webster's low IQ scores were hotly contested at trial. Mr. Webster presented evidence of five IQ scores all falling well within the range of mental retardation. Mr. Webster also presented testimony from four psychologists and psychiatrists who had examined him and determined that his IQ fell within the range of the mentally retarded and that he was, in fact, mentally retarded. (*See* Petition 8-10.) The prosecution argued, on the other hand, not that low IQ scores are irrelevant to a diagnosis of mental retardation, but that *Mr. Webster's* IQ scores were irrelevant because he had *faked* them (or in the Government's words, that Mr. Webster was "motivated" to fake low scores on the IQ and behavioral skills tests in order to avoid a death sentence). (Trial Tr. Vol. 27, 63:16-65:11.) Dr. George Parker, the Government's expert, testified repeatedly that Mr. Webster's scores were artificially deflated because he was "motivated" to do poorly on the tests administered after his arrest. (Trial Tr. Vol. 26, 46:24-48:9, 49:3-50:23, 52:23-53:23, 67:1-12, 88:10-17.) The Government's other expert, Dr. Richard Coons, testified that he believed Mr. Webster was manipulating his performance on the IQ exams. (*Id.* 131:11-134:21, 142:1-147:10.)

Indeed, the district court relied on this testimony in its order denying § 2255 relief, stating "Both Parker and Coons believed that Webster was not motivated to do well on I.Q. tests administered after he was charged in this case, and pointed as evidence of this to prior tests where he scored higher . . . ." (Mem. Op. and Order Den. Am. Mot. to Vacate Conviction and Sentence, Sept. 30, 2003, 29) (internal citations omitted).)

Thus, evidence that Mr. Webster had tested with a very low IQ before the commission of the crime without motivation to "fake" the test scores powerfully undercuts the prosecution's argument at trial that Mr. Webster's scores could and should be disregarded as meaningless. The new diagnoses contained within the social security records provide an invaluable record of the

-5-

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 177 of 341
Case 2:12-cv-00086-WTL-WGH   Document 23-4   Filed 10/12/12   Page 6 of 21   PageID #: 554
PageID #: 1821

medical opinions of three different doctors who evaluated Mr. Webster outside the forensic setting in a real-world context before the crime had even occurred, at a time when Mr. Webster had applied for social security benefits for sinus problems.  As even the Government's expert noted, a patient who seeks professional services in the non-forensic or "real world" setting does not have any "motivation to mislead or deceive;" in fact, as Dr. Parker stated, it would be "pretty silly" for a person seeking professional services "on their own hook, their own motivation," to "go to a doctor and then sit there and tell the doctor a bunch of lies about why he [] is there." (Trial Tr. Vol. 26, 53:1-23.)

That is exactly the evidence Mr. Webster seeks to present:  the unrebutted opinions of three government-employed medical professionals that an individual who sought, in a real-world setting, their professional services to address an unrelated medical issue, is mentally retarded. (*See* Declaration of Marc Tassé ("Tassé Decl.") (Exhibit U to the Affidavit of Steven J. Wells ("Wells Aff.") ¶ 59 (the timing of Dr. Hackett's evaluation was significant because "Mr. Webster was not accused of murder or trying to escape the death penalty—a claim often raised as a possible motivation for malingering on a test of intelligence."))  The new evidence is directly relevant to the highly litigated issue of whether Mr. Webster's IQ scores were credible and whether he does in fact have an IQ that falls within the range of mentally retarded.  (Trial Tr. Vol. 27, 63:16-65:11.)  For the Government to suggest now that IQ scores were never really at issue is false; the prosecution consistently  attacked their credibility.  The new evidence directly undercuts, indeed, entirely eliminates, the government's primary argument to the jury and court as to why they should not seriously consider Mr. Webster's low IQ scores.

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 178 of 341
Case 2:12-cv-00086-WTL-WGH Document 23-4 Filed 10/12/12 Page 7 of 21 PageID #: 655
PageID #: 1822

2.     <u>The Government's Attempt to Minimize the Importance of the SSA Examination Records Has No Basis in Any Evidence</u>

Faced with unambiguous diagnoses and other findings that contradict its trial evidence, the Government attacks the "methodology and expertise" of the doctors who conducted these tests on behalf of and in the employ of a federal agency (*see* Gov't Mem. 21-22.), but that attack has no foundation. The Government offers no evidence that any of the medical professionals in the employ of the federal government were unqualified or that their testing methodology was somehow flawed. Nor does the Government offer any expert opinion in rebuttal to Dr. Marc Tassé's opinion (that the Social Security records "indicate that Mr. Webster had significant subaverage intellectual functioning . . . consistent with a diagnosis of mental retardation," (Tassé Decl. ¶ 61)). Finally, there is again no basis for the Government's claim that the SSA doctors made their diagnoses because Mr. Webster "self-reported." (*See* Gov't Mem. 21-22.) It is clear from the face of these documents that Mr. Webster applied for benefits for sinuses and headaches (Wells Aff. Ex. G.18 (*Alleged Impairments*), G.26 (*Reasons for Visit*).) He was referred to Dr. Spellman on December 22, 1993 "for a psychological evaluation in order to better ascertain eligibility for Social Security benefits." (*Id.* Ex. G.11.) The contents of the records themselves indicate that Mr. Webster sought benefits for chronic sinus issues – not mental retardation – and that each of the government doctors recognized that Mr. Webster suffered from mental retardation.

3.     <u>The New Evidence Shows Mr. Webster's Adaptive Deficits</u>

The unrebutted new evidence of low IQ scores and the explicit diagnoses of mental retardation alone should be sufficient to earn Mr. Webster review by this Court. Nevertheless, the social security records contain ample evidence of Mr. Webster's adaptive deficits, much of which was provided by the doctors themselves. Contrary to the Government's assertions, two of

-7-

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 179 of 341
Case 2:12-cv-00086-WTL-WGH Document 23 Filed 10/12/12 Page 8 of 21 PageID #656
PageID #: 1823

the doctors who diagnosed Mr. Webster as mentally retarded explicitly noted some of his deficits in adaptive functioning. In the "Current Level of Functioning" section of his report, Dr. Spellman noted, "He lives with his mother. He watches television, listens to the radio and goes walking. . . . He goes shopping sometimes. He accompanies his mother to church. He does no chores around the house. Mostly he seems to be idle around the house and on the streets." (Wells Aff. Ex. G.13.) Dr. Spellman then diagnosed Mr. Webster with mental retardation and stated, "Client will not get any better. He is not competent to manage funds, if awarded. There was no evidence of exaggeration or malingering." (*Id.*) Dr. Hackett, who performed a WAIS-R IQ test and diagnosed Mr. Webster as mentally retarded, evaluated Mr. Webster's functioning similarly, stating that Mr. Webster could not be functional in a community setting, would not function well in the work place, and could not manage his own benefits. (*Id.* Ex. G.14, 15-16.) These are all hallmark examples of adaptive deficits. *See Heller v. Doe*, 509 U.S. 312, 329 (1993) ("Mental retardation . . . results in 'deficits or impairments in adaptive functioning,' that is to say . . . how well the person meet the standards of personal independence and social responsibility expected of his or her age by his or her cultural group'").

Moreover, Mr. Webster's deficient reading, writing, and language skills are apparent from simply looking at his SSA application, which is riddled with errors in spelling, grammar, syntax, and comprehension. (*See* Wells Aff. Ex. G.26, 28-35, 24, 50-57, 65-68.) The letter from the Watson Chapel School District indicates that Mr. Webster was in special education classes as a child (*id.* Ex. G.17), and the new declarations of Mr. Webster's relatives and acquaintances provide evidence of Mr. Webster's failure to adapt to life in an unstructured environment before the age of 18 (*id.* Ex. J-T).

-8-

These records directly contradict the prosecution's contentions at trial about Mr. Webster's functioning, which focused heavily on Mr. Webster's behavior in prison and performance in school. Even if an individual's ability to function in the highly regimented and rigidly controlled environment of prison were not (as they are) widely discredited as evidence of adaptive functioning,[3] this new evidence cuts to the heart of the government's "adaptive functioning" arguments at trial. Again, the Government provides no evidence to contradict the adaptive functioning findings by SSA medical professionals prior to the commission of the crime.

Furthermore, the Watson Chapel School District letter acknowledging that Mr. Webster's special education records were destroyed in the 1980s renders the prosecution's trial evidence on this issue at best unreliable. At trial, the prosecution presented evidence that Mr. Webster was never in, did not qualify for, and lied about being placed in special education classes, which, the prosecution argued, suggested Mr. Webster was not mentally retarded. (*See* Trial Tr. vol. 27, 66:16-24.) For example, one junior high counselor testified that while Mr. Webster's scores were low, he would not have been a candidate for special education. (Trial Tr. vol. 25, 57:1-59:7.) Another said she and did not believe that he needed to be referred for inclusion in special education classes. (*Id.* at 35:18-37:22.) Dr. Coons went so far as to tell the jury that Mr. Webster lied about being in special education classes in an attempt to manipulate a diagnosis of mental retardation. (Trial Tr. vol. 26, 132:11-133:7.) In resisting Mr. Webster's request for

---

[3]     *See Thomas v. Allen*, 614 F. Supp. 2d 1257, 1282 (N.D. Ala. 2009) (recognizing that "adaptive behavior is performance in one's community, not in restricted settings, such as prison"); *Wiley v. Epps*, 668 F. Supp. 2d 848, 900 (N.D. Miss. 2009) ("The Court notes that standardized [adaptive] measures are not normed for a prison population, and what a person can do in a structured environment is not indicative of how the individual will perform in the open community."); *see also* Tassé Decl. ¶ 28 (noting prison life and prison expectations for adaptive functioning cannot be substituted for society's expectations in determining the individual's functioning in the general community).

-9-

review, the Government relies on this trial evidence that is called into direct question by the new social security records. (Gov't Mem. 23-24.) The fact that Mr. Webster now has possession of a letter from his school stating that his special education records were destroyed is highly probative of whether Mr. Webster was qualified for special ed, whether he was placed in special ed, and, importantly, whether he lied about being in special ed.

The new evidence obtained from the SSA is, without a doubt, important. It is important because it directly undercuts the Government's central arguments at trial as to why Mr. Webster was not mentally retarded. And it is important because the jury was, despite the government's arguments at trial, already closely divided on the issue of Mr. Webster's mental retardation. Four members of Mr. Webster's jury were already persuaded by the evidence that Mr. Webster "is or may be mentally retarded." The new evidence squarely contradicts the evidence relied upon by the Government in arguing against a finding of mental retardation and provides significant corroboration for the evidence of mental retardation presented by Mr. Webster's attorneys during his trial. Had this evidence been made available during Mr. Webster's trial, there is a substantial likelihood that Mr. Webster would have been deemed mentally retarded and categorically ineligible for the death penalty.

## II. SECTION 2241 IS THE APPROPRIATE MECHANISM TO CHALLENGE MR. WEBSTER'S DETENTION

The writ of habeas corpus guaranteed by 28 U.S.C. § 2241 exists to untie judicial hands, and allow courts to correct fundamental injustices when they arise and cannot be otherwise remedied. As the new evidence described above shows, Mr. Webster is mentally retarded. And absent relief under § 2241, he will be executed in contravention of the Eighth Amendment. As such, § 2241 is the appropriate mechanism—and the *only* mechanism— by which Mr. Webster may challenge his detention.

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 182 of 341
Case 2:12-cv-00086-WTL-WGH Document 23 Filed 10/12/12 Page 11 of 21 PageID 659
PageID #: 1826

### A.    THE SEVENTH CIRCUIT'S LIMITATIONS ON CERTAIN NON-CAPITAL § 2241 ACTIONS DO NOT APPLY HERE

In certain rare cases where, because of the strict limitations of AEDPA, relief from an unconstitutional sentence is not available under 28 U.S.C. § 2255, a federal prisoner may bring a claim under 28 U.S.C. § 2241 if he can show that § 2255 is inadequate or ineffective to test the legality of his sentence. Successive collateral attacks are permitted under AEDPA only when a prisoner has identified newly discovered evidence that establishes that no reasonable factfinder would have found him guilty of the offense, or where there is a new rule of constitutional law made retroactive by the Supreme Court to cases on collateral review. *See* 28 U.S.C. § 2255(h). Because the Fifth Circuit read the provision to exclude innocence of the death penalty, *see Sawyer v. Whitley*, 505 U.S. 333, 341-45 (1992), it refused to review the evidence which, in Judge Weiner's words, "virtually guarantees" that Mr. Webster would be found mentally retarded and thus ineligible for the death penalty. *In re Webster*, 605 F.3d 256, 259 (5th Cir. 2010) (Wiener, J., concurring). In this rare case of a federal capital prisoner who has obtained pre-crime evidence proving that he is categorically ineligible for the death penalty, review under § 2241 is the last resort.

The Government argues that the Seventh Circuit has limited § 2241 to situations in which a prisoner establishes that a change in statutory law has both negated his sentence and renders the prisoner innocent of the underlying offense. That is not accurate.

-11-

First, those limitations have never been imposed by the Seventh Circuit in a capital case.[4]

Second, and importantly, in the one *capital* case in which the Seventh Circuit addressed the availability of § 2241 review, it did not require either a subsequent change in law making defendant's conduct legal or proof that the prisoner was innocent of the underlying criminal offense to find that review was warranted. *See Garza v. Lappin*, 253 F.3d 918, 922-23 (7th Cir. 2001) (granting review under § 2241 when the basis petitioner's argument— a "cognizable treaty obligation not to execute [him]"—did not arise until after his direct appeal or his first § 2255 motion, and therefore it was "literally impossible for him to have raised" except under § 2241).

There is no indication that the Seventh Circuit would so dramatically limit § 2241 to make it inapplicable to the circumstances presented here. Indeed, taken to its logical extreme, the Government's argument, if adopted, would mean that Mr. Webster could present 50 separate, recently-discovered and previously-withheld IQ tests conducted prior to the crime, each accompanied by an evaluation of his various adaptive deficits and an unequivocal diagnosis of mental retardation, and he would still be unable to obtain judicial review of his categorical

---

[4]     *See Unthank v. Jett*, 549 F.3d 534, 534-35 (7th Cir. 2008) (reviewing denial of prisoner's § 2241 petition, which raised the issue whether the sentencing court must recalculate his criminal history score after a prior conviction was vacated); *Taylor v. Gilkey*, 314 F.3d 832, 834 (7th Cir. 2002) (reviewing denial of prisoner's § 2241 petition, which raised the issue whether an error in interpreting the sentencing guidelines in a drug and firearms case deprived the court of jurisdiction); *United States v. Prevatte*, 300 F.3d 792, 794-96 (7th Cir. 2002) (reviewing dismissal of prisoner's § 2241 petition, which raised the issue whether the government had proven a nexus to interstate commerce at petitioner's malicious damage-to-property trial); *In re Davenport*, 147 F.3d 605, 607, 609 (7th Cir. 1998) (addressing jointly the § 2241 petitions of two prisoners convicted of federal firearm offenses, each of whom argued that they were convicted for a "status" not criminalized by statute); *Cooper v. United States*, 199 F.3d 898, 901 (7th Cir. 1999) (declining to address the merits of petitioner's § 2241 petition because his claims that DNA evidence would prove hair in a bag of cocaine was not his own did not change the fact that the hair was not newly discovered nor that he had been convicted despite its unknown origin); *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997) (holding that petitioner's successive § 2255 petition could not be filed based on newly discovered evidence when the evidence would only show petitioner was not an armed career criminal).

-12-

ineligibility for the death penalty. Similarly, an individual who was sentenced to death for a crime committed when he was ostensibly 18 years old could not obtain review of his sentence even after uncovering uncontroverted birth records showing that he was actually 17 when the crime was committed. The Fifth Circuit has held that § 2255 is completely unavailable to address any newly discovered evidence, no matter how conclusive, proving that an individual is categorically ineligible for the death penalty. The Government's position that § 2241 is similarly unavailable creates a constitutional black hole; there is no other mechanism to consider such evidence, yet it is unconstitutional to execute the mentally retarded or those who committed their crimes as minors. This is exactly the type of "glitch" that the § 2241 safety valve was designed to remedy.

### B. SECTION 2255 IS INADEQUATE OR INEFFECTIVE TO RELIEVE MR. WEBSTER OF HIS UNCONSTITUTIONAL SENTENCE

Mr. Webster has shown that § 2255 is inadequate and relief is therefore warranted under § 2241: Mr. Webster is a mentally retarded person in federal prison under a sentence of death, who has uncovered previously unavailable evidence that reveals a "fundamental defect" undermining the constitutionality of his sentence. Section 2255 is "inadequate" and "ineffective" to test the legality of Mr. Webster's detention. *See In re Webster*, 605 F.3d at 257-58. Because allowing his execution to proceed without a court having considered this argument—"the merits of which have never been considered by any judge or jury"—would be in contravention of the Eighth Amendment and the ultimate miscarriage of justice, *id*. at 259 (Wiener, J., concurring), relief is warranted under § 2241. While § 2241 does not require that Mr.

-13-

Webster prove that the evidence is newly discovered or that he is actually innocent,[5] he has

established both.

        1.     <u>The Evidence Mr. Webster Seeks to Present Here is New</u>

The Government accuses Mr. Webster of failing to be diligent in obtaining his Social

Security records, which include the evidence of his adaptive deficits and low IQ, before trial and

before filing his first habeas petition. The Government provides no support whatever for its

contention that lack of diligence is a basis for denying § 2241 review. But even if a showing of

reasonable diligence were required, that standard is clearly met here with unrebutted evidence.

Like virtually all of the Government's contentions about the SSA records, its diligence argument

lacks any basis.

First, it is undisputed that Mr. Webster's trial counsel requested any records in the

possession of the SSA. It is also undisputed that those records were never received, and that the

SSA never gave any reason for failing to produce the records. (*See* Gov't Mem. 11, 21-24.) If

Mr. Webster had received the Social Security records when they were first requested, the records

would have been discovered earlier and would have been offered at trial. Moreover, Mr.

Webster requested, in connection with his § 2255 petition, that the court require the Government

to produce "any reports prepared by a mental health professional in the Government's possession

. . . on the issue of petitioner's mental retardation." (*See* Motion for Leave to Conduct Discovery

10, ¶ 8 (April 30, 2001) (Wells Decl. Ex. X).) The Government vigorously opposed that request

and the Court refused to allow any discovery into issues of Mr. Webster's mental retardation.

---

[5]     Section 2241 does not impose the rigid requirements of § 2255. Even if the evidence weren't "newly discovered" under the successive petition requirements of § 2255(h), it would still be appropriate for this court to evaluate it because it reveals a fundamental defect in Mr. Webster's capital sentence. *Compare* 28 U.S.C. § 2255(h)(1) (requiring "newly discovered evidence" before a petitioner may file a successive § 2255 petition) *with* 28 U.S.C. § 2241 (containing no similar requirement or language).

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 186 of 341
Case 2:12-cv-00086-WTL-WGH   Document 23   Filed 10/12/12   Page 15 of 21   PageID 663
PageID #: 1830

(*See* Gov't Resp. in Opp. to Pet'rs Mot. for Leave to Conduct Disc. and Brief In Supp. Thereof and Order Den. Pet'rs Mot. for Disc., *Webster v. United States*, Case No. 4:00-CV-1646-Y (June 18, 2002).) Having successfully opposed Mr. Webster's request for discovery, the Government cannot now be heard to complain that Mr. Webster should have discovered more.

Mr. Webster does not know, of course, whether the prosecution's failure to locate and produce the records was a "deliberate or malicious action," (Gov't Mem. 11, n.8), and therefore makes no such allegation here; but the fact remains that, despite his prior requests, Mr. Webster has only now gained access to vital records that were in the control of a federal agency.

Further, there is considerable evidence that the SSA has not, in response to the requests of undersigned habeas counsel, been forthcoming in producing Mr. Webster's records – evidence which corroborates the fact that the SSA failed to produce the records earlier when requested by trial counsel. The SSA required Mr. Webster to submit three separate consent forms over the course of nearly one year, and after transmitting what appears on its face to be only partially complete records, the SSA denied Mr. Webster's request for the apparently omitted records and stated that his folder had been "destroyed." (*See* Supplemental Declaration of Kristen K. LeRoux ("LeRoux Supp. Dec.").)

Finally, the Government cannot have it both ways. If, as the Government claims, Mr. Webster's 2255 counsel should have done something more (in the face of staunch opposition from the Government) to obtain the SSA records, Mr. Webster has a claim under *Martinez v. Ryan* for ineffective assistance from his 2255 counsel. In *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the Supreme Court recently held that the right to effective counsel attaches at collateral review proceedings that "provide the first occasion to raise a claim." *Id.* at 1315, 1317. The Court in *Martinez* sought to answer the question whether the petitioner was entitled to effective

-15-

assistance of counsel at his initial-review collateral review proceeding. The Court answered this question in the affirmative, relying in part on the principle that it was inequitable that "no court will review the petitioner's claims," to justify its departure from a previously announced rule. Thus, if this Court denies Mr. Webster the opportunity for review based on his counsel's failure to discover the records sooner, Mr. Webster's 2255 counsel's actions are actionable now as ineffective.

In sum, the Government does not assert or provide any evidence that the SSA records were available to Mr. Webster at trial. There is no dispute that trial counsel requested the records and there is no evidence that they were previously produced. Finally, the SSA's recent actions strongly suggest that it still has not been forthcoming with respect to Mr. Webster's records. No court has ever seen or evaluated this significant evidence that the SSA recently saw fit to produce.

2.  Mr. Webster is Categorically Ineligible for—and Thus Actually Innocent of—the Death Penalty

Mr. Webster has shown that he is "actually innocent" of the capital offense for which he was convicted. As the Supreme Court recognized in *Sawyer v. Whitley*, 505 U.S. 333 (1992), the concept of "actual innocence" under the Constitution includes innocence of the death penalty; thus, a prisoner who is subject to a categorical exclusion such as mental retardation or juvenile status is "actually innocent" for purposes of 28 U.S.C. § 2241.

The Government argues that, under *Hope v. United States*, 108 F. 3d 119 (7th Cir. 1997), the pre-AEDPA concept of "actual innocence" did not survive the amendment of § 2255. But that non-capital case does not address the continuing applicability of *Sawyer* to categorical exclusions from the death penalty, and is not relevant here.

-16-

Rather, "[t]he normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986). Moreover, the Supreme Court has recognized that AEDPA does not "undermin[e] basic habeas principles" and seeks "to harmonize the new statute with prior law." *Holland v. Florida,* 130 S. Ct. 2546, 2562 (2010); *see also Slack v. McDaniel*, 529 U.S. 473, 483 (2000) ("AEDPA's present provisions . . . incorporate earlier habeas principles."). It is clear that, prior to AEDPA's enactment, "actual innocence" included "innocence of the death penalty." Because Congress, in enacting AEDPA, left § 2244 untouched, *Sawyer's* holding that "actual innocence" includes "innocence of the death penalty" remains in full force in an action brought under § 2241. Mr. Webster is "actually innocent" under *Sawyer*, and he is therefore "actually innocent" in this § 2244 action.

## C.   DENYING REVIEW UNDER SECTION 2255 WOULD RESULT IN THE UNCONSTITUTIONAL SUSPENSION OF THE WRIT

If relief under § 2241 is foreclosed, as the Government argues, a prisoner under sentence of death has no judicial means of challenging his death sentence where newly discovered evidence demonstrates that he is constitutionally ineligible for the death penalty. This result is, in the words of Judge Weiner, "Kafkaesque." It is also unconstitutional.

The "writ of habeas corpus plays a vital role in protecting constitutional rights." *Holland v. Florida*, 130 S. Ct. 2549, 2562 (2010) (quoting *Slack v. McDaniel*, 529 U.S. at 483). As discussed in the Petition, "[t]he essential function [of habeas corpus] is to give a prisoner a reasonable opportunity to obtain a *reliable* judicial determination of the fundamental legality of his conviction *and sentence*." *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998) (emphasis added). The Savings Clause is, in short, a failsafe mechanism to prevent injustice. There can be

-17-

no question that to execute a prisoner who is *constitutionally ineligible* for the death penalty, and whose execution therefore violates the Eighth Amendment, would be a profound injustice and precisely the sort of fundamental defect the writ of habeas corpus is intended to remedy. Indeed, as the Supreme Court has recognized, a sentence of death is a punishment in a category of its own: "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Where, as here, § 2255 is not available, failure to consider the newly available evidence of Mr. Webster's categorical ineligibility for the death penalty would result in an unconstitutional suspension of the writ of habeas corpus. *See Holland*, 130 S. Ct. at 2562 (in deciding whether AEDPA's statutory limitations period could be equitably tolled, noting that the Great Writ is "the only writ explicitly protected by the Constitution [which] counsels hesitancy before interpreting AEDPA . . . as indicating a congressional intent to close courthouse doors"); *Triestman v. United States*, 124 F.3d 361, 371 (2d Cir. 1997) (noting the constitutional implications of cutting off all post-conviction relief for a claim of actual innocence that was based on the existing record and that could not have been brought previously). The Government itself recognized this when it suggested to the Supreme Court, in opposing Mr. Webster's request for a successive § 2255 petition, that § 2241 may be available as a further avenue of review to Mr. Webster. (*See* Gov't Brief in Opp'n to Pet. for Writ of Certiorari, 17, *Webster v. United States*, Case No. 10-150 (Oct. 2010).)

<p style="text-align:center">*          *          *</p>

<p style="text-align:center">-18-</p>

There is a very narrow category of individuals who are simply ineligible for a sentence of death,[6] and Mr. Webster is one of them. The purpose of habeas corpus is to ensure the fundamental legality of the convictions *and sentences* of prisoners; there is no more fundamental defect than executing a prisoner in contravention of the Constitution of the United States. Mr. Webster is not merely seeking a second "bite at the apple" nor is he arguing that he is entitled to the remedy provided by 28 U.S.C. § 2241 "simply because he cannot meet the requirements for filing a successive section 2255 motion." (Gov't Mem. 6, 12). No fact finder has ever reviewed the newly discovered evidence that Mr. Webster seeks to present. Yet, as Judge Wiener noted, "[i]f the evidence that Webster attempts to introduce here were ever presented to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded." *In re Webster*, 605 F.3d at 259 (Wiener, J., concurring).

Instead, Mr. Webster falls into a discrete subset of petitioners who qualify for the remedy provided under § 2241 because a Circuit Court, in this case the Fifth Circuit, ruled that § 2255 does not allow a federal prisoner to bring a successive claim that he is categorically ineligible for the death penalty based on newly discovered evidence "where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, i.e., capital murder." *Id.* at 257. The Fifth Circuit held that Mr. Webster cannot meet the strict requirements of § 2255(h). However, the newly discovered evidence Mr. Webster seeks to present to this Court implicates "a fundamental defect" that undermines the constitutionality of his sentence. *See Davenport*, 147 F.3d at 611. As such, Mr. Webster's petition falls squarely into a class of cases that 28 U.S.C. § 2241 seeks to protect. Although the Fifth Circuit determined that

---

[6]     The Supreme Court has held that there are two categories of individuals excluded eligibility for the death penalty—those who suffer from mental retardation, *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), and those who were under the age of eighteen when they allegedly committed a capital offense, *Roper v. Simmons*, 543 U.S. 551, 578 (2005).

§ 2255(h) "illogically" "tie[d]" its "judicial hands" forcing it to "condone . . . an unconstitutional punishment," *In re Webster*, 605 F.3d at 260 (Weiner, J., concurring), § 2255(e) and § 2241 empower this Court to consider the newly available evidence presented here, which taken together with the evidence presented at trial, proves that Mr. Webster is mentally retarded and, therefore, "actually innocent" of the death penalty and constitutionally ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). Indeed, as the Government has noted, "[t]he essential function [of habeas corpus] is to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." (Gov't Mem. 8 (quoting *In re Davenport*, 147 F.3d at 609).)

## CONCLUSION

THEREFORE, for the reasons stated in the petition and in this reply, Mr. Webster respectfully requests that this Court: (1) grant Mr. Webster's request for an evidentiary hearing; and, (2) grant Mr. Webster's request for an order for leave to conduct additional discovery in support of his petition.

DORSEY & WHITNEY LLP

Dated: October 12, 2012

By  s/Kirsten E. Schubert
     Steven J. Wells
     Kirsten E. Schubert
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile: (952) 516-5526

Eric K. Koselke, # 5593-54
6202 N. College Avenue
Indianapolis, IN 46220
Telephone:  (317) 722-2591
Facsimile:  (317) 257-5300

-20-

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2012, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Date: October 12, 2012                                    s/Kirsten E. Schubert                                    p
                                                          Kirsten E. Schubert
                                                          DORSEY & WHITNEY LLP
                                                          Suite 1500, 50 South Sixth Street
                                                          Minneapolis, MN 55402-1498
                                                          Telephone:  (612) 340-2600
                                                          Facsimile:  (612) 340-2868

-21-

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 193 of 341
Case 2:12-cv-00086-WTL-WGH Document 24 Filed 10/12/12 Page 1 of 2 PageID 670
PageID #: 1837

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

|  |  |  |
|---|---|---|
| BRUCE CARNEIL WEBSTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Cause No. 2:12-CR-0086 WTL-WGH |
| | ) | Judge William Lawrence |
| CHARLES L. LOCKETT, WARDEN, | ) | |
| UNITED STATES PENITENTIARY, | ) | |
| TERRE HAUTE (USP), | ) | |
| | ) | |
| Respondent . | ) | |

**AFFIDAVIT OF KIRSTEN E. SCHUBERT IN SUPPORT OF PETITIONER'S
REPLY TO RESPONDENT'S RETURN TO ORDER TO SHOW CAUSE**

STATE OF MINNESOTA )
) ss.
COUNTY OF HENNEPIN )

KIRSTEN E. SCHUBERT, being first duly sworn, deposes and states as follows:

1.   I am an attorney at the law firm of Dorsey & Whitney LLP, attorneys for

Petitioner Bruce Carneil Webster.  I submit this Affidavit in support of Petitioner's Reply to

Respondent's Return to Order to Show Cause.

2.   Attached hereto as Exhibit A is a true and correct copy of a letter from Ronald L.

Rodgers, United States Department of Justice Pardon Attorney, to Philip Wischkaemper, Esq.,

that was maintained in Bruce Webster's legal file.

Dated:   October 12, 2012                       s/Kirsten E. Schubert
                                                 Kirsten E. Schubert


Subscribed and sworn to before me
this 12th day of  October   , 2012.


 s/Dianna L. Breymeier
            Notary Public

193

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2012, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Date: October 12, 2012              s/Kirsten E. Schubert
                                    Kirsten E. Schubert
                                    DORSEY & WHITNEY LLP
                                    Suite 1500, 50 South Sixth Street
                                    Minneapolis, MN 55402-1498
                                    Telephone:  (612) 340-2600
                                    Facsimile:  (612) 340-2868

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 195 of 341
Case 2:12-cv-00086-WTL-WGH Document 24-1 Filed 10/12/12 Page 1 of 1 PageID 672
PageID #: 1839



**U.S. Department of Justice**

Pardon Attorney

*Washington, D.C. 20530*

**JUN 2 4 2008**

Philip Wischkaemper, Esquire
915 Texas Avenue
Lubbock, Texas 79401

Dear Mr. Wischkaemper:

　　This acknowledges receipt of your letter postmarked June 16, 2008, providing notice of your intent to withdraw the petition for commutation of sentence filed on behalf of Bruce Carniel Webster on January 4, 2007. Mr. Webster's case file has been closed without action by the President.

Sincerely,

Ronald L. Rodgers
Pardon Attorney

EXHIBIT A

195

Case 2:12-cv-00086-JPH-MJD    Document 42-1    Filed 07/08/14    Page 196 of 341
Case 2:12-cv-00086-WTL-WGH    Document 25    Filed 10/12/12    Page 1 of 96    PageID #: 673
PageID #: 1840

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
--------------------------------------------------------
BRUCE CARNEIL WEBSTER,

                        :

        Petitioner,

                        :        CAUSE NO: 2:12-CV-0086-WTL-WGH

        vs.

