Case 2:12-cv-00086-TRH-WGH Document 42-6 Filed 07/08/14 Page 1 of 209 PageID
Case 2:12-cv-00086-WTL-WGH Document 3-3 Filed 04/30/14 Page 3 of 209 PageID #: 3435
#: 3086

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Social Security Administration

Form Approved
OMB No. 0960-0144

| For SSA Use Only - Do NOT Complete This Item. | |
|---|---|
| Name of Wage Earner _Bruce C. Webster_ | Social Security Number |
| Name of Claimant | Social Security Number |

| Type of Claim: | |
|---|---|
| Title II — ☐ Freeze  ☐ DIB  ☐ DWB  ☒ CDB    Title XVI — ☒ Disability  ☐ Blind  ☐ Child | |

## RECONSIDERATION DISABILITY REPORT

PLEASE PRINT, TYPE OR WRITE CLEARLY AND ANSWER ALL ITEMS TO THE BEST OF YOUR ABILITY. If you are filing on behalf of someone else, answer all questions. COMPLETE ANSWERS WILL AID IN PROCESSING THE CLAIM.

PRIVACY ACT/PAPERWORK REDUCTION ACT NOTICE: The Social Security Administration is authorized to collect the information on this form under sections 205(a), 223(d) and 1633(a) of the Social Security Act. The information on this form is needed by Social Security to make a decision on your claim. While giving us the information on this form is voluntary, failure to provide all or part of the requested information could prevent an accurate or timely decision on your claim and could result in the loss of benefits. Although the information you furnish on this form is almost never used for any purpose other than making a determination on your disability claim, such information may be disclosed by the Social Security Administration as follows: (1) To enable a third party or agency to assist Social Security in establishing rights to Social Security benefits and/or coverage; (2) to comply with Federal laws requiring the release of information from Social Security records (e.g., the General Accounting Office and the Veterans Administration); (3) to facilitate statistical research and audit activities necessary to assure the integrity and improvement of the Social Security programs (e.g., to the Bureau of the Census and private concerns under contract to Social Security). These and other reasons why information about you may be used or given out are explained in the Federal Register. If you would like more information about this, any Social Security office can assist you.

Date Claim Filed | 9/9/93

### PART I — INFORMATION ABOUT YOUR CONDITION

1. Has there been any change (for better or worse) in your illness or injury since you filed your claim? ........................................................... ☒ Yes   ☐ No
   If "Yes," describe any changes in your symptoms.

   _Constantly sneezing, itching, draining, headaches. getting worse_

2. Describe any physical or mental limitations you have as a result of your condition since you filed your claim.

   _Sinus problems make me upset._

3. Have any restrictions been placed on you by a physician since you filed your claim? ........ ☐ Yes   ☒ No
   If "Yes," give name, address, and telephone number of the physician and show what kinds of restrictions have been imposed.

4. Do you have any additional illness or injury that you feel we should know about? ........... ☐ Yes   ☒ No
   If "Yes," describe the kind of illness or injury and the date that it occurred.

FORM SSA-3441-F6 (2-88)      1      EXHIBIT NO. _17_

**REDACTED**    G.36

## PART II — INFORMATION ABOUT YOUR MEDICAL RECORDS

5. Have you seen any physician since you filed your claim? ............................... ☐ Yes  ☒ No
   If "Yes," provide the following about the physician you last visited:

| NAME | ADDRESS (Include ZIP Code) |
|---|---|
| **AREA CODE AND TELEPHONE NUMBER** | |
| **HOW OFTEN DO YOU SEE THIS PHYSICIAN?** | **DATE YOU SAW THIS PHYSICIAN** |

REASONS FOR VISITS

TYPE OF TREATMENT RECEIVED (Include drugs, surgery, tests)

6. Have you see any other physician since you filed your claim? ........................... ☐ Yes  ☒ No
   If "Yes," show the following:

| NAME | ADDRESS (Include ZIP Code) |
|---|---|
| **AREA CODE AND TELEPHONE NUMBER** | |
| **HOW OFTEN DO YOU SEE THIS PHYSICIAN?** | **DATE YOU SAW THIS PHYSICIAN** |

REASONS FOR VISITS

TYPE OF TREATMENT RECEIVED (Include drugs, surgery, tests)

If you have seen other physicians since you filed your claim, list their names, addresses, dates and reasons for visits in Part V.

7. Have you been hospitalized, or treated at a clinic or confined in a nursing home or extended
   care facility for your illness or injury since you filed your claim? ........................... ☐ Yes  ☒ No
   If "Yes," show the following:

| NAME OF FACILITY | ADDRESS OF AGENCY (Include ZIP Code) |
|---|---|
| **PATIENT OR CLINIC NUMBER** | |
| **WERE YOU AN INPATIENT?** (Stayed at least overnight) ☐ Yes ☐ No IF "YES," SHOW ——▶ | **DATES OF ADMISSIONS AND DISCHARGES** |
| **WERE YOU AN OUTPATIENT?** ☐ Yes ☐ No IF "YES," SHOW ——▶ | **DATES OF VISITS** |

REASON FOR HOSPITALIZATION, CLINIC VISITS, OR CONFINEMENT

TYPE OF TREATMENT RECEIVED (Include drugs, surgery, tests)

If you have been in other hospitals, clinics, nursing homes, or extended care facilities for your illness or injury, list the names, addresses, patient or clinic numbers, dates and reasons for hospitalization, clinic visits, or confinement in Part V.

8. Have you been seen by other agencies for your injury or illness? ......................... ☒ Yes  ☐ No
   (VA, Workmen's Compensation, Vocational Rehabilitation, Welfare, Special Schools, Unions, etc.)
   If "Yes," show the following:

| NAME OF AGENCY | ADDRESS OF AGENCY (Include ZIP Code) |
|---|---|
| **YOUR CLAIM NUMBER** | *Rene Bluff, Ga* |
| **DATES OF VISITS** | **NAME OF COUNSELOR, SOCIAL WORKER, ETC.** |

TYPE OF TREATMENT OR EXAMINATION RECEIVED (Include drugs, surgery, tests)

If more space is needed, list the other agencies, their addresses, your claim numbers, dates, and treatment received in Part V.

FORM SSA-3441-F6 (2-88)                     2

G.37

---

### PART III — INFORMATION ABOUT WORK

9. Have you worked since you filed your claim? ........................................... ☐ Yes  ☒ No

If "Yes," you will be asked to give details on a separate form.

---

### PART IV — INFORMATION ABOUT YOUR ACTIVITIES

10. How does your illness or injury affect your ability to care for your personal needs?

NO

11. What changes have occurred in your daily activities since you filed your claim?
(If none, show, "None")

Can't sleep well. Hard for me to breathe

---

### PART V — REMARKS AND AUTHORIZATIONS

12.(a) READ CAREFULLY: I authorize the Social Security Administration to release information from my records, as necessary to process my claim, as follows:

Copies of my medical records may be furnished to a physician or a medical institution for background information if it is necessary for me to have a medical examination by that physician or medical institution. The results of any such examination may be given to my personal physician.

Information from my records may also be furnished, if necessary, to any company providing clerical and administrative services for the purposes of transcribing, typing, copying or otherwise clerically servicing such information. The State Vocational Rehabilitation Agency may also have access to information in my records to determine my eligibility for rehabilitative services.

I understand and concur with the statement and authorizations given above, except as follows (If there are no exceptions, write "None" in the space below. If you do not concur with any part of the above statement, state your objections clearly):

| 12.(b) | Telephone number where you can be reached: | Best time to reach you: |
|---|---|---|
| | ████████████████ | anytime |

FORM SSA-3441-F6 (2-88)    3

REDACTED

G.38

12.(b) Use this section to continue information required by prior sections. Identify the section for which the information is provided. Note: This section may also be used for any special or additional information which you wish to be recorded.

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

These and other reasons why information about you may be used or given out are explained in the Federal Register. If you want to learn more about this, contact any Social Security office.

TIME IT TAKES TO COMPLETE THIS FORM

We estimate that it will take you about 30 minutes to complete this form. This includes the time it will take to read the instructions, gather the necessary facts and fill out the form. If you have comments or suggestions on this estimate, or on any other aspect of this form, write to the Social Security Administration, ATTN: Reports Clearance Officer, 1-A-21 Operations Bldg., Baltimore, MD 21235, and to the Office of Management and Budget, Paperwork Reduction Project (0960-0144), Washington, D.C. 20503. Do not send completed forms or information concerning your claim to these offices.

Knowing that anyone making a false statement or representation of a material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal Law, I certify that the above statements are true.

NAME (SIGNATURE OF CLAIMANT OR PERSON FILING ON THE CLAIMANT'S BEHALF)

SIGN HERE ▶ ✓ *Brian White* | DATE ✓ 8-17-94

Witnesses are required ONLY if this statement has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the person making the statement must sign below, giving their full addresses.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| Address (Number and street; city, state, and ZIP code) | Address (Number and street, city, state, and ZIP code) |

FORM SSA-3441-F6 (2-88)                    4

G.39

**PART VI — FOR SSA USE ONLY — DO NOT WRITE BELOW THIS LINE**

| Name of Wage Earner | Social Security Number |
|---|---|
| Name of Claimant | Social Security Number |

13. Check each item to indicate whether or not any difficulty was observed:
(Explain all items checked "Yes." in Item 14 below)

| | | | | | | |
|---|---|---|---|---|---|---|
| Reading: | ☐ Yes | ☐ No | Using Hands: | ☐ Yes | ☐ No |
| Writing: | ☐ Yes | ☐ No | Breathing: | ☐ Yes | ☐ No |
| Answering: | ☐ Yes | ☐ No | Seeing: | ☐ Yes | ☐ No |
| Hearing: | ☐ Yes | ☐ No | Walking: | ☐ Yes | ☐ No |
| Speaking: | ☐ Yes | ☐ No | Sitting: | ☐ Yes | ☐ No |
| Understanding: | ☐ Yes | ☐ No | Assistive Devices: | ☐ Yes | ☐ No |

Other (Specify): _____

*not observed*

14. If any of the above items were checked "Yes," describe the observed difficulty:

15. Describe fully: General appearance, behavior, any unusual observed difficulties not noted elsewhere, any unusual circumstances surrounding the interviews.

G.40

16. Claimant requires assistance ................................................................ ☐ Yes  ☒ No
    If "Yes," show name, address, phone number, and relationship of interested person.
    Also show why claimant requires assistance (foreign-speaking, unable to ambulate, etc.)

17. Capability development appears needed ................................................... ☐ Yes  ☒ No
    If "Yes," indicate whether DO will undertake development because it is also developing
    medical evidence from a special arrangement source. (Show name and address of source.)

18. Is development of work activity necessary? ............................................ ☐ Yes  ☒ No

    If "Yes," is an SSA-821 or SSA-820-F4 ☐ Pending   ☐ In File

19. SSA-3441 Taken By:
    ☐ Personal Interview
        ☐ DO/BO  ☐ Home  ☐ Other _____
    ☐ Telephone
    ☒ Mail

| Signature of Interviewer or Reviewer | Title | DO, BO, or TSC | Date |
|---|---|---|---|
| P. Hollowell | CR | 759 | 3/17/94 |

FORM SSA-3441-F6 (2-88) *Prior editions usable*          6

G.41

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Social Security Administration

Form Approved
OMB No. 0960-0141

## DISABILITY REPORT

**PLEASE PRINT, TYPE, OR WRITE CLEARLY AND ANSWER ALL ITEMS TO THE BEST OF YOUR ABILITY.** If you are filing on behalf of someone else, enter his or her name and social security number in the space provided and answer all questions. COMPLETE ANSWERS WILL AID IN PROCESSING THE CLAIM.

**PRIVACY ACT/PAPERWORK REDUCTION ACT NOTICE:** The Social Security Administration is authorized to collect the information on this form under sections 205(a), 223(d) and 1633(a) of the Social Security Act. The information on this form is needed by Social Security to make a decision on your claim. While giving us the information on this form is voluntary, failure to provide all or part of the requested information could prevent an accurate or timely decision on your claim and could result in the loss of benefits. Although the information you furnish on this form is almost never used for any purpose other than making a determination on your disability claim, such information may be disclosed by the Social Security Administration as follows: (1) To enable a third party or agency to assist Social Security in establishing rights to Social Security benefits and/or coverage; (2) to comply with Federal laws requiring the release of information from Social Security records (e.g., to the General Accounting Office and the Veterans Administration); and (3) to facilitate statistical research and audit activities necessary to assure the integrity and improvement of the Social Security programs (e.g., to the Bureau of the Census and private concerns under contract to Social Security). These and other reasons why information about you may be used or given out are explained in the Federal Register. If you would like more information about this, any Social Security office can assist you.

| A. NAME OF CLAIMANT: | B. SOCIAL SECURITY NUMBER | C. TELEPHONE NUMBER where you can be reached (include area code) |
|---|---|---|
| Bruce Webster | ▓▓▓▓▓▓ | ▓▓▓▓▓▓ |

**D. WHAT IS YOUR DISABLING CONDITION?** (Briefly explain the injury or illness that stops you from working.)

Sinus problems and headaches

## PART I — INFORMATION ABOUT YOUR CONDITION

| 1. When did your condition first bother you? | MONTH 5 | DAY 31 | YEAR 87 |
|---|---|---|---|

2. Did you work after the date shown in item 1? (If "no," go on to items 3A and 3B.) — ☐ YES ☒ NO

B. If you did work since the date in item 1, did your condition cause you to change

| Your job or job duties? | ☐ YES | ☐ NO |
|---|---|---|
| Your hours of work? | ☐ YES | ☐ NO |
| Your attendance? | ☐ YES | ☐ NO |
| Anything else about your work? | ☐ YES | ☐ NO |

(If you answered "no" to all of these, go to items 3A and 3B.)

2C. If you answered "yes" to any item in 2B, explain below what the changes in your work circumstances were, the dates they occurred, and how your condition made these changes necessary.

| 3A. When did your condition finally make you stop working? | MONTH | DAY | YEAR |
|---|---|---|---|

3B. Explain how your condition now keeps you from working.

If I work more than 15-20 minutes I begin sneezing and my eyes water

Form SSA-3368-BK (1-89)

**REDACTED**

G.42



☐ YES ☒ NO

NAME OF HOSPITAL OR CLINIC

ADDRESS

PATIENT OR CLINIC NUMBER

WERE YOU AN INPATIENT?
☐ YES   ☐ NO   (If "yes", show:)

WERE YOU AN OUTPATIENT?
☐ YES   ☐ NO   (If "yes", show:)

DATES OF ADMISSIONS | DATES OF DISCHARGES

REASON FOR HOSPITALIZATION OR CLINIC VISITS

NAME OF HOSPITAL OR CLINIC

ADDRESS

PATIENT OR CLINIC NUMBER

WERE YOU AN INPATIENT?
☐ YES   ☐ NO   (If "yes", show:)

WERE YOU AN OUTPATIENT?
☐ YES   ☐ NO   (If "yes", show:)

DATES OF ADMISSIONS | DATES OF DISCHARGES

REASON FOR HOSPITALIZATION OR CLINIC VISITS

☐ YES ☒ NO

NAME OF AGENCY

ADDRESS

YOUR CLAIM NUMBER

DATES OF VISITS

G.44

Case 2:12-cv-00086-WTL-WGH Document 41-9 Filed 04/03/14 Page 10 of 209 PageID #:1445

| 8. | | WHERE DONE | WHEN DONE |
|---|---|---|---|
| Electrocardiogram | ☐ YES ☒ NO | | |
| Chest X-Ray | ☐ YES ☒ NO | | |
| Other X-Ray (name body part here) | ☐ YES ☒ NO | | |
| Breathing Tests | ☐ YES ☒ NO | | |
| Blood Tests | ☒ YES ☒ NO | Dept of Corr. diagnostic | 1/12 |
| Other (Specify) | ☐ YES ☒ NO | | |

9. If you have a medicaid card, what is your number (some hospitals and clinics file your records by your medicaid number.)

PART III. INFORMATION ABOUT YOUR ACTIVITIES

☐ YES ☒ NO

G.45

## PART IV — INFORMATION ABOUT YOUR EDUCATION

12. What is the highest grade of school that you completed and when?    8ᵗʰ. Unk

13. Have you gone to trade or vocational school or had any type of special training? If "yes", show:    ☐ YES   ☒ NO

● The type of trade or vocational school or training:

● Approximate dates you attended:

● How this schooling or training was used in any work you did:

## PART V — INFORMATION ABOUT THE WORK YOU DID

| JOB TITLE (Be sure to begin with your usual job) | TYPE OF BUSINESS | DATES WORKED (Month/Year) From / To | | RATE OF PAY |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| | Yes | No |
|---|---|---|
| | ☒ Yes | ☐ No |
| | ☐ Yes | ☐ No |
| | ☐ Yes | ☐ No |
| | ☐ Yes | ☐ No |

G.46

- **Walking** (circle the number of hours a day spent walking) — 0 1 2 3 4 5 6 7 8
- **Standing** (circle the number of hours a day spent standing) — 0 1 2 3 4 5 6 7 8
- **Sitting** (circle the number of hours a day spent sitting) — 0 1 2 3 4 5 6 7 8
- **Bending** (circle how often a day you had to bend) — Never · Occasionally · Frequently · Constantly
- **Reaching** (circle how often a day you had to reach) — Never · Occasionally · Frequently · Constantly
- **Lifting and Carrying:** Describe below what was lifted, and how far it was carried. Check heaviest weight lifted, and weight frequently lifted and/or carried:

| | |
|---|---|
| ☐ 10 lbs. | ☐ Up to 10 lbs. |
| ☐ 20 lbs. | ☐ Up to 25 lbs. |
| ☐ 50 lbs. | ☐ Up to 50 lbs. |
| ☐ 100 lbs. | ☐ Over 50 lbs. |
| ☐ Over 100 lbs. | |

I have not been seen by a doctor or hosp. for my disabilities,

X Bruce Webster                    10h/u

G.47

PART VII — FOR SSA USE ONLY — DO NOT WRITE BELOW THIS LINE

NAME OF CLAIMANT: Bruce Webb

SOCIAL SECURITY NUMBER: [REDACTED]

PRESUMPTIVE DISABILITY CONSIDERATION

A. ☐ Amputation of two limbs

B. ☐ Amputation of a leg at the hip

C. ☐ Allegation of total deafness

D. ☐ Allegation of total blindness

E. ☐ Allegation of bed confinement or immobility without a wheelchair, walker, or crutches, allegedly due to a longstanding condition — exclude recent accident and recent surgery.

F. ☐ Allegation of a stroke (cerebral vascular accident) more than 3 months in the past and continued marked difficulty in walking or using a hand or arm.

G. ☐ Allegation of cerebral palsy, muscular dystrophy or muscular atrophy and marked difficulty in walking (e.g., use of braces), speaking or coordination of the hands or arms.

H. ☐ Allegation of diabetes with amputation of a foot.

I. ☐ Allegation of Down's Syndrome (Mongolism).

J. ☐ An applicant filing on behalf of another individual alleges severe mental deficiency for claimant who is at least 7 years of age. The applicant alleges that the individual attends (or attended) a special school, or special classes in school, because of his mental deficiency, or is unable to attend any type of school (or if beyond school age was unable to attend), and requires care and supervision of routine daily activities.

L. ☐ Allegation of Acquired Immune Deficiency Syndrome (AIDS)

☒ Yes  ☐ No

☐ Yes  ☒ No

☐ Yes  ☒ No

**REDACTED**     G.48

Case 2:12-cv-00086-WTL-WGH Document 34-9 Filed 04/03/14 Page 14 of 209 PageID #:1448

18A.

| | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| | ☐ Yes | ☑ No | | ☐ Yes | ☑ No |
| | ☐ Yes | ☑ No | | ☐ Yes | ☑ No |
| | ☐ Yes | ☑ No | | ☐ Yes | ☑ No |
| | ☐ Yes | ☑ No | | ☐ Yes | ☑ No |
| | ☐ Yes | ☑ No | | | |
| | ☐ Yes | ☑ No | | | |

18B.

18C.

Claimant was neatly dressed & groomed.

Height - 5'9"

Weight - 150#

19.

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

20. ☑ YES ☐ NO

21. ☐ YES ☑ NO

22. ☐ YES ☑ NO
☐ Pending ☑ In File

23. Claim taken by: ☐ Yes ☑ No
☐ Personal Interview ☐ Telephone ☐ Mail
☐ Personal Interview ☐ Telephone ☐ Mail

SIGNATURE

DATE 10/7/92

DEPARTMENT OF HEALTH AND HUMAN SERVICES
SOCIAL SECURITY ADMINISTRATION



Form Approved
OMB No. 0960-0141

# VOCATIONAL REPORT

This report supplements the Disability Report (Form SSA-3368-BK) by requesting additional information about your past work experience. PLEASE PRINT, TYPE, OR WRITE CLEARLY AND ANSWER ALL ITEMS TO THE BEST OF YOUR ABILITY. If you are filing on behalf of someone else, enter his or her name and Social Security number in the space provided and answer all questions. COMPLETE ANSWERS WILL AID IN PROCESSING THE CLAIM.

PRIVACY ACT/PAPERWORK REDUCTION ACT NOTICE: The Social Security Administration is authorized to collect the information on this form under sections 205(a), 223(d) and 1633(a) of the Social Security Act. The information on this form is needed by Social Security to make a decision on your claim. While giving us the information on this form is voluntary, failure to provide all or part of the requested information could prevent an accurate or timely decision on your claim and could result in the loss of benefits. Although the information you furnish on this form is almost never used for any purpose other than making a determination on your disability claim, such information may be disclosed by the Social Security Administration as follows: (1) to enable a third party or agency to assist Social Security in establishing rights to Social Security benefits and/or coverage; (2) to comply with Federal laws requiring the release of information from Social Security records (e.g., to the General Accounting Office and the Veterans Administration); and (3) to facilitate statistical research and audit activities necessary to assure the integrity and improvement of the Social Security programs (e.g., to the Bureau of the Census and private concerns under contract to Social Security). These, and other reasons why information about you may be used or given out are explained in the Federal Register. If you would like more information about this, any Social Security office can assist you.

TIME IT TAKES TO COMPLETE THIS FORM:
We estimate that it will take you about 20 minutes to complete this form. This includes the time it will take to read the instructions, gather the necessary facts and fill out the form. If you have comments or suggestions on how long it takes to complete this form or on any other aspect of this form, write to the Social Security Administration, ATTN: Reports Clearance Officer, 1-A-21 Operations Bldg., Baltimore, MD 21235, and to the Office of Management and Budget, Paperwork Reduction Project (0960-0141), Washington, D.C. 20503. Do not send completed forms or information concerning your claim to these offices.

| A. Name of Claimant | B. Social Security Number | C. Telephone number where you can be reached (include area code) |
|---|---|---|
| Bruce Webster | ███████████ | ███████████ |

## PART I — INFORMATION ABOUT YOUR WORK HISTORY

List all jobs you have had in the last 15 years before you stopped working, beginning with your usual job; normally, this will be the kind of work you did the longest. (If you have a 6th grade education or less, AND did only heavy unskilled labor for 35 years or more, list all of the jobs you have had since you began to work. If you need more space, use Part III.) If you have already given information about your usual job on the Form SSA-3368-BK (Disability Report), begin with your other jobs.

| JOB TITLE (Be sure to begin with your usual job) | TYPE OF BUSINESS | DATES WORKED (Month and Year) FROM | DATES WORKED (Month and Year) TO | DAYS PER WEEK | RATE OF PAY (Per hour, day, week, month or year) |
|---|---|---|---|---|---|
| 1 CEMENT | PCI | June 22 | June 24 | 725 | 7.00 to 7.25 na |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |

OCT 07 1998

Form SSA-3369-F8 (1-89)

EXHIBIT NO. 15

G.50

REDACTED

## PART II — INFORMATION ABOUT YOUR JOB DUTIES

Provide the following information (on pages 2-5) for each of the jobs listed in Part I starting with your usual job.

Job Title (from Part I):

Cement

A. In your job did you:
- Use machines, tools, or equipment of any kind?   ☑ Yes   ☐ No
- Use technical knowledge or skills?   ☐ Yes   ☐ No
- Do any writing, complete reports, or perform similar duties?   ☐ Yes   ☐ No
- Have supervisory responsibilities?   ☑ Yes   ☐ No

B. Describe your basic duties (explain what you did and how you did it) below.

Ive ally did no what I was doing
I had helpe from the other worker
that work with me. I help spread
the cement out.

C. Describe the kind and amount of physical activity this job involved during a typical day in terms of:

- Walking (circle the number of hours a day spent walking) — 0 1 2 3 4 5 6 7 ⑧
- Standing (circle the number of hours a day spent standing) — 0 1 2 3 4 5 6 7 8
- Sitting (circle the number of hours a day spent sitting) — 0 1 2 3 4 5 6 7 8
- Bending (circle how often a day you had to bend) — Never · Occasionally ⟨Frequently⟩ Constantly

Lifting and Carrying: Describe what was lifted and how far it was carried. Check below the heaviest weight lifted and weight frequently lifted and/or carried.

CEMENT hose

| Heaviest weight lifted | Weight frequently lifted/carried |
|---|---|
| ☐ 10 lbs. | ☐ Up to 10 lbs. |
| ☑ 20 lbs. | ☑ Up to 25 lbs. |
| ☑ 50 lbs. | ☐ Up to 50 lbs. |
| ☐ 100 lbs. | ☐ Over 50 lbs. |
| ☐ Over 100 lbs. | |

Form SSA-3369-F6 (1-89)

G.51

**Job Title (from Part I)**

CEMENT

A. In your job did you:  • Use machines, tools, or equipment of any kind?   ☒ Yes   ☐ No

• Use technical knowledge or skills?   ☐ Yes   ☐ No

• Do any writing, complete reports, or perform similar duties?   ☐ Yes   ☐ No

• Have supervisory responsibilities?   ☐ Yes   ☐ No

B. Describe your basic duties (explain what you did and how you did it) below. Also explain all "Yes" answers by giving a FULL DESCRIPTION on the types of machines, tools, or equipment you used and the exact operation you performed; the technical knowledge or skills involved; the type of writing you did; and the nature of any reports; and the number of people you supervised and the extent of your supervision.

I really didN't no what I was doing
I had help from the other worker's
that work with me. I help spread
the cement out

---

• **Walking** (circle the number of hours a day spent walking) — 0  1  2  3  4  5  6  7  ⑧

• **Standing** (circle the number of hours a day spent standing) — 0  1  2  3  4  5  6  7  8

• **Sitting** (circle the number of hours a day spent sitting) — 0  1  2  3  4  5  6  7  8

• **Bending** (circle how often a day you had to bend) — Never · Occasionally · Ⓕrequently · Constantly

• Lifting and Carrying: Describe what was lifted and how far it was carried. Check below heaviest weight lifted and weight frequently lifted and/or carried.

CEMENt hose

| Heaviest Weight Lifted | Weight Frequently Lifted / Carried |
|---|---|
| ☐ 10 lbs. | ☐ Up to 10 lbs. |
| ☐ 20 lbs. | ☒ Up to 25 lbs. |
| ☒ 50 lbs. | ☐ Up to 50 lbs. |
| ☐ 100 lbs. | ☐ Over 50 lbs. |
| ☐ Over 100 lbs. | |

Form SSA-3369-F6 (1-89)

G.52

## PART III — REMARKS

Use this section for any other information you may want to give about your work history, or to provide any other remarks you may want to make to support your disability claim.

*(If you need more space, use separate sheets of paper.)*

Knowing that anyone making a false statement or representation of a material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law, I certify that the above statements are true.

NAME (Signature of claimant or person filing on the claimant's behalf)

SIGN HERE ▶ ✓ _Bruce Whiton_     DATE 10-6-93

Witnesses are required ONLY if this statement has been signed by mark (X) above. If signed by mark (X), two witnesses to the signing who know the person making the statement must sign below, giving their full addresses.

| 1. Signature of Witness | 2. Signature of Witness |
|---|---|
| Address (Number and street, city, state, and ZIP code) | Address (Number and street, City, state, and ZIP code) |

### Do not write below this line

| SA-3369 to be taken by: | FORM SUPPLEMENTED: | | ☐ YES   ☐ NO |
|---|---|---|---|
| ☐ PERSONAL INTERVIEW | If YES, by: | | |
| ☐ TELEPHONE   ☐ MAIL | ☐ PERSONAL INTERVIEW | ☐ TELEPHONE   ☐ MAIL | |
| SIGNATURE OF INTERVIEWER OR REVIEWER | TITLE (Also check office) | | DATE |
| | ☐ DDS   ☐ DO   ☐ BO | | |

G.53

**Title (from Part I):**

# CEMENT

A. In your job did you:

- Use machines, tools or equipment of any kind?  ☑ Yes  ☐ No
- Use technical knowledge or skills?  ☐ Yes  ☐ No
- Do any writing, complete reports, or perform similar duties?  ☐ Yes  ☐ No
- Have supervisory responsibilities?  ☐ Yes  ☐ No

B. Describe your basic duties. Explain what you did and how you did it below. Also, explain all yes answers by giving a FULL DESCRIPTION of the types of machines, tools, or equipment you used and the exact operation you performed, the technical knowledge or skills involved, the type of writing you did, and the nature of any reports, and the number of people you supervised and the extent of your supervision.

I really didnt kno what I was doing I had help from the other workers that work with me. I help spread the cement out.

C. Describe the kind and amount of physical activity this job involved during a typical day in terms of:

- **Walking** (circle the number of hours a day spent walking) — 0 1 2 3 4 5 6 7 ⑧
- **Standing** (circle the number of hours a day spent standing) — 0 1 2 3 4 5 6 7 8
- **Sitting** (circle the number of hours a day spent sitting) — 0 1 2 3 4 5 6 7 8
- **Bending** (circle how often a day you had to bend) — Never - Occasionally - ⟨Frequently⟩ - Constantly
- **Lifting and Carrying:** Describe what was lifted and how far it was carried. Check below heaviest weight lifted, and weight frequently lifted and/or carried.

## CEMENT hose

| Heaviest Weight lifted | Weight frequently lifted/carried |
|---|---|
| ☐ 10 lbs. | ☐ Up to 10 lbs. |
| ☐ 20 lbs. | ☑ Up to 25 lbs. |
| ☑ 50 lbs. | ☐ Up to 50 lbs. |
| ☐ 100 lbs. | ☐ Over 50 lbs. |
| ☐ Over 100 lbs. | |

IF YOU NEED ADDITIONAL SPACE TO PROVIDE INFORMATION ABOUT OTHER JOBS LISTED IN PART I OF THIS FORM, USE PART III OR ASK THE SOCIAL SECURITY OFFICE FOR ADDITIONAL COPIES OF THIS FORM.

Form SSA-3369

G.54

**Job Title (from Part 1)**

CEMENT

A. In your job did you: Use machines, tools, or equipment of any kind? ☑ Yes ☐ No

Use technical knowledge or skills? ☐ Yes ☐ No

Do any writing, complete reports, or perform similar duties? ☐ Yes ☐ No

Have supervisory responsibilities? ☐ Yes ☐ No

I really bidn't no who t I was doing I hoid help from the other wonker that worked with me. I help spread the cement out

- **Walking** (circle the number of hours a day spent walking) — 0 1 2 3 4 5 6 7 (8)

- **Standing** (circle the number of hours a day spent standing) — 0 1 2 3 4 5 6 7 8

- **Sitting** (circle the number of hours a day spent sitting) — 0 1 2 3 4 5 6 7 8

- **Bending** (circle how often a day you had to bend) — Never · Occasionally (Frequently) · Constantly

CEMENt hose

| Heaviest weight lifted | Weight frequently lifted or carried |
|---|---|
| ☐ 10 lbs. | ☐ Up to 10 lbs. |
| ☐ 20 lbs. | ☑ Up to 25 lbs. |
| ☑ 50 lbs. | ☐ Up to 50 lbs. |
| ☐ 100 lbs. | ☐ Over 50 lbs. |
| ☐ Over 100 lbs. | |

G.55

DEPARTMENT OF HEALTH AND HUMAN SERVICES
SOCIAL SECURITY ADMINISTRATION
OFFICE OF HEARINGS AND APPEALS

Form Approved
OMB No. 0960-0269

| REQUEST FOR HEARING BY ADMINISTRATIVE LAW JUDGE<br>[Take or mail original and all copies to your local Social Security Office] | PRIVACY ACT NOTICE<br>ON REVERSE SIDE OF FORM. |
| --- | --- |

| 1. CLAIMANT<br>Bruce C Webster | 2. WAGE EARNER, IF DIFFERENT<br>Willie Webster | 3. SOC. SEC. CLAIM NUMBER | SPOUSE's CLAIM NUMBER |
| --- | --- | --- | --- |

5. I REQUEST A HEARING BEFORE AN ADMINISTRATIVE LAW JUDGE. I disagree with the determination made on my claim because:

CDB and SSI                                    SSI-

I have had sinus problems -
My medication make me sleepy -

You have a right to be represented at the hearing. If you are not represented but would like to be, your Social Security Office will give you a list of legal referral and service organizations. (If you are represented, complete form SSA-1696.)

