# EXHIBIT 4

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN   DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA        .   CRIMINAL ACTION NO.
                                .       4:94-CR-121-Y
V.                              .
                                .  Fort Worth, Texas
BRUCE CARNEIL WEBSTER            .   June 12, 1996
. . . . . . . . . . . . . . .

VOLUME 23
TRANSCRIPT OF THE TRIAL
BEFORE THE HONORABLE TERRY R. MEANS,
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:            MR. RICHARD B. ROPER
                               MR. PAUL D. MACALUSO
                               MR. CHRISTOPHER CURTIS
                               Assistant United States Attorney
                               801 Cherry Street, Suite 1700
                               Fort Worth, Texas   76102-6897
                               (817) 978-3291

For the Defendant:             MR. LARRY M. MOORE
                               Attorney at Law
                               1112-A East First Street
                               Fort Worth, Texas   76102
                               (817) 338-4800

                               MR. ALLAN K. BUTCHER
                               Hill, Beatty, Butcher
                                 & Gallagher
                               201 Main Street, Suite 1300
                               Fort Worth, Texas   76102
                               (817) 336-3600

Court Reporter:                Ana P. Warren
                               U.S. District Court Reporter
                               501 W. 10th Street, Room 204B
                               Fort Worth, Texas   76102-3637
                               (817) 335-3050

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

U.S. DISTRICT COURT

EXHIBIT 4

Cross - Macaluso/Finn                209

have examined Mr. Webster, are you not?

A.  Yes, I am.

Q.  Have you had the opportunity to review any of the findings of the other doctors?

A.  Yes, I have.

Q.  Do any of them suggest for a moment that he was suffering from any kind of mental illness?

A.  I don't believe any of them do, no.

Q.  We're talking, what, three or four or five doctors?

A.  Something like that, yes.

Q.  So there we are.   He's competent and he's not mentally ill. What were the other things you are looking for now that he's competent and he's not mentally ill or insane?

A.  Well, one would be, how does he function intellectually and is there a question of his being mentally retarded, and in general, are there any other kinds of emotional or psychological problems that this individual has that would have any kind of bearing on why they did what they did or how culpable they would be for --

Q.  And --

A.  -- their behavior.

Q.  I'm sorry.   I talked over you, Doctor.

A.  I kind of stop and start.   I beg your pardon.   I didn't mean to interrupt you.

Q.  I don't mean to be repetitious, but you had the statements,

U.S. DISTRICT COURT

EXHIBIT 4

Cross - Macaluso/Finn                    210

and you had the information from the Southeast Arkansas Mental

Health Center; is that correct?

A.  Yes.   That's what I had before I went to see him.

Q.  What else did you have, other than those documents?

A.  Before I went to see him, that was all.

Q.  So then you sit down and you talk to him?

A.  Yes.

Q.  He talked to you, didn't he?

A.  Yes.

Q.  Did you have any difficulty understanding him at all?

A.  I have already mentioned that I had a little bit of

difficulty in the sense that his speech is very concrete.   He

tends not to be able to abstract very well to form conclusions

or judgments.   But other than that, he was understandable.

Q.  And then you said you became aware of -- I'll hyphenate it,

I guess.   It's W-A-I-S dash R test, that had been administered

by the people up in Arkansas back in 1992?

A.  Yes.

Q.  And you have looked at the results of that, and I believe

you said he scored a 48 I.Q. on that, is that correct, Doctor,

overall?

A.  That's what's reported here, yes.

Q.  Doctor, are you aware of the circumstances under which that

test was administered?

A.  Well, only what was represented in these records.   My

U.S. DISTRICT COURT

EXHIBIT 4

Cross - Macaluso/Finn                    211

understanding is that he came there as a voluntary patient and

that he was, in fact, somewhat agitated and upset.

Q.   Agitated in what sense, Doctor?

A.   Thinking people were following him, having what I would

describe as paranoid kinds of thoughts, being somewhat anxious

and depressed.

Q.   He scored rather low on that, didn't he?

A.   Yes, he did.

Q.   Let me ask you just as a general proposition, because we

will be talking about this test more.   There are a number of

factors that you must take into consideration in the

administering of one of those tests, aren't there?

