UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,

Petitioner,

vs.                                             CAUSE NO. 2:12-cv-86-WTL-MJD
                                                Judge William T. Lawrence

CHARLES LOCKETT,

Respondent.

**PETITIONER'S MEMORANDUM IN SUPPORT OF HIS MOTION TO ISSUE A
SUBPOENA TO THE SOCIAL SECURITY ADMINISTRATION**

## I.      INTRODUCTION

Pursuant to this Court's Entries Regarding Status Conference dated February 12,

2016 (Dkt. No. 62) and December 27, 2017 (Dkt. No. 75), Petitioner Bruce Carneil

Webster respectfully submits this brief in support of his Motion to Issue a Subpoena to

the Social Security Administration (the "SSA" or the "Agency").

Webster has been attempting to obtain relevant documents and testimony from the

SSA for more than 18 months.  Webster seeks information relating to four categories,

which are narrowly tailored in time and in scope to obtain information relevant to the

specific facts of this case: (1) Webster's 1993 application for benefits from the SSA; (2)

requests for Webster's SSA records at the time of his 1996 trial, in particular by

Webster's trial counsel and the Government; (3) requests by undersigned counsel and the

Government for Webster's SSA records starting in 2008; and (4) the creation,

maintenance, production, and destruction of Webster's records.  Copies of the proposed

attachment to a Subpoena to Testify at a Deposition in a Civil Action, setting forth the deposition topics, and the proposed attachment to a Subpoena to Produce Documents, Information, or Objects, setting forth the documents to be produced, are attached as Exhibits A and B to Webster's Motion.

This information is highly relevant to Webster's Petition challenging the constitutionality of his death sentence. As discussed in more detail below, this information is directly related to the threshold issues before the Court—whether SSA records were available at the time of Webster's trial, and whether his trial counsel exercised appropriate diligence. It may also provide additional information regarding Webster's medical testing and diagnosis since Webster has strong reason to believe that portions of his claims record were never produced. The SSA has failed to provide relevant information that currently exists in its files, and has refused to provide any testimony relating to its actions in creating, maintaining, producing, and destroying Webster's files.

The Federal Rules of Civil Procedure afford Webster the right to access his records and obtain related documents and testimony. Webster therefore requests that this Court issue a subpoena requiring the SSA to provide the requested documents and testimony.

## II. THE SSA HAS FAILED TO COMPLY WITH ITS OBLIGATIONS TO PRODUCE WEBSTER'S DOCUMENTS

### A. The SSA Produces Previously Undisclosed Records Establishing that Webster is Intellectually Disabled

Webster was convicted and sentenced to death in 1996. *Webster v. Daniels*, 784 F.3d 1123, 1127 (7th Cir. 2015) (*en banc*). During the sentencing phase of his trial, Webster asserted that he was mentally retarded and ineligible for the death penalty. *Id.* The Government vehemently opposed this position, and both sides presented testimony from multiple expert witnesses regarding Webster's intellectual functioning. *Id.* at 1130. Among other things, the Government argued that Webster was motivated to perform poorly on IQ tests administered by trial experts in order to avoid the death penalty. *Id.* In preparing for trial, Webster's trial team submitted a request for records to the SSA, but nothing was produced. *Id.* at 1132-33. Webster was ultimately sentenced to death. *Id.* at 1127.

However, in 2008, more than a decade after Webster's criminal trial, Dorsey & Whitney LLP ("Dorsey"), as newly retained counsel for Webster, submitted a request to the SSA for all files related to Webster. Declaration of Kirsten Schubert ("Schubert Decl.") Ex. A at 25-27[1]. In response, a yet-unnamed representative from the SSA's Pine Bluff Field Office produced a set of records from 1993 showing that Webster is mentally retarded (the "SSA Evidence"). These records are attached as Exhibit A at 65-134. These records, which appeared on their face to be a subset of a larger file, showed that

---

[1] For the convenience of the Court, Webster has inserted pagination on the lower right-hand corner of Schubert Decl. Ex. A; page number citations refer to this pagination.

Webster applied for Social Security benefits in 1993, before the crime at issue. *Webster*, 784 F.3d at 1133. These files contain medical records from three doctors working on behalf of the SSA who evaluated Webster in connection with his claim; all three doctors diagnosed him as mentally retarded; two of these doctors concluded that Webster's IQ measured below 70; and one specifically noted that Webster did not exhibit signs of malingering. *Id.* These records also contain myriad evidence of Webster's adaptive deficits, including evidence that Webster had been enrolled in special education classes in grade school (a fact that was contested at trial). *Id.* at 1134.

The importance of this evidence cannot be overstated. One federal circuit court judge, upon reviewing the records, concluded that if the records "were ever presented to a judge or jury for consideration, it is virtually guaranteed that he would be found to be mentally retarded." *In re Webster*, 605 F.3d 256, 259 (5th Cir. 2010) (J. Wiener, concurring). Had the SSA produced the records as required in 1996, Webster would not be on death row today because they directly undercut the Government's argument at trial – that Webster was faking tests for intellectual disability to avoid the death penalty.

