UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,
   Petitioner

v.           CAUSE NO. 2:12-CV-86-WTL-MJD
            Judge William T. Lawrence

CHARLES LOCKETT,
    Respondent.

## RESPONDENT'S MEMEORANDUM IN SUPPORT OF HIS
## RESPONSE IN OPPOSITION TO THE ISSUANCE OF A SUBPOENA

### Introduction

There are two threshold issues before this Court in the underlying habeas action:

whether Social Security Administration (SSA) records were available at the time of

Webster's trial and whether his trial counsel exercised appropriate diligence in attempting

to obtain those records. Thus, for purposes of the instant requests for subpoenas, the

primary question is whether SSA has "any nonprivileged [information] that is relevant [to

those threshold issues] and proportional to the needs of the case[.]" Fed. R. Civ. P.

26(b)(1). The SSA has explained to Webster that his file no longer exists, provided or

offered to provide what information it does have, and explained that SSA has been unable

to locate any employee(s) with actual knowledge of the file, its contents, or its

destruction. Nonetheless, Webster presses for the Court to issue subpoenas. Because the

information sought by Webster is either not in SSA's possession, irrelevant to the actual

issues before Court, duplicative of information Webster's counsel has already received or

will receive once he submits a new consent form, and/or available from another reliable source with less burden to SSA, the requested subpoenas are unduly burdensome and not proportional to the needs of the case. For those reasons, the motion for subpoenas should be denied.

**Background Facts**

1. On March 24, 2016, this Court granted Webster's motion to seek discovery from the SSA. (Dkt. No. 69). [1]

2. Thereafter, on April 19, 2016, Webster's counsel made a request to SSA pursuant to the agency's so-called *Touhy* regulations.[2] (Dkt. No. 78-1). The *Touhy* requests sought:

   a. Evaluations, testing, determinations, claims, and all other documents related to Webster's 1993 request for SSA benefits;
   b. Any requests for records or information made by representatives for Webster or the United States Attorney's Office;
   c. Communications with representatives for Webster or the United States;
   d. All documents and information provided to Webster or to the United States Attorney's Office relating to Webster or his case; Records or information sufficient to identify SSA representatives who responded to requests for information relating to Webster's files, including the individuals who

---

[1] The United States starts this recitation of the facts with this Court's Order granting Webster's request to seek discovery from the SSA. Although Webster's motion cites to and appends a number of documents from a purported 1993 file on Webster, and 1996 and 2008-2009 correspondence with SSA, with one exception SSA has no record of those documents and thus cannot corroborate them. The exception is a 2009 letter from the agency to Webster's counsel. A copy of that letter was located in the agency's files. (See generally Appx. A (Declaration of SSA attorney Henry Ernest Velte, III, explaining the scope of the agency's search for responsive information)).

[2] Federal law provides that "[t]he head of an Executive department . . . may prescribe regulations for the government of his department, the conduct of its employees. . . and the custody, use, and preservation of its records, papers, and property." 5 U.S.C. § 301. SSA's regulations are found at 20 C.F.R. Part 403. Those regulations prohibit the unauthorized release of information by agency employees, provide a procedure for centralized agency decision-making concerning how the agency will respond to a subpoena or other requests for testimony or documents served on an agency employee, and provide a procedure by which a subpoenaing litigant may obtain an agency decision. The Supreme Court upheld the validity of such regulations in *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), and thus agencies regulations regarding the release of official information are colloquially known as *Touhy* regulations.

produced the SSA Evidence in 2009, destroyed Webster's files, and communicated with the United States Attorney's Office regarding Webster or his case;

e. Any regulations, policies, or procedures that would have applied to requests for Webster's records from 1994-1997 and 2008 to the present;

f. Any regulations, instructions, policies, etc., relating to the creation, maintenance, storage, and/or destruction of SSA records; and

g. Regulations, policies, procedures, etc., related to the conduct of examinations for intellectual disability/mental retardation from 1993 through 1996.

The request sought both records and testimony from agency employees. (Id.).

3. Webster also made numerous requests for production to the United States Attorney's Office. In response, the United States turned over essentially its entire Webster file, withholding only documents related to Webster's co-defendants. Included in the documents produced by the United States were any and all notes or correspondence between the United States Attorney's Office and SSA.

