UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,

Petitioner,

vs.

CHARLES LOCKETT,

Respondent.

CAUSE NO. 2:12-cv-86-WTL-MJD
Judge William T. Lawrence

## PETITIONER'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTION TO ISSUE A SUBPOENA TO THE SOCIAL SECURITY ADMINISTRATION

## I. INTRODUCTION

This capital case turns directly on the Social Security Administration's ("SSA") mishandling of records that prove Bruce Webster is intellectually disabled. In response to Webster's motion that the Court compel the SSA to produce information plainly relevant to the SSA's record handling, the United States Attorney's Office for the Northern District of Texas ("USAO") submitted a brief opposing Webster's Motion ("Response" or "Resp.") on behalf of itself *and* the SSA, even though the SSA claims to be an "impartial" (*see* 20 C.F.R. § 403.100) third party that should be insulated from further discovery.

If it wasn't clear before, the United States' Response confirms that the SSA is not, as the agencies jointly claim, an impartial, disinterested third party. The SSA has been communicating with the USAO through the Federal Bureau of Investigation ("FBI") (without the involvement of Webster's counsel) since September 2015. The SSA has answered the FBI's questions, performed its requested search and, conveniently, claims to have no relevant knowledge to offer here, other than to report on the only two records that supposedly exist in Webster's files (a snapshot of a database entry showing Webster is intellectually disabled and a copy of a letter sent to Webster's counsel and was already part of the record here). It also conveniently claims that some unspecified responsive documents are protected by an attorney-client privilege which it purports to share with the same lawyers that represent the Government. The SSA, however, has denied Webster the opportunity to conduct an independent inquiry, keeping its SSA employees and representatives out of his counsel's reach.

The Response also clarifies that each agency bears responsibility for the destruction of Webster's records. While the United States contended for seven years that Webster's records had been destroyed by December 4, 2009, it now concedes that they were not destroyed until 2010, *after* the SSA denied Webster's follow-up requests for records and told him his records

had been destroyed, *after* Webster filed his 2009 action with the Fifth Circuit seeking review of his SSA records, and *after* the Government submitted its opposition to that action. By destroying the very records that Webster needed for his pending capital case, the Government has prevented Webster from accessing files that may have contained information that proves he is intellectually disabled, and that rebuts the United States' contention that the records were available to him in 1996. The details of the destruction of Webster's records are obviously relevant – both to the merits of the issues before this Court on remand and, as detailed in the last section of this Memorandum, to the issue of spoliation and its consequences here.

The United States' opposition raises further questions about the extent of its search and its candor in its discussions with Webster's counsel. Its claims at once that:

(1) the SSA conducted a sufficient search (Resp. 10-11);

(2) the SSA has produced all relevant information (*id.* 8-9);

(3) the SSA *does not* have additional relevant information (*id.* 11-13);

(4) the SSA *has* additional relevant information, but it duplicates that which was produced by the USAO (*id.* 14-15);

(5) the SSA and/or the USAO *have* additional information in the form of communications between the SSA and the USAO, but those documents are protected by the attorney-client privilege (*id.* 15 n.8); and

(6) producing the requested undisclosed relevant information would be unduly burdensome to the SSA (*id.* 16-18).

The USAO should not be permitted to use its broad access to the Department of Justice ("DOJ"), FBI, and SSA to conduct its own unfettered investigation, exclude Webster from the process under the guise of agency independence, assert a collective and privileged defense against Webster, and ultimately block Webster from testing these inconsistent positions through cross-examination of the agency that has continuously misrepresented, withheld, and destroyed vitally important information relating to his own SSA files.

2

It should not be this difficult for Webster to obtain evidence from the SSA. The United States put the availability of records and diligence of counsel at issue. *See, e.g.,* Return to Order to Show Cause, Dkt. 17 at 11, 15. The United States agreed that Webster may have discovery from the SSA, including depositions. *See* Rule 16-2 Statement, Dkt. 55 at 11-12 (Government agreeing that Webster "may subpoena an agency representative from the SSA to testify during the hearing about Webster's records *and the SSA's policies and procedures.*") (emphasis added). Excusing the SSA from participating in that process would be an abuse of discretion, contravene the mandate of the Seventh Circuit, and severely prejudice Webster.

## II. THE UNITED STATES IS WITHHOLDING RELEVANT INFORMATION

Webster has requested the SSA produce documents and information, including testimony, relating to: Webster's 1993 application for benefits from the SSA; requests for Webster's SSA records at the time of his 1996 trial, in particular by Webster's trial counsel and the Government; requests by undersigned counsel and the Government for Webster's SSA records starting in 2008; and the creation, maintenance, production, and destruction of Webster's records. Webster also seeks information that the SSA provided to the FBI/USAO.

