# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# TERRE HAUTE DIVISION

| | |
|---|---|
| BRUCE CARNEIL WEBSTER, ) | |
| ) | |
| Petitioner, ) | |
| vs. ) | Cause No. 2:12-cv-86-WTL-MJD |
| ) | |
| CHARLES LOCKETT, ) | |
| ) | |
| Respondent. ) | |

## ENTRY FOLLOWING HEARING OF JUNE 18, 2018

This cause is before the Court to determine whether Bruce Webster has satisfied the savings clause of 28 U.S.C. § 2255, entitling him to bring a petition under 28 U.S.C. § 2241. For the Court to so find, Webster must show that certain evidence was unavailable to him at trial. The parties have fully briefed the relevant issues and presented evidence at a hearing. The Court, being duly advised, finds that Webster has satisfied the savings clause.

### I.   BACKGROUND

**A.  Procedural Background**

On November 4, 1994, Bruce Webster was indicted in the United States District Court for the Northern District of Texas on six counts, including kidnapping in which a death occurred in violation of 18 U.S.C. §§ 1201(a)(1) and (2), and other various noncapital offenses. Webster was convicted and was sentenced to death on June 20, 1996. *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998).

Webster filed his initial Motion to Vacate Conviction and Sentence under 28 U.S.C. § 2255 on September 29, 2000. This motion was subsequently amended and was denied in full on September 20, 2003. *Webster v. United States*, No. 4:00-CV-1646, 2003 WL

23109787 (N.D. Tex. Sept. 30, 2003). The Fifth Circuit rejected Webster's motion for relief under section 2255, *United States v. Webster*, 421 F.3d 308 (5th Cir. 2005), and his application for an order authorizing a successive 2255 proceeding, *In re Webster*, 605 F.3d 256 (5th Cir. 2010).

On April 6, 2012, Webster filed a Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 in this Court, challenging his death sentence based on what he argued was previously unavailable evidence that establishes he is mentally retarded and therefore ineligible for the death penalty. On November 13, 2013, this Court issued an order denying that petition. The Seventh Circuit affirmed this Court's ruling on August 1, 2014. *Webster v. Caraway*, 761 F.3d 764 (7th Cir. 2014). However, en banc review was granted, and the en banc court reversed this Court's decision and remanded for further proceedings. *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc). Pursuant to the Seventh Circuit's directive, this Court held a hearing on June 18, 2018.

The purpose of the hearing was to allow Webster to present evidence as to whether certain Social Security records were unavailable to him and his counsel at the time of trial. The Seventh Circuit instructed this Court to evaluate trial counsel's diligence when considering that question. *Webster*, 784 F.3d at 1146. The parties agree that Webster must prove the unavailability of the Social Security records by a preponderance of the evidence.

> The Seventh Circuit described the relevant Social Security records:
>
> The newly produced records, which Webster's current lawyers received on February 9, 2009, showed that Webster applied for Social Security benefits based on a sinus condition when he was 20 years old, approximately a year before the crime. The agency's attention was evidently quickly redirected to Webster's mental capacity. Two psychologists and one physician examined him. On December 22, 1993, Dr. Charles Spellman, a psychologist, evaluated him for the purpose of ascertaining his eligibility for Social Security benefits. He noted that "[i]deation was sparse and this appeared to be more of a function of his lower

cognitive ability than of any mental illness." Dr. Spellman also observed that Webster's intellectual functioning was quite limited: he could not register three objects (meaning that he could not remember three objects a short time after they were shown to him); he could not do simple calculations; and he did not know what common sayings meant. With respect to adaptive functioning, Dr. Spellman stated that Webster lived with his mother; that he watched television, listened to the radio, and went walking; that he did no chores around the house; and that he was idle both in the house and on the streets. Taking into account both his estimate that Webster's I.Q. was 69 or lower and his assessment of adaptive functioning, Dr. Spellman concluded that Webster was mentally retarded and antisocial. He found no evidence of exaggeration or malingering.

