IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BRUCE CARNEIL WEBSTER,

          Petitioner,

v.

JEFFREY KRUEGAR,

          Respondent.

CAUSE NO. 2:12-CV-86-WTL-MJD

Judge William T. Lawrence

**RESPONDENT'S POST-HEARING BRIEF AND
<u>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

Respectfully submitted,

Josh J. Minkler
United States Attorney

<u>*s/ Jay Weimer*</u>
Special Assistant United States Attorney
Texas State Bar No. 24013727
Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: 817-252-5273
jay.weimer@usdoj.gov

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

RESPONDENT'S POST-HEARING BRIEF AND PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW ................................................................................ 1

    I.     INTRODUCTION ..................................................................................... 1

          A.     The offense, conviction, and sentence .............................................. 1

          B.     The direct appeal ............................................................................. 5

          C.     The 28 U.S.C. § 2255 challenge and appeal ..................................... 5

          D.     The second 28 U.S.C. § 2255 challenge .......................................... 6

          E.     The 28 U.S.C. § 2241 challenge and appeal ..................................... 8

          F.     The instant litigation ........................................................................ 9

    II.    Legal Standard ........................................................................................ 9

    III.   Diagnostic Criteria for Intellectual Disability ........................................ 10

          A.     Intellectual functioning ................................................................. 10

               1.     IQ testing ............................................................................ 11

               2.     Malingering ......................................................................... 12

          B.     Adaptive functioning ...................................................................... 12

               1.     Conceptual domain ............................................................... 14

               2.     Social domain ...................................................................... 15

               3.     Practical domain .................................................................. 15

|   | C. | Relationship between deficits | 16 |

| IV. | Webster is Not Intellectually Disabled | 16 |

|   | A. | Webster's evidence of intellectual functioning is unreliable | 16 |

|   |   | 1. | Webster's IQ test scores vary widely | 17 |

|   |   | 2. | Webster's test results are mutually contradictory | 21 |

|   |   | 3. | Webster's IQ test scores are inconsistent with his functioning | 23 |

|   |   | 4. | There is substantial evidence of malingering | 26 |

|   |   |   | a. | Webster raises three of the four malingering concerns in DSM-5 | 27 |

|   |   |   | b. | Webster had a motive to malinger on all of his tests | 30 |

|   |   |   | c. | Experts, including Webster's, have been skeptical about the validity of Webster's IQ scores | 31 |

|   |   |   | d. | Validity tests show malingering | 33 |

|   |   |   | e. | Malingering is easy | 36 |

|   |   | 5. | Webster's achievement test scores are a better reflection of his intellectual functioning | 37 |

|   | B. | Webster's adaptive functioning is normal | 39 |

|   |   | 1. | Conceptual domain | 40 |

|   |   |   | a. | Academic performance | 41 |

|   |   |   | b. | Special Education | 44 |

|   |   |   | c. | Literacy | 46 |

d.      Executive functioning .................................................50

e.      Short-term memory .....................................................51

2.      Social domain...........................................................53

a.      Webster is a good conversationalist............................54

b.      Webster can regulate his emotions and behavior.......56

c.      Webster is manipulative and a leader .........................58

d.      Webster formed mature social relationships..............62

3.      Practical domain........................................................64

a.      Hygiene and daily living .............................................65

b.      Recreational skills .......................................................66

c.      Ability to travel ...........................................................67

d.      Ability to handle money..............................................69

e.      Ability to perform jobs................................................70

C.      Webster's apparent deficits are not related to intellectual
        functioning ........................................................................73

V.      Expert Witnesses ........................................................................74

A.      Trial experts......................................................................74

B.      Dr. Marc Tassè................................................................76

C.      Dr. Daniel Reschly...........................................................77

D.      Dr. John Fabian................................................................78

E.      Dr. Robert Denney ...........................................................79

F.      Drs. Erin Conner and Jacqueline Blessinger .................................... 81

VI.    Outstanding Legal Issues............................................................... 84

A.      Relevance of certain categories of evidence .................................... 84

1.      Evidence of criminal conduct and prison behavior is
admissible............................................................................... 84

2.      Evidence of adaptive abilities is relevant and admissible..... 90

3.      Evidence of other psychological problems is relevant and
admissible............................................................................... 91

B.      Evidentiary objections ................................................................... 92

1.      Objections to documentary evidence .................................... 92

2.      Trial transcripts .................................................................... 93

3.      Webster's school records ...................................................... 94

4.      Economic Development Records and State Police Driving
Records.................................................................................. 95

5.      Bureau of Prison Records...................................................... 95

C.      Admissibility of Deposition Testimony .......................................... 98

1.      Dr. Charles Spellman ............................................................ 98

2.      Dr. Jacqueline Blessinger..................................................... 103

VII.   Conclusion and Proposed Findings of Fact............................................. 105

CERTIFICATE OF SERVICE ...................................................................... 112

v

## TABLE OF AUTHORITIES

**Federal Cases**                                                                **Page(s)**

*Ameritox, Ltd. V. Millennium Health, LLC*, 2015 WL 1520821 ........................................ 98

*Atkins v. Virginia*, 536 U.S. 304 (2002) ........................................................... 86

*Borre v. United States*, 940 F.2d 215 (7th Cir.1991) .......................................... 94

*Carreon v. United States*, 578 F.2d 176 (7th Cir.1978) ...................................... 94

*Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506 (7th Cir. 2011) ........................ 101

*Hall v. Florida*, 572 U.S.701, 134 S. Ct. 1986 (2014). ...................................... 84

*In re Payne*, 722 Fed. Appx. 534 (6th Cir. 2018).............................................. 88

*In re Webster*, 605 F.3d 256 (5th Cir. 2010) .................................................. 7

*Moore v. Texas*, 137 S. Ct. 1039 (2017)...................................................*passim*

*Moore v. Texas*, 139 S. Ct. 666 (2019).....................................................*passim*

*Thanongsinh v. Bd. of Educ.*, 462 F.3d 762 (7th Cir. 2006) ................................... 98

*Ueland v. United States*, 291 F.3d 993 (7th Cir. 2002)...................................... 104

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998)................................ 5, 76, 80, 82

*United States v. Webster*, 392 F.3d 787 (5th Cir. 2004)....................................... 5

*United States v. Webster*, 421 F.3d 308 (5th Cir. 2005)....................................6, 61, 62

*Webster v. Daniels*, 784 F. 3d 1123 (7th Cir. 2015)........................................*passim*

*Webster v. United States*, 528 U.S. 829, 120 S. Ct. 83, 145 L. Ed. 2d 70 (1999) ......*passim*

*Webster v. United States*, 549 U.S. 828, 127 S. Ct. 45, 166 L. Ed. 2d 47 (2009) .........6, 80

*Webster v. United States*, 2003 WL 23109787 (N.D. Tex. Sept. 30, 2003)....................... 6

**Federal Cases, continued**                                               **Page(s)**

*Williams v. Kelley*, 858 F.3d 464 (8th Cir. 2017)............................................................. 88

*Williams v. Thorntons Inc.*, 2018 WL 1924341 (S.D. In. April 24, 2018)...................... 101

**Federal Statutes and Rules**

18 U.S.C. § 1201(a)(1) ................................................................................................. 3

Fed. R. Civ. P. 26(a)(2)(C) ........................................................................................100

Fed. R. Civ. P. 37(c)(1) ............................................................................................. 100

Fed. R. Civ. P. 401(a) ................................................................................................ 93

Fed.R.Evid. 803(6) .................................................................................................... 96

**RESPONDENT'S POST-HEARING BRIEF AND**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's order (see Dkt. No. 186), the United States of America, on

behalf of Respondent Jeffrey Kruegar, by and through the United States Attorney for the

Southern District of Indiana and the undersigned Special Assistant United States

Attorney ("the government") files the following Post-Hearing Brief and Proposed

Findings of Fact and Conclusions of Law.

I.      **Introduction**

        A.      **The offense, conviction, and sentence**

During the fall of 1994, Petitioner Bruce Webster, Orlando Hall, and Marvin

Holloway operated a marijuana trafficking business in Pine Bluff, Arkansas.  *Webster v.*

*Daniels*, 784 F. 3d 1123, 1125 (7th Cir. 2015).    With the help of Steven Beckley, the

men regularly purchased marijuana from the Dallas/Fort Worth area in Texas and

transported the drugs back to Arkansas.  *Id.*  On September 21, 1994, Hall flew to Dallas

to purchase marijuana from two local drug dealers, Stanfield Vitalis and Neil Rene.  *Id.*

That same day, Hall and Beckley met with Vitalis and Rene at a car wash and gave them

$4,700 for the purchase of marijuana, but Vitalis and Rene never delivered the drugs.  *Id.*

After losing the money, Hall told Holloway to have Webster fly to Dallas to help

because Webster "knew how to handle things like [that]."  *Id.*; Ex. 112 at 283.  On

September 24, 1994, Webster flew to Dallas where he met with Hall, Hall's brother

Demetrius Hall, and Beckley.  *Webster*, at 1125.  After they discovered where Neil Rene

1

lived, the four men drove to Rene's apartment and knocked on the door.  *Id*. at 1126.

Lisa Rene, Neil Rene's sixteen-year-old sister, was the only person at the apartment.  *Id*.

She refused to let the men in and called the police.  *Id*.  Webster, armed with a handgun,

attempted to kick the door in.  When that did not work, he and Demetrius Hall broke

through a sliding glass door.  *Id*.  Webster went into the apartment, grabbed Lisa Rene,

and dragged her to the car.  *Id*.  Webster and his coconspirators took Lisa Rene to a motel

in Pine Bluff, Arkansas.

After kidnapping her, Webster and the other men repeatedly raped Lisa Rene.  *Id*.

The men held her captive in an apartment, then Webster, Demetrius Hall, and Beckley

drove her over 300 miles to Pine Bluff Arkansas.  *Id*.  When they arrived, Webster rented

a motel room.  *Id.*; Ex. 110 at 3342-44.  The men continued to sexually assault Lisa Rene

at the motel.  *Webster*, at 1126.

The next morning, the men determined that Lisa Rene knew too much, and

decided to kill her.  *Id*.  Webster and Hall went to a park, selected a remote location, and

dug a grave.  *Id*.  That evening, Webster and his coconspirators took Lisa Rene to the

park, but it was too dark to find the grave, so they returned her to the motel.  *Id*.  In the

morning, they moved her to a different motel room.  *Id*.

Later that morning, Webster and the two other men took Lisa Rene back to the

park.  *Id*.  Webster and Hall led Beckley and Lisa Rene to the gravesite.  *Id*.  When they

arrived at the grave, Webster and Hall beat Lisa Rene unconscious with a shovel.  *Id*.

Webster then gagged her, dragged her to the grave, stripped her, poured gasoline on her, and pushed her into the grave. *Id.* Webster then buried Lisa Rene alive. *Id.*

Shortly after the murder, Lisa Rene's brothers spoke to police and gave information that lead to Hall and Beckley's arrests. *Id.* Beckley confessed and implicated Webster. *Id.* Webster was arrested at the motel shortly thereafter. *Id.* After his arrest, Webster confessed to murdering Lisa Rene and led police to her grave. Ex. 110 at 158, 3326, 3335-3351.

In 1996, a jury found Webster guilty of kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1) (count one), conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c) (count two), and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (count six). Tr. 21B:2:10-11. The verdict as to count one subjected Webster to a maximum sentence of death. 18 U.S.C. § 1201(a)(1).

During a separate sentencing hearing before the same jury, Webster's defense team argued that Webster was mentally retarded[1] and thus could not be sentenced to death pursuant to 18 U.S.C. § 3596(c). In support of their argument, defense counsel introduced Webster's IQ scores, testimony from Webster's friends and family, and testimony from four expert witnesses. The government presented evidence from expert witnesses as well as teachers, principals, and others who knew Webster. The jury was

---

[1] In earlier stages of this litigation, attorneys and courts referred to intellectual disability as "mental retardation." The two terms are synonymous, and can be used interchangeably, though the former has gained a pejorative connotation and is no longer commonly used. Hr. Tr. 29:22-30:11. This brief will use both terms as necessary to preserve the references made by the parties at the time.

instructed that each juror could determine, by a preponderance of the evidence, whether

he or she believed that Webster "is or may be mentally retarded," and could consider this

as a mitigating factor if they so found.  Tr. 27:21:2.[2]  The jury was also asked to find

whether Webster "has low intellectual functioning," whether "as a result of . . . low

intellectual functioning [Webster] has a lesser capability to appreciate the wrongfulness

of his conduct, or to conform his conduct to the requirements of the law than a normal

person," and whether Webster was "unduly susceptible to the influence of others."  Tr.

27:21:3-18.

        In its special verdict, only four jurors found that Webster was "or may be"

mentally retarded, and only four found that he had "low intellectual functioning."  Tr.

27:102:17.   None of the jurors found that "as a result of . . . low intellectual functioning

[Webster] has a lesser capability to appreciate the wrongfulness of his conduct, or to

conform his conduct to the requirements of the law."  Tr. 27:102:19.  Likewise, none of

the jurors found that Webster was "unduly susceptible to influence by others."  Tr.

27:102:19-20.  The jury unanimously found that the aggravating factors in Webster's

case outweighed the mitigating factors, and recommended a sentence of death.  Tr.

27:102:23 – 103:5.

---

2 Citations to the trial record are in the following format:  "Tr. volume:page:line."

The district court found that Webster was not mentally retarded, and that 18

U.S.C. § 3596 did not apply.  Tr. 26:227:22-25.  The district court sentenced Webster to

death.  Tr. 27:105:5-6.

### B.      The direct appeal

Webster appealed his convictions and sentence to the Fifth Circuit arguing, among

other things, that his death sentence was unconstitutional because he was, in fact,

mentally retarded.  The Fifth Circuit affirmed the sentence, and held that "[t]he

government presented substantial evidence to support the finding [that Webster was not

mentally retarded]."  *United States v. Webster*, 162 F.3d 308, 353 (5th Cir. 1998).  The

Supreme Court denied Webster's petition for certiorari.  *Webster v. United States*, 528

U.S. 829, 120 S. Ct. 83, 145 L. Ed. 2d 70 (1999).

### C.      The 28 U.S.C. § 2255 challenge and appeal

On September 29, 2000, Webster timely filed a motion for relief pursuant to 28

U.S.C. § 2255.  Again, Webster argued that his death sentence was improper because he

was mentally retarded.  Webster also argued that his counsel was ineffective in failing "to

investigate and present additional evidence demonstrating mental retardation and the

extreme abuse Webster suffered as a child." *United States v. Webster*, 392 F.3d 787, 793

(5th Cir. 2004).  After an extensive and detailed review of the evidence presented at trial

regarding Webster's intellectual functioning, the district court denied his motion, finding

that the evidence introduced at trial  "supports a finding that Webster is not mentally

retarded and therefore is not rendered ineligible for the death penalty under either *Atkins*

or 18 U.S.C. § 3596(c)."  *Webster v. United States*, 2003 WL 23109787, at *14 (N.D.

Tex. Sept. 30, 2003).  The district court nevertheless granted a certificate of appealability

as to two of Webster's claims: "first, that the evidence presented at trial was insufficient

to warrant the district court's finding that Webster is not mentally retarded; and second,

that his alleged retardation renders him ineligible for a death sentence."  *United States v.*

*Webster*, 421 F.3d 308, 310 (5th Cir. 2005).

 Webster appealed, but the Fifth Circuit again rejected his arguments regarding his

alleged mental retardation and provided the following explanation for its decision:

> Webster claims he is mentally retarded and thus ineligible for his death
> sentence, but . . . Webster's brief does not point to any new evidence
> bearing directly on his mental capacity; instead, it summarizes the evidence
> presented at trial concerning his cognitive abilities and childhood
> experiences.
>
> Webster cannot, however, continue to litigate this claim hoping that some
> court eventually will agree with him. The question whether he is mentally
> retarded was, as the district court observed, "a highly contested one at
> trial," and Webster failed to convince either the district court that he is
> retarded or, moreover, a majority of the jurors that he is or even may be
> retarded.

*Id.* at 313-14 (citation omitted) (emphasis in original).  Webster's petition for a writ of

certiorari was denied by the Supreme Court.  *Webster v. United States*, 549 U.S. 828, 127

S. Ct. 45, 166 L. Ed. 2d 47 (2009).

### D. The second 28 U.S.C. § 2255 challenge

 On October 22, 2009, Webster petitioned the Fifth Circuit for authorization to file

a second motion for relief under 28 U.S.C. § 2255.  Pursuant to § 2255(h)(1), a second or

successive motion must be certified as provided in § 2244 by a panel of the appropriate court of appeals to contain—(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense.

Webster argued that a successive § 2255 motion was warranted because he had newly discovered evidence "in the form of government and school records and additional testimony" establishing that he is mentally retarded, and thus, ineligible for the death penalty. *In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010). Webster's newly discovered evidence included records from the Social Security Administration indicating that he was diagnosed with mental retardation months before he kidnapped, raped, and murdered Lisa Rene, and a letter from his school declaring that it had destroyed Webster's special education records.

Webster argued that, had this evidence been presented at trial, it would have refuted the government's arguments that he was pretending to be mentally retarded to avoid the death penalty and that he was lying when he said he attended special education classes. The Fifth Circuit, however, held that a petitioner cannot bring a successive claim under § 2255(h)(1) if he does not assert that the newly discovered evidence would negate his guilt. Because Webster's newly discovered evidence challenged only his sentence and not the finding of guilt, the court denied Webster's request to file a subsequent § 2255 motion.

E.      The 28 U.S.C. § 2241 challenge and appeal

Subsequently, Webster sought relief from the District Court for the Southern District of Indiana (where he is being incarcerated) pursuant to 28 U.S.C. § 2241 based on the same evidence that formed the basis of his second 28 U.S.C. § 2255 request.  On November 13, 2013, this Court denied Webster's petition for a writ of habeas corpus under 28 U.S.C. § 2241 based on reasoning similar to that the Fifth Circuit had used to deny his second § 2255 claim.

Webster appealed.  On May 1, 2015, an *en banc* panel of the Seventh Circuit issued a mandate holding that there is no absolute bar to the use of the safety valve found in § 2255(e) for new evidence that would demonstrate categorical ineligibility for the death penalty.  *Webster v. Daniels*, 784 F. 3d 1123 (7th Cir. 2015).  The court held that "[f]urther proceedings are necessary, however, before the district court can reach the merits of his habeas corpus petition. The district court must hold a hearing for the purpose of deciding whether the Social Security records were indeed unavailable to Webster and his counsel at the time of the trial."  *Webster v. Daniels*, 784 F. 3d 1123, 1145 (7th Cir. 2015).   The court further held that, if the district court finds that the social security records were unavailable, it would turn to the merits of the petition: "is Webster so intellectually disabled that he is categorically ineligible for the death penalty under *Atkins* and *Hall*?"  *Id*. at 1146.

**F.      The instant litigation**

On August 31, 2018, this Court found that the Social Security records identified by Webster were unavailable to him at the time of trial and that "Webster has satisfied the savings clause, and the Court next must turn to the merits of the petition and determine whether Webster is so intellectually disabled that he is categorically ineligible for the death penalty. *Webster v. Lockett*, 2018 US Dist. LEXIS 148669 (S.D. Ind.). This Court must now determine whether Webster is intellectually disabled. *Webster v. Daniels*, 784 F. 3d 1123, 1146 (7th Cir. 2015).

**II.    Legal Standard**

Webster bears the burden of proving, by a preponderance of the evidence, that he is so intellectual disabled that he is categorically ineligible for the death penalty. *Webster v. Daniels*, 784 F. 3d 1123, 1146 (7th Cir. 2015). In determining whether Webster has such a disability, this Court may rely on the diagnostic criteria set forth in the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM–5) and the American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition, Classification, and Systems of Supports (11th ed. 2010) (AAIDD–11). *Moore v. Texas*, 139 S. Ct. 666, 668 (2019). As discussed in more detail below, these two volumes both provide that in order to establish that he has an intellectual disability, Webster must prove that he has: (1) deficits in intellectual functioning; (2) adaptive deficits that limit functioning in daily life; and (3) that the onset

of these deficits occurred while Webster was a minor.[3]  DSM-5 at 37-38.  Additionally, "to meet the diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in [the intellectual functioning criterion]."  *Id.* at 38.

