BRUCE CARNEIL WEBSTER
      Petitioner,

                                    CAUSE NO. 2:12-cv-86-WTL-MJD

v.                                   Judge William T. Lawrence

JEFFREY KRUEGAR, WARDEN,
UNITED STATES PENITENTIARY,
TERRE HAUTE (USP)
      Respondent.

## PETITIONER'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

In accordance with Fed. R. Civ. P. Rule 52 and this Court's instructions at the evidentiary hearing on April 5, 2019, Petitioner Bruce Webster submits these Proposed Findings of Fact and Conclusions of Law.

## I. Findings of Fact

### A. Background Information and Procedural History

#### 1. Procedural History

On November 4, 1994, Mr. Webster was indicted on six counts in the Northern District of Texas, including kidnapping in which a death occurred in violation of 18 U.S.C. §§ 1201(a)(1) and (2), along with various noncapital offenses. Mr. Webster was convicted and sentenced to death on June 20, 1996. *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998). Mr. Webster filed his Motion to Vacate Conviction and Sentence under 28 U.S.C. § 2255 on September 29, 2000. The Motion was subsequently amended. The Amended Section 2255 Motion was denied on September 20, 2003. *See Webster v. United States*, No. 4:00-CV-1646-Y, 2003 U.S. Dist. LEXIS 17383 (N.D. Tex. Sept. 30, 2003). The Fifth Circuit denied Mr. Webster's application for certificates of appealability. The Supreme Court denied certiorari. *See United States v. Webster*,

421 F.3d 308 (5th Cir. 2005), *cert. denied*, 549 U.S. 828 (2006).

On October 22, 2009, Mr. Webster moved the Fifth Circuit for authorization to file a successive motion to vacate his death sentence under § 2255(h)(1), based largely upon previously unavailable Social Security Administration records (the "SSA Evidence") obtained by Mr. Webster's current counsel. The Fifth Circuit denied Mr. Webster's motion, holding that the plain language of the statute "does not encompass challenges to a sentence," but instead applied only to newly discovered evidence that a petitioner is not guilty of the offense. *See In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010). Judge Weiner concurred in the majority opinion, but "[wrote] separately to emphasize the absurdity of its Kafkaesque result," and explained that "[i]f the evidence that Webster attempts to introduce here were ever presented to a judge or jury for consideration on the merits, it is virtually guaranteed that he would be found to be mentally retarded." *Id.* at 259. Judge Weiner concluded by noting that "I continue to harbor a deep and unsettling conviction that, albeit under Congress's instruction which ties our judicial hands so illogically, we today have no choice but to condone…an unconstitutional punishment." *Id.* at 260.

On April 6, 2012, Mr. Webster filed a Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241, seeking to challenge his sentence of death based on the previously unavailable SSA Evidence that establishes he is intellectually disabled and therefore ineligible for the death penalty. This Court denied the Petition on November 13, 2013. The Seventh Circuit panel denied his appeal in a decision issued on August 1, 2014. *Webster v. Caraway*, 716 F.3d 764 (7th Cir. 2014).

On May 1, 2015, the Seventh Circuit sitting *en banc* reversed the District Court's decision and remanded to this Court for further proceedings. *Webster v. Daniels,* 784 F.3d 1123

(7th Cir. 2015) (*en banc*).

This Court convened a hearing on June 18, 2018 on Mr. Webster's Petition. The Court recognized that the mandate from the Seventh Circuit required it to:

> "hold a hearing for the purpose of deciding whether the Social Security records were indeed unavailable to Webster and his counsel at the time of the trial. In considering that question, the district court must also evaluate trial counsel's diligence. If the court concludes, as Webster's lawyers urge, that the records were unavailable and all due diligence was exercised, and that Webster has them now only because of a fluke, then it must turn to the merits of the petition: is Webster so intellectually disabled that he is categorically ineligible for the death penalty under *Atkins* and *Hall*?"

*Webster v. Daniels*, 784 F.3d at 1146; *see also Webster v. Lockett*, Transcript of Evidentiary Hearing on June 18, 2018 3:18–4:8. Thus, the June 18th hearing addressed whether counsel was diligent in requesting the records at issue.

On August 31, 2018, the Court issued an opinion and order finding that trial counsel's testimony was credible, that trial counsel exercised due diligence, and that the records from Social Security were unavailable to trial counsel despite his diligence. See Dkt. 117 (Entry Following Hr'g of June 18, 2018) at 12–13. Having found that the records were unavailable, the Court set a hearing for April 1, 2019 "to determine whether Bruce Webster is intellectually disabled and thus categorically ineligible for the death penalty." Dkt. 119 (Scheduling Order) at 1.

At all times since his sentencing, Mr. Webster has been incarcerated and held in federal custody on death row. He currently resides in the federal penitentiary in Terre Haute, Indiana.

### 2. Evidence of Intellectual Disability[1] Presented at Trial

The SSA Evidence that is the subject of Mr. Webster's Section 2241 petition is important

---

[1] This brief uses the term "intellectual disability" or the abbreviation "ID" for what was previously called "mental retardation." Where quoted material or a diagnosis uses the terms "mental retardation"

because of what it adds to the evidence presented at Mr. Webster's trial. Mr. Webster's

intellectual functioning was an issue in the penalty phase of his trial, and "there was a good deal

of evidence about intellectual disability at the trial[.]" *Webster*, 784 F.3d at 1142.

As the Seventh Circuit summarized:

> Drs. Finn, Keyes, and Fulbright [testified] for the defense, and Drs.
> Parker and Coons for the government. That evidence, however,
> included only one I.Q. test that had been performed on Webster
> before the crime—the 1992 test done at the Southeast Arkansas
> Mental Health Clinic. Webster's full-scale score was then just 48,
> but Webster's own experts agreed that he had been under severe
> stress at the time that test was administered and so the score was
> unreliable. Although other tests were performed (two by Dr. Finn,
> showing full-scale I.Q.'s of 59 and 65, and an incomplete one by Dr.
> Parker, showing a full-scale I.Q. of 72), the government argued
> strongly that Webster was motivated to underperform on the later
> tests because of the risk of the death penalty.

*Webster*, 784 F.3d at 1142.

Members of Mr. Webster's family also testified about the prevalence of ID in the family, about

Mr. Webster's adaptive deficits, and about Mr. Webster's placement in special education. For

example, Mr. Webster's brother Mark Webster testified that all the Webster boys were in special

education and that both he and another brother, Tony Webster, had been diagnosed with ID. Trial

Tr. Vol. 23, 19:15–20:6. Mr. Webster's sister Future Mae Rayford (now Patrick) testified that

Mr. Webster had trouble in school and that when she took him for mental health treatment in

1993, the doctor said he was slow (testimony that was eventually corroborated by the Social

Security records that are the subject of the Section 2241 petition). Trial Tr. Vol. 23, 68:20–69:21.

As the Seventh Circuit described:

> The government followed two strategies on rebuttal: first, it called a
> large number of lay witnesses (police officers, school

---

or "mentally retarded," this brief preserves the original language. The terms describe "the identical
phenomenon." *Hall v. Florida*, 572 U.S. 701, 704–05 (2014).

administrators, school teachers, an employer, jailers) who all testified that Webster did not seem mentally retarded to them; second, it offered two experts, Dr. George Parker and Dr. Richard Coons, to rebut Webster's experts. When the topic of special education came up, the government's witnesses all denied that Webster had been in those classes. . . . Both teachers said that he did not seem to be mentally retarded, though Pat Drewett, one of them, said, "[He] performed at a slower level. He did read slower. On the days that he did perform, which most of the days he did sleep. He didn't perform a lot. He could read. He could do. He chose not to do on a lot of days. He did sleep a lot." . . . The government also presented, as evidence of Webster's functional capabilities, several facts about his life in prison.

*Webster*, 784 F.3d at 1130.

The teachers and principal who testified from Watson Chapel Junior High knew Mr. Webster for a limited time period, as he dropped out of school after the first semester of ninth grade. Although they testified that Mr. Webster was not in special education classes, they also testified that students with intellectual disabilities could have been in general education classes as well as special education classes. For example, Linda Monk testified that in the basic English class Mr. Webster took, "I did have some students each year who are rated as borderline or mildly retarded. . . . They don't receive special education services. Some of them will receive these services, but all of them don't." Trial Tr. Vol. 25, 47:12-17. Ms. Monk added, "There are some in there [*i.e.*, her basic class] who are like that [*i.e.*, mentally retarded], yes, sir." Trial Tr. Vol. 25, 48:1. For her part, Ms. Drewett testified that she did not remember specifics about Mr. Webster. Trial Tr. Vol. 25, 36:9–38:2.

B.     **Social Security Records**

1.     **Content of the Records**

The SSA Evidence that is the subject of the instant Petition, and that was unavailable at the time of trial, reveals that in 1993, about a year before the crime, Mr. Webster applied for Social Security on the basis of sinus trouble and was diagnosed with mental retardation. In the

Social Security documents, Mr. Webster repeatedly said his sinus symptoms—not mental retardation—were the basis for the disability claim. Ex. 104 (Statement of Claimant or Other Person); Ex. 105 (Reconsideration Disability Report); Ex. 106 (Disability Report); Ex. 107 (Request for Hearing by Administrative Law Judge); Ex. 108 (Medical History and Disability Report). As the Seventh Circuit put it, the records "showed that Webster applied for Social Security benefits based on a sinus condition when he was 20 years old, approximately a year before the crime. The agency's attention was evidently quickly redirected to Webster's mental capacity." *Webster*, 784 F.3d at 1133.

On October 22, 1993, Dr. Hackett administered a Wechsler Adult Intelligence Scale Revised (WAIS-R). Ex. 102 (Hackett Evaluation and Report). On November 3, 1993, he prepared a report showing that Mr. Webster had a full scale IQ of 59, with a verbal IQ of 71 and performance IQ of 49. *Id.* at Respondent - 000051. Dr. Hackett's evaluation of Mr. Webster diagnosed him as "mildly mentally retarded, but . . . also antisocial." *Id.* at Respondent – 000052. Dr. Hackett stated that "[t]he claimant was viewed as a somewhat mild retarded con man, but very street wise." *Id.* at Respondent – 000050. Dr. Hackett noted that Mr. Webster "was quite verbal" and also that Mr. Webster's "behavior was somewhat bazaar [sic]." *Id.* On December 22, 1993, Dr. Spellman also diagnosed Mr. Webster as mentally retarded and antisocial. Ex. 103 (Spellman Report). Dr. Spellman estimated Mr. Webster's IQ to be 69 or lower and said there was no evidence of exaggeration or malingering. *Id.* at Respondent – 000052.

The application itself contains evidence of ID, including Mr. Webster's poor spelling, mistakes filling out forms, and examples of concrete thinking. For example, when asked to describe his symptoms, he said the pain "fEELs rEal bad" and was "all in my hEad, nosE, EYES" and caused by "dust grass colongE spray bEing outsidE wind . . . " Ex. 104 (Statement of

Claimant or Other Person) at Respondent – 000056. Asked to describe changes in his symptoms, he responded, "aiN't got No chang." *Id.* at Respondent – 000058. Asked whether he grocery shops, he said "not much" and that when he does it takes him "hours" to shop for "potato ships, pops kookiEs." *Id.* at Respondent – 000060. Asked what housework he does, he said "makE my room" and then asked whether there were any changes in household maintenance he said, "I told you I makE my room." *Id.* The Seventh Circuit described Mr. Webster's responses on the SSA forms as "direct evidence about Webster's abilities . . . rife with errors in syntax, spelling, punctuation, grammar, and thought." *Webster*, 784 F.3d at 1134.

The records also include a letter strongly suggesting that Mr. Webster was in special education in elementary school. The letter is on Watson Chapel Schools letterhead and signed by Special Education Supervisor Lou Jackson. Ex. 21 (Social Security Records) at 28; *see also Webster*, 784 F.3d at 1133–34. It is addressed to Adjudicator Helen Rumpf at the Social Security Administration in Little Rock, Arkansas. It says that Bruce C. Webster's "Special Education records were destroyed in 1988. A letter was mailed to parents at the last known address, telling them they could have the records if they wanted them. There was no response to the letter." Ex. 21 (Social Security Records) at 28. The Seventh Circuit described the letter as "an intriguing letter that strongly suggested that Webster in fact had been in special education classes." *Webster*, 784 F.3d at 1133–34.

Summarizing the importance of the Social Security Records—including the doctors' reports, Mr. Webster's application form, and the special education letter—the Seventh Circuit said:

> The government argued strongly [at trial] that Webster was motivated to underperform on the later tests because of the risk of the death penalty. *The tests and estimates from the Social Security Administration records, however, were immune from that argument*

> *about manipulation. . . . It is significant in this respect that Webster was not trying to obtain Social Security benefits on the basis of his intellectual disability, and so an argument about manipulation for purposes of benefits would have been weak.* He asserted instead that he was disabled from a sinus condition. In short, had the I.Q. tests and opinions from the Social Security file been available to the experts at the trial, to the jury, and to the district court, their assessments of Webster may have been different.
>
> Equally importantly, *the Social Security records shed additional light on Webster's adaptive functioning. New counsel found evidence that contradicted everyone's assumption at the trial that Webster had been lying when he said that he was in special education classes.* If it had been clear *that* he was telling the truth, or even if objective evidence had supported his assertion, the jury and the district court may have viewed Webster's poor school performance, sleeping in class, and dropping out in the 9th grade in a different light.

*Webster*, 784 F.3d at 1142 (emphasis added).

The Social Security Administration applied a medical diagnosis code of "Mental Disorder – Intellectual Disability" in its electronic records regarding Mr. Webster. *See* Exs. 42–43.

## 2. Destruction of Additional Records

Mr. Webster's counsel repeatedly requested Mr. Webster's records from the Social Security Administration ("SSA") between October 2008 and February 2009. *See* Dkt. 95 at 3–4.The SSA records that are now a part of the record in this case were disclosed to Mr. Webster in February 2009. But, the list of exhibits included with the records revealed that not all exhibits were included in the records disclosed by the SSA. *See id.* at 4. When Mr. Webster's counsel requested the remaining records from the SSA, the SSA told Webster's counsel that they never should have received Mr. Webster's records at all. *See id.* at 4-5. Then, in December 2009, the SSA informed Mr. Webster's counsel that Mr. Webster's records had been destroyed. *See id.* at 5.

Mr. Webster filed an application with the Fifth Circuit in October 2009 seeking permission to challenge his sentence under 28 U.S.C. § 2255 based in large part on the Social Security records. Dkt. 85-1 at 4. Litigation regarding this application continued until December 2010. *See* Dkt. 95 at 5-6. Mr. Webster subsequently learned through discovery that his records were in fact not destroyed until *2010*, while Mr. Webster had active litigation specifically regarding those records. *See id.* at 7; Dkt. 80 at 12 n. 7. Mr. Webster further learned that the United States Attorney's Office did nothing to preserve or obtain records from the SSA regarding Mr. Webster in 2009 or 2010. *See* Dkt. 95 at 7; Dkt. 85-1 at 3.

Mr. Webster's SSA file contained evidence directly relevant to the question before the Court that was not included in the records disclosed to Webster. *See* Dkt. 25 ¶¶ 6–8, Ex. D. The missing documents include:

1. Leads/Protective Filing Worksheet (showing Protective Filing Date of 9/9/93)

2. Application for Supplemental Security Income, filed 10/4/93 (with Protective Filing Date of 9/9/93)

3. Disability Determination by State Agency, Title II, dated 2/3/94, with attachment

4. Disability Determination by State Agency, Title XVI, dated 2/3/94

5. Supplemental Security Income Notice, dated 2/8/94

6. Disability Determination by State Agency, Title II, dated 3/2/94, with attachments

7. Disability Determination by State Agency, Title XVI, dated 3/2/94, with attachments

8. Earning Record and DEQY, dated 9/13/94.

*Id.* at Ex. D.

The Government acknowledges that "it is reasonable to infer the prior existence of the listed exhibits . . . ." Dkt. 101 at 4. It is, of course, impossible to know the extent to which the destroyed records may have included additional information supporting the SSA's diagnosis of mental retardation. It is also clear that the records address matters the Government has at times

raised (and may, in its post-trial submission, still raise) in this proceeding, such as its speculation that the SSA's ultimate denial of benefits for Mr. Webster means that the SSA's doctors reversed their earlier diagnoses.

### C. Witnesses

The parties presented testimony of several witnesses, through both live and deposition testimony. The testimony of the witnesses presented is summarized below.

#### 1. Mark Tassé

##### a. Summary of Testimony

Dr. Tassé is a professor of psychology and psychiatry at The Ohio State University. Tr. 21:25–26. He is also the director of the Nisonger Center, which conducts research, provides clinical services, and teaches about developmental disabilities, including intellectual disability. Tr. 22:1–7. He obtained his Ph.D. from the University of Quebec in 1994. Tr. 22:16–19. He is a member and fellow of the American Psychological Association (APA) and American Association on Intellectual and Developmental Disabilities (AAIDD). Tr. 24:7–9. He is also a member of the National Association for the Dually Diagnosed, an association that promotes understanding and services for individuals with co-occurring intellectual disability and psychiatric disorders. Tr. 24:12–14. Dr. Tassé is a co-author of the last two editions of the AAIDD terminology and classification manuals and is currently working on the upcoming twelfth edition of the AAIDD manual. Tr. 26:11–17.

Mr. Webster called Dr. Tassé to testify as a teaching expert. Dr. Tassé did not evaluate Mr. Webster, and did not opine on whether Mr. Webster is intellectually disabled. Tr. 20:12–21:2. As a coauthor of the current eleventh edition of the AAIDD terminology and classification manual (AAIDD-11) and upcoming twelfth edition, he "provide[d] information about what is intellectual disability, how do we typically evaluate intellectual disability for the purpose of

making a diagnosis, which includes talking about intellectual functioning, adaptive behavior, age of onset, as well as talking about or discussing some of the common misconceptions or misbeliefs that many lay people have around people who have intellectual disability." Tr. 20:12–20.

Dr. Tassé testified that professionals rely upon both the AAIDD and the DSM to diagnose ID; they are essentially the same. Tr. 31:1–14. The AAIDD and DSM define intellectual disability as significant limitations in intellectual functioning (prong 1), significant limitations in adaptive behavior (prong 2), and onset before the end of the developmental period (prong 3). Tr. 31:18–32:5, 39:15–21.

Adaptive behavior consists of three domains: conceptual skills, social skills, and practical skills. Tr. 31:22–24. There are four important points about assessing adaptive behavior: First, if someone has deficits in even just one of these three domains, they meet prong 2. Tr. 35:1–4. Second, when assessing adaptive functioning, the focus is on typical behavior, not maximal behavior; in other words, the focus is on what the subject does, not on what the subject is capable of doing. Tr. 33:8–10. Third, like all people, people with ID have strengths as well as weaknesses. Tr. 36:20–37:3, 108:15–21. The focus of an ID diagnosis is on deficits, not strengths. Tr. 36:20–37:3. Fourth, evidence of adaptive functioning in a restrictive setting like prison is highly suspect and should not be relied upon because of the structured environment. *See, e.g.*, Tr. 46:9–15, 47:13–21.

Dr. Tassé explained that there are a number of misconceptions about people with ID, for example that they walk or talk differently, and explained that people with mild ID have many strengths that sometimes confound lay people. Tr. 70:9–11, 76:9–12. He also explained that if a person is able to function with supports, that does not mean that person does not have ID—just

as if a person is able to move around with a wheelchair, that does not mean that person does not have a physical disability. Tr. 37:8–38:16.

He also explained the capabilities of people with ID, referring to the U.S. Department of Education's National Longitudinal Transition Study, which collects data about students with ID. Tr. 74:25–75:16, 76:15–19. Thirty-nine percent of the students in the study reported having a driver's license or learner's permit. Tr. 81:19–24. About 35–40% had a high school diploma. Tr. 75:12–16. About 76% report having had a job at some point since leaving high school. Tr. 79:6–10. Roughly eight years after graduating from high school, about 25% reported having a child. Tr. 79:24–80:2. People with ID can use a computer. Tr. 81:12–17. And, having ID does not prevent someone from having musical talent. Tr. 82:5–8.

Dr. Tassé testified that it is not possible to tell if someone has mild ID by looking at him or talking to him, unless it is associated with certain specific conditions such as Down's Syndrome. *See* Tr. 28:13–23. Diagnosing ID requires clinical judgment. Tr. 35:24–25, 83:15–20.

Addressing the language in the DSM-5 suggesting that adaptive deficits have to be caused by deficits in intellectual functioning, Dr. Tassé pointed out that it is not possible to make such a determination clinically, and that is not how professionals go about diagnosing ID. Tr. 110:19–112:17. "The DSM is clear, if you have significant deficits in both and they occurred during the developmental period, you have an intellectual disability diagnosis." Tr. 111:6–9. The AAIDD-11 does not include the ambiguous language about the causal relationship in its statement of the diagnostic criteria.

Dr. Tassé testified that people with ID are also at higher risk of other forms of mental illness. Tr. 60:12–17. Co-occurrence is common, and a person can both be ID and have antisocial personality disorder ("ASPD"). Tr. 60:20–61:9. Dr. Tassé testified that he does not know of any

research that looks specifically at whether ASPD is more or less common among people with ID. Tr. 61:5–9. Because psychiatric disorders occur more frequently in people with ID, it may be that ASPD is more common in people with ID. Tr. 61:5–9.

### b.     Assessment of Dr. Tassé's Testimony

Although Dr. Tassé did not opine about Mr. Webster's intellectual functioning, the United States attempted to suggest that he is a biased anti-death penalty advocate. It pointed out that Dr. Tassé had given presentations to criminal defense lawyers, Tr. 93:21–25, and that he co-authored a book with John Blume, who the Government characterized as a staunch opponent of the death penalty, Tr. 88:7–16. Dr. Tassé responded that he had given presentations to criminal defense lawyers because he had been invited to do so, and stated that he would be happy to present to prosecutors if invited. Tr. 99:16–18. He also explained that—regardless of the views of John Blume, a person who is neither testifying nor counsel in this case—Dr. Tassé personally is in favor of the death penalty. Tr. 110:1–2.

Having considered Dr. Tassé's qualifications and testimony and observed his demeanor while testifying, the Court finds Dr. Tassé to be well-qualified and credible and finds that his testimony was helpful in explaining the clinical scientific framework for diagnosing intellectual disability. The Court does not find that Dr. Tassé's testimony exhibited any bias.

### 2.     Daniel Reschly

### a.     Summary of Testimony

Mr. Webster called Dr. Reschly to testify as an expert in identifying intellectual disability, especially mild ID. He is a school psychologist who has spent much of his career training school psychologists and other psychologists, focusing particularly on identification of persons with intellectual disability. Tr. 115:5–9.

Dr. Reschly holds a Ph.D. in school psychology from the University of Oregon. Tr.

