## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| vs. | ) | Cause No. 2:12-cv-86-WTL-MJD |
| | ) | |
| CHARLES LOCKETT, | ) | |
| | ) | |
| Respondent. | ) | |

## ENTRY ON INTELLECTUAL DISABILITY

This cause is before the Court to determine whether Bruce Webster is entitled to relief under 28 U.S.C. § 2241. For the Court to grant the relief that Webster seeks, Webster must show by a preponderance of the evidence that he is intellectually disabled[1] and thus categorically ineligible for the death penalty. The parties have fully briefed the relevant issues and presented evidence at a hearing. The Court, being duly advised, finds that Webster has satisfied his burden of proving his intellectual disability by a preponderance of the evidence and is thus ineligible for the death penalty.

## I.      BACKGROUND

On November 4, 1994, Bruce Webster was indicted in the United States District Court for the Northern District of Texas on six counts, including kidnapping in which a death occurred in violation of 18 U.S.C. §§ 1201(a)(1) and (2). Webster was convicted and was sentenced to death on June 20, 1996. *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998).

---

[1]Unless quoting or referring to a diagnosis, the Court will use the term "intellectual disability" rather than the term that was used at the time of Webster's trial—"mental retardation." *See Hall v. Florida*, 572 U.S. 701, 704 (2014).

Webster filed his initial Motion to Vacate Conviction and Sentence under

28 U.S.C. § 2255 on September 29, 2000. This motion was subsequently amended and was

denied in full on September 20, 2003. *Webster v. United States*, No. 4:00-CV-1646, 2003 WL

23109787 (N.D. Tex. Sept. 30, 2003). The Fifth Circuit rejected Webster's motion for relief

under section 2255, *United States v. Webster*, 421 F.3d 308 (5th Cir. 2005), and his application

for an order authorizing a successive § 2255 proceeding, *In re Webster*, 605 F.3d 256 (5th Cir.

2010).

On April 6, 2012, Webster filed a Petition for Writ of Habeas Corpus Pursuant to

28 U.S.C. § 2241 in this Court,[2] challenging his death sentence based on what he argued was

previously unavailable evidence—specifically, evidence from Social Security records—that

establishes he is intellectually disabled and therefore ineligible for the death penalty under *Atkins*

*v. Virginia*, 536 U.S. 304 (2002) and *Hall v. Florida*, 572 U.S. 701 (2014). On November 13,

2013, this Court issued an order denying that petition. The Seventh Circuit affirmed this Court's

ruling on August 1, 2014. *Webster v. Caraway*, 761 F.3d 764 (7th Cir. 2014).  However, en banc

review was granted, and the en banc court reversed this Court's decision and remanded for

further proceedings. *Webster v. Daniels*, 784 F.3d 1123 (7th Cir. 2015) (en banc). This Court

held a hearing in June 2018 pursuant to the Seventh's Circuit directive and found that the Social

Security records at issue were unavailable to Webster and his counsel at the time of trial despite

trial counsel's due diligence.

The Seventh Circuit provided the following summary of the Social Security records'

contents:

---

[2]Webster is incarcerated at the United States Penitentiary, Terre Haute, which is located
within the Southern District of Indiana.

The newly produced records, which Webster's current lawyers received on February 9, 2009, showed that Webster applied for Social Security benefits based on a sinus condition when he was 20 years old, approximately a year before the crime. The agency's attention was evidently quickly redirected to Webster's mental capacity. Two psychologists and one physician examined him. On December 22, 1993, Dr. Charles Spellman, a psychologist, evaluated him for the purpose of ascertaining his eligibility for Social Security benefits. He noted that "[i]deation was sparse and this appeared to be more of a function of his lower cognitive ability than of any mental illness." Dr. Spellman also observed that Webster's intellectual functioning was quite limited: he could not register three objects (meaning that he could not remember three objects a short time after they were shown to him); he could not do simple calculations; and he did not know what common sayings meant. With respect to adaptive functioning, Dr. Spellman stated that Webster lived with his mother; that he watched television, listened to the radio, and went walking; that he did no chores around the house; and that he was idle both in the house and on the streets. Taking into account both his estimate that Webster's I.Q. was 69 or lower and his assessment of adaptive functioning, Dr. Spellman concluded that Webster was mentally retarded and antisocial. He found no evidence of exaggeration or malingering.

