UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION


| | | |
|---|---|---|
| BRUCE CARNEIL WEBSTER | ) | |
| | ) | Cause No. |
| Petitioner, | ) | 2:12-CV-00086-WTL-MJD |
| | ) | Indianapolis, Indiana |
| vs. | ) | **June 18**, 2018 |
| | ) | 9:06 a.m. |
| CHARLES LOCKETT, | ) | |
| | ) | |
| Respondent. | ) | |

**Before the Honorable
WILLIAM T. LAWRENCE**

OFFICIAL REPORTER'S TRANSCRIPT OF
EVIDENTIARY  HEARING

**For Petitioner:**                    Steven Wells, Esq.
                                       Kirsten Schubert, Esq.
                                       Dorsey & Whitney LLP
                                       50 S. 6th Street, Suite 1500
                                       Minneapolis, MN  55402

**For Petitioner:**                    Monica Foster, Esq.
                                       Indiana Federal Community
                                       Defenders
                                       111 Monument Circle, Suite 2150
                                       Indianapolis, IN  46204

**For Respondent:**                    Timothy Funnell, Esq.
                                       Jay Weimer, Esq.
                                       U.S. Attorney's Office
                                       801 Cherry Street, Unit 4
                                       Forth Worth, TX  76102

Court Reporter:                        Margaret A. Techert
                                       United States District Court
                                       101 NW Martin Luther King Blvd.
                                       Evansville, Indiana  47708


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

LARRY M. MOORE

Direct Examination by Ms. Foster ...............11
Cross-examination by Mr. Funnell ...............84
Redirect examination by Ms. Foster ...........123
Recross-examination by Mr. Funnell ...........130
Redirect examination by Ms. Foster ...........131

KRISTEN LEROUX

Direct Examination by Ms. Schubert ...........133
Cross-examination by Mr. Weimer ...............176
Redirect examination by Ms. Schubert .........190
Recross-examination by Mr. Weimer .............198

1              (In open court.)

2          THE CLERK:  Please rise.

3          THE COURT:  Be seated, please.  We are on the record

4  on cause number 2:12-CV-86, Bruce Carneil Webster, petitioner

5  versus Charles Lockett, Warden, United States Penitentiary,

6  Terre Haute.

7          Good morning, counsel.

8          We have Mr. Funnell.  Is that correct?

9          MR. FUNNELL:  Yes, Your Honor.

10         THE COURT:  Welcome.  And who's with you today?

11         MR. WEIMER:  Jay Weimer, Your Honor, from the U.S.

12  Attorney's from the Northern District Texas.

13         THE COURT:  Thank you.  And Mr. Wells, who is with

14  you today?

15         MR. WELLS:  Your Honor, seated at counsel table to

16  my left, Katherine Johnson, Monica Foster and Kirsten

17  Schubert, and with us is Mr. Webster.

18         THE COURT:  Very well.  Good morning.  We are here

19  as a result of a mandate from the Seventh Circuit Court of

20  Appeals which has directed that I determine whether

21  Mr. Webster can show that the Social Security records at issue

22  in this case were unavailable to Mr. Webster and his trial

23  counsel at the time this matter went to trial in 1996.

24         In making that determination, I am to determine

25  whether trial counsel exercised due diligence and in the event

1   I find that the records from Social Security were unavailable

2   to trial counsel, despite his due diligence, I am to have a

3   second hearing to determine whether Mr. Webster is

4   intellectually disabled and thus ineligible for the death

5   penalty.

6           If I find that the records were available or that

7   Mr. Webster's trial counsel did not exercise due diligence,

8   then Mr. Webster's petition is to be denied.

9           Mr. Wells, do you believe that is a correct

10  statement as to where this case is now?

11          MR. WELLS:  I do, Your Honor.  That seems to be a

12  correct reading of the Seventh Circuit's opinion.

13          THE COURT:  And Mr. Funnell?

14          MR. FUNNELL:  Yes, Your Honor.  That's correct.

15          THE COURT:  All right.  I've got a few housekeeping

16  matters that I would like to talk about before we get started

17  and if you all have some preliminary issues, we can discuss

18  them also.

19          The first issue I have is, is the government

20  agreeing that the standard or burden here is by a

21  preponderance of the evidence at this first step?

22          MR. FUNNELL:  Yes, we do, Your Honor.

23          THE COURT:  Very well.  And I note in the trial

24  brief from the petitioner, you have acknowledged that you

25  believe it is by a preponderance of the evidence also.  Is

1   that correct, Mr. Wells?

2           MR. WELLS:  That is correct, Your Honor.

3           THE COURT:  Very well.  All right.  I note that

4   there have been stipulations in regards to the exhibits.

5   Although the stipulation states that the parties are

6   stipulating to the authenticity and admissibility of

7   petitioner's first amended exhibit list appearing at docket

8   No. 1, I think that probably was a scribner's error.  I

9   believe it's docket 105.  Is that correct?

10          MR. WELLS:  Yes, Your Honor.

11          THE COURT:  All right.  And I believe there were

12  certain reservations taken to that stipulation.  Is that

13  correct, Mr. Funnell?

14          MR. FUNNELL:  Yes, Your Honor.  You can see from the

15  respondent's exhibits, the Court has them up there and they

16  were attached to our trial brief, we have five of them.  Two

17  of them are the declarations of Ms. LeRoux.  We have an

18  affidavit of Mr. Moore, and then we have two declarations from

19  Mr. Moore.  The government is not offering those for the truth

20  of the statements that those people attribute to the Social

21  Security Administration.

22          However, we are agreeing to the admissibility of all

23  of those sworn statements because we want the Court to be able

24  to look at them, examine them; but again, substantively we are

25  not agreeing that the conversations with Social Security took

1  place.  That's clear from our position in the trial brief.

2  And we're also not agreeing to the truth of the matters that

3  were supposedly said during those conversations.

4       THE COURT:  Mr. Wells, is that agreement?

5       MR. WELLS:  I believe I understand that to be their

6  reservation, Your Honor.

7       THE COURT:  All right.  So essentially, then, we

8  will then be admitting the exhibits previously offered in the

9  first amended hearing exhibit list, which I think goes

10 petitioner's exhibit 1 through 51, and government's exhibits

11 then 1 through 5, with the exception noted by Mr. Funnell.  So

12 we will be admitting those exhibits by stipulation.

13       I also note that as of last night, I believe that

14 the briefing on the spoliation issue is complete.  I had

15 candidly not expected the reply.  So I did not think briefing

16 would be complete this morning.  Have counsel talked about how

17 they wish to, I guess, handle that issue?  Mr. Wells.

18       MR. WELLS:  We haven't had a chance to discuss that

19 this morning, Your Honor, and one of my questions for the

20 Court is whether, after the conclusion of the evidence this

21 morning or early afternoon, whether the Court wanted to hear

22 oral argument on that motion or just take it on the papers.

23       THE COURT:  Mr. Funnell, do you have a word in that

24 regard?

25       MR. FUNNELL:  Your Honor, our position would be --

1   and, of course, we can change that with the Court's

2   preference, but our position would be that our brief on the

3   spoliation issue is comprehensive.  We believe it addresses

4   all of the arguments that have been raised.  That in

5   conjunction with the evidence that will be developed today,

6   and I'm sure the exchanges I think will sufficiently inform

7   the Court that we're not requesting anything additional.  So

8   that would be my position at this point.

9           THE COURT:  All right.  Fair enough.  I think that

10  probably is the -- I think that's the appropriate way to

11  handle that also.

12          MR. WELLS:  Your Honor, so the Court will take that

13  on the papers without argument -- without oral argument?

14          THE COURT:  Although I do believe, as Mr. Funnell

15  has indicated, if there are evidentiary issues that come to

16  the Court's attention in today's hearing, I think that will be

17  fair game and the Court will be considering that in the

18  spoliation issue also, if certain items come up.

19          MR. WELLS:  I understand, Your Honor.  I do want to

20  make one qualification to our stipulation.  I think we were

21  assuming that the exhibits on our list are subject to

22  admission but wouldn't actually be admitted unless we actually

23  offer and discuss them in testimony today.

24          THE COURT:  All right.  Well, let's do this to make

25  it easier on me, which is, of course, the whole point.  When

1   we get through with the hearing today, I will probably just

2   simply ask:  All right.  What exhibits are in play here?  And

3   then you can recite back which exhibits you believe are

4   relevant to the discussion based upon how the evidence comes

5   in and the arguments.

6          MR. WELLS:  Understood, Your Honor.  That's

7   acceptable.

8          MR. FUNNELL:  Your Honor, thank you.

9          THE COURT:  Let's see.  Let's talk about procedure

10  generally.  And what I would like to do is get the evidence

11  from both sides in first, hopefully as expeditiously as

12  possible, of course, with the petitioner going first in that

13  regard.  You have two witnesses today.  Is that correct?

14         MR. WELLS:  That is correct, Your Honor.

15         THE COURT:  And you have listed, Mr. Funnell, the

16  same witnesses.  Is that correct?

17         MR. FUNNELL:  Yes, that's correct, Your Honor.

18         THE COURT:  As far as I'm concerned, just make it

19  easier on me again, if you would incorporate your direct and

20  cross when each witness testifies, I think that way we won't

21  have to parade them to this witness stand twice.  Fair?

22         MR. WELLS:  That's certainly acceptable for us, Your

23  Honor.

24         THE COURT:  Okay.  How long do you think it's going

25  to take to get the evidence in?  Just ballpark.

1        MR. WELLS:  I would anticipate that we would be done

2   by lunch time.

3        MR. FUNNELL:  That's certainly a fair assessment,

4   Your Honor.

5        THE COURT:  We are under somewhat of a problem

6   because of court reporters.  So what I suggest is when the

7   evidence comes in, I will talk to counsel regarding time

8   limits to be assessed for argument and we can resolve this.

9   It's my full intent to get this matter resolved as far as

10  evidence and argument today.

11       MR. WELLS:  Your Honor, does that mean that we'll

12  have closing arguments today or would the Court -- is the

13  Court going to ask for -- excuse me, I've got a bit of a

14  cold -- proposed findings of fact and conclusions of law?

15       THE COURT:  Oh, I don't know.  It probably depends

16  on how it comes in, Mr. Wells.  We'll talk about that at

17  lunch.

18       All right.  Anything else we need to do procedurally

19  from the petitioner?

20       MR. WELLS:  No, Your Honor.  We're ready to proceed.

21       THE COURT:  Respondent?

22       MR. FUNNELL:  Nothing, Your Honor.  Thank you.

23       THE COURT:  Let me say that the temperature here is

24  outrageous, it being a Monday morning and GSA wanting to save

25  every last nickel, decides not to turn the air conditioner on

1  until this morning.  If all of counsel want to take their

2  jackets off during this proceeding, I have no problem with

3  that.

4           MR. WELLS:  Thank you, Your Honor.  If it's cold

5  comfort, our sleek modern 21st Century building has the same

6  problem.

7           THE COURT:  All right.  I see no need for any

8  opening statements.  However, if counsel wants to give me two

9  or three minutes, since you've been staying up all night

10  rehearsing your opening statements, I'll listen to whatever

11  you have to say.  Mr. Wells, any need for opening statements?

12           MR. WELLS:  Your Honor, if it's the Court's

13  preference to proceed with the evidence, we'll proceed with

14  the evidence.

15           MR. FUNNELL:  That's fine, Your Honor.  Thank you.

16           THE COURT:  All right.  In that case, petitioner,

17  you may call your first witness.

18           MR. WELLS:  Thank you, Your Honor.  The petitioner

19  calls Larry Moore.

20           MS. FOSTER:  I'm pretty sure all these Texans

21  brought this weather with them.

22           THE COURT:  Be seated, please.  And Ms. Foster, you

23  may inquire.

24           MS. FOSTER:  Thank you, Your Honor.

25

```
 1
 2            LARRY M. MOORE, PLAINTIFF'S WITNESS, SWORN
 3                      DIRECT EXAMINATION
 4   BY MS. FOSTER
 5   Q   Could you state your name and spell your last name for the
 6   record, please?
 7   A   I'm sorry.  Could you repeat the question?  I didn't hear.
 8   Q   Yes.  Could you state your name and spell your last name
 9   for the record?
10   A   My name is Larry Michael Moore, M-O-O-R-E.
11   Q   And where do you reside, Mr. Moore?
12   A   I live in Fort Worth, Texas.
13   Q   You came into Indiana yesterday.  Is that correct?
14   A   That's correct.
15   Q   Did you come in from Fort Worth, Texas?
16   A   No, I did not.
17   Q   Where did you come in from?
18   A   Knoxville, Tennessee.
19   Q   Why were you in Knoxville?
20   A   My son played a baseball tournament in Knoxville.
21   Q   So you're on vacation?
22   A   Yes.
23   Q   We're going to try our best to get you on and off here,
24   Mr. Moore.
25   A   Thank you.
```

 1  Q    Can you tell me what your current occupation is?

 2  A    I am chief of the criminal division of the Tarrant County

 3  Criminal District Attorney's office.

 4  Q    And Tarrant County is what city?

 5  A    Fort Worth is the county seat.

 6  Q    County seat?  I'm sorry.

 7  A    Fort Worth is the county seat of Tarrant County.

 8  Q    And that's in Texas?

 9  A    Yes.

10  Q    As the chief of the criminal division, can you tell us

11  what your duties are?

12  A    I supervise all of the criminal prosecutors in the

13  district attorney's office.  That's about 155 lawyers.

14  Q    How long have you had that position?

15  A    This time, since January the 1st of 2015.  I also held

16  that position from about November of 2014 through January

17  of -- excuse me, from November of 1984 through January 31st of

18  1986.

19  Q    When you say that position, you mean you were in the

20  prosecutor's office or you were also the chief of the criminal

21  division?

22  A    In the criminal division.  I started in the DA's office in

23  1977.

24  Q    How long have you been practicing law?

25  A    A little over 41 years.

1  Q   Why don't you give us a brief history of what you've done

2  in those 41 years.

3  A   I started in the District Attorney's office in 1977.  I

4  became chief of the criminal division in 1984.  I resigned

5  from the office in January -- January 31st of 1986 and went in

6  private practice; and I was in the private practice of law

7  doing primarily criminal defense work from 1986 until 2015,

8  when I went back to the DA's office.

9  Q   Do you hold any board certifications relevant to your law

10 practice?

11 A   Yes.  I was initially board certified in criminal law in

12 1982, and have been recertified every five years thereafter.

13 Q   We don't have board certifications in Indiana.  So can you

14 explain that to us?

15 A   Board certification is a process through the State Bar of

16 Texas by which you can become distinguished in a particular

17 area of law.  You have to pass an examination.  They do a

18 substantial background check.  You have to have letters of

19 recommendation from judges that you practice in front of and

20 lawyers that you practice with and against.

21 Q   And you first held that certification when?

22 A   I was first certified in 1982.

23 Q   And you say that you've got to be recertified every five

24 years?

25 A   There's a reapplication process every five years

1    thereafter.

2    Q    And is that as strenuous as the initial process?

3    A    No.  You have to have -- you don't have to take the test

4    again.  You have to do everything else other than take the

5    test.

6    Q    So for the recertifications, you have to have the letters

7    from the judges?

8    A    Yes.

9    Q    And the other things that you mentioned?

10   A    That's correct.

11   Q    You've been consistently and continuously recertified

12   since you initially got your certification?

13   A    Yes, I have; and they review your trials.  You have to

14   provide a list of the trials and appeals that you participated

15   in as counsel.

16   Q    How were you employed in 1994?

17   A    1994, I was in the private practice of law.

18   Q    And was your private practice limited in any way or did

19   you specialize in anything?

20   A    I did.  My practice was 100 percent criminal defense.

21   Q    Was that primarily state criminal defense or federal or

22   some combination?

23   A    It was primarily state at that time.  If you were licensed

24   in Federal Court, you were on the panel of attorneys that

25   would be -- could be subject to be appointed in criminal

*MOORE – DIRECT/FOSTER*                                  15

1  cases.

2  Q   Were you sometimes called into service as a panel attorney

3  in Federal Court?

4  A   Yes.

5  Q   At some point in 1994, were you -- were you appointed to

6  represent Bruce Webster?

7  A   Yes, I was.

8  Q   And do you see Mr. Webster in the Court today?  If I get

9  out of your way.

10 A   Yes.  He doesn't look like he did back then but yes, I see

11 him.

12 Q   How did that appointment come to be?

13 A   The federal magistrate for the Northern District of Texas

14 was a man named Alex McGlinchey, who I knew, and he called me

15 on the phone one day and asked me to come to his office and

16 talk about taking an appointment.

17 Q   And did you agree to take the appointment?

18 A   Yes.  After I discussed it with Judge McGlinchey, I

19 eventually accepted --

20 Q   I'm sorry.  After you discussed --

21 A   After I discussed it with Judge McGlinchey, I accepted the

22 appointment.

23 Q   I'm sorry.  I still didn't hear you.  After you discussed

24 it with who?

25 A   Judge McGlinchey, the magistrate.

1  Q   And at the time that you were appointed, had the

2  government committed itself to seeking the death penalty?

3  A   I don't think so.  I think that the conversation that I

4  had with Judge McGlinchey is that he anticipated that the

5  government may seek the death penalty against Mr. Webster and

6  that's the reason why he wanted me to be appointed.

7  Q   At the time that you were appointed to represent

8  Mr. Webster, did you have experience trying capital cases?

9  A   Yes, I did.

10  Q   And was that experience both as a prosecutor and a defense

11  lawyer?

12  A   Yes, it was.

13  Q   How many trials had you actually participated in, as a

14  prosecutor, where the government sought the death penalty?

15  A   At that point, three.

16  Q   And in those three cases that you handled as a prosecutor,

17  did you actually -- were you actually the one to give the

18  penalty phase argument?  In other words, were you the one that

19  asked the jury to return the death penalty?

20  A   Yes.

21  Q   And was the death penalty imposed in those cases?

22  A   One of them was pled during the trial.  One of them

23  resulted in a death verdict, and the other one resulted in a

24  life verdict.

25  Q   In the case that resulted in a death verdict, was that

```
 1   client -- was that defendant executed?

 2   A    He was eventually executed, yes.

 3   Q    In addition to your cases as a prosecutor, at the time

 4   that you were appointed to represent Mr. Webster, had you also

 5   tried cases -- death penalty cases as a defense lawyer?

 6   A    Yes.

 7   Q    And how many of those cases?

 8   A    I think at the time that I was appointed in Bruce's case,

 9   I tried three death penalty cases as a defense lawyer.

10   Q    Do you suspect that's why the magistrate contacted you,

11   because you were well known as a death penalty litigator in

12   Fort Worth?

13   A    Probably.

14   Q    In addition to these death penalty cases that you've

15   described where you went to trial, were you also involved in

16   other death penalty cases that were settled prior to trial?

17   A    I was involved in a number of capital cases.  In Texas,

18   capital murder has -- there's only two punishments; either

19   life in the penitentiary or the death penalty.  So when the

20   case is initially filed, there's a potential for the death

21   penalty, unless and until the State formally waives the death

22   penalty.  And I had been appointed in a number of -- and hired

23   in some capital cases where the determination is whether or

24   not to seek death had not been made yet.  I probably

25   represented 60 or more capital defendants in my time.
```

1    Q    Sixteen.

2    A    Sixty.

3    Q    Six zero?

4    A    Mm-hmm.

5    Q    And what about on the prosecution side?

6    A    I prosecuted a number -- I don't remember how many capital

7    murder cases I prosecuted where we did not seek death but it

8    was a number.

9    Q    Those are all cases that you handled prior to the time you

10   took the appointment for Mr. Webster?

11   A    That's correct.

12   Q    How soon after you were appointed did you meet with

13   Mr. Webster?

14   A    I think that I met him the day that I was appointed.  I

15   think Judge McGlinchey had him in the holding cell and then I

16   was able to talk to him the day that I was appointed.

17   Q    And is the holding cell a cell that's just behind the

18   courtroom?

19   A    Yes.

20   Q    Is it conducive to having a conversation with the client?

21   A    They've got an attorney's booth, but I'm not going to

22   discuss much of the details of the case with him in that

23   situation.

24   Q    As you continued your representation of Mr. Webster, did

25   you continue to meet with him?

```
 1  A    Yes.
 2  Q    And was there anything that stood out to you about his
 3  intellect as you began meeting with him?
 4  A    Yes.
 5  Q    What was that?
 6  A    Bruce is very concrete in the way that he thinks and the
 7  way that he acts and the way that he communicates.  He
 8  communicates on -- he's a very friendly person, very affable,
 9  but he has very limited ability to understand things.  Part --
10  during my representation, during the time that I represented
11  him in the case and that we would meet, I would continuously
12  explain things to him about the trial and about the law; and
13  it was obvious that Bruce did not understand.  He would try to
14  change the subject.  He would ask questions that didn't go to
15  the point that we were discussing, and it was apparent to me
16  that he suffered from some type of disability.
17  Q    And was that apparent to you pretty early on in your
18  representation?
19  A    Very early on.
20  Q    What conclusions did you draw as a result of those
21  observations?
22  A    I had -- I thought that Bruce suffered from some kind of
23  mental disability.  I did not know what the disability was.
24  There was some indication that he had had some kind of head
25  injury as a child, and I didn't know if it was an issue
```

1   regarding mental retardation or if there was some physical

2   source for the problem that he suffered.

3   Q    As a consequence of those observations, did you then

4   retain or ask the Court to appoint mental health experts to

5   evaluate him?

6   A    I did.

7   Q    And do you recall how many mental health experts were

8   appointed in this case?

9   A    I think all told, the defense hired and had appointed a

10  total of five.

11  Q    And were each of those five mental health experts

12  appointed by the Court and paid by the Court?

13  A    No.

14  Q    How -- for the ones that were not appointed and paid by

15  the Court, how were they paid?

16  A    My co-counsel Allan Butcher and I split the expense.

17  Q    Why did you do that?

18  A    Because I thought that it was necessary to have their

19  testimony in the particular areas of expertise in which they

20  practiced.

21  Q    Did you -- did you consider going to the Court before you

22  used your own funds?

23  A    We had talked to the judge.  He actually considered it.  I

24  obviously would prefer not to be paying them out of my pocket

25  but because of the way what had happened in the case -- or the

1    first psychologist we got appointed had been -- had become ill

2    and so we had to have another psychologist appointed.  And I

3    was concerned, based on my conversations with the judge, that

4    he would never authorize it.

5    Q    In your experience as a death penalty litigator, both for

6    the defense and the prosecution, was it your experience that

7    five experts in a capital case in 1996 in Texas was unusual?

8    A    No; it was exceptional.

9    Q    And exceptional in what way?

10   A    It never -- they never would have been appointed by the

11   judge and it was -- there's not many lawyers that would pay

12   them out of their own pocket.

13   Q    It was exceptional in that it was certainly more experts

14   than would be called in the run-of-the-mill capital case in

15   Texas?

16   A    Typically they'll appoint a single expert.

17   Q    Did each of the experts that you retained testify at

18   trial?

19   A    My recollection is that they did.

20   Q    And did you retain or have appointed any expert who gave

21   you an opinion that Mr. Webster did not suffer from mental

22   retardation?

23   A    No.

24   Q    As you became -- as you continued to work on the case and

25   became more familiar with the government's guilt phase

```
 1  evidence, did you develop an opinion as to the strength of the

 2  government's guilt phase case?

 3  A    Yes.

 4  Q    What was that opinion?

 5  A    It was overwhelming.

 6  Q    As a consequence of your belief that the guilt phase

 7  evidence that the government possessed was overwhelming, I

 8  presume you'd be in a penalty phase?

 9  A    Yes.

10  Q    How important was Mr. Webster's intellectual functioning

11  to your penalty phase trial strategy?

12  A    Well, I thought that it was the key to the penalty phase.

13  Q    And can you tell me why?

14  A    Well, at the time that the federal death penalty statute

15  was enacted back at that time in 1994, there was a statutory

16  bar to execution of mentally retarded people that was placed

17  in the statute.

18  Q    And that statute, how old was that statute at the time you

19  took on the -- when I'm talking about that statute, I'm

20  talking about the federal death penalty statute.  How old was

21  that statute at the time you took on Mr. Webster's

22  representation?

23  A    It's my recollection that the statute took effect just

24  weeks before the offense that Mr. Webster was charged with

25  having committed occur.
```

```
 1  Q   And you indicated that the statute had a carve-out for
 2  mental retardation?
 3  A   Yes.
 4  Q   In other words, the statute provided that you could not be
 5  executed if you were mentally retarded?
 6  A   That's correct.
 7  Q   Can you describe the capital case authorization process as
 8  it existed in 1994?
 9  A   At that point, all federal death penalty prosecutions had
10  to be authorized by the Attorney General of the United States.
11  And so the local prosecutor, the United States Attorney for
12  the Northern District of Texas, would have to make application
13  with the Attorney General's office in Washington, D.C. for
14  authority to do a death penalty prosecution.  They would have
15  a representative of the United States Attorney's office that
16  would meet with defense counsel, should they choose to do so,
17  to discuss the case prior to the authorization being made.
18  Q   Did you, in fact, travel to Washington to make a pitch for
19  why the government should not seek the death penalty in
20  Mr. Webster's case?
21  A   Absolutely.
22  Q   And how important was your mental retardation strategy to
23  your strategy seeking -- asking the government not to seek
24  authorization?
25  A   Well, I thought that it was an important issue; and so I
```

1   shared with them the information that I had at that point, had

2   learned in regard to Mr. Webster and the testing that had been

3   done for -- of him at the Arkansas Mental Health clinic that

4   indicated that he was mentally retarded.

5   Q    Did you share that information with the capital case

6   committee?

7   A    I did.

8   Q    As the case proceeded, did you -- I'm sorry.  At the

9   conclusion of the authorization process, the government, in

10  fact, authorized the death penalty?

11  A    Yes.

12  Q    And Texas was required that you file a death count against

13  Mr. -- yes.  And the U.S. Attorney's office in Texas was

14  required to indict Mr. Webster on the death penalty?

15  A    Yes.

16  Q    And they did that?

17  A    Yes.

18  Q    As you were working this case up and after the government

19  had sought authorization and obtained authorization, did you

20  attempt to negotiate the case to get rid of the death penalty?