                        :

CHARLES L. LOCKETT, WARDEN,
UNITED STATES PENITENTIARY,  :
TERRE HAUTE (USP),

                        :

        Respondent.
--------------------------------------------------------

### SUPPLEMENTAL DECLARATION OF KRISTEN K. LEROUX IN SUPPORT OF PETITIONER'S REPLY TO RESPONDENT'S RETURN TO ORDER TO SHOW CAUSE

I, **Kristen K. LeRoux,** declare as follows:

1.     I am a former employee of Dorsey & Whitney LLP ("Dorsey"). I worked at Dorsey for nineteen (19) years from 1993 to 2012. From 1993 to 1996, I worked in an administrative department. From 1996 to 2006, I worked as a paralegal. From 2006 to 2012, I served as a paralegal manager and worked as a paralegal on the Bruce Webster case team.

2.     During the course of my work as a paralegal on the Bruce Webster case team, I reviewed Bruce Webster's trial and appellate case file sent by Mr. Webster's appellate attorneys to Dorsey. The records in Mr. Webster's case file, specifically a facsimile transmission to the Social Security Administration ("SSA") dated March 4, 1996, indicate that Mr. Webster's trial counsel requested his SSA records over sixteen

196

(16) years ago.  A true and correct copy of the 1996 facsimile transmission to the SSA office is attached hereto as Exhibit A.  The case file does not show that any records were produced nor does it show that any response or follow-up correspondence was ever received.

3.	In late October 2008, Dorsey attorneys asked me and my colleagues to collect SSA records for Bruce Webster.

4.	On October 27, 2008, Dorsey sent a letter to the SSA at 3511 Market Street, Pine Bluff, Arkansas 71601, requesting the release of all records pertaining to Bruce Webster.  Dorsey enclosed an "Authorization For Release of Confidential Information and Records" signed by Mr. Webster with this request.  True and correct copies of this request and the signed authorization form are attached hereto as Exhibit B.

5.	On December 4, 2008, one of my colleagues followed up with the SSA regarding Dorsey's written request by calling Logan Hamilton, Assistant District Manager of the Social Security Administration at Pine Bluff, who stated that a completed and signed Social Security Administration Form 3288 Consent for Release of Information would be necessary to release a copy of the requested records.  Accordingly, Dorsey obtained Bruce Webster's signature on a Form 3288 Consent for Release of Information and sent the signed consent form to the SSA on December 15, 2008.  True and correct copies of request for records and the enclosed consent form are attached hereto as Exhibit C.

6.	Dorsey received certain SSA records for Bruce Webster on February 9, 2009.

Case 2:12-cv-00086-JPH-MJD   Document 25-1   Filed 07/08/14   Page 198 of 341
Case 2:12-cv-00086-WTL-WGH   Document 25   Filed 10/12/12   Page 3 of 96   PageID #: 675
PageID #: 1842

7.      Upon examining the SSA records provided for Bruce Webster, Dorsey determined that certain documents, including certain records enumerated in a "List of Exhibits," were missing from the records and that the file appeared to be incomplete.

8.      On October 8, 2009, Dorsey sent a request for additional records to the Pine Bluff, Arkansas, SSA office, along with copies of the December 15, 2008 letter requesting, and Mr. Webster's Consent for Release of Information dated December 12, 2008.  A true and correct copy of this correspondence is attached hereto as Exhibit D. Specifically, Dorsey requested the documents that were listed on the "List of Exhibits" of Mr. Webster's Social Security records but which were not received on February 9, 2009.

9.      On October 15, 2009, I had a telephone conversation with a representative from the Pine Bluff, Arkansas, SSA office and was informed that normal procedures were not followed when the records received in February of 2009 were sent and that the person who copied and sent them had retired.  The representative from the Pine Bluff SSA office stated that the SSA could not provide any more records in response to the request that was submitted.  Reiterating that normal procedures were not followed when the records were sent in February 2009, the representative said that Mr. Webster should have been charged for the copies and that the request should have been sent to the SSA office in the state where Mr. Webster resides, regardless of his incarceration.  The SSA representative explained that the person who had copied and sent Dorsey the records on February 9, 2009 had since retired, and the SSA representative noted that the SSA normally will not honor any request for "any and all" records.

3

10.     On October 22, 2009, the Pine Bluff, Arkansas, SSA office sent a letter to Dorsey denying the request for additional records, citing the following reasons:  (1) it was a "blanket request;"(2) the claimant was not living in the service area; and, (3) the consent was outdated.  A true and correct copy of this correspondence is attached hereto as Exhibit E.

11.     On November 23, 2009, Dorsey sent a request for additional records to the Terre Haute, Indiana, SSA office requesting those records that appeared to be missing from Mr. Webster's SSA file, including documents enumerated on the "List of Exhibits" of Bruce Webster's SSA records but which were not received on February 9, 2009. Dorsey also enclosed a newly-signed Consent for Release of Information, dated November 17, 2009.  True and correct copies of this correspondence  are attached hereto as Exhibit F.

12.     On December 4, 2009, I telephoned the Terre Haute, Indiana, SSA office and spoke to the representative assigned to Mr. Webster's request.    The representative informed me that they had mailed a formal written response to our request stating that there were no other records in Bruce Webster's file.  The representative also told me that the records that Dorsey specifically requested had been destroyed.  When I asked the representative whether the SSA kept any list of other people who had requested Bruce Webster's file, like a chain of custody, he explained that while the Social Security Administration had begun to track records requests electronically, any previous request for Mr. Webster's records would have predated that practice.

4

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 200 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-2 Filed 10/12/12 Page 5 of 96 PageID 677
PageID #: 1844

13. On December 7, 2009, Dorsey received a letter from the Terre Haute, Indiana, SSA office stating Mr. Webster's folder had been destroyed. A true and correct copy of this letter is attached as Exhibit G.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

<div style="text-align:right">
s/Kristen K. LeRoux
</div>

Dated: October 10, 2012                Kristen K. LeRoux

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 201 of 341
Case 2:12-cv-00086-WTL-WGH Document 25 Filed 10/12/12 Page 6 of 6 PageID 678
PageID #: 1845

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2012, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to the following parties by operation of

the Court's electronic filing system.  Parties may access this filing through the Court's

system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com


Dated:  October 12, 2012


<div style="text-align:right">

s/Kirsten E. Schubert
Kirsten E. Schubert
DORSEY & WHITNEY LLP
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

</div>

6

# LeRoux Declaration Ex. A

03/04/1996  23:50    8173353500              LARRY MOORE ATTORNEY              PAGE  01

LAW OFFICE OF

# LARRY M. MOORE
1112-A EAST FIRST STREET
FORT WORTH, TEXAS 76102

BOARD CERTIFIED-CRIMINAL LAW                          OFFICE:  (817) 338-4800
TEXAS BOARD OF LEGAL SPECIALIZATION                   FAX NO: (817) 335-3500

<div style="border:1px solid black">

# FAX TRANSMITTAL SHEET



DATE: 3-5-96          FAX NO. (501) 535-5381

TO: Mr. Hal West, SS Admin. Office

FROM: Kim Whitehead, Paralegal

RE: Bruce Webster

PAGES (INCLUDING COVER SHEET): 4

comments: _____

THE INFORMATION CONTAINED IN AND TRANSMITTED IN THIS FACSIMILE IS ATTORNEY/CLIENT PRIVILEGE AND IT IS INTENDED FOR THE INDIVIDUAL OR ENTITY DESIGNATED ABOVE. YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, COPYING OR USE OF OR RELIANCE UPON THE INFORMATION CONTAINED IN AND TRANSMITTED WITH THIS FACSIMILE BY OR TO ANYONE OTHER THAN THE RECIPIENT DESIGNATED IS UNAUTHORIZED AND STRICTLY PROHIBITED. IF YOU RECEIVE THIS FACSIMILE IN ERROR, PLEASE NOTIFY LARRY M. MOORE BY TELEPHONE (817) 338-4800 IMMEDIATELY. ANY FACSIMILE ERRONEOUSLY TRANSMITTED TO YOU SHOULD BE IMMEDIATELY RETURNED TO THE SENDER BY US MAIL, OR IF AUTHORIZATION IS GRANTED BY THE SENDER, DESTROYED.

PAGE ONE

</div>

**EXHIBIT A**

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 204 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-12 Filed 10/12/12 Page 3 of 5 PageID 681
PageID #: 1848

03/04/1996  23:50    8173353500              LARRY MOORE ATTORNEY              PAGE  02

LAW OFFICE OF

# LARRY M. MOORE

1112-A EAST FIRST STREET
FORT WORTH, TEXAS 76102

BOARD CERTIFIED · CRIMINAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
STATE BAR OF TEXAS

February 29, 1996

TELEPHONE
(817) 338-4800
FAX (817) 335-3500

Mr. Hal West
Social Security Administration Office
Pine Bluff District Office

RE:  BRUCE WEBSTER
     DOB      -73
     SS#      -9579     **REDACTED**

Dear Mr. West:

Thank you for visiting with me regarding the above Defendant. As you requested I have enclosed a copy of a Business Records Authorization and Release and a Business Records Affidavit.  It is my understanding that Mr. Webster applied for disability in 1992 and some testing was done. He did not receive any disability payments.   For purposes of trial, we will need to obtain any information relating to his disability claim.

Mr. J.W. Strickland, of L. Michael Connelley and Associates, will be in Pine Bluff  on March 1st through 5th, 1996.   He will have in his possession the original authorization signed by Mr. Webster for your files.   The Business Records Affidavit will need to be filed out when Mr. Strickland picks up the records. This Affidavit will keep someone from your office from having to come to Fort Worth to testify that these records are true and correct copies of the records in your files.

Please contact me if you have any questions, or if you require anything further in this regard.

Sincerely,

KIMBERLY J. WHITEHEAD,
Legal Assistant to Larry M. Moore

kw/
Faxed
Enclosures

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 205 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-12 Filed 10/12/12 Page 4 of 5 PageID-682
PageID #: 1849

03/04/1996  23:50    8173353500              LARRY MOORE ATTORNEY                    PAGE  03

## BUSINESS RECORDS AUTHORIZATION & RELEASE

TO:   Mr. Hal West                                      DATE: _8/3/96_
      U.S. Social Security Administration
      Pine Bluff District Office

**REDACTED**

I, BRUCE C. WEBSTER, (SSN:    -9579,  DOB   -73 B/M) hereby request
and authorize you to furnish to LARRY M. MOORE, Attorney at Law, or any representative
thereof, any and all information and records that you may have in your possession
concerning BRUCE C. WEBSTER, with respect to any applications for benefits made for, or
on behalf, of BRUCE C. WEBSTER; any testing or examinations of any kind or character
done in connection with such applications for benefits; any review eligibility for benefits that
may have been done; any benefits approved or disapproved in regard to such applications;
and any and all other records of any kind and character that may have been obtained in
connection with any application for benefits made by, or on behalf of, this individual; or any
other records in your possession pertaining to this individual.  I further hereby authorize and
request that you discuss any and all such matters with LARRY M. MOORE, my attorney, or
any of his representatives.

A photostat copy of this authorization shall be considered as effective and valid as the
original.

_____
Bruce C. Webster, Affiant

_____
Address

_____
Witness

205

03/04/1996  23:50    8173353500                    LARRY MOORE ATTORNEY                    PAGE  04

NO._____

STATE OF TEXAS                              *

    v.                                     *

BRUCE C. WEBSTER                             *

## BUSINESS RECORDS AFFIDAVIT

Before me, the undersigned authority, on this day personally appeared
_____, who, being by me duly sown, deposed and said as follows:

My name is _____; I am of sound mind, capable of
making this affidavit, and personally acquainted with the facts herein stated:

I am currently employed in the position of _____ for the U.S. Social
Security administration Office in Pine Bluff, Ark.  Among my duties in regard to my
employment, I am the custodian of the records for the U.S. Social Security Administration
Office In Pine Bluff, Ark.  Attached to this affidavit are _____ pages of records from U.S.
Social security Administration Office in Pine Bluff, Ark.  These records are kept by the U.S.
Social Security Administration Office in Pine Bluff, Ark. In the regular course of business; and
it was the regular course of business of the U.S. Social Security administration Office in Pine
Bluff, Ark., for an employee or representative of the U.S .Social Security administration Office
in Pine Bluff, Ark., with knowledge of the act, event, condition, opinion or diagnosis recorded,
to make the record or to transmit information thereof to be included in such record; and the
record was made at or near the time or reasonably soon thereafter.  The attached records
hereto are the original records or exact duplicates of the original records as they appear in
the files of the U.S. Social Security Administration Office in Pine Bluff, Ark.  .

_____
Affiant

SWORN and SUBSCRIBED TO BEFORE ME, on this the _____ day of March, 1996.

_____
Notary Public, State of Arkansas
Notary's Printed Name: _____

# LeRoux Declaration Ex. B

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 208 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-2 Filed 10/12/12 Page 2 of 3 PageID 685
PageID #: 1852



KATHERINE E. SLAIKEU
Paralegal
(612) 492-6615
FAX (612) 340-2868
slaikeu.katherine@dorsey.com

October 27, 2008

Social Security Administration
3511 Market Street
Pine Bluff, AR 71601

      Re:    Bruce Webster
            DOB    1973
            SSN:    9579    **REDACTED**

Dear Records Administrator:

      Dorsey & Whitney LLP is representing Bruce Webster in a criminal proceeding. I am writing to request any and all records pertaining to Mr. Webster. I have enclosed a release from Mr. Webster authorizing the disclosure of such documents to us.

      Mr. Webster is currently on death row and faces an execution date. Any efforts your office could make to expedite the return of these records would be greatly appreciated. All costs incurred will be paid promptly upon billing or notice of billing.

      Thank you very much for your time and attention. Please feel free to contact me at the number and email address listed above if you have any questions.

                      Sincerely,

                      Katherine E. Slaikeu

KES:kjs
Enclosure

cc:    Gretchen Agee, Esq.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • **T** 612.340.2600 • **F** 612.340.2868
SUITE 1500 • 50 SOUTH SIXTH STREET • MINNEAPOLIS, MINNESOTA 55402-1498
USA CANADA EUROPE ASIA

4827-0056-8579\1

**EXHIBIT B**

208

## AUTHORIZATION FOR RELEASE OF
## CONFIDENTIAL INFORMATION AND RECORDS

To: Social Security Administration, 3511 Market Street, Pine Bluff, AR 71601

Date: 10/27/08

I, __BRUCE CARNEIL WEBSTER__, by this release or a copy
and/or facsimile thereof, authorize and request you to release to:

Steven J. Wells, Esq.
Dorsey & Whitney LLP.
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
(Phone) 612-340-7809
(Fax)    612-340-2807

or his designated agent(s), any and all information and/or records relating to me and/or my deceased family members, including (but not limited to) birth, death and marriage, law enforcement, jail and prison (including classification and custody, psychological/medical, disciplinary, parole and probation, counseling, correspondence, etc.), academic, adoption, social service, juvenile, employment including Social Security Administration, judicial, psychological, psychiatric, medical, including nurse notes, physician notes, progress reports, ward notes, films, reports, charts, HIV status and information, invoices for services, discharge summaries and emergency room records, raw data, test scores and notes, drug treatment, drug and alcohol rehabilitation programs, employment, child custody and marriage records, files prepared in connection with prior civil or criminal litigation, as well as any other records whatsoever, including those normally deemed confidential. I specifically request that you release all records pertaining to _____ _____. You are specifically authorized to photocopy and certify these records and to release copies to the above mentioned investigators and attorney.

In consideration of this disclosure of otherwise confidential information, I hereby release you (in your individual and/or institutional capacity) from any and all liability arising from such disclosure to these designated parties.

These records and this information will be used as background social history information in pending court proceedings. It will not be re-disclosed. I understand that at any time, I have the right to revoke this authorization in writing. I have received a copy of this signed authorization for my records. I have been informed that the disclosure of this information will not result in the direct or indirect remuneration of any health care provider.    This authorization expires on __NEVER__.

Signed: _Bruce Webster_

Date of Birth: _____, 1973 _____

Social Security No. _____ 9579 _____

**REDACTED**

209

# LeRoux Declaration Ex. C

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 211 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-3 Filed 10/12/12 Page 2 of 4 PageID 688
PageID #: 1855



**DORSEY**

DORSEY & WHITNEY LLP

GRETCHEN A. AGEE
(612) 492-6741
FAX (612) 395-5460
AGEE.GRETCHEN@DORSEY.COM

December 15, 2008

Social Security Administration
3511 Market Street
Pine Bluff, AR 71601

    Re:    Bruce Webster
          DOB:     73
          SS#:      9579   **REDACTED**

Dear Records Administrator:

    I am writing to request any and all records pertaining to Bruce Webster. I have enclosed a release from Mr. Webster authorizing the disclosure of such documents to us.

    Mr. Webster is currently on death row and faces an execution date. Any efforts your office could make to expedite the return of these records would be greatly appreciated. All costs incurred will be paid promptly upon billing or notice of billing.

    Thank you very much for your time and attention. Please feel free to contact me at the number and email address listed above if you have any questions.

          Sincerely,

          *Gretchen A. Agee*

          Gretchen A. Agee

GAA:kjs
Enclosure

cc:    Steve Wells, Esq.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • **T** 612.340.2600 • **F** 612.340.2868
SUITE 1500 • 50 SOUTH SIXTH STREET • MINNEAPOLIS, MINNESOTA 55402-1498
USA  CANADA  EUROPE  ASIA

4851-4041-4979\1

**EXHIBIT C**

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 212 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-3 Filed 10/12/12 Page 3 of 4 PageID 689
PageID #: 1856

December 15, 2008
Page 2

bcc:    Kristen LeRoux

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 213 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-32 Filed 10/12/12 Page 4 of 4 PageID 690
PageID #: 1857

12/09/2008 14:28 FAX 6123408800          DORSEY & WHITNEY LLP                      ☒004/004

Form Approved
OMB No. 0960-0566

**Social Security Administration**
**Consent for Release of Information**

## TO: Social Security Administration

**REDACTED**

BRUCE WEBSTER                            73                     -9579
_____                    _____      _____
         Name                        Date of Birth        Social Security Number

I authorize the Social Security Administration to release information or records about me to:

| NAME | ADDRESS |
|------|---------|
| GRETCHEN AGEE | |
| DORSEY & WHITNEY LLP | 50 SOUTH SIXTH STREET #1500 |
| | MINNEAPOLIS, MN 55402 |

I want this information released because:
I need it for a clemency proceeding

(There may be a charge for releasing information.)

Please release the following information:

- XX — Social Security Number
- XX — Identifying information (includes date and place of birth, parents' names)
- XX — Monthly Social Security benefit amount
- XX — Monthly Supplemental Security Income payment amount
- XX — Information about benefits/payments I received from ANY TIME to _____
- XX — Information about my Medicare claim/coverage from ANY TIME to _____
  (specify) _____
- xx — Medical records
- XX — Record(s) from my file (specify) ANY AND ALL _____

- _____ Other (specify) _____

I am the individual to whom the information/record applies or that person's parent (if a minor) or legal guardian. I know that if I make any representation which I know is false to obtain information from Social Security records, I could be punished by a fine or imprisonment or both.

Signature: _Bruce Webster_
(Show signatures, names, and addresses of two people if signed by mark.)
Date: 12-10-08 _____ Relationship: _____

Form SSA-3288 (5-2007) EF (5-2007)

# LeRoux Declaration Ex. D

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 215 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-4 Filed 10/12/12 Page 2 of 7 PageID 692
PageID #: 1859



**KRISTEN K. LEROUX**
Paralegal and Case Assistant Manager
(612) 340-2790
FAX (612) 340-8800
leroux.kristen@dorsey.com

October 8, 2009

**VIA FACSIMILE**

Lisa Ruth
Social Security Administration
3511 Market Street
Pine Bluff, AR 71601
*Facsimile: 870-535-5381*

    Re:  Bruce Webster
       DOB   73    **REDACTED**
       SS#:    ·9579

Dear Ms. Ruth:

    We are writing to request documents pertaining to Bruce Webster. We requested records on December 15, 2008 (copy attached) and received documents on February 9, 2009 but upon reviewing those documents, we note that we did not receive some of the records referenced in the file:

    The "List of Exhibits" (copy attached) lists the following documents by exhibit number that we did not receive:

    1.    Leads/Protective Filing Worksheet (showing Protective Filing Dale of 9/9/93)
    3.    Application for Supplemental Security Income, filed 10/4/93 (with Protective Filing Date of 9/9/93)
    4.    Disability Determination by State Agency, Title II, dated 2/3/94, with attachment
    5.    Disability Determination by State Agency, Title XVI, dated 2/3/94
    7.    Supplemental Security Income Notice, dated 2/8/94
    9.    Disability Determination by State Agency, Title II, dated 3/29/94, with attachments
    10.   Disability Determination by State Agency, Title XVI, dated 3/29/94, with attachments
    14.   Earnings Record and DEQY, dated 9/13/94

We received exhibit 12, the Social Security Notice of Reconsideration, dated April 5, 1994 but we note that the second to last sentence in the first paragraph states, "Attached to this notice is an explanation of the decision we made on your claim and how we arrived at it," (copy attached). We did not receive this attachment and request it now.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • T 612.340.2600 • F 612.340.2868
SUITE 1500 • 50 SOUTH SIXTH STREET • MINNEAPOLIS, MINNESOTA 55402-1498
USA CANADA EUROPE ASIA-PACIFIC

**EXHIBIT D**

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 216 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-4 Filed 10/12/12 Page 3 of 7 PageID. 693
PageID #: 1860



October 8, 2009
Page 2

   Mr. Webster is currently on death row and faces an execution date. Any efforts your office could make to expedite the return of this record would be greatly appreciated. All costs incurred will be paid promptly upon billing or notice of billing.

   Thank you very much for your time and attention. Please feel free to contact me at the number and email address listed above if you have any questions.

          Sincerely,

          Kristen K. LeRoux

KKL:kjm

cc: Steven Wells, Esq. (w/enc.)

4830-7888-9220\1  10/8/2009 2:44 PM

DORSEY & WHITNEY LLP

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 217 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-4 Filed 10/12/12 Page 4 of 21 PageID 694
PageID #: 1861

12/09/2008 14:28 FAX 612340886     DORSEY & WHITNEY LLP     @004/004

Form Approved
OMB No. 0960-0566

**Social Security Administration**
**Consent for Release of Information**

**TO:  Social Security Administration**

**REDACTED**

| | | |
|---|---|---|
| BRUCE WEBSTER | 73 | -9579 |
| Name | Date of Birth | Social Security Number |

I authorize the Social Security Administration to release information or records about me to:

| NAME | ADDRESS |
|---|---|
| GRETCHEN AGEE | |
| DORSEY & WHITNEY LLP | 50 SOUTH SIXTH STREET #1500 |
| | MINNEAPOLIS, MN 55402 |

I want this information released because:
I need it for a clemency proceeding

(There may be a charge for releasing information.)

Please release the following information:

| | |
|---|---|
| XX | Social Security Number |
| XX | Identifying information (includes date and place of birth, parents' names) |
| XX | Monthly Social Security benefit amount |
| XX | Monthly Supplemental Security Income payment amount |
| XX | Information about benefits/payments I received from ANY TIME to ____ |
| XX | Information about my Medicare claim/coverage from ANY TIME to ____ |
| | (specify) _____ |
| XX | Medical records |
| XX | Record(s) from my file (specify) ANY AND ALL |
| ____ | Other (specify) _____ |

I am the individual to whom the information/record applies or that person's parent (if a minor) or legal guardian.  I know that if I make any representation which I know is false to obtain information from Social Security records, I could be punished by a fine or imprisonment or both.

Signature: _Bruce Webster_
(Show signatures, names, and addresses of two people if signed by mark.)
Date: _12-10-08_     Relationship: _____

Form SSA-3288  (5-2007) EF (5-2007)

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 218 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-4 Filed 10/12/12 Page 5 of 7 PageID 695
PageID #: 1862

## LIST OF EXHIBITS

| Bruce C. Webster | -9579 |
|---|---|
| (Claimant) | (Social Security Number) |

Willie L. Webster       -5523                          **REDACTED**

(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 1 | Leads/Protective Filing Worksheet (showing Protective Filing Date of 9/9/93) | 1 |
| 2 | Medical History and Disability Report, dated 10/4/93 (in lieu of application for DAC benefits)(with Protective Filing date of 9/9/93) | 6 |
| 3 | Application for Supplemental Security Income, filed 10/4/93 (with Protective Filing Date of 9/9/93) | 3 |
| 4 | Disability Determination by State Agency, Title II, dated 2/3/94, with attachment | 3 |
| 5 | Disability Determination by State Agency, Title XVI, dated 2/3/94 | 2 |
| 6 | Social Security Notice, dated 2/8/94 | 2 |
| 7 | Supplemental Security Income Notice, dated 2/8/94 | 3 |
| 8 | Request for Reconsideration, filed 3/17/94 | 2 |
| 9 | Disability Determination by State Agency, Title II, dated 3/29/94, with attachments | 16 |
| 10 | Disability Determination by State Agency, Title XVI, dated 3/29/94 | 2 |
| 11 | Social Security Notice of Reconsideration, dated 4/5/94 | 2 |
| 12 | Supplemental Security Income Notice of Reconsideration - Disability, dated 4/5/94 | 3 |
| 13 | Request for Hearing, filed 4/13/94 | 2 |
| 14 | Earnings Record and DEQY, dated 9/13/94 | 4 |
| 15 | Vocational Report, dated 10/6/93 | 6 |
| 16 | Disability Report, dated 10/4/93 | 8 |
| 17 | Reconsideration Disability Report, dated 3/17/94 | 6 |
| 18 | Disability Supplemental Interview Outline, undated | 6 |
| 19 | Statements of Claimant, undated and dated 4/13/94 | 4 |
| 20 | Report of consultative General Physical Examination by C. M. Rittelmeyer, M.D., dated 10/25/93 | 8 |

Form HA-540-U6 (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 219 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-4 Filed 10/12/12 Page 6 of 7 PageID 696
PageID #: 1863

## LIST OF EXHIBITS                                   Page 2

Bruce C. Webster                                    ·9579
_____(Claimant)_____                    (Social Security Number)

Willie L. Webster          5523                     **REDACTED**

(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 21 | Letter from Lou Jackson, Special Education Supervisor, Watson Chapel Schools, dated 11/8/93 | 1 |
| 22 | Report of consultative Psychometric Evaluation by Edward V. Hackett, Ph.D., on 10/22/93; and medical report dated 11/10/93 | 3 |
| 23 | Report of consultative Evaluation For Mental Disorders by Charles M. Spellmann, Ph.D., Palaver, Inc., dated 12/22/93 | 3 |
| 24 | Letter to F. J. Massey, Jr., Vocational Expert from ALJ Goree, dated 10/25/94 requesting testimony at hearing | 2 |
| 25 | Resume of Experience and Background of F. J. Massey, Vocational Expert, dated 7/1/93 | 1 |

Form HA-540-U6 (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 220 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-4 Filed 10/12/12 Page 7 of 72 PageID #: 697
PageID #: 1864

# Social Security
# Notice of Reconsideration

From: Department of Health and Human Services
Social Security Administration

Bruce C. Webster
5219 Hepburn
Pine Bluff, AR  71603

Date: **APR 5 1994**

Claim Number          -5523   **REDACTED**

Claim for
- [ ] Disability Insurance Benefits
- [ ] Disabled Widow, Widower Benefits
- [x] Childhood Disability Benefits
- [ ] Medicare Coverage Only

Upon receipt of your request for reconsideration we had your claim independently reviewed by a physician and disability examiner in the State agency which works with us in making disability determinations. The evidence in your case has been thoroughly evaluated; this includes the medical evidence and the additional information received since the original decision. We find that the previous determination denying your claim was proper under the law. Attached to this notice is an explanation of the decision we made on your claim and how we arrived at it. The reverse of this notice identifies the legal requirements for your type of claim.

The determination on your claim was made by an agency of the State. It was not made by your own doctor or by other people or agencies writing reports about you. However, any evidence they gave us was used in making this determination. Doctors and other people in the State agency who are trained in disability evaluation reviewed the evidence and made the determination based on Social Security law and regulations.

If you believe that the reconsideration determination is not correct, you may request a hearing before an administrative law judge of the Office of Hearings and Appeals. If you want a hearing, you must request it not later than 60 days from the date you receive this notice. You may make your request through any Social Security office. Read the enclosed leaflet for a full explanation of your right to appeal.

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. You might lose benefits if you file a new application instead of filing an appeal. Therefore, if you think this decision is wrong, you should ask for an appeal within 60 days.

This decision refers only to your claim for benefits under the Social Security Disability Insurance Program. If you applied for other benefits, you will receive a separate notice when a decision is made on that claim(s).

If you have questions about your claim, you should get in touch with any Social Security office. Most questions can be handled by telephone or mail. If you visit an office, however, please take this letter with you.

Enclosure:
SSA Pub. No. 70-10281
759
**Important: See other side for additional information.** ►

EXHIBIT NO. _11_ (2) PAGES

Form SSA-L928-U2 (2-90)

# LeRoux Declaration Ex. E

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 222 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-5 Filed 10/12/12 Page 2 of 4 PageID 699
PageID #: 1866

RECEIVED OCT 2 6 2009



**SOCIAL SECURITY**
3511 Market St
Pine Bluff, AR 71601
866-563-9693

October 22, 2009

Dorsey & Whitney LLP
Gretchen Agee
50 South 6th St. #1500
Minneapolis, MN 55402

Dear Sir/Madam:

We are returning your request for a copy of our records because the consent you provided does not meet our requirements. It is a blanket request and our office does not service the area that the claimant lives in.

The Social Security field office is staffed to assist the local population base. Each office services a certain number of zip codes and is to assist individuals and third party requesters in that office's designated service area.

Please visit our website at www.socialsecurity.gov and click on Find a Social Security Office. Enter the zip code of your client. This is the office you request should be sent.

The Privacy Act and the Social Security Administration's privacy rules and regulations require that in order for us to release information from a record, we must have a completed, signed and dated, proper consent by the claimant.

Federal statutes and regulations prohibit the Social Security Administration (SSA) from disclosing the contents of its records in the absence of proper written consent from the individual whose records are being requested. See 5 U.S.C. §552 (b)(6); 5 U.S.C. §552a(b); 42 U.S.C. §1306; 20 C.F.R. §401.100 et. seq. A proper consent must:

- Be directed **specifically** to the **Social Security Administration**;
- **Specify** the records that may be disclosed;
- **Specify** to whom the disclosure may be made, and the **length of time** the consent is effective; and
- Be **signed** and **dated** by the individual.

**EXHIBIT E**

Case 2:12-cv-00086-WTL-WGH Document 25-5 Filed 10/12/12 Page 3 of 4 PageID 700
PageID #: 1867

In addition, the consent must be received by SSA within 60 days of signing for tax return information, 90 days for medical information, and 1 year for all other information. **We do not honor requests for all records, all information, or similar blanket requests**. The consent must describe the specific records or information to be disclosed.

If you wish, you can also obtain a copy of our consent form (Form SSA-3288) by visiting our website at http://www.ssa.gov. Click the icon entitled "Forms," then click the icon on the next page entitled "Other Forms." From there, you can scroll down to "Form SSA-3288 Consent to Release Information." Once an appropriate consent and request for records are received, we will request the folder, make the copies of the requested items and notify you when the file is ready to be picked up.