An Administrative Law Judge of the Office of Hearings and Appeals will be appointed to conduct the hearing or other proceedings in your case. You will receive notice of the time and place of a hearing at least 20 days before the day set for a hearing.

| 6. Check one of these blocks. | 7. Check one of the blocks: |
| --- | --- |
| OHA, Little Rock, AR | |
| [x] I have no additional evidence to submit. | [x] I wish to appear at a hearing. |
| [ ] I have additional evidence to submit.<br>(Please submit it to the Social<br>Security Office within 10 days.)<br>APR 15 1994 | [ ] I do not wish to appear and I request that a decision be made based on<br>the evidence in my case<br>(Complete Waiver Form HA-4608) |

[You should complete No. 8 and your representative (if any) should complete No. 9. If you are represented and your representative is not available to complete this form, you should also print his or her name, address, etc. in No. 9.]

| 8. Bruce Webster | 9. |
| --- | --- |
| (CLAIMANT'S SIGNATURE) | (REPRESENTATIVE'S SIGNATURE/NAME) |
| ADDRESS Pine Bluff Ar 71603 | (ADDRESS) [ ] ATTORNEY; [ ] NON ATTORNEY |
| CITY          STATE          ZIP CODE | CITY          STATE          ZIP CODE |
| DATE 4-13-94          AREA CODE AND TELEPHONE NUMBER | DATE          AREA CODE AND TELEPHONE NUMBER |

**TO BE COMPLETED BY SOCIAL SECURITY ADMINISTRATION—ACKNOWLEDGMENT OF REQUEST FOR HEARING**

10. Request for Hearing RECEIVED for the Social Security Administration on ___4/13/94___ by: P Hollowell

CR          Pine Bluff          759
(TITLE)          (ADDRESS)          Servicing FO Code   PC Code

| 11. [x] Request timely filed | [ ] Request not timely filed-Attach (1) claimant's explanation for delay, (2) any pertinent letter, material, or information in the Social Security Office. |
| --- | --- |
| 12. Claimant not represented —<br>[x] list of legal referral and service organizations provided | 13. Interpreter needed —<br>[ ] enter language (including sign language): ___ |

14. Check one: [x] Initial Entitlement Case
[ ] Disability Cessation Case
[ ] Other Postentitlement Case

15. Check claim type(s):
[ ] RSI only .......................................... (RSI)
[ ] Disability—worker or child only ................... (DIWC)
[ ] Disability—Widow(er) only ....................... (DIWW)
[ ] SSI Aged only ................................... (SSIA)
[ ] SSI Blind only ................................... (SSIB)
[ ] Disability only ................................... (SSID)
[ ] SSI Aged/Title II ................................ (SSAC)
[ ] SSI Blind/Title II ............................... (SSBC)
[x] SSI Disability/Title II ........................... (SSDC)
[ ] HI Entitlement ................................... (HIE)
[ ] Other—Specify: (___)

16. HO COPY SENT TO: S072 HO on 4/13/94
[x] CF Attached: [x] Title II; [x] Title XVI; or
[ ] Title II CF held in FO to establish CAPS ORBIT; or
[ ] CF requested: [ ] Title II; [ ] Title XVI
(Copy of teletype or phone report attached).

17. CF COPY SENT TO: ___ HO on ___
[ ] CF attached: [ ] Title II; [ ] Title XVI
[ ] Other attached ___

FORM HA-501-U5 (5-88)
Issue old stock

CLAIMS FOLDER

13

**REDACTED**          G.56

DEPARTMENT OF HEALTH AND HUMAN SERVICES
SOCIAL SECURITY ADMINISTRATION
OFFICE OF HEARINGS AND APPEALS

Form Approved
OMB No. 0960-0269

## REQUEST FOR HEARING BY ADMINISTRATIVE LAW JUDGE
[Take or mail original and all copies to your local Social Security Office]

PRIVACY ACT NOTICE
ON REVERSE SIDE OF FORM.

| 1. CLAIMANT Bruce C Webster | 2. WAGE EARNER, IF DIFFERENT Willie Webster | 3. SOC. SEC. CLAIM NUMBER | SPOUSE's CLAIM NUMBER |
|---|---|---|---|

5. I REQUEST A HEARING BEFORE AN ADMINISTRATIVE LAW JUDGE. I disagree with the determination made on my claim because:

CDB and SSI          SSI -

I have had sinus problem -
My medication make me sleepy -

You have a right to be represented at the hearing. If you are not represented but would like to be, your Social Security Office will give you a list of legal referral and service organizations. (If you are represented, complete form SSA-1696.)

An Administrative Law Judge of the Office of Hearings and Appeals will be appointed to conduct the hearing or other proceedings in your case. You will receive notice of the time and place of a hearing at least 20 days before the day set for a hearing.

6. Check one of these blocks.

OHA, Little Rock, AR

APR 15 1994

[X] I have no additional evidence to submit.

[ ] I have additional evidence to submit.
(Please submit it to the Social Security Office within 10 days.)

7. Check one of the blocks:

[X] I wish to appear at a hearing.

[ ] I do not wish to appear and I request that a decision be made based on the evidence in my case
(Complete Waiver Form HA-4608)

[You should complete No. 8 and your representative (if any) should complete No. 9. If you are represented and your representative is not available to complete this form, you should also print his or her name, address, etc. in No. 9.]

8. Bruce Webster
(CLAIMANT'S SIGNATURE)

9.
(REPRESENTATIVE'S SIGNATURE/NAME)

ADDRESS Pine Bluff Ar 71603

(ADDRESS) [ ] ATTORNEY; [ ] NON ATTORNEY

| CITY | STATE | ZIP CODE | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|

| DATE 4-13-94 | AREA CODE AND TELEPHONE NUMBER | DATE | AREA CODE AND TELEPHONE NUMBER |
|---|---|---|---|

### TO BE COMPLETED BY SOCIAL SECURITY ADMINISTRATION—ACKNOWLEDGMENT OF REQUEST FOR HEARING

10.
Request for Hearing RECEIVED for the Social Security Administration on ___4/13/94___ by: P Hallowell

CR
(TITLE)          Pine Bluff          759
(ADDRESS)          Servicing FO Code    PC Code

11.
[X] Request timely filed

[ ] Request not timely filed-Attach (1) claimant's explanation for delay, (2) any pertinent letter, material, or information in the Social Security Office.

12. Claimant not represented —
[X] list of legal referral and service organizations provided

13. Interpreter needed —
[ ] enter language (including sign language): _____

14.
Check one: [X] Initial Entitlement Case
[ ] Disability Cessation Case
[ ] Other Postentitlement Case

16.
HO COPY SENT TO: 5072 HO on 4/13/94
[X] CF Attached: [X] Title II; [X] Title XVI; or
[ ] Title II CF held in FO to establish CAPS ORBIT; or
[ ] CF requested: [ ] Title II; [ ] Title XVI
(Copy of teletype or phone report attached).

17.
CF COPY SENT TO: _____ HO on _____
[ ] CF attached: [ ] Title II; [ ] Title XVI
[ ] Other attached _____

15.
Check claim type(s):
[ ] RSI only ............................................ (RSI)
[ ] Disability—worker or child only .................. (DIWC)
[ ] Disability—Widow(er) only ....................... (DIWW)
[ ] SSI Aged only ................................... (SSIA)
[ ] SSI Blind only .................................. (SSIB)
[ ] Disability only ................................. (SSID)
[ ] SSI Aged/Title II ............................... (SSAC)
[ ] SSI Blind/Title II .............................. (SSBC)
[X] SSI Disability/Title II ......................... (SSDC)
[ ] HI Entitlement ................................. (HIE)
[ ] Other—Specify: (_____)

FORM HA-501-U5 (5-88)
Issue old stock

CLAIMS FOLDER

13

REDACTED

G.57

## PRIVACY ACT AND PAPERWORK ACT NOTICE

The Social Security Act (sections 205(a), 702, 1631 (e)(1)(A) and (B), and 1869(b)(1) and (c), as appropriate) authorizes the collection of information on this form. We need the information to continue processing your claim. You do not have to give it, but if you do not you may not receive benefits under the Social Security Act. We may give out information on this form without your written consent if we need to get more information to decide if you are eligible for benefits or if a Federal law requires us to do so. Specifically, we may provide information to another Federal, State, or local government agency which is deciding your eligibility for a government benefit or program; to the President or a Congressman inquiring on your behalf; to an independent party who needs statistical information for a research paper or audit report on a Social Security program; or to the Department of Justice to represent the Federal Government in a court suit related to a program administered by the Social Security Administration. We explain, in the Federal Register, these and other reasons why we may use or give out information about you. If you would like more information, get in touch with any Social Security Office.

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State, or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

These and other reasons why information about you may be used or given out are explained in the Federal Register. If you want to learn more about this, contact any Social Security Office.

## TIME IT TAKES TO COMPLETE THIS FORM

We estimate that it will take you about 10 minutes to complete this form. This includes the time it will take to read the instructions, gather the necessary facts and fill out the form. If you have comments or suggestions on how long it takes to complete this form or on any other aspect of this form, write to the Social Security Administration. ATTN: Reports Clearance Officer, 1-A-21 Operations Bldg., Baltimore, MD 21235, and to the Office of Management and Budget, Paperwork Reduction Project (0960-0269), Washington, D.C. 20503. Do not send completed forms or information concerning your claim to these offices.

FORM **HA-501-U5** (5-88)
Issue old stock

G.58

# Social Security
# Notice of Reconsideration

From: Department of Health and Human Services
Social Security Administration

Bruce G. Webster

Pine Bluff, AR 71603

Date: **APR 5 1994**

Claim Number: 

Claim for
☐ Disability Insurance Benefits
☐ Disabled Widow, Widower Benefits
☒ Childhood Disability Benefits
☐ Medicare Coverage Only

Upon receipt of your request for reconsideration we had your claim independently reviewed by a physician and disability examiner in the State agency which works with us in making disability determinations. The evidence in your case has been thoroughly evaluated; this includes the medical evidence and the additional information received since the original decision. We find that the previous determination denying your claim was proper under the law. Attached to this notice is an explanation of the decision we made on your claim and how we arrived at it. The reverse of this notice identifies the legal requirements for your type of claim.

The determination on your claim was made by an agency of the State. It was not made by your own doctor or by other people or agencies writing reports about you. However, any evidence they gave us was used in making this determination. Doctors and other people in the State agency who are trained in disability evaluation reviewed the evidence and made the determination based on Social Security law and regulations.

If you believe that the reconsideration determination is not correct, you may request a hearing before an administrative law judge of the Office of Hearings and Appeals. If you want a hearing, you must request it not later than 60 days from the date you receive this notice. You may make your request through any Social Security office. Read the enclosed leaflet for a full explanation of your right to appeal.

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. You might lose benefits if you file a new application instead of filing an appeal. Therefore, if you think this decision is wrong, you should ask for an appeal within 60 days.

This decision refers only to your claim for benefits under the Social Security Disability Insurance Program. If you applied for other benefits, you will receive a separate notice when a decision is made on that claim(s).

If you have questions about your claim, you should get in touch with any Social Security office. Most questions can be handled by telephone or mail. If you visit an office, however, please take this letter with you.

Enclosure:
SSA Pub. No. 70-10281
759

**Important: See other side for additional information. ▶**

EXHIBIT NO. 11 12 PAGES

Form SSA-L928-U2 (2-90)

REDACTED G.59

Summarized below are legal requirements for the various types of disability claims:

## Disability Insurance Claim

To be considered disabled, a person must be unable to do any substantial gainful work due to a medical condition which has lasted or is expected to last for at least 12 months in a row. The condition must be severe enough to keep a person from working not only in his or her usual job, but in any other substantial gainful work. We look at the person's age, education, training and work experience when we decide whether he or she can work.

## Disabled Widow (Widower) Claim

A widow, widower, or surviving divorced wife (age 50-60) must meet the disability requirement of the law within a specified 7-year period. A person may be considered disabled only if he or she has a physical or mental impairment that is so severe as to ordinarily prevent a person from working. The disability must have lasted or be expected to last for a continuous period of at least 12 months.

## Childhood Disability Benefits

Childhood disability benefits may be paid to a person age 18 or older if the person has a disability which began before age 22 or within 84 months of the end of an earlier period of childhood disability. The condition, whether physical or mental, must be severe enough to keep the person from doing any substantial gainful work. We look at the person's age, education and previous training when we decide whether he or she can work. In addition, the condition must have lasted or be expected to last for at least 12 months in a row.

Form SSA-L928-U2 (2-90)

G.60

DEPARTMENT OF HEALTH AND HUMAN SERVICES
SOCIAL SECURITY ADMINISTRATION

TOE 710

## REQUEST FOR RECONSIDERATION

*(Do not write in this space)*

The information on this form is authorized by regulation (20 CFR 404.907 – 404.921 and 416.1407 – 416.1421). While your responses to these questions is voluntary, the Social Security Administration cannot reconsider the decision on this claim unless the information is furnished.

| NAME OF CLAIMANT | NAME OF WAGE EARNER OR SELF-EMPLOYED PERSON *(If different from claimant.)* |
|---|---|
| Bruce C. Webster | Willie Webster |

| SOCIAL SECURITY CLAIM NUMBER | SUPPLEMENTAL SECURITY INCOME (SSI) CLAIM NUMBER |
|---|---|
| ███████████ | ██████████ |

SPOUSE'S SOCIAL SECURITY NUMBER *(Complete ONLY in SSI cases)*

3/17/94
AP

CLAIM FOR: *(Specify type, e.g., retirement, disability, hospital insurance, SSI, etc.)*
Disability, CDB claim

I do not agree with the determination made on the above claim and request reconsideration. My reasons are:
I feel I have problems. Sinus and other problems / slow learner that make me disabled

### SUPPLEMENTAL SECURITY INCOME RECONSIDERATION ONLY *(See reverse of claimant's copy)*

"I want to appeal your decision about my claim for supplemental security income, SSI. I've read the back of this form about the three ways to appeal. I've checked the box below."

[X] Case Review    [ ] Informal Conference    [ ] Formal Conference

### EITHER THE CLAIMANT OR REPRESENTATIVE SHOULD SIGN – ENTER ADDRESSES FOR BOTH

| SIGNATURE OR NAME OF CLAIMANT'S REPRESENTATIVE | CLAIMANT SIGNATURE |
|---|---|
| [ ] NON-ATTORNEY  [ ] ATTORNEY | Bruce Webster |

| STREET ADDRESS | STREET ADDRESS ██████████ |
|---|---|

| CITY | STATE | ZIP CODE | CITY Pine Bluff | STATE Ar | ZIP CODE 71603 |
|---|---|---|---|---|---|

| TELEPHONE NUMBER *(Include area code)* (___) ___ | DATE | TELEPHONE NUMBER *(Include area code)* (██████████) | DATE 3/17/94 |
|---|---|---|---|

### TO BE COMPLETED BY SOCIAL SECURITY ADMINISTRATION

See reverse of claim folder copy for list of initial determinations

| 1. HAS INITIAL DETERMINATION BEEN MADE? | [X] YES [ ] NO | 2. CLAIMANT INSISTS ON FILING | [ ] YES [ ] NO |
|---|---|---|---|

3. IS THIS REQUEST FILED TIMELY?    [X] YES [ ] NO
*(If "NO", attach claimant's explanation for delay and attach only pertinent letter, material, or information in social security office.)*

RETIREMENT AND SURVIVORS RECONSIDERATIONS ONLY (CHECK ONE) REFER TO (GN 03102.125)

SOCIAL SECURITY OFFICE ADDRESS
P.O. Box 8309
Pine Bluff, Ar
71611

[X] NO FURTHER DEVELOPMENT REQUIRED    (GN 03102.125)

[ ] REQUIRED DEVELOPMENT ATTACHED

[ ] REQUIRED DEVELOPMENT PENDING, WILL FORWARD OR ADVISE STATUS WITHIN 30 DAYS

| ROUTING INSTRUCTIONS (CHECK ONE) | [ ] DISABILITY DETERMINATION SERVICES *(ROUTE WITH DISABILITY FOLDER)* | [ ] ODO, BALTIMORE | [ ] PROGRAM SERVICE CENTER |
|---|---|---|---|
| | [ ] INTPSC, BALTIMORE | [ ] DISTRICT OFFICE RECONSIDERATION | [ ] OCRO BALTIMORE |

NOTE: TAKE OR MAIL COMPLETED COPIES TO YOUR SOCIAL SECURITY OFFICE

FORM **SSA-561-U2** (9-85)

CLAIMS FOLDER

8

**REDACTED**

G.61

## ADMINISTRATIVE ACTIONS THAT ARE INITIAL DETERMINATIONS
### (See GN 03101.190, GN 03101.200, and GN 03110.210)

NOTE: These lists cover the vast majority of administrative actions that are initial determinations. However, they are not all inclusive.

### Title II

1. Entitlement or continuing entitlement to benefits;
2. Reentitlement to benefits;
3. The amount of benefit;
4. A recomputation of benefit;
5. A reduction in disability benefits because benefits under a worker's compensation law was also received;
6. A deduction from benefits on account of work;
7. A deduction from disability benefits because of claimant's refusal to accept rehabilitation services;
8. Termination of benefits;
9. Penalty deductions imposed because of failure to report certain events;
10. Any overpayment or underpayment of benefits;
11. Whether an overpayment of benefits must be repaid;
12. How an underpayment of benefits due a deceased person will be paid;
13. The establishment or termination of a period of disability;
14. A revision of an earnings record;
15. Whether the payment of benefits will be made, on the claimant's behalf to a representative payee, unless the claimant is under age 18 or legally incompetent;
16. Who will act as the payee if we determine that representative payment will be made;
17. An offset of benefits because the claimant previously received Supplemental Security Income payments for the same period;
18. Whether completion of or continuation for a specified period of time in an appropriate vocational rehabilitation program will significantly increase the likelihood that the claimant will not have to return to the disability benefit rolls and thus, whether the claimant's benefits may be continued even though the claimant is not disabled; and

19. Nonpayment of benefits because of claimant's confinement in a jail, prison, or other penal institution or correctional facility for conviction of a felony.

### Title XVI

1. Eligibility for, or the amount of, Supplement Security Income benefits;
2. Suspension, reduction, or termination of Supplemental Security Income benefits;
3. Whether an overpayment of benefits must be repaid;
4. Whether payments will be made, on claimant's behalf to a representative payee, unless the claimant is under age 18, legally incompetent, or determined to be a drug addict or alcoholic;
5. Who will act as payee if we determine that representative payment will be made;
6. Imposing penalties for failing to report improtant information;
7. Drug addiction or alcoholism;
8. Whether claimant is eligible for special SSI cash benefits;
9. Whether claimant is eligible for special SSI eligibility status;
10. Claimant's disability; and
11. Whether completion of or continuation for a specified period of time in an appropriate vocational rehabilitation program will significantly increase the likelihood that claimant will not have to return to the disability benefit rolls and thus, whether claimant's benefits may be continued even though he or she is not disabled.

NOTE: Every redetermination which gives an individual the right of further review constitutes an initial determination.

### Title XVIII

1. Entitlement to hospital insurance benefits and to enrollment for supplementary medical insurance benefits;
2. Disallowance (including denial of application for HIB and denial of application for enrollment for SMIB);
3. Termination of benefits (including termination of entitlement to HI and SMI).

FORM SSA-561-U2 (9-85)

G.62

# Social Security Notice

From: Department of Health and Human Services
Social Security Administration

Date: FEB 8 1994

Bruce C. Webster

Pine Bluff, AR 71603

Claim Number:

☐ Disability Insurance Benefits

☐ Disabled Widow/Widower Benefits

☒ Childhood Disability Benefits

We have determined that you are not entitled to disability benefits based on the claim that you filed. The attached page explains why we decided that you are not disabled. However, you may appeal this determination if you still think you are disabled.

The determination on your claim was made by an agency of the State. It was not made by your own doctor or by other people or agencies writing reports about you. However, any evidence they gave us was used in making this determination. Doctors and other people in the State agency who are trained in disability evaluation reviewed the evidence and made the determination based on Social Security law and regulations. The law is explained on the back of this page.

In addition, you are not entitled to any other benefits based on this application. If you applied for other benefits, you will receive a separate notice when a decision is made on that claim(s).

## YOUR RIGHT TO APPEAL

If you think we are wrong, you can ask that the determination be looked at by a different person. This is called a reconsideration. IF YOU WANT A RECONSIDERATION, YOU MUST ASK FOR IT WITHIN 60 DAYS FROM THE DATE YOU RECEIVE THIS NOTICE. IF YOU WAIT MORE THAN 60 DAYS, YOU MUST GIVE US A GOOD REASON FOR THE DELAY. Your request must be made in writing through any Social Security office. Be sure to tell us your name, Social Security number and why you think we are wrong. If you cannot write to us, call a Social Security office or come in and someone will help you. You can give us more facts to add to your file. However, if you do not have the evidence yet, you should not wait for it before asking for a reconsideration. You may send the evidence in later. We will then decide your case again. You will not meet with the person who will decide your case. Please read the enclosed leaflet for a full explanation of your right to appeal.

## NEW APPLICATION

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. You might lose benefits if you file a new application instead of filing an appeal. Therefore, if you think this decision is wrong, you should ask for an appeal within 60 days.

cs

759

Enclosure:
SSA Publication No. 05-10058

Important: See other side for additional information.▶

Form SSA-L443-U2 (2-90)

EXHIBIT NO. 6 2 PAGES

**REDACTED** G.63

If you have any questions, call, write, or visit, any Social Security office. Most questions can be handled by telephone or mail. If you visit a Social Security office, please take this notice with you.

## REQUIREMENTS FOR DISABILITY BENEFITS

### Disability Insurance Benefits

To be considered disabled, a person must be unable to do any substantial gainful work due to a medical condition which has lasted or is expected to last for at least 12 months in a row. The condition must be severe enough to keep a person from working not only in his or her usual job, but in any other substantial gainful work. We look at the person's age, education, training and work experience when we decide whether he or she can work.

The condition must be disabling at a time when the person meets the earnings requirement. If you were not disabled when the earnings requirement was met, we have enclosed a leaflet which explains the earnings requirement and tells how Social Security credits are earned.

### Disabled Widow or Widower Benefits

To be considered disabled, a widow, widower or surviving divorced spouse (age 50 to 60) must have a physical or mental condition severe enough to keep a person from working. The condition must have lasted or be expected to last for at least 12 months in a row.

The person's disability must start:

- not later than 7 years after the month of death of the wife or husband, or;
- for a widow, widower or surviving divorced spouse formerly entitled to mother's or father's benefits not later than 7 years after the month those benefits ended, or;
- for a widow/widower or surviving divorced spouse who was previously disabled and who becomes disabled again, not later than 7 years after the prior period of disability ended.

### Childhood Disability Benefits

Childhood disability benefits may be paid to a person age 18 or older if the person has a disability which began before age 22 or within 84 months of the end of an earlier period of childhood disability. The condition, whether physical or mental, must be severe enough to keep the person from doing any substantial gainful work. We look at the person's age, education and previous training when we decide whether he or she can work. In addition, the condition must have lasted or be expected to last for at least 12 months in a row.

## OTHER IMPORTANT INFORMATION

Definitions of disability are not the same in all government and private disability programs. Government agencies must follow the laws that apply to their own disability programs. A finding by a private organization or other government agency that a person is disabled does not necessarily mean that the person meets the disability requirements of the Social Security Act.

No benefits may be paid to a wife, husband or child unless the wage earner or self-employed person is entitled to Social Security disability insurance benefits.

Form SSA-L443-U2 (2-90)

G.64

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Social Security Administration

Form Approved
OMB No. 0960-0504

## MEDICAL HISTORY AND DISABILITY REPORT
## WIDOW, WIDOWER, SURVIVING DIVORCED WIFE, OR DISABLED CHILD

PLEASE PRINT, TYPE, OR WRITE CLEARLY AND ANSWER ALL ITEMS TO THE BEST OF YOUR ABILITY. If you are filling on behalf of someone else, enter his or her name and social security number in the space provided and answer all questions. COMPLETE ANSWERS WILL AID IN PROCESSING THE CLAIM.

PRIVACY ACT/PAPERWORK REDUCTION NOTICE: The Social Security Administration is authorized to collect the information on this form under section 205(a), 223 and 1631(e) of the Social Security Act. The information on this form is needed by Social Security to make a decision on your claim. While giving us the information on this form is voluntary, failure to provide all or part of the requested information could prevent an accurate or timely decision on your claim and could result in the loss of benefits. Although the information you furnish on this form is almost never used for any purpose other than making a determination on your disability claim, such information may be disclosed by the Social Security Administration as follows: (1) To another a third party or agency to assist Social Security in establishing rights to Social Security benefits and/or coverage; (2) to comply with Federal laws requiring the release of information from Social Security records (e.g. to the General Accounting Office and the Veterans Administration); and (3) to facilitate statistical research and audit activities necessary to assure the integrity and improvement of the Social Security programs (e.g. to the Bureau of Census and private concerns under contract to Social Security).

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by the Federal government. The law allows us to do this even if you do not agree to it.

These and other reasons why information about you may be used, or given out are explained in the Federal Register. If you want to learn more about this contact any Social Security office.

TIME IT TAKES TO COMPLETE THIS FORM

This information is collected under the authority of the Privacy Act. We estimate that it will take you about 15 minutes to read the instructions, gather the necessary facts and fill in the form. If you have comments or suggestions on this estimate, write to the Social Security Administration, ATTN: Reports Clearance Officer, 1-A-21 Operations Bldg., Baltimore, MD 21235, and to the Office of Management and Budget, Paperwork Reduction Project (0960-0504), Washington, D.C. 20503. Send only comments relating to our "time it takes" estimate to these offices. Do not send the completed form to these offices.

### PART I — IDENTIFYING INFORMATION

| 1. Print name of person on whose Social Security record this claim is being filed (first name, middle initial, last name) | Enter his or her Social Security Number |
|---|---|
| Willie L. Webster | ▮▮▮▮▮▮ |
| 2. Print your name (disabled person) (first name, middle initial, last name) | Enter your Social Security Number |
| Bruce Webster | ▮▮▮▮▮▮ |

### PART II — INFORMATION ABOUT YOUR CONDITION AND TREATMENT

3A. What is your disabling condition? (Briefly describe the disabling illness or injury)

Sinus problem + headaches

| 3B. When did you become disabled? | MONTH 5 | DAY 31 | YEAR 83 |
|---|---|---|---|

| 4A. Have you worked since you became disabled? | ☐ YES | ☐ NO |
|---|---|---|

4B. If "yes," show the dates you worked and the amount of money you earned.

| DATES | AMOUNTS |
|---|---|
| | |
| | |

| 5. If you are no longer disabled, show the date you believe your disability ended | MONTH | DAY | YEAR |
|---|---|---|---|

Form SSA-3820-F6 (1-92)

1

EXHIBIT NO. 2 16 PAGES

REDACTED       G.65

If more space is needed, list the other agencies, their addresses, your claim numbers, dates, and treatment received in Part III.

6. List the name, address and telephone number of the doctor who has the latest medical records about your disabling condition.

NAME                                                    ADDRESS                    ☐

TELEPHONE NUMBER (include area code)

HOW OFTEN DO YOU SEE THIS DOCTOR?    DATE YOU FIRST SAW THIS DOCTOR    DATE YOU LAST SAW THIS DOCTOR

REASONS FOR VISITS (show illness or injury for which you had an examination or treatment)

TYPE OF TREATMENT OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation, and the medicines you take for your illness or injury, if known. If no treatment or medicines, show "NONE".)

7. Have you seen any other doctors since your disabling condition began?     ☐ YES   ☐ NO

NAME                                                    ADDRESS

TELEPHONE NUMBER (include area code)

HOW OFTEN DO YOU SEE THIS DOCTOR?    DATE YOU FIRST SAW THIS DOCTOR    DATE YOU LAST SAW THIS DOCTOR

REASON FOR VISITS (show illness or injury for which you had an examination or treatment)

TYPE OF TREATMENT OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation, and the medicines you take for your illness or injury, if known. If no treatment or medicines, show "NONE".)

If you have seen other doctors since your illness began, list their names, addresses, dates, and reasons for visits in Part III.

8. Have you been to any hospital or clinic for your disabling condition?     ☐ YES   ☐ NO

NAME OF HOSPITAL OR CLINIC                              ADDRESS

PATIENT OR CLINIC NUMBER

Were you an inpatient (Stayed at least overnight)?     Were you an outpatient?
☐ YES  ☐ NO   If yes, show                            ☐ YES  ☐ NO   If yes, show

DATES OF ADMISSIONS    DATES OF DISCHARGES                DATE OF VISITS

REASON FOR HOSPITALIZATION OR CLINIC VISITS (show illness or injury for which you had an examination or treatment.)

TYPE OF TREATMENT OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation, and the medicines you take for your illness or injury, if known. If no treatment or medicines, show "NONE".)

If you have been in other hospitals or clinics for your illness or injury, list the names, addresses, patient or clinic numbers, dates, and reasons for hospitalization or clinic visits in Part III.

9. Have you been seen by other agencies for your disabling condition? (VA, Worker's Compensation, Vocational Rehabilitation, Welfare, etc.) If yes, show     ☐ YES   ☐ NO

NAME OF AGENCY                                          ADDRESS OF AGENCY

YOUR CLAIM NUMBER

DATES OF VISITS

TYPE OF TREATMENT, EXAMINATION, OR MEDICINES RECEIVED (such as surgery, chemotherapy, radiation, and the medicines you take for your illness or injury, if known. If no treatment or medicines, show "NONE".)

Form SSA-3820-F6 (1-92)                          2

G.66

Case 2:12-cv-00086-JPH-WJH   Document 42-6   Filed 07/02/14   Page 32 of 209 PageID #: 1466
Case 2:12-cv-00086-WTL-WGH   Document 34-9   Filed 04/03/14   Page 32 of 209 PageID #: 1157

| Have you had any of the following in the last year? | | | | |
|---|---|---|---|---|
| | | WHERE DONE | WHEN DONE |
| Electrocardiogram | ☐ YES   ☑ NO | | |
| Chest X-Ray | ☐ YES   ☑ NO | | |
| Other X-Ray (Name the body part here) | ☐ YES   ☑ NO | | |
| Breathing Tests | ☐ YES   ☑ NO | | — .. |
| Blood Tests | ☐ YES   ☑ NO | | |
| Other (Specify) | ☐ YES   ☐ NO | | |

| NAMES | DATES ATTENDED |
|---|---|
| Watson Chapel School Pine Bluff AR RT 84 300 | 1984 n 85 - 1987 n |
| (Coleman School) 4600 W 13 ave  71603  Pine Bluff, AR 71603 | 1979 - 1984 |

8th

G.67



X Bruce Webster

G.68

## DETACH THIS PAGE

### PART V — FOR SSA USE ONLY — DO NOT WRITE BELOW THIS LINE

**NAME OF CLAIMANT**

Bruce Webster

**CLAIM NUMBER**

[REDACTED]

**14A.** Was claimant ever or is now entitled to any type of monthly Social Security benefits?

☒ YES (If "yes", answer B, C, D and E)       ☐ NO (If "no", go on to item 15.)

**14B.** ENTER NAME OF PERSON ON WHOSE SOCIAL SECURITY RECORD CLAIMANT FILED OTHER APPLICATION.

Willie L. Webster

**14C.** ENTER SOCIAL SECURITY NUMBER OF PERSON NAMED IN B (If unknown, so indicate).

[REDACTED]

**14D.** WHAT KIND OF BENEFITS DID OR DOES CLAIMANT RECEIVE? (For example, widows, mother's, disabled child's)

Child

**14E.** ENTER MONTH AND YEAR BENEFITS ENDED OR WILL END.

| MONTH | YEAR |
|-------|------|
| 03 | 91 |

**15.** Check any of the following categories which apply to this case:

Presumptive Disability or Blindness Considerations
(If any of these boxes are checked, DO's (and DDS's) should be alert to the possibility of a presumptive disability or blindness decision in SSI claims per DI 00404.210 and DI 2152.5)

A. ☐ Amputation of two limbs

B. ☐ Amputation of a leg at the hip

C. ☐ Allegation of total deafness

D. ☐ Allegation of total blindness

E. ☐ Allegation of bed confinement or immobility without a wheelchair, walker, or crutches, allegedly due to a longstanding condition - exclude recent accident and recent surgery.

F. ☐ Allegation of a stroke (cerebral vascular accident) more than 3 months in the past and continued marked difficulty in walking or using a hand or arm.

G. ☐ Allegation of cerebral palsy, muscular dystrophy or muscular atrophy and marked difficulty in walking (e.g., use of braces), speaking or coordination of the hands or arms.

H. ☐ Allegation of diabetes with amputation of a foot.

I. ☐ Allegation of Down's Syndrome (Mongolism).

J. ☐ An applicant filing on behalf of another individual alleges severe mental deficiency for claimant who is at least 7 years of age. The applicant alleges that the individual attends (or attended) a special school, or special classes in school, because of his mental deficiency, or is unable to attend any type of school (or if beyond school age was unable to attend), and requires care and supervision of routine daily activities.

K. ☐ Allegation of renal disease requiring dialysis on a regularly scheduled basis.

**16.** Does the claimant speak English?

☒ YES       ☐ NO (If "no", what language does he or she speak?)

**LANGUAGE(S)**

**17.** Does the claimant need assistance in prosecuting his or her claim? (If "yes", show name, address, relationship and telephone number of interested party willing to assist claimant.)

☐ YES       ☒ NO

| NAME | ADDRESS | RELATIONSHIP | TELEPHONE NUMBER (area code) |
|------|---------|--------------|------------------------------|
|      |         |              |                              |

**18.** Is capability development by the DDS necessary? (If "yes", show "DDS Capability Development needed" in item 11 of the SSA-831-U5.)

☐ YES       ☐ NO

Form SSA-3820-F6 (1-88)

5

**REDACTED**       G.69

**19A.** Check each item to indicate if any difficulty was observed:

| | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| Reading | ☐ | ☐ | Using Hands | ☐ | ☐ |
| Writing | ☐ | ☐ | Breathing | ☐ | ☐ |
| Answering | ☐ | ☐ | Seeing | ☐ | ☐ |
| Hearing | ☐ | ☐ | Walking | ☐ | ☐ |
| Sitting | ☐ | ☐ | | | |
| Understanding | ☐ | ☐ | | | |

Other (Specify): _____

**19B.** If any of the above items were checked "yes," describe the exact difficulty involved:

*See 368*

---

**PRESCRIBED PERIOD — COMPLETE IN ALL CASES EXCEPT DISABLED CHILD CASES.**

**20A.** Beginning date *(fill in all applicable dates, check latest)*

| | MONTH |
|---|---|
| ☐ W/E's death | |
| ☐ Last month of previous entitlement to Disabled Widow(er) benefits | |
| ☐ Last month of entitlement to Mother's benefits | |

**20B.** Ending date *(fill in dates, check earliest)*

| | MONTH |
|---|---|
| ☐ If filing for monthly benefits, the month before the month widow(er) attains age 60 | |
| ☐ If filing for Medicare only, the month before the month widow(er) attains age 65 | |
| ☐ Eighty-four months (7 years) following the beginning date checked in 20A. | |

**21.** Controlling date for development of medical evidence — DWB case

| | MONTH | DAY | YEAR |
|---|---|---|---|
| | | | |

**22.** Medical Development — Initiated by District or Branch office

| SOURCE | DATE REQUESTED | DATE(S) OF FOLLOW-UP | CAPABILITY DEVELOPMENT REQUESTED |
|---|---|---|---|
| | | | |
| | | | |

**23.** DO curtailed completion of items 12 and 13 per DI 11005.035 (DI 20501.005B)   ☒ Yes   ☐ No

**24.** Is development of work activity necessary?   ☐ Yes   ☒ No
If "yes", is an SSA-820-F4 or SSA-821-F4   ☐ Pending   ☐ In File

**25.** SSA-3820-F6 taken by:
☐ Personal Interview   ☐ Telephone   ☐ Mail

**26.** Form supplemented If "yes" by:   ☐ Yes   ☐ No
☐ Personal Interview   ☐ Telephone   ☐ Mail

Signature of DO or BO Interviewer or Reviewer: *Caroline Cross-Hallowell CR*

TITLE: _____

DATE: *10/4/93*

Form SSA-3820-F6 (1-88)

6

G.70

# Wells Decl. Ex. H

## PSYCHIATRIC HISTORY, MENTAL STATUS AND NEUROLOGICAL EXAMINATION

Re:  Willie Webster
     A/N █████████
     January 4, 1972

Identifying Data:

This is a 52 year old married black male from Pine Bluff, Arkansas, who was referred to me by the Disability Determination Section of the Social Security Administration for neuropsychiatric examination. He is accompanied by his wife who drove him to my office. He is currently unemployed.