A.   Yes.

Q.   Not the least of which would be the educational achievement

level of the individual?

A.   Well, to some extent, yes.

Q.   Why don't you just tell us, then, if you would, what are

the factors that you necessarily have to take into

consideration that might affect a low score?

A.   Well, obviously, the person's intelligence is one factor.

Cultural factors can make some difference.   If the person,

let's say, grows up in a cultural background that's really

radically different from a standard American upbringing, that

can have some effect.   What language is spoken in the home.

Children who grow up in bilingual homes tend to not do as well

U.S. DISTRICT COURT

EXHIBIT 4

Cross - Macaluso/Finn                212

on tests that are given only in English, for example.

Racial ethnic membership can make a difference.    There is some evidence that minority group members don't score as high on these tests as whites do.   The person's motivation, what is kind of their mental state at the time, and what are their motivations for taking the test.   So those are all things that can have some bearing.

Q.   Motivation.   In that regard, Doctor, let me ask you.   I want to touch on one thing you mentioned about -- I believe you said that in Texas, at least, if you score low enough on one of these tests, you're eligible for certain types of benefits?

A.   Well, you're eligible for certain kinds of educational services from public school systems.

Q.   Are you also eligible for certain types of financial benefits?

A.   Not automatically, no, and not just because of the scores, as far as I know.

Q.   Would that be a part of an application, for example, for either social security benefits or some other state benefits here in this state?

A.   Mental retardation can be a grounds for awarding those kinds of benefits, yes.

Q.   Okay.   Did the defendant tell you anything about, after having taken the W-A-I-S-R test in which he scored a 48, about going with his mother to apply for certain benefits -- I don't

U.S. DISTRICT COURT

EXHIBIT 4

Cross - Macaluso/Finn                 213

know if it's food stamps or whatever the case may be, but some sort of financial benefits from the State of Arkansas?

A.   I don't recall him telling me that.

Q.   He didn't tell you that, did he?

A.   I don't believe he did, no.

Q.   Let me ask you, sir.   Would that be a factor that you might want to take into consideration in deciding about the motivation for the score that he scored up there in Arkansas?

A.   It could, yes.

Q.   You didn't know that, though, did you?

A.   No.

Q.   Now, Doctor, with regard to the evaluation, that is the one that you have before you there that was completed by R. V. Benz and signed by Patrick Caffey, Ph.D.   There is no mention about mental retardation in there, is there?

A.   Well, not exactly.   There is a sentence that says, Mr. Webster is presently functioning within the mild-to-moderate range of intellectual and cognitive abilities. And I think what they meant by that is that he is mildly retarded, but it doesn't say that exactly, no.

Q.   It just simply does not use the word "retardation" anywhere in that two-page document, does it?

A.   No, it doesn't.

Q.   And, in fact, if you go on to the second page of that, the second document, Dr. Finn, the one that's authored by Jeffrey

U.S. DISTRICT COURT

EXHIBIT 4

Cross - Macaluso/Finn                214

Yates and signed by Dr. James, the medical director there, he

has a psychiatric evaluation, doesn't he, sir?

A.   Yes.

Q.   What's his conclusion in a nutshell, Doctor?

A.   Basically, that Mr. Webster has an antisocial personality

and possible schizophrenia with paranoid ideation, that is,

again, these ideas of suspiciousness and feelings of being

followed.

Q.   He says antisocial personality disorder?

A.   Yes.

Q.   Can you acquaint the members of the jury, please, in as

simple terms as you possibly can -- at least for me in as

simple terms as you possibly can -- what that really is, an

antisocial personality disorder that the defendant was

diagnosed as having or being back in 1992?

A.   Well, I don't remember all the criteria, but it's,

basically -- the way you get it is by having a history of

antisocial behavior, usually starting in the teenage -- in

adolescence.   So it's repeated antisocial acts beginning in

adolescence.

Q.   Doctor, let me go off on a tangent here for a second, which

I should have done earlier.   You made reference earlier, on

your direct examination, to a document, or a treatise.   I think

I have got it here.   You recognize this, don't you?

A.   Yes, I do.

U.S. DISTRICT COURT

EXHIBIT 4