Because the SSA Evidence appeared to be an incomplete set of records, Webster, through his habeas counsel Dorsey, submitted another letter to the SSA requesting the omitted documents on October 8, 2009. Schubert Decl. Ex. A at 29-34. This letter noted that some of the records that were referenced in the SSA Evidence were never produced. Dorsey provided a list of the specific documents believed to be missing. Again, this request specifically stated that Webster "is currently on death row and faces an execution date." *Id.* at 30.

On October 15, 2009, a representative from Dorsey had a telephone conversation with a representative from the Pine Bluff Field Office. The SSA informed Dorsey that normal procedures were not followed when the SSA Evidence was sent, and that the person who copied and sent the records had retired. The representative from the Pine Bluff Field Office stated that the SSA could not provide any more records in response to the request that was submitted. *Id.* at 13 ¶ 9.

Following that telephone conference, on October 22, 2009, the SSA sent an unsigned letter to Dorsey confirming the October 15, 2009 discussion and formally rejecting Webster's request. The letter stated that the SSA was "returning your request for a copy of our records because the consent you provided does not meet our requirements." Although Dorsey's letter specifically listed the records that Dorsey recognized as missing from Webster's files, the SSA objected that it was "a blanket request." The SSA also stated that the Pine Bluff office "does not service the area that the claimant lives in." *Id.* at 36-38.

On November 23, 2009, Dorsey sent another letter to the SSA. *Id.* at 40-45. In accordance with the Pine Bluff Field Office's instructions, this letter was addressed to the Terre Haute Field Office, the city in which Webster currently resides, and contained a new consent form which specifically listed the set of records that Dorsey believed to be missing.

On December 7, 2009, Dorsey received a letter signed by Brian Hewitt, Field Office Manager of the Terre Haute SSA office, stating: "You requested information about Bruce Webster. Our record showed that his folder has been destroyed and the last

5

benefit stop [sic] in May of 1991.  We can tell you that his name, date of birth and his social security number does match our records."  *Id.* at 47-53.

**B.      The SSA Refuses to Provide Relevant Documents and Testimony to Webster Through the *Touhy* Process**

Webster's SSA records are at the center of his Petition.  Webster contends that the SSA Evidence produced in 2009 proves that he is intellectually disabled and cannot be executed.  The United States government opposes the Petition, arguing that Webster's trial counsel lacked diligence in attempting to obtain these records from the SSA before Webster's trial.

This Court is tasked with determining whether Social Security records were "unavailable to Webster and his counsel at the time of trial.  In considering that question, the district court must also evaluate trial counsel's diligence."  *Webster*, 784 F.3d at 1146.  Should the Court conclude his records were unavailable despite reasonable diligence on the part of trial counsel, the Court will turn to the question of Webster's intellectual disability and his eligibility for the death penalty.

On February 12, 2016, the Court entered an order permitting Webster to conduct discovery from the SSA.  (Dkt. No. 62.)  In accordance with this Court's direction, Webster initiated his discovery requests through the SSA's *Touhy* process, 20 C.F.R. § 403.100 *et seq*.  In a series of seven letters and emails between April 19, 2016 and November 29, 2017, Webster made repeated requests for records, information, and testimony from the SSA relating to his application for benefits in 1993, requests made for his SSA files at or near the time of his criminal trial, requests made for his records from

2008 to the present, and the maintenance and destruction of his records. This included

documents and testimony relating to:

(1) evaluations, testing, determinations, claims, and all other documents related to Webster's 1993 request for SSA benefits;

(2) all requests for Webster's records at or near the time of his 1996 trial, and the SSA's response;

(3) all requests for Webster's records from 2008 to the present, and the SSA's response;

(4) SSA's communications with representatives for Webster or the United States Attorney's Office relating to Webster or his case;

(5) all documents and information provided to Webster or to the United States Attorney's Office regarding Webster or his case;

(6) records or information sufficient to identify SSA representatives who responded to requests for information relating to Webster's files, including the individuals who produced the SSA Evidence in 2009, destroyed Webster's files, and communicated with the United States Attorney's Office regarding Webster or his case;

(7) the handling of Webster's records or requests for those records, including the nature and circumstances of the SSA's response to requests for records, the SSA's production of records, and the SSA's maintenance and destruction of records; and

(8)     regulations, policies, and procedures regarding the creation, maintenance, production, handling, and destruction of Webster's records, or re including any requests for or communications relating to his records.

*See* Schubert Decl. Ex. A.