4. In an effort to get information to Webster as quickly as possible, SSA legal counsel Henry Velte informally contacted counsel for Webster by email on June 22, 2016. (Dkt. No. 78-2). Therein, SSA explained that SSA had conducted a search of its databases for Webster's social security records but was unable to locate any records other than electronic records, and speculated about what testimony it might be able to approve. SSA also provided screen shots of some of the electronic databases, as permitted by a consent form dated October 16, 2015 that was valid for one year. (Id.).

5. On September 23, 2016, SSA provided its formal *Touhy* response. (Dkt. No. 78-3). Therein, SSA explained that:

a. SSA had been unable to locate SSA employee(s) in the relevant field office(s) with knowledge of Webster's 2008/2009 records requests;

b. It appeared that Webster's claims file had been destroyed, but that there was at least some information available in SSA's electronic records;

c. SSA would produce an agency employee to testify concerning the information located in the electronic record;

d. SSA would not produce an agency employee to testify concerning SSA regulations, instructions, standards, policies, or procedures relating to the creation, maintenance, storage, and/or destruction of any records or documents relating to Webster's case, in part because it would require multiple SSA employees and because such information was available to the public. A web address was provided.

(Id.).

6. Almost 10 months later, on July 17, 2017, Webster responded to the September 23, 2016 formal *Touhy* response. (Dkt. No. 78-4). Therein, Webster complained that SSA's response was incomplete insofar as it failed to address all the categories of documents and testimony sought. Despite taking 10 months to complain, Webster demanded that SSA respond within 11 days. (Dkt. No. 78-4 at PageID # 3824).

7. On July 27, 2017, SSA responded to Webster's follow-up letter with an email by Velte. Velte noted that the SSA's September 2016 response addressed the *Touhy* response, and again noted that it would produce a witness to testify about the information contained in the agency's electronic records. (Dkt. No. 78-5).

8. Three and half months later, on November 15, 2017, Webster again wrote to SSA complaining that the *Touhy* responses were inadequate. (Dkt. No. 78-6). This time Webster demanded a response within 14 days. (Id. at PageID # 3841).

9. On November 29, 2017, SSA responded to Webster's November 15, 2017 letter.

(Dkt. No. 78-7). Therein, SSA broke down its response to Webster's *Touhy*

request in detail, explaining that:

    a. SSA's 2016 final decision considered all of topics of information sought by Webster;
    b. SSA employees, including those at the offices Webster's counsel states it contacted in 2008-2009, had no information about Webster's records other than that contained in the electronic record;
    c. SSA had no documents related to Webster other than those in the electronic record;
    d. SSA would provide a sworn declaration regarding the places searched by the agency for Webster's records;
    e. SSA would provide an agency employee to discuss the electronic records related to Webster;
    f. SSA would provide Webster's counsel with copies of the electronic records as soon as Webster's counsel provided an updated consent form as the one provided with the April 2016 request specifically stated that it was only good for one year;
    g. Information relating to the agency's regulations, instructions, standards, policies, and procedures were available in a less burdensome form insofar as this information was publicly available; and
    h. To the extent information relating to regulations, instructions, standards, policies, and procedures were not publicly available, SSA provided copies of the relevant records and offered to provide certified copies of those records.

(Id.).

10. Webster's counsel has not provided an updated consent form. (Appx. A at 9-10).

11. Webster's counsel has not requested the sworn declaration offered by SSA, nor

have they requested certified copies of policies, etc. (Appx. A at 10).

12. Webster now seeks subpoenas for documents and testimony on the same

categories of documents sought in the *Touhy* request. (Compare Dkt. No. 78-1

with Dkt Nos. 76-1 and 76-2). However, both proposed subpoenas add a ninth

category: "any and all other documents or information produced to the United States Attorney's Office in the course of this litigation." (Dkt. Nos. 76-1 and 76-2).