In response, the United States now contends, in a self-serving, unsupportably restrictive view of the scope of civil discovery, that "the requested subpoenas are unduly burdensome and not proportional to the needs of the case." Resp. at 2. The United States does not seriously argue that the requested information is irrelevant, but instead claims that the information is not in the SSA's possession, is available from and has been produced by the USAO, would be unduly burdensome to produce, or is protected by an undefined attorney-client privilege. *Id.* But the SSA has waived any purported privilege; does not set forth any facts establishing the supposed burden that compliance would impose; does not explain what privilege applies, why, and to what documents; and does not set forth any law requiring Webster to accept a one-sided investigation

conducted by and among agents of the United States, to the express exclusion of Webster. The SSA's status as a government agency does not shield it from discovery, especially where it cannot even feign to be an impartial third party.[1]

### A. Webster Should Be Permitted to Take Discovery of Relevant Information Within the SSA's Possession—Just as the FBI Was Permitted to Do

#### 1. The USAO/SSA is Blocking Access to Important Documents and Witnesses

The SSA has refused to provide testimony relating to the records generated as part of Webster's disability claim, requests for those records by trial counsel in 1996, requests for his records starting in 2008, and the policies and circumstances of the destruction of his file.[2]

In response to Webster's *Touhy* request, the SSA produced the only record it claimed existed—a single database entry showing that Webster is intellectually disabled. Seventeen months later, after multiple pleas from Webster's counsel, the SSA produced a second record, the only *other* record it claimed existed—a copy of the December 2009 letter from Brian Hewitt stating that Webster's SSA file had been destroyed. The SSA agreed to provide a declaration detailing the search it conducted, and also agreed to provide one witness to testify regarding

---

[1] Through their conduct, the USAO and the SSA have surrendered the appearance of any division between the Respondent and the SSA. However, to the extent that Respondent asserts that it is a separate party from the SSA, it has failed to show that it has standing to object to subpoenas to a third party. "A party lacks standing to quash a subpoena issued to a nonparty unless the party has a claim of privilege attached to the information sought or unless it implicates a party's privacy interests." *Hard Drive Prods. v. Does 1-48*, No. 11-cv-9062, 2012 WL 2196038, at *3 (N.D. Ill. June 14, 2012); *see also United States v. Raineri*, 670 F.2d 702, 712 (7th Cir. 1982). Except for the amorphous population of documents that are identified as privileged in the Response, the Respondent has not made any showing that its privilege or privacy rights are implicated by the requested subpoena, nor can it.

[2] The SSA has offered a representative to testify regarding the destruction of files, but only to the extent it is reflected in current records. Presumably this will be limited to the fact that systems show his records were destroyed in 2001 and 2010 and not 2009. It will not, however, allow Webster to ask questions regarding the policies governing any such destruction, or the circumstances surrounding that destruction, a question which the Seventh Circuit clearly finds "troublesome." *See Webster v. Daniels*, 784 F.3d 1123, 1142 (7th Cir. 2015).

Further, the SSA has not clarified whether its proposed deponent would testify regarding the search for Webster's records. Given that the SSA has offered to provide a declaration outlining its search, Webster concludes that this deposition would be limited to the information included on the two existing records.

these two existing records. The SSA, however, refused to provide an SSA representative to discuss any other aspects of Webster's file, including its response to trial counsel Larry Moore's 1996 record request and the contents and destruction of Webster's files. It also refused to provide testimony, notes, or copies of the SSA's correspondence regarding its search.

Despite the fact that the Pine Bluff Field Office administered Webster's claims for benefits, received trial counsel's 1996 request for Webster's files but provided no records, produced a subset of Webster's files in 2009, and now claims that Webster's records were destroyed in 2001 and that nothing existed in 2009, Webster has not been permitted to depose anyone from the SSA's Pine Bluff Field Office.[3]

The SSA has likewise denied Webster's request to depose an individual from the Terre Haute Office. The United States specifically admits, however, that it cannot explain why an employee in the Terre Haute Office told Webster that his records had been destroyed in 2009, when they were actually destroyed in 2010, *after* Webster filed a § 2255 motion against the United States seeking relief based on his SSA records. It states:

> Webster argues that SSA must have additional records because a SSA employee informed Webster that his files were destroyed in 2009, when SSA's records reflect that his files were destroyed in 2010.... He further argues that SSA has offered contradictory information regarding when Webster's files were destroyed. Unfortunately, because SSA does not know who in the Terre Haute, Indiana, field office may have searched for records in 2009, SSA cannot explain what that person may have looked at when representing to Webster that his file had been destroyed.... However, if the person looked at the electronic record for Webster, that record does indicate that there was a destruction of records in 2001. ...In any event, SSA has no records other than those provided to or offered to Webster.