A few months earlier, in October 1993, Dr. Edward Hackett conducted a full-scale WAIS I.Q. test on Webster. He came up with a verbal I.Q. of 71, a performance I.Q. of 49, and a full-scale I.Q. of 59. He evaluated Webster as "mildly retarded, but . . . also antisocial." Pertinent to the central question of adaptive functioning, Dr. Hackett noted in a later report that "[Webster] was viewed as a somewhat mild[ly] retarded con man, but very street wise. . . . [H]e could not be functional in a community setting. . . . He would also not function well in the work place." Dr. Hackett did not believe that Webster was capable of managing his own benefits. He found Webster's behavior somewhat bizarre. Finally, he commented that on the I.Q. tests, Webster's performance was estimated to be lower than his verbal score, and that some organic function might be involved.

The last professional to examine Webster in conjunction with the 1993 Social Security application was Dr. C.M. Rittelmeyer, a physician. Dr. Rittelmeyer found Webster's physical health to be fine, but he also had this to say: "Mental retardation. Flat feet. Chronic sinus problems and allergies by history."

The Social Security records included an intriguing letter that strongly suggested that Webster in fact had been in special education classes. It was dated November 8, 1993, and had been written by Lou Jackson, the Special Education Supervisor for the school system Webster had attended, Watson Chapel Schools. Jackson's letter explained that Webster's special education records had been destroyed in 1988, after the family did not respond to a letter "telling them they could have the records if they wanted them."

The Social Security records also provide some direct evidence about Webster's abilities. The form Webster completed, for example, is rife with errors in syntax, spelling, punctuation, grammar, and thought. In response to a question asking him to describe his pain or other symptoms, Webster wrote "it causEs mE to gEt up sEt Easily hEadhurtsdiffiErnt of brEdth." When asked about the side effects of his medication, he wrote "Is lEEp bEttEr." When asked about his usual daily activities, Webster wrote (consistently with the comments from his teacher

and employer) "I slEEps look at. cartoon." He reported that he "ain't got no chang" in his condition since its onset.

*Webster*, 784 F.3d at 1133-34.

### B. The Hearing

Two witnesses testified at the hearing: Larry Moore, Webster's lead trial attorney; and Kristin LeRoux, who lead the paralegal team for Dorsey & Whitney LLP ("Dorsey"), the law firm that has represented Webster since 2008.

First, the Court heard testimony from Moore. Currently, Moore is the chief of the criminal division of the Tarrant County Criminal District Attorney's office in Fort Worth, Texas. Moore has been practicing law for over forty-one years and has been board certified in criminal law since 1982. Moore was in private practice, doing primarily criminal defense, from 1986 to 2015. Otherwise he has been a prosecutor.

In 1994, when Moore was appointed to represent Webster, his practice consisted entirely of criminal defense. Moore had experience trying capital cases both as a prosecutor and as a defense attorney. As a prosecutor, he had tried three capital cases. One defendant was sentenced to death and eventually executed. He also had tried three death penalty cases as a defense lawyer. Additionally, he was involved in numerous other capital cases that were resolved prior to trial. In all, he probably represented sixty or more capital defendants and prosecuted a number of murder cases in which the death penalty was not sought.

Early on in Moore's representation of Webster, it became apparent to Moore that Webster suffered from some kind of mental disability. Based on these observations, the defense team hired and/or had appointed a total of five mental health experts. Moore and his co-counsel, Allan Butcher, split the expense for the experts who were not court appointed. In Moore's experience, having five experts in a Texas capital case in 1996 was exceptional; that number of experts never

would have been appointed by a judge, and not many lawyers would pay for the experts out of their own pockets. None of the experts opined that Webster did not suffer from mental retardation.[1]

As Moore became more familiar with Webster's case, he came to the opinion that the Government's guilt phase case was overwhelming. Moore thought that Webster's intellectual functioning was the key to the penalty phase. Moore knew that the federal death penalty statute that was enacted in 1994 and became effective just weeks before the crime with which Webster was charged barred the execution of mentally retarded people.

The federal death penalty statute did not set out a procedure as to who would make the determination of mental retardation, the standard under which it would be made, or how it would be made. For that reason, Moore consulted as many legal experts around the country as he could concerning the role of mental retardation, which he felt was the primary issue in Webster's case. He also consulted with experts in mental retardation and special education, including a professor who had assisted in drafting the mental retardation carve-out in the federal death penalty statute. Additionally, Moore read as many articles as he could find about mental retardation. Although Moore previously had handled cases with mentally retarded defendants, Webster's case was the first in which there was a statutory bar to the execution of a mentally retarded person.