### III.    Diagnostic Criteria for Intellectual Disability

"Intellectual disability is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains."  DSM-5 at 33.  To make a diagnosis of intellectual disability, the following criteria must be met: (1) deficits in intellectual functions confirmed by both clinical assessment and standardized intelligence testing; (2) deficits in adaptive functioning that result in failure to meet developmental and socio-cultural standards for personal independence and social responsibility; and (3) onset of deficits prior to age 18. *Id.*  In addition, "to meet the diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in [the intellectual functioning criterion]."  *Id.* at 38.

#### A.    Intellectual functioning

The first prong involves an assessment of an individual's intellectual functioning, that is, reasoning, problem solving, abstract thinking, learning, and practical

---

3 The third prong does not appear to be at issue in this case.  Webster claims that he has been intellectually disabled since he was a child, and the government maintains that Webster is not and has never been intellectually disabled. Neither party claims that Webster's intellectual ability has changed over the course of his life such that the date of onset of any disability would become a relevant inquiry.  Accordingly, the government will not conduct any significant analysis of the third prong.

10

understanding.  DSM-5 at 37.  Intellectual functioning is typically measured with well-accepted tests of intelligence, known as intelligence quotient (IQ) tests.  *Id.*  The validity of IQ test results can be undermined by several factors, and in some instances an IQ score may be insufficient to assess an individual's actual intelligence and ability to reason in real-life situations.  *Id.*  Accordingly, clinicians have to be aware of factors that could artificially depress or inflate an IQ score, must be on alert for the presence of factors that could undermine the validity of test results, and must be skeptical of results that contradict other information about the individual's intellectual ability.  *Id.*  In short, "[C]linical judgment is needed in interpreting the results of IQ tests."  *Id.*

### 1.    IQ testing

Generally, in order to satisfy the intellectual functioning criterion of an intellectual disability diagnosis, an individual must have an IQ score two standard deviations or more below the population average (mean).  *Id.*  IQ tests typical have a mean score of 100, and a standard deviation of 15.  *Id.*  Assuming a standard measurement error of +/- 5, that means that an individual with a score at or below 65-75 (70 +/- 5) would generally satisfy this criterion.  *Id.*

However, clinical training and judgment are necessary to interpret test results and assess actual intellectual performance.  *Id.*  A variety of factors other than the individual's actual intellectual ability can influence performance on an IQ test.  *Id.*  Socio-cultural factors may artificially depress test scores, as may disorders (other than intellectual disability) that affect communication or motor skills.  *Id.*  A clinician must consider

11

confounding variables when assessing whether an IQ score is an accurate representation of an individual's intellectual functioning.  *Id.*

Unusual test results may also render an IQ score invalid.  For instance, "highly discrepant individual subtest scores may make an overall IQ score invalid."  *Id*.  That is, if an individual has wide variation between his performance and verbal subtest scores, the entire result is invalid.  *Id*.; Hr. Tr. 539:3-5.

### 2.     Malingering

Clinicians conducting IQ testing must also be on alert for the possibility that an individual is malingering, that is, intentionally doing poorly on the test in order to achieve some secondary goal.  DSM-5 at 726-27.  Malingering should be suspected whenever an incentive is present to feign disability, but malingering should be strongly suspected if testing occurs during litigation, if there is a marked discrepancy between test results and observational data, or if the test subject has antisocial personality disorder.  *Id*.  The presence of malingering renders test scores invalid.

### B.     Adaptive functioning

The second criteria for a diagnosis of intellectual disability is "an impairment in everyday adaptive functioning in comparison to age-, gender-, and socioculturally-matched peers."  DSM-5 at 37.  Adaptive functioning involves skills in three domains: (1) the conceptual domain; (2) the social domain; and (3) the practical domain.  *Id*. Adaptive functioning is assessed via clinical evaluation and standardized measures.  *Id.*

12

Information for such assessments can be gathered from the subject, family members teachers, care providers, and other "knowledgeable informants." *Id*. All data must be "interpreted using clinical judgment." *Id*.

The adaptive functioning criteria is satisfied only when at least one of the three domains of adaptive functioning (conceptual, social, or practical) is so impaired that the subject needs "ongoing support" to perform adequately in real-life settings. *Id*. at 38. Adaptive functioning must be evaluated "in comparison to others of similar age and sociocultural background." *Id*. Thus, someone from an underprivileged environment should not be compared against a median individual. Additionally, "education, motivation, socialization, personality features, vocational opportunity, cultural experience and coexisting medical conditions or mental disorders can all influence adaptive functioning." *Id*. Likewise, the AAIDD-11 cautions that "[a] person whose opportunities to learn adaptive skills has been restricted in comparison to same-age peers may have acquisition deficits unrelated to ID [intellectual disability]." AAIDD-11 at 52.

It is important to consider, then, whether adaptive deficits are caused by factors other than deficits in intellectual functioning. A lack of work history, for instance, would not be evidence of a deficit if an individual lacks job opportunities due to socioeconomic factors. See DSM-5 at 37. The inability to shop would not be related to intellectual disability if an individual had "not been provided opportunities to make purchases." AAIDD-11 at 52-53. Likewise, one "must consider relevant ethnic and cultural factors," because "[b]ehavioral expectations may differ across cultural groups, along with

13

education and training in adaptive skills."  AAIID-11 at 53.  Consequently, the failure to perform certain daily tasks would not be evidence of intellectual disability if those tasks were not taught to or expected of an individual in the subject's cultural environment.

As discussed in more detail below, "[t]o meet the diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments" required in the first criteria.  DSM-5 at 38.  The adaptive functioning criteria is not satisfied if deficits are the result of lack of opportunity or lack of motivation.

### 1.    Conceptual domain

The conceptual domain is one of three categories of adaptive functioning.  The conceptual domain involves memory, language, reading, writing, mathematical reasoning, problem solving, practical knowledge, and judgement in novel situations.  DSM-5 at 37.  Many of the skills in this domain are utilized and tested most directly in academic settings, and the domain is consequently referred to in the DSM parenthetically as "the academic domain."  *Id*.  Of course, many of the skills involved in this domain can also be observed outside the classroom setting.

In individuals with mild intellectual disability, deficits in the conceptual domain present as "difficulties in learning academic skills involving reading, writing, arithmetic, time, or money."  DSM-5 at 34.  In adults, "abstract thinking, executive function (i.e. planning, strategizing, priority setting, and cognitive flexibility), and short-term memory

14

as well as functional use of academic skills (e.g. reading, money management), are impaired." *Id.*

### 2.      Social domain

The social domain is the second category of adaptive functioning.  It involves the ability to carry on interpersonal relationships.  Specifically, skills in this domain consist of awareness of others' thoughts and feeling, interpersonal communication skills, friendship abilities, and social judgment.  DSM-5 at 37.  Deficits in this domain, even among mildly intellectually disabled people, may be apparent even to lay people.  DSM-5 at 34.

Individuals with mild intellectual disability are often "immature in social interactions," due to "difficulties perceiving peers' social cues."  DSM-5 at 34. Communication, conversation, and language are more "concrete" and "immature" than that of peers.  *Id.*  Individuals with mild intellectual disability have "difficulties regulating emotion and behavior," and these difficulties "are noticed by peers in social situations."  *Id.*  Individuals with deficits in this domain have "limited understanding of risk in social situations," and are likely to be gullible and "at risk of being manipulated by others."  *Id.*

### 3.      Practical domain

The final category of adaptive functioning is known as the practical domain.  The practical domain involves "learning and self-management across life settings," that is, the ability to perform day-to-day tasks such as "personal care, job responsibilities, money

15

management, [and] recreation." DSM-5 at 37. Individuals with mild intellectual

disability "need support with complex daily living tasks," including "grocery shopping,"

"transportation," "nutritious food preparation," and "banking and money management."

DSM-5 at 34.

### C.    Relationship between deficits

"To meet diagnostic criteria for intellectual disability [any] deficits in adaptive

functioning must be directly related to the intellectual impairments described [in the

intellectual functioning criteria]." DSM-5 at 38; Hr. Tr. 521:23-522:8.[4] This

requirement means that adaptive functioning deficits that are solely attributable to some

cause other than a deficit in intellectual functioning do not meet the diagnostic criteria for

intellectual disability. *Id.* For instance, if someone were unable to maintain basic

hygiene due to severe depression, that deficit would not meet the diagnostic criteria for

intellectual disability. Ex. 101 at 40; Hr. Tr. 522:19-523:7.

## IV.   Webster is Not Intellectually Disabled

### A.    Webster's evidence of intellectual functioning is unreliable

In order to prove that he is intellectually disabled, Webster must first show that he

has significant deficits in intellectual functioning. DSM-5 at 37. To do so, he must

produce reliable evidence that he has an IQ at least two standard deviations below the

mean. AAIIDD-11 at 27. That would typically equate to a score at or below 75 (a score

---

4 Citations to the hearing that took place before this Court between April 1, 2019 and April 5, 2019 are in this
format: "Hr. Tr. page:line."

of 70 is two standard deviations below the mean, and the standard error of measurement

is usually +/-5, meaning that a score of 75 or below would fall within the appropriate

range.)  DSM-5 at 37.  But while Webster has a number of tests with scores low enough

to qualify, none of those scores are reliable.  To the contrary, Webster's IQ test scores are

invalid, and should be disregarded entirely.

### 1. Webster's IQ test scores vary widely

In his report, Webster's expert Dr. Daniel Reschly expressed concern about the

validity of Webster's IQ test results due to the discrepancy between his very low scores

and his higher apparent real world functioning.  Ex. 39 at 29.  But Dr. Reschly assuaged

his doubts by noting that Webster had produced "general ability scores at or slightly

above this level" on other IQ tests.  *Id.*  In other words, while Dr. Reschly was (rightly)

skeptical about the extremely low IQ score that Webster produced for him, he argued that

because Webster's prior IQ scores were consistent, there was no need for concern.

Dr. Reschly was right to be skeptical about the results of Webster's IQ test.  But

he was wrong that Webster's other test results were consistent with the test Dr. Reschly

administered.  In fact, Webster's IQ test scores vary so widely that they should be treated

as invalid on that basis alone.

Webster has been tested on a number of occasions, and has produced the following

IQ test scores:

| Psychologist | Year | Score |
|---|---|---|
| Dr. Patrick Caffey<br>(Arkansas Department of Mental Health) | 1992 | 48 (Full scale)<br>56 (Verbal)<br>48 (Performance) |
| Dr. Edward Hackett<br>(Social Security Administration) | 1993 | 59 (Full scale)<br>71 (Verbal)<br>49 (Performance) |
| Dr. Raymond Finn<br>(Defense trial expert) | 1995 | 59 (Full scale)<br>59 (Verbal)<br>60 (Performance) |
| Dr. Dennis Keyes<br>(Defense trial expert) | 1995 | 55 (Composite)<br>67 (Crystalized)<br>46 (Fluid) |
| Dr. Raymond Finn<br>(Defense trial expert) | 1996 | 65 (Full scale)<br>72 (Verbal)<br>59 (Performance) |
| Dr. Dennis Keyes<br>(Defense trial expert) | 1996 | 51 (Full scale)<br>N/A (Verbal)<br>N/A (Performance) |
| Dr. George Parker<br>(Government trial expert) | 1996 | 72 (Full scale)<br>77 (Verbal)<br>67 (Performance) |
| Dr. Robert Denney<br>(Government expert) | 2018 | 61 (Full scale)<br>63 (Verbal)<br>69 (Performance) |
| Dr. Daniel Reschly<br>(Webster expert) | 2018 | 53 (Full scale)<br>N/A (Verbal)<br>N/A (Performance) |

There is a wide variation, or "scatter" between these scores. Indeed, Webster's

own expert, Dr. John Fabian, admitted that the difference between the highest (72) and

lowest (48) scores was greater than one standard deviation, and was "a statistically

18

significant difference." Hr. Tr. 827:8-828:5. And, even if those two scores are eliminated due to concerns about their validity, the next highest (65) and next lowest (51) scores still have a statistically significant difference between them according to Dr. Fabian. Hr. Tr. 828:6-10. In fact, as Dr. Fabian admitted, Webster's second highest IQ score (65) falls within the range for mild intellectual disability, while his second lowest score (51) falls within the range for moderate intellectual disability. Hr. Tr. 828:11-14. The difference in Webster's scores is not only statistically significant, but is so great that the scores fall into different categories of impairment.

Webster's IQ scores are so inconsistent that even scores that initially appear identical actual vary significantly upon further inspection. For instance, Webster produced full-scale IQ scores of 59 on both Dr. Raymond Finn's and Dr. Edward Hackett's WAIS-R IQ tests. But Webster's performance score on the former (49) varied significantly from his performance score on the latter (60). Likewise, his verbal score on the former (71) varied significantly from his verbal score on the latter (59). In comparison to Dr. Finn's test, Dr. Hackett scored Webster much better on the verbal portion and much worse on the performance portion. Only by mere coincidence were the composite scores of both tests the same. The subtest scores show extraordinary inconsistency.

Examining the subtest scores within a test is also an important tool in analyzing the validity of IQ tests. Hr. Tr. 529:9-13. The DSM-5 explains that "highly discrepant individual subtest scores may make an overall IQ score invalid." DSM-5 at 37; see also

Hr. Tr. 539:3-5.  This is true for several reasons.  First, an IQ score is supposed to be a

summary indicator of a person's general cognitive abilities.  Hr. Tr. 539:7-17.  If one

subtest scores is particularly low, while the other is substantially higher, the overall score

no longer does a good job of representing the individual's ability.  *Id*.  Instead, the low

score pulls down the higher score, and the result underestimates the individual's real

ability.  *Id*.  For this reason, if the difference between subtest scores exceeds twenty

points, the test publishers admonisher the tester not to rely on the full scale IQ score.  Hr.

Tr. 540:1-8.

Second, research indicates that even in low-IQ individuals, subtest scores do not

vary widely.  Hr. Tr. 540:18-541:8; Ex 101 at n.1.  Indeed, the manual for the WAIS-IV

IQ test explains that "[m]any studies have been conducted to evaluate the performance of

individuals with intellectual disability on previous versions of the Wechsler intelligence

scales.  The prevalence of large and unusual discrepancies between verbal and nonverbal

composite scores has been shown to decrease with decreasing levels of ability."  Ex. 101

at n.1.  In other words, according to the test publishers themselves, as an individual's

overall IQ decreases, so does the spread between subtest scores.  Wide variations

between subtest scores, therefore, are particularly rare in low-IQ individuals.  *Id*.

Webster, however, produced widely varying subtest scores.  For instance, on the

test administered by Dr. Dennis Keyes, Webster produced a "crystal intelligence" score

of 67, but a "fluid intelligence" score of 46.  Hr. Tr. 643:17-21.  This "huge split" renders

the full scale score of 55 invalid because there is "too much variability" between the

subtest scores.  *Id.*  Likewise, the variation between Webster's verbal IQ score (71) and performance IQ score (49) on the test administered by Dr. Hackett for the Social Security Administration renders the full scale score (59) invalid.  Hr. Tr. 646:19-647:9; Ex. 101 at 14.

Variations between subtest scores as extreme as those produced by Webster simply "do not occur in the absence of a catastrophic neurological insult after the developmental period."  Ex. 101 at 14.  Webster claims no such injury.  Accordingly, the fact that Webster has produced such widely varying subtest scores proves beyond any doubt that his IQ scores are invalid.

## 2.     Webster's test results are mutually contradictory

Research shows that when people suffer from genuine cognitive problems, they tend to produce certain patterns when answering questions during an IQ test.  Hr. Tr. 540:16-25.  So, for instance, an individual with genuine cognitive problems would not typically miss easy questions, but correctly answer difficult ones.  Hr. Tr. 541:1-8.  Nor would someone with genuine intellectual disability do well on one test, but very poorly on a similar test.  Hr. Tr. 581:20-25.  Inconsistent results like these demonstrate that the test results are not accurate reflections of an individual's ability.

Webster demonstrated precisely these kind of inconsistencies.  For instance, Webster's performance during the attention module of the neuropsychological assessment battery (NAB) "suggested severe difficulties with attention."  Hr. Tr. 556:5-9.  But, during the continuous performance task, Webster performed normally, even though

the latter "is a more difficult test of attention." Hr. Tr. 556:9-18. The discrepancy is striking because the continuous performance task is so difficult that "if your basic focused attention is impaired . . . you can't do the task." *Id.* The two results simply "don't make clinical sense" together. Hr. Tr. 556:22-23.

Likewise, when Dr. Robert Denney administer the Minnesota Multiphasic Personality Inventory (MMPI), Webster produced results that showed he was "able to understand the items" and "respond based on item content." Hr. Tr. 581:12-13. But Webster also produced a score of 61 on an IQ test administered by Dr. Denney. Ex. 101 at 37. Webster's MMPI result is wholly inconsistent with someone who scored 61 on an IQ test. Hr. Tr. 581:17-25. Someone with an IQ score that low would simply not be able to understand the MMPI as well as Webster did. *Id.* Now would someone with a 61 IQ be able to do as well as Webster did on Dr. Denney's Test of Premorbid Functioning (TOPF). Ex. 101 at 37.

Webster also got high scores on the Test of Memory Malingering (TOMM), a test administered by Dr. Reschly. Hr. Tr. 699:10-21. But Webster produced a score of 53 on the IQ test administered by Dr. Reschly. *Id.* Research shows that individuals with IQ scores that low typically fail the TOMM. Hr. Tr. 699:25-700:13. Once again, Webster's test results are inconsistent. The extremely low IQ score that Webster produced for Dr. Reschly cannot stand along with his good performance on the TOMM and other tests. *Id.*

Accordingly, many of Webster's test results contradict one another. He produces extremely low scores on some tests, but does well on other, similar tests. He does well

on harder tests than on easier ones.  And he produces IQ scores that are so extremely low that he should not even be able to complete other tests.  These contradictions lead to a simple conclusion: Webster is attempting to feign a disability and his uneven effort occasionally produces contradictory results.  His IQ test scores, then, must be treated as invalid.

### 3.     Webster's IQ test scores are inconsistent with his functioning

IQ test scores, if valid, should correlate to real-life functioning.  Hr. Tr. 529:18-25. In short, test results should make clinical sense.  541:9-542:6.  When a psychologist conducts a clinical interview, he should be able to "get a good sense for the person's cognitive presentation, which would include a mental status examination of [his or her] attention skills, ability to stay on task, verbal skills, reasoning skills, impulse control skills, [and] speed of mental processing."  Hr. Tr. 541:12-18.  Dr. Fabian testified that psychologists can form a reasonable impression about someone's intelligence during a single conversation.  Hr. Tr. 825:8-15.  And he explained that if his impression of an individual's intellect during a clinical interview was very different than that individual's IQ score, he would question the validity of the test results.  Hr. Tr. 825:18-24.

Psychologists also take histories and conduct examinations to evaluate a person's real-world functioning.  Hr. Tr. 541:22-542:20.  If test scores are highly inconsistent with real-life functioning, then the scores are likely invalid.  *Id*.  "Real-world functioning always trumps psychological test results."  *Id*.  Invalid scores are "worthless," and cannot be relied upon at all.  Hr. Tr. 542:21-543:1.

23

In Webster's case, Dr. Denney observed "no indications of substantially below average cognitive functioning" during his 3-hour clinical interview.  Hr. Tr. 549:3-4.  Dr. Denney noted that Webster's "attention and concentration were good," that his "speed of mental processing was quick," and that "[h]e was articulate.  He was able to carry on rapid conversation with me and at the same time also provid[e] witty comments about what [was] going on around us as we [were] interacting."  Hr. Tr. 549:2-9.  Webster displayed a good memory and had no motor problems.  Hr. Tr. 549:10-14.  In summary, "Mr. Webster presented, frankly, normally."  Hr. Tr. 2-3.  But Webster produced a full scale IQ score of 61 on Dr. Denney's test.  Hr. Tr. 553:12-23.  This very low score "represent[ed] a level of cognitive function that is strikingly below" Webster's clinical presentation.  *Id.*  The scores was inconsistent with everything that Dr. Denney had observed.

Likewise, Webster's neuropsychological assessment battery (NAB) attention module test results showed an "exceedingly slow" speed of mental processing that was "inconsistent with his speed of mental processing when [Webster was] not performing a test."  Hr. Tr. 555:12-19.  Dr. Denney observed that when he and Webster were talking, Webster "showed very quick mental processing; and yet, when I put a test in front of him . . . he demonstrated very slow speed of mental processing."  Hr. Tr. 583:17-20.  This change was "striking," and "indicative of feigning."  Hr. Tr. 583:21-22.