117:6–8. He has practiced as a school psychologist. Tr. 117:6. He is currently a professor emeritus of Education and Psychology at Vanderbilt University, where he taught for 15 years after a career as director of the graduate school psychology program for 23 years at Iowa State University. Tr. 114:25–115:3, 119:17–18, 120:4–6. Dr. Reschly has provided testimony to the U.S. Civil Rights Commission, served as a consultant to states and school districts, served on National Academy of Science panels, and testified as an expert in fifteen state and eleven federal court proceedings. Tr. 123:16–19, 124:17–19, 128:8–13. One of the National Academy of Science panels he served on made recommendations to the Social Security Administration about determinations of intellectual disability for Social Security income support. Tr. 126:14–128:7.

As to the particular relevance of school psychology in diagnosing ID, Dr. Reschly testified that school psychology is one of four specialties recognized by the American Psychological Association, and that school psychologists do more initial diagnoses of persons with mild ID than any other specialty in either psychology or medicine. Tr. 115:11–14, 131:19–132:5. Not all diagnoses of ID made by school psychologists occur in a school setting. Tr. 133:4–13.

Dr. Reschly has received distinguished service awards and a lifetime achievement award from the National Association of School Psychologists. Tr. 136:24–137:6. He holds a national certification in school psychology. Tr. 137:14–138:16.

Dr. Reschly testified that the DMS-5 and AAIDD-11 are the authoritative resources for diagnosing intellectual disability. Tr. 143:1–7. He reiterated that the three prongs of ID are significant limitations in intellectual functioning, significant limitations in adaptive behavior, and developmental origin. Tr. 143:12–17.

Dr. Reschly discussed the etiology of ID, and identified many risk factors. Tr. 143:8–

145:4. The more risk factors a person experiences, the more likely poor developmental outcomes are, including the possibility of mild ID. Tr. 148: 3–6. The more protective factors and individual experiences, the less likely poor developmental outcomes are, including mild ID. Tr. 148:6–8. The risk factor that Dr. Reschly identified as having particular importance in Mr. Webster's case is the severe and "noncontingent" physical and emotional abuse that Mr. Webster observed and experienced—beatings with hoses, extension cords, and boards that were unrelated to Mr. Webster's behavior. Tr. 148:12–149:13. Dr. Reschly also noted that some of the violence was sadistic. Tr. 149:18. Several of the children described being forced to lick a cat's anus or being forced to drink urine or eat feces from a slop bucket. Tr. 149:18–23. And Dr. Reschly noted the intergenerational transmission of violence and abuse. Mr. Webster's siblings described observing their father holding a gun to their mother's head. Tr. 151:10–16. Two of Mr. Webster's sisters-in-law described their husbands, Mr. Webster's brothers, being severely physically abusive, and two of Mr. Webster's girlfriends described him as being physically abusive. Tr. 150:21–23, 150:25–151:7. One described Mr. Webster holding a gun to her head. Tr. 151:7–151:9.

Considering protective factors, Dr. Reschly pointed out that while growing up with both parents in the home is typically a protective factor, in this situation growing up with his father Willie in the home may not have been a protective factor, given Willie's frequent, sadistic abuse. Tr. 154:11–18. Dr. Reschly testified that Mrs. Webster told him, through tears, that "Willie ruined the family." Tr. 154:14–17.

Dr. Reschly addressed all three prongs of the ID diagnosis, beginning with prong 1—significant deficits in intellectual functioning. Because mild ID is usually noticed first in a school setting, Tr. 133:1–3, Dr. Reschly considered Mr. Webster's school records, Tr. 220:22–24. He noted that Mr. Webster failed, and was made to repeat, first grade—a critical indicator of slow

development in his early years. Tr. 221:25–222:11; Ex. 4 (Elementary School Record) at 1. He testified that the letter from Watson Chapel Schools supervisor of special education indicated that Mr. Webster was in special education, and that means it is likely that Mr. Webster was identified in school as having an intellectual disability. Tr. 158:8–19. He also explained that special education is formally defined in the law as specially designed instruction, individually developed based on a child's characteristics and needs," and that "[s]pecial education cannot be delivered to students unless they meet the criteria for a disability." Tr. 160:13–17.

Dr. Reschly reviewed all of Mr. Webster's IQ test results and presented a chart reflecting his IQ scores:

| Pre-crime | | | |
|---|---|---|---|
| 1992 | Caffey | WAIS-R | 48 |
| 1993 | Hackett (SSA) | WAIS-R | 59 |
| Post-crime | | | |
| 1995 | Finn | WAIS-R | 59 |
| 1996 | Keyes | Stanford-Binet | 51 |
| 1996 | Finn | WAIS-R | 65 |
| 1996 | Keyes | KAIT | 55 |
| 1996 | Parker | WAIS-R | 72 (67?) |
| 2018 | Denney | WAIS-IV | 61 |
| 2019 | Reschly | WJ-IV (Cognitive GIA) | 53 |

Addressing these scores, Dr. Reschly explained that the score obtained by Dr. Caffey in 1992 may be artificially low because the test was administered while Mr. Webster was experiencing mental health symptoms, including perhaps symptoms of schizophrenia. Tr. 162:21–164:6. Dr. Hackett was a psychologist employed by the SSA who evaluated Webster in 1993, approximately a year before the crime. Tr. 164:7–16. Dr. Hackett administered a WAIS-R and diagnosed Mr. Webster with mild mental retardation and antisocial personality disorder by history. Tr. 164:16–19, 166:7–9. Dr. Finn administered two WAIS-R tests, obtaining scores of

59 and 65. Tr. 194:15–17, 194: 22–25. Dr. Keyes administered a Stanford-Binet and a KAIT (Kaufman Adult Intelligence Test), obtaining scores of 51 and 55. Tr. 419:2–11. Dr. Parker's result of 72 is unreliable because Dr. Parker did not follow standard procedures; specifically, he omitted certain subtests. Tr. 167:8–16. Entering the scores obtained by Dr. Finn a few weeks prior on the subtests omitted by Dr. Parker, Dr. Reschly calculated that if Dr. Parker had not inappropriately omitted certain subtests, the score would have been a 67. Tr. 167:22–168:25. Dr. Parker's result is also potentially unreliable because it was given so soon after Dr. Finn's, allowing for the possibility of practice effect (the possibility that when a test is given twice in close proximity, the second score will be artificially inflated). Tr. 169:1–14. Dr. Denney administered a WAIS-R in 2018, and reported a score of 61. Tr. 169:18–21. Dr. Reschly administered a Woodcock-Johnson Fourth Edition Cognitive Abilities Test in 2019, and reported a score of 53. Tr. 170:5–13.

Dr. Reschly testified that all of these test scores are "indicative of intellectual disability." Tr. 172:21–22. Every one of Mr. Webster's test scores falls below two standard deviations from the mean. Tr. 182:2–183:11. Dr. Reschly testified that it would be extremely difficult, likely impossible, to consistently fake IQ scores in this range over a twenty-seven year period. Tr. 172:23–173:5. Addressing the differences in subtest scores, Dr. Reschly testified that consistent performance across subtests is unusual—it is more common to have fairly wide variations in scores across different subtests. Tr. 178:18–22. He also testified that a large difference between the scores on the verbal and performance indexes is common. Tr. 179:18–180:1, 181:6–15. Dr. Reschly further explained that a person being administered an IQ test would not be able to tell from the administration how it would be scored, and that the scoring criteria are tightly controlled. Tr. 177:21–177:3. It is a serious breach of ethics to disclose the scoring criteria, and

only persons qualified to administer the tests may purchase them. Tr. 177:4–177:19. Test-takers being administered tests do not receive feedback on how they are doing, and test-takers do not know how many items are included on a particular subtest. Tr. 175:21–176:6.

Dr. Reschly also explained effort testing. Symptom validity tests, he explained, try to assess whether an individual is reporting honestly about typical emotional or physical symptoms. Tr. 184:16–23. Performance validity tests try to assess whether an individual is giving a good effort to try to do well on cognitive tests like achievement tests and intelligence tests. Tr. 185:3–7. Because effort tests have some component of ability, there is a risk of false positive results for people with low IQ. Tr. 185:17–186:14. That is, there is a risk that a low performance validity test score could falsely indicate that a person with a low IQ was not giving good effort, when the low score actually results from low IQ. Tr. 186:9–14. To lessen this risk, it is necessary to use a lower cutoff score for lower IQ individuals. Tr. 185:20–186:14. The risk of false positives is the primary concern with using performance validity testing on low IQ people; that is, the primary concern is that performance validity testing will show poor effort when good effort is given, and not that the performance validity testing will show good effort when poor effort is given. Tr. 186:15–19.

Dr. Reschly next explained the Test of Memory Malingering (TOMM), a performance validity test. The TOMM involves three trials: the first testing trial, the second learning trial, and the retention phase. Tr. 187:12–13, 188:5–25. The TOMM can detect poor effort and most individuals with mild ID can, if they are giving good effort, pass the TOMM. Tr. 189:4–10.

Dr. Reschly administered the TOMM to Mr. Webster, following all standard procedures. Tr. 190:5–12. Dr. Reschly strategically administered the TOMM between two challenging tests, because that is when individuals are most likely to give poor effort. Tr. 189:14–20. Mr. Webster

passed all three trials of the TOMM. Tr. 191:4–7. A score of thirty-five or less (out of fifty) indicates failure, as does failing to improve across the trials. Tr. 199:17–23. Mr. Webster obtained a score of forty-five on the first trial, forty-seven on the second trial, and forty-nine out of fifty on the retention trial—passing scores on each trial, and improved scores across the three trials. Tr. 190:24–191:3. From these scores, Dr. Reschly determined that Mr. Webster was giving good effort on the TOMM and that he was giving good effort on the other assessments Dr. Reschly administered that day. Tr. 191:4–7.

Dr. Reschly then explained the Reliable Digit Span (RDS), a derived effort test that looks to the digits repeated correctly during the administration of the WAIS. Tr. 191:8–18. The consensus is that the RDS is an appropriate effort test for low IQ individuals as long as the National Academy of Sciences' recommendation to use a slightly lower cut-off score is followed. Tr. 192:4–9. The recommended cutoff score is six or less. Tr. 193:1–11. The data to determine Mr. Webster's RDS score on Dr. Caffey's 1992 WAIS was not available, but the data was available for the other administrations of the WAIS. Tr. 193:23–194:5. Reviewing the RDS data, Dr. Reschly reported that Mr. Webster obtained a RDS score of 6 on Dr. Hackett's 1993 WAIS (IQ score 59), Tr. 194:6–12; RDS score of 5 on Dr. Finn's 1995 WAIS (IQ score 59), Tr. 194:14–21; RDS score of 8 on Dr. Finn's 1996 WAIS (IQ score 65), Tr. 194:22–25; RDS score of 8 on Dr. Parker's 1996 WAIS (the IQ score of 72 on that test was invalid because Dr. Parker did not follow testing protocol), Tr. 195:3–5; and RDS score of 6 on Dr. Denney's 2018 WAIS (IQ score 61), Tr. 195:8–11. Dr. Reschly testified that while the RDS score on Dr. Finn's 1995 WAIS was questionable or a fail, the RDS score on every other administration of the WAIS for which RDS data is available was either a pass or clear pass. Tr. 194:6–195:11.

Dr. Reschly then testified that, "I believe the overall evidence based on the effort test that

I administered, as well as the effort tests that's derived from the Wechsler scales indicate that Mr. Webster gave strong effort, gave good effort to do well on these tests; and therefore, you cannot attribute, in my view, his low scores to an effort to do badly." Tr. 195:22–196:2.

Dr. Reschly also took into account information about intellectual functioning from Mr. Webster's records and from a large number of people who knew Mr. Webster during the developmental period, whom Dr. Reschly interviewed and/or whose sworn testimony Dr. Reschly reviewed. For example, from age fifteen through eighteen, Mr. Webster lived with Leonda Daniels and Gwen Alexander, with whom he had a child. Tr. 196:23–25. Both reported that he had trouble following the plot of television programs. Tr. 196:25–197:3. He also had difficulty playing card games because he could not distinguish between clubs and spades. Tr. 197:4–13. Luketha Frazier, a relative who is the same age as Mr. Webster, reported that he could not understand the jokes teenagers told each other or follow normal peer conversations. Tr. 197:16–23. Jodin Poupart moved into the family home with her then-husband Mark Webster when Mr. Webster was thirteen. Tr. 198:4–7. Ms. Poupart recalled that Mr. Webster seemed immature for his age. Tr. 198:1–2. He could not tell time, which is unusual for a thirteen-year-old. Tr. 198:1–19. Many people spontaneously reported that he seemed slow. Tr. 199:15–20. Dorothy Harris reported that Mrs. Webster was still tying Mr. Webster's shoes when he was up to eight years old, long after most children learn to tie their shoes. Tr. 394:20–395:6. Mr. Webster's sister, Future Mae, testified Mr. Webster is not a smart person. Trial Tr. Vol. 23 62:24–25. Mr. Webster's participation in special education indicates that limitations in Mr. Webster's intellectual functioning were identified in the school setting. Tr. 158:8-16.

Dr. Reschly opined that Mr. Webster meets the first prong of the intellectual disability diagnosis because he has significant deficits in intellectual functioning. Tr. 200:16–19.

Dr. Reschly then discussed prong 2, significant deficits in adaptive behavior. He discussed the three domains of adaptive behavior, conceptual, social, and practical. Tr. 201:12–22. Dr. Reschly testified that to assess adaptive behavior, he considered a broad variety of information across settings and time periods. Tr. 201:25–202:3. Dr. Reschly interviewed many people who knew Mr. Webster during the developmental period, and he paid particular attention to information from spouses of Mr. Webster's brothers (in one case, a current spouse, and another case a former spouse). Tr. 202:12–15. Mr. Webster's sisters-in-law spent significant amounts of time with Mr. Webster during the developmental period, and because they are not direct family members, were more likely to be objective. Tr. 202:12–17. Ms. Poupart recalled that Mr. Webster seemed immature for his age. Tr. 198:1–2. He could not tell time, which is unusual for a thirteen-year-old. Tr. 198:1–19. Mr. Webster's sister, Future Mae, testified Mr. Webster is not a smart person. Trial Tr. Vol. 23 62:24–25. His niece, Luketha Frazier testified she gave him the answers to the driver's license test. Trial Tr. Vol. 23 76:5–16. Leonda Daniels, a friend of Mr. Webster's sister and his ex-girlfriend, testified that he tried to apply for jobs and she helped him fill out job applications. Trial Tr. Vol. 23 96:15–20, 101:9–102:1. She could not understand his handwriting. Trial Tr. Vol. 23 102:24–25.

Dr. Reschly considered the standardized adaptive behavior assessments, the Vineland Adaptive Behavior Scales, conducted by Dr. Keyes prior to Mr. Webster's trial and sentencing phase. Tr. 205:24–206:2. Mr. Webster's scores on the Vineland Scales were thirty-eight and thirty-six, well below average. Tr. 206:25–207:5.

Dr. Reschly testified that the more recent adaptive behavior assessments conducted by Dr. Denney on two former teachers and one ex-girlfriend of Mr. Webster, the Adaptive Behavior Assessment System (ABAS), must be interpreted with a great deal of caution because it is more

difficult to remember someone's adaptive functioning that far in the past, particularly if that person is a student with limited exposure from a class thirty years ago. Tr. 207:6–208:6. Dr. Reschly also pointed out the marked difference in scores between the two teachers who completed the ABAS, even though they would have observed Mr. Webster in the same setting around the same time. Tr. 212:5–7. This discrepancy is another reason to regard these scores with caution. Tr. 212:5–12.

Dr. Reschly conducted an Independent Living Scales assessment on Mr. Webster, and Mr. Webster achieved extremely low scores that are clearly consistent with intellectual disability. Tr. 213:16–19. Mr. Webster was unable to find a number in a phone book, balance a checking account, or pay an electric bill. Tr. 213:21–214:22.

Turning to the three domains of adaptive behavior, Dr. Reschly first addressed the conceptual domain. The conceptual domain of adaptive behavior includes literacy skills, numeracy, language, concepts of time, and concepts of money. Tr. 216:21–24. To assess Mr. Webster's functioning in the conceptual domain, Dr. Reschly looked at a wide variety of information, including Mr. Webster's school performance, standardized tests of his achievement, and other persons reporting on his literacy. Tr. 217:2–4. Dr. Reschly also relied on his interview with Mr. Webster. Tr. 217:7–8.

Mr. Webster admitted to struggling in school and recalled being in special education, including attending classes in a separate building. Tr. 217:16–22. Mr. Webster did not recall why he was retained in first grade, but his relative Luketha Frazier remembered that they were both retained for poor reading. Tr. 217:10–13. Mr. Webster's description of his special education program was consistent with his brother Mark Webster's description. Tr. 258:8–10. "Both of them described taking classes in a separate building that was associated with special education

and taking low-level classes in the regular school building, such as those classes taught by Ms. Monk and Ms. Drewett." Tr. 258:10–14. Mr. Webster admitted to being disruptive in school, which Dr. Reschly testified is a way students deflect school work that is too difficult. Tr. 218:20–219:12.

Regarding Mr. Webster's scores on the Metropolitan Achievement Test (MAT) and Adult Basic Learning Examination (ABLE), Dr. Reschly pointed out that scores from group-administered achievement tests are not a reliable measure of a person's intellectual functioning. Tr. 224:24–22514. He said that the results of these group-administered tests were inconsistent with the other information about Mr. Webster's literacy skills. Tr. 250:3–24. He also pointed out that Mr. Webster's scores across three administrations of the Woodcock-Johnson, an individually administered achievement test, were consistent with intellectual disability. Tr. 251:3–255:24.

Regarding the significance of the Social Security records, Dr. Reschly pointed out (as the Seventh Circuit also pointed out in its *en banc* opinion) that the records contain direct evidence of Mr. Webster's poor writing and inability to understand the instructions when filling out Social Security forms. Tr. 238:11–21. The records also contain evidence that Mr. Webster did not live independently. Tr. 238:16–249:11.

Dr. Reschly testified that there is "unequivocal evidence" that Mr. Webster was in special education. Tr. 260:3–7. Responding to the Government's suggestion that the letter from the Watson Chapel Schools special education supervisor regarding Mr. Webster's special education records could refer to "a record that says, 'We tested him and did not place him in special ed,'" Dr. Reschly, the only school psychologist to testify at the hearing, explained that "those usually are not regarded as, quote, 'special ed records.' Special education records refer to the records of students who are identified with disabilities and placed in special education." Tr. 322:4–11. Dr.

Reschly also pointed out that teachers said Mr. Webster was in resource classes, which are special education. Tr. 324:15–21. Dr. Reschly knows that resources classes are special education because he "worked with the Arkansas Department of Education—their Department of Special Education and worked with them on their continuum of placements; and by state law, resource was special education." Tr. 325:4–7. Dr. Reschly also noted that the letter refers to "records" in the plural. Tr. 413:12–13. And Dr. Reschly also pointed out that both Mr. Webster and Mark Webster "described taking classes in a separate building that was associated with special education and taking low-level classes in the regular school building." Tr. 258:11–13.

Considering all of this evidence, Dr. Reschly opined that Mr. Webster has significant deficits in the conceptual domain of adaptive functioning. Tr. 260:15–262:7. By having significant deficits in the conceptual domain of adaptive functioning, Mr. Webster satisfies the criteria for prong 2 of an intellectual disability diagnosis. Tr. 262: 8–12.

Addressing the social domain of adaptive functioning, Dr. Reschly explained that the social domain has to do with skills relating to other people and to broader society. Tr. 262:14–18. To assess Mr. Webster's functioning in the social domain, Dr. Reschly relied on interviews with people who knew Mr. Webster well and with Mr. Webster himself. Tr. 262:22–263:4. Mr. Webster's sister-in-law Sharon Webster, former sister-in-law Jodin Poupart, and former girlfriend Gwen Alexander reported that Mr. Webster bragged a lot as a teenager. Tr. 263:16–264:6. Mr. Webster made "pretty strong claims about his sexual attractiveness to women" that seemed exaggerated. Tr. 264:9–15. Mr. Webster bragged about the number of women he had had sex with to an FBI agent who was interviewing in connection with the underlying crime—a rape and kidnapping of a young girl. Tr. 265:6–9. Dr. Reschly also considered Mr. Webster's violent behavior towards girlfriends, as reported by Gwen Alexander and Sylvia Clark, which Dr.

Reschly opined showed deficits in interpersonal skills. Tr. 266:6–10.

Dr. Reschly identified an area of strength for Mr. Webster, noting that Mr. Webster exhibited positive self-esteem in connection with his musical abilities. Tr. 267:7–13. Dr. Reschly noted that accomplishments in music are not inconsistent with ID. Tr. 267:14–20. Mr. Webster also experienced threats to his self esteem; for example, Mr. Webster reported that other students made fun of him for being in special education. Tr. 267:21–268:5. Dr. Reschly further noted that Mr. Webster's family and peers described him as an easily-influenced follower, though Dr. Reschly acknowledged that other witnesses, including school personnel and a parole officer, described Mr. Webster as a leader. Tr. 268:14–270:19.

Dr. Reschly also opined that Mr. Webster's failure to follow rules or obey laws, as demonstrated by Mr. Webster's failure to follow school rules and law violations, is indicative of deficits in the social responsibility element of adaptive behavior. Tr. 270:20–271:19. Dr. Reschly noted that Mr. Webster's "most recent record at the Terre Haute penitentiary indicates he has rarely violated prison rules, has conformed, has obeyed the requirements in the Terre Haute penitentiary pretty consistently over the last 20 years" but that "[g]enerally, persons with mild intellectual disability do best in situations that are highly structured and have very set routines." Tr. 271:20–272:1. Dr. Reschly explained that Mr. Webster's adaptive functioning in prison has "to be understood in the context of which the observations are made." Tr. 272:18–22. He did not give significant weight to Mr. Webster's functioning in prison because "[i]n a prison context, inmates don't make decisions about—by and large, they do not make decisions about when they eat, what they eat, when they have free time, what they do with their free time. They don't pay for the cost of shelter. They don't have to worry about obtaining housing and many, many other practical things that persons outside of prison have to cope with on an everyday basis." Tr.

272:23–273:4.

Finally, Dr. Reschly noted that Mr. Webster showed deficits in the area of social problem solving, which is another element of the social domain of adaptive functioning. Tr. 273:5–275:14. Mr. Webster responded inappropriately when a romantic partner, Ms. Clark, asked him to move out of his home, and behaved inappropriately at his father's funeral. Tr. 273:10–274:12.

Dr. Reschly opined that Mr. Webster demonstrated significant deficits in the social domain of adaptive functioning. Tr. 276:6–14.