A few months earlier, in October 1993, Dr. Edward Hackett conducted a full-scale WAIS I.Q. test on Webster. He came up with a verbal I.Q. of 71, a performance I.Q. of 49, and a full-scale I.Q. of 59. He evaluated Webster as "mildly retarded, but . . . also antisocial." Pertinent to the central question of adaptive functioning, Dr. Hackett noted in a later report that "[Webster] was viewed as a somewhat mild[ly] retarded con man, but very street wise. . . . [H]e could not be functional in a community setting. . . . He would also not function well in the work place." Dr. Hackett did not believe that Webster was capable of managing his own benefits. He found Webster's behavior somewhat bizarre. Finally, he commented that on the I.Q. tests, Webster's performance was estimated to be lower than his verbal score, and that some organic function might be involved.

The last professional to examine Webster in conjunction with the 1993 Social Security application was Dr. C.M. Rittelmeyer, a physician. Dr. Rittelmeyer found Webster's physical health to be fine, but he also had this to say: "Mental retardation. Flat feet. Chronic sinus problems and allergies by history."

The Social Security records included an intriguing letter that strongly suggested that Webster in fact had been in special education classes. It was dated November 8, 1993, and had been written by Lou Jackson, the Special Education Supervisor for the school system Webster had attended, Watson Chapel Schools. Jackson's letter explained that Webster's special education records had been destroyed in 1988, after the family did not respond to a letter "telling them they could have the records if they wanted them."

3

The Social Security records also provide some direct evidence about Webster's abilities. The form Webster completed, for example, is rife with errors in syntax, spelling, punctuation, grammar, and thought. In response to a question asking him to describe his pain or other symptoms, Webster wrote "it causEs mE to gEt up sEt Easily hEadhurtsdiffiErnt of brEdth." When asked about the side effects of his medication, he wrote "Is lEEp bEttEr." When asked about his usual daily activities, Webster wrote (consistently with the comments from his teacher and employer) "I slEEps look at. cartoon." He reported that he "ain't got no chang" in his condition since its onset.

*Webster*, 784 F.3d at 1133-34.

The undersigned held a five-day hearing in April 2019 on the issue of whether Webster is intellectually disabled and thus constitutionally ineligible for the death penalty. The Court heard live testimony from the following witnesses: Dr. Mark Tassé; Dr. Daniel J. Reschly; Dr. John Fabian; Dr. Robert Denney; Dr. Erin Conner; John S. Edwards, III; and Phil Woolston. The Court also received the deposition testimony of Dr. Charles Spellman (video and transcript); Dr. Jacqueline Blessinger (transcript); and Larry Moore (video and transcript). Each party also introduced numerous exhibits.[3]

## II.    DIAGNOSTIC CRITERIA FOR INTELLECTUAL DISABILITY

In determining whether Webster is intellectually disabled, the Court will rely on the clinical definitions of intellectual disability promulgated by the American Association on Intellectual and Developmental Disabilities ("AAIDD") and the American Psychiatric Association ("APA") manuals: (1) AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports (11th ed. 2010) ("AAIDD-11"); and (2) APA, Diagnostic and

---

[3]Over Webster's objection, the Court also has considered the trial transcripts and evidence admitted during the trial that were introduced as exhibits at the hearing, including the Southeast Arkansas Economic Development Records and Arkansas State Police Driving Records.

Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-5"). *See Moore v. Texas*, 137 S.

Ct. 1039, 1045 (2017) (relying on AAIDD-11 and DSM-5).

As the Supreme Court has explained,

the generally accepted, uncontroversial intellectual-disability diagnostic definition . . . identifies three core elements: (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean— i.e., a score of roughly 70—adjusted for the standard error of measurement); (2) adaptive deficits (the inability to learn basic skills and adjust behavior to changing circumstances); and (3) the onset of these deficits while still a minor.