21  A    We attempted to negotiate the case from the very

22  beginning.  Once the authorization was made to seek the death

23  penalty, the government was not interested in negotiating.

24  Q    You indicated that the death penalty statute was new at

25  the time that Mr. Webster's case was authorized?

```
 1   A    That's correct.

 2   Q    But that it excluded persons with mental retardation?

 3   A    Yes.

 4   Q    How specific was the statute regarding the procedure to be

 5   used for determining mental retardation?

 6   A    It was not specific at all.  They wrote a statutory bar

 7   but they did not set out any procedure as to who would make

 8   the determination, the standard under which it would be made,

 9   or how that decision would be made.

10   Q    Did the statute provide for the timing of the decision?

11   A    No.

12   Q    Did the statute -- you said the statute did not provide a

13   standard of proof.  Did it state who had the burden of proof?

14   A    No.

15   Q    You testified earlier that mental retardation was

16   important to you in this case.

17   A    Yes.

18   Q    And you said that it was because it was an exclusion?

19   A    Yes.

20   Q    Did you, as a consequence of the statute's lack of

21   guidance, consult legal experts concerning the role of mental

22   retardation in Mr. Webster's case?

23   A    As many as I could.

24   Q    Can you recall who those people were?

25   A    At that time there were three death penalty assistant
```

1    counsels that were appointed; David Bruck from South Carolina,

2    Kevin McNally from Kentucky, and Dick Burr from Houston,

3    Texas; and I spoke to all three of those.

4    Q   Was it your understanding that these were people who had

5    significant death penalty experience?

6    A   Yes.

7    Q   And they were people from around the country?

8    A   Yes.

9    Q   You sought their advice on the role of mental retardation

10   in Mr. Webster's case?

11   A   Yes.

12   Q   Had you done that before in other capital cases?

13   A   Not with those three particular individuals; but I think

14   in every capital case I've ever tried, I would talk to other

15   lawyers and get advice and kick ideas around, so forth.

16   Q   And in fact, Mr. McNally was then the resource counsel.

17   Is that correct?

18   A   Yes.

19   Q   So he was available for consultation?

20   A   Yes.  And he actually came and sat through, I think,

21   almost all of the voir dire.

22   Q   Did each of those persons make themselves available to you

23   without payment of fees?

24   A   Yes.

25   Q   With regard to the diagnosis of mental retardation, did

1    you consult medical experts?

2    A    Yes.

3    Q    And do you recall who those were?

4    A    We had him evaluated by the five experts that we had

5    appointed and retained in the case.  I also sought out every

6    medical record that I could find, every school record that I

7    could find, every person that I could find that had known

8    Mr. Webster growing up, to try to get information in regard to

9    that.

10   Q    Did you consult anyone who was an expert in mental

11   retardation or special education?

12   A    Yes.

13   Q    And who were those persons?

14   A    Well, I talked to Jim Ellis, who was a professor at the

15   University of New Mexico, and he was the primary author of the

16   statutory exclusion that was found in the federal death

17   penalty statute.

18   Q    It was your understanding that he assisted in drafting the

19   mental retardation carve-out to the statute?

20   A    That's correct.

21   Q    And so you sought him out to get advice from him?

22   A    Basically was trying to figure out how he envisioned that

23   the decision was to be made and who was to be the fact finder

24   in that regard.

25   Q    And you indicated that he was a special education

```
 1   professor.  Was he also a lawyer?

 2   A    I'm sorry?

 3   Q    Was he -- was Mr. Ellis also a lawyer?

 4   A    Yes.  And his wife, Ruth Luckasson, was a special

 5   education professor at the University of New Mexico and I

 6   discussed it with her as well.

 7   Q    And did you discuss the mental retardation aspect of the

 8   case with both professors Ellis and Luckasson without payment

 9   of fee?

10   A    Yes.

11   Q    Did they make themselves available to you generously?

12   A    Yes; very much so.

13   Q    And why were you consulting all of these experts?  You

14   said you talked to legal experts, you talked to special

15   education and mental retardation experts.  Why were you doing

16   that?

17   A    Well, I felt like that the mental retardation issue was

18   the primary issue in the case simply because the guilt case

19   was so stacked against us.  I knew we'd be in a punishment

20   phase and I knew that the statutory bar might be the only way

21   that I could save Bruce's life.

22   Q    Were there other things that you did to educate yourself

23   about mental retardation, such as reading articles or journal

24   articles, things like that?

25   A    As many as I could find.
```

1  Q   And when you reviewed your file, did you find some of

2  those articles in your file?

3  A   A number of them; and I had -- I had handled cases before

4  with mentally retarded defendants.  This was not my first case

5  but this was the first case in which there was an actual

6  statutory bar to execution based on his mental retardation.

7  This case predated Atkins.

8  Q   So you had litigated previously cases with clients that

9  were mentally retarded?

10 A   Yes.

11 Q   Did that require a different skill set or different -- a

12 different approach on your behalf, as opposed to your clients

13 with an average intellectual functioning?

14 A   Yes.

15 Q   Can you describe that?

16 A   Well, the primary problem with representing somebody

17 that's mentally retarded is the communication issue.  Those --

18 those people that are mentally retarded, if they're truly

19 mentally retarded, they don't believe that they are and they

20 don't want to be mentally retarded because of the stigma

21 that's attached to it.  So you have a great deal of problems

22 just communicating with your own client because his beliefs

23 and his thoughts and what he wants is inconsistent with what

24 you know the facts may be.

25 Q   You indicated, though, that in addition to having those

1  special issues in this case, you also had the special issue

2  that his intellectual status was an exclusion to the death

3  penalty?

4  A   Yes.

5  Q   And was that -- that was obviously something important to

6  you?

7  A   Yes.

8  Q   As you worked on this case, did you have an opinion as to

9  whether historical medical records were important in death

10 penalty cases in general?

11 A   Yes.

12 Q   Why?

13 A   Well, as I indicated, anything that -- any type of issue

14 regarding his medical background or his mental background I

15 think could be an issue that would be developed at the

16 punishment phase of the trial, and so we had -- we felt the

17 necessity to do as complete a background investigation of

18 Mr. Webster as we could do to find out what the facts were and

19 then possibly need to marshal those facts into court.

20 Q   And have you collected medical records in the past for

21 other clients?

22 A   Every single time.

23 Q   Do medical record providers have uniform rules for what

24 they require in order to release records to you?

25 A   No.

1  Q   And that was true in 1994, as well as today?

2  A   That's correct.

3  Q   Even before HIPAA was enacted?

4  A   I'm sorry?

5  Q   Even before the health --

6  A   Yes.  That's correct.

7  Q   Was it your custom in 1994 to have a capital client sign

8  blank releases early on in the representation?

9  A   Yes.

10 Q   Why is that?

11 A   Because that way I could send the release whenever I found

12 out the entity that I wanted to try to obtain records from so

13 I have it.

14 Q   Your client was incarcerated prior to trial?

15 A   Yes.

16 Q   And so this --

17 A   Yeah.

18 Q   -- practice prevented you from having to run back and

19 forth to the jail?

20 A   And particularly in Bruce's case.  He's housed down in

21 Cleburne, Texas, which is about 30 miles from Fort Worth.  So

22 if I had to travel back and forth each time I needed to have

23 him sign one of the releases, it would have been cumbersome.

24 Q   And this wasn't just something you did in Mr. Webster's

25 case; it was something that you did with all your capital

*MOORE – DIRECT/FOSTER*                    32

1  clients?

2  A   Yes.

3  Q   Did you have a form release that you used for record

4  collection?

5  A   I'm sorry?

6  Q   Did you have a form release that you used for record

7  collection?

8  A   Yes.

9  Q   And if I could ask you to open that first binder and look

10 at tab 22.  Mr. Moore, I should have asked you this when you

11 took the witness stand.  But can I offer you some water?  It's

12 hot in here.

13 A   That would be really nice.  Thank you.

14          MS. FOSTER:  May I approach the witness, Your Honor?

15          THE COURT:  You may.

16          THE WITNESS:  Thank you very much.

17 BY MS. FOSTER:

18 Q   Mr. Moore, do you have your binder open to exhibit 22?

19 A   I do.

20 Q   Can you identify that?

21 A   This is a medical records authorization and release that I

22 would have drafted, and it bears Bruce Webster's signature.

23 Q   If you look at page 2 of exhibit 22, can you tell me what

24 that is?

25 A   That is a school -- copy of a school records affidavit

1    that I would have had Bruce Webster execute that bears his

2    signature.

3    Q    Bruce Webster executed both of those documents?

4    A    That's correct.

5    Q    And they're not directed to any particular entity.  Is

6    that correct?

7    A    No.  It was my practice to leave the -- the entity to

8    which it was to be addressed blank until I determined who it

9    it would be.

10   Q    And these are examples of your form medical release,

11   correct?

12   A    Yes.

13   Q    Would you say that exhibit 22, page 1, the medical

14   release, that it's intentionally drafted very broadly?

15   A    Yes.

16   Q    And was it your intent to draft something broad enough

17   that it would anticipate in every instance where there were

18   medical records concerning your client?

19   A    Yes.  Tried to draft it as broadly as I possibly could.

20   Q    Did you collect medical records not only of Bruce but also

21   of other family members?

22   A    As many of them as I could, yes.

23   Q    Why did do you that?

24   A    Because I thought it was important.  There was issues in

25   the case regarding whether or not other members of the family

1   were actually suffering from mental retardation as well as

2   Bruce.   There was also accusations that the father -- Bruce's

3   father was physically violent to Bruce and other members of

4   the family, and I thought those medical records would be

5   important in regard to both those issues.

6   Q    Did your mental health experts tell you anything about any

7   connection between mental retardation and family history?

8   A    Yes.

9   Q    What did they tell you?

10  A    They indicated that there is a higher incidence of mental

11  retardation within the families of people that are mentally

12  retarded.   It's higher than it is within the normal

13  population.

14  Q    So as a consequence, you collected not just Bruce's

15  records but family records?

16  A    That's correct.

17  Q    At some time prior to trial, did you learn that

18  Mr. Webster may have been evaluated by the Social Security

19  Administration for disability benefits?

20  A    Yes, I did.

21  Q    How did you learn that?

22  A    I believe I found -- I believe I learned it from his

23  mother.

24  Q    And what did Mr.-- do you recall when this -- when you

25  found out this information?

1  A    Yes.  We went to Little Rock, Arkansas, to interview all

2  his family and the potential witnesses that our investigators

3  had located at the last part of February of the year that we

4  started the trial.  1994, I think.

5  Q    If the record reflects it was '96 --

6  A    '96.  I'm sorry, 1996.

7  Q    I'm sorry.  Did you say you went and interviewed them at

8  the end of February?

9  A    Yeah.  It would have been the end of February.

10  Q    So at that time did Mrs. Webster tell you something about

11  Bruce and an application for Social Security?

12  A    She had told me at that time that she had made an

13  application for Social Security benefits for Bruce.  She told

14  me that she had made an application, that she'd taken him to

15  the state agency, the state mental health agency.  The Social

16  Security application, I think she told me, was for a physical

17  ailment rather than a mental issue.

18  Q    Did she tell you that he was approved for benefits?

19  A    Yes.

20  Q    Did she tell you when this occurred, when the application

21  was made?

22  A    She said it was several years prior -- no.  It was

23  sometime prior to his arrest.  I can't remember exactly when

24  she said.

25  Q    But she didn't tell you that it was for intellectual

1  disability?

2  A   She did not, no.

3  Q   And did you have an opinion at that time about what this

4  would have been about?

5  A   Yes.

6  Q   What was your opinion?

7  A   Well, I knew that the Southeast Arkansas Mental Health

8  agency that he had gone to had tested him and determined him

9  to be mentally retarded.  So based on what she was saying,

10 that she took him for this physical disability or physical

11 problem, but she said that he was tested.  That they did some

12 testing of Bruce and that made me suspicious that it may very

13 well have been for his mental retardation issue.

14 Q   And you indicated that your suspicion had to do with --

15 with what?  I'm sorry.

16 A   I thought that -- I thought that Bruce was mentally

17 retarded.  And when she told me that she had applied for

18 Social Security benefits and that he had been tested by some

19 doctors in connection with that application process, even

20 though she indicated that the application that she made was

21 for some type of physical ailment, I thought that there was

22 probably a mental issue involved in it.

23 Q   At the time that Mrs. Webster told you this at the end of

24 February 1996, did you also at that time have diagnoses of

25 mental retardation from your own experts?

*MOORE — DIRECT/FOSTER*                           37

```
 1  A    Yes.

 2  Q    And at the end of February 1996, when Mrs. Webster told

 3  that you Bruce had been evaluated for disability, were you

 4  aware that other family members also suffered similarly?

 5  A    Yes.

 6  Q    Including Mrs. Webster?

 7  A    That's correct.

 8  Q    At the time -- excuse me just a minute.  Do you recall if

 9  you -- I'm sorry.  Strike that.  As a consequence of what

10  Mrs. Webster told you, did you take further actions?

11  A    Yes.

12  Q    What did you do?

13  A    I told my legal assistant to try to contact the Social

14  Security Administration office in Little Rock Arkansas to

15  determine how we could go about getting records for his Social

16  Security benefits application.

17  Q    Did you consider the information from Mrs. Webster to be

18  important?

19  A    Absolutely.

20  Q    When you say absolutely, did you consider it to be

21  critically important?

22  A    Yes.

23  Q    Why?

24  A    Because it's a single biggest issue in the trial, from my

25  mind.
```

1   Q   And that's -- speaking at that time you believed that the

2   mental retardation was the single biggest issue at trial?

3   A   Yes.  Absolutely.

4   Q   Did the timing of when Mrs. Webster said this disability

5   application had been made, did the timing of it have any

6   bearing on your thoughts about its critical nature?

7   A   Could you repeat it?  I'm sorry.

8   Q   Sure.  That was a very badly phrased question.

9   Mrs. Webster told you that the application for disability had

10  been made some years earlier?

11  A   Yes.

12  Q   And so that would have been some years prior to the crime

13  that Bruce was charged with?

14  A   That's correct.

15  Q   Did that timing have any impact as to why you thought her

16  information was critical?

17  A   Yes.  Any -- any finding of mental retardation that

18  predated Bruce's arrest and prosecution for this case I

19  thought was going to be critically important to be able to

20  convince the jury of the truth of the diagnosis.

21  Q   At the time that you received this information from

22  Mrs. Webster, did you have a sense of where the government was

23  going on the mental retardation claim?

24  A   Yes.

25  Q   And where were they going?

1   A    Well, I knew, because I'd given them the information at

2   the original meeting with the Attorney General's office in

3   Washington D.C., about the -- his having been diagnosed as

4   suffering from mental retardation by the Southeast Arkansas

5   Mental Health Clinic.  They contacted the examiner in that

6   case and he changed his opinion.  He basically came in and

7   indicated that he did not have confidence in the tests that he

8   gave or the scores that were obtained.

9   Q    So was it important to you to find out if

10  Mrs. Webster's -- what she had told you was correct?

11  A    Yes.

12  Q    Now, you indicated that you instructed your staff to find

13  these records.  At the end of February 1996, who worked for

14  you?

15  A    At that point, her name was Kimberly Whitehead.

16  Q    She must have done a really good job as a paralegal

17  because what's her name today?

18  A    Kimberly Moore.

19  Q    And she's your wife?

20  A    Yes.  We actually got married in 1996.

21  Q    I assume she was a good paralegal?

22  A    Yes.

23  Q    If you could take your binder and open to tab 20.

24  A    Twenty?

25  Q    Yes.

1   A   Yes.

2   Q   Does that record look familiar to you?

3   A   Yes.

4   Q   Can you describe what it is?

5   A   Yes.  This is the note that I wrote to Kim to find out

6   what information we needed to have in order to get copies of

7   the records from the Social Security office in Pine Bluff.

8   Q   When you say Kim, you're referring to Kim Whitehead, now

9   Kim Moore?

10  A   Yes.

11  Q   She was the only person that worked in your office at that

12  time?

13  A   That's correct.

14  Q   Is that -- exhibit 20, is that dated?

15  A   I don't believe so.

16  Q   Do you recognize that as your handwriting?

17  A   Yes.

18  Q   And you recognize that as coming from your trial file?

19  A   I'm sorry?

20  Q   You recognize that document as coming from your trial

21  file?

22  A   Yes.

23  Q   In the first paragraph, can you tell me where you received

24  that information?

25  A   I'm sorry?

1  Q   The first paragraph says that Bruce Webster applied for

2  Social Security Disability benefits at Pine Bluff office --

3  A   Yes.

4  Q   -- of Social Security.  Where did you get that

5  information?

6  A   From his mother.

7  Q   And is that also true with paragraph 4, he never received

8  benefits but I think that he did go through the testing?

9  A   Yes.

10 Q   Also in that paragraph 4 you say:  I need test results.

11 A   Yes.

12 Q   Why did you say that?

13 A   Because I thought that he had been tested for mental

14 retardation, based on everything that I knew, and I thought it

15 was critical to have it.

16 Q   And at the end of that sentence you've got an exclamation

17 point.  Why is that?

18 A   Because I needed the test results.

19 Q   You wanted them pretty badly, didn't you?

20 A   Yes, I did.

21 Q   Included there is what appears to be the Pine Bluff office

22 and a phone number?

23 A   Yes.

24 Q   Is that also your handwriting?

25 A   All of it's my handwriting, except the very, very bottom.

1  Q    The bottom on the left side is not your writing?

2  A    Yes.

3  Q    Is that Kim's writing?

4  A    Yes, it is.

5  Q    Returning to the Pine Bluff Social Security

6  Administration, there is a number there and there is what

7  appears to be a physical address?

8  A    Yes.

9  Q    Does that appear to indicate that you had looked this

10 information up?

11 A    I think that I -- I had to have looked it up because I've

12 got a telephone number and an address.

13 Q    Is that your common practice, to look that sort of stuff

14 up, or would your common practice in '96 have been to give Kim

15 that duty?

16 A    Well, you know, I would have done the preliminary part to

17 get the information as to where she would be able to go get

18 the records, if I was able to do it quicker and more

19 efficiently than she would.

20 Q    In Paragraph 2, where you say:  Please call that office to

21 find out what we need to get copies of those records, you

22 weren't assuming that your normal form release would be

23 adequate?

24 A    I didn't know if it would or not.

25 Q    But I think you testified earlier you had experiences

```
1   where different entities required different forms?
2   A   Yes.   Some of them generate their own release form that
3   they want you to use.   Others will just accept a release that
4   you have signed by your client.
5   Q   And you wanted Kim to make sure that she found out exactly
6   what Social Security would require?
7   A   Yes.
8   Q   I'd ask you to turn to exhibit 23 in your binder.  Can you
9   identify that document?
10  A   Yes.   That is a note that I made in connection with my
11  request to my legal assistant to get his records.
12  Q   And that comes from your trial file?
13  A   Yes.
14  Q   Is that your handwriting?
15  A   Yes, it is.
16  Q   It appears to be a directive to Ms. Whitehead to secure
17  Mr. Webster's Social Security Disability records?
18  A   Yes.
19  Q   And at the bottom of that there's a parenthesis and I had
20  a little trouble interpreting what you've written there.  Does
21  it say:  Any testing, question mark, or interesting question
22  mark?
23  A   No.  It's any testing.
24  Q   And so that's further evidence that you were interested in
25  not just the result of the disability process but also the
```

```
 1   testing?

 2   A   Yes.

 3           MR. FUNNELL:  Objection, Your Honor.  Leading,

 4   argumentative.

 5           THE COURT:  Sustained.  Next question.

 6   BY MS. FOSTER:

 7   Q   On the right-hand of that document, it says:  Call Pine

 8   Bluff office first.

 9   A   Yes.

10   Q   First is underlined?

11   A   Mm-hmm.

12   Q   And there's an exclamation point.  Can you tell me why you

13   underlined and put an exclamation point on there?

14   A   Well, because I thought that the records would be -- we

15   were able to get them, they would have been generated at the

16   Pine Bluff office of the Social Security Administration.  I

17   didn't know if we would eventually have to go beyond the Pine

18   Bluff office or if that would be the place that we would go to

19   get it.

20   Q   And again, in your directive to Kim as to what she needed

21   to do, do you direct her there to find out what you needed to

22   do or were you assuming that your standard form would be

23   correct -- would be adequate?

24   A   Well, my -- my import -- I mean, what I indicated to her

25   is find out what it is that we need to give them in order to
```

*MOORE — DIRECT/FOSTER*                        45

```
 1    get copies of the records.

 2    Q    If I could ask you now to turn to exhibit 21.   Could you

 3    identify that document?

 4    A    Yes.   That is a note and it's in my wife's handwriting

 5    that indicates a fax number for Hal West, who is the head of

 6    the Social Security Administration office in Pine Bluff —— in

 7    Pine Bluff, Arkansas.

 8    Q    Is there a date and time on that notation?

 9    A    Yes; February 29, 1996.

10    Q    And is there a time on it?

11    A    11:30.

12    Q    And do you recognize this as coming from your file?

13    A    Yes.

14    Q    You say this is your wife's handwriting?

15    A    Yes, it is.

16    Q    Are you able to discern from this note whether she spoke

17    with Hal West?

18    A    I would assume that she spoke with him because she's got

19    the fax number for Mr. West.

20            MR. FUNNELL:   Objection, Your Honor.   He's

21    speculating.   No foundation.

22            THE COURT:   Sustained.

23    BY MS. FOSTER:

24    Q    I'm going to ask you to turn to exhibit 15.

25    A    Yes.
```

1   Q    Can you identify that record?

2   A    Yes.

3   Q    What is it?

4   A    It's a copy of a fax transmittal sheet that was within my

5   file from my wife to Mr. Hal West at the Social Security

6   Administration office in Pine Bluff, Arkansas.

7   Q    Is there a date that's handwritten in on that?

8   A    Yes; March the 5th, 1996.

9   Q    And then do you see the fax header at the top of that

10  document?

11  A    Yes.

12  Q    And is there a date that indicates when that document was

13  faxed?

14  A    Yes.  It shows it was faxed on March the 4th, 1996 at

15  23:50 hours.

16  Q    As you sit here today, do you know whether this was faxed

17  on March 5th or March 4th?

18  A    I'm sorry?

19  Q    As you sit here today, do you know whether this document

20  was faxed actually on March 5th or March 4th?

21  A    This would have been the fax -- this would have been the

22  date and time would have been generated by the fax machine.

23  So it would be my belief that it was faxed on March the 4th at

24  23:50 hours.

25  Q    Take a look at that fax number where the document says

1    that it's going.

2    A    Yes.

3    Q    It indicates it's going to Mr. Hal West but there's a

4    number there, too.  Is that correct?

5    A    That's correct.

6    Q    Is that number the same number that appears on exhibit 21?

7    A    Yes, it is.

8    Q    Next to where it says Hal West?

9    A    Yes.

10   Q    Again, turning to the fax header.  Is there any indication

11   as to what page of the fax this is?

12   A    Page 1.

13   Q    I ask you now to turn to exhibit 16.  Can you identify

14   that document?

15   A    Yes.

16   Q    What is it?

17   A    That would be the letter that my wife wrote to Mr. West

18   asking for copies of the records, enclosing the records

19   authorization and release.

20   Q    And what is the date on this -- on this document?

21   A    Well, the letter is dated February 29, 1996.

22   Q    And is that date the same as the date that's contained on

23   exhibit 21?

24   A    Yes.

25   Q    Was this letter sent as part of Ms. Whitehead's duties to

1    you as a paralegal?

2    A    Yes.

3    Q    And it's on your letterhead?

4    A    Yes.

5    Q    Came from your trial file?

6    A    I'm sorry?

7    Q    It came from your trial file?

8    A    Yes.

9    Q    If you look at the top of that document, do you see a fax

10   header there?

11   A    Yes.

12   Q    At what -- on what date and time was this document sent?

13   A    March 4, 1996 at 23:50 hours.

14   Q    So the same date and time as the previous document?

15   A    Yes.  And it also indicates this is page 2 of the fax

16   transmittal.

17   Q    Which is one page advanced from the previous exhibit?

18   A    That's correct.

19   Q    Is there any -- directing your attention to paragraph 1,

20   is there any indication on this letter that Ms. Whitehead

21   actually spoke personally with Mr. West?

22   A    Yes.

23   Q    And directing your attention to the second sentence in

24   paragraph 1, is there any indication there that Mr. West, in

25   fact, told her what was necessary to secure the Social

*MOORE - DIRECT/FOSTER*                    49

```
 1   Security Disability records?

 2   A    Yes.

 3              MR. FUNNELL:   Judge, I'm going to object at this

 4   point, just make sure that we understand that the basis -- the

 5   sole basis for his answers here is what's on the face of this

 6   document.

 7              THE COURT:   Very well; with that understanding.

 8   BY MS. FOSTER:

 9   Q    This comes from your trial file?

10   A    Yes.

11   Q    And Ms. Whitehead works at your direction?

12   A    Yes.

13   Q    Are you familiar with her work habits?

14   A    Yes.

15              MR. FUNNELL:   I'm sorry.  I couldn't understand what

16   counsel asked him before.  Are you familiar with her work

17   habits?  I didn't catch the question.  I heard the trial file

18   question.

19   BY MS. FOSTER:

20   Q    Came from your trial file.  You're familiar with Ms. --

21   A    Yes.

22   Q    This was done at your -- at your direction?

23   A    Yes.

24   Q    Does the letter note that there were enclosures?

25   A    Yes.
```

1  Q    And what are those enclosures?

2  A    It indicates that there was the business records

3  authorization release and a business records affidavit that

4  were included for their use.

5  Q    Turning to exhibit 17.  Can you identify that record?

6  A    Yes.  It's a business record authorization and release

7  addressed to Mr. Hal West at the Social Security

8  Administration office in Pine Bluff, Arkansas.

9  Q    Is it executed by your client?

10  A    Yes.

11  Q    And is your signature there at the bottom?

12  A    Mine and Allan Butcher, my co-counsel.

13  Q    Allan Butcher was appointed at some point in this case as

14  well.  Is that correct?