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 224 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-3 Filed 10/12/12 Page 4 of 4 PageID 701
PageID #: 1868

12/09/2008 14:28 FAX 6123408800          DORSEY & WHITNEY LLP                    004/004

Social Security Administration
Consent for Release of Information

Form Approved
OMB No. 0960-0566

TO:  Social Security Administration                                    **REDACTED**

BRUCE WEBSTER                          73                    9579
——————————          —————————          —————————
        Name                     Date of Birth         Social Security Number

I authorize the Social Security Administration to release information or records about me to:

| NAME | ADDRESS |
|---|---|
| GRETCHEN AGEE | |
| DORSEY & WHITNEY LLP | 50 SOUTH SIXTH STREET #1500 |
| | MINNEAPOLIS, MN 55402 |

I want this information released because:
I need it for a clemency proceeding

(There may be a charge for releasing information.)

Please release the following information:

XX  Social Security Number
XX  Identifying information (includes date and place of birth, parents' names)
XX  Monthly Social Security benefit amount
XX  Monthly Supplemental Security Income payment amount
XX  Information about benefits/payments I received from ANY TIME to _____
XX  Information about my Medicare claim/coverage from ANY TIME to _____
     (specify) _____
XX  Medical records
XX  Record(s) from my file (specify)  ANY AND ALL

____  Other (specify) _____

I am the individual to whom the information/record applies or that person's parent (if a minor) or legal guardian.  I know that if I make any representation which I know is false to obtain information from Social Security records, I could be punished by a fine or imprisonment or both.

Signature:  _Bruce Webster_____
(Show signatures, names, and addresses of two people if signed by mark.)
Date:  12-10-08 _____  Relationship: _____

Form SSA-3288  (5-2007) EF (5-2007)

Case 2:12-cv-00086-WTL-WGH    Document 25-6    Filed 10/12/12    Page 1 of 7    PageID 702
PageID #: 1869

# LeRoux Declaration Ex. F



**OLIVER MCKINSTRY**
(612) 492-6785
FAX (612) 340-8800
MCKINSTRY.OLIVER@DORSEY.COM

November 23, 2009

**_VIA US MAIL_**
Social Security Administration
222 Cherry Street
Terre Haute, IN  47808

    Re:   Bruce Webster           **REDACTED**
          DOB    73
          SS#:    9579

Dear Records Administrator:

    I am writing to request records pertaining to Bruce Webster.  I have enclosed a release from Mr. Webster authorizing the disclosure of such documents to us.

    Mr. Webster is currently on death row and faces an execution date.  Any efforts your office could make to expedite the return of these records would be greatly appreciated.  All costs incurred will be paid promptly upon billing or notice of billing.

    Thank you very much for your time and attention.  Please feel free to contact me at the number and email address listed above if you have any questions.

                 Sincerely,

                 Oliver McKinstry

Enclosure

cc:    Steve Wells, Esq.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • **T** 612.340.2600 • **F** 612.340.2868
SUITE 1500 • 50 SOUTH SIXTH STREET • MINNEAPOLIS, MINNESOTA 55402-1498
USA   CANADA   EUROPE   ASIA-PACIFIC

**EXHIBIT F**

Social Security Administration
Consent for Release of Information

Form Approved
OMB No. 0960-0566

**TO:** Social Security Administration                                           **REDACTED**

| BRUCE WEBSTER | 73 | -9579 |
|---|---|---|
| Name | Date of Birth | Social Security Number |

I authorize the Social Security Administration to release information or records about
me to:

| NAME | ADDRESS |
|---|---|
| OLIVER MC KINSTRY | |
| DORSEY & WHITNEY LLP | 50 SOUTH SIXTH STREET #1500 |
| | MINNEAPOLIS, MN 55402 |

I want this information released because:
I need it for my legal proceedings. This consent is good for

one year.
(There may be a charge for releasing information.)

Please release the following information:

_XX_ Social Security Number
_XX_ Identifying information (includes date and place of birth, parents' names)
_XX_ Monthly Social Security benefit amount
_XX_ Monthly Supplemental Security Income payment amount
_XX_ Information about benefits/payments I received from _1993_ to _1996_
_XX_ Information about my Medicare claim/coverage from _1993_ to _1996_
    (specify) _____
_XX_ Medical records
_XX_ Record(s) from my file (specify) SEE ATTACHED LIST

_____ Other (specify) _____

I am the individual to whom the information/record applies or that person's
parent (if a minor) or legal guardian. I know that if I make any representation
which I know is false to obtain information from Social Security records, I could
be punished by a fine or imprisonment or both.

Signature: _Bruce Webster_
(Show signatures, names, and addresses of two people if signed by mark.)
Date: _11-17-09_          Relationship: _____

Form SSA-3288 (5-2007) EF (5-2007)

227

List of Requested Documents on Consent for Release of Information for

Bruce Webster
DOB        73
SS#:              9579        **REDACTED**

I.        I request release of the following documents from the attached "List of Exhibits,"
contained in my records:

     1.        Leads/Protective Filing Worksheet
          (showing Protective Filing Dale of 9/9/93)
     3.        Application for Supplemental Security Income, filed 10/4/93
          (with Protective Filing Date of 9/9/93)
     4.        Disability Determination by State Agency, Title II, dated 2/3/94,
          with attachment
     5.        Disability Determination by State Agency, Title XVI, dated 2/3/94
     7.        Supplemental Security Income Notice, dated 2/8/94
     9.        Disability Determination by State Agency, Title II, dated 3/29/94,
          with attachments
     10.       Disability Determination by State Agency, Title XVI, dated 3/29/94,
          with attachments
     14.       Earnings Record and DEQY, dated 9/13/94.

II.       I also request release of the explanation of the April 5, 1994 decision made
regarding my claim and described in the attached Social Security Notice of
Reconsideration.  (*See* first paragraph, second to last sentence: "Attached to this notice
is an explanation of the decision we made on your claim and how we arrived at it.")

## LIST OF EXHIBITS

| Bruce C. Webster | -9579 |
|---|---|
| (Claimant) | (Social Security Number) |

Willie L. Webster          -5523

**REDACTED**

(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 1 | Leads/Protective Filing Worksheet (showing Protective Filing Date of 9/9/93) | 1 |
| 2 | Medical History and Disability Report, dated 10/4/93 (in lieu of application for DAC benefits)(with Protective Filing date of 9/9/93) | 6 |
| 3 | Application for Supplemental Security Income, filed 10/4/93 (with Protective Filing Date of 9/9/93) | 3 |
| 4 | Disability Determination by State Agency, Title II, dated  2/3/94, with attachment | 3 |
| 5 | Disability Determination by State Agency, Title XVI, dated 2/3/94 | 2 |
| 6 | Social Security Notice, dated 2/8/94 | 2 |
| 7 | Supplemental Security Income Notice, dated 2/8/94 | 3 |
| 8 | Request for Reconsideration, filed 3/17/94 | 2 |
| 9 | Disability Determination by State Agency, Title II, dated  3/29/94,with attachments | 16 |
| 10 | Disability Determination by State Agency, Title XVI, dated 3/29/94 | 2 |
| 11 | Social Security Notice of Reconsideration, dated 4/5/94 | 2 |
| 12 | Supplemental Security Income Notice of Reconsideration - Disability, dated 4/5/94 | 3 |
| 13 | Request for Hearing, filed 4/13/94 | 2 |
| 14 | Earnings Record and DEQY, dated 9/13/94 | 4 |
| 15 | Vocational Report, dated 10/6/93 | 6 |
| 16 | Disability Report, dated 10/4/93 | 8 |
| 17 | Reconsideration Disability Report, dated 3/17/94 | 6 |
| 18 | Disability Supplemental Interview Outline, undated | 6 |
| 19 | Statements of Claimant, undated  and dated 4/13/94 | 4 |
| 20 | Report of consultative General Physical Examination by C. M. Rittelmeyer, M.D., dated 10/25/93 | 8 |

Form HA-540-U6 (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 230 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-6 Filed 10/12/12 Page 6 of 73 PageID 707
PageID #: 1874

**LIST OF EXHIBITS**                                                      Page 2

Bruce C. Webster                                              -9579
_____                              _____
        (Claimant)                                        (Social Security Number)

Willie L. Webster            -5523                          **REDACTED**
_____
(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 21 | Letter from Lou Jackson, Special Education Supervisor, Watson Chapel Schools, dated 11/8/93 | 1 |
| 22 | Report of consultative Psychometric Evaluation by Edward V. Hackett, Ph.D., on 10/22/93; and medical report dated 11/10/93 | 3 |
| 23 | Report of consultative Evaluation For Mental Disorders by Charles M. Spellmann, Ph.D., Palaver, Inc., dated 12/22/93 | 3 |
| 24 | Letter to F. J. Massey, Jr., Vocational Expert from ALJ Goree, dated 10/25/94 requesting testimony at hearing | 2 |
| 25 | Resume of Experience and Background of F. J. Massey, Vocational Expert, dated 7/1/93 | 1 |

Form HA-540-U6 (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 231 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-6 Filed 10/12/12 Page 7 of 73 PageID #: 708
PageID #: 1875

# Social Security
# Notice of Reconsideration

From:  Department of Health and Human Services
        Social Security Administration

Bruce C. Webster
5219 Hepburn
Pine Bluff, AR   71603

Date:  **APR  5 1994**

Claim Number:        -5523  **REDACTED**

Claim for
☐ Disability Insurance Benefits
☐ Disabled Widow, Widower Benefits
☒ Childhood Disability Benefits
☐ Medicare Coverage Only

Upon receipt of your request for reconsideration we had your claim independently reviewed by a physician and disability examiner in the State agency which works with us in making disability determinations. The evidence in your case has been thoroughly evaluated; this includes the medical evidence and the additional information received since the original decision. We find that the previous determination denying your claim was proper under the law. Attached to this notice is an explanation of the decision we made on your claim and how we arrived at it. The reverse of this notice identifies the legal requirements for your type of claim.

The determination on your claim was made by an agency of the State. It was not made by your own doctor or by other people or agencies writing reports about you. However, any evidence they gave us was used in making this determination. Doctors and other people in the State agency who are trained in disability evaluation reviewed the evidence and made the determination based on Social Security law and regulations.

If you believe that the reconsideration determination is not correct, you may request a hearing before an administrative law judge of the Office of Hearings and Appeals. If you want a hearing, you must request it not later than 60 days from the date you receive this notice. You may make your request through any Social Security office. Read the enclosed leaflet for a full explanation of your right to appeal.

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. You might lose benefits if you file a new application instead of filing an appeal. Therefore, if you think this decision is wrong, you should ask for an appeal within 60 days.

This decision refers only to your claim for benefits under the Social Security Disability Insurance Program. If you applied for other benefits, you will receive a separate notice when a decision is made on that claim(s).

If you have questions about your claim, you should get in touch with any Social Security office. Most questions can be handled by telephone or mail. If you visit an office, however, please take this letter with you.

Enclosure:
SSA Pub. No. 70-10281
    759
**Important: See other side for additional information.** ▶

EXHIBIT NO. 11 (2) PAGES
Form SSA-L928-U2 (2-90)

231

# LeRoux Declaration Ex. G

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 233 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-7 Filed 10/12/12 Page 2 of 8 PageID 710
PageID #: 1877

# Social Security Administration
Important Information

SOCIAL SECURITY
222 CHERRY STREET
TERRE HAUTE, IN 47807-2932
Claim Number:        9579
December 04, 2009
SR2                    **REDACTED**

DORSEY & WHITNEY LLP
ATTN:OLIVER MCKINSTRY
50 SOUTH SIXTH STREET
SUITE 1500
MINNEAPOLIS, MN 55402-1498

DEC 0 7 2009

Dear OLIVER MCKINSTRY

Please call if any questions our office before December 18, 2009 and ask for any service representatives. The telephone number is 812-232-4909,EXT.205. We need to talk to you about:

You requested information about Bruce Webster. Our record showed that his folder has been destroyed and the last benefit stop in May of 1991. We can tell you that his name, date of birth and his social security number does match our records. If you have any questions feel free to call us.

When you call our office, please have this letter with you. It will help us to serve you more quickly.

*Brian Hewitt*
Brian Hewitt
Field Office Manager

**EXHIBIT G**

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 234 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-7 Filed 10/12/12 Page 3 of 8 PageID-711
PageID #: 1878



**DORSEY** ™

DORSEY & WHITNEY LLP

2009 NOV 25  AM IO: 27

TERRE HAUTE, IN.
51458 SSA OFFICE

OLIVER MCKINSTRY
(612) 492-6785
FAX (612) 340-8800
MCKINSTRY.OLIVER@DORSEY.COM

November 23, 2009

**<u>VIA US MAIL</u>**
Social Security Administration
222 Cherry Street
Terre Haute, IN  47808

> Re:   Bruce Webster
> DOB:    73
> SS#:    9579    **REDACTED**

Dear Records Administrator:

    I am writing to request records pertaining to Bruce Webster.  I have enclosed a release from Mr. Webster authorizing the disclosure of such documents to us.

    Mr. Webster is currently on death row and faces an execution date.  Any efforts your office could make to expedite the return of these records would be greatly appreciated.  All costs incurred will be paid promptly upon billing or notice of billing.

    Thank you very much for your time and attention.  Please feel free to contact me at the number and email address listed above if you have any questions.

Sincerely,

Oliver McKinstry

Enclosure

cc:    Steve Wells, Esq.

DORSEY & WHITNEY LLP • WWW.DORSEY.COM • T 612.340.2600 • F 612.340.2868
SUITE 1500 • 50 SOUTH SIXTH STREET • MINNEAPOLIS, MINNESOTA 55402-1498
USA  CANADA  EUROPE  ASIA-PACIFIC

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 235 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-72 Filed 10/12/12 Page 4 of 8 PageID 712
PageID #: 1879

|  | Form Approved<br>OMB No. 0960-0566 |
|---|---|

**Social Security Administration**
Consent for Release of Information

**TO:** Social Security Administration                    **REDACTED**

BRUCE WEBSTER                    /73·              -9579
_____    _____    _____
         Name                   Date of Birth      Social Security Number

I authorize the Social Security Administration to release information or records about
me to:

|  NAME | ADDRESS |
|---|---|
| OLIVER MC KINSTRY | |
| DORSEY & WHITNEY LLP | 50 SOUTH SIXTH STREET #1500 |
|  | MINNEAPOLIS, MN 55402 |
|  | |

I want this information released because:
I need it for my legal proceedings. This consent is good for

one year.
(There may be a charge for releasing information.)

Please release the following information:

XX   Social Security Number
XX   Identifying information (includes date and place of birth, parents' names)
XX   Monthly Social Security benefit amount
XX   Monthly Supplemental Security Income payment amount
XX   Information about benefits/payments I received from 1993 to 1996
XX   Information about my Medicare claim/coverage from 1993 to 1996
     (specify) _____
XX   Medical records
XX   Record(s) from my file (specify) SEE ATTACHED LIST

_____ Other (specify) _____

I am the individual to whom the information/record applies or that person's
parent (if a minor) or legal guardian. I know that if I make any representation
which I know is false to obtain information from Social Security records, I could
be punished by a fine or imprisonment or both.

Signature: _Bruce Webster_____
(Show signatures, names, and addresses of two people if signed by mark.)
Date: _11-17-09_____ Relationship: _____

Form SSA-3288 (5-2007) EF (5-2007)

List of Requested Documents on Consent for Release of Information for

Bruce Webster
DOB:          73
SS#:              9579          **REDACTED**

I.       I request release of the following documents from the attached "List of Exhibits,"
contained in my records:

    1.       Leads/Protective Filing Worksheet
           (showing Protective Filing Dale of 9/9/93)

    3.       Application for Supplemental Security Income, filed 10/4/93
           (with Protective Filing Date of 9/9/93)

    4.       Disability Determination by State Agency, Title II, dated 2/3/94,
           with attachment

    5.       Disability Determination by State Agency, Title XVI, dated 2/3/94

    7.       Supplemental Security Income Notice, dated 2/8/94

    9.       Disability Determination by State Agency, Title II, dated 3/29/94,
           with attachments

    10.     Disability Determination by State Agency, Title XVI, dated 3/29/94,
           with attachments

    14.     Earnings Record and DEQY, dated 9/13/94.

II.       I also request release of the explanation of the April 5, 1994 decision made
regarding my claim and described in the attached Social Security Notice of
Reconsideration. (*See* first paragraph, second to last sentence: "Attached to this notice
is an explanation of the decision we made on your claim and how we arrived at it.")

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 237 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-7 Filed 10/12/12 Page 6 of 8 PageID 714
PageID #: 1881

## LIST OF EXHIBITS

Bruce C. Webster                                                    -9579
_____              _____
             (Claimant)                              (Social Security Number)

Willie L. Webster           5523                          **REDACTED**
_____
(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 1 | Leads/Protective Filing Worksheet (showing Protective Filing Date of 9/9/93) | 1 |
| 2 | Medical History and Disability Report, dated 10/4/93 (in lieu of application for DAC benefits)(with Protective Filing date of 9/9/93) | 6 |
| 3 | Application for Supplemental Security Income, filed 10/4/93 (with Protective Filing Date of 9/9/93) | 3 |
| 4 | Disability Determination by State Agency, Title II, dated 2/3/94, with attachment | 3 |
| 5 | Disability Determination by State Agency, Title XVI, dated 2/3/94 | 2 |
| 6 | Social Security Notice, dated 2/8/94 | 2 |
| 7 | Supplemental Security Income Notice, dated 2/8/94 | 3 |
| 8 | Request for Reconsideration, filed 3/17/94 | 2 |
| 9 | Disability Determination by State Agency, Title II, dated 3/29/94, with attachments | 16 |
| 10 | Disability Determination by State Agency, Title XVI, dated 3/29/94 | 2 |
| 11 | Social Security Notice of Reconsideration, dated 4/5/94 | 2 |
| 12 | Supplemental Security Income Notice of Reconsideration - Disability, dated 4/5/94 | 3 |
| 13 | Request for Hearing, filed 4/13/94 | 2 |
| 14 | Earnings Record and DEQY, dated 9/13/94 | 4 |
| 15 | Vocational Report, dated 10/6/93 | 6 |
| 16 | Disability Report, dated 10/4/93 | 8 |
| 17 | Reconsideration Disability Report, dated 3/17/94 | 6 |
| 18 | Disability Supplemental Interview Outline, undated | 6 |
| 19 | Statements of Claimant, undated and dated 4/13/94 | 4 |
| 20 | Report of consultative General Physical Examination by C. M. Rittelmeyer, M.D., dated 10/25/93 | 8 |

Form HA-540-U6 (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 238 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-7 Filed 10/12/12 Page 7 of 8 PageID 715
PageID #: 1882

**LIST OF EXHIBITS**                                        Page 2

Bruce C. Webster                                    -9579
_____              _____
            (Claimant)                        (Social Security Number)

Willie L. Webster          -5523                    **REDACTED**
_____
(Wage Earner) (Leave blank in Title XVI Cases or if name is same as above)

| EXHIBIT NO. | DESCRIPTION | NO. OF PAGES |
|---|---|---|
| 21 | Letter from Lou Jackson, Special Education Supervisor, Watson Chapel Schools, dated 11/8/93 | 1 |
| 22 | Report of consultative Psychometric Evaluation by Edward V. Hackett, Ph.D., on 10/22/93; and medical report dated 11/10/93 | 3 |
| 23 | Report of consultative Evaluation For Mental Disorders by Charles M. Spellmann, Ph.D., Palaver, Inc., dated 12/22/93 | 3 |
| 24 | Letter to F. J. Massey, Jr., Vocational Expert from ALJ Goree, dated 10/25/94 requesting testimony at hearing | 2 |
| 25 | Resume of Experience and Background of F. J. Massey, Vocational Expert, dated 7/1/93 | 1 |

Form **HA-540-U6** (6-88)

ATTACH TO CLAIMANT'S COPY OF THE DECISION

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 239 of 341
Case 2:12-cv-00086-WTL-WGH Document 25-72 Filed 10/12/12 Page 8 of 8 PageID 716
PageID #: 1883

# Social Security
# Notice of Reconsideration

From: Department of Health and Human Services
Social Security Administration

Bruce C. Webster
5219 Hepburn
Pine Bluff, AR  71603

Date: APR  5 1994

Claim Number: 5523 **REDACTED**

Claim for
- ☐ Disability Insurance Benefits
- ☐ Disabled Widow, Widower Benefits
- ☒ Childhood Disability Benefits
- ☐ Medicare Coverage Only

Upon receipt of your request for reconsideration we had your claim independently reviewed by a physician and disability examiner in the State agency which works with us in making disability determinations. The evidence in your case has been thoroughly evaluated; this includes the medical evidence and the additional information received since the original decision. We find that the previous determination denying your claim was proper under the law. Attached to this notice is an explanation of the decision we made on your claim and how we arrived at it. The reverse of this notice identifies the legal requirements for your type of claim.

The determination on your claim was made by an agency of the State. It was not made by your own doctor or by other people or agencies writing reports about you. However, any evidence they gave us was used in making this determination. Doctors and other people in the State agency who are trained in disability evaluation reviewed the evidence and made the determination based on Social Security law and regulations.

If you believe that the reconsideration determination is not correct, you may request a hearing before an administrative law judge of the Office of Hearings and Appeals. If you want a hearing, you must request it not later than 60 days from the date you receive this notice. You may make your request through any Social Security office. Read the enclosed leaflet for a full explanation of your right to appeal.

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. You might lose benefits if you file a new application instead of filing an appeal. Therefore, if you think this decision is wrong, you should ask for an appeal within 60 days.

This decision refers only to your claim for benefits under the Social Security Disability Insurance Program. If you applied for other benefits, you will receive a separate notice when a decision is made on that claim(s).

If you have questions about your claim, you should get in touch with any Social Security office. Most questions can be handled by telephone or mail. If you visit an office, however, please take this letter with you.

Enclosure:
SSA Pub. No. 70-10281
759

**Important: See other side for additional information. ▶**

EXHIBIT NO. 11 (2 ) PAGES

Form SSA-L928-U2 (2-90)

INSD Change of Attorney Information (Rev. 09/23) 7:11 PH & MJD
Case 2:12-cv-00086-JPH-MJD   Document 26   Filed 05/03/13   Page 1 of 1
Case 2:12-cv-00086-WTL-WGH   Document 42-1   Filed 07/08/14   Page 240 of 341
PageID #: 1884   PageID #: 717

# UNITED STATES DISTRICT COURT
Southern District of Indiana

# NOTICE OF CHANGE OF
# ATTORNEY INFORMATION

TO:  THE CLERK OF THE COURT AND ALL OTHER PARTIES

       I have **no pending cases** in the District Court for the Southern District of Indiana.

       I have **pending case(s)** in the District Court for the Southern District of Indiana.

$$\left.\begin{array}{c}\\\\\\\\\\\\\\\end{array}\right)$$

Pending Case No(s).[1]

Pursuant to Local Rule 5-3, the undersigned counsel notifies the Clerk's Office of the following changes:

| | *Previous Information:* | *Current Information:* |
|---|---|---|
| **Name:** | | |
| **Law Firm, Company, and/or Agency:** | | |
| **Address:** | | |
| **Primary E-mail:** | | |
| **Secondary E-mail(s):** | | |
| **Telephone Number:** | | |
| **Facsimile:** | | |

Date: _____         s/ _____

---

[1] Identify each case in which you have filed a Notice of Appearance and the case is still pending. This Notice must be filed in each pending case.

Case 2:12-cv-00086-WTL-WGH   Document 27   Filed 10/07/13   Page 1 of 4   PageID #: 718

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

IN RE:                                              )
                                                    )
THE MATTER OF ALL CIVIL ACTIONS                     )       1:13-mc-120-RLY
IN WHICH THE UNITED STATES IS A PARTY               )
PENDING IN THE SOUTHERN DISTRICT                    )
OF INDIANA                                          )

### ORDER REGARDING CIVIL CASES IN WHICH THE UNITED STATES, ITS AGENCIES, OFFICERS AND EMPLOYEES ARE PARTIES

This matter is before the Court on the motion of the United States for a stay of civil litigation, including bankruptcy cases, pending before this Court, in which the United States, its agencies, officers or employees (the "United States") are parties.

Whereupon the Court, having considered the motion and being duly advised now finds that:

1.      At the end of the day on September 30, 2013, the appropriations act that had been funding the Department of Justice expired, resulting in a lapse of appropriations to the Department. The same is true for most Executive agencies. As a result of the lapse in appropriations, certain Department of Justice employees, including Assistant United States Attorneys, responsible for representing the interests of the United States in civil litigation have been furloughed. Likewise personnel from the Executive agencies that are named as parties, or whose interests are represented in civil litigation have been subjected to furloughs. The Department of Justice does not know when funding will be restored by Congress.

2.      The lapse in appropriations has resulted in the excepted employees in the United States Attorney's Office to be unable to fully represent the interests of the United States in all of civil litigation pending before this Court.

3.      A stay of civil litigation in which the United States, is a party is necessary and appropriate under the circumstances, and it is in the interests of justice to stay civil cases, including bankruptcy cases, in which the United States is a party pending a resolution of the lapse in appropriations by Congress.

IT IS THEREFORE ORDERED that:

1.      The motion to stay civil litigation in which the United States, its agencies, officers and employees are parties should be, and hereby is, GRANTED IN PART and DENIED IN PART.

2.      The United States' motion is GRANTED as to all civil cases, except habeas corpus proceedings, in which the United States, its agencies, officers, or employees are parties, except those which are specifically exempted from this Order in Exhibit A.   All such civil cases are STAYED and immediately suspended, postponed and held in abeyance, pending further Order of the Court.   The Court intends "civil litigation" to include all pending non-criminal cases in which the United States, its agencies, its officers or employees (whether in their individual or official capacity and whether current or former employees) is in any way a named party and any non-criminal cases in which the United States Attorney's Office or the Department of Justice is counsel of record.   This includes, without limitation, all pending Social Security cases, bankruptcy cases, and all cases seeking monetary or equitable relief in which the United States is involved as a civil litigant.

3.      The United States' motion is specifically DENIED as to habeas corpus proceedings and this Order does not affect habeas corpus cases pending or filed under Title 28 of the United States Code.   *See* U.S. Const. art. I, § 9, cl. 2 (The Privilege of the Writ of Habeas Corpus shall not be suspended unless when in Cases of Rebellion or Invasion the public safety may require it.")

4.     The United States' Motion and this Order shall be docketed in civil cases in which the United States is party. The absence of such docketing in a specific case shall not affect the effect of this Order in a particular case or proceeding.

5.     All civil cases in which the United States, its agencies, officers, or employees have been named as a party, but in which no appearance has been filed by an attorney for the United States are also and immediately suspended, postponed and held in abeyance, pending further Order of the Court.   As those cases are identified by the United States, it may seek to have this order docketed in those cases or matters as notice.   The absence of such docketing in a specific case shall not affect the effect of this Order in a particular case or proceeding.

6.     Any party, including the United States, to any civil case stayed by this Order may seek relief from this Order by motion filed in the case or proceeding.   Notice of such motion for relief shall be filed in the specific action, and shall also be served by first class mail on the United States Attorney for the Southern District of Indiana, Attn: Jill Z. Julian, Civil Chief, 10 West Market Street, Suite 2100, Indianapolis, Indiana, 46204.

IT IS SO ORDERED.

Dated: _10/07/2013_____

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

3

243

Cases Exempted from Order Staying Civil Litigation in which the United States is a Party

| CAUSE NUMBER | CASE CAPTION |
|---|---|
| 1:12-cv-01882-JMS-DKL | ANTONACCI et al v. DEPARTMENT OF THE NAVY |
| 3:12-cv-00178-RLY-WGH | COPELAND v. USA et al. |
| 2:11-cv-00004-LJM-WGH | FURROW et al v. VEACH et al |
| 1:11-cv-01303-SEB-MJD | HULL v. OWEN COUNTY STATE BANK |
| 1:13-cv-01014-SEB-MJD | INTERNATIONAL UNION OF PAINTERS & ALLIED TRADES, DISTRICT COUNCIL 91 v. METROPOLITAN SCHOOL DISTRICT OF WARREN TOWNSHIP et al |
| 1:12-cv-00818-TWP-DKL | JACKSON et al v. UNITED STATES   OF AMERICA |
| 1:08-cv-00133-WTL-DML | MCARTOR, et al v. ROLLS-ROYCE CORPORATION |
| 1:13-cv-01383-RLY-DML | SRIVASTAVA v. UNITED STATES OF AMERICA et al |
| 1:12-cv-00830-JMS-TAB | UNITED STATES OF AMERICA et al v. HORNING INVESTMENTS, LLC et al |
| 1:13-cv-00785-WTL-TAB | UNITED STATES OF AMERICA v. $24,170.00 UNITED STATES CURRENCY |
| 1:13-cv-01283-RLY-MJD | UNITED STATES OF AMERICA v. $24,335.00 UNITED STATES CURRENCY |
| 1:13-cv-00500-JMS-DKL | UNITED STATES OF AMERICA v. $30,000.00 UNITED STATES CURRENCY |
| 1:12-cv-00468-RLY-MJD | UNITED STATES OF AMERICA v. $4,020.00 UNITED STATES CURRENCY |
| 1:13-cv-00611-WTL-TAB | UNITED STATES OF AMERICA v. $4,299.00 UNITED STATES CURRENCY |
| 1:13-cv-00650-TWP-MJD | UNITED STATES OF AMERICA v. $6,286.00 UNITED STATES CURRENCY |
| 1:12-cv-01057-RLY-MJD | UNITED STATES OF AMERICA v. &#036;100,945.00 UNITED STATES CURRENCY et al |
| 1:12-cv-00026-TWP-MJD | UNITED STATES OF AMERICA v. TRIAD MINING, INC. |
| 1:13-cv-01361-SEB-MJD | UNITED STATES SECURITIES AND EXCHANGE COMMISSION v. MARCUM et al |
| 1:11-cv-00891-LJM-TAB | WELCH v. ELI LILLY   & COMPANY |
| 1:12-cv-00818-TWP-DKL | JACKSON et al v. UNITED STATES   OF AMERICA |
| 3:12-cv-00178-RLY-WGH | COPELAND v. USA et al. |
| 1:13-cv-01489-WTL-MJD | UNITED STATES SECURITIES AND EXCHANGE COMMISSION v. IMPERIAL PETROLEUM, INC. et al |

Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

IN RE:                                             )
                                                   )
THE MATTER OF ALL CIVIL ACTIONS                    )
IN WHICH THE UNITED STATES IS A PARTY              )
PENDING IN THE SOUTHERN DISTRICT                   )
OF INDIANA                                         )

## MOTION FOR A STAY OF CIVIL PROCEEDINGS IN WHICH THE UNITED STATES, ITS AGENCIES, OR OFFICERS ARE A PARTY

The United States, by counsel, Joseph H. Hogsett, United States Attorney, by Jill Z.

Julian, Assistant United States Attorney, respectfully moves this Court to stay civil cases in

which the United States, its agencies, officers, or employees are a party. In support of this

motion, the United States states:

1.      At the end of the day on September 30, 2013, the appropriations act that had been

funding the Department of Justice expired, resulting in a lapse of appropriations to the

Department. The same is true for most Executive agencies. As a result of the lapse in

appropriations, employees in the United States Attorney's Office, including Assistant United

States Attorneys responsible for representing the interests of the United States, its agencies,

officers, and employees (the "United States") in civil litigation have been furloughed. Likewise

personnel from the Executive agencies that are named as parties, or whose interests are

represented in civil litigation have been subjected to furloughs. The Department of Justice does

not know when funding will be restored by Congress.

2.      Absent an appropriation, furloughed Department of Justice employees, and

furloughed employees and attorneys of the Executive agencies that are parties to civil litigation

are prohibited from working, even on a voluntary basis, except in limited circumstances

including, "emergencies involving the safety of human life or the protection of property." *See* 31

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 246 of 341
Case 2:12-cv-00086-WTL-WGH Document 27-12 Filed 10/07/13 Page 2 of 3 PageID #723
PageID #: 1890

U.S.C. § 1342. This is creating difficulties for the Department to perform the functions necessary to support its litigation efforts and, accordingly, the Department's policy is to seek a stay in all pending civil litigation.