Present Illness:

This man states that in June 1969, while working on the job, he was struck in the right side of his head by a log in a timber cutting accident. Since that time he has had marked changes in his personality and in his total ability to function.

He states that at the present time his major symptoms are pain in the left shoulder and back, headache, primarily on the right side, dizziness, a weakness in all extremities, slowness of thought, irratability and decrease of libido. He has had all of these symptoms in a varying severity since the accident and although they have improved to some degree, there are still numerous occasions on which these symptoms are quite disturbing to the point that he feels that he is "losing my mind".

He has been evaluated on several occasions in the past and apparently has been judged to be unable to be gainfully employed on each examination. In addition to his being unemployable, his wife reports that he also has had such a severe personality change that she and the children are quite afrain of him. She reports that he is rather suspicious and verbally abusive and relates that earlier he had even been charged with second degree murder. She relates that his temper outbursts are considerably improved and she says that things at home are not as bad as they once were.

### DIRECT PSYCHIATRIC EXAMINATION

General Appearance and Behaviour:

This is a well developed, well nourished negro male who appears to be about the stated age. He walks into the examiner's office without noticeable evidence of any neurological disturbance. From the very beginning, he was somewhat suspicious of the examiner and was rather difficult to examine. He exhibited no other unusual behavior, however.

Stream of Talk and Activity:

The patient answered direct questions with some suspiciousness and

EXHIBIT H

REDACTED

H.01

Re:  Willie Webster
     A/N ██████████
     January 4, 1972
     Page 2.

evasiveness. He could not give a coherent story and much of the information was obtained from his wife.  When he chose to answer a question, he did so without any spontaneous elaboration.  He was quite restless throughout the interview and showed a good deal of overt anxiety, but made no attempt to prevent the examiner from completing the examination nor any attempt to leave the room.

Mood and Affect:
     The patient's mood is somewhat surley and hostile.  His affect was appropriate.

Sensorium and Intellectual Resources:
     The patient appeared to be well oriented in all spheres.  In spite of this fact, however, he had a rather slow recall of both remote and recent events with a lot of blanks in his memory.

     His fund of knowledge of general information was quite poor.  He answered very few of the usual test questions, but was unable to present any distinct localizing signs.  He could count change accurately but was unable to name the months of the year either forward or backward and could not do serial sevens.

Content and Trend of Thought:
     The patient's thought content was somewhat distorted by his degree of suspiciousness but he did give the examiner some information about his injury and what had been going on since that time.  He was markedly evasive about any of the information concerning the physical and verbal abusiveness related by his wife.

     He states that his most disturbing symptoms are his headache and his irritatability.  The pain in his shoulder and back are somewhat irritating to him but he said that these did not bother him enough now to be much trouble.  He stated that his irritatability was what bothered him most because he was sometimes rather short tempered with his wife and children.

     He did feel that the people responsible for giving him employment and/or social security and welfare benefits were not very sympathetic to his needs of the moment.  Although he had shown a great deal of paranoid ideation in the past as related by his wife, he showed very little of this type thought content at this time.  He denied either auditory or visual hallucinations.  He insisted that all he was interested in was the social security benefits to which he felt himself entitled since he had paid in so much money.

Judgment and Insight:
     The patient's judgment is very poor and his insight is rather limited.

**REDACTED**

H.02

Re:  Willie Webster
     A/N <span style="background:black">████████</span>
     January 4, 1972
     Page 3.

## NEUROLOGICAL EXAMINATION

The patient's sensorium and cerebral functions are outlined above. His station and gait were normal throughout the examination. He was able to walk on his toes and heels, to bend, to stoop and to squat without difficulty.

The cranial nerves all appeared to be intact. The fundi were visualized with considerable difficulty but appeared to be normal in appearance. The pupils were round, regular and equal and reacted briskly to both light and accomodation. The extra-ocular movements appeared to be normal and the visual fields were full to confrontation. The palate elevated and the tongue protruded in the midline. The gag reflex was brisk.

The Rhomberg test for balance indicated that the patient had a tendency to fall toward the back and to the right but it appeared that he could right himself before completely falling down had he not been caught by the examiner. Coordination as tested by the finger-nose-finger and heel-knee-ankle test was normal.

The deep tendon reflexes were hyperactive in the right upper extremity and both lower extremities tested at 4 plus. In the left upper extremity the deep tendon reflex was somewhat decreased as compared to that on the right, but was still two plus. The abdominal and cremasteric reflexes were both present and the Babinski's were negative. There was no indication of demonstrable sensory deficits as tested by pin prick, proprioception and vibratory sense.

Summary:
     This is a 52 year old black male who was injured in a logging accident in June of 1969 and since that time has had marked neuropsychiatric difficulties which have apparently left him with a rather severe personality change and physical limitations to the point of making him unemployable.

At the present time he continues to complain of headache, pain in the left shoulder, and back, dizziness, weakness, slowness of thought and loss of libido. The previously seen psychotic reaction is not grossly apparent but this examiner felt that his reality testing was tenous, at best, and that his psychotic is simply in remission. A strong depressive component is currently very obvious and probably accounts for much of his symtomatology.

Diagnostic Impression:
     Psychotic organic brain syndrome associated with gross force trauma (in partial remission).

**REDACTED**

H.03

Re: Willie Webster
A/N ██████████
January 4, 1972
Page 4.

Conclusions:

This man's prognosis for full recovery is poor and his employability is grossly impaired. Maximum improvement has probably occurred. Appropriate psychotrophic drugs are probably indicated. He is not competent to manage his own funds.

Sincerely,

Lewis R. Sutton, M.D.

LRS/lew

REDACTED

H.04

Case 2:12-cv-00086-WHL-WGH   Document 43-9   Filed 04/30/14   Page 41 of 209 PageID #: 1175

RICHARD E. WALTERS, M. D.
OFF. 663-4549 · Ex. 372-6789
5422 WEST MARKHAM
LITTLE ROCK. ARK. 72205

February 4, 1971

Disability Determination for Social Security Administration
Suite 700 - The 1515 Building
1515 West Seventh Street
Little Rock, Arkansas 72203

Re:   Willie L. Webster
      A/N ████████

Dear Mr. Lofton:

This 47 year old, married, Negro male from Pine Bluff,
Arkansas, reported for neuropsychiatric evaluation on
January 30, 1971. He was driven to and from the examina-
tion by his wife. The client himself was unable to give
any reasonable history of injury or description of symp-
toms, other than the fact that he had a skull fractured
by a flying log. He could recall no dates nor approximate
time duration since the injury or anything about the
treatment received. He did indicate that he had some
weakness of his left arm and leg with a numb, dead feeling
much of the time and he further stated that his vision was
getting smoky. Beyond that the history was obtained from
his wife, that he was involved in an injury in the timber
fields during June, 1969, when a log was thrown somehow
from a bulldozer and struck him on the right side of the
head. She said that he was taken to the Pine Bluff hospit-
al and then transferred to the Baptist Medical Center in
Little Rock for repair of the cranial defect.

Further questioning of Mr. Webster regarding effects of
the injury and current personality functioning, resulted
in his rising from the chair and attempting to leave the
room, stating that he was hot and would have to get out of
there. With persuasion he did return to the chair, a
window was opened and his wife continued to give a descrip-
tion of her observations. She stated that her husband had
become increasingly irritable around any noise, especially
by the children. He would either strike them or walk out
of the house for an hour or more. She said that he frequent-
ly complains of hot and cold sensations over the right side
of the head and about six months ago he had a convulsive
seizure and was treated overnight at Jefferson Hospital.

REDACTED   H.05

Page 2   -   Willie L. Webster

He was given some capsules to take but is irregular and sometimes refuses to take the medicine.  When I asked if her husband had been involved in any difficulty in the community outside the home, she reluctantly reported that he had been charged with Second Degree Murder one month ago. When I turned to Mr. Webster for details he again wanted to leave the room, so no further information is available on the details of that event.

The past history revealed that Mr. Webster was born in Louisiana, had no formal education, but has learned to sign his own signature.  Both parents are deceased and he said with some uncertainty, that he thought there were 24 children in his family.  He has been married twice, seven years to his present wife and they have seven children.

In The evaluation of his mental status reveals him to be functioning on a psychotic level.  He was inappropriately suspicious of all the examining procedures and seemed to be preoccupied with the delusional belief that he was being prepared for some dire event, such as confinement in a hospital. With great patience he did allow testing of his cranial nerves, but he followed the moving finger quite erratically; he was unable to focus on an object for a funduscopic exam and he seemed not to understand the purpose of my asking him to go through various motions with the facial muscles and sticking out the tongue, swallowing, hunching the shoulders, etc.  As near as I could tell however, from his spontaneous motions, there was no significant impairment of cranial nerve function.

With the wife in the room, I asked him to strip to his waist and again he was very suspicious, looked at his wife and asked her what I was going to do to him.  On some of the occasions during the interview, I asked him to give the name of the examiner and he never did concentrate on that task sufficient to recall.  He said that he did not know the names of the month but did slowly name the days of the week and stated that the current day was Saturday, which was correct.  Throughout the exam he made remarks indicating a sense of fearfulness and mistrust regarding the purpose of the procedures.  He would not answer any questions of a personal nature or regarding changes in his feelings.  He seemed to become more tense and close to a point of behavior explosion.  His apperception therefore, was markedly impaired and he had no insight or judgement into his present functioning. There was no modulation of affect and he maintained a quizzical, confused and suspicious attitude throughout the contact.

H.06

Page 3 - Willie L. Webster

In addition to the cranial nerve functions it was noted that there was no atrophy of the musculature.   There was a noticably weaker grip in the left arm.   He was able to perform tests of balance and coordination normally.   His deep tendon reflexes were more elicited on the left side compared to 3+ to 4+ on the right side, both in the upper and lower extremity, indicating some paresis plus a diminished sensation to pin prick over the left arm and left leg.

SUMMARY AND CONCLUSIONS:   Though authorities recommend no final conclusions on neurological injuries for a period of 24 months, it does not appear that there has been very little change in his mental or neurological functioning since the examination by Dr. James Moore in June, 1970, which would have been 12 months following the injury.   The findings on this examination are compatible with a right parietal skull fracture with depression and apparently a permanent contusion injury to the cortical cells straddling the Sylvian fissure sparing the speech and hearing centers.   The mental status indicates some catastrophic emotional reactions and disturbed cognative and apperceptive functions.   He is in my opinion, functioning in a psychotic state and is considered extremely dangerous and subject to violent behavioral outbursts with minimul stressing.   He is therefore incapable of relating to any social situation requiring directions from others or sustain work procedures since he questions every direction and is apparently delusional even toward his wife, who stated that he has struck out at her without provocation.

The psychotropic drugs are of little value in treating this type of psychosis but should be offered along with anti convulsants for behavioral control.   If he is placed on disability status, complete neurologic studies should be repeated in about six months along with electroencephalogram if he will permit it, to make a final determination as to his permanent disability.

Sincerely yours,

Richard E. Walters, M.D.

REW/ab

H.07

January 21, 1971

Richard E. Walters, M. D.
5422 West Markham
Little Rock, Arkansas 72205

Re:   Willie L. Webster
A/N ███████████

Dear Doctor:

Enclosed is our authorization for a consultative neuro-psychiatric evaluation of the above named person on Saturday, January 30, 1971 at 12:00 noon.

Please submit your report in narrative form, original and three copies, relative to claimant's orientation, judgment, insight, hallucinations, delusions, presence or absence of psychosis, diagnosis, prognosis, and describe any of the following conditions that are present, indicating severity, distribution and residual function in affected parts: i.e., atrophy, paralysis, hemiplegia, impaired speech, tremors, gait and reflexes.

Use of the report that you prepare in connection with this examination (plus any background material about the individual which we may furnish you) is restricted by the provisions of Federal Law and Regulation (42 U.S.C. 1306 and 20 CFR 401.1 et.seq.). Unauthorized release is strictly prohibited and subject to legal penalties. Should you receive a request for the report or the background material, or should your records or personal testimony be subpoenaed, notify this office at once. In any action seeking to compel the disclosure of your report, the services of the Department's Regional Attorney will be available and, where necessary, every effort will be made to secure the services of the US Attorney on your behalf.

Your cooperation in this matter is indeed appreciated.

Very truly yours,


Wayne J. Lofton, Director
Disability Determination for
Social Security Administration

dh
Enclosures

REDACTED

H.08

DRS. PADBERG AND MOORE
NEUROLOGICAL SURGERY
SUITE 704 · DOCTORS BUILDING
500 SOUTH UNIVERSITY AVENUE
LITTLE ROCK, ARKANSAS 72205

FRANK PADBERG, M.D.

MOHAWK 6-5466

JIM J. MOORE II, M.D

August 11, 1970

RECEIVED
DEC 15 1970
DISABILITY
DETERMINATION

John E. Cowne, Jr., Secretary
Workmen's Compensation Commission
Justice Building
State Capitol Grounds
Little Rock, AR 72201

Dear Mr. Cowne:

Re Willie Lee Webster vs. Pulpwood Producers Co.
    WCC File ███████

I received a letter from Mr. Owens, Mr. Webster's attorney,
requesting some additional opinions. I do not have a release
from the patient to submit this information. I, therefore,
though it would be advisable to write you some additional
comments. If you feel that it is correct to pass this infor-
mation on to Mr. Owens, of course, this is perfectly acceptable
with me.

In Mr. Owens' letter he indicated residuals and I did indicate
that I would prefer to see Dr. Jouett's opinions. Actually,
in review of a letter Dr. Jouett wrote dated January 21, 1970,
there is really very little that he and I would be in disagree-
ment about. He does describe the symptoms that he feels are
secondary to contusion as I suggested in my evaluation on June 22,
1970. I notice, also, that he suggests a permanent partial dis-
ability rating of 18% to the body as a whole and this would be
in an acceptable range; though perhaps I would consider 20 to
22%, in view of the fact that the patient does have the cranial
defect with a cranial prosthesis and his residual symptoms and,
also, the findings that suggest some psychological distress.

Very sincerely yours,

Jim J. Moore, II, M.D.

bc - 8/18/70

Commission Exhibit No. 3

-17-

REDACTED

H.09

**DRS. PADBI   AND MOORE**

NEUROLOGICAL SURGERY
SUITE 704 - DOCTORS BUILDING
500 SOUTH UNIVERSITY AVENUE
LITTLE ROCK, ARK. 72205
PHONE MO 6-5466

JUN 25 1970

PROFESSIONAL SERVICES RENDERED

| DATE | CODE | CHARGES | CREDITS | BALANCE |
|------|------|---------|---------|---------|
|      |      |         |         |         |

All Accounts are Payable 10 Days after Receipt of This Statement Unless Other Terms Have Been Arranged.

CODE:
1. NEUROLOGICAL CONSULTATION AND EXAM.
2. OFFICE FOLLOW-UP VISIT
3. HOSPITAL VISITS
4. SPINAL PUNCTURE
5. ARTERIOGRAM
6. MYELOGRAM
7. VENTRICULOGRAM
8. PNEUMOENCEPHALOGRAM
9. SURGERY
10. NERVE INJECTION
11. REPORT
12. MISCELLANEOUS

H.10

**DRS. PADBERG AND MOORE**
NEUROLOGICAL SURGERY
SUITE 704 · DOCTORS BUILDING
500 SOUTH UNIVERSITY AVENUE
LITTLE ROCK, ARKANSAS 72205

MOHAWK 6-5468

FRANK PADBERG, M.D.

JIM J. MOORE II, M.D.

June 22, 1970

Robert E. Diles, Referee
Workmen's Compensation Commission
Justice Building, State Capitol Grounds
Little Rock, Arkansas   72201

Dear Mr. Diles:

Re Willie Lee Webster vs. Pulpwood Producers Co.
   WCC File ███████

This 47 year old colored male was in the office today accompanied
by his wife.

HISTORY:  He states, with some urging, that his complaints are con-
tinued, migrating, pains in his head; a numbness of the left side
of the body, head down; and periodic dizziness.  His wife, on ques-
tioning, adds that he has some problem with memory, he tends to
lose his temper easily and is rough on both her and their children.
The patient states that he does not do too much in the way of ac-
tivities at present; though he has been doing some driving of his
personal car; but that when it zig-zags, he stops.  He states that
his past history is excellent and that he never knew what a doctor
was until his injury.  We have copies of the discharge summary and
admission note from the Arkansas Baptist Medical Center which in-
dicate his injury; the injury occurring on or about June 11, 1969,
when he sustained a blow to the top of his head and right shoulder
area and with findings pointing to a compound, depressed, skull
fracture in the right parietal region.  Dr. Jouett saw him and,
apparently, carried out immediate repair and removal of the de-
pressed fragments and apparently, according to the note, a plate
was inserted at the same time.  The neurologic examination, accord-
ing to those notes, indicates a fairly symmetrical pattern.  There
is a history, apparently, of some momentary unconsciousness.  A re-
view of the surgical note reveals that there was no dural lacera-
tion; that is, there was no involvement, apparently, of the soft
tissues or brain underlying the bony fracture.

NEUROLOGICAL EXAMINATION:  Examination on this patient is somewhat
difficult; it is difficult to get his attention; frequently he appears
a bit hostile or, at least, surly.  He tends toward much deep sighing
during both the interview and examination.  He moves around very
fluidly; he walked into the examining room without difficulty nor

REDACTED

H.11

Robert E. Diles, Referee
Re Willie Lee Webster vs. Pulpwood Producers Co.
Page 2
June 22, 1970

limp. His Romberg's was noted to be normal. He followed simple commands fairly well; though complex commands, such as rapid alternative movements of the upper extremities, must be demonstrated to him. Motor power seems well preserved. Muscle development is good. Left handgrasp is a bit depressed as compared to the right, however. He suggests a drifting of the outstretched left upper extremity with his eyes closed. He, also, suggests a relative extinction phenomenon on the left side of the body. He relates depressed sensory acuity to pin-stick testing on the left side of the body as compared to the right. His skull is symmetrical. There is a well healed fine line of craniotomy incision in the right parietal region. His cranial nerves appear intact. There is no extraocular muscle palsy; his extraocular muscle function seems good. The visual fields, also, are grossly full. The fundi reveal sharp and distinct disc margins and normally sized retinal vessels. There is no facial weakness. The tongue extends to the midline. His reflexes are active and symmetrical. There are no pathologic reflexes. Heel and toe walking is well accomplished.

X RAYS: His X rays from Arkansas Baptist Medical Center were reviewed and revealed the evidence of a depressed fracture in the right parietal region of the skull.

CONCLUSIONS AND RECOMMENDATIONS: This patient stated that he is primarily left-handed and, therefore, if this is the case, his injury would have been on, possibly, his dominant hemisphere. There was no evidence of any aphasia, apparently, following his injury and there is none demonstrated today. He does show some changes that might be related to minimal parietal lobe dysfunction in the sense of some altered sensory response of the left side of the body. He, also, exhibits some changes, primarily that are thought to be personality; but it is difficult to say how real this is as I have no way of knowing what the patient's pattern in this area was prior to his injury.

Physically, it is felt that this patient has shown a good response to his course of treatment. There may be some residuals related to parietal lobe dysfunction in the sense of the sensory changes that are described above. As best as can be told, in talking with the patient and his wife, no postoperative X rays of the skull nor other studies have been accomplished. For completeness, it is felt that, likely, postoperative X rays of the skull, if not accomplished, should be obtained as well as an electroencephalogram would be in order. Furthermore, this patient might be a candidate for psychological study to see if there is any organicity in his somewhat unusual behavior, as described above. Other than these areas mentioned, it is felt that he has achieved a good response from his surgery.

Very sincerely yours,

Jim J. Moore, II, M.D.

bc - 6/25/70

H.12

DOCTORS WATSON, ADAMETZ AND JOUETT
NEUROLOGICAL SURGERY
1026 Donaghey Building
LITTLE ROCK, ARKANSAS 72201

ROBERT WATSON, M. D.
JOHN H. ADAMETZ, M. D.
RAY JOUETT, M. D.

December 17, 1969

TELEPHONE FRanklin 5-5567

Dr. R. D. Dickins
1003 Cherry Street
Pine Bluff, Arkansas

Re:   Willie Lee Webster vs.
Pulpwood Producers Co.
Ins. Co. # ████████████

Dear Dr. Dickins:

Willie Lee Webster was seen in the office on December 12, 1969, and was definitely improved over his last visit. He continues to complain of pain in the right side of his head when he is out in the cold. Seemingly, this discomfort disappears once he gets warm.

Neurologically, things look well with this man.

I asked him to let me see him again in one month, at which time I plan to make a disability rating and dismiss him from my care.

Thank you again for allowing me to help with his care.

Sincerely,

Ray Jouett, M. D.

RJ:ab

cc   Employers Mutuals of Wausau
Fausett Plaza
Little Rock, Arkansas

REDACTED

H.13

## DOCTORS WATSON, ADAMETZ AND JOUETT
### NEUROLOGICAL SURGERY
1026 Donaghey Building
LITTLE ROCK, ARKANSAS 72201

ROBERT WATSON, M. D.
JOHN H. ADAMETZ, M. D.
RAY JOUETT, M. D.

November 15, 1969

TELEPHONE FRanklin 5-5547



Dr. R. D. Dickins
1003 Cherry Street
Pine Bluff, Arkansas

      Re: Willie Lee Webster vs.
      Pulpwood Producers Co.
      Ins. Co. # ███████

Dear Dr. Dickins:

    Willie Lee Webster was seen in the office on November 14, 1969, and seemingly is doing well, although he was complaining of some discomfort of the scalp over the region of his plate which he stated the cold weather had made worse.

    Neurologically, things look well. He continues to complain of some dizziness, and I advised him to continue with the Cyclospasmol and to let me see him again in one month.

    I am having great difficulty getting this man to return to work. Perhaps we will be able to do so when I next see him.

    Thank you again for allowing me to help with his care.

        Sincerely,

        Ray Jouett, M. D.

RJ:ab

cc Employers Mutuals of Wausau
  Fausett Plaza
  Little Rock, Arkansas

**REDACTED**

**H.14**

## DOCTORS WATSON, ADAMETZ AND JOUETT
### NEUROLOGICAL SURGERY
1026 Donaghey Building
LITTLE ROCK, ARKANSAS 72201

ROBERT WATSON, M. D.
JOHN H. ADAMETZ, M. D.
RAY JOUETT, M. D.

October 23, 1969

TELEPHONE FRanklin 5-5547



Dr. R. D. Dickins
1003 Cherry Street
Pine Bluff, Arkansas

Re:  Willie Lee Webster vs.
Pulpwood Producers Co.
Ins. Co. #

Dear Dr. Dickins:

Willie Lee Webster was seen in the office on October 15, 1969.

He was complaining of dizziness, which he stated had been a problem with him since I last saw him. He described this as coming on when he would attempt to look up or down.

Neurologically, no abnormality could be found.

I placed him on Cyclospasmol again, 200 mg., three times a day, and will see him again in one month.

Thank you again for allowing me to help with his care.

Sincerely,

Ray Jouett, M. D.

RJ:ab

cc  Employers Mutuals of Wausau
Fausett Plaza
Little Rock, Arkansas

**REDACTED**

H.15

—Revised. 1-1-42

## THE USE OF THIS FORM IS REQUIRED UNDER THE PROVISIONS
## OF THE ARKANSAS WORKMEN'S COMPENSATION LAW

# REPORT OF INITIAL PAYMENT OF COMPENSATION OR INTENTION TO CONTROVERT CLAIM

| State's Number For: | File |
| --- | --- |
| | Carrier |
| | Employer |

Carrier's File No. ████████
(The space above not to be filled in by employer.)

1. Employee ...... Willie Lee Webster ...... Address ████████, Pine Bluff, Ark.
2. Employer Pulpwood Producers Co., Inc. ...... Address P.O. Box 580, Pine Bluff, Ark.
3. Insurance Carrier ...... EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN
4. Address of Claim Office making this report ...... FAUSETT PLAZA   LITTLE ROCK, ARKANSAS 72205

**IF COMPENSATION IS BEING STARTED COMPLETE THIS SECTION**

5. Date of injury ...... 6-11-69
6. Nature of injury ...... Fract. Skull
7. Date disability began ...... 7-12-69
8. Date of first compensation check $ 6-24-69
9. Amount of first compensation check $98.00, representing compensation from 6-12-69 to 6-26-69
10. Employee's normal work week 5 days; 8 hours
11. Piece or time worker? time
12. Employee's rate of pay at time of injury (Hour) (Day) $80.00 (Week) (Month)
13. Number of days operated by employer per week
14. Number of hours operated by employer per day
15. Employee's average weekly wage $ 80.00
16. Weekly rate of compensation $49.00

**IF COMPENSATION IS BEING CONTROVERTED COMPLETE THIS SECTION**

17. Date of injury or death
18. Reason for controverting claim

**IF A DEATH CASE, EITHER COMPENSABLE OR CONTROVERTED, COMPLETE THIS SECTION**

19. Name, address and age of employee's wife

20. Name, address and ages of employee's children

21. Name, address and age of other dependents of employee

22. Date of this report ...... 8-14-69   Employer Pulpwood Producers Co.

By ................ (Adjuster)

NOTE TO INJURED EMPLOYEE: This is a copy of a report furnished the Commission by your employer or insurance carrier relating the above information regarding your injury. If it is not substantially correct, please notify the Arkansas Workmen's Compensation Commission, Union Life Building, Little Rock, Arkansas.

(OVER)

1303-0318

REDACTED

H.16



# WORKMEN'S COMPENSATION COMMISSION
### STATE OF ARKANSAS
#### JUSTICE BUILDING
#### STATE CAPITOL GROUNDS
#### LITTLE ROCK
#### 72201

December 8, 1970

Social Security Administration
P. O. Box 5700
Pine Bluff, Arkansas  71601

In re:   Willie Lee Webster vs.
         Pulpwood Producers Company
         WCC File ████████

Gentlemen:

In response to your forms requesting information as to what
has been paid to the above claimant, we are enclosing to you
a copy of the Final Report and Settlement Receipt along with
a copy of the Joint Petition Order filed September 30, 1970.

Very truly yours,

JOHN E. COWNE, JR.
Secretary of Commission

JECjr/dr
Enclosures

**REDACTED**

H.17

THE USE OF THIS FORM IS REQUIRED UNDER THE PROVISIONS OF THE ARKANSAS
WORKMEN'S COMPENSATION LAW

Form A-11
2M—1-41—

# FINAL REPORT AND
# SETTLEMENT RECEIPT

| State's | File _____ |
| Number | Carrier _____ |
| For: | Employer _____ |
| Carrier's File No. _____ | |

(The spaces above not to be filled in by Employer)

(1) Employer's name __Pulpwood Producers Co., Inc.__ _____ Employer File No. _____

(2) Office address __P.O. Box 5516__ __Pine Bluff, Arkansas__
(Number and street) (City or town)

(3) Name of injured employee __Willie Lee Webster__

(4) Address _____ __Pine Bluff, Arkansas__
(Number and street) (City or town)

| | | Compensation payments were made on following basis: |
|---|---|---|
| (5) | Date of injury __6-11-69__, 19__ | |
| (6) | Last day employee worked __6-11-69__, 19__ | (14) __30__ Weeks __5__ days temporary total disability __$1506 00__ |
| (7) | Date on which employee was able to return to work __1-13-70__, 19__ | (15) ____ Weeks ____ days temporary partial disability _____ |
| (8) | Employee returned to work on _____, 19__ | (16) ____ Weeks permanent partial disability for loss of _____ |
| (9) | Did employee work between the date of injury and last day of disability? __no__ | |
| (10) | If so, give dates _____ | ____ % loss of use of |
| (11) | Length of temporary disability: __30__ weeks, __5__ days | __Paid on Acct. PPD__ __1666 00__ |
| (12) | Average weekly wage __$_____ | (17) ____ Weeks permanent total disability _____ |
| (13) | Rate of weekly compensation: __$_____ | (18) ____ Weeks for death _____ |
| | | (19) Other (specify) __Joint Petition__ __5449 00__ |
| | | Total compensation __$8620 00__ |
| | | (20) Hospital expense __798 60__ |
| | | (21) Medical expense __1430 54__ |
| | | (22) Funeral expense _____ |
| | | (23) Other (specify) _____ |
| | | Total cost __$10849 14__ |

## FINAL RECEIPT

(24) Received from __Pulpwood Producers Co., Inc.__ **EMPLOYERS MUTUAL LIABILITY**
(Name of employer or insurance carrier) **and INSURANCE COMPANY OF WISCONSIN** the sum of

_____ Dollars and _____ Cents ($_____)

making in all, with payments already received, a total of _____

__Eighty-Six Hundred Twenty__ Dollars and __No/100__ Cents ($ __8620.00__)

as compensation for the disability indicated above.

Date __10-6-70__, 19__

Witnessed by* _____ Employee's signature _____
(*To be signed when injured employee is not able to (Or agent or beneficiary)
sign his name)

Address _____ __Pine Bluff, Arkansas__

(25) Insurance carrier __EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN__ Insurance Company File No. _____

(26) If full compensation was not paid, explain why _____

(27) If receipt is not signed by injured, explain why __Joint Petition__

Signed by _____
Position __Clerical Claim Supervisor__

**REDACTED**

H.18

BEFORE THE ARKANSAS WORKMEN'S COMPENSATION COMMISSION

CLAIM NO. ████████

WILLIE LEE WEBSTER, EMPLOYEE        CLAIMANT

PULPWOOD PRODUCERS COMPANY, EMPLOYER        RESPONDENT

EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY,
INSURANCE CARRIER        RESPONDENT

JOINT PETITION ORDER

Now on this 30th day of September, 1970, the above-styled cause comes on for consideration pursuant to a Joint Petition filed herein by all parties. Claimant appeared in person and by his attorney, Mr. Edward M. Owens, and respondents appeared by Mr. Tom Abercrombie, a hearing having been conducted on the 29th day of September, 1970, at Pine Bluff, Arkansas, before Referee L. Philip McClendon, with the claimant being advised of his rights under the provisions of Section 19(L) of the Arkansas Workmen's Compensation Act, and with full consideration of the facts, issues and the law; it was found to be in the best interest of the claimant.

IT IS THEREFORE ORDERED that the Joint Petition as filed herein be approved; that the respondents are ordered and directed to pay to claimant $4,949.00 in full settlement of the claim filed herein for the acknowledged, alleged claim which arose on June 11, 1969. Claimant's attorney is hereby awarded a fee of $300.00 to be paid by respondents.

IT IS FURTHER ORDERED that upon payment of these sums by the respondents this claim shall be forever barred, and the Arkansas Workmen's Compensation Commission loses any and all jurisdiction.

IT IS SO ORDERED.

*L. Philip McClendon*

L. PHILIP McCLENDON, REFEREE

be

**REDACTED**

H.19

DRS. PADBERG AND MOORE
NEUROLOGICAL SURGERY
SUITE 704 · DOCTORS BUILDING
800 SOUTH UNIVERSITY AVENUE
LITTLE ROCK, ARKANSAS 72205

MOHAWK 6-5466

FRANK PADBERG, M. D.                                                      JIM J. MOORE II, M.D.

August 11, 1970

John E. Cowne, Jr., Secretary
Workmen's Compensation Commission
Justice Building
State Capitol Grounds
Little Rock, AR 72201

Dear Mr. Cowne:

Re: Willie Lee Webster vs. Pulpwood Producers Co.
    WCC File ████████

I received a letter from Mr. Owens, Mr. Webster's attorney, requesting some additional opinions. I do not have a release from the patient to submit this information. I, therefore, though it would be advisable to write you some additional comments. If you feel that it is correct to pass this information on to Mr. Owens, of course, this is perfectly acceptable with me.

In Mr. Owens' letter he indicated residuals and I did indicate that I would prefer to see Dr. Jouett's opinions. Actually, in reviewed of a letter Dr. Jouett wrote dated January 21, 1970, there is really very little that he and I would be in disagreement about. He does describe the symptoms that he feels are secondary to contusion as I suggested in my evaluation on June 22, 1970. I notice, also, that he suggests a permanent partial disability rating of 18% to the body as a whole and this would be in an acceptable range, though perhaps I would consider 20 to 22%, in view of the fact that the patient does have the cranial defect with a cranial prosthesis and his residual symptoms and, also, the findings that suggest some psychological distress.

Very sincerely yours,

*J. J. Moore, M.D.*

Jim J. Moore, II, M.D. /bc

bc - 8/18/70

RECEIVED
AUG 20 1970
ARKANSAS WORKMEN'S
COMPENSATION COMM.

REDACTED

H.20

The original document, of which this is a photocopy, appears to be genuine and unaltered and to have been made at the time purported. This photocopy consists of _____ pages.

Signature _____

Date 12/13/7 Title _____

H.21

DRS. PACIERO AND MOORE
NEUROLOGICAL SURGERY
SUITE 104 • DOCTORS BUILDING
600 SOUTH UNIVERSITY AVENUE
LITTLE ROCK, ARKANSAS 72205
MOHAWK 6-8466

FRANK PACIERO, M.D. JIM J. MOORE II, M.D.

August 11, 1970

John E. Coffey, Jr., Secretary
Workmen's Compensation Commission
Justice Building
State Capitol Grounds
Little Rock, Ark. 72201

Dear Mr. Coffey:

Re: Willie Lee Webster vs. Pulpwood Producers Co.
W.C. File [redacted]

I received a letter from Max Owens, Mr. Webster's attorney, requesting some additional opinions. I do not have a release from the patient to submit this information. I, therefore, though it would be advisable to write you some additional comments. If you feel that it is correct to pass this information on to Mr. Owens, of course, this is perfectly acceptable with me.

In Mr. Owens' letter he indicated residuals and I did indicate that I would prefer to see Dr. Jouett's opinions. Actually, in reviewing a letter Dr. Jouett wrote dated January 21, 1970, there is really very little that he and I would be in disagreement about. He does describe the symptoms that he feels are secondary to contusion as I suggested in my evaluation on June 22, 1970. I notice, also, that he suggests a permanent partial disability rating of 18% to the body as a whole and this would be in an acceptable range, though perhaps I would consider 20 to 22%, in view of the fact that the patient does have the cranial defect with a cranial prosthesis and his residual symptoms and, also, the findings that suggest some psychological distress.