On June 22, 2016, Henry Velte, Assistant Regional Counsel for the SSA's Office of General Counsel, sent an unofficial preliminary email response, providing a snapshot of a database entry regarding Webster, and stating that a formal response would be forthcoming.  Schubert Decl. Ex. B.  On September 23, 2016, Michael Chitwood, Associate General Counsel for General Law for the SSA's Office of General Counsel, sent a letter formally responding to Webster's request, stating that Webster's claims file has been destroyed and that the Agency has only a single record for Webster—the snapshot of the database entry sent by Velte.  The SSA would also permit an SSA employee to testify "concerning the information contained in that electronic record," but denying all of Webster's remaining requests.  Schubert Decl. Ex. C. Webster responded on July 17, 2017 urging the SSA to comply with his requests, *id.* Ex. D, and the SSA again replied on July 27, 2017 confirming its decision.  *Id.* Ex. E.  On November 15, 2017, Webster sent a final letter to the agency reiterating his requests for his records.  *Id.* Ex. F.  On November 29, 2017, the SSA responded with a letter stating that it had located an additional record within its files, the SSA's December 7, 2009 letter to Dorsey, but confirming that it had made its "final decision" regarding these requests.  *Id.* Ex. G.

In sum, the SSA Commissioner has agreed to produce two documents relating to Webster—a snapshot of a database entry showing that Webster has been categorized as

intellectually disabled and a copy of the December 7, 2009 letter that the SSA sent to Webster stating that his records had been destroyed. The SSA has agreed to allow an employee to testify only about the information contained in those two documents. The SSA has stated that no other records relating to Webster exist, and that all of his remaining records—including the SSA Evidence that was produced to Webster in 2009—have been destroyed.

In denying the remaining portion of Mr. Webster's requests, the SSA has refused to provide any information relating to the maintenance and destruction of Webster's records. The SSA claims that permitting SSA representatives to testify regarding the maintenance and destruction of Webster's records, and the governing document retention policies, would put an undue burden on the agency (although the SSA has not yet explained what that burden would be). The SSA also claims that providing this evidence would not further the SSA's mission or serve its interests, and that it would jeopardize the Agency's policy of "impartiality" in civil proceedings.

C.  **The SSA Has Provided Information to the Government that It Refuses to Provide to Webster**

The *Touhy* regulations require that Webster obtain permission from the SSA before obtaining testimony or information from any employee or former employee of the Agency, but the United States Attorney's Office is under no such restriction. *See* 20 C.F.R. § 403.100, 403.115. While the SSA has denied Webster the opportunity to obtain testimony or information from its representatives, the SSA has permitted the agents from the Federal Bureau of Investigation ("FBI"), acting on behalf of the United States

9

Attorney's Office, to contact SSA representatives directly and on multiple occasions to obtain information relating to Webster's files and the facts and circumstances of his case

Files produced by the Department of Justice show that Special Agent Edmond F. Grant from the FBI interviewed Michael Ferguson from the SSA Office in Pine Bluff on September 21, 2015. Ferguson informed Special Agent Grant that physical copies of Webster's SSA Disability Claim were retained until 2001 and that "[p]ursuant to Social Security policy, the physical record was destroyed in 2001 and no digital copy was retained due to the age of the file." Ferguson agreed to provide Special Agent Grant with the name of an individual "who will be able to comment on what is required for Social Security to provide documents relating to disability claims to a third party representative of the claimant." Schubert Decl. Ex. H.

In September 2015, Special Agent Grant contacted SSA employee Sharon Ward and "provided the details of a fax request which was sent from the Law Office of Larry Moore [Webster's trial counsel] to Hal West, employee of the SSA in Pine Bluff, Arkansas." Special Agent Grant asked Ward for her opinion as to whether the SSA "would comply with such a request from a defense attorney." Ward stated that she did not know whether the SSA would have complied with the request, and that all disclosure requests are governed by the C.F.R. Ward further stated that she would "pass this information on to the SSA legal compliance department for any additional information/insight they may be able to provide." Schubert Decl. Ex. I. In an email exchange between Special Agent Grant and Ward, Special Agent Grant stated:

> Per our earlier telephone conference, I have attached the fax request that was sent to Mr. Hal West in the Social Security Office in Pine Bluff, Arkansas. If you could please provide me with the CFR regulation related to this request and the contact information for someone who could comment on this specific request in regards to complying with the request I would greatly appreciate it.

Ward responded: "Ted, You will find the code of regulation as it relates to privacy and disclosure by following this link." *Id.* Ex. J.

On January 4, 2016, Special Agent Grant interviewed Kendall Rees, Attorney for the SSA Office of the General Counsel, who also opined as to whether Webster's 1996 request for records would have been sufficient. Rees stated that, under today's standards, the SSA does not generally honor "any and all" requests. "However, it is possible that the office manager at the time would have reviewed the request, determined that it established Webster's consent, and released the records anyway." He also stated that if the request did not satisfy the SSA's requirements,

> the requester would have been made aware of the SSA requirements and what would need to be done in order to get the requested SSA documents. It is not the practice of the SSA to deny requests and provide no guidance as to what would be required to get the requested documents. As part of the Privacy Act, individuals have a right to their records. Therefore, with due diligence, the requester would have been able to get a copy of their SSA records.