<div align="center">**Applicable law**</div>

The scope of discovery available by way of a Rule 45 subpoena is generally measured by the same broad relevancy standard applicable to party discovery under Rule 26(b)(1). *See, e.g., Jackson v. Brinker*, 147 F.R.D. 189, 193–94 (S.D. Ind. 1993) ("The scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules . . . if material is relevant, not privileged, and is, or is likely to lead to, admissible evidence, it is obtainable by way of subpoena") (internal citations omitted). Rule 26(b)(1) makes discoverable "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Furthermore, a district court may limit any discovery that is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive...." Fed. R. Civ. P. 26(b)(2)(C).

In the context of third-party discovery, however, "relevance alone may not be enough to justify a subpoena, particularly given that the undue burden calculus is more protective of non-parties than it is for parties." *Charles v. Quality Carriers,* Inc., No.

**Response in Opposition to Petitioner's Motion for a Subpoena – Page 6**

1:08-cv-00428-RLY-JMS, 2010 WL 396356, at *1 (S.D. Ind. Jan. 28, 2010) (citing

*Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998)).  Indeed, multiple

courts have noted that non-parties are not treated like parties in the discovery context, and

"courts should be especially careful in protecting the [third] parties from excessive or

oppressive discovery."  *Lee v. City of Elkhard*, No. 2:12–CV–25–TLS–APR, 2013 WL

1754977 (N.D. Ind. Apr. 22, 2013) (quoting *Moore v. PlasmaCare, Inc.*, 2012 WL

602623, at *2 (S.D. Ind. Feb. 23, 2012).[3]

## Argument

### I.  A subpoena is unnecessary and duplicative in this case.

As an initial matter, the United States notes that a subpoena is unnecessary.  In March

of 2016 this Court authorized Webster to obtain discovery from the SSA.  In response to

that authorization, Webster's counsel properly submitted a request for documents and

testimony to the SSA pursuant to the agency's *Touhy* regulation.  (Dkt. No. 77).

Importantly, with one exception, the *Touhy* request submitted to the SSA contains the

same requests for documents and testimony as those contained in the proposed subpoenas

Webster now requests from this Court.

The SSA's *Touhy* regulation, subject to certain exceptions not applicable here,

"applies to *any* request in connection with any legal proceeding for SSA records or other

---

[3] Webster initially sought to obtain discovery from the United States Attorney's Office under Rule 34 of the Federal Rules of Civil Procedure, and from the SSA through use of the agency's *Touhy* regulations.  That was proper because while the United States is a party to this litigation, the SSA, an agency of the United States, is not. Similarly, Webster now seeks Rule 45 subpoenas to obtain discovery from the SSA.  Rule 45 is also a vehicle for obtaining discovery from a non-party.  Yet inexplicably, Webster criticizes the SSA for asserting in its *Touhy* response that SSA is not a party to this litigation.  (Dkt. No. 77 at PageID # 3639).  But SSA is *not* a party to this litigation, and the burden of the proposed discovery must be viewed through that context.

information or for testimony from SSA or its employees.  [It] applies to requests for testimony related to SSA's functions or to any information or record created or acquired by SSA as a result of the discharge of its official duties."  20 C.F.R. § 403.115 (emphasis added).  Thus, the fact that Webster's initial request did not come pursuant to a subpoena is of no moment.  Webster's counsel made a request for documents and testimony in connection with his legal proceeding.  SSA responded in the same manner and reached the same result that it would reach if Webster's counsel sought the documents and testimony pursuant to a subpoena: It looked for responsive documents, agreed to produce what it could, subject to consent by Webster, and objected to the parts of the requests that were unduly burdensome.  (Dkt No. 78-7).

And, contrary to Webster's assertions, SSA agreed to do more than "produce two documents relating to Webster—a snapshot of a database entry showing that Webster has been categorized as intellectually disabled and a copy of the December 7, 2009 letter that the SSA sent to Webster's counsel stating that his records had been destroyed."  (Dkt. No. 77 at PageID # 3624).  Rather, in response to Webster's *Touhy* response, the SSA has provided, or offered to provide subject to a valid consent by Webster, all of the documents it has pertaining to Webster (primarily in the form of screen shots of electronic databases),[4] and testimony related to those documents.  If Webster is dissatisfied with that response, his remedy does not lie in the subpoena process,[5] but

---

[4] The final agency decision issued on September 23, 2016 explained that although the file had been destroyed, the agency had certain electronic records that would be provided, certified, once Webster provided an updated consent form.  (Dkt. No. 78-7 at PageID # 3845).