---

[3] The SSA has claimed that its search was exhaustive, yet the agency has not been able to locate the individual from the Pine Bluff Office who produced the records, even though it knows this person retired sometime between February and October of 2009.

Resp. at 12 n.7. This is precisely the kind of question that parties explore in discovery, and Webster should have the opportunity to look for the answer. If there is no explanation, Webster may present that. This is even more true now that the United States appears to question, for the first time, the authenticity of the SSA Evidence itself. Resp. at 2 n.1 ("Although Webster's motion cites to and appends a number of documents from a purported 1993 file on Webster, and 1996 and 2008-2009 correspondence with SSA, with one exception *SSA has no record of those documents and thus cannot corroborate them.*") (emphasis added).

In the same vein, the United States should have to identify and provide Webster with the policies that governed destruction, especially since SSA representatives have told the FBI that the records were destroyed pursuant to policy. *See, e.g., Burd v. Ford Motor Co.*, No. 3:13-cv-20976 2015 U.S. Dist. LEXIS 88518, at *9-11 (S.D. W. Va. July 8, 2015) (permitting inquiry into document retention and disposition policies, even absent a claim of spoliation or proof of discovery abuses); *Doe v. District of Columbia*, 230 F.R.D. 47, 55-56 (D.D.C. 2005) (noting that Fed. R. Civ. P. 26(b)(1) permits discovery regarding document destruction policies). Given the dearth of other evidence from the SSA, these policies will be highly instructive on what the SSA was required to do in handling Webster's records—and whether it complied with its obligations. Because, as set out in the last section of this Memorandum, spoliation has emerged as a major issue, Webster is entitled to explore whether the SSA violated its own policies in destroying the records after it had clear notice they were needed for, and directly at issue in, a capital case.

### 2. The Government Was Permitted By the SSA to Conduct an Investigation Similar to That It Now Seeks to Block

The United States seeks to block Webster from conducting the very investigation that the FBI itself conducted. It is now clear that the Government has shared information freely among the three agencies contributing to its investigation, and yet seeks to preclude Webster from

conducting his own investigation in this adversarial litigation. In responding to the USAO's request, the SSA permitted FBI agents to talk to at least five employees or representatives it believed to have knowledge of Webster's case. Through telephone conversations and written correspondence, the FBI asked direct questions of SSA representatives, and elicited information within the knowledge of those individuals or the SSA systems they could access.

Michael Ferguson of the Pine Bluff Field Office reported that, "[p]ursuant to Social Security policy, the physical record was destroyed in 2001 and no digital copy was retained due to the age of the file." Schubert Decl. Ex. H. The SSA has refused to provide Webster with information on the policy governing destruction. Resp. at 16. Special Agent Grant also apparently talked to Special Agent Joseph Luna of the SSA Office of Inspector General ("OIG"), who told Grant that Webster's records were destroyed in 2010. Schubert Decl. Ex. A at 62 ¶ 3. Neither the SSA nor the USAO have produced any notes reflecting this correspondence so it is impossible for Webster to evaluate what else was said.

The FBI asked SSA representatives for referrals to other representatives who may have additional information relating to its questions. Michael Ferguson agreed to provide Grant with the name of an individual "who will be able to comment on what is required for Social Security to provide documents relating to disability claims to a third party representative of the claimant," Schubert Decl. Ex. H, and SSA employee Sharon Ward agreed to direct Grant to an individual who could comment on the sufficiency of Larry Moore's 1996 request, *id.* Ex. J.

The FBI was also able to pursue inconsistencies with the SSA. In one telling passage, FBI Supervisory Special Agent Michael Elsey wrote to Luna for help finding Webster's records. Elsey noted that Mr. Ferguson reported that Webster's physical file was destroyed in 2001 and no digital copy was retained. Elsey was skeptical of this response, stating "[h]owever, since the

defense team was sent a copy of Webster's file in 2009, it is probable that a copy of his file is still in existence." He asked for Luna's help: "In an effort to exhaust all means of establishing when and where Webster's defense team initially received the Social Security document in question, the FBI is seeking the [SSA OIG's] help in locating Bruce Webster's files." *Id.* Ex. L. Luna then apparently spoke with Grant, but Webster does not know the full content of the conversation. Webster may conduct his own investigation.