Moore also sought out every medical record and school record he could find and also talked to every person he could find who had known Webster growing up to try to get information relevant to the issue of Webster's mental retardation. Moore knew that historical medical records were important in any death penalty case, and he felt that in Webster's case any

---

[1]The Court will use the term that was used at the time of Webster's trial—"mental retardation"—rather than the term "intellectual disability," which is the term now used by the Supreme Court. *See Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).

type of issue regarding Webster's medical or mental background needed to be developed through as complete a background investigation as could be performed. In 1994, it was Moore's custom to have a capital client sign blank release forms early in the representation of that client so that he could complete and send the release without having to go back to the jail each time. Moore followed this practice in Webster's case and had Webster execute a blank medical release form.

At some point prior to trial, Moore learned that Webster may have been evaluated by the Social Security Administration ("SSA") for disability benefits. He believed that he learned this information from Webster's mother, Beatrice Webster, during a trip in late February 1996 to Little Rock, Arkansas, to interview Webster's family members and other potential witnesses. Mrs. Webster told Moore that, sometime prior to Webster's arrest, she had made an application for Social Security benefits for Webster for a physical ailment. She also told Moore that she had taken Webster to the state agency and the state mental health agency.

Mrs. Webster told Moore that Webster's application was based on a physical ailment, not intellectual disability. However, based on what Mrs. Webster told him, Moore understood that during the course of the proceedings Webster may have had testing for possible mental issues, which Moore suspected may have included testing to determine whether Webster met the criteria for mental retardation. Moore also knew that Webster had been tested by the Southeast Arkansas Mental Health agency and been found to be mentally retarded. By the time that Mrs. Webster told Moore about the testing, Moore already had diagnoses of mental retardation from his own experts.

Moore considered the information from Mrs. Webster to be critically important, as he believed that Webster's mental retardation would be the single biggest issue at trial. He knew that the Government would argue that Webster was not mentally retarded, as it previously had

6

contacted the examiner from the Southeast Arkansas Mental Health Clinic who had diagnosed Webster as mentally retarded. After the Government's contact, the examiner changed his opinion as to whether Webster was mentally retarded. Further, Moore knew that, because the application for disability had been made years prior to the crime with which Webster was charged, any finding that Webster was mentally retarded would have been made prior to Webster's arrest and prosecution. He believed that any such finding made prior to the arrest would be critically important to convince the jury of the accuracy of the diagnosis.

Based on what Mrs. Webster told him, Moore told his legal assistant, Kimberly Whitehead, to contact the SSA office in Little Rock, Arkansas, to determine how he could get records for Webster's Social Security benefits application. At the hearing, Moore identified an undated handwritten note that he had written to Whitehead telling her to call the Pine Bluff SSA office to find out what information was needed to get copies of the records of Webster's application for disability. In part, the note explained,



Pet. Ex. 20. Moore thought it was critical to have the test results, and the exclamation point at the end was to emphasize this fact. The note also included the address and phone number of the Pine Bluff office, also in Moore's handwriting.

Moore wanted Whitehead to find out exactly what type of release the Social Security office would require; he knew that some entities required their own release forms. Moore also identified another note in his trial file as a directive to Whitehead to secure Webster's Social Security records:

7



Pet. Ex. 23. Again, Moore was instructing Whitehead to get the results of any testing that had been done. Moore also identified a note in Whitehead's handwriting that had a fax number for Hal West, the head of the SSA office in Pine Bluff. The note was dated February 29, 1996, and had the time 11:30 written on it.

     A fax transmittal sheet with a handwritten date of March 5, 1996, to recipient Mr. Hal West, SS Admin. Office, at fax number of 501-535-5381, all in Whitehead's handwriting, was also in the file. The fax header at the top showed the document was faxed on March 4, 1996, at 23:50 and was page 1. Another document with the same fax header but numbered as page 2 was a letter dated February 29, 1996, from Kimberly Whitehead to Hal West. The letter, on Moore's letterhead, reads:

Dear Mr. West:

Thank you for visiting with me regarding the above Defendant. As you requested I have enclosed a copy of a Business Records Authorization and Release and a Business Records Affidavit. It is my understanding that Mr. Webster applied for disability in 1992 and some testing was done. He did not receive any disability payments. For purposes of trial, we will need to obtain any information relating to his disability claim.