Webster's extremely low IQ scores also fail to correlate with his behavior outside the clinical setting.  Hr. Tr. 622:25-626:6.  For instance, Dr. Reschly concluded that

24

Webster had "certainly mastered the basic fundamental daily living skills of eating, toileting, dressing, [and] things of that nature." Hr. Tr. 279:11-13. But Webster produced a score of 53 on an IQ test administered by Dr. Reschly. Hr. Tr. 629:22-25. An individual with a 53 IQ would be "severely impaired as far as daily functioning goes." Hr. Tr. 630:7-8. Webster's IQ results, therefore, are inconsistent with his known abilities.

Likewise, Webster was able to drive a car. See, e.g., Hr. Tr. 245:5-10; Ex. 102 at 51; Ex. 113 at 543. But his ability to drive is flatly inconsistent with IQ scores in the 40's and 50's. Hr. Tr. 627:11-19. As Dr. Denney explained, for people with IQ's that low, "[i]t's not that they can't drive well. They can't drive . . . we're talking about motor skills that are too poor to effectively drive." Hr. Tr. 627:23-25. Even Webster's expert Dr. Fabian admitted that "it would be difficult" for someone with an IQ in the 50's to drive a car. Hr. Tr. 829:2-8.

This inconsistency is even more apparent when one examines Webster's subtest scores. For instance, on an IQ test administered by Dr. Keyes, Webster scored a 46 in "fluid intelligence," which is "basically the [same] concept [as] performance intelligence." Hr. Tr. 643:17-644:25. A genuine score this low would mean that Webster had such severe motor impairments that he would be unable to drive, play drums, or play the guitar. *Id.* Likewise, the "performance index" score of 49 that Webster produced during his Social Security examination would, if genuine, mean Webster would be unable to drive or play musical instruments. Hr. Tr. 647:10-13. Even Dr. Fabian admitted that it

25

would be "extraordinarily difficult" for someone with a performance IQ of 49 to play a guitar.  Hr. Tr. 830:21-831:4.  But there is no dispute that Webster can drive, play guitar, and play drums.  In fact, Webster was such a good drummer that he and his brother were paid to perform at gospel concerts.  Ex. 101 at 7.  His extremely low performance subtest scores, then, simply "can't be valid."  Hr. Tr. 647:14.

Thus, while some of Webster's abilities are not necessarily inconsistent with a very mild intellectual disability, those abilities *are* inconsistent with the extremely low IQ scores Webster produced.  See, Hr. Tr. 628:1-3; 631:7-9; 641:11-642:1; 645:19-23.  Indeed, even Webster's own experts expressed surprise at the discrepancy between his IQ scores and his real world presentation.  Hr. Tr. 646:11-14.  And because "[r]eal-world functioning always trumps psychological test results," Webster's IQ scores must be considered invalid, and cannot be relied upon at all.  Hr. Tr. 541:22-543:1.

### 4.      There is substantial evidence of malingering

Malingering is "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as . . . obtaining financial compensation [or] avoiding criminal prosecution."  DSM-5 at 726.  Malingering is not an illness, but can actually "represent an adaptive behavior."  *Id.* at 726-27.  Thus, Webster's malingering is not only rationally motivated by external incentives (the desire to obtain financial compensation from the Social Security Administration and the desire to avoid capital punishment), but it actually constitutes evidence of his adaptive abilities.  That is, his ability to recognize the value of malingering and feign symptoms of

26

intellectual disability show strong adaptive skills in the conceptual domain (planning, strategizing, priority setting, and cognitive flexibility). *See* DSM-5 at 34.

The evidence that Webster is malingering is overwhelming. As discussed above, his test scores alone provide substantial proof that Webster was feigning a disability. Additionally, the diagnostic literature cautions that in cases like Webster's, malingering should be suspected. And the specific evidence shows that he was doing so.

### a. Webster raises three of the four malingering concerns in DSM-5

The DSM-5 states that:

Malingering should be strongly suspected if any combination of the following [factors] is noted:

1. Medicolegal context of presentation (e.g. the individual was referred by an attorney to the clinician for examination).

2. Marked discrepancy between the individual's claimed stress or disability and the objective findings and observations.

3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen.

4. The presence of antisocial personality disorder.

DSM-5 at 727. At least three, and possibly all four, of those factors are present in Webster's case. Malingering, therefore, must be "strongly suspected." *Id*.

Webster's testing occurred in a medicolegal context. In the vast majority of his tests, Webster was referred to the testing psychologist by an attorney during his capital-case litigation. And, with respect to his Social Security evaluation, the

27

testing was conducted to determine his legal eligibility for Social Security benefits. Accordingly, Webster's testing clearly occurred in a medicolegal context.

Webster also showed a "marked discrepancy between" his claimed disability and the objective observations. In fact, even Webster's own experts were surprised by his test results. At his original trial, Webster's expert Dr. Keyes testified that "I have to admit the first time I tested Bruce Webster, I felt very concerned because this is not a person who comes off with an IQ of that area. I didn't expect him to be functioning that low." Hr. Tr. 332:23-334:3. Dr. Reschly also noted that Webster's IQ test scores "might be questionable," and that he and other experts "had the impression that [Webster] might do better than he did [on any of the IQ tests] because of how verbal he was." Hr. Tr. 334:17-23. Likewise, Dr. Hackett noted that there was a discrepancy between Webster's IQ scores and his history. Ex. 102 at 50. Dr. Charles Spellman, who evaluated Webster for the Social Security Administration, but did not have the results of Dr. Hackett's IQ tests at the time, expressed surprise upon seeing those results. (Spellman Depo at 122:17-123:9.) Dr. Spellman also testified that Webster's performance IQ score, a 49, was "very unusual." *Id.* at 123:7-9. He further opined that Webster's answers to individual questions looked "awfully suspicious" because one would have to "really be stupid or making a poor effort to get that low [a score] on some of these [questions]." *Id.* at 123:2-5. Additionally, two trained psychologists who

28

regularly interacted with Webster noticed no signs of intellectual disability during their many conversations with him.  (Blessinger Depo at 124:24-125:13); Hr. Tr. 883:18-889:22.  Finally, Dr. Denney testified at length that Webster's observed abilities were wholly inconsistent with his IQ scores.  Hr. Tr. 549:1-554:12.  Thus, Webster clearly shows "a marked discrepancy between [his] claimed stress or disability and the objective findings and observations."  DSM-5 at 727.

Because Webster's testing occurred exclusively in a "medicolegal" context, he was not prescribed a treatment regimen by the psychologists who evaluated him.  Thus, it is more difficult to evaluate the applicability of the third category— lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen.  *See id.*  It is, nevertheless, noteworthy that Dr. Hackett observed that "Webster manifests no signs of wanting to improve."  Ex. 102 at 52.  This observation suggests that Webster had no desire to "comply with [any] prescribed treatment regimen," and could thereby trigger the third area of concern.  *See* DSM-5 at 727.

The fourth malingering concern — the presence of antisocial personality disorder — clearly applies.  Webster has been repeatedly diagnosed with antisocial personality disorder, even by his own experts.  *See, e.g.*, Ex. 101 at 48 (Dr. Denney diagnosed Webster with antisocial personality disorder); Ex. 102 at 52 (Dr. Hackett diagnosed Webster with antisocial personality disorder); Ex. 103 at 55 (Dr. Spellman diagnosed Webster with antisocial personality disorder); Ex. 163

29

at 2101 (Dr. Jeffrey Yates diagnosed Webster with antisocial personality disorder); Hr. Tr. 481:3-8 (Dr. Fabian diagnosed Webster with antisocial personality disorder).

Webster, therefore, triggers at least three, and possibly all four, of the malingering concerns listed in the DSM-5. *See* DSM-5 at 727; Hr. Tr. 533:15-22. Accordingly, malingering "should be strongly suspected." DSM-5 at 727; Hr. Tr. 533:23-534:1. Research backs this conclusion. The rate of malingered neurocognitive dysfunction among pretrial criminal defendants is at least 54 percent, and potentially as high as 70 percent. Hr. Tr. 537:3-538:15. Accordingly, even without specific, direct evidence of malingering, this Court should be extremely suspicious that Webster feigned poor performance his IQ tests. And Webster had clear incentives to do so.

### b.      Webster had a motive to malinger on all of his tests

The overwhelming majority of Webster's IQ tests were conducted in the context of this, or some other phase, of his death penalty litigation. His motive to malinger on those tests is obvious: he wanted to present as intellectually disabled in order to avoid the death penalty.

Webster was also tested by the Social Security Administration, and he has argued in previous phases of this litigation that those test results are particularly relevant because he lacked a motive to malinger. But that claim is false. Webster was tested in order to determine his eligibility for Social Security benefits, and therefore he had a strong

financial motive to malinger.  Indeed, research shows that about 50% of people seeking

Social Security benefits related to cognitive problems are feigning their symptoms.  Ex.

101 at 43.  And, while Webster argues that he only applied for benefits due to sinus

problems, his mother told Dr. Denney that she brought Webster to the Social Security

Administration because of his sinus problem and concerns that he may have issues with

his brain.  Hr. Tr. 688:1-9.  Webster clearly had a motive to feign intellectual disability

during his Social Security examinations.  Accordingly, Webster not only triggers the

concerns listed in the DSM-5 for malingering, but had specific motives to do so during

his IQ testing.

### c.   Experts, including Webster's have been skeptical about the validity of Webster's IQ scores.

Given all of the reasons to suspect that Webster was feigning his IQ test results, it

is no surprise that various experts had concerns about malingering.  Webster's own

experts, of course, found various reasons to reassure themselves that his scores were

legitimate, but their initial skepticism is nevertheless very telling.  Independent evaluators

have also expressed concern about the validity of Webster's test results.  Indeed, it

appears that few people who evaluated Webster were without at least some doubts about

the legitimacy of his IQ test results.

During trial, Webster's expert Dr. Keyes testified that "I have to admit the first

time I tested Bruce Webster, I felt very concerned because this is not a person who comes

31

off with an IQ of that area.  I didn't expect him to be functioning that low."  Hr. Tr. 332:23-334:3.

Webster's expert Dr. Reschly noted that Webster's IQ test scores "might be questionable," and conceded that he and other experts were surprised by the IQ results: "I think all of us had the impression that he might do better than he did [in any of the IQ tests] because of how verbal he was."  Hr. Tr. 334:17-23.

Dr. Hackett, who evaluated Webster for the Social Security Administration, noted that Webster's "IQ scores were not normal considering [his] history," and opined that "there may have been some malingering."  Ex. 102 at 50.

Dr. Charles Spellman also evaluated Webster for the Social Security Administration, and opined in 1993 that he saw no signs of malingering.  But Dr. Spellman did not give any Webster any validity tests.  (Spellman Depo at 29:19-23.) And, more recently, Dr. Spellman saw the results of Dr. Hackett's IQ test for the first time.  Dr. Spellman was surprised by the results and testified that Webster's performance IQ score, a 49, was "very unusual."  (Spellman Depo at 123:7-9).  He further noted that Webster's answers to individual questions looked "awfully suspicious" because one would have to "really be stupid or making a poor effort to get that low [a score] on some of these [questions]."  *Id*. at 123:2-5.  And, even after seeing the results of another IQ tests whose composite score was close to that Webster produced for Dr. Hackett, Dr. Spellman would not rule out malingering: "he could have been malingering both times." *Id*. at 128:16-20.  Thus, of the two psychologists who evaluated Webster for the Social

Security Administration, one suspected at the time that Webster was malingering, and one later came to suspect malingering based on the specifics of Webster's IQ test answers. Given that Webster's entire collateral attack rests on the Social Security records produced in large part by these two psychologists, this fact is particularly damning for his case.

The skepticism of independent experts and experts retained by Webster is telling. If even these experts suspect malingering, then it is certainly a significant concern. And the validity testing shows that they were right to be skeptical. Indeed, that testing proves that Webster was malingering.

### d.      Validity tests show malingering

Validity tests are used to measure "performance validity," that is, whether an individual is putting forth adequate effort during testing to "make the results meaningful and valid." Hr. Tr. 528:3-8. Validity tests can be freestanding, or can be derived from a portion of the subject test. Hr. Tr. 528:3-529:22. In a forensic setting, such as the one in which Webster has been tested, current standards of psychological practice require validity testing. Hr. Tr. 530:8-9. This is so because "there is a significant incentive for the individuals [in a forensic setting] not to perform in a valid manner for secondary gain." Hr. Tr. 530:11-13.

Drs. Denney and Fabian both administered freestanding validity tests during their evaluations of Webster. Hr. Tr. 530:24-531:4. Dr. Denney, who has conducted significant research into validity testing, administered the Word Memory Test (WMT)

and the Medical Symptom Validity Test (MSVT) to Webster.  Hr. Tr. 534:2-13; 537:1-2;

554:21-24.  Published research shows that the WMT functions well inside the prison

setting as a test of validity and that the MSVT is particularly good at distinguishing

genuine cognitive problems from feigned problems.  Hr. Tr. 534:14-25; 535:1-536:1.

Research also shows that the WMT and the MSVT, used in combination, are very

"sensitive" to people who were feigning cognitive problems; that is, they "pick up

feigning when feigning is present."  Hr. Tr. 536:6-25.  Dr. Denney also evaluated

Webster's Reliable Digit Span (RDS) score, a form of validity test derived from other

testing.  Hr. Tr. 554:2-11.

Dr. Denney administered the WMT, a "verbal learning and retention task" that

tests the subject's ability to learn, recognize, and remember word pairs.  Hr. Tr.  557:6-

15.  The initial section of the test is "very, very easy," while later sections are

increasingly difficult.  *Id*.  Webster "failed" the WMT, in other words, his test results

indicated malingering.  Hr. Tr. 560:17-22.  Specifically, the test indicated that Webster

was malingering because he did better on more difficult sections than he did on easier

ones.  *Id*.  This pattern, known as an "order violation," is not consistent with any genuine

cognitive impairment.  *Id*.; Hr. Tr. 561:23-564:4.  Moreover, Webster's poor performance

on the easiest portions of the test were wholly inconsistent with his real world

functioning.  Hr. Tr. 564:12-565:4.  Dr. Denney also compared Webster's results with

those from groups of people with genuine intellectual disabilities.  Hr. Tr. 565:5-572:17.

Webster's results differed substantially from those of people with genuine intellectual

34

disabilities.  Webster results on the WMT, therefore, showed malingering.  Hr. Tr. 572:12-17.

Dr. Denney also administered the MSVT.  Hr. Tr. 572:18-20.  Webster's results on the MSVT were "very similar" to his results on the WMT.  Hr. Tr. 573:9-18.  Webster failed easy parts of the test, did better on harder sections than on easier ones, and produced results that were not consistent with any group of genuinely intellectually disabled people.  Hr. Tr. 573:9-579:1.  Accordingly, the MSVT also showed that Webster was malingering.  *Id.*

Webster's expert Dr. Fabian also administered a validity test, the non-verbal MSVT (NV-MSVT).  Hr. Tr. 638:22-640:19.  Webster failed this test in the same way he failed the validity tests administered by Dr. Denney.  *Id.*  He did poorly on easy sections, did better on more difficult sections than on easy ones, and produced scores that were inconsistent with any known population of intellectually disabled people.  *Id.*  And, while Webster's expert Dr. Fabian refused to concede that Webster was malingering, he did admit that "Bruce Webster [has] had variable effort in his testing. . . suboptimal effort."  Hr. Tr. 819:5-6.5.  The results of three freestanding validity tests, then, show that Webster was malingering.

Webster also did poorly on validity tests that are embedded in, or derived from, other tests he took.  On Dr. Denney's IQ test, Webster produced a RDS of 6, which "was

---

5 Dr. Fabian argued that Webster's "suboptimal effort" might be the result of other psychological problems.  Hr. Tr. 800:10-15.  But even if the "suboptimal effort" were the result of psychological problems as opposed to intentional malingering, Webster's test results would underrepresent his true ability, and would be invalid.

an indication of invalid performance." Ex. 101 at 32-33.  Webster produced an RDS of 5 on an IQ test administered by Dr. Finn, which was lower than expected of genuinely intellectually disabled individuals. Ex. 101 at 18.  These scores also suggest malingering. Hr. Tr. 555:2-6.

The inconsistency of Webster's test scores shows those scores were invalid. Based on the context of his testing, there is ample reason to suspect that Webster produced these inconsistent results because he was malingering.  And the validity testing provides strong, specific evidence that Webster was in fact malingering.  Given the ease with which one can feign disability on IQ testing, it is not surprising that Webster did so.

### e.   Malingering is easy

Research shows that malingering in IQ tests is "very easy," and that when people malinger, they typically produce a falsified score in the impaired range.  Hr. Tr. 631:20-23.  Thus, it is no surprise that Webster was able to fabricate scores in the impaired range on multiple IQ tests.  Hr. Tr. 631:23-25.  In one study, a group of college students with an average IQ of 110 was asked to feign low IQs while taking an IQ test.  Hr. Tr. 632:2-633:18.  A group of juvenile-justice inmates with an average IQ of 85 was also asked to feign low IQs.  *Id*.  Though the two groups had significantly different genuine IQ scores, both groups feigned IQ scores in the low 60s.  *Id*.  Feigning IQ scores in the mildly impaired range, then, is very easy.  Thus, while Webster's experts appear to give great weight to the fact that he produced a number of scores in the impaired range, doing so via malingering is actually quite easy.

**5.  Webster's achievement test scores are a better reflection of his intellectual functioning**

For the reasons discussed above, Webster's IQ scores are invalid and cannot be relied upon.  Fortunately, there is evidence of Webster's genuine intellectual functioning that the Court can credit.  Webster took a number of standardized tests of academic achievement and intellectual ability outside the context of litigation.  These tests are inconsistent with a diagnosis of intellectual disability, and show that Webster was functioning in the normal range of intellectual ability.

While in school, Webster took the MAT 6, a national achievement test for students, and scored in the 43rd percentile.  Ex. 138 at 1146-47.  He took the Army Beta test, a group-administered IQ test, and scored 76.  Hr. Tr. 343:17-21.  Webster took a Jobs Corps reading comprehension test, and scored 76 percent.  Hr. Tr. 345:22-24.  And when he was transferred to USP Terre Haute, Webster took the Adult Basic Learning Exam (ABLE) test, a standardized test given to students who enroll in GED preparation courses.  Ex. 171 at 2465; Hr. Tr. 974:2-23.  Webster scored at the college level in several subjects.  Ex. 171 at 2465; Hr. Tr. 977:1-7.

 The results of these standardized tests are inconsistent with Webster's IQ test scores.  Indeed, even Dr. Reschly testified that if Webster's "scores [on the ABLE test] are accurate, [those scores] would not be consistent overall with a diagnosis of intellectual disability."  Hr. Tr. at 227:17-19.  And Dr. Fabian agreed that Webster's scores on the MAT 6 and ABLE tests were "inconsistent with a finding of [intellectual

disability]." Hr. Tr. 484:18-20. Given the significance of these test scores, it is unsurprising that Webster's experts attempt to discredit them. However, their argument — that Webster cheated on these tests — is completely baseless and devoid of evidentiary support.

There is no evidence whatsoever that Webster cheated on any standardized academic test. Webster himself has never claimed that he cheated on these tests. See Hr. Tr. 346:22-23. Indeed, protocols were in place specifically to prevent cheating. See, e.g., Ex. 138 at 1146-50 (teachers monitored test-takers during the MAT 6); *id*. at 1150; (the chances that Webster would have been able to cheat are "very, very slim."); Hr. Tr. 975:24-976:5 (ABLE test-takers are given different versions of the test so they cannot copy off one another); Hr. Tr. 979:18-24 (the ABLE test is supervised by prison staff). And, finally, Webster did not have any incentive to cheat. There was no benefit to Webster in performing well on a MAT 6 or ABLE test. See, e.g. Hr. Tr. 957:22-25 (noting that there are not any benefits that Webster can receive due to his highly-restricted status as a death-row inmate). Accordingly, this Court should disregard any argument or insinuation that Webster cheated on these tests.

Webster's standardized academic test scores are a better reflection of his intellectual ability than the IQ test scores. The academic tests were not administered in the course of litigation, or as a prerequisite to any kind of benefit. Webster, therefore, had no motive to malinger (by producing an artificially low score) or cheat (by producing an artificially high score). Webster's only motive was to complete the test. Accordingly,

these tests should be regarded as a more accurate reflection of Webster's ability than any of the IQ tests, which were the product of malingering.