Addressing the practical domain of adaptive functioning, Dr. Reschly pointed out that persons with mild ID generally do somewhat better in the practical than social and conceptual domains. Tr. 276:22–23. The practical domain encompasses functioning independently and responsibly. Tr. 277:1–4. To assess Mr. Webster's functioning in the practical domain, Dr. Reschly looked to items from the Independent Living Scales that he administered and reports of other people concerning Mr. Webster's daily living skills. Tr. 277:16–23. Mr. Webster never lived independently. Tr. 278:19–279:3. He has mastered the basic daily living skills like eating and getting dressed, which is nearly always the case for people with mild ID. Tr. 279:11–18. He was slow to learn to tie his shoes and accomplish other developmental tasks. Tr. 280:2–24. He never acquired skills like cooking or shopping. Tr. 281:7–19. He does not know common measures associated with cooking like pint or quart. Tr. 281:17–19. His job skills were far below those typically obtained by people with mild ID, and he never maintained employment for more than a few days. Tr. 282:1–283:14. At age 20, Mr. Webster did drive, but not beyond familiar areas. Tr. 288:22–289:2. He did not establish his own resources financially. Tr. 284:19-285:9. Although he obtained a driver's license, he failed the exam twice before a family member supplied Mr. Webster the answers to the written test. Tr. 288: 2–21. Dr. Reschly opined that Mr.

Webster had many deficits in the practical domain of adaptive functioning. Tr. 289:16–21.

Overall, Dr. Reschly opined that "Mr. Webster has many deficits in social, conceptual, and practical competencies. He could not live independently, and he was not socially responsible. I believe the evidence is convincing that he had significant deficits in adaptive behavior, thus, meeting the second prong of the intellectual disability diagnosis." *Id.*

Dr. Reschly then discussed prong 3, and, based on conversations with individuals who knew Mr. Webster during the developmental period and his placement in special education, determined that Mr. Webster meets prong 3. Tr. 290:4–8.

Addressing co-morbidity, Dr. Reschly reiterated Dr. Tassé's point that there is an increased risk of comorbidity of psychiatric disorders and ID and as many as 40% of people with ID also present with a diagnosable psychiatric disorder. Tr. 290:14–22. It would not be inconsistent with having mild ID if Mr. Webster also has ASPD, and Dr. Reschly has evaluated other people who were co-morbid for both ID and ASPD. Tr. 290:23–291:1. There are no mental disorders that rule out an ID diagnosis. Tr. 291:2–5. "[B]oth DSM-5 and AAIDD specify explicitly that if more than one mental disorder exists, that is, if comorbidity exists, that both should be diagnosed and both should be considered in the development of treatment plans." Tr. 291:6–9.

Ultimately, Dr. Reschly opined that Mr. Webster "meets the criteria for intellectual disability that are established by the authoritative organizations, the American Association on Intellectual and Developmental Disabilities and the American Psychiatric Association in their Diagnostic and Statistical Manual of the mental disorders." Tr. 291:16–21.

### b.    Assessment of Dr. Reschly's Testimony

Having observed Dr. Reschly's demeanor while testifying and having considered his testimony along with all the testimony in this case, the Court finds Dr. Reschly to be credible.

The Court also finds that Dr. Reschly's training and experience as a school psychologist are particularly relevant to diagnosing ID.

Assessing prong 1 (intellectual deficits), Dr. Reschly convincingly explained how multiple IQ tests over a 27-year period—all of which reflected scores well within the range of mild intellectual disability—demonstrated impaired intellectual functioning; and how stand-alone and derived effort tests indicated that Mr. Webster was putting forth good effort during the intellectual assessments, meaning that Mr. Webster's low IQ scores are reliable measures of his intellectual functioning. Dr. Reschly also explained how his review of other evidence of Mr. Webster's intellectual functioning, such as school records and interviews with individuals who knew Mr. Webster during the developmental period, informed his view that Mr. Webster's low IQ scores were reliable measures of his low intellectual functioning. Dr. Reschly's opinion that it would be extremely difficult, and likely impossible, for a person to fake mild ID IQ results this consistently, in this many tests, over a 27-year period in the circumstances here (where there is no evidence that Mr, Webster had any knowledge how the tests were scored or, at least in some cases, even what the tests were for) is rational, logical, and convincing.

Assessing prong 2 (adaptive deficits), Dr. Reschly convincingly explained which information to weigh heavily and which information to discount. Dr. Reschly interviewed a large number of people who lived with Mr. Webster during the developmental period and knew him well. He credited information when multiple informants corroborated each other. He also considered possible bias, particularly crediting the information from Mr. Webster's sisters-in-law because he was aware that closer family members may be more likely to be biased. He considered Mr. Webster's ex-girlfriend Sylvia Clark's lay assessment that Mr. Webster was not ID and was a leader. But he more heavily weighed information about Mr. Webster's intellectual

functioning from sources whose statements were corroborated by other information. Ms. Clark's statements were contradicted by Ms. Alexander's (another ex-girlfriend) statement that he could not follow the plot of television programs, Ms. Poupart's statement that he could not tell time at age thirteen, and evidence from the Social Security records that Mr. Webster was in special education. Dr. Reschly did not heavily weigh the information provided to Dr. Denney by Mr. Webster's teachers because it was internally inconsistent and inconsistent with other information, and because the teachers knew Mr. Webster for a brief period over thirty years ago.

Similarly, assessing prong 3, Dr. Reschly relied on information from multiple informants who knew Mr. Webster during the developmental period. He also considered Mr. Webster's placement in special education, along with Dr. Reschly's knowledge as a school psychologist that placement in special education typically requires intellectual testing.

### 3. John Fabian

#### a. Summary of Testimony

Mr. Webster called Dr. Fabian to testify as an expert in neuropsychology and forensic psychology. Tr. 431:17–18. He testified both during Petitioner's case and in rebuttal to Respondent's expert witness, Dr. Denney.

Dr. Fabian has a Psy.D. in clinical psychology from the Chicago School of Professional Psychology, a post-doctoral certificate in clinical neuropsychology from the Fielding Graduate Institute, and completed a two-year, post-doctoral fellowship in clinical neuropsychology from the University of New Mexico School of Medicine and the Raymond G. Murphy VA Medical Center in Albuquerque, New Mexico. He also has a juris doctorate ("JD") from the Cleveland Marshall College of Law and two years of law and psychiatry training from Case Western Reserve University. Tr. 433:16–434:2. He is board certified in forensic psychology and clinical psychology and fellowship trained in neuropsychology. Tr. 434:4–5. To Dr. Fabian's knowledge,

he is the only person in the United States who is board certified in forensic psychology, board certified in clinical psychology, and has fellowship training in neuropsychology. Tr. 490:4–7. Dr. Fabian now lives and works in Austin, Texas, where he contracts with the county to conduct the court's competency and sanity evaluations. He has evaluated individuals' competency to be executed in both Texas and Ohio, and in every case found the individual competent to be executed. Tr. 436:19–437:7. In about half of the death penalty cases where he has been asked to determine whether a defendant is ID, he found that the person was not ID. Tr. 438:23–439:7.

Dr. Fabian identified neurodevelopmental risk factors that affected the development and functioning of Mr. Webster's brain. He explained:

> I think the major factor here that we've examined but not emphasized enough in this case is the trauma. You know, it really, I think, affects Bruce developmentally. So relevant to your question of neurodevelopment—you know, intellectual disability is a neurodevelopmental disorder in that DSM book; and that really means there's a compromise in brain development and a dysfunction in brain development, and there's several neurodevelopmental disorders, ADHD, autism; but intellectual disability is kind of, I would say, the king of those disorders. And that requires the most impairment and global impairment.
>
> So developmental trauma is critical in this case because that trauma and complex trauma can affect brain development and I would say basically in how the brain forms and functions. So he would be at risk for, with that type of trauma, early compromise, especially in areas of the limbic system, the emotional processing and functioning of the brain, in particular, the amygdala and the hippocampus, and then later on as the brain develops, the area of the cortical part of the brain that really covers that first area of the emotional processing part. That would be the frontal lobes, really responsible for executive functioning.
>
> So I am concerned about early neurodevelopmental risk factors that would affect his development and function of his brain.

Tr. 444:13–445:12.

Defining "complex trauma," he explained:

> When I talk about complex trauma, it really looks at severe interpersonal trauma typically with primary caregivers early in life relevant to poly trauma, a varied multiple types of trauma, early initiation, multiple traumas, severe, intense and chronic with long lasting duration. That's not a good combination. And that I would say especially when it's interpersonal with primary caregivers and problems with attachment to primary caregivers due to profound abuse, neglect, that's going to be critical in the development of him . . . .

Tr. 445:17–446:2.

As examples of complex trauma, he pointed to "the urine and cat feces and the being exposed in some way, shape, or form to sexual abuse in the family, chronic and intense physical abuse, beatings, and then the beatings with the other children, his siblings. So it certainly is not a good indicator. It's a marker for dysfunction in a number of areas of life." Tr. 446:7–12.

Dr. Fabian also testified that there is a genetic component to low intelligence, with the caveat that science has not pinpointed the precise percentage of intelligence that is attributable to genetics. Tr. 446:13–20. Trial testimony from Mr. Webster's brothers revealed that some of Mr. Webster's siblings were identified as ID or in special education classes.

Mr. Webster's brother, Mark, testified at trial that all his brothers were in special education classes. Trial Tr. Vol. 23 19:12–16. According to Mark, he was diagnosed as mild mentally retarded as was his brother Tony. Trial Tr. Vol. 23 19:20–20:6. He described Mr. Webster as "just slow" and explained that he could not handle a construction job because "it's a hard thing to do if you don't know what to do." Trial Tr. Vol. 23 27:5–7. He testified that neighbors had said they did not understand what Mr. Webster was talking about. Trial Tr. Vol. 23 32:3–8.

Mr. Webster's brother, Tony, testified at trial that he had been drawing social security "just about all my life" for "slowness in school". Trial Tr. Vol. 23 35:22–36:2. He graduated from high school and played the organ in church. Trial Tr. Vol. 23 35:6–9, 36:3–4. He said he

was not in special education but was in "resource classes" because he was a slow learner. Trial Tr. Vol. 23 36:5–11. It is difficult to draw conclusions about intellect from a cold record but it is noteworthy that prior to the AUSA's cross examination, he told Tony: "I'll try to speak slowly and clearly enough to make myself understandable." Trial Tr. Vol. 23 43:19–20.

In his assessment of Mr. Webster, Dr. Fabian took into account a wide variety of information including testing conducted by other psychologists; information contained in the Social Security records, including the fact that Mr. Webster sought Social Security benefits for a sinus problems and ended up being diagnosed as intellectually disabled and evidence that Mr. Webster was in special education; and the fact that Mr. Webster failed first grade. Tr. 447:15–448:10, 454:20–455:18.

Dr. Fabian testified that Mr. Webster meets prong 1. Tr. 451:3–11. Discussing his clinical impression of Mr. Webster, Dr. Fabian explained, "my impressions were the same as most docs who have seen him, psychiatry or psychologists where he comes across as being quite verbal, expressive; but there's not a lot of substance or depth to what he says. So he talks a lot, but there's not a lot of deeper meanings. We kind of look at that as more concrete thinker than an abstract thinker." Tr. 804:16–21.

Dr. Fabian explained that Mr. Webster's WAIS scores of 59, 59, 61, and 65 obtained over the course of twenty-six years were consistent with each other and indicated mild intellectual disability. Tr. 447:14–24, Tr. 811:1–8; 837:18–21. He also testified that variability is to be expected between the different kinds of tests, such as the WAIS, Stanford-Binet, and Woodcock-Johnson tests. Tr. 811:15–23. That means it is not surprising that scores on the WAIS would be very consistent with each other, but slightly less similar to scores on a Stanford-Binet. Overall, Dr. Fabian testified, Mr. Webster's IQ scores were consistent. Tr. 812:3–4.

Dr. Fabian conducted his own testing to assess skills like general reasoning, auditory comprehension, and vocabulary. Tr. 449:2–25. Dr. Fabian explained that while the results from Dr. Reschly and Dr. Denney's IQ tests are the most significant for assessing general intellectual functioning, his test results are relevant, are consistent with the IQ tests results, and indicate ID. Tr. 449:25–450:3.

Dr. Fabian's test results confirmed Mr. Webster's concrete thinking. For example, on a judgment test, when asked why you should blow out a candle before bed, Mr. Webster responded to save the candle. Dr. Fabian explained that while that response may be technically correct, it is concrete. The important reason to blow out a candle is to avoid causing a fire, and Mr. Webster's response did not address the risk of fire. Tr. 806:12–807:14. Several other questions reveal a similar pattern of concrete thinking.

Dr. Fabian added that Mr. Webster's responses on the Social Security records from 1993 reflect Mr. Webster's concrete thinking. The Social Security records contain "the same responses that are concrete and limited as what we just looked at when I was doing my own testing with him." Tr. 815:23–25.

Dr. Fabian testified that Mr. Webster meets prong 2. To assess Mr. Webster's adaptive functioning, Dr. Fabian administered a series of tests. He administered a bill payment test, which revealed significant impairments. Tr. 451:23–452:2. He administered a visuospatial map reading task, which revealed mild impairments. Tr. 452:3–5. Mr. Webster struggled and was severely impaired on tasks measuring social impairment and judgment, and verbal abstract reasoning skills. Tr. 452:6–20. Dr. Fabian considered Dr. Keyes' adaptive functioning assessments, Dr. Reschly's assessment, and Mr. Webster's self-report on Dr. Denney's ABAS. Dr. Fabian testified that these assessments were consistent with significant limitations in adaptive

functioning. Tr. 453:4–454:2. Dr. Fabian considered Mr. Webster failing first grade to be critical evidence of ID. Tr. 455:3–8. He also explained that Mr. Webster's poor writing skills exhibited in the Social Security records were marked proof of adaptive deficits. Tr. 455:22–24.

Dr. Fabian explained that he does not heavily weigh evidence of adaptive functioning in prison. "It's difficult to assess a defendant in these proceedings on death row in a structured prison environment. So I do not consider a hardcore analysis in prison environment when it's so structured and, essentially, everything's available to a[n] inmate." Tr. 458:5–10. He added, "Bruce doesn't have to, you know, hold a full-time job, pay for a cell phone, get house insurance, pay for medical insurance, get a car, drive to the grocery, buy food, things that we do every day. All of that is taken care of for him." Tr. 458:13–17.

Dr. Fabian also explained that he does not rely on the crime facts as evidence of adaptive behavior. Dr. Fabian—who is a forensic psychologist with a JD—first explained that *Moore v. Texas* structures his analysis and dictates that he should not consider the crime facts. Tr. 455:25–456:6. He added that even prior to *Moore*, he did not typically look at crime facts to assess intellectual disability because the AAIDD-11 and DSM-5 indicate that it is not an appropriate consideration for assessing ID (in contrast to, for example, assessing insanity, where Dr. Fabian testified that looking to crime facts might be relevant). Tr. 457:9–25.

Dr. Fabian testified that Mr. Webster meets prong 3. Assessing this prong, he focused on Mr. Webster failing first grade and his placement in special education, which indicate that Mr. Webster suffered from intellectual and adaptive deficits at a young age. Tr. 459:11–13.

On the subject of malingering, Dr. Fabian first noted that the AAIDD User's Guide cautions that there is a risk of false positives when using effort tests on people who are ID. The tests are not based on or developed with people who are ID. Tr. 460:12–462:6; *see also* AAIDD

User's Guide at 24. Dr. Fabian also pointed to an overview of different effort tests by Dr. Christopher Ray, *Assessment of Feigned Cognitive Impairment: A Cautious Approach to the Use Of The Test of Memory Malingering for Individuals with Intellectual Disability*. The article explains the risk that tests, such as the Word Memory Test (WMT), will falsely say that low functioning individuals are malingering. Tr. 468:22–470:5. More recent research has not rectified this problem, in large part because when later studies have used these tests with ID populations, the sample sizes have been extremely small. Tr. 795:7–797:24. For example, in one study, the sample size was fourteen. Tr. 797:17–24.

Dr. Fabian differentiated malingering from poor effort, stressing that this was an important distinction. "So when we look at these tests, they're called effort tests; and when people fail effort tests, that does not necessarily mean that they're formally malingering. They could have variable or suboptimal effort or they can be malingering. And so I'm not equating every effort test failure to, therefore, he's malingering. There are a lot of other factors here that can lead to a failed effort test." Tr. 462:18–25. Among these factors are Mr. Webster's "base foundation of complex trauma," which Dr. Fabian characterized as a "virus." Tr. 798:1–24. Dr. Fabian testified, "those traumatic experiences that Bruce had early on have been pretty—they're going to have long-lasting psychological and emotional effects on him. I am concerned at the risk that those symptoms and experiences have on just how he does take part in different tests or situations, interpersonal experiences, et cetera." Tr. 800:10–15. Dr. Fabian also testified that the atypical testing conditions on death row could impact effort. Tr. 798:1–24.

Dr. Fabian described the problems with the Green tests (a group of effort tests) that both he and Dr. Denney administered. These tests were developed in a personal injury setting for traumatic brain injury ("TBI") and are now being used in ID settings, but they have not been well

normed for ID adults. Tr. 467:17–19. Even today, there are few studies and they involved small samples of people who also had conditions other than ID. Tr. 468:6–12. Dr. Fabian explained that these tests are not perfect because they are not well normed, so they must be treated with caution. But he also explained that effort testing is relevant, and since these tests are all we have, we use them. Tr. 468:11–12.

Dr. Fabian also pointed out that even if an effort test indicates suboptimal effort, it only indicates suboptimal effort on the day it was administered, and does not undermine the validity of tests conducted on different days. So none of the effort testing in this case offers any reason to question the results of other tests, including the IQ tests and the TOMM administered by Dr. Reschly; Mr. Webster passed that TOMM and obtained a low IQ score. Tr. 799:9–25.

Dr. Fabian testified that Mr. Webster passed Dr. Reschly's TOMM "with flying colors." Tr. 465:13–18. Mr. Webster's scores on all three trials were passing, and there was no concern about poor effort. Tr. 465:2–4. Because, as Dr. Ray's article (along with the AAIDD) warns, "[t]he main problem with the TOMM as well as other effort measures with respect to their applicability to individuals with intellectual disability has to do with the potential of a false positive identification," Mr. Webster's passing score on the TOMM indicates the testing Dr. Reschly performed was valid. Tr. 474:20–23.

Dr. Fabian testified that the Green tests administered by himself and Dr. Denney indicate that there could have been issues with effort. He testified affirmatively that the Green tests do not show that Webster was malingering. Tr. 478:2–4. He explained, at most, "there's some variability in effort, suboptimal effort at times. I am not opining that he's intentionally malingering." Tr. 478:2–4. Webster's scores on the Green tests were never close to chance, which would have suggested intentionally getting questions wrong. Tr. 465:16–23, 490:17–19.

Mr. Webster also passed other validity measures, including RDS embedded validity tests, the TOMM, and the Rey test. Tr. 476:17–477:1.

Because complex trauma and atypical testing conditions create a risk of variable effort that is not attributable to intentional malingering, because low IQ creates a risk of false positives for poor effort on effort tests, and because Mr. Webster passed most of the RDS tests and later effort tests, Dr. Fabian testified that Mr. Webster was not intentionally malingering. Tr. 478:2–4, 799:6–8.

Applying his clinical judgment to the totality of the circumstances, Dr. Fabian testified that Mr. Webster has mild ID. Tr. 815:11–14. Dr. Fabian identified as key evidence of Mr. Webster's ID: special education placement; failing first grade; that Mr. Webster's responses on the Social Security application show the same concrete, limited thinking that Mr. Webster displayed in his testing with Dr. Fabian; and the assessments of adaptive functioning by Dr. Keyes and Dr. Denney. Tr. 815:18–816:7. Dr. Fabian acknowledged that there were exceptional facts that, in isolation, may not support a finding of ID. He considered the fact that Dr. Denney concluded that Mr. Webster did not have deficits in adaptive functioning and that there were issues with variability in effort testing. Tr. 816:10–13. "But when you look at this altogether," he testified, "I rarely see, you know, slam dunks that are like 100 percent; but altogether, this is a clear case to me of mild intellectual disability in the totality of the circumstances." Tr. 816:14–17. Pressed on cross-examination about issues with effort testing and contradictory evidence, Dr. Fabian reiterated that it is necessary to look at the totality of the circumstances, and testified, "[h]e passed the TOMM. He had an ID range, and everything he did had convergent validity with Reschly; and we have all these records. At some point, this is my judgment on the stand"— "at the end of the day, he's ID." Tr. 835:13–14, 836:2–4.

### b. Assessment of Dr. Fabian's Testimony

Having observed Dr. Fabian's demeanor while testifying and having considered his qualifications and testimony along with all the testimony in this case, the Court finds Dr. Fabian to be credible. Dr. Fabian is highly qualified to offer an opinion in this case, being the only person in the country who is board certified in forensic psychology, board certified in clinical psychology, and fellowship trained in neuropsychology. His explanation of the reliability of effort tests was helpful to the Court. His discussion of the limits of effort testing in low IQ populations was informative. His discussion of the distinction between intentional malingering and poor effort was illuminating. His willingness to consider the possibility of variable effort and conclusion that trauma and out-of-the-ordinary testing conditions are the most likely explanation for any variability in effort, in particular, put Mr. Webster's test results into context. The Court also notes that Dr. Fabian did not insist that all of the available data perfectly supported his conclusion that Mr. Webster is ID and not malingering, but looked at the totality of the evidence available to him and considered a variety of explanations for what he observed. The Court is convinced that he applied his unique training and experience, bringing to bear his well-informed clinical judgement, to reach the conclusion best supported by the totality of the evidence.

### 4. Larry Moore

### a. Summary of Testimony

Larry Moore is a Texas attorney with extensive death penalty experience, currently serving as Chief of the Criminal Division of the Tarrant County Criminal District Attorney's Office. Moore Dep. at 6:11–7:15.[2] Mr. Moore represented Mr. Webster in the underlying

---

[2]  By agreement of the parties, a transcript and video recording of Mr. Moore's deposition were submitted for the Court's review. Dkt. 164; Dkt. 175. The transcript of Mr. Moore's deposition is referred to herein as "Moore Dep."

criminal case. *Id.* at 8:19–9:4. His diligence in trying to obtain Mr. Webster's social security records was the subject of the first hearing in this case. The Court determined that Mr. Moore was credible and had made diligent efforts to obtain the social security records. Dkt. 117 at 12–13. Mr. Moore testified by deposition about his observations of Mr. Webster and Mr. Webster's reaction to the news that Mr. Moore was going to mount an ID defense to the death penalty.

Mr. Moore testified that he did not recall Mr. Webster expressing interest in the case, and that he was worried that Mr. Webster would fall asleep during the trial "because he just didn't really appear to have any interest in the case, and he wasn't too invested." Moore Dep. at 9:21–11:20. As far as Mr. Webster's behavior during the trial, Mr. Moore noted that "Bruce was just kind of there." *Id.* at 9:25. Mr. Moore testified that it was difficult to communicate with Mr. Webster because he wanted to talk about what he wanted to talk about, which was not the trial. Mr. Moore did not think Mr. Webster had an understanding of what the trial meant or what the result would be. The trial "was something that was happening to Bruce, not something that he was involved in." *Id.* at 12:13–15.