*Moore*, 137 S. Ct. at 1045. Each of these three prongs must be met for a person to be

intellectually disabled.[4]

The APA defines intellectual disability as "a disorder with onset during the

developmental period that includes both intellectual and adaptive functioning deficits in

conceptual, social, and practical domains." DSM-5 at 33. The following three criteria must be

met before an individual may receive a diagnosis of intellectual disability:

A. Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.

B. Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.

C. Onset of intellectual and adaptive deficits during the developmental period.

*Id.*

---

[4]The Government does not argue—and there is no suggestion in the record—that if Webster is intellectually disabled that condition did not arise prior to age 18.

The AAIDD provides a similar explanation, stating that intellectual disability is "characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." AAIDD-11 at 6. Deficits in intellectual functioning are established by "an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations." *Id.* at 27. Deficits in adaptive functioning are measured by:

> performance on a standardized measure of adaptive behavior that is normed on the general population including people with and without [intellectual disability] that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, and practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills.

*Id.*

## A. Intellectual Functioning

The first prong requires an assessment of an individual's intellectual functions that "involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding." DSM-5 at 37. Intellectual functioning is typically measured by intelligence quotient (IQ) tests. *Id.* The APA describes this prong, in relevant part, as follows:

> Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence. Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65–75 (70 ± 5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

DSM-5 at 37. The AAIDD Manual provides:

6

The "significant limitations in intellectual functioning" criterion for a diagnosis of intellectual disability is an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific instruments used and the instruments' strengths and limitations.

AAIDD-11 at 31.

**B. Adaptive Functioning**

The second prong involves an assessment of an individual's adaptive functioning to determine whether "adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community." DSM-5 at 33. The APA indicates that adaptive functioning involves adaptive reasoning in three broad domains:

The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others.

DSM-5 at 37-38.

A person's adaptive functioning in at least one of these three domains must be "sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." *Id.* at 38; *Moore*, 137 S. Ct. at 1046 ("In determining the significance of adaptive deficits, clinicians look to whether an individual's adaptive performance falls two or more standard deviations below the mean in any of the three adaptive skill sets (conceptual, social, and practical)."). The AAIDD defines the second prong as "significant limitations . . . in conceptual, social, and

practical skills." AAIDD-11 at 43. Further, "the deficits in adaptive functioning must be directly related to the intellectual impairments described in [the first prong]." DSM-5 at 38.

Both the DSM-5 and the AAIDD-11 direct clinicians to use standardized measures of adaptive functioning when possible. *See* DSM-5 at 37 ("Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures."); AAIDD-11 at 43 ("[S]ignificant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population . . . .").

## III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court will address Webster's intellectual functioning and adaptive functioning in turn.

### A.   Webster's Intellectual Functioning

The Court finds that Webster has proved by a preponderance of the evidence that he has significant limitations in intellectual functioning and thus satisfies the first prong of the intellectual disability definition. He has produced reliable evidence that he has an IQ at least two standard deviations below the mean.[5]

Webster has produced the following IQ test scores:

| Psychologist | Year | Score |
|---|---|---|
| Dr. Patrick Caffey (Arkansas Department of Mental Health) | 1992 | 48 (Full scale) 56 (Verbal) 48 (Performance) |
| Dr. Edward Hackett (Social Security Administration) | 1993 | 59 (Full scale) 71 (Verbal) 49 (Performance) |
| Dr. Raymond Finn (Defense trial expert) | 1995 | 59 (Full scale) 59 (Verbal) |

---

[5]"Although far from perfect, intellectual functioning is currently best represented by IQ scores when they are obtained from appropriate, standardized and individually administered assessment instruments." AAIDD-11 at 31.

| | | 60 (Performance) |
|---|---|---|
| Dr. Dennis Keyes (Defense trial expert) | 1995 | 55 (Composite) 67 (Crystalized) 46 (Fluid) |
| Dr. Raymond Finn (Defense trial expert) | 1996 | 65 (Full scale) 72 (Verbal) 59 (Performance) |
| Dr. Dennis Keyes (Defense trial expert) | 1996 | 51 (Full scale) N/A (Verbal) N/A (Performance) |
| Dr. George Parker (Government trial expert) | 1996 | 72 (Full scale) 77 (Verbal) 67 (Performance) |
| Dr. Robert Denney (Government expert) | 2018 | 61 (Full scale) 63 (Verbal) 69 (Performance) |
| Dr. Daniel Reschly (Webster expert) | 2018 | 53 (Full scale) N/A (Verbal) N/A (Performance) |

Additionally, as noted above, as part of the Social Security process in 1993, Dr. Spellman estimated that Webster's IQ was 69 or lower, and Dr. Rittelmeyer commented that Webster was mentally retarded.