15  A    Correct.

16  Q    And was it at the same time as you or later?

17  A    No.  He was appointed, I think, January of 1995.

18  Q    And was he appointed at your request?

19  A    Yes.

20  Q    Who served as lead counsel during the trial?

21  A    I did at trial.

22  Q    And who was responsible for investigating the mental

23  health related claims primarily?

24  A    That was my primary responsibility.

25  Q    And is that true with the presentation at trial as well?

*MOORE - DIRECT/FOSTER*                                    51

1   A    Yes.

2   Q    Looking at this exhibit 17, does this appear to be one of

3   the documents that is referenced in the previous exhibit, the

4   letter to Mr. West from Ms. Whitehead?

5   A    That's correct.

6   Q    And again, is there a fax header on this document?

7   A    Yes.

8   Q    Is the date and time on this fax header the same as the

9   previous two exhibits that we've discussed?

10  A    Yes.

11  Q    And does it indicate what page number this is?

12  A    This was Page 3.

13  Q    The date on this is 3/3.  Is that correct?

14  A    Yes.

15  Q    And was Mr. Webster incarcerated on 3/3 of '96?

16  A    Yes.

17  Q    So you would have had to travel to the jail to get this

18  from him?

19  A    No.  Actually, we had begun -- the first week of March, we

20  began the jury selection in the case and I think that I had

21  him execute this at the courthouse.

22  Q    Okay.

23  A    This was not our normal -- this was not our normal

24  business records authorization.  We drafted this specifically

25  according to the instructions that we had received from the

1    Arkansas Social Security Administration office.

2    Q    So this is a different form than the general medical

3    records authorization that you would generally send, which is

4    exhibit 22.  Is that correct?

5    A    That's correct.

6    Q    This is more specific to Social Security?

7    A    Yes.  It would have been drafted at the request -- to

8    include the information that they requested that we include in

9    the request.

10   Q    I would now ask you to take a look at exhibit 18.  What is

11   this document?

12   A    It's a business records affidavit.

13   Q    And do you recognize this from your trial file?

14   A    Yes.

15   Q    Does this also appear to be one of the enclosures that

16   Ms. Whitehead referenced in her February 29th letter?

17   A    Yes.  I specifically -- I drafted the affidavit consistent

18   with the instructions we received from them and it was

19   included with the fax that she sent to them.

20   Q    What's the purpose of a business records affidavit?

21   A    To allow the introduction of the evidence without a

22   sponsoring witness.

23   Q    Was it your common practice to send a business records

24   affidavit when you requested records?

25   A    Yes.

*MOORE - DIRECT/FOSTER*                              53

1   Q    And would business entities commonly sign them?

2   A    I'm sorry?

3   Q    Would the entities that you were receiving records from,

4   would those entities commonly sign this?

5   A    Yes.

6   Q    Why is that?

7   A    Well, it makes the records admissible without the

8   necessity of bringing a sponsoring witness to the Court.

9   Q    So they don't have to have a witness in court?

10  A    Mm-hmm.

11  Q    Looking at the fax header on that, do you see that?

12  A    Yes.

13  Q    Is this document sent at the same time and date as the

14  previous three documents we talked about?

15  A    Yes.  This would have been Page 4 of the fax.

16  Q    Is it your belief that these last four documents together,

17  exhibit 18, exhibit 17, exhibit 16, and exhibit 15 are

18  actually one document?

19  A    Yes.  This would have been what we faxed to the Social

20  Security office in Pine Bluff, Arkansas.

21  Q    On what date do you believe this was faxed?

22  A    I'm sorry?

23  Q    On what date do you believe it was faxed?

24  A    It was faxed on March the 4th, 1996.

25  Q    So is it fair to say that the letter from Ms. Whitehead

 1  that indicates that it was written on 2/29, that letter may

 2  have been written on 2/29 but was not sent at that time?

 3  A   Yeah.  It wasn't sent until --

 4          MR. FUNNELL:  Objection, Your Honor.  She's leading

 5  the witness and arguing.

 6          MS. FOSTER:  I am leading the witness, Your Honor.

 7  I will rephrase.

 8          THE COURT:  Thank you.

 9          MS. FOSTER:  It's hard to break the

10  cross-examination habit.

11  BY MS. FOSTER:

12  Q   Do you have an opinion as to when that 2/29 letter was

13  sent?

14  A   Yes.  She wrote the letter on the 29th, obviously, but it

15  wasn't faxed until the 4th day of March.

16  Q   And you didn't have a -- what was the date that you got

17  the signature on exhibit 17?

18  A   The date of the signature was March 3rd.

19  Q   So you didn't -- you wouldn't have had that record when

20  she wrote the letter on 2/29?

21  A   No.  We would have -- I may have had her draft -- or I may

22  have drafted the actual document itself.  I wouldn't have had

23  it executed by Bruce until the 3rd.

24  Q   Turning now to exhibit 27.  Can you identify that?

25  A   That is a transmission verification report that would have

*MOORE - DIRECT/FOSTER*                    55

1   been generated at the time that the fax was sent.

2   Q    And is this something that you recall seeing in your file?

3   A    Yes.

4   Q    Is the number that the fax is sent to, can you take a look

5   at that?

6   A    Yes.

7   Q    Is that the same number that is reflected on exhibit 15 as

8   belonging to Hal West?

9   A    Yes, the same number.

10  Q    Is it the same number that's reflected on exhibit 21?

11  A    Yes.

12  Q    And what does this transmission verification report tell

13  us?

14  A    It tells us that on March the 4th, at 23:50 hours, there

15  was a fax transmission sent from my fax machine to that

16  number.  It took two minutes for it to transmit.  It was four

17  pages and that the transmission was apparently successful.

18  Q    Do you have an opinion as to whether this transmission

19  verification report is the report relevant to the 2/29 letter

20  and the attached exhibits?

21  A    It is.

22  Q    Turning now to page exhibit 9.  And specifically, exhibit

23  9, page 3 and I would direct your attention -- let me ask you

24  this.  Do you recognize exhibit 9?

25  A    Yes, I do.

1   Q    What is it?

2   A    It is a Federal Express bill for various Federal Express

3   letters or documents that we would have sent.

4   Q    And is this something that you recall seeing in your trial

5   file?

6   A    Yes.

7   Q    I direct your attention to the second entry on Page 3.

8   A    Yes.

9   Q    And I specifically direct your attention to the column

10  that's noted "services".  What is the service FedEx billed you

11  for?

12  A    Sending a Federal Express letter document to Mr. Hal West

13  at the Social Security Administration in Pine Bluff, Arkansas.

14  Q    Did you have any other business besides Mr. Webster's

15  business in the Pine Bluff Arkansas Social Security office?

16  A    No.  And it specifically -- Bill specifically notes it was

17  in connection with the Webster case.

18  Q    Does this document indicate when the package was sent?  I

19  direct your attention to the second column.

20  A    It was delivered on March the 9th, 1996 at 9:38 a.m.

21  Q    I'm sorry.  Are you on page 2, the second row?

22  A    I'm sorry.  Where are you talking about?

23  Q    Exhibit 9.

24  A    Yes.

25  Q    Page 3.

1    A    Yes.

2    Q    The second row.

3    A    Yes.

4    Q    That indicates that a letter was sent on the Webster case?

5    A    Yes.

6    Q    Can you tell me when the letter was dropped off?

7    A    Yes.  It was dropped off on March the 6th of 1996 and

8    delivered on March the 7th of 1996.

9    Q    Do you have an opinion as to what was contained in this?

10   A    It was the same document that we had previously faxed.

11   Q    If you had faxed it to them, why did you subsequently

12   Federally Express it to them?

13   A    Because it was my common practice, and has always been my

14   practice, to follow-up a fax transmission with the hard

15   documents themselves.

16   Q    Why is that?

17   A    So they'll have an original copy.

18   Q    Because what?

19   A    So they'll have an original copy.

20   Q    Why did you send the exhibit Federal Express as opposed to

21   first class mail?

22   A    I'm sorry?

23   Q    Why did you send the letter Federal Express as opposed to

24   first class mail?

25   A    Because I wanted to have a record as to when it was sent,

*MOORE - DIRECT/FOSTER*                          58

```
 1   when it was received.

 2   Q    You've had an opportunity to review your file?

 3   A    Yes.

 4   Q    In your file, did you find any records responsive to your

 5   request for the records from the Social Security

 6   Administration in Pine Bluff?

 7   A    No.

 8   Q    So there were no records rejecting your request?

 9   A    I'm sorry?

10   Q    You didn't receive any correspondence from them rejecting

11   your request?

12   A    No.

13   Q    Or asking for different information?

14   A    No.

15   Q    Or giving you records?

16   A    No.

17   Q    If the Social Security Administration had asked for

18   different information, would you have provided it?

19   A    Absolutely.

20   Q    And if they had said they had records but denied your

21   request, what would you have done?

22   A    I would have attempted to get the records by any means

23   that we could have.

24   Q    By subpoena?

25   A    We would have done a subpoena.  We would have attempted to
```

1   get the records, comply with whatever requirements that they

2   needed.

3   Q   And why is that?

4   A   Because I thought the records were critical.

5   Q   Did you, yourself, ever contact the Social Security

6   Administration in Pine Bluff in an effort to secure

7   Mr. Webster's records?

8   A   Yes, I'm sure I did.

9   Q   And when did you do that?

10  A   That would have been that first week of March when we

11  were -- that was the first week of voir dire in the case and I

12  know we -- I learned first from Mr. Strickland, I think, who

13  was my private investigator that was in Arkansas, because I

14  had told them in the letter that he would come pick up the

15  records when they had them available.  And I think I first

16  learned from him that they indicated that there was no -- they

17  had no records.

18              MR. FUNNELL:  Your Honor, it's hearsay, if it's

19  offered for the truth.

20              MS. FOSTER:  It's not offered for the truth.  It's

21  offered to explain what he did next.

22              THE COURT:  What he understood?

23              MS. FOSTER:  It's offered to explain what -- it's

24  not offered for the truth.  It's offered to explain what

25  Mr. Moore did next.

```
 1              THE COURT:  For that limited purpose, overruled.
 2   You may answer, if you know.
 3              THE WITNESS:  Thank you.  As I indicated,
 4   Mr. Strickland indicated first that they had no records.  So I
 5   had my wife contact them, and then I eventually would have
 6   called Mr. West myself personally.
 7   Q    Okay.  And you said that you were in jury selection?
 8   A    Yes.
 9   Q    Beginning the first week of March?
10   A    Yes.
11   Q    How would you have done that while you were in jury
12   selection?
13   A    Call him on the telephone.
14   Q    Is it your belief, as you sit here today, that you called
15   him on the phone?
16   A    It had to be.  I didn't go back to Pine Bluff until June.
17   Q    There was a -- do you recall from the transcript, you
18   picked the jury for about a month.  Is that right?
19   A    Yeah.
20   Q    Did you start evidence immediately after --
21   A    No.
22   Q    -- you selected the jury?
23   A    No.  We finished picking the jury sometime in April and
24   didn't start with the actual trial until the first part of
25   June.
```

1  Q   So you continued -- did you continue to investigate the

2  case during that recess period?

3  A   Yes.

4  Q   Okay.  What was your -- if Mr. Strickland had told you

5  that Social Security said they didn't have any records, why

6  did you call them?

7  A   Well, it was my primary responsibility to obtain the

8  evidence; and when they're telling my investigator that they

9  don't have it, I want to make sure that they tell me

10 personally that they don't have it.

11 Q   Do you recall specifically who you spoke with?

12 A   I don't recall but I think it was Hal West.

13 Q   And what did they tell you?

14 A   I'm sorry?

15 Q   What did they tell you?

16 A   That there weren't any records in existence.

17 Q   So that was consistent --

18          MR. FUNNELL:  Your Honor, I'll object as to hearsay,

19 if it's offered for the truth of what these representatives at

20 Social Security said to him.

21          MS. FOSTER:  It's not offered for the truth of what

22 they said.  But I would also note that it's an admission by a

23 party opponent.

24          THE COURT:  Party opponent?

25          MS. FOSTER:  Yes, sir.  I think there's no question

1   but that the U.S. Attorney's office in Texas is representing

2   Social Security.

3              THE COURT:  Are they a party?

4              MS. FOSTER:  What?

5              THE COURT:  U.S. Attorney's office is a party?

6              MS. FOSTER:  Yes -- Social Security is a party.

7              THE COURT:  I don't believe so.  Sustained.

8              MR. FUNNELL:  Thank you.

9              MR. WELLS:  Your Honor, could I have just a minute?

10             THE COURT:  You may.

11             (Off the record.)

12             MS. FOSTER:  My co-counsel tells me to also suggest

13  to you, Your Honor, that it's not offered for the truth but

14  it's offered to show Mr. Moore's diligence, which is what is

15  at issue here today.

16             THE COURT:  I think it can be asked in terms of what

17  this witness did or what this witness understood; but what the

18  gentleman from Social Security said is clearly still hearsay.

19  So what he did as a result of that conversation I think is

20  appropriate.

21             MS. FOSTER:  Okay.

22             MR. WELLS:  Your Honor, if I may, because I know

23  this is a very important point.  When we say it's not offered

24  for the truth of the matter asserted, it doesn't matter

25  whether what they were saying was true or false.  What matters

1    is what they told him and what his reaction was to it.

2          THE COURT:  That's where I'm going.  I said what he

3    understood from that conversation is fair game.  What he said

4    I still believe has to be for the truth of the matter.  I

5    think what he understood, what he did is all fair game; and if

6    what he understood can be translated into diligence by the

7    Court, I think we'll have to just see how that shakes out.

8          MR. FUNNELL:  Your Honor, could I just clarify for

9    the record, please, because when I made my objection, my

10   objection was that if it is offered for the truth of the

11   matter asserted, then it is hearsay.  Counsel's response --

12   Ms. Foster's response was that it was not offered for the

13   truth; and that if it was, it was admissible as an admission

14   by a party opponent.  That portion of her response, I think,

15   is clearly incorrect and the Court correctly denied that.

16         I am not objecting to him on his current

17   recollection recounting what this person supposedly said to

18   him.  I am not objecting on that basis.  What I am objecting

19   on is if it is offered for the truth of the matter asserted.

20         THE COURT:  I agree.  I think that's a correct

21   assessment.  You may continue.

22         MS. FOSTER:  Thank you, Your Honor.

23   BY MS. FOSTER:

24   Q   So where are we?  What did Mr. -- what did the people at

25   Social Security tell you?

1  A   Told me they didn't have any record regarding

2  Mr. Webster's application for benefits.

3  Q   And at that point, did you think there was anything else

4  you could do?

5  A   No.

6  Q   Did you take them at their word?

7  A   Yes.

8  Q   I think you mentioned Mr. Strickland.

9  A   Mm-hmm.

10  Q   Who was Mr. Strickland in regard to this case?

11  A   Mr. Strickland was a member of the private investigative

12  firm Michael Connelly & Associates that was appointed to be

13  our investigator in connection with the case.

14  Q   And if you look at exhibit 24, you'll see that -- which is

15  the letter from Ms. Whitehead, there's reference in there to

16  Mr. Strickland traveling to the Social Security office.

17  A   Yes.

18  Q   Do you believe that he did that?

19  A   Yes.  I know he did.

20  Q   And do you believe he did that during that time period

21  that Ms. Whitehead --

22  A   I don't know if it was exactly that time period.  I know

23  that we had intended for him to be in Pine Bluff talking to

24  our witnesses that first week of jury selection.  I don't know

25  specifically if the dates were going to be the 1st or the 5th.

 1  That's what she put in the letter.

 2           MR. FUNNELL:  Your Honor, I'm going to object.  The

 3  questions were coming pretty rapid fire there, so I couldn't

 4  get it in, but my understanding was counsel asked him if he

 5  knew that Mr. Strickland traveled to the Pine Bluff office and

 6  he said, "I know he did."  My objection is foundation and

 7  hearsay.

 8           THE COURT:  Why don't you rephrase.

 9  BY MS. FOSTER:

10  Q    Did Mr. Strickland work at your direction?

11  A    Yes.

12  Q    Did you give him directions on what he should do

13  specifically related to this case?

14  A    Yes.

15  Q    And did you direct him to when he should do these things?

16  A    Yes.

17           MR. FUNNELL:  Objection.  Counsel is leading.

18           MS. FOSTER:  I'm leading because it's foundation.

19           THE COURT:  I agree.  Overruled.

20  BY MS. FOSTER:

21  Q    Did Mr. Strickland report back to you when he had done the

22  things that you had requested?

23  A    Yeah.  We communicated daily by telephone.

24  Q    About the status of his investigation?

25  A    Yes.

1  Q    And do you recall that Mr. Strickland at some point

2  traveled to Pine Bluff during this time period?

3  A    Yes.

4           MR. FUNNELL:  Your Honor, again, this is based on

5  hearsay.  It's based on what Mr. Strickland reported and he is

6  taking it as truth that Mr. Strickland did, indeed, do what he

7  reported.  That is hearsay.  He has no foundation for this

8  testimony.

9           THE COURT:  I think we're there.  Overruled.  Next

10 question.

11 BY MS. FOSTER:

12 Q    Who Annette Lamoreaux?

13 A    Ms. Lamoreaux was a mitigation specialist that was

14 originally appointed to assist us in the preparation of the

15 mitigation phase.

16 Q    Is it possible that you tasked her with securing

17 Mr. Webster's Social Security Disability records?

18 A    No.

19 Q    Why not?

20 A    She -- she had -- she became ill or something because she

21 was no longer involved in the case at the time that all this

22 occurred.  She did not -- she had done some work early on in

23 connection with the case but my recollection is by the time

24 that this occurred, she was no longer involved in assisting

25 us.  She became ill or something and that's the reason why we

1   were having the investigators pick up these records.

2   Q   Did you have some issues with the work that Ms. Lamoreaux

3   was doing for you?

4   A   Yes.

5   Q   What were those issues?

6   A   Well, the original authorization that we obtained from the

7   judge for her assistance in the case was in the amount of

8   $15,000.  She did a great deal of work in connection with the

9   case but the original bill that she submitted was well in

10  excess of the $15,000 that had been authorized and we had told

11  her was the limitation.

12          Also, I had some problems with some of the things

13  that were included in that initial bill, and I told her that I

14  wasn't going to submit it in the form that she had given it to

15  me.

16  Q   So is it -- I'm sorry.  Strike that.  Is it possible that

17  your co-counsel, Allan Butcher, followed up on the request to

18  Social Security?

19  A   No.

20  Q   Why do you say that?

21  A   Because I was the one that was doing it.

22  Q   You were responsible?

23  A   Yeah.  We divided responsibilities and this was something

24  I would have been doing.

25  Q   I would ask you now to look at exhibit 45, which I think

1    is in the other binder.

2    A    Okay.

3    Q    Do you recognize those records?

4    A    These appear to be a copy of the records from the Social

5    Security Administration that was provided to me by Dorsey

6    Whitney.

7    Q    When you say Dorsey, you're referring to Mr. Webster's

8    current lawyers?

9    A    Yes.

10   Q    Had you seen those records at the time of trial?

11   A    No.

12   Q    Have you reviewed your file?

13   A    I'm sorry?

14   Q    You've reviewed your file?

15   A    Yes.

16   Q    Your trial file?

17   A    Yes.

18   Q    Are those records contained in your trial file?

19   A    No.

20   Q    Are they -- do they appear to be responsive to the

21   request -- I'm sorry, not responsive.  Do they appear to be --

22   let me ask you this.  When did you first see those records?

23   A    I don't recall the exact date.  I think it was sometime

24   earlier this year.

25   Q    Is it possible that you saw them -- you recall giving a

*MOORE − DIRECT/FOSTER*                          69

1    statement in 2009?

2    A    I don't remember when I first saw the records.  It was

3    whenever -- I mean, whenever they were discovered because

4    somebody asked me if I'd ever seen those before, if they'd

5    ever been given to us in response to our request and I had

6    not.

7    Q    Would it refresh your recollection to look at your 2009

8    statement?

9    A    Sure.

10            MS. FOSTER:  May I approach the witness, Your Honor?

11            THE COURT:  You may.

12            MS. FOSTER:  Page 3, counsel.

13            If you could review that page silently.

14            MR. FUNNELL:  Your Honor, could we identify for the

15   record what the witness is looking at?

16            MS. FOSTER:  The 2009 statement.  I did identify it.

17   It's 2009.

18            MR. FUNNELL:  By exhibit number can we identify it?

19            MS. FOSTER:  It's your exhibit.  You don't have the

20   number?

21            MR. FUNNELL:  It's Exhibit 4.

22            MS. FOSTER:  Government's Exhibit 4.

23            THE COURT:  Very well.

24            THE WITNESS:  Okay.  I've looked at it.

25

1  BY MS. FOSTER:

2  Q   Does that refresh your recollection?

3  A   Yes.

4  Q   And looking at the date on that statement on the last

5  page --

6  A   Yes.

7  Q   -- when was the first time that you saw -- saw this

8  record?

9  A   The statement was dated October the 20th of 2009.  So it

10 would have been shortly before that.

11 Q   And you did not see those records prior to trial?

12 A   No.

13         MR. FUNNELL:  I'm sorry.  I believe that was

14 Exhibit 3, if it was the October 2009 declaration.  Is that

15 correct?

16         MS. FOSTER:  Yes.

17         MR. FUNNELL:  Yes.  That's my exhibit 3.

18         THE COURT:  Very well.

19 BY MS. FOSTER:

20 Q   Would those -- would that exhibit have been useful to you

21 at Mr. Webster's trial?

22 A   Very much so.

23 Q   And why is that?

24 A   Because it indicates that he was tested by the Social

25 Security Administration and determined to be mentally

1  retarded.

2  Q    And are there other documents in that -- in that exhibit

3  that also would have been useful to you?

4  A    Yes.   There's school records that are -- there's an

5  indication that his special education records were destroyed

6  in 1988 and that had been an issue at trial as to whether or

7  not he was actually in special education.

8  Q    And what was the defense position at trial with regard to

9  whether Mr. Webster had been in special education?

10 A    We obviously indicated that he was because that's what his

11 mother had told us but we didn't -- we were not able to obtain

12 any records from the school district indicating that he was in

13 special education.

14 Q    Did the government seize on that?

15 A    Yes.

16 Q    In what way?

17 A    Well, because -- because the only thing we had was the

18 testimony from his family members that he was in special

19 education, and we were not -- we did not have any objective

20 records to demonstrate that was in fact true.   They -- they,

21 of course, did not accept that.

22 Q    Was it at all relevant to you that government doctors had

23 determined that he was mentally retarded?

24 A    Yes.

25 Q    And why is that important or relevant?

1   A    Well, I think that it would have been very important to

2   any of the doctors in -- both the government's doctors or my

3   doctors, to know that he, in fact, had been in special

4   education.  He communicated that during the examinations that

5   he had gave -- or his mother indicated that he had been in

6   special education.  But like I said, we had no records to

7   verify that.

8   Q    What about the diagnosis of mental retardation by the

9   government doctors hired by Social Security?

10  A    Yes.  That would have been critically important because it

11  came at a time prior to the commission of the crime.

12  Q    Do you believe that those records could have made a

13  difference in the result of Mr. Webster's trial?

14  A    Absolutely.

15          MR. FUNNELL:  Objection, Your Honor, as to relevance

16  at this hearing.

17          THE COURT:  I'll allow it.  Next question.

18  BY MS. FOSTER:

19  Q    Do you believe those records could have made a difference

20  in the result of Mr. Webster's trial?

21  A    Yes.

22  Q    Why?

23  A    It was critically important to us to try to demonstrate

24  that the diagnoses that Mr. Webster had of being mental

25  retarded predated the offense.  It was -- there's a natural

1  tendency, on the part of the jury, to discredit sometimes the

2  testimony of experts that come in after the commission of the

3  crime because they're either afraid that the defendant himself

4  is feigning some type of illness or disability, or that the

5  doctor's in some way motivated to testify in a particular way.

6  Q   Do you recall what -- in the records there in exhibit 45,

7  do you recall what they reflect Mr. Webster went for

8  disability for?

9  A   I know that I had reviewed it.  I don't remember what page

10 it appears on but it was some kind of -- his original

11 appearance was for some kind of a sinus problem or something

12 like that.

13 Q   And as a consequence of going to disability -- going to

14 SSA for sinus infection, they did testing.  Is that correct?

15 A   Yes.

16 Q   And determined he was mentally retarded?

17 A   Yes.

18 Q   Do you recall giving a declaration in October of 2009, the

19 declaration we just looked at?

20 A   Yes.

21 Q   Who requested that declaration from you?

22 A   The attorneys for Dorsey Whitney.

23 Q   So Dorsey was representing Mr. Webster at the time that

24 that declaration was given?

25 A   Yes.

1   Q    Do you recall what that declaration was in support of?

2   A    I don't remember exactly what it was.  My understanding

3   was that there was some kind of a time deadline that they were

4   facing in connection with their request for authorization to

5   file a subsequent writ.

6   Q    Would it refresh your recollection to take a look at?

7   A    Sure.

8           MS. FOSTER:  Government's exhibit 3.

9           MR. FUNNELL:  Yes, ma'am.

10          MS. FOSTER:  May I approach the witness?

11          THE COURT:  You may.

12  BY MS. FOSTER:

13  Q    If you would look at the title of that document and the

14  last sentence on the last page.

15  A    Okay.  Okay.

16  Q    Does that refresh your recollection?

17  A    Yes.  It was filed in connection with a -- they had

18  requested that I provide the affidavit in connection with

19  their motion for authorization to file a successive motion to

20  vacate the sentence.

21  Q    At the time -- at the time that you issued this

22  declaration, did you -- I think you said you understood Dorsey

23  was under a time constraint?

24  A    That was my understanding.  That there was some kind of

25  time pressure for them to get the motion filed.

1  Q    At the time that you gave the 2009 statement, did you

2  review the transcript of Mr. Webster's trial?

3  A    No.

4  Q    And did you have possession of the transcript of

5  Mr. Webster's trial?

6  A    No.

7  Q    Where was it?

8  A    It was contained within my trial file that I had provided

9  to the original 2255 counsel back when we finished the direct

10 appeal.