3.      Under the unusual circumstances regarding the lapse in appropriations, the current excepted employees of the United States Attorney's Office are unable to fully represent the interests of the United States in all civil proceedings, and and the United States therefore seeks a stay of all civil proceedings in which the United States is a party, except those cases specifically exempted in Exhibit A.

4.      If this motion for a stay is granted, upon resolution of the appropriations issues, the attorney for the United States assigned to the proceedings will propose an appropriate order in each stayed civil proceeding for the conduct of the litigation going forward. If the Court denies the request, the United States will comply with the Court's order, which would constitute express legal authorization for the activity to continue.

Wherefore, the United States, greatly regretting the disruption caused to the Court and the other litigants, respectfully requests that the Court issue an order staying all civil proceedings, in which the United States is a party, pending further Order of this Court.

Respectfully submitted,

JOSEPH H. HOGSETT
UNITED STATES ATTORNEY

By: _____
Jill Z. Julian
Assistant United States Attorney

Cases Exempted from Order Staying Civil Litigation in which the United States is a Party

| CAUSE NUMBER | CASE CAPTION |
|---|---|
| 1:12-cv-01882-JMS-DKL | ANTONACCI et al v. DEPARTMENT OF THE NAVY |
| 3:12-cv-00178-RLY-WGH | COPELAND v. USA et al. |
| 2:11-cv-00004-LJM-WGH | FURROW et al v. VEACH et al |
| 1:11-cv-01303-SEB-MJD | HULL v. OWEN COUNTY STATE BANK |
| 1:13-cv-01014-SEB-MJD | INTERNATIONAL UNION OF PAINTERS & ALLIED TRADES, DISTRICT COUNCIL 91 v. METROPOLITAN SCHOOL DISTRICT OF WARREN TOWNSHIP et al |
| 1:12-cv-00818-TWP-DKL | JACKSON et al v. UNITED STATES OF AMERICA |
| 1:08-cv-00133-WTL-DML | MCARTOR, et al v. ROLLS-ROYCE CORPORATION |
| 1:13-cv-01383-RLY-DML | SRIVASTAVA v. UNITED STATES OF AMERICA et al |
| 1:12-cv-00830-JMS-TAB | UNITED STATES OF AMERICA et al v. HORNING INVESTMENTS, LLC et al |
| 1:13-cv-00785-WTL-TAB | UNITED STATES OF AMERICA v. $24,170.00 UNITED STATES CURRENCY |
| 1:13-cv-01283-RLY-MJD | UNITED STATES OF AMERICA v. $24,335.00 UNITED STATES CURRENCY |
| 1:13-cv-00500-JMS-DKL | UNITED STATES OF AMERICA v. $30,000.00 UNITED STATES CURRENCY |
| 1:12-cv-00468-RLY-MJD | UNITED STATES OF AMERICA v. $4,020.00 UNITED STATES CURRENCY |
| 1:13-cv-00611-WTL-TAB | UNITED STATES OF AMERICA v. $4,299.00 UNITED STATES CURRENCY |
| 1:13-cv-00650-TWP-MJD | UNITED STATES OF AMERICA v. $6,286.00 UNITED STATES CURRENCY |
| 1:12-cv-01057-RLY-MJD | UNITED STATES OF AMERICA v. &#036;100,945.00 UNITED STATES CURRENCY et al |
| 1:12-cv-00026-TWP-MJD | UNITED STATES OF AMERICA v. TRIAD MINING, INC. |
| 1:13-cv-01361-SEB-MJD | UNITED STATES SECURITIES AND EXCHANGE COMMISSION v. MARCUM et al |
| 1:11-cv-00891-LJM-TAB | WELCH v. ELI LILLY & COMPANY |
| 1:12-cv-00818-TWP-DKL | JACKSON et al v. UNITED STATES OF AMERICA |
| 3:12-cv-00178-RLY-WGH | COPELAND v. USA et al. |
| 1:13-cv-01489-WTL-MJD | UNITED STATES SECURITIES AND EXCHANGE COMMISSION v. IMPERIAL PETROLEUM, INC. et al |

Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

IN RE:                                             )
                                                   )
THE MATTER OF ALL CIVIL ACTIONS       )       Cause No. 1:13-mc-120-RLY
IN WHICH THE UNITED STATES IS A PARTY  )
PENDING IN THE SOUTHERN DISTRICT       )
OF INDIANA                             )

## ORDER LIFTING STAY OF CIVIL LITIGATION IN WHICH THE UNITED STATES IS PARTY

This matter is before the Court on the motion of the United States to lift the stay of civil

litigation, previously imposed by this Court on October 7, 2013, in cases before this Court,

including bankruptcy cases in which the United States, its agencies, officers or employees (the

"United States") are parties.

Whereupon the Court, having considered the motion and being duly advised now finds

that:

1.      The lapse in appropriations that commenced at the end of the day on September 30,

2013, has been resolved, resulting in appropriations to the Department of Justice, and other

Executive agencies.   The furloughs of Department of Justice employees, including Assistant

United States Attorneys, responsible for representing the interests of the United States in civil

litigation have ended.   Likewise furloughs of personnel from other Executive agencies that are

named as parties, or whose interests are represented in civil litigation, have ended.

2.      The stay of civil litigation in which the United States is a party, previously imposed

by this Court as necessary and appropriate under the circumstances, and in the interests of justice,

is no longer warranted given the resolution of the lapse in appropriations by Congress.

IT IS THEREFORE ORDERED that:

1

1.       The STAY of civil litigation in which the United States, its agencies, officers and employees are parties imposed by this Court's Order of October 7, 2013, is LIFTED.

2.       Unless otherwise ordered by a judge of this Court or a bankruptcy judge in a particular case, any deadlines in a case, including bankruptcy cases, impacted by this Court's Order of October 7, 2013, imposed by order of a judicial officer of this Court, by a bankruptcy judge, by the Federal Rules of Civil Procedure, or by the Federal Rules of Bankruptcy Procedure, and in effect as of October 1, 2013, are hereby extended by 16 calendar days from the deadline. Any party may seek relief from this general Order extending time by motion in a particular case.

IT IS SO ORDERED.

Dated:    10/18/2013             

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Cause No. 2:12-cv-86-WTL-WGH |
| | ) | |
| CHARLES  LOCKETT Warden, United | ) | |
| States Penitentiary, Terre Haute (USP), | ) | |
| | ) | |
| Respondent. | ) | |

**ENTRY ON PETITION FOR WRIT OF HABEAS CORPUS**

This cause is before the Court on Petitioner Bruce Carneil Webster's petition for writ of

habeas corpus pursuant to 28 U.S.C. § 2241.[1] Dkt. No. 1. Webster's motion is fully briefed, and

the Court, being duly advised, **DENIES** the motion for the reasons set forth below.

## I.    BACKGROUND

During the fall of 1994, Webster, Orlando Hall, and Marvin Holloway operated a

marijuana trafficking business in Pine Bluff, Arkansas.[2] With the help of Steven Beckley, the

men regularly purchased marijuana from the Dallas/Fort Worth area in Texas and transported the

drugs back to Arkansas. On September 21, 1994, Hall flew to Dallas to purchase marijuana from

two local drug dealers, Stanfield Vitalis and Neil Rene. That same day, Hall and Beckley met

with Vitalis and Rene at a car wash and gave them $4,700 for the purchase of marijuana. The

---

[1] Although Webster received a sentence of death and is currently incarcerated in the
Special Confinement Unit in Terre Haute, Indiana,  his execution has been stayed pending the
outcome of *Roane v. Gonzalez*, 1:05-cv-2337 (D. D.C.). *Roane* involves a constitutional
challenge to the method of lethal injection used by the federal government. Webster's Pet. at 2,
n. 1, Dkt. No. 1.

[2] The circumstances that led to Webster's arrest and convictions are discussed in more
detail in *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998) ("*Webster Direct Appeal*").

Case 2:12-cv-00086-WTL-WGH Document 29-4 Filed 11/13/13 Page 2 of 13 PageID #: 728

men agreed to return to the car wash later that that day to transfer the drugs. Vitalis and Rene, however, never returned to the car wash and later claimed they were robbed of the $4,700.

On September 24, 1994, Webster flew to Dallas where he met with Hall, Hall's brother Demetrius Hall, and Beckley. After they discovered where Neil Rene lived, the four men drove to Rene's apartment and knocked on his door. Lisa Rene, Neil Rene's sixteen-year-old sister, was the only one home. She refused to let the men in and called police. Armed with handguns, a baseball bat, duct tape, and gasoline, the men forced their way into the apartment and kidnapped Lisa before police arrived. Lisa was eventually taken to a motel in Pine Bluff, Arkansas where she was held for several days. During the ordeal, she was repeatedly sexually assaulted by Webster and the other men. After two days of captivity, Webster, Hall, and Beckley drove Lisa to a park where they placed a sheet over her head and beat her with a shovel. "Webster then gagged her and dragged her into [a] grave. He stripped her, covered her with gasoline, and shoveled dirt back into the grave." *Webster Direct Appeal*, 162 F.3d at 319. Although she was "likely still breathing," Webster, Hall, and Beckley buried Lisa and returned to the motel. *Id.*

Shortly thereafter, Beckley was arrested and confessed to police. As a result, Webster was charged by indictment with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) (count one), conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c) (count two), traveling in interstate commerce with the intent to promote extortion in violation of 18 U.S.C. § 1952 (count five), and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (count six). In February 1995, the Government filed its notice of intent to seek the death penalty against Webster.

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 252 of 341
Case 2:12-cv-00086-WTL-WGH Document 29 Filed 11/13/13 Page 3 of 13 PageID #729
PageID #: 1896

In 1996, a jury found Webster guilty of counts one, two, and six of the indictment.[3] During a separate sentencing hearing before the same jury, Webster's defense team argued that Webster is mentally retarded and thus could not be sentenced to death pursuant to 18 U.S.C. § 3596(c).[4] In support of this argument, defense counsel introduced as evidence Webster's low IQ scores, testimony from Webster's friends and family, and testimony from four psychologists and psychiatrists who examined Webster after his arrest.[5]

During the hearing, clinical psychologist Dr. Raymond Finn testified that he administered a full-scale intelligence test on Webster, the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"), and Webster received an IQ score of 59. Dr. Finn also opined that Webster is "clearly mentally retarded." Similarly, psychologist Dr. Denis Keyes testified that he administered two intelligence tests on Webster, the Stanford-Binet Fourth Edition and the Kaufman Adolescent and Adult Intelligence Test, and Webster's IQ scores were 51 and 55, respectively. Dr. Keyes also conducted a Vineland adaptive skills test on Webster to measure his "adaptive functioning."[6] Dr. Keyes ultimately concluded that Webster functions at the level of a seven-year-old and is mentally retarded. Neuropsychologist Dr. Robert Fulbright testified that he performed several neuropsychological tests on Webster. Based on the results, he believed Webster had significant impairment in his intellectual capacity, attention capacity, and reasoning

---

[3] The Government agreed to dismiss count five.

[4] Section 3596(c) provides that "[a] sentence of death shall not be carried out upon a person who is mentally retarded."

[5] A fifth medical expert was presented on surrebuttal to critique the methodology used by one of the Government's experts.

[6] The term "adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*, Text Revision (DSM-IV-TR) at 42.

3

abilities, and suffered from limited language and memory capabilities. The fourth expert, Dr. Mark Cunningham, testified that he spoke with Webster's family and examined Webster while he was in prison. Dr. Cunningham further testified that Webster suffers from mild mental retardation

Defense counsel also introduced evidence of an IQ test that was given to Webster by an Arkansas state mental health center in 1992. The test demonstrated that Webster had an IQ of only 48 more than a year before Lisa's kidnapping and murder. Webster's friends and family also testified at the hearing. They stated that Webster had to repeat two grades in school, was in special education classes, was unable to live away from his mother, received income from welfare, food stamps, family members, and girlfriends, and had illegible handwriting.

To rebut Webster's evidence of mental retardation, the Government presented testimony from two experts. Dr. George Parker testified that he administered a partial WAIS-R and estimated Webster's IQ to be 72. He also testified that Webster does not suffer from mental retardation, and Webster's IQ scores were artificially deflated because he was motivated to do poorly on the tests to avoid the death penalty. Dr. Richard Coons, a psychiatrist, testified similarly. Dr. Coons further claimed that Webster had lied about taking special education classes in his youth.[7]

The Government also focused on Webster's apparent ability to adapt to life in jail. Dr. Parker and Dr. Coons testified that Webster made his bed, put away his clothes, and kept an organized cell while awaiting trial. Fellow inmates and corrections officers also testified that Webster had written letters, grievances, and requests for various services, read newspapers aloud, submitted names and addresses for his visitation list, appeared to be reading from law books and

---

[7] Two witnesses from Watson Chapel Schools testified at the sentencing hearing that Webster did not attend special education classes while in school.

4

253

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 254 of 341
Case 2:12-cv-00086-WTL-WGH Document 29 Filed 11/13/13 Page 5 of 13 PageID 731
PageID #: 1898

taking notes in the law library, and on one occasion, Webster complained because he received incorrect change from the commissary.

At the conclusion of the hearing, the jury determined that several statutory and non-statutory aggravating factors existed, *see* 18 U.S.C. § 3592, and concluded that the death penalty was an appropriate sentence for Webster's actions. On September 30, 1996, the court agreed with the jury's recommendation and sentenced Webster to death on count one, life imprisonment on count two, and sixty months' imprisonment on count six. The court also issued an entry entitled Factual Finding Regarding Mental Retardation stating that, "Webster is not mentally retarded and . . . he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty." *Webster Direct Appeal*, 162 F.3d at 351.

Webster appealed his convictions and sentence to the Fifth Circuit arguing, among other things, that his death sentence was unconstitutional because he is, in fact, mentally retarded. The court disagreed, however, noting that "[t]he government presented substantial evidence to support the finding" the he was not mentally retarded. *Id.* at 353. Webster's conviction and death sentence were ultimately affirmed by the Fifth Circuit, and the Supreme Court of the United States denied his petition for certiorari. *Webster v. United States*, 528 U.S. 829 (1999).

Thereafter, on September 29, 2000, Webster timely filed a motion for relief pursuant to 28 U.S.C. § 2255.[8] Again, Webster argued that his death sentence is improper because he is mentally retarded. Webster also argued that counsel was ineffective in failing "to investigate and present additional evidence demonstrating mental retardation and the extreme abuse Webster suffered as a child." *United States v. Webster*, 392 F.3d 787, 793 (5th Cir. 2004) ("*Webster 2255*

---

[8] An amended motion was filed on August 16, 2002.

Case 2:12-cv-00086-JPH-MJD    Document 42-1    Filed 07/08/14    Page 255 of 341
Case 2:12-cv-00086-WTL-WGH    Document 29    Filed 11/13/13    Page 6 of 13    PageID #: 732
PageID #: 1899

*I*"). The district court denied his motion, but granted a certificate of appealability as to two of Webster's claims: "first, that the evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded; and second, that his alleged retardation renders him ineligible for a death sentence." *United States v. Webster*, 421 F.3d 308, 310 (5th Cir. 2005) ("*Webster 2255 II*").

Once more, however, the Fifth Circuit rejected Webster's arguments regarding his alleged mental retardation and provided the following explanation for its decision:

> Webster claims he is mentally retarded and thus ineligible for his death sentence, but . . . Webster's brief does not point to any new evidence bearing directly on his mental capacity; instead, it summarizes the evidence presented at trial concerning his cognitive abilities and childhood experiences.

> Webster cannot, however, continue to litigate this claim hoping that some court eventually will agree with him. The question whether he is mentally retarded was, as the district court observed, "a highly contested one at trial," and Webster failed to convince either the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may be* retarded.

*Id.* at 313-14 (citation omitted) (emphasis in original). Webster's petition for a writ of certiorari was denied by the Supreme Court. *Webster v. United States*, 549 U.S. 828 (2009).

Webster also separately appealed the district court's denial of a certificate of appealability on the remainder of his § 2255 claims, including the allegation that counsel was ineffective in failing to present additional evidence of his mental retardation during the sentencing hearing. The Fifth Circuit, however, agreed with the district court's assessment of Webster's ineffective assistance of counsel claim noting that

> [a]fter engaging in an exhaustive review of the trial record, the district court determined that defense counsel presented a significant amount of such evidence; and, although more of the same or similar evidence could have been furnished, counsel were not constitutionally ineffective for failing to present more of the same.

*Webster 2255 I*, 392 F.3d at 793. The Fifth Circuit further stated:

6

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 256 of 341
Case 2:12-cv-00086-WTL-WGH   Document 29   Filed 11/13/13   Page 7 of 13   PageID #: 733
PageID #: 1900

> Indeed, our review of the trial record confirms that Webster's counsel were far from constitutionally ineffective in investigating and presenting evidence of his mental condition and the abuse he suffered as a child. During the punishment phase, counsel presented lengthy and detailed testimony from four medical experts regarding Webster's mental capacity and the testimony of a fifth medical expert on surrebuttal to critique the methodology used by one of the government's experts in testing Webster's cognitive abilities.

*Id.* at 793-94.

Webster's appeals did not stop there, however. On October 22, 2009, Webster moved the Fifth Circuit for authorization to file a second motion for relief under 28 U.S.C. § 2255. Pursuant to § 2255(h)(1),

> A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense.

Webster argued that a successive 2255 motion was warranted because he had newly discovered evidence "in the form of government and school records and additional testimony" establishing that he is mentally retarded, and thus, ineligible for the death penalty. *In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010) ("*Webster 2255 III*"). Webster's "newly discovered evidence" included records from the Social Security Administration indicating that he was diagnosed with mental retardation months before he kidnapped, assaulted, and murdered Lisa and a letter from his school indicating that he was, in fact, enrolled in special education classes. Webster argued that, had this evidence been presented at trial, it would have refuted the Government's arguments that he was pretending to be mentally retarded to avoid the death penalty and he was lying when he said he attended special education classes. The Fifth Circuit, however, held that "a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital

7

murder." *Id.* at 257. Because Webster's newly discovered evidence challenged only his sentence,

i.e., his death sentence, the court denied Webster's request to file a subsequent § 2255 motion

without considering the merits of the new evidence.[9]

Webster now seeks relief from this Court pursuant to 28 U.S.C. § 2241 based on the same

newly discovered evidence addressed in his motion for authorization to file a second motion

under 28 U.S.C. § 2255. Webster argues that "because section 2255 is inadequate and

ineffective, section 2241 is the appropriate mechanism for Petitioner to challenge the

unconstitutionality of his death sentence based on previously unavailable evidence." Webster's

Pet. at 26.

## II.    STANDARD

A federal court may issue a writ of habeas corpus pursuant to 28 U.S.C. § 2241(c)(3) if it

finds the petitioner "is in custody in violation of the Constitution or laws or treaties of the United

States." Webster seeks such a writ from this Court.

## III.    DISCUSSION

Before the Court may consider the merits of Webster's petition, the Court must determine

whether he satisfies the savings clause of § 2255, and is thus entitled to attack his sentence under

§ 2241.

> In general, federal prisoners who wish to attack the validity of their convictions or
> sentences are required to proceed under § 2255. Furthermore, in the
> overwhelming majority of cases § 2255 specifically prohibits prisoners from
> circumventing § 2255 and challenging their convictions to sentences through a
> habeas petition under § 2241. There is, however, a recognition in the statute that it
> will not apply in a narrow class of cases. This is the so-called "savings clause" of

---

[9] The court, however, was not unsympathetic to Webster's situation, as one concurring
judge wrote that the court's holding, although legally correct, was absurd and "Kafkaesque." *Id.*
at 259. He believed that if Webster were allowed to present the newly discovered evidence "to a
judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to
be mentally retarded," and thus, ineligible for the death penalty. *Id.*

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 258 of 341
Case 2:12-cv-00086-WTL-WGH   Document 29   Filed 11/13/13   Page 9 of 13   PageID #: 735
PageID #: 1902

> § 2255, which allows prisoners to bring § 2241 petitions if they can show that the
> § 2255 remedy "is inadequate or ineffective to test the legality of [the prisoner's]
> detention."

*United States v. Prevatte*, 300 F.3d 792, 799 (7th Cir. 2002) (quoting *Garza v. Lappin*, 253 F.3d

918, 921 (7th Cir. 2001)). According to the Seventh Circuit, "[a] federal prisoner should be

permitted to seek habeas corpus only if he had no reasonable opportunity to obtain earlier

judicial correction of a fundamental defect in his conviction or sentence because the law changed

after his first 2255 motion." *In re Davenport*, 147 F.3d 605, 611 (7th Cir. 1998); *see also Collins*

*v. Holinka*, 510 F.3d 666, 667 (7th Cir. 2007) (if § 2255 offers "one full and fair opportunity to

contest" one's conviction, a § 2241 petition must be dismissed under § 2255), *Potts v. United*

*States*, 210 F.3d 770, 770 (7th Cir. 2000) ("The essential point is that a prisoner is entitled to one

unencumbered opportunity to receive a decision on the merits."). The following qualifications,

however, apply to this rule:

> The first is that the change of law has to have been made retroactive by the
> Supreme Court. . . . The second is that it must be a change that eludes the
> permission in section 2255 for successive motions. . . . Third, "change in law" is
> not to be equated to a difference between the law in the circuit in which the
> prisoner was sentenced and the law in the circuit in which he is incarcerated.

*Id.* at 611-12.

Post-*Davenport*, the Seventh Circuit has concluded that "[e]very court that has addressed

the matter has held that § 2255 is 'inadequate or ineffective' only when a structural problem in §

2255 forecloses even one round of effective collateral review—and then only when as in

*Davenport* the claim being foreclosed is one of actual innocence." *Taylor v. Gilkey*, 314 F.3d

832, 835 (7th Cir. 2002); *see also Unthank v. Jett*, 549 F.3d 534, 536 (7th Cir. 2008) ("§ 2255 is

inadequate or ineffective only when a prisoner is unable to present a claim of actual innocence").

In other words, a petitioner cannot show that a motion under § 2255 is "ineffective" simply

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 259 of 341
Case 2:12-cv-00086-WTL-WGH Document 29 Filed 11/13/13 Page 10 of 13 PageID 736
PageID #: 1903

because that remedy is no longer available, either because the deadline for filing such a motion

has passed or because petitioner filed a previous motion under § 2255 and cannot satisfy the

requirements for filing a second motion under § 2255(h). *Unthank*, 549 F.3d at 535-36 (citing

*Taylor*, 314 F.3d at 836) (further rejecting argument that "whenever § 2255(h) closes the door to

a renewed challenge under § 2255, then § 2255(e) must open the door to a challenge under §

2241").

In *Taylor*, the petitioner was convicted of several drug and firearms offenses. After the

Seventh Circuit affirmed his convictions and sentences, Taylor filed a motion for relief pursuant

to § 2255 with the district court arguing that "an error in applying the Sentencing Guidelines'

grouping rules had elevated his range by 6 to 21 months, and that the judge should correct this

error by reducing his sentence." *Id.* at 833. The court denied his motion under then prevailing

Circuit law without investigating whether "counsel's failure to call this to the attention of the

trial and appellate courts was constitutionally deficient." *Id.*

Thereafter, the Supreme Court issued a decision unrelated to Taylor's case that suggested

that the district court erred in denying Taylor's § 2255 motion. As a result, Taylor filed a petition

for writ of habeas corpus under § 2241, arguing effectively that "his lawyer furnished ineffective

assistance by failing to argue at sentencing or on appeal that his convictions should have been

grouped under U.S.S.G. § 3D1.2," as the Supreme Court had ruled in a similar case. *Id.* at 836.

In determining whether Taylor's petition satisfied the savings clause of § 2255, the court

reasoned that "the sort of argument Taylor want[ed] to present . . . has been around for a long

time. . . . It does not illuminate any structural defect in § 2255 or present any fundamental error

equivalent to actual innocence." *Id.* Moreover, the court noted that, although the Supreme Court

issued a decision showing that the disposition of his first § 2255 proceeding had been mistaken,

10

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 260 of 341
Case 2:12-cv-00086-WTL-WGH Document 29 Filed 11/13/13 Page 11 of 13 PageID 1737
PageID #: 1904

"[t]he intervening decision did not . . . create a new and retroactive rule of constitutional law; at most it just showed that an error had been made in applying an old rule to Taylor's situation." *Unthank*, 549 F.3d at 535. Accordingly, Taylor's petition was denied.

Here, Webster argues that he is mentally retarded and thus ineligible for the death penalty. This sort of argument, however, is by no means new. *See Atkins v. Virginia*, 536 U.S. 304, 314 (2002) ("In 1988, when Congress enacted legislation reinstating the federal death penalty, it expressly provided that a 'sentence of death shall not be carried out upon a person who is mentally retarded.'"). Thus, the law on this topic has not recently changed such that Webster was *unable* to argue that he was mentally retarded prior to the instant petition. Rather, it is clear from the record that Webster's mental ability was a highly contested issue at every stage of the proceedings.[10] *Cf. Felder v. McVicar*, 113 F.3d 696, 698 (7th Cir. 1997) ("A newly discovered factual basis for a claim may permit filing a successive petition raising a new claim, . . . but it does not permit filing a successive petition raising the same claim that was presented in a previous petition."); *In re Hill*, 715 F.3d 284, 292 (11th Cir. 2013) (Petitioner "cannot convert his previously asserted 'claim' into a wholly new 'claim' merely by coming forward with new supporting evidence or even new legal arguments.").

Notwithstanding the foregoing, Webster argues that "[t]he newly available evidence . . . taken together with the evidence presented at trial, proves that Mr. Webster is mentally retarded

---

[10] Webster argues that "it was simply not possible for [him] to bring his claim in connection with his original petition because most of the new evidence upon which [his] Petition is based was in government files that were neither produced to [him] nor made available to him, despite his request." Webster's Br. at 31. Based on the affidavits provided by Webster, trial counsel requested the information prior to Webster's trial, but the documents were never produced. Apparently, trial counsel did not follow-up on his request. The information was not requested again until October 2008, more than twelve years after his trial and several years after his direct appeals and his initial § 2255 motion were unsuccessful. Unfortunately, it is now too late to present this evidence.

11

and, therefore, 'actually innocent' of the death penalty." Webster's Br. at 32. Thus, like one of

the petitioners in *Davenport*, he is "actually innocent" of the offense and the Court should

consider the merits of his petition. The Government argues, on the other hand, that "a challenge

to a sentence does not amount to a claim that a prisoner is innocent of the offense."

Government's Resp. at 13, Dkt. No. 17.

The term "actual innocence" is derived from § 2255(h)(1), which allows for successive

2255 motions under limited circumstances. The rule provides as follows:

> A second or successive motion must be certified as provided in section 2244 by a
> panel of the appropriate court of appeals to contain—(1) newly discovered
> evidence that, if proven and viewed in light of the evidence as a whole, would be
> sufficient to establish by clear and convincing evidence that no reasonable
> factfinder would have found the movant guilty of the offense.

Before it was codified in § 2255 of the Antiterrorism and Effective Death Penalty Act

("AEDPA"), "the 'actual innocence' exception . . . was judge-made." *Hope v. United States*, 108

F.3d 119, 120 (7th Cir. 1997). The Supreme Court discussed the judge-made actual innocence

exception as it applies in capital cases in *Sawyer v. Whitley*, 505 U.S. 333 (1992). In that case,

the Court held that "to show 'actual innocence' one must show by clear and convincing evidence

that, but for a constitutional error, no reasonable juror would have found the petitioner eligible

for the death penalty under the applicable state law." *Id.* at 336. In other words, "actual

innocence" could mean "innocent of the death penalty." Webster argues that this Court should

apply this definition and allow his petition to proceed.

Webster, however, made this exact argument before the Fifth Circuit on his motion for

authorization to file a second motion for relief under 28 U.S.C. § 2255, and the Fifth Circuit

rejected his argument, concluding that the judge-made exception noted in *Sawyer* no longer

applied. It decided that

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 262 of 341
Case 2:12-cv-00086-WTL-WGH   Document 29   Filed 11/13/13   Page 13 of 13   PageID 1739
PageID #: 1906

there is no reason to believe that Congress intended the language "guilty of the offense" to mean "eligible for a death sentence." Had Congress wanted the provision to cover challenges to a sentence—even if only to a death sentence—it easily could have referenced sentences explicitly in the text, as it did numerous times throughout § 2255. Or if Congress had intended to signal courts to incorporate the old, broad interpretation of actual innocence, it well could have used the words, "actual innocence." Instead, it elected to couch § 2255(h)(1) . . . in the markedly different, unmistakable terms of *guilt of the offense*.

*Webster 2255 III*, 605 F.3d at 258-59 (emphasis in original). Moreover, since the actual innocence exception was codified, Circuit courts, including the Seventh Circuit, have unanimously held that the *Sawyer* exception did not survive the enactment of AEPDA. *See, e.g.*, *Hope*, 108 F.3d at 120; *Hill*, 715 F.3d at 300; *Webster 2255 III*, 605 F.3d at 258. Therefore, as the Government contends, actual innocence means innocent of the offense—not innocent of the death penalty.

Webster does not argue that he is actually innocent of his crimes. He argues only that he is not eligible for the death penalty because he is mentally retarded. Thus, based on the foregoing case law, Webster is unable to show that § 2255 is an inadequate or ineffective remedy such that he may bring a petition for writ of habeas corpus under § 2241. Accordingly, and unfortunately, the Court is unable to consider the merits of Webster's petition.

## IV.   CONCLUSION

For the foregoing reasons, Webster's petition for writ of habeas corpus under 28 U.S.C. § 2241 is **DENIED**.

SO ORDERED: 11/13/2013

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | |
|---|---|
| **BRUCE CARNEIL WEBSTER,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| vs. | )     **Cause No. 2:12-cv-86-WTL-WGH** |
| | ) |
| **CHARLES LOCKETT Warden, United** | ) |
| **States Penitentiary, Terre Haute (USP),** | ) |
| | ) |
| **Respondent.** | ) |

## <u>JUDGMENT</u>

The Court having this day made its Entry, **IT IS THEREFORE ADJUDGED** that the

Petitioner take nothing by his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241,

and the civil action docketed as Cause No. 2:12-cv-86-WTL-WGH is **DISMISSED WITH**

**PREJUDICE**.

SO ORDERED:

Copies to all counsel of record via electronic communication.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| **BRUCE CARNEIL WEBSTER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| vs. | ) | **Cause No. 2:12-cv-0086-WTL-WGH** |
| | ) | |
| **CHARLES L. LOCKETT, Warden,** | ) | **Hon. William T. Lawrence** |
| **United States Penitentiary,** | ) | |
| **Terre Haute (USP),** | ) | |
| | ) | |
| **Respondent.** | ) | |

**<u>NOTICE OF APPEAL</u>**

**<u>THIS IS A DEATH PENALTY CASE</u>**

Notice is hereby given, pursuant to Fed. R. App. P. 3 and 4(a)(1)(B)(iii), that Bruce Carneil Webster, Petitioner in the above-named[1] case, hereby appeals to the United States Court of Appeals for the Seventh Circuit from the final judgment entered in this action on the 13th day of November, 2013, and from all orders subsumed therein, including but not limited to the Entry on Petition for Writ of Habeas Corpus dated November 13, 2013.

---

[1]  Please take note that the warden at the United States Penitentiary, Terre Haute, has changed since this action was commenced, and filings in the Court of Appeals will reflect this change. The current warden is John F. Caraway.