Very sincerely yours,

Jim J. Moore, II, M.D.

bc – 8/18/70

RECEIVED
AUG 20 1970
ARKANSAS WORKMEN'S
COMPENSATION COMMISSION

REDACTED

H.22

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
Social Security Administration



APPLICATION FOR DISABILITY INSURANCE BENEFITS

Form Approved.
Budget Bureau No. 72-R0530

(Do not write in this space)

*Pine Bluff Ark*

*12-3-70*

*Kreimer CR*

| NOTICE. — (a) Whoever makes or causes to be made any false statement or representation of a material fact in an application or for use in determining a right to payment under the Social Security Act, or (b) whoever, having received a payment for the use and benefit of another person, knowingly and willfully uses such payment for other than the person for whom it is received, is subject, under the Social Security Act, to a fine of not more than $1,000 or 1 year's imprisonment, or both. |

I hereby apply for a period of disability and/or all insurance benefits payable to me under Title II of the Social Security Act, as amended.

| 1. | Enter your full name | (*Check one*) | Enter your Social Security number |
|---|---|---|---|
| | *Willie Lee Webster* | ☒ Male<br>☐ Female | (*If none or unknown so indicate*) |

| 2. | Enter your date of birth (*Show month, day, and year*) | Enter the name of the State or Foreign Country where you were born |
|---|---|---|
| | ▓▓▓ 2 3 | *La.* |

3.  (a) Have you (or has someone on your behalf) ever filed an application for a period of disability or social security benefits before?

☐ Yes (*If "Yes," answer (b), (c), and (d).*)   ☒ No (*If "No," go on to item 4*).

(b) Kind of claim filed

(c) Enter name of person on whose earnings record you filed other application(s)

(d) Enter Social Security Number of person named in (c)

4.  What is your disability? (*Briefly describe your impairment, that is, the injury or illness that prevents, or has prevented, you from working.*)

*Shortness of breath — head hurts —*

| 5. | (a) When did you become unable to work because of your disability? | Date (*Month, day, and year*)<br>*6-11-69* |
|---|---|---|

(b) Are you still disabled?
☒ Yes (*If "Yes," go on to item 6.*)     ☐ No (*If "No," answer (c).*)

(c) If you are no longer disabled, enter the date you were again able to work. ⟶      | Date (*Month, day, and year*) |

6.  Check any of the following which apply to you:

| (a) ☐ Confined in a medical institution other than a general hospital | (d) ☐ Confined in a chair (*Including wheel chair*) |
|---|---|
| | (e) ☐ None of the above but unable to go outside |
| (b) ☐ Patient in a general hospital | (f) ☒ Able to go outside but only with help of another person or device |
| (c) ☐ Confined in bed at home | (g) ☐ Able to go outside without help |

FORM SSA-16 (1-70)                    (*Over*)

REDACTED

H.23

**7.** **(a)** Have you EVER filed (or do you intend to file) claims for disability benefits under any workmen's compensation law or plan?

☒ Yes (*If "Yes," answer (b) and (c).*)    ☐ No (*If "No," go on to item 8.*)

**(b)** Has there been any decision or any payment (temporary, permanent, or lump-sum) made on the claim(s) filed?

☒ Yes (*If "Yes," answer (c) and (d).*)    ☐ No (*If "No," answer (c).*)

**(c)** Workmen's compensation claim number(s) .............. W.C.C. — ▮▮▮▮▮▮

**(d)** Enter the amount of the weekly payment made to you $ *settlement made last apt.*
(If you are receiving or have received payments on other than a weekly basis, such as bi-weekly or monthly payments, or if you have received a lump-sum payment based on your workmen's compensation claim, please indicate in "Remarks" and include the amount of such payment or payments. *$ 4,900. lump sum*

**8.** Did you work in the railroad industry any time on or after January 1, 1937?
☐ Yes    ☒ No

**9.** **(a)** Were you in active military or naval service after September 7, 1939?
☐ Yes (*If "Yes," answer (b) and (c).*)    ☒ No (*If "No," go on to item 10.*)

**(b)** Enter name of branch (Army, Navy, etc.), country served (if other than U.S.) and dates of service.

**(c)** Have you received, or do you expect to receive, a benefit from any other Federal agency?
☐ Yes (*If "Yes," enter the names of all such agencies.*)    ☐ No

**10.**
- Enter the names and addresses of all the persons, companies or government agencies for whom you worked during the last 12 months.
- If you worked in agricultural employment, give this information for this year and last year.

NOTE: If you were not an employee this year or last year, enter the information for your *last* period of employment no matter how long)

- If you have never been an employee, enter "none" below and go on to item 12 regarding self-employment.

| NAME AND ADDRESS OF EMPLOYER | WORK BEGAN | | WORK ENDED (If still working show "Not Ended") | |
|---|---|---|---|---|
| | Month | Year | Month | Year |
| *Pulpwood Producers Co* | | | *June* | *'69* |
| *Pine Bluff, Ark.* | | | | |

(If you need more space, use "Remarks" space on the back page.)

**11.** May the Social Security Administration or the State agency reviewing your case ask your employers for information needed to process your claim?    ☒ Yes    ☐ No

**12.** Were you self-employed this year, last year, or the year before?
☐ Yes (*If "Yes," answer item 13.*)    ☒ No (*If "No," go on to item 14.*)

**13.**

| CHECK THE YEAR OR YEARS IN WHICH YOU WERE SELF-EMPLOYED | IN WHAT KIND OF TRADE OR BUSINESS WERE YOU SELF-EMPLOYED? | WERE YOUR NET EARNINGS FROM YOUR TRADE OR BUSINESS $400 OR MORE? (Check "Yes" or "No") |
|---|---|---|
| ☐ This Year | | |
| ☐ Last Year | | ☐ Yes    ☐ No |
| ☐ Year Before Last | | ☐ Yes    ☐ No |

**REDACTED**

H.24

| 14. | How much were your total earnings last year? *(Count both wages and self-employment income. If none, write "None")* .................................. | $ | |

| 15. | How much have you earned so far this year? *(If none, write "None")* ...... | $ | 0 |

**16.** (a) Check (✔) whether you are:

☒ MARRIED *(Whether living together or separated)*  ☐ WIDOWED  ☐ DIVORCED  ☐ SINGLE

*(If you checked "MARRIED" or "WIDOWED," complete (b), (c), and (d) if appropriate.)*  *(If you checked "DIVORCED" or "SINGLE" go on to item 18.)*

| (b) Enter your wife's maiden name or your husband's name | Date of Birth *(If unknown, give age)* | Date of Marriage | If husband or wife is age 62 or over or is filing for disability benefits, enter his or her Social Security No. |
|---|---|---|---|
| Beatrice Harris | ███ -42 | 1964 | ████████ |

(c) If your husband or wife is deceased, enter the date of death here ⟶  Date of Death

(d) If you are a married woman, was your husband receiving at least one-half of his support from you at the time you became unable to work because of your disabling condition, or is he receiving at least one-half of his support from you now?  ☐ Yes  ☐ No

**17.** Answer item 17 only if you are married AND your husband or wife is applying for benefits.

(a) Check (✔) whether your marriage was performed by:
Clergyman or authorized public official ☒ or other ☐ ....................
*(Explain)*

(b) Were you married before your present marriage?  ☒ Yes  ☐ No
*(If "Yes," give the following information about each of your previous marriages.)*

| | To Whom Married | When *(Month, day, and year)* | Where, *(Enter name of city and State)* |
|---|---|---|---|
| **Previous marriage** | Missouri Turner | about 1938 | Claiborne Parish, La. |
| | How marriage ended | When *(Month, day, and year)* | Where *(Enter name of city and State)* |
| | Divorce | in the early 1940's | Ithrite El Dorado ark or Homer La. |
| | To Whom Married | When *(Month, day, and year)* | Where *(Enter name of city and State)* |
| **Previous marriage** | | | |
| | How marriage ended | When *(Month, day, and year)* | Where *(Enter name of city and State)* |

*(Use "Remarks" space on back page for information about any other marriage.)*

**18.** (a) Do you have ANY children (including natural children, adopted children, and stepchildren) who are now or were in the past 12 months UNMARRIED and

| • UNDER AGE 18 | ☒ Yes | ☐ No |
| • AGE 18 TO 22 AND ATTENDING SCHOOL | ☐ Yes | ☒ No |
| • DISABLED (18 OR OVER AND DISABILITY BEGAN BEFORE AGE 18) | ☐ Yes | ☒ No |

If you have children who may qualify for benefits under any of the above conditions, answer (b) and (c).

| (b) Full Name of Child | Full Name of Child |
|---|---|
| | |
| | |

(c) Do you wish to apply on behalf of all the children named in item 18(b) for all insurance benefits payable to them under Title II of the Social Security Act, as amended?  ☐ Yes  ☐ No

If you are not applying for any child you name, enter the child's name under "Remarks" (back page of this form) and explain why you are not applying for such child. You may apply for a child even though you do not wish to be the payee for the child's benefits.

*(Over)*

**REDACTED**

**H.25**

| 19. | Do you have a dependent parent who was receiving at least one-half of his or her support from you at the time shown in item 5(a) when you became unable to work because of your disability? | ☐ Yes | ☒ No |
|---|---|---|---|
| 20. | Do you authorize any physician, hospital, agency, or other organization to disclose to the Social Security Administration or to the State agency that may review this application or your continuing disability, any medical records or other information about your disability? | ☒ Yes | ☐ No |

YOU MUST NOTIFY THE SOCIAL SECURITY ADMINISTRATION PROMPTLY IF:
- Your MEDICAL CONDITION IMPROVES so that you would be able to work, even though you have not yet returned to work.
- You GO TO WORK whether as an employee or a self-employed person.
- You apply for periodic benefits under any workmen's compensation law or plan.
- You are DISCHARGED FROM THE HOSPITAL if you are now hospitalized.

| 21. | Do you agree to notify the Social Security Administration promptly if any of the above events occur? | ☒ Yes | ☐ No |
|---|---|---|---|

**Remarks:** (*This space may be used for explaining any answers to the questions. If additional space is required, attach separate sheet.*)

IMPORTANT INFORMATION. PLEASE READ CAREFULLY.—A claimant for disability insurance benefits is required to submit medical evidence showing the nature and extent of his disability during the time he alleges he was under a disability. If such evidence is not sufficient to arrive at a determination, he may be requested to have an independent medical examination at the expense of the Social Security Administration. Should Social Security obtain information useful to his physican for treatment, such information may be furnished to him.

I know that anyone who makes a false statement or representation of a material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal Law. I affirm that the above statements are true.

| SIGNATURE OF WITNESSES | SIGNATURE OF APPLICANT |
|---|---|
| If this application has been signed by mark (X), two witnesses who know the applicant must sign below, giving their full addresses. | Signature (*First name, middle initial, last name*) (*Write in ink*) |
| 1. Signature | SIGN HERE ➤ |
| Address (*Number and street, City, State, and ZIP Code*) | Mailing address (*Number and street, Apt. No., P.O. Box, or Rural Route*) |
| 2. Signature | City and State: Pine Bluff Ark / Zip Code: 71601 |
| Call One Day Toy Store. | Date (*Mo., day and year*): 12-3-70 / Telephone number: none |
| Address (*Number and street, City, State, and ZIP Code*): Pu W. 6 th. Mrs Louise Carter— | Enter name of county (*if any*) in which you now live: Jefferson |

H.26

# Wells Decl. Ex. I

**10/31/2008**

Arkansas Department of Human Services

**Referral Narrative: WEBSTER [554482]**

*What are the details of the Abuse/Neglect of the children?*

**Why are you calling Today?**

**What Happened? When Happened? Who did it? Does the person still have access to the child?**

CHILDREN BEATEN;FORCED TO HAVE SEX WHILE FATHER WATCHES.

**What are the children's conditions/injuries now? Describe the children's current conditions and any injuries.**

**When were the children last seen and by whom?**

**Where are the children located and how long will they be there (include address and county)?**

**What are the risk factors in the home?  (Domestic Violence, Safety Hazards, Physically/Mentally Disabled Victim, Etc.)**

**Who else was told or knows of this situation?**

**Additional Information:**

**EXHIBIT I**

**I.01**

Arkansas Department of Human Services

## Maltreatment Summary Report

10/31/2008 09:30 am

| Referral Number | Referral Date | Family Name |
|---|---|---|
| 554482 | 11/28/1983 01:00 PM | WEBSTER |
| **Staff Name** | | **Incident County**<br>Jefferson (Pine Bluff) |

### CLIENT INFORMATION

| Client Number 1: ▓▓▓▓ WEBSTER | | Primary Role in Referral Alleged Offender |
|---|---|---|
| **Client ID**<br>1137089 | **Gender**<br>Female | **Birth Date** | **Approx. Age**<br>41 |

### CLIENT INFORMATION

| Client Number 2: ▓▓▓ WEBSTER | | Primary Role in Referral Alleged Offender |
|---|---|---|
| **Client ID**<br>1137090 | **Gender**<br>Male | **Birth Date** | **Approx. Age**<br>66 |

### CLIENT INFORMATION

| Client Number 3: BRUCE WEBSTER | | Primary Role in Referral Alleged Victim |
|---|---|---|
| **Client ID**<br>1137094 | **Gender**<br>Male | **Birth Date** | **Approx. Age**<br>10 |

| Allegations |
|---|

| Allegation #1 | Age of Injury |
|---|---|
| **Abuse Category** Abuse | **Abuse Type** |

### CLIENT INFORMATION

| Client Number 4: D▓▓ W▓▓▓▓ | | Primary Role in Referral Alleged Victim |
|---|---|---|
| **Client ID**<br>1137092 | **Gender**<br>Male | **Birth Date** | **Approx. Age**<br>13 |

| Allegations |
|---|

| Allegation #1 | Age of Injury |
|---|---|
| **Abuse Category** Abuse | **Abuse Type** |

REDACTED

I.02

## CLIENT INFORMATION

| Client Number 5:  T████ W'████ | Primary Role in Referral Alleged Victim |
|---|---|

| Client ID | Gender | Birth Date | Approx. Age |
|---|---|---|---|
| 1137093 | Male | | 12 |

### Allegations

| Allegation #1 | Age of Injury |
|---|---|
| Abuse Category  Abuse | Abuse Type |

## CLIENT INFORMATION

| Client Number 6:  D ████ W ████ | Primary Role in Referral Alleged Victim |
|---|---|

| Client ID | Gender | Birth Date | Approx. Age |
|---|---|---|---|
| 1137091 | Male | | 16 |

### Allegations

| Allegation #1 | Age of Injury |
|---|---|
| Abuse Category  Abuse | Abuse Type |

## COLLATERAL INFORMATION

| Collateral Name | | |
|---|---|---|
| Relation to Family | Start Date | End Date |

## CURRENT FINDINGS

| Name | Abuse/Neglect | Abuse/Neglect Type | Injury | Offender | Findings |
|---|---|---|---|---|---|
| D████ W████ | Sexual Abuse | | Unknown | ████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Sexual Abuse | | Unknown | ████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Sexual Abuse | | Unknown | ████ WEBSTER | See Legacy File |
| D. ████ W'████ | Abuse | | Cuts, Bruises, Welts | ████ WEBSTER | True |
| D ████ W ████ | Abuse | | Cuts, Bruises, Welts | ████ WEBSTER | True |
| D. ████ W. ████ | Sexual Abuse | | Unknown | ████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Abuse | | Cuts, Bruises, Welts | ████ WEBSTER | True |
| D ████ W ████ | Abuse | | | | |

**REDACTED**

I.03

## CURRENT FINDINGS

| Name | Abuse/Neglect | Abuse/Neglect Type | Injury | Offender | Findings |
|------|---------------|---------------------|--------|----------|----------|
| T⬛ W⬛ | Abuse | | Cuts, Bruises, Welts | ⬛ WEBSTER | True |
| T⬛ W⬛ | Sexual Abuse | | Unknown | ⬛ WEBSTER | See Legacy File |
| T⬛ W⬛ | Abuse | | | | |
| BRUCE WEBSTER | Abuse | | | | |
| D⬛, W⬛ | Abuse | | Cuts, Bruises, Welts | ⬛ WEBSTER | True |
| D⬛, W⬛ | Abuse | | Cuts, Bruises, Welts | ⬛ WEBSTER | True |
| D⬛ W⬛ | Sexual Abuse | | Unknown | ⬛ WEBSTER | See Legacy File |
| D⬛, W⬛ | Sexual Abuse | | Unknown | ⬛ WEBSTER | See Legacy File |
| D⬛ W⬛ | Abuse | | | | |
| T⬛ W⬛ | Abuse | | Cuts, Bruises, Welts | ⬛ WEBSTER | True |
| T⬛ W⬛ | Sexual Abuse | | Unknown | ⬛ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Abuse | | Cuts, Bruises, Welts | ⬛ WEBSTER | True |

## WORKER/STATUS INFORMATION

| Family Service Worker | | County | |
|------------------------|--|--------|--|

| Current Status | True | | |
|----------------|------|--|--|

**REDACTED**

I.04

Arkansas Department of Human Services

## Maltreatment Summary Report

10/29/2008 02:52 pm

| Referral Number<br>554482 | Referral Date<br>11/28/1983 01:00 PM | Family Name<br>WEBSTER |
|---|---|---|
| Staff Name | | Incident County<br>Jefferson (Pine Bluff) |

### CLIENT INFORMATION

| Client Number 1: ⬛⬛⬛ . WEBSTER | | Primary Role in Referral Alleged Offender | |
|---|---|---|---|
| Client ID<br>1137089 | Gender<br>Female | Birth Date | Approx. Age<br>41 |

### CLIENT INFORMATION

| Client Number 2: ⬛⬛⬛ WEBSTER | | Primary Role in Referral Alleged Offender | |
|---|---|---|---|
| Client ID<br>1137090 | Gender<br>Male | Birth Date | Approx. Age<br>66 |

### CLIENT INFORMATION

| Client Number 3: BRUCE WEBSTER | | Primary Role in Referral Alleged Victim | |
|---|---|---|---|
| Client ID<br>1137094 | Gender<br>Male | Birth Date | Approx. Age<br>10 |

| Allegations | |
|---|---|
| Allegation #1 | Age of Injury |
| Abuse Category  Abuse | Abuse Type |

### CLIENT INFORMATION

| Client Number 4: D. ⬛⬛ . W ⬛⬛ | | Primary Role in Referral Alleged Victim | |
|---|---|---|---|
| Client ID<br>1137092 | Gender<br>Male | Birth Date | Approx. Age<br>13 |

| Allegations | |
|---|---|
| Allegation #1 | Age of Injury |
| Abuse Category  Abuse | Abuse Type |

**REDACTED**

I.05

## CLIENT INFORMATION

| Client Number 5:   T███ W'████ | Primary Role in Referral Alleged Victim | |
|---|---|---|
| Client ID<br>1137093 | Gender<br>Male | Birth Date | Approx. Age<br>12 |

| Allegations |
|---|
| Allegation #1 | Age of Injury |
| Abuse Category  Abuse | Abuse Type |

## CLIENT INFORMATION

| Client Number 6:   D.███ W'████ | Primary Role in Referral Alleged Victim | |
|---|---|---|
| Client ID<br>1137091 | Gender<br>Male | Birth Date | Approx. Age<br>16 |

| Allegations |
|---|
| Allegation #1 | Age of Injury |
| Abuse Category  Abuse | Abuse Type |

## COLLATERAL INFORMATION

| Collateral Name | | |
|---|---|---|
| Relation to Family | Start Date | End Date |

## CURRENT FINDINGS

| Name | Abuse/Neglect | Abuse/Neglect Type | Injury | Offender | Findings |
|---|---|---|---|---|---|
| D███ W████ | Sexual Abuse | | Unknown | ████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Sexual Abuse | | Unknown | ████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Sexual Abuse | | Unknown | ████ WEBSTER | See Legacy File |
| D███ W'███ | Abuse | | Cuts, Bruises, Welts | ████ WEBSTER | True |
| D█████ WI███ | Abuse | | Cuts, Bruises, Welts | ████ WEBSTER | True |
| D.███ 'VI███ | Sexual Abuse | | Unknown | ████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Abuse | | Cuts, Bruises, Welts | ████ WEBSTER | True |
| D.███ WI███ | Abuse | | | | |

**REDACTED**

I.06

## CURRENT FINDINGS

| Name | Abuse/Neglect | Abuse/Neglect Type | Injury | Offender | Findings |
|------|---------------|--------------------|--------|----------|----------|
| T███ W█████ | Abuse | | Cuts, Bruises, Welts | ████████ WEBSTER | True |
| T'██ W█████ | Sexual Abuse | | Unknown | ████████ WEBSTER | See Legacy File |
| T██ W█████ | Abuse | | | | |
| BRUCE WEBSTER | Abuse | | | | |
| D █████ W█████ | Abuse | | Cuts, Bruises, Welts | ████████ WEBSTER | True |
| D'████ W█████ | Abuse | | Cuts, Bruises, Welts | ██████ WEBSTER | True |
| D ███ W'█████ | Sexual Abuse | | Unknown | ██████ WEBSTER | See Legacy File |
| D. █████ W█████ | Sexual Abuse | | Unknown | ██████ WEBSTER | See Legacy File |
| D ████ W'█████ | Abuse | | | | |
| T'████ W█████ | Abuse | | Cuts, Bruises, Welts | ████████ WEBSTER | True |
| T'███ W'██████ | Sexual Abuse | | Unknown | █████ WEBSTER | See Legacy File |
| BRUCE WEBSTER | Abuse | | Cuts, Bruises, Welts | █████ WEBSTER | True |

## WORKER/STATUS INFORMATION

| Family Service Worker | County |
|-----------------------|--------|
|  |  |

| Current Status | True |
|----------------|------|

**REDACTED**

I.07

10/29/2008

**Arkansas Department of Human Services**
**Referral Narrative: WEBSTER [554482]**

*What are the details of the Abuse/Neglect of the children?*

Why are you calling Today?

What Happened? When Happened? Who did it? Does the person still have access to the child?

CHILDREN BEATEN;FORCED TO HAVE SEX WHILE FATHER WATCHES.

What are the children's conditions/injuries now? Describe the children's current conditions and any injuries.

When were the children last seen and by whom?

Where are the children located and how long will they be there (include address and county)?

What are the risk factors in the home?  (Domestic Violence, Safety Hazards, Physically/Mentally Disabled Victim, Etc.)

Who else was told or knows of this situation?

Additional Information:

I.08

Arkansas Department of Human Services

## Maltreatment Summary Report

10/29/2008 02:52 pm

| Referral Number | Referral Date | Family Name |
|---|---|---|
| 541374 | 01/15/1986 01:00 PM | WEBSTER |

| Staff Name | Incident County |
|---|---|
| | Jefferson (Pine Bluff) |

### CLIENT INFORMATION

| Client Number 1: ▬▬ WEBSTER | | Primary Role in Referral Alleged Offender | |
|---|---|---|---|
| Client ID 1090276 | Gender Male | Birth Date | Approx. Age 66 |

### CLIENT INFORMATION

| Client Number 2: ▬▬ WEBSTER | | Primary Role in Referral Alleged Offender | |
|---|---|---|---|
| Client ID 1090277 | Gender Female | Birth Date | Approx. Age 43 |

### CLIENT INFORMATION

| Client Number 3: BRUCE WEBSTER | | Primary Role in Referral Other Person in Home | |
|---|---|---|---|
| Client ID 1090281 | Gender Male | Birth Date | Approx. Age 00 |

### CLIENT INFORMATION

| Client Number 4: D▬▬ W▬▬ | | Primary Role in Referral Other Person in Home | |
|---|---|---|---|
| Client ID 1090279 | Gender Male | Birth Date | Approx. Age 00 |

### CLIENT INFORMATION

| Client Number 5: T'▬▬ W▬▬ | | Primary Role in Referral Other Person in Home | |
|---|---|---|---|
| Client ID 1090280 | Gender Male | Birth Date | Approx. Age 00 |

**REDACTED**

I.09

The top has overlapping court stamps.

## CLIENT INFORMATION

| Client Number 6:  D▮▮▮ W ▮▮▮▮ | Primary Role in Referral Alleged Victim |
|---|---|

| Client ID 1090278 | Gender Male | Birth Date | Approx. Age 16 |
|---|---|---|---|

| Allegations |
|---|

| Allegation #1 | Age of Injury |
|---|---|
| Abuse Category  Neglect | Abuse Type |

## COLLATERAL INFORMATION

| Collateral Name | | |
|---|---|---|
| Relation to Family | Start Date | End Date |

## CURRENT FINDINGS

| Name | Abuse/Neglect | Abuse/Neglect Type | Injury | Offender | Findings |
|---|---|---|---|---|---|
| D. ▮▮ W ▮▮▮▮ | Neglect | | | | |
| D▮▮ W▮▮▮▮ | Neglect | | Inadequate Supervision | ▮▮▮ WEBSTER | True |
| D▮▮ W ▮▮▮ | Neglect | | Inadequate Supervision | ▮▮▮▮▮ WEBSTER | True |

## WORKER/STATUS INFORMATION

| Family Service Worker | County |
|---|---|
| Current Status | True |

REDACTED

I.10

Case 2:12-cv-00086-JPH-MJD   Document 43-6   Filed 07/02/14   Page 74 of 209 PageID #: 13159

Arkansas Department of Human Services

**Referral Narrative: WEBSTER [541374]**

*What are the details of the Abuse/Neglect of the children?*

**Why are you calling Today?**

**What Happened? When Happened? Who did it? Does the person still have access to the child?**

CHILD ARRESTED AND PARENTS REFUSED TO COME AND GET HIM.

What are the children's conditions/injuries now? Describe the children's current conditions and any injuries.

When were the children last seen and by whom?

Where are the children located and how long will they be there (include address and county)?

What are the risk factors in the home?  (Domestic Violence, Safety Hazards, Physically/Mentally Disabled Victim, Etc.)

Who else was told or knows of this situation?

Additional Information:

I.11

# Wells Decl. Ex. J

PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

                         CRIMINAL ACTION NO. 4:94-CR-121-Y

                                  FROM

              THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF TEXAS

v.

Bruce Carneil Webster,

    Defendant.

                         **DECLARATION OF**

                         **LEONDA DANIELS**

I, **Leonda Daniels**, declare as follows:

1.     I live in Pine Bluff, Arkansas. I have lived here since I was 12 years old. I am employed by Welspun, Inc., a gas pipeline company in Little Rock. I have worked there for 2 years.

2.     I met Bruce Webster through his sister, Future Mae, when I was roughly 16 years old and he was 17. We dated for a couple of years and lived together at his sister's house.

3.     Bruce was a fun-loving happy sort of guy and he was fun to be around but he had very obvious mental problems. Bruce was unable to be serious about anything. It was not a matter of being disrespectful because Bruce was always very respectful. It was just that he truly could not understand the seriousness of anything, no matter what it was.

4.     It was impossible for Bruce to focus on anything for long. He had the attention span of a small child. He could not sit through a television program or a movie without

1

EXHIBIT J

getting up every 5 minutes to do something. He could not follow the plot of anything and would always have to ask me what was going on and what the characters were talking about.

5.     We would play games like cards or dominoes with our friends, but Bruce was not able to keep up. He could not play a card game like "Spades" where the rules required you to "follow suit." He truly could not tell the difference between spades and clubs. Playing dominoes was out of the question for Bruce. He could not think fast enough and calculate fast enough to make a correct or proper move. He would just sit there and stare at his pieces and not know what to do. Finally, he would just give up. He would make some sort of comment about how he wanted to do something else and he would just drop out to save face.

6.     In all my time around Bruce, I never once saw him read a book, magazine or newspaper.

7.     Bruce could not do any kind of paper work. I had to fill out a job application for him. When I testified at his trial in 1996, the government lawyer got me all confused about this and got me to say that Bruce could fill out an application but that he just did not want to. The reality is that Bruce really could not do it himself.

8.     Bruce would go along with anything. He could not think for himself. Whatever anybody wanted to do, that was alright with Bruce.

9.     Bruce could not be counted on to do anything where he had to exercise judgment or common sense. If you sent him to the store for, say, a coke, a pack of cigarettes and a bag of chips, when he came back there would always be something

2

wrong. I would say, "You can't remember three things?" Even if you wrote him out a list, like "milk, Fruit Loops, etc.," he could not follow directions.

10.    Bruce did not have any money of his own. His mother would give him money.

11.    Bruce did not understand a lot of words. Like, he thought "double date" meant going out on two dates, one this week and one next week.

12.    Bruce and I split up about two years before he was arrested in the murder case. I heard about the case when my cousin called me on the phone. I was asleep when she called and said, "Hurry up! Turn on Channel 7. The guy you used to date is on TV." I turned on the television and saw Bruce's picture. I could not believe it. Bruce was always sweet to me and was never violent or abusive. I was in total shock.

Pursuant to 28 U.S.C. § 1746, I, **Leonda Daniels**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12-9-08

Leonda Daniels

3

# Wells Decl. Ex. K

PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

.V

Bruce Carneil Webster,

    Defendant.

**DECLARATION OF**

**LANETRA EVANS**

I, **Lanetra Evans**, declare as follows:

1.    I live in Pine Bluff, Arkansas. I am a Licensed Practical Nurse. I am presently employed in a supervisory position at a convalescent home in Pine Bluff.

2.    Prior to my current employment, I worked at a facility for children with developmental disabilities including mental retardation and Down Syndrome.

3.    I have known Bruce Webster since we were children. I went through school with Bruce and his brothers and sisters and I spent a lot of time as a child at the home of my friend who lived directly across the street from the Webster home.

4.    The Webster home was known in the neighborhood as a very strange place. Even though I would visit and play right across the street and I knew all the Webster kids I would never go over there. The father was someone you did not want to have anything to do with. He was known to abuse his children and they were all obviously affected by it.

Declaration of Lanetra Evans

Page 1

**EXHIBIT K**

5.  I always thought that two of the Webster children were especially slow mentally, Bruce and Tony. Bruce was always very needy and dependent as a child. He wanted a lot of attention and he would act silly to get attention. From the things he would do and say you could tell he was not normal.

6.  When we got a little older, Bruce got romantically involved with my cousin, Gwen. Gwen stayed with us a lot when she was in high school and Bruce would often stay at our house with her when they were teenagers. He obviously did not want to be in his own home.

7.  Gwen would have to do everything for Bruce. She would pick out his clothes for him and she would even tie his shoes for him which I thought was extremely odd.

8.  He spent a lot of time in our home but I do not remember ever seeing him read or write.

9.  Bruce was not a mean person at all. He was polite and respectful towards everyone in our home. He mostly wanted people to like him.

Pursuant to 28 U.S.C. § 1746, I, **Lanitra Evans**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _11/12/08_          _Lanitra Evans_

Lanitra Evans

Page 2

# Wells Decl. Ex. L

## PETITION FOR EXECUTIVE CLEMENCY
## TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

                             CRIMINAL ACTION NO. 4:94-CR-121-Y

                                    FROM

                      THE UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT TEXAS

V

Bruce Carneil Webster,

    Defendant.

                              **DECLARATION OF**

                              **LUKETHA FRAZIER**

I, **Luketha Frazier**, declare as follows:

1.    Bruce Webster is my uncle. I am the daughter of Bruce's older sister, Dassie Mae Frazier.

2.    I grew up with Bruce. I saw him almost every day, and when I was seven or eight years old I lived with Bruce's family for about a year.

3.    Bruce and I were in the same grade at school. We both had to repeat the first grade. Bruce was always a poor student.

4.    Most of the kids liked Bruce because he was funny and goofy. Since he was not good at school, he was sort of a class clown.

5.    Even though I repeated first grade and was never a very good student, I was a better student than Bruce and would help him with his school work.

6.    Bruce and I were in 8th grade science class together. Other students would do

Declaration of Luketha Frazier

Page 1

EXHIBIT L

Bruce's work for him or show him how to do it. Some of them would let Bruce look at their papers during tests. Other students liked Bruce and wanted to help him. They knew he could not pass tests on his own, so they would help him.

7. School was very hard for Bruce. I know he was embarrassed that he could not keep up and by eighth grade he was going to school less and less.

8. When Bruce got his driver's license I had gotten the answers to the written part of the test from a man who worked at the drivers license department, a relative of a classmate of ours. I gave the answers to Bruce so he could pass the test. Bruce could never have been able to pass it otherwise.

9. When I lived with Bruce's family, I often heard Willie beating Bruce and his brothers and sisters. The sounds were gruesome. He would beat Bruce and his siblings two or three times a week, often for the smallest things or for nothing at all. He would beat them with extension cords and a water hose that gave them big bruises and welts. We were all terrified of Willie. He kept us all in constant fear of his anger and cruelty.

10. Willie beat me with a belt when I was 7 or 8 years old. I wanted to go to church with my grandmother. He told me I could not go, but I went anyway. His brutal beating left a large bruise on my back.

11. Willie would make his own children do awful things. He would make one of his children pour a cup of warm water into another one of his children's ear. Tony used to wet the bed, so Willie put one end of a hose on Tony's penis with a clothespin and the other end in his mouth when he went to sleep. He did that so he

Declaration of Luketha Frazier

Page 2

would urinate into his mouth instead of on the bed. He beat the bottom of David's feet with a water hose. I would hear the kids yelling when they got beat.

12. Willie would force his sons to call my grandmother's sister, my Great-aunt Ruby, to harass her and say nasty things and bad stuff over the phone.

13. Bruce was a sweet, fun uncle. He was my favorite uncle. He always there for me and he was very protective of me and the girls in his family. I have never seen him be violent. The Bruce I knew was not a mean person at all. I will never understand how he could have been involved in what he was charged with and sentenced to death for.

Pursuant to 28 U.S.C. § 1746, I, **Luketha Frazier**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 11/11/08 _____   _Luketha Frazier_____
                                   Luketha Frazier

Declaration of Luketha Frazier

**Page 3**

# Wells Decl. Ex. M

## PETITION FOR EXECUTIVE CLEMENCY
## TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT TEXAS

V

Bruce Carneil Webster,

Defendant.

### DECLARATION OF

### MARVIN HOLLOWAY

I, **Marvin Holloway**, declare as follows:

1.    I live in Pine Bluff, Arkansas. I was Bruce Webster's co-defendant in the murder case that resulted in Bruce being sentenced to death. I testified for the United States government against Bruce and Orlando Hall.

2.    I served twelve years in prison as part of a plea agreement in return for my testimony against Bruce. I was released from prison one year ago, on December 5, 2007. Since my release from prison, I have been employed as a salesman at a major car dealership in Little Rock.