Schubert Decl. Ex. K

On January 5, 2016, Supervisory Special Agent Michael Elsey of the Dallas FBI sent a letter to Special Agent Joseph Luna of the Social Security Administration Office of the Inspector General, stating:

In September 2015, the FBI made contact with the Pine Bluff, Arkansas, Social Security Administration Office in an attempt to establish when this document [Dr. Spellman's December 22, 1993 report] was originally handed over to Webster's defense team. FBI Special Agent Edmond F. Grant spoke with the office manager, Michael Ferguson, who looked through both digital and physical records attempting to locate Mr. Webster's file. After his search, Ferguson stated that the only information he could find on Webster was that his physical file was destroyed in 2001 and that no digital copy was retained due to the age of the file. However, since the defense team was sent a copy of Webster's file in 2009, it is probable that a copy of his file is still in existence. In an effort to exhaust all means of establishing when and where Webster's defense team initially received the Social Security document in question, the FBI is seeking the Social Security Administration, Office of the Inspector General's help in locating Bruce Webster's file.

Schubert Decl. Ex. L. There is no written record of Special Agent Luna's response, but it is clear that he spoke to Special Agent Grant sometime before March 8, 2016, when Special Agent Grant submitted a declaration to this Court stating that he had interviewed Special Agent Luna. Special Agent Luna "indicated that Webster was the subject of two SSA claims, and that the records regarding the claims were destroyed in 2001 and 2010." *Id.* Ex. A at 62-63 ¶ 3.

The final contact reflected in the Department of Justice files is a letter from Jennifer Gunn to Special Agent Grant on May 18, 2016, stating that SSA systems show that all of Mr. Webster's "folders have been marked as destroyed." She further stated that when she searched for a paper file for Webster, she could see that a folder was destroyed as of November 16, 2010. *Id.* Ex. M.

Because the SSA has failed to provide critical information through the *Touhy* process, Webster requests that this Court issue a subpoena to the SSA compelling relevant information.

## III. THIS COURT SHOULD ISSUE A SUBPOENA REQUIRING THE SSA TO PRODUCE ALL DOCUMENTS AND PROVIDE TESTIMONY REGARDING WEBSTER'S FILES

Federal Rule of Civil Procedure 45 authorizes the court to issue a subpoena for documents and testimony regarding "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). For the purposes of this Rule, relevance means "any matter that bears on or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Chavez v. Daimler Chrysler Corp.*, 206 F.R.D. 615, 619 (S.D. Ind. 2002) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 427 U.S. 340, 351 (1978)); *Sanyo Laser Prods., Inc. v. Arista Records, Inc.*, 214 F.R.D. 496, 502 (S.D. Ind. 2003) (holding that the information sought need not be directly relevant to the claims pled as long as it is relevant to the subject matter of the dispute).

Here, there is no dispute that the issue at stake in this case—Webster's ineligibility for his capital sentence—is extremely important, nor is there any dispute that the information requested from the SSA is important to resolving those issues. Any burden

13

that the SSA may experience in complying with a subpoena is greatly outweighed by the benefit that could result.

A.       **The Requested Information is Vital to Webster's Petition**

Webster made his first request for his SSA records more than two decades ago and was denied. The Court has ordered the parties to litigate whether the records were available from the SSA at the time of Webster's trial, the diligence of his counsel, and Webster's disability. All of these questions are inextricably linked to the SSA's creation, production, maintenance, and destruction of Webster's records.

Webster seeks documents and testimony relating to these key events: (1) his application and claim for SSA benefits in 1993; (2) his counsel's attempts to obtain his SSA records in 1996; and (3) undersigned counsel's attempts to obtain his SSA records, starting in 2008. The SSA does not deny that these records are important to Webster's case, and contends that it has produced all responsive documents that currently exist in its files (although, as detailed below, it has not). But because it is clear that many responsive documents have been destroyed, including the SSA Evidence that was produced to Dorsey in 2009 after the Agency was on notice that Webster's records were relevant to a capital case, the SSA claims to have almost no records for Webster. Accordingly, Webster also seeks information and testimony regarding the handling and destruction of his records—namely, the records that were destroyed, the date they were destroyed and why, and the policies that governed their destruction.

Documents and testimony relating to Webster's application for benefits, including medical records, evaluations, and claims documents are undoubtedly relevant to

14

Webster's Petition. In 1993, less than three years before Webster's criminal trial, the SSA performed testing on Webster and diagnosed him as mentally retarded. The SSA Evidence, which constitutes just a subset of the records that were generated as part of Webster's claim, shows that three SSA doctors diagnosed Webster as mentally retarded, that Webster had an IQ well within the range of intellectual disability, and that he suffered significant adaptive deficits. Those documents also show that the SSA's files contained additional records relating to Webster's application and claim, but these records were never produced.