[5] Indeed, as a Northern District of Illinois district court noted, "There is an unbroken chain of authority holding that a federal employee cannot be compelled to obey a subpoena, even a federal subpoena, that acts against valid agency

rather in a collateral challenge to that *Touhy* decision under the Administrative

Procedures Act. *See U.S. ex rel. Lusby v. Rolls-Royce Corp.*, No. 1:03-CV-680-SEB-

WGH, 2011 WL 4903201, at *1 (S.D. Ind. Oct. 14, 2011) (rejecting a party's motion for

a subpoena to a government agency following an unfavorable *Touhy* decision, and noting

that "[i]n the Seventh Circuit, at least, '[t]he proper method for judicial review of an

agency decision pursuant to valid agency regulations is through the Administrative

Procedure Act, 5 U.S.C. § 701 et seq.'" (quoting *Edwards*, 43 F.3d at 315).

In short, through the *Touhy* process the SSA has provided or offered to Webster's

counsel all of the documents it has in its possession related to the evaluation and

treatment of Webster and what may have happened to his files, and has offered testimony

related to the information in its possession. [6] A subpoena at this point is wholly

unnecessary, unduly burdensome, and will not lead to the production of any new,

relevant, information.

## II.    The requested subpoena would create an undue burden on SSA.

Rule 26(c) states that this Court "must limit the frequency or extent" of any discovery

otherwise allowed by the Rules that is "unreasonably cumulative or duplicative, or can be

obtained from some other source that is more convenient, less burdensome, or less

---

regulations." *Miller v. Hill*, No. CIV. 10-514-GPM, 2010 WL 2836299, at *2 (S.D. Ill. July 16, 2010) (quoting in part *Edwards v. U.S. Dep't. of Justice*, 43 F.3d 312, 315 (7th Cir. 1994) (Citations and quotations omitted).

[6] As noted earlier, SSA offered to provide Webster with a declaration detailing its search for responsive information. (Dkt. No. 78-7 at PageID # 3844).  To date, Webster has not requested such a declaration.  (Appx. A at 9-10). However, at the request of the United States Attorney's Office, the SSA has prepared a detailed declaration explaining its efforts to locate relevant documents.  (App'x. A at 2-9).  As that document demonstrates, the SSA has conducted an exhaustive search that was reasonably calculated to uncover all relevant documents.  (Id.).  As the declaration further explains, SSA took steps to identify any SSA employees with personal knowledge of Webster's files.  It has not identified any SSA employees with personal knowledge.  (Id.).  Thus, SSA's responses to subpoenas for this information will be the same, substantively, as its responses to Webster's *Touhy* requests.

expensive. . . ." Fed. R. Civ. P. 26(b)(2)(c). A Northern District of Illinois district court recently listed another factor to consider in the context of determining whether discovery created an undue burden: Whether -compliance will result in production of the information. *Allstate Ins. Co. v. Electrolux Home Prod., Inc.*, Case No. 16-cv-4161, 2017 WL 5478297, at *2 (N.D. Ill. Nov. 15, 2017) (internal citations and quotations omitted). Non-parties generally are entitled to greater protection under Rule 45 when making this assessment.

As explained below, each of the factors this Court must consider in determining whether subpoenas to the SSA in this case would be unduly burdensome support the conclusion that this Court should deny Webster's requests for subpoenas.

**a. Webster's proposed subpoenas are duplicative, cumulative, and not likely to result in the production of any of the *relevant* information sought.**

**i. Other than some SSA regulations and policies, etc., that are available online, all responsive documents in SSA's possession were produced or will be produced once a valid consent form is provided.**

The primary documents and testimony sought through Webster's proposed subpoenas relate to evaluations, testing, determinations, claims, and any and all other documents related to Webster's 1993 request for SSA benefits, and all requests for Webster's records at or near the time of his 1996. The United States does not dispute that these records are important to the threshold questions before this Court. However, as the SSA has explained to Webster on numerous occasions, it has conducted both physical

and electronic searches of all relevant locations and has been unable to locate any substantive responsive records. What SSA has are a few notes on electronic databases and a 2009 letter from SSA to Webster's counsel. Admittedly, the electronic records are not substantive, but based on SSA's reasonable search, they and the 2009 letter are *all* the records that remain in the SSA's possession. SSA has agreed to provide all of these records to Webster's counsel as soon as they provide SSA with up-to-date consent form. As of the filing of the instant Response, Webster's counsel has yet to provide such a form. (Appx. A at 9).