The FBI also asked SSA representatives how the SSA would have responded to Webster's 1996 request for records. The FBI was trying to elicit information regarding Webster's trial counsel's diligence in requesting records. Sharon Ward reviewed a copy of trial counsel's 1996 fax requesting Webster's records. She reported that she did not know whether the SSA would have complied with the request. *Id.* Ex. J. Kendell Rees, attorney for the SSA OIG, stated that under today's standards, the SSA does not generally honor "any and all" requests, but there are exceptions to that rule. *Id.* Ex. K. The Government characterizes this as "speculation," but overlooks entirely the fact that Webster may be interested in using information provided by these witnesses against the United States.

The FBI also interviewed Pine Bluff Office SSA employee Lisa Ruth, who received the October 8, 2009 record request letter that Webster's counsel sent to the Pine Bluff Office. Webster may make his own determination on the extent of Ms. Ruth's knowledge and recollection. Even if she doesn't recall the request (a subject Webster may explore, rather than rely on the Government's word for it), she may be able testify as to how record requests were handled by that Office in 2009; how she handled record requests in general, even if she has no specific memory of this request; and the applicable "systems" for responses to record requests and the names of those who may have been able to use that system to respond to Webster's

requests. In light of the fact that a representative from the Pine Bluff Office told Dorsey that "normal procedures" had not been followed when the SSA Evidence was produced, *see* LeRoux Decl. ¶ 9, Ms. Ruth may provide valuable information about those procedures.

In sum, the FBI—an arm of the Department of Justice—was granted wide-ranging access to SSA employees to conduct its own investigation of the circumstances regarding Webster's SSA files. Now the Government claims that a similar investigation by Webster will by "unduly burdensome." And it contends that Webster must meekly accept whatever the Government claims resulted from its own investigation. Both claims are baseless.

### 3. The Government's Position is Otherwise Self-Contradictory and Inadequate

The Government's arguments in its attempts to stave off discovery are inherently contradictory. For example, Webster has received no records showing the actual date of his record destruction even though, according to the Government, three of its employees saw the dates of destruction on an undisclosed "system" from which no printout has been provided. Similarly, the United States also claims that, in determining that the records were destroyed in 2001 and 2010, SSA representatives "relied on the same electronic records that have been offered to Webster," but the only reference to the destruction of Webster's files in the one record produced is a *2009* letter – sent *before* the SSA, FBI, and USAO now admit Webster's files were destroyed. Resp. at 11. The FBI was also told that Webster was the subject of two disability claims, but again, Webster has not been given access to the source of that information.

The United States also claims it need not produce SSA witnesses such as employees of the Pine Bluff or Terre Haute Field Offices to Webster because no SSA representatives have "personal knowledge" of Webster's records. But Webster may depose witnesses and make his own determination. And that the SSA has no information—not because it never existed, but

9

because the SSA destroyed it—is highly probative of the unavailability of the records in 1996 and the existence of spoliation.

## B. The USAO's Production Does Not Exempt SSA From Discovery

The United States argues that other relevant documents in the SSA's files, including files reflecting the SSA's communications with the FBI and the USAO, need not be produced because the USAO has produced its own investigative files; thus, the United States argues, "Webster has obtained the records from another, reliable source, and a subpoena will not result in any additional records other than those already in Webster's possession." Resp. at 11-12.

The SSA concedes that the Rule 26 standard for discoverable information governs the scope of discovery available here, *see, e.g.*, Resp. at 6 (applying the Rule 26 standard),[4] but has failed to show with specificity that the requested production is unreasonably duplicative. *Exec. Mgmt. Servs. v. Fifth Third Bank*, No. 1:13-cv-00582-WTL-MJD, 2014 U.S. Dist. LEXIS 155977, at *7-8 (S.D. Ind. Nov. 3, 2014) (requiring a party resisting a motion to compel discovery to prove with specificity that that the request was improper).

That the USAO has produced information from its own files does not excuse the SSA from participating in discovery. Webster's request is neither duplicative nor unreasonable. Webster seeks, for instance, notes from employees regarding their conversations with the FBI, or internal messages or memos to the file regarding the FBI's inquiry. These communications could provide, at the very least, information on the SSA's internal processes that the FBI did not have access to, the SSA employee's impressions regarding the FBI's inquiries (as opposed to the FBI agent's), or evidence that corroborates—or contradicts—the United States' claims. The United States does not claim that the documents being withheld are identical to those which have

---

[4] The SSA has not contested that good cause exists to conduct discovery, *see* Pet's Mem. at 26; it clearly does.