Mr. J.W. Strickland, of L. Michael Connelley and Associates, will be in Pine Bluff on March 1st through 5th, 1996. He will have in his possession the original authorization signed by Mr. Webster for your files. The Business Records Affidavit will need to be filed out when Mr. Strickland picks up the records. This Affidavit will keep someone from your office from having to come to Fort Worth to testify that these records are true and correct copies of the records in your files.

Please contact me if you have any questions, or if you require anything further in this regard.

Sincerely,

Kimberly Whitehead

KIMBERLY J. WHITEHEAD,
Legal Assistant to Larry M. Moore

kw/
Faxed
Enclosures

Pet. Ex. 16.

Moore's trial file also included a Business Records Authorization & Release addressed to Hal West at the U.S. Social Security Administration, Pine Bluff District Office. This document, page 3 of the March 4, 1996, 23:50 fax, was signed by Webster and witnessed by Moore and his co-counsel. Jury selection in Webster's case had begun by March 3, 1996, the date of the release, and Moore recalled that Webster had executed the authorization at the courthouse. Moore drafted the business records authorization and release according to the instructions that had been received from the Arkansas SSA office and included the information that the office had requested. A business records affidavit had the same fax header other than being numbered page 4.

9

A transmission verification report showed that on March 4 at 23:50, a fax transmission was sent from Moore's fax machine to Hal West's number. It was four pages and took two minutes to transmit, and the transmission was successful. Moore's file also contained a Federal Express bill for a Federal Express letter sent to Hal West at the SSA in Pine Bluff. The bill notes that the shipment was in connection with the Webster case. The package, which was delivered on March 7, 1996, at 9:38 a.m., contained the same pages that previously had been faxed. It was Moore's practice to always follow up a fax transmission with the hard documents themselves.

J.W. Strickland, one of Moore's investigators, went to Pine Bluff in early March 1996 to interview witnesses and gather facts. Strickland reported to Moore that he had gone to the Pine Bluff Social Security Office but had been told that it had no records on Webster. Moore had Whitehead contact the SSA, and then Moore called West himself.

Even though Strickland had reported to Moore that the SSA had indicated that it had no records, Moore felt that it was his primary responsibility to obtain the records. He had had experiences where a lawyer was able to get results when an investigator had not been able to. Moore wanted to be personally told by someone at the SSA that it did not have any records regarding Webster. Thus, during the first week of March, during voir dire in Webster's case, Moore contacted the Pine Bluff Social Security Office himself. Moore did not recall with whom he spoke at the SSA, but he thought it was Hal West. The person with whom Moore spoke told him that there were no records in existence.

Moore testified that he had no doubt that he personally made contact with the Pine Bluff SSA office to request Webster's records and was told that it did not have any records pertaining

to Webster. Having been told this, Moore did not think there was anything else he could do.[2] He did not research the SSA's retention policies. Nor did he seek a subpoena, as he had no good faith belief that the records existed.

Moore's trial file contained no records responsive to his request for the records from the SSA in Pine Bluff.[3] He did not receive any records, nor did he receive any correspondence rejecting his request or asking for additional information. If the SSA had asked for additional information, he absolutely would have provided it. If the SSA had indicated that it had records but denied Moore's request to get them, he would have attempted to get the records by any means. He thought such records were critical to Webster's defense.

Moore first learned of the existence of the records shortly before October 20, 2009. The records would have been very useful in Webster's defense: they indicated that Webster had been tested by the SSA and had been found to be mentally retarded. The diagnosis would have been critically important because it had been made prior to the commission of the crime.

Further, the records contained an indication that Webster's special education records were destroyed in 1988; at trial, there had been an issue as to whether Webster actually had been in special education. Webster's counsel had not been able to obtain records from the school

---

[2]The Government argues that the Court should find Moore's hearing testimony was not credible because it was far more specific and detailed than a declaration he made in 2009. However, the Court credits Moore's explanation that reviewing his trial file, portions of the transcript of Webster's trial, and some of the trial exhibits—which he had not done before making the 2009 declaration—refreshed his recollection about the attempts to obtain any records pertaining to Webster that were in the possession of the SSA. Moore's additional review of the file, which he did after making the 2018 declaration and before the hearing, further helped Moore recall the events, as he remembered that his direct contact with the SSA took place during voir dire.