**B.    Webster's adaptive functioning is normal**

Even assuming Webster had a legitimately low IQ, that alone would not support a diagnosis of intellectual disability.  Intellectual disability is only diagnosed if an individual has a sufficiently low IQ, and significant deficits in adaptive functioning.  The former does not preordain the latter.  Some individuals with low IQs can learn adaptive skills such that they do not meet the definition of intellectual disability.  Hr. Tr. 526:20-23.  Thus, even if Webster could show that he had a low IQ—which he cannot—he would still have to prove that he has significant deficits in adaptive functioning.  He cannot do so.

The adaptive-functioning criterion is satisfied only when at least one of the three domains of adaptive functioning (conceptual, social, or practical) is so impaired that the subject needs "ongoing support" to "perform adequately" in real-life settings.  DSM-5 at 38.  Webster has not needed and does not need such support.  He has been able to "perform adequately" in all aspects of his life without "ongoing support" and pursue his goals, evil though they may be, without special assistance.

The adaptive functioning evidence that Webster offers suggests shortcomings, but not significant deficits such that Webster  needs "ongoing support" to "perform adequately" in real-life settings.  *Id*.  And the evidence he offers is unreliable.  Most of Webster's evidence comes from friends and family members, individuals who are highly

39

biased and motivated to shape their accounts in order to spare Webster from execution. Indeed, even Dr. Reschly conceded that statements from Webster's family members have to be evaluated "in consideration of their relationship with Mr. Webster." Hr. Tr. 355:22-356:2.

In contrast, the government's evidence of Webster's abilities comes from sources with no stake in the outcome of the proceeding, such as teachers and school administrators. The government's evidence also includes objective and undisputed facts, such as Webster's test scores, excellent hygiene, and ability to drive. And, importantly, the government does not offer this evidence to demonstrate Webster's "strengths" in an effort to outweigh his weaknesses. Instead, evidence of Webster's adaptive abilities demonstrates that he does not have significant deficits in the relevant categories. By showing that Webster performs normally in the conceptual, social, and practical domains, the evidence demonstrates that he lacks significant deficits in those domains and cannot meet the diagnostic criteria for intellectual disability.

### 1.    Conceptual domain

In intellectually disabled individuals, "abstract thinking, executive function, (i.e., planning, strategizing, priority setting, and cognitive flexibility), and short-term memory, as well as functional use of academic skills . . .  are impaired." DSM-5 at 34. Dr. Denney testified that, based on his expertise and testing of Webster, Webster did not have significant deficits in the conceptual domain. Hr. Tr. 621:25-623:22. The evidence supports his conclusion.

40

### a.    Academic performance

Webster dropped out of school in the ninth grade.  Ex. 162 at 2080.  But before he did so, his academic record was mixed.  As a young first grader, who had not attended kindergarten, he was held back a year.  *Id*. at 2079.  But when repeating the first grade, Webster got almost all A's and B's.  *Id*.  He got mostly B's in second grade, then a mixture of A's, B's and C's in third, fourth, and fifth grades.  *Id*.  In sixth grade, his grades began to decline and he recorded C's, D's and a few F's.  *Id*.  In seventh, eighth, and ninth grades, Webster made mostly D's and F's.  *Id*. at 2080.  Webster then dropped out of school.  *Id*.  E.C. Turner, the counselor at Webster's school, testified that Webster "did well" academically "until about the sixth grade."  Ex. 138 at 1148.

Webster will, of course, argue that his poor grades in the later part of his academic career are reflective of an intellectual disability.  But this argument ignores the fact that he did quite well in the earlier grades.  The more logical explanation is that as he got older, Webster simply lost interest in school and stopped trying.  This explanation is supported by a 1998 letter from Webster's school counselor.  Ex. 163.  In the letter, Webster's counselor explains that Webster's poor grades were largely the result of "misbehavior and lack of effort according to his teachers."  *Id*. at 2092.  The counselor notes that Webster had been caught "sleeping in class on numerous occasions," talking excessively in class, playing his radio and disrupting class, and showing disrespect for "teachers, administrators, bus drivers and other students."  *Id*.  He further reported that Webster had been suspended from school twice in the last semester, and had missed 17

41

days of school.  *Id*. at 2092-93; *see also* Ex. 164.  Given these circumstances, even a

brilliant student could not achieve good grades.  Webster simply chose not to participate

in school, and he received grades that reflected that choice.  His achievement test scores

show that he could have passed his classes if he had tried.

      While in school, Webster took the MAT 6, a nationally-administered achievement

test.  Ex. 138 at 1146-47.  The test was administered over a four- to five-day period, and

teachers monitored the test-takers.  *Id*. at 1149-50.  Webster scored in the 43rd percentile,

which placed him in the low-average range nationally.  *Id*. at 1147.  But Webster's score

"place[d] him with the average student at Watson Chapel."  *Id*.  Based on his score,

Webster was "definitely not" a candidate for a special education program.  *Id*. at 1148.

Webster, then, did not have any academic deficits.  He merely chose not to apply himself

to academic pursuits.

      Webster's scores on subsequent achievement tests further support the conclusion

that he had ability, but lacked motivation.  When Webster was transferred to USP Terre

Haute, Webster took the Adult Basic Learning Exam (ABLE) test, a standardized test

given to students who enroll in GED preparation courses.  Ex. 171 at 2465; Hr. Tr. 974:2-

23.  Webster scored at the college level in two subjects: reading comprehension and

spelling.  Ex. 171 at 2465.  He scored 11.9, or at the ninth month of eleventh grade, in

vocabulary.  *Id*.  And he scored at the eighth-grade level in problem-solving, a score that

matches the last grade of school he completed.  *Id*.  Webster scored at the fifth grade

level in two subjects: language and number operations, but the director of education at

USP Terre Haute testified that these subjects were "the two hardest parts" of the test, and were "common low scores." *Id*; Hr. Tr. 979:11-17. Overall, Webster's scores were very good, and qualified him for placement in either intermediate or advanced GED classes. Hr. Tr. 979:2-10. Webster scores were so good, in fact, that even Dr. Reschly conceded that his scores "would not be consistent overall with a diagnosis of intellectual disability." Hr. Tr. at 227:17-19. Webster clearly has the intellect to do well academically.

Indeed, Webster did well academically in prison, when he tried. His record in USP Terre Haute shows a pattern of uneven effort, with Webster sometimes refusing to participate in academics and other times taking courses. Ex. 171. But when he opted to participate, he did quite well. Webster passed classes in Spanish and legal research. Ex. 171 at 2465. And he scored well on quizzes in GED-preparatory mathematics, getting between 79 and 96 percent of the questions correct. Ex. 171 at 2458. Webster's experts, of course, argue that he could have cheated on these tests. But there is no evidence whatsoever that he did so. Webster has not produced a single witness to testify that Webster cheated on any academic test. Moreover, Webster had absolutely no incentive to cheat. As a death-row inmate, he had nothing to gain by scoring well on GED-preparatory quizzes or cheating on a Spanish test. There were no perks or benefits that could be afforded him for academic success; he could not earn "good-time credit" for doing well in his classes. Hr. Tr. 957:19-958:14. Because there is no evidence that Webster cheated, and because he had no reason to do so, one can only conclude that his

academic performance is genuine.  And his performance, along with the other evidence
discussed above, demonstrates that Webster has no significant academic deficits.

> **b.**     **Special Education**

Evidence that Webster was in special education is thin at best.  Webster relies
primarily on a single letter from his school stating only that "[t]he above student's
Special Education records were destroyed in 1988."  Ex. 21 at 28.  The letter, however,
offers no insight about the contents of the records, either in substance or in volume.  The
records referenced in the letter could be a denial of an application to enter special-
education classes.  Or, the records could contain the results of tests that were used to
determine Webster's ineligibility for special education.  Indeed, even Webster's expert
Dr. Reschly conceded that the letter could have been referring to a record of Webster's
rejection from the special education program.  Hr. Tr. 322:4-8.  It is even possible that the
letter is a form response sent to anyone seeking old records — whether such records
existed or not.  Drawing any conclusions based on such a short, generic statement would
be improper.  Instead, the Court should rely on substantive testimony from teachers,
administrators, and relatives about Webster's educational history.  That testimony shows
Webster was not in special education classes.

Gene Stewart was the principal at Webster's junior high school when Webster
attended.  Ex. 133 at 1078.  He was involved in decisions about which students would be
placed in special education classes.  *Id*. at 1079.  He testified at trial that Webster was not
in special education classes.  *Id*.  Moreover, Stewart testified that Webster did not meet

the qualifications for assignment to special education classes.  *Id.*  Stewart also testified

that he had, in the course of his 25-year career in education, had the opportunity to work

with individuals who were mildly mentally retarded, he and did not believe that Webster

was.  *Id*. at 1078-79.

Richard McLaughlin, the assistant principal at Webster's school, testified that no

teacher or other administrator ever suggested to him that Webster was mentally retarded,

or that he should be placed in a special education program.  Ex. 134 at 1090.

McLaughlin did not believe that Webster was mentally impaired.  *Id.*

E.C. Turner, the counselor for Webster's school, testified that based on Webster's

scores on the standardized MAT 6 test, he would "definitely not" be a candidate for a

special education program.  Ex. 138 at 1148.  Turner was certain about this, and

emphasized that there was no question at all that, based on his test scores, Webster would

not have been in special education classes.  *Id.*

Luketha Frazier, Webster's niece, is his age and lived with Webster when they

were children.  Ex. 129 at 993-95.  She and Webster were in the same grade at school,

and they had a class together.  *Id*. at 995.  Frazier testified on Webster's behalf at trial,

but she admitted that, to her knowledge, Webster was not in special education classes.

*Id*. at 1003.  And she testified that the class that she and Webster were in together was not

a special education class.  *Id*. at 1002.

Pat Drewett, Webster's ninth grade civics teacher, testified that Webster was in her

class, which was not a special education class.  Ex. 136 at 1122-23.  She testified that

45

Webster could read, and was a capable student, but he chose not to perform, and slept in class often.  *Id*. at 1123.  Like Gene Stewart, she had worked with mildly mentally retarded students in the past, and did not believe that Webster was mentally retarded.  *Id*. at 1124.  If she had seen an indication that he had an intellectual disability, she would have referred him to special education, but she did not do so because she did not believe he had any intellectual disability.  *Id*.

Linda Monk, Webster's ninth grade English teacher, testified that her class was a basic class, but was not a special education class.  Ex. 137 at 1131.  She believed that Webster was "one of the brighter ones" in her class, and "seemed rather mature for his age," but that "his grade did not reflect that."  *Id*. at 1131-32.  Webster frequently slept in class and "did not apply himself."  *Id*. at 1131-33.  But Monk believed that he "certainly was capable of [doing] the work" if he had been more motivated.  *Id*. at 1132-33.  Like Stewart and Drewett, Monk had worked with mildly mentally retarded students.  *Id*. at 1133.  She did not believe that Webster was either mildly mentally retarded or even borderline mentally retarded.  *Id*.

### c.      Literacy

Webster is clearly literate.  Leonda Daniels, one of Webster's ex-girlfriends, testified that he wrote letters to her.  Ex. 130 at 1023.  While his handwriting was bad, she had no difficulty understanding the substance of his communications.  *Id*; Tr. 23:103:1-3.  She also testified that while Webster was lazy and made her fill out his job applications, he was capable of reading and filling out the applications himself:

"[Webster] could fill one out, but at the time I guess he wanted me to fill out the application form . . . [Webster] can fill out an application, yeah . . . he can fill one out." Ex. 130 at 1023.

Webster's sister Dorothy Harris McKelvy testified that she received Christmas cards and letters from Webster.  Ex. 36 at 16-17.  John Clay, an inmate who knew Webster when he was in the Mansfield Jail, testified that Webster would handwrite letters to him, and Webster used a code to conceal illicit plans.  Ex. 141 at 1178-97.  And Luther Alexander, who was a guard at the Mansfield Jail, testified that Webster went to the law library on a daily basis, read books, and took notes about the books he read.  Ex. 144 at 1223-24.

Dr. George Parker examined Webster prior to his trial and testified that Webster was able to read stories aloud to Parker during the examination.  Ex. 148 at 1282.  Parker also observed Webster address an envelope for him.  *Id.* at 1283.

During his incarceration at USP Terre Haute, Webster has written a number of emails.  Ex. 172.  Webster's emails are coherent, responsive to questions, on-topic, socially-appropriate, and demonstrate a good vocabulary and understanding of grammar. *See* Ex. 172 at 2475, 2478.  Indeed, when Dr. Charles Spellman, one of the psychologists who evaluated Webster for the Social Security Administration, read Webster's emails, he testified that "[p]eople who are mentally retarded are not able to express themselves this well . . . this is just inconsistent with any intellectually disabled person I have ever dealt with."  (Spellman Depo at 66:14-67:2).  Moreover, Webster's ability to communicate via

47

email not only demonstrates his literacy, but also shows that he is proficient with a computer.

Given the importance of these emails, and the degree to which they demonstrate Webster's intellectual ability, it is unsurprising that Webster has objected to their admission.  Hr. Tr. 590:10-17.  Webster claims, through his lawyers, that he did not write the emails and that someone else must have written them for him, or at least assisted him in doing so.  *Id*.  The argument itself is a significant form of concession — Webster admits that the emails are so well written, and the process of drafting them so technically demanding, that only someone who was not intellectually disabled could have created them.  Webster, the argument goes, must therefore not be the one who wrote the emails.

But the evidence demonstrates that Webster did draft the emails.   John Edwards, a correctional counselor at USP Terre Haute who worked with Webster on a daily basis for several years, explained the email system at the prison.  Hr. Tr. 923:2-926:25.  Webster had access to an email system.  Hr. Tr. 931:3-10.  In order to access the system, he had to enter a passcode that ensured that only he could access his email account.  *Id*.  There were computers located only in a few locations, such as the law library, legal consult area, and leisure room.  Hr. Tr. 931:24-932:3.  And the computers were restricted to email; the computers could not be used to access the internet, play videogames, or do anything else.  Hr. Tr. 933:5-14.  The computers could only send and receive emails.  *Id*. Accordingly, if an inmate was using one of these computers, he was necessarily sending or receiving email.

48

Edwards testified that he saw Webster typing on the email computers "numerous times." Hr. Tr. 933:15-21. The majority of the times Edwards saw Webster using the email computers, Webster was alone. Hr. Tr. 934:9-11. Webster often used the email computer in the law library, and he was *always* by himself when he did so. Hr. Tr. 947:24-948:2.

Edwards saw Webster, on numerous occasions, in the law library, by himself, typing on a computer that could only be used to send and receive emails. The only logical conclusion is that Webster wrote the emails on his own. Under these circumstances, it would have been impossible for him to have help.

Edwards also testified that he had received emails from Webster. Hr. Tr. 934:15-21. Webster would email him requests for legal consultations, or complaints about prison conditions. *Id.* Edwards testified that Webster's emails were well written, with good grammar, spelling, and punctuation. Hr. Tr. 935:13-19. Edwards never had any trouble understanding the content of Webster's emails. *Id.* Webster could have made his requests verbally, but he chose to do so via email, showing that he was comfortable with communicating in writing even when other options were available. Hr. Tr. 935:4-6.

Interestingly, Webster may have been instructed to conceal his literacy. At one point during his confinement in the Mansfield Jail, Webster made a complaint to Luther Alexander, one of the guards. Ex. 144 at 1224-25. Alexander instructed him to fill out a request slip as usual. Ex. 144 at 1225. But Webster "told [Alexander] that he couldn't fill out a request anymore because he was advised by his attorney not to." *Id.* Of course,

49

despite this attempt to conceal his literacy, evidence of Webster's ability to read and write is overwhelming.

### d.      Executive functioning

The DSM-5 emphasizes that in adults with even mild intellectual disabilities, "executive function (i.e. planning, strategizing, priority setting, and cognitive flexibility) . . . [is] impaired."  DSM-5 at 34.  Webster, far from having an impairment in executive function, has shown a superlative ability to plan, strategize, achieve goals, and respond flexibly to new circumstances.  Unfortunately for his victims, most of Webster's schemes have been criminal.  But his ability to plan and carry out those schemes nevertheless demonstrates his lack of impairment in executive function.

While being detained in Mansfield jail prior to his trial, Webster concocted and carried out a scheme to escape from the men's section of the jail into the women's area in order to meet a female prisoner.  Ex. 124 at 887-900; Ex. 125 at 904-912.  In order to accomplish his escape, Webster used a piece of wire to pick the locks on a food chute, then slipped through the chute into the women's area.  Ex. 125 at 910-12.  There was no other way for inmates on the men's side to access the women's side of the jail.  *Id*.  But Webster, ingenuously, figured out how to do so, and was caught only when a head count came up short and a guard checking the cells found Webster missing.  Ex. 124 at 893.

Webster was eventually found in the women's shower area.  Ex. 124 at 894.  An initial search of Webster turned up nothing, but during a second search, guards found a wire concealed in his pants.  *Id*.  After Webster's escape, the Mansfield jail installed extra

latches on the food chute to prevent further escapes.  Ex. 124 at 897.  Webster later told

Dr. Richard Coons that he had been able to escape to the women's quarters undetected on

four or five occasions before he got caught.  Ex. 149 at 1365.  Webster's clever escapes

show an ability to set a goal, plan, strategize, and adapt.  *Id*.

After murdering Lisa Rene, Webster burned the clothes, gloves, and rope used in

the crime.  Ex. 110 at 3349-50.  He also washed and cleaned out his car to remove any

evidence of Lisa Rene's presence in the vehicle.  *Id*. at 3349-50, 3353.  His destruction of

evidence showed "foresight and thoughtfulness" that was "not consistent with substantive

conceptual deficits related to intellectual disability."  Hr. Tr. 599:1-5.  Webster later

explained that he had murdered Lisa Rene because "she had seen them."  *Id*. at 3357.

While chilling and horrific, his explanation of his decision to kill Lisa Rene was

consistent with his plan to conceal evidence of the kidnapping and rape.

Accordingly, Webster has repeatedly shown an ability to plan, strategize, and

adapt to changing circumstances.  Most of his plans have had criminal ends, but his

schemes show good executive function despite their immoral aims.

### e.      Short-term memory

According to the DSM-5, individuals with mild intellectual disability often have

impairments in short-term memory.  DSM-5 at 34.  Webster has displayed no such

deficit.  To the contrary, Webster has an excellent memory.

After being arrested for this offense, Webster made a statement to police about his

crime.  Ex. 110 at 3335-3351.  In his statement, Webster recalled numerous specific

details about the events of the preceding days.  Webster remembered the motel name and

room number where he stayed when he arrived in Dallas to assist his friends with their

drug debt.  *Id*. at 3338.  He remembered that when he and his coconspirators met to plan

the crime, Orlando Hall was wearing "green and white Nike tennis shoes," and that his

brother was wearing "cami bottoms and a gray-colored sweatshirt."  *Id*. at 3339.  Webster

remembered not only the name of the motel where he held Lisa Rene, but the number of

the room he rented.  *Id*. at 3344.  He remember how much he paid for the room.  *Id*.  He

remembered that while Lisa Rene was being held in Room 513, he saw another woman

who he knew, and he remembered the number of the room that woman was staying in.

*Id*. at 3345.  He remembered the room number of a friend of his who was also staying at

the motel, and helped him jump start his car.  *Id*. at 3346-47.  Webster remembered the

name of the motel and number of the room his coconspirators moved Lisa Rene to on the

second day of her captivity in Pine Bluff.  *Id*. at 3347.  Webster remembered the number

of the motel room where they stored the gasoline he poured over Lisa Rene's body.  *Id*. at

3348.  He remembered the make, model, and colors of cars that he saw during the

offense.  *Id*. at 3348-49.  He remembered the color of Lisa Rene's clothes.  *Id*.  He

remembered the cross-streets of the location where he went to burn evidence, and the

name of the street where he found a car wash to wash his car following the crime.  *Id*. at

3349-50.  He remembered how much money Marvin Holloway gave him to pay for the

motel room.  *Id*. at 3350.

And, critically, Webster remembered exactly where he buried Lisa Rene.  *Id*. at
3326-27.  He was able to do so despite the fact that the grave was in an extremely
isolated area, and was so well concealed that "you could not look at the ground and know
that a grave was there."  *Id*. at 3327.  The grave was so difficult to find, in fact, that after
he confessed, coconspirator Beckley was unable to locate it when he tried to lead
investigators to the body.  Ex. 113 at 566.  Beckley "tried all day" to find the grave for
the police, but he could not find it.  *Id*.  Only Webster was able to remember where it was
and take investigators to the grave.

Webster has no deficits in memory.  His memory is excellent.