Asked to describe Mr. Webster's verbal abilities, Mr. Moore said, "Bruce was not articulate. He was verbose. I mean, he liked to talk. He talked on kind of a superficial level. . . . [H]e liked to talk about the things that he liked to talk about, mostly about girls and cartoons that he watched on TV and things like that." *Id.* at 14:14–20.

Mr. Moore testified that "From the very—really from the first detailed conversation that I had with Bruce, I had concerns about his mental abilities. You know, I did not know the genesis or the origin of what his problem was, but I knew that he had some kind of problem." *Id.* at 18:11–18.

Mr. Moore testified that he did not tell Mr. Webster the purpose of the pretrial

psychological evaluations conducted by defense or prosecution experts, and, in particular, never told Mr. Webster that they were intellectual testing. *Id.* at 22:12–21. Prior to both defense and Government testing Mr. Moore gave Mr. Webster the same advice, that he should do his very best on the tests and that the better he did, the more it would help him. *Id.* at 21:20–22:15.

Mr. Moore waited until right before the trial to tell Mr. Webster he was pursuing an argument about intellectual disability because he "thought that Bruce would not believe that he had a mental disability and not want us to pursue that at trial. And [Mr. Moore] did not want to color any of the interviews that he was doing with any of the experts." *Id.* at 23:25–24:19. Mr. Moore explained that he told him before the trial because, "I don't think Bruce believed that he was mentally retarded, he didn't at that  time. He didn't like the term. He didn't want to  be stigmatized as being retarded. And so he was not  in agreement with any of that. I wasn't—I wasn't concerned that he would be violent. I was  concerned that he might have some kind of emotional response  to the testimony." *Id.*at 24:12–19. Mr. Moore further testified that when he explained to Mr. Webster that "there was gonna be testimony coming from experts that in their opinion Bruce suffered from mental retardation, he—he was basically in disagreement with that. He said he didn't believe that. . . . [H]e really didn't want us saying that in Court." *Id.* at 33:21–34:5. Mr. Webster did not fight with Mr. Moore about it because, Mr. Moore explained, "I didn't present it to him as a question. I told him that's what I'm fixin' to do." *Id.* at 34:8–10.

Mr. Moore testified that he did not coach Mr. Webster on the intelligence tests. *Id.* at 24:25–25:2. Mr. Moore "absolutely" does not believe that Mr. Webster was faking intellectual disability—because "I don't think that Bruce was sophisticated enough to fake intellectual disability. And second of all, it was my personal opinion that he was mentally

retarded." *Id.* at 26:16–19.

In response to questioning by the Government, Mr. Moore testified that he was "devastated" by the outcome in this case, but in response to whether he viewed "what the lawyers are doing here" as "an opportunity to correct that disappointment" Mr. Moore responded simply that "I think what they're doing is trying to find the truth. And I think that's always a good thing." *Id.* at 43:25–44:5.

### b. Assessment of Mr. Moore's Testimony

The Court previously found Mr. Moore's testimony in the first hearing to be credible. The Court finds his testimony in this hearing to be credible, as well.

In experts' discussions of the interviews they conducted about Mr. Webster's adaptive functioning, they discussed the importance of finding unbiased individuals who could discuss Mr. Webster's functioning. *See* Tr. 202:12–17, 527:17–23; 596:13–23; *see also* Tr. 497:6–11. With that discussion in mind, the Court notes that Mr. Moore is ideally suited to give an unbiased lay opinion of Mr. Webster's functioning. First, Mr. Moore had a front row seat to Mr. Webster's intellectual functioning immediately after the offense when he was 21 years old. Second, Mr. Moore's relationship to Mr. Webster is entirely professional, and Mr. Moore remembers Mr. Webster well. Third, as a prosecutor, Mr. Moore twice asked a jury to sentence a defendant to death. *See, e.g.*, Moore Dep. 8:8–12. In one of those cases, the defendant received a death sentence and has since been executed. Consequently, it is not plausible to argue that Mr. Moore is exaggerating Mr. Webster's deficits in a last-ditch effort to save him from execution. Fourth, Mr. Moore has been an attorney for more than forty years, has worked as both a defense attorney and prosecutor, and holds a position of responsibility at a prosecutor's office overseeing more than 150 attorneys. Consequently, Mr. Moore has every motivation to be honest and forthright in his testimony.

Mr. Moore's testimony that he did not tell Mr. Webster the purpose of the testing conducted before trial and told him to do his best eliminates any argument that Mr. Webster was motivated to fake his IQ scores on those tests. Not only did Mr. Webster pass the RDS effort measures on the majority of those tests, but also, since he did not know the purpose for which the tests were being administered and had been instructed to do well, he had no motivation to fake his IQ scores.

### 5. Robert Denney

#### a. Summary of Testimony

The United Stated called Dr. Denney, who opined that Mr. Webster does not meet the definition of intellectual disability and is malingering. Tr. 653:2–4. Dr. Denney received his Psy.D. in clinical psychology from the Forest Institute of Professional Psychology, where he also taught. Tr. 512:7–23. He spent the bulk of his career working as a psychologist at the U.S. Medical Center for Federal Prisoners in Springfield, MO. Tr. 503:19–21. The Forest Institute of Professional Psychology was not accredited by the APA when Dr. Denney received his degree. It became accredited after he graduated, but has since closed. Tr. 722:18–723:8. Dr. Denney is board certified in forensic psychology and neuropsychology.

Dr. Denney opined that none of the eight IQ tests that Mr. Webster had taken over a twenty-seven year period was valid. Tr. 652:10–12. He based this assessment in part on the fact that the results of the cognitive testing were not consistent with his view of Mr. Webster's real life functioning, which suggested malingering. Tr. 652:3–20.

Dr. Denney based his assessment of Mr. Webster's real life functioning almost entirely on his twenty-minute interview of one person familiar with Mr. Webster's late teens or early twenties, Sylvia Clark. Tr. 584:15–19, 615:16–616:19. Ms. Clark and Mr. Webster dated in 1994 and have a son from that relationship. Trial Tr. Vol. 22 48:13–23. Ms. Clark had reason to be

angry with Mr. Webster because, she said, he had physically abused her. *See* Tr. 615: 21–24. Perhaps more importantly, she has every reason to discount evidence of intellectual disability to avoid the stigma of having been in a relationship with him and allowing him to father her child. Dr. Denney also interviewed two of Mr. Webster's high school teachers, Ms. Monk and Ms. Drewett, but he later decided to discount much of the information he collected from them because of inconsistencies. Dr. Denney met with Mrs. Webster, but said she did not have good recollections, so he did not put much weight on what she said or conduct a formal assessment. Tr. 617:18–24. Dr. Denney administered formal assessments of Mr. Webster's adaptive functioning, the ABAS, on Ms. Monk, Ms. Drewett, and Ms. Clark. Tr. 605:14–606:3. Ms. Monk rated Mr. Webster 102 (average). Tr. 613:16–614:5. Ms. Drewett rated Mr. Webster 58 (extremely low). Tr. 607: 8–21. Ms. Clark rated Mr. Webster 80 (below average). Tr. 617:4–17.

Dr. Denney testified that did not give the results of Ms. Drewett's ABAS—the lowest score—a lot of weight. He said her ABAS rating was inconsistent with the general recollections she offered in her interview, where she described Mr. Webster as "an average to low average student in terms of his general abilities in a class based upon her knowledge of him, which was strikingly better than she rated him in the actual scale." Tr. 608:13–16. He surmised, "this suggests to me that she may have general recollection of him, but her recollection of details of his behavior are probably not very—I mean not as good because of the inconsistency between the two." Tr. 608:23–609:1. And so, "As I explain in my report, I don't—for these reasons, I don't give it [the ABAS score] a lot of weight. I think she rated him probably too low. I give more weight to her general recollections of him, particularly in comparison to other students she's taught over the years." Tr. 610:20–24.

At the time of trial—many years before she spoke with Dr. Denney—Ms. Drewett

testified that her recollection of Mr. Webster was vague. She testified that, "I don't remember specifics." Trial Tr. Vol. 25, 36:18–22. She recalled teaching "several" Webster brothers, but did not recall how many Webster brothers there were—she could not remember whether there were three or four. Trial Tr. Vol. 25, 41:10–11. There are six Webster brothers (including Bruce). Trial Tr. Vol. 23, 2–3. Asked about Mr. Webster's grades, she said, "I don't recall that so much. He dropped out during the ninth grade. So I'm not real sure what he ended up with." Trial Tr. Vol. 25, 38:16–18.

No one else was present at the interview where Ms. Drewett offered her general recollections that Dr. Denney credited. Although an FBI agent accompanied Dr. Denney to Ms. Drewett's home, the agent was not present for the interview and consequently did not create any record of the interview and could not corroborate Dr. Denney's account. Tr. 740:22–741:14.

Dr. Denney testified that Ms. Monk's formal assessment was inconsistent with what she said during her clinical interview, as well. Tr. 614:7–21. Ms. Monk's and Ms. Drewett's formal assessments were also inconsistent with each other, as Ms. Monk rated him average and Mr. Drewett rated him extremely low. Tr. 607: 8–21, 613:16–614:5. Dr. Denney described disregarding some of the information he collected, like Ms. Drewett's extremely low ABAS score, as an exercise of clinical judgment. Tr. 611:2–12.

Dr. Denney also based his assessment of Mr. Webster's real life functioning on his clinical interview with Mr. Webster. He said:

> Well, his presentation during the clinical interviews is meaningful because you can gauge a rough estimate of somebody's overall intellectual ability as far as basically what category it might fall in, and that's more meaningful the more extreme the individual's presentation is. So if it's extremely bright, then that's more obvious; extremely not bright, that's more obvious. So you can tell—clinical acumen can identify somebody who functions in the substantially impaired range.

Tr. 651:4–12.

Dr. Denney also had Mr. Webster fill out a self-assessment ABAS. Tr. 619:5–8. He reviewed information from prison staff about Mr. Webster's adaptive functioning in prison and analyzed the facts of the crime of conviction, concluding that the crime was sophisticated and that Mr. Webster displayed leadership. *See, e.g.*, Tr. 585:14–25, 587:3–588:3, 598:18–601:6.

Dr. Denney testified that someone's intellectual deficits and adaptive deficits have to be related for that person to be ID, but he did not contradict Dr. Tassé's point that it is impossible to prove this relationship clinically. Tr. 521:23–522:8.

Focusing on malingering, Dr. Denney testified that the rate of malingering is higher in forensic contexts and higher among individuals with ASPD. Tr. 533:2–14. He discussed the importance of having malingering "more on your radar" in forensic settings and that a forensic context with someone who has been diagnosed ASPD "should really raise one's red flags." *Id.*

As evidence of malingering, Dr. Denney testified that Mr. Webster's "speed of mental processing during some of the tests—during the tests was extremely slow, and that showed up in the results of the neuropsychological assessment battery attention module because it includes measures of speed of mental processing; and his speed of mental processing was exceedingly slow and inconsistent with his speed of mental processing when he's not performing a test," *i.e.*, during the clinical interview. Tr. 555:12–19. He also pointed to "inconsistencies inside the battery itself that made no clinical sense" such as showing difficulty paying attention during some parts of the test but not others. Tr. 555:25–556:23.

Dr. Denney discussed the Green tests that he administered, which Dr. Fabian acknowledged may have shown variable effort. Dr. Denney specifically pointed out that "there are order violations, which means Mr. Webster performed better on harder tests than he did on a

little bit easier tests; and that order violation is not consistent with genuine known clinical pathology." Tr. 560:19–22.

In explaining how he reached his conclusions—such as the decision not to give Ms. Drewett's ABAS a lot of weight, and his assessment that Mr. Webster's mental processing speed was much faster when he was not taking a test—Dr. Denney's testimony focused on the importance of clinical judgment. He explained, "You have don't necessarily accept every test score at face value assuming it's 100 percent value. You have to look at the nature of it, how does it fit in, how does it all go together . . . Same kind of idea, is it consistent with the clinical interview." Tr. 611:2–8. He testified that clinical judgment is critically important in this evaluation. Tr. 611:6–7. Dr. Denney agreed that clinical judgment is somewhat subjective. Tr. 611:11, 662:3.

**b.      Assessment of Dr. Denney's Testimony**

Having observed Dr. Denney's demeanor while testifying and having considered his testimony along with all the testimony in this case, the Court finds that Dr. Denney is less credible than the other experts, and will not give weight to his testimony.

First, Dr. Denney's attempts to discredit another expert, Dr. Reschly, reflect poorly on his own credibility. During his deposition, Dr. Denney testified that by administering IQ tests to Mr. Webster without (according to Dr. Denney) being properly licensed in Indiana, Dr. Reschly was practicing without a license. Denney Dep. at 142:21–143:14. From this, and based on no other evidence, Dr. Denney speculated that Dr. Reschly lacked integrity and coached Mr. Webster on the TOMM. Tr. 707:13–24; *see also* Denney Dep. at 151:2–15. Such an unsupported attack on the professional integrity of another psychologist strongly suggests that Dr. Denney's opinions are driven by his advocacy of the Government's position, rather than the facts. But his credibility was further damaged when he was asked whether he was properly licensed in Indiana; in

response, Dr. Denney said that he could practice temporarily in Indiana because he was licensed in a different state. Denney Dep. at 143:15–18. When asked if he had checked the Indiana license requirements before testing Mr. Webster, he said yes. Tr. 719:7–10; *see also* Denney Dep. at 143:15–20. Dr. Denney then submitted an errata sheet to his deposition explaining that he had been mistaken and an out-of-state psychologist could not come to Indiana to practice temporarily. *See* Tr. 720:23–25. At the hearing, he tried to explain his mistake by stating that he had confused checking the Indiana rules with checking the Delaware rules. Tr. 717:3–17, 719:21–23.

Yet, Dr. Denney persisted in arguing that Dr. Reschly was not properly licensed. Abandoning his initial argument about state licensing—as the lack of a state license also applies to him—Dr. Denney testified that because Dr. Reschly is a school psychologist, he is practicing in an area outside his training by administering intellectual testing in a prison. Tr. 708:3–9. But, under oath in a different case, *United States v. Jones*, Dr. Denney testified about working at the BOP with school psychologists who conducted intellectual testing in a prison. Tr. 710:3–22.

Dr. Denney's attacks on Dr. Reschly did not reveal anything about Dr. Reschly's qualifications to conduct intellectual testing, as Dr. Reschly is a nationally certified school psychologist and professor emeritus of school psychology at an esteemed institution of higher learning, Vanderbilt. Tr. 114:24–115:9, 122:13–15. These attacks did reveal that Dr. Denney has offered contradictory testimony under other circumstances about the necessary qualifications for conducting intellectual testing, both about state licensing requirements and about whether school psychologists can conduct intellectual testing in a prison setting. Dr. Denney offered this contradictory testimony despite having written an article about state licensing requirements. Tr. 711:5–17.

Second, Dr. Denney offered many reasons why Dr. Reschly's TOMM should be considered invalid, but all of those reasons were based on incorrect information. As discussed above, he first tried to argue that Dr. Reschly was not qualified to administer the tests because he is not licensed in Indiana or because he is a school psychologist. Tr. 709:6–11; *see also* Denney Dep. at 142:21–143:14. However, Dr. Denney is also not licensed in Indiana. Tr. 715:8; *see also* Denney Dep. at 143:15–15. And the Court has seen no reason to believe that school psychologists are not qualified to conduct intelligence testing. Dr. Denney himself worked with school psychologists who administered intelligence tests in a prison setting. Tr. 710:3–22.

At the hearing, Dr. Denney raised a new reason to question Dr. Reschly's TOMM results, a reason not found in Dr. Denney's expert report. Dr. Denney testified that he questioned the validity of Dr. Reschly's TOMM because "he didn't give the whole test. He only gave the first two trials. He didn't give the retention trial, which research shows makes it a more sensitive validity test. He didn't do that. . . ." Tr. 634:2–5. In fact, Dr. Reschly did administer all three trials of the TOMM, including the retention trial. Tr. 703:8–15. Mr. Webster passed all three trials. Tr. 190:15–191:3. Dr. Reschly clearly testified that he had administered all three trials, Tr. 190:22–191:3, and Dr. Denney acknowledged that he had access to the raw data from Dr. Reschly's administration of the TOMM, which shows that the retention trial was administered, Tr. 702:19–703:15.

At the hearing, Dr. Denney also testified that he questioned the validity of the TOMM because it was surprising that Mr. Webster would do well on the TOMM with an IQ so low. Tr. 699:16–21, 704:11–15. But at his deposition and in his expert report, Dr. Denney said nothing about *passing* the TOMM being a red flag. At his deposition, Dr. Denney said that the TOMM is "very, very easy," which is what makes it a good effort test. Denney Dep. 146:18–21; *see also*

Tr. 700:14–18. In addition, Dr. Denney's opinion in this regard was another clear indication that his opinions were driven by his advocacy for the Government's position. According to Dr. Denney, Mr. Webster's failure to achieve a passing score on a TOMM would be strong evidence that he was malingering. But if Mr. Webster had passed the TOMM administered by Dr. Reschly (as he did), a passing score would *also* have been proof of malingering. Such contradictory opinions are simply not credible.

Dr. Denney testified that the TOMM only detects poor effort 50% of the time. Tr. 704:8–10. In fact, according to the unrebutted testimony of Dr. Fabian, the studies show that the sensitivity ranges from around 50% to 90%. Tr. 830:7–17.

Third, Dr. Denney also based his opinion that Mr. Webster was malingering on his performance on the MMPI, a test that creates a personality profile. *See* Tr. 746:21–23. It is also allegedly able to determine whether someone is endorsing symptoms of psychological problems that he is not actually experiencing. Tr. 752:10–23. The basis for believing the person is not experiencing symptoms they endorse is that the symptoms are atypical. Tr. 752:21–23.

Dr. Denney did not consider the truthfulness of Mr. Webster's responses. Some of the items that indicated to Dr. Denney that Mr. Webster was exaggerating his psychological symptoms include answering yes to: "I believe I am being followed"; "I feel I have been punished without cause"; "I believe I am being plotted against"; and "I am sure I am being talked about." Tr. 754:25–757:22. As Dr. Denney acknowledged on cross-examination, as a result of being an inmate on death row, Mr. Webster is followed everywhere he goes—there were several U.S. Marshals present in the courtroom specifically to follow him. Tr. 755:24–756:10. As a child, he was frequently punished without cause. Tr. 757:2–9. The United States government is seeking to have him executed, through legal proceedings that Mr. Webster might think of as a

plot. Tr. 758:2–5. And as a result of the proceedings in this case, a lot of people have spent a lot of time talking about Mr. Webster. Tr. 757:19–22. There is reason to believe that the statements—or at least some of the statements—that Dr. Denney characterized as over-endorsement of rare psychological symptoms are instead accurate statements about the rare and abnormal conditions of Mr. Webster's childhood and current life on federal death row.

Fourth, in his analysis of Mr. Webster's intellectual functioning, Dr. Denney relied heavily on Mr. Webster's adaptive behavior in prison and the facts of the crime. The Court, below, rules that prison behavior and crime facts are inadmissible as evidence regarding ID or that, in any event, they should be given little or no weight. For purposes of further assessing Dr. Denney's credibility, however, the Court points out that in considering the crime facts, Dr. Denney appears not to have considered those facts suggesting Mr. Webster was not functioning at a particularly high level. For example, he appears not to have considered the testimony that Mr. Webster ran into a security guard at the hotel where parts of the crime occurred (where they were holding the victim) and told the security guard the room number and opened the door so he could look into the room. Tr. 768:13–22. He also appears not to have considered the testimony that there was no plan or specific goal when they went to the apartment looking for the men who had robbed them. Tr. 769:18–22.

Fifth, Dr. Denney inaccurately stated the conclusions of some of the research he relied on. In his report he said that, "research demonstrates that IQ scores are typically placed in the range of impairment when IQ tests are feigned and doing so is easy." Tr. 771:10–14. He then cited a specific article in support of this proposition. Tr. 771:15–19. Contrary to Dr. Denney's report, that article actually concludes that, "faking results on the WAIS-R is a difficult endeavor." Tr. 770:21–23. That is, Dr. Denney cited the article to support the view that faking

low results is easy, when in fact the article says that faking low results is difficult. The article reports that some of the psychologists who were instructed to fake a score in the ID range failed to successfully fake a score in the ID range, and that other malingering research found that subjects instructed to fake forgot or otherwise failed to actually fake. *See* Lorraine Johnstone & David J. Cooke, *Feigned Intellectual Deficits on the Wechsler Adult Intelligence Scale-Revised*, British Journal of Clinical Psychology 303, 313–14 (2003) (*hereinafter* Johnstone et al.). When confronted with this disparity, Dr. Denney said, "It says that in that sentence but that's not what that's talking about at that point. . . . Really. It's true," but he never explained what he meant by this. Tr. 771:24–772:2.

This is not the first time that Dr. Denney has misstated the conclusion of the very same article. *See United States v. Roland*, 281 F. Supp. 3d 470, 522 (D.N.J. 2017) ("Equally harmful to Dr. Denney's credibility is the article he cites in support of his assertion that '[i]t is typical for individuals attempting to feign on intelligence tests to place results in the range of mild ID.' That article, however, cautions that it is 'erroneous to assume that such observations are conclusive and we would advocate that other assessment procedures specifically developed for detecting malingering are administered in order to substantiate the results.'" (internal record citations omitted); *accord* Johnstone et al. at 315.

Moreover, the article relied upon by Dr. Denney does not analyze or address whether it is possible to fake similar IQ scores on eight different tests over more than two decades. *See* Johnstone et al. None of the psychologists who testified pointed to any research suggesting this is even possible. Dr. Reschly testified that there is at least an informal consensus that it is not possible. Tr. 173:1–174:3.

Sixth, there were important pieces of information that Dr. Denney did not consider when

forming his opinion in this case. For example, he opined that one reason he believed Mr. Webster was malingering was that psychiatrists who evaluated Mr. Webster at the SE Arkansas Mental Health Center in 1992 did not see signs of substantially low intellectual functioning. Tr. 676:19–24, 678:20–24. At the time he formed this opinion, he had not seen a report from the same clinic on the same day in which two psychologists tested him for his cognitive deficits and produced a report noting he produced a full scale IQ of 48. Tr. 683:16–684:13.

As another example, although he claims that he considered it and simply forgot to write it into his report, Dr. Denney's report did not mention Dr. Rittlemeyer's 1993 *sua sponte* diagnosis of ID, when Mr. Webster was referred to that doctor for sinus problems. Tr. 692:15–19. That record was included among the Social Security records that prompted this hearing. Ex. 21 (Social Security Records) at 43–50.