All of Webster's full-scale IQ tests fall below 75. The parties agree that some of the tests are invalid and should not be considered.[6] Eliminating those scores, the remaining scores are as follows: 59, 59, 65, 51, 55, 61, and 53.[7] Thus, if these scores are valid, they demonstrate that Webster satisfies the intellectual deficit prong of intellectual disability.

---

[6]Specifically, the score obtained in 1992 by Dr. Caffey might have been artificially low because the test was administered while Mr. Webster was experiencing mental health symptoms, including perhaps symptoms of schizophrenia, and in 1996 Dr. Parker improperly omitted certain subtests, which rendered the results he obtained unreliable.

[7]The weight of the evidence supports a finding that Webster was not motivated to underperform on tests conducted prior to his trial. The evidence presented at the trial included only one IQ test that had been performed on Webster before the crime—the 1992 test done at the Southeast Arkansas Mental Health Clinic. Notably, the jury did not hear evidence that was later obtained from Webster's Social Security files: Webster had scored 59 on Dr. Hackett's test; Dr. Spellman had estimated Webster's IQ to be 69 or lower; and Dr. Rittelmeyer commented that Webster was "mentally retarded."  In light of the Government's arguments at trial that Webster

The scores themselves were obtained over a period of twenty-five years and consistently demonstrate that Webster has an IQ that falls within the range of someone with intellectual deficits. In reaching this conclusion, the Court finds that the evidence does not support a finding of malingering[8] such that the tests are invalid. The Court relies on the testimony of Dr. Fabian, who is board certified in forensic psychology and clinical psychology and fellowship trained in neuropsychology.[9] Specifically, Dr. Fabian explained that the effort testing[10] showed, at most,

---

was motivated to underperform on later tests to avoid the death penalty, this omission is particularly significant.

[8]The APA describes malingering as follows:

The essential feature of malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs. . . . Malingering should be strongly suspected if any combination of the following is noted:

1. Medicolegal context of presentation (e.g., the individual is referred by an attorney to the clinician for examination, or the individual self-refers while litigation or criminal charges are pending).

2. Marked discrepancy between the individual's claimed stress or disability and the objective findings and observations.

3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen.

4. The presence of antisocial personality disorder.

DSM-5 at 726-27.

[9]The Court finds the testimony of Dr. Fabian to be extremely credible and persuasive. Of particular note is that Dr. Fabian acknowledged and considered evidence that was contrary to his ultimate conclusion. As he put it, "Certainly, there are strengths and weaknesses in these cases. They're not perfect cases, but you want to look at the case in its totality and come up with your clinical judgment and overall opinion as to your findings as in this case what intellectual disability is or whether that person has it." Dkt. No. 192 at 161. Nonetheless, after applying his clinical judgment to the totality of the evidence and facts, Dr. Fabian concluded that Webster did have a mild intellectual disability.

[10]Effort testing involves stand-alone or embedded questions within another test used to determine whether someone is putting forth adequate effort on a test.

that Webster at times had variable effort.[11] He also distinguished malingering from poor effort and pointed to Webster's "base foundation of complex trauma" and the atypical testing conditions. Dkt. No. 192 at 145. Dr. Fabian also testified that low IQ creates a risk of false positives for poor effort on effort tests and that Webster passed most of the Reliable Digit Span tests and other later effort tests. The Court credits Dr. Fabian's testimony that, considering all of these factors, Webster was not malingering.[12]

Further, the Court credits the testimony of Dr. Reschly, a school psychologist who is currently a professor emeritus of Education and Psychology at Vanderbilt University, that it would be "extremely difficult" to consistently fake IQ scores in that range over the course of twenty-seven years.[13]  Dkt. No. 189 at 173. The Court also credits the testimony of Dr. Reschly

---

[11]The Government argues that the validity tests indicated that Webster was malingering. Specifically, the Government points to the testimony of Dr. Denney that Webster failed the Word Memory Test ("WMT") and that Webster's results on the Medical Symptom Validity Test ("MSVT") also showed that Webster was malingering. For the reasons explained below, the Court gives Dr. Denney's testimony little weight.