11 Q    And the original 2255 was not Dorsey?

12 A    I'm sorry?

13 Q    Was Dorsey the original 2225 counsel?

14 A    Philip Wischkaemper and somebody else.

15 Q    At the time that you gave the statement, did you have the

16 opportunity to review your trial file?

17 A    No.

18 Q    Where was your trial file?

19 A    I had given it to Philip Wischkaemper when we finished the

20 direct appeal.

21 Q    How were you employed --

22         MR. FUNNELL:  Object as to the form of that

23 question.  It was leading.  The question was:  Did he have the

24 opportunity.  That is a subject of argument.  The question is

25 whether he did or did not review it.

```
 1              MS. FOSTER:  I'll rephrase, Your Honor.

 2              THE COURT:  You may.

 3  BY MS. FOSTER:

 4  Q    Did you, in fact, review your file?

 5  A    No.

 6  Q    Did you have an opinion as to whether it was your

 7  obligation to do that?

 8  A    I didn't have it.

 9  Q    Did you have an opinion as to whether it was your

10  obligation to seek out your file?

11  A    No.

12  Q    At the time you gave the October 2009 statement, how were

13  you employed?

14  A    I was in the private practice of law.

15  Q    And how -- how active was your private practice?

16  A    Pretty active.  I had a trial practice and so I stayed in

17  trial fairly consistently.

18  Q    Do you recall if you were, in fact, in trial when you were

19  contacted about providing this declaration?

20  A    I do not recall.

21  Q    Do you recall stating in your 2009 declaration that you

22  had not had the -- that that was -- let me rephrase.  You had

23  not reviewed your file prior to the 2009 declaration?

24  A    That's correct.

25  Q    Do you recall stating in the 2009 declaration that you had
```

1  not --

2  A   Yes, I did.

3  Q   -- reviewed your file?

4  A   Yes.

5  Q   Was that important?

6  A   Well, I thought it was important because I was answering

7  it based on the best of my recollection some nine years after

8  I had given up the file.

9  Q   So it was important enough to include in that declaration?

10 A   Yes.

11 Q   And in 2009, when you gave this -- when you gave this

12 statement, did you have a good faith belief that you must have

13 been told that no records regarding Mr. Webster existed?

14 A   Yes.

15         MR. FUNNELL:  Objection, Your Honor.  It's leading.

16         THE COURT:  Sustained.

17 BY MS. FOSTER:

18 Q   Did you have an opinion -- I'm talking about in 2009, when

19 you executed this declaration.  What was your opinion about

20 the status of Mr. Webster's records?

21         MR. FUNNELL:  Objection, Your Honor.

22         MS. FOSTER:  Disability records.

23         MR. FUNNELL:  Is this an opinion based on his

24 testimony today?  I mean, I'm not sure of the --

25         MS. FOSTER:  I'm asking for --

1          MR. FUNNELL:  -- foundation for the --

2          THE COURT:  I'm going to allow some latitude.  I

3    don't think the question is otherwise objectionable.  You

4    probably did not finish your question.  You may do so.

5    BY MS. FOSTER:

6    Q   In 2009, what was your opinion about the status of what

7    you did to get Mr. Webster's Social Security Disability

8    records?

9    A   It was my belief that we had done everything that we could

10   in an attempt to obtain the records and had been told that

11   there were no records.

12   Q   And did you include something about that in your

13   declaration?

14   A   Yes.

15         MR. FUNNELL:  Objection, Your Honor.  She's been

16   bolstering the witness for the last several questions before

17   his credibility on this issue has been tested on

18   cross-examination.

19         MS. FOSTER:  Your Honor, I think we know where the

20   government's going.  We've all seen the --

21         MR. FUNNELL:  That doesn't mean that it's --

22         THE COURT:  I think your questions at this point

23   seem to be more appropriate maybe for redirect or cross on the

24   government's questions.

25         MS. FOSTER:  Thank you, Your Honor.

```
 1  BY MS. FOSTER:

 2  Q   Did you give another declaration in 2018?

 3  A   Yes.

 4  Q   And to whom did you give that declaration?

 5  A   To you and Ms. Schubert.

 6  Q   And did we meet with you before you gave that declaration?

 7  A   Extensively.

 8  Q   I'm sorry?

 9  A   Extensively, yes.

10  Q   How many times did we meet with you?

11  A   I don't remember if it was two or three but it was

12  several.

13  Q   Where did those meetings take place?

14  A   At my office in Fort Worth.

15  Q   How long did they last?

16  A   I remember one of them lasted almost all day.

17  Q   Did we ask you questions about what you did --

18  A   Yes.

19  Q   -- with the Social Security records?

20  A   Yes.

21  Q   And you answered them?

22  A   Yes.

23  Q   Did you also have the opportunity and did you, in fact,

24  look at the transcript of Mr. Webster's case?

25  A   Yes.
```

*MOORE - DIRECT/FOSTER*                           80

```
 1   Q   And did you -- did we share with you exhibits from the
 2   file?
 3   A   Yes.  And parts of the transcript, yes.
 4   Q   Have you since had the opportunity to review your entire
 5   file?
 6   A   I have flipped through it.  I have not read the -- I have
 7   not re-read the transcript, which is contained in the file.  I
 8   have looked at most of the documents that are contained in the
 9   file -- I've looked at all of the documents that are contained
10   in the file.
11           MR. FUNNELL:  Your Honor, I have the same objection
12   to the form of that question where she said it was
13   opportunity.  Again, that's the subject of argument.
14           THE COURT:  I agree.
15   BY MS. FOSTER:
16   Q   Did you, in fact, review your file?
17   A   Yes.
18   Q   Or at least parts of your file?
19   A   Parts of it, yeah.
20   Q   Did you review parts that were relevant to what we're
21   talking about today?
22   A   That's correct.
23   Q   Did review of all of these things, the exhibits, the
24   transcript, your file, the conversations that you had with
25   Ms. Schubert and I, did that serve to refresh your
```

1  recollection?

2        MR. FUNNELL:  Objection.  Bolstering the witness

3  again, Your Honor.

4        THE COURT:  Overruled.  You may answer, if you know.

5        THE WITNESS:  Yes, it did.

6  BY MS. FOSTER:

7  Q   How did it refresh your recollection?

8  A   Well, in a number of ways.  I had not looked at that file

9  since I gave it up in the late 1990's, and it was able to help

10 me in terms of various dates and the things that we were

11 doing.  Like I did not recall that we had begin -- that we had

12 begun jury selection the first week of March.  And by

13 reviewing the file, I was able to determine that's exactly

14 when it all occurred.

15 Q   So the government says that that review couldn't have

16 aided your recollection about your contact with SSA because

17 there's nothing in your file that corroborates the phone call.

18        Do you agree with that?

19        MR. FUNNELL:  Objection; argumentative and it's

20 bolstering the witness, Your Honor.

21        THE COURT:  I agree with that.  Sustained.

22 BY MS. FOSTER:

23 Q   How many cases have you tried since you tried the

24 defendant's case in 1996?

25 A   Probably more than a hundred.

1  Q    Some of those were death penalty cases?

2  A    A number, yes.

3  Q    How many do you think?

4  A    I've been involved at this point in 14 death penalty

5  trials.

6  Q    You said earlier that you had been in practice for 40 plus

7  years?

8  A    Yes.

9  Q    You've tried a lot of cases in that time?

10 A    Yes.

11 Q    Have you prepared witnesses for those trials?

12 A    Yes.

13 Q    How do you prepare witnesses for trial?

14 A    Normally I get them in and I talk to them or go to them

15 and talk to them, discuss what they know about the case; and

16 then I'll talk to them about the mechanics of the trial, the

17 courtroom, how the questions are asked and answered, what

18 objections mean, what the judge's role is, and things like

19 that.

20 Q    Do you show them documents that may help to refresh their

21 recollection?

22 A    Certainly.

23 Q    Have you seen instances where witnesses' recollections

24 were refreshed by reviewing relevant documents?

25 A    Absolutely.

1  Q   And would that be true even if the documents did not

2  specifically cover what it is that their -- that their

3  recollection was refreshed on?

4            MR. FUNNELL:  Your Honor, I'm going --

5            MS. FOSTER:  That's a terrible question.  You don't

6  have to object.  I'll object and sustain my own objection.

7  BY MS. FOSTER:

8  Q   Do you have any doubt, as you sit there today, that you

9  personally made contact with Social Security in Pine Bluff and

10 requested Mr. Webster's Social Security Disability records?

11 A   No, absolutely not.

12 Q   Do you have any doubt, as you sit there today, that you

13 were told by them that they did not have any records

14 pertaining to this case?

15 A   No.  I'm absolutely sure they told us that.

16           MS. FOSTER:  I have nothing further.

17           THE COURT:  All right.  Counsel, let's take a brief

18 recess.  Ten minutes or so.  We'll come back for cross.  And

19 you've indicated, I believe, Mr. Funnell, you'd be able to

20 incorporate your direct into your cross?

21           MR. FUNNELL:  All of it's going to be cross, yes,

22 Your Honor.

23           THE COURT:  Very well.  My point is that you will

24 not then need to call this witness in your case.  Is that

25 correct?

1          MR. FUNNELL:  That's correct.

2          THE COURT:  Very well.  Let's take ten minutes.

3          THE CLERK:  All rise.  Court is in recess.

4          (A recess was taken at this time.)

5          THE CLERK:  Please rise.

6          THE COURT:  Be seated, please.  Your witness,

7  Mr. Funnell.

8                      **CROSS EXAMINATION**

9          MR. FUNNELL:  Thank you, Your Honor.

10  BY MR. FUNNELL:

11  Q   Mr. Moore, up there to your right are respondent's

12  exhibits 3, 4 and 5.  Do you see those?

13  A   Yes.

14  Q   During your examination I'll be asking you about those but

15  I just wanted to have that clear on the record that you had

16  those up in front of you.

17          Mr. Moore, you were lead counsel in this case, is

18  that right, the trial case of Mr. Webster?

19  A   Yes, as lead trial prosecutor.

20  Q   You maintained a trial file.  Is that right?

21  A   That's right.

22  Q   Was that your practice in 1996, to maintain a trial file?

23  A   Yes.

24  Q   Is it important to keep relevant documents in your trial

25  file?

1   A    Yes.

2   Q    Has that been your practice throughout the time that

3   you've been a lawyer?

4   A    Yes.

5   Q    Because you were lead counsel and you were maintaining a

6   trial file, is it fair to say that it was your responsibility

7   to make sure that your file reflected all of the critical

8   events that went on in the case?

9   A    There were two lawyers and so there's two files.  I would

10  have tried to made sure that I had a copy of everything that I

11  thought was important in the file that I maintained but

12  Dr. Butcher also maintained a file.

13  Q    Earlier on your direct testimony, I think you made it

14  pretty clear that there was a division of responsibility

15  between yourself and Mr. Butcher, is it?

16  A    Dr. Butcher, yes.

17  Q    Dr. Butcher.  And that you were solely responsible for the

18  investigation into Mr. Webster's mental health and his mental

19  retardation.  Am I saying that correctly?

20  A    I was not solely responsible but I did the lion's share of

21  the work in that regard, yes.

22  Q    Well, am I misstating your direct testimony?  I believe

23  that you said that Dr. Butcher didn't play a role in that

24  portion of the case; that that was your role.  Did I hear that

25  incorrectly?

1  A   I would have done the lion's share of the work.  I can't

2  say that I didn't play a part in it because my recollection is

3  that he actually participated in the mental retardation

4  investigation as well.  I did the lion's share of the work but

5  it's not like he was a bookend at that point.

6  Q   Okay.  But from your direct testimony, you indicated that

7  with regard to this request to Social Security, that

8  Dr. Butcher played no role whatsoever.  Is that correct?

9  A   I would have done that, yes.

10 Q   All right.  So Dr. Butcher wouldn't have been responsible

11 for documenting this in his file?

12 A   No.

13 Q   This would have been something that was your sole

14 responsibility?

15 A   Yes.

16 Q   Whether it came from Mr. Strickland or anybody else on the

17 defense team, it would have been your responsibility to make

18 sure not only that the request was made but the result of that

19 request.  Is that correct?

20 A   That's correct.

21 Q   And I want to make clear for the record that there is

22 nothing in your trial file to reflect this phone call that you

23 said that you had with Social Security in 1996.  Is that

24 right?

25 A   Probably not other than the documents that are already --

1   we've already talked about.

2   Q    Well, the documents that you've testified to --

3   A    Yes.

4   Q    -- none of them include a note that you wrote to the file

5   documenting that conversation, correct?

6   A    That's correct.

7   Q    And it does include a lot of other information about the

8   request itself.  Is that fair to say?

9   A    Yes.

10  Q    I mean, you kept fax cover sheets, transmission reports,

11  Fed Ex records.  Is that right?

12  A    That's correct.

13  Q    And yet there's no handwritten note from you, right?

14  A    Not at this point.

15  Q    Not at this point, I don't understand the answer.

16  A    There's not -- I don't find that record in my file at this

17  point but there's other records that I wrote that are not in

18  this file at this point either.

19  Q    Are you suggesting that at some point you did make a note

20  in the file regarding this conversation with Social Security

21  and that it is now no longer in your file?

22  A    I don't have -- I don't know because a big part of my

23  notes from the investigation and trial of this case are not in

24  the file at this point.

25  Q    Do you have an explanation for how they're not in your

1  file?

2  A   Well, it's been out of my hand for 20 years.  So no, I

3  don't.  I don't know why they wouldn't be there.

4  Q   I read your two declarations in 2009 and 2018, which are

5  respondent's exhibits 3 and 4 in front of you.

6  A   Yes.

7  Q   Correct me if I'm wrong, but it doesn't says anything in

8  those declarations about you suspecting that your notes are

9  missing from your file, does it?

10  A   I don't think I reviewed my file at the time that I did

11  either of those declarations.

12  Q   Are you saying that with regard to the declaration Exhibit

13  No. 4 that was April 23, 2018, that you had not reviewed your

14  file by that time?

15  A   I think that they gave me back the boxes that it was

16  contained in, but I had not gone through all the boxes at the

17  time that I did that declaration, no.

18  Q   So I want to make sure I understand you correctly.

19  A   Okay.

20  Q   Let's both look at respondent's exhibit 4.  You see that?

21  A   Mm-hmm.

22  Q   It's your declaration on the last page, page 10, it's

23  dated April 23, 2018, and your signature is on that.  Is that

24  right?

25  A   Yes.

1  Q   And are you -- you're saying now that it's your

2  recollection at the time that you signed and declared those

3  facts to be true, that you had not reviewed your file.   Is

4  that right?

5  A   I -- I reviewed those portions that they showed to me

6  whenever we sat down and talked.   I did not do my own search

7  through the file until after this declaration was completed.

8  Q   Let's start with exhibit 5 because I think we need some

9  clarification on this.

10  A   Okay.

11  Q   Do you have exhibit 5 -- respondent's exhibit 5 in front

12  of you?

13  A   I do.

14  Q   Do you recognize it?

15  A   Yes, I do.

16  Q   What is exhibit 5?

17  A   It is an affidavit that I did back in September of 2000.

18  Q   All right.   Am I correct that this is an affidavit rather

19  than a declaration, right?

20  A   That is correct.

21  Q   And the notary on this particular affidavit was your wife,

22  Kimberly Moore.   Is that right?

23  A   Yes.

24  Q   Ms. Moore, as you've testified, was a member of the

25  defense team in the Webster case?

A Yes.
Q Did you, prior to -- at the time that you -- did you draft this affidavit or did somebody draft it for you?
A No. I drafted it.
Q Did any of the information in this affidavit come from Kimberly Moore or was this all your recollection?
A It's all my recollection.
Q Did you review your trial file before you prepared this affidavit in September of 2000?
A No. I didn't have it.
Q You didn't have it. It was in the possession of the first post-conviction counsel. Is that right?
A We tendered it to them as soon as the direct appeal was ended.
Q All right. So it was in your possession from the time that the trial was over until sometime during the litigation of the direct appeal. Am I correct?
A That's correct.
Q And then you handed it off to post-conviction counsel?
A That's correct.
Q And then the first post-conviction counsel came to you and asked you to draft this affidavit in response to some ineffective assistance of counsel and other allegations that they were making in the first 2255. Is that right?
A I don't remember what they asked me to do the affidavit

1  for.

2  Q   Well, the affidavit itself talks about your representation

3  and it speaks about the difficulties that you had with

4  Attorney Lamoreaux.  Is that right?

5  A   That's correct.

6          MS. FOSTER:  Objection.  Ms. Lamoreaux is not an

7  attorney.

8          THE WITNESS:  I think she is.

9          MS. FOSTER:  She was acting as a mitigation attorney

10 at the time.

11         MR. FUNNELL:  But she is an attorney.

12         And for the court reporter, Lamoreaux is

13 L-A-M-M-O-R-E-A-U-X (sic).

14 BY MR. FUNNELL:

15 Q   So you were providing this affidavit talking about what

16 you said here were the lines of communication that broke down

17 between you, Ms. Lamoreaux and the remainder of the defense

18 team.  Is that right?

19 A   Yes.

20 Q   Is that because Mr. Webster in the first 2255 was accusing

21 you of not conducting a sufficient investigation regarding

22 mitigating evidence, among other things?

23 A   I don't recall what this affidavit was -- was tendered

24 for.  They asked me to do an affidavit, obviously.  I don't

25 remember if this -- I did a separate affidavit in response to

1    the ineffective assistance claim that was made.

2    Q    Let me ask you this.  When you were compiling your file in

3    1994 through 1996 -- am I stating those dates correctly, your

4    criminal trial file?

5    A    Yes.

6    Q    You've already testified about your experience as both a

7    defense attorney and a prosecutor prior to the '94 to '96 time

8    period.  Is that right?

9    A    That's correct.

10   Q    You knew that you were defending a death penalty case?

11   A    Mm-hmm.

12   Q    Is that yes?

13   A    Yes.

14   Q    Am I correct that you would have anticipated that there

15   was going to be a direct appeal if Mr. Webster was convicted.

16   Is that fair to say?

17   A    Yes.

18   Q    Would you have predicted post-conviction litigation if he

19   was going to be convicted?

20   A    Yes.

21   Q    Would you have predicted that post-conviction litigation

22   could include allegations that you were an ineffective lawyer?

23   A    Yes.

24   Q    And that you had not done enough to investigate?

25   A    Yes.

1   Q    Knowing that, would it have been that much more important

2   for you, at the time that you were compiling that file from

3   1994 to 1996, to make sure that you documented critical

4   investigative steps regarding his mental retardation?

5   A    Yes.  I would have documented what we did and what we

6   learned, yes.

7   Q    Well, you're telling us today that one of the things that

8   you did was that you had a phone call with somebody at the

9   Social Security office, right?

10  A    That's correct.

11  Q    And that this person specifically told you that these

12  records that you had requested did not exist?

13  A    Yes.

14  Q    You're also telling us today that you had a conversation

15  with Mr. Strickland about him traveling to Pine Bluff and

16  being told the same thing.

17  A    Yes.

18  Q    Right?

19  A    Yes.

20  Q    Well, those are all things that you did in this case.

21  That's what you're telling the judge, right?

22  A    That's correct.

23  Q    But you didn't document those.  There's no documents of

24  those things whatsoever.

25  A    They're not in there now.  I don't -- I don't know if I

1  documented it at the time or not because I don't have that

2  part of the file.  I wish that I did but it's not there.

3  There's notes that are not included within the file that I did

4  at the time of the trial.

5  Q   Are you saying that you made notes about your conversation

6  with Mr. Strickland that are not in your file?

7  A   I don't know if I did or not because the notes are not

8  there for me to know.

9  Q   Are you saying that Mr. Strickland gave you any sort of

10 note or documentation about his alleged conversation with

11 Social Security?

12 A   I don't know if he gave it -- I know that he called me on

13 the telephone and talked about it because we were in jury

14 selection.  Whether or not he actually memorialized it in some

15 note or not, I don't know.  I don't find one in the file at

16 this point from Mr. Strickland.

17 Q   Is it correct both Mr. Connelly and Mr. Strickland were

18 your two investigators on this defense case?

19 A   Yes; and there may have been a third one, as a matter of

20 fact.

21 Q   Who was that?

22 A   I don't remember the name.  They all worked for Mike

23 Connelly.

24 Q   But you don't remember the name?

25 A   No.

1   Q    Mr. Connelly and Mr. Strickland at the time were retired

2   FBI agents.   Is that right?

3   A    That's correct.

4   Q    Have you worked with FBI agents from time to time?

5   A    Yes.

6   Q    Both as a defense attorney reviewing their work product

7   and as a prosecutor reviewing their work product?

8   A    Yes.

9   Q    Is it fair to say FBI agents like to document things?

10  A    Yes.

11  Q    Is it fair to say that an FBI agent conducts an

12  investigation and is told that the results of the

13  investigation are that there is no record of something, they

14  document that, don't they?

15  A    I would say generally so, yes.

16  Q    And here you were specifically using retired FBI agents as

17  your investigators, correct?

18  A    They were the investigators we were using, yes.

19  Q    You trusted them?

20  A    Yes.

21  Q    Let's look at exhibit No. 3 -- respondent's exhibit No. 3.

22  A    Okay.

23  Q    Do you have that?

24  A    Yes.

25  Q    And do you recognize that as the declaration that you

1    submitted in October of 2009 regarding -- what it says

2    specifically in the declaration itself, that it was in support

3    of a motion to file a successive post-conviction motion.

4    A    Yes.

5    Q    Is that right?

6    A    That's correct.

7    Q    So on the face of the declaration itself, you are

8    declaring that you are going to be filing this to support a

9    post-conviction motion for Mr. Webster?

10   A    Yes.  That was my understanding.  I had not seen the

11   motion.

12   Q    So you knew the purpose of this declaration?

13   A    That's what they asked me to do.

14   Q    You knew it was important?

15   A    Yes.

16   Q    Did you draft this or was it drafted for you?

17   A    No.  I drafted it.

18   Q    Did you consult with Kimberly Moore or any other member of

19   the defense team before you submitted this declaration in

20   2009, or is this based on your recollection?

21   A    Well, I'm sure that I consulted with Kim.  Whether or

22   not -- it's my declaration based on what my recollections are.

23   Q    Do you recall if you consulted with Mr. Strickland before

24   you authorized this declaration?

25   A    I did not.  I believe Mr. Strickland was deceased by the

1  time this declaration was done.

2  Q    Let me ask you this.  If you had consulted with

3  Mr. Strickland, or any other member of the defense team, that

4  would have been important to include in this declaration,

5  right?

6  A    Well, only if they were telling me something that I didn't

7  recall.

8  Q    Well, in the declaration you talked about the fact that

9  you didn't have your criminal file when you were preparing it.

10 Is that right?

11 A    That is correct.

12 Q    Who had your file at that time?

13 A    At the time that this was done, I think Dorsey Whitney had

14 obtained the file.

15 Q    All right.  So you drafted exhibit 3 and you're saying

16 that you did it when you did not have possession of your file?

17 A    That's correct.

18 Q    An attorney from Dorsey is mentioned in here as providing

19 you with certain records.  Do you see the third page of the

20 exhibit where it says that Mr. Oliver McKinstry of the Dorsey

21 Whitney law firm provided me copies of Social Security

22 Administration records regarding Mr. Webster.  Do you see

23 that?

24 A    Yes.

25 Q    So those records are the only documents that the Dorsey

1   firm gave you prior to authoring this declaration.  Is that

2   right?

3   A    I think that's correct.

4   Q    And unlike exhibit 4, where you said that two members of

5   the Dorsey firm -- excuse me, where Ms. Foster and

6   Ms. Schubert came and spoke to you extensively to prepare

7   that -- this declaration exhibit 3, you drafted this yourself?

8   A    That's correct.

9   Q    Why didn't you ask Mr. McKinstry to give you a copy of

10  your file before you prepared this declaration?

11  A    Well, for two reasons.  First of all, it was 12 boxes and

12  they had it at their office out of state; and second of all,

13  as I recall, they were under some kind of a time crunch and

14  they needed my affidavit very quickly.

15  Q    You have now characterized in your latest declaration --

16  in 2018, you have now characterized your memory in 2009 as

17  somewhat vague?

18  A    That's correct.

19  Q    Do you make it a practice of signing statements under

20  penalty of perjury with a vague recollection?

21  A    I put in the affidavit what I remember.

22  Q    And you also put in the declaration that you had not been

23  able to review your file?

24  A    That's correct.  That is absolutely correct.

25  Q    And on direct examination counsel asked you about that,

1   the fact that you included in the declaration:  I haven't been

2   able to review my file before I signed this, right?

3   A    That's correct.

4   Q    And your response to her was, it was important to say that

5   in the declaration that you hadn't reviewed your file because

6   this was in 2009, some 13 years after the events.  Is that

7   right?

8   A    That's correct.

9   Q    So you thought it was important to put in the declaration

10  that you hadn't reviewed the file because of the length of

11  time that had passed, but you didn't insist on reviewing the

12  file before actually authoring the declaration.  Do I have

13  that correct?

14  A    That's correct.

15  Q    Now, you're saying that Dorsey was under a time constraint

16  to get this filed in 2009.  Is that right?

17  A    That's my memory, yes.

18  Q    Did they tell you that these records had been in their

19  possession since February of 2009, eight months earlier?

20  A    I don't think we discussed it.

21  Q    So that didn't come up?

22  A    I don't believe so.

23  Q    So how did this declaration come to be?  I see that it's

24  dated October 20th of 2009.  How many days did it take you to

25  draft it?