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 265 of 341
Case 2:12-cv-00086-WTL-WGH Document 31 Filed 01/09/14 Page 2 of 3 PageID #: 742
PageID #: 1909

-2-

Dated: January 9, 2014

DORSEY & WHITNEY LLP

By: s/Kirsten E. Schubert
Steven J. Wells (admitted *pro hac vice*)
(COUNSEL OF RECORD)
Kirsten E. Schubert (admitted *pro hac vice*)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

Eric K. Koselke, # 5593-54
6202 N. College Avenue
Indianapolis, IN 46220
Telephone:  (317) 722-2591
Facsimile:  (317) 257-5300

*Attorneys for Petitioner Bruce Webster*

# CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2014, a copy of the foregoing NOTICE OF APPEAL was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Dated: January 9, 2014                               DORSEY & WHITNEY LLP

                                               By:  Kirsten E. Schubert
                                               Kirsten E. Schubert

-3-

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 267 of 341
Case 2:12-cv-00086-WTL-WGH Document 32 Filed 01/09/14 Page 1 of 5 PageID #: 1744
PageID #: 1911

<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

</div>

| | | |
|---|---|---|
| **BRUCE CARNEIL WEBSTER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| vs. | ) | **Cause No. 2:12-cv-0086-WTL-WGH** |
| | ) | |
| **CHARLES L. LOCKETT, Warden,** | ) | **Hon. William T. Lawrence** |
| **United States Penitentiary,** | ) | |
| **Terre Haute (USP),** | ) | |
| | ) | |
| **Respondent.** | ) | |

<div align="center">

**<u>DOCKETING STATEMENT OF PETITIONER-APPELLANT BRUCE CARNEIL
WEBSTER</u>**

**<u>THIS IS A DEATH PENALTY CASE</u>**

</div>

Pursuant to Rules 3(c)(1) and 28(a) of the Circuit Rules for the United States

Court of Appeals for the Seventh Circuit, Petitioner-Appellant Bruce Carneil Webster

("Webster") hereby submits his Docketing Statement:

(1)     **Statement concerning the district court's jurisdiction**:  The jurisdiction

of the United States District Court for the Southern District of Indiana in the above-

captioned matter is based upon 28 U.S.C. § 2241.

(2)     **Statement concerning appellate jurisdiction**:  The United States Court of

Appeals for the Seventh Circuit has appellate jurisdiction over this matter pursuant to 28

U.S.C. § 2253(a), in that this is an appeal from a final judgment and order in a habeas

corpus proceeding.  Webster further provides the following particulars:

(i)   **The date of entry of the judgment or decree sought to be reviewed:** The order sought to be reviewed, and judgment thereon, were entered on November 13, 2013;

(ii)   **The filing date of any motion for a new trial or alteration of the judgment or any other motion claimed to toll the time within which to appeal:** No motion for a new trial, motion for alteration of the judgment, or other motion claimed to toll the time for appeal was filed in this case;

(iii)   **The disposition of such a motion and the date of its entry:** Not applicable in this case;

(iv)   **The filing date of the notice of appeal (together with information about an extension of time if one was granted):** The Notice of Appeal in this matter was filed on January 9, 2014;

(v)   **If the case is a direct appeal from the decision of a magistrate judge, the dates on which each party consented in writing to the entry of final judgment by the magistrate judge:** Not applicable in this case.

(3)   **Whether appeal is or is not from a final judgment**: This appeal is from a final judgment and from all orders subsumed therein, including the District Court's November 13, 2013 Entry on Petition for Writ of Habeas Corpus.

(4) **Prior or related appellate proceedings**:

   (i)   *In re Webster*, No. 09-11039, 605 F.3d 256 (5th Cir. 2010);

   (ii)  *United States v. Webster*, No. 03-11194, 421 F.3d 308 (5th Cir.

         2005), *cert. denied*, 549 U.S. 828 (2006);

   (iii) *United States v. Webster*, No. 96-11224, 162 F.3d 308 (5th Cir.

         1998), *cert. denied*, 528 U.S. 829 (1999).


(5) **Petitioner's current place of confinement and warden**:  Webster is

currently confined at the United States Penitentiary, Terre Haute (USP).  When this

action was commenced, the warden at Terre Haute was Charles L. Lockett.  The current

warden at Terre Haute is John F. Caraway.


(6) **No certificate of appealability required**:  This appeal does not require a

certificate of appealability.  28 U.S.C. § 2253; Fed. R. App. P. 22(b); *Bush v. Pitzer*, 133

F.3d 455, 456 (7th Cir. 1997) ("Under 28 U.S.C. § 2253(c)(1)(B), a federal prisoner

needs a certificate of appealability only when appealing from the denial of relief under 28

U.S.C. § 2255.").

Dated: January 9, 2014

DORSEY & WHITNEY LLP

By: s/Kirsten E. Schubert
Steven J. Wells (admitted *pro hac vice*)
(COUNSEL OF RECORD)
Kirsten E. Schubert (admitted *pro hac vice*)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Eric K. Koselke, # 5593-54
6202 N. College Avenue
Indianapolis, IN 46220
Telephone: (317) 722-2591
Facsimile: (317) 257-5300

*Attorneys for Petitioner Bruce Webster*

-4-

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 271 of 341
Case 2:12-cv-00086-WTL-WGH   Document 32   Filed 01/09/14   Page 5 of 5   PageID #: 748
PageID #: 1915

-5-

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2014, a copy of the foregoing DOCKETING

STATEMENT OF PETITIONER-APPELLANT BRUCE CARNEIL WEBSTER was filed

electronically.  Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Dated: January 9, 2014                                  DORSEY & WHITNEY LLP

                                                                    By:  s/Kirsten E. Schubert
                                                                    Kirsten E. Schubert

-5-

Case 2:12-cv-00086-JPH-MJD   Document 42   Filed 07/08/14   Page 272 of 341
Case 2:12-cv-00086-WTL-WGH   Document 33   Filed 01/09/14   Page 1 of 1   PageID #: 749
PageID #: 1916

## SEVENTH CIRCUIT TRANSCRIPT INFORMATION SHEET

PART I – Must be completed by party or party's attorney pursuant to Rule 10(b) of the Federal Rules of Appellate Procedure and Rule 11(a) of the Circuit Rules.  The appellant must file this form with the court reporter within 14 days of filing the notice of appeal, whether transcript is being ordered or not. (FRAP 10(b)(1)) Satisfactory arrangements with the court reporter for payment of the costs of the transcripts must also be made at that time. (FRAP 10(b)(4)) (Note: Appellees as well as appellants are expected to use this form when ordering transcripts.)

| Short Title | District | D.C. Docket No. |
|---|---|---|
| Webster v. Lockett | S.D. Ind. | 2:12-cv-0086-WTL-WGH |
| | District Judge | Court Reporter |
| | Hon. William T. Lawrence | N/A |

☐ I am ordering transcript.

☑ I am not ordering transcript because: **There were no oral arguments in this matter.**

☐ The transcript has been prepared.

Sign below and return original and one copy to court reporter. Distribute remaining copies to the Clerk of the District Court and opposing party, retaining one copy for yourself.

Indicate proceedings for which transcript is required.  Dates must be provided:                              Date(s)

☐ Pretrial proceedings.  Specify: _____     _____

☐ Voir Dire     _____

Trial or Hearing.  Specify: _____     _____

☐ Opening statement     _____

☐ Instruction conference     _____

☐ Closing statements     _____

☐ Court instructions     _____

☐ Post-trial proceedings.  Specify: _____     _____

☐ Sentencing     _____

☐ Other proceedings.  Specify: _____     _____

Method of Payment: ☐ Cash     ☐ Check or Money Order     ☐ C.J.A. Voucher

Status of Payment: ☐ Full Payment     ☐ Partial Payment     ☑ No Payment Yet

Signature: _s/ Steven J. Wells_____     Telephone No. _(612) 340-2600_

Address: _Suite 1500, 50 South Sixth Street_____
_Minneapolis, MN 55402_____     Date: _1/9/2014_

PART II – Must be completed by Court Reporter pursuant to Rule 11(b) of the Federal Rules of Appellate Procedure.  By signing this Part II, the Court Reporter certifies that *satisfactory arrangements for payment have been made*.

| U.S.C.A. Docket No. | Date Order Received | Estimated Completion Date | Estimated Length |
|---|---|---|---|
| | | | |

Signature of Court Reporter: _s/_ _____     Date: _____

NOTICE: The Judicial Conference of the United States, by its resolution of March 11, 1982, has provided that a penalty of 10 percent must apply, unless a waiver is granted by the Court of Appeals' Clerk, when a "transcript of a case on appeal is not delivered within 30 days of the date ordered and payment received therefor." The penalty is 20 percent for transcript not delivered within 60 days.

Original to Court Reporter.  Copies to: ● U.S.C.A. Clerk  ● Service Copy  ● District Court Clerk and to  ● Party / Counsel
Ordering Transcript.

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2014, a copy of the foregoing, PETITIONER-APPELLANT'S PROPOSED JOINT DESIGNATION OF ADDITIONAL ITEMS FOR THE RECORD ON APPEAL, was served on counsel for Respondent by electronic mail to the email address set forth below:

Gerald A. Coraz
gerald.coraz@usdoj.gov

I further certify that on January 9, 2014, a copy of the foregoing, PETITIONER-APPELLANT'S PROPOSED JOINT DESIGNATION OF ADDITIONAL ITEMS FOR THE RECORD ON APPEAL, was mailed, by first-class U.S. Mail, postage prepaid and properly addressed to the following:

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048

Dated: January 9, 2014                    By:s/Kirsten E. Schubert
                                          Kirsten E. Schubert (admitted *pro hac vice*)

273

**SEVENTH CIRCUIT APPEAL INFORMATION SHEET**

Include names of all plaintiffs (petitioners) and defendants (respondents) who are parties to the appeal.  Use separate sheet if needed.

District:  SOUTHERN INDIANA  Docket No.:  2:12-cv-86-WTL-WGH

Division:  TERRE HAUTE

| **Petitioner (Appellant)** | **Short Caption** | **Respondent (Appellee)** |
|---|---|---|
| BRUCE CARNEIL WEBSTER | V. | CHARLES LOCKETT |

---

**Current Counsel for Petitioner (Appellant):**  **Current Counsel for Respondent (Appellee):**

(Use separate sheet for additional counsel)

| | | | | |
|---|---|---|---|---|
| Name: | Kirsten E. Schubert | | Name: | Gerald A. Coraz |
| Firm: | DORSEY & WHITNEY LLP | | Firm: | UNITED STATES ATTORNEY'S OFFICE |
| Address: | 50 South Sixth Street | | Address: | 10 West Market Street |
| | Suite 1500 | | | Suite 2100 |
| | Minneapolis, MN 55402-1498 | | | Indianapolis, IN 46204-3048 |
| Phone: | (612) 492-6755 | | Phone: | (317) 226-6333 |

---

| | | | |
|---|---|---|---|
| Judge: | William T. Lawrence | Nature of Suit Code: | 535 |
| Court Reporter: | CATHY JONES | Date Filed in District Court: | 4/6/2012 |
| | 291 U.S. COURTHOUSE | Date of Judgment: | 11/13/2013 |
| | INDIANAPOLIS, IN 46204 | EOD: | 11/13/2013 |
| | (317) 423-0436 | Date of Notice of Appeal: | 1/9/2014 |

Counsel: _ Appointed  X Retained  _ Pro Se

Fee Status:  X Paid  _ Due  _ IFP  _ IFP Pending  _ U.S.  _ Waived

(Please mark only 1 item above)

Has Docketing Statement been filed with the District Court's Clerk's Office:  X Yes  _ No

Was certificate of Appealability: _ granted; _ denied; _ pending; X N/A

If certificate of Appealability was granted or denied, what is the date of the order: _

If Defendant is in Federal custody, please provide United States Marshal number (USM#): 26177-077

**IMPORTANT: THIS FORM IS TO ACCOMPANY THE SHORT RECORD SENT TO THE CLERK OF THE U.S. COURT OF APPEALS PURSUANT TO CIRCUIT RULE 3(a).**

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 275 of 341
Case 2:12-cv-00086-WTL-WGH   Document 35   Filed 01/09/14   Page 2 of 33   PageID 752
PageID #: 1919

**ADDITIONAL COUNSEL FOR PETITIONER:**

**Eric K. Koselke**
141 East Washington Street
Suite 200
Indianapolis, IN 46204
(317) 722-2591


**Steven J. Wells**
DORSEY & WHITNEY LLP
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402-1498
(612) 340-7809

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 276 of 341
Case 2:12-cv-00086-WTL-WGH Document 35 Filed 01/09/14 Page 3 of 33 PageID #: 753
PageID #: 1920

# UNITED STATES DISTRICT COURT
## Southern District of Indiana
## Office of the Clerk

921 OHIO STREET                                      LAURA A. BRIGGS
TERRE HAUTE, IN 47807                                CLERK OF COURT
                                                     (812) 231-1840

January 9, 2014

COUNSEL OF RECORD:

RE:  BRUCE CARNEIL WEBSTER V. CHARLES LOCKETT

CAUSE NO:  2:12-cv-86-WTL-WGH

Dear Appellant and Appellee:

    Please be advised that the Notice of Appeal received in our office has been forwarded to the U.S. Court of Appeals for the Seventh Circuit.  The Court of Appeals for the Seventh Circuit will docket the appeal and assign an appellate case number.  You will be notified of the case number assigned to this matter by the Court of Appeals.

    Filing a Designation of Record in the District Court helps ensure the correct documents (i.e. pleadings and their attachments/exhibits, exhibits) are transmitted to the Court of Appeals.  The docket sheet,  with the docket numbers that are to be included in the appellate record circled or highlighted in gray (via electronic means),  may be attached as an exhibit to your Designation of Record.  A copy of the docket sheet has been included for your convenience.  The designation may also simply list the docket numbers (all attachments and exhibits will be included) and a description of the pleadings that are being designated.  Review enclosed Local Rule 76.1 and Circuit Rule 10 for guidance regarding designation of a record. Please comply with the provisions of Rule 5 of the Federal Rules of Civil Procedure when filing your designation.

    If you have any questions, please do not hesitate to contact our office.

                                    Sincerely,

                                    LAURA A BRIGGS
                                    CLERK

                                    By Janet Mathews
                                    (812) 542-4512

Case 2:12-cv-00086-WTL-WGH Document 35-4 Filed 01/09/14 Page 4 of 33 PageID #: 754
PageID #: 1921

## Local Rule 76.1
## Designation of Additional Items to Be Included in Record on Appeal

If an appellant wishes to designate items to be included in the record on appeal pursuant to Circuit Rule 10(a), it must serve a proposed joint designation on the appellee with the notice of appeal. The parties will confer and, if they agree, will prepare a joint designation, highlighting those entries on the court's docket sheet, if practicable, and file it with the clerk of the district court within 14 days of the filing of the notice of appeal. If the parties are unable to reach agreement on a joint designation, each party may submit a separate designation within 14 days of the filing of the notice of appeal.

7th Circuit
Cir. R. 10

### CIRCUIT RULE 10. Preparation of Record in District Court Appeals

(a) *Record Preparation Duties*. The clerk of the district court shall prepare within 14 days of filing the notice of appeal the original papers, transcripts filed in the district court, and exhibits received or offered in evidence (with the exceptions listed below). The transcript of a deposition is "filed" within the meaning of this rule, and an exhibit is "received or offered," to the extent that it is tendered to the district court in support of a brief or motion, whether or not the rules of the district court treat deposition transcripts or exhibits as part of the record. These materials may be designated as part of the record on appeal without the need for a motion under Fed. R. App. P. 10(e). Counsel must ensure that exhibits and transcripts to be included in the record which are not in the possession of the district court clerk are furnished to the clerk within fourteen days after the filing of the notice of appeal. The following items will not be included in a record unless specifically requested by a party by item and date of filing within fourteen days after the notice of appeal is filed or unless specifically ordered by this court:

briefs and memoranda,

notices of filings,

subpoenas,

summonses,

motions to extend time,

affidavits and admissions of service and mailing,

notices of settings,

depositions and notices, and jury lists.

(b) *Correction or Modification of Record*. A motion to correct or modify the record pursuant to Rule 10(e), Fed. R. App. P., or a motion to strike matter from the record on the ground that it is not properly a part thereof shall be presented first to the district court. That court's order ruling on the motion will be transmitted to this court as part of the record.

(c) *Order or Certification with Regard to Transcript*. Counsel and court reporters are to utilize the form prescribed by this court when ordering transcripts or certifying that none will be ordered. For specific requirements, see Rules 10(b) and 11(b), Fed. R. App. P.

(d) *Ordering Transcripts in Criminal Cases*.

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 278 of 341
Case 2:12-cv-00086-WTL-WGH Document 35-4 Filed 01/09/14 Page 5 of 33 PageID #: 755
PageID #: 1922

(1) *Transcripts in Criminal Justice Act Cases.* At the time of the return of a verdict of guilty or, in the case of a bench trial, an adjudication of guilt in a criminal case in which the defendant is represented by counsel appointed under the Criminal Justice Act (C.J.A.), counsel for the defendant shall request a transcript of testimony and other relevant proceedings by completing a C.J.A. Form No. 24 and giving it to the district judge. If the district judge believes an appeal is probable, the judge shall order transcribed so much of the proceedings as the judge believes necessary for an appeal. The transcript shall be filed with the clerk of the district court within 40 days after the return of a verdict of guilty or, in the case of a bench trial, the adjudication of guilt or within seven days after sentencing, whichever occurs later. If the district judge decides not to order the transcript at that time, the judge shall retain the C.J.A. Form No. 24 without ruling. If a notice of appeal is filed later, appointed counsel or counsel for a defendant allowed after trial to proceed on appeal in forma pauperis shall immediately notify the district judge of the filing of a notice of appeal and file or renew the request made on C.J.A. Form No. 24 for a free transcript.

(2) *Transcripts in Other Criminal Cases.* Within 14 days after filing the notice of appeal in other criminal cases, the appellant or appellant's counsel shall deposit with the court reporter the estimated cost of the transcript ordered pursuant to Rule 10(b), Fed. R. App. P., unless the district court orders that the transcript be paid for by the United States. A non-indigent appellant must pay a pro rata share of the cost of a transcript prepared at the request of an indigent co-defendant under the Criminal Justice Act unless the district court determines that fairness requires a different division of the cost. Failure to comply with this paragraph will be cause for dismissal of the appeal.

(e) *Indexing of Transcript.* The transcript of proceedings to be transmitted to this court as part of the record on appeal (and any copies prepared for the use of the court or counsel in the case on appeal) shall be bound by the reporter in a volume or volumes, with the pages consecutively numbered throughout all volumes. The transcript of proceedings, or the first volume thereof, shall contain a suitable index, which shall refer to the number of the volume as well as the page, shall be cumulative for all volumes, and shall include the following information:

(1) An alphabetical list of witnesses, giving the pages on which the direct and each other examination of each witness begins.

(2) A list of exhibits by number, with a brief description of each exhibit indicating the nature of its contents, and with a reference to the pages of the transcript where each exhibit has been identified, offered, and received or rejected.

(3) A list of other significant portions of the trial such as opening statements, arguments to the jury, and instructions, with a reference to the page where each begins.

When the record includes transcripts of more than one trial or other distinct proceeding, and it would be cumbersome to apply this paragraph to all the transcripts taken together as one, the rule may be applied separately to each transcript of one trial or other distinct proceeding.

(f) *Presentence Reports.* The presentence report is part of the record on appeal in every criminal case. The district court should transmit this report under seal, unless it has already been placed in the public record in the district court. If the report is transmitted under seal, the report may not be included in the appendix to the brief or the separate appendix under Fed. R. App. P. 30 and Circuit Rule 30. Counsel of record may review the presentence report at the clerk's office but may not review the probation officer's written comments and any other portion submitted in camera to the trial judge.

(g) *Effect of Omissions from the Record on Appeal.* When a party's argument is countered by a contention of waiver for failure to raise the point in the trial court or before an agency, the party opposing the waiver contention must give the record cite where the point was asserted and also ensure that the record before the court of appeals contains the relevant document or transcript.

<div align="center">

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

</div>

| | | |
|---|---|---|
| **BRUCE CARNEIL WEBSTER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| vs. | ) | **Cause No. 2:12-cv-0086-WTL-WGH** |
| | ) | |
| **CHARLES L. LOCKETT, Warden,** | ) | **Hon. William T. Lawrence** |
| **United States Penitentiary,** | ) | |
| **Terre Haute (USP),** | ) | |
| | ) | |
| **Respondent.** | ) | |

<div align="center">

**NOTICE OF APPEAL**

**THIS IS A DEATH PENALTY CASE**

</div>

Notice is hereby given, pursuant to Fed. R. App. P. 3 and 4(a)(1)(B)(iii), that Bruce Carneil Webster, Petitioner in the above-named[1] case, hereby appeals to the United States Court of Appeals for the Seventh Circuit from the final judgment entered in this action on the 13th day of November, 2013, and from all orders subsumed therein, including but not limited to the Entry on Petition for Writ of Habeas Corpus dated November 13, 2013.

---

[1] Please take note that the warden at the United States Penitentiary, Terre Haute, has changed since this action was commenced, and filings in the Court of Appeals will reflect this change. The current warden is John F. Caraway.

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 281 of 341
Case 2:12-cv-00086-WTL-WGH Document 35 Filed 01/09/14 Page 8 of 33 PageID #: 758
PageID #: 1925

-2-

Dated: January 9, 2014

DORSEY & WHITNEY LLP

By: s/Kirsten E. Schubert
Steven J. Wells (admitted *pro hac vice*)
(COUNSEL OF RECORD)
Kirsten E. Schubert (admitted *pro hac vice*)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Eric K. Koselke, # 5593-54
6202 N. College Avenue
Indianapolis, IN 46220
Telephone: (317) 722-2591
Facsimile: (317) 257-5300

*Attorneys for Petitioner Bruce Webster*

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 282 of 341
Case 2:12-cv-00086-WTL-WGH   Document 35   Filed 01/09/14   Page 9 of 33   PageID #: 759
PageID #: 1926

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2014, a copy of the foregoing NOTICE OF APPEAL

was filed electronically.  Notice of this filing will be sent to the following parties by operation of

the Court's electronic filing system.  Parties may access this filing through the Court's system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Dated: January 9, 2014                          DORSEY & WHITNEY LLP

                                                By:  Kirsten E. Schubert
                                                Kirsten E. Schubert

-3-

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | |
|---|---|
| **BRUCE CARNEIL WEBSTER,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **vs.** | )     **Cause No. 2:12-cv-86-WTL-WGH** |
| | ) |
| **CHARLES LOCKETT Warden, United** | ) |
| **States Penitentiary, Terre Haute (USP),** | ) |
| | ) |
| **Respondent.** | ) |

## <u>JUDGMENT</u>

The Court having this day made its Entry, **IT IS THEREFORE ADJUDGED** that the

Petitioner take nothing by his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241,

and the civil action docketed as Cause No. 2:12-cv-86-WTL-WGH is **DISMISSED WITH**

**PREJUDICE**.

SO ORDERED:

Copies to all counsel of record via electronic communication.

283

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | | |
|---|---|---|
| **BRUCE CARNEIL WEBSTER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| vs. | ) | **Cause No. 2:12-cv-86-WTL-WGH** |
| | ) | |
| **CHARLES  LOCKETT Warden, United** | ) | |
| **States Penitentiary, Terre Haute (USP),** | ) | |
| | ) | |
| **Respondent.** | ) | |

### ENTRY ON PETITION FOR WRIT OF HABEAS CORPUS

This cause is before the Court on Petitioner Bruce Carneil Webster's petition for writ of

habeas corpus pursuant to 28 U.S.C. § 2241.[1] Dkt. No. 1. Webster's motion is fully briefed, and

the Court, being duly advised, **DENIES** the motion for the reasons set forth below.

### I.      BACKGROUND

During the fall of 1994, Webster, Orlando Hall, and Marvin Holloway operated a

marijuana trafficking business in Pine Bluff, Arkansas.[2] With the help of Steven Beckley, the

men regularly purchased marijuana from the Dallas/Fort Worth area in Texas and transported the

drugs back to Arkansas. On September 21, 1994, Hall flew to Dallas to purchase marijuana from

two local drug dealers, Stanfield Vitalis and Neil Rene. That same day, Hall and Beckley met

with Vitalis and Rene at a car wash and gave them $4,700 for the purchase of marijuana. The

---

[1] Although Webster received a sentence of death and is currently incarcerated in the
Special Confinement Unit in Terre Haute, Indiana,  his execution has been stayed pending the
outcome of *Roane v. Gonzalez*, 1:05-cv-2337 (D. D.C.). *Roane* involves a constitutional
challenge to the method of lethal injection used by the federal government. Webster's Pet. at 2,
n. 1, Dkt. No. 1.

[2] The circumstances that led to Webster's arrest and convictions are discussed in more
detail in *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998) ("*Webster Direct Appeal*").

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 285 of 341
Case 2:12-cv-00086-WTL-WGH Document 35 Filed 01/09/14 Page 12 of 53 PageID 1762
PageID #: 1929

men agreed to return to the car wash later that that day to transfer the drugs. Vitalis and Rene, however, never returned to the car wash and later claimed they were robbed of the $4,700.

On September 24, 1994, Webster flew to Dallas where he met with Hall, Hall's brother Demetrius Hall, and Beckley. After they discovered where Neil Rene lived, the four men drove to Rene's apartment and knocked on his door. Lisa Rene, Neil Rene's sixteen-year-old sister, was the only one home. She refused to let the men in and called police. Armed with handguns, a baseball bat, duct tape, and gasoline, the men forced their way into the apartment and kidnapped Lisa before police arrived. Lisa was eventually taken to a motel in Pine Bluff, Arkansas where she was held for several days. During the ordeal, she was repeatedly sexually assaulted by Webster and the other men. After two days of captivity, Webster, Hall, and Beckley drove Lisa to a park where they placed a sheet over her head and beat her with a shovel. "Webster then gagged her and dragged her into [a] grave. He stripped her, covered her with gasoline, and shoveled dirt back into the grave." *Webster Direct Appeal*, 162 F.3d at 319. Although she was "likely still breathing," Webster, Hall, and Beckley buried Lisa and returned to the motel. *Id.*

Shortly thereafter, Beckley was arrested and confessed to police. As a result, Webster was charged by indictment with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) (count one), conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c) (count two), traveling in interstate commerce with the intent to promote extortion in violation of 18 U.S.C. § 1952 (count five), and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (count six). In February 1995, the Government filed its notice of intent to seek the death penalty against Webster.

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 286 of 341
Case 2:12-cv-00086-WTL-WGH Document 35 Filed 01/09/14 Page 13 of 33 PageID 1763
PageID #: 1930

In 1996, a jury found Webster guilty of counts one, two, and six of the indictment.[3]

During a separate sentencing hearing before the same jury, Webster's defense team argued that

Webster is mentally retarded and thus could not be sentenced to death pursuant to 18 U.S.C. §

3596(c).[4] In support of this argument, defense counsel introduced as evidence Webster's low IQ

scores, testimony from Webster's friends and family, and testimony from four psychologists and

psychiatrists who examined Webster after his arrest.[5]

During the hearing, clinical psychologist Dr. Raymond Finn testified that he administered

a full-scale intelligence test on Webster, the Wechsler Adult Intelligence Scale-Revised ("WAIS-

R"), and Webster received an IQ score of 59. Dr. Finn also opined that Webster is "clearly

mentally retarded." Similarly, psychologist Dr. Denis Keyes testified that he administered two

intelligence tests on Webster, the Stanford-Binet Fourth Edition and the Kaufman Adolescent

and Adult Intelligence Test, and Webster's IQ scores were 51 and 55, respectively. Dr. Keyes

also conducted a Vineland adaptive skills test on Webster to measure his "adaptive

functioning."[6] Dr. Keyes ultimately concluded that Webster functions at the level of a seven-

year-old and is mentally retarded. Neuropsychologist Dr. Robert Fulbright testified that he

performed several neuropsychological tests on Webster. Based on the results, he believed

Webster had significant impairment in his intellectual capacity, attention capacity, and reasoning

---

[3] The Government agreed to dismiss count five.

[4] Section 3596(c) provides that "[a] sentence of death shall not be carried out upon a person who is mentally retarded."

[5] A fifth medical expert was presented on surrebuttal to critique the methodology used by one of the Government's experts.

[6] The term "adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*, Text Revision (DSM-IV-TR) at 42.

3

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 287 of 341
Case 2:12-cv-00086-WTL-WGH Document 35 Filed 01/09/14 Page 14 of 33 PageID 1764
PageID #: 1931

abilities, and suffered from limited language and memory capabilities. The fourth expert, Dr.

Mark Cunningham, testified that he spoke with Webster's family and examined Webster while

he was in prison. Dr. Cunningham further testified that Webster suffers from mild mental

retardation

Defense counsel also introduced evidence of an IQ test that was given to Webster by an

Arkansas state mental health center in 1992. The test demonstrated that Webster had an IQ of

only 48 more than a year before Lisa's kidnapping and murder. Webster's friends and family

also testified at the hearing. They stated that Webster had to repeat two grades in school, was in

special education classes, was unable to live away from his mother, received income from

welfare, food stamps, family members, and girlfriends, and had illegible handwriting.

To rebut Webster's evidence of mental retardation, the Government presented testimony

from two experts. Dr. George Parker testified that he administered a partial WAIS-R and

estimated Webster's IQ to be 72. He also testified that Webster does not suffer from mental

retardation, and Webster's IQ scores were artificially deflated because he was motivated to do

poorly on the tests to avoid the death penalty. Dr. Richard Coons, a psychiatrist, testified

similarly. Dr. Coons further claimed that Webster had lied about taking special education classes

in his youth.[7]

The Government also focused on Webster's apparent ability to adapt to life in jail. Dr.

Parker and Dr. Coons testified that Webster made his bed, put away his clothes, and kept an

organized cell while awaiting trial. Fellow inmates and corrections officers also testified that

Webster had written letters, grievances, and requests for various services, read newspapers aloud,

submitted names and addresses for his visitation list, appeared to be reading from law books and

---

[7] Two witnesses from Watson Chapel Schools testified at the sentencing hearing that
Webster did not attend special education classes while in school.

4

taking notes in the law library, and on one occasion, Webster complained because he received incorrect change from the commissary.

At the conclusion of the hearing, the jury determined that several statutory and non-statutory aggravating factors existed, *see* 18 U.S.C. § 3592, and concluded that the death penalty was an appropriate sentence for Webster's actions. On September 30, 1996, the court agreed with the jury's recommendation and sentenced Webster to death on count one, life imprisonment on count two, and sixty months' imprisonment on count six. The court also issued an entry entitled Factual Finding Regarding Mental Retardation stating that, "Webster is not mentally retarded and . . . he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty." *Webster Direct Appeal*, 162 F.3d at 351.

Webster appealed his convictions and sentence to the Fifth Circuit arguing, among other things, that his death sentence was unconstitutional because he is, in fact, mentally retarded. The court disagreed, however, noting that "[t]he government presented substantial evidence to support the finding" the he was not mentally retarded. *Id.* at 353. Webster's conviction and death sentence were ultimately affirmed by the Fifth Circuit, and the Supreme Court of the United States denied his petition for certiorari. *Webster v. United States*, 528 U.S. 829 (1999).

Thereafter, on September 29, 2000, Webster timely filed a motion for relief pursuant to 28 U.S.C. § 2255.[8] Again, Webster argued that his death sentence is improper because he is mentally retarded. Webster also argued that counsel was ineffective in failing "to investigate and present additional evidence demonstrating mental retardation and the extreme abuse Webster suffered as a child." *United States v. Webster*, 392 F.3d 787, 793 (5th Cir. 2004) ("*Webster 2255*

---

[8] An amended motion was filed on August 16, 2002.

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 289 of 341
Case 2:12-cv-00086-WTL-WGH Document 35 Filed 01/09/14 Page 16 of 33 PageID #: 1766
PageID #: 1933

*I*"). The district court denied his motion, but granted a certificate of appealability as to two of Webster's claims: "first, that the evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded; and second, that his alleged retardation renders him ineligible for a death sentence." *United States v. Webster*, 421 F.3d 308, 310 (5th Cir. 2005) ("*Webster 2255 II*").