3.    Other than this offense, I have no other felony convictions.

4.    I knew Bruce for several years before the offense, but I did not know him well. I could tell that Bruce was not right mentally and that he was lacking in intelligence.

5.    In the first paragraph of its opinion affirming Bruce's death sentence, the U.S Court of Appeals for the Fifth Circuit stated: "Webster, Hall and Marvin Holloway ran a

**EXHIBIT M**

marihuana trafficking enterprise in Pine Bluff, Arkansas." The Court was totally incorrect about this. Bruce was definitely not a partner in the marihuana enterprise. As far as I know, Bruce did not run anything.

Pursuant to 28 U.S.C. § 1746, I, **Marvin Holloway**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12/07/08

Marvin Holloway

# Wells Decl. Ex. N

**PETITION FOR EXECUTIVE CLEMENCY**
**TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

United States of America,

                                          CRIMINAL ACTION NO. 4:94-CR-121-Y

                                                            FROM

                           THE UNITED STATES DISTRICT COURT
                              NORTHERN DISTRICT OF TEXAS

v.

Bruce Carneil Webster,

        Defendant.

                                 **DECLARATION OF**

                                 **ANGELA MADISON**

I, **Angela Madison**, declare as follows:

1. My name is Angela Madison and I live in Pine Bluff, Arkansas. I was born and grew up in a house a couple of blocks from where Bruce Webster grew up. I am 37 years old, roughly two years older than Bruce and the same age as his brother, Tony.

2. As a child, I used to play with Bruce and his brothers and one of his sisters. The one thing I remember most about Bruce back then is that he would always do whatever anybody asked him to do, no matter what it was. I remember one time, we were all sitting around listening to the radio and we decided we wanted to listen to tapes. Bruce had to be no more than 10 or 11 years old at the time. We knew his brother David collected music but we also knew he did not like anybody messing with his stuff. We told Bruce to go sneak some of his brother's tapes out. We told him, "He won't know." Bruce, as always, did what we asked him to

1

**EXHIBIT N**

do without any questions or hesitation. David came over and heard us listening to his music and, of course, Bruce got beat up for it.

3. Bruce could never sit still so it was very hard for him to sit in church. Our house was right across the street from his family's church on 13th Street. Bruce would sneak out and come over. His mother was extremely strict and he would always get in trouble for this – time after time after time.

4. Truthfully, I thought all of Bruce's brothers were retarded. The ones I knew best were David, Tony and Bruce and they were all very slow mentally, but Bruce was the slowest. His mind would wander. You would be talking to him and he would just ramble from one subject to another. I'd tell him, "We weren't even talking about that." It seemed like he would change the subject to cover up the fact that he did not understand what we were talking about. As Bruce got a little older, maybe 11 or 12, it was hard or impossible to have a normal conversation with him. He would just talk in an ignorant sort of slang, saying nothing intelligent.

5. When I was 13 or 14 years old we moved to Milwaukee, Wisconsin, so I never saw Bruce again. When I was 22, I moved back to Pine Bluff, but I never did see Bruce again after we were children.

Pursuant to 28 U.S.C. § 1746, I, **Angela Madison**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12-09-08                  _Angela Madison_

                                 Angela Madison

# Wells Decl. Ex. O

PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

                                     CRIMINAL ACTION NO. 4:94-CR-121-Y

                                             FROM

                        THE UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT OF TEXAS

v.

Bruce Carneil Webster,

    Defendant.

                                   **DECLARATION OF**

                            **THERESSIA MARTIN MOTEN**

I, **Theressia Martin Moten**, declare as follows:

1. I am Bruce Webster's cousin. I live in Pine Bluff, Arkansas. I am 50 years old which makes me about 15 years older than Bruce.

2. My mother and Bruce's mother were sisters. My mother passed away about two years ago.

3. There is a lot of mental retardation in my mother's and Bruce's mother's family. Bruce and I have a first cousin in Little Rock named Alpercy Cox, our Aunt Delores' son, who is severely retarded. He is around 50 years old and can barely speak. He went to special schools and rehabilitation his whole life just to learn how to speak at all. His sister, Denise, has to take care of him. We have another first cousin in Monticello, Arkansas, Varner Martin, who is around 40 years old who cannot take care of himself at all. He still goes to a special school for the retarded. I have a nephew named Johnny Foster who is 8 years old. He is severely mentally disabled

1

**EXHIBIT O**

and cannot talk at all.

4. There were a number of other people in our family who were very abnormal. Our Auntie Leola was very strange. She was afraid to stay by herself. She would pay you a week's pay just to stay the night with her. She would get confused and think her nephew was her own child. Meanwhile, she could not raise her own daughter at all and had to let other people raise her.

5. Bruce's sister Dassie Mae was the same way. She did not develop properly and was always very tiny. Her head hurt all the time and she had two brain operations. She is very hard to communicate with unless you are family or know her well.

6. I always thought Bruce was the same way. When Bruce was a youngster, the way he moved and carried himself was not normal. He didn't talk and he didn't play with the other children when he was small. Even his brother Tony, who was definitely "not all there" either, did a lot better than Bruce did.

Pursuant to 28 U.S.C. § 1746, I, **Theressia Martin Moten**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12/9/08

Theressia Martin Moten

2

# Wells Decl. Ex. P

## PETITION FOR EXECUTIVE CLEMENCY
## TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

V

Bruce Carneil Webster,

     Defendant.

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT TEXAS

### DECLARATION OF

### MICHAEL PARKS

I, **Michael Parks**, declare as follows:

1.      I live in Hensley, Arkansas. I have a barber shop in Pine Bluff and I am a supervisor for UPS. I have an associate degree in electronics from Arkansas College of Technology.

2.      I have known Bruce Webster's family my entire life. I grew up in the same neighborhood and I went through school with Bruce's older brother, Mark.

3.      My mother did not allow me to go to the Webster home when I was growing up. Their father was known to be very abusive and there was a lot of family violence in the home. The father was reputed to have killed a man and gotten away with it.

4.      All the Webster children were mentally slow and most of them were in special education classes. They were also very lacking in social skills. Even so, some of Bruce's brothers overcame these obstacles and were able to acquire some job skills and to make

**EXHIBIT P**

decent lives for themselves. For example, Bruce's brother, Mark, is a very good carpenter and Tony is a minister and has had a steady job with the sanitation department. This was not true of Bruce, however. Bruce never developed any of these skills due, I am quite sure, to his mental limitations. He never seemed to be able to develop skills like his brothers did despite their own limitations.

5.     Bruce was always a fun-loving person and pretty outgoing but I believe he used this to cover up for the fact that he was mentally impaired. It was deceptive because it hid the fact that he was far below average in intelligence.

Pursuant to 28 U.S.C. § 1746, I, **Michael Parks**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12/8/08

Michael Parks

# Wells Decl. Ex. Q

## PETITION FOR EXECUTIVE CLEMENCY
## TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**JODIN SMITH**

**I, Jodin Smith**, declare as follows:

1. I am the ex-wife of Bruce Webster's brother Mark. I live in Pine Bluff, Arkansas. I am employed as the Agency Manager for an insurance and tax preparation agency.

2. I moved to Pine Bluff when I was 16 to live in a youth home. My family had abandoned me and I had nowhere to turn.

3. I met Mark Webster in 1986 and we were married in 1987 shortly before I graduated from high school. We were both working at the book store at the University of Arkansas in Pine Bluff. He is one year older than I am.

4. I married Mark and we have two children together, a daughter who is 20 and a son, 17. I left Mark in 1996 because I could no longer tolerate his violence and his physical and mental abuse. I was genuinely afraid that he might kill me.

Declaration of Jodin Smith

Page 1

**EXHIBIT Q**

5. During the time I was dating and married to Mark Webster, I became very close to all of his family. To this day, I think of them as my own family and I remain close to many of Mark's brothers and sisters, his Aunt Ruby and others in his family.

6. Bruce was around 13 years old when I met him. He was a very sweet kid who loved to have fun more than anything else. Bruce and I were very close and I was always crazy about him. I considered their brother Darrie to be my best friend. Darrie's nickname was "Tacky." That's what everybody called him. Darrie was stabbed to death in 1992 by their sister's husband.

7. The Webster kids had a terrible childhood. I heard many stories from all of them about the horrible things that were done to them by their father. Their father's nickname was "Bear" or "Mr. Bear." Mr. Bear was a ferocious mean man. I heard about a lot of what he did to them, but I saw some of it firsthand. I know for a fact he hit Darrie with a 2x4 and left welts all over his back and shoulder. He beat David and Darrie with a water hose and PVC pipe. David told me his father made him drink out of the slop jar they kept in the house to urinate and defecate in before they had a toilet. He also told me about his father forcing him to have sex with his own mother. Their sister, Future Mae, told me her father forced her to have sex with her sister Dassie Mae.

8. The Webster kids never really had a chance to be children. They were deprived of the opportunity children should have to be care free and to have fun. Instead, they lived in a constant state of fear and terror. Because of their home life they were all very sexual at a young age, before they even reached adulthood.

Declaration of Jodin Smith

Page 2

9. When my daughter was a small baby, Mr. Bear would pick her up by her limbs. He almost broke her arm one time. He picked my son up by his foot when he was a baby and scared me half to death.

10. Mark has serious problems with uncontrollable anger and violence. I know it is a result of what his father did to him and his brothers and sisters. It is as if he has multiple personalities. He has three sides to him. One is childlike and sweet, one is a fairly normal adult, and one is a violent terrifying demon. The demonic Mark was very physically abusive to me and our children. He hit me in the head with an iron skillet. He pounded me repeatedly in the chest and bruised three ribs and my breast bone. He also stomped on my face and left a shoe print on it. He would threaten to blow up the house with me and the kids in it. When he shot at me, that was the last straw. I was afraid he would eventually kill me and I knew I had to leave him. Once when he was in a violent rage, he even referred to himself by a different name which terrified me. He said, "You don't know who I am, bitch? I'm William." His father's name is Willie, so that struck me as very strange.

11. When my daughter got a little older, I could see that she was developing violent tendencies that she was picking up from her father. One time after we had split up, they were having a fight and he picked her up by her leg and slammed her on the floor. He had a scratch on his face and neck and he claimed she attacked him, but really she was just trying to get away from him. I took him to court over it and the judge called his actions "reasonable discipline."

12. Bruce was a wonderful kid. When I met him he was about 13, but he was still

Declaration of Jodin Smith

Page 3

very much a Mama's boy. His mother still called him her "Titty baby" because he was still very immature. To me he was always a childlike, even when he was full grown.

13. Bruce had a hard time expressing himself with words. He would have trouble finding the right word for things and would even ask you in the middle of a sentence to help him find the word he was looking for. He did not understand some basic concepts that we take for granted. For example he did not understand that a quarter, the coin, was ¼ of a dollar or that a quarter of an hour was the same thing as 15 minutes. He could not do simple things like give directions and would have to ask me to do it. He would just hand me the phone and say, "Hold on, Jodin will tell you." You could never count on him to handle any type of responsibility like going to the store or dealing with any sort of emergency. He was just not mentally up to it. I never saw him read a book or newspaper or talk about anything serious.

Pursuant to 28 U.S.C. § 1746, I, **Jodin Smith**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 11\11\2008

Jodin Smith

Declaration of Jodin Smith

Page 4

# Wells Decl. Ex. R

<div align="center">

**PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA**

</div>

United States of America,

                                              CRIMINAL ACTION NO. 4:94-CR-121-Y

                                                     FROM

                              THE UNITED STATES DISTRICT COURT
                              NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

        Defendant.

                                            **DECLARATION OF**

                                            **DOROTHY HARRIS
WALLACE**

I, **Dorothy Harris Wallace,** declare as follows:

1. My name is Dorothy Harris Wallace. I am Bruce Webster's sister. I live in Pine Bluff, Arkansas.

2. I am thirteen years older than Bruce. Bruce and I have different fathers. My mother brought my sister and me to live with Bruce's father, Willie Webster, when I was about two years old. I have a memory of hiding up under the house all night when I was about 2 or 3 years old because I was so afraid of my step-father. I have no other memories until I was about 9 years old. I thought he was my real father until I was about 14. My Aunt Ruby told me he was not my father. I was glad to know he was not really my father.

3. My step-father, Willie Webster, is a violent perverted man who tortured,

Declaration of Dorothy Harris Wallace

                             - Page 1

<div align="center">

**EXHIBIT R**

</div>

brutalized and sexually abused everyone living under his roof. He did things to me and my brothers and sisters that most people could never imagine people doing to each other – especially a father to his own children. He beat us constantly, hit us with belts, cords, hoses, fire pokers, hoes – anything he could get his hands on. He made us all be sexual with each other and even made my brother do sexual things with our own mother. He beat my mother all the time.

4. My step-father even beat my mother when she was pregnant. I remember him jumping on her when she was pregnant with Bruce. He held her down and beat her. I always thought he might have damaged the fetus and that maybe that is why Bruce was not normal mentally.

5. Our childhood was pure hell. Not a one of us really survived life with Willie Webster without lasting and deep mental injuries. We are all very damaged people after those horrible experiences. Most of us have needed long years of therapy just to get from one day to the next without totally falling apart, without killing ourselves and without doing terrible things to our own children and spouses.

6. One time Willie tied my hands to the side of the house and beat me on the back with a water hose until my back split open. He often whipped me and the others with a water hose folded over. I still have the scars on my back. Another time, he hit me in the leg with a hoe so hard it knocked a big chunk out of my leg. I ran to my Aunt Ruby's house, but Willie followed me and shot at my auntie. I still have a big scar on my leg more than 40 years later. When I was around 13, he made me

Declaration of Dorothy Harris Wallace
- Page 2

carry jugs of water long distances in the snow barefoot. Then he tied me up and beat the bottoms of my feet. They were frozen so I couldn't feel anything. I could not walk for days.

7. He called it punishing us but he got pleasure out of it and most times it did not have anything to do with something we had done that was so wrong. He made David drink urine out of a slop bucket we used instead of a bathroom before we had indoor plumbing. The girls were usually whipped with extension cords high up on their legs and backs so the wounds would be covered by our clothes. He would do all sorts of things to humiliate us and dominate us. He forced our mother to eat a spoonful of black pepper at gun point.

8. Willie was jealous of Bruce's relationship with our mother. Bruce was the baby of the family and our mother always treated him like her baby. Bruce developed slowly compared to my daughter who is two years younger than Bruce. She learned to speak earlier and she could always explain herself better than Bruce even when they were small. When she was 4 years old and he was 6, you could understand her but you could not understand what he was trying to say.

9. Bruce had a hard time learning to tell time. Our father would get mad and beat him for not being able to tell him what time it was.

10. Bruce was very babyish for a long time. He always stayed up under Mama, hanging onto her. She would have to help him with everything, tying his shoes, dressing him, feeding him. He always needed more help than the others.

11. Most of us had learning disabilities. Out of the nine children in our family, only

Declaration of Dorothy Harris Wallace
- Page 3

three graduated from high school. I always thought Bruce and Tony were the slowest of all. Tony got disability when he was a child for being mentally retarded but Bruce was just as slow as Tony.

12. I remember Willie beating Bruce for coming home after dark. He tied his hands behind his back and tied his feet. Then he took him underneath the car shed and beat him with a water hose. He would normally give twenty-five licks and if you'd move, he'd double it. He beat Bruce with a hose a lot.

13. David and Bruce got the most whooping. I think Bruce got it the worst because Willie was jealous of the extra attention my mother gave him.

14. Willie physically and verbally abused our mother constantly. He was always threatening to kill her or to burn the house down with her inside. He always made it known that he would kill her if she ever reported him to the police or child protection agencies. She wanted to run away and sometimes she would leave him when it got real bad, but she would always come right back.

15. He even abused my daughters when they were little. I heard screaming one morning and ran out of my house to find him beating my daughter because she didn't want to comb his hair. He was whipping her with an extension cord. He beat my other daughter with an extension cord when she was only one year old. She got welts all over her back from it. I called SCAN, the child protection service. Mama put peroxide and ointments on her so by the time SCAN came out to check on it, the bruises had healed up and they didn't do anything. He did the same thing to my sister Future Mae's son when he was about six. The boy's father

Declaration of Dorothy Harris Wallace

- Page 4

called SCAN. When they got there, Future Mae said she had done it to cover for our father.

16. Willie would beat you for any reason he could think of. If you didn't get him water fast enough or wash the dishes right or fast enough, he would beat you. He would beat my slower brothers because they could not tell time. You never knew when or why you might get beat. He didn't need a real reason.

17. He sexually abused the girls. He would make us get naked and touch and kiss each other's private parts. I wouldn't do it so he would beat me.

18. One time my brother David had taken all he could take and he tried to kill Willie, but Willie got a gun and put David back in his place.

19. I believe my little brother Darrie died because Willie kicked him out of the house. After Willie put him out, he was roaming the streets. He got into a knife fight with our brother-in-law, my sister Dassie Mae's husband, Boyd Lee Frazier. Boyd Lee stabbed him real bad and Darrie ended up bleeding to death in a ditch outside our house.

20. Willie beat my sister Dassie Mae in the head three weeks after she had brain surgery.

21. No one ever went to the doctor for injuries from the abuse. He would not let us get medical attention or treatment. All us kids were afraid to tell our teachers about the abuse and Willie was careful to beat us in places that would be covered by clothes.

22. One time, he came home early and my brother David was sleeping in bed with our

Declaration of Dorothy Harris Wallace

- Page 5

Mama. Willie got mad and told them to have sex with each other. He ordered David to take off Mama's clothes and lie on top of her. They were both crying and screaming so he told David to get out of the house and if he ever caught him in bed again he would make them do it.

23. I got pregnant when I was 15 years old. My step-father beat me and ran the boy off. He beat me across the head with a belt buckle.

24. I have had a tough life because of the abuse I experienced at the hands of Willie Webster. I left his house when I turned seventeen and went to California. I took a lot of drugs there and became suicidal. When I came back to Pine Bluff I went to the mental health clinic and got antidepressants. I still have headaches and my brain goes crazy and I get very angry. I have to spend long periods of time alone to work through my anger. I have been with my present husband, Robert Wallace, for thirteen years. We have been married for three years. I was on disability for many years but when we got married I lost some of my benefits. Sometimes I go into sort of a trance and I don't know what I'm doing. I walked clear across town one night and did not even know it.

25. I am in therapy now and I am on medications for depression.

26. Our mother was physically abusive also. I guess all that violence and meanness rubbed off on her. Being around it all the time, she got to be the same way. She would hit my brother David in the head with a jug of frozen water or a plate. She beat me with a broomstick.

27. We have all had mental and emotional problems as adults. All of my brothers

Declaration of Dorothy Harris Wallace
- Page 6

have had trouble with domestic violence. All of them have had to work very hard not to be like their father and not to abuse their wives the way he abused our mother. My sisters and I have all been in very abusive relationships.

27. Bruce has never been able to relate to other people normally. He did not even really know how to relate to us. He never made much sense verbally. Most of the time he could not relate to the world like normal people do. He has always been very easily influenced by others and because of his low intelligence he has always been a follower. You could tell him something and he would just do what you say. Whatever you tell him, he would always go along with it. I have never known Bruce to be a leader at all. There is no one he could lead.

28. I have known my baby brother Bruce his whole life. He was a good boy and a sweet child. Everybody liked him because he was easy-going and silly. He was not a violent person and I never knew him to start trouble. After he stopped going to school, he started to fall in with a bad crowd and one thing led to another. I really don't think Bruce ever would have meant to harm anyone and certainly he would not ever mean to kill someone, especially a young woman. In fact, he was always very protective of the girls in our family, his sisters, nieces and cousins. I know in my heart he had to have been forced into that. It is not something he would have done or thought of on his own. Bruce is just not that kind of person.

29. I could not have gotten to where I am today without the help of the Lord. At times, it was too much for me to bear, but He always got me through.

Declaration of Dorothy Harris Wallace

- Page 7

30.     I hope and pray the President will see fit to grant mercy to Bruce.

Pursuant to 28 U.S.C. § 1746, I, **Dorothy Harris Wallace,** declare under penalty

of perjury under the laws of the United States of America that the foregoing is true and

correct.

Dated: ___11/11/08___          _Dorothy Wallace_

                               Dorothy Harris Wallace

# Wells Decl. Ex. S

PETITION FOR EXECUTIVE CLEMENCY
TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

                                   CRIMINAL ACTION NO. 4:94-CR-121-Y

                                             FROM

                       THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

      Defendant.
                                    <u>DECLARATION OF</u>

                                    <u>SHARON WEBSTER</u>

I, **Sharon Webster**, declare as follows:

1.     I am married to Bruce Webster's brother, Tony Webster. Tony and I met when we were both seventeen years old. We married when we were both 21. We have three children, ages 16, 14 and 11.

2.     I am a substitute teacher in the Dollarway School District in Pine Bluff. I work in the Special Education department. My brother is a special education teacher. Between my work and my conversations with my brother, I have learned a great deal about special education and learning disabilities.

3.     My husband, Tony Webster, was raised in a home of unthinkable physical, sexual, mental and emotional abuse. His father, Willie, constantly beat and tormented his children and their mother and made them do terrible things to each other. They were all terrified of their father. Even to this day he holds a power over some of

Declaration of Sharon Webster

EXHIBIT S

them, especially their mother, Beatrice. Very recently I heard Willie scream at her that he was going to beat her.

4. I always told Tony he did not have to be like his parents. Maybe they could not control themselves, but he could. Tony has always tried to be a good person, but because he was constantly subjected to abuse as a child, he has at times been abusive to me. In January of 1994, I was pregnant with our second child. One day Tony came home very angry. He held a gun to my head. Of course, this is something his father used to do to his mother and he was just imitating the behavior he learned in his home. Although I always knew that Tony wanted to be a good person and did not really want to hurt me, I had had enough and I left him. On Easter of that year I realized he had changed. He has not been abusive since that time, but I know he struggles constantly to manage the pain and rage caused by his horrible childhood.

5. Both Beatrice and Willie have intellectual impairments. I have always suspected they are both mentally retarded. When I first knew them, they wanted to get on welfare but could not figure out how to do it. My grandmother had to help them with their paperwork and the process. Willie can not read at all, and can not even sign his own name. The best he can do is to scratch out a shaky "WW." Beatrice can read, but she does not understand what she is reading. She needs someone to explain the meaning of what she reads. She can not understand insurance papers or medical information, so someone has to explain them to her.

6. Education was not valued in the Webster home. There was no effort to make sure

Declaration of Sharon Webster

Page 2

the children got to school or did their school work. On the contrary, their father often kept them home from school, whether it was because he wanted them to do chores or did not want anyone to see the bruises and injuries he regularly inflicted on them.

7. Of the nine Webster children, Tony was one of only three to graduate from high school. He was 20 years old when he graduated. When Tony was 21 he was awarded disability payments for mental retardation, back-dated to the time he was 12 years old.

8. I met Bruce Webster when he was 15 years old. He was a sweet, nice boy, but I could tell right off that there was something wrong with him intellectually. He could not do many of the normal tasks of every day life. He didn't take care of himself like other teenagers. Everyone, especially his mother, helped him with his clothes and getting himself together for a regular day.

9. Bruce had a very short attention span, like that of a three-year old. He could never stay still. He had trouble focusing on a conversation. Bruce was not someone I could go to if I needed something done, even a small errand. He just didn't know how to do relatively simple things. He had difficulty listening and he had a limited vocabulary, so it was hard to explain things to him. He seemed to be stuck at about the 3rd or 4th grade level as far as his literacy skills. I have never seen him read anything. Even after all his time in prison, the letters we receive from him are still on about the same level as my son in 6th grade.

10. As Bruce got older, he would pretend he was "too cool" to do things for himself,

Declaration of Sharon Webster

Page 3

like shop or find his way around town. It has always been very clear to me that he was covering up for some kind of deficiency in his ability to function like a normal person in every day life. He had a lot of defense mechanisms for hiding what he could not do for himself.

11. My husband, Tony, who received disability from the age of 12 for mental retardation, is far more functional than Bruce. Tony is a reliable hard worker who has held down a job for many years. He is quite handy when it comes to repairs and fixing things, and he relates to people normally. None of these things are true of Bruce. Bruce is definitely impaired mentally.

12. In light of Bruce's mental impairments, it is impossible to imagine that he was the leader of any type of criminal enterprise or that anyone would take orders from him.

13. Based on all of these factors, I would hope and pray that the federal authorities would see it in their hearts to spare his life.

Pursuant to 28 U.S.C. § 1746, I, **Sharon Webster**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 11/11/08

Sharon Webster

Declaration of Sharon Webster

Page 4

# Wells Decl. Ex. T

# PETITION FOR EXECUTIVE CLEMENCY
## TO THE PRESIDENT OF THE UNITED STATES OF AMERICA

United States of America,

CRIMINAL ACTION NO. 4:94-CR-121-Y

FROM

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

V

Bruce Carneil Webster,

Defendant.

**DECLARATION OF**

**TONY WEBSTER**

**I, TONY WEBSTER, declare as follows:**

1.    I am Bruce Webster's brother. I am two years older than Bruce.

2.    When I was in school, they said I was a slow learner. I received social security most of my life for what they called mental retardation. Of the nine children in our family, I am one of three to graduate high school. I was 20 years old when I graduated.

3.    My brother Bruce is definitely no smarter than I am. In fact, there are many things I could always do better than Bruce could and there is really nothing I can think of that Bruce could do that I can't do. Bruce flat-out could not build or fix anything. He could not do any plumbing work or work on cars. Bruce could not even put up shelves. He would have to get me or someone else to do anything like that for him. It took Bruce too long to do everything, whether it was get dressed, iron a

Declaration of Tony Webster

- Page 1

EXHIBIT T

shirt or use the bathroom. It always took him twice as long as everybody else. Even playing checkers, he would take 5 or 10 minutes to make a move. We would get tired of waiting on him. He would do other stupid things like cut the grass or work in the yard in his good clothes. When we got older, I learned to do things for myself like cook and take care of myself. Bruce never did learn those things. So, if they can say I am mentally retarded, the same has to be true for Bruce. He must be retarded, too.

4. We had a very hard childhood. I am the only boy in our family to never do a day in jail or prison, but I am quite sure our home was a lot worse than any prison. Our Daddy was a mean nasty man. Most people would not believe the things he did to us and made us do to each other. He beat all of us on a regular basis. He would beat me 2 or 3 times a week, but my brothers Bruce and David got it worse than me. He would make the boys beat and whip each other and if they didn't do it hard enough they would get a whooping instead. He would tell you to be still while he beat you and if you didn't be still he would whoop you double. He would hit you with anything he had in his hand – belt, water hose, extension cords, an opossum tail – anything he could use to hurt you. He would try to hit you where no one would see it, where the marks would be covered by your clothes.

5. When I was about 19, he hit me in the back of the head with a cast-iron fire poker. It knocked me silly. Since then, I get dizzy spells and other problems. Years after that, I would sometimes pass out. In church, I was playing the organ and I passed out for 10 or 15 minutes. They took me to the hospital and did a CT scan and

Declaration of Tony Webster

- Page 2

found that I had a trauma to the brain in the same spot where my father had hit me with the fire poker. They said it was like I had a stroke.

6. He knocked one of my brothers out cold with an iron pipe.

7. He would make you sit down and eat human feces and you better eat it or you'll get a beating. He would make us lick the cat's anus or get a beating. I refused so he beat me.

8. He would make all of us -- both the boys and the girls -- take off our clothes and he would beat us in the house or out in the yard.

9. He would wake us up at 4:00 in the morning banging on a big metal pot with a spoon, yelling at us to do chores. I can still hear that loud clanking in my head from when he would beat on those metal pots.

10. We were not allowed to go in the ice box or take a drink of water without asking him first. If we didn't ask permission, we would get beaten.

11. Our daddy told us that he had killed people and that he did time in Angola penitentiary for it. He would tell us how mean he was so we would be afraid of him. He told us how mean his daddy was, too, that he would whip him with a razor strap.

12. Our father would make us call our Aunt Ruby, our Mama's sister, and talk nasty to her over the phone. He would make us ask her about her sex life and about her private parts. We loved our Aunt Ruby and hated to do it but he would beat us if we refused, so we had no choice. We would apologize to her later and she understood we had to do it or get beat.

Declaration of Tony Webster

- Page 3

13. It was a joyful time when our father was gone from the house. Friday night he would take off and we would not see him again until Monday. He would be out running around with other women and going to night clubs. We were so happy when he would leave --Friday night was a joyful time in our home.

14. When I was 17, I would run away and hide from my father. I would sleep in abandoned cars, abandoned houses and old schools.

15. I have been married for sixteen years to my wife Sharon. I used to beat Sharon like my father used to do to our mother but I spent many years praying and working on my anger and now I have control of it. With the Lord's help I have gotten better, but it was not easy after all we went through as children.

16. I love my brother Bruce and I will never believe he could have done what they say he did except if someone else told him to do it. Bruce always would do what he was told and he is not the type of person to tell other people what to do. It's just not the way he is. Never was.

17. I have always gone to church and been a very religious person. I play the organ in two churches and I am now an ordained minister myself. I pray that the Lord will guide the President's hand and let him see that my brother may have been

Declaration of Tony Webster

- Page 4

involved in a terrible thing but that he is deserving of mercy and the right to go on living.

Pursuant to 28 U.S.C. § 1746, I, **Tony Webster,** declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 11-11-08

Tony Webster

Declaration of Tony Webster

- Page 5

# Wells Decl. Ex. U

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

BRUCE CARNEIL WEBSTER

        Petitioner,

v.

CHARLES LOCKETT, WARDEN,
United States Penitentiary, Terre
Haute (USP),

        Respondent.

Civil File No. _____

**DECLARATION OF
MARC J. TASSÉ, PHD**

I, Marc J. Tassé, declare as follows:

## I.    BACKGROUND

1.    My name is Marc J. Tassé, Ph.D. and I am a licensed psychologist in North Carolina (NC #2613). I completed my Ph.D. in research-clinical psychology at the Université du Québec à Montréal. My doctoral dissertation focused on the study of adaptive behavior assessment in individuals with mental retardation. Following my Ph.D., I completed a post-doctoral fellowship in mental retardation and developmental disabilities at The Ohio State University Nisonger Center, University Center for Excellence in Developmental Disabilities Education, Research, and Service. I am also a "Fellow" of the American Psychological Association and the American Association on Intellectual and Developmental Disabilities.

2.    I am a Professor in the Departments of Psychology and Psychiatry at The Ohio State University (OSU). I am also the Director of the OSU Nisonger Center. The OSU Nisonger Center is a federally funded University Center for Excellence in

**EXHIBIT U**

Developmental Disabilities. Our Mission is three-fold: (1) provide training to undergraduate, graduate and post-graduate students in the field of mental retardation and related developmental disabilities (MR/DD), (2) offer services and state-wide technical assistance to individuals with MR/DD across the age span and to agencies providing supports and services to these individuals, and (3) conduct research in the field of MR/DD.

3. I've worked with individuals with mental retardation for more than 25 years. I have provided direct clinical services as well as supervised graduate and post-graduate psychology students in providing direct services to children and adults with MR/DD. I've been involved in hundreds of psychological assessments and eligibility/diagnostic evaluations of mental retardation involving children, adolescents, and adults. I have worked extensively over the past 20 years directly with individuals with mental retardation across the age span. I have provided consultative services and technical assistance to families, service providers, and state MR/DD agencies. I have also been involved in providing individual therapy to adolescents and adults with mental retardation and co-occurring psychiatric disorders or complex behavior problems.

4. In the past (1985 to 1993), I also worked as a behavior specialist (Douglas Hospital; Montreal, Canada), providing behavior programming and developing intervention plans for children and adults with mental retardation and co-occurring behavior problems or psychiatric disorders.

5. In addition to my clinical work, I actively conduct research in the field of mental retardation. I have published more than 75 peer-reviewed journal articles, book

2

chapters, and monographs in the area of mental retardation and developmental disabilities. I have given over 100 presentations, workshops, or seminars at local, state/provincial, national, and international scientific/professional meetings in the field of mental retardation.

6.     I am a co-author on the American Association on Intellectual and Developmental Disabilities (AAIDD; formerly known as the American Association on Mental Retardation) 2010[1] Manual (Schalock et al., 2010) that defines mental retardation, as well as the prior 2002[2] Manual and the 2007 AAIDD User's Guide (Schalock et al., 2007).[3] I have also worked on the development of standardized tests in the field of mental retardation. One such assessment instrument was the *Supports Intensity Scale* (SIS). The SIS is a standardized measure of individual support needs for adolescents and adults with mental retardation. I have also worked on the development and refinement of

---

[1] Schalock, R. L., Buntinx, W. H. E., Borthwick-Duffy, S., Bradley, V., Craig, E. M., Coulter, D. L., Gomez, S. C., Lachapelle, Y., Luckasson, R. A., Reeve, A., Shogren, K. A., Snell, M. E., Spreat, S., Tassé, M. J., Thompson, J. R., Verdugo, M. A., Wehmeyer, M. L., & Yeager, M. H. (2010). *Intellectual disability: Definition, classification, and system of supports (11e)*. Washington, DC: American Association on Intellectual and Developmental Disabilities.

[2] Luckasson, R., Borthwick-Duffy, S., Buntinx, W. H. E., Coulter, D. L., Craig, E. M., Reeve, A., Schalock, R. L., Snell, M. E., Spitalnik, D. M., Spreat, S., & Tassé, M. J. (2002). *Mental retardation: Definition, classification, and system of supports.* Washington, DC: American Association on Mental Retardation.

[3] Schalock, R. L., Buntinx, W. H. E., Borthwick-Duffy, S., Luckasson, R., Snell, M. E., Tassé, M. J., & Wehmeyer, M. L. (2007). *User's Guide Mental Retardation: Definition, Classification, and Systems of Supports, 10th Edition. Applications for Clinicians, Educators, Disability Program Managers, and Policy Makers.* Washington, DC: American Association on Intellectual and Developmental Disabilities.

3

the *Quebec Adaptive Behavior Scale*, as well as other standardized assessment instruments in the area of measuring problem behavior and psychopathology in individuals with mental retardation. I am currently the lead author on the American Association on Intellectual and Developmental Disabilities' Diagnostic Adaptive Behavior Scale (DABS). The DABS has been in development for more than three years and should result in a standardized test of adaptive behavior that focuses on diagnosing the presence of "significant adaptive behavior deficits" for the purpose of diagnosing mental retardation. I was recently awarded an "Exceptional Service" award by the American Association on Intellectual and Developmental Disabilities for my work in developing the *Supports Intensity Scale*, a standardized test that is used to assess support needs of persons with mental retardation.