In 2009, after receiving the SSA's partial production (now known as the SSA Evidence), Webster specifically asked the SSA to produce missing documents. The SSA refused, and then sent a letter informing Webster that his records had already been destroyed. The SSA did not inform Webster that his records would be destroyed, nor did it inform Webster what other records existed, despite multiple opportunities to do so. The missing records may have provided additional evidence of Webster's testing or diagnoses—information which would be highly relevant to Webster's claim of intellectual disability. Because the SSA destroyed all of Webster's records instead of producing them as required by the Privacy Act, 5 U.S.C. § 552a *et seq.*, and has not provided a log or an inventory of the documents that were destroyed, Webster does not know what additional documents existed or what they said.

Information and testimony relating to requests for Webster's files, and the SSA's response to those requests, at or near the time of Webster's 1996 criminal trial are also highly relevant. The availability of Webster's files at the time trial counsel requested

15

them in 1996, and trial counsel's diligence in attempting to obtain those files, are the threshold issues before this Court. Any information reflecting efforts to obtain the SSA's files, how the SSA handled or treated those requests, and how it responded (or failed to respond), would go directly to the heart of those questions.

Finally, Webster seeks documents and testimony relating to his files for the period beginning in December 2008, when Dorsey made a routine request for his records. As set forth more fully above, the December 2008 request initiated a troubling series of events during which the SSA first refused to produce documents, then made a partial production of documents, and ultimately destroyed *all* of Webster's records, including those that had been produced, depriving Webster of the ability to potentially obtain other documents from his file that could have bolstered the already-compelling evidence of Webster's intellectual disability.

The SSA does not dispute the importance of these documents. It has stated that it has two responsive records in its file: (1) a snapshot of a database entry that shows the Agency categorized Webster as intellectually disabled and (2) a copy of the SSA's December 7, 2009 letter indicating that Webster's folder had been destroyed. The SSA has confirmed that all other records, including the SSA Evidence, have been destroyed. The SSA has also agreed to produce an employee to testify about the contents of the records that currently exist in its files, *i.e.*, the database entry and the 2009 letter.

However, the SSA has refused to provide any additional information. Inexplicably, the SSA has refused to produce documents from the files of the Agency's Office of Inspector General ("SSA OIG"), *see* Schubert Decl. Ex. G at 3, yet the SSA

16

acknowledges (and the Department of Justice's files confirm) that the SSA OIG has possession of information that was used to respond to the FBI's 2015/2016 request for information regarding Webster. *See id.* at 2. The SSA further claims that testimony regarding the existence and destruction of Webster's records would be futile because "[a]bsent any records disposition information appearing in existing agency records, agency employees do not have information about records no longer in the agency's possession." *Id.* at 2.  The SSA has also stated that it has not located any employees with knowledge of Webster's records, and that the Terre Haute and Pine Bluff field offices have no knowledge about the 2008 Request, except for the December 7, 2009 letter.  *Id*. Finally, the SSA claims that providing testimony regarding the existence, maintenance, and destruction of Webster's materials, and the relevant document retention policies, would be overly burdensome on the Agency.  "To provide such testimony, multiple SSA employees would be diverted from their official duties for a matter unrelated to SSA operations.  Thus, the testimony would unduly expend the United States' resources for private purposes."  *Id*.  The SSA has directed Webster to the online versions of its document retention policies.  *Id.* at 5.

B.    **The SSA Should Be Required To Produce All Existing Records for Webster**

While the SSA claims it has searched for all documents relating to Webster and has located only two relevant documents, it is clear that the SSA's search is not complete.

For instance, the SSA has not produced files reflecting the SSA's communications with the Government.  On December 7, 2009 letter, Brian Hewitt of the SSA's Terre

Haute field office denied Webster's request for his records, claiming that Webster's files had been destroyed. However, the SSA has told a much different story to the Government: on at least three occasions, SSA representatives told FBI Special Agent Grant that the files were actually destroyed in 2001 and/or 2010. *See* Schubert Decl. Ex. H (Sept. 21, 2015, interview with Michael Ferguson), Ex. A at 62-63 (SA Grant Decl. ¶ 3), and Ex. M (May 18, 2016 letter from Gunn).

Two SSA representatives also expressed opinions to Special Agent Grant as to the sufficiency of Webster's 1996 request for records under SSA regulations. *Id.* Ex. I (Sept. 24, 2015 Ward interview), Ex. J (Sept. 24, 2015 email exchange between Ward and SA Grant), and Ex. K (Jan. 4, 2016 Rees interview). The SSA failed to identify or disclose this or any other correspondence—with the Government or otherwise.

Webster has asked the SSA repeatedly for the information that was provided to the FBI, and the SSA insists that it has produced the only evidence of destruction—the December 2009 letter which stated, in direct contradiction to the SSA's statements to the FBI, that his records had already been destroyed and could not be produced as of December 7, 2009. *See id.* Ex. G. Webster is also entitled to other information the SSA has provided to the Government, including the sufficiency of the 1996 request. The Government may attempt to use information to argue that the 1996 request was not sufficient to obtain the records under SSA's consent policies or that Webster's counsel likely failed to follow up. Absent a court order, Webster does not have access to the SSA employees who have provided or may provide this information to the Government.