In an attempt to deflect this fact, Webster asserts that SSA has provided information to the government that has not been provided to Webster. (Dkt. No. 77 at Page ID # 3624-3627). This is simply wrong. Webster relies on notes from a Federal Bureau of Investigation (FBI) agent regarding conversations with various SSA employees. (Dkt. No. 77 at PageID # 3624-3627, 3633-3634). However, as is clear from documents related to these conversations, and as is explained more fully below, none of those persons had any personal knowledge of Webster's files. (Id.; see also App'x. A). None of those employees relied on records that are unavailable to Webster. Instead, they relied on the same electronic records that have been offered to Webster, or offered speculation about what should have happened when and if the SSA received the 1996 request. (Id.).

Webster also attempts to challenge the assertion that SSA possesses no additional responsive documents by complaining that SSA did not produce "files reflecting the SSA's communications with the Government." (Dkt. No. 77 at PageID 3632). However,

the United States has turned over all of its records to Webster's counsel, including records related to the United States' investigation of what happened with Webster's files. Thus, Webster has obtained the records from another, reliable source, and a subpoena will not result in any additional records other than those already in Webster's possession.[7]

### ii. There are no SSA employees with personal knowledge of Webster's file.

With respect to testimony, as the SSA has already informed Webster, it has been unable to locate any employees in the local SSA field offices with personal knowledge related to the Webster file. In an attempt to controvert that, Webster complains that representatives of the United States Attorney's Office have been permitted to contact "SSA representatives directly and on multiple occasions to obtain information relating to Webster's files and the facts and circumstances of his case." (Doc. No. 77 at PageID # 3625-3627). Webster later asserts that "SSA found at least five representatives who do have [] knowledge and it produced those people to be interviewed by Special Agent Grant." (Dkt. No. 77 at PageID # 3634). However, as explained below, none of the persons contacted by the FBI during its investigation of what happened to Webster's file

---

[7] Webster argues that SSA must have additional records because a SSA employee informed Webster that his files were destroyed in 2009, when SSA's records reflect that files were destroyed in 2010. (Dkt No. 77 at PageID # 3632-3633, 3634). He further argues that SSA has offered contradictory information regarding when Webster's files were destroyed. Unfortunately, because SSA does not know who in the Terre Haute, Indiana, field office may have searched for records in 2009, SSA cannot explain what that person may have looked at when representing to Webster that his file had been destroyed. (See App'x. A at 6-7). However, if the person looked at the electronic record for Webster, that record does indicate that there was a destruction of records in 2001. (App'x. A at 8). In any event, SSA has no records other than those provided to or offered to Webster.

has personal knowledge of the Webster file, nor any information that is arguably relevant

to the threshold issues in this case:

- Michael Ferguson:  Michael Ferguson is the District Manager, Pine Bluff, AR.  He arrived to that duty location in September 2014, having worked before in Little Rock.  He was interviewed by FBI Special Agent Grant in September of 2015.  (Dkt. No. 78-12 at PageID # 3858).  He has no personal knowledge of the Webster file, and obtained the information he provided to the special agent from a review of SSA's electronic records.  (App'x. A at 9; see also generally Dkt. No. 78-12 at PageID # 3858 (FBI letter to Special Agent Joseph Luna explaining that in response to the FBI's inquiry into Webster's records, Ferguson "looked through both digital and physical records attempting to locate Webster's file.  After his search, Ferguson stated that the only information he could find on Webster was that his physical file had been destroyed . . . .")).

- Sharon Ward:  Sharon Ward worked at the Dallas Center for Disability, the predecessor unit to the Dallas Region Center for Disability and Programs Support (CDPS) beginning in 2007, where she served as a Program Expert.  She was appointed regional coordinator for disclosure matters for the Center for Disability in July 2011.  She was interviewed by a FBI special agent in September of 2015.  The substance of her testimony was that she did not know whether the 1996 request for records by Webster would have been accepted by the local SSA office.  (Dkt. No. 78-9).