been produced, nor does it show that any overlap would be unreasonable. *See L-3 Commc'n's. Corp. v. Jaxon Eng'g & Maint., Inc.*, No. 10-cv-02868-MSK-KMT, 2014 U.S. Dist. LEXIS 103157, at *74 (D. Colo. July 29, 2014) (two documents that were different were not duplicates and must be produced); *Kenyon v. Simon & Schuster, Inc.*, No. 16 Misc. 327 (P1), 2016 U.S. Dist. LEXIS 140917, at *17-18 (S.D.N.Y. Oct. 11, 2016). And given the long string of inconsistencies in the Government's position, overlap may be necessary to test the veracity of its disclosures. *See Saller v. QVC, Inc.*, No. 15-2279, 2016 U.S. Dist. LEXIS 82895, at *16 (E.D. Pa. June 24, 2016) ("Defendant is entitled to serve third-party subpoenas 'to test the veracity of [the opposing party's] assertion that they have produced all documents they were required to produce.'" (quotation omitted)). Contrary to the United States' claims, this information has "bearing" on the forefront issues and should be made available to Webster.

The Government, while it seeks Webster's execution, may not have the benefit of doubt here. It effectively requests that he be foreclosed from investigating his own case. The SSA's internal notes and communications may shed light on the SSA's failure to turn over records in 1996, despite diligent attempts by Webster's trial counsel to obtain them. Webster may unearth facts and question the veracity of the SSA's statements, especially here, where the SSA withheld important records from Webster, falsely informed Webster that his records had been destroyed when he needed them to develop his case, destroyed his records after Webster filed suit in the Fifth Circuit based on those records, misrepresented the information currently in its files, and now, using the DOJ's counsel, is fighting to keep that information secret.

## C. The United States Has Not Shown Undue Burden

The document retention policies applicable to Webster's records are important to this case. The SSA destroyed Webster's records after it had notice the records related to Webster's capital case. The United States claims that "approving such testimony would burden SSA and

divert [its] employees from performing their official duties with the agency," Velte Decl. ¶ 23 and that "[g]iven the complexity, number, and changes in the rules, regulations and policies that govern these topics, the agency would be required to call multiple SSA witnesses in order to provide competent subject matter testimony on all relevant topics," *id.* ¶ 3.

It provides no detail regarding the actual burden, by identifying, for example, the number of employees, number of hours, number of policies to be reviewed, or the estimated cost of complying with Webster's request. This is insufficient. "[O]ne claiming undue burden must do more than intone the phrase…Undue burden or expense, actual or potential, must be shown by a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Papst Licensing GmbH & Co. KG v. Apple, Inc.*, No. 6:15-cv-1095, 2017 U.S. Dist. LEXIS 51274, at *10 (N.D. Ill. Apr. 4, 2017(citations omitted) (citations omitted); *Allstate Ins. Co. v. Electrolux Home Prods.*, No. 16-cv-4161, 2017 U.S. Dist. LEXIS 189229, at *5 (N.D. Ill. Nov. 15, 2017) (moving party has burden of demonstrating that undue burden exists). "'[U]nfortunately…saying so doesn't make it so….' 'Lawyers' talk is no substitute for data.'" *Papst*, 2017 U.S. Dist. LEXIS 51274, at *10 (quotations omitted). The law requires a "particularized showing" of undue burden, *id.* at *11, which the United States has not provided.

The United States avers that the SSA has satisfied its duty because it provided cites to or, in some limited cases, copies of certain document retention policies. But the SSA refuses explain which policies applied, to which records, at which time. The SSA refuses to tell Webster which specific policy authorized the destruction of his records. And the SSA argues that it would be unduly burdensome for it to do so. The Government's refusal to meaningfully engage in discovery on the retention policies only illustrates that this information is not readily available

in another form—if the SSA can't sort out its own document retention policies, it cannot expect Webster to do so on his own. *See* Pet.'s Mem. at 22-23.

Finally, the Government's argument that the discovery sought by Webster is "not proportional" is as unsupported as it is callous. The Government seeks to execute Mr. Webster, yet asks this Court not to "inconvenience" a handful of SSA employees with depositions, or to bother the SSA with requests for highly relevant documents. A man's life is at stake. With no specific showing as to what burdens the SSA would endure, and given the fact that the FBI was allowed to conduct an investigation similar to the inquiry that Webster now seeks to undertake, "proportionality" is not a principle that the Government can hide behind.

**D. The United States Has Not Demonstrated That Documents Are Protected by the Attorney-Client Privilege**

Incredibly, the USAO purports to concurrently represent both the Respondent Department of Justice and the SSA, boldly claiming not only that they should be permitted to sequester their joint internal investigation, but, based on some twisted version of the attorney-client privilege, they should also be able to shield their communications about that investigation.