[3]Moore also testified that the trial file did not contain any documentation that he had made regarding what he had learned from the SSA. While he did not recall whether he had, in fact, made any such document, he testified that many notes from the investigation and trial were no longer in the file.

district showing that Webster had been in special education, and at trial the Government had seized on the lack of records and argued that Webster's family members who testified that he had been in special education classes were lying.

The Court next heard from LeRoux. Attorneys from Dorsey began representing Webster in 2008 with plans to prepare a clemency petition. On October 27, 2008, Dorsey sent a request for Webster's records to the SSA office in Pine Bluff. On February 9, 2009, after requests and phone calls, Dorsey received records regarding Webster from the SSA.[4] These records were not part of the trial file that Dorsey had received and indexed.[5]

## II.    DISCUSSION

The Court must determine whether the Social Security records were unavailable to Webster and his counsel at the time of the trial. In considering that question, the Court must evaluate trial counsel's diligence. Having observed the demeanor of Moore during the hearing, the Court finds his testimony to be credible. As such, the Court must determine whether Moore was duly diligent when, after Moore's investigator reported that the SSA had told him that no records existed and Moore himself was told by someone from the SSA that no records existed, Moore relied on these representations and did not take further action. The Court finds that Moore was duly diligent and that the records were unavailable to Moore and thus Webster at the time of the trial.

---

[4]After reviewing the records, Dorsey realized that they were incomplete; an index in the file referred to documents that were not in the file the SSA produced to Dorsey. Dorsey sought to obtain these records, but the SSA eventually indicated that it had destroyed Webster's entire file.

[5]Because in the Court's view Dorsey's ability to obtain some of Webster's Social Security records—after what LeRoux characterized as the most difficult records process she had experienced in her twenty-two-year career as a paralegal—is irrelevant to whether Moore exercised due diligence in 1996, the Court need not recite the entire process through which Dorsey obtained the records and attempted to obtain additional records.

The Seventh Circuit has explained, in the context of 28 U.S.C. § 2244, that due diligence is reasonable diligence, not "the maximum feasible diligence." *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004) (quotation and citation omitted). The Supreme Court has recognized that "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

Here, Moore's only source of information that SSA records might exist was Webster's mother, who herself was intellectually disabled. Moore, recognizing the importance of any records, directed his assistant to contact the SSA to find out how to obtain any records. Pursuant to the instructions from the SSA, Moore drafted a release specifically to meet the SSA's requirements and had Webster sign that release. At Moore's request, Whitehead both faxed and sent via FedEx a packet of material with a letter and the release form that complied with SSA's requirements.

Strickland then went to Pine Bluff to attempt to pick up any records. He reported to Moore that the SSA office had told him that no records existed. Moore then personally called the SSA to follow up because he wanted to confirm that no records existed. Moore also was told that no records existed; he was not told that records existed but would not be provided. He was simply told that no records existed.

Given this response from the SSA, Moore's failure to take further action was reasonable. As such, the Court finds that Moore made diligent efforts to obtain any evidence based on the information he had been provided at the time. Accordingly, the SSA records were unavailable for trial, s*ee Webster v. Daniels*, 784 F.3d at 1140 n.9, and Webster has satisfied the savings clause and may proceed with his section 2241 petition.

## III. CONCLUSION

The Court finds that Webster has met his burden and shown by a preponderance of the evidence[6] that the Social Security records were unavailable to him at the time of trial despite trial counsel's due diligence. As such, they constitute newly discovered evidence. Accordingly, Webster has satisfied the savings clause, and the Court next must turn to the merits of the petition and determine whether Webster is so intellectually disabled that he is categorically ineligible for the death penalty.[7] A telephonic status conference will be set by separate order.

Date: 8/31/18

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution to all registered counsel by electronic notification via CM/ECF

---

[6] As noted above, the parties agree that the proper standard is preponderance of the evidence. Even if the applicable standard were clear and convincing, the Court finds that the evidence of record would satisfy that standard as well.

[7] In light of this Entry, Webster's motion for spoliation sanctions (Dkt. No. 95) is **DENIED AS MOOT**.

14