### 2.  Social domain

Individuals with mild intellectual disability are often "immature in social
interactions," due to "difficulties perceiving peers' social cues."  DSM-5 at 34.
Communication, conversation, and language are more "concrete" and "immature" than
that of peers.  *Id*.  Individuals with mild intellectual disability have "difficulties
regulating emotion and behavior," and these difficulties "are noticed by peers in social
situations."  *Id*.  Individuals with deficits in this domain have "limited understanding of
risk in social situations," and are likely to be gullible and "at risk of being manipulated by
others."  *Id*.  Deficits in this domain may be evident even to lay people.  DSM-5 at 34.

Dr. Denney testified that during his evaluation of Webster, Webster "demonstrated
a level of communication, conversation and language that [was] not consistent with [the

DSM-5 description of impairment in the social domain]."  Hr. Tr. 624:16-18.  The evidence supports Dr. Denney's impressions.

### a.    Webster is a good conversationalist

People with deficits in the social domain may have difficulties with communication and language.  DSM-5 at 37.  "communication, conversation, and language" may be immature and "there may be difficulty in accurately perceiving peers' social cues."  *Id.* at 34.  Webster, however, has no trouble with communication, language, or conversation.  To the contrary, numerous witnesses have commented on Webster's skills as a conversationalist.  And while his experts contend that there is nothing noteworthy about this fact, the DSM-5 specifically comments that individuals with intellectual disability often have deficits in this area that can be observed by lay people.  DSM-5 at 34.  But people who interact regularly with Webster have noticed no such impairment.  To the contrary, even trained psychologists regard Webster as an excellent conversationalist.

Dr. Denney conducted a three-hour clinical interview with Webster, and he continued to talk with Webster over the course of a two-day evaluation.  Hr. Tr. 551:13-552:1.  He observed that Webster's "speed of mental processing was quick," and that "[Webster] was articulate.  He was able to carry on rapid conversation with me and at the same time also provid[e] witty comments about what [was] going on around us as we [were] interacting."  Hr. Tr. 549:2-9.

54

Dr. Jacqueline Blessinger, a staff psychologist who saw Webster on a monthly basis in USP Terre Haute, also noted that Webster was good at conversation.  He was "easygoing, polite, friendly [and] definitely enjoy[ed] holding [Dr. Blessinger] at the door for a little bit and chatting."  *Id.* at 86.  In his conversations, Webster was "appropriate," "polite," and "show[ed] good use of humor."  *Id.* at 87.  In one monthly meeting, Webster had a legitimate complaint, and he was able to "to express frustration appropriately and understandably so, but then … engage in a conversation, understanding the other person's perspective, come to a mutual understanding, and then sort of resolve his concerns by the end of the conversation and no longer be frustrated."  *Id.*  His ability to resolve issues through conversation was in stark contrast to other inmates.  *Id.*  at 80.  Webster's conversational ability was, in Dr. Blessinger's opinion, "really great," and "something I don't always see."  *Id.*  Webster was also able to "appropriately and adequately describe his feelings," which is "often one of the areas that is most difficult for an individual with even mild intellectual disability."  *Id.* at 100.  And Webster was "articulate" with a "larger vocabulary" than normal.  *Id.* at 100-01.

Dr. Erin Conner, a licensed psychologist working at USP Terre Haute, conversed with Webster on a monthly basis for several years.  Hr. Tr. 848:16-860:13.  She observed that Webster is "able to carry on conversation very well.  He articulates himself well . . . his vocabulary is very good.  He doesn't seem to struggle to find words and . . . uses appropriate words in an articulate manner."  Hr. Tr. 885:5-14.  Like Dr. Blessinger, Dr. Conner also noted that Webster was able to "manage his emotions appropriately" in

55

stressful situations, such as after the death of his father and the illness of another relative. Hr. Tr. 874:10-21; 877:13-16.

E.C. Turner, the counselor at Webster's junior high school, testified that he and Webster conversed on a number of occasions, and that Webster never had any problems communicating with him. Ex. 138 at 1145. Turner had worked with intellectually disabled students before, and he had training in the detection of intellectual disability. *Id*. In his conversations with Webster, he saw "no indications of [intellectual disability] whatsoever." *Id*.

One of Webster's ex-girlfriends, Sylvia Henry, testified that Webster had no trouble articulating his thoughts or telling stories. Ex. 121 at 848. And Leonda Daniels, another of Webster's ex-girlfriends, testified that Webster never had any difficulty communicating with her. Ex. 130 at 1020.

It is clear, then, that Webster had no trouble expressing himself verbally and was able to engage in productive conversations without difficulty. Despite verbal communication being a particular area of difficulty for intellectually disabled people, Webster has no deficits in this area.

> **b.** **Webster can regulate his emotions and behavior**

The DSM-5 notes that individuals with intellectual disability "may have "difficulties in regulating emotion and behavior in age-appropriate fashion; *these difficulties are noticed by peers in social situations*." *Id*. (emphasis added). It is critical to note, as the DSM-5 does, that deficits in this domain are not only detectible by trained

professionals.  Thus, if Webster suffered such deficits, people with no psychological training would be able to notice.  But Webster suffered no such deficits.  Indeed, even trained professionals saw nothing amiss.

Dr. Blessinger, who has extensive experience and training relating to intellectual disability, talked at length about Webster's ability to regulate his emotions and behavior. She testified that "emotional processing is very difficult for an individual with an intellectual disability."  (Blessinger Depo at 106.)  She explained that when she worked with intellectually-disabled people at Mount Sinai Hospital, she would have to provide structure and themes to conversations to help these patients work through their emotions. *Id*.  Webster, according to Dr. Blessinger, needed no such assistance, and was the "antithesis" of her intellectually disabled patients.  *Id*.   Whether it was discussions about the hardships of prison, or the death of his uncle, Webster "was able to process his thoughts and feelings without [Dr. Blessinger] providing that structure for the process to happen."  *Id*.  And when Dr. Blessinger missed a meeting with Webster one month, he was later able to express his frustration appropriately, understand her perspective, and share a story about a niece he had who was a psychologist.  *Id*. at 78.  Webster's ability to manage his emotions appropriately demonstrated the "sort of cerebral thinking that requires higher order processing, and that is certainly challenging for an individual who has an intellectual disability to do without prompting."  *Id*. at 106-07.  Dr. Conner agreed that Webster was able to "manage his emotions appropriately" in

stressful situations, such as after the death of his father and the illness of another relative. Hr. Tr. 874:10-21; 877:13-16; 880:1-15.

Dr. Blessinger also noted that Webster was able to "reciprocate humor," which is something that is difficult for intellectually disabled people to do. (Blessinger Depo at 112.) "Humor is one of those things . . . that is often difficult for individuals to pick up on, you know, just the nuances in someone's tone in which they deliver [a joke], [Webster] seemed to get that really well." *Id*. at 112-13. And not only was Webster able to understand and appreciate other people's jokes, "he was able to reciprocate similarly." *Id*. Indeed, Dr. Blessinger made a point of recording the fact that "[Webster] reciprocated or demonstrated the use of humor" in her notes because the use of humor shows that he was "able to understand nuances in tone and other social pragmatics." *Id*.

Webster's ability to regulate his emotions and understand humor demonstrate a lack of deficits in what is typically a weak area for people with intellectual disability.

### c.  Webster is manipulative and a leader

The DSM-5 notes that individuals with intellectual disabilities are often gullible, and can be easily manipulated by others. DSM-5 at 34. Indeed, the AAIDD ranks gullibility as "a cardinal feature of [intellectual disability]." AAIDD-11 at 160. But Webster is neither gullible nor an easily-manipulated victim. Instead, he is a manipulator, a leader, and a predator.

58

The question of Webster's gullibility was actually specifically resolved at trial. Each of his trial jurors were asked to determine individually, by a preponderance of the evidence, whether Webster was "unduly susceptible to influence by others."  Tr. 27:21:17-18.  The jurors had heard from experts, family members, teachers, and friends of Webster's.  And not a single juror believed that Webster was "unduly susceptible to influence by others."  Tr. 27:102:19-20.

The evidence amassed during various stages of litigation supports the jury's conclusion that Webster is not gullible or easily manipulated.  Instead, it is quite clear that Webster is the manipulator.  Dr. Hackett, who examined Webster for the Social Security Administration, observed that Webster is "a con man," "a predator," and "a user of others" who "would take advantage of other people."  Ex 102 at 50, 52.  And while the AAIDD states that intellectually-disabled people are "overly trusting," and particularly likely to yield to the instructions of people "in a position of power," Webster was hardly a compliant subject during his examination.  AAIDD-11 at 161.  Instead, while being examined by Dr. Hackett, Webster tried to take advantage of the authority figure by asking the doctor to give him money.  Ex. 102 at 51.  Webster was "somewhat cocky from the start," and eventually made "personal comments" to Dr. Hackett toward the end of their encounter.  Webster's behavior does not square with the AAIDD description of intellectually disabled people being gullible ("a cardinal feature of ID") or complaint toward authority figures.  AAIDD-11 at 160-61.

Webster also attempted to turn circumstances to his advantage in meetings with other psychologists.  Dr. Richard Coons testified at trial that, during his examination of Webster, Webster gratuitously brought up a story about how he had to cheat to pass a driver's license test.  Ex. 149 at 1357-58.  Webster's story was not in response to any question, but was "offered out of the blue."  Ex. 149 at 1357.  Dr. Coons found it "very unusual that someone would spontaneously bring up that they had cheated on – had to cheat on their driver's license test."  Ex. 149 at 1358.  In Dr. Coons's opinion, Webster's gratuitous story "represent[ed] an attempt to manipulate [him] about [Webster's] mental abilities."  *Id.*

Health care providers also indicated in the Southeast Arkansas records that Webster was manipulative.  Ex. 34 at 4315.  And even defense expert Dr. Robert Fulbright admitted that Webster "could be manipulative at times."  *Id.*

Correctional Officer Ricardo Saenz, Jr. testified at trial that while Webster was incarcerated at the Mansfield jail, he tricked the guards into coming to his cell by faking a seizure.  Ex. 146 at 1239.  When the guards responded, Webster laughed and explained that he just wanted to draw them to his cell so he could have someone to talk with.  *Id.*

And Webster was more than a manipulative con man.  He was a leader.  Webster's supervisor at a summer jobs program, Marcus Hollien, testified that Webster worked for him for six weeks, and that Webster was a leader that the other participants followed.  Ex. 139 at 1160.  The school counselor at Watson Chapel Junior High School, E.C. Turner, testified that he had conversed with Webster on a number of occasions, and found

Webster to be "an independent thinker," who was "more of a leader than he would have been a follower." Ex. 138 at 1144-45, 1148. And Pat Drewett, one of Webster's ninth grade teachers, described him as "more of a leader" than a follower. Ex. 136 at 1127.

Webster also played a leadership role in the kidnapping and murder of Lisa Rene. The conspirators surveilled the apartment where Lisa Rene lived for some time, but it was Webster who finally decided to act, telling the others "[i]f we're going to do this, let's do it now." Ex. 112 at 388. And he ordered his coconspirators to leave the car running because it had had engine trouble earlier. *Id*. When they could not break down the front door, it was Webster's idea to go around to the sliding glass door and break in through it. *Id*. at 392. And when they entered, Webster took charge, grabbed Lisa Rene, and dragged her to the car. *Id*. at 399-402. After he and the others kidnapped Lisa Rene, it was Webster who took charge of interrogating her about the money missing from the drug deal with her brothers. *Id*. at 403; Ex. 113 at 514.

While he and his coconspirators were transporting Lisa Rene in their car, Webster yelled at Beckley for making a wrong turn, and told him to stop acting nervous about the crime. Ex. 113 at 519. Later, Webster threatened to kill Beckley if he did not stop "acting all scared." *Id*. at 522. Webster also ordered Beckely to "just do the speed limit and watch the road," while Webster raped Rene in the backseat. *Id*. at 527. After they arrived in Pine Bluff and Webster rented a motel, Webster told Beckley to "walk Lisa around to the room like she was [his] girlfriend," and to "just casually walk her into the room." *Id*. at 531.

Once the men had Lisa Rene confined in the motel room, Webster left to buy food. *Id*. at 531.  He took Beckley's car, but before leaving, he ordered the men to "make Lisa take a shower," and told them that "he was going to bring back a small comb to comb out her pubic hair."  *Id*. at 532.  The men did as they were instructed.  *Id*.  And after Webster took Lisa Rene outside, he ordered Demetrius Hall to clean the room.  Ex. 112 at 334-35.

These actions show that Webster held a leadership role within the group, and that the other coconspirators deferred to him.  They also show foresight, planning, and strategy, as Webster told the others to take steps to avoid being caught and to destroy evidence that could link them to the crime.

### d.      Webster formed mature social relationships

The DSM-5 explains that individuals with intellectual disability are "immature in social interactions."  DSM-5 at 34.  And the AAIDD explains that individuals with mild intellectual disability have "[r]educed ability to form and sustain mutually beneficial friendships."  AAIDD-11 at 154.  But Webster had no such difficulties.  Webster formed strong friendships and had several romantic partnerships prior to his incarceration.

Webster had friends who trusted and relied upon him.  In school, Webster was "very liked by the [other] students," and "got along with them well."  Ex. 129 at 995. Unfortunately, after he dropped out of school, he turned to criminal endeavors.  But even in these endeavors, Webster had friends who trusted and relied upon him.  For instance, after Webster's friends lost money in a drug deal, Orlando Hall called Webster and asked him to fly from Arkansas to help because "[Webster] knew how to handle things like

62

[that]." Ex. 112 at 283.  The fact that Hall would not only ask Webster for assistance, but fly him in from another state and rely upon him to fix the problem shows that people close to Webster trusted him and counted on him to make important decisions.

Webster formed romantic relationships with several women.  Sylvia Henry met Webster in a club, began dating him, and eventually invited him to live with her.  Ex. 121 at 807-08.  Henry described their relationship as a "normal one" and said she was attracted to Webster because he "seemed normal," and was "a nice guy, [who was] fun to be around."  Ex. 121 at 845-46.  She and Webster did "normal things that couples do," and she considered Webster "a smart person intellectually."  *Id*. at 845.  She and Webster had a child together.  Ex. 121 at 819.

Webster also dated Gwen Alexander for several years and had a child with her.  Ex. 130 at 1016; Hr. Tr. 367:17-368:1.  She and Webster lived together for a period of time, and Alexander continued her romantic relationship with Webster even after he went to prison.  *Id*.  The fact that Webster was able to convince a woman to continue dating him even after he was incarcerated shows that he had very good social skills.

Webster also dated Leonda Daniels from 1989 to 1992.  Ex. 130 at 1013.  Daniels met Webster through his sister, and she described Webster as "nice and sweet" and said that "he was there for me."  Ex. 130 at 1014.  Daniels testified that Webster made her laugh, and that even after his kidnapping conviction, she still cared about him.  *Id*. at 1014-15.  It is clear that Webster had the social skills to form a strong romantic relationship with Daniels, one so strong that she continued to stand by him even after his

conviction for a heinous crime.  Or, more cynically, one could argue that Webster was able to emotionally manipulate Daniels into seeing past his extreme character flaws. Either way, Webster's social skills greatly exceed those of someone who was intellectually disabled.

Webster also formed and maintained positive social relationships with prison staff. For instance, on one occasion when Dr. Conner stopped by to visit him, he waived her away without engaging in conversation.  Hr. Tr. 880:17-881:14.  Dr. Conner was visiting with an intern, and she had not seen Webster for at least a year.  *Id*.  Several days later, Webster approached Dr. Conner in a recreation room to apologize for his behavior.  Hr. Tr. 881:15-882:17.  He told her "I didn't realize that was you at my door the other day or else I would have talked a little bit longer.  I wasn't trying to be rude, but I didn't realize that you was there."  *Id*.  After apologizing for his inadvertently rude behavior, Webster had a conversation with Dr. Conner.  *Id*.  This incident shows that Webster is socially adept and able to recognize when his behavior — even unintentionally — might be rude or socially inappropriate.  *Id*.  He was also able not only to recall the potential social mistake, but address his actions with a timely and appropriate apology, and maintain a positive social relationship by doing so.  These are hardly the actions of someone with severe social deficits.

### 3.     Practical domain

The practical domain involves "learning and self-management across life settings," including the ability to perform day-to-day tasks such as "personal care, job

responsibilities, money management, [and] recreation."  DSM-5 at 37.  Dr. Denney

testified that Webster does not have the deficits in the practical domain described in the

DSM-5.  Hr. Tr. 624:25-626:6.  He further explained that, to the extent that Webster has

made bad decisions in his life, his behavior is the result of a maladaptive personality

disorder, and not the result of an intellectual disability.  Hr. Tr. 625:22-626:6.  The

evidence supports this conclusion.

### a.      Hygiene and daily living

The practical domain involves includes "personal care" and daily living skills.

DSM-5 at 37.  Webster has no deficit here.  Webster is able to maintain consistently good

hygiene and has no trouble with fundamental daily tasks.  Even Dr. Reschly conceded

that Webster "certainly mastered the basic fundamental daily living skills of eating,

toileting, dressing, [and] things of that nature."  Hr. Tr.  279:11-13.  In fact, Webster went

beyond mere competence and took great pride in his personal appearance, always

presenting himself as "carefully groomed"  and well dressed.  Hr. Tr. 279:22-280:16.

Other witnesses corroborate Dr. Reschly's observations.  Richard McLaughlin, the

assistant principal at Webster's junior high school, testified that Webster was always

"very nicely dressed," and "always seemed to take pride in his appearance."  Ex. 134 at

1087-88.

John Edwards, a correctional counselor at USP Terre Haute, observed that

Webster was "very clean," and "squared away."  Hr. Tr. 936:4-6.  Everything in his cell

was put away, his clothes were folded, and his living space was "very clean."  Hr. Tr.

936:8-10.  Webster was one of the cleanest inmates in the facility.  Hr. Tr. 936:13-18.

Dr. Blessinger, a psychologist at USP Terre Haute, noted that Webster "was always groomed appropriately," and his "cell [was] kept orderly."  (Blessinger Depo at 103.)  Dr. Conner, another psychologist at USP Terre Haute, observed that Webster was "very well put together.  His hygiene is definitely not a concern."  Hr. Tr. 869:10-11.

It is clear, then, that Webster has no deficit when it comes to hygiene, cleanliness, or personal care.

**b.     Recreational skills**

Recreational skills are an aspect of the practical domain in which individual with intellectual disability may have difficulties.  DSM-5 at 34, 37.  Webster, however, has no such deficit.  To the contrary, he excels as a musician.  As a youth, he played drums in his church choir.  Ex. 129 at 998.  Webster was "[p]retty smooth on the drums and singing," according to his brother Tony.  Ex. 127 at 967.  Later, Webster was hired to play drums at gospel concerts.  Ex. 101 at 7.  Webster also taught himself to play guitar while in prison.  (Blessinger Depo at 108); Hr. Tr. 878:4-11.

Dr. Blessinger saw Webster playing guitar in his cell on two separate occasions.  (Blessinger Depo at 108.)  She observed that his ability to play guitar demonstrated not only good recreational skills, but "fine motor processing . . . that has to go along with the cognitive process."  *Id.* at 107.  Dr. Blessinger also saw Webster apparently reading music.  She testified that while he was playing guitar, Webster "had a music book out and was following along with that."  *Id.*  She believed that Webster was reading music:  "one

66

would imagine that if you have a music book out as you're playing an instrument that you are reading that music." *Id*.  Webster's musical ability, therefore, is quite advanced.

In addition to his musical talents, Webster also played basketball with his brothers, along with ordinary childhood games like hide-and seek.  Hr. Tr. 398:21-24.  It is clear, then, that when it comes to recreational skills, Webster has no deficits.

### c.     Ability to travel

The DSM-5 notes that individuals with mild intellectual disability often need support with transportation.  DSM-5 at 34.  Webster does not.

In 1992, Webster passed his driver's license test.  Ex. 132 at 1068.  And, while Webster claims that he cheated on the test, his claims are implausible.  The administrator of the test, Charles McLemore, testified at trial that the test consisted of two parts; there were 25 questions on the first part and 10 on the second.  *Id*. at 1069.  The licensing office had three different versions of the test, so an individual wanting to cheat would need to memorize the answers to 105 questions.  *Id*.  Webster took the test in a small room, and McLemore watched him to ensure that he was not cheating.  *Id*. at 1070.  As an additional precaution, people taking the test were separated so they could not see one another's answers.  *Id*. at 1071.  And Webster was only allowed to have a pencil while taking the test; even extraneous clothing like hats was prohibited.  *Id*. at 1070.