Dr. Denney did not even consider the possibility that Mr. Webster was in special education, and did not even consider the letter from Watson Chapel Schools as evidence "that he may have been in special education." Tr. 730:18–19. This is despite the fact that many other people—including a majority of judges of the Seventh Circuit—considered this letter strong evidence that Mr. Webster was in special education. And while Dr. Denney said he relied on a teacher's trial testimony as evidence that Mr. Webster was not in special education, Tr. 727:25–728:17, he did not mention that some of that testimony was consistent with Mr. Webster being in special education. For example, Ms. Monk testified at trial that she taught Mr. Webster in her "basic English class." Trial Tr. Vol. 25, 43:12–13. Although she characterized this class as not a special education class, she also testified that several students in the class each year were mildly mentally retarded or borderline and may have received special education services. Trial Tr. Vol. 25, 45:1–8. She explained:

> In my basic class, I did have some students each year who are rated as borderline or mildly retarded, but it's also for students whose reading skills are not on grade level, but all of them who are in there certainly are not mentally retarded. They don't receive special education services. Some of them will receive these services, but all of them don't. It's also a class where many of the students who just simply don't apply themselves end up.

Trial Tr. Vol. 25, 47:11–18. She added, "There are some in there [*i.e.*, her basic class] who are like that [*i.e.*, mentally retarded], yes, sir." Trial Tr. Vol. 25, 47:23–48:1. Ms. Monk explained to Dr. Denney that her basic English class was for high school students reading at a third to fifth grade level. Tr. 736:5–15. Ms. Monk testified at trial that she read stories aloud to her students (not that they read stories on their own): "The second nine weeks is whenever *I read a lot to them*, and we discuss the stories, and most of them find that more interesting." Trial Tr. Vol. 25, 48:23–25 (emphasis added).

Dr. Denney also did not consider the trial testimony that despite taking daily classes for four years while incarcerated in Arkansas, Mr. Webster failed to obtain his GED. Tr. 774:16–775:10; Trial Tr. Vol. 22, 98:12–16, 102:1–3. Given Dr. Denney's focus on secondary gain, this fact is particularly relevant because Mr. Webster had an incentive to get his GED. If Mr. Webster had obtained his GED, he would have received "good time," or a reduction in his prison sentence. Trial Tr. Vol. 22, 98:12–16.

Dr. Denney testified that Mr. Webster must have been faking IQ tests at the time of his trial, but he did not consider and had never read the testimony of Larry Moore that Mr. Webster was never told the purpose of the tests prior to trial, and was surprised and unhappy when he learned immediately prior to trial that Mr. Moore was putting on an ID defense. Tr. 775:11–776:25. Mr. Moore's testimony, along with the fact that Mr. Webster showed good effort on the RDS subtests that were embedded in those IQ tests, eliminate any reasonable basis to assert that Mr. Webster faked those IQ tests.

Seventh, Dr. Denney conducted just three interviews about Mr. Webster's adaptive functioning. Not only did Dr. Denney interview far fewer people than Dr. Reschly in the first place, he also did not seek out additional people to interview when he realized that the few people he did speak to gave inconsistent responses. Instead, Dr. Denney relied on some of the information but not all of it, explaining, "I don't give it [Ms. Drewett's ABAS score] a lot of weight. I think she rated him probably too low. I give more weight to her general recollections of him, particularly in comparison to other students she's taught over the years." Tr. 610:20–24. He weighed her general recollections heavily despite the fact that even at the time of trial Ms. Drewett testified that, "I don't remember specifics" about Mr. Webster. Trial Tr. Vol. 25, 36:19–20.

Eighth—unlike Dr. Fabian, who offered a nuanced discussion of the importance *and* limitations of effort testing—Dr. Denney does not appear to have considered possible explanations for Mr. Webster's results on effort tests other than intentional malingering. Beyond the fact that he ignored the limitations of effort tests that Dr. Fabian and the AAIDD describe, Dr. Denney's explanation for why he was convinced that Mr. Webster was putting forth poor effort do not withstand scrutiny. He did not focus on the fact that Mr. Webster's WMT scores were not below chance. Tr. 558:19–20. He focused instead on "order violations," or performing better on hard questions than easy questions. Tr. 560:17–22. He did not allow for the possibility that there was an explanation for the order violations other than malingering, such as variable effort caused by loss of focus or exhaustion or taking the tests under the stress of prison conditions. *See, e.g.*, Tr. 462:18–25, 798:1–24, 800:10–15 (Dr. Fabian testifying about possible explanations for variable effort).

In his report, Dr. Denney concludes that Mr. Webster's Full Scale IQ of 48 obtained on

the test administered by Dr. Caffey was likely feigned. Ex. 101 (Denney Report) at 18. Dr. Denney reached the conclusion that Mr. Webster feigned a 48 IQ without seeing Dr. Caffey's report. Tr. 672:9–15. Dr. Denney's conclusion ignores Dr. Caffey's statements that Mr. Webster was "possibly psychotic" and that the score might be suppressed because Mr. Webster was presenting with psychosis. Tr. 672:12–675:14. No one testified that the score of 48 was an accurate measure of Mr. Webster's abilities and the defense has never suggested it was accurate. *See* Tr. 836:19–837:11. Even at the time of trial "Webster's own experts agreed that he had been under severe stress at the time that test was administered and so the score was unreliable." *Webster*, 784 F.3d at 1142. Yet, Dr. Denney concluded that the score of 48 resulted from malingering without ever having seen the report that generated that report or the raw data from the testing.

Dr. Denney's failure to "rule[] out alternatives or . . . consider[] any explanations other than . . . effort or malingering" is a concern other courts have raised. *Roland*, 281 F. Supp. 3d at 522; *see also United States v. Wilson*, 170 F. Supp. 3d 347, 385 (E.D.N.Y. 2016) ("Dr. Denney's explanations for Wilson's deficits were at times incoherent."). In *Roland*, for example, the court noted that:

> Roland passed twelve effort tests, including standalone and embedded measures" and concluded, "[e]specially disturbing is Dr. Denney's catch-22 explanation that had Roland failed these validity measures, you can 'take that to the bank,' but the fact that he passed requires the Government to 'question the rest of the test data.' . . . Dr. Denney's decision to ignore Roland's performance on these tests indicates a resistance to recognize Roland's cognitive deficits, which undermines these experts' credibility.

*Roland*, 281 F. Supp. 3d at 515–16 (internal record citations omitted). Dr. Denney's testimony here that Mr. Webster's failing *and passing* scores on effort tests both indicated malingering is exactly the kind of "damned if you do, damned if you don't" opinion for which the *Roland* court

sharply criticized Dr. Denney.

Finally, Dr. Denney's testimony that the deviation of the IQ scores on the various tests demonstrated malingering was also not credible, because the various WAIS scores were actually quite close (*i.e.*, 59, 59, 61, and 65), and it was undisputed that there is variability between different kinds of IQ tests. *See, e.g.*, Tr. 811:15–23. Dr. Denney's testimony that Mr. Webster—a person who failed first grade and was in a third to fifth grade reading class in his late teen years, who was never told the purpose of IQ testing at least through the time of trial and was never told how the IQ tests were scored—could have faked eight IQ scores while passing numerous effort tests over a period of twenty-seven years is not credible. This testimony is particularly not credible in light of the fact that Dr. Denney's support for his conclusion that faking an IQ in the ID range is easy actually reveals that *psychology doctoral students and research fellows (who presumably knew how the tests were scored)*—not laypeople—asked to fake an IQ in the ID range *once*—not eight times over twenty-six years—failed to fake an IQ in the ID range. *See* Johnstone et al. at 313 ("It is notable that some of the participants included in this study faked IQ scores that were above 70 . . . two psychologists [out of fifteen] failed to lower their IQ scores sufficiently[.]").

Dr. Denney's point that clinical judgment is important in assessing whether someone is ID was shared by all of the experts who testified. But the Court has been presented with overwhelming evidence that Dr. Denney's clinical judgment is not trustworthy.[3] Therefore, the

---

[3] It is also not logical. The Court observes that Dr. Denney's argument that Mr. Webster was faking low IQ scores because his scores contradicted his presentation during the clinical interview does not make sense. Dr. Denney offered no explanation as to how or why Mr. Webster could have been so skilled and motivated to successfully fake multiple IQ and effort tests over almost three decades, yet inexplicably act, according to Dr. Denney, like a "normal person" in his clinical interview with Dr. Denney—whom he knew (again according to Dr. Denney) was retained by the Government to assess his intellectual functioning. This illogical conclusion also applies to Mr. Webster's scores on the ABLE. If Mr. Webster set out to fake ID, and was committed to this project for at least twenty-seven

Court must rely on the clinical judgment of more credible experts. Moreover, while acknowledging that clinical judgement is important, the Court is concerned that Dr. Denney may be overestimating the role that clinical judgment should play, given that clinical judgment can be somewhat subjective. Dr. Denney testified that, merely by talking to someone, he is capable of determining whether they are of above average, average, or substantially below average intelligence, and that when estimating someone's intelligence, he has never been wrong. Tr. 671:9–672:4. This assertion was disputed by the other psychologists who testified. Dr. Fabian, in particular, pointed out that as a psychologist he can often estimate someone's intelligence by talking to them, but that he is wrong sometimes. Tr. 803:13–804:1. He said he was taught his first year out of graduate school that you have to administer tests prior to offering an opinion about someone's level of intellectual functioning. Tr. 804:2–6. Without the data, "[y]ou cannot go to court to say that because you have no data to prove yourself." Tr. 804:6–10.

### 6. Erin Conner

#### a. Summary of Testimony

The Government called Dr. Erin Conner, a clinical psychologist employed as the restrictive housing unit psychologist at USP Terre Haute. Tr. 848:16–849:5. She conducts rounds to check in with inmates in the Special Confinement Unit (SCU or death row) and provides therapy to inmates who request it. Tr. 848:16–849:10, 850:1–8.

Dr. Conner initially testified that she had spent approximately seven to eight hours talking with Mr. Webster, comprised mostly of a series of conversations lasting about ten minutes each. Tr. 857:3–11, 860:6–13, 918: 17–22. But she later acknowledged that she did not

---

years, it stands to reason that he would have faked a low score on the ABLE as well as IQ tests. Dr. Denney made no attempt to explain this obvious inconsistency in his opinions.

specifically recall the majority of these interactions, and that for approximately nineteen of the thirty or so conversations she estimated to be about ten minutes long, the documentation of those conversations was consistent with a conversation that she testified was closer to thirty seconds long. Tr. 918:17–919:14.

Dr. Conner testified about her general impressions of Mr. Webster: that he is well put together, neat, and hygienic; that, as far as she could tell, he was attuned to developments in his case; that he seemed aware of current events; that he seemed able to remember things they had discussed; that he seemed able to appropriately manage his emotions; that he is polite; and that he can play the guitar. Tr. 882:18–23, 885:2–886:6, 870:6–871–873:22, 874:15–24, 877:24–878:8, 882:21–23.

Dr. Conner acknowledged that she could not make a diagnosis of ID just by talking to someone. Tr. 894:19–25. While in school, Dr. Conner received some basic training regarding ID. She admitted that when she was deposed she was not able to list the diagnostic criteria for ID or the three domains of adaptive functioning, and she looked them up since her deposition in preparation for her testimony. Tr. 892:1–22, 893:11–20. Despite having recently looked up the criteria, she was unable to name all three domains of adaptive functioning. Tr. 893:11–14. She is not familiar with the American Association on Intellectual and Developmental Disabilities. Tr. 893:3–5. Dr. Conner has not completed any coursework in how to assess an individual's adaptive functioning, and has never performed a formal assessment of adaptive functioning. Tr. 891:19–21, 911:23–912:5.

Despite the fact that all of the psychologist expert witnesses in this case acknowledged that Mr. Webster has ASPD, Dr. Conner testified that she has not observed Mr. Webster exhibiting any symptoms of ASPD. Tr. 905:6–17.

Dr. Conner testified that she believes if Mr. Webster had adaptive deficits, she would have "observed things that would have kind of raised a red flag that would need additional assessment." Tr. 911:16–18. Dr. Conner testified that "from what I can tell, everything seems to be in the normal range," *i.e.*, that Mr. Webster is in the normal range of intellectual ability. Tr. 885:15–20. Dr. Conner acknowledged that, in the case of another inmate later diagnosed as ID, she did not identify any signs of ID. Tr. 913:2–19, 918:4–14.[4]

### b.    Assessment of Dr. Conner's Testimony

The Court finds that Dr. Conner's testimony does not meaningfully contribute to answering the question whether Mr. Webster is ID. Dr. Conner is not well informed about ID and has not had substantial interactions with Mr. Webster.

Dr. Conner is not well-informed about ID. She had to familiarize herself with the diagnostic criteria in preparation for her testimony at the hearing because she was unable to list the diagnostic criteria at her deposition. Tr. 893:15–20. Despite this preparation, Dr. Conner was unable to list all three domains of adaptive functioning at the hearing. Tr. 893:11–14. She is not trained in formal assessments of adaptive functioning. Tr. 912:2–13.

Nor has Dr. Conner had substantial interactions with Mr. Webster. Dr. Conner's interactions with Mr. Webster were almost always brief and perfunctory. During the two longer interactions, they discussed basic topics like Mr. Webster's family. Tr. 856:12–16, 866:10–11, 866:17–25. She has not conducted any intellectual testing on Mr. Webster. Tr. 883:11–12.

Dr. Conner's observations about Mr. Webster do not show that he is not ID. The fact that

---

[4]    The Court conditionally admitted Dr. Conner's testimony regarding her evaluation of another inmate during the hearing. For the reasons set forth in Section II.C.5, the Court finds that this testimony is admissible and, in any event, is already a matter of public record because the Wilson court discussed it. *See Wilson*, 170 F. Supp. 3d at 379.

Mr. Webster is capable of keeping himself clean, commenting about current events, making polite small talk, appearing to appropriately manage his emotions, playing guitar, or appearing to keep up with legal developments that may determine whether he lives or dies does not show that he is of average intellect. Tr. 882:18–23, 885:2–886:6, 870:6–871–873:22, 874:15–24, 877:24–878:8, 882:21–23. Additionally, his ability to do these things in a controlled and structured environment—in which Mr. Webster spends twenty-three hours a day in a cell with limited possessions such as clothes, a guitar, and a television, and therefore ample time and motivation to keep up with legal developments, learn to play guitar, and keep himself and his confines clean—does not show that he is of average intellect. Dr. Tassé's testimony and the authoritative sources he relied on, the DSM-5 and AAIDD-11, establish that someone with ID could be capable of doing all these things, especially in a structured setting like a prison. *See* Tr. 46:9–15, 47:13–21.

Dr. Conner has not done a meaningful assessment of Mr. Webster's psychological status. Although Dr. Conner claimed that she would notice a red flag that might indicate adaptive deficits, Dr. Conner failed to notice anything that would suggest to her that Mr. Webster has ASPD—a diagnosis that nearly every psychologist who has examined Mr. Webster agrees upon. Without making a general comment on the quality of psychological care at USP Terre Haute, the Court concludes that, given Dr. Conner's lack of training or education in diagnosing ID, her very limited and abbreviated interactions with Mr. Webster, her failure to notice symptoms of ASPD, and the general and well-accepted concern about the use of prison conduct to assess adaptive functioning, no weight should be given to her failure to notice that Mr. Webster had adaptive deficits.

### 7. Jacqueline Blessinger

#### a. Summary of Testimony

The United States sought to introduce the deposition of Dr. Jacqueline Blessinger.[5] For the reasons discussed below, the Court concludes that this testimony is not admissible. Nevertheless, the Court will summarize her deposition testimony.

Dr. Blessinger is a psychologist who holds a doctorate and master's in clinical psychology, a master's in school psychology, and at one point was licensed as a school psychologist nationally and by New York state. Blessinger Dep. at 10:22–11:4. As part of her master's program in school psychology, Dr. Blessinger completed coursework involving intellectual disability, including how to administer assessments. *Id.* at 21:21–22:3. She also took courses in intellectual assessment as part of her doctoral program. *Id.* at 33:10–34:9. She has administered intellectual testing. *Id.* at 28:13–22, 41:18–22.

As of the time of her deposition, Dr. Blessinger worked as a staff psychologist at the Bureau of Prisons ("BOP"), a position she held starting in January 2017. *Id.* at 45:25–46:2. Starting February 2018, in addition to her general population caseload, she became the lead psychologist for the SCU and Communications Management Unit ("CMU"). *Id.* at 46:15–19. Shortly after her deposition on March 11, 2019, she left the BOP to work for the DOD. *Id.* at 46:20–25.

Dr. Blessinger spends an average of two hours per week in the SCU, and spends additional time "occupied by things going on but am not physically in the unit." *Id.* at 53:19–

---

[5]  The Government filed a motion to admit the testimony of Dr. Blessinger, attaching Dr. Blessinger's deposition transcript. *See* Dkt. 166; 166-1. Mr. Webster opposed the admission of Dr. Blessinger's testimony. *See* Dkt. 170. The transcript of Dr. Blessinger's testimony is referred to herein as "Blessinger Dep."

54:3. She has not had very many interactions with Mr. Webster. *Id.* at 65:11–66:13, 72:15–73:21, 85:10–86:25, 90:10–12. In total, Dr. Blessinger spoke with Mr. Webster six times—in April 2018, June 2018, July 2018, November 2018, December 2018, and January 2019. *Id.* at 65:11–66:13, 72:15–73:21, 85:10–90:9, 92:4–11.

Some of her interactions with Mr. Webster were as short as 45 seconds to a minute. *Id.* at 73:14–74:3. A couple of their interactions may have been longer than ten minutes—Dr. Blessinger characterized two of their conversations as "long" but did not specify how long these two conversations lasted. *Id.* at 78:1–79:4, 81:3–82:18, 92:23–93:7. Their conversations were "just typically about, you know, the weather, you know, sort of superficial conversations." *Id.* at 87:19–25. In total, she has probably spoken with him for under an hour (she was only able to give a vague estimate). *Id.* at 92:23–93:7.

Dr. Blessinger testified that there was nothing obvious to suggest to her that Mr. Webster was ID, and, as to whether there would be anything obvious based on their interactions, "Based off of one 45-second interaction, is there anything obvious? No. Over a period of time, even brief, non-brief interactions, there would be certain things to suggest that perhaps something cognitively was going on and there never was." *Id.* at 105:2–12.

Asked for examples of Mr. Webster speaking "in a cerebral manner" or "engag[ing] in higher level thinking," Dr. Blessinger pointed to Mr. Webster's ability to express frustration, and surmised that playing the guitar required above average intellectual ability because she has above average intellectual ability and cannot play an instrument. *Id.* at 106:2–107:5. She later clarified:

> I don't know if I would say it quite as above average intellectual ability but it is something—one of many aspects to consider in terms of whether cognitive abilities are compromised and that his ability to play suggests perhaps one aspect of that being that he does not have global intellectual cognitive deficits."

*Id.* at 121:18–23.

Dr. Blessinger made a number of statements about her ability to estimate someone's intellectual ability based on the sort of limited interactions she had with Mr. Webster. When interviewed by the FBI, she said that *Mr. Webster had average to above average intellectual ability. Id.* at 109:8–12. At her deposition she testified that she would not be able to quantify Mr. Webster's intellectual ability without formal testing, *would not be able to say anything about what his intellectual ability is based on her observations*, and would not be able express any opinion as to whether he is intellectually disabled without formal testing. *Id.* at 109:8–110:12. She testified that that if she interacted with any individual in the SCU for approximately an hour over the course of several months, *she would be able to determine whether that person needed intellectual testing. Id.* at 120:18–25. She estimated that three to five interactions of about ten minutes each would be enough to pick up on indicators of intellectual disability. *Id.* at 13:22–14:11. She testified that she "*wouldn't say that, you know, you can look at someone and through a conversation you can say, Well, their IQ score is about . . . , but there are certain indicators that might suggest an individual has some cognitive difficulties.*" *Id.* at 12:11–22 (emphasis added) (alteration in original). She also testified that "*there's not a one-size-fits-all* for mild" intellectual disability and acknowledged that some people's social skills might be affected more than others. *Id.* at 15:4–10 (emphasis added).

### b.      Assessment of Dr. Blessinger's Testimony

The Court finds that Dr. Blessinger's testimony, even if it were admissible, does not meaningfully contribute to answering the question whether Mr. Webster is ID. Dr. Blessinger made contradictory claims about whether she could assess Mr. Webster's intellectual functioning based on her limited interactions with him. To the FBI she said that *Mr. Webster had average to above average intellectual ability*. Blessinger Dep. at 109:8–12. But at her deposition she testified that she *would not be able to say anything about what his intellectual ability is based on*

*her observations*. *Id.* at 109:8–16. She said that she would know by interacting with someone for a total of an hour whether they needed intellectual testing, *id.* at 120:18–25; but she also testified, contradictorily, that you cannot estimate someone's IQ by talking to them, *id.* at 12:11–22.

Contradictory testimony about ID aside, the main reason why Dr. Blessinger's testimony is not useful to the Court—in addition to the fact that evidence of adaptive deficits or strengths in a prison environment is entitled to little or no weight—is that she interacted very little with Mr. Webster. She herself acknowledged that she could not make a diagnosis without testing, and her limited observations of Mr. Webster's behavior do not reveal any more than his ability to carry on a brief conversation, appear to manage his emotions appropriately over the course of a ten-minute conversation, and play guitar. There is ample evidence in the record that Mr. Webster can converse and play guitar, and ample evidence that these skills are not inconsistent with ID. Even if this Court did not need to be cautious about relying on adaptive functioning in prison (which of course it does), Dr. Blessinger's testimony simply does not add information about Mr. Webster's adaptive functioning that aids this Court in determining whether Mr. Webster has ID.

### 8. Charles Spellman

#### a. Summary of Testimony

The United States also sought to introduce the deposition of Dr. Charles Spellman.[6] For the reasons discussed below, the Court concludes that this testimony is not admissible. Nevertheless, the Court will summarize his deposition testimony. Dr. Spellman is a psychologist who conducts evaluations for the Social Security Administration. Spellman Dep. at 21:20–22:8.

---

[6] The parties stipulated that Dr. Spellman was unavailable to testify, *see* Dkt. 164, and submitted his deposition transcript and a video of his deposition subject to Mr. Webster's objections regarding admissibility. *See* Dkt. 171. The transcript of Dr. Spellman's deposition is referred to herein as "Spellman Dep."

Dr. Spellman testified that when he conducts an IQ test for Social Security determinations, he uses the Wechsler Adult Intelligence test for anyone over 16. *Id.* at 30:21–31:4. He does not conduct collateral interviews, but does look at any collateral information available to him. *Id.* at 29:6–18. He generally uses the same assessment methods in Social Security referrals and private practice. *Id.* at 32:2–6. He does not give a malingering test, but he does watch out for malingering. *Id.* at 29:23–30:3. When he met with Mr. Webster, there was no evidence of malingering, per his report. *Id.* at 55:1–10.

He evaluated Mr. Webster in 1993 in connection with Mr. Webster's application for SSA disability due to his sinus condition—27 years ago. *Id.* at 100:14–16, 103:7–104:11. That was his last interaction with Mr. Webster. *Id.* at 33:9–12. He had no independent recollection of Mr. Webster, even when he reviewed his report. *Id.* at 33:6–8, 74:10–15. He acknowledged that Mr. Webster was referred to him for a mental status evaluation. *Id.* at 35:12. He testified that more often than not, when people were referred to him for a mental status evaluation, he did not make a mental retardation diagnosis. *Id.* at 36:9–12.