[12]The Government has pointed to contrary evidence, including DSM-5 factors that the Government argues indicate that malingering should be strongly suspected. Specifically, the Government points to the fact that much of Webster's testing occurred in the medicolegal context of presentation. Further, the Government points to evidence that there was a marked discrepancy between Webster's claimed disability and the objective findings and observations. As the Government notes, even some of Webster's own experts were surprised by the test results. The Government acknowledges that it is difficult to evaluate the third factor—lack of cooperation with the diagnostic evaluation and in compliance with the prescribed treatment regimen—but points to Dr. Hackett's observation that Webster showed no signs of wanting to improve. Finally, Webster has been diagnosed with antisocial personality disorder. While the Court gives this evidence some weight, for the reasons explained above, the Court finds that this evidence is outweighed by other evidence that does not support a finding of malingering.

[13]The Court finds the testimony of Dr. Denney, a licensed clinical psychologist who is board certified in clinical neuropsychology and forensic psychology, overall to be not credible and thus gives it little or no weight. As a whole, Dr. Denney focused on evidence that supported his conclusions while ignoring, disregarding, or minimizing evidence that called his conclusions into question.

For example, the Court finds that the testimony of Dr. Denney that malingering on IQ tests is easy is unsupported by the article on which Dr. Denney relied. In fact, the article reached the following conclusion: "The results of this study suggest that faking low on the WAIS-R is a

that it would be "extremely unusual" for a person to have the same performance across multiple

subtests; rather, what happens frequently "is that there are fairly wide variations across different

subtests." Dkt. No. 189 at 178.[14] The Court also credits the testimony of Dr. Fabian that

Webster's IQ scores were consistent and indicated mild intellectual disability. Dr. Fabian's own

---

difficult endeavour." Lorraine Johnstone & David J. Cooke, "Feigned Intellectual Deficits on the Wechsler Adult Intelligence Scale-Revised," 42 *British J. of Clinical Psych.* 303, 314 (2003). When asked about this statement in the article, Dr. Denney replied, "Yes. It says that in that sentence, but that's not what that's talking about at that point." Dkt. No. 192 at 118. He did not elaborate. In any case, the study did not address the ease of repeatedly producing fake low IQ test results over several decades, as the Government argues Webster did.

Similarly, Dr. Denney's criticism of Dr. Reschly for allegedly being not properly licensed in Indiana and allegedly practicing outside his training as a school psychologist is not well taken. Dr. Denney himself is not licensed in Indiana, and Dr. Denney acknowledged that he worked with a master's level school psychologist who did testing in a prison setting.

More importantly, some of Dr. Denney's testimony is demonstrably incorrect or appears to reveal biases. Specifically, Dr. Denney testified that the results of the Test of Malingering Memory ("TOMM") administered by Dr. Reschly should be considered invalid because Dr. Reschly "didn't give the whole test. He only gave the first two trials. He didn't give the retention trial, which research shows makes it a more sensitive validity test. He didn't do that, but the results of it were within expected limits." Dkt. No. 191 at 208. Dr. Reschly, however, did administer all three trials of the TOMM, including the retention trial, and Webster passed all three trials. Dr. Denney testified that he had access to the raw data from Dr. Reschly's administration of the TOMM—which shows that the retention trial was administered.

Also troubling to the Court is Dr. Denney's reliance on an evaluation done on July 8, 1992, in which, according to Dr. Denney, psychiatrists at the Southeast Arkansas Mental Health Center "did not see an indication of a substantially low intellectual functioning in their examination." Dkt. No. 192 at 25. Notably, the report to which Dr. Denney refers does not mention Webster's intellectual functioning, instead focusing on Webster's reports of the voices in his head that were telling him to kill people. It does, however, mention that Webster was in for psychological testing. At the time Dr. Denney formed his opinion on the psychiatric evaluation report, he had not realized that another report, completed by a psychologist examiner and consulting psychologist at the Southwest Arkansas Mental Health Center on the same day, showed that Webster had a full-scale IQ of 48. Even after Dr. Denney reviewed the reports of the psychological evaluation for the first time during the hearing, he refused to consider explanations other than the conclusion he had reached before learning of the psychological evaluation report.