*MOORE — CROSS/FUNNELL*                                100

```
 1   A    I don't recall.

 2   Q    Did Mr. McKinstry provide you those records by mail, in

 3   person?  How did that happen?

 4   A    I don't recall ever meeting him.  So my memory would be

 5   that he sent them to me by mail.

 6   Q    So you don't remember?

 7   A    I just don't remember.

 8   Q    So you drafted this in October of 2009 and your

 9   understanding was that there was a time constraint?

10   A    Yes.

11   Q    And your recollection at that time was vague?

12   A    Yes.

13   Q    You knew that it was submitted in support of a successive

14   motion to challenge his sentence, right?

15   A    That's correct.

16   Q    Well, if, indeed, there was a time constraint to get it

17   filed, did you ever suggest to Dorsey, later in 2009, that you

18   would like to file a supplemental declaration after reviewing

19   your file?

20   A    I didn't review my file in 2009.

21   Q    Well, that's not my question.  My question is, after you

22   submitted this exhibit 4 in October of 2009, did you tell the

23   Dorsey firm:  All right.  I would like to submit a

24   supplemental declaration so that my memory isn't vague and I'd

25   like to review my file.  Did you do that?
```

*MOORE — CROSS/FUNNELL*                                        101

1   A    No.

2   Q    Did you do it in 2010?

3   A    No.

4   Q    2011?

5   A    No.

6   Q    2012?

7   A    No.

8   Q    2013?

9   A    No.

10  Q    2014?

11  A    No.

12  Q    2015?

13  A    No.

14  Q    2016?

15  A    No.

16  Q    2017?

17  A    No.

18  Q    Well, we know about this declaration of April 23rd of

19  2018.   How far in advance of you signing that on April 23rd of

20  2018 did Ms. Schubert and Ms. Foster contact you to prepare

21  that second declaration?

22  A    We met probably three times prior to my executing the

23  affidavit -- or the declaration.

24  Q    Do you know how long before you signed it that this

25  occurred?  Was it a month before?  Was it just a few days

*MOORE — CROSS/FUNNELL*                                    102

```
 1   before?

 2   A    It was spread out over a period of probably a number of

 3   months.

 4   Q    So for the 2018 declaration, Mr. Webster's post-conviction

 5   lawyers gave you your file to review, right?

 6   A    Yes, at some point they did.

 7   Q    They didn't do that in 2009, right?

 8   A    No.

 9   Q    The only thing that they showed you in 2009 were the

10   records that you didn't get?

11   A    That's correct.

12   Q    Going back to exhibit 5, which was your affidavit that you

13   submitted back in 2000, do you see that?

14   A    Yes.

15   Q    There are a number of times in there -- and this was about

16   four years after the trial, right, September of 2000?  The

17   trial was in June of 1996?

18   A    Yes.

19   Q    There are a number of times in that affidavit where you

20   use the phrase, "as I recall," for example, in the fourth

21   paragraph.  Do you see that?

22   A    Yes.

23   Q    Later in that paragraph you again use the phrase, "I also

24   recall?"

25   A    Yes.
```

*MOORE — CROSS/FUNNELL*                                    103

```
 1              MS. FOSTER:  I'm sorry, counsel.  What?
 2              MR. FUNNELL:  We're looking at respondent's exhibit
 3  5.
 4              MS. FOSTER:  Thank you.
 5  BY MR. FUNNELL:
 6  Q   You look at page 2 of exhibit 5, the first paragraph, you
 7  talk about, "I recall Judge Means calling a bench conference."
 8  Do you see that phrase?
 9  A   Yes.
10  Q   The next paragraph, again you use the phrase, "as I
11  recall."  You're talking about an opinion given by Dr. Kuhns.
12  Do you see that?
13  A   Yes.
14  Q   Looking at exhibit 4, which was the 2009 declaration, when
15  you describe your pursuit of these records with the Social
16  Security Administration in March of 1996, you didn't use the
17  phrase, as I recall, did you?
18  A   Is there a particular part of the affidavit that you're
19  referring to?
20  Q   I'm talking about the declaration from 2009.  Why don't
21  you take the opportunity just to look it over make, sure
22  you've had a good chance to look at it.
23  A   The 2009 declaration?
24  Q   Yes; respondent's exhibit 4.
25  A   Okay.
```

*MOORE — CROSS/FUNNELL*                                    104

1  A    The respondent's exhibit 4 is the 2018 declaration.

2  Q    Excuse me; respondent's exhibit 3.

3  A    Okay.  That's the 2009 declaration.  I'm sorry.

4  Q    Would you like me to direct your attention to the portion

5  of the declaration that I'm referring to?

6  A    Yes, please.

7  Q    I'm talking about page 3, the bottom of the page.

8  A    Okay.

9  Q    Where it starts out, "while I do not currently have any

10 direct recollection of the response," do you see that?

11 A    Yes.

12 Q    There you don't say, "I recall."  You use the phrase your

13 "good faith belief," right?

14 A    Yes.

15 Q    Now, you drafted this yourself you told us?

16 A    Yes.

17 Q    What did you mean by good faith belief?

18 A    It was my belief that that's what -- that's what we had

19 been told, that there were no records.

20 Q    All right.  Earlier in that same sentence you admitted

21 that you don't have any direct recollection?

22 A    That's correct; I didn't.

23 Q    So there is a difference then between having a direct

24 recollection and what you called a good faith belief.  Is that

25 fair to say?

1   A    Yes, I guess.

2   Q    Well, otherwise you wouldn't have any reason to say it

3   another way, correct?

4   A    Well, I'm not sure that it was artfully written anyway;

5   but at the time that I executed the affidavit, it was my

6   belief that we'd been told there were no records and that's

7   what I put in the affidavit.

8   Q    You didn't use the phrase that "it was likely," right?

9   You didn't say that.  You said "good faith belief," correct?

10  A    That's what -- yes, that's what's in the affidavit.

11  Q    Now, even though you didn't review your file before you

12  authored and signed this, because you knew what it was being

13  submitted for, is it fair to say that you gave this serious

14  thought before you drafted and signed it?

15  A    Yes.

16  Q    That you searched your memory banks before you drafted and

17  signed this?

18  A    Yes.

19  Q    And at that time you didn't remember the conversation that

20  you are now certain that you had?

21  A    I indicated I didn't recall, that's correct.

22  Q    If I understand your testimony today, you're saying that

23  you would have been able to say the exact same things with the

24  exact same level of certainty about this recollection with the

25  Social Security Administration, the conversation that you had

*MOORE — CROSS/FUNNELL*                                   106

```
 1  with them, you would have been able to say those exact same
 2  things in 2009 if you had reviewed your file at the time you
 3  submitted that declaration.  Do I understand that correctly?
 4  A   I would have had a better recollection than I had at this
 5  point.  I hadn't reviewed anything in 2009, when I signed
 6  this.
 7  Q   Right.  Well, now in 2018, you're saying that the exercise
 8  of going through your file is what has refreshed your memory,
 9  correct?
10  A   That's correct.
11  Q   Not that there is any note or written record indicating
12  that you had the conversation or that Social Security gave you
13  a response, but just simply going through the file refreshed
14  your memory.  Am I saying that right?
15  A   In 2009, I didn't have access to the fax that we sent to
16  the Social Security Administration or the notes that I had
17  given to Kimberly for the things that I needed her to do to
18  get the records.  I didn't have any of that.
19  Q   Right.  I'm not asking about 2009 for this question.  I'm
20  asking about 2018.
21  A   Oh.  Okay.
22  Q   2018, you're saying that the exercise of going through
23  your file is what has refreshed your memory on this
24  conversation and given you the ability to tell this judge that
25  you are certain that this conversation took place.  Am I
```

*MOORE − CROSS/FUNNELL*                                107

```
 1  stating that correctly?
 2  A   Yes.
 3  Q   All right.  So if you would have done the exact same thing
 4  in 2009, if you had reviewed your file, are you saying that
 5  your declaration in 2009 would have had that same level of
 6  certainty instead of a good faith belief?
 7  A   Probably.
 8  Q   Probably?
 9  A   Yeah.
10  Q   Despite the fact that the file itself has no proof of that
11  conversation?
12  A   Not at this point.
13  Q   Is that a yes?
14  A   There is nothing in the file at this point that reflects
15  that, that's correct.
16  Q   Going back to the 2009 declaration, exhibit 3, page 2,
17  that sentence that I reviewed to before -- excuse me.  Page
18  3 -- the bottom of Page 3, "while I do not currently have any
19  direct recollection," do you see that?
20  A   Yes.
21  Q   Why did you include the word "currently"?
22  A   Because I didn't.  At the time that I executed this
23  affidavit, I didn't have any recollection.
24  Q   Okay.  Did you expect that that would change in the
25  future?
```

1  A    No.

2  Q    So the fact that you said currently didn't suggest that in

3  the future, if you had a chance to review your file, that

4  might change?

5  A    My intent, when I said that, is just simply to indicate

6  that at the time they asked me to do the affidavit, I didn't

7  have any direct recollection of that fact.  That's all it

8  meant.

9  Q    Exhibit 3, 2009 declaration, doesn't have any indication

10  about a conversation that you had with Mr. Strickland as

11  you've testified to today, right?

12  A    That's correct.

13  Q    I'd like you to look at your 2018 declaration, the one

14  that is the most recent.  There is nothing in that declaration

15  about the conversation that you supposedly had with

16  Mr. Strickland, is there?

17  A    No.

18  Q    How many pages is that 2018 declaration?

19  A    Ten pages.

20  Q    Would you agree with me that it is substantially more

21  detailed than the 2009 declaration?

22  A    Yes, it is.

23  Q    And by that time, you had had a chance to review your

24  file?

25  A    No.  I reviewed parts of it.

MOORE — CROSS/FUNNELL                    109

1  Q    The parts that the Dorsey firm gave you to review?

2  A    That's correct.  They had given me the file.  They pulled

3  out specific parts of the file to ask me about and that's how

4  this declaration got drafted.

5  Q    All right.  And nowhere in here does it say anything about

6  a conversation with Mr. Strickland?

7  A    No.

8  Q    About him traveling to the Social Security office and

9  being told that there were no records?

10 A    No.

11 Q    So we're hearing that for the first time today, right?

12 A    I don't know.  I don't know what you're hearing.  First

13 time I've testified to it is today.

14 Q    Okay.  So you've given an affidavit and two declarations

15 in this case.  We've established that.  And you're testifying

16 today.  Is there any other sworn written or testimonial

17 statement, other than those four things?

18 A    Yes.

19 Q    What's that?

20 A    I did another affidavit.  I don't think it had anything to

21 do with Mr. Strickland.  It was in response to the ineffective

22 assistance claim.

23 Q    Okay.  Thank you.  In the 2018 declaration, exhibit 4,

24 page 8, paragraph 34, do you see that?

25 A    Yes.

MOORE - CROSS/FUNNELL                                    110

1   Q   It starts out by saying, "At the time I executed a prior

2   declaration on October 20th of 2009, I had not yet had the

3   opportunity to review my file."  Are we looking at the same

4   paragraph?

5   A   Yes.

6   Q   At the end of that paragraph you say, "Today, after

7   reviewing my file and considering this matter in depth, I am

8   certain that I was personally told that such records did not

9   exist, although I cannot actually recall whether this was via

10  phone or in person."

11           Do you see that sentence?

12  A   Yes.

13  Q   And that sentence was produced after this extensive back

14  and forth between you, Ms. Schubert and Ms. Foster, right?

15  A   That's correct.

16  Q   It doesn't say anything in that sentence or anywhere else

17  about your testimony today that it was during a phone call

18  during jury selection in the first week of March that you

19  talked to somebody at Social Security.  We're hearing that for

20  the first time today, aren't we?

21  A   At the time that I did this affidavit, I didn't even know

22  when the jury selection started in the case.  I couldn't

23  remember.  I have since gone back and looked through the file

24  at the trial transcript and note that during the first week of

25  March was the week this first came up, and that's the week we

 1  started jury selection.

 2  Q    Again, let's look at paragraph 34.  In the middle.  "In

 3  executing this declaration, I have spent hours reviewing

 4  relevant portions of my trial file and the trial transcript."

 5  A    They gave me excerpts, yes.

 6  Q    I'm sorry?

 7  A    They provided me with excerpts of the trial transcript.

 8  Q    So you did know when the trial occurred, when you authored

 9  this declaration?

10  A    I didn't recall there being a date on any of the pages

11  that I received.

12  Q    In any event, you said at the time that you couldn't

13  remember whether this was in phone or in person, right?

14  A    That's correct.

15  Q    But today you have testified definitively, if I understood

16  you, that it was by phone during jury selection in March.  Is

17  that right?

18  A    That's correct.

19  Q    Of 1996?

20  A    Yes.

21  Q    And the reason that you're able to state that definitively

22  now, as opposed to your declaration, is because now you're

23  saying that you know when the trial was?

24  A    I know what I was doing the first week of March.  I didn't

25  go to Pine Bluff in the first week of March because I was in

1  voir dire.  When we went the last part of February, is when I

2  learned from Mrs. Webster that she had taken him to the Social

3  Security Administration.  That's when I generated all the

4  documents to my legal assistant to try to get those records,

5  and told the Social Security Administration that my

6  investigator would be there the first week of March to pick

7  them up.

8  Q   All right.  According to those documents -- and the reason

9  that you're able to say that these things happened is because

10  of the documents, right, because of your file?

11  A   They have refreshed my recollection that we were in trial,

12  yes.

13  Q   So again, your file is critically important to refreshing

14  your recollection, correct?

15  A   Yes.

16  Q   Okay.  According to those documents, you're saying that

17  the defense team had a plan in place to get those records?

18  A   Absolutely.

19  Q   That you had sent -- that Kimberly Moore -- really

20  Whitehead at the time, but Kimberly Moore had this

21  conversation that you had instructed her to pursue these

22  records, right?

23  A   Yes.

24  Q   She had acted on those instructions by sending the fax,

25  right?

```
 1   A    Yes.

 2   Q    She also sent it by Fed Ex, right?

 3   A    Yes.

 4   Q    And you kept a record not only of the request by Fed Ex

 5   but a request of the record by Fed Ex?

 6   A    That's correct.

 7   Q    Because you wanted to document these things?

 8   A    That's correct.

 9   Q    The plan that was in place was that Mr. Strickland was

10   going to travel there?

11   A    Yes.

12   Q    Obtain the records?

13   A    Yes.  He was going to be there interviewing witnesses

14   anyway; but that -- when we learned about the records, that

15   became part of his responsibilities.

16   Q    And these were records that, as you testified at the time,

17   based on what you had learned from observing Mr. Webster, all

18   of the other experts that you had talked to, his family, these

19   are records that you wanted, right?

20   A    Very much so.

21   Q    So you had this plan in place.  Mr. Strickland is going to

22   go there and he's actually going to take a business records

23   authorization to perfect the admissibility of the records.

24   A    He was going to take the originals of the documents that

25   we faxed him, yes.
```

*MOORE - CROSS/FUNNELL*                                114

1   Q    From what you're telling us today, both you and

2   Mr. Strickland were told those records didn't exist?

3   A    That's correct.

4   Q    Even though by phone, you were told they did exist, right?

5   A    I was never told that they existed by telephone.

6   Q    Well, your defense team was.  That's why you had sent him

7   up there with the hearsay authorization -- the business

8   records authorization, right?

9            MS. FOSTER:  Your Honor, I've got to object to this.

10  The witness did not testify on direct that the Social Security

11  told him that documents existed.  Social Security would never

12  do that without a signed release.  What Social Security told

13  him, or his office, was that if there are documents, this is

14  what you do to get them.

15           THE COURT:  My recollection, but I think it's your

16  opportunity to cross.

17           MR. FUNNELL:  Thank you.

18  BY MR. FUNNELL:

19  Q    Just to clarify.  At the time that you sent your

20  investigator there, is it your recollection that you had been

21  told that the records were there to pick up or that he would

22  simply show up with these documents to obtain the records, if

23  they existed?

24  A    To show up to obtain the documents if they existed.  The

25  only information I had that Social Security had any records

 1  came from the mother of Bruce, Beatrice Webster.

 2  Q   All right.  So according to your testimony today, you're

 3  saying that Mr. Strickland did that.  He went there with these

 4  documents to get them signed, to pick up the records, and was

 5  told there are no records?

 6  A   Well, we had mailed the original copies.  I don't remember

 7  if I gave him additional original copies.  We'd already mailed

 8  them to be executed by the Social Security Administration.  He

 9  was just simply going to pick up the records that they

10  provided to us.

11  Q   So he was going there -- it was your understanding that he

12  was going there to pick up records that you were told were

13  there?

14  A   Yes.  They were told by his mother.

15  Q   Told by his mother; not Social Security?

16  A   Yeah.  They never would tell us anything about any

17  records.

18  Q   All right.  So Mr. Strickland goes there and he is now

19  told, according to your testimony today, that the records

20  don't exist?

21  A   Yes.

22  Q   You then wanted to personally follow-up on that?

23  A   Yes.

24  Q   That's why you're saying you made this phone call during

25  jury selection?

*MOORE - CROSS/FUNNELL*                                    116

1   A    Yes.

2   Q    Why was it important for you to personally follow-up on

3   that?

4   A    Because I needed -- I wanted an affirmative affirmation

5   from them that there were no records.  Otherwise, if they were

6   telling me that I needed something else to get them, a

7   subpoena or whatever it is, that's what I would have done.

8   But when they tell me that there were no records to be had,

9   then there was no other evidence for me to pursue at that

10  point.

11  Q    Despite all of that, and you doing those personal steps

12  because they were so critically important, you never

13  documented this conversation with Social Security in your

14  file, right?

15  A    I don't -- I don't know if that's correct or not.  There's

16  no documents in my file now, but I've already told you that

17  there are notes that I took that I recall taking that are out

18  of the file at this point.

19  Q    Did you ask the person from Social Security to give you

20  written proof of what they had just told you?

21  A    I don't recall because I -- I actually think that I asked

22  them to send me a letter.  I just don't recall and so -- I

23  can't testify that that occurred.  For some reason I'm

24  thinking that I asked for some type of written verification

25  that they didn't have any records.

*MOORE — CROSS/FUNNELL*                                117

```
 1  Q   Well, I guess the question would be, why wouldn't you have

 2  requested written proof from them?

 3  A   If I didn't -- if I didn't do it, it was just simply an

 4  oversight.  I don't recall if I did or didn't.  That's the

 5  problem.  And I don't have any notes in the file at this point

 6  to help refresh my recollection in that regard.

 7  Q   It may have been an oversight that you didn't ask them to

 8  document this conversation about these critical records?

 9  A   If I didn't ask them to do that, yes, it was obviously a

10  big oversight.

11  Q   At the time this was going on, you had compiled, I think

12  what you testified to on direct, an extraordinary number of

13  expert witnesses as part of the defense case?

14  A   That's correct.

15  Q   More than the typical death penalty case in Texas?

16  A   Yes.

17  Q   You were confident that your case on the death penalty was

18  strong?

19  A   Yes.  I was -- I felt that we had the strongest case that

20  I could produce under the circumstances.  The reason the

21  records were so important to me is because they predated the

22  offense and would have predated any time -- any ability of him

23  to fabricate for purposes of an avoiding punishment in this

24  trial.

25  Q   Did you think that your case in support -- excuse me.  Let
```

1  me rephrase that.  Did you think that you had compiled an

2  overwhelming amount of evidence to support a finding of mental

3  retardation?

4  A   Yes.

5  Q   Let's assume that you did, in fact, have a conversation

6  with the Social Security and somebody told you that the

7  records didn't exist.  And by the way, I think you said on

8  direct that you believe or remember that that was Hal West?

9  A   That's my memory.  I don't -- I think he was the person

10  that we were dealing with.

11  Q   You don't say Mr. West's name in your 2018 declaration

12  though, do you?

13  A   I don't recall.

14  Q   Let's assume that that was what they told you.  Did you

15  ask to speak to anybody else at Social Security, either at the

16  Pine Bluff office or at a different office, to confirm that?

17  A   No.  It was my understanding Mr. West was like the

18  director of the office or something.

19  Q   So it would have been fairly easy for the director of the

20  office to provide you with written documents of what he

21  represented that his office did or did not have, correct?

22  A   I don't know.

23           MS. FOSTER:  Objection, Your Honor, speculation.

24           THE COURT:  Sustained.  Next question.

25

*MOORE — CROSS/FUNNELL*                         119

```
 1   BY MR. FUNNELL:

 2   Q   At the time that, you know, you had this conversation and

 3   you were told that the records didn't exist, you had been told

 4   by the family that these records were just a couple years

 5   before the crime, right?

 6   A   Yes.

 7   Q   According to the handwritten notes that you had talked

 8   about earlier in your testimony, I think you said in there

 9   that it was in 1992 that the family said that Mr. Webster had

10   been evaluated, right?

11   A   I think that's correct.

12   Q   So these weren't old records that you were looking for?

13   A   No.

14   Q   They were relatively recent --

15   A   Yes.

16   Q   -- at that time?

17   A   Yes.

18   Q   Did it surprise you, being told that these records didn't

19   exist, after what you had learned from the family and knowing

20   that these were so recent?

21   A   Yes.

22   Q   Did you research the retention policies of the Social

23   Security Administration?

24   A   No.

25   Q   Why not?
```

MOORE — CROSS/FUNNELL                            120

1   A   Because I took Mr.-- I took him at his word when he told

2   me they didn't have any record.  What else am I supposed to

3   do?

4   Q   That's what I'm asking you.  You didn't look for the

5   retention policies to see if, indeed, they had done something

6   wrong, not retained the records?

7   A   No.  I took him at his word.

8   Q   Have you ever spoken to other members of a business or the

9   government and been told something that you later found out to

10  be factually incorrect?

11  A   Yes.

12  Q   Well, here we're talking about what you said earlier, you

13  said that these records could have been a difference between

14  life and death.  Did I hear you correctly?

15  A   Absolutely correct.

16  Q   And so you took an oral recitation over the phone and took

17  the man at his word on that issue?

18  A   Yes.

19  Q   So you didn't ask the Court to get involved to issue some

20  sort of a court order?

21  A   I don't think there was a basis to issue a court order.  I

22  had no good faith belief that the records existed at that

23  point.  Even if I requested a subpoena in good faith, the

24  records that I didn't believe existed.

25  Q   If you had looked up the agency's retention policies and

MOORE – CROSS/FUNNELL                              121

1  found that they conflicted with what you would have been told,

2  then you would have had a basis to ask further at Social

3  Security or to ask the judge to intervene, correct?

4  A    Perhaps.

5  Q    You didn't seek any sort of opinion from the Office of

6  General Counsel at Social Security, did you?

7  A    No, I did not.

8  Q    Did you ask any other member of the defense team to do any

9  of these things?

10  A    No, not that I recall.

11  Q    Prior to your testimony today, am I correct that you have

12  reviewed your 2009 declaration?

13  A    Yes, I've read it.

14  Q    And before your testimony today, did you review your 2018

15  declaration?

16  A    I read through it, yes.

17  Q    And all the attachments?

18  A    I don't know that I read every attachment.

19  Q    Before you drafted that 2018 declaration, you had

20  obviously reviewed your declaration from 2009?

21  A    Yes.

22  Q    I would assume that you had kept abreast of what was going

23  on in the post-conviction litigation before the Fifth Circuit

24  and the Seventh Circuit.  Is that fair to say?

25  A    Just to a small degree.  What people told me was all that

```
 1   I knew.  I didn't specifically search it out to find out what

 2   the status was.

 3   Q    Did you read the Seventh Circuit's opinion --

 4   A    Yes.

 5   Q    -- in 2015?

 6   A    I didn't read it in 2015, no.

 7   Q    When did you read it first?

 8   A    Probably sometime this year.

 9   Q    Sometime this year?

10   A    Mm-hmm.

11   Q    There was a majority opinion and a minority opinion,

12   right?

13   A    Correct.

14   Q    And you read the minority opinion, too?

15   A    Yes.

16   Q    In there, Judge Easterbrook used the word "weak" to

17   describe your recollection of this conversation or this

18   interaction that you had with Social Security.  Do you

19   remember reading that?

20   A    I remember something like that.

21   Q    And you read that in 2018?

22   A    Sometime, yes.

23   Q    Did that prompt you to reach out to post-conviction

24   counsel and say, "I want to do a supplemental declaration?"

25   A    No.
```

*MOORE - REDIRECT/FOSTER*                                123

1   Q    You waited until they contacted you?

2   A    Yes.

3           MR. FUNNELL:  No further questions, Your Honor.

4           THE COURT:  Very well.  Ms. Foster, how much

5   redirect do you have?

6           MS. FOSTER:  Very short.

7           THE COURT:  Very well.

8                   **REDIRECT EXAMINATION**

9   BY MS. FOSTER:

10  Q    We're going to get you back to your vacation very quickly.

11  A    Thank you.

12  Q    JW Strickland, was he the primary investigator?

13  A    No.  Mike Connelly was the primary investigator.

14  Q    You tasked Mr. Strickland with getting these Social

15  Security records?

16  A    Yes.  He was the one that was going to Pine Bluff that

17  first week of March.  So he was the one that I asked to pick

18  them up.

19  Q    Where is Mr. Strickland today?

20  A    He's deceased.

21  Q    How long has he been deceased?

22  A    For some time.  I don't recall exactly when he died.  I

23  think it was early in -- in the early 2000's.

24  Q    Your testimony on direct and cross was that you believe

25  that you reached out to SSA while you were in jury selection?

*MOORE - REDIRECT/FOSTER*                                    124

1   A    Yes.

2   Q    Can you tell the Court what jury selection in a capital

3   case is like?

4   A    At that time -- at that point, we were doing -- the judge

5   would do an initial panel voir dire of ten venire men at a

6   time and then he gave us 30 minutes a side to question the

7   individual venire on the panel.

8   Q    How long were your days?

9   A    It was all day every day.

10  Q    I'm sorry?

11  A    All day every day.  We started at 9:00 and ended about

12  5:00.

13  Q    Is jury selection a stressful part of a capital case?

14  A    Very much so.

15  Q    When the government asked you if you had researched the

16  retention policies of the Social Security Administration, is

17  that something that you could have done while you were picking

18  a jury?

19  A    I don't know if I could have done it or not.  It didn't

20  dawn on me to research the retention policies for the Social

21  Security Administration.

22  Q    What about contacting the Office of the General Counsel.

23  Is that something that you would have thought was a high

24  priority during jury selection?

25  A    No.

1  Q    The government asked you if you thought you had provided

2  an overwhelming amount of evidence in the penalty phase.  Do

3  you recall that?

4  A    That's correct.

5  Q    And I think your answer was that you did?

6  A    Yes.

7  Q    Did you believe that the overwhelming amount of evidence

8  was so substantial in a Texas death penalty case that you

9  could just blow off getting Social Security Disability

10 records?