Once more, however, the Fifth Circuit rejected Webster's arguments regarding his alleged mental retardation and provided the following explanation for its decision:

> Webster claims he is mentally retarded and thus ineligible for his death sentence, but . . . Webster's brief does not point to any new evidence bearing directly on his mental capacity; instead, it summarizes the evidence presented at trial concerning his cognitive abilities and childhood experiences.

> Webster cannot, however, continue to litigate this claim hoping that some court eventually will agree with him. The question whether he is mentally retarded was, as the district court observed, "a highly contested one at trial," and Webster failed to convince either the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may be* retarded.

*Id.* at 313-14 (citation omitted) (emphasis in original). Webster's petition for a writ of certiorari was denied by the Supreme Court. *Webster v. United States*, 549 U.S. 828 (2009).

Webster also separately appealed the district court's denial of a certificate of appealability on the remainder of his § 2255 claims, including the allegation that counsel was ineffective in failing to present additional evidence of his mental retardation during the sentencing hearing. The Fifth Circuit, however, agreed with the district court's assessment of Webster's ineffective assistance of counsel claim noting that

> [a]fter engaging in an exhaustive review of the trial record, the district court determined that defense counsel presented a significant amount of such evidence; and, although more of the same or similar evidence could have been furnished, counsel were not constitutionally ineffective for failing to present more of the same.

*Webster 2255 I*, 392 F.3d at 793. The Fifth Circuit further stated:

> Indeed, our review of the trial record confirms that Webster's counsel were far from constitutionally ineffective in investigating and presenting evidence of his mental condition and the abuse he suffered as a child. During the punishment phase, counsel presented lengthy and detailed testimony from four medical experts regarding Webster's mental capacity and the testimony of a fifth medical expert on surrebuttal to critique the methodology used by one of the government's experts in testing Webster's cognitive abilities.

*Id.* at 793-94.

Webster's appeals did not stop there, however. On October 22, 2009, Webster moved the Fifth Circuit for authorization to file a second motion for relief under 28 U.S.C. § 2255. Pursuant to § 2255(h)(1),

> A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense.

Webster argued that a successive 2255 motion was warranted because he had newly discovered evidence "in the form of government and school records and additional testimony" establishing that he is mentally retarded, and thus, ineligible for the death penalty. *In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010) ("*Webster 2255 III*"). Webster's "newly discovered evidence" included records from the Social Security Administration indicating that he was diagnosed with mental retardation months before he kidnapped, assaulted, and murdered Lisa and a letter from his school indicating that he was, in fact, enrolled in special education classes. Webster argued that, had this evidence been presented at trial, it would have refuted the Government's arguments that he was pretending to be mentally retarded to avoid the death penalty and he was lying when he said he attended special education classes. The Fifth Circuit, however, held that "a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital

7

murder." *Id.* at 257. Because Webster's newly discovered evidence challenged only his sentence, i.e., his death sentence, the court denied Webster's request to file a subsequent § 2255 motion without considering the merits of the new evidence.[9]

Webster now seeks relief from this Court pursuant to 28 U.S.C. § 2241 based on the same newly discovered evidence addressed in his motion for authorization to file a second motion under 28 U.S.C. § 2255. Webster argues that "because section 2255 is inadequate and ineffective, section 2241 is the appropriate mechanism for Petitioner to challenge the unconstitutionality of his death sentence based on previously unavailable evidence." Webster's Pet. at 26.

## II.      STANDARD

A federal court may issue a writ of habeas corpus pursuant to 28 U.S.C. § 2241(c)(3) if it finds the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." Webster seeks such a writ from this Court.

## III.      DISCUSSION

Before the Court may consider the merits of Webster's petition, the Court must determine whether he satisfies the savings clause of § 2255, and is thus entitled to attack his sentence under § 2241.

> In general, federal prisoners who wish to attack the validity of their convictions or sentences are required to proceed under § 2255. Furthermore, in the overwhelming majority of cases § 2255 specifically prohibits prisoners from circumventing § 2255 and challenging their convictions to sentences through a habeas petition under § 2241. There is, however, a recognition in the statute that it will not apply in a narrow class of cases. This is the so-called "savings clause" of

---

[9] The court, however, was not unsympathetic to Webster's situation, as one concurring judge wrote that the court's holding, although legally correct, was absurd and "Kafkaesque." *Id.* at 259. He believed that if Webster were allowed to present the newly discovered evidence "to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded," and thus, ineligible for the death penalty. *Id.*

8

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 292 of 341
Case 2:12-cv-00086-WTL-WGH Document 35 Filed 01/09/14 Page 19 of 33 PageID 769
PageID #: 1936

§ 2255, which allows prisoners to bring § 2241 petitions if they can show that the § 2255 remedy "is inadequate or ineffective to test the legality of [the prisoner's] detention."

*United States v. Prevatte*, 300 F.3d 792, 799 (7th Cir. 2002) (quoting *Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001)). According to the Seventh Circuit, "[a] federal prisoner should be permitted to seek habeas corpus only if he had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence because the law changed after his first 2255 motion." *In re Davenport*, 147 F.3d 605, 611 (7th Cir. 1998); *see also Collins v. Holinka*, 510 F.3d 666, 667 (7th Cir. 2007) (if § 2255 offers "one full and fair opportunity to contest" one's conviction, a § 2241 petition must be dismissed under § 2255), *Potts v. United States*, 210 F.3d 770, 770 (7th Cir. 2000) ("The essential point is that a prisoner is entitled to one unencumbered opportunity to receive a decision on the merits."). The following qualifications, however, apply to this rule:

> The first is that the change of law has to have been made retroactive by the Supreme Court. . . . The second is that it must be a change that eludes the permission in section 2255 for successive motions. . . . Third, "change in law" is not to be equated to a difference between the law in the circuit in which the prisoner was sentenced and the law in the circuit in which he is incarcerated.

*Id.* at 611-12.

Post-*Davenport*, the Seventh Circuit has concluded that "[e]very court that has addressed the matter has held that § 2255 is 'inadequate or ineffective' only when a structural problem in § 2255 forecloses even one round of effective collateral review—and then only when as in *Davenport* the claim being foreclosed is one of actual innocence." *Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002); *see also Unthank v. Jett*, 549 F.3d 534, 536 (7th Cir. 2008) ("§ 2255 is inadequate or ineffective only when a prisoner is unable to present a claim of actual innocence"). In other words, a petitioner cannot show that a motion under § 2255 is "ineffective" simply

9

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 293 of 341
Case 2:12-cv-00086-WTL-WGH Document 35 Filed 01/09/14 Page 20 of 33 PageID #: 1770
PageID #: 1937

because that remedy is no longer available, either because the deadline for filing such a motion

has passed or because petitioner filed a previous motion under § 2255 and cannot satisfy the

requirements for filing a second motion under § 2255(h). *Unthank*, 549 F.3d at 535-36 (citing

*Taylor*, 314 F.3d at 836) (further rejecting argument that "whenever § 2255(h) closes the door to

a renewed challenge under § 2255, then § 2255(e) must open the door to a challenge under §

2241").

In *Taylor*, the petitioner was convicted of several drug and firearms offenses. After the

Seventh Circuit affirmed his convictions and sentences, Taylor filed a motion for relief pursuant

to § 2255 with the district court arguing that "an error in applying the Sentencing Guidelines'

grouping rules had elevated his range by 6 to 21 months, and that the judge should correct this

error by reducing his sentence." *Id.* at 833. The court denied his motion under then prevailing

Circuit law without investigating whether "counsel's failure to call this to the attention of the

trial and appellate courts was constitutionally deficient." *Id.*

Thereafter, the Supreme Court issued a decision unrelated to Taylor's case that suggested

that the district court erred in denying Taylor's § 2255 motion. As a result, Taylor filed a petition

for writ of habeas corpus under § 2241, arguing effectively that "his lawyer furnished ineffective

assistance by failing to argue at sentencing or on appeal that his convictions should have been

grouped under U.S.S.G. § 3D1.2," as the Supreme Court had ruled in a similar case. *Id.* at 836.

In determining whether Taylor's petition satisfied the savings clause of § 2255, the court

reasoned that "the sort of argument Taylor want[ed] to present . . . has been around for a long

time. . . . It does not illuminate any structural defect in § 2255 or present any fundamental error

equivalent to actual innocence." *Id.* Moreover, the court noted that, although the Supreme Court

issued a decision showing that the disposition of his first § 2255 proceeding had been mistaken,

10

"[t]he intervening decision did not . . . create a new and retroactive rule of constitutional law; at most it just showed that an error had been made in applying an old rule to Taylor's situation." *Unthank*, 549 F.3d at 535. Accordingly, Taylor's petition was denied.

Here, Webster argues that he is mentally retarded and thus ineligible for the death penalty. This sort of argument, however, is by no means new. *See Atkins v. Virginia*, 536 U.S. 304, 314 (2002) ("In 1988, when Congress enacted legislation reinstating the federal death penalty, it expressly provided that a 'sentence of death shall not be carried out upon a person who is mentally retarded.'"). Thus, the law on this topic has not recently changed such that Webster was *unable* to argue that he was mentally retarded prior to the instant petition. Rather, it is clear from the record that Webster's mental ability was a highly contested issue at every stage of the proceedings.[10] *Cf. Felder v. McVicar*, 113 F.3d 696, 698 (7th Cir. 1997) ("A newly discovered factual basis for a claim may permit filing a successive petition raising a new claim, . . . but it does not permit filing a successive petition raising the same claim that was presented in a previous petition."); *In re Hill*, 715 F.3d 284, 292 (11th Cir. 2013) (Petitioner "cannot convert his previously asserted 'claim' into a wholly new 'claim' merely by coming forward with new supporting evidence or even new legal arguments.").

Notwithstanding the foregoing, Webster argues that "[t]he newly available evidence . . . taken together with the evidence presented at trial, proves that Mr. Webster is mentally retarded

---

[10] Webster argues that "it was simply not possible for [him] to bring his claim in connection with his original petition because most of the new evidence upon which [his] Petition is based was in government files that were neither produced to [him] nor made available to him, despite his request." Webster's Br. at 31. Based on the affidavits provided by Webster, trial counsel requested the information prior to Webster's trial, but the documents were never produced. Apparently, trial counsel did not follow-up on his request. The information was not requested again until October 2008, more than twelve years after his trial and several years after his direct appeals and his initial § 2255 motion were unsuccessful. Unfortunately, it is now too late to present this evidence.

11

Case 2:12-cv-00086-JRH-MJD  Document 42-1  Filed 07/08/14  Page 295 of 341
Case 2:12-cv-00086-WTL-WGH  Document 35  Filed 01/09/14  Page 22 of 33  PageID 1772
PageID #: 1939

and, therefore, 'actually innocent' of the death penalty." Webster's Br. at 32. Thus, like one of

the petitioners in *Davenport*, he is "actually innocent" of the offense and the Court should

consider the merits of his petition. The Government argues, on the other hand, that "a challenge

to a sentence does not amount to a claim that a prisoner is innocent of the offense."

Government's Resp. at 13, Dkt. No. 17.

The term "actual innocence" is derived from § 2255(h)(1), which allows for successive

2255 motions under limited circumstances. The rule provides as follows:

> A second or successive motion must be certified as provided in section 2244 by a
> panel of the appropriate court of appeals to contain—(1) newly discovered
> evidence that, if proven and viewed in light of the evidence as a whole, would be
> sufficient to establish by clear and convincing evidence that no reasonable
> factfinder would have found the movant guilty of the offense.

Before it was codified in § 2255 of the Antiterrorism and Effective Death Penalty Act

("AEDPA"), "the 'actual innocence' exception . . . was judge-made." *Hope v. United States*, 108

F.3d 119, 120 (7th Cir. 1997). The Supreme Court discussed the judge-made actual innocence

exception as it applies in capital cases in *Sawyer v. Whitley*, 505 U.S. 333 (1992). In that case,

the Court held that "to show 'actual innocence' one must show by clear and convincing evidence

that, but for a constitutional error, no reasonable juror would have found the petitioner eligible

for the death penalty under the applicable state law." *Id.* at 336. In other words, "actual

innocence" could mean "innocent of the death penalty." Webster argues that this Court should

apply this definition and allow his petition to proceed.

Webster, however, made this exact argument before the Fifth Circuit on his motion for

authorization to file a second motion for relief under 28 U.S.C. § 2255, and the Fifth Circuit

rejected his argument, concluding that the judge-made exception noted in *Sawyer* no longer

applied. It decided that

12

295

there is no reason to believe that Congress intended the language "guilty of the offense" to mean "eligible for a death sentence." Had Congress wanted the provision to cover challenges to a sentence—even if only to a death sentence—it easily could have referenced sentences explicitly in the text, as it did numerous times throughout § 2255. Or if Congress had intended to signal courts to incorporate the old, broad interpretation of actual innocence, it well could have used the words, "actual innocence." Instead, it elected to couch § 2255(h)(1) . . . in the markedly different, unmistakable terms of *guilt of the offense*.

*Webster 2255 III*, 605 F.3d at 258-59 (emphasis in original). Moreover, since the actual innocence exception was codified, Circuit courts, including the Seventh Circuit, have unanimously held that the *Sawyer* exception did not survive the enactment of AEPDA. *See, e.g.*, *Hope*, 108 F.3d at 120; *Hill*, 715 F.3d at 300; *Webster 2255 III*, 605 F.3d at 258. Therefore, as the Government contends, actual innocence means innocent of the offense—not innocent of the death penalty.

Webster does not argue that he is actually innocent of his crimes. He argues only that he is not eligible for the death penalty because he is mentally retarded. Thus, based on the foregoing case law, Webster is unable to show that § 2255 is an inadequate or ineffective remedy such that he may bring a petition for writ of habeas corpus under § 2241. Accordingly, and unfortunately, the Court is unable to consider the merits of Webster's petition.

## IV.    CONCLUSION

For the foregoing reasons, Webster's petition for writ of habeas corpus under 28 U.S.C. § 2241 is **DENIED**.

SO ORDERED: 11/13/2013

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

13

296

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 297 of 341
Case 2:12-cv-00086-WTL-WGH Document 35 Filed 01/09/14 Page 24 of 53 PageID 1774
PageID #: 1941

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

BRUCE CARNEIL WEBSTER,          )
                                )
                    Petitioner, )
                                )
        vs.                     )      Cause No. 2:12-cv-0086-WTL-WGH
                                )
CHARLES L. LOCKETT, Warden,     )      Hon. William T. Lawrence
United States Penitentiary,     )
Terre Haute (USP),              )
                                )
                Respondent.     )

## DOCKETING STATEMENT OF PETITIONER-APPELLANT BRUCE CARNEIL WEBSTER

## THIS IS A DEATH PENALTY CASE

Pursuant to Rules 3(c)(1) and 28(a) of the Circuit Rules for the United States

Court of Appeals for the Seventh Circuit, Petitioner-Appellant Bruce Carneil Webster

("Webster") hereby submits his Docketing Statement:

(1)     **Statement concerning the district court's jurisdiction**:  The jurisdiction

of the United States District Court for the Southern District of Indiana in the above-

captioned matter is based upon 28 U.S.C. § 2241.

(2)     **Statement concerning appellate jurisdiction**:  The United States Court of

Appeals for the Seventh Circuit has appellate jurisdiction over this matter pursuant to 28

U.S.C. § 2253(a), in that this is an appeal from a final judgment and order in a habeas

corpus proceeding.  Webster further provides the following particulars:

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 298 of 341
Case 2:12-cv-00086-WTL-WGH Document 35 Filed 01/09/14 Page 25 of 33 PageID 1775
PageID #: 1942

(i) **The date of entry of the judgment or decree sought to be reviewed:** The order sought to be reviewed, and judgment thereon, were entered on November 13, 2013;

(ii) **The filing date of any motion for a new trial or alteration of the judgment or any other motion claimed to toll the time within which to appeal:** No motion for a new trial, motion for alteration of the judgment, or other motion claimed to toll the time for appeal was filed in this case;

(iii) **The disposition of such a motion and the date of its entry:** Not applicable in this case;

(iv) **The filing date of the notice of appeal (together with information about an extension of time if one was granted):** The Notice of Appeal in this matter was filed on January 9, 2014;

(v) **If the case is a direct appeal from the decision of a magistrate judge, the dates on which each party consented in writing to the entry of final judgment by the magistrate judge:** Not applicable in this case.

(3) **Whether appeal is or is not from a final judgment**: This appeal is from a final judgment and from all orders subsumed therein, including the District Court's November 13, 2013 Entry on Petition for Writ of Habeas Corpus.

-2-

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 299 of 341
Case 2:12-cv-00086-WTL-WGH   Document 35   Filed 01/09/14   Page 26 of 53   PageID 776
PageID #: 1943

(4)   **Prior or related appellate proceedings**:

   (i)   *In re Webster*, No. 09-11039, 605 F.3d 256 (5th Cir. 2010);

   (ii)   *United States v. Webster*, No. 03-11194, 421 F.3d 308 (5th Cir. 2005), *cert. denied*, 549 U.S. 828 (2006);

   (iii)   *United States v. Webster*, No. 96-11224, 162 F.3d 308 (5th Cir. 1998), *cert. denied*, 528 U.S. 829 (1999).

(5)   **Petitioner's current place of confinement and warden**:  Webster is currently confined at the United States Penitentiary, Terre Haute (USP).  When this action was commenced, the warden at Terre Haute was Charles L. Lockett.  The current warden at Terre Haute is John F. Caraway.

(6)   **No certificate of appealability required**:  This appeal does not require a certificate of appealability.  28 U.S.C. § 2253; Fed. R. App. P. 22(b); *Bush v. Pitzer*, 133 F.3d 455, 456 (7th Cir. 1997) ("Under 28 U.S.C. § 2253(c)(1)(B), a federal prisoner needs a certificate of appealability only when appealing from the denial of relief under 28 U.S.C. § 2255.").

-3-

Dated: January 9, 2014                  DORSEY & WHITNEY LLP

By: s/Kirsten E. Schubert
Steven J. Wells (admitted *pro hac vice*)
(COUNSEL OF RECORD)
Kirsten E. Schubert (admitted *pro hac vice*)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Eric K. Koselke, # 5593-54
6202 N. College Avenue
Indianapolis, IN 46220
Telephone: (317) 722-2591
Facsimile: (317) 257-5300

*Attorneys for Petitioner Bruce Webster*

-4-

-5-

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2014, a copy of the foregoing DOCKETING

STATEMENT OF PETITIONER-APPELLANT BRUCE CARNEIL WEBSTER was filed

electronically.  Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Dated: January 9, 2014                                    DORSEY & WHITNEY LLP

By:  s/Kirsten E. Schubert
Kirsten E. Schubert

Case 2:12-cv-00086-WTL-WGH   Document 35   Filed 01/09/14   Page 302 of 341
PageID #: 1946

APPEAL,HABEAS,CLOSED

# U.S. District Court
## Southern District of Indiana (Terre Haute)
## CIVIL DOCKET FOR CASE #: 2:12-cv-00086-WTL-WGH

WEBSTER v. LOCKETT                                   Date Filed: 04/06/2012
Assigned to: Judge William T. Lawrence             Date Terminated: 11/13/2013
Referred to: Magistrate Judge William G. Hussmann, Jr   Jury Demand: None
Cause: 28:2241 Petition for Writ of Habeas Corpus (federa   Nature of Suit: 535 Death Penalty - Habeas
                                                     Corpus
                                                     Jurisdiction: Federal Question

**Petitioner**

**BRUCE CARNEIL WEBSTER**              represented by   **Eric K. Koselke**
                                                     141 East Washington Street
                                                     Suite 200
                                                     Indianapolis, IN 46204
                                                     (317)722-2591
                                                     Fax: (317)920-9726
                                                     Email: ekoselke@wkelaw.com
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Kirsten E. Schubert**
                                                     DORSEY & WHITNEY LLP
                                                     50 South Sixth Street
                                                     Suite 1500
                                                     Minneapolis, MN 55402-1498
                                                     612-492-6755
                                                     Fax: 612-340-8800
                                                     Email: schubert.kirsten@dorsey.com
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Steven J. Wells**
                                                     DORSEY & WHITNEY LLP
                                                     50 South Sixth Street
                                                     Suite 1500
                                                     Minneapolis, MN 55402-1498
                                                     612-340-7809
                                                     Fax: 952-516-5526
                                                     Email: wells.steve@dorsey.com
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

V.

**Respondent**

302

CM/ECF LIVE                                                                                            https://ecf.insd.circ7.dcn/cgi-bin/DktRpt.pl?123721831880383-L_1_0-1

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 303 of 341
Case 2:12-cv-00086-WTL-WGH   Document 35   Filed 01/09/14   Page 30 of 33   PageID 780
PageID #: 1947

**CHARLES LOCKETT**                                   represented by   **Gerald A. Coraz**
*Warden, United States Penitentiary, Terre*                           UNITED STATES ATTORNEY'S OFFICE
*Haute (USP)*                                                         10 West Market Street
                                                                     Suite 2100
                                                                     Indianapolis, IN 46204-3048
                                                                     (317)226-6333
                                                                     Fax: (317)226-6125
                                                                     Email: gerald.coraz@usdoj.gov
                                                                     *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/06/2012 | 1 | PETITION for Writ of Habeas Corpus, filed by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Receipt # IP029188)(MAC) (Entered: 04/06/2012) |
| 04/06/2012 | 2 | NOTICE of Appearance by Eric K. Koselke on behalf of Petitioner BRUCE CARNEIL WEBSTER. (MAC) (Entered: 04/06/2012) |
| 04/06/2012 | 3 | DECLARATION of Steven J. Wells re 1 Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. Section 2241 by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y)(MAC) (Entered: 04/06/2012) |
| 04/06/2012 | 4 | CIVIL COVER SHEET, filed by Petitioner BRUCE CARNEIL WEBSTER. (MAC) (Entered: 04/06/2012) |
| 04/19/2012 | 5 | MOTION for Attorney Kirsten E. Schubert to Appear pro hac vice, filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Text of Proposed Order Granting Schurbert to appear Pro Hac Vice)(RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 6 | MOTION for Attorney Steven J. Wells to Appear pro hac vice, filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Text of Proposed Order Granting Wells to appear Pro Hac Vice)(RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 7 | RECEIPT #IP029385 in the amount of $ 30.00 regarding PHV appearance of Kirsten E. Schubert. (RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 8 | RECEIPT #IP029386 in the amount of $ 30.00 regarding PHV appearance of Steven J. Wells. (RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 9 | ENTRY and ORDER TO SHOW CAUSE - A copy of this Entry and Order to Show Cause shall be distributed to the United States Attorney. The respondent shall have through May 30, 2012, in which to answer the allegations of the habeas petition, and in doing so shall show cause why the relief sought by the petitioner should not be granted. The petitioner shall have thirty (30) days after service of the answer in which to reply. (See Entry.) Copies mailed pursuant to distribution list. Signed by Judge William T. Lawrence on 4/19/2012.(RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 10 | ***PLEASE NOTE MARGINAL ENTRY***ORDER granting 6 Motion to Appear pro hac vice. Attorney Steven J. Wells for BRUCE CARNEIL WEBSTER added. |

CM/ECF LIVE                                               https://ecf.insd.circ7.dcn/cgi-bin/DktRpt.pl?123721831880383-L_1_0-1

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 304 of 341
Case 2:12-cv-00086-WTL-WGH   Document 35   Filed 01/09/14   Page 31 of 33   PageID 781
PageID #: 1948

| | | Signed by Magistrate Judge William G. Hussmann, Jr., on 4/19/2012. (NRN) (Entered: 04/19/2012) |
|---|---|---|
| 04/19/2012 | 11 | ***PLEASE NOTE MARGINAL ENTRY***ORDER granting 5 Motion to Appear pro hac vice. Attorney Kristen E. Schubert for BRUCE CARNEIL WEBSTER added. Signed by Magistrate Judge William G. Hussmann, Jr., on 4/19/2012. (NRN) (Entered: 04/19/2012) |
| 05/02/2012 | 12 | NOTICE of Appearance by Gerald A. Coraz on behalf of Respondent CHARLES LOCKETT. (Coraz, Gerald) (Entered: 05/02/2012) |
| 05/02/2012 | 13 | MOTION for Extension of Time to August 28, 2012 , filed by Respondent CHARLES LOCKETT. (Attachments: # 1 Text of Proposed Order)(Coraz, Gerald) (Entered: 05/02/2012) |
| 05/09/2012 | 14 | ENTRY - granting in part and denying in part 13 Motion for Extension of Time. The respondent shall have through July 10, 2012, in which to show cause why the relief sought by the petitioner shall not be granted. (See Entry.) Signed by Judge William T. Lawrence on 5/9/2012. (RSF) (Entered: 05/09/2012) |
| 07/03/2012 | 15 | Second MOTION for Extension of Time to August 9, 2012 , filed by Respondent CHARLES LOCKETT. (Attachments: # 1 Text of Proposed Order)(Coraz, Gerald) (Entered: 07/03/2012) |
| 07/08/2012 | 16 | ORDER - granting 15 Motion for Extension of Time, to 8/9/12, in which to respond to the petitioner's Writ of Habeas Corpus. Signed by Judge William T. Lawrence on 7/8/2012. (RSF) Modified on 7/9/2012 - removed language regarding mailing copy to petitioner (RSF). (Entered: 07/09/2012) |
| 08/07/2012 | 17 | RETURN TO ORDER TO SHOW CAUSE, re 9 Order to Show Cause, filed by CHARLES LOCKETT.. (Attachments: # 1 Attach 1-Summary Evidence, # 2 Attach 2-Westlaw Document)(Coraz, Gerald) (Entered: 08/07/2012) |
| 08/16/2012 | 18 | First MOTION for Extension of Time to September 29, 2012 , filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Text of Proposed Order)(Schubert, Kirsten) (Entered: 08/16/2012) |
| 08/16/2012 | 19 | Amended MOTION for Extension of Time to September 28, 2012 , filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Text of Proposed Order)(Schubert, Kirsten) (Entered: 08/16/2012) |
| 08/20/2012 | 20 | ENTRY - denying as moot 18 Motion for Extension of Time, and granting 19 Motion for Extension of Time, to 9/28/12, in which to file reply. Signed by Judge William T. Lawrence on 8/20/2012. (RSF) Modified on 8/20/2012 (RSF). (Entered: 08/20/2012) |
| 09/20/2012 | 21 | Second MOTION for Extension of Time to October 12, 2012 , filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Proposed Order)(Schubert, Kirsten) (Entered: 09/20/2012) |
| 09/24/2012 | 22 | ORDER - granting 21 Motion for Extension of Time, to 10/12/12, in which to Reply to Respondent's Return to Order to Show Cause. Signed by Judge William T. Lawrence on 9/24/2012. (RSF) (Entered: 09/24/2012) |
| 10/12/2012 | 23 | RESPONSE *Reply to Return to Order to Show Cause*, re 17 Return to Order to Show Cause, filed by Petitioner BRUCE CARNEIL WEBSTER. (Schubert, Kirsten) (Entered: 10/12/2012) |

CM/ECF LIVE

https://ecf.insd.circ7.dcn/cgi-bin/DktRpt.pl?123721831880383-L_1_0-1

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 32 of 33 PageID-782
Case 2:12-cv-00086-WTL-WGH Document 35 Filed 01/09/14 Page 32 of 33 PageID #: 1949

| 10/12/2012 | 24 | AFFIDAVIT re 23 Response *of Kirsten E. Schubert* by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Exhibit Exhibit A - 6-24-08 Rodgers Letter)(Schubert, Kirsten) (Entered: 10/12/2012) |
|---|---|---|
| 10/12/2012 | 25 | DECLARATION of Kristen K. LeRoux re 23 Response by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Exhibit A - 1996 Fax to SSA, # 2 Exhibit B - 10-27-08 Letter to SSA, # 3 Exhibit C - 12-15-08 Letter to SSA, # 4 Exhibit D - 10-8-09 Letter to SSA, # 5 Exhibit E - 10-22-09 Letter from SSA, # 6 Exhibit F - 11-23-09 Letter to SSA, # 7 Exhibit G - 12-4-09 Letter from SSA)(Schubert, Kirsten) (Entered: 10/12/2012) |
| 09/03/2013 | 26 | NOTICE of Change of Attorney Information. Consistent with Local Rule 5-3, Eric K. Koselke hereby notifies the Clerk of the court of changed contact information. (Koselke, Eric) (Entered: 09/03/2013) |
| 10/07/2013 | 27 | ORDER Granting in Part and Denying in Part United States' Motion for a Stay of Civil Proceedings in which the United States, its Agencies, or Officers are a Party. All such Civil actions are STAYED and immediately suspended, postponed and held in abeyance, pending further Order of the Court, except habeas corpus proceedings and those which are specifically exempted form this Order in Exhibit A. A copy of the United States Motion is attached to this Docket Entry. This Order is docketed into the following cases: 1:13-cv-01092-TWP-MJD, 1:13-cv-01093-WTL-TAB, 1:13-cv-01101-SEB-DKL, 1:13-cv-01110-RLY-MJD, 1:13-cv-01118-SEB-DKL, 1:13-cv-01119-SEB-MJD, 1:13-cv-01128-WTL-MJD, 1:13-cv-01132-SEB-DKL, 1:13-cv-01137-RLY-MJD, 1:13-cv-01141-SEB-DKL, 1:13-cv-01170-JMS-TAB, 1:13-cv-01172-JMS-DKL, 1:13-cv-01182-SEB-TAB, 1:13-cv-01200-SEB-DML, 1:13-cv-01209-TWP-MJD, 1:13-cv-01212-WTL-DML, 1:13-cv-01257-JMS-MJD, 1:13-cv-01283-RLY-MJD, 1:13-cv-01361-SEB-MJD, 1:13-cv-01381-TWP-DML, 1:13-cv-01383-RLY-DML, 1:13-cv-01517-TWP-DKL, 2:10-cv-00042-LJM-MJD, 2:10-cv-00140-JMS-WGH, 2:10-cv-00149-WTL-WGH, 2:10-cv-00172-JMS-WGH, 2:10-cv-00180-WTL-TAB, 2:10-cv-00244-WTL-WGH, 2:10-cv-00314-WTL-WGH, 2:11-cv-00004-LJM-WGH, 2:11-cv-00015-WTL-DKL, 2:11-cv-00091-WTL-DKL, 2:11-cv-00142-JMS-DKL, 2:11-cv-00149-WTL-WGH, 2:11-cv-00187-JMS-WGH, 2:11-cv-00262-JMS-DKL, 2:11-cv-00263-WTL-WGH, 2:11-cv-00299-WTL-WGH, 2:11-cv-00300-JMS-WGH, 2:11-cv-00337-JMS-MJD, 2:12-cv-00061-WTL-WGH, 2:12-cv-00080-WTL-WGH, 2:12-cv-00086-WTL-WGH, 2:12-cv-00109-WTL-DKL, 2:12-cv-00176-JMS-MJD, 2:12-cv-00177-JMS-WGH, 2:12-cv-00206-WTL-DKL, 2:12-cv-00211-WTL-DKL, 2:12-cv-00224-JMS-MJD, 2:12-cv-00248-LJM-DKL. Signed by Judge Richard L. Young on 10/7/2013. (Attachments: # 1 Motion to Stay)(MAC) (Entered: 10/07/2013) |
| 10/18/2013 | 28 | ORDER granting United States Motion for Order Lifting Stay of Civil Litigation in which the United States is a Party. Unless otherwise ordered by a judge of this Court or a bankruptcy judge in a particular case, any deadlines in a case, including bankruptcy cases, impacted by this Court's Order of October 7, 2013, imposed by order of a judicial officer of this Court, by a bankruptcy judge, by the Federal Rules of Civil Procedure, or by the Federal Rules of Bankruptcy Procedure, and in effect as of October 1, 2013, are hereby extended by 16 calendar days from the deadline. Any party may seek relief from this general Order extending time by motion in a particular case. This Order is docketed into the following cases: 1:13-cv-01092-TWP-MJD, 1:13-cv-01093-WTL-TAB, 1:13-cv-01101-SEB-DKL, 1:13-cv-01110-RLY-MJD, 1:13-cv-01118-SEB-DKL, 1:13-cv-01119-SEB-MJD, 1:13-cv-01128-WTL-MJD, 1:13-cv-01132-SEB-DKL, 1:13-cv-01137-RLY-MJD, 1:13-cv-01141-SEB-DKL, 1:13-cv-01170-JMS-TAB, 1:13-cv-01172-JMS-DKL, 1:13-cv-01182-SEB-TAB, 1:13-cv-01200-SEB-DML, |