7.      I am an active member of the following professional organizations:

- American Association on Intellectual and Developmental Disabilities (Fellow)

- American Psychological Association (Fellow) [member of Divisions: 5 (Assessment), 33 (Intellectual and Developmental Disabilities), 41 (Psychology & Law Society)]

- International Association for Behavior Analysis

- International Association for the Scientific Study of Intellectual Disabilities

- National Association for the Dually Diagnosed (MR/MI)

- North Carolina Psychology Board of Psychologists (License #2613)

8.      I am currently serving a one-year term as President-elect of the American Association on Intellectual and Developmental Disabilities.

4

9.    I have served, since January 2009, as an Associate Editor of the *American Journal on Intellectual and Developmental Disabilities*. I am also an *ad hoc* reviewer for the following professional journals:

- American Journal on Mental Retardation

- Intellectual and Developmental Disabilities

- International Clinical Psychopharmacology

- Journal of Autism and Developmental Disorders

- Journal of Intellectual Disability Research

- Research in Developmental Disabilities

- *Revue francophone de la déficience intellectuelle*

10.    I was asked by Attorney Sydney Crowder, on behalf of her client Mr. Bruce Webster, to review materials recently discovered from the Social Security Administration and provide an affidavit which addressed the following subjects:

- an overview of mental retardation diagnosis;

- a discussion of the professional and clinical tools that assist psychologists in navigating the complexity of such diagnoses;

- an opinion whether, based on the mental retardation information recently made available (e.g., records from the Social Security Administration as well as previous psychological evaluations recently made available), the evidence supports a diagnosis of mental retardation.

11.    In undertaking the tasks described above, I examined the following relevant case materials relating to Mr. Webster:

    a.    Mr. Webster's Elementary Permanent Record from Watson Chapel School District No. 24 – with grades from grade 1 through grade 9.

    b.    Mat6Survey – Metropolitan Achievement Tests completed in April 1987 – Master List of Test Results.

5

c.    Blank copy of a test protocol of the Ottis-Lennon School Ability Test.

d.    Declarations dated November and December 2008 from: Leondra Daniels, Lanetra Evans, Luketha Frazier, Marvin Holloway, Angela Madison, Theressia Martin Moten, Michael Parks, Jodin Smith, Dorothy Harris Wallace, and Sharon Webster.

e.    Select pages from the transcript of the trial held on June 12, 1996 in the US District Court for the Northern District of Texas Forth Worth Division (Vol. 23: pp. 1, 33, 67, 75-76, 102-103, 138, 145, 187, 194, 246).

f.    Select pages from the transcript of the trial held on June 13, 1996 in the US District Court for the Northern District of Texas Forth Worth Division (Vol. 24: pp. 1, 20, 43-44, 107, 131, 189, 238-239, 247-248, 260).

g.    Select pages from the transcript of the trial held on June 14, 1996 in the US District Court for the Northern District of Texas Forth Worth Division (Vol 25: pp. 1, 89, 125-126, 128-129, 138, 143, 151).

h.    Select pages from the transcript of the trial held on June 18, 1996 in the US District Court for the Northern District of Texas Forth Worth Division (Vol. 26: pp. 1, 25, 59, 86,120-121, 136-137, 139-141, 177, 224-225, 227, 229).

i.    Select pages from the transcript of the trial held on June 19 & 20, 1996 in the US District Court for the Northern District of Texas Forth Worth Division (Vol. 27: pp. 1, 19-21, 101-102, 106).

j.    Recently discovered records from the Social Security Administration.

k.    Recently discovered Psychological Evaluation by Dr. Spellman (dated: 12/22/1993).

l.    Recently discovered Psychological Evaluation by Dr. Hackett (dated: 10/22/1993).

## II.   AN OVERVIEW OF THE DIAGNOSIS OF MENTAL RETARDATION

DEFINING MENTAL RETARDATION

12.    The Diagnostic and Statistical Manual of Mental Disorders (**DSM-IV-TR**; American Psychiatric Association, 2000)[4] defines mental retardation as follows: (a) significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test;[5] (b) concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety; and (c) onset is before age 18 years.

13.    The **American Association on Intellectual and Developmental Disabilities'** (AAIDD; formerly known as the American Association on Mental Retardation) defines mental retardation[6] as a disability: *"characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18."* The AAIDD operationally defined "significant limitations" to be at least two

---

[4] American Psychiatric Association (2000). *Diagnostic and Statistical Manual of Mental Disorders (4th Edition, Text Revision; DSM-IV-TR)*. Washington, DC: Author.

[5] According to the DSM-IV-TR (American Psychiatric Association, 2000), the IQ prong of mental retardation is met if an individual's full-scale IQ score falls between 70 – 75 (roughly accounting for a 95% confidence interval resulting from standard error of measurement on most IQ tests) or lower (DSM-IV-TR; see pages 41 – 42).

[6] While the 2010 AAIDD Manual uses the terminology "intellectual disability" rather than "mental retardation," the two terms are equivalent, and I will use the latter for the sake of consistency.

7

standard deviations below the population mean (i.e., typically a standard score of 70 when the mean = 100 and the standard deviation = 15). The adaptive behavior prong of this definition is met if the individual has significant limitations in (1) conceptual, practical, or social skills or (2) the overall composite (e.g., full-scale) score of adaptive behavior.

*Intellectual Functioning*

14. The assessment of intellectual functioning is a task that requires specialized professional training. For the purpose of diagnosing mental retardation, AAIDD stipulates that IQ assessment data should be obtained and interpreted by an examiner experienced with people who have mental retardation and who is qualified in terms of professional and state regulations as well as publisher's guidelines for conducting thorough and valid evaluations of intellectual functioning.

15. The determination that an individual's intellectual functioning is "significantly" sub-average fulfills the first requirement for being diagnosed with mental retardation. "Significant subaverage intellectual functioning" is defined as a performance that is represented by a full-scale IQ score of approximately 70 or less, while considering all sources of test error. A standard score or intelligence quotient of "70" represents a population-referenced performance that is two standard deviations below the population mean (i.e., population average score = 100, standard deviation = 15). Significant deficits in intellectual functioning are best determined using an individually administered comprehensive standardized test of intelligence. The full scale or composite IQ is

8

generally regarded as the best estimate of an individual's general intellectual functioning (Schalock et al., 2010).

16.    Assessment of intellectual functioning must be done using an individually administered comprehensive standardized test of intelligence. The results obtained from group administered tests of intelligence or abbreviated measures (i.e., short form) of intellectual functioning lack sufficient reliability and psychometric robustness to be used for the purpose of making a diagnosis of mental retardation. These instruments serve a screening purpose but should not be relied upon when making or refuting a diagnosis of mental retardation.

17.    The Wechsler Adult Intelligence Scale – Fourth Edition, when used in accordance to best practice, is considered by many as the gold standard for measuring an adult individual's intellectual functioning. Other well accepted individually administered comprehensive measures of intellectual functioning for adults include: Stanford-Binet Intelligence Scale-Fifth Edition, Woodcock-Johnson III Test of Cognitive Abilities, and Kaufman Adolescent and Adult Intelligence Test.

18.    Established practice in intellectual assessment informs us that there are several important factors to consider when interpreting the IQ score. The IQ score obtained on any standardized IQ test is an *estimate* of the individual's "true" intelligence. This estimate is not without error. In addition to the standard error of measurement of the test used, it is important to consider the age of the test's normative data (i.e., Flynn effect) and possible practice effect when interpreting IQ results (see AAIDD's User's Guide).

9

19.  The AAIDD User's Guide proposed a number of guidelines to ensure proper assessment of intellectual functioning for the purpose of diagnosing mental retardation. Chief among these elements are the following:

- *"intellectual functioning is best understood as being composed of a general factor ('g') [i.e., full-scale IQ score].*

- *appropriate standardized measures should reflect the individual's social, linguistic, and cultural background and that proper adaptations must be made for any motor or sensory limitations.*

- *psychometric instruments that assess intelligence perform best when used with people who score within two to three standard deviations of the mean and that extreme scores are more subject to measurement error.*

- *assessment of intellectual functioning through the reliance on intelligence tests is fraught with the potential for misuse if consideration is not given to possible errors in measurement."* (Schalock et al., 2007; page 12).

20.  The AAIDD and DSM-IV-TR agree on the importance of taking into consideration all factors contributing error to the obtained IQ test results when interpreting someone's intellectual functioning for the purpose of making a diagnosis of mental retardation. The AAIDD (Luckasson et al., 2002) stipulated the following:

*"Although far from perfect, intellectual functioning is still best represented by IQ scores when obtained from appropriate assessment instruments. The criterion for diagnosis is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instrument's strengths and weaknesses."* (page 14).

21.  Furthermore, according to the DSM-IV-TR (American Psychiatric Association, 2000), *the IQ prong of mental retardation is met if an individual's full-scale IQ score falls between 70 – 75 (roughly accounting for a 95% confidence interval*

10

*resulting from standard error of measurement on most IQ tests) or lower* (DSM-IV-TR; see pages 41 – 42). In addition to the standard error of measurement, sources of error surrounding the obtained IQ score may include error that is attributable to the Flynn effect and/or practice effect, and thus the interpretation of the results should account for these factors (see Schalock et al., 2007).

***Adaptive Behavior***

22.    The AAIDD 2010 manual recommended that significant limitations in adaptive behavior be established through the use of standardized measures that have been normed on the general population. In the AAIDD 2010 manual, adaptive behavior is defined as an individual's conceptual, social, and practical adaptive skills (see Schalock et al., 2010). This well accepted AAIDD conceptual definition of adaptive behavior is incorporated in the Louisiana statute La. C. Cr. P. art. 905.5.1(H)(1) defining mental retardation. These three adaptive skills domains are defined as follows:

> ***Conceptual Skills:*** defined by communication skills, functional academics, and self-direction.
>
> ***Social Skills:*** defined by such abilities as interpersonal skills, social responsibility, following rules, and self-esteem. Higher order social skills have also been identified to include such elements as gullibility, naiveté, and avoiding victimization.
>
> ***Practical Skills:*** consist of basic personal care skills such as hygiene, domestic skills, health and safety as well as work skills.

23.    The AAIDD specified: *"[T]he person's strengths and limitations in adaptive skills should be documented within the context of community and cultural environments typical of the person's age peers and tied to the person's needs for individualized supports."* (page 45). Hence, assessing an individual's adaptive behavior

11

in an institutional context is inappropriate for the purpose of determining if an individual has mental retardation. Assessing if someone is well adapted in an institutional setting (e.g., a prison) might be useful for determining if additional structure is needed or for planning interventions to facilitate integration, but has no relevance in determining how an individual's adaptive functioning compares to the general population for the purpose of establishing a diagnosis of mental retardation.

24.    Another important aspect of adaptive behavior assessment is the measure of the individual's "typical performance" and not best or assumed ability (Schalock et al., 2010). Thus, when assessing the individual's adaptive behavior, we assess what the person *typically does* and not what he/she can do or could do. This is a critical distinction with the assessment of intellectual functioning, where we assess best or maximal performance.

25.    The AAIDD 2010 Manual reminded us of an important understanding about mental retardation. Namely, that within an individual with mental retardation, significant impairments often co-exist with strengths. Individuals with mild mental retardation are capable of doing many things. Most of these individuals will have strengths and areas of competence that might surprise many laypersons or even professionals who have limited experience in working with individuals with mild mental retardation. In the process of diagnosing mental retardation, the finding of significant limitations in conceptual, social, or practical adaptive skills is not outweighed by the presence of some ability on the individual's part. These discrete abilities are not

12

uncommon in individuals with mild mental retardation and should not be viewed as discounting a diagnosis of mental retardation.

### Age of Onset and Etiology

26.     With respect to the possible cause of mental retardation, more than 40% of all cases of mild mental retardation are of undetermined etiology. The cause of mental retardation is often likely related to a combination of risk factors. These might include, but are not limited to, pre-natal maternal malnutrition, in uterine insult or trauma, genetic disorders, fetal alcohol spectrum disorder, pre-natal and post-natal exposure to toxins, childhood malnutrition, neglect, abuse, and/or impoverished and under-stimulating home environment.

27.     Mental Retardation is a functional diagnosis, based on evidence regarding someone's functioning in academic and real-world settings. As such, knowledge of the cause of someone's mental retardation is not necessary in order to make a diagnosis, and in the majority of cases (especially of mild MR) one cannot say for certain what caused the condition. Nevertheless, knowledge of a possible or likely cause is a valuable thing to have, especially in establishing whether someone meets the developmental criterion. In the case of mild MR, especially in individuals from impoverished and disadvantaged backgrounds, it is often the case that environmental deprivation and parental understimulation in infancy and early childhood are contributing risk factors. However, one can be from such a background and additionally have contributing biological factors such as pre-maturity, low birth weight, prenatal infection or malnutrition, mother's alcohol consumption during pregnancy, birth trauma, chromosomal syndromes, etc. The

13

key in diagnosing individuals from disadvantaged backgrounds is to see if an individual is viewed within his own family and community as unusually impaired, even when compared to other individuals from the same background. It also helps in making a diagnosis if one can also point to biological risk factors, such as severe head injuries or maternal alcohol consumption during pregnancy, even though evidence of a known cause is not necessary to make a diagnosis of mental retardation.

### Retrospective Assessment

28. A retrospective diagnosis is needed when an individual has not been diagnosed before the age of 18 years. One important criterion in diagnosing mental retardation is clearly establishing that the individual's significant adaptive and intellectual deficits were present prior to age 18. A retrospective assessment/diagnosis may be needed for different reasons. Criminal justice cases involving sentencing eligibility such as claims seeking relief under *Atkins v. Virginia* are cited by the AAIDD User's Guide as often needing a retrospective evaluation and diagnosis. A retrospective evaluation is especially pertinent in death penalty cases where the individual has been in prison for a number of years. The diagnosis of mental retardation explicitly requires two conditions: (1) the assessment of the individual's ability in meeting society's expectations with respect to conceptual, practical, and social adaptive skills and (2) the assessment of the individual's present functioning. Assessment of present intellectual functioning does not often pose a problem. However, these two conditions may be at odds with one another in death penalty cases where the individual's "present" adaptive functioning can only be assessed against life in a prison or on a death row. Prison life and prison expectations for

14

adaptive functioning cannot be substituted for society's expectations in making the determination of the individual's everyday functioning in the general community. Since the individual's "present" adaptive functioning is in a prison setting, one must rather seek a retrospective evaluation of the individual's adaptive functioning in the community (i.e., prior to incarceration).

29.    Conducting a retrospective assessment and diagnosis is not unusual but should be done with caution and under proper conditions to ensure the reliability of the conclusions (i.e., ruling-in or ruling-out of the diagnosis). The AAIDD User's Guide has provided some guidelines for conducting a retrospective assessment/diagnosis of mental retardation. Below are some key elements (see AAIDD User's Guide):

- Conduct a thorough social history.

- Conduct a thorough review of school records.

- Assess adaptive behavior:
  - use multiple informants and multiple contexts

  - recognize that limitations in present functioning must be considered within the context of community environments typical of the individual's peers and culture

  - be aware that many important social behavioral skills, such as gullibility and naiveté, are not measured on current adaptive behavior scales;

  - use an adaptive behavior scale that assesses behaviors that are currently viewed as developmentally and socially relevant;

  - understand that adaptive behavior and problem behavior are independent constructs and not opposite poles of a continuum; and

  - realize that adaptive behavior refers to typical and actual functioning and not to capacity or maximum functioning.

15

- When assessing the individual's level of intellectual functioning - recognize the "Flynn effect."

- Recognize that self-ratings have a high risk of error in determining "significant limitations in adaptive behavior." However, consistent with the need for multiple informants or respondents, self-ratings can be used under the following cautions:

  o people with MR/ID are more likely to attempt to look more competent and "normal" than they actually are — which is sometimes incorrectly interpreted as "faking";

  o people with MR/ID typically have a strong acquiescence bias or inclination to say yes or agree with the authority figures; and

  o MR/ID is a social status that is closely tied to how a person is perceived by peers, family members, and others in the community.

- Conduct a longitudinal evaluation of adaptive behavior that involves multiple raters, very specific observations across community environments (especially in regard to social competence), school records, and ratings by peers during the developmental process.

- Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior or about having MR/ID.

### Cloak of Competence or Masking

30. It is well established (see Schalock et al., 2007) that self-ratings of individuals with mental retardation have a certain degree of error and should be interpreted with caution when determining an individual's level of adaptive behavior. If self-ratings are used in establishing a diagnosis of mental retardation, these should be used while considering the following cautions: (a) persons with MR are more likely to mask their deficits and attempt to look more able and "typical" than they actually are

16

(Edgerton, 1967[7]); (b) mental retardation (MR) is a particularly stigmatizing and pejorative label that leads most individuals with mild forms of this condition to fight hard NOT to be identified as "mentally retarded"; (c) MR is a social status that is closely tied to how a person is perceived by peers, family members, and others in the community; and (d) persons with MR typically have a strong acquiescence bias (Finlay & Lyons, 2002[8]) or bias to please that might lead to erroneous patterns of responding.

***Myths and Misconceptions Regarding Mental Retardation***

31. For most people with mental retardation, there is not a "mentally retarded" look. There are no distinctive features or personality types to mental retardation. It is important to remember the sage words of Ruth Luckasson (1990): *"Ninety percent of persons with mental retardation don't drool, don't stumble, aren't mute. They have significantly impaired intellectual ability, but often don't have any physical stigmata that indicate mental retardation. They won't 'look' a certain way."* It is dangerously naïve to think that one can "tell" if someone is mentally retarded, or not mentally retarded, by looking or talking to them. Less than 10% of all cases of mental retardation are attributable to a condition such as Down syndrome. The vast majority (approximately 80%) of individuals with mental retardation function in the mild range of intellectual and adaptive behavior deficits.

---

[7] Edgerton, R. B. (1967). *Cloak of Competence: Stigma in the Lives of the Mentally Retarded.* Berkeley, CA: University of California Press.

[8] Finlay, W. M. L., & Lyons, E. (2002). Acquiescence in interviews with people who have mental retardation. *Mental Retardation, 40,* 14 - 29.

32. The DSM-IV-TR notes: *"No specific personality and behavioral features are uniquely associated with mental retardation. Some individuals with mental retardation are passive, placid, and dependent, whereas others can be aggressive and impulsive"* (*see* pages 44 – 45). Additionally, mental retardation can co-exist with any number of other psychiatric disorders or personality traits. The DSM-IV-TR is quite explicit on page 47 when it states: *"The diagnostic criteria for mental retardation do not include an exclusion criterion; therefore, the diagnosis should be made whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder."* Thus, for example, an individual may have both mental retardation and antisocial personality disorder or mental retardation and learning disability. The presence of a co-existing mental disorder should not summarily be used to deny the individual's functioning if it meets criteria for a diagnosis of mental retardation.

## III. THE ROLE OF CLINICAL JUDGMENT IN DIAGNOSING MENTAL RETARDATION

33. The AAIDD (Schalock et al., 2010) has recognized the important role of the professional's experience and knowledge of mental retardation and individuals with this condition, in diagnosing mental retardation, and in fact devotes an entire chapter to the role of clinical judgment in diagnosis, classification, and development of systems of support. The AAIDD has defined clinical judgment as it relates to diagnosing mental retardation as follows:

> *"Clinical judgment is a special type of judgment rooted in a high level of clinical expertise and experience; it emerges directly from extensive data. It is based on the clinician's explicit training, direct experience with those with whom he*

18

*or she is working, and specific knowledge of the person and the person's environments.*" (page 86).

34. Making or ruling out a diagnosis of mild mental retardation requires the utmost clinical judgment and skills. These pre-requisite skills to making a diagnosis of mental retardation are more than the technical ability to administer IQ tests or adaptive behavior scales. It is relatively easier to make or rule out a diagnosis of severe or profound mental retardation than it is in the case of mild mental retardation. The diagnosis of mental retardation at or near the cut-off range for IQ and adaptive functioning requires extensive clinical experience and/or training in the area of mental retardation.

35. To be a qualified clinician in mental retardation, individuals must have relevant training, engage in clinical activities, and use professionally accepted best practices (*see*: Schalock et al., 2010). An ordinary layman lacks the training, experience, and familiarity with the accepted professional standards and clinical strategies to properly diagnose mental retardation.

36. The professional must use his or her clinical judgment throughout the diagnostic process. Experience and clinical judgment in mental retardation informs the professional regarding how to take well-established phenomena such as Flynn effect, practice effect, and cloak of competence into consideration when evaluating the data used in making a diagnosis of mental retardation (see AAIDD User's Guide; Schalock et al., 2007).

19

37. One of the major purposes of using clinical judgment strategies is "to avoid thinking errors that can lead to faulty reasoning and, thereby, impact negatively the clinician's decision or recommendation." Among these thinking errors are (Schalock *et al.*, 2010; p. 91):

**Affective error:** your feelings, such as incorrect stereotypes, misplaced empathy, or what you wish were true

**Anchoring error:** the first bit of information anchors your mind on an incorrect decision or recommendation

**Availability error:** what happened recently or most dramatically

**Blind obedience:** what the authority said

**Commission bias:** do something, anything

**Confirmation bias:** you find what you expect to find

**Diagnosis momentum:** piling on after an initial diagnosis

**Framing effects:** mistakenly influenced by the context

**Premature closure:** deciding too soon

**Representativeness error:** what is typically true

38. All people are susceptible to thinking errors. Clinical judgment, rooted in expertise and experience in a specialized field, is a necessary tool to overcome these common errors.

39. A key component of clinical judgment is the exercise of critical thinking. An evaluating psychologist must work closely with a client while maintaining a professional distance from which she can apply critical thinking to the diagnostic question posed. Critical thinking skills include analysis, evaluation, inference,

20

interpretation, and explanation (Schalock & Luckasson, 2005; pp. 27-30). A careful exercise of clinical judgment strategies, including critical thinking, is particularly important when complicating factors (e.g., presence of a co-occurring mental illness, forensic setting) make establishing a diagnosis of mental retardation even more difficult.

40. For example, clinical judgment strategies are imperative where "**Complex medical or behavioral conditions require multiple analyses . . .** that must be balanced in the application of clinical judgment." (Schalock & Luckasson, 2005; p. 16[9]). In situations of dual diagnosis, a trained psychologist specializing in mental retardation will be able to draw from his or her experience and expertise, and the strategies of clinical judgment, to separate symptoms associated with a patient's behavioral and mental health diagnoses from indicators of mental retardation and to make an accurate diagnosis. Psychologists who specialize in mental retardation have a professional responsibility as well as the training and experience to apply their clinical judgment objectively, without overreliance on problem behaviors presented by the patients with whom they work. This objectivity is particularly important as "Individuals with Mental Retardation have a prevalence of co-morbid mental disorders that is estimated to be three to four times greater than in the general population." (American Psychiatric Association, 2000; p. 45). It is a routine part of psychologists' work to look beneath what might appear to a layperson to be obnoxious or offensive behaviors, to analyze whether the root of these

---

[9] Schalock, R.L. & Luckasson, R. (2005). *Clinical Judgment.* Washington, DC: American Association on Mental Retardation.

21

behaviors is a health or competence issue, and to make a clinical diagnosis without being prejudicially swayed by a difficult presentation.

41.     Clinical judgment is also critical where *"**Legal restrictions significantly impact opportunities to assess the person** consistent with the five assumptions of the definition of mental retardation."* (Schalock & Luckasson, 2005; p. 16). As mentioned above, diagnosing mental retardation in the context of a death penalty case is an involved process that requires a careful analysis by a trained professional experienced in the field. The patient, who is incarcerated, cannot be assessed contemporaneously in a community-based setting; frequently a retrospective analysis is necessary, which requires careful analysis and attention; and there is an increased concern about malingering, which again poses a special need for the careful exercise of clinical judgment.

## IV.     SUMMARY OBSERVATIONS OF RECORDS REVIEWED

42.     School records available are scant. A document made available indicates that school records have been destroyed. Examination of the Elementary Permanent Record indicates that Mr. Webster was retained in 1st grade. His number of absences was low through grade 6. The records available did not indicate attendance beyond 6th grade. His grades starting in 6th grade seemed to drop from As, Bs, and Cs, to Ds and Fs consistently throughout grades 6 – 9.

43.     It is unclear from the school records whether or not Mr. Webster received special education services.

44.     The MAT6 Survey document seems to be a school record containing a master list of test results for 4 students, including Bruce Webster. It is unclear from this

22

document who these other students are. It would appear that this list is an alphabetical list, all four students having surnames starting with the letter "W". The results for Mr. Webster's performance on this test indicate that some of his standard scores place him below, at grade level, and above grade level. For example, his performance in the following areas is below the 7.7 grade level: Reading – Comprehension, Math Concepts, Math Computation, Spelling, Science, Social Studies, Total Reading, Total Math, Total Basic Battery, and Total Comprehensive Battery. His performance in the following areas is above the 7.7 grade level: Math Problem Solving, Language, Research Skills, and Total Language.

45. It is unclear what can be deduced from the MAT6 Survey since it unclear how and by whom this test was administered. Mr. Webster's performance on this test while he was part way through grade 7 (norms used were 7.7) ranges from a grade equivalent of 5th grade to a grade equivalent of 10th grade.

46. A review of the declarations from siblings, family members, ex-classmates, friends, and co-defendant speak of a person whom they know growing up in an abusive home environment, and describe him as being outgoing and somewhat of a class clown but being slow, immature, gullible, and having limited intellectual abilities.

47. The recently released documents from the Social Security Administration (SSA) date as far back as July 1, 1993.

48. A psychological evaluation was conducted on October 22, 1993 by Dr. Edward V. Hackett, psychologist. Dr. Hackett administered the Wechsler Adult Intelligence Scale - Revised (WAIS-R) to Mr. Webster. Mr. Webster obtained a Full-

23

Scale IQ = 59, Performance IQ = 49, and Verbal IQ = 71. Dr. Hackett diagnosed Mr. Webster with (1) mental retardation and (2) antisocial personality disorder.

49. A request for release of school records from the SSA was met with a letter from the Watson Chapel Schools dated 11/8/1993 informing SSA that all of Mr. Webster's "special education" records had been destroyed in 1988. The one salient element of this school district letter is an acknowledgement that Mr. Webster did receive special education services.

50. A medical report containing additional information was dated 11/10/1993 and signed by Dr. Edward V. Hackett. Despite mentioning in this note that he suspected that Mr. Webster might have been malingering some, Dr. Hackett reiterated his diagnosis of mild mental retardation for Mr. Webster. Dr. Hackett's described Mr. Webster's behavior as bizarre and was of the opinion that Mr. Webster was not able to manage his own benefits, not function well in a work setting or the community.

51. Dr. Hackett's psychological evaluation was conducted when Mr. Webster was 20 years old and approximately 11 months before the date of the crime for which Mr. Webster was convicted.

52. On October 25, 1993 Dr. C. M. Rittelmeyer, physician, conducted a physical examination of Mr. Webster. His report concluded he was physically healthy and negative for abnormal physical findings.

53. A second psychological evaluation was conducted by Dr. Charles M. Spellman on 12/22/1993 at the request of SSA for disability determination. Dr. Spellman conducted an informal evaluation of Mr. Webster's intellectual functioning. No test was

24

mentioned in his report but he reported an estimated IQ score of "69 or lower" and diagnosed Mr. Webster with (1) mental retardation and (2) antisocial personality disorder. Dr. Spellman reported an absence of malingering on Mr. Webster's part and found him to be disabled.

54.     Dr. Spellman's psychological evaluation was conducted when Mr. Webster was 20 years old and approximately 9 months before the date of the crime for which Mr. Webster was convicted.

55.     SSA document dated 4/13/1994 signed by P. Hallowell acknowledges having received of written Social Security Insurance (SSI) Disability request for hearing from Mr. Webster.

56.     Another SSA document dated 10/25/1994 and signed by Administrative Law Judge Jahn Heck Goree indicates that Mr. Webster had made an application for child's insurance benefits and supplemental security income. This document indicates that a SSA hearing was scheduled on 11/16/1994 but Mr. Webster failed to appear.

57.     A Social Security Administration ruling dated 4/5/1994 addressed to Mr. Webster informed him that his request for reconsideration for Childhood Disability Benefits was rejected and that SSA found that he did not qualify for SSI/SSDI.

## V.     PROFESSIONAL OPINION

58.     The SSA information recently made available contains compelling psychological evaluation results showing that Mr. Webster has significant subaverage intellectual functioning. Two independent psychologists (Drs. Hackett and Spellman) diagnosed Mr. Webster with mental retardation.

59.     Importantly, Dr. Hackett's evaluation of Mr. Webster's intellectual functioning was done almost 1 year before the date of the murder for which Mr. Webster was convicted and sentenced to death.  This is significant because at the time of his performance on Dr. Hackett's WAIS-R, Mr. Webster was not accused of murder nor trying to escape the death penalty -- a claim often raised as a possible motivation for malingering on a test of intelligence.

60.     Furthermore, there is an abundance of examples of adaptive behavior deficits in the declarations as well as delayed milestones and childhood deficits.  This information along with other previous psychological evaluations and these recently released SSA records are consistent with mental retardation.  In addition, this information has the added merit that it was not gathered in an institutional setting, such as a prison, which is unsuited for determining if an individual has mental retardation.

61.     The released SSA records and two psychological reports dated 1993 indicate that Mr. Webster had significant subaverage intellectual functioning.  The evidence available in these SSA records is consistent with a diagnosis of mental retardation.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29 day of September, 2011.

Marc J. Tassé, PhD
Licensed Psychologist (NC#2613)

26

# Wells Decl. Ex. V

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

-------------------------------------------------------x

BRUCE CARNEIL WEBSTER,

                Petitioner,       :

                               :        CAUSE NO:

vs.

CHARLES L. LOCKETT, WARDEN,    :
UNITED STATES PENITENTIARY,  :
TERRE HAUTE (USP),

                               :

           Respondent.

--------------------------------------------------- x

## DECLARATION OF KRISTEN K. LEROUX IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

I, **Kristen K. LeRoux,** declare as follows:

1.     I am an employee of Dorsey & Whitney LLP ("Dorsey") and a paralegal on the Bruce Webster case team. I have worked at Dorsey since 1993.

2.     In September 2008, my colleagues and I reviewed and indexed Bruce Webster's trial and appellate case file sent by Mr. Webster's appellate attorneys to Dorsey.

3.     In October 2008, Dorsey attorneys asked me and my colleagues to collect Arkansas Department of Human Services, Division of Children and Family Services records for Bruce Webster and his immediate family members, including Tony Webster, Dassie Mae Harris Frazier, and Dorothy Harris McKelvey Wallace.

**EXHIBIT V**

In late October 2008, Dorsey attorneys asked me and my colleagues to collect Social Security Administration records for Bruce Webster and his immediate family members, including Willie Webster, Tony Webster, Dassie Mae Harris Frazier, and Dorothy Harris McKelvey Wallace.

4.     On October 7, 2008, Dorsey sent a request to Arkansas Department of Human Services, Division of Children and Family Services, Central Registry Unit, P.O. Box 1437 (Slot S566), Little Rock, AR 72203-1437, to release records for Bruce Webster. On October 23, 2008, Dorsey sent requests to release the same for Tony Webster, Dassie Mae Harris Frazier, and Dorothy Harris McKelvey Wallace. On October 27, 2008, Dorsey called the Central Registry with the same request.

5.     On October 31, 2008 Dorsey received a fax from Central Registry attaching the Maltreatment Summary Report and Narrative for the Webster family, which included entries for Bruce Webster and Tony Webster. The cover letter stated, however, that the Jefferson County office of the Division of Children and Family Services could not locate the investigative file, and therefore Central Registry was unable to provide the complete investigative file as requested.

6.     On the same date, one of my colleagues spoke with Vellor Williams, following up on the request for the investigative file. Although Dorsey offered to send someone to Pine Bluff to collect the investigative file, Ms. Williams insisted that it had been either lost or destroyed.

2

7. On November 4, 2008, Dorsey received a letter from Central Registry regarding our request for records for Dassie Mae Harris Frazier and Dorothy Harris McKelvey Wallace. The letter stated that after a search of their files, they were unable to locate any reports in the Child Maltreatment Central Registry under those names.

8. On November 3, 2008, November 5, 2008, and November 18, 2008, one of my colleagues spoke with Vellor Williams regarding the term "legacy file" in the Webster family's Maltreatment Summary Report and Narrative. No further detail was provided.

9. On October 27, 2008, Dorsey sent a request to Social Security Administration at 3511 Market Street, Pine Bluff, Arkansas 71601, to release records for Bruce Webster, Willie Webster, Tony Webster, Dassie Mae Harris Frazier, and Dorothy Harris McKelvey Wallace.

10. On December 4, 2008, one of my colleagues called Logan Hamilton, Assistant District Manager of the Social Security Administration at Pine Bluff, who stated that a completed and signed Social Security Administration Form 3288 is necessary to release a copy of their records. Dorsey sent Bruce Webster's signed form to Social Security Administration on December 15, 2008. Dorsey sent signed forms from Willie Webster, Tony Webster, Dassie Mae Harris Frazier, and

3

Dorothy Harris McKelvey Wallace to Social Security Administration on January 15, 2009.

11. Dorsey received Social Security Administration records for Dassie Mae Harris Frazier on February 2, 2009.

12. Dorsey received Social Security Administration records for Bruce Webster and for Willie Webster on February 9, 2009.

13. Dorsey did not receive Social Security Administration records for Tony Webster or Dorothy Harris McKelvey Wallace.

14. On October 8, 2009, Dorsey sent a request for additional records to the Pine Bluff, Arkansas, Social Security office that were listed in the "List of Exhibits" of Bruce Webster's Social Security records but were not received on February 9, 2009, along with copies of the letter requesting the records dated December 15, 2008, and Mr. Webster's Consent for Release of Information dated December 12, 2008.

15. On October 15, 2009, Dorsey had a telephone conversation with the Pine Bluff, Arkansas, Social Security office and was informed that normal procedures were not followed when the records received in February of 2009 were sent and that the person who copied and sent them had retired.

16. On October 22, 2009, the Pine Bluff, Arkansas, Social Security office sent a letter to Dorsey denying the request for additional records citing it was a

"blanket request," the claimant is not living in the service area, and the consent was outdated.

17. On November 23, 2009, Dorsey sent a request for additional records to the Terre Haute, Indiana, Social Security office that were listed in the "List of Exhibits" of Bruce Webster's Social Security records but were not received on February 9, 2009, along with Mr. Webster's Consent for Release of Information dated November 17, 2009.

18. On December 7, 2009, Dorsey received a letter from the Terre Haute, Indiana, Social Security office stating Mr. Webster's folder had been destroyed.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: March 23 , 2012

Kristen K. LeRoux

5

# Wells Decl. Ex. W

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Bruce Carneil Webster

v.