The SSA insists that it is unable to locate anyone with knowledge of the production, maintenance, and destruction of his records, and that it will not provide any information regarding the policies that governed that destruction. That is clearly not true. The SSA found at least five representatives who do have that knowledge and it produced those people to be interviewed by Special Agent Grant. According to Special Agent Grant, these representatives knew that Webster's records were destroyed in 2001 and 2010 and they knew that it was done pursuant to agency policy, or that they believe that SSA policy may or may not have governed production of records in 1996.

The Department of Justice files demonstrate that the SSA has not only misrepresented (once again) the records currently existing in its files, but that the information provided to the Government also directly contradicts the information given to Webster, *i.e.*, that Webster's records were destroyed in 2009, not 2001 and 2010. If the information given to Special Agent Grant is correct, the SSA's December 7, 2009 letter to Webster may be a fabrication, meaning that Webster's records still existed at the time he was told they had been destroyed. Furthermore, while the SSA disclosed for the first time in its November 29, 2017 letter that it has not produced records from the SSA's OIG, that omission does not excuse its failure to produce the FBI's communications with other divisions, including the Office of General Counsel. *Id.* Ex. G at 3.

Clearly this information is very important. Until the SSA has given Webster access to all available information, the record in this case will be incomplete. The burden of conducting a complete search for Webster's records, and then testifying about those records, would appear to be low, especially when compared to the import of the evidence.

19

Webster therefore requests that the Court issue a subpoena to the SSA for all records within its files relating to Webster, and for testimony regarding those records.

**C. The SSA Should Be Required to Provide Testimony Regarding the Creation, Maintenance, and Destruction of Webster's Files and Produce All Related Document Retention Policies**

The SSA now states that Webster's entire file has been destroyed, including the SSA Evidence that forms the basis for the Petition. This action is extraordinary—the Seventh Circuit described it as "troubling," *Webster*, 784 F.3d at 1133, while the Department of Justice actively questioned the SSA's representations that the documents were destroyed, writing "since the defense team was sent a copy of Webster's file in 2009, it is probable that a copy of his file is still in existence." Schubert Decl. Ex. L at 2. Although the dates of that destruction remain unclear, there is no question that key records were destroyed after Webster requested his records in 2008.

Even if the Court accepts the SSA's claim that no additional documents exist, the Court should allow Webster to depose representatives from the SSA regarding the creation, maintenance, and destruction of Webster's records. The SSA's testimony could reveal the nature of the records that were destroyed, the date of destruction, the policies pursuant to which they were destroyed, the person or system responsible for the destruction, and any communications regarding the destruction.

This information is key to this case: the destroyed files may have included additional evidence of Webster's disability, including the documents that appeared to be missing from the initial SSA production, or documents showing that trial counsel had requested the files in 1996 and the SSA refused to provide them. Because the files are no

longer available—a situation which the SSA brought upon itself by taking affirmative action to destroy Webster's records, after receiving numerous requests from Webster that those records be produced in connection with a death penalty case—Webster should be permitted to question the SSA about what was in the files and why they were destroyed. Webster has requested logs or inventories of the documents that existed and were destroyed, but the SSA has provided nothing. Thus, deposition testimony is Webster's only tool for discovering the nature and contents of those records.

The SSA generally avers that it has not located any employees or representatives with any information regarding Webster's 1996 request for records, Webster's 2008 request for records, the subsequent correspondence and production, or the destruction of those records, but does not explain who it has spoken to and how the Agency has come to that conclusion. This is not true. As set forth above, at least five SSA representatives were permitted to talk to Special Agent Grant, and those representatives were able to disclose information that has never been disclosed to Webster. Further, Webster asked specifically to depose the individual who produced the records to Webster in 2009, but the SSA has failed to even disclose the name of that person. If that individual is not available, there are multiple other people who were involved in processing Webster's 2008/2009 requests including, for instance, Brian Hewitt, Field Office Manager of the Terre Haute SSA office, who signed the December 7, 2009 letter informing Webster that

his records had been destroyed.  Special Agent Luna would also, presumably, have some relevant information.[2]

The SSA has informed the FBI that "*pursuant to agency policy*, the physical records of the SSA Evidence were destroyed and no digital copy was retained." Schubert Decl. Ex. A at 62-63; *see also* Ex. M.  But the SSA has refused to provide similar information or testimony to Webster.  The SSA has produced 18 policies governing the sufficiency of record requests and the SSA's *disclosure* obligations, but the Agency refuses to identify, produce, and provide testimony as to the document retention policies that were in existence and applicable at the time of the creation, maintenance, and destruction of Webster's records.  Instead, the Agency has produced a single policy relating to the preservation of documents, a June 30, 2016 Litigation Preservation Policy, which took effect a full 6-7 years after the alleged destruction of Webster's file, provided a broken link to a single retention schedule, *see* Schubert Decl. Ex. G at 5, and claimed that it would be too burdensome to collect, produce, and explain the remaining document retention policies, which it claims are available to Webster online.