- Kendell Rees:    Kendell Rees is an attorney for the SSA Office of the General Counsel.  Rees had no personal knowledge of Webster, but offered his opinions and speculations as to what the Pine Bluff office of the SSA might have or should have done if it received the 1996 request.  (See App'x. A at 9; see also Dkt. No. 78-11).

- SSA Special Agent Joseph Luna: SA Luna is employed by the SSA Office of Inspector General.  At the request of a FBI special agent, SA Luna assisted with locating Webster's files, to the extent any remained in existence.  SA Luna's investigation did not locate any records, however, SA Luna did not personally participate in those searches.  (App'x. A at 7-8).

- Jennifer Gunn: Jennifer Gunn is a Technical Security Expert employed by the SSA in Dallas, TX.  (Dkt. 78-13).  SSA OIG requested that she perform a search of SSA's records to determine whether any records existed.  Her

search revealed that files were destroyed in 2001 and 2010. (Id.). She has no personal knowledge of Webster or his files. (App'x. A at 9).

In short, in response to Webster's complaints about SSA, the United States Attorney's Office had its agents investigate what may have happened to the 1996 request as well as the 2008/2009 requests. That investigation included contacting persons who were positions to possibly shed light on what happened. Ultimately, however, the investigation did not lead to the production of any information other than that which has been provided—or offered once Webster provides an updated consent form—to Webster, and did not lead to the discovery of any witness with personal knowledge regarding the facts of this case. The notes of the investigation have all been provided to Webster through the discovery turned over by the United States. Webster has failed to demonstrate that a subpoena would accomplish a different result, and SSA asserts that there would not be a different result. The proposed subpoenas are duplicative of discovery that has already been sought and responded to, and thus would be unduly burdensome.

### iii. Webster has been provided with all non-privileged communications between the SSA and the United States and/or its agents.

Three of Webster's requests, specifically requests D, E, and I, address correspondence between the SSA and the United States Attorney's Office. In this motion, Webster asserts that the SSA's failure to turn over these records proves that the SSA did not conduct a reasonable search. (Dkt. No. 77 at PageID # 3632-3633). However, as the United States has previously explained, it had no contact with the SSA

regarding Webster until the SSA Evidence became the subject of post-conviction litigation. (Dkt. No. 67 at PageID # 3537). The United States first directed its agent, FBI Special Agent Edmond F. Grant, to contact the SSA following the Seventh Circuit's remand in 2015. (Id. at PageID # 3538). Notes related to this contact have no bearing on the question of whether the SSA conducted a reasonable search to determine whether any of Webster's records still exist, and whether any persons at SSA might have personal knowledge of what happened to those files. Moreover, because substantially similar requests were made to the United States Attorney's Office, this office has produced all responsive, non-privileged, documents related to communication between this office and the SSA.[8] A subpoena to SSA for these same documents would be unduly burdensome and not likely to produce any new relevant evidence.

### iv. SSA does not have information sufficient to identify the representatives who responded to Webster's requests for information in 2008-2009.

Webster requests "records sufficient to identify the SSA representatives who responded to requests for information relating to Webster's files, including the individuals who produced the SSA Evidence in 2009 [and] destroyed Webster's files." (Doc. No. 76-1 at 3). However, as previously noted, the SSA searched all relevant field offices and has not located any persons with direct knowledge of Webster's files.

---

[8] The United States notes that there is a small category of responsive documents that have not been produced. Specifically, since Webster contacted the United States to complain about SSA's *Touhy* responses, and to threaten to file a motion to compel, there have been contacts between the two agencies related to *Touhy* and the defense of the instant motion for subpoenas. None of those records bears on the questions of whether SSA's records were available at the time of Webster's trial and whether his trial counsel exercised appropriate diligence in attempting to obtain those record, thus they are irrelevant. More important, they are privileged and protected by the attorney-client privilege as the communications relate to Webster's complaint about SSA and threat to file litigation compelling the agency's response.