In footnote 8 of its brief, the United States identifies, for the first time, a "small category of responsive documents that have not been produced," including "contacts between the two agencies related to *Touhy* and the defense of the instant motion for subpoenas." It claims that the records "are privileged and protected by the attorney-client privilege as the communications relate to Webster's complaint about SSA and threat to file litigation compelling the agency's response." Resp. at 15. The United States admits that these documents are responsive and, because the United States has not adequately asserted the privilege, they should be produced.

To show the attorney-client privilege attaches, the SSA must show that its communications with the USAO were to obtain legal advice. *Evans v. United States DOI*, 135 F.

Supp. 3d 799, 827 (N.D. Ind. 2015). Specifically, the SSA must show that a document "reflects communications between an agency and an attorney that occurred in the course of providing or obtaining legal advice on the ramifications of an agency's actions." *Id.* (citation omitted).

The SSA has failed to distill how the same Assistant United States Attorneys ("AUSAs") representing the Respondent DOJ are also able to represent the SSA (which claims, unconvincingly, to be a disinterested third party).[5] The DOJ, Webster's opponent in the litigation, has aligned itself with the SSA in obstructing access to relevant information even as the SSA claims it is a "third party."[6] Furthermore, the United States has waived any attorney-client privilege that may have existed by producing certain documents reflecting the position it favors. It cannot now arbitrarily claim privilege over other documents relating to the same subject. *See, e.g., Eco Mfg. LLC v. Honeywell Intern'l. Inc.*, 1:03-CV-0170, 2003 WL 1888988, *2 (S.D. Ind. Apr. 11, 2003) (party cannot use waiver of the privilege as a sword and a shield).

The United States' position here is surprising to Webster. As discussed at the December 21, 2017 telephone conference with the Court, Tami Parker and Timothy Funnell, the AUSAs representing the United States, had two telephone conferences with counsel for Webster regarding the SSA's response to Webster's *Touhy* requests. During those discussions, the AUSAs elicited Webster's position on his discovery requests and requested the opportunity to communicate Webster's position to the SSA before Webster filed any motion, but made clear that they could not influence the SSA's response to Webster's request. Throughout these

---

[5] The only "common interest" evident here is protection of the SSA. *See Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 273 (N.D. Ill. 2004) (noting that the common interest doctrine applies where there is a common litigation interest and protects "the confidentiality of communications...where a joint...effort or strategy has been decided upon or undertaken....") (internal quotation marks and citations omitted).

[6] The SSA and DOJ could just have easily promoted the DOJ's position—that Webster should be entitled to "relevant, unprivileged documents and information from the SSA relating to Webster's Social Security documents at issue here and the SSA's document-retention policies." Rule 16-2 Statement of Position of the Parties, Dkt. 55 at 8.

discussions, however, the AUSAs never disclosed that the USAO and they, themselves, represented the SSA in this matter, or importantly, that they were communicating with Webster as the SSA's advocate. If, at the time of these discussions the USAO was not representing the SSA, its communications with the SSA are not privileged, including those that relate to "Webster's complaint" and "threat to file litigation." If the USAO was (or knew that it would be) representing the SSA, it clearly should have disclosed that fact to Webster.

The United States' failure to provide a privilege log compounds this problem. Webster does not know what documents have been withheld, the subject matter and date of the documents, the nature of the privilege, the legitimate basis for a common interest (if there is one), or the individuals and counsel party to the communications. The United States, having violated the requirements Fed. R. Civ. P. 26(b)(5), should have to produce the documents.[7]

### E.  The SSA Is Not Immune From the Court's Subpoena Power

The United States argues that the Court cannot review the SSA's response to Webster's *Touhy* requests. This is a complete red herring. The SSA is not immune from this Court's subpoena power simply because it already improperly denied a request for information through its administrative channels. Regardless of whether the SSA is a party or third party to this case, it is subject to discovery here under Fed. R. Civ. P. Rule 34 or 45.[8]

As Webster pointed out in his opening brief, he is not, as the United States argues, limited to relief under the Administrative Procedures Act. "*Touhy* is applicable only in cases where the United States is not a party to the original legal proceeding." *Alexander v. FBI*, 186

---

[7] At a minimum, the United States should be required to provide a privilege log describing, for each document: the type of document protected (*e.g.*, email, letter); the date and title of the document; the nature of the privilege asserted; the subject of the advice; and the names of the author/sender and recipients, identifying counsel.

[8] Webster does not concede that the SSA is not a party to this case, but seeks information through a Rule 45 subpoena for the convenience of the Court and the parties.