Webster scored 96% correct on the first portion of the test, and got 70% correct on the second portion.  *Id*. at 1070-71.  He only missed four questions on the entire test.  *Id*. And, after passing the written portion of the test, Webster successfully passed a road test.

*Id*. at 1072-73.  In order to do so, he had to drive a car with an examiner in the passenger's seat and demonstrate knowledge of traffic laws and the ability to operate a car safely.  *Id*. at 1073.  His ability to pass this test demonstrates skills in a number of domains, as does his ability to drive.

Webster's ability to drive is undisputed.  Dr. Hackett noted that "Webster drove himself to the [Social Security] evaluation."  Ex. 102 at 51.  Dr. Reschly conceded that Webster could and did drive in everyday situations.  Hr. Tr. 245:5-10.  And, of course, it is well-established that Webster drove Lisa Rene to the park where he murdered her.  Ex. 113 at 543.  It is clear, then, that Webster had no difficulties when it came to driving.

Webster argues that he had difficulties with airline travel, citing the fact that Marvin Holloway purchased his airline ticket to fly from Arkansas to Texas.  *See*, Ex. 116 at 731.  But the AAIDD-11 cautions that "[a] person whose opportunities to learn adaptive skills has been restricted in comparison to same-age peers may have acquisition deficits unrelated to ID [intellectual disability]."  AAIDD-11 at 52.  Given Webster's underprivileged background, it is unlikely that he ever had opportunities to travel by air, much less purchase his own airline tickets.  Indeed, because most of his life since age 15 was spent in prison, he would have been physically unable to do so even if he had the means.  It is unsurprising, then, that Webster might have need assistance navigating the byzantine process of purchasing an airline ticket and flying – especially in a pre-internet era when user-friendly travel applications were unavailable.  Thus, Holloway's assistance

is not evidence of any intellectual failing on Webster's part.  It is merely evidence that, at most, Webster lacked certain opportunities due to his background.  Webster's ability to travel, therefore is normal.  He has no deficit in this area.

### d.     Ability to handle money

Intellectually disabled individuals often struggle with money management, and need support to handle money.  DSM-5 at 34.  Webster, however, has no impairment in this area.

Indeed, even defense psychologist Denis Keyes conceded during his trial testimony that Webster "has an understanding of money on a reasonably good level."  Ex. 32 at 4260.  And Dr. Reschly gave Webster full credit during a test of his ability to count money.  Hr. Tr. 364:9-18.  More specifically, Webster was given an "array of coins" and was able to correctly select coins that added up to a specified amount of money.  *Id*. Webster's ex-girlfriend, Sylvia Henry, also agreed that Webster had no problems counting his money, and testified that he would sometimes help her with her bills.  Ex. 121 at 819.

While in jail awaiting trial, Webster managed his commissary account carefully and precisely.  Debra Harrison, a correctional officer at the jail, testified that on one occasion Webster complained to her that the commissary had incorrectly calculated his balance.  Ex. 145 at 1233.  Harrison looked into his complaint and determined that Webster was right, and the commissary was wrong.  *Id*.  Another officer, B.J. Valdez, testified that Webster approached him to complain that the commissary had overcharged

69

him for an item.  Ex. 143 at 1219-20.  Webster asked Valdez to talk to the commissary

officer, and Valdez determined that the commissary officer had made a mistake.  *Id*.

Webster also displayed an ability to manage money in day-to-day affairs during

the offense.  Before kidnapping Lisa Rene, Webster and his coconspirators went to a gas

station.  Ex. 110 at 3339.  While Orlando Hall got gas, Webster went into the

convenience store and bought beer.  *Id*.  After he and his coconspirators kidnapped Lisa

Rene, they drove to Pine Bluff, Arkansas.  Ex. 110 at 3342-44.  When they arrived, it was

Webster who went into the Pine Bluff Inn and rented a room.  *Id*. at 3344.  He paid for

the room, filed out the registration card, and supplied a false address because he realized

that the motel would not check to verify that the address was real.  *Id*.  After the

coconspirators put Lisa Rene in the motel room, Webster left on his own to buy food for

the group.  *Id*. at 3345.

It is clear, then, that Webster is able to manage money well inside and outside of

the prison setting.

### e.      Ability to perform jobs

Intellectually disabled people may have difficulties with the responsibilities of

jobs.  DSM-5 at 37.  But when evaluating a subject's capacity to perform job-related

tasks, the DSM-5 cautions that one must be aware of "education, motivation . . . [and]

vocational opportunities."  *Id*.  These factors are particularly relevant in Webster's case.

As Dr. Hackett noted in his report to the Social Security Administration, Webster

showed no signs of wanting to seek employment.  Ex. 102 at 52.  And Webster's formal

employment history is also severely limited by the fact that he has spent most of his life in jail or prison.  It is further limited by the fact that, when not in custody, Webster chose primarily to pursue criminal endeavors.  Nevertheless, on those occasions when he chose to work, Webster demonstrated that he could perform the expected tasks without support.

In 1992, Webster participated in a summer program known as CETA in which a small group of students did work cleaning up neighborhoods for six weeks.  Ex. 139 at 1158-59.  His supervisor, Marcus Hollien, testified at trial that Webster needed to work on his "self-discipline," but was a "very intelligent individual with good characteristics."  Ex. 139 at 1161.  Hollien had no problems communicating with Webster.  Ex. 139 at 1159.

Webster also found work using his musical talents.  He and his brother were hired to play at churches and gospel concerts.  Ex. 101 at 7.  Webster played drums and his brother played the keyboard.  *Id*.  He got jobs playing drums from his teens until his arrest in his 20's.  *Id*.  Webster said "the money [from playing drums] was decent, but not the kind of money like I was getting from drugs, that's for sure."  *Id*.

While incarcerated at USP Terre Haute, Webster held a job as an orderly.  Hr. Tr. 936:19-21.  Webster, in fact, was given a role as an "out orderly," which gave him access to the entire unit.  Hr. Tr. 936:24-937:15.  The "out-orderly" job was the most trusted, and sought-after position an inmate in the Special Confinement Unit (SCU) could obtain.  *Id*.  Webster was "very good" at his job.  Hr. Tr. 938:8-9.  Webster cleaned, mopped and swept the unit, and he prepared food trays for the other inmates.  Hr. Tr. 938:11-13.

71

Webster never had trouble following instructions, never needed additional instructions or

clarification to understand his tasks, and never misunderstood his instructions.  Hr. Tr.

938:21-939:3.  And Webster's job involved arithmetic and reading.  In order to prepare

food trays, Webster would have to consult a written list that indicated which inmates

needed special diets due to religious obligations or allergy concerns.  Hr. Tr. 939:4-940:2.

Webster had to then select food from a cart and assemble each inmate's tray according to

his individualized dietary requirements.  *Id*.  Webster did this job "very well," and was

"self-sufficient," never requiring help or additional instructions.  Hr. Tr. 940:12-22.

   Webster's brother Tony testified that Webster could have gotten an "honest" job

like Tony had, "if he wanted to."  Ex. 127 at 965.  And Webster's brother Mark agreed

that Webster could have held "a regular job."  Ex. 126 at 943.  But Webster chose instead

to pursue criminal endeavors.  He was, nevertheless, successful in those endeavors.

Webster made enough money selling drugs that he was able to help his girlfriend, Sylvia

Henry, pay her bills.  Ex. 121 at 809, 819.  Webster sold a pound of marijuana a week for

Orlando Hall.  Ex. 110 at 3336.  Webster paid Hall $1,100 upfront for the marijuana, and

would keep the cash profits, plus some of the marijuana for personal use.  *Id*.  And

Webster apparently had no problems running his business.  As the facts of his offense

indicate, drug deals gone wrong can lead to violence.  Thus, Webster had to consistently

handle money well or face potentially severe consequence from underpaid suppliers, or

overcharged customers.  It is very telling, then, that Orlando Hall not only employed

Webster in the drug trade, but trusted him enough to transport him to Texas to assist

when a deal went bad.  Ex. 112 at 283.  Had Webster not been able to manage his drug

business successfully, Hall would certainly not have trusted him in such a high-stakes

operation.

Webster has primarily pursued illicit endeavors.  But there is no evidence that he

had any difficulty performing any of the jobs he chose to do.

### C.    Webster's apparent deficits are not related to intellectual functioning

"To meet diagnostic criteria for intellectual disability [any] deficits in adaptive

functioning must be directly related to the intellectual impairments described [in the

intellectual functioning criteria]."  DSM-5 at 38.  But the deficits that Webster alleges

stem from causes other than any deficit in intellectual functioning.  They do not,

therefore, meet the diagnostic criteria for intellectual disability.

For instance, Dr. Reschly testified that Webster's repeated violations of the law

demonstrated an adaptive deficit in the social domain.  Hr. Tr. 375:23-376:3.  But there is

no evidence that Webster's pattern of criminal behavior resulted from a deficit in

intellectual functioning.  To the contrary, Webster suffers from antisocial personality

disorder.  *See*, *e.g.* Ex. 101 at 48 (Dr. Denney diagnosed Webster with antisocial

personality disorder); Ex. 102 at 52 (Dr. Hackett diagnosed Webster with antisocial

personality disorder); Ex. 103 at 55 (Dr. Spellman diagnosed Webster with antisocial

personality disorder); Ex. 163 at 2101 (Dr. Jeffrey Yates diagnosed Webster with

antisocial personality disorder); Hr. Tr. 481:3-8 (Dr. Fabian diagnosed Webster with

antisocial personality disorder).   This condition explains his decision to engage in

criminal behavior, and it explains many of his other bad choices.  Bad choices that are the result of an antisocial personality disorder simply do not meet the diagnostic criteria for intellectual disability.  DSM-5 at 38.

## V.      Expert Witnesses

Expert testimony, both at Webster's original trial and at the hearing in this matter, constitutes a large portion of the evidence relating to Webster's intellectual ability.  The opinions of those experts are discussed at length above as they relate to various aspects of the evidence.  Nevertheless, due to the outsized importance of experts in this case, the government provides the following brief summaries of the experts' testimony and opinions.

### A.      Trial experts

Dr, Raymond Finn testified for Webster at his trial, and he concluded that Webster had a 59 IQ.  Ex. 101 at 17.  But Dr. Finn did not perform any freestanding validity testing, and did not analyze any embedded validity measures.  *Id*.  Dr. Denney analyzed Dr. Finn's raw test data, and was able to calculate a Reliable Digit Span score from the data.  *Id*. at 18.  Webster's score of 5 on Dr. Finn's test was suggestive of malingering.  *Id*.  Likewise, Webster's pattern of answers on Dr. Finn's tests were "more consistent with feigned low IQ than they [were] with genuine low IQ."  *Id*.

Dr. Dennis Keyes examined Webster and testified on his behalf at trial.  Ex. 101 at 18.  Webster produced a composite IQ of 55 for Dr. Keyes.  *Id*.  Dr. Keyes himself expressed surprise at this extremely low number, and he testified that "I have to admit the

74

first time I tested Bruce Webster, I felt very concerned because this is not a person who comes off with an IQ of that area." Hr. Tr. 332:23-334:3; Ex. 32. Moreover, Webster produced widely discrepant subtest scores for Dr. Keyes — a 46 in fluid intelligence, and a 67 in crystalized intelligence. Ex. 101 at 18. As discussed in more detail above, this wide variation renders the composite score invalid. Dr. Keyes also did not appear to administer any form of validity testing to Webster. *Id*. at 19.

Dr. Robert Fulbright testified for Webster at trial. Ex. 101 at 22. Dr. Fulbright did not conduct IQ testing, but instead he relied on testing done by other experts. Ex. 34 at 10. He conducted other testing, and testified that Webster did poorly on those tests. *Id*. at 17-20. But he admitted that Webster raised three of the four red-flags set forth in the DSM that indicate malingering. *Id*. at 40-42. And Dr. Fulbright does not appear to have conducted any validity tests to determine whether Webster was malingering.

Dr. George Parker testified for the government. He administered an IQ test to Webster, and Webster scored a 72. Ex. 101 at 20. But Dr. Parker did not administer the full test, so the data cannot be relied upon. *Id*. Dr. Parker did, however, provide useful information about Webster's adaptive abilities. Ex.148 at 1282-92. For instance, Dr. Parker observed that Webster was able to speak in full sentences, address an envelope, read stories aloud, and make his own bed. Ex. 148 at 1282-83. While these skills are simple ones — and Webster's current experts do not appear to disagree that he can do these things — Dr. Keyes had previously claimed that Webster was unable to perform

75

these tasks.  Ex. 148 at 1281-83.   Accordingly, Dr. Parker's testimony cast further doubt on the reliability of Dr. Keyes's methods and conclusions.

Dr. Richard Coons, a forensic psychiatrist, testified for the government.  Ex. 101 at 23; Ex. 149.  He testified that he evaluated Webster and found that he had a good memory, was able to relate stories in a coherent and topical narrative, and was able to stay on subject.  Ex. 149 at 1352-54.  He also observed Webster's living skills and talked to people who knew him.  *Id*. at 1359-65.  He opined that Webster functioned at a higher level than is possible for mentally retarded people.  *Id*. at 1367.  He further opined that Webster does not have any significant deficits in adaptive functioning.  *Id*.  Instead, he said that Webster adapted well to the life he chose to live, a life that involved the commission of crimes and incarceration in prison.  *Id*. Webster could have chosen otherwise, but chose not to pursue an ordinary lifestyle.  *Id*.

After hearing from all of these experts, and numerous fact witnesses, the district court found that Webster was not mentally retarded, and that 18 U.S.C. § 3596 did not apply.  Tr. 26:227:22-25.  The Fifth Circuit affirmed the sentence, and held that "[t]he government presented substantial evidence to support the finding [that Webster was not mentally retarded]."  *United States v. Webster*, 162 F.3d 308, 353 (5th Cir. 1998).

### B.    Dr. Marc Tassè

Dr. Marc Tassè testified at the hearing about intellectual disability in general.  Hr. Tr. 20:1-113:24.  Dr. Tassè did not opine specifically about Webster.  Most of Dr. Tassè's testimony was uncontroversial.  He did, however, attempt to deny the existence

76

of a diagnostic requirement that adaptive functioning deficits be related to intellectual functioning deficits.  Hr. Tr. 47:22-49:6.  Dr. Tassè is simply wrong about this.  The DSM-5 clearly states that "to meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments." DSM-5 at 38.  His opinion on this subject, therefore, should be disregarded.

### C.   Dr. Daniel Reschly

Dr. Daniel Reschly frequently testifies in capital cases, and he does so exclusively on behalf of criminal defendants.  Hr. Tr. 303:4-8.  Courts in these cases have found Dr. Reschly's testimony to "be unreliable and substantially lacking in credibility" and have given his opinions "limited weight" and his conclusions "no weight."  Hr. Tr. 308:25-310:8.

Dr. Reschly conducted testing of Webster and concluded that Webster was intellectually disabled.  Hr. Tr. 292:9-14.  But Dr. Reschly's tests were mutually contradictory, as explained above.  Webster produced an IQ score of 53 for Dr. Reschly, an extremely low score that is "ridiculously inconsistent with [Webster's] behavior in the community."  Ex. 101 at 45.  This extraordinarily low score was also inconsistent with Webster's very good performance on the TOMM administered by Dr. Reschly.  Hr. Tr. 699:25-700:13.  The IQ score, therefore, should have been discarded as invalid.  But Dr. Reschly continued to rely upon it.

Dr. Reschly also engaged in a "selective" review of the record as it pertained to Webster's adaptive functioning.  Ex. 101 at 25.  Dr. Reschly acknowledged that

77

Webster's scores on the MAT 6 and ABLE tests "would not be consistent overall with a diagnosis of intellectual disability." Hr. Tr. at 227:17-19. But he dismissed these results as the product of cheating, even though there was no evidence that Webster cheated on either test, and Webster had no incentive to do so. Dr. Reschly was also dismissive of all evidence of adaptive ability from Webster's time in jail or prison. Ex. 101 at 25. Given that Webster has spent nearly all of his adult life, and many of his teen years, in jail or prison, Dr. Reschly's dismissal of this evidence leaves him with an extraordinarily limited picture of Webster's abilities.

Dr. Reschly also attempted to cast evidence of Webster's adaptive abilities during the kidnapping of Lisa Rene as an indication of poor adaptive function, specifically the lack of social skills, instead of evaluating the cognitive abilities that Webster displayed during the crime. Ex. 101 at 25; Hr. Tr. 375:19-376:3. Dr. Reschly's decision to view the evidence strictly in a light that favors his diagnosis is wrong. To the contrary, Webster's criminal behavior "should be considered maladaptive behavior and not indicative of poor adaptive function." Ex. 101 at 25, n. 6.

### D.    Dr. John Fabian

Dr. John Fabian reviewed testing conducted by other experts, and conducted some validity testing of his own. Ex. 101 at 26. Webster failed the Nonverbal Medical Symptom Validity Test (NV-MSVT) that Dr. Fabian administered, as he had failed both validity tests performed by Dr. Denney. *Id.* at 26, 32-33. Dr. Fabian initially attempted to insinuate that Dr. Denney had not used appropriate comparison samples. But during

78

cross-examination, he admitted that Dr. Denney used "the best groups that we have available for use in comparing Mr. Webster's scores to the population we want to compare against."  Hr. Tr. 817:24-818:2.  He further conceded that he was "not criticizing Dr. Denney" for his choice of comparison groups.  Hr. Tr. 818:8-9.

Ultimately, Dr. Fabian refused to admit that Webster was malingering:  "my concern is to go from, you know, the continuum of variable effort to slam dunk malingering.  I'm just not there."  Hr. Tr. 818:21-25.  But he did admit that Webster's scores on validity tests differed from those of genuinely intellectually-disabled people, and that Webster "had variable effort in his testing."  Hr. Tr. 818:23-819:6.  Dr. Fabian also admitted that the fact that Webster failed several validity tests was reason to at least question the validity of all his other test results.  Hr. Tr. 835:5-9.

Despite all of the evidence of malingering, Dr. Fabian stood by his conclusion that Webster was intellectually disabled.  Hr. Tr. 835:13-14.  He did, however, concede that his diagnosis was "a tough call."  Hr. Tr. 836:5-9.

### E.     Dr. Robert Denney

Dr. Robert Denney is a licensed clinical psychologist who is board certified in clinical neuropsychology and forensic psychology.  Ex. 101.  Dr. Denney's opinions are discussed at length above, and are also set forth in his report.  Ex. 101.  In forming his opinions, Dr. Denney conducted a clinical interview of Webster, performed two-days' worth of testing, interviewed witnesses, and reviewed numerous records.   Ex. 101 at 2-3.

79

Dr. Denney concluded that the low IQ scores that Webster produced for various experts were inconsistent with his abilities. For instance, Dr. Denney explained, "[a] man with an IQ of 53 could not perform on the ABLE Achievement test like Mr. Webster [did]." *Id*. at 45. Likewise, Webster's interactions with Dr. Denney during his two-day examination were not consistent with intellectual disability. *Id*.

Webster failed multiple freestanding validity tests, and produced scores on embedded validity tests that were suggestive of malingering. *Id*. at 32-33. And Webster's scores on various tests were "clinically inconsistent with each other and more like simulators [or malingerers] than genuine low IQ individuals." *Id*. at 35. Dr. Denney concluded that Webster was malingering on his IQ tests. *Id*. at 48.

In terms of adaptive functioning, Dr. Denney found Webster to be manipulative of others. *Id*. at 46. This findings was not only indicative of his cleverness, but also concealed his abilities. By getting other people to do things for him, Webster sometimes gave the impression that he could not do things himself. *Id*. at 46. But Webster was quite capable. Indeed, his manipulative skills were "functionally adaptive to the criminal lifestyle which manipulates and uses others to [his] own personal gain." *Id*.

Dr. Denney ultimately concluded that, "to a reasonable degree of scientific certainty, [Webster] did not have intellectual disability at the time of the offenses and he does not have it now." *Id*. at 48.

80

### F.      Drs. Erin Conner and Jacqueline Blessinger

Dr. Jacqueline Blessinger was a staff psychologist for the Bureau of Prisons from

January 2017 until March 14, 2019, when she left to take a job with the Department of

Defense.  (Blessinger Depo 45:24-46:5; 46:20-46:25.)  In February 2018, she was

assigned to be the lead psychologist at the Special Confinement Unit (SCU) of the

Federal Correctional Facility at Terre Haute.  (Blessinger Depo 46:15-46:19.)  During her

time as lead psychologist for the SCU, she met with each inmate on an at-least monthly

basis, and she provided individual counseling services to inmates upon request.