Dr. Spellman estimated Mr. Webster's IQ to be 69 or less because he believed, based on his clinical observation, that Mr. Webster was mentally retarded. *Id.* at 50:1–8. He did not perform an IQ test. *Id.* at 50:5–8, 51:7–8. He also diagnosed Mr. Webster with ASPD, based on his criminal history as reflected earlier in the report and the interview. *Id.* at 53:19–54:14.

When presented with hypothetical behaviors that the United States attributed to Mr. Webster, Dr. Spellman opined that these behaviors were inconsistent with mental retardation. It is noteworthy that the hypotheticals presented to Dr. Spellman were not completely truthful as relates to Mr. Webster. For example, the Government asked him if it would be consistent with mental retardation for a person to fly on his own to another location. *Id.* at 59:13–14, 141:4–17.

Missing from this hypothetical is critical information that the plane ticket was purchased for Mr. Webster because the person purchasing it did not believe Mr. Webster was capable of purchasing it for himself. Trial Tr. Vol. 20, 141:16–18. Moreover, that person brought Mr. Webster to the airport in Little Rock and someone else met him in Dallas. Trial Tr. Vol. 19, 42:17–21. Additionally, Dr. Spellman opined that the ability to communicate and read at a high level were inconsistent with mental retardation, although Dr. Spellman did not have information about whether Mr. Webster could communicate or read at a high level. Spellman Dep. at 68:11–15, 143:1–144:8. Dr. Spellman agreed that his diagnosis of Mr. Webster was limited by the amount of information he had about Mr. Webster and the amount of time he spent with Mr. Webster. *Id.* at 68:22–25.

When shown other documents containing evidence of Mr. Webster's intellectual functioning, he agreed that there was significant information he would like to have if making a prognostication about Mr. Webster's intellectual functioning. *Id.* at 114:5–10. In particular, he would have liked to see the IQ test performed by Dr. Hackett about a month and a half prior to Dr. Spellman's evaluation. *Id.* at 118:14–122:13. In asking him to offer a current opinion about Mr. Webster's intellectual functioning, the United States did not show him the IQ results obtained by Dr. Hackett. *Id.* at 121:23–122:6. The United States also did not tell him that Mr. Webster had been evaluated recently, even though Dr. Spellman encouraged them to have Mr. Webster evaluated again and specifically inquired as to whether there was current test data. *Id.* at 123:22–126:7, 129:2–8. Seeing the recent WAIS testing would have been helpful for determining Mr. Webster's current functioning. *Id.* at 129:2–5.

At the end of his deposition, Dr. Spellman indicated that he needed to digest all the new information he had been given—including information the United States had in its possession

but did not give to Dr. Spellman, despite Dr. Spellman specifically asking for some of this information, and despite the United States seeking to have Dr. Spellman testify as an expert witness in this case. *Id.* at 145:21–25.

### b. Assessment of Dr. Spellman's Testimony

The Court finds that Dr. Spellman's testimony, even if it were admissible, does not meaningfully contribute to answering the question whether Mr. Webster is ID. Dr. Spellman's evaluation of Mr. Webster in 1993 is before the Court. Dr. Spellman does not presently recall Mr. Webster or his evaluation of Mr. Webster. The best evidence of Dr. Spellman's 1993 evaluation is the documentation introduced as an exhibit. Because the United States did not provide Dr. Spellman with additional information beyond what he had when he initially evaluated Mr. Webster, Dr. Spellman was not able to expand on his initial evaluation—and of course it is not surprising that the consequence of providing no additional information to Dr. Spellman is that that Dr. Spellman could provide no additional information to the parties or this Court.

### 9. John S. Edwards, III

### a. Summary of Testimony

The United States called John S. Edwards, III, who previously served as one of Mr. Webster's correctional counselors at the SCU at USP Terre Haute. For the reasons discussed below, the Court concludes that this testimony is not admissible. Nevertheless, the Court will summarize his deposition testimony.

In his eight or nine years at the SCU, Mr. Edwards interacted with Mr. Webster daily in conversations lasting five to ten minutes. Tr. 943:11–22. In these five-to-ten minute conversations, they discussed the goings-on at the SCU, sports, religion, and politics. Tr. 927:9–14. Mr. Edwards sometimes observed Mr. Webster reading the newspaper, but could not say

whether he was reading news, the weather, sports, or cartoons. Tr. 942:9–943:8. Mr. Edwards described Mr. Webster's position as an orderly. While serving as an orderly, Mr. Webster was tasked with cleaning the SCU and delivering food trays. Tr. 938:8–13. Mr. Edwards described Mr. Webster as being very good at these tasks. Tr. 938:8–9.

### b. Assessment of Mr. Edwards's Testimony

The Court finds that Mr. Edwards's testimony, even if it were admissible, does not meaningfully contribute to answering the question whether Mr. Webster is ID. Mr. Edwards's testimony that Mr. Webster could carry on perfunctory conversations about sports and politics, that Mr. Webster appeared able to read some sections of the newspaper, and that Mr. Webster held a position as an orderly do not indicate one way or the other whether Mr. Webster is ID. Dr. Tassé's testimony and the authoritative sources he relied on, the DSM-5 and AAIDD-11, establish that someone with ID is capable of doing all these things, especially in a structured setting like a prison.

### 10. Phil Woolston

### a. Summary of Testimony

The United States called Phil Woolston in an attempt to lay a foundation for the admission of BOP educational records. Mr. Woolston is the supervisor of education at USP Terre Haute. Tr. 954:1–6. He started working at Terre Haute in 2014 as the assistant supervisor of education and was eventually promoted to supervisor. Tr. 954:1–4, 955:5–9. From 2005 to 2007 he was a teacher at the Federal Correctional Institution in Williamsburg, SC, and from 2007 until moving to USP Terre Haute, he was a teacher at the Federal Correctional Complex in Florence, Colorado. Tr. 954:21–955:7.

He cannot recall ever having any personal interaction with Mr. Webster, except when Mr. Webster introduced himself to Mr. Woolston about a week before the hearing. Tr. 955:23–956:3.

This brief introduction is the "first and only interaction [Woolston] can specifically remember." Tr. 955:2–3.

He testified that, pursuant to the current record-keeping system, teachers enter data into the BOP's database system (Sentry) to track students' progress. Tr. 961:14–24. He also testified about the meaning of certain educational records, including Exhibit 171, Bates page 2465, "Inmate Education Data Transcript," which contains results from the ABLE test. Tr. 970:6–8, 974:2–977:17.

Although Mr. Woolston has personal knowledge of USP Terre Haute's test administration, course administration, and record keeping practices since his arrival at USP Terre Haute in 2014, Mr. Woolston's understanding of test administration, course administration, and record keeping practices prior to 2014 is based on what someone else told him. Tr. 983:2–6, 985:20–986:4. Mr. Woolston does not have personal knowledge of how tests or educational courses were administered at Terre Haute prior to his arrival in 2014. Tr. 982:10–22, 983:7–15, 985:20–24. Mr. Woolston does not have personal knowledge of the record-keeping procedures at USP Terre Haute prior to his arrival in 2014. Tr. 983:2–6. Mr. Woolston did not administer any tests to Mr. Webster, and has no personal knowledge of how any tests or GED materials were administered. Tr. 982:1–3, 982:17–24, 985:8–11. The available evidence indicates that some tests and course materials are provided to prisoners in their cells and returned on the honor system. Tr. 957:5–10, 960:23–961:1, 983:16–20. Based on the available evidence here, there is no way to know who completed materials attributed to Mr. Webster. The available evidence also indicates that the ABLE is administered in a group setting. Tr. 984:11–14.

### b.     Assessment of Mr. Woolston's Testimony

Mr. Woolston's testimony is insufficient to lay a foundation for the BOP education records, and his testimony does not otherwise contribute to answering the question whether Mr.

Webster is ID. Mr. Woolston does not recall any personal interactions with Mr. Webster, save for Mr. Webster recently introducing himself to Mr. Woolston.

### D. Bruce Webster's Intellectual and Adaptive Functioning

Certain key facts particularly relevant to Mr. Webster's intellectual functioning stood out at the hearing. First, Mr. Webster has taken several IQ tests and consistently obtained scores in the mild ID range. His pattern of scores on the WAIS tests is remarkably consistent. Setting aside the score of 48 that Mr. Webster obtained when he was demonstrating symptoms of psychosis and the score of 72 he obtained when Dr. Parker failed to follow the proper testing procedures, he obtained scores of 59, 59, 61, and 65. His scores on other intelligence tests, such as the Stanford-Binet, are also consistent with this pattern of scores. This pattern of consistent scores is particularly notable because Mr. Webster took these tests over a period of twenty-seven years.

Second, Mr. Webster has passed a number—indeed, the vast majority—of effort tests administered to him, including RDS tests embedded in the WAIS tests and the TOMM. He has also taken some effort tests that may have demonstrated variable effort, notably the Green tests that Drs. Denney and Fabian administered. But Dr. Fabian explained that the main concern about these tests is false positives in low IQ populations, and that even if they did correctly detect variable effort, there are many reasons why Mr. Webster may have demonstrated variable effort. Dr. Fabian opined that Mr. Webster was not malingering, and that the IQ test results from days when Mr. Webster did pass effort tests were valid. On one such day, when Dr. Reschly administered the TOMM and Stanford-Binet, Mr. Webster passed the TOMM with flying colors and obtained an IQ score in the ID range.

Third, there is no evidence that Mr. Webster knew that the tests administered by the SSA were IQ tests, or, since he was applying for disability benefits based on a sinus condition, why they were being administered. Mr. Webster's trial counsel, Mr. Moore, testified that he did not

tell Mr. Webster the purpose of the pre-trial IQ tests, and just told Mr. Webster to do his best. This credible testimony undercuts the argument that Mr. Webster had motivation to do poorly on the pre-trial IQ tests. Mr. Moore also testified about some of the intellectual and adaptive deficits that he observed while representing Mr. Webster.

Fourth, there is no evidence that Mr. Webster was ever told or had any understanding as to how IQ tests were scored or what score he had to achieve in order to be considered ID. No explanation was offered by the Government as to how a person could successfully fake an IQ test without knowing which questions, and how many, to fake, or what would be the ultimate desired score. There was also no evidence that any person—even a highly trained psychologist let alone an impoverished victim of child abuse who failed the first grade and was in special education— could successfully fake multiple IQ tests *and* effort tests over a long period of time, here, almost three decades. And there was credible—and logical—testimony that this was not possible.

As for adapative functioning, the Social Security records that are the subject of the instant Section 2241 petition and hearing are significant. These records show that prior to the crime, Mr. Webster had already been diagnosed as ID by doctors from the SSA. They provide evidence of his adaptive functioning, and reflect poor writing, concrete thinking, and an inability to carry out many tasks of independent living such as shopping and cooking. There is no evidence that Mr. Webster even knew what the SSA's tests were for (since he was presenting with a sinus condition), much less how to answer questions in a way that would lead to a finding that he was ID.

These records also include a letter that, at minimum, strongly suggests that Mr. Webster was in special education. The Government's suggestion that this letter is likely referring to records stating that Mr. Webster was *not* in special education is not supported, logical or

credible, and ignores other evidence that Mr. Webster *was* in special education. Dr. Reschly, an expert in school psychology, convincingly and logically testified that "special education records" usually refer to records of students who were in special education, and there was ample corroborating evidence (Mr. Webster's failure of first grade, classes in a separate building, assignment to a third to fifth grade reading class when he was in ninth grade) to support that testimony. The Government offered no explanation as to why the Watson Chapel School District would notify Mr. Webster's parents of the destruction of records of Mr. Webster's non-involvement with special education. And, contrary to the Government's view, the Seventh Circuit described the letter as "an intriguing letter that strongly suggested that Webster in fact had been in special education classes" and "evidence that contradicted everyone's assumption at the trial that Webster had been lying when he said that he was in special education classes." *Webster*, 784 F.3d at 1133–34, 1142.

The overwhelming evidence shows that Mr. Webster had deficits in all three domains of adaptive functioning, although a diagnosis of ID requires a showing of deficits in just one domain. In addition to the SSA records, Dr. Reschly's interviews and tests, the tests administered by Dr. Fabian, the testimony of trial witnesses and the other evidence set forth above clearly demonstrate that Mr. Webster had significant adaptive deficits. The Government's evidence, which largely focused on certain strengths not inconsistent with ID and, improperly, prison behavior, failed to undermine Mr. Webster's showing of adapative deficits.

Finally, the evidence clearly shows that the onset of Mr. Webster's deficits in intellectual and adaptive functioning occurred before the age of 18, satisfying the third prong of ID.

The totality of the evidence in this case clearly demonstrates that Mr. Webster is intellectually disabled. While not every single fact points to the same conclusion, the Court

acknowledges Dr. Fabian's point that there are no ID cases where 100% of the evidence points the same way, and that it is important to consider the totality of the evidence. The overwhelming evidence in this case establishes that Mr. Webster is ID.

## II. Conclusions of Law

### A. Legal Framework for Assessing ID

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held intellectually disabled persons are ineligible for the death penalty. In *Hall v. Florida,* 572 U.S. 701 (2014), *Moore v. Texas*, 137 S. Ct. 1039 (2017) (*Moore I*), and, most recently, *Moore v. Texas*, 139 S. Ct. 666, 2019 U.S. LEXIS 821 (Feb. 19, 2019) (*Moore II*), the Court reaffirmed "that the Constitution 'restrict[s] . . . the State's power to take the life of' *any* intellectually disabled individual." *Moore I*, 137 S. Ct. at 1048 (alterations and emphasis in original) (quoting *Atkins*, 536 U.S. at 321). The Supreme Court has established rules about how to assess claims of intellectual disability, emphasizing that current clinical standards control.

In line with the testimony of the expert witnesses in this case, the Supreme Court has held that "[t]o make a finding of intellectual disability, a court must see: (1) deficits in intellectual functioning—primarily a test-related criterion; (2) adaptive deficits, 'assessed using both clinical evaluation and individualized . . . measures,'; and (3) the onset of these deficits while the defendant was still a minor[.]" *Moore II*, 139 S. Ct. at 668 (quoting DSM-5 at 37; citing DSM-5 at 37–38); *Moore I*, 137 S. Ct. at 1045; *Hall*, 572 U.S. at 710. The Supreme Court has repeatedly held that the required standards are "the most recent (and still current) versions of the leading diagnostic manuals—the DSM-5 and AAIDD-11." *Moore I*, 137 S. Ct. at 1048; *see also Moore II*, 139 S. Ct. at 668.

### B. Prong 1 – Intellectual Functioning

Intellectual functioning is typically measured with individually administered,

comprehensive tests of intelligence. Tr. 42:9-18. The WAIS is "the standard instrument in the United States for assessing intellectual functioning." *Atkins*, 536 U.S. at 309 n.5.

The best evidence of an individual's IQ is scores that are consistent over time and across different individually administered comprehensive tests. Federal courts have recognized that "consistent scores across multiple tests over multiple years ruled out malingering" and presented an accurate picture of an individual's intellectual functioning. *Brumfield v. Cain*, 808 F.3d 1041, 1060 (5th Cir. 2015); *see also Hall*, 572 U.S. at 742 (Alito, J., dissenting) ("[T]he well-accepted view is that multiple consistent scores establish a much higher degree of confidence."); *Roland*, 281 F. Supp. 3d at 525 ("Courts have also recognized that consistency among intelligence testing, together with other consistent evidence, can be a compelling argument against the possibility of malingering."); *Allen v. Wilson*, No. 1:01-cv-1658-JDT-TAB, 2012 U.S. Dist. LEXIS 92028, at *20 (S.D. Ind. July 3, 2012) ("[T]here aren't any real tests for malingering in mental retardation, so [an expert] looks for consistency in the testing over a long period of time."); *United States v. Shields*, No, 04-20254, 2009 U.S. Dist. LEXIS 130612, at *41 (W.D. Tenn. May 11, 2009) ("In light of Defendant's consistency on administrations of the Wechsler, however, it is simply not plausible that Defendant's Wechsler scores are artificially low as a result of poor effort, malingering for 'secondary gain,' or any other influence not actually attributable to mental retardation.").[7] The Seventh Circuit recognized this reality in this very

---

[7] *Shields* provides a detailed discussion of this evidence against malingering, including that Shields received consistent scores on an IQ test administered when he applied for Social Security benefits and an IQ test administered in support of his *Atkins* claim, and Shields put forth good effort on the Test of Memory Malingering. The court explained:

> Ultimately, Defendant's results have been generally consistent. Dr. Cunningham credibly testified that, even as an expert in psychological testing, he questioned whether he could himself take these IQ tests and purposefully generate full scale scores clustered as consistently around 70 as did Defendant. Thus, this consistency not only leads to the conclusion

case. *See Webster*, 784 F.3d at 1142 ("Although other tests were performed (two by Dr. Finn, showing full-scale I.Q.'s of 59 and 65, and an incomplete one by Dr. Parker, showing a full-scale I.Q. of 72), the government argued strongly that Webster was motivated to underperform on the later tests because of the risk of the death penalty. The tests and estimates from the Social Security Administration records, however, were immune from that argument about manipulation.").

### C.      Prong 2 – Adaptive Deficits

"[I]t is well-established that assessment of adaptive behavior focuses on weaknesses, rather than strengths, and isolated achievements cannot 'trump' broad deficits." *United States v. Davis*, 611 F. Supp. 2d 472, 500 (D. Md. 2009). "[T]he medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." *Moore I*, 137 S. Ct. at 1050. Because the diagnosis requires impairment in only one of three adaptive functioning domains, "[b]y definition, then, persons with mental retardation can have the capacity to manage a number of

---

that Defendant's true IQ is approximately 70 or below, as indicated by his five full scale scores on Wechsler IQ tests, but it also discredits Dr. Greiffenstein's position that Defendant's results were the product of poor effort or malingering to obtain some "secondary gain." Dr. Greiffenstein suggests that Defendant intentionally performed poorly on the Wechsler administered during the process of applying for Social Security disability benefits in order to obtain money, that he intentionally performed poorly on a non-Wechsler test administered while Defendant was in prison in Mississippi for other offenses occurring before the crimes with which Defendant is now charged, and that he intentionally performed poorly on the two tests (a Wechsler and the K-BIT) given by Dr. Cunningham in evaluating Defendant in this case so that he would be deemed ineligible for the death penalty.

In light of Defendant's consistency on administrations of the Wechsler, however, it is simply not plausible that Defendant's Wechsler scores are artificially low as a result of poor effort, malingering for "secondary gain," or any other influence not actually attributable to mental retardation.

*Shields*, 2009 U.S. Dist. LEXIS 130612, at *40–41 (internal record citations omitted).

areas of their lives." *Davis*, 611 F. Supp. 2d at 501. "It is axiomatic to an understanding of mental retardation that weaknesses may coexist with strengths, as in any other individual." *Id.* "[I]ntellectually disabled persons may have strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation." *Moore I*, 137 S. Ct. at 1050 (alteration in original) (internal quotation marks omitted).

Stereotypes of intellectual disability have no place in a court's determination. *See Moore II*, 139 S. Ct. at 669; *Moore I*, 137 S. Ct. at 1044, 1052. In *Moore I*, the Court faulted the Texas Court of Criminal Appeals ("CCA") for relying on stereotypes, explaining that "the medical profession has endeavored to counter lay stereotypes of the intellectually disabled." *Moore I*, 137 S. Ct. at 1052 (citing AAIDD-11 User's Guide at 25–27; Br. for AAIDD et al. as Amici Curiae at 9–14 & nn.11–15, 2016 U.S. S. Ct. Briefs LEXIS 2888, at *18–23 & nn.11–15). The Supreme Court held in *Moore II* that emphasizing stereotypes over clinical factors is unconstitutional, not because it unfairly characterizes individuals with intellectual disability, but because doing so "'*creat[es] an unacceptable risk that persons with intellectual disability will be executed.*'" *Moore II*, 139 S. Ct. at 669 (alterations in original) (emphasis added) (quoting *Moore I*, 137 S. Ct. at 1044).

### D. Adaptive behavior in prison and crime facts are not relevant evidence for assessing adaptive behavior

Courts may not rely on adaptive skills developed in prison or other controlled settings to disprove intellectual disability. *See Moore II*, 139 S. Ct. at 669, 671. In *Moore II*, the Court wrote that "[t]he length and detail of the [CCA's] discussion" of Moore's use of the prison commissary, occasionally refusing to clean up spills or get a haircut while in prison, and correspondence written in prison "is difficult to square with our caution against relying on

prison-based development." *Id.* at 671. In *Moore I*, the Supreme Court wrote that "[c]linicians . . . caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." *Moore I*, 137 S. Ct. at 1050 (quoting DSM-5 at 38) (citing AAIDD-11 User's Guide at 20).

Additionally, the Supreme Court noted that evidence of Moore's *pro se* filings while in prison "is relevant, but it lacks convincing strength without a determination about whether Moore wrote the papers on his own, a finding that the court of appeals declined to make." *Moore II*, 139 S. Ct. at 671. The Court acknowledged the unremarkable truth that persons who regularly interact with prisoners know:  incarcerated individuals help each other draft documents.

As to the observations of prison officials, even if a court "does not question the honesty of the many prison officials who have evaluated and worked with [a defendant] over the years," nevertheless "the fact that they have only known [the defendant] in a correctional setting leads the court to treat their observations with measured skepticism." *Wilson*, 170 F. Supp. 3d at 370. Furthermore,

> prison officers' observations are limited to an extremely unusual set of circumstances, and are likely to be filtered through their experience with other prisoners, many of whom may also suffer from intellectual limitations. Their intuitive 'control group' is therefore not representative of the general population, while the diagnosis of mental retardation must be made with reference to average levels of functioning in the general population.

*United States v. Hardy*, 762 F. Supp. 2d 849, 900 (E.D. La. 2010).

Courts also may not rely on crime facts to disprove intellectual disability. *Moore I*, 137 S. Ct. at 1047, 1053 (vacating CCA decision that relied in part on crime facts as relevant to ID determination). The Court held in *Moore I* that "committing the crime in a sophisticated way and then fleeing" is not evidence that a defendant is not intellectually disabled. *Id.* Whether the crime was committed in a "sophisticated" way was among the factors the CCA had used to assess

intellectual disability—a consideration the Supreme Court rejected in *Moore I* because it relied on stereotypes. *Compare Ex parte Briseno*, 135 S.W.3d 1, 8–9 (Tex. Crim. App. 2004) (holding that whether the capital offense required "forethought, planning, and complex execution of purpose" is relevant to the intellectual disability inquiry), *with Moore I*, 137 S. Ct. at 1051 (reversing *Briseno* and holding that "[b]y design and in operation, the *Briseno* factors 'creat[e] an unacceptable risk that persons with intellectual disability will be executed.'" (quoting *Hall*, 134 S. Ct. at 704)).