[14]The Government points to Dr. Denney's testimony that Webster's test results are inconsistent and mutually contradictory. The Court has considered this testimony but finds that it is outweighed by other evidence discussed above.

testing to assess Webster's general reasoning ability was also consistent with the IQ testing that Drs. Denney and Reschly conducted.

Looking first at the tests that were performed before the crime, the weight of the evidence supports a finding that Webster was not motivated to underperform on the testing performed as part of his application for Social Security.[15] In the form Webster filled out, he described his symptoms as follows:

---

[15]The Government argues that Webster had motive to malinger when he was tested to determine his eligibility for Social Security benefits. In support of that argument, the Government points to the testimony of Dr. Denney: "And, while Webster argues that he only applied for benefits due to sinus problems, his mother told Dr. Denney that she brought Webster to the Social Security Administration because of his sinus problem and concerns that he may have issues with his brain. Hr. Tr. 688:1-9." Dkt. No. 195 at 38.

In fact, Dr. Denney testified as follows:

Q: In 1993, [Webster] applied for Social Security; is that correct?
A: I'm not exact on the date; but yes, he did apply.
Q: Okay. And he applied because he had sinus trouble; is that right?
A: Well, that's what's written on the document. I recalled -- actually, I recalled it last night, that Mrs. Webster told me during her interview that they applied for sinus problems; and she also told me that she was concerned that that might relate to his brain.
Q: That his sinus trouble might relate to his brain?
A: Yes.
Q: That's what Mrs. Webster told you?
A: Yes, it was in the notes.

Dkt. No. 192 at 34-35. As such, the Government's argument mischaracterizes Dr. Denney's testimony.

Hrg. Ex. 21 at 63.[16] In additional Social Security documents, Webster also referred to sinus

symptoms as the basis for his disability claim.

Further, Dr. Charles Spellman,[17] a psychologist who conducted a mental status evaluation

of Webster at the request of the Social Security Administration in 1993 and who found that

Webster's total presentation was of someone who was mentally retarded, with an IQ of 69 or

lower, testified that he is "always hyper vigilant for malingering" Dkt. No. 164-1 at 31, yet he

found no evidence of exaggeration or malingering.[18]

With regard to the testing that was performed after the crime and before Webster's trial,

the testimony of Larry Moore, Webster's trial attorney, which the Court finds to be credible,

established that Webster did not know the purpose of the testing that was conducted between the

time of the crime and Webster's trial and that Moore told Webster to do his best because the

---

[16]The Court did not consider Exhibits 42 and 43 in making its ruling, as the Court found other evidence sufficient to make its findings with regard to whether Webster is intellectually disabled.

[17]The Court considered the testimony of Dr. Spellman over Webster's objection.

[18]During Dr. Spellman's deposition, the Government asked Dr. Spellman many hypothetical questions about whether a person who was intellectually disabled could perform certain tasks. The Court gives no weight to his answers to those questions, as the questions did not provide Dr. Spellman with enough details or context to warrant giving his answers weight in making a finding specific to Webster.

better Webster did, the more it would help him. Moreover, Moore testified that he purposely avoided telling Webster that he planned to argue that Webster was mentally retarded until right before jury selection because he knew that Webster did not like the term and "didn't want to be stigmatized as being retarded." Dkt. No. 164-2 at 25. Accordingly, the Court finds that Webster has presented convincing evidence that he was not motivated to malinger on the IQ tests given in 1995 and 1996 and that the results of those tests are valid.

The Court finds that Webster has shown by a preponderance of the evidence that his IQ scores were valid, and, after considering the evidence as a whole, the Court finds that Webster has shown by a preponderance of the evidence that he has deficits in intellectual functioning.[19]

### B.     Webster's Adaptive Functioning

The Court finds that Webster also has proved by a preponderance of the evidence that he has significant limitations in adaptive functioning and thus satisfies the second prong of the intellectual disability definition.