11 A    No.

12 Q    You remember the government asking you about why you

13 didn't get -- why you didn't request the trial file from

14 Dorsey?

15 A    Yes.

16 Q    Did you feel it was your responsibility to ask to see

17 these things?

18 A    I'm sorry.  Say it again.

19 Q    Do you feel it was your responsibility to get the trial

20 file and review it?

21 A    Not unless --

22 Q    Before you wrote a declaration.

23 A    No.  At the time that I did that original declaration, I

24 didn't have it.  There was a time element in regard to when

25 they needed it and so I didn't request it.

```
 1   Q   And in light of that time element, did you think maybe
 2   Dorsey needed that file for their work?
 3              MR. FUNNELL:  Objection, Your Honor.  Speculation.
 4              THE COURT:  Sustained.
 5   BY MS. FOSTER:
 6   Q   Remember the government asking you about -- or contending
 7   that we were hearing for the first time today that you sent
 8   Mr. Strickland to Pine Bluff to secure the record -- records?
 9   A   I don't recall the question.
10   Q   On cross-examination, do you remember they asked you if we
11   were hearing for the first time today that you had sent
12   Mr. Strickland to secure that SSA records?
13   A   I remember them asking a question something like that.  I
14   don't recall exactly what the question was.
15   Q   Can you look at tab 16?
16   A   Yes.
17   Q   In fact, in that letter that's been provided to the
18   government, is there reference there to Mr. Strickland going
19   to Pine Bluff?
20   A   At tab 15?
21   Q   16.  Sorry.
22   A   I'm sorry.  Yes.
23   Q   And I would ask you to take a look at respondent's exhibit
24   3, page 3?
25   A   Okay.
```

*MOORE - REDIRECT/FOSTER*                              127

1  Q    Five lines down.  This is -- this is the declaration that

2  you gave in 2009?

3  A    Yes.

4  Q    Did you state there, "We also arranged for our defense

5  investigator to retrieve any records which the Social Security

6  Administration might locate during a trip to Pine Bluff

7  Arkansas during March of 1996?"

8           MR. FUNNELL:  Your Honor, this is outside the scope

9  of cross and redirect.  Your Honor, I did not ask about the

10 content of these documents.  What I asked him was about the

11 conversation that he is recounting under oath for the first

12 time today regarding Mr. Strickland.  Those things are not in

13 these records or in his file.

14           My question was about if we are hearing under oath

15 for the first time about this conversation that Mr. Strickland

16 supposedly had with Social Security.  That is outside the

17 scope.

18           MS. FOSTER:  Your Honor, the record will speak for

19 itself but my notes --

20           THE COURT:  Overruled.

21 BY MS. FOSTER:

22 Q    Do you recall the question?

23 A    Yes.  You asked me about that portion of the affidavit

24 we're talking about Mr. Strickland will be -- that we arranged

25 for Mr. Strickland to be in Pine Bluff to pick up the records,

*MOORE — REDIRECT/FOSTER*                              128

1  if there were any, at that first week of March.

2  Q   So today's not the first day that we heard about that?

3          MR. FUNNELL:  Objection, Your Honor.  It's

4  argumentative.

5          THE COURT:  Sustained.

6  BY MS. FOSTER:

7  Q   Mr. Moore, do you recall the government asking you why you

8  called the Social Security Administration to confirm that they

9  had no records, if Mr. Strickland had already told you that?

10 A   Yes.

11 Q   Have you had the experience, sir, where lawyers are

12 sometimes able to get results where investigators and people

13 of that ilk are not?

14 A   Yes.

15 Q   Is that part of the reason why you made that call?

16 A   That's part of it, yes.

17 Q   And what's the rest of the reason?

18 A   Well, sometimes -- I was the one that was primarily

19 responsible for the defense of Mr. Webster in this case.  So

20 it was my responsibility to marshal all the evidence into

21 court that I could.  And I don't know that they maybe give the

22 same answer to Mr. Strickland that they give to me.  I just

23 don't know that.

24          And so I would want to personally assure myself that

25 there were no records in this case before we abandoned the

*MOORE — REDIRECT/FOSTER*                                    129

1    search.

2    Q    Do you recall the government asking you questions about

3    why it is that your file contains a fair amount of

4    documentation of what you did to get these records but it

5    doesn't contain a record of your conversation with Social

6    Security?

7    A    That's correct.  I recall that.

8    Q    At the time that, for example, exhibit 16, the 2009 letter

9    was written, was Ms. Whitehead in jury selection in the

10   capital case?

11   A    She was assisting.

12   Q    She was assisting on 2/29?

13   A    No, not when she drafted this letter at the time that she

14   faxed it and so forth.  First week of March we were in jury

15   selection.

16   Q    When you wrote the handwritten notes that are contained in

17   exhibits 23 and 20, were you in jury selection in a capital

18   case?

19   A    23 and what?

20   Q    20 and 23.

21   A    No, I don't think we'd begun yet.

22            MS. FOSTER:  I have nothing further.

23            THE COURT:  Mr. Funnell, on those issues?

24            MR. FUNNELL:  Your Honor, I just want to clarify one

25   factual issue.

*MOORE — REDIRECT/FOSTER*                                    130

1                           **RECROSS-EXAMINATION**

2    BY MR. FUNNELL:

3    Q    Mr. Moore, you and I had a conversation in April of 2018

4    over the phone, correct?

5    A    That's correct.

6    Q    And in that conversation with me, you indicated that

7    Mr. Strickland had given you this information and that's why

8    you followed up with Pine Bluff, right?

9    A    Giving me what information?

10   Q    That he had had a conversation with Social Security that

11   the records did not exist?

12   A    Yes, that's correct.

13   Q    You did not, however, include that in your sworn

14   declaration in April of 2018, correct?

15   A    That's correct.

16   Q    So my question to you on cross was, is this the first time

17   that we are hearing about that in any sworn testimony is today

18   about this conversation that Mr. Strickland supposedly had

19   with Social Security?  Do you understand that?

20   A    I understand.  It's the only time I've testified to it.

21   Q    And you've never put that in at sworn declaration before?

22   A    Not that I recall, no.

23                MR. FUNNELL:  That's all.

24                MS. FOSTER:  One question.

25

1                      <u>**REDIRECT EXAMINATION**</u>

2    BY MS. FOSTER:

3    Q   Do I understand you to say that you had a conversation

4    with the government in April of 2018?

5    A   On the telephone.

6    Q   On the phone?

7    A   Yes.

8    Q   Where you told them that you had talked to Mr. Strickland

9    about whether or not he had gotten the records?

10   A   We had a conversation about the affidavits that I had

11   done.  I did not know at the time -- we were talking about

12   this particular hearing, I did not know what affidavits they

13   had received and hadn't received, and I did not know that they

14   had received the declaration that I did -- the last

15   declaration that I did this year in 2018.

16   Q   And you were willing to talk to them, right?

17   A   Absolutely.

18          MS. FOSTER:  Okay.  I have nothing further.

19          THE COURT:  I think we've probably flushed this out.

20   What do you think?

21          MR. FUNNELL:  We have.  I can provide further

22   information as the Court needs, but the conversation was

23   prompted and the witness can answer this, because he had

24   received a subpoena from the government.  And so he was

25   contacting me regarding the subpoena to appear at this hearing

*MOORE — REDIRECT/FOSTER*                                    132

1   and that's what prompted the conversation.  I had not received

2   at that time or did I know about his April 2018 declaration.

3   Is that correct?

4              THE WITNESS:  Yeah.  I think I told you that.

5              MR. FUNNELL:  Thank you.

6              THE COURT:  Fair enough.  All right.  May this

7   witness be excused?  Ms. Foster?

8              MS. FOSTER:  Yes, Your Honor.

9              THE COURT:  Mr. Funnell?

10             MR. FUNNELL:  Yes, Your Honor.

11             THE COURT:  Very well.  Thank you.  You may step

12  down.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  Will we be hearing from Ms. LeRoux, if

15  I'm pronouncing that correct?

16             MR. WELLS:  Yes, Your Honor.  She would -- she would

17  be petitioner's second and last witness.

18             THE COURT:  Very well.  Let's take the lunch break.

19  It's about ten after 12:00.  Let's reconvene at ten after

20  1:00.  How long do you expect her testimony to be?

21             MS. SCHUBERT:  Not more than an hour, Your Honor.

22             THE COURT:  Very well.  We'll see everybody back

23  ready to go at ten after 1:00.

24             THE CLERK:  Please rise.  Court's in recess.

25                 (A recess was taken at this time.)

*LEROUX – DIRECT/SCHUBERT*                    133

```
 1              THE CLERK:  Please rise.

 2              THE COURT:  Be seated, please.  We are back on the

 3   record.  And whose witness will this be?

 4              MR. WELLS:  It will be Ms. Schubert's witness, Your

 5   Honor.

 6              THE COURT:  Very well.  You may call your next

 7   witness.

 8              MS. SCHUBERT:  Petitioner is calling Kristen LeRoux.

 9              THE COURT:  Be seated, please.  And you may inquire.

10              MS. SCHUBERT:  Thank you, Your Honor.

11              KRISTEN LEROUX, PLAINTIFF'S WITNESS, SWORN

12                          DIRECT EXAMINATION

13   BY MS. SCHUBERT:

14   Q   Ms. LeRoux, could you please state your name and spell it

15   for the record?

16   A   Yes.  My name is Kristen Kay LeRoux.  K-R-I-S-T-E-N,

17   middle name K-A-Y, last name L-E-R-O-U-X.

18   Q   And where do you live?

19   A   I live in New Brighton, Minnesota.

20   Q   What's your occupation?

21   A   I'm a paralegal.

22   Q   Where do you work?

23   A   I work at Medtronic.

24   Q   You had to take some time off work to travel here today?

25   A   I did.
```

*LEROUX - DIRECT/SCHUBERT*                    134

1  Q    Where did you go to school?

2  A    I have a Bachelor of Arts degree from the University of

3  Minnesota in poli sci and sociology.  I also have an applied

4  arts and sciences degree from North Hennepin Community College

5  in paralegal studies.

6  Q    That degree was obtained specifically in pursuit as your

7  work as a paralegal?

8  A    Yes.

9  Q    What was your first job out of college?

10 A    Out of college I worked at a campaign finance watchdog

11 agency at the state capital of Minnesota.

12 Q    And then where did you work?

13 A    After that, from 1993 to 1996, I worked at Dorsey in the

14 conflicts department.

15 Q    That's Dorsey and Whitney?

16 A    Dorsey and Whitney.

17 Q    What was your general duty in the conflict department?

18 A    General duties was to screen new matters coming in and if

19 we saw any conflicts, we would report them to the ethics

20 partner.

21 Q    And did you move departments.

22 A    Yes, I did.

23 Q    When was that?

24 A    That was in 1996.

25 Q    Which department did you move to?

*LEROUX - DIRECT/SCHUBERT*                                 135

```
 1   A    I moved into the litigation department as a paralegal.

 2   Q    And how long were you in that role?

 3   A    I was in that role for ten years.

 4   Q    What were your general duties as a paralegal?

 5   A    My general duties as a paralegal were to assist the

 6   attorneys under their supervision.  I was a fact finder and a

 7   case manager.

 8   Q    And did you change positions again?

 9   A    I did.

10   Q    When was that?

11   A    That was in 2006.

12   Q    And what -- what was your new role?

13   A    I was promoted to paralegal and case assistant manager.

14   Q    And what did that entail?

15   A    That entailed staffing cases, hiring, training,

16   terminating paralegals and case assistants.  I also mentored

17   and found resources for the paralegals when needed.

18   Q    Did you oversee other paralegals?

19   A    Yes.

20   Q    And case assistants?

21   A    Yes.

22   Q    How many people were direct reports to you?

23   A    Direct reports during this time were about 40 people.

24   Q    And when you were working as a paralegal, how many trials

25   were you involved with?
```

*LEROUX - DIRECT/SCHUBERT*                    136

```
 1   A    Eight at least.

 2   Q    And those were cases that went to arbitration or trial?

 3   A    Yes.

 4   Q    And over that time period, if you can remember and

 5   approximate, how many cases did you handle total?

 6   A    Over that ten years, I would say a hundred.

 7   Q    And when you were working on this case, the Bruce Webster

 8   case, which was the role that you were serving in?

 9   A    A paralegal role.

10   Q    And at that time, though, you were a paralegal manager?

11   A    Yes.

12   Q    Was this your only case during that time?

13   A    Yes.

14   Q    Why did you get involved with this case?

15   A    This case needed strong paralegal support from the very

16   beginning.  We got a lot of evidence in.  We got a lot of

17   deadlines set upon the team right away.  We had one paralegal

18   already assigned to the case, who had done a prior death

19   penalty case.  We had another more junior paralegal but we

20   needed more paralegal power at that point on the case.

21   Q    And at what time did you join the team?

22   A    As soon as the case came in.

23   Q    Do you remember what Dorsey was originally working on in

24   the case?

25   A    Yeah.  Clemency was the focus.
```

*LEROUX - DIRECT/SCHUBERT*                          137

```
 1  Q    At some point did the team start working on a different

 2  petition, I'll say?

 3  A    Yes.

 4  Q    And is that the Fifth Circuit petition?

 5  A    Yes.

 6  Q    Was -- was the team under some kind of deadline?

 7  A    For the -- for that petition?

 8  Q    For the Fifth Circuit petition.

 9  A    Yes.

10  Q    Do you know what that was?

11  A    Yes.  It was the end of October of that year.

12  Q    Of 2009?

13  A    2009.

14  Q    So on the -- once you were on the Dorsey team -- and you

15  started to speak about this a little bit but I'll ask you to

16  elaborate.  What was your role and responsibilities?

17  A    Pardon?  I'm sorry.

18  Q    What were your role and responsibilities when you were

19  working on the Bruce Webster case?

20  A    Okay.  So as a paralegal, again, I was in a fact finding

21  and case management role.  I took direction from attorneys.

22  The three paralegals on the case that I mentioned before and I

23  worked together as a team.  We basically, you know, followed

24  the attorneys' strategy and helped them find evidence and find

25  facts in the case.
```

*LEROUX - DIRECT/SCHUBERT*                          138

```
 1   Q    You mentioned there were two other paralegals.   Who were

 2   they?

 3   A    Katherine Slaikue.

 4   Q    Could you spell that name for the record?

 5   A    Yes.  First name is K-A-T-H-E-R-I-N-E.

 6   Q    Do you remember how to spell her last name?

 7   A    S-L-A-I-K-E-U.

 8   Q    Ms. LeRoux, it seems like you're getting a little bit

 9   emotional right now.  Do you want to take a second?

10   A    Just a second.  Thank you.

11   Q    Why are you crying?

12   A    Katherine died during the case.

13   Q    Was she a good friend?

14   A    She was a very good friend.

15   Q    Did you speak at her funeral?

16   A    I did.  I gave the obituary -- or the eulogy.

17   Q    And this case just brings up some emotional --

18   A    It does.

19   Q    -- thoughts and just emotional feelings?

20   A    Yes.

21   Q    And those aren't clouding your judgment or otherwise

22   affecting the truth of your testimony today?

23   A    Not at all.

24   Q    In addition to the two other paralegals, were there any

25   other administrative people on the case?
```

```
 1   A    Yes.   There were two case assistants that helped us on the

 2   case.

 3   Q    What is the duty of a case assistant?

 4   A    A case assistant will take direction from the paralegal.

 5   It's almost like a very junior paralegal role.  So it's more

 6   of an assembly of evidence type of role.  They would handle,

 7   you know, different -- different duties for us that really

 8   were at a very junior, low level paralegal role.

 9   Q    So they were supporting the paralegal team?

10   A    Yes.

11   Q    So the case assistants were supporting the legal team?

12   A    Yes.

13   Q    Excuse me, the paralegal team?

14   A    Yes.

15   Q    And were the paralegals supporting an attorney team?

16   A    Yes.

17   Q    How many attorneys were on this case when it first came in

18   in 2008?

19   A    When it first came in, there were five attorneys on the

20   case.

21   Q    Do you remember who they are?

22   A    Yes.  Steve Wells was the partner in charge.

23   Q    Is he sitting in the courtroom today?

24   A    Yes.

25   Q    Is there another one?
```

1   A    You.

2   Q    Am I sitting in the courtroom today?

3   A    You are.

4   Q    Who else?

5   A    Oliver McKinstry.

6   Q    More?

7   A    Gretchen Agee.

8   Q    Would you mind spelling her last name for the record?

9   A    Yes; A-G-E-E.

10  Q    Do you remember if there were any more?

11  A    There was another associate Aileen Grossman.

12  Q    And how many years of experience did the paralegal team

13  have in total?

14  A    In total at that point, we would have had about 25 years

15  of paralegal experience behind us.

16  Q    And when Dorsey got the case in 2008, is it fair to say

17  that the team came together pretty quickly?

18  A    Very quickly.

19  Q    And what were the main issues that you were looking at at

20  that time?

21  A    The main issues we were looking at were mental retardation

22  and abuse.

23  Q    Is there a particular reason you were looking at those

24  issues?

25  A    Yes.

*LEROUX - DIRECT/SCHUBERT*                    141

1  Q    What was it?

2  A    The paralegal that came on board who had the death penalty

3  experience gave us a lot of good tips and strategy for the

4  paralegal team.  One of the things that she brought forward

5  was a specific list of places that should be contacted for

6  records specifically.

7  Q    So it sounds like -- so I just want to back up a second.

8  Why were the issues of mental retardation and abuse considered

9  important in putting together the case itself?

10 A    Oh, it was part of the attorney strategy.

11 Q    And so you just went into a little bit about how the

12 paralegals began their work.  Did anybody from the team -- the

13 paralegal team have death penalty experience?

14 A    Yes.

15 Q    And what was that?  What was the experience?

16 A    The experience?  The one paralegal was just on another

17 death penalty case right before this case came in.

18 Q    Was that Katherine?

19 A    Yes.

20 Q    And did that -- did her experience and the experience she

21 brought inform your approach to the case?

22 A    Yes.

23 Q    In what way?

24 A    Myself and the other paralegal in the case had never done

25 a death penalty case before.  Katherine had done one.  And so

*LEROUX - DIRECT/SCHUBERT*                      142

1   she was coming in with a lot of knowledge and a lot of

2   experience, a lot of lessons learned, a lot of great ways to

3   manage the case.

4   Q   So what was the first step, when you all joined the

5   Webster team, for the paralegal team?

6   A   For the paralegal team?  Well, first we put our index in

7   order.  We put our records checklist that we were just talking

8   about in order so it was ready to go.  The next --

9   Q   Well, let's step back another second, Ms. LeRoux.  Did you

10  get the file?

11  A   Yes.

12  Q   And what file did you get?

13  A   The file came from the appellate attorney and it included

14  his file, as well as the trial file.

15  Q   Mr. Moore's trial file?

16  A   Yes.

17  Q   Did it also include the file for the direct appeal?

18  A   Yes.

19  Q   And you said that -- that the previous appellate counsel

20  had provided the file.  Do you remember who that was?

21  A   Phil Wischkaemper.

22  Q   And when the file came to you, was there an index?

23  A   No.

24  Q   Did you do something to build an index?

25  A   Yes, we did.

*LEROUX – DIRECT/SCHUBERT*                                    143

1   Q    What did you do?

2   A    As soon as the boxes came in, we had an idea from Steve

3   how many we would be dealing with.  We were able to assemble a

4   paralegal team at that point.  We had labels for the boxes

5   ready to go.  They were all delivered together outside of

6   Katherine's office.  We lined them up.  We labeled them with

7   our internal case number and name, and a box number was

8   assigned to each one in order.

9   Q    And how many boxes were there?

10  A    I think 18.

11  Q    So after you numbered and labeled the boxes, what did you

12  do?  Did you put these in storage?

13  A    We actually had the paralegal team lined up and ready to

14  go to index the documents.  So we assigned -- I assigned

15  personally the boxes to the paralegal team to help.

16  Q    Where did you put the boxes when they came in?

17  A    When the boxes -- when the boxes came in, they went to the

18  paralegals to index.  When they came back from the paralegals,

19  we had a very specific designated file room right up the hall

20  from mine, Bridget's and Katherine's office.

21  Q    And was that file room held within the offices of the

22  Dorsey & Whitney firm?

23  A    Yes.

24  Q    And those offices were secure?

25  A    Yes.

*LEROUX - DIRECT/SCHUBERT*                                144

1   Q    Did you consider the file room a safe place for the boxes?

2   A    Yes.

3   Q    When you -- after you stored the boxes, who else had

4   access to them?

5   A    The case assistants on the case, the paralegals.

6   Q    Was that it?

7   A    You know, Dorsey's litigation staff would have had --

8   Q    Were -- so after you received the boxes, did you -- did

9   you immediately make a copy?

10  A    No.

11  Q    Why not?

12  A    We were under a lot of time constraints and deadlines.

13  The attorneys were really, really anxious to see what was in

14  the boxes.  It was really important for the strategy that we

15  turn over the information that we saw first when the boxes

16  came in through this index.

17          The other reason we didn't send it out is because we

18  wanted to keep really tight control over these boxes.  So with

19  me and the other two paralegals assigned to the case, we felt

20  very responsible to keep the boxes in our control.  If we

21  would have sent them out for copying, they would have gone to

22  an outside vendor.

23  Q    So after you put the boxes in a safe place, you made sure

24  that control is limited to Dorsey people; and did you say

25  paralegals and administrative staff?

*LEROUX - DIRECT/SCHUBERT*                          145

1   A    Yes.

2   Q    Did you start reviewing the file to make the index?

3   A    Yes.

4   Q    And in order to make the index, you -- who was working on

5   that?

6   A    The paralegal team.

7   Q    In order to make the index, what did you have to do?

8   A    Basically, I assigned each of the people a box or however

9   many boxes they had time to help on.  And basically, we had

10  this index sample from Katherine from the previous death

11  penalty case, and so we were able to capture the fields that

12  would be important on another death penalty case.  Each

13  paralegal got an Excel spreadsheet.  Each paralegal completed

14  their Excel spreadsheet per box and then an administrative

15  assistant put the whole thing together.

16  Q    As part of this, were all of the -- were all the documents

17  within the file reviewed?

18  A    Yes.

19  Q    And did you personally participate in this process?

20  A    Yes.

21  Q    Did you actually review file and exhibits?

22  A    Yes.

23  Q    What specifically do you remember reviewing?

24  A    I remember reviewing the set of trial exhibits.

25  Q    And at the start of getting these documents, were you and

1    your team the first people at Dorsey to see these records?

2    A    Yes.

3    Q    Did you consider it important to make sure that the boxes

4    and the files in general remained intact?

5    A    Yes.

6    Q    And the order in which they were received?

7    A    Yes.

8    Q    And was this procedure what you'd devised to do that?

9    A    Pardon?

10   Q    Did you devise this procedure to do that?

11   A    Yes.

12   Q    What happened after you assembled the index and reviewed

13   the files?

14   A    Basically, we provided the index to the attorneys and then

15   the attorneys had an opportunity to look through it.

16   Q    And this was the attorney team you mentioned before?

17   A    Yes.

18   Q    And what was your process for managing that review?

19   A    So the attorneys would come back to us and specifically

20   tell us what documents they were interested in.  So our

21   procedure would have been to find the box that those documents

22   were in -- kept in through the index.  We would go in the

23   document room.  We would take that box.  We would find the

24   document.

25            We had a set of very stiff -- it was, I think, eight

LEROUX - DIRECT/SCHUBERT                    147

```
 1   and a half by 11 cards in there.  So we had a copy machine and

 2   scanner right next door to this file room.  We literally would

 3   take the boxes, after we identified the document, when we

 4   would remove a document for copying or scanning -- and

 5   scanning, we would place that card where we took the document

 6   out of.

 7            And then we would -- we always scan the documents.

 8   If the attorney wanted a copy, we would either run it at that

 9   point or we would run it off the scanned version.

10            So not only did we have then -- the copy goes back

11   in the box where the card is, take the card out.  Then you

12   return the box to the file room.  So we had a scanned version

13   immediately for our use and then the original went back.

14   Q   And the scanned versions were of the documents that the

15   attorneys had requested that you remove?

16   A   Yes.

17   Q   And the documents that you had put back into the file,

18   those were the originals that originally came out of the file?

19   A   Right.

20   Q   And did you make sure that no attorneys were pulling any

21   records on their own?

22   A   Yes.

23   Q   Did you keep close watch over those documents?

24   A   Yes.

25   Q   If an attorney needed to sift through large parts of the
```

1   file at once, how did you manage that?

2   A    We spoke to the attorney or, you know, through email.  We

3   would find out what they were looking for.  We would determine

4   which boxes that they needed to review.  Typically we would

5   use a conference room to do this and a paralegal would always

6   be stationed in there with an attorney while the attorney was

7   reviewing the documents so the paralegal could keep close tabs

8   that the documents went back in the boxes the way that they

9   should have been.

10  Q    And you helped carry out this procedure?

11  A    Yeah.

12  Q    Did you oversee it as well?

13  A    Yes.

14  Q    Ultimately, who controlled the file?

15  A    The paralegals.

16  Q    Do you have every sense that the file remained intact?

17  A    Yes.

18  Q    Did you do everything you could to make sure there weren't

19  any documents that went missing?

20  A    Yes.

21  Q    In the case did you issue record requests?

22  A    Yes.

23  Q    To whom?

24  A    Again, we worked off the checklist from the previous death

25  penalty case.  So there were -- the three categories were

*LEROUX - DIRECT/SCHUBERT*                          149

1    medical, educational, and then government agencies like social

2    services.

3    Q    So you targeted agencies that would have had records

4    having to do with those topics?

5    A    Yes.

6    Q    Do you remember some samples of those agencies?

7    A    Yes; Department of Human Services and Social Security

8    Administration.  Those are the two that come to mind quickly.

9    Q    And what was the purpose of making those requests?

10   A    Again, it was a fact finding exercise that was -- that was

11   requested by the attorneys and used in the previous death

12   penalty case.

13   Q    As part of this, did you make requests for Bruce and his

14   family members?

15   A    Yes.

16   Q    And did you identify any agencies that Bruce might have

17   been in contact with that you opted not to send requests to?

18   A    No.

19   Q    So let's move to the SSA requests that were sent.  Did

20   your office send a request for Social Security records?