Case 2:12-cv-00086-WTL-WGH   Document 35   Filed 01/09/14   Page 33 of 33   PageID #: 1950

| | | |
|---|---|---|
| | | 1:13-cv-01209-TWP-MJD, 1:13-cv-01212-WTL-DML, 1:13-cv-01257-JMS-MJD, 1:13-cv-01283-RLY-MJD, 1:13-cv-01361-SEB-MJD, 1:13-cv-01381-TWP-DML, 1:13-cv-01383-RLY-DML, 1:13-cv-01517-TWP-DKL, 2:10-cv-00042-LJM-MJD, 2:10-cv-00140-JMS-WGH, 2:10-cv-00149-WTL-WGH, 2:10-cv-00172-JMS-WGH, 2:10-cv-00180-WTL-TAB, 2:10-cv-00244-WTL-WGH, 2:10-cv-00314-WTL-WGH, 2:11-cv-00004-LJM-WGH, 2:11-cv-00015-WTL-DKL, 2:11-cv-00091-WTL-DKL, 2:11-cv-00142-JMS-DKL, 2:11-cv-00149-WTL-WGH, 2:11-cv-00187-JMS-WGH, 2:11-cv-00262-JMS-DKL, 2:11-cv-00263-WTL-WGH, 2:11-cv-00299-WTL-WGH, 2:11-cv-00300-JMS-WGH, 2:11-cv-00337-JMS-MJD, 2:12-cv-00061-WTL-WGH, 2:12-cv-00080-WTL-WGH, 2:12-cv-00086-WTL-WGH, 2:12-cv-00109-WTL-DKL, 2:12-cv-00176-JMS-MJD, 2:12-cv-00177-JMS-WGH, 2:12-cv-00206-WTL-DKL, 2:12-cv-00211-WTL-DKL, 2:12-cv-00224-JMS-MJD, 2:12-cv-00248-LJM-DKL. Signed by Judge Richard L. Young on 10/18/2013.(MAC) (Entered: 10/18/2013) |
| 11/13/2013 | 29 | ENTRY ON PETITION FOR WRIT OF HABEAS CORPUS - This cause is before the Court on Petitioner Bruce Carneil Webster's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. 1 Webster's motion is fully briefed, and the Court, being duly advised, DENIES the motion for the reasons set forth below. (See Entry.) Signed by Judge William T. Lawrence on 11/13/2013.(RSF) Modified on 11/13/2013 (RSF). (Entered: 11/13/2013) |
| 11/13/2013 | 30 | CLOSED JUDGMENT - JUDGMENT - The Petitioner take nothing by his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, and the civil action docketed as Cause No. 2:12-cv-86-WTL-WGH is DISMISSED WITH PREJUDICE. Signed by Judge William T. Lawrence on 11/13/2013.(RSF) Modified on 11/13/2013 (RSF). (Entered: 11/13/2013) |
| 01/09/2014 | 31 | NOTICE OF APPEAL as to 29 Entry, filed by Petitioner BRUCE CARNEIL WEBSTER. (Filing fee $505, receipt number 0756-2920875) (Schubert, Kirsten) (Entered: 01/09/2014) |
| 01/09/2014 | 32 | DOCKETING STATEMENT by BRUCE CARNEIL WEBSTER re 31 Notice of Appeal (Schubert, Kirsten) (Entered: 01/09/2014) |
| 01/09/2014 | 33 | SEVENTH CIRCUIT TRANSCRIPT INFORMATION SHEET by BRUCE CARNEIL WEBSTER re 31 Notice of Appeal (Schubert, Kirsten) (Entered: 01/09/2014) |

**Case #: 2:12-cv-00086-WTL-WGH**

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 307 of 341
Case 2:12-cv-00086-WTL-WGH   Document 36   Filed 01/09/14   Page 1 of 29   PageID #: 784
PageID #: 1951

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | | |
|---|---|---|
| **BRUCE CARNEIL WEBSTER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| vs. | ) | **Cause No. 2:12-cv-0086-WTL-WGH** |
| | ) | |
| **CHARLES L. LOCKETT, Warden,** | ) | **Hon. William T. Lawrence** |
| **United States Penitentiary,** | ) | |
| **Terre Haute (USP),** | ) | |
| | ) | |
| **Respondent.** | ) | |

## NOTICE OF APPEAL

## THIS IS A DEATH PENALTY CASE

Notice is hereby given, pursuant to Fed. R. App. P. 3 and 4(a)(1)(B)(iii), that Bruce Carneil Webster, Petitioner in the above-named[1] case, hereby appeals to the United States Court of Appeals for the Seventh Circuit from the final judgment entered in this action on the 13th day of November, 2013, and from all orders subsumed therein, including but not limited to the Entry on Petition for Writ of Habeas Corpus dated November 13, 2013.

---

[1] Please take note that the warden at the United States Penitentiary, Terre Haute, has changed since this action was commenced, and filings in the Court of Appeals will reflect this change. The current warden is John F. Caraway.

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 308 of 341
Case 2:12-cv-00086-WTL-WGH   Document 36   Filed 01/09/14   Page 2 of 29   PageID #: 785
PageID #: 1952

Dated: January 9, 2014

DORSEY & WHITNEY LLP

By: s/Kirsten E. Schubert
Steven J. Wells (admitted *pro hac vice*)
(COUNSEL OF RECORD)
Kirsten E. Schubert (admitted *pro hac vice*)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

Eric K. Koselke, # 5593-54
6202 N. College Avenue
Indianapolis, IN 46220
Telephone:  (317) 722-2591
Facsimile:  (317) 257-5300

*Attorneys for Petitioner Bruce Webster*

-2-

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 309 of 341
Case 2:12-cv-00086-WTL-WGH Document 36 Filed 01/09/14 Page 3 of 29 PageID #: 786
PageID #: 1953

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2014, a copy of the foregoing NOTICE OF APPEAL

was filed electronically.  Notice of this filing will be sent to the following parties by operation of

the Court's electronic filing system.  Parties may access this filing through the Court's system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Dated: January 9, 2014                    DORSEY & WHITNEY LLP

                                          By:  Kirsten E. Schubert
                                          Kirsten E. Schubert

-3-

Case 2:12-cv-00086-JPH-MJD Document 36-1 Filed 01/09/14 Page 4 of 29 PageID #: 787
Case 2:12-cv-00086-WTL-WGH Document 42-1 Filed 07/08/14 Page 310 of 341
PageID #: 1954

# SEVENTH CIRCUIT APPEAL INFORMATION SHEET

Include names of all plaintiffs (petitioners) and defendants (respondents) who are parties to the appeal. Use separate sheet if needed.

District: SOUTHERN INDIANA               Docket No.:              2:12-cv-86-WTL-WGH

Division: TERRE HAUTE

| **Petitioner (Appellant)** | **Short Caption** | **Respondent (Appellee)** |
|---|---|---|
| BRUCE CARNEIL WEBSTER | V. | CHARLES LOCKETT |

-------------------------------------------------------------------------------------------------------------------

**Current Counsel for Petitioner (Appellant):**          **Current Counsel for Respondent (Appellee):**

(Use separate sheet for additional counsel)

| | | | | |
|---|---|---|---|---|
| Name: | Kirsten E. Schubert | | Name: | Gerald A. Coraz |
| Firm: | DORSEY & WHITNEY LLP | | Firm: | UNITED STATES ATTORNEY'S |
| Address: | 50 South Sixth Street | | | OFFICE |
| | Suite 1500 | | Address: | 10 West Market Street |
| | Minneapolis, MN 55402-1498 | | | Suite 2100 |
| | | | | Indianapolis, IN 46204-3048 |

Phone:     (612) 492-6755                    Phone:     (317) 226-6333

-------------------------------------------------------------------------------------------------------------------

| | | | |
|---|---|---|---|
| Judge: | William T. Lawrence | Nature of Suit Code: | 535 |
| Court Reporter: | CATHY JONES | Date Filed in District Court: | 4/6/2012 |
| | 291 U.S. COURTHOUSE | Date of Judgment: | 11/13/2013 |
| | INDIANAPOLIS, IN 46204 | EOD: | 11/13/2013 |
| | (317) 423-0436 | Date of Notice of Appeal: | 1/9/2014 |

Counsel: _ Appointed  X Retained   _ Pro Se

Fee Status:    X Paid        _ Due _ IFP _ IFP Pending _ U.S. _ Waived

(Please mark only 1 item above)

Has Docketing Statement been filed with the District Court's Clerk's Office:        X Yes         _ No

Was certificate of Appealability: _ granted; _ denied; _ pending; X N/A

If certificate of Appealability was granted or denied, what is the date of the order: _

If Defendant is in Federal custody, please provide United States Marshal number (USM#): 26177-077

**IMPORTANT: THIS FORM IS TO ACCOMPANY THE SHORT RECORD SENT TO THE CLERK OF THE U.S. COURT OF APPEALS PURSUANT TO CIRCUIT RULE 3(a).**

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 311 of 341
Case 2:12-cv-00086-WTL-WGH   Document 36   Filed 01/09/14   Page 5 of 29   PageID #: 788
PageID #: 1955

**ADDITIONAL COUNSEL FOR PETITIONER:**

**Eric K. Koselke**
141 East Washington Street
Suite 200
Indianapolis, IN 46204
(317) 722-2591

**Steven J. Wells**
DORSEY & WHITNEY LLP
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402-1498
(612) 340-7809

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 312 of 341
Case 2:12-cv-00086-WTL-WGH Document 36 Filed 01/09/14 Page 6 of 29 PageID #: 789
PageID #: 1956

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

BRUCE CARNEIL WEBSTER,     )
     )
                  **Petitioner,**    )
     )
                **vs.**    )     **Cause No. 2:12-cv-0086-WTL-WGH**
     )
CHARLES L. LOCKETT, Warden,     )     **Hon. William T. Lawrence**
United States Penitentiary,     )
Terre Haute (USP),     )
     )
             **Respondent.**  )

## DOCKETING STATEMENT OF PETITIONER-APPELLANT BRUCE CARNEIL WEBSTER

## THIS IS A DEATH PENALTY CASE

Pursuant to Rules 3(c)(1) and 28(a) of the Circuit Rules for the United States Court of Appeals for the Seventh Circuit, Petitioner-Appellant Bruce Carneil Webster ("Webster") hereby submits his Docketing Statement:

(1)    **Statement concerning the district court's jurisdiction**:  The jurisdiction of the United States District Court for the Southern District of Indiana in the above-captioned matter is based upon 28 U.S.C. § 2241.

(2)    **Statement concerning appellate jurisdiction**:  The United States Court of Appeals for the Seventh Circuit has appellate jurisdiction over this matter pursuant to 28 U.S.C. § 2253(a), in that this is an appeal from a final judgment and order in a habeas corpus proceeding.  Webster further provides the following particulars:

Case 2:12-cv-00086-WTL-WGH Document 36-4 Filed 01/09/14 Page 7 of 29 PageID #: 790

(i) **The date of entry of the judgment or decree sought to be reviewed:** The order sought to be reviewed, and judgment thereon, were entered on November 13, 2013;

(ii) **The filing date of any motion for a new trial or alteration of the judgment or any other motion claimed to toll the time within which to appeal:** No motion for a new trial, motion for alteration of the judgment, or other motion claimed to toll the time for appeal was filed in this case;

(iii) **The disposition of such a motion and the date of its entry:** Not applicable in this case;

(iv) **The filing date of the notice of appeal (together with information about an extension of time if one was granted):** The Notice of Appeal in this matter was filed on January 9, 2014;

(v) **If the case is a direct appeal from the decision of a magistrate judge, the dates on which each party consented in writing to the entry of final judgment by the magistrate judge:** Not applicable in this case.

(3) **Whether appeal is or is not from a final judgment**: This appeal is from a final judgment and from all orders subsumed therein, including the District Court's November 13, 2013 Entry on Petition for Writ of Habeas Corpus.

-2-

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 314 of 341
Case 2:12-cv-00086-WTL-WGH Document 36 Filed 01/09/14 Page 8 of 29 PageID 791
PageID #: 1958

(4)     **Prior or related appellate proceedings**:

    (i)     *In re Webster*, No. 09-11039, 605 F.3d 256 (5th Cir. 2010);

    (ii)    *United States v. Webster*, No. 03-11194, 421 F.3d 308 (5th Cir.

2005), *cert. denied*, 549 U.S. 828 (2006);

    (iii)   *United States v. Webster*, No. 96-11224, 162 F.3d 308 (5th Cir.

1998), *cert. denied*, 528 U.S. 829 (1999).


(5)     **Petitioner's current place of confinement and warden**:  Webster is currently confined at the United States Penitentiary, Terre Haute (USP).  When this action was commenced, the warden at Terre Haute was Charles L. Lockett.  The current warden at Terre Haute is John F. Caraway.


(6)     **No certificate of appealability required**:  This appeal does not require a certificate of appealability.  28 U.S.C. § 2253; Fed. R. App. P. 22(b); *Bush v. Pitzer*, 133 F.3d 455, 456 (7th Cir. 1997) ("Under 28 U.S.C. § 2253(c)(1)(B), a federal prisoner needs a certificate of appealability only when appealing from the denial of relief under 28 U.S.C. § 2255.").

Case 2:12-cv-00086-JPH-MJD Document 42-1 Filed 07/08/14 Page 315 of 341
Case 2:12-cv-00086-WTL-WGH Document 36 Filed 01/09/14 Page 9 of 29 PageID #: 792
PageID #: 1959

-4-

Dated: January 9, 2014                    DORSEY & WHITNEY LLP

                                          By: s/Kirsten E. Schubert
                                          Steven J. Wells (admitted *pro hac vice*)
                                          (COUNSEL OF RECORD)
                                          Kirsten E. Schubert (admitted *pro hac vice*)
                                          Suite 1500, 50 South Sixth Street
                                          Minneapolis, MN 55402-1498
                                          Telephone: (612) 340-2600
                                          Facsimile: (612) 340-2868

                                          Eric K. Koselke, # 5593-54
                                          6202 N. College Avenue
                                          Indianapolis, IN 46220
                                          Telephone: (317) 722-2591
                                          Facsimile: (317) 257-5300

                                          *Attorneys for Petitioner Bruce Webster*

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 316 of 341
Case 2:12-cv-00086-WTL-WGH   Document 36   Filed 01/09/14   Page 10 of 29   PageID-793
PageID #: 1960

-5-

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2014, a copy of the foregoing DOCKETING

STATEMENT OF PETITIONER-APPELLANT BRUCE CARNEIL WEBSTER was filed

electronically.  Notice of this filing will be sent to the following parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Dated: January 9, 2014                              DORSEY & WHITNEY LLP

                                                    By:  s/Kirsten E. Schubert
                                                    Kirsten E. Schubert

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 317 of 341
Case 2:12-cv-00086-WTL-WGH   Document 36   Filed 01/09/14   Page 11 of 29   PageID 794
PageID #: 1961

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | |
|---|---|
| **BRUCE CARNEIL WEBSTER,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| vs. | )  **Cause No. 2:12-cv-86-WTL-WGH** |
| | ) |
| **CHARLES  LOCKETT Warden, United** | ) |
| **States Penitentiary, Terre Haute (USP),** | ) |
| | ) |
| **Respondent.** | ) |

**ENTRY ON PETITION FOR WRIT OF HABEAS CORPUS**

This cause is before the Court on Petitioner Bruce Carneil Webster's petition for writ of

habeas corpus pursuant to 28 U.S.C. § 2241.[1] Dkt. No. 1. Webster's motion is fully briefed, and

the Court, being duly advised, **DENIES** the motion for the reasons set forth below.

## I.    BACKGROUND

During the fall of 1994, Webster, Orlando Hall, and Marvin Holloway operated a

marijuana trafficking business in Pine Bluff, Arkansas.[2] With the help of Steven Beckley, the

men regularly purchased marijuana from the Dallas/Fort Worth area in Texas and transported the

drugs back to Arkansas. On September 21, 1994, Hall flew to Dallas to purchase marijuana from

two local drug dealers, Stanfield Vitalis and Neil Rene. That same day, Hall and Beckley met

with Vitalis and Rene at a car wash and gave them $4,700 for the purchase of marijuana. The

---

[1] Although Webster received a sentence of death and is currently incarcerated in the
Special Confinement Unit in Terre Haute, Indiana,  his execution has been stayed pending the
outcome of *Roane v. Gonzalez*, 1:05-cv-2337 (D. D.C.). *Roane* involves a constitutional
challenge to the method of lethal injection used by the federal government. Webster's Pet. at 2,
n. 1, Dkt. No. 1.

[2] The circumstances that led to Webster's arrest and convictions are discussed in more
detail in *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998) ("*Webster Direct Appeal*").

Case 2:12-cv-00086-WTL-WGH Document 36 Filed 01/09/14 Page 12 of 29 PageID #: 1962

men agreed to return to the car wash later that that day to transfer the drugs. Vitalis and Rene, however, never returned to the car wash and later claimed they were robbed of the $4,700.

On September 24, 1994, Webster flew to Dallas where he met with Hall, Hall's brother Demetrius Hall, and Beckley. After they discovered where Neil Rene lived, the four men drove to Rene's apartment and knocked on his door. Lisa Rene, Neil Rene's sixteen-year-old sister, was the only one home. She refused to let the men in and called police. Armed with handguns, a baseball bat, duct tape, and gasoline, the men forced their way into the apartment and kidnapped Lisa before police arrived. Lisa was eventually taken to a motel in Pine Bluff, Arkansas where she was held for several days. During the ordeal, she was repeatedly sexually assaulted by Webster and the other men. After two days of captivity, Webster, Hall, and Beckley drove Lisa to a park where they placed a sheet over her head and beat her with a shovel. "Webster then gagged her and dragged her into [a] grave. He stripped her, covered her with gasoline, and shoveled dirt back into the grave." *Webster Direct Appeal*, 162 F.3d at 319. Although she was "likely still breathing," Webster, Hall, and Beckley buried Lisa and returned to the motel. *Id.*

Shortly thereafter, Beckley was arrested and confessed to police. As a result, Webster was charged by indictment with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) (count one), conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c) (count two), traveling in interstate commerce with the intent to promote extortion in violation of 18 U.S.C. § 1952 (count five), and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (count six). In February 1995, the Government filed its notice of intent to seek the death penalty against Webster.

2

In 1996, a jury found Webster guilty of counts one, two, and six of the indictment.[3] During a separate sentencing hearing before the same jury, Webster's defense team argued that Webster is mentally retarded and thus could not be sentenced to death pursuant to 18 U.S.C. § 3596(c).[4] In support of this argument, defense counsel introduced as evidence Webster's low IQ scores, testimony from Webster's friends and family, and testimony from four psychologists and psychiatrists who examined Webster after his arrest.[5]

During the hearing, clinical psychologist Dr. Raymond Finn testified that he administered a full-scale intelligence test on Webster, the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"), and Webster received an IQ score of 59. Dr. Finn also opined that Webster is "clearly mentally retarded." Similarly, psychologist Dr. Denis Keyes testified that he administered two intelligence tests on Webster, the Stanford-Binet Fourth Edition and the Kaufman Adolescent and Adult Intelligence Test, and Webster's IQ scores were 51 and 55, respectively. Dr. Keyes also conducted a Vineland adaptive skills test on Webster to measure his "adaptive functioning."[6] Dr. Keyes ultimately concluded that Webster functions at the level of a seven-year-old and is mentally retarded. Neuropsychologist Dr. Robert Fulbright testified that he performed several neuropsychological tests on Webster. Based on the results, he believed Webster had significant impairment in his intellectual capacity, attention capacity, and reasoning

---

[3] The Government agreed to dismiss count five.

[4] Section 3596(c) provides that "[a] sentence of death shall not be carried out upon a person who is mentally retarded."

[5] A fifth medical expert was presented on surrebuttal to critique the methodology used by one of the Government's experts.

[6] The term "adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*, Text Revision (DSM-IV-TR) at 42.

3

abilities, and suffered from limited language and memory capabilities. The fourth expert, Dr. Mark Cunningham, testified that he spoke with Webster's family and examined Webster while he was in prison. Dr. Cunningham further testified that Webster suffers from mild mental retardation

Defense counsel also introduced evidence of an IQ test that was given to Webster by an Arkansas state mental health center in 1992. The test demonstrated that Webster had an IQ of only 48 more than a year before Lisa's kidnapping and murder. Webster's friends and family also testified at the hearing. They stated that Webster had to repeat two grades in school, was in special education classes, was unable to live away from his mother, received income from welfare, food stamps, family members, and girlfriends, and had illegible handwriting.

To rebut Webster's evidence of mental retardation, the Government presented testimony from two experts. Dr. George Parker testified that he administered a partial WAIS-R and estimated Webster's IQ to be 72. He also testified that Webster does not suffer from mental retardation, and Webster's IQ scores were artificially deflated because he was motivated to do poorly on the tests to avoid the death penalty. Dr. Richard Coons, a psychiatrist, testified similarly. Dr. Coons further claimed that Webster had lied about taking special education classes in his youth.[7]

The Government also focused on Webster's apparent ability to adapt to life in jail. Dr. Parker and Dr. Coons testified that Webster made his bed, put away his clothes, and kept an organized cell while awaiting trial. Fellow inmates and corrections officers also testified that Webster had written letters, grievances, and requests for various services, read newspapers aloud, submitted names and addresses for his visitation list, appeared to be reading from law books and

---

[7] Two witnesses from Watson Chapel Schools testified at the sentencing hearing that Webster did not attend special education classes while in school.

taking notes in the law library, and on one occasion, Webster complained because he received incorrect change from the commissary.

At the conclusion of the hearing, the jury determined that several statutory and non-statutory aggravating factors existed, *see* 18 U.S.C. § 3592, and concluded that the death penalty was an appropriate sentence for Webster's actions. On September 30, 1996, the court agreed with the jury's recommendation and sentenced Webster to death on count one, life imprisonment on count two, and sixty months' imprisonment on count six. The court also issued an entry entitled Factual Finding Regarding Mental Retardation stating that, "Webster is not mentally retarded and . . . he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty." *Webster Direct Appeal*, 162 F.3d at 351.

Webster appealed his convictions and sentence to the Fifth Circuit arguing, among other things, that his death sentence was unconstitutional because he is, in fact, mentally retarded. The court disagreed, however, noting that "[t]he government presented substantial evidence to support the finding" the he was not mentally retarded. *Id.* at 353. Webster's conviction and death sentence were ultimately affirmed by the Fifth Circuit, and the Supreme Court of the United States denied his petition for certiorari. *Webster v. United States*, 528 U.S. 829 (1999).

Thereafter, on September 29, 2000, Webster timely filed a motion for relief pursuant to 28 U.S.C. § 2255.[8] Again, Webster argued that his death sentence is improper because he is mentally retarded. Webster also argued that counsel was ineffective in failing "to investigate and present additional evidence demonstrating mental retardation and the extreme abuse Webster suffered as a child." *United States v. Webster*, 392 F.3d 787, 793 (5th Cir. 2004) ("*Webster 2255*

---

[8] An amended motion was filed on August 16, 2002.

*I*'). The district court denied his motion, but granted a certificate of appealability as to two of Webster's claims: "first, that the evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded; and second, that his alleged retardation renders him ineligible for a death sentence." *United States v. Webster*, 421 F.3d 308, 310 (5th Cir. 2005) ("*Webster 2255 II*").

Once more, however, the Fifth Circuit rejected Webster's arguments regarding his alleged mental retardation and provided the following explanation for its decision:

> Webster claims he is mentally retarded and thus ineligible for his death sentence, but . . . Webster's brief does not point to any new evidence bearing directly on his mental capacity; instead, it summarizes the evidence presented at trial concerning his cognitive abilities and childhood experiences.

> Webster cannot, however, continue to litigate this claim hoping that some court eventually will agree with him. The question whether he is mentally retarded was, as the district court observed, "a highly contested one at trial," and Webster failed to convince either the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may be* retarded.

*Id.* at 313-14 (citation omitted) (emphasis in original). Webster's petition for a writ of certiorari was denied by the Supreme Court. *Webster v. United States*, 549 U.S. 828 (2009).

Webster also separately appealed the district court's denial of a certificate of appealability on the remainder of his § 2255 claims, including the allegation that counsel was ineffective in failing to present additional evidence of his mental retardation during the sentencing hearing. The Fifth Circuit, however, agreed with the district court's assessment of Webster's ineffective assistance of counsel claim noting that

> [a]fter engaging in an exhaustive review of the trial record, the district court determined that defense counsel presented a significant amount of such evidence; and, although more of the same or similar evidence could have been furnished, counsel were not constitutionally ineffective for failing to present more of the same.

*Webster 2255 I*, 392 F.3d at 793. The Fifth Circuit further stated:

6

322

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 323 of 341
Case 2:12-cv-00086-WTL-WGH Document 36 Filed 01/09/14 Page 17 of 29 PageID 800
PageID #: 1967

> Indeed, our review of the trial record confirms that Webster's counsel were far from constitutionally ineffective in investigating and presenting evidence of his mental condition and the abuse he suffered as a child. During the punishment phase, counsel presented lengthy and detailed testimony from four medical experts regarding Webster's mental capacity and the testimony of a fifth medical expert on surrebuttal to critique the methodology used by one of the government's experts in testing Webster's cognitive abilities.

*Id.* at 793-94.

Webster's appeals did not stop there, however. On October 22, 2009, Webster moved the Fifth Circuit for authorization to file a second motion for relief under 28 U.S.C. § 2255. Pursuant to § 2255(h)(1),

> A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense.

Webster argued that a successive 2255 motion was warranted because he had newly discovered evidence "in the form of government and school records and additional testimony" establishing that he is mentally retarded, and thus, ineligible for the death penalty. *In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010) ("*Webster 2255 III*"). Webster's "newly discovered evidence" included records from the Social Security Administration indicating that he was diagnosed with mental retardation months before he kidnapped, assaulted, and murdered Lisa and a letter from his school indicating that he was, in fact, enrolled in special education classes. Webster argued that, had this evidence been presented at trial, it would have refuted the Government's arguments that he was pretending to be mentally retarded to avoid the death penalty and he was lying when he said he attended special education classes. The Fifth Circuit, however, held that "a petitioner cannot bring a successive claim under § 2255(h)(1) where he does not assert that the newly discovered evidence would negate his guilt of the offense of which he was convicted, *i.e.*, capital

7

murder." *Id.* at 257. Because Webster's newly discovered evidence challenged only his sentence, i.e., his death sentence, the court denied Webster's request to file a subsequent § 2255 motion without considering the merits of the new evidence.[9]

Webster now seeks relief from this Court pursuant to 28 U.S.C. § 2241 based on the same newly discovered evidence addressed in his motion for authorization to file a second motion under 28 U.S.C. § 2255. Webster argues that "because section 2255 is inadequate and ineffective, section 2241 is the appropriate mechanism for Petitioner to challenge the unconstitutionality of his death sentence based on previously unavailable evidence." Webster's Pet. at 26.

## II.   STANDARD

A federal court may issue a writ of habeas corpus pursuant to 28 U.S.C. § 2241(c)(3) if it finds the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." Webster seeks such a writ from this Court.

## III.   DISCUSSION

Before the Court may consider the merits of Webster's petition, the Court must determine whether he satisfies the savings clause of § 2255, and is thus entitled to attack his sentence under § 2241.

> In general, federal prisoners who wish to attack the validity of their convictions or sentences are required to proceed under § 2255. Furthermore, in the overwhelming majority of cases § 2255 specifically prohibits prisoners from circumventing § 2255 and challenging their convictions to sentences through a habeas petition under § 2241. There is, however, a recognition in the statute that it will not apply in a narrow class of cases. This is the so-called "savings clause" of

---

[9] The court, however, was not unsympathetic to Webster's situation, as one concurring judge wrote that the court's holding, although legally correct, was absurd and "Kafkaesque." *Id.* at 259. He believed that if Webster were allowed to present the newly discovered evidence "to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded," and thus, ineligible for the death penalty. *Id.*

8

§ 2255, which allows prisoners to bring § 2241 petitions if they can show that the § 2255 remedy "is inadequate or ineffective to test the legality of [the prisoner's] detention."

*United States v. Prevatte*, 300 F.3d 792, 799 (7th Cir. 2002) (quoting *Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001)). According to the Seventh Circuit, "[a] federal prisoner should be permitted to seek habeas corpus only if he had no reasonable opportunity to obtain earlier judicial correction of a fundamental defect in his conviction or sentence because the law changed after his first 2255 motion." *In re Davenport*, 147 F.3d 605, 611 (7th Cir. 1998); *see also Collins v. Holinka*, 510 F.3d 666, 667 (7th Cir. 2007) (if § 2255 offers "one full and fair opportunity to contest" one's conviction, a § 2241 petition must be dismissed under § 2255), *Potts v. United States*, 210 F.3d 770, 770 (7th Cir. 2000) ("The essential point is that a prisoner is entitled to one unencumbered opportunity to receive a decision on the merits."). The following qualifications, however, apply to this rule:

> The first is that the change of law has to have been made retroactive by the Supreme Court. . . . The second is that it must be a change that eludes the permission in section 2255 for successive motions. . . . Third, "change in law" is not to be equated to a difference between the law in the circuit in which the prisoner was sentenced and the law in the circuit in which he is incarcerated.

*Id.* at 611-12.

Post-*Davenport*, the Seventh Circuit has concluded that "[e]very court that has addressed the matter has held that § 2255 is 'inadequate or ineffective' only when a structural problem in § 2255 forecloses even one round of effective collateral review—and then only when as in *Davenport* the claim being foreclosed is one of actual innocence." *Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002); *see also Unthank v. Jett*, 549 F.3d 534, 536 (7th Cir. 2008) ("§ 2255 is inadequate or ineffective only when a prisoner is unable to present a claim of actual innocence"). In other words, a petitioner cannot show that a motion under § 2255 is "ineffective" simply

9

because that remedy is no longer available, either because the deadline for filing such a motion has passed or because petitioner filed a previous motion under § 2255 and cannot satisfy the requirements for filing a second motion under § 2255(h). *Unthank*, 549 F.3d at 535-36 (citing *Taylor*, 314 F.3d at 836) (further rejecting argument that "whenever § 2255(h) closes the door to a renewed challenge under § 2255, then § 2255(e) must open the door to a challenge under § 2241").

In *Taylor*, the petitioner was convicted of several drug and firearms offenses. After the Seventh Circuit affirmed his convictions and sentences, Taylor filed a motion for relief pursuant to § 2255 with the district court arguing that "an error in applying the Sentencing Guidelines' grouping rules had elevated his range by 6 to 21 months, and that the judge should correct this error by reducing his sentence." *Id.* at 833. The court denied his motion under then prevailing Circuit law without investigating whether "counsel's failure to call this to the attention of the trial and appellate courts was constitutionally deficient." *Id.*

Thereafter, the Supreme Court issued a decision unrelated to Taylor's case that suggested that the district court erred in denying Taylor's § 2255 motion. As a result, Taylor filed a petition for writ of habeas corpus under § 2241, arguing effectively that "his lawyer furnished ineffective assistance by failing to argue at sentencing or on appeal that his convictions should have been grouped under U.S.S.G. § 3D1.2," as the Supreme Court had ruled in a similar case. *Id.* at 836. In determining whether Taylor's petition satisfied the savings clause of § 2255, the court reasoned that "the sort of argument Taylor want[ed] to present . . . has been around for a long time. . . . It does not illuminate any structural defect in § 2255 or present any fundamental error equivalent to actual innocence." *Id.* Moreover, the court noted that, although the Supreme Court issued a decision showing that the disposition of his first § 2255 proceeding had been mistaken,

10

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 327 of 341
Case 2:12-cv-00086-WFL-WGH   Document 36   Filed 01/09/14   Page 21 of 29   PageID 804
PageID #: 1971

"[t]he intervening decision did not . . . create a new and retroactive rule of constitutional law; at most it just showed that an error had been made in applying an old rule to Taylor's situation." *Unthank*, 549 F.3d at 535. Accordingly, Taylor's petition was denied.