United States of America

**DECLARATION OF LARRY M. MOORE IN SUPPORT OF MOTION FOR
AUTHORIZATION TO FILE SUCCESSIVE MOTION TO
VACATE SENTENCE**

I, **Larry M. Moore,** declare under penalty of perjury, as follows:

1.      I am an attorney duly licensed to practice law in the State of Texas, and have been so licensed since November of 1977.   I am also licensed to practice before the United States District Court for the Northern District of Texas; the United States Court of Appeals for the Fifth Circuit; and the United States Supreme Court.  I am Board Certified in Criminal Law by the Texas Board of Legal Specialization, and I have been so certified since 1982.   I am a sole practitioner; however, I am associated and share offices with another sole practitioner, and we practice under the firm name of the Law Offices of Moore and Cummings (not a partnership).

2.      I was appointed in the United States District Court for the Northern District of Texas as one of the attorneys representing Bruce Carneil Webster in his case, both at trial and upon his direct appeal to the United States Court of Appeals for the Fifth Circuit.  I served as Mr. Webster's "lead counsel" at trial, and as "second chair counsel" on appeal.  I

**EXHIBIT W**

was originally appointed to represent Mr. Webster at the end of October in 1994, and his case was ultimately tried during the summer of 1996. His direct appeal ended approximately October of 1999, and we subsequently obtained the appointment of alternative counsel to pursue Mr. Webster's Section 2255 Application.

3. While representing Mr. Webster, I employed one paralegal/legal assistant, Ms. Kimberly J. Whitehead (Moore), but had no other full-time employees. For purposes of Mr. Webster's trial, I secured the appointment of co-counsel to participate in the case (Dr. Allan K. Butcher), as well as a defense investigator (L. Michael Connelly and Associates), and a Mitigation Specialist (Ms. Annette Lamoreaux). Additionally, we had a number of experts appointed to assist in Mr. Webster's defense, including three mental health experts. Dr. Butcher and I also retained additional experts to assist us with various aspects of Mr. Webster's defense (including an additional mental health expert), whom we paid with our own funds. We also consulted with a number of other experts who advised and/or assisted us without compensation; however, Dr. Butcher and I were also required to pay with our own funds for some additional expenses which were incurred by some of these individuals.

4. During our representation of Mr. Webster, we came to believe that the issue regarding Mr. Webster's mental retardation was going to be a critical issue in Mr. Webster's defense. For that reason, we made every effort which we were able to make, in an attempt to secure any and all evidence which might relate to the issue of Mr. Webster's mental retardation. In that regard, we were apprised at some point by Mr. Webster's family that an application had been made for social security disability benefits on Mr.

Webster's behalf; and we were further advised that some testing may have been done of Mr. Webster attendant to that application. We contacted the Social Security Administration District Office in Pine Bluff, Arkansas, and requested that we be provided with copies of any and all records that might exist pertaining to Mr. Webster, pursuant to a written release which I had obtained from Mr. Webster for that purpose. We also arranged for our defense investigator to retrieve any records which the Social Security Administration might locate during a trip to Pine Bluff, Arkansas, during March of 1996. I have reviewed the copies of the Social Security Administration records pertaining to Mr. Webster's application for benefits that have been provided to me by Mr. Oliver McKinstry of the Dorsey Whitney Law Firm. I do not recall ever having seen these records before, and to the best of my recollection, they were never provided to us by the Social Security Administration pursuant to the request we made during our preparation for trial. I have not had access to my case file regarding Mr. Webster's case since I originally provided it several years ago to the attorneys representing Mr. Webster in his original Section 2255 application. For that reason, I have been unable to review any notes which I may have made, or which may have been provided to me by our investigator, regarding the result of our investigator's trip in Arkansas in March of 1996; particularly in regard to any response that might have been made to our request for the production of any Social Security Administration records that might exist regarding Mr. Webster. While I do not currently have any direct recollection of the response which we received, it is my good faith belief that we must have been told that no records regarding Mr. Webster existed, otherwise we would have continued to pursue them by every means available to us.

5. In my opinion, the Social Security Administration records which I have reviewed could have been important during the trial on the issue of Mr. Webster's mental retardation, as the testing conducted attendant to Mr. Webster's claim for benefits predates the offense for which he was convicted. Additionally, the anecdotal information provided in the records regarding Mr. Webster's adaptive functioning would have provided support for our experts' determinations of the deficits in those areas of adaptive functioning they found to exist relative to Mr. Webster.

6. During my representation of Mr. Webster, I also attempted to obtain any and all records which might exist regarding Mr. Webster's abuse or mistreatment as a child. To that end, I requested that I be provided with copies of any and all such records that might be in the possession of the Arkansas Department of Human Services. I was ultimately advised by the Arkansas Department of Human Services Division of Children and Family Services that they were unable to locate any such information pertaining to Mr. Webster within the Child Maltreatment Central Registry of the Department, and we never received any such records from them.

7. Although I have heretofore neither been provided with, nor had the opportunity to review the Motion for Authorization to File Successive Motion to Vacate Sentence which I understand is to be filed on Mr. Webster's behalf, I have nonetheless provided this Declaration in support of such an application.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct to the best of my knowledge

Dated: _10-20-09_

Larry M. Moore
Attorney at Law
Texas State Bar No. 14357800
Law Offices of Moore and Cummings
4210 West Vickery Blvd.
Fort Worth, Texas 76107
Telephone Number: 817-338-4800
Fax: 817-989-2442

# Wells Decl. Ex. X

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.
Fort Worth Division

2001 APR 30 PM 3: 02

CLERK OF COURT

UNITED STATES OF AMERICA,

Plaintiff,

vs.

CASE NO. 4:00-CV-1646-Y
(4:94-CR-121-Y)

BRUCE CARNEIL WEBSTER,

Defendant.

## MOTION FOR LEAVE TO CONDUCT DISCOVERY
## AND BRIEF IN SUPPORT

### I. MOTION

Defendant BRUCE CARNEIL WEBSTER, through undersigned counsel, respectfully moves the Court to grant him leave to conduct discovery, as set forth in detail below. This request for discovery is authorized by Rule 6 of the Rules Governing Section 2255 Proceedings For the United States District Courts ("Habeas Rule 6"). Moreover, Mr. Webster would show this Court that the requested discovery is essential to guarantee him a full and fair opportunity to present the claims alleged in his September 2000, motion under 28 U.S.C. § 2255, to amend that motion, as well as to ensure that this Court reviews and resolves his claims for relief in light of a fully developed factual record.

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

*1*

**EXHIBIT X**

I.    **BRIEF IN SUPPORT**

Under Rule 6 of the *Rules Governing Section 2255 Proceedings for the United States District Courts* ("Habeas Rule 6"), this Court holds the specific and express authority to order discovery:

> A party may invoke the processes of discovery available under the Federal Rules of Criminal Procedure or the Federal Rules of Criminal Procedure or elsewhere in the usages and principles of law if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Habeas Rule 6(a) (West 2000). Habeas Rule 6(a) incorporates the Supreme Court's directive that a federal habeas corpus petitioner is "entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977); *see also Rules Governing Section 2254 Cases in the United States District Courts*, Advisory Committee Note to Rule 6 (West 2000) ("Subdivision (a) is consistent with *Harris v. Nelson*").

Thus, this Court may grant the petitioner leave to conduct discovery when "good cause" is shown. Good cause is established "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997).[1]

---

[1]    By contrast, the Supreme Court has indicated that such good cause is absent when the petitioner's allegations are patently frivolous (*i.e.*, the product of "fantasy which has its basis in the paranoia of prison rather than fact." *Harris*, 394 U.S. at 300; *see also* Advisory Committee Note to Habeas Rule 6 (West 2000) (same, quoting *Harris*).

Before discovery is warranted under Habeas Rule 6(a), the Fifth Circuit has required a petitioner to set forth specific allegations of fact supporting his or her claims for relief. *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994) (citing *Willie v. Maggio*, 737 F.2d 1372 (5th Cir.)).[2] Further, the petitioner must have a reasonable basis to believe that the requested information exists. *Kirkpatrick v. Whitley*, 992 F.2d 491, 496 (5th Cir. 1993).

A petitioner who (1) made specific allegations warranting relief, (2) demonstrated why the requested information is essential to the adequate factual development of his claims, and (3) demonstrated that the requested information is likely in the hands of the party from whom discovery is sought and cannot be obtained through other means, has established "good cause" under the Fifth Circuit's consistent reading of *Bracy* and Habeas Rule 6. *See, e.g., Murphy v. Johnson*, 205 F.3d 809, 813-814 (5th Cir. 2000) ("where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he [is] entitled to relief, it is the *duty* of the courts to provide the necessary facilities and procedures for an adequate inquiry") (internal quotation marks omitted; citation omitted; emphasis added); *see also East v. Scott*, 55 F.3d 996 (5th Cir. 1995) (although a "district court generally has discretion to grant or deny discovery requests under Rule 6, a court's blanket denial of discovery is an abuse of discretion if discovery is indispensable to a fair, rounded, development of the material facts") (internal quotation marks omitted).[3]

---

[2] *See also, e.g., Matta-Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir.) ("good cause" under Rule 6(a) "cannot exist where the facts alleged do not provide a basis for relief"), *cert. denied*, 498 U.S. 878 (1990).

[3] *See Coleman v. Zant*, 708 F.2d 541 (11th Cir. 1983) (quoting *Townsend v. Sain*, 372 U.S. 293, 322 (1963)) (same); *see, e.g., Smith v. United States*, 618 F.2d 507, 509 (8th Cir. 1980) (affirming district court's denial of discovery because petitioner merely listed the records he sought

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

3

Within this motion, Mr. Webster demonstrates that the information sought is "indispensable" to the "fair, rounded development of the material facts," which in turn is essential to the full consideration and accurate resolution of the claims for relief in Mr. Webster's § 2255 motion.

Mr. Webster would further show this Court that he has expended all investigative funds provided by the Court and has been denied additional investigative funds. Moreover, Mr. Webster would show the Court that he sought the issuance of Subpoenas duces tecum which was denied by the Court.

## GROUND FOR REVIEW NO. ONE

### PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT, EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE RACIALLY DISCRIMINATORY MANNER WHICH RESULTS FROM THE FEDERAL CAPITAL SENTENCING SCHEME.

In his first ground for review, petitioner demonstrates that the federal capital sentencing scheme is administered in a racially discriminatory manner. In support of this claim, petitioner demonstrated that trial counsel first raised this objection, arguing that the raw statistics available to the public suggested a racially discriminatory practice. After petitioner's trial, the government released its own study, *Survey of the Federal Death Penalty System (1988-2000)*,

---

without stating how they would assist him in prosecuting his writ of habeas corpus); *Gaitan-Campanioni v. Thornburgh*, 777 F. Supp. 1355, 1356 (E.D. Tex. 1991) (noting that the courts should not hesitate to order discovery "where it will help illuminate the issues underlying the applicant's claim").

which is attached to petitioner Sec. 2255 motion as "Attachment A". This survey demonstrates that over eighty percent (80%) of cases in which the death penalty was considered involved a non-white, or minority, defendant. Moreover, only 28 percent (28%) of the cases approved by the Attorney General for prosecution as a death penalty case involved white defendants. When one considers that many of these death penalty cases are later plea bargained to a penalty less than the death penalty, one will find that over forty percent (40%) of those plea bargained cases involved a white defendant.

In today's society, African Americans comprise approximately 12 percent (12%). However, African Americans account for some sixty-five percent (65%) of the death penalty verdicts, and sixty-eight percent (68%) of the federal death row. Petitioner would show this Court that he has demonstrated to the Court all of the racial disparity evidence available to the public regarding the United States Government's prosecution of death penalty eligible offenses. However, petitioner would show this Court that additional evidence exists to demonstrate that the effect of the Government's prosecution of capital offenses is racially discriminatory.

Through discovery petitioner seeks to demonstrate the racially discriminatory effect of the Justice Department's procedures regarding the determination whether to pursue the death penalty, as well as the awareness of the Justice Department of the racially discriminatory effect of their procedures. Petitioner understands the voluminous nature of his requests relating to this claim, but would respectfully show the Court that such evidence is essential in establishing the claims of racial discrimination raised herein. In support of this claim, petitioner would respectfully request the following discovery:

1. The Government be required to produce for petitioner's counsel, for inspection and photocopying, case information for every "death penalty eligible" case since

the inception of the federal death penalty statute. Petitioner specifically does not request "work product" but instead public information for all such cases, including names, locations, descriptions of the alleged offense, gender and race of the alleged offender, name, race, gender and age of all victims, and resolution.

2.    The Government be required to produce for petitioner's counsel, for inspection and photocopying, the names and identifying information, including name, race, gender and age of all alleged offenders and the name, race, gender and age of all alleged victims, for all cases referred to the committee of Senior Attorneys in the Justice Department for prosecution as a death penalty offense.

3.    The Government be required to produce for petitioner's counsel, for inspection and photocopying. all matters relied upon by the committee of Senior Attorneys in the Justice Department in its recommendation whether to prosecute the cases before it as a death penalty offense.

4.    The Government be required to produce for petitioner's counsel, for inspection and photocopying, the names and identifying information of all cases, including name, race, gender and age of all alleged offenders and the name, race, gender and age of all alleged victims, referred to the Attorney General for prosecution as a death penalty offense.

5.    The Government be required to produce for petitioner's counsel, for inspection and photocopying, all matters relied upon by the Attorney General in his or her decision whether to prosecute a case as a death penalty offense.

6.    The Government be required to produce for petitioner's counsel, for inspection and photocopying, the resolution or disposition of every case for which the death penalty could have been sought since the inception of the federal death penalty statute.

7.    The Government be required to produce for petitioner's counsel. for inspection and photocopying, any information in the possession of the Government relating to the investigation of racially discriminatory practices in: the decision to seek the death penalty, the evaluation of offenses eligible for death penalty, the prosecution of a death eligible offense, or plea bargaining practices relating to death eligible offenses.

## GROUND FOR REVIEW THREE

**TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT ADDITIONAL EVIDENCE DEMONSTRATING PETITIONER'S MENTAL RETARDATION AND HIS ADAPTIVE SKILLS.**

## GROUND FOR REVIEW FOUR

**TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT EVIDENCE OF RACIAL BIAS IN THE WATSON CHAPEL SCHOOL SYSTEM AND THE POTENTIAL BIAS OF THE GOVERNMENT'S WITNESSES**

## GROUND FOR REVIEW NINE

**PETITIONER'S RIGHTS TO DUE PROCESS WERE VIOLATED BECAUSE THE GOVERNMENT WAS IN POSSESSION OF THE INFORMATION WHICH SUGGESTS PETITIONER WAS NOT PROVIDED SPECIAL EDUCATION SERVICES DUE TO RACIAL DISCRIMINATION.**

Because of the relationship between grounds for review three, four, and nine, and to conserve the Court's valuable time and resources, Mr. Webster will address these grounds together. As is argued in Petitioner's Sec. 2255 motion, the jury herein heard some evidence from the Watson Chapel School District officials concerning petitioner's performance in school. Petitioner contends there was significant evidence which was not presented to the jury concerning petitioner's mental retardation, his adaptive skills, and the probable racial bias which was inherent in this school district and with these witnesses. The Government counters with an affidavit from petitioner's trial counsel asserting that they interviewed every teacher of which they were aware. Thus, in order to resolve petitioner's grounds herein, the Court must consider any new evidence of mental retardation, adaptive skills, and/or racial bias which was not presented to the jury, and which was not developed by trial counsel. For example, the school

counseler, E.C. Turner, would indicate that petitioner was not always a "leader" as the Government led the jury to believe. Instead, whenever petitioner was in the company of older children, and children more advanced in their mental abilities, Turner would have testified petitioner was a "follower." And, in spite of his testimony at trial, Turner was never able to assess petitioner's academic functioning, partially because of the inability of school officials to "followup" with students. but particularly because of petitioner's family and home life. Finally, Turner could have explained to the jury that his suspicions that petitioner was on drugs because he "talked in circles" and his disposition was "not normal."

Loula Gray, an elementary school teacher with the Watson Chapel School District for thirty-six years, and petitioner's elementary school teacher, did not testify. Had she been called, Ms. Gray, could have discussed the racial discrimination which existed in the Watson Chapel School District at the time petitioner attended school, and the school's policies concerning social promotion. Ms. Gray previously indicated her belief petitioner was promoted to the next grade even though he had not mastered the skills and knowledge in his current grade and that petitioner should have received special education services.

Several potential witnesses either believe that race was a factor in petitioner's failure to receive special education services, or provide reasons for a failure to provide special education services to petitioner. For example Dr. Sally Church, documents that sometimes "problem students" will not be classified as mentally retarded, even if they are, because once classified as mentally retarded, such students may not be dismissed from school for their behavior.

Moreover, in petitioner's Sec. 2255 motion, he sets forth the extensive racial discrimination history suffered by minorities in the Watson Chapel School District. This

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

8

Case 2:12-mc-00006-JPH-MJD Document 42-6 Filed 07/08/14 Page 171 of 209
Case 2:12-cv-00686-WTL-WGH Document 43 Filed 01/30/14 Page 170 of 209 PageID #: 487
PageID #: 3256
16053256

evidence is supported not only by witnesses such as Ms. Gray, but also by the Justice Department itself who actually forced the Watson Chapel School District to desegregate their schools—against their will. These problems continue as at least one African American teacher was denied an administrative position on the basis of her race.

Petitioner would respectfully show that trial counsels' failure to discover and present this type of evidence, which was available, is critical. The evidence concerning petitioner's mental retardation at trial was the focus of both parties. One of the most important considerations in determining mental retardation was petitioner's adaptive skills. While the Government seemed focused on presenting the jury a picture of petitioner as a normal person who was maladapted and a "leader," the evidence to this point demonstrates this was not necessarily true. Moreover, those Government witnesses who testified to petitioner's level of functioning had an incentive to portray petitioner in such a way as to explain the failure of the school district to meet petitioner's needs.

In an effort to develop these facts, petitioner's counsel attempted to obtain records from the Watson Chapel School District. The School District did not voluntarily provide counsel any records. Moreover, the School District did not honor an open records request indicating that the Arkansas state statute did not require compliance with "out of state" requests.

Through discovery, petitioner intends to fully develop the factual basis for the claims raised within these grounds for review in his Sec. 2255 motion. Moreover, appellant seeks to obtain information from the government relevant to these issues and which should be turned over pursuant to the dictates of Due Process and the Fifth and Fourteenth Amendments. Petitioner further seeks to demonstrate a bias on the part of the Government's witnesses from the

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

9

Watson Chapel School District, as well as a reasonable explanation for the failure of Watson

Chapel School District to provide petitioner services relating to his mental retardation.  In an

effort to continue the full development of the facts relating to the claims before this Court,

petitioner would propose the following discovery be conducted with regard to grounds for

review Three, Four, and Nine:

8.    The Government be required to produce for petitioner's counsel, for inspection and photocopying, any reports prepared by a mental health professional in the Government's possession which, in any manner, questions or rebuts the testimony by the government's witnesses at trial (i.e. Dr. Coons and Dr. Parker) on the issue of petitioner's mental retardation.

9.    The Government be required to produce for petitioner's counsel, for inspection and photocopying, the names, addresses and telephone numbers of all witnesses interviewed by the Government, and its agents, concerning the lack of adaptive skills demonstrated by petitioner prior to his eighteenth birthday.

10.   The Government be required to produce for petitioner's counsel, for inspection and photocopying, any and all records maintained concerning racially discriminatory practices at the Watson Chapel School District.

11.   A deposition of E.C. Turner be taken relating to: the treatment of mentally retarded children by the Watson Chapel School District; the failure of the Watson Chapel School District to provide special education services to mentally retarded children; petitioner's lack of adaptive skills prior to his eighteenth birthday; and, any other matters relating to petitioner's mental retardation and/or its assessment by the Watson Chapel School District and its employees.  If the Court denies this discovery request, petitioner respectfully requests that such process issue to E.C. Turner as is necessary to require him to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of E.C. Turner, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of E.C. Turner.

12.   A deposition of Loula Grey be taken relating to: the treatment of mentally retarded children by the Watson Chapel School District; the failure of the Watson Chapel School District to provide special education services to mentally retarded children; the role racial discrimination has played in the education of minorities within the Watson Chapel School District, petitioner's academic performance;

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

10

petitioner's lack of adaptive skills prior to his eighteenth birthday; and, any other matters relating to racial discrimination, petitioner's mental retardation, and/or its assessment by the Watson Chapel School District and its employees. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Loula Grey as is necessary to require her to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Loula Grey, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Loula Grey.

13.     A deposition of Dr. Sally Church be taken relating to: the classification/diagnosis of mental retardation; the role of schools with regard to mental retardation; and, the various reasons why, in her experience and training, that a mentally retarded person may be denied services by a school district. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Dr. Sally Church as is necessary to require her to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Dr. Sally Church, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Dr. Sally Church.

14.     A deposition of Lydell Willis be taken relating to: racial discrimination occurring within the Watson Chapel School District; the impact of the School District's racial attitudes on students, and the policies, written and unwritten, of the school district toward student's with special needs. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Lydell Willis as is necessary to require her to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Lydell Willis, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Lydell Willis.

15.     Such process issue as is necessary to require the Watson Chapel School District to produce to petitioner's counsel, for inspection and copying, all records, memorandum, and/or papers in its possession concerning the policies of the School District relating to services for mentally retarded children from 1978 until present.

16. Such process issue as is necessary to require the Watson Chapel School District to produce to petitioner's counsel, for inspection and copying, all records, memorandum, and/or papers in its possession, including the minutes and/or recordings of School Board Meetings, concerning the investigation of complaints of racial discrimination involving the School District.

17. Such process issue as is necessary to require the Watson Chapel School District to produce to petitioner's counsel, for inspection and copying, all records, memorandum, and/or papers in its possession, including the minutes and/or recordings of School Board Meetings, concerning the investigation and disposition of a child related to Principal Steward bringing a weapon onto school grounds, as well as the investigation and disposition of similar conduct by other students within two years of the incident.

## GROUND FOR REVIEW FIVE

**PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO OBJECT TO THE TRIAL JUDGE'S DETERMINATION THAT HE WOULD MAKE THE REQUISITE FINDINGS CONCERNING MENTAL RETARDATION**

## GROUND FOR REVIEW SIX

**PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN ALLOWING A BREAKDOWN IN COMMUNICATION WITH THEIR MITIGATION SPECIALIST TO AFFECT THE DISCOVERY, INVESTIGATION AND PRESENTATION OF EVIDENCE AT TRIAL.**

In their written statements before this Court, trial counsel have indicated that their failure to object to the trial judge's determination that petitioner was not mentally retarded, was inadvertent, a mistake, and not the part of any reasonable trial strategy. The trial judge's action came as a surprise to counsel and the failure to object ultimately acted as a procedural default of petitioner's right to complain of the trial judge's determination. Not only was this determination contrary to the evidence, but also unsupported by any rule of procedure.

The Sec. 2255 motion, and the Government's response, demonstrate that trial counsel retained the services of an attorney, Annette Lamoreaux, to assist in the investigation and

preparation of mitigating evidence for presentation at petitioner's trial.[4] Lamoreaux is an attorney with specialized training in mitigation investigations in death penalty cases and was previously an attorney at the Texas Resource Center, a federally funded entity charged with representing capital defendants and providing resources to private attorneys who represented capital defendants. No other attorney or investigator on the defense team had Lamoreaux's experience and training in mitigation investigation and preparation.

Trial Counsel Larry Moore provided petitioner and the Government written statements. These statements demonstrate a disagreement between trial counsel and Lamoreaux which carried forth into the representation. Moreover, Lamoreaux's written statement demonstrates she had a basic disagreement with trial counsel over the manner in which a mitigation case should be investigated and presented. As is apparent from all the written statements on this issue, trial counsel and Lamoreaux disagreed over many different issues, including her billings for services This disagreement festered and grew to such an extent that, shortly before trial, trial counsel were unable to locate Lamoreax or her materials. Trial counsel attempted to complete the mitigation investigation using factual investigators, former law enforcement officers who were untrained in conducting mitigation investigations. Such circumstances denied petitioner and the jury relevant information concerning petitioner's moral culpability for the offense for which he was convicted.

---

[4] The importance of a mitigation specialist to the defense of a capital offense is demonstrated in the Supreme Court's opinion in *Williams v. Taylor*, 529 U.S. 362 (2000). In *Williams*, the Supreme Court specifically held that evidence of mitigation such as mental retardation, mistreatment, abuse and neglect, must be considered and that defense counsel are obligated to conduct a thorough investigation into such evidence, presenting that evidence favorable to the defendant. *Id.*, 529 U.S. at 396-397.

*Motion for Leave to Conduct Discovery*
*USA v. Webster*                                                                                    13

Through discovery, petitioner seeks to establish the volatile relationship between an attorney retained to investigate and prepare mitigating evidence and the trial attorneys and its effect on petitioner's trial. With relation to this claim, petitioner requests the following:

18. A deposition of Annette Lamoreaux be taken to determine the information and evidence she developed during her investigations, her relationship with trial counsel. how and why that relationship degenerated and what additional investigations could have been completed had the relationship with trial counsel not degenerated. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Annette Lamoreaux as is necessary to require her to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Annette Lamoreaux, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Annette Lamoreaux.

19. A deposition of Mr. Webster's trial attorneys, Larry Moore and Alan Butcher, to determine any reasons said attorneys failed to object to the trial judge's finding regarding mental retardation, said attorneys' relationship with Annette Lamoreaux, how and why that relationship degenerated, and the impact upon Mr. Webster's defense/mitigation case as a result of not having the retained mitigation specialist/attorney available prior to and during trial. If the Court denies this discovery request. petitioner respectfully requests that such process issue to Larry Moore and Alan Butcher, as is necessary to require them to produce for petitioner's counsel. for inspection and photocopying, all evidence relating to the matters described above. Moreover. if the Court denies petitioner's request for a deposition of Larry Moore and Alan Butcher, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Larry Moore and Alan Butcher.

20. The Government be required to produce to petitioner's counsel, for inspection and photocopying. the following information relative to these claims: any mitigating evidence in its files which questions the jury's verdict in any manner and was not presented during petitioner's trial; any communications its representatives had with the Court and/or petitioner's trial counsel regarding the procedures for determining mental retardation.

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

14

## GROUND FOR REVIEW SEVEN

## PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT THE JURY AN ACCURATE ASSESSMENT OF THE EXTREME ABUSE SUFFERED BY PETITIONER AS MITIGATING EVIDENCE.

In his seventh ground for review, petitioner contended there was extensive evidence of abuse which trial counsel either did not discover or did not produce for the jury. At least some of the evidence of abuse was available to counsel because Lamoreax's investigation documented a cycle of abuse within petitioner's family which existed for several generations, at least through petitioner's grandfather and great-grandfather. Petitioner's father was one of the worst abusers in this lineage. Various family members informed Lamoreaux that petitioner's father was easily provoked and very violent toward his children and his wife. These episodes involved beating, bleeding, drinking urine and bondage. Little of this evidence was documented or developed by trial counsel. The jury was denied full knowledge of its existence.

Through discovery petitioner seeks to establish the existence of strong and compelling mitigating evidence of abuse inflicted upon petitioner and his siblings. Petitioner seeks to demonstrate the environment in which he was raised and demonstrate that petitioner was entitled to hear evidence which was related to petitioner's moral blameworthiness for the crime for which he was convicted. Finally, petitioner seeks to establish the effect of the failure to present such evidence at trial. With relation to this claim, petitioner would request the following discovery:

21. The government be required to produce for petitioner's counsel, for inspection and photocopying, all evidence within its files, or at its disposal, concerning any physical, mental or sexual abuse suffered by petitioner or other members of his family.

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

15

22.     Such process issue as is necessary to compel the State of Arkansas, or its agencies, to produce to petitioner's counsel, for inspection and photocopying, any and all information regarding neglect, physical abuse, mental abuse, and/or sexual abuse occurring withing petitioner's immediate family, or involving a member of petitioner's immediate family.

23.     Such process issue as is necessary to compel the city of Pine Bluff, Arkansas, or its agencies, to produce to petitioner's counsel, for inspection and photocopying, any and all information regarding neglect, physical abuse, mental abuse, and/or sexual abuse occurring withing petitioner's immediate family, or involving a member of petitioner's immediate family.

24.     Such process issue as is necessary to compel the Watson Chapel School District, or its agencies, to produce to petitioner's counsel, for inspection and photocopying, any and all information regarding neglect, physical abuse, mental abuse, and/or sexual abuse occurring withing petitioner's immediate family, or involving a member of petitioner's immediate family.

25.     Such process issue as is necessary to any other governmental entity in or around Pine Bluff, Arkansas, or its agencies, to produce to petitioner's counsel, for inspection and photocopying, any and all information regarding neglect, physical abuse, mental abuse, and/or sexual abuse occurring withing petitioner's immediate family, or involving a member of petitioner's immediate family.

26.     A deposition of Mr. Webster's trial attorneys, Larry Moore and Alan Butcher, to determine the extent of their investigation of the neglect, physical abuse, mental abuse, and/or sexual abuse occurring withing petitioner's family or involving a member of petitioner's family. Said deposition will further address why counsel did not present evidence of such abuse to the jury during petitioner's trial. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Larry Moore and Alan Butcher, as is necessary to require them to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Larry Moore and Alan Butcher, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Larry Moore and Alan Butcher.

27.     A deposition of petitioner's siblings and his parents be taken to determine the existence, extent and results of any neglect, physical abuse, mental abuse and/or sexual abuse involving any member of petitioner's family. If the Court denies this discovery request, petitioner respectfully requests that such process issue to each member of petitioner's immediate family, his siblings and his parents, to produce for petitioner's counsel, for inspection and photocopying, all evidence

relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of petitioner's siblings and parents, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of petitioner's siblings and parents.

## GROUND FOR REVIEW EIGHT

### PETITIONER'S TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO PRESENT EVIDENCE OF PETITIONER'S SPECIAL TALENTS, MUSICAL ABILITIES, AND RELIGIOUS DEVOTION IN MITIGATION OF THE DEATH PENALTY.

In his eighth ground for review, petitioner contended his trial counsel erred in failing to inform the jury of petitioner's extensive musical talents, his devotion to Christianity and his religious training. Petitioner provided factual allegations concerning his musical performance background and his steadfast dedication to the study of Christianity. Through discovery, petitioner seeks to establish the existence of evidence which was: relevant to sentencing, mitigating, called for a sentence less than death, and was not presented to the jury. Moreover, appellant seeks to demonstrate harm. With respect to this claim, petitioner requests the following discovery:

28. The government be required to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to any special talent or religious devotion held by petitioner.

29. A deposition of Mr. Webster's trial attorneys, Larry Moore and Alan Butcher, to determine the extent of their investigation into petitioner's special talents and/or religious devotion. Said deposition will further address why counsel did not present evidence of such talents and religious devotion to the jury during petitioner's trial. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Larry Moore and Alan Butcher, as is necessary to require them to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Larry Moore and Alan

Butcher, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Larry Moore and Alan Butcher.

## GROUND FOR REVIEW TEN

PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE PRESENTATION OF UNTRUE AND DAMAGING TESTIMONY BY PETITIONER'S CO-DEFENDANT, STEVE BECKLEY.

## GROUND FOR REVIEW ELEVEN:

PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE PRESENTATION OF UNTRUE AND DAMAGING TESTIMONY BY PETITIONER'S CO-DEFENDANT, MARVIN HOLLOWAY.

In his Sec. 2255 motion, petitioner demonstrated that co-defendant Steven Beckley testified at petitioner's trial pursuant to an agreement with the government. Beckley's testimony was a cornerstone in the Government's case and was directly related to petitioner's alleged involvement in the kidnaping and subsequent murder of Lisa Rene. Beckley's testimony included: the identification of petitioner on the 911 tape yelling "this is the FBI"; testimony that petitioner actually abducted Lisa Rene and dragged her from the apartment; Petitioner raped Lisa Rene at least twice on the way to Pine Bluff Arkansas; Petitioner's statements that he knows a place where they can take Lisa Rene and burn her and "nobody will ever find her"; Petitioner statements that "the hole is dug"; Petitioner and Orlando Hall led Beckley and Lisa Rene to a burial site in Byrd Park where a grave had been dug; Petitioner striking Lisa Rene in the head with a shovel multiple times; Petitioner placing Lisa Rene in the grave; Petitioner

removing Lisa Rene's clothes; Petitioner pouring gasoline on Lisa Rene after she is placed in the grave; and. Petitioner and Orlando Hall are "talking and laughing" when Beckley returns to the grave site.

Co-defendant Marvin Holloway testified at Petitioner's trial pursuant to an agreement with the government. Although Holloway was not present during the kidnapping or murder of Lisa Rene, his testimony was directly related to Petitioner's alleged involvement in the kidnapping and subsequent murder of Lisa Rene. Among other things, Holloway's testimony included: Orlando Hall's statement that he wanted petitioner to be involved because he believed petitioner could "kill someone if it came down to it"; petitioner's statements that "we can handle these punk motherfuckers"; Beckley's statements that petitioner was "messing with [Lisa Rene] all night"; petitioner's statements to Orlando Hall that he knew plenty of places to kill Lisa Rene; and, statements by petitioner and Orlando Hall about killing Lisa Rene by different methods ... "either beat her to death, choke her or shoot her."

Petitioner learned that, after his trial, Beckley was being held in the Federal Correctional Institute in Ft. Worth, Texas. In the presence of Correctional Officer Ward and inmate Albert Williams. Beckley made statements to the effect that he lied under oath in the trial of Petitioner in order to garner favor with the government, avoid the death penalty, and procure a favorable sentence. Petitioner further learned that co-defendant Orlando Hall received a letter from Marvin Holloway wherein Holloway indicates that he owed petitioner an apology.

Through discovery, petitioner seeks to establish that the testimony of Steven Beckley and Marvin Holloway was not true and that both co-defendant's minimized their roles in order to avoid the death penalty in their cases. Moreover, petitioner believes such discovery will

establish that the theory upon which petitioner was prosecuted was not true, and that the major participants in this crime included the testifying co-defendants. Petitioner seeks to establish that his role in this offense, if any, was much more limited than that argued by the Government. Finally, petitioner would show the Court that he does not have the resources necessary to complete his investigation of these issues absent the discovery process and the provision of resources by the Court. Relevant to the above claims, petitioner requests leave to conduct the following discovery:

30. The Government be required to produce to petitioner's counsel, for inspection and photocopying, records from FCI Ft. Worth reflecting the full name, address and phone numbers of all correctional officers with the last name "Ward" who were employed at FCI Ft. Worth during the time periods Steven Beckley was incarcerated in that facility.