Requiring Webster to decipher the maze of the SSA's online archive is not workable.  The single retention schedule identified by the SSA was approved in 2005, after the SSA says, at least to the Government, that it destroyed some of Webster's records.  Schubert Decl. Ex. N.  There are at least *six* additional National Archives and Records Administration record retention schedules available online that may have applied

---

[2] Because the Department of Justice did not produce notes of its conversation with Special Agent Luna, Webster does not know what was said.

to Webster's claim folders at various times since 1993, but which were not identified by the SSA. *See* Schubert Decl. Ex. O.[3]  At times, there appear to be separate retention schedules for Title II (Social Security disability insurance) and Title XVI (Supplemental Security Income) files, while at other times they are combined into one policy.  Each retention schedule includes numerous situations under which records may be destroyed, with different retention periods for different situations and categories of documents.  For example, the retention schedule identified by the SSA calls for the destruction of a file at either seven years, 90 months, five years, two years, six years, ten years or seven years, following various trigger events. *See* Schubert Decl. Ex. N.  The SSA apparently believes that Webster's records were destroyed pursuant to policy, and has made employees available to the Government to discuss this destruction; Webster must be given the same opportunity.

Webster is entitled to understand the basis for the SSA's position that policy mandated the destruction of the original papers constituting the SSA Evidence (and whatever other undisclosed records have also been destroyed) and, just as importantly, dictated that no copy be retained, which requires the SSA to (1) identify and produce the relevant policies and (2) provide sworn deposition testimony regarding the application of those policies to Webster's files.

---

[3] These include: N1-047-88-002 (approved in 1988); N1-047-89-001 (approved in 1989); N1-047-95-002 (approved in 1995); N1-047-95-001 (approved in 1995); N1-047-03-001 (approved in 2003); and N1-047-05-001 (approved in 2005).

The SSA objects that providing any additional testimony or information would be overly burdensome. In its four separate emails and letters to Webster, the SSA did not detail the burden of providing this testimony, stating merely that "multiple SSA employees would be diverted from their official duties for a matter unrelated to SSA operations." Schubert Decl. Exs. B, C, E, and G. But the time that employees may spend to locate appropriate witnesses, locate applicable documents and policies, and attend depositions cannot possibly outweigh the importance of this highly relevant evidence.

Further, the SSA's contention thus far, that the SSA is not a party to the proceeding and therefore has no interest in participating in discovery, is a red herring. The SSA attempts to argue, with a straight face, that it "is not a party to [this] case," and that "[p]ermitting testimony would provide no benefit to the SSA and would be inconsistent with SSA's strict policy of impartiality among private litigants." Schubert Decl. Ex. G at 3. It further states: "SSA must balance other important interests with the need for program integrity when assessing a request for testimony…Among these interests are minimizing the possibility of involving SSA in issues not related to its mission, maintaining the SSA's impartiality, and protecting sensitive and confidential information and the deliberative process of the SSA." *Id.* at 2-3. But the Department of Justice and the SSA are both agencies of the United States government. Webster does not seek documents and testimony for a civil matter in which the SSA is only tangentially implicated. This a capital proceeding against the United States government, which centers around the SSA's conduct in withholding and destroying important records. "Impartiality" cannot now excuse the SSA from participating in a matter that arises solely

24

from its own conduct, which is itself a violation of "program integrity," especially when it has disclosed requested information to another branch of the federal government.[4]

The SSA's handling of Webster's documents over the past two decades is unsettling. Any actions to destroy Webster's records could be symptomatic of the Agency's overall handling of his records. According to the collective statements of the Agency and the FBI, all copies of the key SSA Evidence were destroyed—and are thus no longer available for Webster's hearing—*after* the SSA had been notified, on multiple occasions, that the records were requested for use in a capital case. The Seventh Circuit echoed Webster's concern, calling the SSA's destruction of its remaining records "troubling." *Webster*, 784 F.3d at 1133. Since the Seventh Circuit decision was issued, the SSA has further contradicted its own, already convoluted explanation of the fate and location of Webster's records. The SSA told Webster that his records were destroyed in 2009 (after insinuating that the SSA Evidence was produced by mistake), Schubert Decl. Ex. A at 13, 47; the SSA told the Government that Webster's records were destroyed in 2001 and 2010, *id.* Exs. H and M; and the SSA has now told Webster that all of his records (save one database entry and one letter) have been destroyed, *id.* Ex. G.

For all of these reasons, the Court should issue a subpoena requiring the SSA to produce all records relating to the creation, existence, maintenance, handling, and

---

[4] The Privacy Act requires that "[e]ach agency that maintains a system of records shall – (1) upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him and upon his request, a person of his own choosing to accompany him, to review the record and have a copy made of all or any portion thereof in a form comprehensible to him...." 5 U.S.C. § 552a(d).

destruction of Webster's files, including any document retention policies that applied to those files. The Court should also require the SSA to provide testimony regarding its handling of Webster's documents.