(App'x. A).  The electronic files that reflect the destruction of his records do not contain the name of the person(s) responsible for their destruction.  A subpoena will not produce any information other than what has previously been provided to Webster, and thus would be unduly burdensome.

> ### v. The United States has already provided Webster with information sufficient to identify the SSA employees who communicated with the United States Attorney's Office.

Webster's proposed subpoenas also seek information sufficient to identify the SSA employees who communicated with the United States Attorney's Office.  (Dkt. No. 76-1 at 3; 76-2 at 3).  Because the United States Attorney's Office has turned over all of its records on Webster, including the notes of the investigation conducted by FBI agents, that information has already been provided to Webster through the discovery produced by the United States.  And equally important, as explained above, none of those persons have personal knowledge about Webster's files.  A subpoena to the SSA to obtain information already in Webster's possession would be unduly burdensome.

> ### b. Webster's requests for documents and testimony related to SSA's creation, maintenance, production, handing, and destruction of Webster's records are unduly burdensome.

> #### i. SSA has already provided Webster with its regulations, policies, procedures, etc., relating to the creation, maintenance, storage, and destruction of SSA records.

In the November 2017 letter responding to Webster's complaints about its *Touhy* response, the SSA provided Webster with pinpoint cites to where the relevant policies, regulations, and guidelines requested by Webster were available online.  (Dkt No. 78-7 at PageID # 3845-3847).  Where those records were not available online, but were in SSA's

possession, copies of those items were provided to Webster. A subpoena for these records would be unduly burdensome given that the information sought is reasonably available for another reliable source, especially where SSA has offered to certify any records that are not publicly available. Equally important, these documents have no relevance to the questions before this Court regarding counsel's diligence seeking records in 1996.

### ii. The requests for testimony regarding SSA's regulations, policies, and procedures would be unduly burdensome.

Webster has asked for testimony on a variety of policies that span a variety of topics. He asserts that he should be allowed to question SSA about "what was in the file and why they were destroyed." (Dkt No. 77 at PageID # 3636). But again, SSA has explained that it has not located any employees with personal knowledge about what was in the file. Moreover, SSA does not have one "expert" who can speak competently as to all of SSA complex policies and regulations. (App'x. A at 10). Rather, multiple employees would be required to research and learn the policies and regulations and rules related to creation, maintenance, production, handling, and destruction of records. (Id.). Many of those rules change over time, thus those persons would be required to research and learn multiple policies and regulations even on the same topic, such as creation of records. (Id.). And even with all of the above, these "experts" would still have no actual knowledge about what happened to *Webster*'s records. The most they could offer would be speculation about what should or may have been in his file, and what destruction should have been done and when. Such speculation is not evidence, and is not

reasonably calculated to lead to admissible evidence given that SSA no longer has Webster's files. Requiring the SSA to funnel its already limited resources into preparing witnesses to testify about policies and regulations that span many years solely for the purpose of speculating about a destroyed file is unduly burdensome and not proportional to the needs of this case.

## CONCLUSION

The United States recognizes the importance of the SSA Evidence sought by Webster. But as thoroughly detailed in the attached declaration, SSA has searched every reasonable location for responsive documents or persons with personal knowledge about this matter, and has found nothing other than the documents already provided or offered to Webster through the *Touhy* process. Subpoenas are unnecessary and duplicative and unduly burdensome. Webster's motion should be denied.

Dated this 2nd day of February, 2018.

<div style="margin-left:50%">

Respectfully submitted,

ERIN NEALY COX
UNITED STATES ATTORNEY

s/ *Tami C. Parker*
Tami C. Parker
Assistant United States Attorney
Texas State Bar No. 24003946
Burnett Plaza, Suite 1700
801 Cherry Street - Unit #4
Fort Worth, Texas 76102-6882
Telephone: 817-252-5200
Facsimile: 817-252-5458
E-Mail: tami.parker@usdoj.gov

</div>

*Attorney for Respondent USA*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 2nd day of February, 2018, I electronically filed the forgoing

document with the Clerk of the Court using CM/ECF.  I also certify that the forgoing

document is also being served this day on all counsel of record as listed on the CM/ECF's

notice of electronic filing.

<div align="right">

s/ *Tami C. Parker*
Tami C. Parker
Assistant United States Attorney

</div>