F.R.D. 66, 70 (D.D.C. 1998) (internal citation omitted). In cases like this one, originating in federal court and to which the federal government is a party, "there is no requirement that the litigant proceed under the APA and file a separate lawsuit in order to obtain testimony from a witness." *Id.* The Southern District of Indiana has also recognized this distinction. *See Bosaw v. Nat'l Treasury Emps. Union*, 887 F. Supp. 1199, 1212 (S.D. Ind. 1995) ("When the case is originally brought in federal court . . . if the government is a named party to the action, it is subject to the same rules of discovery as any private litigant."); *see also Watts v. SEC*, 482 F.3d 501, 508 (D.C. Cir. 2007) (challenge to an agency's failure to comply with a Rule 45 request for documents should proceed under the Federal Rules of Civil Procedure and not the APA); *Exxon Shipping Co. v. United States Dep't of Interior*, 34 F.3d 774, at 780 (9th Cir. 1994) (the proper means of reviewing a request for documents from an agency are the Rules of Civil Procedure).

The United States cites no case where the court sustained a *Touhy* denial when the DOJ worked directly with the SSA in investigating, responding to, and denying a Touhy request. Instead, the United States relies on *Edwards v. United States Department of Justice*, 43 F.3d 312, 314 (7th Cir. 1994), which does not apply here. In *Edwards*, a state court order directed the FBI to show cause why it would not comply with a state subpoena. *Id.* The FBI removed the proceeding to federal court, and the federal district court quashed the state court's order. *Id.* On appeal, the Seventh Circuit concluded that because the plaintiffs' enforcement of a state court order against an unwilling federal officer implicated sovereign immunity concerns, and so plaintiffs must proceed under a separately-filed federal APA claim. *Id.* at 317. This case originated in federal court against the federal government. The SSA's opposition to Webster's discovery requests is raised by the Respondent federal government. There are no sovereign immunity concerns and no need for a collateral proceeding. *Alexander*, 186 F.R.D. at 70.

*Touhy* does not preclude the Court from issuing subpoenas, and does not excuse the SSA from complying. The federal housekeeping statute, 5 U.S.C. § 301, "does not authorize withholding information from the public or limiting the availability of records to the public." Courts agree. *Exxon*, 34 F.3d at 777 (housekeeping statute does not, by its own force, authorize withholding of evidence sought under a valid federal subpoena); *N.L.R.B. v. Capitol Fish Co.*, 294 F.2d 868, 875 (5th Cir. 1961) (§ 301 "cannot be construed to establish authority in the executive department to determine whether certain papers and records are privileged"); *Leyh v. Modicon, Inc.*, 881 F. Supp. 420, 422 (S.D. Ind. 1995) (§ 301 creates no privilege that protects federal agencies from ever being required to provide evidence in federal court); *see also United States v. Reynolds*, 345 U.S. 1, 9-10 (1953) ("[J]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers."). The SSA cannot use § 301 and the SSA's own regulations to subvert the Court's judgment; such an action would unconstitutionally usurp the Court's authority to determine the relevance of evidence.

The United States does not contend that the requested information is not relevant to the threshold issues of the availability of Webster's records and the diligence of his counsel. This Court should reject the United States' attempts to withhold vital information and order it to provide Webster with the documents, information, and testimony requested in his subpoena.

## III. WEBSTER IS ENTITLED TO EVIDENCE RELATING TO SPOLIATION

Webster should be permitted to take discovery relating to the SSA's admitted destruction of his records. It is now clear from the United States' Response that the SSA destroyed all of Webster's remaining records, including the SSA Evidence, *after* the United States Attorney's Office for the Northern District of Texas (which represents the Respondent and the SSA in this action) received and responded to Webster's Fifth Circuit motion seeking to introduce the SSA Evidence in his collateral appeal. This is an extraordinary revelation. The United States has

pushed Webster to show his SSA records weren't available, and that his counsel exercised diligence, yet the SSA actively destroyed Webster's records and the DOJ did nothing to stop them, depriving Webster of access to key evidence within the United States' files that likely shed light on those issues. The United States has also contested the importance of the records in showing intellectual disability, claiming that the SSA records are cumulative of evidence presented at trial, and they have now gone so far as to question the authenticity of the records themselves. But due directly to their actions, Webster will never have access to any additional records in those files. Webster knows that those records likely included additional medical records, including multiple documents regarding the SSA's disability determination. *See* Schubert Decl. Ex. A at 29. Webster does not know—and will never know—what additional records were in those files, including records that corroborate his trial counsel's diligence in attempting to obtain records and additional never-disclosed medical records that further corroborate Webster's disability but are not available from any other source.