(Blessinger Depo 51:4-53:10.)  In this capacity, Dr. Blessinger met with Webster, who

was housed in the SCU, on a number of occasions.  (Blessinger Depo 65:8-66:2; 72:15-

90:12.)  She also spoke with SCU staff, including other psychologists, about Webster and

reviewed his records.  (Blessinger Depo 90:13-91:25.)

Dr. Blessinger is a school psychologist with extensive training and experience

relating specifically to the diagnosis of intellectual disabilities.  (Blessinger Depo 18:7-

45:2.)  Her background with intellectually disabled individuals made her particularly

aware of the ways in which that condition can affect behavior.  Though she did not

conduct a formal evaluation of Webster, based on her training and experience, Dr.

Blessinger was able to testify that she observed certain behaviors in Webster that were

inconsistent with his having an intellectual disability.  (Blessinger Depo 79:8-80:6;

107:6-108:23; 112:16-116:14.)  Those behaviors, such as his strong conversational skills,

ability to regulate emotions, appropriate use of humor, and musical skills, are discussed

in detail above.  Dr. Blessinger also testified that during her interactions With Webster, she did not observe anything that would lead her to suspect that he might have an intellectual disability.  (Blessinger Depo 124:24-125:13.)  She further testified that had she made any such observations, she would have referred Webster for additional evaluation and testing.  (Blessinger Depo 117:1-117:14; 124:24-125:13.)  She did not do so because, in her clinical judgement, there were no grounds to even suspect that he might have an intellectual disability.  (Blessinger Depo 124:24-125:13.)

Dr. Erin Conner is a licensed psychologist working at USP Terre Haute who visited Webster on a monthly basis for a period of several years.  Hr. Tr. 848:16-860:13. In all, she spent seven or eight hours conversing with him.  Hr. Tr. 860:6-13.  She spoke to Webster at length both at his cell and during private meetings.  Hr. Tr. 848:16-860:13; 874:1-18.  She and Webster conversed about a wide variety of subjects, and Dr. Conner counselled Webster during times of stress and bereavement.  *Id*.  Dr. Conner described Webster as "cordial and polite," someone who "articulates himself well," who "appears very well put together, very neat" and who is "very socially appropriate."  Hr. Tr. 882:18-23.  During her years of interaction with Webster, she has never had cause to doubt his intellectual ability.  Hr. Tr. 882:24-883:1.  And, while she did not perform testing, she did make observations that could factor into an evaluation of his abilities.  Hr. Tr. 883:11-884:11.  She also reviewed his records, and consulted with other psychologists and prison staff about Webster.  *Id*.  During all of her time interacting with Webster, Dr. Conner never saw anything that caused her concern about his intellectual functioning, and she

82

never saw any reason to refer him for testing.  Hr. Tr. 889:15-22.  Dr. Conner believed, based on her interactions with Webster, her review of his file, and her consultations with other psychologists, that Webster falls "within the normal range of intellectual functioning."  Hr. Tr. 890:14-21.

The opinions of Drs. Conner and Blessinger are particularly relevant here.  While neither conducted a formal examination, both are trained psychologists who observed Webster repeatedly over many months.  And even Dr. Fabian admitted that trained psychologists can estimate an individual's intellectual ability based on conversations with that individual.  Hr. Tr. 825:8-15.  Thus, even without formal testing, the observational opinions of Drs. Conner and Blessinger are valuable.

Moreover, unlike the retained experts, neither Dr. Conner nor Dr. Blessinger were hired to offer an opinion about Webster's intellectual ability.  They did not conduct evaluations for litigation, and they have no stake in the outcome of this case.  Consequently, their interactions with Webster were organic and natural.  Because neither Dr. Conner nor Dr. Blessinger were visiting with Webster for the purposes of this litigation, Webster had no reason to alter his behavior when interacting with them.  And because they were not performing testing or formal evaluations for the purposes of this litigation, Webster had no reason to hide his abilities.  Finally, unlike the retained experts, both Drs. Conner and Blessinger visited Webster repeatedly over many months.

Webster was able to malinger during his limited interactions with retained experts, and he knew to do so because of the context of those interactions.  But it would have

83

been difficult or impossible for him to hide his abilities over many months of interactions

with Drs. Conner and Blessinger, particularly because those interactions were not tied to

this litigation.  Drs. Conner and Blessinger, therefore, obtained a more accurate

impression of Webster than any other expert.  And, during all of their interactions, neither

Dr. Conner nor Dr. Blessinger observed anything that would lead either one of them to

suspect that Webster suffered from intellectual disability.

## VI.   Outstanding Legal Issues

### A.   Relevance of certain categories of evidence

Webster has objected to several categories of evidence on the grounds that such

evidence is not relevant.  Webster also argues that, even if admissible, such evidence

should be given little weight.  While the Supreme Court has cautioned against certain

forms of analysis of intellectual disability those cautions must be understood in light of

the diagnostic criteria.  The evidence to which Webster objects is relevant and admissible

when understood in the proper context.

### 1.   Evidence of criminal conduct and prison behavior is admissible

During the hearing, Webster repeatedly objected to evidence related to his

criminal conduct and behavior in prison.  Neither medical guides, nor Supreme Court

precedent preclude this Court from considering such evidence.

In assessing Webster's adaptive abilities, this Court must be guided by the medical

community's diagnostic criteria.  *Moore v. Texas*, 137 S. Ct. 1039, 1048 (2017); *Hall v.*

*Florida*, 572 U.S. 701, 721 (2014).  Nothing in the DSM-5 or AAIDD-11 prohibits

84

consideration of an individual's past criminal conduct in determining whether adaptive deficits are present.  Similarly, when adaptive-behavior assessments are difficult because the subject has been incarcerated, the manuals instruct caution, but do not prohibit reliance on prison conduct to assess adaptive behavior.  DSM-V at 38; AAIDD-11 at 45, 48, 96-97.

Webster's criminal behavior strongly undercuts his claim that he has significant adaptive deficits.  As discussed above, Webster's behavior during the kidnapping demonstrates that he took on a leadership role, gave orders to others, took rational and steps to conceal the crime, and had a strong memory.  His behavior demonstrates strong abilities in the conceptual, social, and practical domains, and is clearly relevant to the issue of his adaptive functioning.

Likewise, Webster's conduct while incarcerated belies any claim that his adaptive abilities are impaired.  As discussed above, evidence shows that Webster is well-groomed and keeps an orderly cell, although neither habit is required.  Webster converses regularly with psychologists, who were able to evaluate his linguistic and behavioral abilities. Webster was entrusted as an orderly and took academic classes.  And Webster has spent the majority of his life in prison, making it the environment to which he has had the most time to adapt.  The exclusion of prison behavior would mean ignoring a large portion of Webster's life.

85

In *Atkins*, the Supreme Court reasoned:

> Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.  Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.  There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders.

*Atkins v. Virginia*, 536 U.S. 304, 318 (2002); *see also id*. at 307 ("Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, [intellectually disabled individuals] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct.").  Webster's criminal conduct and behavior while incarcerated are clear windows into his behavioral abilities.  Indeed, given that this crime occurred almost 25 years ago, his criminal behavior and prison conduct are, arguably, the best and most reliable evidence of his adaptive abilities.

During the evidentiary hearing, counsel repeatedly cited the Supreme Court's opinions in *Moore v. Texas*, 137 S. Ct. 1039 (2017) (*Moore I*), and 139 S. Ct. 666 (2019) (*Moore II*) for the assertion that this Court may not consider Inmate Webster's criminal conduct or prison conduct in assessing his adaptive abilities.  Counsel grossly overstates the holdings in the *Moore* decisions.  In *Moore I*, the Supreme Court vacated Moore's death sentence because the Texas Court of Criminal Appeals (the CCA) "deviated from prevailing clinical standards and from the older clinical standards the court claimed to

86

apply" when it found no adaptive deficits. 137 S. Ct. at 1050. The Court held that the CCA: 1) "*overemphasized* Moore's perceived adaptive strengths," *id.* at 1050 (emphasis added); 2) improperly "stressed Moore's improved behavior in prison," *id.*; 3) improperly discounted "risk factors" for intellectual disability, *id.* at 1051; 4) improperly required Moore to show that his adaptive deficits were not related to a personality disorder, *id*; and 5) improperly relied on the state's *Briseno* factors and evidentiary factors that were (i) not included in clinical standards, (ii) were aligned with lay stereotypes of intellectual disability, and (iii) were not used in any other context to determine intellectual disability. *Id.* at 1051-52.

Upon remand, the CCA again fell prey to several of the same errors. *See Moore II*, 139 S. Ct. at 672 ("We conclude that the appeals court's opinion, when taken as a whole and when read in the light both our prior opinion and the trial record, rests upon analysis too much of which too closely resembles what we previously found improper."). Of importance to the analysis in Webster's case, the *Moore II* Court found that the CCA "again relied less upon the adaptive *deficits* to which the trial court had referred than upon Moore's apparent adaptive *strengths*." *Id.* at 670 (explaining the CCA disregarded evidence of significant communication deficits in light of the fact that Moore wrote *pro se* legal documents, for which there was no proof that Moore wrote himself, and that the CCA gave too much weight to Moore's adaptive improvements made in prison). The *Moore II* Court also found that the CCA essentially still relied on the *Briseno* factors, even if not by name. *Id.* at 671-72.

87

While there is still a relative dearth of case law substantively interpreting the

*Moore* decisions,[6] the Florida Supreme Court aptly distinguished the *Moore I* adaptive-

behavior analysis in *Wright v. State*, 256 So. 3d 766 (2018). *Moore I* was decided two

weeks after the Florida Supreme Court initially affirmed a post-conviction court's finding

that Wright was not intellectually disabled. The Supreme Court summarily granted

*certiorari* and instructed the Florida Supreme Court to reconsider its opinion in light of

*Moore I*. On remand, the Florida Supreme Court confirmed its denial of Wright's

intellectual disability claim. With regard to the adaptive functioning prong of the

intellectual disability analysis, the Florida court explained that, unlike the CCA in *Moore*,

the Florida Supreme Court and the lower post-conviction court in Florida applied

appropriate and current medical standards. *Id.* at 775. The court also noted that it had

never relied on the *Briseno* factors. *Id*   The court then explained that "the only

remaining basis from *Moore [I]* that could even remotely entitle Wright to relief was an

alleged "overemphasis on adaptive strength and improper focus on prison conduct." *Id.*

at 775-76.

In response to its own question, the Florida Supreme Court stated in pertinent part:

> It is uncertain exactly where *Moore [I]* drew the tenuous line of
> "overemphasis" on adaptive strengths. In fact, that uncertainty spawned the
> dissent's criticism. . . . Regardless of where the nebulous line of
> "overemphasis" is drawn, however, the *Moore [I]* majority noted that "even
> if clinicians would consider adaptive strengths alongside adaptive

---

6 Several cases have referenced *Moore I*, but the vast majority are either Texas cases relating to the use of the *Briseno* factors or habeas cases questioning whether *Moore I* created a substantive rule that could apply retroactively to give rise to a successive habeas petition. *See, e.g.*, *In re Payne*, 722 F. App'x. 534 (6th Cir. 2018); *Williams v. Kelley*, 858 F.3d 464 (8th Cir. 2017).

weaknesses with the same adaptive-skill domain, neither Texas nor the dissent identifies any clinical authority permitting the *arbitrary offsetting of deficits against unconnected strengths* in which the CCA engaged." This clarification strikes at the heart of the Supreme Court's rationale and allows us to conclude that we did not "overemphasize" Wright's adaptive strengths to an extent that ran afoul of *Moore [I]*.

*Id.* at 776-77 (internal citations omitted) (explaining further that evidence of adaptive strengths the court considered was "directly relevant to the conceptual domain," the lone domain at issue in that case).

The instant case is consistent with *Wright*. There can be no question that the inquiry regarding Webster's adaptive abilities is guided by the appropriate medical and/or clinical standards. This Court received extensive testimony from both parties' experts relating to the standards set forth in the DSM-V and AAIDD-11. There was also no use of the *Briseno* factors, either overtly (as was condemned in *Moore I*), or covertly (as was condemned in *Moore II*).

Moreover, the criminal and prison behavior was not introduced to "overemphasize" any adaptive strengths. As in *Wright*, this Court should conclude that the *Moore* opinions do not prohibit reliance upon criminal or prison conduct. The *Moore I* Court used the term "overemphasis," which implies *some* emphasis is permissible. That is, the Supreme Court did not categorically prohibit consideration of prison and criminal conduct. As discussed above, Dr. Denney analyzed Webster's criminal and prison conduct in order to evaluate his adaptive abilities. But he did not rely on this evidence exclusively, as he also analyzed interviews relating to Webster's childhood, standardized

89

measures, his own clinical assessment, and trial testimony from other expert witnesses. Likewise, in the government's analysis herein, evidence of Webster's criminal conduct and prison behavior are offered to demonstrate that Webster lacked deficits in particular domains of adaptive functioning, not engage in "arbitrary offsetting of deficits against unconnected strengths," as was done in *Moore I*.

In sum, neither clinical texts, nor Supreme Court case law prohibit this Court from considering Webster's criminal conduct or prison behavior in determining whether he has significant limitations in adaptive functioning. The conduct is probative of Webster's adaptive ability and is, indeed, some of the most reliable evidence of his abilities given the fact that his criminal conduct is well documented, and he has been incarcerated for the past 25 years. This Court should admit this evidence and weigh it in light of all of the available evidence of Webster's adaptive functioning.

### 2. Evidence of adaptive abilities is relevant and admissible

Even outside the context of prison behavior and criminal conduct, some have argued that evidence of "adaptive strengths" is inadmissible. But the evidence is admissible and highly probative when viewed in the proper context.

In *Moore II*, the Supreme Court criticized a lower court for relying too heavily on evidence of the defendant's adaptive "strengths" while placing not enough weight on his deficits. *Moore II*, 139 S.Ct. at 670-71. It is true that strengths in one area do not negate deficits in another. A particular strength in the practical domain, for instance, does not negate a deficit in the social domain. And if a significant deficit exists in the social

90

domain, that is sufficient to satisfy the second prong of the diagnostic criteria regardless of strengths in other domains.

But evidence of "strengths" within a domain is relevant to demonstrate the absence of deficits in that domain.  So, the fact that a defendant did well in school is relevant to demonstrate that he lacks deficits in the conceptual domain.  Thus, this Court should not take the Supreme Court's guidance in *Moore* as a mandate that evidence of Webster's abilities cannot be considered.  Webster's abilities are always relevant to demonstrate the absence of adaptive deficits in their respective domains.

### 3.    Evidence of other psychological problems is relevant and admissible

Evidence of psychological conditions unrelated to intellectual disability, such as antisocial personality disorder, is relevant to a determination of intellectual disability, provided it is considered in the proper context.

In *Moore II*, the Supreme Court held that evidence that a defendant had an emotional disorder did not preclude the possibility that he also had an intellectual disability.  *Moore*, 139 S. Ct. 671.  It is true that other psychological conditions can exist alongside an intellectual disability.  The existence of the former, therefore, does not preclude the existence of the latter.  But the DSM-5 clearly states that "to meet the diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in [the intellectual functioning criterion]."  DSM-5 at 38.  Accordingly, deficits in adaptive functioning that are

91

unrelated to intellectual impairments do not satisfy the diagnostic criteria for intellectual disability.  *Id.*  So, for instance, if an individual performed poorly in school due to an undiagnosed hearing problem, his academic difficulties would not satisfy the second prong of the diagnostic criteria.  See,  Ex. 101 at 40; Hr. Tr. 522:19-523:7.

The existence of other psychological conditions does not preclude a diagnosis of intellectual disability.  But the adaptive functioning deficits that Webster relies upon to satisfy the second prong of the diagnostic criteria must be related to a deficit in intellectual functioning, and not be caused by some other condition.  Thus, evidence that some other psychological problem was the cause of an adaptive deficit is relevant and should be considered.

### B.    Evidentiary objections[7]

### 1.    Objections to documentary evidence

Webster objects to the admission of trial transcripts and documentary evidence admitted during the underlying trial.  (Dkt. 153.)  As the Court is aware, this matter is essentially a 28 U.S.C. § 2255 proceeding challenging Webster's sentence.  To the extent Webster did not object to the trial court or on appeal, the record, consisting of both testimony and documentary evidence admitted at trial, is de facto a part of the record

---

7 The government withdraws exhibits 151, 168, 170, 172, and 174-175.  The government did not rely on these exhibits during the hearing in this matter, and they were not part of the evidence offered in the underlying trial. Additionally, Webster objected in part to exhibits 150 and 164.  The parties reached an agreement with respect to those exhibits and the portions to which Webster objected were removed from the Court's copy of the exhibits at the conclusion of the hearing.  The Court's copy of these exhibits should contain the portions that the parties have agreed are admissible.

before this Court.  Per this Court's statements at the hearing, the government believes this Court agrees that the entire transcript of the original proceedings is evidence in this Court.  Hr. Tr. 7:6-8:4.  However, out of an abundance of caution, the government incorporates by reference its entire response to the motion to exclude (Dkt. 156), and offers the following brief summary of its arguments for the Court.

> ### 2.      Trial transcripts

Webster objects to all trial transcripts related to the underlying crime on the basis of relevance.  Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Civ. P. 401(a).  Here, as explained above and in Section VI(b) below, evidence of Webster's actions before, during, and after the commission of the crime, while not dispositive of intellectual disability, makes the existence of intellectual disability far less probable.  These transcripts are, therefore, relevant, and the Court can weigh them appropriately in light of the expert testimony adduced at trial.

Webster also objects to a small portion of the trial transcripts on the basis of hearsay[8] and under Rules 602 and 701.[9]  Each of the contested statements was admitted at trial without a hearsay objection from Webster, who had the assistance of counsel at all times.  None of the evidence was rejected on appeal.  Habeas corpus relief under 28 U.S.C. § 2255 is limited to "an error of law that is jurisdictional, constitutional, or

---

8 The relevant transcripts are at Respondent's Exhibits 110, 111, 133, 135, and 140.
9 The relevant transcripts are at Respondent's Exhibits 133-034, and 136-139.

constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *Borre v. United States*, 940 F.2d 215, 217 (7th Cir.1991) (*quoting Carreon v. United States*, 578 F.2d 176, 179 (7th Cir.1978)).  Any objections to those portions of the testimony were waived.

### 3.    Webster's school records

Webster objects, in part, to the government's evidence related to his school attendance and performance on the basis of relevance and hearsay.[10]  Evidence from his school, including opinions of Webster documented by school personnel, makes the likelihood of intellectual disability less probable.  And while the government does not dispute that these records are hearsay, there is no dispute as to the authenticity of these school records, and Webster himself offers as exhibits records from his school, albeit only the ones he believes helpful to his case.  *See* Exs. 3 and 4.  This Court should overrule Webster's objections and admit these exhibits under Rule 807.

Finally, Webster objects to these exhibits on the basis of Rule 602.  The government did not rely on anything the school records for which there was no basis for discerning personal knowledge.  This Court should overrule Webster's objections.

---

10 The relevant exhibits are Respondent's Exhibits 162-164.

### 4.      Economic Development Records and State Police Driving Records

Webster objects to the Southeast Arkansas Economic Development Records and Arkansas State Police Driving Records on several bases.  (Dkt. 153).[11]  These records were admitted at the underlying trial without objection from Webster, who had the assistance of counsel at all times.  Any objections to these records should be deemed waived.

### 5.      Bureau Of Prison Records

Webster objects to the Bureau of Prisons (BOP) records offered as evidence in this matter on several bases, including relevance.[12]  As an initial matter, these records are not offered as definitive evidence of whether Webster is intellectually disabled, and as noted above and below, the government recognizes that such evidence should not be given undue weight.  But the evidence of Webster's intellectual functioning prior to age 18 is weak, contradictory, and mostly obtained from witnesses who were biased in Webster's favor.  Moreover, Webster has spent most of his teenage and almost all of his adult life incarcerated.  Evidence of Webster's behavior, conduct, and activities while incarcerated, while not dispositive of intellectual disability, will assist this Court in weighing the evidence and reduces the likelihood that Webster is intellectually disabled.  The records are, therefore, relevant.