The ability "to elude law enforcement, travel around several states, use an alias, and avoid certain topics when being interrogated by police officers" while on "crime sprees" does not exclude a diagnosis of intellectual disability. *Davis*, 611 F. Supp. 2d at 506–07. Rather, "it suggests that a person whose IQ tests strongly indicated mental retardation has not adapted." *Id.* (quoting *Holladay v. Campbell*, 463 F. Supp. 2d 1324, 1346 (N.D. Ala. 2006)); *see also United States v. Nelson*, 419 F. Supp. 2d 891, 901–02 (E.D. La. 2006) ("[T]he Government also introduced the testimony . . . concerning the details of Bryan Nelson's alleged behavior during the crimes . . . . to illustrate that Bryan Nelson allegedly had a leadership role in both crimes, thus suggesting a level of adaptive functioning high enough to preclude a finding of mental retardation. The Court makes two observations with respect to this testimony. First, some of the details of the testimony actually suggest that Nelson was not functioning at a very high level . . . . Second, . . . Nelson's behavior in these isolated incidents has limited relevance to the mental retardation diagnosis because it is isolated, in contrast to the recurring patterns which emerge from all of the records in this case and which indicate a low level of adaptive functioning.").

### E.    Co-morbidity

"[T]he diagnostic criteria for ID do not require exclusion of accompanying diagnoses." *Roland*, 281 F. Supp. 3d at 480, 546 (citing *Moore I*, 137 S. Ct. at 1051; DSM-5 at 40; AAIDD-

11 at 58–63)); *see also United States v. Lewis*, 2010 U.S. Dist. LEXIS 138375, 93–94 (N.D.

Ohio 2010) ("'[T]he diagnostic criteria for Mental Retardation does not include an exclusion

criterion.' Thus, an individual should be diagnosed with intellectual disability if the individual

meets the three prongs for an intellectual disability determination." (quoting DSM-IV-TR)). "As

mental-health professionals recognize . . . many intellectually disabled people also have other

mental or physical impairments . . . . Coexisting conditions frequently encountered in

intellectually disabled individuals have been described in clinical literature as 'comorbidities.'"

*Moore I*, 137 S. Ct. at 1051 (internal citations and alternations omitted); *see also Moore II*, 139

S. Ct. at 671 (quoting *Moore I*, 137 S. Ct. at 1051).

> **F.** **The assessment of intellectual disability in death penalty cases must comport with the assessment of intellectual disability in other contexts—courts cannot impose a higher standard in death penalty cases**

Courts cannot impose higher standards for proving intellectual disability in death penalty

cases. In *Moore I*, the Supreme Court faulted the Texas court for imposing more rigorous

standards in death penalty cases than in assessing intellectual disability in other settings such as

student assessments and within the juvenile justice system. 137 S. Ct. at 1052.

Similarly, in *Roland*, the district court addressed the Government's suggestion that

"because this is a forensic setting, the Court should apply a somewhat heightened standard for

assessing [the defendant's] ID claim." *Roland*, 281 F. Supp. 3d at 508 n.54 (citing government

experts applying different methodology "specifically because this is a forensic setting" and "Dr.

Denney citing favorably an article that recommends higher cut-off scores for performance-

validity tests in *Atkins* cases"). The *Roland* court responded:

> The suggestion that a standard other than those listed in the clinical
> guidelines is appropriate because this case involves secondary gain
> or an *Atkins* claim is counter to both caselaw and common sense.
> Courts are required to follow the "prevailing clinical standards," not
> an undefined forensic standard, in determining whether a defendant

is ID. Given the high stakes in *Atkins* litigations, courts generally
exercise caution, and the legal standard has arguably become even
more protective than the clinical standard. So, to the extent that the
Government's experts proffer opinions that run afoul of the clinical
standards, the Court rejects them here.

*Id.* (internal citations omitted).

### G.     Admissibility and Relevance of Certain Evidence Presented at Trial

#### 1.     Evidence of Functioning in Prison

The Government seeks to introduce five exhibits—Exhibits 168–172—relating to Mr.

Webster's behavior and functioning while incarcerated at USP Terre Haute. These records are

inadmissible both because the Government did not provide sufficient testimony supporting their

admission and because they are not relevant to the Court's determination.

#### a.     Admissibility of Bureau of Prisons Records

##### (i)     Disciplinary Records

The Government identified Mr. Webster's BOP disciplinary records as Exhibit 168. *See*

Dkt. 167 (Third Am. Ex. List). Although the parties stipulated to the authenticity of the records,

*see* Dkt. 155 (Stipulation regarding Authenticity and Admissibility of Documents), Mr. Webster

disputed their admissibility.

The Government did not reference these records during its presentation, and did not

present any testimony establishing the admissibility of the records. Specifically, Mr. Webster

objected to these records as hearsay. *See* Dkt. 153.[8]  In response, the Government did "not

dispute that some of these records could be considered hearsay," but represented that it would

---

[8]     Subsequent to Mr. Webster's submission of his Objections to Respondent's First Amended Final
Exhibit List, the Government updated its exhibit numbers to eliminate duplicative exhibit numbers
between Petitioner and Respondent's exhibits. *See* Dkt. 161 n.1.  Thus, the exhibit referred to as
Exhibit 067 in Webster's objections was re-numbered to Exhibit 167.  The Court refers to exhibits by
the latter number throughout.

"call BOP employees at trial to discuss the records upon which the government intends to rely. Those witnesses will establish the necessary exceptions under Rules 803 or 804." Dkt. 156 at 10. The Government, having failed to establish any hearsay exception regarding Exhibit 168, the Court finds that Exhibit 168 is not admitted as evidence in this proceeding.

### (ii)    Mental Health Records

The Government identified Mr. Webster's BOP mental health records as Exhibit 169. *See* Dkt. 167. Exhibit 169 consists of 301 pages of psychology records regarding Mr. Webster, dated between 1999 and 2019. Although the parties stipulated to the authenticity of the records, *see* Dkt. 155, Mr. Webster disputed the admissibility of these records on the bases of relevance and hearsay, noting that numerous records were generated by individuals other than Dr. Conner. *See* Tr. 860:20–25. In response, the Government asserted that Exhibit 169 consists of business records and thus is admissible pursuant to Fed. R. of Evid. 803(6).

To establish the foundation for the admission of business records, a party must present testimony from a qualified witness that the records were kept in the course of a regularly conducted business activity, and that it was the regular practice of that business to make such records. Fed. R. of Evid. 803(6) further requires that the record be "made at or near the time by…someone with knowledge…."

The Government presented some testimony from Dr. Conner regarding Exhibit No. 169. Dr. Conner testified that she "briefly review[ed]" the "old contacts" that she had with Mr. Webster. Tr. 857:23–858:2. Dr. Conner did not offer any testimony about contacts by individuals other than herself, and did not testify that she had reviewed those records. She testified that she documents contacts with inmates in a central system and, with respect to one page of Exhibit 169, that she entered the information contained within the document. Tr. 857:15–20, 865:15–24. Dr. Conner did not offer further testimony regarding the process for creating the records

contained within Exhibit 169 to establish that the records constitute business records within the meaning of Fed. R. Evid. 803(6).[9] And, Dr. Conner did not address in any way the records created before she began working at USP Terre Haute five and a half years ago. *See* Tr. 848:21–23.

To establish the foundation for the admission of business records, a party must demonstrate, through the testimony of a qualified witness, that the records were kept in the course of a regularly conducted business activity, and that it was the regular practice of that business to make such records. *See* Rule 803(6); *United States v. Given*, 164 F.3d 389, 394 (7th Cir. 1999). "While Rule 803(6) does not require that the qualified witness be the person who prepared the record, or that the witness have personal knowledge of the entries in the records, the business records exception does require that the witness have knowledge of the procedure under which the records were created." *Collins v. Kibort*, 143 F.3d 331, 337–38 (7th Cir. 1998) (citations omitted); *see also Given* 164 F.3d at 394 (finding that a witness who did not know how records were prepared was not sufficient to establish the applicability of the business records exception); *Design Basics, LLC v. Heller & Sons, Inc.*, 2018 U.S. Dist. LEXIS 75432, at *22–23 (N.D. Ind. May 3, 2018) (excluding exhibit where the proffered witness "makes no assertion that he is a custodian of these records or otherwise has personal knowledge of the procedure under which these documents were created").

Dr. Conner's testimony is insufficient to establish that records generated by persons other than herself are admissible business records pursuant to Fed. R. Evid. 803(6). She did not offer

---

[9] Dr. Conner testified as a live witness. Although she testified regarding certain psychology records during her deposition, that testimony is not in the record of this hearing because Dr. Conner was an available witness, and in fact testified. The Government therefore may not rely upon Dr. Conner's deposition testimony in support of its argument that Exhibit 169 constitutes a business record.

any testimony regarding the generation of those records and, with respect to those generated before she began working at USP Terre Haute, Dr. Conner does not have any knowledge regarding the procedure under which the records were created. Dr. Conner did not even testify that she had reviewed records created by individuals other than herself, such that she could offer testimony regarding those records.

Approximately 34 pages of the 301-page Exhibit 169 relate to interactions between Mr. Webster and Dr. Conner and appear to be authored by Dr. Conner. Dr. Conner testified regarding many of these records, but, as noted above, offered minimal testimony regarding how, why, and when those records were created. Dr. Conner's cursory testimony is insufficient to establish that these records constitute business records.

Moreover, several of the records generated by Dr. Conner were not generated at or near the time of her interaction with Mr. Webster. *See* Ex. 169 at -000763 (record completed approximately 2 months after interaction); *id.* at -000765 (record completed approximately 4.5 months after interaction); *id.* at -000766 (record completed approximately 5.5 months after interaction). Many other records were created days or weeks after Dr. Conner's clinical interactions with Mr. Webster and 57 other individuals housed in the SCU. *See* Tr. 899:13–15. These records do not meet the timeliness requirement of the business records exception. *See United States v. Lemire*, 720 F.2d 1327, 1350 (D.C. Cir. 1983) (holding that a report summarizing events stretching over six months which was prepared nearly five months after last event was not timely). Because the Government failed to establish that the business record exception applies to Exhibit 169, it is not admitted into evidence and the Court does not consider it in its opinion.

### (iii)     Work Records

The Government identified Mr. Webster's BOP work records as Exhibit 170.  *See* Dkt.

167 . Although the parties stipulated as to the authenticity of the records, *see* Dkt. 155, Mr.

Webster disputed their admissibility.

The Government did not reference these records during its presentation, and did not

present any testimony establishing the admissibility of the records.  As with Mr. Webster's

disciplinary records, the Government did "not dispute that some of these records could be

considered hearsay," but represented that it would "call BOP employees at trial to discuss the

records upon which the government intends to rely.  Those witnesses will establish the necessary

exceptions under Rules 803 or 804." Dkt. 156 at 10. Having failed to establish any hearsay

exception regarding Exhibit 170, the Court finds that Exhibit 170 is not admitted as evidence in

this proceeding.

### (iv)     Education Records

The Government identified education records relating to Mr. Webster as Exhibit 171.

*See* Dkt. 167.  Mr. Webster objected to the admissibility of Exhibit 171; the Government

acknowledged that the records are hearsay, but asserted that Exhibit 171 is a business record and

admissible on that basis. Tr. 962:14–964:8. The Court conditionally admitted Exhibit 167,

pending argument in post-trial briefing. Tr. 964:9–11, 16.

As explained above, to establish the foundation for the admission of business records, a

party must demonstrate, through the testimony of a qualified witness, that the records were kept

in the course of a regularly conducted business activity, and that it was the regular practice of

that business to make such records. *See* Rule 803(6); *Given*, 164 F.3d at 394; *see also* section

entitled "Mental Health Records," *supra*.[10]

Mr. Woolston acknowledged that he had no personal knowledge relating to records

created before his arrival at USP Terre Haute in 2014. Tr. 982:4–15, 985:17–986:4. Because

Mr. Woolston was unable to provide sufficient testimony to establish that the records pre-dating

his arrival at USP Terre Haute were kept in the ordinary course of business, and that it was a

regular practice to keep such records, the Court finds that the Government has not established the

applicability of the business records exception with respect to those portions of Exhibit 171 that

pre-date Mr. Woolston's arrival at USP Terre Haute in August 2014.The Court finds that the

Government has established that the business records exception applies to records created after

August 2014, and admits that portion of Exhibit 171.

### (v)  Emails

The Government identified emails purportedly sent from Mr. Webster's email account as

Exhibit 172. *See* Dkt. 167.The Government did not specifically reference this exhibit during its

presentation. However, Mr. Edwards testified that he saw Mr. Webster typing on a computer

from which inmates can send emails. Tr. 933:5–25. Mr. Edwards acknowledged on cross-

examination that, when he observed Mr. Webster, he could not see the screen to determine what

Mr. Webster was doing. Tr. 947:9–15. [11] He further testified that he observed Mr. Webster with

---

[10] The Government also argued that the parties stipulated to the authenticity of the records, and so the Government was not prepared to offer the testimony of a custodian of record. Tr. 963:10-15. But authenticity is not sufficient to establish the business record exception to the rule against hearsay; they are distinct questions. *See Labrec v. Wis & Southern R.R. Co.*, 2019 U.S. Dist. LEXIS 12673 (W.D. Wis. Jan. 25, 2019) (noting that, in lieu of presenting a witness, the parties "could stipulate to the document's authenticity *and its status as a business record*" (emphasis added)).

[11] Although Mr. Edwards testified that he received emails from Mr. Webster, no emails from Mr. Webster to Mr. Edwards were included in Exhibit 172.

other inmates in areas where inmates are able to send email on more than one occasion. Tr. 947:24–948:7. At most, the Government has established that Mr. Webster has sent emails in the past, and that the emails included in Exhibit 172 were sent from his account. Where, as here, the Government seeks to use these documents as evidence of Mr. Webster's writing and typing abilities, whether Mr. Webster actually composed and typed the emails is the most significant issue. Because the Government has not established that Mr. Webster himself composed and typed the emails included in Exhibit 172, the Court does not admit, and does not consider, Exhibit 172.[12]

### b. Even If the Court Were to Consider the BOP Education and Psychology Records, They Do Not Contribute to the Determination Whether Mr. Webster is ID

Even if the Court were to consider the BOP education and psychology records, these records do not help answer the question whether Mr. Webster is ID.

The point the United States seeks to make with the educational records is that Mr. Webster's ABLE scores are too high for him to have an ID. But—even if there were a foundation for this evidence and even if the Court knew how the ABLE was administered to Mr. Webster— the authoritative sources the Court must rely upon do not endorse determining IQ based on achievement tests like the ABLE, but rather require reliance on standardized intelligence tests. *See* Tr. 42:9-18; Atkins, 536 U.S. at 309 n.5. There are results from gold-standard IQ tests for the Court to rely upon in assessing Mr. Webster's intellectual functioning—not just one WAIS result, but a pattern of consistent WAIS results over the course of twenty-seven years. The Court

---

[12] Exhibit 172 also contains significant amounts of hearsay, as it includes emails written by individuals other than Mr. Webster, to Mr. Webster. The Government has not established any applicable hearsay exception. Even if the Court were to admit Exhibit 172, the Court could not consider emails written by individuals to Mr. Webster for the truth of the matter asserted. Fed. R. Evid. 801.

cannot rely on tests that are not psychometrically sound tests when valid results from gold-standard tests are available.

The point the United States seeks to make with the psychology records is that Mr. Webster did not appear to staff psychologists to have an ID. But these records reflect a series of conversations that would commonly last no more than thirty seconds. Tr. 762:16-22. During the few longer conversation, Dr. Conner testified Mr. Webster showed her photos of his family. Tr. 866:10-11, 23. Dr. Blessinger had even less contact with Mr. Webster than Dr. Conner.

The BOP staff psychologists simply do not have enough information about Mr. Webster—even if the Court could consider information about his functioning in prison—to indicate one way or the other whether Mr. Webster has an ID. Dr. Conner had no training in the diagnosis of ID.  Further, despite the fact that she had the greater share of contact with Mr. Webster, Dr. Conner did not recognize symptoms of ASPD. She is one of the few psychologists who has not identified Mr. Webster as ASPD. This oversight makes some sense in light of the brief and perfunctory nature of their interactions—and it shows why Dr. Conner's observations of Mr. Webster are not informative.

Ultimately, what is important in this case is the totality of the evidence, and in light of the other evidence available, the evidence of Mr. Webster's adaptive functioning in prison contributes nothing to the determination of whether Mr. Webster is ID.

> **2.** **Evidence About Adaptive Behavior in Prison is Inadmissible, and the Evidence About Adaptive Behavior in Prison Does Not Show that Mr. Webster Is Not ID**

Courts may not rely on evidence of skills developed in prison or other controlled settings in assessing whether someone is ID. *Moore II*, 139 S. Ct. at 669, 671; *Moore I*, 137 S. Ct. at 1050 (quoting DSM-5 at 38) (citing AAIDD-11 User's Guide at 20). The Supreme Court's "caution against relying on prison-based development" means that the BOP records are not

relevant evidence. *Moore II*, 139 S. Ct. at 669, 671. Any attempt to argue that prison-based development is admissible but deserving of limited weight is undermined by the language of the Supreme Court's two opinions in *Moore*. See *id.* at 671 ("[t]he length and detail of the [CCA's] discussion" of Moore's use of the prison commissary, occasionally refusing to clean up spills or get a haircut while in prison, and correspondence written in prison "is difficult to square with our caution against relying on prison-based development."); *Moore I*, 137 S. Ct. at 1050 (quoting DSM-5 at 38) (citing AAIDD-11 User's Guide at 20) ("[c]linicians . . . caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is."). The only prison-based evidence the Supreme Court suggested could be relevant is evidence that an inmate drafted a sophisticated legal document—but the Supreme Court discounted that evidence in *Moore* because it was unclear whether Mr. Moore drafted that document himself, and there is no such evidence here.

The inadmissibility of evidence of adaptive behavior in prison is yet another reason why the BOP education and psychology records are not admissible. The testimony of witnesses who observed Mr. Webster only in a prison setting, including Mr. Edwards, Dr. Conner, and Dr. Blessinger is also inadmissible on these grounds.

Even if it were admissible, the BOP evidence shows merely that Mr. Webster can keep himself and his cell clean; write short emails to family, friends, and prison staff; order items from a commissary; discuss current events; or briefly hold a job as an orderly delivering food trays. As many experts testified, people in structured environments like prison, especially death row, do not have to undertake the kinds of tasks that are difficult for someone with mild ID. Suggesting that Mr. Webster is not ID because he is able to do the few things he does, like keep clean a small cell where he spends twenty-three hours of each day, misunderstands the capabilities of

people with ID, as the DSM-5, AAIDD-11, and Dr. Tassé's testimony, in particular, make clear.

Yet again the Court reiterates that what is important in this case is the totality of the evidence, and in light of all the evidence in this case, the evidence of Mr. Webster's ability to carry out the basic tasks of daily living in prison does not contribute to the determination whether he is ID.

> **3.** **Evidence About the Facts of the Crime of Conviction Is Not Admissible, and, Even If the Crime Facts Were Admissible, If Anything, They Tend to Support the Argument that Mr. Webster Is ID**

As discussed above, the Supreme Court has held that "committing the crime in a sophisticated way and then fleeing" is not evidence that a defendant is not intellectually disabled. *Moore I*, 137 S. Ct. at 1047 (citation omitted); *see also Davis*, 611 F. Supp. 2d at 506–07; *Nelson*, 419 F. Supp. 2d at 901–02. The *Nelson* court observed, "First, some of the details of the testimony actually suggest that Nelson was not functioning at a very high level . . . . Second, . . . Nelson's behavior in these isolated incidents has limited relevance to the mental retardation diagnosis because it is isolated, in contrast to the recurring patterns which emerge from all of the records in this case and which indicate a low level of adaptive functioning." *Id.* This case is similar to *Nelson*. Even if the Court were permitted to consider the facts of the crime, isolated incidents do not outweigh recurring patterns of adaptive deficits, and the facts do not suggest that Mr. Webster was functioning at a very high level.

The facts of the crime relied upon by the Government come largely from the testimony of codefendants who were promised leniency. In some circuits—though not the Seventh—this fact alone entitles a criminal defendant to a jury instruction that directs great caution when assessing credibility. *See, e.g.*, 5th Cir. Pattern Jury Instructions 1.14; 6th Cir. Pattern Jury Instructions 7.07. Though the defendant here was convicted beyond a reasonable doubt of each of the

essential elements of first degree murder, the underlying facts relied upon the Government ostensibly to demonstrate Mr. Webster's intellectual functioning may or may not have been found by the jury and there is no way at this point to tell.

The codefendants' status as cooperating witnesses is one reason to look closely at their credibility and testimony but there are also others. Codefendant Beckley admitted at trial that he did not tell the police the truth when he gave his first post-arrest statement. Trial Tr. Vol. 19, 111:10–14. He gave a second statement, "Because [he] knew the first statement wasn't the full truth." *Id.* 146:12–20. Beckley admitted he lied in that statement too. *Id.* 152:5–153:11. Beckley talked to the FBI for a week in December of 1994; he admitted he did not tell the truth then either. *Id.* 158:1–19.

Beckley testified that he was family with Orlando and Demetrius Hall; and Webster was not family. *Id.* 145:15–22. Beckley admitted that in his statement, he "put it off all on Bruce Webster." *Id.* 145:23–146:3. Beckley told Demetrius Hall that he gave a statement and kept him out of it. *Id.* 147:23–148:2. Beckley said he tried to keep Holloway and Orlando Hall out of it as well. *Id.* 148:3–5. He told Demetrius Hall he put the whole deal off on Webster. *Id.* 148:6–8. Special Agent Floyd testified he told Webster that all the other defendants were family and Webster was "the only outsider." Trial Tr. Vol. 20, 22:9–16.

Though the Government attempts to paint Mr. Webster as the mastermind behind this offense, it does not appear there was much planning. Witnesses testified there was no plan to kidnap—indeed there was no plan at all—even as the defendants approached the apartment where Ms. Rene was kidnapped. Trial Tr. Vol. 18, 195:10–12 (no plan for where everybody was going to stand when they entered the apartment); *id.* 195:13–17 (no plan for what they were going to when they arrived at apartment door); *id.* 196:9–12 (no plan to kidnap). The men used

materials found at the apartment to restrain Ms. Rene. Trial Tr. Vol. 18, 225:18–22.

The planning that was done appears to have been completed by the codefendants. Trial Tr. Vol. 18, 174:9–12 ("all the preparatory work" done by Demetrius Hall and Beckley); *id.* 91:12–21, 172:1–12 (guns secured by Beckley prior to Webster arriving in town); *id.* 174:13–16 (bullets purchased by Demetrius Hall and Beckley); *id.* 98:20–99:4 (gloves and tape purchased by Demetrius Hall and Beckley while Webster slept); *id.* 143:13–16 (Holloway decided to change hotels); *id.* 144:3–9 (motel room rented by Beckley); *id.* 90:10–18 (Demetrius Hall and Beckley procured camouflage outfits and brought them to Orlando Hall to look at); *id.* 194:23–195:3 (Beckley and Orlando Hall decided Demetrius Hall and Webster would be the ones to approach apartment); *id.* 235:3–8 (although Webster had a pager, it was Holloway who was consulted about what to do next); *id.* 239:2–17 (during the time Ms. Rene was held by the defendants there was no discussion of what to do with her, including holding her for ransom or killing her). Though the Government has claimed the gravesite was in a remote location selected by Mr. Webster, the agent assigned testified it was less than a ½ mile from the parking lot in front of a road and less than ½ a mile from the nearest house. Trial Tr. Vol. 20, 66:2–16.