The Court gives great weight to the testimony of Dr. Fabian that Webster has significant deficits in adaptive behavior. Dr. Fabian administered a series of tests to Webster and considered adaptive functioning assessments administered by other psychologists. Dr. Fabian also spent a great deal of time interviewing Webster and reviewed numerous records, including Webster's school records and the Social Security records. Additionally, Dr. Fabian's explanation of why he gave weight to some evidence while giving little weight to other evidence was especially persuasive. In particular, the Court found Dr. Fabian's explanation of why he gave little weight

---

[19]In reaching its decision, the Court has considered the evidence that could suggest that Webster does not have deficits in intellectual functioning, including Dr. Denney's testimony as to the import of the results of Webster's effort testing, Webster's real-world functioning, and Webster's achievement test scores.

to Webster's adaptive functioning in prison to be very convincing. Dr. Fabian explained that a prison environment is very structured, and everything is available to an inmate.

The Court also credits the testimony of Dr. Reschly that Webster meets the second prong. Dr. Reschly considered a wide variety of information in reaching his decision, and he interviewed many people who knew Webster during the developmental period, including people who are not his direct relatives. Dr. Reschly also considered standardized adaptive behavior assessments, and the Court finds his explanation of why the more recent adaptive behavior assessments should be viewed with caution to be persuasive. Dr. Reschly explained that someone with an intellectual disability does not likely function in the "predictable, very rigid structure" of prison the same way that person would function outside of that environment. Dkt. No. 190 at 43. The Court also credits the testimony of Dr. Reschly that Webster has deficits in the conceptual, social, and practical domains.

In reaching this conclusion, the Court also has looked to the Social Security records that were not available to Webster at the time of his trial. As the Seventh Circuit pointed out, the application materials revealed that Webster was barely literate.[20] For example, for information about his job duties, Webster listed his job title as "Cement" and provided the following description:

---

[20]The Court also found persuasive Dr. Fabian's characterization of Webster's responses to questions in the Social Security records as being concrete and limited, which Dr. Fabian testified was consistent with his interactions with Webster.

> I vEAlly did no what I was doing
> I had helpE from the other worker
> that work with mE. I hElp spread
> the cEment out.

Hrg. Ex. 21 at 66. He listed this same job on four separate pages, although the instructions indicated that the applicant should provide the information for each job he had listed, and Webster had listed only one job.

Webster's answers to the section on Recreational Activities and Hobbies also supports the conclusion that Webster was barely literate:

Recreational Activities and Hobbies

A. Do you do any reading?  ☑ Yes  ☐ No
   If yes, describe what you read: _Playboy naked_
   _books_

         How often and how long do you read? _____
   _long times_

   If no, describe why not: _____

B. Do you watch television or listen to the radio?  ☑ Yes  ☐ No
   If yes, describe what you watch or listen to: _cartoons._
   _BET cinamacks rap musics_

         How much time do you spend doing this? _____
   _lots of times_

   If no, describe why not: _____

C. Do you have any hobbies or pastimes?  ☑ Yes  ☐ No
   If yes, describe the things you do: _radio, TV past_
   _my times_
         How often do you do these things? _everyday_

         How much time do you spend doing these? _a lots of_
   _time_

   If no, describe why not: _____

D. Describe any changes in these activities since your condition began:
   _thats my everyday thang_

Hrg. Ex. 21 at 19.

The Government has pointed to evidence that Webster does exhibit areas of strength, including, but not limited to, his musical ability, excellent hygiene, ability to drive, achievement test scores, and ability to engage in conversation.[21] The Government also has argued that the facts of the crime demonstrate that Webster does not have deficits in adaptive functioning.[22] However, in accordance with guidance from the medical community and as instructed by the Supreme Court, the Court has focused its adaptive-functioning inquiry on adaptive deficits. *See Moore I*, 137 S. Ct. at 1050 (citing AAIDD-11, at 47 ("significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills"); DSM-5, at 33, 38 (inquiry should focus on "[d]eficits in adaptive functioning"; deficits in only one of the three adaptive-skills domains suffice to show adaptive deficits); *see Brumfield* [*v. Cain*, 135 S. Ct. 2269, 2281 (2015)] ("[I]ntellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.'" (quoting AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 8 (10th ed. 2002))).