21   A    Yes.

22   Q    Was that by letter?

23   A    Yes.

24   Q    If you could turn to what's exhibit 3 in the binder.  Yep,

25   that binder in front of you.

*LEROUX – DIRECT/SCHUBERT*                    150

1   A    Okay.

2   Q    And turn to the second page.

3   A    Yeah.

4   Q    Do you know what this document is?

5   A    Yes.  This is the request to the Social Security

6   Administration in Pine Bluff, Arkansas from Katherine Slaikeu.

7   Q    And she's one of the paralegals?

8   A    Yes.

9   Q    What's the date on this document?

10  A    The date on this document is October 27, 2008.

11  Q    What was the purpose of this document?

12  A    The purpose of this document was to request records from

13  the Social Security Administration.

14  Q    And were you directly involved in submitting this request?

15  A    I was definitely involved with the records collection.

16  This particular request Katherine handled.

17  Q    What -- did something go with the request?

18  A    Yes.

19  Q    What was that?

20  A    That was a consent form that Bruce had signed.

21  Q    And is there a date on this consent?

22  A    Yes.

23  Q    What's that?

24  A    Oh.  October 27, 2008.

25  Q    And who was this request -- this consent form addressed

*LEROUX - DIRECT/SCHUBERT*                              151

1    to?

2    A    It's addressed to Social Security Administration in Pine

3    Bluff.

4    Q    Why did you choose the Pine Bluff office?

5    A    Because that's where Bruce grew up and lived.

6    Q    And that signature at the bottom, that was Bruce

7    Webster's?

8    A    Yes.

9    Q    And if you look at it, what is the scope of documents that

10   he is consenting to be released?

11   A    Basically, he's asking for his entire file to be sent to

12   Dorsey.

13   Q    Now, when you made this request, did you offer to pay the

14   costs of copying?

15   A    Yes.

16   Q    And when was that -- when were you offering to make that

17   payment?

18   A    In the cover letter that Katherine had written.

19   Q    Was there a time that you expected that the firm would

20   actually pay that?

21   A    We paid our bills immediately when they came in.

22   Q    So it would be upon an invoice or bill?

23   A    Right.

24   Q    Did you notify the Social Security Administration that

25   this letter was in pursuit of records relating to any specific

1   proceeding?

2   A    Yes.

3   Q    What's that?

4   A    In the cover letter, specifically it says that Mr. Webster

5   is currently on death row and faces an execution date.

6   Q    Did you hear anything back from the Social Security

7   Administration?

8   A    No.

9   Q    Did you get a letter or anything from them right way?  Did

10  you eventually call them up?

11  A    Yes.

12  Q    Do you remember when that was?

13  A    About a month later.

14  Q    And do you remember who actually made that call?

15  A    I think it was Katherine.

16  Q    Were you actually present for the phone call?

17  A    No.

18  Q    How did you find out about it?

19  A    She told me immediately.

20  Q    And do you remember who she spoke to?

21  A    I do not.

22  Q    Was it an SSA representative?

23  A    Yes.

24  Q    In the Pine Bluff office?

25  A    Yes.

*LEROUX - DIRECT/SCHUBERT*                    153

1  Q    Do you remember what you were told?

2  A    Yes.  She said that the Social Security rep told her that

3  we used the wrong consent form and we would need to use a

4  different form, and the person gave us the information we

5  needed to get ahold of that form that they required.

6  Q    Did he mention that the request was deficient in any other

7  way?

8  A    No.

9  Q    So what did you do then?

10 A    Basically, we took that form, sent it back to Bruce for

11 signature, and then his family members as well.

12 Q    You took the new consent form --

13 A    Yes.

14 Q    -- that the SSA directed you use?

15 A    Yes.

16 Q    And did Bruce sign that form?

17 A    Yes.

18 Q    And did you then send another letter to the Social

19 Security Administration?

20 A    Yes.

21 Q    Could you turn to exhibit 4 in your binder.  Do you

22 recognize this letter?

23 A    I do.

24 Q    What is it?

25 A    This is a request to the Social Security Administration in

1  Pine Bluff again asking for Bruce's records.

2  Q   What's the date on this document?

3  A   This one is December 15, 2008.

4  Q   Who is this document from?

5  A   Gretchen Agee.

6  Q   Who is she?

7  A   She was one of the attorneys on the case.

8  Q   And what does this request seek?

9  A   This request seeks Bruce's file to be copied and sent to

10 us.

11 Q   Is this the same set of documents you sought in the first

12 letter?

13 A   Yeah.

14 Q   And who -- is anybody copied on this letter?

15 A   Steve Wells, the partner on the case, is copied, and I'm

16 blind copied.

17 Q   And was something submitted along with this letter?

18 A   Yes.

19 Q   What was it?

20 A   This would be the consent that Social Security had told us

21 that we needed to use.  This one is signed by Bruce.

22 Q   On what date?

23 A   December 10, 2008.

24 Q   Does it say what he needs the information for?

25 A   Yes.

*LEROUX - DIRECT/SCHUBERT*                    155

1   Q    And what is that?

2   A    It says, "I need it for a clemency proceeding."

3   Q    Do you remember if there were any follow-up telephone

4   calls after you received this -- after you sent this letter,

5   were there any follow-up calls?

6   A    Yes.

7   Q    Do you remember who made those calls or who they were

8   with?

9   A    I don't remember at this moment.

10  Q    Did you get reports of those calls?  Were you notified

11  that those calls happened?

12  A    Yes.

13  Q    By your team?

14  A    Yes.

15  Q    Did Dorsey eventually receive the Social Security

16  Administration records?

17  A    Yes.

18  Q    When was that?

19  A    That was February 9, 2009.

20  Q    Where were you when the records came in?

21  A    I was in the office they were delivered to.

22  Q    Whose office was that?

23  A    That would be Bridget Cosgriff.

24  Q    Was she the only person with you in that office?

25  A    Yes.

1  Q   What did -- what did the package with the records look

2  like?

3  A   It came in a package.  An administration -- an

4  administrative assistant had dropped it off for us.  We both

5  happened to be in the office at the same time and it was a

6  package.

7  Q   Was the envelope labeled Social Security Administration?

8  A   I don't recall.

9  Q   Did you open the envelope?

10 A   Yes.

11 Q   What was in it?

12 A   We saw Willie Webster's file copies and then we saw

13 Bruce's file.

14 Q   Can you turn to tab 45, please.  Do you recognize these

15 documents?

16 A   Yes.

17 Q   Are these the records that were received for Bruce that

18 day?

19 A   Yes.

20 Q   If you want to take a look and let me know -- if you want

21 to take a look and tell us, are these a true and correct copy

22 of what was received?

23 A   Yes.

24 Q   Does this packet appear to be complete?

25 A   Yes.

*LEROUX - DIRECT/SCHUBERT*                           157

1   Q    I think it's 70 pages.

2   A    Yes.

3   Q    Is this -- this packet, is this what you received for

4   Bruce?

5   A    Yes.

6   Q    And you looked at these right away?

7   A    Yes.

8   Q    Did anything in these documents jump out at you?

9   A    Yes.

10  Q    What?

11  A    Immediately I noticed three medical reports signed by

12  doctors, and they all provided a very similar diagnosis of

13  mental retardation.

14  Q    And why did you think that was important?

15  A    Because that's one of the topics that we were specifically

16  looking for in the case file.

17  Q    Did this document come with a cover letter?

18  A    No.

19  Q    Were there any other records for Bruce Webster produced at

20  that time?

21  A    No.  This was the entire packet.

22  Q    Did you receive a bill for costs or otherwise an invoice?

23  A    No.

24  Q    At any time?

25  A    No.

*LEROUX – DIRECT/SCHUBERT*                                158

1   Q   You said earlier that you reviewed the trial file?

2   A   Yes.

3   Q   Mr. Moore's trial file?

4   A   Yes.

5   Q   You personally reviewed that?

6   A   Yes.

7   Q   And drawing on that knowledge, had you seen these records

8   before?

9   A   No, not until that day that we opened this envelope.

10  Q   They weren't in the trial file?  Are these records

11  something you would have noticed?

12  A   Definitely.

13  Q   Why is that?

14  A   Because it was exactly pertaining to the topic -- one of

15  the topics that we were looking for medical records, you know,

16  education records, and social service agency records were some

17  of them we needed to look for and gather.  But on top of that,

18  our two main topics of interest were abuse and mental

19  retardation, and these three documents fit one of those

20  criteria.

21  Q   Who did you reach -- well, did you reach out to somebody

22  after you -- after you reviewed the records?

23  A   Yeah.

24  Q   Who was that?

25  A   We reached out to the entire team.

1  Q    And that would include the attorneys?

2  A    Yes.

3  Q    And other administrative staff?

4  A    Yes.

5  Q    What did you send to them?

6  A    I was standing in Bridget's office when we got these and I

7  asked her, right there on the spot:  Bridget, this is really

8  important.  Can you notify the team immediately?  I'm going to

9  go scan these documents in and make sure they're accessible to

10 the attorneys on the case.  They need to see these right away.

11 They need to know these exist.

12          So Bridget sent an email to the entire team,

13 including me, you know, saying:  Hey, guys, Social Security

14 records came in for Willie and Bruce, and she gave a -- she

15 gave a description that medical records were included.

16 Q    And were a scanned copy of those records also provided to

17 the attorneys?

18 A    Yes.  I -- like I said, I went right away to scan the

19 copies and then I sent the link -- when I got back to my desk,

20 I sent the link to the attorneys.

21 Q    And had any of the attorneys seen these records before?

22 A    No.

23 Q    Did the team undertake a review, then, to confirm whether

24 these records were new?

25 A    Yes.

```
 1  Q    What was that review?

 2  A    I did it myself.  So my first step was to do a search of

 3  the index.  So I typed some key words, if I would have been

 4  entering them.  Nothing came up.  So I read the entire index,

 5  just in case it might be described a different way than I

 6  might do it.  Didn't find anything.

 7              So I was able to narrow down the boxes that possibly

 8  could have these records in them, and I went and physically

 9  looked through those boxes for the documents.

10  Q    And that index, it tracked all of the documents in the

11  boxes?

12  A    Yes.

13  Q    You would have expected to see reference to these in that

14  index --

15  A    Yes.

16  Q    -- had they been in the trial file?

17  A    Yes.

18  Q    And the same with the 2255 file?

19  A    Yes.

20  Q    Did other team members participate in this review?

21  A    Yes.

22  Q    Who were they?

23  A    It was Bridget Cosgriff was helping me on the review.

24  Q    Did the attorney team eventually review the file as well?

25  A    I'm sorry.  I need to back up.  No.  I did that review
```

1   myself.  I'm sorry.

2   Q   Over the course of the case, was the file reviewed again?

3   A   Yes.

4   Q   How many times?

5   A   Approximately five.

6   Q   And you were personally involved or overseeing that,

7   correct?

8   A   Yes.

9   Q   Are you certain as to whether these documents were in the

10  trial file?

11  A   Yes.

12  Q   Mr. Moore's trial file?

13  A   Yes.

14  Q   Were they?

15  A   No.

16  Q   During your review, did you find some other information

17  related to the SSA and the trial file?

18  A   Yes.

19  Q   What was that?

20  A   We found a letter -- or a fax that was from his paralegal,

21  Kim Whitehead, to the Social Security Administration.

22  Q   And did that -- did that jump out at you as important?

23  A   Yeah.

24  Q   Why's that?

25  A   Because I thought it related to this file requesting this

*LEROUX – DIRECT/SCHUBERT*                     162

```
 1   file.

 2   Q   Did you look for a response to that letter?

 3   A   Yes.

 4   Q   Is this the -- I'm going to actually have you turn to

 5   exhibits 15 through 27.  If you could just page through those

 6   quickly.

 7   A   Okay.

 8   Q   Are these the documents in the file that you located which

 9   you believed were related to the Social Security

10   Administration?

11   A   Yes.

12   Q   And what did you think these were?

13   A   It looks to me like it was a request from Kim Whitehead

14   for Bruce's Social Security records.

15   Q   Did you find any communications from the SSA?

16   A   No.

17   Q   Any in response to this request?

18   A   No.

19   Q   Any other communications from the SSA?

20   A   No.

21   Q   Did you find any -- any documents whatsoever stating that

22   these records existed?

23   A   No.

24   Q   Did you find anything showing that they had been produced

25   at any time?
```

```
 1   A    No.
 2   Q    Was there anything in the file referencing the fact that
 3   these might have been picked up?
 4   A    No; other than this communication.
 5   Q    Did you -- did you find anything stating that:  Oh, an
 6   investigator was supposed to pick these up but he dropped the
 7   ball?
 8   A    Not -- no.
 9   Q    Were there any notes from Larry or from his assistant to
10   that effect?
11   A    No.
12   Q    And even with Mr. Moore's request, you still didn't find
13   any SSA records?
14   A    No.
15   Q    After you uncovered these records, you continued working
16   with the attorneys to develop the case.  Is that right?
17   A    Yes.
18   Q    In the course of that work, did you notice an index in
19   Bruce's file?
20   A    Yes.
21   Q    And that was in the SSA records that were produced in
22   February?
23   A    Yes.
24   Q    There was an index in there?
25   A    Yes.
```

*LEROUX - DIRECT/SCHUBERT*                                    164

1    Q    Did you compare the list of exhibits with -- that were a

2    part of that index with the documents that were produced in

3    the file?

4    A    Yes, I did.

5    Q    Tell me about that review.

6    A    So within the file that we got on February 9th for Bruce,

7    within that file was a list of exhibits, as you said.

8    Basically, I took that set of documents that we had and I

9    literally went through exhibit by exhibit, as described in

10   this list of exhibits, against what we had received from

11   Social Security.

12   Q    And did you -- did you then contact the Social Security

13   Administration regarding these documents?

14   A    Yes.

15   Q    Did you do that by letter?

16   A    Yes.

17   Q    If you could turn to exhibit 5, please.  Do you recognize

18   this document?

19   A    Yes.

20   Q    What is it?

21   A    It's a letter from me to Lisa Ruth at the Social Security

22   Administration in Pine Bluff.

23   Q    What's the date on this letter?

24   A    October 8, 2009.

25   Q    What was the purpose of this letter?

1   A    This letter was to request the copies of the documents on

2   that list of exhibits that I identified as not being included

3   in the package that we got on February 9th.

4   Q    I see that there are some numbered items listed in the

5   middle of that page.  Were those the documents that you

6   believed to be missing?

7   A    Yes.

8   Q    And who was copied on this letter?

9   A    Steve Wells, the partner in the case.

10  Q    If you turn then to the next page.  Was this document

11  called Consent for Release of Information, was it submitted

12  with the letter?

13  A    Yes.

14  Q    And what's the date on this consent?

15  A    This is the December 10, 2008 consent.

16  Q    And this is signed by Bruce Webster?

17  A    Yes.

18  Q    Were there anything else included with this letter?

19  A    We also included the actual list of exhibits that we had

20  received so they could reference it, and then we --

21  Q    Go ahead.

22  A    Okay.  And then we also noted in that cover letter that we

23  found another document within that file that refers to a

24  different document that wasn't attached.  So we included

25  that -- that letter as well.

1  Q   Did you have a follow-up telephone call?

2  A   Yes.

3  Q   Do you remember the date -- about the date of that call?

4  A   I think it was a few weeks later.

5  Q   And were you personally on that call?

6  A   Yes.

7  Q   Who did you talk to?  Do you remember?

8  A   I talked to a representative at Social Security

9  Administration.

10 Q   In which office?

11 A   Pine Bluff.

12 Q   And what were you told?

13        MR. WEIMER:  Your Honor, I'm going to object to the

14 extent that this is the being offered for the truth of the

15 matter.  We don't have an objection to the extent that it's

16 being offered to show what she did next; but to the extent

17 it's being offered for the truth of the matter for any

18 purposes, we would object.

19        THE COURT:  Response?

20        MS. SCHUBERT:  Yes, Your Honor.  This is not being

21 offered for the truth of the matter asserted.  It is being

22 offered to show what Ms. LeRoux was doing in an attempt to get

23 the records.

24        THE COURT:  Very well.  For that limited purpose,

25 the objection will be overruled.

```
 1   BY MS. SCHUBERT:

 2   Q   Ms. LeRoux, what did the Social Security Administration

 3   tell you?

 4   A   The representative on the phone told me that our request

 5   was not going to be fulfilled for three reasons.  She also

 6   told me that -- because I questioned, I said:  Well, we got

 7   part of the file before; and she said:  You shouldn't have.

 8   Procedures were not followed.

 9   Q   And what were the three reasons she gave you?

10   A   The three reasons she gave me, first she said we should be

11   dealing with the Terre Haute, Indiana, office rather than the

12   Pine Bluff office because that's the state Bruce resides in,

13   Indiana.  She gave me the contact name and address for that

14   office.

15        She also said that the consent that we used says:

16   Any and all records, and she said they don't take those type

17   of requests.  We had to have something more specific, like a

18   date range there.

19        And then the other thing she mentioned, too, is:  We

20   should have been invoiced for that package that we received on

21   February 9th.  Again, I offered.  I said:  We're very happy to

22   pay the invoice.  Just send it to us.

23   Q   Did you ever receive an invoice?

24   A   No.

25   Q   Were you told ever in earlier 2009 that you needed to send
```

*LEROUX - DIRECT/SCHUBERT*                        168

1   a request to a different office?

2   A    No.

3   Q    And so the request you sent was to Pine Bluff?

4   A    Yeah.

5   Q    And were documents produced in response to that request?

6   A    Which?

7   Q    Excuse me.  Were the documents -- were documents produced

8   in response to your 2008 request for documents?

9   A    Yes.

10  Q    Even though you sent them to the Pine Bluff office?

11  A    Yes.

12  Q    And in the same vein, did you request -- in that initial

13  October 2008 request, did you request any and all documents?

14  A    Yes.

15  Q    And despite, you know, her saying that that doesn't get

16  honored, were documents produced?

17  A    Yes.

18  Q    And did she say anything about the person who had made the

19  copies, whether he was still in the office?

20  A    She told me he had retired.

21  Q    And is he the one who didn't follow the normal procedures?

22  A    Yes.

23  Q    And you had told her, correct, that this was a death

24  penalty case?

25  A    Yes.

*LEROUX - DIRECT/SCHUBERT*                          169

1  Q   And she still said that they wouldn't produce any and all

2  records?

3  A   Yes.

4  Q   Did they ever tell you to contact the office of General

5  Counsel.

6  A   No.

7  Q   Did they ever tell you to contact anybody else?

8  A   No.

9  Q   Did you send a letter then to the Terre Haute office?

10  A   Yes.

11  Q   If you could turn to exhibit 6, please.  What is this?

12  A   This is a letter from the Social Security office.  You

13  said exhibit 6?  I'm sorry.

14  Q   Yes, exhibit 6.  Sorry.  So let me back up on my

15  questioning.  After you had the phone call with the Social

16  Security representative, did you get a response in writing

17  from the Social Security Administration?

18  A   Yes.

19  Q   So -- and is exhibit 6 that communication?

20  A   Yes.

21  Q   Could you talk to me about what this exhibit is?

22  A   Yes.  It's a letter dated October 22, 2009, and it's from

23  the Social Security office in Pine Bluff and it's telling --

24  it's telling us that they will not fulfill the request.

25  Q   And is this essentially just a reiteration of what you had

*LEROUX - DIRECT/SCHUBERT*                              170

1   been told --

2   A    Yes.

3   Q    -- in your phone call?

4   A    Yes.

5   Q    Did you renew your request?  Did you renew your request

6   after receiving this letter?

7   A    Yes.

8   Q    Did you do that by letter?

9   A    Yes.

10  Q    Could you turn to exhibit 7, please.  What is this?

11  A    This is a letter dated November 23, 2009 from Oliver

12  McKinstry, another attorney on the case, writing to the

13  records administrator at the Terre Haute, Indiana address that

14  the Pine Bluff rep had given me.

15  Q    And you -- this letter was sent to the Terre Haute office

16  in response to the rejection that you had received from the

17  Pine Bluff office?

18  A    Yes.

19  Q    And were you seeking the same kinds of records?

20  A    Yes.

21  Q    Just to a different office?

22  A    Yes.

23  Q    And this letter states again that Mr. Webster is on death

24  row and facing an execution date?

25  A    Yes.

*LEROUX – DIRECT/SCHUBERT*                                    171

1   Q    It also offered to pay costs?

2   A    Yes.

3   Q    Was that on receipt of billing?

4   A    Pardon?

5   Q    Receipt of billing?

6   A    Yes.

7   Q    And who's copied on this letter?

8   A    Steve Wells, the partner on the case.

9   Q    Did you include anything with this letter?

10  A    Yes.  We included the list of the documents we identified

11  as missing from the February 9th packet that we received,

12  including that letter that I referenced that references

13  another letter that we didn't get.  We also included the

14  actual list of exhibits, and then that letter that had the

15  reference that we didn't get.

16  Q    All right.  So you included with the document -- with the

17  letter you included as a separate page the list of exhibits.

18  Is that right?

19  A    Yes.

20  Q    And is this the same list that you had enumerated in your

21  previous letter?

22  A    Yes.

23  Q    That went to the Pine Bluff office?

24  A    Yes.

25  Q    And what was the purpose of including this list now as

LEROUX – DIRECT/SCHUBERT                                 172

1    opposed to before?  Let me rephrase that.

2    A    Rephrase, please.

3    Q    Did you include this list now as a separate document in

4    response to their request that you can't request any and all

5    records?

6    A    Yes.

7    Q    And why did you include the list of exhibits as well?

8    A    We again included the list of exhibits basically for ease

9    for them.

10   Q    And did you also include a consent in this -- with this

11   letter?

12   A    Yes, we did.

13   Q    And what's the date on that consent?

14   A    That consent is November 17, 2009.

15   Q    And is that signed by Bruce Webster?

16   A    Yes.

17   Q    And looking particularly at that last -- the categories of

18   information that you're requesting in the middle of the page

19   and you see:  Records from my file specify?

20   A    Yes.

21   Q    And so what did you refer to to specify those files?

22   A    Because of the direction that I received that they

23   wouldn't accept any and all records, that was the space that

24   we had before, we put instead:  See attached list.  So it

25   refers to the list of missing exhibits.

*LEROUX – DIRECT/SCHUBERT*                              173

1   Q    Now, did you have a follow-up call with the Social

2   Security Administration in response to -- excuse me, relating

3   to this request?

4   A    Yes.

5   Q    And when was that call?  Do you remember?

6   A    I think it was a few weeks after we sent this.

7   Q    What was the purpose of that call?

8   A    The call was just to follow-up and make sure that they got

9   the request.

10  Q    At that point in time, had you received any response from

11  the Social Security Administration relating to this November

12  request?

13  A    No.

14  Q    And which office did you call?

15  A    The Terre Haute office.

16  Q    What were you told?

17  A    I was told that they did receive our request but they

18  couldn't fulfill it because the record --

19          MR. WEIMER:  Your Honor, I'll object again for the

20  same reason.  We have no objection to her testifying to what

21  she was told to the extent that that relates to an explanation

22  for her further actions; but to the extent that it's being

23  offered for the truth of the matter, we object as hearsay.

24          THE COURT:  Same ruling.

25          MS. SCHUBERT:  Go ahead, Ms. LeRoux.

```
 1              THE WITNESS:  Okay.  So as I was saying, I talked to
 2   the representative at the Terre Haute office.  He said yes, he
 3   had received our request but he couldn't fulfill it because he
 4   said the file had been destroyed.
 5   BY MS. SCHUBERT:
 6   Q    Did you ask for a chain of custody?
 7   A    I did.
 8   Q    Why did you want that?
 9   A    I wondered if anyone else had requested the file along the
10   way.
11   Q    Did you believe him when he said the records had been
12   destroyed?
13   A    Yes.
14   Q    Did you get any follow-up correspondence from the SSA?
15   A    Yeah.  When I was talking to him, I asked him
16   specifically:  Can you send us a letter for our file, and he
17   did.
18   Q    And if you could turn to exhibit 8, please.
19   A    Yes.
20   Q    What is this?
21   A    This is the letter that he sent that I just referenced.
22   Q    And does this essentially encapsulate your phone call with
23   him?
24   A    Yes.
25   Q    When you heard that no other records existed, what did you
```

*LEROUX - DIRECT/SCHUBERT*                                      175

1  think that meant?

2  A   I thought it meant that the file was destroyed.  It was

3  gone.

4  Q   It says that you should call.  It says in that first

5  paragraph:  We need to talk to you about -- and then it says:

6  You requested information about Bruce Webster.  Our records

7  show that his file has been destroyed and the last benefit

8  stops in May of 1991.

9        Did you call in response to this letter request?

10 A   No.  I had already had the phone call.  I had called them.

11 So the phone call actually happened before the letter was sent

12 back to us.

13 Q   And you didn't see any reason to follow-up?

14 A   No.

15 Q   Is that because you thought the records had been

16 destroyed?

17 A   Yes.

18 Q   In terms of difficulty, in your experience as a paralegal,

19 how does your experience in obtaining the records here stack

20 up?

21 A   This was the most difficult records collection I've done

22 in my career.

23        MS. SCHUBERT:  Thank you.

24        MR. WEIMER:  May I approach, Your Honor?

25        THE COURT:  You may.

LEROUX — CROSS/WEIMER                           176

1        MR. WEIMER:  May I inquire?

2        THE COURT:  You may.

3                    **CROSS EXAMINATION**

4   BY MR. WEIMER:

5   Q    Thank you.  Good afternoon, ma'am.

6   A    Good afternoon.

7   Q    I've just handed you some records.  Those are your two

8   declarations, and I know you have those in another form marked

9   under different exhibits numbers, but we've got those marked

10  as respondent's exhibits No. 1 and 2 just for ease of

11  reference.  I'll refer to them in that way since that's how my

12  record keeping has been done, but they are the same as what

13  you've been looking at previously.

14  A    Thank you.

15  Q    Now, you just testified that in 2009 -- at the end of

16  2009, when the Social Security Administration told you that

17  the records had been destroyed, Mr. Webster's records, you did

18  two things.  First thing you did was ask for a chain of

19  custody, correct?