Here, Webster argues that he is mentally retarded and thus ineligible for the death penalty. This sort of argument, however, is by no means new. *See Atkins v. Virginia*, 536 U.S. 304, 314 (2002) ("In 1988, when Congress enacted legislation reinstating the federal death penalty, it expressly provided that a 'sentence of death shall not be carried out upon a person who is mentally retarded.'"). Thus, the law on this topic has not recently changed such that Webster was *unable* to argue that he was mentally retarded prior to the instant petition. Rather, it is clear from the record that Webster's mental ability was a highly contested issue at every stage of the proceedings.[10] *Cf. Felder v. McVicar*, 113 F.3d 696, 698 (7th Cir. 1997) ("A newly discovered factual basis for a claim may permit filing a successive petition raising a new claim, . . . but it does not permit filing a successive petition raising the same claim that was presented in a previous petition."); *In re Hill*, 715 F.3d 284, 292 (11th Cir. 2013) (Petitioner "cannot convert his previously asserted 'claim' into a wholly new 'claim' merely by coming forward with new supporting evidence or even new legal arguments.").

Notwithstanding the foregoing, Webster argues that "[t]he newly available evidence . . . taken together with the evidence presented at trial, proves that Mr. Webster is mentally retarded

---

[10] Webster argues that "it was simply not possible for [him] to bring his claim in connection with his original petition because most of the new evidence upon which [his] Petition is based was in government files that were neither produced to [him] nor made available to him, despite his request." Webster's Br. at 31. Based on the affidavits provided by Webster, trial counsel requested the information prior to Webster's trial, but the documents were never produced. Apparently, trial counsel did not follow-up on his request. The information was not requested again until October 2008, more than twelve years after his trial and several years after his direct appeals and his initial § 2255 motion were unsuccessful. Unfortunately, it is now too late to present this evidence.

11

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 22 of 35
Case 2:12-cv-00086-WTL-WGH Document 36 Filed 01/09/14 Page 22 of 29 PageID 805
PageID #: 1972

and, therefore, 'actually innocent' of the death penalty." Webster's Br. at 32. Thus, like one of

the petitioners in *Davenport*, he is "actually innocent" of the offense and the Court should

consider the merits of his petition. The Government argues, on the other hand, that "a challenge

to a sentence does not amount to a claim that a prisoner is innocent of the offense."

Government's Resp. at 13, Dkt. No. 17.

The term "actual innocence" is derived from § 2255(h)(1), which allows for successive

2255 motions under limited circumstances. The rule provides as follows:

> A second or successive motion must be certified as provided in section 2244 by a
> panel of the appropriate court of appeals to contain—(1) newly discovered
> evidence that, if proven and viewed in light of the evidence as a whole, would be
> sufficient to establish by clear and convincing evidence that no reasonable
> factfinder would have found the movant guilty of the offense.

Before it was codified in § 2255 of the Antiterrorism and Effective Death Penalty Act

("AEDPA"), "the 'actual innocence' exception . . . was judge-made." *Hope v. United States*, 108

F.3d 119, 120 (7th Cir. 1997). The Supreme Court discussed the judge-made actual innocence

exception as it applies in capital cases in *Sawyer v. Whitley*, 505 U.S. 333 (1992). In that case,

the Court held that "to show 'actual innocence' one must show by clear and convincing evidence

that, but for a constitutional error, no reasonable juror would have found the petitioner eligible

for the death penalty under the applicable state law." *Id.* at 336. In other words, "actual

innocence" could mean "innocent of the death penalty." Webster argues that this Court should

apply this definition and allow his petition to proceed.

Webster, however, made this exact argument before the Fifth Circuit on his motion for

authorization to file a second motion for relief under 28 U.S.C. § 2255, and the Fifth Circuit

rejected his argument, concluding that the judge-made exception noted in *Sawyer* no longer

applied. It decided that

12

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 329 of 341
Case 2:12-cv-00086-WTL-WGH Document 36 Filed 01/09/14 Page 23 of 29 PageID 806
PageID #: 1973

there is no reason to believe that Congress intended the language "guilty of the offense" to mean "eligible for a death sentence." Had Congress wanted the provision to cover challenges to a sentence—even if only to a death sentence—it easily could have referenced sentences explicitly in the text, as it did numerous times throughout § 2255. Or if Congress had intended to signal courts to incorporate the old, broad interpretation of actual innocence, it well could have used the words, "actual innocence." Instead, it elected to couch § 2255(h)(1) . . . in the markedly different, unmistakable terms of *guilt of the offense*.

*Webster 2255 III*, 605 F.3d at 258-59 (emphasis in original). Moreover, since the actual innocence exception was codified, Circuit courts, including the Seventh Circuit, have unanimously held that the *Sawyer* exception did not survive the enactment of AEPDA. *See, e.g.*, *Hope*, 108 F.3d at 120; *Hill*, 715 F.3d at 300; *Webster 2255 III*, 605 F.3d at 258. Therefore, as the Government contends, actual innocence means innocent of the offense—not innocent of the death penalty.

Webster does not argue that he is actually innocent of his crimes. He argues only that he is not eligible for the death penalty because he is mentally retarded. Thus, based on the foregoing case law, Webster is unable to show that § 2255 is an inadequate or ineffective remedy such that he may bring a petition for writ of habeas corpus under § 2241. Accordingly, and unfortunately, the Court is unable to consider the merits of Webster's petition.

## IV.     CONCLUSION

For the foregoing reasons, Webster's petition for writ of habeas corpus under 28 U.S.C. § 2241 is **DENIED**.

SO ORDERED: 11/13/2013

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

13

329

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 330 of 341
Case 2:12-cv-00086-WTL-WGH Document 36 Filed 01/09/14 Page 24 of 29 PageID 807
PageID #: 1974

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Cause No. 2:12-cv-86-WTL-WGH |
| | ) | |
| CHARLES LOCKETT Warden, United | ) | |
| States Penitentiary, Terre Haute (USP), | ) | |
| | ) | |
| Respondent. | ) | |

## JUDGMENT

The Court having this day made its Entry, **IT IS THEREFORE ADJUDGED** that the

Petitioner take nothing by his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241,

and the civil action docketed as Cause No. 2:12-cv-86-WTL-WGH is **DISMISSED WITH**

**PREJUDICE**.

SO ORDERED:

Copies to all counsel of record via electronic communication.

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 331 of 341

# U.S. District Court
## Southern District of Indiana (Terre Haute)
## CIVIL DOCKET FOR CASE #: 2:12-cv-00086-WTL-WGH

WEBSTER v. LOCKETT                                             Date Filed: 04/06/2012
Assigned to: Judge William T. Lawrence                         Date Terminated: 11/13/2013
Referred to: Magistrate Judge William G. Hussmann, Jr          Jury Demand: None
Cause: 28:2241 Petition for Writ of Habeas Corpus (federa      Nature of Suit: 535 Death Penalty - Habeas
                                                               Corpus
                                                               Jurisdiction: Federal Question

**Petitioner**

**BRUCE CARNEIL WEBSTER**              represented by  **Eric K. Koselke**
                                                       141 East Washington Street
                                                       Suite 200
                                                       Indianapolis, IN 46204
                                                       (317)722-2591
                                                       Fax: (317)920-9726
                                                       Email: ekoselke@wkelaw.com
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Kirsten E. Schubert**
                                                       DORSEY & WHITNEY LLP
                                                       50 South Sixth Street
                                                       Suite 1500
                                                       Minneapolis, MN 55402-1498
                                                       612-492-6755
                                                       Fax: 612-340-8800
                                                       Email: schubert.kirsten@dorsey.com
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Steven J. Wells**
                                                       DORSEY & WHITNEY LLP
                                                       50 South Sixth Street
                                                       Suite 1500
                                                       Minneapolis, MN 55402-1498
                                                       612-340-7809
                                                       Fax: 952-516-5526
                                                       Email: wells.steve@dorsey.com
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

V.

**Respondent**

CM/ECF LIVE                                                                https://ecf.insd.circ7.dcn/cgi-bin/DktRpt.pl?30679241534544-L_1_0-1

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 332 of 341
Case 2:12-cv-00086-WTL-WGH   Document 36   Filed 01/09/14   Page 2 of 29   PageID-809
PageID #: 1976

**CHARLES LOCKETT**                             represented by **Gerald A. Coraz**
*Warden, United States Penitentiary, Terre*                    UNITED STATES ATTORNEY'S OFFICE
*Haute (USP)*                                                   10 West Market Street
                                                               Suite 2100
                                                               Indianapolis, IN 46204-3048
                                                               (317)226-6333
                                                               Fax: (317)226-6125
                                                               Email: gerald.coraz@usdoj.gov
                                                               *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/06/2012 | 1 | PETITION for Writ of Habeas Corpus, filed by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Receipt # IP029188)(MAC) (Entered: 04/06/2012) |
| 04/06/2012 | 2 | NOTICE of Appearance by Eric K. Koselke on behalf of Petitioner BRUCE CARNEIL WEBSTER. (MAC) (Entered: 04/06/2012) |
| 04/06/2012 | 3 | DECLARATION of Steven J. Wells re 1 Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. Section 2241 by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y)(MAC) (Entered: 04/06/2012) |
| 04/06/2012 | 4 | CIVIL COVER SHEET, filed by Petitioner BRUCE CARNEIL WEBSTER. (MAC) (Entered: 04/06/2012) |
| 04/19/2012 | 5 | MOTION for Attorney Kirsten E. Schubert to Appear pro hac vice, filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Text of Proposed Order Granting Schurbert to appear Pro Hac Vice)(RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 6 | MOTION for Attorney Steven J. Wells to Appear pro hac vice, filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Text of Proposed Order Granting Wells to appear Pro Hac Vice)(RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 7 | RECEIPT #IP029385 in the amount of $ 30.00 regarding PHV appearance of Kirsten E. Schubert. (RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 8 | RECEIPT #IP029386 in the amount of $ 30.00 regarding PHV appearance of Steven J. Wells. (RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 9 | ENTRY and ORDER TO SHOW CAUSE - A copy of this Entry and Order to Show Cause shall be distributed to the United States Attorney. The respondent shall have through May 30, 2012, in which to answer the allegations of the habeas petition, and in doing so shall show cause why the relief sought by the petitioner should not be granted. The petitioner shall have thirty (30) days after service of the answer in which to reply. (See Entry.) Copies mailed pursuant to distribution list. Signed by Judge William T. Lawrence on 4/19/2012.(RSF) (Entered: 04/19/2012) |
| 04/19/2012 | 10 | ***PLEASE NOTE MARGINAL ENTRY***ORDER granting 6 Motion to Appear pro hac vice. Attorney Steven J. Wells for BRUCE CARNEIL WEBSTER added. |

CM/ECF LIVE                                                                                                           https://ecf.insd.circ7.dcn/cgi-bin/DktRpt.pl?30679241534544-L_1_0-1

Case 2:12-cv-00086-JRH-MJD   Document 42-1   Filed 07/08/14   Page 333 of 341
Case 2:12-cv-00086-WTL-WGH   Document 36   Filed 01/09/14   Page 27 of 29   PageID #: 810
PageID #: 1977

| | | Signed by Magistrate Judge William G. Hussmann, Jr., on 4/19/2012. (NRN) (Entered: 04/19/2012) |
|---|---|---|
| 04/19/2012 | 11 | ***PLEASE NOTE MARGINAL ENTRY***ORDER granting 5 Motion to Appear pro hac vice. Attorney Kristen E. Schubert for BRUCE CARNEIL WEBSTER added. Signed by Magistrate Judge William G. Hussmann, Jr., on 4/19/2012. (NRN) (Entered: 04/19/2012) |
| 05/02/2012 | 12 | NOTICE of Appearance by Gerald A. Coraz on behalf of Respondent CHARLES LOCKETT. (Coraz, Gerald) (Entered: 05/02/2012) |
| 05/02/2012 | 13 | MOTION for Extension of Time to August 28, 2012 , filed by Respondent CHARLES LOCKETT. (Attachments: # 1 Text of Proposed Order)(Coraz, Gerald) (Entered: 05/02/2012) |
| 05/09/2012 | 14 | ENTRY - granting in part and denying in part 13 Motion for Extension of Time. The respondent shall have through July 10, 2012, in which to show cause why the relief sought by the petitioner shall not be granted. (See Entry.) Signed by Judge William T. Lawrence on 5/9/2012. (RSF) (Entered: 05/09/2012) |
| 07/03/2012 | 15 | Second MOTION for Extension of Time to August 9, 2012 , filed by Respondent CHARLES LOCKETT. (Attachments: # 1 Text of Proposed Order)(Coraz, Gerald) (Entered: 07/03/2012) |
| 07/08/2012 | 16 | ORDER - granting 15 Motion for Extension of Time, to 8/9/12, in which to respond to the petitioner's Writ of Habeas Corpus. Signed by Judge William T. Lawrence on 7/8/2012. (RSF) Modified on 7/9/2012 - removed language regarding mailing copy to petitioner (RSF). (Entered: 07/09/2012) |
| 08/07/2012 | 17 | RETURN TO ORDER TO SHOW CAUSE, re 9 Order to Show Cause, filed by CHARLES LOCKETT.. (Attachments: # 1 Attach 1-Summary Evidence, # 2 Attach 2-Westlaw Document)(Coraz, Gerald) (Entered: 08/07/2012) |
| 08/16/2012 | 18 | First MOTION for Extension of Time to September 29, 2012 , filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Text of Proposed Order)(Schubert, Kirsten) (Entered: 08/16/2012) |
| 08/16/2012 | 19 | Amended MOTION for Extension of Time to September 28, 2012 , filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Text of Proposed Order)(Schubert, Kirsten) (Entered: 08/16/2012) |
| 08/20/2012 | 20 | ENTRY - denying as moot 18 Motion for Extension of Time, and granting 19 Motion for Extension of Time, to 9/28/12, in which to file reply. Signed by Judge William T. Lawrence on 8/20/2012. (RSF) Modified on 8/20/2012 (RSF). (Entered: 08/20/2012) |
| 09/20/2012 | 21 | Second MOTION for Extension of Time to October 12, 2012 , filed by Petitioner BRUCE CARNEIL WEBSTER. (Attachments: # 1 Proposed Order)(Schubert, Kirsten) (Entered: 09/20/2012) |
| 09/24/2012 | 22 | ORDER - granting 21 Motion for Extension of Time, to 10/12/12, in which to Reply to Respondent's Return to Order to Show Cause. Signed by Judge William T. Lawrence on 9/24/2012. (RSF) (Entered: 09/24/2012) |
| 10/12/2012 | 23 | RESPONSE *Reply to Return to Order to Show Cause*, re 17 Return to Order to Show Cause, filed by Petitioner BRUCE CARNEIL WEBSTER. (Schubert, Kirsten) (Entered: 10/12/2012) |

Case 2:12-cv-00086-WTL-WGH Document 36 Filed 01/09/14 Page 28 of 29 PageID #: 811

Case 2:12-cv-00086-JRH-MJD Document 42-1 Filed 07/08/14 Page 334 of 341
PageID #: 1978

| | | |
|---|---|---|
| 10/12/2012 | 24 | AFFIDAVIT re 23 Response *of Kirsten E. Schubert* by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Exhibit Exhibit A - 6-24-08 Rodgers Letter)(Schubert, Kirsten) (Entered: 10/12/2012) |
| 10/12/2012 | 25 | DECLARATION of Kristen K. LeRoux re 23 Response by BRUCE CARNEIL WEBSTER. (Attachments: # 1 Exhibit A - 1996 Fax to SSA, # 2 Exhibit B - 10-27-08 Letter to SSA, # 3 Exhibit C - 12-15-08 Letter to SSA, # 4 Exhibit D - 10-8-09 Letter to SSA, # 5 Exhibit E - 10-22-09 Letter from SSA, # 6 Exhibit F - 11-23-09 Letter to SSA, # 7 Exhibit G - 12-4-09 Letter from SSA)(Schubert, Kirsten) (Entered: 10/12/2012) |
| 09/03/2013 | 26 | NOTICE of Change of Attorney Information. Consistent with Local Rule 5-3, Eric K. Koselke hereby notifies the Clerk of the court of changed contact information. (Koselke, Eric) (Entered: 09/03/2013) |
| 10/07/2013 | 27 | ORDER Granting in Part and Denying in Part United States' Motion for a Stay of Civil Proceedings in which the United States, its Agencies, or Officers are a Party. All such Civil actions are STAYED and immediately suspended, postponed and held in abeyance, pending further Order of the Court, except habeas corpus proceedings and those which are specifically exempted form this Order in Exhibit A. A copy of the United States Motion is attached to this Docket Entry. This Order is docketed into the following cases: 1:13-cv-01092-TWP-MJD, 1:13-cv-01093-WTL-TAB, 1:13-cv-01101-SEB-DKL, 1:13-cv-01110-RLY-MJD, 1:13-cv-01118-SEB-DKL, 1:13-cv-01119-SEB-MJD, 1:13-cv-01128-WTL-MJD, 1:13-cv-01132-SEB-DKL, 1:13-cv-01137-RLY-MJD, 1:13-cv-01141-SEB-DKL, 1:13-cv-01170-JMS-TAB, 1:13-cv-01172-JMS-DKL, 1:13-cv-01182-SEB-TAB, 1:13-cv-01200-SEB-DML, 1:13-cv-01209-TWP-MJD, 1:13-cv-01212-WTL-DML, 1:13-cv-01257-JMS-MJD, 1:13-cv-01283-RLY-MJD, 1:13-cv-01361-SEB-MJD, 1:13-cv-01381-TWP-DML, 1:13-cv-01383-RLY-DML, 1:13-cv-01517-TWP-DKL, 2:10-cv-00042-LJM-MJD, 2:10-cv-00140-JMS-WGH, 2:10-cv-00149-WTL-WGH, 2:10-cv-00172-JMS-WGH, 2:10-cv-00180-WTL-TAB, 2:10-cv-00244-WTL-WGH, 2:10-cv-00314-WTL-WGH, 2:11-cv-00004-LJM-WGH, 2:11-cv-00015-WTL-DKL, 2:11-cv-00091-WTL-DKL, 2:11-cv-00142-JMS-DKL, 2:11-cv-00149-WTL-WGH, 2:11-cv-00187-JMS-WGH, 2:11-cv-00262-JMS-DKL, 2:11-cv-00263-WTL-WGH, 2:11-cv-00299-WTL-WGH, 2:11-cv-00300-JMS-WGH, 2:11-cv-00337-JMS-MJD, 2:12-cv-00061-WTL-WGH, 2:12-cv-00080-WTL-WGH, 2:12-cv-00086-WTL-WGH, 2:12-cv-00109-WTL-DKL, 2:12-cv-00176-JMS-MJD, 2:12-cv-00177-JMS-WGH, 2:12-cv-00206-WTL-DKL, 2:12-cv-00211-WTL-DKL, 2:12-cv-00224-JMS-MJD, 2:12-cv-00248-LJM-DKL. Signed by Judge Richard L. Young on 10/7/2013. (Attachments: # 1 Motion to Stay)(MAC) (Entered: 10/07/2013) |
| 10/18/2013 | 28 | ORDER granting United States Motion for Order Lifting Stay of Civil Litigation in which the United States is a Party. Unless otherwise ordered by a judge of this Court or a bankruptcy judge in a particular case, any deadlines in a case, including bankruptcy cases, impacted by this Court's Order of October 7, 2013, imposed by order of a judicial officer of this Court, by a bankruptcy judge, by the Federal Rules of Civil Procedure, or by the Federal Rules of Bankruptcy Procedure, and in effect as of October 1, 2013, are hereby extended by 16 calendar days from the deadline. Any party may seek relief from this general Order extending time by motion in a particular case. This Order is docketed into the following cases: 1:13-cv-01092-TWP-MJD, 1:13-cv-01093-WTL-TAB, 1:13-cv-01101-SEB-DKL, 1:13-cv-01110-RLY-MJD, 1:13-cv-01118-SEB-DKL, 1:13-cv-01119-SEB-MJD, 1:13-cv-01128-WTL-MJD, 1:13-cv-01132-SEB-DKL, 1:13-cv-01137-RLY-MJD, 1:13-cv-01141-SEB-DKL, 1:13-cv-01170-JMS-TAB, 1:13-cv-01172-JMS-DKL, 1:13-cv-01182-SEB-TAB, 1:13-cv-01200-SEB-DML, |

Case 2:12-cv-00086-JRH-MJD    Document 42-1    Filed 07/08/14    Page 29 of 341

Case 2:12-cv-00086-WTL-WGH    Document 36    Filed 01/09/14    Page 29 of 29    PageID 812

PageID #: 1979

| | | |
|---|---|---|
| | | 1:13-cv-01209-TWP-MJD, 1:13-cv-01212-WTL-DML, 1:13-cv-01257-JMS-MJD, 1:13-cv-01283-RLY-MJD, 1:13-cv-01361-SEB-MJD, 1:13-cv-01381-TWP-DML, 1:13-cv-01383-RLY-DML, 1:13-cv-01517-TWP-DKL, 2:10-cv-00042-LJM-MJD, 2:10-cv-00140-JMS-WGH, 2:10-cv-00149-WTL-WGH, 2:10-cv-00172-JMS-WGH, 2:10-cv-00180-WTL-TAB, 2:10-cv-00244-WTL-WGH, 2:10-cv-00314-WTL-WGH, 2:11-cv-00004-LJM-WGH, 2:11-cv-00015-WTL-DKL, 2:11-cv-00091-WTL-DKL, 2:11-cv-00142-JMS-DKL, 2:11-cv-00149-WTL-WGH, 2:11-cv-00187-JMS-WGH, 2:11-cv-00262-JMS-DKL, 2:11-cv-00263-WTL-WGH, 2:11-cv-00299-WTL-WGH, 2:11-cv-00300-JMS-WGH, 2:11-cv-00337-JMS-MJD, 2:12-cv-00061-WTL-WGH, 2:12-cv-00080-WTL-WGH, 2:12-cv-00086-WTL-WGH, 2:12-cv-00109-WTL-DKL, 2:12-cv-00176-JMS-MJD, 2:12-cv-00177-JMS-WGH, 2:12-cv-00206-WTL-DKL, 2:12-cv-00211-WTL-DKL, 2:12-cv-00224-JMS-MJD, 2:12-cv-00248-LJM-DKL. Signed by Judge Richard L. Young on 10/18/2013.(MAC) (Entered: 10/18/2013) |
| 11/13/2013 | 29 | ENTRY ON PETITION FOR WRIT OF HABEAS CORPUS - This cause is before the Court on Petitioner Bruce Carneil Webster's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. 1 Webster's motion is fully briefed, and the Court, being duly advised, DENIES the motion for the reasons set forth below. (See Entry.) Signed by Judge William T. Lawrence on 11/13/2013.(RSF) Modified on 11/13/2013 (RSF). (Entered: 11/13/2013) |
| 11/13/2013 | 30 | CLOSED JUDGMENT - JUDGMENT - The Petitioner take nothing by his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, and the civil action docketed as Cause No. 2:12-cv-86-WTL-WGH is DISMISSED WITH PREJUDICE. Signed by Judge William T. Lawrence on 11/13/2013.(RSF) Modified on 11/13/2013 (RSF). (Entered: 11/13/2013) |
| 01/09/2014 | 31 | NOTICE OF APPEAL as to 29 Entry, filed by Petitioner BRUCE CARNEIL WEBSTER. (Filing fee $505, receipt number 0756-2920875) (Schubert, Kirsten) (Entered: 01/09/2014) |
| 01/09/2014 | 32 | DOCKETING STATEMENT by BRUCE CARNEIL WEBSTER re 31 Notice of Appeal (Schubert, Kirsten) (Entered: 01/09/2014) |
| 01/09/2014 | 33 | SEVENTH CIRCUIT TRANSCRIPT INFORMATION SHEET by BRUCE CARNEIL WEBSTER re 31 Notice of Appeal (Schubert, Kirsten) (Entered: 01/09/2014) |
| 01/09/2014 | 34 | CERTIFICATE OF SERVICE by BRUCE CARNEIL WEBSTER *Petitioner/Appellant's Proposed List of Additional Items to Designate for Record on Appeal* (Schubert, Kirsten) (Entered: 01/09/2014) |
| 01/09/2014 | 35 | SEVENTH CIRCUIT APPEAL INFORMATION SHEET re 31 Notice of Appeal **- Instructions for Attorneys - Parties' Short Record, Instructions, and Designation of Record information attached.** (JLM) (Entered: 01/09/2014) |

**Case #: 2:12-cv-00086-WTL-WGH**

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 336 of 341
PageID #: 1980
Case 2:12-cv-00086-WTL-WGH   Document 37   Filed 01/09/14   Page 1 of 1   PageID #13

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



| Everett McKinley Dirksen United States Courthouse<br>Room 2722 - 219 S. Dearborn Street<br>Chicago, Illinois 60604 | Office of the Clerk<br>Phone: (312) 435-5850<br>www.ca7.uscourts.gov |

## NOTICE OF DOCKETING - Short Form

January 9, 2014

The below captioned appeal has been docketed in the United States Court of Appeals for the Seventh Circuit:

> Appellate Case No: 14-1049
>
> Caption:
> BRUCE WEBSTER,
> Petitioner - Appellant
>
> v.
>
> JOHN F. CARAWAY, Warden,
> Respondent - Appellee
>
> ---
>
> District Court No: 2:12-cv-00086-WTL-WGH
> Clerk/Agency Rep Laura Briggs
> Court Reporter Cathy Jones
> District Judge William Lawrence
>
> Date NOA filed in District Court: 01/09/2014

If you have any questions regarding this appeal, please call this office.

form name: **c7_Docket_Notice_short_form**(form ID: **188**)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | |
|---|---|
| BRUCE CARNEIL WEBSTER, | ) |
| | ) |
|          Petitioner, | ) |
|   vs. | )     2:12-cv-86-WTL-WGH |
| | ) |
| CHARLES LOCKETT, | ) |
| | ) |
|          Respondent. | ) |

**ENTRY AND NOTICE**

Final judgment was entered in this action for habeas corpus relief on November 13, 2013. The petitioner filed a notice of appeal, which has been processed.

Shortly after the notice of appeal was filed the petitioner filed a document entitled Certificate of Service. The court understands this document [dkt 34] to indicate the petitioner's desire that the record on appeal include materials which were not part of this court's record at the conclusion of the case.

A record on appeal is typically limited to "the original papers and exhibits filed in the district court." Fed. R. App. P. 10(a)(1). "Ordinarily, material not included in the record on appeal will not be considered." *Loria v. Gorman,* 306 F.3d 1271, 1280 n.2 (2d Cir. 2002) (internal citation omitted).

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 338 of 341
Case 2:12-cv-00086-WTL-WGH   Document 38   Filed 01/13/14   Page 2 of 2   PageID #: 1815
PageID #: 1982

Nonetheless, Rule 10(e) prescribes a procedure whereby the record on appeal may be supplemented, and in doing so "allow[s] the district court to correct omissions from or misstatements in the record for appeal, not to introduce new evidence in the court of appeals." *S & E Shipping Corp. v. Chesapeake & Ohio Ry. Co.*, 678 F.2d 636, 641 (6th Cir. 1982). Rule 10(e) does not grant the parties "a license to build a new record," *Anthony v. United States*, 667 F.2d 870, 875 (10th Cir. 1981)(*citing Borden, Inc. v. Federal Trade Commission*, 495 F.2d 785 (7th Cir. 1974)), but is merely an opportunity to correct or modify the record in order to "truly disclose[ ] what occurred in the district court". *Fed. R. App. P.* 10(e); *see also Allen v. Minnstar, Inc.*, 8 F.3d 1470, 1473 (10th Cir. 1993).

The petitioner's filing described above is in the form of a notice, not a motion. Any request to supplement the record on appeal should be filed not more than 28 calendar days from the issuance of this Entry and Notice.

**IT IS SO ORDERED.**

Date: 1/13/14

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution:

Electronically Registered Counsel

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,         )
           )
          Petitioner,    )
           )
          vs.      )      **Cause No. 2:12-cv-0086-WTL-WGH**
           )
CHARLES L. LOCKETT, Warden,   )      **Hon. William T. Lawrence**
United States Penitentiary,       )
Terre Haute (USP),          )
          Respondent.  )

## JOINT DESIGNATION OF ITEMS FOR THE RECORD ON APPEAL
## THIS IS A DEATH PENALTY CASE

Pursuant to Federal Rule of Appellate Procedure 10(a), Circuit Rule 10(a), and Local

Rule 76-1, counsel for Petitioner-Appellant Bruce Carneil Webster requests that the entire record

of proceedings in the district court be designated and transmitted as the record on appeal in the

above-captioned matter, which has been docketed in the Seventh Circuit as *Webster v. Caraway*,

No. 14-1049. Counsel for Petitioner-Appellant has conferred with counsel for Respondent-

Appellee, who has agreed to this designation.


Dated: January 23, 2014                By: s/Kirsten E. Schubert_____
                                  Steven J. Wells (admitted *pro hac vice*)
                                  (COUNSEL OF RECORD)
                                  Kirsten E. Schubert (admitted *pro hac vice*)
                                  DORSEY & WHITNEY LLP
                                  Suite 1500, 50 South Sixth Street
                                  Minneapolis, MN 55402-1498
                                  Telephone: (612) 340-2600
                                  Facsimile: (612) 340-2868

                                  Eric K. Koselke, # 5593-54
                                  6202 N. College Avenue
                                  Indianapolis, IN 46220
                                  Telephone: (317) 722-2591
                                  Facsimile: (317) 257-5300

                                  *Attorneys for Petitioner Bruce Webster*

Case 2:12-cv-00086-JPH-MJD   Document 42-1   Filed 07/08/14   Page 340 of 341
Case 2:12-cv-00086-WTL-WGH   Document 39   Filed 01/23/14   Page 2 of 2   PageID 817
PageID #: 1984

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 23, 2014, a copy of the foregoing JOINT

DESIGNATION OF ITEMS FOR THE RECORD ON APPEAL was filed electronically.  Notice

of this filing will be sent to the following parties by operation of the Court's electronic filing

system.  Parties may access this filing through the Court's system.

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204-3048
Email: gerald.coraz@usdoj.gov

Eric K. Koselke
Attorney at Law
6202 North College
Indianapolis, IN  46220
ekoselke@wkelaw.com

Dated: January 23, 2014                                  DORSEY & WHITNEY LLP

By s/Kirsten E. Schubert_____
Kirsten E. Schubert
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

-2-

340

Case 2:12-cv-00086-WTL-WGH   Document 40   Filed 01/30/14   Page 1 of 1   PageID #: 818

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

BRUCE CARNEIL WEBSTER,            )
                                  )
                    Petitioner,   )
                                  )
        vs.                       )          2:12-cv-86-WTL-WGH
                                  )
CHARLES LOCKETT,                  )
                                  )
                    Respondent.   )

**Entry Directing Further Proceedings**

The clerk shall prepare and make available to counsel for the parties the record on appeal. This shall be done in whatever number of electronic volumes which will eventually be used by the Court of Appeals. The record thus prepared will be available when requested by the Court of Appeals, together with any materials in a supplemental record which may hereafter be authorized.

IT IS SO ORDERED.

Date: _____

Distribution:

Electronically Registered Counsel