31. The Government be required to produce to petitioner's counsel, for inspection and photocopying, information from the Bureau of Prisons or other governmental agency, all information relevant to the location of inmate Albert Williams. In the event that inmate Albert Williams may no longer be within the BOP system, the Government should be required to produce all relevant identification information within its possession (Social Security Number, date of birth, last place of incarceration, employment, address while under Mandatory Supervision) so as to allow petitioner to locate and interview Williams.

32. The Government be required to produce to petitioner's counsel, for inspection and photocopying, all information within its possession, or at its disposal, regarding exculpatory or mitigating statements made by co-defendant Beckley during his incarceration at the federal facility in Fort Worth. Said production shall include any evidence that petitioner's role in this offense was limited or differed from that argued by the Government at petitioner's trial.

33. The Government be required to produce to petitioner's counsel, for inspection and photocopying, all information within its possession, or at its disposal, regarding exculpatory or mitigating statements made by co-defendant Holloway concerning Holloway's and petitioner's roles in the offense for which they were charged. Said production shall include any evidence that petitioner's role in this offense was limited or differed from that argued by the Government at petitioner's trial.

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

20

34.    A deposition of Officer Ward be taken, once his whereabouts are determined, to determine the existence and extent of any statements he overheard co-defendant Beckley make regarding petitioner, or the crime for which they both were charged, while incarcerated at the federal facility in Fort Worth.  If the Court denies this discovery request, petitioner respectfully requests that such process issue to Officer Ward to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above.  Moreover, if the Court denies petitioner's request for a deposition of Officer Ward, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Officer Ward.

35.    A deposition of Albert Williams be taken, once his whereabouts are determined, to determine the existence and extent of any statements he overheard co-defendant Beckley make regarding petitioner, or the crime for which they both were charged, while incarcerated at the federal facility in Fort Worth.  If the Court denies this discovery request, petitioner respectfully requests that such process issue to Albert Williams to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above.  Moreover, if the Court denies petitioner's request for a deposition of Albert Williams, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Albert Williams.

36.    A deposition be of Steven Beckley be taken, once his whereabouts are determined, to determine the existence and extent of any exculpatory and/or mitigating statements he made regarding petitioner, or the crime for which they both were charged, while incarcerated at the federal facility in Fort Worth.  If the Court denies this discovery request, petitioner respectfully requests that such process issue to Steven Beckley to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above.  Moreover, if the Court denies petitioner's request for a deposition of Steven Beckley, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Steven Beckley.

37.    A deposition of Marvin Holloway be taken, once his whereabouts are determined, to determine the existence, meaning and extent of any statements he made in a letter to co-defendant Orlando Hall, regarding the need for an apology to petitioner.  Said deposition will further explore the relative roles of all of the alleged participants in the instant offense.  If the Court denies this discovery request, petitioner respectfully requests that such process issue to Marvin

Holloway to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Marvin Holloway, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Marvin Holloway.

38. A deposition of co-defendant Orlando Hall be taken, to establish that he received the letter from Marvin Holloway which is attached to petitioner's Sec. 2255 Motion. If the Court denies this discovery request, petitioner respectfully requests that such process issue to Orlando Hall to produce for petitioner's counsel, for inspection and photocopying, all evidence relating to the matters described above. Moreover, if the Court denies petitioner's request for a deposition of Orlando Hall, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Orlando Hall.

39. The Government be required to produce for petitioner's counsel, for inspection and photocopying, all evidence in its possession regarding any letters received by co-defendant Orlando Hall from co-defendant Marvin Holloway.

## GROUND FOR REVIEW TWELVE:

### PETITIONER IS INELIGIBLE FOR EXECUTION BECAUSE HE IS MENTALLY RETARDED.

Petitioner's claim of mental retardation became a central focus of these proceedings even before trial, and continues to be so today. Petitioner's Sec. 2255 motion details evidence at trial as well as additional evidence which petitioner contends satisfies any reasonable definition of mental retardation. However, although 18 U.S.C. 3596(c) precludes the execution of a mentally retarded person, the statute does not define mental retardation. Moreover, the statute does not set forth the procedure for determining mental retardation. Petitioner presented expert testimony and evidence of his mental retardation. The Government sought to rebut evidence of mental retardation with the testimony of two experts who testified that, based upon their interviews,

testing, and observations, petitioner was not retarded. Additionally the Government presented testimony from employees of the Watson Chapel School District and Corrections officers concerning the "adaptive skills" of Petitioner, arguing such skills belied mental retardation. Evidence obtained since petitioner's conviction provided additional evidence of petitioner's low level of functioning and his adaptive skills, as well as the failure of the Watson Chapel School District to provide services to petitioner relating to his mental retardation. Moreover, petitioner has demonstrated a possible motive and/or explanation for the School District's failure to provide services.

Through discovery, petitioner seeks to establish that he is mentally retarded and is ineligible for execution. Petitioner has presented additional evidence from that presented at trial. Petitioner seeks to fully develop the factual basis for this claim through this discovery process. With relation to this ground for review petitioner requests the following:

40. The Government be required to produce to petitioner's counsel, for inspection and photocopying, any and all briefs, memos or position papers in possession of the Government which reflects the Government's position on what constitutes mental retardation or the appropriate definition for mental retardation. Petitioner asserts the above request is relevant in that any position concerning mental retardation held by the Justice Department prior to Petitioner's trial that is contrary to that promulgated at petitioner's trial should have been disclosed by the Government pursuant to the dictates of *Brady v. Maryland* and *Kyles v. Whitley*. Petitioner further asserts this request is not overbroad nor burdensome inasmuch as a request for such information could easily be placed on a Government e-mail system or "listserve" to determine the existence and availability of such documents.

41. The Government be required to produce to petitioner's counsel, for inspection and photocopying, any evidence in its possession which suggests petitioner is mentally retarded. Petitioner contends that such evidence should be produced regardless of when the Government obtained such evidence. i.e. before, during or after trial.

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

23

42. The Government be required to produce to petitioner's counsel, for inspection and photocopying, the names of all persons it consulted or interviewed regarding the existence (or not) of petitioner's mental retardation. Petitioner contends that such evidence should be produced regardless when the Government consulted such persons, i.e. before, during or after trial.

## GROUND FOR REVIEW THIRTEEN:

## THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE TRIAL JUDGE'S DETERMINATION THAT PETITIONER IS NOT MENTALLY RETARDED.

Petitioner would respectfully show this Court that the only *expert* testimony presented by the government concerning Petitioner's mental retardation was the testimony of Dr. George Parker and Dr. Richard Coons.[5] Parker's estimation of petitioner's full scale IQ (72) was fully within the range for a diagnosis for mental retardation pursuant to the DSM IV and the American Association on Mental retardation Manuel. Further, Parker admitted on cross-examination that he was not certified by the Texas Department of Mental Health and Mental Retardation to make a diagnosis of mental retardation.

Through discovery, petitioner seeks to establish the information available at the time of trial was sufficient to find appellant mentally retarded. Petitioner further seeks to develop facts which demonstrate the Government's experts were not able to accurately assess mental retardation. Finally, petitioner seeks to investigate the Government's experts ability, training, and experience in determining mental retardation. With regard to this claim, petitioner requests the following discovery:

---

[5] Dr. Parker performed an incomplete series of psychological tests, estimating petitioner's performance in crucial areas. while Dr. Coons only interviewed petitioner and reviewed various reports and tests of other Doctors, (including Parker's) school records, as well as statements of co-defendants. Neither expert interviewed anyone who knew petitioner outside the correctional setting.

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

24

43. Such process issue as is necessary to the State of Texas, any state agency, the Texas Medical Association, the Texas Board of Medical Examiners, and any State Board regulating psychologists, requiring the production to petitioner's counsel, for inspection and photocopying, of any documents reflecting any disciplinary action or complaints against Dr. Richard Coons within the past 10 years.

44. Such process issue as is necessary to the State of Texas, any state agency, the Texas Medical Association, the Texas Board of Medical Examiners, and any State Board regulating psychologists, requiring the production to petitioner's counsel, for inspection and photocopying, of any documents reflecting any disciplinary action or complaints against Dr. George Parker within the past 10 years.

45. The Government should be required to produce to petitioner's counsel, for inspection and photocopying, any and all records, reports, memos, notes or other documents of any kind in possession of the government that in any way reflect the opinions of mental health professionals or lay witnesses which would in any way rebut the testimony of Drs. Coons and Parker concerning mental retardation (or lack thereof).

46. The Government be required to produce to petitioner's counsel, for inspection and photocopying, the names of all persons it consulted or interviewed regarding the existence (or not) of petitioner's mental retardation. Petitioner contends that such evidence should be produced regardless of when the Government consulted such persons, i.e. before, during or after trial.

47. Such process issue as is necessary to Dr. Richard Coons, requiring the production to petitioner's counsel, for inspection and photocopying, of all documentary support of Dr. Coons training, experience, certification and ability to diagnose mental retardation.

48. Such process issue as is necessary to Dr. George Parker, requiring the production to petitioner's counsel, for inspection and photocopying, of all documentary support of Dr. Parker's training, experience, certification and ability to diagnose mental retardation.

49. A deposition of Dr. Richard Coons be taken, to establish that his training, experience, certification and ability to diagnose mental retardation. Said deposition will also include Dr. Coons' understanding of the definition of mental retardation. his understanding of the requisite procedures involved in the determination of mental retardation, and the actions he performed in the instant case. If the Court denies this discovery request, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255

motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Dr. Richard Coons.

50. A deposition of Dr. George Parker be taken, to establish his training, experience, certification and ability to diagnose mental retardation. Said deposition will also include Dr. Parker's understanding of the definition of mental retardation, his understanding of the requisite procedures involved in the determination of mental retardation, and the actions he performed in the instant case. If the Court denies this discovery request, petitioner respectfully requests the Court enter its order for an evidentiary hearing on petitioner's Sec. 2255 motion and allow petitioner the resources and such process as is necessary to require the attendance and testimony of Dr. George Parker.

## GROUND FOR REVIEW FIFTEEN

## 18 U.S.C. Sec. 3596 IS UNCONSTITUTIONALLY VAGUE AND VIOLATES PETITIONER'S RIGHTS TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS.

In his fifteenth ground for review. petitioner contended 18 U.S.C. Sec. 3596 was unconstitutionally vague because the statute does not set forth: who is to be the fact-finder regarding mental retardation; what burden of proof applies to mental retardation; and, what standards are to be utilized in defining mental retardation. The Government agrees: "There is no question but that section 3596(c) fails to set forth the procedure by which a determination of whether a defendant is mentally retarded is to be made." However, the Government argues this does not invalidate the statute. *Government's Response*, pg 46. With respect to this claim, petitioner requests the following discovery:

51. The Government be required to produce to petitioner's counsel, for inspection and photocopying. any and all briefs, memos or position papers in possession of the Government which reflects the Government's position on the procedures to be employed in establishing mental retardation, the lack of direction in 18 U.S.C. Sec. 3596. and the validity of 18 U.S.C. 3596. Petitioner asserts the above request is relevant in that any position proffered by the Justice Department that is contrary to that promulgated herein should be disclosed by the Government pursuant to the dictates of *Brady v. Maryland* and *Kyles v. Whitley.* Petitioner further asserts this request is not overbroad nor burdensome inasmuch as a

request for such information could easily be placed on a Government e-mail system or "listserve" to determine the existence and availability of such documents.

## GROUND FOR REVIEW SIXTEEN:

## BINDING INTERNATIONAL LAW FORBIDS PETITIONER'S EXECUTION BECAUSE PETITIONER IS MENTALLY RETARDED.

In his Sec. 2255 motion, petitioner contends his execution would violate International Law. The Government responds that petitioner has "failed to establish the existence of any international law which forbids the execution of mentally retarded persons." The Government further alleges that the authority provided are non-binding resolutions and requests.

As a result of the foregoing allegations and assertions by the Government, Petitioner requests the following discovery:

52.  Any and all documents. briefs, memos, papers or any other materials in the possession of the Government that reflects the position of the Department of Justice concerning the applicability and binding nature of International Law on the Courts of the United States in general and, specifically as it relates to the execution of the mentally retarded. Petitioner asserts the above request is relevant in that any position held by the Justice Department concerning the applicability of International Law to the Courts of the United States in general and specifically as it relates to the execution of the mentally retarded that is contrary to the position it has taken within this litigation must be disclosed by the Government pursuant to the dictates of *Brady v. Maryland* and *Kyles v. Whitley*. Petitioner further asserts this request is not overbroad nor burdensome inasmuch as a request for such information could easily be placed on a Government e-mail system or "listserve" to determine the existence and availability of such documents.

## III. CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons. Mr. Webster respectfully requests that the Court enter the attached proposed Order authorizing him to conduct discovery related to the claims contained in his § 2255 motion. If the Government alleges that any of the information Mr. Webster seeks via discovery is privileged and/or constitutes attorney work product, we further move the Court to

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

27

require the Government to produce that information for *in camera* inspection and review by the Court. If the Government submits any such material, we further move the Court to copy that material and maintain it in the record under seal for purposes of any subsequent appeal in this proceeding.

Respectfully Submitted,

**PHILIP WISCHKAEMPER**
SNUGGS & WISCHKAEMPER
State Bar No. 21802750
915 Texas Avenue
Lubbock, TX 79401
(806) 763-9900

**GARY TAYLOR**
State Bar No. 19691650
P.O. Box 90212
Austin, Texas 78709-0212
(512) 301-5100
(512) 301-5329 (fax)

## CERTIFICATE OF DELIVERY

I herein certify that a true and correct copy of the above and foregoing was delivered to the United States Attorney's Office in Fort Worth, Texas by United States Mail, Certified Mail, Return Receipt Requested.

_____
Date

_____
Gary Taylor

*Motion for Leave to Conduct Discovery*
*USA v. Webster*

28

Case 2:12-cv-00086-JPH-MJD   Document 42-6   Filed 07/09/14   Page 191 of 209 PageID #: 6253

# Wells Decl. Ex. Y

Case 2:12-cv-00086-WTL-WGH Document 15-4 Filed 04/30/12 Page 192 of 209 PageID #: 1508
Case 2:12-cv-00086-WTL-WGH Document 42-6 Filed 04/30/12 Page 192 of 209 PageID #: 3277

ORIGINAL

FILED

JUN 18 2002

CLERK, U.S. DISTRICT COURT
By_____
Deputy

NORTHERN DISTRICT OF TEXAS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER, | § | |
| | § | |
| Petitioner, | § | |
| | § | CIVIL NO. 4:00-CV-1646-Y |
| VS. | § | |
| | § | (Criminal No. 4:94-CR-121-Y) |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER
## DENYING PETITIONER'S MOTION FOR DISCOVERY

Petitioner Bruce Carneil Webster (Webster) is a federal prisoner under a death sentence who, having been being convicted of capital murder in this Court, is currently seeking habeas relief. In pursuing habeas relief through a motion to vacate his conviction and sentence under 28 U.S.C. § 2255, Webster filed a motion for discovery on April 30, 2001. The government filed a response opposing discovery on May 16, and Webster filed a reply on July 30.

In his motion for discovery, Webster makes fifty-two separate requests for discovery. These requests can be grouped into three different categories. In order to support claims that he was selectively prosecuted, that his trial counsel were ineffective, that the State presented false testimony at trial, and that his constitutional rights have been violated because he is mentally retarded, Webster seeks various information from the government, asks this Court to subpoena information from various Arkansas state and local entities, and asks this Court's permission to depose a number of witnesses. Having determined that these requests are

**EXHIBIT Y**



either without merit or are premature, this Court denies Webster's motion for discovery.

### *Applicable Law*

Under Rule 6(a) of the "Rules Governing Section 2255 Cases in the United States District Courts," a federal habeas petitioner may invoke the discovery process "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." *See* Fed. R. 6(a) Governing § 2255 Cases. Thus, a federal habeas petitioner, "unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). In order to determine whether a habeas petitioner is entitled to discovery, a federal court must first identify the "essential elements" of his claims for habeas relief for which he seeks discovery. *Id.* Then, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Id.* at 908-9, *citing Harris v. Nelson*, 394 U.S. 286, 300 (1969). Nevertheless, the Fifth Circuit has repeatedly stated that Rule 6 does not authorize fishing expeditions and that conclusory allegations are not enough to warrant discovery. *Rector v. Johnson*, 120 F.3d 551,

558 (5th Cir. 1997); *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir 1996); *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994).

## *Analysis*

### 1.  Selective-Prosecution Claim

In the first ground for relief in his § 2255 motion, Webster contends that the government violated his constitutional rights because it has used ethnicity as a basis for seeking the death penalty against African-Americans like himself. In an effort to support a claim that he was selectively prosecuted for the death penalty, Webster seeks case information from the United States government regarding every "death-penalty eligible" case since the inception of the federal death penalty; the identities and personal information of all persons recommended by U.S. Attorneys for a death penalty prosecution; all information relied on by the Justice Department in reaching its decisions to seek the death penalty; the resolution and disposition of every case for which the death penalty could have been sought; and any information in the government's possession relating to the investigation of racially discriminatory practices in the government's evaluation of possible death-penalty prosecutions, deciding to seek the death penalty, and prosecuting death-penalty cases.  Webster states that he needs all of this information in order to help prove his claim that the government sought the death penalty against him whereas the death penalty was

not sought against similarly situated non-African-American defendants.

As initial support for this claim, Webster points to a survey released by the United States Department of Justice in September of 2000, entitled "Survey of the Federal Death Penalty System (1988-2000)," a copy of which Webster has submitted as an exhibit with his initial § 2255 motion. (§ 2255 motion, ex. A) Webster argues that statistics included in this survey strongly imply that the federal government's decisions regarding who will face the death penalty are impermissibly influenced by the race of the defendants.

Webster raised this claim on direct appeal, and the Fifth Circuit, citing *United States v. Armstrong*, 517 U.S. 456 (1996), ruled that it was without merit. *United States v. Webster*, 162 F.3d 308, 334-35 (5th Cir.), *cert. denied*, 528 U.S. 829 (1999). In *United States v. Armstrong*, 517 U.S. 456 (1996), the Supreme Court addressed both the appropriate standard for establishing a selective-prosecution case and the appropriate standard for granting discovery when a selective-prosecution claim is made. In *Armstrong*, the Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their duties. The Court then went on to state that, in order to dispel this presumption and establish that he has been selectively prosecuted on the basis of his race, a criminal defendant must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. And, in order to

4

establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.* at 464-65. Applying this standard to the case at hand, the Fifth Circuit held that the statistics presented to that court on direct appeal showed neither a discriminatory purpose on the part of the government, nor a discriminatory effect. *Webster,* 162 F.3d at 334-35.

Webster nevertheless asserts that the justice department's survey, issued after the Fifth Circuit handed down its opinion on direct appeal, supplies evidence of selective prosecution warranting the discovery he seeks. This Court disagrees. As evidence that he is entitled to discovery, Webster points to the fact that, according to the federal survey, over eighty percent of cases considered for the death penalty in the relevant period involved a non-white defendant, only twenty-eight percent of cases approved for the death penalty involved white defendants, while over forty percent of cases where there was a plea bargain to a lesser sentence are cases in which the defendant was white. Finally, Webster points out that, as of September of 2000, African-Americans accounted for about two-thirds of the group of people under federal death sentences. But in *Armstrong* the Supreme Court stated that, because ordering discovery in a case in which a selective-prosecution claim is made imposes many costs on the government, in order to be entitled to discovery on such a claim, "some evidence" of the essential elements of the claim must be presented, including some evidence

5

that similarly situated individuals of another race have not been prosecuted. The Court then concluded that Armstrong's evidence that twenty-four black individuals had been prosecuted for dealing crack cocaine was not "some evidence" of a discriminatory impact because Armstrong identified no individuals who were not black and could have been prosecuted for dealing crack cocaine, but were not. *Id.* at 468-69.

While the Court in *Armstrong* was confronted with a pre-trial request for discovery, rather than a request made during the federal habeas process, this Court concludes that the analysis performed by the Supreme Court in that case, requiring "some evidence" of the elements of the claim before discovery is authorized, is sufficiently analogous to the "good cause" standard applicable in this case to be instructive to the Court in reaching a decision here. Webster has not presented the type of evidence that constitutes good cause for discovery. In *Armstrong*, the Supreme Court contrasted the evidence presented in that case with the evidence presented in *Underwood v. Hunter,* 471 U.S. 222 (1985). In *Hunter*, the Supreme Court invalidated an Alabama state law that provided for the disfranchisement of voters convicted of crimes against moral turpitude on the basis that the law violated the Equal Protection clause. In *Hunter*, however, there was direct evidence presented that the state law was originally intended to discriminate against blacks when it was enacted in 1901 *and* that blacks were 1.7 times more likely to suffer disfranchisement. *Id.* at 227, 229-233.

6

While Webster has arguably presented some statistical evidence that there has been a disparate effect on African-Americans, Webster has presented no evidence that there were *similarly situated* non-African-American defendants against whom the death penalty was not sought. Furthermore, Webster has failed to present any evidence, implied or otherwise, that there has been any discriminatory intent when prosecutors have asked for permission to seek the death penalty against African-American individuals or when the Department of Justice has authorized the death penalty in cases against African-American defendants. Accordingly, following the reasoning in *Armstrong*, Webster's statistical presentation is not sufficient to constitute "some evidence" of both elements of his claim of selective prosecution.

This Court also notes that recently the Fifth Circuit held that the statistics contained in the Department of Justice report were insufficient to support a claim of selective prosecution under the test set forth in *Armstrong*. *See United States v. Jones*, 287 F.3d 325 (5th Cir. 2000). While this Court recognizes that in *Jones* the Fifth Circuit was ruling on a constitutional claim rather than a request for discovery, the Fifth Circuit's decisions in both *Jones* and *Webster* are strong indicators that, based upon the evidence presented to this Court, Webster has failed to show reason to believe that, were discovery granted on this issue, he would be able to demonstrate that he is entitled to relief.

7

In reaching this decision, this Court is aware that the Sixth Circuit has recently issued an opinion in which it held that a district court did not abuse its discretion in granting pre-trial discovery on an identical claim supported by similar evidence because the evidence was "some evidence" not only of discriminatory effect but of discriminatory intent. *See United States v. Bass*, 266 F.3d 532 (6th Cir. 2001). As the Sixth Circuit noted, however, "the relevant inquiry [for its review] is not how the reviewing judges would have ruled if they had been considering the case in the first place, but rather, whether any reasonable person could agree with the district court." *Bass* at 536. The Sixth Circuit's 2-1 opinion held that a reasonable person could agree with the district court, not that every reasonable person would. This Court respectively disagrees with that Court's analysis of the statistics presented to it and finds Judge Nelson's dissent persuasive. Moreover, while not commenting on its evidentiary value, this Court notes that the Court in *Bass* was also provided additional evidence not provided to this Court regarding the ethnic make-up of non-capital federal offenders that it used as support for its finding that there was some evidence of discriminatory intent. *Id.* at 539. Because this Court concludes that Webster has not met the standard set forth in *Armstrong* for discovery on this issue, this Court concludes that Webster has failed to establish good cause for habeas discovery on this issue, as well.

## 2. Ineffective-Assistance Claims

In his § 2255 petition, Webster also asserts that his trial counsel were ineffective in several respects. Specifically, Webster contends that his trial counsel were ineffective for: failing to present, as additional mitigating evidence, more testimony regarding his mental retardation, accurate evidence regarding the abuse Webster suffered as a child, evidence of Webster's musical abilities and religious devotion, evidence of a racial bias in the school system for the area in Arkansas where Webster grew up, and evidence that this racial bias resulted in Webster's not being placed in special education classes as additional mitigating evidence; failing to object to the trial court's determination that the court would make the required factual findings regarding Webster's mental retardation or lack thereof; and allowing a breakdown in communication with their mitigation specialist to affect the investigation and presentation of evidence. In an effort to support these claims of ineffective assistance of counsel, Webster requests that the government be required to produce any mitigating evidence in its possession, including evidence that suggests that Webster might be mentally retarded, evidence that the Watson Chapel School District used racially discriminatory practices, evidence of any physical, mental, or sexual abuse of Webster, and evidence of any special talents or religious devotion Webster might have. Webster also requests that this Court subpoena the Watson Chapel School District for all of its records regarding mental retardation, complaints of racial

9

discrimination, incidents of students bringing guns to school, and information about any abuse or neglect within Webster's family; and subpoena the State of Arkansas, the City of Pine Bluff, Arkansas, and any other relevant Arkansas government entity for any records of neglect or abuse in Webster's family. Finally, Webster asks that this Court permit him to depose numerous witnesses, including employees of the Watson Chapel School District, Webster's trial attorneys, the defense mitigation specialist, and members of Webster's family. In lieu of these depositions, Webster requests that this Court conduct an evidentiary hearing at which these people would testify.

With regard to Webster's request that the government produce any mitigating evidence in its possession, under *Brady v. Maryland*, 373 U.S. 83 (1963), it is a violation of a criminal defendant's due-process rights for the prosecution to suppress evidence that is material to either guilt or punishment. Accordingly, the government's duty to disclose *Brady* material includes mitigating evidence. In the instant case, the government has the continuing duty to produce material mitigating evidence in its possession, unavailable to Webster, such as evidence it might possess that is mitigating, including evidence indicating that Webster is mentally retarded. Because the government has the duty to disclose such evidence, there is no need for this Court to order the discovery of exculpatory or mitigating evidence. The Court does note, however, that the government has no duty to produce evidence or information

10

that is already known to the defendant or that he could have obtained from other sources by exercising reasonable diligence. *Brown v. Cain,* 104 F.3d 744, 750 (5th Cir. 1997). Thus, the government has no duty to produce evidence of any abuse in Webster's past, his special talents, or his religious devotion, as this is evidence about which Webster himself would be aware.

With regard to Webster's request that this Court subpoena numerous Arkansas state agencies in an attempt to obtain numerous documents about possible abuse in Webster's family, this extremely broad discovery request, with no evidence presented by Webster that any such records exist, is the very type of fishing expedition that is prohibited. Moreover, Webster's claim is that his counsel were ineffective for failing to present certain evidence. Webster has failed even to allege, much less present evidence, that, should such subpoenas issue, he might be able to prevail on a claim that his trial counsel were ineffective for failing to uncover documents that are evidently unknown even to Webster. Accordingly, Webster has failed to show good cause for subpoenaing these records, and this request is therefore denied.

Webster further requests that this Court permit him to subpoena the Watson Chapel School District, the district in which Webster was educated, for numerous documents regarding its history of racial discrimination in an effort to support his claim that his attorneys were ineffective for failing to present evidence that the school district operated under racially discriminatory practices. With

11

his initial § 2255 petitioner, however, Webster submitted an opinion and an order from a federal district court in the Eastern District of Arkansas, dated November 16, 1970, and February 6, 1971, respectively. Pursuant to a suit by the federal government against, among others, the Watson Chapel School District, the federal district court ruled that that school district operated a segregated school system and ordered that a plan submitted by the Department of Health, Education, and Welfare be adopted by the school district in order to desegregate the school system. (Petition, attachments B & C) Webster also submitted as an exhibit a report from the Watson Chapel School District to the federal district court filed on October 27, 1989, pursuant to the previous order, and an order from the district court in 1991 suspending its previous requirement that the Watson Chapel School District submit yearly reports regarding its desegregation plan. (attachments D & E). The Court concludes that this information already submitted by Webster is sufficiently developed to support his claim that trial counsel were ineffective for failing to present evidence of the racial bias of the school system. Furthermore, Webster's request to subpoena voluminous records from the school district is overly broad and that Webster has failed to present the Court with any evidence that school district documents, to the extent that they exist, would have been available to trial counsel. Accordingly, the Court concludes that Webster has failed to show that, if these documents were produced, he may be entitled to relief as a result.

12

Finally, Webster requests that he be allowed to depose several individuals in order to further develop his ineffective assistance of counsel claim in furtherance of filing an amended § 2255 motion or, in the alternative, that he be permitted to question these individuals in an evidentiary hearing. With respect to Webster's request that he be allowed to depose the defense mitigation specialist and Webster's trial attorneys, this Court notes that Webster had submitted an affidavit from the mitigation specialist with his initial § 2255 motion and the government has submitted an affidavit from his two trial attorneys with their response to Webster's § 2255 motion. The Court concludes therefore that there is no need to depose these three individuals in order to further develop the ineffective assistance of counsel claims for purposes of filing an amended petition. Webster also requests that he be permitted to depose his siblings and parents regarding abuse in the household. At Webster's trial, however, his siblings, his mother, and his aunt testified about the extreme abuse suffered by the children at the hands of their father. Because trial counsel presented this testimony at trial, Webster has not shown why it is necessary to depose these same individuals in an effort to support his ineffective assistance of counsel claim. With respect to Petitioner's request to depose several former or current employees of the Watson Chapel School District in order to support his claim that trial counsel were deficient for not presenting evidence that the school system had a racial bias, such as the school counselor

13

who testified at his trial, and two teachers from the district, this Court concludes that there is no need to depose these individuals in order to further support an amended petition as an affidavit from an investigator outlining the information they could provide has been submitted by Webster and the government has submitted an affidavit from his trial attorneys responding in detail to each of Webster's ineffective assistance of counsel claims. Accordingly, Webster's requests for discovery with respect to his claims of ineffective assistance of counsel are denied.

### 3. False-Testimony Claims

In his tenth and eleventh ground for relief, Webster argues that his due-process rights were violated when the government presented the "untrue and damaging" testimony of two of his co-defendants, Steve Beckley and Marvin Holloway. To support these grounds, Webster asks that the government be required to produce any exculpatory or mitigating statements made by Beckley or Holloway, all information regarding any letters received by co-defendant Orlando Hall from Holloway, and certain information about persons employed by and incarcerated by the Federal Correctional Institute in Fort Worth. Moreover, Webster seeks permission to depose Beckley, Holloway, and Hall, among others, or in the alternative that these people be called as witnesses in an evidentiary hearing. Webster asserts that this discovery will enable him to prove that the testimony that Beckley and Holloway gave at trial was untrue because

14

they minimized their roles in order to avoid the death penalty and that therefore the theory under which Webster was prosecuted was not true because Beckley and Holloway were, contrary to their testimony, actually major participants in the crime.

With regard to Webster's request that the government turn over any exculpatory or mitigating statements made by Beckley or Holloway, as noted earlier, the government is under a continuing duty to produce such statements if they are known to the government, and this Court need not order any additional discovery regarding them.

With regard to Webster's request for permission to depose certain people and Webster's request that the government produce information about certain unknown persons who either work for or are incarcerated by the federal government, this Court concludes that Webster has failed to establish good cause for this requested discovery.    In his § 2255 motion, Webster states that, "[i]rrespective of whether the government had knowledge of the untruthful testimony of Holloway or Beckley, [Webster's] right to due process under the Fifth and Fourteenth Amendments to the United States Constitution was violated by Holloway and Beckley's untruthful testimony." (§ 2255 motion at 49.)  Contrary to this assertion, in order to prevail on a claim that his constitutional rights were violated by the presentation of false testimony, Webster must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false. *See Napue v. Illinois*, 360 U.S. 264, 271 (1959).    Thus, while

15

conclusory allegations are not enough to warrant discovery, Webster has failed even to allege that the government knew that any testimony given by Holloway or Beckley was false, much less present specific allegations before this Court that would show any reason to believe that, if the facts were fully developed, Webster may be able to demonstrate that he is entitled to relief. Accordingly, Webster has failed to show good cause for his request for depositions or his request that the government produce information about certain inmates and employees of the federal prison system. The Court denies Webster's discovery requests with respect to these claims.

## 4. Claims Regarding Mental Retardation

In his twelfth, thirteenth, fifteenth, and sixteenth grounds for relief in his motion to vacate his conviction and sentence, Webster asserts that: he is ineligible for execution under 18 U.S.C. § 3596(c) because he is mentally retarded; the evidence presented at trial was insufficient to support this Court's determination that Webster is not mentally retarded; 18 U.S.C. § 3596(c) is unconstitutionally vague; and binding international law prohibits Webster's execution because he is mentally retarded. In an effort to support these claims, Webster seeks to have the government produce the following information: all records in its possession regarding its position on what constitutes mental retardation; any evidence in its possession that suggests that Webster is not mentally retarded; the names of people the government consulted in this case on the

16

issue of mental retardation; all records that would rebut the expert witnesses on mental retardation who testified for the government at trial; all records regarding the government's position on the proper procedures to be taken under 18 U.S.C. § 3596, as well as the validity of the statute; and all records reflecting the government's position on the applicability of international law on the issue of the execution of the mentally retarded. Webster also seeks to subpoena the State of Texas and any relevant state agency for any records reflecting any disciplinary actions or complaints about the government's mental health experts and seeks to subpoena the experts for records documenting their training and experience. And, Webster seeks permission to either depose both of the mental health experts who testified for the government at trial or have them testify at an evidentiary hearing.

The Court initially notes that, on direct appeal, the Fifth Circuit held that the finding made by this Court that Webster is not mentally retarded and is therefore not exempt from execution under 18 U.S.C. § 3596(c) was properly made and was supported by the evidence. *See Webster*, 162 F.3d at 352-353. Given that Webster did not prevail on direct appeal with regard to two of the four claims he raises here, Webster has not presented to this Court any evidence that, if the discovery he seeks was granted, he may prevail either on a claim that he is ineligible to be executed because he is mentally retarded or that the evidence presented at trial was insufficient to support the finding that he is not mentally retarded.

17

Moreover, Webster has not shown why any discovery is necessary for him to fully explore his claim that 18 U.S.C. § 3596 is unconstitutionally vague or his claim that his execution would violate international law. Accordingly, Webster has failed to establish good cause for discovery on these claims, and it is therefore denied.[1]

Webster has also requested that he be granted an evidentiary hearing during which he be allowed to call several people as witnesses. This Court in an order dated April 4, 2001, granted Webster leave to file an amended § 2255 petition sixty days after the Court ruled on his motion for discovery. Therefore, any decision regarding the need an evidentiary hearing before any amended petition and response are filed would be premature.

As Webster has failed to establish good cause for discovery, his motion for discovery seeking records and permission to take depositions is **DENIED**.

SIGNED June __18__, 2002.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/eb:be

---

[1] As noted earlier, the government is under a continuing duty under *Brady v. Maryland* to produce any evidence that is material to either guilt or punishment. Evidence in the government's possession that Webster is mentally retarded would, as noted earlier, be *Brady* material, and it is therefore unnecessary for this Court to order discovery of such evidence, if it exists.

18