### D. The SSA Is Subject to this Court's Subpoena Power

The SSA is not immune to a subpoena in this case, and there is clearly good cause to issue one.[5] The Federal Rules of Civil Procedure do not create separate discovery procedures for cases involving the federal government. *Bosaw v. Nat'l Treas. Emp. Union*, 887 F. Supp. 1199, 1212 (S.D. Ind. 1995); *Leyh v. Modicon, Inc.*, 881 F. Supp. 420, 423-24 (S.D. Ind. 1995). "[D]istrict courts should apply the federal rules of discovery when deciding on discovery requests made against government agencies, whether or not the United States is a party to the underlying action." *Exxon Shipping Co. v. U.S. Dept. of Interior*, 34 F.3d 774, 775 (9th Cir. 1990). Allowing the SSA to rely on agency regulations to restrict the availability of information for a judicial proceeding would deprive the public of the "right to every man's evidence," *Id.* at 779, and may unconstitutionally subject the courts to the "'caprice of executive officers,'" *id.* at 778 (quoting *United States v. Reynolds*, 345 U.S. 1, 9-10 (1953)).

Furthermore, Webster's right to obtain discoverable information from the SSA is not hindered by the SSA's decision to withhold the information pursuant to its internal

---

[5] *See* Rule 6(a), Rules Governing Section 2254 Cases in the United States District Courts ("A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil procedure any may limit the extent of discovery."); *see also Neal v. Oliver*, No. 2:13-cv-199-JMS-WGH, 2013 U.S. Dist. LEXIS 159523, at *1 (S.D. Ind. Nov. 7, 2013) (applying the "good cause" standard from the Rules Governing Section 2254 Cases in United States District Courts to a habeas petition brought under 28 U.S.C. § 2241).

policies. *Id.* at 777 ("Section 301 [the federal housekeeping statute] does not by its own force authorize federal agency heads to withhold evidence sought under a valid subpoena."). These internal policies, known as *Touhy* regulations, are enacted pursuant to 5 U.S.C. § 301. Although this section authorizes the agency head to regulate his or her employees, the statute specifically notes, "[t]his section does not authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301; *see Exxon*, 34 F.3d at 777; *N.L.R.B. v. Capitol Fish Co.*, 294 F.2d 868, 875 (5th Cir. 1961) (holding that the federal housekeeping statute "cannot be construed to establish authority in the executive department to determine whether certain papers and records are privileged"); *Leyh*, 881 F. Supp. at 422 (5 U.S.C. § 301 does not create a privilege that protects federal agencies or their employees from being required to provide evidence in federal court.); *see also Reynolds*, 345 U.S. at 9-10 ("[J]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers."). To the extent the SSA's decision to withhold information from Webster is based upon its internal *Touhy* regulations, that decision has no basis in statute or case law. The SSA's denial of Webster's *Touhy* requests is an abuse of discretion and should not be sustained.

## IV. CONCLUSION

Webster respectfully requests that this Court issue a subpoena ordering the SSA to produce documents and testimony relating to his SSA claim file, requests for those records and the SSA's response, and the agency's handling of his records, as reflected in this brief and on the proposed attachments to the subpoena to testify and produce documents (Exhibits A and B to Webster's Motion). The SSA is obligated to provide

27

Webster the requested information under the Federal Rules of Civil Procedure, as the documents and testimony requested are proportional and relevant to the needs of Webster's case. For the foregoing reasons, this Court should compel the SSA to immediately provide the documents and testimony Webster requests.

Dated:  January 5, 2018      DORSEY & WHITNEY LLP


          By  s/ Kirsten E. Schubert_____
             Steven J. Wells
             *Admitted pro hac vice*
             Kirsten E. Schubert
             *Admitted pro hac vice*
             Kathryn A. Johnson
             *Admitted pro hac vice*
          Suite 1500, 50 South Sixth Street
          Minneapolis, MN 55402-1498
          Telephone:  (612) 340-2600
          Facsimile:  (612) 340-2868

          Monica Foster (No. 8368-49)
          INDIANA FEDERAL COMMUNITY
          DEFENDERS, INC.
          111 Monument Circle, Suite 2150
          Indianapolis, IN  46204
          Telephone:  (317) 383-3520
          Facsimile:  (317) 383-3525

          *Attorneys for Petitioner Bruce Carneil Webster*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of January, 2018, the foregoing MEMORANDUM IN SUPPORT OF MOTION TO ISSUE A SUBPOENA TO THE SOCIAL SECURITY ADMINISTRATION was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.  Counsel for Respondent may access this filing through the court's system.

I further certify that on the 5th day of January, 2018, the foregoing MEMORANDUM IN SUPPORT OF MOTION TO ISSUE A SUBPOENA TO THE SOCIAL SECURITY ADMINISTRATION was served via First Class Mail upon the General Counsel for the Social Security Administration, Room 611, Altmeyer Building, 6401 Security Boulevard, Baltimore, MD 21235, pursuant to 20 C.F.R. § 423.3.

By  s/ Kirsten E. Schubert
Kirsten E. Schubert