"It is the duty of the United States, no less than any other party...to ensure, through its agents, that documents relevant to a case are preserved. Indeed...a good argument can be made that, as the enforcer of the laws, the United States should take this duty more seriously than any other litigant." *United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 274 (2007). "A party has a duty to preserve evidence over which it has control and reasonably knows or could foresee would be material to a potential legal action." *Hoskins v. Bowles*, No. 3:15-cv-280-SMY-RJD, 2018 U.S. Dist. LEXIS 15741, at *5 (S.D. Ill. Jan. 31, 2018) (quoting *Bryant v. Gardner*, 587 F. Supp. 2d 951, 967-68 (N.D. Ill. 2008)).

Here, the facts strongly reflect that the Government spoliated evidence by willfully and intentionally destroying Webster's records in the middle of litigation:

18

(1) Webster notified the SSA on October 27, 2008 that his documents were needed for a capital case.

(2) In February 2009, the SSA accessed Webster's file and produced the SSA Evidence.

(3) Starting in October 2009, the SSA prevented Webster from obtaining additional documents by invoking supposed administrative deficiencies in response to Webster's follow-up requests.

(4) On October 21, 2009, Webster filed his Motion for Authorization to File Successive Motion to Vacate his Death Sentence with the Fifth Circuit, which was based on the SSA Evidence. The Fifth Circuit Motion would be defended by the United States Attorney's Office in the Northern District of Texas.

(5) On November 30, 2009, the USAO filed its opposition to Webster's Fifth Circuit Motion.

(6) On December 4, 2009, the SSA told Webster that all of his files had been destroyed. The SSA has now admitted that this statement was false and that Webster's files had not actually been destroyed.

(7) In 2010, the SSA destroyed all of Webster's files, including the SSA Evidence that formed the basis for his Fifth Circuit Motion.

(8) On April 28, 2010, the Fifth Circuit issued an order denying Webster's Fifth Circuit Motion.

(9) Webster filed his cert petition on July 27, 2010; the United States responded on October 29, 2010; and the Court denied Webster's petition on December 6, 2010. Webster filed this action on April 6, 2012.

(10) On March 9, 2016, the United States submitted the Declarations of FBI SA Edmond F. Grant and former Assistant U.S. Attorney Delonia Watson. For the first time, the United States asserted that the SSA destroyed Webster's records in 2001 and 2010, and this destruction included the SSA Evidence. SA Grant and Ms. Watson also confirm that no one from, or acting on behalf of, the USAO contacted the SSA regarding Webster's records, including the SSA Evidence, prior to September 21, 2015.

In its Response, the United States admits that the SSA did destroy Webster's records, including the SSA Evidence, in 2010. Resp. at 12 n.7, 14. It has also admitted that the only other destruction took place in 2001. *Id.* It has disclaimed the possibility that any records were destroyed in 2009 and conceded that an SSA representative had no basis to tell Webster that all

of his records had been destroyed in 2009. *Id.* at 12 n.7. It appears that no records were destroyed between 2001 and December 31, 2009. Whatever documents existed on October 27, 2008, when Dorsey sent the first request to the SSA notifying it that the records were needed for a capital criminal case, still existed on November 30, 2009, when the United States filed its opposition to Webster's Fifth Circuit Motion, and on December 4, 2009, when Webster was falsely informed that his records had been destroyed.

The SSA has destroyed relevant evidence after it was requested for use in capital litigation and provided false information to Webster's counsel about its destruction. Its current counsel, the USAO, admits that it did nothing to preserve that evidence. At the same time, the USAO contends that the unavailability of the SSA's records means that the trial counsel's diligence in seeking the records at the time of trial, and even the subset of SSA records earlier produced by the SSA, cannot be "corroborated." *Id.* at 2 n.1. Where the SSA and the USAO, at a minimum, failed to retain Webster's SSA records in 2008 when Webster made his request and explained what it was for, they should be prevented now from asserting that trial counsel's contentions and the records produced to habeas counsel cannot be "corroborated."

The United States should be held responsible for the conduct of the SSA and the USAO, and Webster should be permitted to take discovery to ensure that it is.

## IV. CONCLUSION

The SSA should not be excused from discovery. It began cooperating and sharing key information with Webster's opposition in 2015. These agencies are acting in concert as arms of the federal government to withhold this same key information from Webster, in violation of all established principles of discovery and fairness. This Court should order the SSA to respond to Webster's subpoenas.

Dated: February 23, 2018

DORSEY & WHITNEY LLP

By  s/Kirsten E. Schubert
    Steven J. Wells
    *Admitted pro hac vice*
    Kirsten E. Schubert
    *Admitted pro hac vice*
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Monica Foster (No. 8368-49)
INDIANA FEDERAL COMMUNITY
DEFENDERS, INC.
111 Monument Circle, Suite 2150
Indianapolis, IN 46204
Telephone: (317) 383-3520
Facsimile: (317) 383-3525

*Attorneys for Petitioner Bruce Carneil Webster*