---

11  Exhibits 166 and 167.
12  Exhibits 169 and 171.

Webster further objects to these exhibits on the basis of hearsay.  However, BOP employees provided testimony showing that these documents are admissible under the business record exception to the hearsay rule.  *See* Fed.R.Evid. 803(6).  Rule 803(6) provides in relevant part that

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness,

Here, the government's witnesses established that the BOP records qualified as an exception to the hearsay rule by virtue of being official government records of regularly conducted activity.  *See, e.g.*, Hr. Tr. at 863:18-864:16; 964:21-965:18.  Webster does not dispute that the BOP conducts the activities noted therein and records the activity at or near the time in question in the normal course of business.[13]  There was no dispute as to the authenticity of the documents.  These records should be admitted as exceptions to the hearsay rule under Rule 803(6), or under the residual exception provision of Rule 807, as they are formal BOP records for which there is circumstantial guarantees of trustworthiness, they are offered as evidence of a material fact, they are more probative of Webster's mental functioning in prison than any other evidence, and admitting them will best serve the purposes of the rules and the interests of justice.

---

13 As discussed below, Webster does raise one challenge to a few of mental health records not being finalized immediately.

With respect to the BOP mental health records, Webster complains that some of the records cannot be considered to have been made "at or near the time by someone with knowledge."  (Hr. Vol. 5 at 861:20-862:7).  Webster refers to one record in particular where an observation was made on September 29, 2017, but not recorded until November 27, 2017.  (*Id.* at 862:2-5).  The vast majority of the mental health records were clearly completed at or near the time of the event in question.  *See, generally* Ex. 169. Moreover, the two-month delay does not *de facto* remove any individual record from falling within the scope of Rule 803(6).  Finally, the government notes that statements within the mental health records qualify as exceptions to the hearsay rule under several provisions of Rule 803.  Specifically, the records qualify under Rule 803(3) to the extent that they contain statements of Webster's then-existing state of mind and emotional condition, and under Rule 803(4) as statements made for medical diagnosis or treatment. These records should be admitted.

With respect to the BOP education records, Webster objects to the sponsoring witness's foundation for testifying that the records meet the exception.  Hr. Tr. 963:21-964:3.  Specifically, Webster asserted that the witness, Phillip Woolston, could not testify to record-keeping practices that predated his employment with the BOP.  *Id.*  However, Woolton was the Supervisor of Education for the BOP.  The records are BOP education records, made specifically for the purpose of allowing the BOP to keep track of a prisoner's education performance and data.  Hr. Tr. at 965:16-18.  As the supervisor, it was Woolston's job to rely on the records.  Hr. Tr. at 968:11-23.  He printed the

document and provided it for use in this case.  Hr. Tr. at 964:21-965:2.  He was familiar with how the records were made.  Hr. Tr. 965:3-18.  Woolston, therefore, was more than qualified to sponsor the BOP education records.  *See e.g. Ameritox, Ltd. V. Millennium Health, LLC*, 2015 WL 1520821 (W.D. Wisc. Apr. 3, 2015 (rejecting the contention that a witness could not serve as a custodian because he had not been employed at the time of the relevant records); *see also Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006) ("The custodian of the records need not be in control of or have individual knowledge of the particular corporate records, but need only be familiar with the company's recordkeeping practices." (Citation omitted)).[14]

The other BOP witnesses also established the requisite personal knowledge to satisfy Rule 602.  *See, e.g.*, Hr. Tr. at 873:6-22 (establishing that Dr. Conner had had a number of conversations with Webster over a span of years).  This Court should overrule Webster's objections.

### C.    Admissibility of Deposition Testimony

#### 1.    Dr. Charles Spellman

The government and Webster jointly submitted the deposition of Dr. Charles Spellman in lieu of live testimony, pursuant to Federal Rule of Civil Procedure 32(a)(4)(B), with Webster reserving certain objections to the use of Dr. Spellman's

---

14 It is unclear whether Webster is asserting an objection based on the fact that the testifying witness did not author all the records.  (See Hr. Vol. 5 at 862:8-13).  The Seventh Circuit has made clear that the witness sponsoring documents for purposes of Rule 803(6) does not have to have to be the author of the records.  (*See Thanongsinh*, 462 F.3d at 777).

testimony.  (*See* Dkts. 164, 164-1.)  Webster asserted those objections in a separate filing, (*see* Dkt. 171), to which the government responded.  *See* Response to Motion to Exclude (Dkt. 178.)  The government incorporates by reference its entire response to that motion, but it also offers the following brief summary of its arguments for the convenience of the Court.

On or about December 22, 1993, Dr. Charles Spellman conducted a psychological evaluation of Webster to assist in the determination of his eligibility for Social Security benefits.  Ex. 103.  Dr. Spellman created a report memorializing the results of that evaluation.  *Id.*  Since at least 2009, Webster relied extensively on the information in that report in an effort to establish that he should be considered intellectually disabled.  *See, e.g.*, Motion for Authorization to File Successive Motion to Vacate Sentence, *United States v. Webster*, No. 09-11039 (5th Cir. Oct. 22, 2009); Petition (Dkt. 1 at 19-20 (citing Spellman Report).)

On December 15, 2018, the government interviewed Dr. Spellman, and based on the discussion, Dr. Spellman "speculate[d] Webster was malingering and not actually mentally retarded" when he interviewed him in 1993.  *See* Interview Summary (Dkt. 171-1 at 5.)  The government noticed Dr. Spellman's deposition, and in advance of the deposition it provided Webster with a Rule 26 disclosure naming Dr. Spellman as a non-retained expert witness.  *See* Expert Disclosure (Dkt. 171-1 at 1-4.)  The disclosure pointed out that the government had already provided Webster with a recording and summary of Dr. Spellman's December 2018 interview, and that it "anticipated that Dr.

99

Spellman will provide testimony consistent with the statements provided in his December 28, 2018 interview." (*Id.* at 2.)  During Dr. Spellman's deposition, the government posed hypotheticals to Dr. Spellman and asked him whether, if a person demonstrated certain abilities, that would be consistent or inconsistent with a finding of mental retardation. *See* Spellman Deposition Transcript (Dkt. 164-1 at 59:3-64:18, 66:18-68:15.)

Despite relying heavily on his opinions for nearly a decade, Webster argued that the Court should exclude Dr. Spellman's testimony because his non-retained-expert disclosure contained neither "facts nor opinions."  *See* Motion to Exclude (Dkt. 171 at 5.) Because the disclosure on its own satisfied Rule 26—and was supplemented by a contemporaneously provided, fulsome summary and audio recording of a December 2018 interview on the same subjects covered in Dr. Spellman's deposition—this argument has no merit.  Having this information a week before Dr. Spellman's deposition categorically precludes any credible claim of surprise about the subjects of his deposition.

Federal Rule of Civil Procedure 26 indicates that a non-retained expert must be disclosed, but the disclosure need only encompass "(i) the subject matter on which the witness is expected to present evidence . . . and (ii) a summary of the facts and opinions to which the witness is expected to testify."  *See* Fed. R. Civ. P. 26(a)(2)(C).  If a party fails to provide the required expert-witness information, or does so in an untimely manner, Rule 37 states that "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  But, courts possess considerable

100

discretion in determining whether a violation warrants the exclusion of evidence or witnesses.  *See Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 514-15 (7th Cir. 2011).

This Court recently found in *Williams v. Thorntons Inc.* that expert disclosures far less fulsome than Dr. Spellman's, also from non-retained-expert doctors, were sufficient under Rule 26(a)(2)(C).  *See* 2018 WL 1924341, at *1-2.  There, the plaintiff disclosed three non-retained experts under Rule 26(a)(2)(C).  *See id.*  In the disclosures, the plaintiff listed three of her treating physicians and listed brief, general summaries on the subjects about which they would testify.  *See* Exhibit to Response (Dkt. 178-1 at 4-6.) The defendant challenged these disclosures, arguing that this Court should strike the witnesses from offering their opinions.  *See Williams*, 2018 WL 1924341, at *1.  This Court denied the request and held that all three disclosures were sufficient under Rule 26(a)(2)(C).  *Id.* at *2.

Like the *Williams* disclosure quoted above, the Rule 26 disclosure for Dr. Spellman alone was sufficient.  *See* Disclosure (Dkt. 171-1 at 1-4.)  It included what the government anticipated would constitute Dr. Spellman's testimony: information about his examination of Webster, its purpose, its limitations, as well as how facts unknown to him at the time of his 1993 report might have influenced his conclusions.  (*See id.* at 2.)  But the government also noted that it expected Dr. Spellman's testimony to be consistent with his December 2018 interview and provided a summary of that interview as well as a recording of the interview in its entirety.  This additional information far exceeds the

101

disclosures the Court found sufficient in *Williams*, and Webster has presented no case law or statute that indicates such a fulsome disclosure is insufficient.

Webster's contention that Dr. Spellman's Rule 26 disclosure did not contain facts or opinions was simply false.  See Motion (Dkt. 171 at 2.)  The disclosure indicated that the government expected Dr. Spellman to testify consistently with the statements made during his interview and it incorporated both the written summary of that interview and a verbatim recording.  See Disclosure (Dkt. 171-1 at 2 ("It is anticipated that Dr. Spellman will provide testimony consistent with the statements provided in his December 28, 2018 interview.").  The interview contained an extensive discussion about Webster and subjects covered in Dr. Spellman's deposition, and Webster's attempt to elide this extensive information in favor of a hyper-narrow view of the disclosure alone is therefore unavailing.

Further, there are lesser measures Webster could have taken in lieu of the extreme relief he sought on the eve of the hearing.  For instance, he could have sought a second deposition of Dr. Spellman.  Instead, he waited until the day before the last business day prior to the hearing to seek the extreme sanction of total exclusion of Dr. Spellman's testimony.  This request has no basis in the case law and it ignores the substantial amount of information the government provided about Dr. Spellman.  Webster has failed to that this Court should exclude Dr. Spellman's testimony.  The testimony should be admitted.

### 2.    Dr. Jacqueline Blessinger

On March 26, 2019, the government filed its Motion to Admit Deposition Testimony of Dr. Jacqueline Blessinger in Lieu of Live Testimony.  (Dkt 166.)  Webster filed a response, and the government filed a reply to that response on March 29, 2019.  (Dkt 170, 179.)  The arguments for the admission of Dr. Blessinger's testimony are detailed in those filings, and the government incorporates its briefing fully herein.  The government, however, offers the following brief summary of those arguments for the convenience of the Court.

Dr. Blessinger was deposed by Webster's attorneys on March 11, 2019.  Prior to the deposition, the government notified Webster's counsel that Dr. Blessinger was leaving the Bureau of Prisons and moving to the Washington, D.C., area and that she would likely be unavailable for the hearing.  Webster's counsel made note of this fact on the record, and proceeded to take the deposition.

Federal Rule of Civil Procedure 32(a) allows the use of all or a part of a deposition in lieu of live testimony if (1) the opposing party was represented at the deposition, (2) the deposition testimony is otherwise substantively admissible, and (3) the witness is unavailable.  Webster was represented at Dr. Blessinger's deposition.  In fact, Webster noticed the deposition and his counsel conducted the overwhelming majority of the questioning.  (Blessinger Depo at 4:8-127:13; 132:8-136:4).  As illustrated in numerous citations above, Dr. Blessinger's testimony is relevant to issues that are central to this case.  Finally, Dr. Blessinger was unavailable for the hearing.  Dr. Blessinger left her job

with the Bureau of Prisons on March 14, 2019, and took a job with the Department of

Defense in Washington, D.C.  (Blessinger Depo at 46:21-46:25; 136:16-136:17.)   She

now works and resides more than 100 miles from the location of the upcoming hearing,

and is therefore an "unavailable witnesses" under Rule 32(a)(4)(B).  (Blessinger Depo at

136:16-136:17.)  Accordingly, under Rule 32(a), Dr. Blessinger's deposition testimony is

admissible.  *See Ueland v. United States*, 291 F.3d 993, 996-97 (7th Cir. 2002) ("[The

rule] does not condition admissibility on the witness' inability to show up in court; 100

miles is a bright line.")

Although Webster was told that Dr. Blessinger would likely be unavailable for the

hearing prior to the deposition, he complains that he had insufficient notice of this fact.

But there is no authority to support his argument that any notice is required for the

admission of testimony under Rule 32(a)(4), much less that notice must occur some

number of days before the deposition.  Rule 32(a)(4) contains no notice requirement.

Webster also complains that the government (meaning Dr. Blessinger's

supervisors at the Bureau of Prisons) knew about her departure weeks before the

deposition.  But this complaint is also irrelevant.  Whether Dr. Blessinger's supervisors

knew about her departure prior to telling government's counsel on the morning of her

deposition is of no import.  Again, Rule 32(a)(4) contains no notice requirement.  And, at

any rate, counsel for the government notified Webster's counsel about the situation

immediately after speaking to BOP counsel on the morning of the deposition.

Webster knew about Dr. Blessinger's relocation prior to the deposition and could have framed his questions accordingly or asked to reschedule.  He chose to proceed with the deposition, and Dr. Blessinger's testimony should be admitted under Rule 32(a)(4)(B).

## VII.   Conclusion and Proposed Findings of Fact

For the reasons set forth above, the government proposes that the Court deny Webster's motion and enter the following findings of fact:

1.   Webster has failed to meet his burden of proving that he is so intellectually disabled that he is categorically ineligible for the death penalty.

2.   In order to do so, Webster would have to show that he has (1) significant deficits in intellectual functioning; (2) significant deficits in adaptive functioning; (3) that the deficits developed when Webster was a minor; and (4) that the adaptive functioning deficits were related to the deficits in intellectual functioning.  He has failed to do so.

3.   Webster cannot prove that he has significant deficits in intellectual functioning.  Intellectual functioning is usually measured by IQ scores, and scores between roughly 55-70 can be indicative of mild intellectual disability.

4.   Webster has produced a number of IQ scores in this range, but there is ample reason to doubt the validity of those results.

105

5.     First, Webster's scores are inconsistent.  They range from 48 on the low-end, to 72 on the high end, a statistically significant variation of well over one standard deviation.  And even if objections to the accuracy of those two extreme results are credited, his second-lowest (51) and second highest (65) scores also vary by almost exactly one standard deviation. Webster's IQ scores show a degree of inconsistency far too great to be accounted for by the standard error of measurement.  This fact alone is reason to doubt the validity of his test scores.

6.     Likewise, there is extreme variation between his subtest scores.  For instance, on the test administered by Dr. Hackett for the Social Security Administration, Webster's verbal score was 71 and his performance score was 49.  On a test administered by defense expert Dr. Keyes prior to trial, Webster produced a 67 crystal intelligence score, and a 46 fluid intelligence score.  In both of these examples, the subtest scores deviate from one another by more than 20 points.  As the test publishers suggest, and Dr. Denney testified, these scores indicate that the test results are invalid. Moreover, Webster's extremely low scores on certain subtests is inconsistent with much higher scores on the same subtests during other test administrations.  These inconsistencies all point to invalid results.

7.     Webster's IQ scores are also inconsistent with his observed abilities. Several witnesses, including Webster's own experts, expressed surprise at

106

the discrepancy between his low IQ scores and his real world abilities. When IQ scores and real world abilities are inconsistent with one another, psychologists question the validity of the scores.

8. These inconsistencies were due largely to Webster's extremely low IQ scores. While disabled people with higher scores might be able to duplicate some of Webster's abilities, Webster's scores are simply too low for him to have such skills. In other words, had Webster's IQ scores been an accurate reflection of his intellectual ability, he would not have been able to do many of the things he has indisputably been able to do.

9. The discrepancies between Webster's IQ test scores and his observed abilities is best resolved by the conclusion that Webster was malingering during the tests. It is, after all, easier to throw a test than it is to fake a disability for a prolonged period of time in daily interactions.

10. Webster, of course, had strong incentives to malinger on all of his IQ tests. The vast majority of those tests were conducted during various phases of his death penalty litigation and his motive to malinger was clear: to avoid execution. But he also had a motive to malinger on the test performed by the Social Security Administration: to obtain a financial benefit. Indeed, the psychologist that administered that test specifically opined that Webster may have been malingering. (The remaining test, a 48 IQ score achieved during a test administered by the Arkansas Department of Public Health, is

107

so implausibly low that even Webster's own experts appear to give it no weight.)

11.     There is also scientific evidence that Webster was malingering.  Webster failed several reliable validity tests.  These tests were administered by both Webster's expert and an expert for the government.  Webster's failure on these tests show that he was not giving a full effort when he was being tested.  Although there are several reasons that an individual might not produce maximal effort on a standardized test, given the context of this testing and the history of this case, malingering is by far the most likely explanation here, and the Court so finds.

12.     Without any reliable IQ scores, Webster cannot meet his burden of establishing the first prong of intellectual disability.  His claim, therefore, fails.   But, even if he could meet this prong, he fails to meet the second prong.

13.     Webster has failed to establish that he has significant deficits in adaptive functioning.

14.     Webster functions well in all three domains of adaptive functioning.

15.     In the conceptual domain, Webster has the ability to read and write well as demonstrated by numerous witness accounts and documented by emails sent from prison.  He is able to handle money, as demonstrated by the testimony of his ex-girlfriend, Sylvia Henry, and his ability to successfully

manage a drug-dealing business.  His executive functioning is good as shown by his ability to plan, strategize, and adapt to changing circumstances.  His escape, undetected on several occasions, from the men's section of Mansfield Jail to the women's section was particularly clever, and required him to devise a plan, time his escape, pick a lock, and escape through a food chute.  Likewise, during the course of the commission of this crime, Webster demonstrated an ability to plan, strategize, and adapt, particularly in his numerous efforts to conceal his crime by destroying forensic evidence.

16.     Webster's scores on standardized achievement tests, such as the MAT 6 and the ABLE tests, also show that he has normal, if slightly below average, academic ability.  Webster's experts admit that his performance on these tests is inconsistent with a diagnosis of intellectual disability.  They attempt to save their diagnoses by suggesting that Webster cheated on these tests, but Webster has offered no evidence that he cheated, and he would have had no incentive to do so.

17.     It is also important to note that Webster was raised in severely underprivileged and abusive circumstances.  He dropped out of school in the ninth grade, and he had chosen a life of crime even before that.  To the extent that he has academic shortcomings, they are the result of a poor opportunities and a lack of motivation, not a lack of intellectual ability.

109

18.   Webster does not have significant deficits in the social domain.  To the contrary, he fares quite well in this area.  Webster is a strong conversationalist as reported by several sources.  He manages his emotions maturely, and displays a good ability to use and understand humor.  He has formed and maintained strong social relationships with family members, friends, and romantic partners.  And Webster has repeatedly displayed an ability to manipulate others.  Gullibility is a hallmark of intellectual disability, and Webster is anything but gullible.  He is not easily fooled and frequently manipulates other people to his own advantage.  Webster is not a gullible victim, but a cunning predator.

19.   Webster does not have significant deficits in the practical domain.  Webster can drive a car on his own, manage money, play musical instruments, and, by all accounts take good care of himself.  Many witnesses report that his hygiene, organization, and manner of dress is exemplary and has been since his childhood.  Webster has also been able to hold a job, albeit it criminal in nature.  Nevertheless, being a successful drug dealer is no less demanding than holding any number of legitimate jobs, and Webster was able to navigate the challenges of that occupation without any apparent difficulty.  And, to the extent that Webster has any shortcomings in this area, they are

110

the result of lack of opportunity and motivation. For instance, his apparent need for assistance with air travel most likely stems from his lack of previous exposure to air travel due to his underprivileged upbringing.

20. Webster, therefore, has failed to establish that he has deficits in adaptive functioning sufficient to support a diagnosis of intellectual disability. For this reason alone, his claim fails.

21. Webster has also failed to establish that any of his alleged deficits are related to a deficit in intellectual functioning, as required by DSM-5. To the extent that Webster has some behavioral shortcomings, those shortcomings are not the product of a low IQ, but are the result of antisocial personality disorder, lack of motivation, and lack of opportunity. Accordingly, these deficits do not satisfy the diagnostic criteria for intellectual disability.

22. Webster has failed to meet his burden of proving that he a deficit in intellectual functioning. Webster had failed to prove that he has significant deficits in adaptive functioning. And Webster has failed to prove that any of his behavioral deficits are caused by a low IQ. For each of these reasons, independently and collectively, Webster's claim fails.

23. This Court finds that Webster has failed to prove that he is intellectually disabled. His motion is denied and Webster remains eligible for the death penalty.

111

Respectfully submitted,

Josh J. Minkler
United States Attorney

*s/ Jay Weimer*
Special Assistant United States Attorney
Texas State Bar No. 24013727
Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: 817-252-5273
jay.weimer@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on May 24, 2019, I electronically filed the foregoing document with

the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is also

being served this day on all counsel of record as listed on the CM/ECF's notice of

electronic filing.

*s/ Jay Weimer*
Jay Weimer

112