Other facts surrounding the crime point toward Mr. Webster being intellectually disabled. These include:

- Marvin Holloway testified he went to the airport and bought Webster's plane ticket with $61 cash. He did not just give Webster the money to buy the plane ticket for himself because "he act like he didn't know how to do that." Trial Tr. Vol. 20, 141:4–18. Then Holloway directed him to the gate. Trial Tr. Vol. 20, 142:2–4. Webster was met on the other end of his trip by Beckley. Trial Tr. Vol. 19, 42:17–21.

- Webster purportedly dug a grave for the victim and then later that day could not find it.  Trial Tr. Vol. 19, 91:11–19; Trial Tr. Vol. 20, 129:3–13.

- Webster told the security guard at the motel—a person he had previously known—what room he was staying in. Trial Tr. Vol. 17, 189:18–20.

- Webster gave one of the codefendants the wrong room number at the motel. Trial Tr. Vol. 20, 120:1–4.

Again, what is important in this case is the totality of the evidence, and when considered along with other evidence, the crime facts, if anything, support the conclusion that Mr. Webster is ID.

### 4.    Testimony of Dr. Blessinger

The Government sought admission of the deposition transcript of Dr. Jacqueline Blessinger. *See* Dkt. 160. Mr. Webster opposed the Government's motion. *See* Dkt. 170. For the reasons set forth below, the Court denies the Government's motion and will not consider the deposition testimony of Dr. Blessinger. Although, as discussed above, even if the Court did consider her testimony, it would not impact its decision.

Dr. Blessinger was, until recently, a psychologist working for the Bureau of Prisons at USP Terre Haute. In the course of her employment, Dr. Blessinger had approximately six interactions with Mr. Webster. The Government identified Dr. Blessinger as a potential fact and expert witness on its Preliminary Witness List, *see* Dkt. 128 at 1, and on its Final Witness List, *see* Dkt. 145 at 1.  The Government also provided Rule 26 disclosures for Dr. Blessinger. *See* Dkt. 170-4 at 5–6.

Following the Government's Rule 26 disclosures, and shortly before the evidentiary hearing in this matter, Mr. Webster deposed Dr. Blessinger. *See* Dkt. 170 at 4–6.  Shortly before

the deposition began on March 11, 2019, the Government disclosed that Dr. Blessinger *may* be unavailable for trial and that the Government may, therefore, wish to introduce her deposition testimony at trial. *Id.* at 4–5. Counsel for Mr. Webster noted both prior to the deposition and on the record in the deposition that Mr. Webster would likely object to the admission of the deposition testimony. *Id.* at 6.

The Government argues that Dr. Blessinger is an unavailable witness pursuant to Fed. R. Civ. P. 32(a) because Dr. Blessinger now resides more than 100 miles from the location of the hearing, and that her deposition should be admitted on that basis. *See* Dkt. 160 at 3. Mr. Webster does not contest that Dr. Blessinger resides more than 100 miles from the location of the hearing, but argues that the Court should exercise its discretion to exclude Dr. Blessinger's testimony because the Government withheld information regarding Dr. Blessinger's unavailability and never sought to take a trial deposition, contrary to the parties' practice with two other witnesses known to be unavailable. Mr. Webster asserts that introducing Dr. Blessinger's testimony would be prejudicial because he did not have a fair opportunity to conduct a thorough and complete cross-examination of Dr. Blessinger.

Whether to admit deposition testimony in lieu of live testimony lies "within the sound discretion of the trial court." *Rascon v. Hardiman*, 803 F.2d 269, 277 (7th Cir. 1986) (citations omitted). Although Federal Rule of Civil Procedure 32(a)(4) provides that a party "may use for any purpose the deposition of a witness . . . if the court finds . . . that the witness is more than 100 miles from the place of hearing or trial . . . unless it appears that the witness's absence was procured by the party offering the deposition," the Court is "not automatically required to admit . . . deposition testimonies under Federal Rule of Civil Procedure 32(a)(3)(B) just because the witnesses were more than 100 miles away. . . ." *Polys v. Trans-Colorado Airlines, Inc.*, 941 F.2d

1404, 1410 (10th Cir. 1991) (noting that "the trial judge appropriately considered surprise to opposing counsel."). "Although Rule 32 provides a mechanism for presentation of deposition testimony, the rule does not alter the judicial preference for direct and cross-examination of a witness at trial," and "the court must balance various factors toward the ends of fairness." *In re Air Crash Disaster at Stapleton Int'l Airport, Denver*, 720 F. Supp. 1493, 1501–02 (D. Colo. 1989) (citation omitted).

While the Rules of Civil Procedure do not distinguish between discovery depositions and trial depositions, the distinction:

> is generally recognized by the courts in this judicial district. . . . [The] distinction goes beyond the lore or myth surrounding the practice of litigation in the federal courts. The difference is recognized in the daily practice of these courts, and is commonly accepted by the members of the bar who frequently practice here.

*Spangler v. Sears, Roebuck & Co.*, 138 F.R.D. 122, 124–25 (S.D. Ind. 1991). A trial deposition is used where "thorough preparation might entail the need to preserve, by means of deposition, the testimony of witnesses who might be unable to attend the trial." *Id.* at 125.

Counsel for Mr. Webster submitted a declaration stating that Mr. Webster would not have deposed Dr. Blessinger had he not anticipated, based on the Government's disclosures, that she would testify at trial; that deposing Dr. Blessinger was necessary giving the limited nature of her expert disclosure; and that counsel would have prepared differently to depose Dr. Blessinger had the Government disclosed in advance that Dr. Blessinger would be unavailable for trial. Dkt. 170-1 ¶¶ 14–15.

The record clearly reflects that it was known to the Government well before Dr. Blessinger's deposition that she would be leaving employment with the Bureau of Prisons and would be unavailable for trial. Dr. Conner knew that Dr. Blessinger was leaving by, at the latest,

February 21, 2019, because Dr. Conner began to take over Dr. Blessinger's duties. See Tr. 910:24–911:10. The Government has not offered a plausible explanation for why it did not disclose this information until the morning of Dr. Blessinger's deposition, contrary to its prior practice with Dr. Spellman, for whom the Government disclosed well in advance that he was unavailable to offer live testimony. In short, the Government made no effort to schedule a trial deposition, instead waiting to disclose Dr. Blessinger's potential unavailability until counsel for Mr. Webster traveled to Indiana to conduct a discovery deposition of Dr. Blessinger, a mere three weeks before the evidentiary hearing in this matter.

Based on this record, the Court finds that Mr. Webster would be prejudiced by the admission of Dr. Blessinger's deposition testimony. The Government's motion to admit the deposition of Dr. Blessinger is denied.

### 5.    Testimony of Dr. Spellman

On March 26, 2019, the parties jointly submitted a transcript of the deposition of Dr. Charles Spellman to the Court, and stipulated that Dr. Spellman was an unavailable witness pursuant to Fed. R. Civ. P. 32(a)(4)(B). *See* Dkt. 164 ¶ 1.  Mr. Webster reserved the right to object to the admissibility of Dr. Spellman's testimony via a separate filing. *Id.* ¶ 2.

On March 28, 2019, Mr. Webster filed a motion to exclude the deposition testimony of Dr. Spellman, on the basis that the Government failed to properly disclose the expert opinions of Dr. Spellman in advance of his deposition, which the parties had previously agreed was a trial deposition due to Dr. Spellman's unavailability for trial. *See* Dkt. 171. Prior to the deposition, the Government disclosed:

> Dr. Spellman will provide testimony consistent with the statements provided in his December 28, 2018 interview. Specifically, it is anticipated Dr. Spellman will testify about his examination of Webster, the purpose of that examination, and its limitations. Dr. Spellman will also likely testify about examinations conducted for

> the Social Security Administration in general, the circumstances of such examinations, the purpose of such examinations, and the limitations of those examinations. Finally, Dr. Spellman may testify about how various facts, unknown to him at the time of his examination of Webster, might have influenced his conclusions.

Dkt. 171-1 at 2.

When Mr. Webster requested additional information, the Government stated that it could not disclose Dr. Spellman's opinions because it did not "know what Dr. Spellman's opinions will be." Dkt. 171-2 at 1. The Government further stated that "[h]is answers may surprise us all." Id.

The Government contends that its disclosure went beyond the requirements of Rule 26, particularly when coupled with a summary and recording of its pre-deposition interview of Dr. Spellman. See Dkt. 178 at 5–11. The Government further contends that Mr. Webster could have taken further measures, such as deposing Dr. Spellman for a second time, rather than seeking the exclusion of Dr. Spellman's testimony. Id. at 9.

Federal Rule of Civil Procedure 26(a)(2)(C) requires parties to disclose "(i) the subject matter on which [a non-retained expert witness] is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Pursuant to Federal Rules of Civil Procedure 16(f)(1)(C) and 37(b)(2)(A), a party who fails to provide a proper disclosure may be "prohibit[ed] . . . from introducing designated matters in evidence." Federal Rule of Civil Procedure 37(c)(1) similarly provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In determining whether the failure is harmless, the Court considers: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not

disclosing the evidence at an earlier date." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir.

2012) (citation omitted).

A party seeking to introduce a non-retained expert witness must disclose the facts and

opinions to which the witness is expected to testify. *See Kazmierski v. Bonafide Sage & Lock,*

*Inc.*, No. 2:15-cv-00059, 2015 U.S. Dist. LEXIS 166847, at *2–3 (E.D. Wis. Dec. 11, 2015)

(citations omitted). As the court explained in *Kazmierski*, it is not sufficient to state the general

subject matter of opinions without stating what those opinions are: "To constitute a 'summary' of

'facts and opinions,' a disclosure must at least identify the opinions and some facts that relate to

them…." *Id.* at *3 (citations omitted). The *Kazmierski* court offered the following example of a

proper disclosure:

> The witness is expected to opine that the plaintiff is unable to lift
> more than 50 pounds and will remain unable to do so for the
> indefinite future. This opinion is based on the following facts: the
> witness diagnosed the plaintiff with three herniated discs in his back,
> he observed during office visits that the plaintiff is experiencing
> symptoms that prevent him from lifting more than 50 pounds, and
> he observed during office visits that the plaintiff's condition is not
> improving.

*Id.* at *4-5.

Here, the Government admits that its disclosure does not meet the requirements of

Rule 26(a) when it states that it could not disclose Dr. Spellman's opinions because it does not

"know what Dr. Spellman's opinions will be." *See* Dkt. 171-2 at 1. Rule 26(a) does not include

an exception for parties that purportedly fail to learn what an expert's opinions will be before

obtaining his or her testimony.

The Government's failure to properly disclose Dr. Spellman's opinions prior to his trial

deposition is prejudicial to Mr. Webster. Improper or inadequate disclosures of expert witnesses

impact counsel's ability to fully and fairly cross-examine those expert witnesses. *See Smith v.*

*Ford Motor Co.*, 626 F.2d 784, 794 (10th Cir. 1980) (citations omitted). Improper or inadequate disclosures of expert witnesses also impact counsel's ability to consult her own experts for advise on how best to question the other side's expert. *Id.* That prejudice is evidenced by the Government's questioning of Dr. Spellman, during which it posed more than twenty traits and/or actions to Dr. Spellman, asking him after each one whether such a trait or action was consistent or inconsistent with Mr. Webster being "mentally retarded." *See, e.g.*, Spellman Dep. at 59:3–68:3. Each of these traits or actions constitutes a (disputed) fact upon which the Government asked Dr. Spellman to base an opinion; but, it did not disclose those facts in advance.

The evidence in the record clearly demonstrates that the Government's failure to make an adequate disclosure was, at minimum, willful: Mr. Webster repeatedly asked for more information and informed the Government that it would object to the introduction of Dr. Spellman's testimony on the basis of the inadequate disclosures, but the Government declined to provide more information despite knowing what questions it intended to ask Dr. Spellman. The Government did not make any effort to learn what its own disclosed expert's opinions would be, opting instead to be surprised.

Because the Government opted to conduct a trial deposition of Dr. Spellman—and because Mr. Webster informed the Government of his objection prior to the deposition—there is no concern with respect to disruption to the trial in this matter. The Court does not find, as the Government suggests, that requiring Mr. Webster to take a second deposition of Dr. Spellman—and requiring Dr. Spellman to sit for a second deposition—is an appropriate remedy for the Government's willful disregard of its Rule 26(a) obligations. For the foregoing reasons, Mr. Webster's motion is granted, and the Court excludes Dr. Spellman's deposition testimony.

### 6.    Testimony of Dr. Conner Regarding Ronell Wilson

The United States objected to questions about whether Dr. Conner identified signs of

Ronell Wilson's intellectual disability. Mr. Wilson was removed from federal death row because he is intellectually disabled. *See Wilson*, 170 F. Supp. 3d at 392 (citation omitted). Dr. Conner was responsible for conducting SCU reviews while Mr. Wilson was on death row, and interacted with Mr. Wilson. Tr. 913:2–11. Dr. Conner did not identify concerns that Mr. Wilson was intellectually disabled. Tr. 918:6–8.

The district court's opinion in *Wilson* plainly states that prison psychologists did not observe signs of intellectual disability:

> Regular clinical evaluations performed by prison officials report normal mental health, and none suggest that he suffers from an intellectual disability. Educational records from prison indicate high passing scores on a pre-GED placement test and good progress in GED classes. Wilson has also worked as a prison orderly and in the kitchen, and he has received positive performance reviews for both positions.

*Wilson*, 170 F. Supp. 3d at 379 (citing Denney Report at 20, 22). The fact that prison psychologists did not notice signs of Mr. Wilson's intellectual disability was in the record in *Wilson* because the Government chose to introduce the evidence in that case (through a report by the same expert witness they rely on in this case). *See id.* The Government did not object as to questions about whether Dr. Conner was one of these psychologists. Tr. 913:2–19.

Therefore, it is already a matter of public record that none of the prison psychologists who evaluated Mr. Wilson, which includes Dr. Conner, noticed signs of Mr. Wilson's intellectual disability.[13]

---

[13] There are two additional points about this testimony. First, the United States waived this issue. Counsel for Mr. Webster pointed out (and the Government did not contest) that Dr. Conner answered counsel's questions about Mr. Wilson at her deposition. Tr. 917:23–25. A party waives a privilege by not objecting to the disclosure of confidential information in a deposition. *See United States v. Brock*, 724 F.3d 817, 821 (7th Cir. 2013) (failing to assert a privilege in a prior proceeding waives the privilege); *Nguyen v. Excel Corp.*, 197 F.3d 200, 206–07 (5th Cir. 1999) (failing to assert a privilege when the privileged information is sought waives the privilege); Fed. R. Civ. P. 30(c)(2) (explaining that one of the few instances when an attorney may instruct a deponent not to answer a question is

### 7. Admissibility of Exhibits 42 and 43

The Government objected to the admissibility of Exhibits 42 and 43 on the bases of hearsay, relevance, and lack of foundation. *See* Dkt. 151 at 4–5. Although the Government did not dispute the authenticity of the records, the Government argued that the records were confusing and redundant. In response, Mr. Webster argued that Exhibits 42 and 43 are admissible as public records pursuant to Federal Rule of Evidence 803(8), that there is appropriate foundation, and that the records are relevant. *See* Dkt. 157 at 3–5. Exhibit 43 is a certified record from the Social Security Administration and, pursuant to Federal Rule of Evidence 803(8), self-authenticating and presumed reliable. *See* Fed. R. Evid. Adv. Cmmte. Note

---

when necessary to preserve a privilege). By not objecting at the deposition, the United States waived their objection.

Second, the Government objected that the court in *Wilson* differentiated between the clinical and legal standards, and, according to the United States, Dr. Conner's failure to comply with a legal definition is not reason to question her judgment. *See* Tr. 915:14–25. This argument is not convincing. According to the Supreme Court, the clinical and legal definitions for intellectual disability are the same. The Supreme Court has repeatedly held that the standard courts must rely on in making intellectual disability determinations is "the most recent (and still current) versions of the leading diagnostic manuals—the DSM-5 and AAIDD-11." *Moore I*, 137 S. Ct. at 1048 (citation omitted); *see also Moore II*, 139 S. Ct. at 669. Moreover, to the extent that the *Wilson* opinion relied on a distinction between clinical and legal standards, any distinction would have been relevant only to intellectual functioning (prong 1), not adaptive functioning (prong 2). The *Wilson* court expressed some hesitation as to whether Mr. Wilson's IQ scores showed significant intellectual deficits. *See Wilson*, 170 F. Supp. 3d at 364–65. In an earlier opinion, the court held that Mr. Wilson's test scores did not show significant intellectual deficits, and consequently it did not address adaptive deficits. *See id.* at 350. The court later examined Mr. Wilson's adaptive functioning, pursuant to a Second Circuit remand. *See id.* In its opinion following remand, the district court expressed no hesitation in finding that Mr. Wilson demonstrated significant adaptive deficits. For example, addressing the conceptual domain of adaptive functioning, the court said, "Wilson's experts all determined that he demonstrated significant deficits in this domain. The court believes that this determination is *clearly supported by the wealth of the evidence in the record*, and it is notable that *all of the Government's experts conceded this point at various times*." *Id.* at 388 (emphasis added) (internal record citations omitted); *see also id.* at 390–91. Mr. Webster's questions to Dr. Conner were about his adaptive functioning. Although according to the Supreme Court there is no distinction between clinical and legal standards, if the *Wilson* court made a distinction between clinical and legal standards, the distinction was relevant only to its analysis of intellectual functioning, not adaptive functioning. Any distinction by the *Wilson* court does not affect Mr. Webster's questions to Dr. Conner.

to Rule 803(8); *see also United States v. De La Cruz*, 469 F.3d 1064, 1069 (7th Cir.2006) (citations

omitted). The party seeking to exclude documents falling within the Rule 803(8) exception bears the

burden of rebutting the presumption of admissibility as well as the factual information contained in

the document. *Daniel v. Cook County*, 833 F.3d 728, 740 (7th Cir. 2016) (citation omitted). "The

defendants are entitled to a full opportunity to rebut it. . . . But the general presumption of

admissibility in the text of Rule 803(8) has considerable force." *Id.* at 742. Exhibit 42, an email from

the Social Security Administration regarding the Social Security Administration's records, defines

the medical diagnosis code identified in Exhibit 43. The information relevant to this proceeding—

the definition of the medical diagnosis code—is also published by the Social Security

Administration. *See* Program Operations Manual System (POMS), *DI 26510.015 Completing Item

16A and 16B (Primary and Secondary Diagnosis, Body System Code, and Impairment Code) on the

SSA-831 Disability Determination and Transmittal*, Soc. Sec. Admin.,

https://secure.ssa.gov/apps10/poms.nsf/lnx/0426510015 (last visited May 24, 2019).

The Court finds that Exhibits 42 and 43 are admissible for purposes of showing that the

Social Security Administration applied a medical diagnosis code of "Mental Disorder –

Intellectual Disability" in Mr. Webster's electronic records.

### H. The Government Should Suffer an Adverse Inference and Should Be Precluded from Basing Argument or Opinion on Evidence Missing from the Social Security Administration Records

The Court has broad inherent authority to remedy actions which interfere with the fair

administration of justice. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 42–51 (1991). There can

be no more fundamental question of justice than ensuring that the United States does not

unconstitutionally execute Mr. Webster—*particularly* on the basis of facts or suppositions that

Mr. Webster cannot confront because the evidence relating to those facts or suppositions has

been destroyed. Faced with such situations, the Court has a wide array of options, including

taking "facts as established for purposes of the case" or "barring evidence or arguments."

*Oyebade v. Boston Sci. Corp.*, No. 1:11-cv-0968-JMS-DML, 2012 U.S. Dist. LEXIS 129987, at

*40–41 (S.D. Ind. Sept. 12, 2012) (internal quotations and citations omitted).

The Court need only find that the Government is at "fault" to impose sanctions for the

destruction of evidence. *See Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992)

(citations omitted); *see also* Fed. R. Civ. P. 37(e); *Claiborne v. Wisdom,* 414 F.3d 715, 724 (7th

Cir. 2005) (citing *Chambers*, 501 U.S.). The Government is, at the very least, at "fault" for

destroying the records. "Fault . . . only describes the reasonableness of the conduct—or lack

thereof—which eventually culminated in the violation." *Marrocco*, 966 F.2d at 224 (internal

quotations omitted).

Given the egregious nature of the destruction of evidence in this case, the Court could

make an adverse inference that the SSA information that was destroyed would have been

favorable to Webster and provided support for his position that he is intellectually disabled. The

Court can also simply bar the Government from offering opinion or argument based on the

absence of information or documents that may have been destroyed, or not consider evidence

offered based on the absence of information. To the extent that the Government has made any

arguments based on the absence of information, the Court did not and will not consider it.

### III.     As a Matter of Fact and Law, Mr. Webster is Intellectually Disabled

The Seventh Circuit held that at the hearing to determine whether Mr. Webster is

intellectually disabled, Mr. "Webster, as the petitioner, bears the burden of proving intellectual

disability. . . . the proper burden of proof is a preponderance of the evidence[.]" *Webster*, 784

F.3d at 1146. Mr. Webster has satisfied that burden. Considering the totality of the evidence in

this case, paying particular attention to the credibility of the expert witnesses, and considering

the Supreme Court's cases instructing what evidence to weigh most heavily, the Court concludes

that Mr. Webster is intellectually disabled. The Court finds that Mr. Webster's experts were credible, and that the United States' expert lacked credibility. One reason the Court finds Mr. Webster's experts to be more credible is that they considered the new information revealed by the Social Security records that were the subject of the instant Petition and hearing. The overwhelming weight of the evidence clearly supports the conclusion that Mr. Webster is ID.

DATED:  May 24, 2019

DORSEY & WHITNEY LLP

By: /s/ Steven J. Wells

Steven J. Wells
wells.steve@dorsey.com

Kirsten E. Schubert
*Admitted pro hac vice*
schubert.kirsten@dorsey.com

Kathryn A. Johnson
*Admitted pro hac vice*
johnson.kate@dorsey.com

Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Monica Foster (No. 8368-49)
F. Italia Patti
INDIANA FEDERAL COMMUNITY DEFENDERS, INC.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: (317) 383-3520
Facsimile: (317) 383-3535

*Attorneys for Petitioner Bruce Carneil Webster*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 24th day of May, 2019, this PETITIONER'S

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW was filed

electronically. Service of this filing will be made on all ECF-registered counsel by

operation of the court's electronic filing system. Counsel for Respondent may access this

filing through the court's system.


By: /s/ Steven J. Wells
       Steven J. Wells