Over Webster's objections, the Court has considered evidence about Webster's behavior, education, work, and mental health in prison, including all of the Bureau of Prisons records[23]

---

[21]For reasons explained above, the Court gives little weight to the testimony of Dr. Denney that Webster does not have significant deficits in the conceptual domain, social domain, or practical domain. The Court has looked at the evidence pointed to by Dr. Denney in support of his conclusion and does not find Dr. Denney's explanation as to the conclusions that he has drawn to be persuasive.

[22]Over Webster's objection, the Court has considered evidence about the facts of the crime and has viewed those facts in the light that most favorably supports the Government's argument.

[23]These records include the emails that the Government argues that Webster has written while incarcerated. The Court has assumed for the purposes of making its findings that Webster did, in fact, write these emails himself.

introduced by the Government and the testimony of Dr. Jacqueline Blessinger; John S. Edwards, III; and Phil Woolston.[24] The Court also considered much of the testimony of Dr. Erin Conner.[25] The Court gives little weight to this evidence, relying on Dr. Fabian's cautions as to the use of such evidence. *See also Moore I*, 137 S. Ct. at 1050 ("Clinicians, however, caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is. DSM-5, at 38 ('Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.'); *see* AAIDD-11 User's Guide 20 (counseling against reliance on 'behavior in jail or prison'").). Additionally, the Court would give little weight to the testimony of Drs. Conner and Blessinger even had their interactions with Webster not taken place in a prison setting. Neither the quantity nor depth of their interactions with Webster would lead the Court to find their testimony to be more persuasive than that of Drs. Fabian and Reschly. The Court did consider Edwards' testimony as to his conversations with Webster, observations of Webster's behavior and performance as an orderly, and emails that he received that he believed to be from Webster but finds that this testimony is outweighed by other evidence discussed above.

Weighing the evidence as whole, the Court finds that Webster does have deficits in his adaptive functioning.[26]  Further, the Court finds that the evidence supports a finding that

---

[24]Woolston has only been briefly introduced to Webster. Woolston testified to lay the foundation for the BOP educational records, which the Court has admitted and considered.

[25]The Court finds that Dr. Conner's testimony about inmate Ronell Wilson is not relevant; as such, the Court did not consider that testimony.

[26]While there was some evidence that Webster was not in special education classes in school, the Court finds that the weight of the evidence supports a finding that Webster was, in fact, in special education. In making this finding, the Court has considered, over Webster's objections, the school records introduced by the Government at the hearing.

Webster's deficits are related to intellectual functioning.[27] In making this decision, the Court has considered, over Webster's objection, evidence of Webster's other psychological conditions.[28] Therefore, the Court finds that Webster has shown by a preponderance of the evidence that he has significant deficits in adaptive functioning and as such satisfies the second prong of intellectual disability.

## IV.    CONCLUSION

The Court finds that Webster has met his burden and shown by a preponderance of the evidence that he is intellectually disabled, as he meets all three prongs of intellectual disability: 1) Webster has intellectual-functioning deficits; 2) Webster has adaptive deficits; and 3) the onset of these deficits was while Webster was a minor. In making this ruling, the Court has carefully considered the totality of the evidence and weighed the testimony in accordance with its credibility assessment of each witness.

Accordingly, Webster's petition for a writ of habeas corpus is **GRANTED**. Webster's death sentence is vacated under 28 U.S.C. § 2241. The Attorney General has 120 days from the Entry of Final Judgment to take appropriate action in light of the writ. Further sentencing proceedings shall occur in the Northern District of Texas.

SO ORDERED: 6/18/2019

_William T Lawrence_
Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[27]Dr. Tassé testified that it is impossible to prove this relationship clinically. See Dkt. No. 189 at 48 ("[W]e wouldn't know whether it's the adaptive behavior deficits that caused the intellectual functioning deficits or the intellectual deficits caused the adaptive behavior deficits."). The Court finds his testimony on this topic to be persuasive.

[28]Specifically, the Government has pointed to Webster's antisocial personality disorder.