20  A    Yes.

21  Q    You're familiar with Mr. Larry Moore's file.  You

22  testified that you reviewed that fairly extensively?

23  A    Yes.

24  Q    And on repeated occasions you reviewed that?

25  A    Yes.

*LEROUX — CROSS/WEIMER*                                    177

1   Q    There was no record in his file that he ever asked for a

2   chain of custody with respect to Mr. Webster's file, was

3   there?

4   A    I did not see one.

5   Q    Nothing in his notations that he ever requested a chain of

6   custody to find out what had happened to those records?

7   A    No.

8   Q    And in addition to asking for a chain of custody, the

9   other thing you did was to ask for a written statement from

10  the Social Security that those records had been destroyed?

11  A    Right.

12  Q    And they did, indeed, provide you that written statement

13  shortly after your telephone conversation?

14  A    Yes.

15  Q    There was no record -- going back to Mr. Moore's file,

16  there was no record in his file that he ever requested a

17  written declaration that the records had been destroyed,

18  correct?

19  A    No.

20  Q    And there was no written declaration from Social Security

21  in his file that the records had been destroyed?

22  A    No.

23  Q    Nothing to -- and no written declaration that the records

24  were unavailable or lost or anything, correct?

25  A    No.

*LEROUX - CROSS/WEIMER*                              178

```
 1  Q    In fact, there was no response from Social Security of any
 2  kind in his file, correct?
 3  A    Correct.
 4  Q    But you were able to obtain a declaration with a simple
 5  phone call?
 6  A    Yes.
 7        MS. SCHUBERT:  Objection to the use of the term
 8  "declaration".
 9  BY MR. WEIMER:
10  Q    You were able to obtain a letter from Social Security
11  stating that the records had been destroyed with a simple
12  request over the telephone?
13  A    Yes.  We received the letter.
14  Q    Now, you -- on the topic of Mr. Moore's trial file, you've
15  testified that you went to great lengths to preserve that file
16  and make sure that everything was kept together, that nothing
17  was lost, nothing was inadvertently misplaced or taken out of
18  the file and not put back, correct?
19  A    Correct.
20  Q    And it sounded like you had fairly rigorous procedures to
21  make sure that that was the case?
22  A    Yes, we did.
23  Q    So when you provided that file to Mr. Moore for his
24  review -- or a copy of that file, that was the complete file.
25  Nothing had been lost, nothing had been misplaced, nothing had
```

*LEROUX — CROSS/WEIMER*                                    179

1   been omitted, correct?

2   A    I was not on the case at that time.

3   Q    You had already left the office?

4   A    Yeah.

5   Q    But by the time you left, based on these procedures,

6   everything was still in place and if a copy of the last thing

7   you saw had been provided to Mr. Moore, it would have been a

8   complete copy of his trial file?

9   A    Yes.

10  Q    And at the time you were leaving, you didn't have any

11  reason to believe that those procedures were going to change,

12  correct?

13  A    Correct.

14  Q    Now, let's go back, kind of review over the timeline a

15  little bit, if we could.  You actually -- you testified that

16  you sought the Social Security records not because of anything

17  you saw in Mr. Moore's trial file but because you had a

18  checklist from a paralegal who had worked on death penalty

19  cases before.  Is that right?

20  A    That's right.

21  Q    So there wasn't anything in Mr. Moore's notes or in the

22  records that he had in his trial file that prompted you to

23  seek these records.  It was an independent decision that you

24  made?

25  A    Yes.

LEROUX — CROSS/WEIMER                                180

```
 1  Q    And in fact, the first thing you did -- or that your
 2  office did, is send a letter to the Arkansas Department of
 3  Human Service, Central Registry Unit, correct?
 4  A    Correct.
 5  Q    And you did that on October 7, 2008?
 6  A    I did not personally send that letter.
 7  Q    Somebody from your office acting under your supervision
 8  sent that letter?
 9  A    Yes.
10  Q    And that was a request for Mr. Webster's records, along
11  with the records of some of his family members?
12  A    Yes.
13  Q    And then shortly after that request to the Central
14  Registry Unit on October 27, 2008, somebody from your office
15  called and followed up with a telephone call requesting those
16  records?
17  A    I don't remember at that point.
18  Q    Would it refresh your recollection to take a look at your
19  declaration?
20  A    Yeah.
21  Q    This would be what's marked as respondent's Exhibit No. 1;
22  and if you take a look at page 2, the bottom of paragraph 4.
23  A    Okay.  Thank you.  Yes, Dorsey called.
24  Q    So somebody from your office on your team made a phone
25  call --
```

*LEROUX — CROSS/WEIMER*                                    181

```
 1  A    Yes.
 2  Q    -- following up on that?  And then on the 31st of October,
 3  your office received a fax from the Central Registry Unit with
 4  a summary report and a narrative for the records of the
 5  Webster family, correct?
 6  A    Yes.
 7  Q    So you received some documentation from the Central
 8  Registry Unit at that time in response to one phone call and
 9  one letter?
10  A    Yes.
11  Q    But you also received information that the Central
12  Registry Unit could not locate the investigative file?
13  A    Yes.
14  Q    And on the same date, in other words, October 31st, one of
15  your colleagues spoke with somebody at the Central Registry
16  Unit and that person told your colleague that the records were
17  not available from the Central Registry Unit; they had been
18  lost or destroyed?
19  A    Yes.
20  Q    That was on October 31, 2008, correct?
21  A    Correct.
22  Q    And somebody from your office was told by Social
23  Security -- by a representative from Social Security that the
24  records had been lost or destroyed?
25  A    I think you might mean the other agency?
```

 1   Q    The department -- Arkansas Department of Human Services,

 2   yes.  They were told that those records were lost or

 3   destroyed?

 4   A    Can you repeat your question?

 5   Q    Somebody told one of your colleagues on October 31st that

 6   the records had been lost or destroyed?

 7   A    Yes.

 8   Q    Nevertheless, despite being told that over the phone, you

 9   all continued to seek the records, correct?

10   A    Correct.

11   Q    And you sent a letter to the Pine Bluff, Arkansas unit

12   requesting those records?

13   A    Yes.

14   Q    And we heard that -- check the timeline here.  But that

15   letter was sent on the 27th of '08, and on the -- December the

16   4th of '08, you followed up with a phone call -- or somebody

17   from your office followed up with a phone call to Social

18   Security about receiving those records from the Pine Bluff

19   office?

20   A    Are you talking about -- which agency are you talking

21   about in your question?

22   Q    Social Security Administration.

23   A    Could you repeat your question?

24   Q    Yes.  On December 4, 2008, you all followed up with a

25   phone call to that office to find out if you could get

*LEROUX - CROSS/WEIMER*                                   183

1   records?

2   A    Yes.

3   Q    And they told you that you needed to send a particular

4   form in order to obtain the records?

5   A    Yes.

6   Q    And you actually specified in your declaration -- it's a

7   form 3288 that they wanted?

8   A    Yes.

9   Q    And you were able to locate that form and print it out?

10  A    Yes.

11  Q    And have Mr. Webster sign it.  That particular form was

12  not in Mr. Moore's trial file, was it?

13  A    No.

14  Q    There's nothing in his trial file that indicates that he

15  ever sent that form 3288 to anybody in request for records?

16  A    No.

17  Q    After sending that form, you did, in fact, receive 70

18  pages of records for Mr. Webster from SSA?

19  A    Yes.

20  Q    And you said that you reviewed those records as soon as

21  you got them?

22  A    Yes.

23  Q    And you recognized their importance as soon as you got

24  them?

25  A    Yes.

*LEROUX — CROSS/WEIMER*                                      184

1   Q    Particularly because it had records relating to his mental

2   disability?

3   A    Yes.

4   Q    It wasn't until eight months later, though, that anybody

5   made an additional request for missing records, was it?

6   A    Correct.

7   Q    So let's talk about that event.  Eight months after you

8   received the first set of records on the 8th of October, 2009,

9   you sent a request for additional records to the Pine Bluff

10  office?

11  A    Correct.

12  Q    And then followed up with a phone call on the 15th of

13  October, 2009?

14  A    Yes.

15  Q    And that's the point at which you were told that the

16  records were unavailable and you needed to address any further

17  requests to Indiana?

18  A    Correct.

19  Q    At that point you actually -- on October 22nd, 2009, you

20  actually got a letter from SSA representing the same thing?

21  A    Yes.

22  Q    Saying that you need to direct your requests to Indiana

23  and it needs to be in a certain format and contain a certain

24  level of specificity, etcetera, etcetera?

25  A    Yeah, correct.

*LEROUX - CROSS/WEIMER*                                      185

1   Q    But you did get a letter following up on that phone call?

2   A    Yes.

3   Q    And in response to that, you sent out a request for

4   records to Indiana asking for the missing records and

5   following the procedures that had been delineated to you with

6   specificity and so on and so forth, and you sent that request

7   on November 23rd, '09, correct?

8   A    That's correct.

9   Q    And then just a couple days later, it looks like you

10  followed up, that would be December 4, '09, with a phone call

11  and that's when you were told over the phone that the records

12  had been destroyed?

13  A    That's correct.

14  Q    And again, on that phone call you asked for a log or a

15  chain of custody, we could call it?

16  A    Yes.

17  Q    Because you wanted to find out what had happened to the

18  records and you also asked for some sort of written

19  documentation that the records had been destroyed?

20  A    Yes.

21  Q    And they did, in fact, provide that written documentation

22  just three days later?

23  A    Correct.

24  Q    So we have really several events.  You have -- beginning

25  on October 27, '08, you send a request to Pine Bluff, Arkansas

 1   for the first time and you -- after a phone call and -- well,

 2   you sent a letter on the 27th of October, you made a phone

 3   call on the 4th -- and when you say "you," I mean your office.

 4   A    Okay.  Thank you.

 5   Q    You sent a letter on the 27th of October, made a phone

 6   call on the 4th of December, and sent a form pursuant to the

 7   request on the phone call on December 15th; and after those

 8   three things, you got records, correct?

 9   A    Correct.

10   Q    Let's call that the first event.  Eight months later you

11   begin another attempt to get records.  October 8th, a request

12   for additional records you sent to Pine Bluff.  Then there's

13   one phone call in which they tell you that you have to make --

14   you should have directed your request to Indiana and make your

15   request in a certain format And that's it.  After that, they

16   send you a letter documenting what was in the phone call?

17   A    Yes.

18   Q    So one request written, one phone call, and you get a

19   letter back from them?

20   A    Yes.

21   Q    And then finally, when you direct your request to Indiana,

22   you make a request in writing on November 23, '09, a phone

23   call on December 4, '09; and they send you a letter saying the

24   documents have been destroyed on December 7th.  So one letter,

25   one phone call and they sent you a letter?

1   A    Correct.

2   Q    So really, we're only talking about a grand total of --

3   for the first sequence, we're talking about two letters and

4   one phone call to get the letters in the first place, right?

5   A    Correct.

6   Q    And to get verification that -- on the second attempt from

7   Pine Bluff, when you're trying to get additional records, it's

8   one letter and one phone call before they respond to you in

9   writing?

10  A    Correct.

11  Q    And then when you address Indiana, it takes two letters,

12  two phone calls and you get a written declaration that the

13  records -- a written letter -- a written statement that the

14  records have been destroyed.  So only two letters and two

15  phone calls and you get that written statement?

16  A    Yes.

17  Q    And yet in Mr. Moore's file, there is no response

18  whatsoever from Social Security; nothing in writing?

19  A    Nothing.

20  Q    No records, no statement that the records were

21  unavailable, no statement that the records have been lost or

22  destroyed, correct?

23  A    Correct.

24  Q    No statement that the records should have -- that the

25  request should be in at different format, or that the request

LEROUX — CROSS/WEIMER                              188

1  needs to be addressed to a different office?

2  A   No.

3  Q   And there's no notes to that effect.  No notes that he was

4  told over the phone that the request needs to be addressed in

5  a different format, or that the records were lost or destroyed

6  or not available.  None of that's in his file.

7  A   No.

8  Q   Yet you were able to get all those things with a grand

9  total of about four phone calls and six letters?

10  A   A grand total?

11  Q   I'm talking about all of these events that we've talked

12  about, the Pine Bluff that we've gone through.  You were able

13  to get -- each step of the way you were able to get a written

14  response from Social Security, whether the response was the

15  records themselves or the response was a request that you

16  address your request to somebody else, or whether the response

17  was a written statement that the records had been destroyed.

18  With just three or four phone calls and four or so written

19  requests, you were able to get all those things?

20  A   Yes.

21  Q   When you spoke to the representative in December of '09

22  and you asked for a chain of custody, you were told that

23  that's not available.  That they don't have such a thing as

24  that.  Is that right?

25  A   Yes.

```
 1   Q   And specifically what he told you is that they didn't do

 2   that kind of record -- they didn't record requests for

 3   documentation prior to very recently?

 4   A   Yes.

 5   Q   So in other words, if somebody had made a request to them

 6   in 2005, they wouldn't have a record of that?

 7   A   Correct.

 8   Q   Whether that request was fulfilled or not?

 9   A   That's what I assumed.

10   Q   That's what you were told?

11   A   Yes.

12   Q   But when you requested some kind of declaration:  Can you

13   please give me a written statement that the records are

14   destroyed, they provided that to you within just a couple of

15   days?

16   A   Yes.

17            MR. WEIMER:  Could I have just a moment, Your Honor?

18            THE COURT:  You may.

19            (Off the record.)

20            MR. WEIMER:  Thank you very much, ma'am.  Pass the

21   witness, Your Honor.

22            THE COURT:  Very well.  Your witness.

23            MS. SCHUBERT:  Yes, Your Honor.  Short amount of

24   redirect.

25
```

1              **REDIRECT EXAMINATION**

2   BY MS. SCHUBERT:

3   Q    Ms. LeRoux, how many people did you say were working on

4   the Webster case team in 2008 and 2009?

5   A    There were five attorneys, three paralegals, two case

6   assistants, and we all had administrative assistants assigned

7   to each of us.

8   Q    Do you remember which attorneys or paralegals were working

9   on or touched these requests for records to the Social

10  Security Administration?

11  A    That would have been Katherine Slaikeu, myself, Bridget

12  Cosgriff, Gretchen Agee, Oliver McKinstry.

13  Q    Steve Wells as well?

14  A    Wells, yes.  Sorry.

15  Q    So that was four or five attorneys, three paralegals and

16  some extra administrative staff?

17  A    Yes.

18  Q    And all of those people had to work to get these records?

19  A    Yes.

20  Q    And then work to try to track down what we deemed to be

21  missing records?

22  A    Yes.

23  Q    Ms. LeRoux, do you know what happened to the file before

24  we received it?

25  A    No.

*LEROUX − REDIRECT/SCHUBERT* 191

1  Q    Can you say whether the file left -- the trial file left

2  Mr. Moore's office and went to its next destination in the

3  same -- excuse me.  Mr. Moore's trial file left his office and

4  went to the next destination, correct?

5  A    Yes.

6  Q    You understand that at some point it was transferred to

7  2255 counsel?

8  A    Yes.

9  Q    At that time before 2008, you had no control or

10 information about what happened to that file?

11 A    Correct.

12 Q    So you can't say what was in the file when it left

13 Mr. Moore's office and went to its next destination?

14 A    No.

15 Q    And you can't say what happened from the time it arrived

16 at that destination and then the time that it was transferred

17 to us by 2255 counsel?

18 A    Correct.

19 Q    And you requested a chain of custody from the Social

20 Security Administration, correct?

21 A    Yes.

22 Q    Did they ever provide you with that?

23 A    No.

24 Q    Did they tell you to look at their document retention

25 policies?

*LEROUX - REDIRECT/SCHUBERT*                              192

```
 1   A    No.

 2   Q    You were just asked about the Department of Human Services

 3   in Arkansas and testified that Dorsey had received some

 4   records from that agency, correct?

 5   A    Correct.

 6   Q    And you spoke briefly about your attempts to follow-up on

 7   that request, correct?

 8   A    Correct.

 9   Q    And if I'm -- I'm going to refer back to the

10   government's -- excuse me, the respondent's exhibit -- is that

11   exhibit 1?  I believe it is.  Your declaration dated -- your

12   declaration dated March 23, 2012, and I'm going to direct you

13   to paragraphs 4 and 5.

14   A    Okay.

15   Q    And 6.  So looking at paragraph 4, is it correct that

16   Dorsey sent a request to the Arkansas Department of Human

17   Services on October 7, 2008?

18   A    October 27th?

19   Q    Is that --

20   A    I'm sorry.  October 7th, yes.

21   Q    October 7, 2008.  And is it your recollection and

22   knowledge that Dorsey received a response from DHS on or

23   around October 31, 2008?

24   A    Yes.

25   Q    And did that response contain records?
```

```
 1   A    That response contained a summary report.

 2   Q    And do you remember what that summary report looked like?

 3   A    Yes.

 4   Q    And what was it?

 5   A    Basically it listed family members and reports of abuse.

 6   Q    Would you just mind holding on for one second.

 7             Ms. LeRoux, I'm going to have you turn to tab 29 in

 8   the binder, the petitioner's exhibits.

 9   A    Yes.

10   Q    Can you tell me what this document is?

11   A    This is a -- this is a letter from the Arkansas Department

12   of Human Services to Gretchen Agee.

13   Q    And what's the date on this?

14   A    March 11, 2008.

15   Q    If you look at the first page of that document, the fax

16   cover sheet page, what date is listed on that page?

17   A    October 31, 2008.

18   Q    And do you believe that's the date you actually received

19   the records from the Arkansas Department of Human Services?

20   A    Yes.

21   Q    And this letter you just referenced is dated March 11,

22   2008?

23   A    Yes.

24   Q    Do you understand that that's probably a typo?

25   A    I would assume that.
```

LEROUX - REDIRECT/SCHUBERT                              194

1  Q    And listed in that letter, that first paragraph to

2  Ms. Agee says:  Attached is the maltreatment summary report

3  and narrative for the file you recently requested from the

4  Child Maltreatment Central Registry.  Is that correct?

5  A    That's correct.

6  Q    And if you turn the page two pages over, take a look at

7  that document, the document on the bottom starting with BW77?

8  A    Yes.

9  Q    What do you understand this document to be?

10 A    It looks like a summary of a report of abuse.

11 Q    And how many pages is this document?

12 A    I think I counted 12.

13 Q    Okay.  Did this document -- did any of the content in this

14 document stick out to you as meaningful in any way?

15 A    Yes.

16 Q    Just give me an example or two.

17 A    Well, the first page that we just read would have stood

18 out because one of the topics that we were focused on was

19 abuse.

20 Q    Is that the line that says children beaten, forced to have

21 sex while father watches?

22 A    Yes.

23 Q    Is there anything else in here?

24 A    Yes.  If you turn to the next page, there's -- there's

25 references to like alleged offender, alleged victim.  That

```
 1  would infer that there was something wrong, some kind of abuse

 2  going on.

 3  Q   And abuse was one of the topics you were investigating

 4  with the team?

 5  A   Yes.

 6  Q   And so as you stated a moment ago, you then followed up on

 7  this request, right?

 8  A   Yeah; Dorsey did.

 9  Q   And actually, I want to go back -- excuse me.  I want to

10  go back to the letter in tab 29, the letter to Gretchen Agee.

11  A   Yes.

12  Q   And in that second paragraph, can you read that second

13  paragraph for me?

14  A   It says, "The Jefferson County office of the Division of

15  Children and Family Services cannot locate the investigative

16  file.  Therefore, Central Registry is unable to provide the

17  complete investigative file that you have requested."

18  Q   At that time you recognized that the DHS did have records

19  relating to Mr. Webster.  Is that correct?

20  A   Yes.

21  Q   And at that time did you see that there was some benefit

22  in potentially following up on this document that was

23  produced?

24  A   Yes.

25  Q   And why is that?
```

*LEROUX - REDIRECT/SCHUBERT* 196

1  A    Because it just says they can't locate the file.  It

2  doesn't say they don't have it.  They just can't locate it.

3  Q    And when you followed up with the SSA in 2009, did you

4  likewise know that documents had existed in Bruce's file?

5  Excuse me.  I'll rephrase.  When you followed up with the

6  Social Security Administration office in the fall of 2009 --

7  A    Yes.

8  Q    In October of 2009.

9  A    Yes.

10 Q    At that point you had already received Mr. Webster's file.

11 Is that correct?

12 A    Correct.

13 Q    And at that time then, you knew that records had existed

14 in that Social Security Administration's file?

15 A    Yes.

16 Q    Why did you deem it appropriate to follow-up on the

17 request in October, if you'd already received records in the

18 spring?

19 A    Because an attorney directed me to do that and because

20 when we did look at the list of exhibits and I compared them

21 against the file that we received, there were missing

22 documents.

23 Q    And did you think it reasonable to believe that missing

24 documents listed on an exhibit could possibly have been in the

25 file somewhere and just not been produced?

1    A    Possibly, yes.

2    Q    And those are the documents specifically that you were

3    referencing as well, correct?

4    A    On the list of exhibits?

5    Q    Yes.

6    A    Yes.

7    Q    And after you were told in October of -- November --

8    December -- excuse me.  After you were told in December of

9    2009 that the Social Security Administration no longer had any

10   records, did you deem it necessary to follow-up after you

11   received that letter?

12   A    No; because they said they destroyed the file.

13   Q    There was some confusion, I think, regarding the consents

14   that were sent with the various letters during the testimony

15   on cross.

16   A    Okay.

17   Q    Do you confirm that the consents that we've gone through

18   today, that are attached to the letters that are dated, are

19   those true and correct copies of the consents that were

20   actually sent?

21   A    Yes.

22   Q    And are those letters true and correct copies of the

23   letters that were actually sent?

24   A    Yes.

25   Q    So to the extent there's any confusion, would you rely on

*LEROUX – RECROSS/WEIMER*                                        198

1    the written documents there?

2    A    Yes.  I would rely on these exhibits.

3              MS. SCHUBERT:  Thank you, Your Honor.  No more

4    questions.

5              THE COURT:  On those issues?

6              MR. WEIMER:  Very briefly.

7                        **RECROSS–EXAMINATION**

8    BY MR. WEIMER:

9    Q    Ma'am, with respect to each set of requests that you made,

10   your efforts only stopped when you received something in

11   writing from the agency that you were making the request of,

12   correct?

13   A    Can you rephrase that?  I don't understand.

14   Q    Every time you made a request, whether it was to the

15   Central Registry Unit of the Arkansas DHS or to SSA at Pine

16   Bluff or SSA at Indiana, or the other time you made a request

17   to SSA at Pine Bluff, every time you got some sort of written

18   response telling you -- written response answering your

19   request, correct?

20   A    Correct.

21   Q    Whether it was a response to say contact somebody else or

22   response to say here's some records.  You always got a written

23   response, correct?

24   A    Yes.

25   Q    And there was no such written response of any kind in

1    Mr. Moore's file?

2    A    No.

3    Q    Now, you just testified that one of the reasons you

4    followed up on the Pine Bluff records was because you knew

5    there were some records based on the inventory sheet that they

6    sent you?

7    A    The list of exhibits.

8    Q    You initiated your request to SSA based on a checklist

9    that had been given to you by a paralegal who had experience

10   with death penalty cases, correct?

11   A    Yes.

12   Q    You didn't hear from Mr. Webster's family that he had

13   received services from SSA, other he'd been evaluated or

14   treated by SSA?

15   A    I don't remember.  I did not receive any communication.

16   Q    It was just a standard checklist from somebody who knew

17   what they were doing that you have to go after these records.

18   That was the basis for the initiation of your request?

19   A    Yes.

20            MR. WEIMER:  Thank you very much, ma'am.

21            THE WITNESS:  Thanks.

22            MS. SCHUBERT:  No more questions, Your Honor.

23            THE COURT:  May this witness be excused?

24            MS. SCHUBERT:  Yes, Your Honor.

25            MR. WEIMER:   Yes, Your Honor.

```
 1              THE COURT:  You may step down.  Thank you.  Any

 2   further witnesses from the petitioner?

 3              MR. WELLS:  No, Your Honor.

 4              THE COURT:  From the respondent?

 5              MR. FUNNELL:  No, Your Honor.

 6              THE COURT:  Very well.  Could I see counsel, please?

 7   This is off the record.

 8              (Off the record.)

 9              THE COURT:  That concludes the evidentiary portion

10   of this matter.  Counsel, are you prepared for final arguments

11   or do you think it would be of benefit for the Court to

12   receive findings and conclusions?  And I guess I'll ask

13   Mr. Wells first.

14              MR. WELLS:  Thank you, Your Honor.  I would say we

15   are prepared to give final argument but we think the better

16   course here is to prepare proposed findings of fact and

17   conclusions of law, and we agree to that procedure.

18              THE COURT:  And Mr. Funnell?

19              MR. FUNNELL:  We're in agreement with that, Your

20   Honor.

21              THE COURT:  All right.  Very well.  This is the 18th

22   of June.  Two weeks, three weeks?  What is your pleasure?

23              MR. WELLS:  Three weeks would be -- would be better

24   for us, Your Honor, because of some other commitments.

25              THE COURT:  Very well.  Three weeks, Mr. Funnell?
```

1        MR. FUNNELL:  Yes, Your Honor.  Thank you.

2        THE COURT:  Very well.  Three weeks from today then

3   I will expect findings and conclusions, which would also

4   include issues regarding the spoliation issue that is still

5   before the Court and it's been taken under advisement in that

6   regard.  Anything further?

7        MR. WELLS:  Understood, Your Honor.  Then the

8   exchange of proposed findings will be simultaneous?

9        THE COURT:  Very well.  Fair enough.

10        MR. WELLS:  Okay.

11        MR. FUNNELL:  Thank you.

12        THE COURT:  Thank you very much.

13        THE CLERK:  Please rise.  Court is adjourned.

14        (Court proceedings concluded at 1:43 p.m.)

15   ********************************************************

16                  CERTIFICATE OF COURT REPORTER

17

18     I, Margaret A. Techert, hereby certify that the

19   foregoing is a true and correct transcript from

20   reported proceedings in the above-entitled matter.

21

22

23   /S/ Margaret A. Techert_____      **June 21, 2018**
     MARGARET A. TECHERT
24   Official Court Reporter
     Southern District of Indiana
25   Evansville Division